UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | | |
|---|---|---|---|
| In Re: Cengiz J. Comu | Debtor | § | Case No. 09-38820 SGJ7 |
| **Cengiz J. Comu, et al** | | § | |
| | Appellant | § | |
| vs. | | § | 10-03269 |
| **King Louie Mining, LLC, et al** | | § | |
| | Appellee | § | |

**148 Judgment revoking discharge of debtor Entered 7/8/14**

## VOLUME 5
## APPELLANT RECORD

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |
| and | § |
| | § |
| PHYLLIS E. COMU, | § |
| BERNARD D. BROWN, | § |
| THE BARCLAY GROUP, INC. AND | § |
| SUNSET PACIFIC, L.P., | § |
|     Third-party Defendants. | § |

_I X I D E X_

**APPELLANT'S FIRST AMENDED DESIGNATION**
**OF RECORD AND ISSUES ON APPEAL**             **Page 1**

## APPELLANT'S FIRST AMENDED DESIGNATION OF RECORD
## AND ISSUES ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Cengiz J. Comu, Appellant, and files this his First Amended Designation

of Record and Issues on Appeal for the Judgment entered July 8, 2014 [Document No. 148] as

follows:

I.      Appellant designates the following documents from the docket sheet in Adversary Case

No. 10-03269 for the Record on Appeal:

[Intentionally left blank]

| Filing Date | # | Docket Text |
|---|---|---|
| 08/27/2014 | 164 | Notice of appeal . Fee Amount $298 filed by Defendant Cengiz J. Comu (RE: related document(s)148 Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed)). Appellant Designation due by 9/10/2014. (Moroles, D.) |
| 07/08/2014 | 148 | Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed) (Rielly, Bill). |
| 07/08/2014 | 147 | Findings of fact and conclusions of law in support of judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Rielly, Bill) |
| 09/09/2014 | | Docket Sheet |
| 10/07/2010 | 5 | Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 11/08/2010 | 8 | Motion for leave *to Amend* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/29/2010. (Attachments: 1 First Amended Complaint2 Exhibit A3 Exhibit B4 Exhibit C) (Lippe, Emil) |
| 11/08/2010 | 9 | Response opposed to (related document(s): 5 Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 01/10/2011 | 10 | Order denying motion to dismiss adversary proceeding as moot (related document # 5), granting motion for leave to amend complaint(related document # 8) Entered on 1/10/2011. Case is removed from docket for week of January 11, 2011. Counsel ORDERED to confer and submit proposed amended scheduling order for the trial of this case, to be submitted within 10 days from date of this Order. (Mathews, M.) |

*Vol. 2*
*000211*

*000215*

*000263*

*000273*

*Vol. 2*

| | | | |
|---|---|---|---|
| 006275 | 01/20/2011 | 12 | Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000279 | 02/11/2011 | 16 | Response opposed to (related document(s): 12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000287 | 02/24/2011 | 17 | Order conditionally denying second motion to dismiss adversary proceeding (related document # 12) Entered on 2/24/2011. Plaintiffs are ORDERED to file amended complaint within 20 days of entry of this order. Defedant is ORDERED to file an answeror responsive pleading within 20 days of filing of the amended complaint. (Mathews, M.) |
| 000290 | 03/02/2011 | 19 | Motion for leave *to Prosecute Action* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 3/23/2011. (Lippe, Emil) |
| 000293 | 03/02/2011 | 20 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) (Lippe, Emil) |
| 000340 | 03/23/2011 | 23 | Order denying motion for leave to prosecute action without prejudice (related document # 19) Entered on 3/23/2011. (Simpson, B) |
| 000342 | 03/24/2011 | 24 | Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000345 | 04/19/2011 | 28 | Agreed Order granting 27 Motion to extend time to file response to motion to dismiss until 4/28/2011. Entered on 4/19/2011. (Simpson, B) |
| 000347 | 04/28/2011 | 30 | Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000357 | 05/04/2011 | 31 | Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[Unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |
| 000361 | 05/06/2011 | 32 | Order granting motion to continue hearing on (related document # 31) (related documents Motion to dismiss adversary proceeding*(THIRD)* and 20 Amended Complaint) Entered on 5/6/2011. Hearing to be held on 7/11/2011 at 10:30 AM Dallas Judge Jernigan Ctrm for 24, Trial Docket Call date reset for 9/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Mathews, M.) Modified text on 5/6/2011 (Mathews, M.). |
| 000 363 | 07/06/2011 | 36 | Second Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |

_Vol. 2_

| | Date | No. | Description |
|---|---|---|---|
| 000367 | 07/08/2011 | 37 | Order granting second unopposed motion to continue hearing on (related document # 36) (related documents Amended complaint, Motion to dismiss adversary proceeding*(THIRD)*) Entered on 7/8/2011. Hearing to be held on 9/15/2011 at 09:30 AM Dallas Judge Jernigan Ctrm for 24 Third motion to dismiss and for Trial Docket Call date set for 12/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. Further conditions per Order. (Mathews, M.) |
| 000369 | 08/24/2011 | 39 | Agreed Motion to Abate Adversary Proceeding (related document(s)1 Complaint) Filed by Interested Party Diane G. Reed (Elmquist, David) Modified TEXT on 8/25/2011 (Blanco, J.). |
| 000374 | 08/31/2011 | 40 | Agreed Order granting motion to abate adversary proceeding (related document # 39) Entered on 8/31/2011. (Mathews, M.) |
| 000377 | 05/24/2012 | 48 | Supplemental Order granting agreed motion to abate adversary proceeding including any hearing on the motion to dismiss, abated until August 1, 2012 further conditions per order (related document # 39 agreed motion to abate ) Entered on 5/24/2012. (Moroles, D.) |
| 000379 | 08/07/2012 | 50 | Order terminating abatement of adversary proceeding and requiring: (A) Trustee's Complaint in Intervention to be filed by August 31, 2012; and (B) parties to upload Agreed Scheduling Order, or in the alternative, Court will enter its own Scheduling Order (related document # 39) Entered on 8/7/2012. Further details per Order. (Mathews, M.) |
| 000381 | 09/05/2012 | 53 | Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) |
| 000395 | 09/06/2012 | 54 | Order granting Trustee's Unopposed Motion to Extend Deadline to File a Complaint in Intervention 52 Motion to extend time. Ordered that the deadline is hereby extended to September 5, 2012. Entered on 9/6/2012. (Tello, Chris) |
| 000397 | 09/20/2012 | 59 | Agreed Scheduling Order Entered on 9/20/2012 (RE: related document(s)20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial Docket Call date set for 7/8/2013 at 01:30 PM at Dallas Judge Jernigan Ctrm. Hearing on Defendant Cengiz J. Comu's Third Amended Motion to Dismiss Case is set for 10/31/2012 at 9:30 AM. (Mathews, M.) MODIFIED hearing dates on 9/21/2012 (Mathews, M.). |
| 000401 | 09/28/2012 | 61 | Supplemental Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000406 | 09/28/2012 | 62 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against |

| | | | |
|---|---|---|---|
| *Vol. 2* | | | Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Lippe, Emil) |
| *000429* | 10/09/2012 | 64 | Answer to Intervenor complaint (Related document: 53 Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) filed by Bernard D Brown, Cengiz J. Comu, Phyllis E. Comu, Sunset Pacific, L.P., The Barclay Group, Inc.. (Olson, Dennis) Modified text on 10/9/2012 (Tello, Chris). |
| *000433* | 10/09/2012 | 65 | Reply to (related document(s): 30 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 61 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Defendant Cengiz J. Comu. (Olson, Dennis) |
| *000437* | 10/26/2012 | 66 | Motion to appear pro hac vice for David H. Wander. Fee Amount $25 filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit) (Lippe, Emil) |
| *000441* | 10/29/2012 | 68 | Motion for leave *to File Third Amended Complaint and Brief in Support* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Lippe, Emil) |
| *Vol. 3* *000451* | 10/30/2012 | 69 | Motion for leave *to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Attachments: # 1 Exhibit A - Surreply# 2 Proposed Order) (Lippe, Emil) |
| *000470* | 10/31/2012 | 70 | Order granting motion to appear pro hac vice adding David H. Wander for Ronald Katz and King Louie Mining, LLC (related document # 66) Entered on 10/31/2012. (Mathews, M.) |
| *000471* | 11/02/2012 | 71 | Order denying Plaintiffs' motion for leave to file Third Amended Complaint (related document # 68) Entered on 11/2/2012. (Mathews, M.) |
| *000473* | 11/02/2012 | 72 | Order denying Plaintiffs' motion for leave to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss (related document # 69) Entered on 11/2/2012. (Mathews, M.) |
| *000475* | 11/14/2012 | 76 | Order denying motion to dismiss adversary proceeding (related document # 24) Entered on 11/14/2012. (Mathews, M.) |
| *000477* | 12/07/2012 | 78 | Answer to complaint *(Second Amended) to Revoke Discharge* filed by Cengiz J. Comu. (Olson, Dennis) |
| *000481* | 06/07/2013 | 88 | Motion to substitute attorney Emil Lippe, Jr., Law Offices of Lippe & Associates with Shari L. Heyen, Kendyl T. Hanks and Charles P. Floyd, Greenberg Traurig, LLP *and for Withdrawal of Attorney Emil Lippe, Jr., Law Offices of Lippe & Associates,* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| 000785 | 06/12/2013 | 89 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Agreed Scheduling Order) (Heyen, Shari) |
| 000795 | 06/21/2013 | 90 | Agreed order granting motion to amend scheduling order (related document # 89) Trial Docket Call date set for 9/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 6/21/2013. (Rielly, Bill) |
| 000799 | 06/21/2013 | 91 | Order granting motion to substitute attorney adding Shari L. Heyen for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Kendyl T. Hanks for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Charles P. Floyd for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, terminating Emil Lippe, Jr.. (related document # 88) Entered on 6/21/2013. (Rielly, Bill) |
| 000502 | 07/19/2013 | 94 | Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order) (Lippe, Emil) |
| 000539 | 08/12/2013 | 96 | Response opposed to (related document(s): 94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Heyen, Shari) |
| 000598 | 08/14/2013 | 97 | Reply to (related document(s): 96 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Lippe, Emil) |
| 000606 | 08/21/2013 | 98 | Order denying motion to intervene (related document # 94) Entered on 8/21/2013. (Rielly, Bill) |
| 000608 | 08/23/2013 | 99 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Agreed Order to Amend Scheduling Order) (Heyen, Shari) |
| 000617 | 09/13/2013 | 101 | Agreed order granting motion to amend scheduling order (related document # 99) Trial Docket Call date set for 12/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 9/13/2013. (Rielly, Bill) |
| 000621 | 11/25/2013 | 103 | Witness and Exhibit List *for Trial, per Scheduling Order* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000624 | 11/25/2013 | 104 | Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Order) (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| 000630 | 11/27/2013 | 105 | Support/supplemental document *(Supplement to Plaintiffs' Motion for Continuance of Scheduling Order Deadlines and Trial)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)104 Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding)). (Heyen, Shari) |
| 000633 | 12/09/2013 | 106 | Agreed order granting motion to amend scheduling order (related document # 104) Entered on 12/9/2013. Trial Docket Call date set for 3/3/2014 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000637 | 12/20/2013 | 108 | Motion for preliminary injunction *(expedited)* filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| 000647 | 12/20/2013 | 109 | Motion for expedited hearing(related documents 108 Motion for preliminary injunction) filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| 000651 | 12/20/2013 | 110 | Order granting ex parte motion for expedited hearing (Related Doc# 109)(document set for hearing: 108 Motion for preliminary injunction) Entered on 12/20/2013. Hearing to be held on 12/23/2013 at 09:30 AM Dallas Judge Jernigan Ctrm for 108, (Rielly, Bill) |
| 000653 | 12/20/2013 | 111 | Agreed order granting motion for temporary restraining order (related document 108) Entered on 12/20/2013. Preliminary injunction hearing to be held on 1/3/2014 at 09:30 AM Dallas Judge Jernigan Ctrm (Rielly, Bill) |
| 000656 | 01/03/2014 | 116 | Agreed Order Continuing Temporary Restraining Order (related document # 108) Entered on 1/3/2014. (Jones, A.) |
| 000659 | 02/24/2014 | 118 | Amended Witness and Exhibit List filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)103 List (witness/exhibit/generic)). (Olson, Dennis) |
| 000662 | 02/24/2014 | 119 | Witness and Exhibit List *for Trial* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)62 Amended complaint). (Elmquist, David) |
| *Vol. 4*<br>000670 | 02/24/2014 | 120 | Witness and Exhibit List filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000722 | 02/26/2014 | 121 | Stipulation by Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC and All Defendants. filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)106 Order on motion to amend scheduling order). (Heyen, Shari) |
| 000726 | 03/03/2014 | 124 | Stipulation by Diane G. Reed and Plaintiffs and Defendants. filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint, 62 Amended complaint). (Elmquist, David) |
| 000729 | 03/03/2014 | 125 | Proposed findings of fact and conclusions of law filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint). (Elmquist, David) |

Vol. 4

| | | | |
|---|---|---|---|
| 000741 | 03/04/2014 | 126 | Proposed findings of fact and conclusions of law filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000746 | 03/04/2014 | 127 | Proposed findings of fact and conclusions of law filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000778 | 03/05/2014 | 130 | Order setting trial Entered on 3/5/2014 (RE: related document(s)62 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial date set for 3/17/2014 at 09:30 AM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000780 | 03/11/2014 | 132 | Amended Witness and Exhibit List *for Trial* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)120 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000805 | 03/13/2014 | 134 | Amended Witness and Exhibit List filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)119 List (witness/exhibit/generic)). (Elmquist, David) |
| 000813 | 03/14/2014 | 135 | Amended Witness and Exhibit List *Second Amended* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)118 List (witness/exhibit/generic)). (Olson, Dennis) |
| 000816 | 03/16/2014 | 137 | Amended Witness and Exhibit List *(Second)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)132 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000842 | 03/17/2014 | 138 | First Amended Proposed Joint Pre-Trial order Entered on 3/17/2014. (Rebecek, B) |
| 000871 | 04/04/2014 | 142 | Extended temporary restraining order and mandatory injunction Entered on 4/4/2014. (Rielly, Bill) |
| 000878 | 04/23/2014 | 144 | Notice *of Trustee's Status Report of Compliance* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)142 Temporary restraining order). (Elmquist, David) |
| 000892 | 07/29/2014 | 161 | Motion to extend time to appeal - Rule 8002c (RE: related document(s)148 Judgment) Filed by Defendant Cengiz J. Comu (Blanco, J.) (Entered: 08/20/2014) |
| 000896 | 07/30/2014 | 153 | Application for compensation *Plaintiffs Preliminary Application for Attorneys' Fees and Expenses Awarded in the Court's July 8, 29014 Judgment* for Shari L. Heyen, Creditor's Attorney, Period: 10/26/2011 to 7/28/2014, Fee: $946,504.90, Expenses: $12,800.00. Filed by Attorney Shari L. Heyen (Heyen, Shari) |
| 000906 | 07/30/2014 | 154 | Motion to extend time to To Submit Affidavit and Evidence in Support of Application for Attorneys' Fees & Expenses Awarded in the Court's July 8, 2014 Judgment Filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |
| 000914 | 08/20/2014 | 162 | Order granting motion for leave to file notice of appeal out of time 161 |

*Vol. 4*

*000916*

*000919*

| | | | |
|---|---|---|---|
| | | | Motion to extend time to appeal - Rule 8002c. Entered on 8/20/2014. (Rielly, Bill) |
| | 08/27/2014 | 165 | Order granting motion to extend time to file application for attorney's fees and expenses 154 Motion to extend time. Entered on 8/27/2014. (Rielly, Bill) |
| | 08/29/2014 | 168 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)164 Notice of appeal filed by Defendant Cengiz J. Comu) (Blanco, J.) |

II.    Appellant also designates all exhibits admitted at trial, March 17 through March 21, 2014.    *Not Provided by Appellant*

III.    Appellant also designates the following transcripts:

*Vol. 5*

| | 11/09/2010 | 177 | Hearing held on 11/9/2010. (RE: related document(s)5 Motion to dismiss adversary proceeding Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6) filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) APPEARANCES: D. Olson for Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Announcement of an agreed order having been submitted that contemplates Plaintiff's agreement to file Amended Complaint with Debtor's reservation of right to re-urge motion to dismiss. Court will sign order. (Womack, Jennifer) (Entered: 11/12/2010) |
|---|---|---|---|
| 000921 | | | |
| 000927 | 02/14/2011 | 178 | Hearing held on 2/14/2011. (RE: related document(s)12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) Appearances: D. Olsen for Defendant/Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Motion denied, conditional on Plaintiff, within 20 days, amending Complaint again to provide more specificity regarding specific provisions of Section 727(d) being alleged, when acts were discovered and how, and addressing his standing, versus the Chapter 7 Trustees, to seek avoidance of alleged fraudulent transfers. If not amendment within 20 days, complaint will be dismissed. If amendment, then Defendant has 20 days thereafter to answer/respond. Counsel to submit order. (Harden, D.) (Entered: 02/18/2011) |
| 000952 | 05/02/2012 | 179 | Status conference held (RE: related document(s)20 Amended complaint) Appearances: E. Lippe and D. Wander (telephonically) for Plaintiffs; D. Elmquist for Trustee; D. Olson for Debtor. Nonevidentiary hearing. Based on statements of counsel, court will continue abatement through 8/1/12 and counsel shall contact courtroom deputy for another status conference the first week of August 2012. Counsel shall upload an order continuing abatement. (Davis, T.) (Entered: 05/14/2012) |
| 000964 | 07/31/2012 | 180 | Hearing held on 7/31/2012. (RE: related document(s)20 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) Appearances: D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff; D. Olson for Debtor. Nonevidentiary status conference. Court heard reports regarding Rule 2004 examinations that have been ongoing and Trustees intention to file a Complaint in Intervention by 8/31/12. Court will enter Order terminating the abatement of this Adversary Proceeding and requiring: (a) Trustees Complaint in Intervention to be filed by 8/31/12; and (b) parties to upload Agreed Scheduling Order by 9/14/12 (inclusive of deadlines pertaining to the pending Rule 12(b)(6) |

*Vol. 5*

| | | | |
|---|---|---|---|
| | | | motion) or, in the alternative, court will enter its own Scheduling Order thereafter setting a January 2013 trial docket call and deadlines pertaining to the Rule 12(b)(6) motion. (Baird, Dennis) (Entered: 08/01/2012) |
| 000975 | 10/31/2012 | 181 | Hearing held on 10/31/2012. (RE: related document(s)24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) Appearances: D. Olson for Movant/Defendant/Debtor; D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff/King Louie Mining. Nonevidentiary hearing. Motion denied. Court also denied a pending Motion for Leave by Plaintiff/King Louie Mining to File Third Amended Complaint. Thus, Second Amended Complaint of King Louie Mining (Section 727 count only) and Complaint in Intervention of Trustee are now governing pleadings in this Adversary Proceeding. Mr. Lippe to upload orders on motion to dismiss and motion for leave. (Baird, Dennis) |
| 001004 | 08/15/2013 | 182 | Hearing held on 8/15/2013. (RE: related document(s)94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order)) Appearances: E. Lippe for his firm; K. Hanks and C. Floyd for Plaintiffs other than the Trustee; D. Elmquist for Trustee; R. Nicoud for Debtor. Nonevidentiary hearing. Motion denied. Ms. Hanks to upload order. (Harden, D.) (Entered: 08/21/2013) |
| 001035 | 03/04/2014 | 183 | Pre-trial conference held on 3/4/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz).) Appearances: K. Hanks and V. Vital for Creditor/Plaintiffs; D. Elmquist for Intervenor/Plaintiff; D. Olson for Defendants. Nonevidentiary status conference. Court will issue order setting trial for March 17, 2014 at 9:30 am, continuing through March 21, 2014. Parties to upload final Pre-Trial Order by March 14, 2014. (Harden, D.) (Entered: 03/06/2014) |
| 001052 | 03/17/2014 | 184 | Trial held on 3/17/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) |

| | | | |
|---|---|---|---|
| *Vol. 6* | | | Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/18/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *001277* | 03/18/2014 | *185* | Trial held on 3/18/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/19/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 7* *001538* | 03/19/2014 | *186* | Trial held on 3/19/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/20/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 8* *001787* | 03/20/2014 | *187* | Trial held on 3/20/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/21/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 9* *001909* | 03/21/2014 | *188* | Trial held on 3/21/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial concluded. Court gave bench ruling: (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it toTtrustee; (b) The Barclay Group, Inc. and Sunset Pacific are the alter |

| | | egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific. Counsel will subsequently upload proposed Findings of Fact, Conclusions of Law and Judgment that are consistent with the courts oral ruling and otherwise consistent with the evidence. (Harden, D.) (Entered: 03/25/2014) |
|---|---|---|

IV.    Appellant states the following Issues presented on Appeal:

   1.    The Bankruptcy Judge erred in revoking the Debtor's discharge.

   2.    The Bankruptcy Judge erred in finding that the Barclay Group and Sunset Pacific

are the alter egos of the Debtor.

   3.    The Bankruptcy Judge erred in calculating the amount of the damages for which

the Debtor was found to be liable.




[Signature on following page]

Respectfully submitted,

Cengiz J. Comu
14873 Oaks North Place
Dallas, Texas 75254
(972) 965-2545 – Telephone
Email: cjcomu@gmail.com

By: Cengiz J. Comu
*Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on the __11__ day of September, 2014, a true and correct copy of the foregoing document was sent via electronic means or by first class mail, postage prepaid to the persons shown below:

Kendyl T. Hanks
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

David W. Elmquist
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, Texas 75165



By: Cengiz J. Comu

1          IN THE UNITED STATES BANKRUPTCY
           NORTHERN DISTRICT OF TEXAS
2                DALLAS DIVISION

3
KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4  RONALD KATZ,

5          Plaintiffs

6
V.
7
CENGIZ J. COMU, a/k/a CJ COMU,
8
           Defendant.
9

10  BANKRUPTCY PETITION NUMBER: 10-3269

11  _____

12                12(b)(6) MOTION
13                NOVEMBER 9, 2010

14            9:40 A.M. TO 9:42 A.M.
15       HONORABLE STACEY JERNIGAN, PRESIDING

16      TRANSCRIPT FROM AUDIO RECORDING
17   _____

18

19  Transcript produced from audio recording by:
    LINDA YORK, RPR, CSR
20  CSR No. 4899, Expiration Date 12/31/15
    Cathy Sosebee & Associates
21  Firm Registration No. 49
    P.O. Box 86
22  Lubbock, TX  79408
    806.763.0036
23

24

25

```
 1   APPEARANCES:

 2   FOR PLAINTIFFS:

 3        MR. EMIL LIPPE, JR.
          Law Offices of Lippe & Associates
 4        Plaza of the Americas, South Tower
          600 N. Pearl Street, Suite S2460
 5        Dallas, TX 75201
          214-855-1850
 6

 7   FOR CENGIZ J. COMU a/k/a CJ COMU:

 8        MR. DENNIS OLIVER OLSON
          Olson, Nicoud & Gueck, LLP
 9        1201 Main Street, Suite 2470
          Dallas, TX 75202
10        214-979-7300
          denniso@dallas-law.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1

2              I N D E X
                                         Page
3

4

5

   Certification of Transcriptionist.............   6
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  * * * P R O C E E D I N G S * * *

 2                  THE COURT:  Is an agreement according to

 3       the docket.  So let me call that, King Louie Mining, LLC

 4       versus Comu, adversary 10-3269.

 5                  We'll take appearances.

 6                  MR. OLSON:  Your Honor, Dennis Olson for

 7       the debtor defendant.

 8                  THE COURT:  Okay.

 9                  MR. LIPPE:  Emil Lippe for the plaintiffs

10       in the adversary.

11                  THE COURT:  Okay.

12                  MR. OLSON:  Your Honor, it's my 12(b)(6)

13       motion and Mr. Lippe has filed a motion for leave to

14       amend and an amended complaint and I have agreed that

15       that's the proper thing to do.  And then I will respond

16       to it timely and maybe answer it or maybe re-urge my

17       motion at some point.

18                  THE COURT:  All right.  Mr. Lippe, will you

19       all upload a form of order that memorializes this just

20       so we will have a placeholder on the docket knowing

21       what's going on?

22                  MR. LIPPE:  Okay.  I can -- I already have

23       uploaded an order --

24                  THE COURT:  Oh, you have.

25                  MR. LIPPE:  -- granting the motion for
```

1   leave to amend, but it doesn't say anything about the

2   motion to dismiss.

3              THE COURT:  All right.  Well, actually I

4   mean I will just take that order and work with it.  I

5   will reflect your announcement here and this is, you

6   know, without prejudice obviously your right to re-urge

7   your motion to dismiss or file a new one.

8              MR. OLSON:  And I will commit to file a

9   response within 30 days of today's date.

10             THE COURT:  That's the agreement?

11             MR. LIPPE:  Sure.

12             THE COURT:  Okay.  All right.  We'll find

13  your form of order and we will get it signed.

14             MR. LIPPE:  Thank you, Your Honor.

15             THE COURT:  Thank you.

16             (Adjourned.)

17

18

19

20

21

22

23

24

25

1                            CERTIFICATE

2

3    COUNTY OF LUBBOCK   )

4    STATE OF TEXAS      )

5

6            I, Linda York, Registered Professional

7    Reporter and Certified Shorthand Reporter in and for the

8    State of Texas, do hereby certify that the foregoing

9    pages contain a full, true and correct transcript, to

10   the best of my ability, of audiotape furnished by the

11   Clerk of the Bankruptcy Court.

12

13           Given under my hand this the 16th day of

14   October, 2014.?

15

16

17

18                          /s/_____
                            LINDA YORK, CSR No. 4899
19                          Expiration Date: 12/31/15
                            Cathy Sosebee & Associates
20                          Firm Registration No. 49
                            P.O. Box 86
21                          Lubbock, TX  79408
                            806.763.0036
22

23

24

25

1            IN THE UNITED STATES BANKRUPTCY
             NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3
KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4 RONALD KATZ,

5          Plaintiffs

6
V.
7
CENGIZ J. COMU, a/k/a CJ COMU,
8
           Defendant.
9

10 BANKRUPTCY PETITION NUMBER: 10-3269

11 _____

12

13               MOTION TO DISMISS

14              FEBRUARY 14, 2011

15            10:55 A.M. TO 12:10 P.M.

16        HONORABLE STACEY JERNIGAN, PRESIDING

17         TRANSCRIPT FROM AUDIO RECORDING

18    _____

19

20

21

22 Transcript produced from audio recording by:
   LINDA YORK, RPR, CSR
23 CSR No. 4899, Expiration Date 12/31/15
   Cathy Sosebee & Associates
24 Firm Registration No. 49
   P.O. Box 86
25 Lubbock, TX  79408
   806.763.0036

Case 10-03269-sgj Doc 178 Filed 10/22/14   Entered 10/22/14 13:28:08   Page 2 of 25
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 24 of 256   PageID 1017

2

```
 1
       APPEARANCES:
 2
     FOR PLAINTIFFS:
 3
           MR. EMIL LIPPE, JR.
 4         Law Offices of Lippe & Associates
           Plaza of the Americas, South Tower
 5         600 N. Pearl Street, Suite S2460
           Dallas, TX 75201
 6         214-855-1850

 7
     FOR CENGIZ J. COMU a/k/a CJ COMU:
 8
           MR. DENNIS OLIVER OLSON
 9         Olson, Nicoud & Gueck, LLP
           1201 Main Street, Suite 2470
10         Dallas, TX 75202
           214-979-7300
11         denniso@dallas-law.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

                                                        Page
2

3
    Ruling....................................     24
4
    Certification of Transcriptionist.............     25
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              * * * P R O C E E D I N G S * * *

2

3              THE COURT:  Motion to dismiss under Rule

4    12(b) in the King Louie Mining, LLC versus Comu matter,

5    Case Number 10-3269.

6              We will take appearances in that.

7              MR. OLSON:  Good morning, Your Honor,

8    Dennis Olson appearing for the defendant.

9              THE COURT:  All right.

10             MR. LIPPE:  Emil Lippe for the plaintiff.

11   Apologize for being late, Your Honor.  The parking

12   garage was backed up and the scanner downstairs wasn't

13   working.

14             THE COURT:  Okay.  Well, thank you.  We did

15   get the message that you were running late.  I

16   appreciate the phone call.

17             All right.  Mr. Olson, I think we've had a

18   setting on this once before and now we're back, right?

19             MR. OLSON:  Yes, ma'am.  On the eve of the

20   last hearing Mr. Lippe timely filed a motion to amend

21   and tendered his amended pleading, and I think that

22   mooted that hearing, and I said as much.  And the Court

23   told us to get an order entered.

24             And upon reviewing the first amended

25   complaint, I stand on my original 12(b)(6) motion.  And

1  today I would like to go into that in some detail.

2                    THE COURT:  Okay.

3                    MR. OLSON:  May I proceed?

4                    THE COURT:  You may.

5                    MR. OLSON:  In order to revoke a discharge,

6  you not only have to prove that you had grounds for

7  denial of discharge, but when you come in post discharge

8  you have to also meet the burden of showing why you

9  didn't timely file your objection.  In this case what is

10  it that the plaintiff has learned post discharge that

11  the plaintiff didn't know before the discharge was

12  entered.

13                    And, you know, I think that we win this

14  case on the merits on both issues if we go to trial, but

15  defendants shouldn't have to be put to trial or even

16  discovery until the plaintiff plainly tells this Court

17  what it is that he did not know when this discharge was

18  entered and why he thinks that now gives him the right

19  to bring this 727.

20                    Now, it's a process that's not available to

21  a plaintiff that simply ignores the deadline to file a

22  727.  And in this case when you review that amended

23  complaint it's obvious that this plaintiff has hounded

24  this defendant for years.  And at the 361 meeting

25  plaintiffs' counsel appeared and grilled the defendant

1    extensively on things that he's complaining about in

2    this complaint.

3              And as a result of that, the trustee asked

4    the defendant to bring a voluminous amount of books and

5    records to her office, which the debtor did.  And on

6    March 24th, Mr. Lippe reviewed all those documents.  And

7    after March 24th, the trustee and Mr. Lippe had until

8    April 12th to file a complaint, which they didn't do,

9    file an extension, which they didn't do, seek a 2004,

10   which they didn't do.

11             Now, if you look at the complaint, he says

12   that the defendant controls a couple of companies and so

13   on.  Well, if you look at Schedule B and statement of

14   financial affairs 18, those things were in the

15   schedules.  So I think we're entitled to know exactly

16   what is it that he learned after this discharge,

17   April 14th, that entitles him to come in six months

18   later and file this complaint.

19             Now, in tracking the complaint the first

20   amended complaint, certainly through the first 20

21   paragraphs ending on Page 6, these are all things that

22   even the plaintiff had known for a long time

23   prebankruptcy and predischarge in the case of Paragraph

24   20.

25             So on Paragraph 21 he starts saying well,

Case 10-03269-sgj Doc 178 Filed 10/22/14   Entered 10/22/14 13:28:08   Page 7 of 25
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 29 of 256   PageID 1022

7

1  we determined that he's got this complex structure and

2  that he controls this thing.  Two things, again, Exhibit

3  B and statement of financial affairs Paragraph 18 told

4  everybody upfront that he controlled these two entities,

5  and we gave the trustee the tax return and the other

6  books and records.

7           He refers in Paragraph 21 to Exhibit B as

8  some evidence of something.  Well, Exhibit B is

9  consistent with what we put in our schedules and

10 statement of financial affairs, but more importantly,

11 it's dated in 2005.  It's years before the filing of the

12 bankruptcy.

13          In Paragraph 22, the allegation is that he

14 transferred controlling interest to Sunset Pacific.  I

15 assume that that's some allegation of a fraudulent

16 transfer.  Number one, there's no allegation that that

17 was done within a year.  Number two, we deny it's a

18 fraudulent transfer.  Number three, the trustee and

19 Mr. Lippe were made available copies documenting that

20 transfer on December 31st -- I'm sorry -- on January 1st

21 of 2006.  This bankruptcy was filed December 31st of

22 2009.  That transfer, even if it were fraudulent, which

23 we deny, would not be the basis for denial of a

24 discharge.

25          THE COURT:  Okay.  I'm going to interrupt.

1   I don't show where this first amended complaint was

2   filed.  I was disturbed that in my pile of paper I have

3   the original complaint and then your newest motion to

4   dismiss and his response, and I'm like where is the

5   first amended complaint.  I'm looking on the docket.

6   It's not on the docket.

7              MR. OLSON:  His response that he filed

8   Friday refers to a docket number for the amended

9   complaint -- well, I say that, I don't see it either.

10             THE COURT:  Mr. Lippe --

11             MR. OLSON:  Docket number eight, docket

12  entry number eight.  It's footnote eight on Page 5 of

13  the response he filed Friday.

14             THE COURT:  Docket number -- it looks

15  (inaudible) -- it hasn't been separately filed, first

16  amended complaint.  Okay.

17             MR. OLSON:  If that entitles me to relief,

18  I will take it.

19             THE COURT:  It just explains why I don't

20  have it in my pile of paper I studied before coming out

21  here.  Okay.  Well, now I have pulled up the document so

22  I can follow with you.  Okay.  You were talking about

23  individual paragraphs and I couldn't --

24             MR. OLSON:  Yes, ma'am.

25             THE COURT:  -- follow you.  Okay.

Case 10-03269-sgj Doc 178 Filed 10/22/14 Entered 10/22/14 13:28:08 Page 9 of 25
Case 3:14-cv-04163-B Document 1-5 Filed 11/21/14 Page 31 of 256 PageID 1024

9

1          MR. OLSON:  The first 20 paragraphs ending

2  on Page 6, I said none of that is possibly anything that

3  was learned postdischarge.  And I was talking about

4  Paragraph 21 --

5          THE COURT:  Okay.  I'm with you now.

6          MR. OLSON:  -- the transfer and -- 21 and

7  22.  The schedules and statement of financial affairs

8  clearly show that the defendant debtor runs these

9  entities for the benefit of others, Sunset Pacific for

10  his wife; Barclay Group for Mr. Brown.  That is simply

11  nothing that was learned postdischarge.

12          In support of Paragraph 21, the last

13  sentence refers to Exhibit B.  If you look at it, it's a

14  memorandum dated in 2005.  In Paragraph 22 he's talking

15  about the transfer of the controlling interest of Sunset

16  Pacific to his wife for no consideration.  My point

17  there is that was done January 1st, 2006.  All those

18  documents have been reviewed by the trustee and

19  Mr. Lippe.  Even if there were fraudulent transfers in

20  that time frame, they wouldn't be the basis for denial

21  of a discharge.

22          I don't believe that plaintiff can with a

23  straight face tell this Court that in Paragraph 22 he

24  wasn't aware of these things.  That's my point.  Exactly

25  what is it that you didn't know.  And why didn't you

1   know it.  How come you didn't file a 727 timely?

2   Because if you just missed the deadline, it's just too

3   bad.

4            And I think that my client is entitled to

5   that before he's required to jump through a bunch of

6   hoops responding to a bunch of allegations, Your Honor,

7   that are frankly noncompliance with Rules 8 and 9 and

8   are simply conclusions.  My brief addresses those points

9   as to what -- if we were going to proceed, I think he

10  needs to tell us.  But he needs to come in and say,

11  Judge, after the discharge here's what we learned.  And

12  he can say it's on information and belief.  But what

13  transfer are we talking about?  Those transfers in '06

14  don't count.

15           If you look at Count 1, Paragraph 32,

16  that's an example of what I'm talking about.  Debtor

17  committed fraud by concealing and failing to disclose

18  assets and sources of income which was required by law

19  to disclose.  What was not disclosed?  What asset are we

20  talking about?  And when did you learn that?  And why

21  didn't you seek a 2004 or an extension or file your 727?

22           The succeeding paragraphs talk about the

23  transfers to Sunset Pacific.  Again, plaintiff is on

24  actual knowledge that transfer was January 1st, 2006.

25  The plaintiff has reviewed the documents.  Accordingly,

1   Your Honor, we feel that we are entitled to either

2   specific pleadings addressing the points that I have

3   been talking about or if plaintiff takes the position,

4   "well, Judge, I can't plead any more specifically than

5   that," then I think I'm entitled to dismissal of the

6   complaint.

7                Thank you.

8                THE COURT:  Thank you.

9                Mr. Lippe.

10                MR. LIPPE:  Perhaps we should have filed

11   the amended complaint separately.  The order provided

12   that it was deemed filed.  I probably should have for

13   clarity sake submitted a copy thereafter.

14                But going to the specifics, it's rather

15   inconsistent.  He's saying that we've got a duty to

16   plead with specificity, yet if you look at his so-called

17   brief, it's basically a page long and it is conclusory

18   and just recites boilerplate statements -- do not --

19   allegations do not establish that it was obtained by

20   fraud or that you discovered until afterward.  There's

21   no specificity in what he's saying.

22                So what he's doing is saying that you've

23   got to be specific, but I can wait until the hearing and

24   then start coming up with things that I say you failed

25   to meet your burden on.  I've looked at the -- pardon

1   me -- at the schedules.  And counsel very artfully goes

2   through Paragraph 22 of the amended complaint and then

3   he skips the Paragraph 30 of the amended complaint and

4   he talks about a transfer that allegedly occurred in

5   2006.

6           But if you look at Paragraph 24, we

7   specifically allege that plaintiffs were not aware of

8   the fraudulent transfers, hidden assets and employment

9   positions of Comu prior to discharge.  And then

10  beginning in Paragraph 25 and continuing through 29 we

11  specify these.  And I think it's quite detailed.

12  Consulting services and disguised ownership interest in

13  partners National Real Estate, LLC.  Going down a few

14  points, I'm looking at Page 7 of Paragraph 25 sports

15  memorabilia actually owned by Sun Sports which

16  disappeared when Sun Sports ceased doing business.

17          We have discovered through information that

18  we obtained after the discharge that Comu has been

19  selling restricted stock through the Barclay Group.

20          Now, counsel states that the ownership was

21  disclosed in the schedules.  What was disclosed was a

22  structure where "my wife owns 99 percent of Sun Sports

23  and Mr. Brown owns 99 percent of the Barclay Group, so,

24  golly, gee, Your Honor, I only own one percent of the

25  holding company and then I only own one percent of the

1  main entity thereunder."  And those we are saying are

2  fraudulent they are simply false representations to the

3  Court.

4              In fact, although nominally his wife may

5  own 99 percent and nominally Mr. Brown, who resides

6  somewhere overseas, may own 99 percent; in fact, if you

7  look at who signs the bank accounts, who has control

8  over the email accounts, who sends out the

9  correspondence, who negotiates the transactions, who

10  provides the consulting services and who controls the

11  money, it's all C.J. Comu.  And --

12              THE COURT:  Let me ask you to address this

13  though.  I don't see any details of when you discovered

14  this.  You say after the discharge.  But not when or

15  how.  I mean Mr. Olson is right that 727(d) is a pretty

16  extraordinary procedure.  We have tight deadlines to

17  object to discharge in a bankruptcy and we have a

18  procedure under Rule 4004 where you can extend the --

19  move to extend the time if you're, you know, looking at

20  a complex financial picture, needing discovery and the

21  Court pretty generously grants those in, you know, on

22  daily basis, we get those kind of motions.

23              So when you come in after the fact, we do

24  need specifics when you discovered these things and how

25  and why it was that you didn't get information before

 1  the discharge order.  I'm not seeing that in the

 2  complaint.

 3           MR. LIPPE:  Well, we have alleged generally

 4  that it was thereafter.  If we have to be more specific

 5  than that, then it's going -- I feel we're getting into

 6  discovery at this point.  It is Mr. Comu who had the

 7  burden to come forward and disclose his assets.  In

 8  fact, we had an informant who had been a former business

 9  partner and unhappy with Mr. Comu who furnished us with

10  a lot of this detail.

11           One of the items, for example, is a loan of

12  $90,000 that Mr. Comu arranged while he was in

13  bankruptcy and advanced to a company that the Barclay

14  Group had an interest in.  And we didn't find out about

15  that until months after the discharge.  If he had

16  $90,000 available, it certainly should have been

17  disclosed somehow to the Court in one of these

18  schedules, one of these subcategories.

19           We have detailed documents indicating

20  various contacts with and business relationships with

21  these various entities that are detailed in Paragraph

22  25, none of which we got from the trustee and none of

23  which Mr. Comu disclosed to the trustee.

24           In fact, he's been participating in some

25  extensive consulting scheme through the Barclay Group,

1   and he's just saying, "oh, I'm just a one percent owner

2   of an entity that I only own one percent of."  And

3   really he's the one running everything.

4                   I think the motion is defective because

5   it's conclusory.  Under the pleading standards all we

6   have to demonstrate is that there's a plausible basis

7   for recovery.  If he wants to conduct discovery and then

8   file a motion for summary judgment and go at these point

9   by point, then I believe that would be appropriate.

10                  The Court certainly is correct that we have

11  that duty to demonstrate that we didn't know and why we

12  didn't apply for an extension.  But the bottom line is

13  is that we didn't know because he had concealed it.  So

14  it's hard to prove a negative.  The schedules clearly

15  show an absence of disclosure.  The trustee might very

16  well be deposed or asked to furnish an affidavit in

17  connection with the motion for summary judgment.

18                  THE COURT:  Who is the trustee?

19                  MR. OLSON:  Diane Reed, Your Honor.

20                  MR. LIPPE:  Diane Reed, yes.

21                  THE COURT:  Okay.  I see that you have

22  alleged that certain transfers should be avoided.  Those

23  are really the trustee's claims and causes of action to

24  pursue, aren't they?

25                  MR. LIPPE:  Yes.  And I'm not sure what we

1  do where -- in a situation where the trustee should

2  pursue something and has not pursued it.  I have gone

3  over Judge Houser's opinion in the Faulkner matter,

4  Faulkner/Kornman matter, and I think that a lot of the

5  reasoning of fraudulent transfers and going back a

6  number of years prior to the discharge would apply in

7  this case.

8              And I, you know, I believe that these

9  certainly should be.  If we can demonstrate to the Court

10 that Mr. Comu actually controls and runs the Barclay

11 Group and Sunset Pacific and that his wife is a mere

12 figurehead, doesn't have a clue as to what's going on

13 with either of those entities and is engaged in social

14 work and charity ventures rather than the business of

15 either of those two entities, then I think some relief

16 should be available for the benefit of the creditors.

17             Now, yes, we have been after Mr. Comu for

18 years.  Yes, we obtained judgments against him in New

19 York state court.  Yes, there have been disputes going

20 back to 2004 with Mr. Comu.  He has a long smattered

21 history of running one company after another into the

22 ground.  And my client is just continuing to pursue him.

23 He just makes people give up.

24             We will certainly comply with any

25 directions of the Court -- pardon me -- but I believe

1   that particularly in light of the fact that the motion

2   to dismiss is so vague, so conclusory.  We do have very

3   specific details of assets.  Marathon Management, Grey

4   Point Partners, New Edge Consulting, and a number of

5   others is set forth, and we have alleged that we didn't

6   learn about that until after the discharge.

7              I think we have met the specificity

8   standard for pleading.  Now, it's another thing on

9   summary judgment.  And I suspect Mr. Olson will want

10  discovery on how you found out about this and that, and

11  we will go back and forth.  But we would respectfully

12  request that the motion be denied.

13             THE COURT:  Okay.  Mr. Olson, 60 seconds, I

14  will give you the last word.

15             MR. OLSON:  Thank you, Your Honor.

16             In the statement of financial affairs

17  number 18 and in Schedule B we made it clear to

18  everybody that Mr. Comu was running these two companies.

19  That is not a basis for denial of discharge.  And it's

20  certainly nothing new.

21             Similarly, transfers made more than a year

22  prepetition are not a basis for denial of discharge.

23  The trustee knows that.  The trustee didn't file a 727.

24  The trustee is not out of time if she thinks that

25  transfer was fraudulent.  But I suspect she has

```
 1   concluded that it was not fraudulent because she hasn't
 2   filed her complaints yet.
 3                Thank you.
 4                THE COURT:  Thank you.  All right.  I need
 5   to take a short break and look more carefully at the
 6   complaint and the schedules.
 7                MR. OLSON:  Oh.
 8                THE COURT:  Yes.
 9                MR. OLSON:  If I had any time left, my
10   second motion to dismiss is not my brief.  It's a
11   separate document.  And it's very specific about what's
12   wrong with the first amended complaint.
13                THE COURT:  Well, let me make sure I
14   understand what you're talking about.
15                MR. OLSON:  Well, he --
16                THE COURT:  I'm looking at a four-page
17   document or -- no, that's including the certificate of
18   service -- a three-page document.  What do you have?
19                MR. OLSON:  Yes, ma'am.  He was referring
20   to my brief as being conclusory.  That pleading is very
21   specific what's wrong.
22                THE COURT:  Okay.  All right.  Thank you.
23   All right.  We're going to take about a 20-minute break.
24   I will come back at 11:45 and rule.
25                THE CLERK:  All rise.
```

1              (Break taken.)

2              THE COURT:  We're going back on the record

3  now in the Adversary Number 10-3269 styled King Louie

4  Mining, LLC versus Comu.

5              Before the Court is, of course, the debtor

6  defendant's motion to dismiss plaintiff's complaint for

7  alleged failure to state a claim.  The standard that

8  applies to a Rule 12(b)(6) motion, such as this, is that

9  a complaint is to be charitably construed with all

10  well-pleaded factual allegations being accepted as true

11  and with any reasonable inferences from those facts

12  being drawn in favor of the nonmoving party.

13              Rule 12(b)(6) motions are disfavored in the

14  law and shall be cautiously granted.  And a well-pleaded

15  complaint may proceed even where it strikes a judge that

16  actual proof of those facts may be speculative.  Only

17  when the allegations in the complaint, however true,

18  could not raise a claim of entitlement to relief should

19  there be dismissal.

20              Twombly and Iqbal are the most recent U.S.

21  Supreme Court decisions articulating the standards under

22  12(b)(6).  The Court really starts, it should add, with

23  Rule 8(a)(2).  Under Federal Rule 8(a)(2), a complaint

24  must provide a short and plain statement of the claim

25  showing that the pleader's entitled to relief.

1          And then where we have a fraud allegation,

2    the Court must also look to Rule 9.  Rule 9(b)

3    specifically requires that when pleading any type of

4    fraud, quote, the circumstances constituting fraud shall

5    be stated with particularity.  The 5th Circuit has

6    elaborated there that when alleging fraud the pleader

7    should allege the time, place, and contents of any false

8    representations as well as the identity and person

9    making those false representations and what the person

10   obtained thereby.

11          And then turning back to Twombly and Iqbal,

12   the Supreme Court elaborated in those recent cases that

13   to survive the motion to dismiss a civil complaint must

14   contain sufficient factual matter accepted as true to

15   state a claim to relief that is plausible on its face.

16          Basically there's a two-pronged approach

17   articulated in those cases.  First, determine what is a

18   factual allegation versus a legal conclusion and only

19   factual allegations will be accepted as true.  And then

20   second prong, you determine whether the factual

21   allegations state a plausible claim for relief.

22          Turning to our adversary here, here there

23   are lots of factual allegations, alleging concealment of

24   assets in entities in which the debtor allegedly has a

25   beneficial interest and failure to properly disclose

Case 10-03269-sgj Doc 178 Filed 10/22/14   Entered 10/22/14 13:28:08   Page 21 of 25
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 43 of 256   PageID 1036

21

1  some of this in the debtor's bankruptcy schedules and

2  statement of financial affairs.  The legal conclusions

3  are that this entitles the plaintiff to revocation of

4  discharge under 727(d) and (e) and may be also

5  declaratory judgment that the assets of certain of these

6  entities be determined to be the debtor and may be also

7  avoiding certain transfers under 544 and the Uniform

8  Fraudulent Transfer Act.

9           Here there is plenty of flesh on the bone,

10 so to speak.  And the Court can infer a plausible cause

11 of action.  But there is not quite the clarity that I

12 think Rule 8 and 9 require, but again, the law favors --

13 disfavors dismissals and so the Court is going to give

14 the plaintiff one more opportunity to amend here.

15          Specifically, the Court believes that the

16 first amended complaint must be amended to state which

17 exact subsection of Section 727(d) warrants revocation

18 of discharge and also when and how plaintiff discovered

19 the facts that form the basis for revocation of

20 discharge.

21          While Mr. Lippe does make a good point that

22 this borderlines on information that you might expect a

23 party to simply take discovery on, I think in the unique

24 context of 727(d) more information is required because

25 we have a policy in bankruptcy of favoring certainty

1  sooner than later as to whether a debtor is going to

2  obtain a fresh start. And we have very strict deadlines

3  in Rule 4004, and 4004 typically requires a motion

4  before a deadline hits to object to discharge asking for

5  an extension to file a late objection to discharge.

6        So in a 727(d) context, I do think more

7  specificity is required in a pleading regarding when and

8  how plaintiff discovered facts that form the basis for

9  revocation of a discharge.

10        The Court also with respect to Section 544

11  and the Uniform Fraudulent Transfer Acts -- Uniform

12  Fraudulent Transfer Act believes that we need more

13  specificity. Not only do we need a better articulation

14  of exactly what property is alleged to have been

15  transferred when and the exact provisions of the Uniform

16  Fraudulent Transfer Act that are being relied upon, but

17  the Court is concerned about standing. I dangled that

18  out there.

19        I think under 5th Circuit law and

20  provisions of the Bankruptcy Code, it is the trustee,

21  the Chapter 7 trustee who has standing to avoid and

22  recover property that may have been fraudulently

23  transferred. And we are still within a time frame it

24  would appear to do that.

25        There is 5th Circuit law that may apply

1  here and I'm talking about an old case from the 1980s,

2  Louisiana World Exposition that talks about a procedure

3  you go through at least in a Chapter 11 context when a

4  debtor -- there's no trustee -- when a debtor is not

5  going forward with what might be a colorable claim, it

6  says that a party, a creditor who might want to go

7  forward has to bring a motion to the Court showing it

8  has a, quote, colorable claim, it made a demand on the

9  trustee or debtor and the trustee or debtor

10  unjustifiably refused.  So now creditor is seeking

11  standing.

12          I had actually written some opinions

13  questioning whether that applies in Chapter 7,

14  questioning whether anyone other than a trustee ever

15  ought to be able to go forward with a fraudulent

16  transfer act.  A clear exception would be if the

17  creditor had brought a fraudulent transfer action

18  prepetition in state court.  So I think there would

19  clearly be dual standing, co-standing.

20          But here I think the 5th Circuit in this

21  Louisiana World case makes clear that it's, again, even

22  though it's a Chapter 11 case, it's really the trustee

23  with initial standing.  And you have to obtain standing

24  from the court by filing a motion and giving the trustee

25  notice of your motion.

1            So anyway, again, a second amended

2    complaint will be allowed here, but I'm going to need

3    not only more articulation on the fraudulent transfer

4    cause of action, but I'm going to have to have a clear

5    showing of standing.

6            All right.  I am going to give 20 days for

7    the second amended complaint to be filed; otherwise, the

8    motion to dismiss would be granted.  And then debtor

9    defendant would have 20 days to answer or otherwise

10   respond after the second amended complaint is presumably

11   filed.

12           All right.  So I would like the lawyers to

13   upload to me an order denying the motion to dismiss

14   conditional on a second amended complaint being filed

15   within 20 days of entry of this order addressing the

16   issues announced by the Court orally.

17           Can I get the two of you -- Mr. Olson, I'll

18   ask you to take the laboring oar on that but run it by

19   Mr. Lippe before you submit it to the Court.

20           MR. OLSON:  Yes, ma'am.  We will arrive at

21   a form of an agreed order.

22           THE COURT:  Okay.  Thank you.

23           MR. OLSON:  Thank you.

24           THE COURT:  We stand adjourned.

25           (Adjourned.)

```
 1                        CERTIFICATE

 2

 3   COUNTY OF LUBBOCK    )

 4   STATE OF TEXAS       )

 5

 6            I, Linda York, Registered Professional

 7   Reporter and Certified Shorthand Reporter in and for the

 8   State of Texas, do hereby certify that the foregoing

 9   pages contain a full, true and correct transcript, to

10   the best of my ability, of audiotape furnished by the

11   Clerk of the Bankruptcy Court.

12

13            Given under my hand this the 16th day of

14   October, 2014.

15

16

17                         /s/_____
                           LINDA YORK, CSR No. 4899
18                         Expiration Date: 12/31/15
                           Cathy Sosebee & Associates
19                         Firm Registration No. 49
                           P.O. Box 86
20                         Lubbock, TX  79408
                           806.763.0036
21

22

23

24

25
```

```
 1              IN THE UNITED STATES BANKRUPTCY
                 NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3
   KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
 4 RONALD KATZ,

 5          Plaintiffs,

 6 V.

 7 CENGIZ J. COMU a/k/a CJ COMU,

 8          Defendant.

 9 DIANE G. REED, TRUSTEE.

10          Intervenor, Co-Plaintiff, and Third-Party
   Plaintiff,
11
   V.
12
   CENGIZ J. COMU, a/k/a CJ COMU,
13
            Defendant,
14
   and
15
   PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16 INC., AND SUNSET PACIFIC, L.P.,

17          Third-Party Defendants.

18 BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19 _____

20          REQUEST FOR REVOCATION OF DISCHARGE

21                     MAY 2, 2012

22              2:31 P.M. TO 2:46 P.M.

23          HONORABLE STACEY JERNIGAN, PRESIDING

24

25          TRANSCRIPT FROM AUDIO RECORDING
```

```
 1   Transcript produced from audio recording by:
     LINDA YORK, RPR, CSR
 2   CSR No. 4899, Expiration Date 12/31/15
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC AND RONALD KATZ:
 8        MR. EMIL LIPPE, JR.
          Law Offices of Lippe & Associates
 9        Plaza of the Americas, South Tower
          600 N. Pearl Street, Suite S2460
10        Dallas, TX 75201
          214-855-1850
11        - AND -
          MR. DAVID WANDER
12        Davidoff, Hutcher & Citron
          605 Third Avenue, 34th Floor
13        New York, NY 10158
          212-557-7200
14
15   FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
     PLAINTIFF, TRUSTEE DIANE REED:
16
17        MR. DAVID ELMQUIST
          Reed & Elmquist, P.C.
          501 N. College Street
18        Waxahachie, TX 75165
          972-938-7339
19        delmquist@bcylawyers.com
20   FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
     BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
21   COMU:
22        MR. DENNIS OLIVER OLSON
          Olson, Nicoud & Gueck, LLP
23        1201 Main Street, Suite 2470
          Dallas, TX 75202
24        214-979-7300
          denniso@dallas-law.com
25
```

1
2                              I N D E X
                                                        Page
3

4

5    Certification of Transcriptionist.............    12

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              * * * P R O C E E D I N G S * * *
2              THE COURT:  King Louie Mining, LLC versus
3    Comu adversary 10-3269, let's take that first.
4              MR. LIPPE:  Your Honor, Mr. Olson is
5    working his way through security right here, so he will
6    be in in just a moment.
7              THE COURT:  Okay.  Well --
8              MR. LIPPE:  Emil Lippe for the creditor and
9    the plaintiff in the adversary proceeding King Louie
10   Mining.
11             THE COURT:  Okay.
12             MR. WANDER:  Your Honor, this is David
13   Wander.  I'm appearing telephonically.  It's a little
14   hard to hear.  I'm co-counsel for the plaintiff and I
15   have submitted an application to be admitted pro hac
16   vice.  I believe we may be making some small minor
17   amendments to that application.  And I request Your
18   Honor's permission to be heard at this hearing.
19             THE COURT:  Okay.  That's fine.
20             MR. ELMQUIST:  Good afternoon, Your Honor
21   David Elmquist on behalf of Diane Reed, the trustee.
22             THE COURT:  All right.
23             MR. OLSON:  Good afternoon, Your Honor.
24   Dennis Olson representing the debtor defendant.
25             THE COURT:  All right.  Well, let's make
```

1   sure that everyone speaks into the mic' up here at the

2   podium, especially so Mr. Wander can hear what's

3   happening here.

4             For the record, we have had this adversary

5   proceeding pending since September 3rd, 2010.  It is an

6   objection to or I guess request for revocation of

7   discharge in the Chapter 7 bankruptcy case of Mr. Comu.

8   We have had this adversary proceeding abated for several

9   months.  We have heard discussions I guess at prior

10  hearings that the trustee Ms. Reed may be evaluating

11  whether she might want to intervene or substitute in in

12  this adversary proceeding.

13            So anyway I felt the need to check in here

14  and see what is going on and see if we need to get a

15  scheduling order in place, see if we have by chance a

16  settlement in the works, anything of that nature.  So

17  who would like to go first.

18            MR. ELMQUIST:  Your Honor, if I might I

19  will start out here because I was the one that caused

20  the abatement, or my client.

21            Your Honor, the Court is accurate that the

22  trustee is evaluating -- the trustee is still evaluating

23  -- the trustee's made the determination that there will

24  be a complaint and intervention filed.  The scope of

25  that complaint is not yet determined, largely because we

1  have not yet completed the 2004 examination.

2  Examination's required to determine the claims to

3  present.  We did conduct, in accordance with agreements

4  of counsel for the trustee and the debtor, the 2004

5  examination on November 30th.

6          Mr. Comu has been involved in a number of

7  businesses and business transactions that to some degree

8  spill over to this Chapter 7 case from the standpoint of

9  what interest he held and whether there is in fact

10 property interests that are property of this estate.

11         So there was an extensive request for

12 production of documents, bank records.  Most of but not

13 all of the documents we requested for that examination

14 were provided.  And Mr. Olson has and his client have

15 been cooperative in that endeavor but they simply could

16 not get together everything that we felt we needed for

17 the examination.  So at that examination we agreed that

18 we would conduct the examination that day, but we would

19 resume the examination once we got the additional

20 documents.

21         And during the course of the examination,

22 additional documents were requested.  Your Honor, to be

23 quite honest, after that examination was at the end of

24 November I think counsel -- I certainly got busy with

25 other matters and we didn't press it.  So we are now

1   pressing it from the standpoint of getting that

2   examination concluded.  I have discussed with Mr. Olson

3   getting that concluded examination done and the

4   documents that I had asked for some time ago to me so we

5   can conduct and conclude that examination in the next 30

6   days.

7               There is one, perhaps two other 2004s that

8   we need to do in connection with the evaluation of the

9   complaint to file.  And that had to do with, again, Mr.

10  Comu's interest in business ventures that involve his

11  wife and a business venture that involves a partner or

12  partners in a company called Barclay Group which has

13  vast holdings in a company called Green Automotive,

14  which may or may not be property of this estate

15  depending on what we determine with respect to those

16  interests.

17              But we simply have not been able to

18  conclude that portion of the investigation.  We

19  understand this case has been pending for some time.  We

20  need to move it forward.  I talked to Mr. Olson about a

21  scheduling order and other issues with respect to where

22  this case stands.  And subject to the Court's approval,

23  what we anticipate is the complaint intervention being

24  filed as prompt as we can after the conclusion of those

25  examinations, which we think we can get done in the next

1   60 days.  So 60 days to complete the examinations and

2   within 30 days thereafter the complaint and intervention

3   is filed, in which we will be determining or asserting

4   the claims the trustee think are appropriate for this

5   action.

6                The Court may recall that this is a

7   revocation of discharge action filed by King Louie along

8   with issues with respect to alleged fraud or fraudulent

9   transfers.  That is part of what we're looking at and

10  ultimately trying to determine whether there is, in

11  fact, the trustee's perspective, a basis for seeking

12  revocation of discharge.

13               We don't take that lightly, so we're

14  studying it very carefully.  And we have the examination

15  to conclude before we can make that final determination.

16  I believe that King Louie intends to stay in the case

17  but to a certain extent if the trustee decides that

18  there's basis for revocation of discharge that King

19  Louie would sort of take a back seat to the trustee in

20  terms of the prosecution of this action.

21               We do, given the fact this case has been

22  pending, we do intend to move it forward as quickly as

23  we can and complete this examination.  I think the

24  scheduling order, in my view, recommendation would be

25  the scheduling order wait until we have the complaint

Case 10-03269-sgj Doc 179 Filed 10/22/14 Entered 10/22/14 13:34:11 Page 9 of 12
Case 3:14-cv-04163-B Document 1-5 Filed 11/21/14 Page 56 of 256 PageID 1049

9

1  and intervention on file, might also note, Your Honor,

2  that there is a pending motion to dismiss under 12(b)(6)

3  that the debtor filed that's just been held in abeyance.

4  I discussed that with Mr. Olson, and he felt it more

5  appropriate to address that motion to dismiss after the

6  complaint and intervention is filed by the trustee

7  because there may be grounds to seek dismissal of the

8  trustee's claims along with the claims that King Louie

9  has asserted under 727.

10               So I think Mr. Olson feels that the

11  appropriate way to handle the motion to dismiss is after

12  the complaint and intervention is filed.  So once that

13  -- once the complaint and intervention is filed I think

14  it is certainly time to get a scheduling order in place,

15  we would move forward quickly with litigation

16  thereafter.

17               THE COURT:  All right.  Who else wishes to

18  be heard?

19               MR. WANDER:  Your Honor, David Wander.  I

20  just want to affirm what the trustee has said from point

21  of view of counsel for King Louie, I think it was well

22  stated.

23               THE COURT:  Okay.  Mr. Olson, anything to

24  add for the debtor?

25               MR. OLSON:  Your Honor, I don't think I

1   have anything to add today.  Mr. Elmquist and I have

2   been working along on this and I think that once he

3   determines what he wants to allege then we can sit down

4   and figure out if he's going to be --

5            MR. WANDER:  Excuse me, Mr. Olson, could

6   you -- Your Honor, if you could ask Mr. Olson to speak

7   directly in the mic', I can't hear what he's saying.

8            THE COURT:  All right.  He's going to

9   repeat himself.

10            MR. OLSON:  Once Mr. Elmquist has filed his

11   complaint so that we know what he's alleging and we know

12   whether King Louie is still going to have any standing

13   or whether they're going to take a back seat, to use

14   Mr. Elmquist's phrase, and I think we would be ready to

15   address the 12(b)(6) motion and whatever I file in

16   response to the complaint and intervention and issue a

17   scheduling order and I think we can probably agree on a

18   scheduling order.

19            THE COURT:  Okay.  All right.  Well, the

20   Court is going to go ahead and continue the abatement

21   for another 90 days.  I don't know who was the preparer

22   of the last agreed motion to abate.  Was it you,

23   Mr. Elmquist?

24            MR. ELMQUIST:  It was, Your Honor.  And I'm

25   happy to prepare this order.

```
 1                    THE COURT:  All right.  If you can prepare
 2    it.
 3                    MR. ELMQUIST:  I'll run it by counsel.
 4                    THE COURT:  Let's make it go through
 5    August 1st and then -- and if you could coordinate with
 6    Ms. Davis, I would like to have another status
 7    conference the week of August 1st shortly after
 8    August 1st, which the Court would be happy to cancel if
 9    by that point we have motions to intervene filed and set
10    for hearing, we can just go forward with the hearing on
11    that rather than have the status conference.
12                    All right.
13                    MR. ELMQUIST:  Very good, Your Honor.
14                    THE COURT:  All right.  So it sounds like
15    we will see you in August.
16                    MR. ELMQUIST:  Thanks so much, Your Honor.
17                    THE COURT:  All right.  Thank you.  We'll
18    hang up on you, Mr. Wander.
19                    MR. WANDER:  Thank you, Your Honor.
20                    THE COURT:  Thank you.
21                    (Adjourned.)
22
23
24
25
```

```
 1                        CERTIFICATE

 2

 3   COUNTY OF LUBBOCK  )

 4   STATE OF TEXAS     )

 5

 6           I, Linda York, Registered Professional

 7   Reporter and Certified Shorthand Reporter in and for the

 8   State of Texas, do hereby certify that the foregoing

 9   pages contain a full, true and correct transcript, to

10   the best of my ability, of audiotape furnished by the

11   Clerk of the Bankruptcy Court.

12

13           Given under my hand this the 16th day of

14   October, 2014.

15

16

17                        /s/_____
                          LINDA YORK, CSR No. 4899
18                        Expiration Date: 12/31/15
                          Cathy Sosebee & Associates
19                        Firm Registration No. 49
                          P.O. Box 86
20                        Lubbock, TX  79408
                          806.763.0036
21

22

23

24

25
```

1              IN THE UNITED STATES BANKRUPTCY
              NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3
KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4  RONALD KATZ,

5           Plaintiffs,

6  V.

7  CENGIZ J. COMU a/k/a CJ COMU,

8           Defendant.

9  DIANE G. REED, TRUSTEE.

10          Intervenor, Co-Plaintiff, and Third-Party
   Plaintiff,
11
V.
12
CENGIZ J. COMU, a/k/a CJ COMU,
13
          Defendant,
14
and
15
PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16  INC., AND SUNSET PACIFIC, L.P.,

17          Third-Party Defendants.

18  BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19  _____

20                    HEARING

21                  JULY 31, 2012

22            9:48 A.M. TO 9:57 A.M

23        HONORABLE STACEY JERNIGAN, PRESIDING

24

25        TRANSCRIPT FROM AUDIO RECORDING

```
 1   Transcript produced from audio recording by:
     LINDA YORK, RPR, CSR
 2   CSR No. 4899, Expiration Date 12/31/15
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC AND RONALD KATZ:

 8        MR. EMIL LIPPE, JR.
          Law Offices of Lippe & Associates
 9        Plaza of the Americas, South Tower
          600 N. Pearl Street, Suite S2460
10        Dallas, TX 75201
          214-855-1850
11        - AND -
          MR. DAVID WANDER
12        Davidoff, Hutcher & Citron
          605 Third Avenue, 34th Floor
13        New York, NY 10158
          212-557-7200

14

15   FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
     PLAINTIFF, TRUSTEE DIANE REED:
16
          MR. DAVID ELMQUIST
17        Reed & Elmquist, P.C.
          501 N. College Street
18        Waxahachie, TX 75165
          972-938-7339
19        delmquist@bcylawyers.com

20   FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
     BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
21   COMU:

22        MR. DENNIS OLIVER OLSON
          Olson, Nicoud & Gueck, LLP
23        1201 Main Street, Suite 2470
          Dallas, TX 75202
24        214-979-7300
          denniso@dallas-law.com

25
```

1                              I N D E X

                                                              Page
2

3

4
      Certification of Transcriptionist.............    11
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              * * * P R O C E E D I N G S * * *

2              THE COURT:  All right.  Turning back now to

3  matter number two, King Louie Mining, LLC versus Comu,

4  adversary 10-3269.

5              We'll take appearances from counsel.

6              MR. WANDER:  Your Honor, David Wander of

7  Davidoff, Hutcher & Citron, co-counsel for plaintiff

8  King Louie.

9              THE COURT:  Okay.  Thank you.

10             MR. ELMQUIST:  Good morning, Your Honor,

11 David Elmquist on behalf of Diane Reed, trustee.

12             THE COURT:  Okay.

13             MR. LIPPE:  Emil Lippe on behalf of

14 plaintiff King Louie with Mr. Wander.

15             THE COURT:  Okay.

16             MR. OLSON:  Dennis Olson representing the

17 debtor defendant.

18             THE COURT:  Okay.  All right where do

19 things stand here?  We've got a pretty old adversary

20 proceeding now and we have had it in an abatement phase

21 for many months.  I think our last reports,

22 Mr. Elmquist, were the trustee continued to evaluate

23 whether she wanted or thought it was appropriate to

24 intervene.  The nature of the adversary is a request to

25 revoke the debtor's discharge, correct, as well as
```

Case 10-03269-sgj Doc 180 Filed 10/22/14   Entered 10/22/14 13:37:46   Page 5 of 11
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 64 of 256   PageID 1057

5

1   fraudulent transfer claims.

2            MR. ELMQUIST:  That is correct, Your Honor.

3            THE COURT:  Okay.

4            MR. ELMQUIST:  Let me give the Court a

5   brief report on where we are.  We are close to

6   concluding and have presently scheduled the final

7   examinations, the conclusion of Mr. Comu's 2004

8   examination and we have also scheduled two other

9   examinations that we felt we needed to do based upon the

10  examinations and document review we have done to date

11  that being Mr. Comu's wife and Mr. Comu's tax accountant

12  preparer.

13            THE COURT:  Okay.

14            MR. ELMQUIST:  Those are scheduled for time

15  frame of August 7 to August 9.  I have discussed with

16  Mr. Olson the fact that once we have that examination

17  concluded, the trustee can and will proceed to file a

18  motion to intervene and complaint and intervention.  Our

19  claims won't -- we won't be adopting the claims that

20  King Louie has filed.  We will have other claims to

21  assert.  But they arise out of the same transactions

22  that are set forth in the King Louie complaint, so we

23  think -- and I think counsel has agreed that it's

24  appropriate that the trustee's claims be tried along

25  with the King Louie claims that are asserted.

1              Specifically with respect to fraudulent

2    transfer claims, Your Honor, based upon what we have

3    seen, we don't believe that there are fraudulent

4    transfer claims.  There are claims relating to transfers

5    but not fraudulent transfer claims that would require

6    avoidance under 548.

7              We do believe we can have a complaint on

8    file and intend to have a complaint on file by the end

9    of August.  And we anticipate having an agreed

10   scheduling order to submit in connection with that.  I'm

11   hopeful that the motion to intervene and the complaint

12   and intervention will be agreed to by the debtor so that

13   we can submit an agreed order on that and in conjunction

14   with that so we'll have a complaint and intervention

15   filed and in conjunction with that the parties can get

16   together and submit a proposed agreed scheduling order

17   to get this case back on track.

18             Mr. Comu and his counsel have been very

19   cooperative in terms of providing information documents

20   but it's taken quite some time because of the breadth of

21   the information requested and the fact that we're going

22   to bank records that go back several years and going to

23   a number of different business entities.  It's just

24   taking a considerable amount of time to pull all that

25   together.

Case 10-03269-sgj Doc 180 Filed 10/22/14   Entered 10/22/14 13:37:46   Page 7 of 11
Case 3:14-cv-04163-B  Document 1-5  Filed 11/21/14   Page 66 of 256  PageID 1059

7

1          But we do now have -- not everything we

2     asked for but the lion's share of it so we can conclude

3     those examinations and get this case moving forward.

4          THE COURT:  All right.  Who else wishes to

5     be heard?

6          MR. LIPPE:  Your Honor, Emil Lippe.  The

7     plaintiff has been ready to proceed with discovery to

8     prepare for trial.  We have supported and agreed to the

9     trustee's investigation and happily the result of the

10    2004 examinations and the document productions will be

11    to shorten the discovery that would otherwise be

12    required in the pursuit of our claims, so it has not

13    been a fruitless delay.

14          We will join in and support the motion to

15    intervene at the appropriate time and will do our best

16    to work with the trustee in moving the case forward

17    expeditiously.  Mr. Olson has been cooperative and I

18    believe the parties can agree on a schedule that will

19    satisfy the Court.

20          THE COURT:  All right.  Mr. Olson, anything

21    you wanted to say?

22          MR. OLSON:  Yes, ma'am, just very briefly.

23    I believe that Mr. Elmquist when he files his plea and

24    intervention or his complaint will not be seeking to

25    revoke the discharge.  So I think that the first order

Case 10-03269-sgj Doc 180 Filed 10/22/14   Entered 10/22/14 13:37:46   Page 8 of 11
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 67 of 256   PageID 1060

8

1  of business would be to schedule our 12(b)(6) motion on

2  the plaintiff's motion to revoke discharge.  Then I

3  think the scheduling order for whatever's left would be

4  appropriate.

5                I also think that Mr. Elmquist and I will

6  probably be able to settle his complaint, so just to put

7  that into the mix.  We will agree to the intervention.

8                THE COURT:  All right.  So there has been a

9  12(b)(6) motion pending during all this time of

10 abatement?

11               MR. OLSON:  Yes, ma'am.

12               THE COURT:  Okay.  All right.

13 Mr. Elmquist, do you -- are you able to say today

14 whether you're going to be joining in the --

15               MR. ELMQUIST:  The 727 action?

16               THE COURT:  -- the 727 action?

17               MR. ELMQUIST:  I can't say definitively,

18 Your Honor.  I can't say based upon what I -- what we

19 have done thus far in the examination, document review.

20 I'm not finding a basis for 727 revocation of discharge.

21 But we haven't concluded the examination.  But if I had

22 to say today whether or not we would be joining in that,

23 I would say probably not.

24               THE COURT:  Okay.  Did you all get to

25 respond, Mr. Lippe, to the 12(b)(6) motion before the

1    abatement was instituted, do you even remember?

2                    MR. LIPPE:  I don't recall, Your Honor.  I

3    would need to look at the pleadings file.  We would

4    request probably with the passage of time and with the

5    discovery leave to supplement our response and perhaps

6    even amend the pleading.  I would need to review the

7    documents.

8                    THE COURT:  All right.  Well, here is all

9    we will do for now.  I want to make sure we stick to the

10   plan announced here today and get things on track so,

11   Laura, we will do an order terminating abatement of the

12   adversary proceeding.  It will be a very simple order

13   that, number one, gives a complaint to the trustee --

14   gives a deadline to the trustee for filing her complaint

15   and intervention of August 31st.

16                   And then I'm going to further submit a

17   deadline for the parties to submit an agreed form of

18   scheduling order by September 14th and then if the

19   parties do not, then the Court's going to simply

20   generate the standard form of scheduling order that the

21   clerk's office would normally generate absent an agreed

22   order.

23                   And I am thinking probably we'll stick in a

24   January trial docket call and January trial setting

25   again absent an agreement of the parties that they want

```
 1   to propose to the Court.
 2                And then as far as the 12(b)(6) motion, I'm
 3   hoping that the parties will agree as part of the agreed
 4   scheduling order I'm anticipating, on response deadlines
 5   supplementation, and then we will contact my courtroom
 6   deputy for a setting.  But if you all don't do that as
 7   part of an agreed scheduling order that you submit by
 8   September 14th, then the Court will also, as part of the
 9   scheduling order I crank out, will put in some deadlines
10   for the 12(b)(6) motion.
11                All right.  Anything else?
12                MR. ELMQUIST:  No, Your Honor.
13                (Adjourned.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          CERTIFICATE

 2

 3   COUNTY OF LUBBOCK    )

 4   STATE OF TEXAS       )

 5

 6           I, Linda York, Registered Professional

 7   Reporter and Certified Shorthand Reporter in and for the

 8   State of Texas, do hereby certify that the foregoing

 9   pages contain a full, true and correct transcript, to

10   the best of my ability, of audiotape furnished by the

11   Clerk of the Bankruptcy Court.

12

13           Given under my hand this the 16th day of

14   October, 2014.

15

16

17                           /s/_____
                             LINDA YORK, CSR No. 4899
18                           Expiration Date: 12/31/15
                             Cathy Sosebee & Associates
19                           Firm Registration No. 49
                             P.O. Box 86
20                           Lubbock, TX  79408
                             806.763.0036
21

22

23

24

25
```

1                IN THE UNITED STATES BANKRUPTCY
              NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3
KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4 RONALD KATZ,

5          Plaintiffs,

6 V.

7 CENGIZ J. COMU a/k/a CJ COMU,

8          Defendant.

9 DIANE G. REED, TRUSTEE.

10          Intervenor, Co-Plaintiff, and Third-Party
Plaintiff,
11
V.
12
CENGIZ J. COMU, a/k/a CJ COMU,
13
          Defendant,
14
and
15
PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16 INC., AND SUNSET PACIFIC, L.P.,

17          Third-Party Defendants.

18 BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19 _____

20
    MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
21
                OCTOBER 31, 2012
22
           10:09 A.M. TO 10:48 A.M.
23
      HONORABLE STACEY JERNIGAN, PRESIDING
24
       TRANSCRIPT FROM AUDIO RECORDING
25 _____

1   Transcript produced from audio recording by:
    LINDA YORK, RPR, CSR
2   CSR No. 4899, Expiration Date 12/31/15
    Cathy Sosebee & Associates
3   Firm Registration No. 49
    P.O. Box 86
4   Lubbock, TX  79408
    806.763.0036
5
    APPEARANCES:
6
    FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
7   ENTERPRISES, LLC AND RONALD KATZ:

8        MR. EMIL LIPPE, JR.
         Law Offices of Lippe & Associates
9        Plaza of the Americas, South Tower
         600 N. Pearl Street, Suite S2460
10       Dallas, TX 75201
         214-855-1850
11       - AND -
         MR. DAVID WANDER
12       Davidoff, Hutcher & Citron
         605 Third Avenue, 34th Floor
13       New York, NY 10158
         212-557-7200

14

15  FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
    PLAINTIFF, TRUSTEE DIANE REED:
16
         MR. DAVID ELMQUIST
17       Reed & Elmquist, P.C.
         501 N. College Street
18       Waxahachie, TX 75165
         972-938-7339
19       delmquist@bcylawyers.com

20  FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
    BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
21  COMU:

22       MR. DENNIS OLIVER OLSON
         Olson, Nicoud & Gueck, LLP
23       1201 Main Street, Suite 2470
         Dallas, TX 75202
24       214-979-7300
         denniso@dallas-law.com

25

1

I N D E X

2                                                          Page

3

4      Ruling........................................  25

5     Certification of Transcriptionist.............  29

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  * * * P R O C E E D I N G S * * *

2                  THE COURT:  Adversary proceeding King Louie

3   Mining, et al versus Comu, et al.  This is adversary

4   10-3269.

5                  Let's start by getting lawyer appearances.

6                  MR. LIPPE:  Good morning, Your Honor, Emil

7   Lippe for King Louie Mining and King Louie

8   Enterprises --

9                  THE COURT:  Okay.

10                 MR. LIPPE:  -- Katz, plaintiffs.

11                 THE COURT:  Okay.

12                 MR. OLSON:  Good morning, Your Honor,

13  Dennis Olson for the defendant movant.

14                 THE COURT:  Okay.

15                 MR. ELMQUIST:  Your Honor, David Elmquist

16  on behalf of Diane Reed.

17                 MR. WANDER:  David Wander co-counsel for

18  plaintiff.

19                 THE COURT:  Okay.  We kind of had some

20  bleed over there.

21                 Mr. Wander, we're still getting appearances

22  in the courtroom so hold on a minute.

23                 MR. ELMQUIST:  Thank you, Your Honor.

24  David Elmquist on behalf of Diane Reed, the intervenor.

25  Your Honor, the trustee has not taken a position on this

1   motion.  We're here just to listen to the argument.

2                 THE COURT:  All right.

3                 Now go ahead, Mr. Wander.

4                 MR. WANDER:  Yes, Your Honor, David Wander

5   of Davidoff, Hutcher & Citron, co-counsel for plaintiff.

6   And my pro hac vice papers have been filed with the

7   Court by Mr. Lippe.

8                 THE COURT:  All right.  Thank you.  I think

9   I may have already signed an order approving your pro

10  hac vice.

11                All right.  Well, I am very, very confused.

12  We have an adversary proceeding that was filed

13  September 3rd, 2010 in a bankruptcy case that has been

14  on file since December 31st, 2009.  We, of course, had a

15  long period of abatement and ultimately the trustee has

16  intervened.  And it looks like the adversary proceeding

17  is continuing to morph as I speak.

18                So let me hear what you all thought you

19  were going to present today.  All I technically have is

20  a motion to dismiss the second amended complaint filed

21  by King Louie Mining.  That's all we technically had set

22  today.  But I see pleadings are being filed until last

23  night, I guess, was the last one.

24                So what do you all think you're arguing

25  this morning?  And then we're going to figure out what

1   we are going to hear.

2               MR. LIPPE:  Emil Lippe, Your Honor.  The

3   only thing on the docket is, as the Court said, the

4   motion to dismiss.  We -- as you may recall at the last

5   status conference, you instructed us to reach an

6   agreement as to a calender for (inaudible) motion to

7   dismiss and to include that in the proposed agreed

8   scheduling order.  We did that.

9               I filed my supplementary response according

10  to that calendar.  Mr. Olson filed his reply to our

11  latest filing according to that calendar.  In his

12  supplemental response, Mr. Olson raised certain points

13  such as you didn't get leave to file your third amended

14  complaint, which I'll argue the merits of that when the

15  Court deems appropriate.  But we thought it was implicit

16  in the scheduling order; it was not explicitly stated.

17  The Court did not explicitly grant leave at the status

18  conference, nor did the Court even explicitly

19  (inaudible) leave to the trustee, although we thought

20  that was implicit in what was going on.

21              So out of an abundance of caution to

22  respond to Mr. Olson's arguments, we are seeking leave

23  to have our (inaudible) considered and we are seeking

24  formal leave for permission to file our third amended

25  complaint.

```
 1                    And I don't know that leave is necessary
 2   for filing the third amended complaint, but we certainly
 3   want to seek leave if it is necessary.  And so that's
 4   why we filed that.
 5                    THE COURT:  All right.  So what do you
 6   think we're arguing today?  I mean --
 7                    MR. LIPPE:  Well, the motion to dismiss.
 8                    THE COURT:  It's as to a second amended
 9   complaint.
10                    MR. LIPPE:  Okay.  If that's all that --
11                    THE COURT:  And you're not even -- you're
12   not wanting to go forward with it.  You're wanting to go
13   forward with the third amended complaint.
14                    MR. LIPPE:  We have filed our third amended
15   complaint.  It does change certain legal contentions.
16   Since we filed our second amended complaint, the trustee
17   has intervened.  The trustee is asserting claims that
18   the Court had observed earlier.  We, as creditors,
19   didn't have standing.  So we are now as creditors in the
20   third amended complaint only asserting 727 claims which
21   creditors do have standing to assert.  So --
22                    THE COURT:  Okay.
23                    MR. LIPPE:  -- if the Court grants us leave
24   to file the third amended complaint, we believe the
25   motion to dismiss the second is moot.
```

```
1              THE COURT:  All right.  So let me respond
2    to something you just said.  You said in the third
3    amended complaint --
4              MR. LIPPE:  Yes.
5              THE COURT:  -- you're only pursuing 727,
6    revocation of discharge?
7              MR. LIPPE:  We're seeking revocation of
8    discharge.  Maybe I cited the wrong section.  And I
9    apologize.
10              THE COURT:  No, 727 is correct, but you've
11   added eight defendants.
12              MR. LIPPE:  Yes.  And these defendants --
13   these defendants are the -- we claim, the alter egos of
14   Mr. Comu and entities under his control as of the date
15   of filing.  And we believe that in order for the Court
16   to grant full and complete relief under the revocation
17   of discharge and to bring in all the assets, that should
18   have been included.
19              THE COURT:  Well, bringing in assets and
20   alter ego is wholly different from 727.
21              MR. LIPPE:  Okay.
22              THE COURT:  And so we seem to be back at
23   the point the Court observed many months ago of these
24   being estate claims and causes of action.
25              Clearly, a creditor can bring a 727
```

1  revocation of discharge action.  But when you get into

2  veil piercing, alter ego, bringing in assets as property

3  of the estate, then we're back in the area of these

4  being estate claims causes of action remedies.

5            That's, you know -- so there's the issue of

6  your third amended complaint does more than seek

7  revocation of discharge, and then the issue of you have

8  standing to be doing that, in addition to, you know, was

9  leave appropriate.  So I'm kind of confused.  I thought

10  the purpose of sort of the stand-down we had and the

11  abatement period all these months was for the trustee to

12  evaluate did he think there were valid reasons to go

13  against third parties and bring in assets.  And then now

14  he's filed a complaint and intervention and is doing

15  that.

16            So why are we still going down these

17  separate, what seem like, duplicative trails?

18            MR. LIPPE:  Well, we certainly join in all

19  the relief that the trustee is asking for and we would

20  seek to assist and essentially try to help out --

21            THE COURT:  Well, that's --

22            MR. LIPPE:  -- to the extent appropriate.

23            THE COURT:  -- all perfectly fine.

24            MR. LIPPE:  We have added additional

25  defendants who we believe are necessary.  If the Court

1  determines that we don't have standing to bring those in

2  at this time, we would probably, if the trustee does not

3  choose to act with respect to those, seek leave

4  derivatively to assert those claims in situations where

5  the trustee has chosen not to.  And I realize there are

6  issues there that I could discuss today, but are

7  probably not directly within the ambit of the hearing.

8           I mean our position simply would be that we

9  believe to afford full relief for the benefit of the

10 estate, these additional parties should be added because

11 they are now in possession of monies that are derivative

12 of rights that Comu had before the bankruptcy.  Now, how

13 you draw the line between concealment of assets and

14 fraudulent transfer I think is an interesting question.

15          And we believe that assets were concealed

16 by putting them in third parties names.  And I mean

17 we've gone into that in great detail in our complaint.

18 The wife, The Barclay Group, and then trusts created

19 that took over the rights of the Barclay Group, all

20 those things.

21          THE COURT:  All right.  Well --

22          MR. LIPPE:  We'll follow the procedures the

23 Court instructs.

24          THE COURT:  All right.  Well, I thought we

25 were going to be clear about that a few months ago.  I'm

```
 1   confused.  Is there something you think your complaint
 2   adds that the trustee's complaint and intervention
 3   doesn't cover?
 4              MR. LIPPE:  Well, the revocation of
 5   discharge clearly.
 6              THE COURT:  Well, yes, okay.
 7              MR. LIPPE:  And --
 8              THE COURT:  That's perfectly fine for a
 9   creditor to go forward with that.  But the trustee's
10   complaint and intervention filed in September.  It has
11   added defendants Phyllis Comu, Bernard Brown, The
12   Barclay Group, and Sunset Pacific.  It asks for
13   declaratory judgment, the Barclay and Sunset Pacific are
14   alter egos of Comu.  It asks for veil piercing, reverse
15   corporate veil piercing as to Barclay Group, then Sunset
16   Pacific.  It asks for turn-over of property.
17              I guess I'm trying to figure out, what, are
18   there additional entities you -- in your third amended
19   complaint --
20              MR. LIPPE:  The additional --
21              THE COURT:  -- you have added some
22   additional defendants that aren't in the trustee's.
23              MR. WANDER:  Your Honor, this is David
24   Wander.  May I address the Court's comments?
25              THE COURT:  You may.
```

1          MR. WANDER:  What I would suggest is for

2    purposes of our third amended complaint, we would have

3    in our caption the defendant would just be the debtor

4    Mr. Comu on the 727 actions.  Then have the trustee

5    beneath that, as the intervenor coplaintiff and

6    third-party plaintiff.  And the trustee's asserted the

7    claims against Phyllis Comu, Bernard Brown and two

8    corporate entities.

9          We will simply speak with the trustee as to

10   whether he -- whether she would amend the complaint to

11   include the additional entities that we had listed.  But

12   for purposes of our 727 action, we will just list the

13   debtor as the defendant.

14          THE COURT:  All right.  Let me ask

15   Mr. Elmquist, I mean you say you're just basically here

16   to observe and not take a position, but I --

17          MR. ELMQUIST:  Given the issues Your

18   Honor's raised, I think I need to clarify a point or

19   two, Your Honor.  I frankly was a bit confused in terms

20   of second versus third amended complaint as it relates

21   to the motion to dismiss.  I do think that it is still

22   -- there is issue jointed with respect to whether the

23   727 revocation should be dismissed under 12(b)(6).  I

24   think Mr. Olson is arguing that.

25          MR. OLSON:  Certainly, because there's been

1    no compliance with the handful of orders previously

2    entered by this Court in this adversary.

3                 MR. ELMQUIST:  So the -- well, the 727 as I

4    understood it, what was still a live issue was the

5    dismissal of the revocation count of the second amended

6    complaint and the third amended complaint.

7                 As it relates to the additional defendants

8    that King Louie Mining would like to add with respect to

9    their third amended complaint, these are parties that

10   I'm familiar with.  The trustee after doing the --

11   through counsel doing extensive 2004 examinations

12   determined the parties that we felt were appropriate to

13   name as additional defendants.  And at this juncture I

14   don't believe the additional defendants that the King

15   Louie Mining would like to add are appropriately added

16   to the complaint simply because what we're talking about

17   with respect to the Daptco Trust, the TKY Trust,

18   Marathon Management and Regus Advisors, these are all

19   entities in which Mr. Comu either has an interest or a

20   family relation has an interest.  They're obligations

21   that relate to ultimately Mr. Comu's involvement with

22   The Barclay Group, which is the centerpiece of really

23   what Your Honor will eventually be hearing about as

24   relates to the business activities Mr. Comu was engaged

25   in.  It all centers around The Barclay Group.

1          So for instance, with respect to TKY Trust

2    and the Daptco Trust, those -- they come into the

3    picture because those trusts have promissory note

4    obligations to The Barclay Group.

5          If the Court ultimately determines that the

6    piercing the corporate veil theory or relief that we can

7    recover The Barclay Group assets, then one of those

8    assets will be --

9          THE COURT:  -- notes receivable.

10         MR. ELMQUIST:  -- those notes receivable.

11   And at that point we will pursue claims against Daptco

12   and TKY.  But at this juncture since the Court has made

13   no determination that the Barclay Group is the alter ego

14   of Mr. Comu, we did not think it appropriate to name TKY

15   Trust or Daptco Trust as defendants.  In fact, I think

16   they would be subject to 12(b)(6) motion because there's

17   no basis for the trustee to seek relief directly against

18   those entities at this juncture.

19         So that was the reason we didn't include

20   them.  As far as Regus Advisors and Marathon Management

21   are concerned, those are entities that Mr. Comu has done

22   business under since the filing of the bankruptcy case

23   and I did not, from the examination, find any basis for

24   seeking relief from those entities as a basis for any

25   kind of recovery.  Again, I think the crux of the basis

1  for recovery is The Barclay Group is the alter ego and

2  Sunset Pacific and not these entities under which

3  Mr. Comu has done business since the filing.

4           I mean those are issues I guess Your Honor

5  can take up in connection with the request to leave to

6  file the third amended complaint as whether or not the

7  claims asserted are appropriately asserted at this

8  juncture by King Louie Mining.  But based upon my

9  analysis, I don't believe those claims against those

10 third parties are claims that either -- for which either

11 King Louie has standing or present a viable claim at

12 this juncture.

13           THE COURT:  Okay.

14           MR. ELMQUIST:  Having said all that, I do

15 think that the Court can proceed this morning and I

16 thought what was going to be heard this morning would be

17 the issue of whether or not the 727 count should be

18 dismissed under 12(b)(6).

19           THE COURT:  Okay.  Well, Mr. Olson, let me

20 hear your argument on your motion to dismiss.  And

21 again, I view it as Mr. Elmquist has just articulated,

22 it pertains to the 727 action.

23           MR. OLSON:  I think that's where we're at.

24 And I have answered the complaint and intervention.  But

25 we're dealing with a situation here where the plaintiffs

1  had a fraud judgment prepetition and have been actively

2  participating at the meeting of creditors and in

3  discovery by the trustee, and they did not file an

4  objection to discharge or an exception to discharge.

5  And after the discharge was entered when they come back

6  under 727(d) there's a heightened requirement there.

7  They've got to plead and show what in the world is it

8  that they now know that they didn't know when the

9  discharge was entered.  And we filed a 12(b)(6) in

10  response to that.  And they exercised their one time

11  right to amend and mooted that motion.

12            So I filed a second motion to dismiss.  And

13  a year and a half ago this Court ordered -- and I have

14  got copies if you'd like for me to hand them up to you.

15            THE COURT:  You may.

16            MR. OLSON:  The brief and the argument that

17  we had at the hearing on the second motion to dismiss

18  was plaintiffs have failed to state a cognizable claim

19  against the defendant for fraud under 727(d) and the

20  fraud was not pled in accordance with (9)(b).  After

21  hearing that argument, the Court entered that February

22  order and said "we're going to give you one last chance

23  to plead and you have to specify the subsections of 727

24  relied on.  You have to show when and how you learned

25  your facts.  And if you're claiming fraudulent

1  transfers, you must in each instance state when the

2  transfer was made and explain your standing to prosecute

3  the fraudulent transfer claim."

4          The amended pleading was filed which

5  prompted my third motion to dismiss, which is what's set

6  for today, where my position basically is they didn't

7  comply with any of the requirements in that February

8  order, nor did they comply with the requirements in the

9  March order.  If they were going to try to pursue

10 fraudulent transfers, that's what they had to do.

11         So today we're sitting here with the third

12 motion to dismiss, their second amended complaint, and

13 we have had a whole blizzard of pleadings and motions

14 for leave, all of which are in violation of the agreed

15 scheduling order.  When we reached the point that the

16 trustee was going to intervene and he had filed his

17 complaint, the three lawyers submitted to this Court an

18 agreed scheduling order, which I have handed up to you.

19         And it does not contemplate amended

20 pleadings, period.  It doesn't contemplate adding

21 parties, period.  We were going to litigate what was on

22 file at that time.  There's got to be structure.  The

23 trustee has given you a rational explanation of what he

24 wants to pursue.  He's looked at everything that King

25 Louie and their lawyers have dragged in and said this is

1    what I want to pursue.  Enough is enough.

2                    THE COURT:  Thank you.

3                    All right.  Mr. Lippe, your response.

4                    MR. LIPPE:  First of all, I'm going to

5    simply observe that the specifics now argued orally by

6    counsel are not contained within his motions.  This is

7    indicative of the way the arguments have proceeded on

8    the motions to dismiss.

9                    With respect to our second amended

10   complaint, it is certainly true that the Court did

11   instruct us to amend and say why is it that we didn't

12   know.  I'm paraphrasing.  But basically why didn't you

13   know before the discharge.

14                   Looking at our second amended complaint,

15   after we have alleged that there were sham transfers

16   such as the transfer of -- such as the control of the

17   Barclay Group in Paragraph 24 -- and I'm referring to

18   our second amended complaint -- and the sham transfer to

19   Comu's wife in Paragraph 25, we allege specifically in

20   Paragraph 28, "plaintiffs were not aware of these

21   fraudulent transfers, hidden assets and employment

22   positions of Comu prior to the discharge herein as set

23   forth below in greater detail.  Instead, plaintiffs

24   first learned of information concerning such concealed

25   assets and fraudulent transfers beginning around

1  June 2010.  From informants who had dealt personally

2  with Comu.  Upon information and belief these fraudulent

3  transfers occurred within one year of the bankruptcy

4  filing but were backdated in order to shield the assets

5  from bankruptcy.  Such assets and fraudulent transfers

6  were material and materially impacted the true net worth

7  of the debtor and were fraudulently concealed in

8  violation of law."

9              Paragraph 29, "plaintiffs have been

10  hindered in obtaining full disclosure of all facts" --

11  skipping -- "by Comu's repeated refusal to produce

12  discovery prior to the filing of the petition and his

13  willful concealment of assets and misrepresentation of

14  ownership on the schedules."

15              The detail is then set forth in Paragraph

16  31 where we have listed a number of very specific items

17  which were not fully and effectively disclosed in the

18  schedule.  That paragraph goes on for a page and a half.

19  It talks about loans.  It talks about the Green

20  Automotive stock and a number of other information --

21  items of information, which we learn ed from informants.

22              These were insiders that had worked with

23  Mr. Comu whom he had stabbed in the back.  But he had

24  not stabbed them fatally and so they were able -- I mean

25  figuratively, of course -- and they were able to talk

1   and complain about seeing that he was living the high

2   life.  And we have filed our disclosures -- we have

3   served our disclosures as required by the scheduling

4   orders and we have named these informants.  So the

5   detail is fleshed out even more fully in our third

6   amended complaint which is based upon information that I

7   did not have at the time of filing the second amended

8   complaint, but which adds the specifics that were

9   learned through the 2004 examinations conducted by

10  Mr. Elmquist.

11              For example, we allege that these rights

12  were created prior to the filing of bankruptcy in our

13  second amended complaint.  The details of that are set

14  forth very explicitly in the third.  There was a

15  November 4th, 2009 meeting prior to the December 31,

16  2009 meeting at which various rights were created,

17  various rights that specifically dealt with The Barclay

18  Group's control of Green Automotive, its rights to

19  receive stock in Green Automotive, which is discussed at

20  great length in the trustee's complaint and in our

21  amended complaint, but basically millions of dollars

22  have gone through Comu's hands through entities that he

23  controls as a result of that November 4th, 2009

24  transaction.

25              We only had the outlines of it in our

 1   pleading, but I believe this is clearly a noticed

 2   pleading that sets out how we obtained the information

 3   through informants and when we obtained it after the

 4   discharge and going on for several months thereafter and

 5   I believe we have adequately met the instructions of the

 6   Court with our second amended complaint.

 7              I would simply observe that with respect to

 8   Mr. Elmquist's statements about the two trusts, that's

 9   probably the only thing we disagree with what he said or

10   what he's filed or failed to file so far, otherwise we

11   fully agree with all of the points that he's making.

12              These were entities that on January 10th,

13   10 days after the filing of bankruptcy and five days

14   before the filing of the schedules.  January 10th these

15   two entities, one of which is a trust created for Comu's

16   brother -- for Comu by his brother and one of them --

17   one is for his mother.  These entities supposedly

18   purchased stock from The Barclay Group and gave notes.

19   The notes were due just a few months later.  But they

20   didn't start making payments on the notes until they

21   started -- until Mr. Comu started directing the sales of

22   Green Automotive stock.  And the total sales we've

23   alleged in our third amended complaint -- the total

24   sales grossed over $3 million but only about $600,000

25   ultimately made its way into The Barclay Group because

1   of so-called commissions that they claim they had to pay

2   on these strange sales, commissions that would be far in

3   excess of what is legal and proper.

4              And so the promissory notes executed by

5   these trusts that Mr. Comu created right after he filed

6   for bankruptcy were a sham designed to put stock in the

7   hands of another couple of entities that he controlled

8   and the value is not in the promissory notes.  The value

9   is in the Green Automotive stock that those entities

10  acquired which really belong to The Barclay Group and

11  which Comu controlled through The Barclay Group as of

12  November 2009.

13             So we believe that for the Court to enter a

14  fully effective and valid judgment with respect to The

15  Barclay Group and the Green Automotive stock that it

16  controlled prior to the filing of bankruptcy and the

17  rights that it had acquired prior to filing bankruptcy

18  that those entities should be part -- should be brought

19  before the Court.

20             Now, procedurally whether the trustee

21  brings them in, whether we bring them in with leave of

22  Court -- subject to leave of Court, that will be for the

23  Court to say.  But that's our argument as to why we

24  believe they should be part of this proceeding.

25             I believe we have set forth the detail as

Case 10-03269-sgj Doc 181 Filed 10/22/14   Entered 10/22/14 13:39:19   Page 23 of 29
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 93 of 256   PageID 1086

23

1   to why we didn't know about these transfers before the

2   discharge and how we have learned of them, and, I

3   believe, was set forth in detail in the second amended

4   complaint, some of them, and then our third amended

5   complaint when and if we're granted leave to file it

6   adds to that detail.

7                    THE COURT:  All right.

8                    Mr. Olson.

9                    MR. WANDER:  Your Honor, this is David

10  Wander.  Can I address some points?

11                    THE COURT:  Okay.  Briefly.

12                    MR. WANDER:  Yes.  Your Honor, the true

13  nature of the debtor's fraudulent conduct did not become

14  apparent until well over two, two and a half years after

15  the bankruptcy filing.  Most of the details came out

16  through the trustee's discovery, which we participated

17  in.

18                    It took the trustee over two and a half

19  years to get the facts that form the basis of the

20  complaint relating to the fraudulent transfers.  The

21  true nature didn't really come to light until the stock

22  of Green Automotive started to be sold for millions

23  dollars apparently by The Barclay Group and by the

24  trust.  These sales did not occur until I believe the

25  first one was June 23rd, 2011, then January 10th, 2012.

Case 10-03269-sgj Doc 181 Filed 10/22/14 Entered 10/22/14 13:39:19 Page 24 of 29
Case 3:14-cv-04163-B Document 1-5 Filed 11/21/14 Page 94 of 256 PageID 1087

24

1    Those sales by The Barclay Group.  And then the sales by

2    the trust occurred December 23rd, 2011 and June 16th,

3    2012.

4              So the information basically underlying not

5    only the trustee's fraud claims or declaratory judgment

6    that the assets that Comu had not scheduled were really

7    his assets as well as the facts underlying the

8    revocation of discharge didn't come out until well over

9    two years after the bankruptcy filing.  And I note in

10   the -- in Your Honor's decision in re: Cooper, the

11   revocation for discharge was filed I believe

12   approximately six years, six to seven years after the

13   filing date.

14             Thank you, Your Honor.

15             THE COURT:  All right.  Thank you.

16             Mr. Olson, you get the last word.

17             MR. OLSON:  Your Honor, at the time the

18   agreed scheduling order in this case was entered into,

19   the trustee's complaint was of record.  If they wanted

20   to add parties, if they wanted to amend pleadings, that

21   was the time to say so and argue for it in the

22   scheduling order.  They did not do that.

23             Now, at the time that agreed scheduling

24   order was entered into, they had already replied to my

25   motion to dismiss the second amended complaint.  They

1  asked for and I agreed to the right for them to

2  supplement that.  That's all they asked for.

3           Now, to come in this week and say, well, we

4  want to further supplement.  We want to sur-reply.  We

5  want to add an amended complaint.  We want to do all

6  these things, they're out of time.

7           THE COURT:  Thank you.  All right.

8           The Court first denies the debtor

9  defendant's motion to dismiss the second amended

10 complaint of King Louie Mining, which complaint was

11 filed March 2nd, 2011.  The Court believes that this

12 second amended complaint pleads with specificity a

13 plausible claim on its face, a plausible claim under

14 Section 727(d) of the Bankruptcy Code for possible

15 revocation of discharge.

16          And the Court also believes the particulars

17 -- the plaintiffs did give the particulars that the

18 Court required in this Court's February 24th, 2011

19 order.  Looking at that order, the Court directed the

20 plaintiffs be given one more chance to amend their

21 complaint and plead with sufficient specificity their

22 allegations against the defendant.  The plaintiffs next

23 amended complaint must particularly identify the

24 subsections of 727(d) the plaintiffs rely upon and state

25 when an how plaintiffs learned of the facts which are

1    the basis for their complaint, et cetera.

2                 The Court does believe that the -- again,

3    the second amended complaint came back and did give the

4    particulars, and under the case law construing Rule

5    12(b)(6) there is stated a plausible claim.

6                 So defendant's motion to dismiss is denied.

7                 But additionally, the Court is going to go

8    ahead and rule on the motion for leave to file third

9    amended complaint even though it was not technically

10   noticed and set today, and I'm going to deny that.

11                The Court does believe it made clear in

12   this February 24th, 2011 order that it was giving the

13   plaintiffs one more chance.  That's exactly the words

14   the Court used.  So no more amendments by plaintiffs

15   King Louie Mining.  That means that what we have is as

16   the controlling pleadings in this case the King Louie

17   Mining second amended complaint filed on March 2nd,

18   2011 -- that's docket entry number 20 -- and the

19   trustee's complaint in intervention.  Those are the

20   governing pleadings now.  You know, certainly this is

21   without prejudice to the trustee under Rule 15 seeking

22   leave to amend.  But I'm not inviting that, encouraging

23   that.  I'm just saying he is not barred -- or she is not

24   barred.

25                But I think -- I think we have very fulsome

1  complaints now and we need to stick to these deadlines

2  in the scheduling order and move ahead.  I should add

3  that one additional reason I'm denying the motion for

4  leave to file third amended complaint is not just the

5  fact that I said one more chance in the February 24th,

6  2011 order, but I think it would be an exercise in

7  futility.  It is the trustee who has standing to pursue

8  assets of third parties and to bring the alter ego

9  remedy request and the reverse corporate veil piercing

10  request.

11         So, again, the trustee is the lead party on

12  that.  So we have our governing pleadings now.  We have

13  a ruling on the motion for leave to file third amended

14  complaint.

15         Any other housekeeping matters that the

16  parties want to raise at this juncture?  I think we're

17  clear now, right?

18         MR. OLSON:  I hope, Your Honor.  Let me

19  approach.

20         THE COURT:  Okay.

21         MR. OLSON:  The second amended complaint

22  alleges 727(d) --

23         THE COURT:  Right.

24         MR. OLSON:  -- which survives under the

25  Court's ruling.

1              THE COURT:  Right.

2              MR. OLSON:  It also complains about certain

3    transfers without having standing to pursue those.  May

4    I safely ignore those and focus on the 727(d)

5    allegations in that complaint --

6              THE COURT:  Well --

7              MR. OLSON:  -- and focus on the transfers

8    complained of by the trustee?

9              THE COURT:  -- all of the factual

10   allegations are still ripe for litigation.  I mean

11   transfers may be a ground for 727 revocation of

12   discharge.  But as far as avoiding them, seeking to

13   bring them into the estate, that's the trustee's --

14             MR. OLSON:  Limited to those that the

15   trustee wants to set aside?

16             THE COURT:  Correct.

17             MR. OLSON:  All right.  That just --

18             THE COURT:  All right.  So I'm going need

19   two forms of order.

20             Could you, Mr. Lippe, upload those forms of

21   order for me?

22             MR. LIPPE:  Yes, Your Honor.

23             THE COURT:  Okay.  Anything else?  All

24   right.  That concludes this matter.

25             (Adjourned.)

1                            CERTIFICATE

2

3
   COUNTY OF LUBBOCK   )
4  STATE OF TEXAS      )

5

6           I, Linda York, Registered Professional

7  Reporter and Certified Shorthand Reporter in and for the

8  State of Texas, do hereby certify that the foregoing

9  pages contain a full, true and correct transcript, to

10 the best of my ability, of audiotape furnished by the

11 Clerk of the Bankruptcy Court.

12

13          Given under my hand this the 17th day of

14 October, 2014.

15

16

17                         /s/_____
                           LINDA YORK, CSR No. 4899
18                         Expiration Date: 12/31/15
                           Cathy Sosebee & Associates
19                         Firm Registration No. 49
                           P.O. Box 86
20                         Lubbock, TX  79408
                           806.763.0036

21

22

23

24

25

1                 IN THE UNITED STATES BANKRUPTCY
                  NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION

3
KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4 RONALD KATZ,

5             Plaintiffs

6 AND

7 DIANE G. REED, TRUSTEE

8             Intervenor-Plaintiff

9
V.
10
CENGIZ J. COMU, a/k/a CJ COMU,
11
              Defendant.
12

13 BANKRUPTCY PETITION NUMBER:  10-3269

14 _____

15

16                   HEARING ON MOTIONS

17                   AUGUST 15, 2013

18               2:37 P.M. TO 3:15 P.M.

19         HONORABLE STACEY JERNIGAN, PRESIDING

20         TRANSCRIPT FROM AUDIO RECORDING

21    _____

22 Transcript produced from audio recording by:
   LINDA YORK, RPR, CSR
23 CSR No. 4899, Expiration Date 12/31/15
   Cathy Sosebee & Associates
24 Firm Registration No. 49
   P.O. Box 86
25 Lubbock, TX  79408
   806.763.0036

```
 1
      APPEARANCES:
 2
      FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 3    ENTERPRISES, LLC AND RONALD KATZ,

 4         MS. KENDYL T. HANKS
           - AND -
 5         MR. CHARLES P. FLOYD
           Greenberg, Traurig, LLP
 6         2200 Ross Avenue, Suite 5200
           Dallas, TX 75201
 7         214-665-3600
           floydc@gtlaw.com
 8         hanksk@gtlaw.com

 9
      FOR MOVANT AND PROPOSED INTERVENORS:
10
           MR. EMIL LIPPE, JR.
11         Law Offices of Lippe & Associates
           Plaza of the Americas, South Tower
12         600 N. Pearl Street, Suite S2460
           Dallas, TX 75201
13         214-855-1850

14    FOR THE INTERVENOR TRUSTEE, DIANE REED:

15         MR. DAVID ELMQUIST
           Reed & Elmquist, P.C.
16         501 N. College Street
           Waxahachie, TX 75165
17         972-938-7339
           delmquist@bcylawyers.com
18

19    FOR DEFENDANT CENGIZ J. COMU a/k/a CJ COMU:

20         MR. ROBERT NICOUD
           Olson, Nicoud & Gueck, LLP
21         1201 Main Street, Suite 2470
           Dallas, TX 75202
22         214-979-7300
           denniso@dallas-law.com
23

24

25
```

1                            I N D E X
                                                       Page
2

3

4
     Certification of Transcriptionist.............    31
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          * * * P R O C E E D I N G S * * *

2               THE COURT:  We'll do King Louie Mining

3    first versus Comu, Adversary 10-3269.

4               Let's go ahead and get formal appearances

5    on the record from every lawyer here on this matter.

6               MR. LIPPE:  Emil Lippe, Your Honor, on

7    behalf of the movants and proposed intervenors.

8               THE COURT:  Okay.

9               MS. HANKS:  Kendyl Hanks from Greensburg

10   Traurig on behalf of the plaintiffs and in opposition to

11   the motion to intervene.

12              THE COURT:  All right.  Thank you.

13              MR. FLOYD:  Charles P. Floyd, Your Honor,

14   on behalf of plaintiffs, and in opposition to the

15   motion.

16              THE COURT:  Thank you.

17              MR. ELMQUIST:  Good afternoon, Your Honor,

18   David Elmquist on behalf of Diane Reed, intervenor.

19              THE COURT:  Okay.

20              MR. ELMQUIST:  And Your Honor, just so you

21   know, the trustee is unopposed to the motion.

22              THE COURT:  Okay.

23              MR. NICOUD:  Robert Nicoud for C.J. Comu.

24   We likewise are unopposed to the motion.

25              THE COURT:  All right.

Case 10-03269-sgj Doc 182 Filed 10/22/14 Entered 10/22/14 13:41:03 Page 5 of 31
Case 3:14-cv-04163-B Document 1-5 Filed 11/21/14 Page 104 of 256 PageID 1097

5

1        Well, Mr. Lippe, you get to go first.  I

2   guess the first thing I hope you will address is make

3   sure I've got the context correct.  We have a three-year

4   old adversary proceeding at this point.  We have

5   basically arguments for revocation of the debtor's

6   discharge under 727(d).  We have fraudulent transfer

7   allegations, request for declaratory judgment that this

8   Court declare certain property property of the

9   bankruptcy estate, alter ego, corporate veil piercing.

10  I guess it was originally three judgment creditors of

11  the debtor as plaintiffs, but then Ms. Reed intervened

12  because of standing issues.  So we now have

13  co-plaintiffs.

14        It's been pending about three years, so I

15  think that is the context for this.  And then you, of

16  course, formally represented the non-trustee

17  plaintiffs --

18        MR. LIPPE:  Correct.

19        THE COURT:  -- until recently.  All right.

20  So correct me if I've gotten anything wrong or left

21  anything out.  Now your argument.

22        MR. LIPPE:  Well, there's a huge amount of

23  background as we have tried to summarize and capsulize

24  in our motion.  First of all I want to say we have

25  absolutely no desire to interfere with the current

1    scheduling of the trial.  We're requesting leave to

2    intervene and then we will ask that our claims be

3    bifurcated such that the regular schedule go forward.

4    We have no intention of claiming the right to

5    participate in the trial, the main trial, scheduled for

6    next month or to take that dis -- any of that discovery

7    -- pardon me -- but rather our claims go to the rights

8    of recovery of our former clients and our interest to be

9    paid out of their recovery.

10                    And of course I mean I fully --

11                    THE COURT:  Okay.  Let me back up.  Any

12   recovery -- unless there's a special agreement between

13   the trustee and the judgment of creditor plaintiffs that

14   I can't remember -- any recovery is going to come into

15   the bankruptcy estate.

16                    MR. LIPPE:  I think it would have to, yes.

17                    THE COURT:  And then the judgment

18   creditors, I think I read have about 90 plus percent of

19   the claims, so any ultimate dividend to unsecured

20   creditors they get the bulk of.  You're talking about a

21   right to get part of their ultimate recovery as

22   unsecured creditors in the bankruptcy case?

23                    MR. LIPPE:  Yes, Your Honor.

24                    THE COURT:  Okay.

25                    MR. LIPPE:  And our rights as we set forth

1   in our motion and in our proposed complaint are that we

2   had an agreement with the plaintiffs that we would be

3   paid first out of any proceeds that were collected.

4   That is a policy that has been followed through in

5   practice in the past on other claims where we have

6   represented Katz and his related companies.  And it is

7   something that he had promised and assured us on

8   numerous occasions would be followed in this case.  We

9   came to a parting of the ways very shortly -- just a

10  couple months ago.  It's been less than two months since

11  we were replaced by the Greenberg Traurig firm.  And we

12  have done most of the work necessary to get the case

13  ready for trial.  And now disputes have arisen over

14  payments of our fees and claims were filed in state

15  court alleging malpractice which we believe were simply

16  an attempt to avoid payment.

17              The claims that were filed were essentially

18  simultaneously with our motion to intervene.  I

19  conferred with opposing counsel and they waited nearly

20  an hour to respond, and in the interim they

21  electronically filed their lawsuit in state court

22  wanting to say, "ah-ha, we beat you, the state court has

23  primacy."

24              The issues that we're talking about are

25  issues that this Court decides just about every week, I

1  think, reasonableness and necessity of attorneys' fees,

2  reasonable of actions taken.  And --

3               THE COURT:  Okay.  What -- do I have a

4  subject matter jurisdiction problem though right off the

5  bat?

6               MR. LIPPE:  I think there's --

7               THE COURT:  Is there two nondebtor third

8  parties -- and you were not retained as a professional

9  of the bankruptcy estate, the trustee's counsel or any

10  other party in interest counsel pursuant to a Bankruptcy

11  Court order.  So first off, where is my bankruptcy

12  subject matter jurisdiction?

13               MR. LIPPE:  Under diversity.  There's

14  complete diversity and it's in excess of $75,000.  All

15  the defendants --

16               THE COURT:  But that's the district court's

17  jurisdiction.

18               MR. LIPPE:  Yes.

19               THE COURT:  I'm talking about bankruptcy

20  subject matter jurisdiction.

21               MR. LIPPE:  And bankruptcy it relates to

22  these causes of action that the case that we've cited

23  out of the Northern District focuses upon whether an

24  attorney has some sort of right in the action that's

25  being pursued on behalf of his or her client.  And that

1   is what we are asserting.  It's -- it would be the same

2   if we collected money on behalf of our client and then

3   we had the common law attorneys right to retain our fee

4   out of what we've collected.  And --

5               THE COURT:  Okay.  Well, let me back up on

6   my bankruptcy subject matter jurisdiction question.

7   Because that is the first thing that matters here.

8               Don't we strictly look at 28 USC Section

9   1334, and I think you were using some of the buzz words

10  under that statute related to the bankruptcy case.  But

11  the 5th Circuit says the standard we use in deciding if

12  a dispute is related to is the outcome of the dispute

13  could conceivably have an impact on the bankruptcy

14  estate being administered.  Okay.  What is my impact

15  here on the bankruptcy estate being administered, your

16  claim for attorneys' fees against these nondebtor

17  plaintiffs.

18              MR. LIPPE:  It will require analysis of the

19  bankruptcy laws concerning dischargeability.  They have

20  asserted claims that misstate federal bankruptcy law as

21  grounds for alleged malpractice.  They have alleged that

22  this so-called malpractice --

23              THE COURT:  Okay.  Ms. Hanks is standing

24  up.

25              MS. HANKS:  Your Honor, I'm afraid we're

1    going to have to object.  May we approach?

2              THE COURT:  You may.  Well, you want to

3    have a bench conference?

4              MS. HANKS:  Yes.

5              THE COURT:  Okay.  Go ahead and come

6    forward.

7              (Off-the-record bench conference.)

8              THE COURT:  Dawn, we'll go back on the

9    record.

10             Let me tackle this a different way.  Being

11   careful, I guess, not to reveal any attorney/client

12   privileges or to state anything that could be adverse to

13   the plaintiffs' position in the underlying litigation,

14   help me to understand the impact on the bankruptcy

15   estate being administered if you either get a claim for

16   attorneys' fees or not, if the plaintiffs ultimately

17   prevail.  I don't understand the effect on the estate.

18             MR. LIPPE:  The --

19             THE COURT:  Either they get -- either

20   co-plaintiffs get 100 percent of the recovery they're

21   entitled to as a creditor of the Comu estate or I guess

22   they get 67 percent and you get 33 percent or whatever

23   the contingency arrangement was.  But either way, I

24   don't understand the impact on the bankruptcy estate.

25             MR. LIPPE:  Well, in addition to proving up

1  the primary claim against Comu, there would be an

2  attempt to recover attorneys' fees, I presume.  That

3  would have been the next step that, assuming that I was

4  still representing the plaintiffs and assuming that we

5  prevailed at trial, we would then come to the Court and

6  ask the Court to award attorneys' fees in its discretion

7  and it would then be up to the Court to determine

8  whether or not to do so, and if so, the reasonableness

9  and necessity of the fees that were requested.  The

10  trustee is going to come and --

11              THE COURT:  Okay.  So you're saying that it

12  would be a larger award against defendant Comu and the

13  co-defendants potentially?

14              MR. LIPPE:  Yes, against --

15              THE COURT:  If you are allowed to --

16              MR. LIPPE:  -- the defendants.

17              THE COURT:  -- intervene.  Okay.  Assuming

18  that's an impact on the estate, which I still don't see

19  how it is, it's an impact on the defendants, a larger

20  judgment maybe against them.

21              MR. LIPPE:  And --

22              THE COURT:  Humor me.  What would your

23  basis for attorneys' fees be?

24              MR. LIPPE:  That --

25              THE COURT:  I mean 727 and torts, right?

1              MR. LIPPE:  Yes.

2              THE COURT:  So what is the base for

3   attorneys' fees?

4              MR. LIPPE:  Well, the Texas Fraudulent

5   Conveyance Statute allows for recovery of attorneys'

6   fees.

7              THE COURT:  Okay.

8              MR. LIPPE:  And there is an opinion by

9   Judge Houser which in a lengthy case just a couple years

10  ago that I think awarded that in the Kornman and I

11  forget the name of the company right now, the Kornman

12  case.  So we believe that that would be part of what's

13  sought to be recovered.  The amount --

14             THE COURT:  Okay.  So that's --

15             MR. LIPPE:  -- of the trustee's --

16             THE COURT:  -- in the Uniform Fraudulent

17  Transfer Act, I just don't happen to remember that, is

18  that where it is?

19             MR. LIPPE:  Yes, the UFTA.

20             THE COURT:  Well, again, then I guess I

21  will go back to my other question:  How does that impact

22  the estate?

23             MR. LIPPE:  And it also impacts the

24  determination of the timing of various things that

25  occurred in the litigation and who did them, whether it

1   was being done on behalf of the plaintiffs or the

2   trustee.  We were attempting for some time to assert

3   claims on behalf of the estate in the trustee's absence

4   or inaction and the trustee is now chosen to, you know,

5   to join in and to intervene in those claims.  I believe

6   that those assisted the trustee in pursuing and

7   advancing the trustee's interest.  And that would be

8   part of the Court's consideration in the overall

9   administrative expenses of the estate.

10                  THE COURT:  He didn't employ you as special

11  counsel though, correct?

12                  MR. LIPPE:  No.

13                  THE COURT:  And there's no substantial

14  contribution tied to administrative expense claim in

15  Chapter 7.

16                  MR. LIPPE:  There was an agreement at one

17  time to retain us as special counsel.  That never ended

18  up being executed or presented to the Court.  And work

19  was done along those lines.

20                  THE COURT:  All right.  I mean tell me why

21  it doesn't make more sense.  I mean I still am hung up

22  on the subject matter jurisdiction, but assume I could

23  get past that, tell me why it doesn't make more sense to

24  simply let the state court litigation play out, you

25  know, I know what you said about the timing.  They say

1  malpractice, negligence, whatever claims they have

2  against you.  You're obviously able to counterclaim for

3  your attorneys' fees, I mean why doesn't it make more

4  sense to let that happen and then --

5             MR. LIPPE:  Because at its very core, those

6  claims focus upon what was or wasn't done and when it

7  was or wasn't done in this case.  Their claims are based

8  almost entirely upon alleged breaches of duties in this

9  very adversary proceeding, and frankly, I don't believe

10 that there's any other court that can make as complete

11 and accurate and full determination of that issue other

12 than this Court, because the Court was aware from day

13 one of what was or wasn't happening.  The Court

14 supervised -- that's not a good word -- the Court was

15 there and acting as a court in connection with these

16 things and you've seen or what was or wasn't presented.

17 This Court knows the bankruptcy laws.  There are federal

18 laws, determinations of dischargeability, determinations

19 of all these other alleged violations of the federal

20 bankruptcy laws should reside with the Bankruptcy Court.

21 And that's what the claims in the state court are

22 basically focusing on.

23             THE COURT:  So it's a judicial efficiency

24 economy kind of argument?

25             MR. LIPPE:  Yes.  And in fact, we have

1  cited at length for one case that emphasized that

2  congress gave exclusive jurisdiction to determine issues

3  of dischargeability to the bankruptcy courts. So this

4  isn't a predominantly state law claim that we're trying

5  to bring in the bankruptcy court. It's a case involving

6  work done in the bankruptcy court and whether or not

7  that complied with issues of bankruptcy law. We will

8  have our disputes later about which side is right. But

9  I think this Court is the best capable to make that

10  determination.

11         THE COURT: All right. Ms. Hanks, your

12  argument now.

13         MS. HANKS: Thank you, Your Honor. The

14  first thing we would like to do is clear up a couple of

15  things. As an initial matter, the Court is absolutely

16  right, there is a very clear jurisdictional problem

17  here. This is a malpractice dispute between a nondebtor

18  attorney and plaintiffs in this action that has no

19  impact whatsoever on the estate. Either those

20  claims are -- however those claims are resolved, there

21  will or will not be recovery against one party or

22  another either for fees or for breach of fiduciary duty

23  and other claims. But that has nothing to do with the

24  resolution of the bankruptcy -- of the estate in this

25  case.

1            Something that's key that we would like to

2    clarify, the Court said something about the contingency

3    agreement.  There is no agreement here.  There are

4    accrued fees at an hourly basis.  There's no written

5    retainer agreement.  He's seeking reimbursement for

6    those claims.

7            But there is no case out of the 5th Circuit

8    that has ever permitted intervention based on an

9    attorney's claim for accrued fees without some sort of

10   either formal government -- formal legal lien or

11   executed contingency agreement.  And in fact, one of the

12   cases that Mr. Lippe himself cited in his reply brief at

13   Page 3 -- this is the Allen versus Fannie Mae case out

14   of -- 2007 out of the Southern District of Texas by

15   Judge Raney, specifically rejected the idea that they

16   would extend permission to intervene in a bankruptcy by

17   an attorney to something that wasn't strictly a

18   contingency fee agreement that complied with prior

19   precedent.  And so one of the cases he cites in his own

20   brief actually supports not permitting intervention here

21   because that case tracks our situation which is no

22   contingency agreement and no formal lien.

23            And Your Honor, I actually have a copy of

24   that case if --

25            THE COURT:  All right.

```
 1                MS. HANKS:  -- I may.

 2                THE COURT:  You may approach.

 3                MR. LIPPE:  Do you have a copy for us?

 4                MS. HANKS:  It's cited in your brief.  I'm

 5    sorry.  I only had two copies.

 6                THE COURT:  Alam versus Fannie Mae.

 7                MR. LIPPE:  We cited or the case is?

 8                MS. HANKS:  It is cited at Page 3 of your

 9    reply.

10                MR. LIPPE:  Okay.

11                MS. HANKS:  It's Alam A-L-A-M versus Fannie

12    Mae.

13                The second issue that's important in a

14    variety of the elements -- he sought intervention both

15    as a right and as permissive intervention.  And in a

16    variety of these elements the Court asks the question of

17    prejudice.  Is he going to be prejudiced by not being

18    permitted to intervene and are the existing parties

19    going to be prejudiced if he does intervene?

20                Well, first of all, there's been no

21    allegation whatsoever that if he does succeed in his

22    claims for attorneys' fees that he claims are owed,

23    which of course we challenge because we do believe there

24    are a variety of breaches.  But none of that needs to be

25    resolved by this Court.  If he does prevail, there's no
```

1   allegation whatsoever that this is not -- that our

2   client is not a party he could not recover from.

3   There's no allegation whatsoever that once those claims

4   are resolved by the state court that he doesn't have the

5   opportunity to somehow seek remedy.  This isn't someone

6   who's trying to escape jurisdiction.  It's not a party

7   who's not amenable to jurisdiction.  There's been no

8   allegation whatsoever about that.  Now, so there's

9   really no prejudice on his part.

10            The prejudice here is that -- is exactly

11   what we're gravely concerned about, and in fact, we're

12   going to ask the Court to strike from the record

13   Mr. Lippe's reply because he is literally taking a

14   position in defense of his own conduct as an attorney

15   that materially conflicts with his own client's position

16   in this bankruptcy adversary.

17            And so in order for him to intervene in

18   this case and prevail on the claims that he's making

19   right now, he essentially has to undermine the very case

20   that his former client is prosecuting in the adversary.

21   Not only is that not permissible and certainly there's

22   no case law supporting intervention in that situation,

23   it would be a blatant violation of the Texas Rules of

24   Ethical -- of Professional Conduct.

25            Not only concerning conflict of interest

1  but specifically concerning failure to mitigate because

2  there is even though there's a pending state court

3  proceeding, he's now seeking to intervene here with

4  claims that undermine the parties which only exacerbate

5  those damages.

6           Very briefly, just to make sure the Court

7  is fully aware of the circumstances of this filing

8  Mr. Lippe claims this argument, "ah-ha we beat you to

9  the courthouse."  First of all, it's not relevant to the

10 Court's analysis here.  The question is whether, A,

11 there's an interest sufficient to get permission or

12 intervention of right or if the Court has jurisdiction.

13 But more importantly he hasn't filed a petition.  He

14 filed a motion to intervene.  And we have four letters

15 that we are more than happy to provide to the Court

16 beginning on June 27th that on July 2nd, on July 9th and

17 July 17th, trying very hard to get Mr. Lippe's response

18 from malpractice counsel before we filed our petition.

19 We waited approximately -- almost close to a month.

20           MR. LIPPE:  We're going to object to any

21 such argument that's seeking to introduce evidence

22 without foundation, evidence that's not supported by any

23 of the pleadings or briefing and with no advance filing

24 as required by the local rules.

25           MS. HANKS:  Your Honor, just to let you

1   know, in the reply brief that was just filed, the first

2   two pages allege that this is counsel that we, counsel

3   for Katz, took advantage of the requirement of a

4   certificate of conference under the local rules to beat

5   intervenors to the courthouse.  We are responding to an

6   argument he made in his reply and that he made before

7   this Court in this hearing.

8             THE COURT:  All right.  Well, I sustain the

9   objection.  I don't need to see the letters.  I don't

10  feel like they're terribly relevant.

11            MS. HANKS:  There are a variety of other

12  reasons why intervention should be denied not the least

13  of which the Alam case that we have cited to you.  We

14  also have and we've cited in our brief Texas

15  Professional Ethics Committee opinion 610, which

16  specifically says that there is no security interest or

17  other proprietary interest in litigation for an

18  attorney.  They cannot take an interest in litigation

19  the way he's claiming right now unless it is a

20  contingency fee agreement which he has admitted this is

21  not.  He admitted in his briefing.  Or it is a lien

22  granted by law to secure the lawyers' fee or expenses.

23  And that has not happened here.

24            And the cases that he's relied on -- there

25  are four -- none of them apply to this situation.

1    Gaines versus Dixie Carriers, 5th Circuit, 1970, first
2    of all, there's been a lot of case law since then that
3    actually called the Gaines analysis into question.  But
4    in any event Gaines was a contractual interest based on
5    a spined contingency fee agreement that depended on the
6    outcome of the actual adversary proceeding.
7              Gilbert versus Johnson, 5th Circuit, 1979.
8    Under Georgia law the attorney actually had a lien on
9    the client's cause of action for services rendered.
10   There is no lien here.  And Sierra Club versus Espe, the
11   quote, unquote interest in that case was actually
12   property interest in existing timber contracts that had
13   nothing to do with the case here.
14             And finally, the case that Mr. Lippe
15   referred to earlier out of the Northern District of
16   Texas, which -- out of Dallas which is the Bibles the
17   versus City of Irving.  That was a signed retainer
18   agreement also providing for a contingency fee agreement
19   in the underlying litigation.
20             Two really important distinguishing facts
21   here:  No signed contract, no contingency agreement, no
22   lien.  Undisputed facts.  This is just a claim for
23   accrued hourly billables.  The second undisputed fact:
24   The attorneys' fees that he's seeking and his proposed
25   complaint, he claims that this all related to this

1  adversary.  Starting on Page 3 of his proposed

2  complaints and intervention, in Paragraph 9, Mr. Lippe

3  lists five or six different proceedings.  These are

4  proceedings that have been in New York state court,

5  Texas state court.  There was one in arbitration that's

6  currently on appeal in the Dallas Court of Appeals.

7  He's seeking attorneys' fees related to all of these

8  representations, and yet, he's trying to convince the

9  Court that all of these are necessary -- should be

10  decided here even though they have nothing to do with

11  the bankruptcy except to the extent they regard

12  attorneys' fees concerning this adversary.  And all of

13  that can easily be resolved by the state court where the

14  petition is already pending and where an answer will be

15  filed or is due to be filed within the next couple of

16  weeks.

17            Unless the Court has any other questions.

18            THE COURT:  I don't.  Thank you.

19            MS. HANKS:  Thank you, Your Honor.

20            THE COURT:  All right.  Mr. Elmquist, I'm

21  curious to hear from you.  What is the reason you have

22  chosen the position you have taken here?

23            MR. ELMQUIST:  Your Honor, I have --

24  frankly, I have stated that the trustee was unopposed to

25  the motion for the simple reason that Mr. Lippe's claim

1  with respect to his attorneys' fees, according to

2  Mr. Lippe, was not going to affect the presentation of

3  the trial here.  Having heard the argument today, I have

4  to say I don't see a basis for the intervention from the

5  standpoint of subject matter jurisdiction.  I don't see

6  a connection to the estate.  As the Court noted whatever

7  recovery might come from the claim he asserts is not

8  going to have any effect on what ultimately the trustee

9  distributes to the claimant, which is King Louie.  So in

10  other words, as the Court noted, how those dollars get

11  parsed between the plaintiff claimant creditor and

12  Mr. Lippe as counsel has no impact upon the distribution

13  to creditors in this case.  So on that basis I don't see

14  any reason for the intervention.

15            THE COURT:  All right.  The Court is going

16  to deny the motion to intervene.  Rule 24 of the Federal

17  Rules of Civil Procedure is the rule that has been

18  invoked here.  It's applicable in this bankruptcy

19  adversary proceeding because of Bankruptcy Rule of

20  Procedure 7024 which incorporates it.

21            Subsection (a) of Rule 24, of course, deals

22  with when a party might have a right to intervene and

23  then subjection (b) deals with permissive intervention.

24  The Court has determined that neither one of these

25  subdivisions support intervention here.

1          To be clear, this is a very unusual context

2   for seeking intervention.  In any event, I don't think

3   movant has shown that he has an interest here in the

4   subject matter of the adversary proceeding that is

5   sufficient to trigger Rule 24(a) and give him a right to

6   intervene.

7          Moreover, the Court believes that

8   intervention whether permissive or argued as a matter of

9   right would be an inappropriate circumvention of a very

10  real problem of lack of bankruptcy subject matter

11  jurisdiction.

12         As I alluded to, we have essentially two

13  nondebtor third parties with disputes against one

14  another, Mr. Lippe asserting that the nondebtor third

15  parties owe him attorneys' fees, and the co-plaintiffs

16  arguing malpractice and other torts.  These are clearly

17  state law issues and applying 28 USC 1334(b), which is

18  the statute governing bankruptcy subject matter

19  jurisdiction, the Court cannot get to any plausible

20  argument that there is an impact on the bankruptcy

21  estate being administered.

22         Again, as I alluded to, the Court is going

23  to rule however it rules in the underlying adversary

24  which is a 727, objection to discharge, fraudulent

25  transfers, its veil piercing theories, request for

1  declaratory judgment that certain property is property

2  of the bankruptcy estate.  The Court is going to rule

3  however its going to rule.  If I rule in favor of the

4  plaintiffs, there is going to be a pot of money come

5  into the bankruptcy estate, the bankruptcy trustee will

6  administer it and the co-plaintiffs, the respondents

7  here today, are either going to get 100 percent of the

8  dividend that the Bankruptcy Code entitles them to or

9  they're going to have to share some of that dividend, I

10  guess, with Mr. Lippe.

11              But again, this doesn't impact the

12  bankruptcy estate so the Court believes, regardless of

13  whatever judicial efficiency might be argued, the

14  correct thing to do from a jurisdiction standpoint is to

15  allow the state court to decide those issues.  And

16  again, I don't know why Rule 24 is being properly

17  invoked here, so the motion to intervene is denied.

18              All right.  Ms. Hanks, can you upload a

19  simple form of order denying the motion?  And you don't

20  have to reference all of the different reasoning I gave.

21              MS. HANKS:  Your Honor, we actually brought

22  one if you would like a physical copy or we would be

23  glad to upload it.

24              THE COURT:  If you would just upload it,

25  please.

```
 1              MS. HANKS:  Sure.

 2              THE COURT:  All right, thank you.

 3              MS. HANKS:  Your Honor, we also, very

 4   briefly, counsel for the trustee contacted us a couple

 5   days ago because the -- this is unrelated to the motion.

 6   It's regarding the scheduling order.

 7              The depositions for the defendant and --

 8   well, two of the defendants have been pushed back

 9   because electronic discovery is still being conducted.

10   We've got how much --

11              UNIDENTIFIED SPEAKER:  Approximately 80

12   gigabytes.

13              MS. HANKS:  That we have just gotten and

14   have not even had a chance to look at yet.  And we're

15   still trying to do the depositions in September.  We

16   have conferred with counsel -- Elmquist contacted us.

17   We conferred with Olson as well.  And we would like to

18   discuss moving some of the deadlines back because the

19   depositions and the discovery is pushing up so close to

20   the Court's deadlines for pretrial briefing.

21              THE COURT:  All right.  Mr. Elmquist, my

22   staff told me that I guess someone had visited with Dawn

23   about a November trial.

24              MR. ELMQUIST:  Yeah, my paralegal had

25   contacted your staff about the possibilities -- the
```

1  issue is this, Your Honor, the King Louie plaintiffs

2  believe that their portion of the trial that relates to

3  727 actual take close to a week.  My portion of the case

4  that really focuses on the alter ego claims will take a

5  few hours to present.  So all told it's looking like a

6  week trial.  And from the standpoint of the Court's

7  normal trial scheduling, wondering about whether we can

8  get a week-long trial on the Court's November trial

9  calendar or December trial calendar.  October I think is

10  questionable in light of the fact that we have still

11  discovery to complete.  So my main purpose was to simply

12  inform the Court that we're going to have to present the

13  modified scheduling order and other presumably agreed

14  amended scheduling order but also to talk to the Court

15  about how we should go about trying to get a week of

16  this Court's time for trial.

17           THE COURT:  All right.  Well, if everyone

18  is amenable, I agree to continue the trial docket call

19  from September to November.  And Dawn, I think you

20  looked and found there were a few consecutive days in

21  November.

22           (Inaudible).

23           THE COURT:  Okay.  So that is the week of

24  what?

25           MR. ELMQUIST:  It's the week of the 18th of

```
 1  November, Your Honor.
 2                (Inaudible).
 3                MR. ELMQUIST:  Yes.
 4                THE COURT:  Okay.
 5                MR. ELMQUIST:  So that would be --
 6                THE COURT:  I don't have a November
 7  calendar here but --
 8                MR. ELMQUIST:  So I guess Thanksgiving
 9  would be like on the 29th, thereabouts.
10                UNIDENTIFIED SPEAKER:  30th.
11                MR. ELMQUIST:  30th.
12                THE COURT:  Thanksgiving is the 30th.  All
13  right.  So November 18th, is that --
14                MR. ELMQUIST:  That Monday.
15                THE COURT:  All right.  Well, we can go
16  ahead and reserve those dates.
17                UNIDENTIFIED SPEAKER:  Deadlines.
18                MR. ELMQUIST:  We'll push --
19                THE COURT:  Roll everything off of that and
20  we can have a trial docket call -- what would that be --
21  November 4th because we've got a federal holiday, I
22  guess on the 7th.  So we could have a trial docket call
23  November 4th and address any pre-trial, you know,
24  housekeeping matters and confirm that y'all are ready
25  for trial, but we will go ahead and block off, I guess
```

```
 1    November 18th -- the week of November 18th.  And so
 2    hopefully you can get it all done in five days.  If not
 3    we'll --
 4                  MR. ELMQUIST:  Yeah, absolutely.  And if we
 5    find that we can do better once we stipulate, we will
 6    advise the Court.
 7                  THE COURT:  Okay.
 8                  MR. ELMQUIST:  And I guess we're also
 9    trying to mediate this.
10                  MS. HANKS:  Yes.  We will know a lot more
11    about how long we think the trial is going to take after
12    the depositions.
13                  THE COURT:  Okay.
14                  MS. HANKS:  Because we're just now getting
15    the electronic documents.  And what we have agreed to do
16    is try to find a date the week of that September trial
17    setting to mediate.
18                  THE COURT:  Okay.  All right.
19                  MS. HANKS:  And we will keep the Court
20    informed.
21                  THE COURT:  All right.  Well, we will go
22    ahead and if you will upload an order continuing or an
23    amended scheduling order and go ahead and insert those
24    November trial dates, we will go ahead and block those
25    off.
```

1               MR. ELMQUIST:  Thank you, Your Honor.  We

2    will do so.

3               THE COURT:  Okay.  Thank you.

4               Stand adjourned.

5               (Adjourned.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

COUNTY OF LUBBOCK   )

STATE OF TEXAS      )

        I, Linda York, Registered Professional

Reporter and Certified Shorthand Reporter in and for the

State of Texas, do hereby certify that the foregoing

pages contain a full, true and correct transcript, to

the best of my ability, of audiotape furnished by the

Clerk of the Bankruptcy Court.

        Given under my hand this the 17th day of

October, 2014.

                        /s/_____
                        LINDA YORK, CSR No. 4899
                        Expiration Date: 12/31/15
                        Cathy Sosebee & Associates
                        Firm Registration No. 49
                        P.O. Box 86
                        Lubbock, TX  79408
                        806.763.0036

1                    IN THE UNITED STATES BANKRUPTCY
2                     NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
3

4    KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
     RONALD KATZ,
5
              Plaintiffs,
6
     V.
7
     CENGIZ J. COMU a/k/a CJ COMU,
8
              Defendant.
9
     DIANE G. REED, TRUSTEE.
10
              Intervenor, Co-Plaintiff, and Third-Party
11   Plaintiff,

12   V.

13   CENGIZ J. COMU, a/k/a CJ COMU,

14            Defendant,

15   and

16   PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
     INC., AND SUNSET PACIFIC, L.P.,
17
              Third-Party Defendants.
18

19   BANKRUPTCY PETITION NUMBER: 10-03269-sgj

20   _____

21                   TRIAL DOCKET CALL HEARING

22                        MARCH 4, 2014

23                   2:33 P.M. TO 2:47 P.M.

24            HONORABLE STACEY JERNIGAN, PRESIDING

25              TRANSCRIPT FROM AUDIO RECORDING

```
 1        _____

 2   Transcript produced from audio recording by:
     LINDA YORK, RPR, CSR
 3   CSR No. 4899, Expiration Date 12/31/15
     Cathy Sosebee & Associates
 4   Firm Registration No. 49
     P.O. Box 86
 5   Lubbock, TX  79408
     806.763.0036
 6
     APPEARANCES:
 7
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 8   ENTERPRISES, LLC AND RONALD KATZ:

 9        MS. KENDYL T. HANKS
          - AND -
10        MR. VICTOR VITAL
          - AND -
11        MR. NICHOLAS SAROKHANIAN
          Greenberg Traurig
12        2200 Ross Avenue
          Suite 5200
13        Dallas, TX 75201
          512-320-7200
14        hanks@gtlaw.com

15   FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
     PLAINTIFF, TRUSTEE DIANE REED:
16
17        MR. DAVID ELMQUIST
          Reed & Elmquist, P.C.
          501 N. College Street
18        Waxahachie, TX 75165
          972-938-7339
19        delmquist@bcylawyers.com

20   FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
     BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
21   COMU:

22        MR. DENNIS OLIVER OLSON
          Olson, Nicoud & Gueck, LLP
23        1201 Main Street, Suite 2470
          Dallas, TX 75202
24        214-979-7300
          denniso@dallas-law.com
25
```

1                          I N D E X
                                                      Page
2

3

4
     Certification of Transcriptionist............. 17
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CATHY SOSEBEE & ASSOCIATES * LUBBOCK, TEXAS * 806.763.0036

Case 10-03269-sgj Doc 183 Filed 10/22/14   Entered 10/22/14 13:42:57   Page 4 of 17
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 134 of 256   PageID 1127

4

1          * * * P R O C E E D I N G S * * *

2               THE COURT:  Counsel, let's come forward to

3     the podium and make appearances, please.  This is King

4     Louie Mining versus Comu, et al, Adversary 10-3269.

5               MS. HANKS:  Kendyl Hanks, Greenburg Traurig

6     for the plaintiffs and my co-counsel Victor Vital and

7     Nick Sarokhanian.

8               THE COURT:  Okay.

9               MR. ELMQUIST:  Good afternoon, Your Honor,

10    David Elmquist on behalf of Diane Reed, trustee,

11    intervenor and third-party plaintiff.

12              THE COURT:  All right.

13              MR. OLSON:  Your Honor, Dennis Olson for

14    the defendants.

15              THE COURT:  All right.  I heard y'all went

16    to the wrong courtroom, some of you.

17              MR. OLSON:  Not me.

18              THE COURT:  Not you?  Okay.  All right.

19    Well, I don't think Judge Hale wanted to have a five-day

20    trial.  Just kidding.

21              MS. HANKS:  We're hoping it won't take that

22    long, Your Honor.

23              THE COURT:  All right.  Well, let's talk

24    about where things stand.  This is of course just trial

25    docket call today.

1          I noticed that someone has been busy

2     between the time I checked this morning and checked this

3     afternoon, I saw a joint pretrial order, which I was

4     very pleased to see that all counsel had participated

5     and signed off on.  It looks like it is complete except

6     you all may still be working on stipulated facts and

7     have a game plan to get those submitted on or before

8     March 14th; is that true?

9          MS. HANKS:  Yes, Your Honor, we've already

10    scheduled a meeting for Tuesday.  We're going to sit

11    down and nail down stipulated facts for the joint

12    pretrial order.  And I think there will be quite a few.

13          THE COURT:  Okay.  All right.  Well, that

14    would be obviously very, very helpful.  I don't know if

15    that will cause the five-day trial estimate to go down,

16    but I heard you say you hope it won't be five days but

17    that's everyone's safest guess right now?

18          MS. HANKS:  That is from our perspective,

19    yes, Your Honor.

20          THE COURT:  Okay.

21          MR. ELMQUIST:  Your Honor, I don't think

22    it's going to take five days and I'm hoping that we can

23    streamline the case with a good bit of stipulated facts.

24          THE COURT:  I mean I'm hoping there

25    certainly wouldn't be duplication between the trustee's

1  case and --

2           MR. ELMQUIST:  By no means, Your Honor.

3           THE COURT:  -- the creditors case.

4           MR. ELMQUIST:  Counsel for the plaintiffs

5  and I were already -- scoped that out and sort of have a

6  game plan for what will be presented by the trustee and

7  what will be presented by the King Louie plaintiffs.  So

8  I think in that respect there will be no duplication.

9  You know, we will just see how far we can get with the

10  stipulations to try to streamline the case.  We

11  certainly intend to, as much as possible, to stipulate

12  to the admissibility of exhibits.  And I think it's

13  likely that the witness and exhibit list of the

14  plaintiffs which right now has 800 some exhibits is

15  going to be reduced.

16           MS. HANKS:  That's not likely, Your Honor,

17  it is absolutely -- it is going to be much reduced.  We

18  are in that process.

19           THE COURT:  Okay.  Very good.  Well, on

20  that topic of evidence, looks like all of you filed

21  witness and exhibit lists back on February 24th.  There

22  are no objections that I see on file to any particular

23  exhibit named, so under the terms of our scheduling

24  order, all objections to anyone's exhibits would be

25  deemed waived except as to relevance.  All right?  So

1  any misunderstanding about that?  That doesn't

2  necessarily mean, you know, you will stipulate to

3  everyone's evidence, but all objections except as to

4  relevance would be deemed waived at this point under the

5  terms of the scheduling order.

6                    MR. ELMQUIST:  Understood, Your Honor.

7                    MR. VITAL:  That's fine with us, Your

8  Honor.

9                    THE COURT:  Okay.  All right.  Very good.

10                   All right.  Well, again, I have looked

11 through the pretrial order and I appreciate the work

12 that has gone into that.  It certainly helps the Court

13 get a handle on what is going to potentially be covered

14 at trial.  So what I would ask is if you all will upload

15 into orders processing once you have the stipulated

16 facts worked out, the pretrial order, and I will get it

17 signed before trial so you will know on trial date

18 that's the governing order for trial.

19                   So can we get that -- let's see -- the 14th

20 is Friday.  And I'm about to tell you we're going to be

21 set for trial on Monday.  So can you by 5:00 on Friday

22 get the pretrial order submitted so I can sign it?

23                   MR. ELMQUIST:  Absolutely, Your Honor.

24                   THE COURT:  And look at it over the

25 weekend.

1          MS. HANKS:  Yes, Your Honor.

2          THE COURT:  All right.  Which brings me to

3  the next point, trial the week of March 17th.  I think

4  through conversations with my courtroom deputy, you all

5  knew that we had reserved those days.  So at this point

6  I'm ready to just go ahead and officially enter an order

7  setting trial for Monday, March 17th at 9:30 in the

8  morning.  We would go all day every day and hopefully

9  finish by the end of the day Friday, March 21st, if not

10  sooner.

11          The one issue I have is on Thursday the

12  20th at 1:30, I do have a motion to lift stay docket

13  that would maybe take 30 minutes.  So we'll just

14  schedule a late lunch that day so we don't lose any

15  time.

16          So the Court will go ahead and issue the

17  order setting the trial for March 17th.  I will be

18  looking for the final pretrial order.  It will be

19  exactly what I have here that you filed today, only with

20  stipulated facts added.  And I will sign that as soon as

21  you get it submitted on Friday the 14th.

22          MR. ELMQUIST:  Your Honor, excuse me, but

23  if I might --

24          THE COURT:  Yeah.

25          MR. ELMQUIST:  -- make a comment.  It is

Case 10-03269-sgj Doc 183 Filed 10/22/14  Entered 10/22/14 13:42:57  Page 9 of 17
Case 3:14-cv-04163-B  Document 1-5  Filed 11/21/14  Page 139 of 256  PageID 1132

9

1    conceivable based upon the stipulated facts that the

2    (inaudible) might be altered slightly, to the extent we

3    stipulate --

4                    THE COURT:  Okay.

5                    MR. ELMQUIST:  -- wouldn't necessarily

6    have (inaudible) --

7                    THE COURT:  All right well, that's

8    certainly fine.  I just didn't want the pretrial order

9    growing as far as new contested facts and issues of law.

10                   MR. ELMQUIST:  Right.  Understood.

11                   MS. HANKS:  No, Your Honor, I mean although

12   I will say that all the parties have quite broadly

13   drafted the scope of what the issues are, and I think

14   the particularities are really better reflected in the

15   parties' proposed findings and conclusions.

16                   I do -- we do -- we did also talk about the

17   possibility of our proposed findings and conclusions

18   also slightly changing based on stipulations that we --

19                   THE COURT:  Okay.

20                   MS. HANKS:  -- that we reached.

21                   THE COURT:  Okay.

22                   MS. HANKS:  But that would only be to the

23   extent of narrowing --

24                   THE COURT:  Okay.

25                   MS. HANKS:  -- the issues for the purpose

1  of stipulation, not (inaudible).

2                THE COURT:  All right.  Understood.  So I

3  guess I slightly misspoke.  To the extent you narrow

4  issues and facts, you know, go for it, but I don't want

5  any new stuff popping up.  All right.

6                So let me see -- do we have any other

7  business?  The order setting the trial will simply

8  specify March 17th through March 21st and it will remind

9  people to bring sufficient copies of exhibits.  And by

10 sufficient copies, one set for the Court, one set for my

11 law clerk who will sit in.  So sometimes people get that

12 wrong.  I mean I am a little concerned if you have a

13 huge number, I hate to put you to extra copying, but I

14 typically like one set for me, one set for the law

15 clerk, one set for the witness and then each counsel to

16 have a set.  Is that any problem?

17               MR. ELMQUIST:  It's not for the intervenor,

18 Your Honor, but would it be helpful to have electronic

19 and hard copy?

20               THE COURT:  I would love both.  I'm not

21 going to order it, but I would love both if you can

22 easily do that.

23               MS. HANKS:  It's not a problem, Your Honor.

24               THE COURT:  It's always very helpful if you

25 can avoid, you know, giant notebooks by having --

```
 1              MS. HANKS:  Would you prefer -- would you
 2  like for us to bring a CD with everything loaded up on
 3  it or would you like for us to load them up?
 4              THE COURT:  A CD would be good.
 5              MS. HANKS:  We're happy to do that, Your
 6  Honor.
 7              THE COURT:  And so that -- yeah, that's
 8  always good when we have a whole bunch of documents.
 9              All right.  Well, any other housekeeping
10  matters at this juncture?
11              MR. VITAL:  Yes, Your Honor.
12              THE COURT:  Okay.
13              MR. VITAL:  Just for housekeeping purposes,
14  Victor Vital for the record.  Does the Court desire
15  opening or closing or should we just be prepared to move
16  straight into testimony?
17              THE COURT:  I would like opening and
18  closing, you know.  I don't think it has to be too
19  lengthy.
20              MR. VITAL:  Yes, Your Honor.
21              THE COURT:  In fact, perhaps we should talk
22  about timing.
23              MR. VITAL:  Yes, Your Honor.
24              THE COURT:  So is 20 minutes for each
25  lawyer --
```

1          MR. VITAL:  That's sufficient.

2          THE COURT:  -- enough for opening?  I

3    think --

4          MR. ELMQUIST:  It's fine with -- Your

5    Honor, it's fine with the intervenor.

6          THE COURT:  Okay.

7          MS. HANKS:  Yes, Your Honor.  Thank you.

8          THE COURT:  Okay.

9          MR. VITAL:  And then your work day, I'm

10   assuming is through 5:00 p.m. just --

11         THE COURT:  Well, yeah, typically I would

12   want to stop by 5:00.

13         MR. VITAL:  Okay.

14         THE COURT:  You know, if we're like

15   10 minutes away from some critical witness finishing,

16   then I would certainly, you know, spill over a little,

17   but let's try to end at 5:00 every day.

18         MR. VITAL:  Yes, Your Honor.

19         THE COURT:  As far as lunch breaks, you

20   know, I don't know, would you all prefer an hour and a

21   half each day so you --

22         MR. VITAL:  Yes, Your Honor.

23         THE COURT:  Yeah?  Okay.  So we will

24   probably plan on an hour and a half.  And then, you

25   know, once again I kind of like to just see where we are

1  on a particular witness as opposed to say we're going to

2  stop at 12:00.  We will be a little flexible each day

3  depending on the witness testimony.

4              MR. VITAL:  And I will be guided by Your

5  Honor's pleasure on this and counsel as well.  I am

6  double booked.  If I have to move a hearing over at the

7  state court house -- (inaudible) in the right direction,

8  I can, if we could take a later lunch -- break for lunch

9  a little later on Monday, that would be helpful, because

10  I have to pop over there just for 30 minutes and then

11  come right back.  So if maybe we took lunch at 1:00,

12  that would give me time --

13              THE COURT:  Okay.

14              MR. VITAL:  -- to be back by 2:30.

15              THE COURT:  That's fine with me.  Fine with

16  counsel.

17              MR. VITAL:  Thank you, Your Honor.  I

18  appreciate it.

19              THE COURT:  All right.  We will just plan

20  that for Monday and like I said probably do the same

21  thing on Thursday because of the 1:30 docket that I'm

22  going to take.

23              MR. VITAL:  Yes, Your Honor.  That's all I

24  have.  Thank you.

25              THE COURT:  Anything else then?

1        MS. HANKS:  The only other thing that I

2   know with regard to witnesses, there have been a lot of

3   cross designations.  The parties are conferring about

4   making sure witnesses are here and available and we

5   don't need to issue trial subpoenas.

6        THE COURT:  Okay.

7        MS. HANKS:  But I just wanted to raise it

8   in case there was some sort of formality the Court would

9   like us to address with you, assuming there's not --

10  assuming we can't resolve all that by stipulation.  Do

11  we -- if parties are ensuring particular witnesses

12  availability, do we need to file anything or all just

13  separately?

14        THE COURT:  Well, I mean if you're worried

15  about someone's cooperation, you know, really showing up

16  and -- or not, I mean I would, you know, encourage you

17  to issue subpoenas to make sure we have an order we can

18  enforce in case they don't show up.  But other than

19  that, I guess what I would say is if you all can reach

20  agreements, you know, if you all three designated the

21  same person, instead of calling them three separate

22  times that, you know, whichever, you know, plaintiffs

23  are going to call the person, but anyone who wants to do

24  cross that exceeds the scope of direct, you know, rather

25  than having to recall them later, I hope you all would

 1   work that out.

 2              MS. HANKS:  We would very much like that,

 3   Your Honor.

 4              THE COURT:  Okay.

 5              MR. ELMQUIST:  In fact, I believe we've

 6   discussed and agreed to that already that we would call

 7   the witness one time and get in all our direct and cross

 8   and let the cross exceed the direct so we have that

 9   person as a witness.

10              THE COURT:  Okay.

11              MR. ELMQUIST:  Is that true --

12              MR. OLSON:  That is true for nonparties.

13   Obviously we'd want to have the right to re-call the

14   defendants.

15              THE COURT:  Okay.  So we have an agreement

16   on that.  It will be so ordered on nonparties.  But you

17   reserve the right, for example Mr. Comu, to recall him

18   later in a defensive posture.

19              All right.  Well, again, if you're worried

20   about anyone showing up, I encourage the use of

21   subpoenas.

22              But we'll hopefully be able to streamline

23   the evidence a little bit through that agreement with

24   regard to the scope of cross and direct.

25              All right.  Anything else?

```
 1                    MR. ELMQUIST:  I don't believe so, Your
 2   Honor.
 3                    MR. VITAL:  Nothing from us, Your Honor.
 4                    THE COURT:  Well, thank you again for the
 5   cooperation I have seen so far as far as the pretrial
 6   order and whatnot.  And then I will issue the order
 7   setting the trial and look for the final pretrial order
 8   on the 14th.  And we will see you on the 17th.
 9                    MS. HANKS:  Thank you, Your Honor.
10                    MR. VITAL:  Thank you.
11                    MR. ELMQUIST:  Thank you.
12                    (Adjourned.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          CERTIFICATE

 2

 3   COUNTY OF LUBBOCK   )

 4   STATE OF TEXAS      )

 5

 6          I, Linda York, Registered Professional

 7   Reporter and Certified Shorthand Reporter in and for the

 8   State of Texas, do hereby certify that the foregoing

 9   pages contain a full, true and correct transcript, to

10   the best of my ability, of audiotape furnished by the

11   Clerk of the Bankruptcy Court.

12

13          Given under my hand this the 16th day of

14   October, 2014.

15

16

17                         /s/_____
                           LINDA YORK, CSR No. 4899
18                         Expiration Date: 12/31/15
                           Cathy Sosebee & Associates
19                         Firm Registration No. 49
                           P.O. Box 86
20                         Lubbock, TX  79408
                           806.763.0036
21

22

23

24

25
```

```
1              IN THE UNITED STATES BANKRUPTCY
                  NORTHERN DISTRICT OF TEXAS
2                      DALLAS DIVISION

3
   KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4  RONALD KATZ,

5           Plaintiffs,

6  V.

7  CENGIZ J. COMU a/k/a CJ COMU,

8           Defendant.

9  DIANE G. REED, TRUSTEE.

10          Intervenor, Co-Plaintiff, and Third-Party
   Plaintiff,
11
   V.
12
   CENGIZ J. COMU, a/k/a CJ COMU,
13
            Defendant,
14
   and
15
   PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16 INC., AND SUNSET PACIFIC, L.P.,

17          Third-Party Defendants.

18 BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19 _____

20                        TRIAL

21                   MARCH 17, 2014

22              9:40 A.M. TO 5:01 P.M.

23        HONORABLE STACEY JERNIGAN, PRESIDING

24         TRANSCRIPT FROM AUDIO RECORDING

25 _____
```

```
 1   Transcript produced from audio recording by:
     LINDA YORK, RPR, CSR
 2   CSR No. 4899, Expiration Date 12/31/15
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC AND RONALD KATZ:
 8        MS. KENDYL T. HANKS
          - AND -
 9        MR. VICTOR VITAL
          - AND -
10        MR. NICHOLAS SAROKHANIAN
          Greenberg Traurig
11        2200 Ross Avenue
          Suite 5200
12        Dallas, TX 75201
          512-320-7200
13        hanks@gtlaw.com
14   FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
     PLAINTIFF, TRUSTEE DIANE REED:
15
          MR. DAVID ELMQUIST
16        Reed & Elmquist, P.C.
          501 N. College Street
17        Waxahachie, TX 75165
          972-938-7339
18        delmquist@bcylawyers.com
19   FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
     BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
20   COMU:
21        MR. DENNIS OLIVER OLSON
          Olson, Nicoud & Gueck, LLP
22        1201 Main Street, Suite 2470
          Dallas, TX 75202
23        214-979-7300
          denniso@dallas-law.com
24
25
```

1                          I N D E X
                                                    Page
2

3

   WITNESSES BY DEPOSITION:
4
        BERNARD BROWN...................... 55
5
        ALVIN DAHL............................ 96
6
        STEVEN EVANS........................... 144
7
        MATTHEW TROSTER........................ 168
8

9

10 Certification of Transcriptionist............. 225

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

001054  CATHY SOSEBEE & ASSOCIATES * LUBBOCK, TEXAS * 806.763.0036

1              * * * P R O C E E D I N G S * * *

2

3              THE COURT:  Go ahead and call King Louie

4    Mining, LLC, et al versus Comu, et al.  This is

5    Adversary 10-3269.

6              Let's start by getting lawyer appearances,

7    please.

8              MS. HANKS:  Kendyl Hanks, Nick Sarokhanian

9    and Victor Vital for the plaintiffs.

10             THE COURT:  Good morning.

11             MR. VITAL:  Good morning, Your Honor.

12             MR. ELMQUIST:  Good morning, Your Honor,

13   David Elmquist on behalf of Diane Reed, intervenor in

14   this action.

15             THE COURT:  Good morning.

16             MR. OLSON:  Good morning, Your Honor,

17   Dennis Olson representing the defendants.

18             THE COURT:  Good morning.

19             All right.  We are set for trial all this

20   week.  If we need the full five days that have been

21   estimated, my law clerk informs me that I'm very well

22   organized, I have got electronic copies and folders here

23   of all of the plaintiffs' collective exhibits.  I

24   likewise have a notebook here of the debtors' six

25   exhibits in hard copy.

1          Are there any housekeeping matters we need

2    to address before we actually start with opening

3    statement?  Hopefully you saw I did sign the pretrial

4    order that you all submitted yesterday afternoon, Sunday

5    afternoon, so it will be what governs the trial unless

6    someone tells me something otherwise that happened

7    Sunday night.  No?  I know it was a --

8                    MS. HANKS:  Yes.

9                    THE COURT:  Yes, I have hard copies of all

10   behind me but I'm probably going to be using the

11   computer for most of it.

12                   MR. ELMQUIST:  Your Honor, there is one

13   matter I need to take up.  I am set on Judge Houser's

14   lift stay docket tomorrow.  I'm hoping the movant will

15   see that they should pass for a final because of the

16   level of the contested issues involved, but if not, I

17   may need to ask for a short recess to make argument on

18   that motion tomorrow afternoon.  It's on the 1:15

19   docket.

20                   THE COURT:  1:15.  All right.  Well, we

21   will try to adjust our lunch perhaps around that time

22   frame.

23                   MR. ELMQUIST:  Thank you.  If there's an

24   update in terms of being passed, I will let Your Honor

25   know.

1               THE COURT:  Okay.  Thank you.

2               MR. VITAL:  Good morning, Your Honor.  I

3    have, just as a reminder, a summary judgment hearing so

4    if we could take a late lunch today, that hearing is at

5    1:30.

6               THE COURT:  1:30.

7               MR. VITAL:  At 600 Commerce and I could be

8    right back so I would ask for maybe a late lunch that we

9    break for lunch at like 1:00 and I would be back.

10              THE COURT:  Okay.  And then --

11              MR. VITAL:  If that's fine, Your Honor.

12              THE COURT:  1:00 to 2:30, you think.

13              MR. VITAL:  Yes, Your Honor, that would be

14   perfect.

15              THE COURT:  All right.  Well, I assume no

16   one has an issue.  I do remember him raising that.  So

17   that's what we will do, 1:00 to 2:30 lunch today.

18              MR. VITAL:  And with respect to -- the only

19   other housekeeping matter plaintiffs have, we have quite

20   a bit of boxes here.  And we wanted to know the Court's

21   pleasure regarding storage of boxes and items.  If we

22   were able, I would prefer if it's okay with Your Honor

23   that we could keep the notebooks in the courtroom

24   throughout the week.

25              THE COURT:  We can do that.  The only thing

Case 10-03269-sgj Doc 184 Filed 10/22/14   Entered 10/22/14 13:44:35   Page 7 of 225
Case 3:14-cv-04163-B  Document 1-5  Filed 11/21/14  Page 154 of 256  PageID 1147

7

```
 1  we have set this week besides this one short matter this
 2  morning is lift stay docket on Thursday at 1:30, right?
 3            (Inaudible).
 4            THE COURT:  Okay.  All right.  Well, I mean
 5  it's certainly okay.  I was just checking if there were
 6  going to be any attorneys in and out over the week.  But
 7  very few, and so yes, that's fine for you to keep them
 8  in here.  We will lock up the courtroom overnight.
 9            MR. VITAL:  Yes, Your Honor.
10            THE COURT:  And on lunch breaks.
11            MR. VITAL:  Thank you very kindly.  Also it
12  occurs to me that we would like to invoke the Rule.  I
13  don't know we have witnesses that are in here but if --
14  so we will need -- I would ask any witnesses that are
15  here be sworn in and we would like to have the Rule
16  invoked.
17            THE COURT:  Okay.  Let's see who they are.
18  Who is going to be the party representative first of all
19  for each party?
20            MR. VITAL:  For the plaintiff it will be
21  Ron Katz, who is here in the courtroom on the second
22  row.
23            THE COURT:  All right.  And then we have
24  Ms. Reed here.
25            MR. OLSON:  And Mr. Comu.
```

```
 1              THE COURT:  And Mr. Comu.  All right.  So
 2   those three parties will be allowed to stay in the
 3   courtroom and we have -- is it the fellow there in the
 4   tan jacket?
 5              MS. HANKS:  Yes, Your Honor.
 6              THE COURT:  All right.  You are who, sir.
 7              (Inaudible).
 8              THE COURT:  All right.  Well, we're going
 9   to invoke the Rule here.  I don't know if you know what
10   that means.
11              UNIDENTIFIED SPEAKER:  He's an attorney.
12              THE COURT:  You are an attorney, so you
13   know exactly what that means.  All right.  So you will
14   have to leave the courtroom, and I'm going to require
15   you to stay available for whenever you are going to be
16   called.  Any clue from the plaintiffs how long he is
17   going to need to wait?
18              MS. HANKS:  We talked about him probably
19   being called tomorrow and it not taking very long, Your
20   Honor.
21              THE COURT:  Okay.
22              MS. HANKS:  But we're not sure exactly how
23   long.
24              THE COURT:  Okay.  Well, then, you want to
25   excuse him then so he doesn't have to wait around in the
```

1    courtroom today?

2           MS. HANKS:  Correct.  Yes.  We've told him

3    that he doesn't need to be available today to testify.

4           THE COURT:  All right, sir.  Well, the way

5    I normally do it is I just swear you in right before

6    you're about to take the stand, but I will however

7    though order you to reappear tomorrow at 9:30.  I don't

8    now if there's a subpoena or you're here voluntarily,

9    but I am going to require you to be present and testify

10   tomorrow at 9:30.  All right.  So any questions or

11   problems with that?

12          MR. MCNEILL:  No, Your Honor.

13          THE COURT:  Okay.  Well, thank you very

14   much.  And then you're excused for now.  We'll see you

15   tomorrow morning.

16          MR. MCNEILL:  Thank you.

17          THE COURT:  All right.  Thank you.  All

18   right.  So there's no one else that needs to be excused

19   from the courtroom.  All right.  Any other housekeeping

20   matters?

21          MR. OLSON:  Yes, Your Honor, just a couple.

22   I've got a couple of cases that I would like to hand up.

23   They're just on revocation.  They're kind of basic.

24   They're not new to the Court or anything and you don't

25   need to review them today.  But when we get to final

1    arguments, I will be arguing from them.

2              THE COURT:  All right.  Do you have copies

3    for the others in the courtroom?

4              MR. OLSON:  I do.  And I have handed them

5    out.

6              THE COURT:  All right.  Very good.  Thank

7    you.  So I have been handed Mid Tech Consulting,

8    Sheppard.  All right.

9              MR. OLSON:  I do have a number of

10   objections to exhibits on the basis of relevance.  I can

11   do that in my opening statement.  None of us expect you

12   to rule on them but to carry them.  It's a strange case.

13   I think there are a lot of exhibits that are not

14   relevant on the issue of revocation of discharge but are

15   relevant in connection with the trustee's complaint.  So

16   they're going to come in, but just, at the end, I think

17   the Court will probably need to say "I've excluded these

18   from consideration on the revocation of discharge

19   issue".

20             THE COURT:  All right.  Well --

21             MR. OLSON:  Otherwise, we would have to

22   have a bifurcated trial or something, and I don't think

23   anybody wants to get bogged down in this.

24             THE COURT:  All right.  Well, this is an

25   unusual argument.  Let me ask you this.  Can you just

1   identify the exhibits that you're going to make

2   relevancy objections to right now on the record?

3                  MR. OLSON:  Yes, ma'am.  Up through

4   Exhibit 336.  Now last night they added more exhibits,

5   and I'm not complaining about that, but I don't have the

6   list describing what those are, and so after the noon

7   break if I could give you any additional exhibits that I

8   think might not be relevant to the plaintiffs' case.

9                  THE COURT:  All right.

10                  MR. OLSON:  I can give you what I've got.

11                  THE COURT:  Yes, just by number.

12                  MR. OLSON:  Yes, ma'am.

13                  THE COURT:  I don't want to hear argument.

14   But by number which ones are you making this argument

15   about or objection to?

16                  MR. OLSON:  Right.  Starting, Your Honor,

17   Exhibit 12, 13, 30, 31, 38, 39, 40, 41, 43, 44, 45

18   through 60, 61 through 74, 75 through 81, and then

19   objection 91 with the next, 94, 95, 100, 101, 102, 106,

20   115, 121, 122, 134, 135, 137, 142 through 146, and then

21   150 through 161.

22                  That concludes my relevancy objections to

23   Exhibits 1 through 336.  Before we start up this

24   afternoon, I can give you my objections, if any, to the

25   exhibits that were added last night.

 1                THE COURT:  Okay.  Let me understand.  1

 2    through 336, that's what you knew about until last night

 3    that's why you're cutting it off there?

 4                MR. OLSON:  Yes, ma'am.  And I got those

 5    exhibits this morning, and I'm not complaining.  We've

 6    been culling exhibits.

 7                THE COURT:  Okay.

 8                MR. OLSON:  And as I understand it, these

 9    were inadvertently let out by the plaintiff.  In fact, I

10    don't know if your volumes have Exhibits 337 --

11                MS. HANKS:  They do.

12                MR. OLSON:  They do?

13                MS. HANKS:  Yes.

14                MR. OLSON:  Okay.  Mr. Elmquist and I don't

15    have the descriptions.  We have the exhibits.  We were

16    handed those this morning.  So it won't take me long to

17    let you know if there's any additional.

18                THE COURT:  Yeah, my exhibits go through

19    368.

20                MR. OLSON:  They should.

21                THE COURT:  All right.  So let me be clear,

22    I mean obviously, sort of in vacuum, not in context

23    right now --

24                MR. OLSON:  Right.

25                THE COURT:  -- with just a list of numbers.

1   But you're saying that you are going to object on the

2   basis of relevancy as to these exhibits being considered

3   on the 727(d) revocation of discharge --

4               MR. OLSON:  Correct.

5               THE COURT:  -- claim.  But you're not

6   objecting to them being considered --

7               MR. OLSON:  On the trustee's complaint.

8               THE COURT:  -- on any of the trustee's

9   claims?

10              MR. OLSON:  Right.  And I can explain that

11  now or in opening statement.

12              THE COURT:  Okay.  Why don't you explain it

13  because --

14              MR. OLSON:  Okay.  You've got a chronology

15  here, events prepetition --

16              THE COURT:  Right.

17              MR. OLSON:  -- events postpetition to the

18  date of discharge.  And then you've got between the date

19  of discharge and the filing of the second amended

20  complaint, that's where they have to allege under the

21  cases I gave you, here's something that we have learned

22  since the discharge that we didn't know at the time of

23  the discharge.  And our exhibits go way past that into

24  events that hadn't even occurred at the time the second

25  amended complaint was filed.  So that can't possibly be

1   a basis for determining whether they meet the test for

2   revocation of discharge. You've also got kind of a

3   subset of things that had occurred before the filing of

4   the second amended complaint, but they're not complained

5   about in the second amended complaint and they weren't

6   apparently known until discovery post filing of the

7   complaint. So that might not be relevant either, on

8   what did you know when you filed the complaint that you

9   didn't know when the discharge deadline was missed.

10              THE COURT: All right. Well, let me ask

11  this, can -- just to make the record very clear from the

12  beginning and to save time, there are no objections to

13  any of the plaintiffs' non-trustee plaintiffs' exhibits

14  3 -- I mean 1 through 330 (sic) other than these you

15  have listed out?

16              MR. OLSON: Correct.

17              THE COURT: All right.

18              MR. OLSON: And no objection to the

19  trustee's exhibits.

20              THE COURT: All right. So I can go ahead

21  and admit now by stipulation all of the non-trustee

22  plaintiffs' exhibits except for the ones you have listed

23  out. Okay.

24              So, Dawn, we can coordinate later. But

25  they've got of exhibits, KLM Exhibits 1 through 330

```
 1   (sic) are now admitted except for the ones you have just

 2   specifically objected to.  And what I --

 3                MR. OLSON:  Yes, ma'am.

 4                THE COURT:  -- anticipate is as they want

 5   to offer them at trial, I will have a better flavor and

 6   context.  I will look at them.  And I can specifically

 7   rule on your relevancy objection at that time.

 8                Ms. Hanks.

 9                MS. HANKS:  Your Honor, just to let you

10   know it's through 336.

11                THE COURT:  Oh, I'm sorry.  So 1 -- KLM

12   Exhibits 1 through 336 with the exception of these we

13   have just named on the record are now added by

14   stipulation.  Trustee's exhibits --

15                MR. OLSON:  1 through 91?

16                MR. ELMQUIST:  91.

17                THE COURT:  1 through 91, okay, are now

18   admitted.

19                And then do we have a stipulation on the

20   Defendants' Exhibits 1 through 6 or no?

21                MS. HANKS:  I believe most of them are

22   pleadings, Your Honor.

23                MR. OLSON:  There are three orders of this

24   Court in this adversary that in our meeting last week we

25   thought that things that we were going to ask you to
```

 1  take judicial notice of we would put an exhibit number

 2  on just to help people prepare a record on appeal.

 3            THE COURT:  All right.  So --

 4            MR. OLSON:  And then there's a pleading and

 5  then there's the trustee's case notes and then there's a

 6  transcript of the meeting of creditors prepared by the

 7  plaintiffs.

 8            THE COURT:  All right.  So Ms. Hanks, it

 9  looks like all of these are things I can take judicial

10  notice of, so you have no issue with them?

11            MS. HANKS:  The one thing is, Your Honor, a

12  transcript of the creditors meeting just to make it

13  clear, that's not an official transcript.  It was --

14  it's sort of taken from an audio.

15            THE COURT:  Okay.

16            MS. HANKS:  And there's definitely some

17  gaps and issues in it, but otherwise, we don't -- and

18  we're not raising an objection to it on that basis, but

19  we want to make sure it's clear that it's not an

20  official transcript.

21            THE COURT:  Okay.  Understood.  All right.

22  So Defendants Exhibits 1 through 6 are admitted.  Again,

23  Trustee's Exhibits 1 through 91 and KLM Exhibits 1

24  through 336 with the exceptions of those that we have

25  relevancy objections pending.

1              All right.  Any other housekeeping matters

2    then?

3              MR. OLSON:  Yes, ma'am.

4              THE COURT:  Okay.

5              MR. OLSON:  I don't have any problem with

6    you doing it that way, but I also don't have any problem

7    with you just giving me a running objection to the

8    relevance of those things.  And if you don't want to get

9    bogged down, you know, ruling on this exhibit right now

10   you can come back later and clean up the record and say

11   "I admitted these and rejected those."

12             THE COURT:  All right.  Well --

13             MR. OLSON:  If that helps.

14             THE COURT:  That's fine.  But I -- even

15   though I'm keeping my list handy, I would like you to go

16   ahead and make the objection at the time it's offered

17   just so I don't --

18             MR. OLSON:  All right.

19             THE COURT:  -- miss this is one of the ones

20   that --

21             MR. OLSON:  All right.

22             THE COURT:  -- you had raised.  All right.

23             MR. OLSON:  And then similarly this has

24   been kind of a moving train on the plaintiffs' part and

25   I'm going to be complaining that they've put contentions

1   in the pretrial order that are not supported by the

2   second amended complaint that they're going to trial on.

3   And I don't want this to be tried by agreement or

4   consent or trial amendment or anything else.  You may

5   recall, and that's why I stuck those first three

6   exhibits in there, we tied Mr. Lippe down to -- he was

7   limited to the second amended complaint.  His third

8   amended complaint was denied.  His attempt to pursue

9   transfers was denied.  And so he's left with what's in

10  the second amended complaint.  And your order

11  specifically said the trustee can seek leave to amend

12  but not Mr. Lippe.

13              So I think they want to get into all kinds

14  of things that are not contained in their pleading.

15              THE COURT:  Okay.  I'm very confused

16  because you signed the pretrial order and typically a

17  pretrial order governs, not the last pleadings.

18              MR. OLSON:  You've got plaintiffs'

19  contentions.  You've got defendants' contentions.

20  Defendants third contention is they're complaining --

21  they're contending things that are not based on their

22  pleadings and I don't agree to that, don't think they

23  should be permitted to go forward with that.

24              THE COURT:  Okay.  Show me in the pretrial

25  order where you have carved out --

```
 1              MR. OLSON:  Defendants' contentions --

 2              THE COURT:  Yeah.

 3              MR. OLSON:  Defendants' contentions

 4    Paragraph 3.

 5              THE COURT:  Okay.  Defendants' contentions

 6    Paragraph 3.  To the extent the Plaintiffs' contentions

 7    or the Trustee's contentions stated herein are not

 8    supported by their respective complaints, defendants do

 9    not agree that this pretrial order permits an amendment

10    of their respective complaints (inaudible) and supported

11    by their respective complaints.  Okay.  You want to

12    identify what contentions you're referring to?

13              MR. OLSON:  If I may have just a moment,

14    Your Honor.  You may not have a copy of the second

15    amended complaint handy.

16              By way of background, you may recall that

17    the motion to revoke was filed and a 12(b)(6) motion was

18    filed in response and before the first hearing on the

19    12(b)(6) motion to dismiss, Mr. Lippe filed his first

20    amended complaint.  And then after he did that, we had a

21    second motion to dismiss filed and the Court

22    conditionally denied it.  This is Exhibit 1 in the

23    defense exhibit volume.

24              On the second page of the order, you say

25    that for the reasons stated and the cases cited
```

1   plaintiffs should be given one more chance to amend

2   their complaint and plead with sufficient specificity

3   their allegations against defendant.  I'm contending

4   they have never pled fraud in compliance with Federal

5   Rule 9.  The Court finds that the next amended complaint

6   must particularly identify the sections that they're

7   relying on and when and how they learned the facts which

8   are the basis of their complaint.  And if they're

9   relying on fraudulent transfers, they must in each

10  instance state to the best of their ability when the

11  transfer was made and explain the standing of plaintiffs

12  to prosecute that claim.

13          Now, that was February 24th, 2011.  Then

14  the plaintiffs sought leave to pursue transfer actions

15  and the Court entered an order which is our Exhibit 2

16  which said you can't proceed on these because you said

17  you made a demand that the trustee pursue the claims but

18  that there was no Exhibit A attached to the motion.  The

19  certificate of service doesn't reflect that it was

20  served on the trustee.  And the motion should have been

21  filed in the main case so the motion for leave is denied

22  without prejudice to re-filing of the main case, which

23  they never did.

24          So then when they filed their second

25  amended complaint, their one last chance, we filed our

```
 1  motion to dismiss and got it set for hearing, and they
 2  filed a third amended complaint, and sought leave to
 3  pursue all of the stuff contained in it.
 4            And this Court in our Exhibit 3 ruled on
 5  that.  The second page says you're going to go to trial
 6  on the second amended complaint.  Now, denial of the
 7  motion to have leave to file the third amended complaint
 8  is without prejudice to the trustee to seek leave to
 9  amend, which the trustee never did.
10            So I think if you look at the contentions,
11  they're still trying to get back into all kinds of
12  stuff.
13            THE COURT:  Show me which contentions
14  you're talking about.
15            You need a copy of the pretrial order?
16            MR. OLSON:  I've got one here somewhere.
17            THE COURT:  We need to pick up the pace
18  here.
19            MR. OLSON:  Page 3.
20            THE COURT:  Okay.
21            MR. OLSON:  Talking about knowledge,
22  mandatory and continuing disclosure requirements, which
23  is a broad category.  And at the bottom misrepresented
24  assets and business interest at commencement of the
25  case, misled people with his involvement.
```

 1              And if you look at the second amended

 2   complaint, it's much more narrow than that.  And I think

 3   that they're limited to in Page 6 of the complaint

 4   they're pleading about Sunset Pacific.

 5              THE COURT:  Okay.  I just want to be very,

 6   very clear about your argument, because people generally

 7   are supposed to give notice with complaints.

 8              MR. OLSON:  That's right.

 9              THE COURT:  And of course, fraud you have

10   to plead it with specificity, has to put the defendants

11   on notice of what the claims are about, but then people

12   develop their case in discovery.  Things expand.  So I'm

13   trying to understand where you think things have

14   expanded impermissibly as far as like adding claims or

15   adding whole new areas of subject matter.

16              So I'm looking at Page 3.  Show me exactly

17   the impermissible contention.

18              MR. OLSON:  Well, I have tried to work at

19   it backwards, Your Honor, and I will try to get in step

20   with you.

21              THE COURT:  I want -- you say that their --

22   you don't agree to certain of the plaintiffs and

23   trustee's contentions to the extent they're not

24   supported by the complaints.

25              MR. OLSON:  Just plaintiffs.

1          THE COURT:  So their contentions appear on

2     three pages.  Show me which ones are problematic.

3          MR. OLSON:  I think that to say we want to

4     revoke him for statements that were incomplete, false,

5     or inaccurate that we learned about after we filed the

6     complaint does not count in determining whether

7     revocation is appropriate.  So when they complain in the

8     second amended complaint, "you didn't tell us about

9     Sunset Pacific, you made a transfer to the wife in less

10    than a year, you backdated documents," they can get into

11    that.  But they can't get into all these complaints

12    about the TKY Trust and the Daptco Trust and so on which

13    you specifically denied them to pursue in their third

14    amended complaint.

15          Now, it's highly relevant to the trustee's

16    case, but it's not something that you can come in on a

17    revocation and say "we're going to do what we should

18    have done predischarge and we're just going to use 2004

19    and other stuff and we will find something to complain

20    about by the time we get to trial."  You can't do that

21    on revocation.  They got to show there was a basis for

22    denial of discharge.  They've got to show that they

23    didn't know it or weren't put on inquiry, didn't have

24    due diligence.  They've got to show what it is they

25    learned between the discharge deadline they missed and

Case 10-03269-sgj Doc 184 Filed 10/22/14  Entered 10/22/14 13:44:35  Page 24 of 225
Case 3:14-cv-04163-B  Document 1-5  Filed 11/21/14  Page 171 of 256  PageID 1164

24

1    the day they filed this complaint.

2                THE COURT:  All right.  Well --

3                MR. OLSON:  So if they learned it after

4    that.

5                THE COURT:  I understand the argument

6    you're making.  You can raise these objections at the

7    time that they attempt to put in evidence, but again,

8    people are entitled to take discovery and expand the

9    scope of the evidence beyond literal wording of their

10   complaint.  It's one thing to object to them adding

11   claims and causes of action and wholly new subject

12   matter.

13               But people -- I mean that's what discovery

14   is for to kind of flush through the information you have

15   early on.  So I'm just letting you know I'm a little

16   skeptical of this, but you certainly have the right to

17   make these objections as they try to introduce evidence.

18               MR. OLSON:  Well, and I understand that.

19   And again, my point is it's normally done the way you're

20   talking about.  We do that all the time.  But not in

21   litigation over revocation of a discharge.  What is it

22   that you didn't know when the discharge was issued that

23   you learned --

24               THE COURT:  Okay.  You can cross-examine

25   their witness on that.

```
1              MR. OLSON:  I understand.

2              THE COURT:  Okay.

3              MR. OLSON:  And what I would like to do

4   rather than get bogged down every time, I will give you

5   the objection and if you want to carry it, like carry

6   the relevancy objection, I don't have any problem with

7   that.  But that way I've got my record and --

8              THE COURT:  All right.

9              MR. OLSON:  And you've got the case

10  flowing.

11             THE COURT:  All right.  All right.

12  Understood.  Any other housekeeping matters?

13             MR. OLSON:  No, Your Honor.

14             THE COURT:  All right.  Well, tell you

15  what, I think we have all of our parties that are

16  lawyers in the room on Avid Oak Ridge Apartments so I'm

17  going to take a short break on King Louie Mining.

18             Let me ask the lawyers how long do you

19  think this will take so they know how long of a break

20  they have?  We don't have any objections, correct?

21             UNIDENTIFIED SPEAKER:  No objections.

22             THE COURT:  Pardon?

23             UNIDENTIFIED SPEAKER:  Just a couple

24  minutes.

25             THE COURT:  Okay.  So we will take a
```

1 five-minute break and then we will start with opening

2 statements in King Louie Mining.

3                    (Break taken.)

4                    THE COURT: All right. We are going back

5 on the record now in King Louie Mining, et al versus

6 Comu, et al.

7                    The Court had indicated at the trial docket

8 call I would allow 20 minutes each for opening

9 statement. Are plaintiffs King Louie Mining parties

10 ready for your opening statement?

11                    MR. SAROKHANIAN: Yes, we are, Your Honor.

12                    THE COURT: All right. I will hear it at

13 this time.

14                    Laura is going to keep track of your time.

15                    MR. SAROKHANIAN: Your Honor, opposing

16 counsel, may it please the Court.

17                    This is not the case or the man that the

18 privilege of discharge was designed for. The law

19 requires a debtor's good faith, candor, honesty and

20 complete transparency in exchange for the privilege of

21 discharge.

22                    At every turn C.J. Comu refused to and

23 avoided fulfilling those paramount obligations. He has

24 deliberately misled the trustee, his creditors, and this

25 Court. That is the basic inequity of this discharge and

1  that is why it should be revoked.  We're seeking

2  revocation under 11 USC Section 727(d)(1) and (d)(2).

3  We have the burden to show by preponderance of the

4  evidence of Mr. Comu's bankruptcy fraud.  The evidence

5  will show a course of fraudulent conduct such as the

6  knowing concealment of assets at the commencement of

7  bankruptcy, numerous false oaths, and the intentional

8  omissions and failures to report and turn over assets

9  that are property of the estate to the trustee.

10              Let me tell you what this case is really

11  about.  Although C.J. Comu has probably swindled many

12  people, this bankruptcy was designed and aimed to thwart

13  and hurt one set of people, Ronald Katz, King Louie

14  Mining and King Louie Enterprises.  His deception dates

15  back to 2004 when he pocketed a secret $500,000 kickback

16  out of Mr. Katz's money.

17              What happened is C.J. Comu tricked Mr. Katz

18  into investing in and loaning about $2 million to

19  Mr. Comu's then-company called Humitech.  Now what

20  Humitech used to do is they made a product that used

21  this mineral called sorbite.  Now, it helped keep your

22  food fresh in refrigerators and keep the moisture out,

23  increasing the efficiency of refrigerators.  According

24  to C.J. Comu back in '04 Humitech was successfully

25  franchising its product both within the United States

1    and internationally.

2           And Humitech was looking to purchase

3    valuable sorbite mining rights in California, which is

4    what -- which is why they wanted money.  But what

5    Mr. C.J. Comu never disclosed is that he would be taking

6    that $500,000 kickback out of Mr. Katz's money that he

7    would be loaning and he also failed to mention that the

8    sorbite mining rights were completely worthless.

9           So in 2006 Mr. Katz sued C.J. Comu in New

10   York state court for common law fraud, securities fraud,

11   and some other causes of action.  For three years C.J.

12   Comu actively resisted that lawsuit in New York.  He

13   appeared.  He answered.  He gave a deposition.  He filed

14   dilatory motions.  And he even showed up on the day of

15   trial and said he needed a new lawyer and extra time for

16   trial.  So he got 30 days.

17          But where was he on the 30 day anniversary

18   when the trial was supposed to start?  Nowhere to be

19   found.  So the New York court signed a judgment granting

20   my clients over $2 million plus interest for Mr. Comu's

21   fraud.

22          But his efforts to avoid responsibility for

23   what he did to Mr. Katz did not end there.  When we came

24   down to Texas to domesticate that judgment, Mr. Comu did

25   everything he could to avoid or delay postjudgment

 1   discovery of his assets.  He delayed.  He was sanctioned

 2   by a judge over at the state court for delaying.  But he

 3   had a reason for that.  See, the reason was he was

 4   stalling for time to launch the next part of his

 5   fraudulent scheme:  Closing of lucrative reverse merger

 6   transaction and filing this bankruptcy case.

 7              Now right before he told you he was

 8   bankrupt, Your Honor, he set up a lucrative business

 9   transaction that he didn't tell you about.  What he did

10   is he bought a public shell company for peanuts.  He set

11   up a reverse merger and he took a 40 percent cut of the

12   new company, which is called Green Auto.  And he took

13   that 40 percent cut in the form of 95 million common

14   shares as well as valuable antidilution rights to keep

15   him at 40 percent.

16              As soon as he closed that transaction which

17   was in November 2009 just one month before he filed his

18   Chapter 7 case, he was already selling shares.  Before,

19   during and after his bankruptcy, C.J. Comu has made

20   millions of dollars off of that Green Auto stock.  And

21   that's something he has deliberately concealed from this

22   Court.

23              On December 31, 2009, the day he filed his

24   petition, he wrote his wife two $2,000 checks, they

25   grabbed their bags, they put on their sunscreens, and

Case 10-03269-sgj Doc 184 Filed 10/22/14  Entered 10/22/14 13:44:35  Page 30 of 225
Case 3:14-cv-04163-B  Document 1-5  Filed 11/21/14  Page 177 of 256  PageID 1170

30

1   they go on a cruise.  That's what bankrupt means to

2   Mr. C.J. Comu.

3            And so I would like to take a snapshot of

4   what his life was like on the day he filed bankruptcy

5   when they were going on that cruise.  The Green Auto

6   stock I was just mentioning, he was slicing and dicing

7   it.  He was selling it left and right.  The way he did

8   it is he has many, many alter egos that he twists, he

9   manipulates, he swaps in, swaps out, whatever, for his

10  fancies.

11           One of his favorite alter egos is called

12  The Barclay Group or TBG.  TBG is the alter ego that got

13  the 40 percent cut of Green Auto, which is the reverse

14  merger I just mentioned, and he funneled the Green Auto

15  shares through TBG, through that alter ego to other

16  alter egos that he controls.  Was that scheme disclosed

17  on these schedules or in a statement of financial

18  affairs, no.

19           Let's talk about the other things that were

20  going on in his life.  He has a company called Sunset

21  Pacific, which is the personal piggybank for C.J. Comu

22  and his wife to support their lavish lifestyle.  Sunset

23  Pacific has always been controlled by C.J. Comu.  The

24  evidence will show that Sunset is owned by a company

25  called Marathon Management and another company called

 1  Coral Group, which are just two more of Mr. Comu's alter

 2  egos.

 3          The evidence will also show that any time

 4  Mr. and Mrs. Comu needed something, C.J. Comu would just

 5  stroke a check from Sunset Pacific and they would have

 6  it paid.  If he needed a new Mercedes, no problem.

 7  Thanks a lot, Sunset.  It would come right out of their

 8  account.

 9          Now I want to talk a little bit more about

10  TBG.  TBG is the one he sliced and diced the Green Auto

11  stock through.  And just like Sunset Pacific he has a

12  story about it.  And the story on his schedules, and his

13  story changes of course, is that some person in the

14  United Kingdom or maybe France, we're not sure, named

15  Bernard Brown, owns 99 percent of this TBG, this

16  personal piggybank -- or is it Brown and Lampe because

17  his story changed in the middle of the bankruptcy that,

18  now, "oh, I forgot TBG did a 99 percent stock exchange

19  with Brown and Lampe, a company.  So Brown and Lampe

20  owns 99 percent, not Bernard Brown."  Okay.

21          But even if that's true, and it's not, then

22  C.J. Comu owned 99 percent of Brown and Lampe, which

23  again, was not disclosed on his schedules.  So whichever

24  is the truth and whichever is the lie, it wasn't

25  disclosed and he's committed fraud on this Court.

1          I would like to talk about where the Comus

2    are living because that is disclosed partially on his

3    schedules.  He says that he's living in a house in

4    Preston Hollow on Flavian Drive and it's his homestead.

5    It's a $400,000 house up in Preston Hollow.  But what he

6    doesn't tell you is he does what most bankrupt people

7    do, go out and buy a second Preston Hollow house with

8    straight cash.  The way he does it is just like Sunset

9    Pacific, he uses his brother -- his favorite straw man.

10   His brother lives in Turkey named Sam or Jim Comu.  He

11   uses offshore accounts.  He set up this new company

12   called Continental Partnership.  He temporarily puts the

13   company under his brother's control for this one

14   transaction and then, voila, he starts collecting rent

15   on his homestead-exempted house in Preston Hollow.

16          The evidence will also show that he's not

17   paying any rent despite the sham lease that he has here,

18   sham five-year lease.  He's not paying any rent on this

19   new Preston Hollow house.  So he's actually making money

20   in bankruptcy off of something he claimed was exempted.

21          Now, another company he controls is

22   something called a TKY trust.  So Mr. Comu knows he's

23   going to file bankruptcy and he knows he has millions of

24   dollars in shares coming in through this Green Auto

25   transaction I described.  So another way he launders

1    that money is through this Canadian trust, TKY.  Who is

2    the trustee?  Again, brother Comu.

3              After the bankruptcy, he admits that he's a

4    beneficiary to TKY Trust.  Is that on the schedules?  Of

5    course not.

6              The fact is he's a lot more than just a

7    beneficiary, Your Honor.  He is TKY Trust.  TKY Trust is

8    nothing more than another C.J. Comu money funnel.  This

9    is important because it establishes just one more

10   confirmation of Mr. Comu's intention to be deceptive

11   with this Court, to never be honest.

12             There's much more.  C.J. Comu had other

13   undisclosed positions, management positions of

14   companies, undisclosed assets and other benefits, but

15   those weren't disclosed.  There's much more.  This is

16   just a taste of the fraud that we're dealing with that

17   will be coming into evidence.

18             Despite this evidence, we expect that

19   Mr. Comu will say that we should have known about the

20   bankruptcy fraud, that Mr. Katz's previous lawyer missed

21   the deadline to object and that Mr. Katz even sued his

22   previous lawyer for malpractice.  We expect that's going

23   to be his defense.

24             But the truth is Mr. Katz had no idea about

25   Mr. Comu's bankruptcy fraud until after the discharge.

1    He didn't know about TBG, Green Auto, TKY, an extra

2    Preston Hollow house.  He didn't know he was netting

3    millions of dollars and owning millions of shares of

4    this Green Auto transaction.  Something completely

5    unheard of to him.

6                The first he began to hear about Green

7    Auto, and when he started unravelling all this, was

8    after discharge when he got information from various

9    informants that C.J. Comu had also defrauded.  So he

10   received a dossier in September or so of 2011, and

11   that's when he said, "Okay.  There's Green Auto.

12   There's TBG.  There's this connection.  There's

13   something going on."  And then in 2013 after our law

14   firm was hired, we were finally able to dig into the

15   electronic correspondence and discovery for Mr. Comu's

16   computers and after spending a lot of time and money is

17   when we finally were able to see the breadth of his

18   fraud on the Court.

19               So Mr. Katz did sue his previous lawyer,

20   but that was because the lawyer missed an easier but not

21   exclusive path to revocation.  And that was because he

22   had a fraud judgment, an underlying fraud judgment was

23   his debt.

24               So to the extent they're going to try to

25   use that against him, knowledge of the underlying

1  Humitech fraud does not equate to the bankruptcy fraud,

2  which of course he did not learn of until after

3  discharge.

4           Your Honor, at the end of the day, this

5  Court is a court of equity.  The law's very clear that a

6  debtor must have clean hands and be brutally honest

7  about his financial affairs in order to get a discharge.

8  Mr. Comu didn't do either of those things.  Instead he

9  orchestrated this entire bankruptcy process to avoid

10 paying Mr. Katz his money.

11          Moreover Mr. Katz had suffered over five

12 years of delay, aggravation and expense due to

13 Mr. Comu's plans.  When the Court gets to meet Mr. Katz,

14 the Court will see that the equities lie with Mr. Katz.

15          Based on the deception and duplicity of

16 Mr. Comu and the pervasive pattern of the fraud that we

17 will show you, we are confident and hopeful that this

18 Court will revoke the privilege of discharge that

19 Mr. Comu was never entitled to receive.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.

22          Mr. Elmquist.

23          MR. OLSON:  Your Honor, before he steps up,

24 I never like to interrupt somebody's opening statement.

25 They've put on the screen for the Court and left up

1   there and it's still up there, money laundering, house.

2   Before that there was an exhibit, I don't own a car.  I

3   want both of those marked as exhibits and I object to

4   them and I want them to be part of the record.

5           THE COURT:  All right.  You're objecting --

6   I mean they are demonstrative aids used as part of

7   opening statement.

8           MR. OLSON:  That's fine.  Just give them an

9   exhibit number and I object to their preparation.  I

10  object to the way they're being used and you can carry

11  that objection.

12          THE COURT:  All right.  Well, I'm not going

13  to call them exhibits, because they're demonstrative

14  aids being used in connection with opening.

15          MR. OLSON:  All right.

16          THE COURT:  But what --

17          MR. OLSON:  DA 1 and DA 2.

18          THE COURT:  -- you're arguing is, I don't

19  know, they're prejudicial, inflammatory, I ought not to

20  consider them until I have seen evidence of this, maybe,

21  maybe not.

22          MR. OLSON:  I don't think you will find

23  that this house or the car existed on the day of the

24  filing of the petition.

25          THE COURT:  I think that --

 1          MR. OLSON:  The debtor got his discharge.

 2  He got his exemption allowed.  He went on with his life.

 3  He got this house and got this car.

 4          THE COURT:  Okay.  All right.  You know, I

 5  understood that he bought them after the bankruptcy.  I

 6  didn't misunderstand the opening.

 7          MR. OLSON:  They're consistent --

 8          THE COURT:  Anyway everybody will put on

 9  their evidence.

10          MR. OLSON:  All right.

11          THE COURT:  We're either going to hear

12  evidence of this or not.

13          MR. OLSON:  Can we mark them demonstrative

14  aids 1 and demonstrative aids 2 and preserve them for

15  the record?

16          THE COURT:  All right.  So --

17          UNIDENTIFIED SPEAKER:  And Judge --

18          THE COURT:  -- a picture of the Mercedes,

19  that slide of the demonstrative and then the picture of

20  the house in Preston Hollow, those two slides have been

21  objected to as essentially inflammatory and prejudicial.

22  I overruled the objection, but it's clear for the record

23  what you have objected to.

24          All right.  Mr. Elmquist.

25          MR. ELMQUIST:  Thank you, Your Honor.  May

1    it please the Court, opposing counsel.

2              Your Honor, the trustee filed on September

3    5th, 2012 its complaint and intervention after

4    undertaking extensive examinations of Mr. Comu,

5    Mrs. Comu and business associates of Mr. Comu to get a

6    better understanding of exactly what was going on with

7    respect to Mr. Comu's business activities prior to the

8    bankruptcy filing and in particular to find out about

9    the entities that were known to the trustee, Sunset

10   Pacific and The Barclay Group, but not nearly enough was

11   known from the standpoint of what was going on with

12   these companies.

13             And Your Honor, what the trustee, through

14   counsel, discovered through those examinations is The

15   Barclay Group is the alter ego of Mr. Comu and we

16   believe the evidence will show that Mr. Comu has used

17   that entity for purposes of diverting funds to himself

18   and to his wife and to other entities that he controls.

19   The entity, The Barclay Group, according to his

20   schedules was owned one percent by Mr. Comu and

21   99 percent by either Brown and Lampe or Mr. Brown.

22             Brown and Lampe, Your Honor, was an entity

23   that was supposedly formed for the purpose of doing a

24   merger transaction which all of The Barclay Group stock

25   was to be acquired by Brown and Lampe, which was an

1  entity supposedly formed in the UK by Mr. Brown and

2  Mr. Comu would end up with 99 percent of Brown and

3  Lampe. Well, through discovery we learned that, in

4  fact, Brown and Lampe never legally existed and the

5  transaction that supposedly gave rise to the 99 percent

6  ownership by Mr. Brown or Brown and Lampe was a sham.

7              This was information that was known to

8  Mr. Comu when he filed the case because the transaction

9  supposedly occurred in 2007. The reverse merger

10  transaction that plaintiffs' counsel alluded to was a

11  transaction that commenced in terms of formation in the

12  summer and into the fall of 2009 before the filing.

13             The evidence will show, Your Honor, this is

14  information that is relatively new from -- immediately

15  from the standpoint of what was discovered through the

16  email traffic that was obtained. That transaction did,

17  in fact, close on November 4, 2009. And there was an

18  entitlement at that time to obtain through that

19  transaction 40 percent. The Barclay Group was entitled

20  through that transaction to obtain 40 percent of the

21  stock that was outstanding or about 95 million shares.

22             Mr. Comu also received for a fee in

23  connection to that transaction 300,000 shares of the

24  stock. The certificate was dated, I believe, January 12

25  or January 13, 2010. But it was a certificate

1  evidencing shares he was entitled to before the petition

2  was filed.  And that certificate was handed over to the

3  trustee, but the full breadth of that transaction was

4  not disclosed.  Your Honor, we have not because, simply

5  we did not have, at the time the complaint and

6  intervention was filed, the breadth of the knowledge or

7  information that has been gathered by plaintiffs'

8  counsel.

9          I believe that simply from the standpoint

10 of what they were capable through their resources and

11 pursuing, as far as developing this case certainly had

12 much more access to information and documents that we --

13 the standpoint of involving forensic experts to review

14 the email traffic and the like, there's -- I think

15 there's something like 10,000 emails that were reviewed.

16 In any event, Your Honor, our focus with respect to the

17 trustee's complaint is to recover assets that belong to

18 the bankruptcy estate and that is The Barclay Group

19 assets in the form of the Green Auto stock that was

20 issued to The Barclay Group before and after the filing.

21          The stock that was issued after the filing,

22 Your Honor, was issued pursuant to the antidilution

23 provisions of the agreement that The Barclay Group

24 entered into prepetition.  So the additional 1.8 million

25 shares of Barclay -- excuse me -- of Green Auto stock

1  that The Barclay Group received was stock that was

2  entitled to prepetition.

3          Your Honor, we're also seeking to acquire

4  the value of the assets that Mr. Comu dissipated through

5  the sales of this Green Auto stock through The Barclay

6  Group.  The evidence will show The Barclay Group

7  received at least $3 million in the sale transactions

8  that Mr. Comu undertook by and through The Barclay Group

9  and most of those -- most of that revenue that was

10  received was paid out in the form of consulting fees to

11  undisclosed parties because no 1099s or any other

12  evidence was developed with respect to actually receive

13  the monies.

14          Your Honor, the other entity that you're

15  going to hear a lot about is Sunset Pacific.  This was a

16  partnership that was formed back in 1996.  In January

17  of 2006, according to Mr. Comu, he made a gift of

18  98 percent of that partnership, the limited partnership

19  interest in that partnership to his wife, Phyllis Comu.

20  Irrespective of whether or not there was a gift, there's

21  no doubt that the partnership interest that was in the

22  name of Mrs. Comu was under the joint management control

23  of Mr. Comu and his wife since Mr. Comu controlled the

24  partnership through the general partner which she owned

25  and controlled.

1    So it doesn't really matter whether the

2    stock or -- excuse me -- the limited partnership

3    interest was transferred to Mrs. Comu because the

4    ownership and control of that was under joint management

5    control of Mr. Comu and his wife.  And as counsel

6    indicated, the limited partnership interest or this

7    limited partnership was used as a means to transfer

8    revenue from the sales of the Green Auto stock that The

9    Barclay Group sold.

10    There are three transactions that counsel

11    did not mention that you're going to hear about.  These

12    are transactions that occurred in January 2010.  In

13    January of 2010 The Barclay Group, Mr. Comu, entered

14    into a purchase and sale transaction where he sold two

15    and a half million shares of the Green Auto stock to

16    Sunset Pacific and received in exchange, The Barclay

17    Group received in exchange, a $200,000 promissory note.

18    At the same time Mr. Comu arranged for the

19    sale of 5 million shares to one of these family trusts,

20    TKY Trust and in exchange received a $500,000 promissory

21    note.  Finally, Mr. Comu through The Barclay Group sold

22    2 million shares of the Green Auto stock to the Daptco

23    Trust, another family trust, and in exchange received

24    the $200,000 promissory note.

25    There have been some payments on those

1   notes through the subsequent sale of the Green Auto

2   stock that Mr. Comu arranged for through the Daptco

3   Trust; in other words, the stock was sold.  Green Auto

4   stock was sold to Daptco Trust, TKY Trust, and Sunset

5   Limited.  Thereafter Mr. Comu arranged for sales of that

6   same stock to third parties and there was some revenues

7   received by each of those entities that were applied to

8   the promissory notes but the balances of those notes

9   remain outstanding.

10              Your Honor, we do believe that Mr. Comu was

11  aware of his ownership, his 100 percent ownership and

12  his de facto ownership of The Barclay Group.  He thus

13  knew or should have known that the assets of that entity

14  were property of his estate.  He had a duty to fully

15  disclose that, and certainly had a duty not to liquidate

16  the assets of that estate without -- excuse me -- of

17  that entity without the knowledge or consent of the

18  trustee.

19              For that reason, Your Honor, we think the

20  Court should find that the -- not only is The Barclay

21  Group the alter ego of Mr. Comu, but in fact, Mr. Comu

22  is responsible and indebted to this estate for the

23  monies he received from the (inaudible) sale of the

24  Green Auto stock through The Barclay Group.

25              The Barclay Group received at least

1    $3 million through the sales that it undertook between

2    June of 2011 and January of 2012.  These are

3    transactions that the trustee had no knowledge of until

4    the second examination of Mr. Comu in August of 2012.

5    And through the examination of the stock transfer agent

6    Omadwet (phonetic) who handled the transfers of these

7    shares for The Barclay Group and for Daptco Trust and

8    the TKY Trust.

9              Your Honor, the trustee has pled, and I

10   don't think counsel mentioned anything about the

11   allegations of the trustee's complaint that go out --

12   that are beyond -- or the contentions of our -- the

13   contentions that we have set forth in the pretrial order

14   are addressed in our complaint.  We have asked that the

15   Court find there's grounds for reverse corporate veil

16   piercing in this case because, as this Court found in

17   the Kale Company versus Brunswick Home case, a court

18   can, the Texas law -- under Texas law, the court can

19   reverse veil pierce and determine that a corporation is

20   the alter ego of an individual, if the individual has an

21   actual ownership or de facto ownership in the

22   corporation, the corporation was organized or operated

23   as a mere tool or business conduit for the individual

24   considering the total dealings of the corporation and

25   the individual, including the degree to which corporate

1  formalities have been followed and corporate and

2  individual property have been kept separately, the

3  amount of financial interest ownership and control the

4  individual maintains over the corporation, and whether

5  the corporation has been used for the personal or legal

6  or improper purposes.  And that applying the reverse

7  veil piercing will not prejudice non-culpable

8  shareholders.

9         The evidence will show, Your Honor, that

10  this -- that these factors are clearly met with respect

11  to Mr. Comu's activities and that this Court should

12  therefore reverse veil pierce The Barclay Group entity

13  and find that The Barclay Group and Mr. Comu are

14  responsible for the debts of this debtor's estate.

15         We're asking the Court also reverse veil

16  pierce Sunset Pacific for the same reasons.  This entity

17  was likewise used as a mere conduit for Mr. and Mrs.

18  Comu's personal gain and profit.  And it was used to

19  divert funds from creditors.

20         So, Your Honor, in connection with our

21  action, we're asking that the Court ultimately grant a

22  judgment directing the turnover of the assets of The

23  Barclay Group and Sunset Pacific and find that the

24  debtor is liable for the monies that were received by

25  The Barclay Group and wrongfully diverted to entities

1    under Mr. Comu's ownership and control.

2                Thank you.

3                THE COURT:  Thank you.

4                Mr. Olson.

5                MR. OLSON:  May it please the Court.  After

6    hearing those two openings statements, perhaps you can

7    see a little bit better what I was saying earlier,

8    you've got two distinctly different lawsuits here.

9    You've got a motion to revoke a discharge and then

10   you've got a trustee's attempt to recover assets.

11               And let me address first the attempt to

12   revoke the discharge.  I think the evidence in this case

13   is going to show that Mr. Katz's real complaint about

14   Mr. Comu started with the alleged kickback in '04.  I

15   think the evidence will show that in '07 in depositions

16   there was testimony by Mr. Comu that Sunset Pacific was

17   98 percent owned by his wife.  I think the evidence is

18   going to show that the money that Mr. Katz was

19   complaining about was paid to Sunset Pacific.  I think

20   that Mr. Katz and his lawyers have known that for at

21   least seven years.

22               Now, the evidence, I think, is also going

23   to show that the judgment that they obtained for fraud

24   would be a lay-down 523 pleading if they had filed it.

25   But they didn't.  That bankruptcy was filed with the

1    anticipation that they were going to come in and get

2    their exception to discharge.

3            Now, at the first meeting of creditors the

4    evidence is going to show that Mr. Katz's lawyer

5    attended and made a record that he thought that there

6    were a lot of assets hidden in Sunset Pacific and that

7    they were going to do a lot of discovery and there was

8    discussion with the trustee about 2004s. And there was

9    also another fellow there with Mr. Katz's lawyer, a

10   fellow by the name of Buckeye Epstein who complained to

11   the trustee on the record in front of Lippe, he owns

12   more than one percent of these entities, he owns these,

13   he controls these.

14           So at the end of that meeting of creditors,

15   trustee asked for me to round up certain things and take

16   them to her. Mr. Lippe asked if he could review the

17   documents that I took to her. And she said, "sure".

18           The evidence will be that I produced for

19   her all the documents she requested plus a share

20   certificate in Green Auto for 300,000 shares made out to

21   C.J. Comu postpetition. And she said, "is this property

22   of the estate?" And I said, "I don't think so. But

23   it's going to be a bone of contention and I want you to

24   hold this and know that it's there."

25           And she called Mr. Lippe and said, "I've

 1   got this stuff for you to come look at."  Mr. Lippe came

 2   out, talked to her, wanted to be hired as her special

 3   counsel to pursue the discharge objection.

 4              Now, we're talking 727.  Trustees don't

 5   pursue 523s.  Nobody asked for a 2004.  Nobody asked for

 6   an extension of the deadline.  The discharge was

 7   entered.  And months went by.

 8              Now, at that point, Mr. Comu has the one

 9   percent ownership interest in TBG that he had on the day

10   that he filed the bankruptcy.  He didn't do the Green

11   Auto reverse merger.  TBG did.  TBG is not the alter ego

12   of C.J. Comu.  It's had a lot of activities for a lot of

13   years.  It's had employees.  It's had bank accounts,

14   it's had landlords.  It's had other owners.  It's not a

15   one-man band.

16              Now, it's not at all unusual for somebody

17   that's running a business, particularly one like this on

18   a day-to-day basis, to own a very small percentage of

19   ownership and somebody else own the rest.  If you look

20   at the schedules, you will see that Mr. Comu said that

21   TBG was 99 percent owned by Mr. Brown, Bernard Brown.

22              I think the evidence is going to show that

23   that's correct.  I think the evidence is going to show

24   that Brown and Comu contemplated a deal where Comu would

25   get a toehold in Europe, Brown would get a toehold in

1  the states.  He would form an entity Brown and Lampe UK,

2  which was never formed, but was going to be formed.

3  That, I think, means the fact that it wasn't formed

4  means that it's Brown that owns it, not Brown and Lampe.

5         When the suit was filed against Brown and

6  we answered for all the defendants, Brown said, "I think

7  it's in Brown and Lampe," so we put in the answer.  And

8  I think Mr. Elmquist will concur that I told him that --

9  Mr. Elmquist at the time -- "don't worry about it.

10 You've got it pled.  We're not going to come to trial

11 and say you've sued the wrong person.  You're attacking

12 that ownership interest and I got it."

13        Now, in an attempt to explain why it was

14 Brown and Lampe as opposed to Brown individually, I

15 think it was obvious to everybody that Brown and Lampe

16 UK was never formed, never existed.  Brown was just

17 wrong about that.

18        But you've got a situation where when this

19 Green Auto deal is closed in November of '09, what does

20 Comu individually have?  He's got one percent of Green

21 Auto -- one percent of TBG.  TBG has -- Chris McNeil can

22 explain it better -- but TBG has closed on the deal.

23 They're going to get stock certificates and so on.  They

24 hadn't been issued yet.  But it's kind of like McNeil, I

25 think will use the example, kind of like you bought the

1  car but you hadn't got the title yet.

2          So we disclosed that ownership interest in

3  TBG.  Postpetition we disclosed that we had gotten stock

4  out of that.  We still think that's all Comu got.  We do

5  not agree that TBG is the alter ego of Comu.  Now, if

6  TBG is the alter ego of Comu, then Mr. Elmquist's

7  contentions are correct, that what TBG got should have

8  been property of the estate, and you go down that path.

9          Mr. Elmquist and I don't agree on that, but

10 also have a problem with how do you calculate the

11 damages.  For example, he said between these two dates

12 there were $3 million worth of sales.  I think we've got

13 a stipulation that it was certainly in excess of $2.7

14 gross proceeds.  But that's not net proceeds.  When you

15 sell restricted stock overseas, everybody and their dog

16 takes a commission on it.  And what TBG got was

17 substantially less and I think there's a stipulation

18 it's $686,000.

19         Now, what was TBG doing with that money?

20 Running its business.  Paying rent.  Paying employees.

21 Paying taxes.  That's not the money of C.J. Comu.

22         Now, what is required of Katz when the

23 bankruptcy is filed and he's got all these suspicions?

24 He's got years of complaints against Comu.  He's trying

25 to pursue his fraud judgment.  He's got a lay-down 523.

1   He's attending the 341. He's making all these claims

2   and accusations and here other people, Epstein, make

3   accusations. And he goes out and even wants to get the

4   trustee on board with pursuing a 727. That's imputed to

5   Mr. Katz, whether he likes it or not. He can't come in

6   here and say, "I get a do over because of the

7   malpractice of my lawyer." That's not the law in the

8   5th Circuit.

9            Now, I think that evidence is going to show

10  that with regard to Sunset Pacific, the gift of Sunset

11  Pacific 98 percent ownership January 1st of '06 is way

12  past being set aside. It's just a separate property of

13  Mrs. Comu. Now, it's a limited partnership. That's a

14  different entity. It's very common in limited

15  partnerships for the GP to own one, two percent, call

16  all the shots. The limiteds don't run the thing. They

17  don't have any liability other than their investment.

18            To come in and say "well, we just want to

19  smear everybody and everything and we want to kick up a

20  lot of dirt in the water and tromp around and make it

21  all look like, you know, this is all C.J.'s doings and

22  it's a fraud on this Court", that's why you have Federal

23  Rule 9. You got to plead that stuff with specificity.

24  And you're limited to what they put in their amended

25  complaint. And they're trying to backdoor now the very

1  things that you told them in three orders that they

2  could not do.

3            Now, we understand we've got a legitimate

4  problem with the trustee, that but for this application

5  to revoke discharge, would have been resolved years ago.

6  I think the trustee will testify that I told her at the

7  time we knew these entities were not exempt. We knew

8  that we could not keep them. We wanted to buy them

9  back. We wanted to buy them back whenever the trustee

10 was ready and had a handle on what the value was.

11           The trustee wasn't ready to do that on the

12 day of the entry of the discharge. Trustees don't

13 typically administer their estates that quickly,

14 particularly asset estates. And there was a legitimate

15 question as to what the Green Auto stock was worth. It

16 was restricted stock. It's on the pink sheets. Didn't

17 have any real value on that day. But the upside was

18 something that had to be gauged.

19           It was stock in an electric auto car. They

20 were going to attempt to compete with Ford and the other

21 people that make -- or working on electric cars. Could

22 have been huge. So to come in and mess that up and say,

23 "well, you know, we weren't put on inquiry by any of the

24 stuff that we saw. We didn't know until later." By the

25 way, they've still never come forth and put in a

1  pleading who the informants were, what they were told,

2  what that was based on.

3              And again, they do not want to respect the

4  time line.  What happened prepetition is what we're

5  focused on.  Is there something there that's a basis for

6  denial of a discharge.  And did you know about it or

7  were you put on notice about it before the discharge

8  deadline to object.  And if not, what is it that you

9  learned after that discharge was entered that you now

10 know when you filed this second amended complaint.

11             And what happened in '14, '13, '12 doesn't

12 matter on that issue on that pleading you filed in March

13 of '11.  That's the problem I've got with the

14 plaintiffs' case.

15             Thank you.

16             THE COURT:  Okay.  Thank you.

17             All right.  Plaintiffs, you may call your

18 first witness.

19             MR. SAROKHANIAN:  Thank you, Your Honor.

20 The plaintiffs call Ronald Katz.

21             THE COURT:  All right, Mr. Katz, if you

22 could come up to the witness stand, please.

23             (Testimony of RONALD KATZ previously

24 transcribed.)

25             THE COURT:  Plaintiffs next witness.

```
 1                MR. SAROKHANIAN:  Your Honor, we're going

 2     to call Bernard Brown by deposition.

 3                Your Honor, may we use the Elmo that's in

 4     the podium --

 5                THE COURT:  You certainly may.

 6                MR. SAROKHANIAN:  -- for these exhibits?

 7                THE COURT:  Dawn, I think you --

 8                UNIDENTIFIED SPEAKER:  -- (inaudible) use

 9     your laptop at the same time you use Elmo.

10                MR. SAROKHANIAN:  There's a switch though,

11     correct?

12                UNIDENTIFIED SPEAKER:  I have control of

13     it.  You have to tell me every time.

14                MR. SAROKHANIAN:  Okay.  We can tell you.

15     That's no problem.  Thank you.

16                UNIDENTIFIED SPEAKER:  Do you want me to

17     put the Elmo up now?  So, do you want me to switch it

18     over to Elmo now or are you going to use your laptop

19     right now?

20                MR. SAROKHANIAN:  We will ask you to switch

21     it to Elmo now.  Thank you.

22                MR. VITAL:  May I approach, Your Honor?

23                THE COURT:  You may.  All right.  Thank

24     you.

25                MR. SAROKHANIAN:  And Your Honor, if it
```

1    pleases the Court, I would like to do the questions and

2    Mr. Vital will do the answers.  And then Ms. Hanks will

3    have on the Elmo the exhibits that refer therein.

4                    THE COURT:  All right.  Very good.  That

5    will work.

6                    (Inaudible.)

7                    MS. HANKS:  We may not need to do this,

8    because a lot of these are trustee's exhibits, and I

9    believe the Court has the trustee binder.

10                    THE COURT:  I do.

11                    MR. SAROKHANIAN:  Okay.  Well, then we can

12   just refer you to that.

13                    THE COURT:  All right.  I will pull that

14   up.

15                    MR. SAROKHANIAN:  Would that be easier?

16                    THE COURT:  That's probably easier, yes.

17                    MR. SAROKHANIAN:  Okay.  Great.

18                    Is the Court ready?

19                    THE COURT:  I'm ready.

20                    MR. SAROKHANIAN:  Now this is from the oral

21   deposition of BERNARD D. BROWN taken on March 18th,

22   2013.

23                    THE COURT:  Okay.

24                    MR. SAROKHANIAN:  Mr. Vital is sitting on

25   the witness stand.  He will be Mr. Brown, the witness,

1   and I will be referring to the various people who are

2   questioning Mr. Brown.

3                THE COURT:  Okay.

4                MR. SAROKHANIAN:  I will begin on Page 9 of

5   his deposition, Line 12 through 25.  I believe this is

6   Mr. Elmquist conducting the examination.

7                THE COURT:  Okay.

8                "Q.  Mr. Brown, you understand you have

9   been sued in this lawsuit?

10               "A. Yes.

11               "Q. You do not consider that to be an

12  important matter, a lawsuit filed against you?

13               "A. I do, yeah.

14               "Q. Okay.  But you haven't retained

15  documents pertaining to the lawsuit.

16               "A. No.

17               "Q. So you have no documents under

18  Paragraph Number 1, documents that are referred to in

19  your answers to the complaint?

20               "A. No.

21               "Q. The next category of documents is

22  documents evidencing your ownership in The Barclay

23  Group.  Do you have any such documents?

24               "A. There's only one document, the share

25  swap.

1          "Q. The share swap?

2          "A. Yeah."

3              MR. SAROKHANIAN:  And Your Honor, if you

4    could refer to Trustee Exhibit Number 61, Trustee 61.

5              THE COURT:  All right.

6              MR. SAROKHANIAN:  That's Deposition Exhibit

7    Number 2 in the transcript.  When you're there.

8              THE COURT:  I'm there.

9              MR. SAROKHANIAN:  Great.  This is Page 10,

10   starting at Line 10 by Mr. Elmquist.

11         "Q.  Take a look at Exhibit 2 and tell me

12   if that's the document you're referring to as the share

13   swap?  This is the one that's marked --

14         "A.  Yeah.

15         "Q. Excuse me?

16         "A. Yes.

17         "Q. This is what you're referring to as the

18   share swap?

19         "A. Yes.

20         "Q. Okay.  And so this acquisition and plan

21   of share exchange is the only document that evidences

22   Brown and Lampe's or your ownership interest in The

23   Barclay Group, is that what you're saying?

24         "A. Yeah.  I thought there was another one

25   as well."

1          MR. SAROKHANIAN:  Now on Page 11, Line 11.

2          "Q.  So, again, the only document that you

3    know of that evidences your ownership in The Barclay

4    Group is Exhibit 2, this acquisition agreement, correct?

5          "A. Yes.

6          "Q. The next category is Allbritton

7    communications between you and Comu.  Do you have any

8    written communications from Mr. Comu that you retained?

9          "A. No.

10         "Q. You have absolutely no written

11   communications with him?

12         "A. No.

13         "Q. The next category was written

14   communications between you and The Barclay Group.  Have

15   you retained any written communications between you and

16   The Barclay Group?

17         "A. No.

18         "Q.  Do you have any documents in your

19   position (sic) relating to The Barclay Group?

20         "A. No.

21         "Q. Are there other documents on your PC

22   just as we have been going through these that you have,

23   for instance, you have documents in your possession

24   relating to The Barclay Group on your PC?

25         "A. No.

1              "Q. So the only documents in these

2    categories 1 through 6, the only documents you have in

3    your possession are the ones under number six that refer

4    to or relate to Green Auto; is that correct?

5              "A. Yeah.

6              MR. SAROKHANIAN:  Now moving to Page 17

7    starting on Line 22.

8              "Q. Okay.  The next heading or reference is

9    EuroCap Investments, PLC, do you see that?

10             "A. Yes.

11             "Q. What type of consultant services do you

12   provide to your EuroCap Investments?

13             "A.  EuroCap seeks to invest in companies

14   and I keep an eye open for potential acquisitions.

15             "Q. Who do you deal with at EuroCap?

16             "A. I deal with a chap called Nigel and

17   C.J.

18             "Q. So the persons you have dealt with at

19   EuroCap are Mr. Comu, C.J. Comu, and someone named

20   Nigel; is that right?  Yes?

21             "A. Yes.

22             "Q. What is your understanding as to

23   Mr. Comu's involvement or relationship to EuroCap?

24             "A. I know he has dealings with them.

25             "Q. Do know whether he's an officer or

1   director of EuroCap or an owner?

2              "A. I'm not sure if he's an official owner,

3   director, or anything like that.

4              "Q. How did you have reason to get involved

5   with EuroCap Investments?  Did Mr. Comu contact you

6   about that?

7              "A. He told me about it, and I liked the

8   idea.

9              "Q. Tell me what Mr. Comu described as a

10  business plan or purpose for EuroCap.  What was it

11  engaged to do?

12             "A. EuroCap engaged -- is engaged in

13  acquiring up and coming companies that have moved beyond

14  the initial stages of formation, companies with a

15  certain track record.

16             "Q. Are these companies that are formed in

17  the UK?

18             "A. Essentially yes.

19             MR. SAROKHANIAN:  And moving to Page 23,

20  Line 4.

21             "Q.  Of what country are you a citizen?

22             "A. UK."

23             MR. SAROKHANIAN:  The next page, Page 24,

24  Line 8.

25             "Q.  Under what country's laws was that

1    entity formed?  Referring to Brown and Lampe.

2              MR. VITAL:  I'm sorry.  I missed.  Where

3    were you?

4              MR. SAROKHANIAN:  Let me start again.  Page

5    24, I will start at Line 3.  This is Mr. Lippe asking

6    the questions at this point.

7              "Q.  Okay.  I will ask the court reporter

8    to mark as Exhibit 4 this business card.  And we have

9    put it on a sticky note so that you can retain the

10   original, and we will just have a copy.  What is that

11   business card?

12             "A. That's the old business card of Brown

13   and Lampe, MBH, Limited.  So it's a limited company.

14             "Q.  And under what country's laws was that

15   entity formed?

16             "A. Austria.

17             "Q. Austria?  Were you previously the owner

18   of that company?

19             "A. Yes.

20             "Q. And what was the -- there was a

21   discussion before we began the deposition of the

22   corporate history.  Could you explain in your own words

23   what happened to this Austrian entity?

24             "A. Sold 2004."

25             MR. SAROKHANIAN:  Moving to Page 25, Line

1   5.

2              "Q. Okay.  So the name of Brown and Lampe

3   PLC, a UK corporation.  Is there any such entity

4   formally in existence?

5              "A. No.

6              "Q. So are you doing business using the

7   name of Brown and Lampe, PLC, a UK corporation?

8              "A. No."

9              MR. SAROKHANIAN:  Moving now to Page 28,

10  starting on Line 4.

11             "Q. At one point in time, isn't it correct

12  that The Barclay Group actually owned the predecessor

13  entity for Green Automotive?

14             "A. I believe so yeah.

15             "Q. Okay.  And then in November of 2009

16  there was a --

17             "A. That's right.

18             "Q -- a reorganization, was there not?

19             "A. Correct.

20             "Q. Okay.  Whose idea was that

21  reorganization?

22             "A. C.J., I believe.

23             "Q. We've got some documents that relate to

24  it, but generally was the plan to do a merger so that

25  there would be publicly traded stock and Barclay would

1   get some of that stock?

2            "A. Of course.

3            "Q. Okay.  And was it C.J. who made those

4   arrangements?

5            "A. Yeah.  C.J. and the people he works

6   with.

7            "Q. Okay.  Did -- go ahead.

8            "A. But we talk every week.  I follow

9   things in detail.

10           "Q. Did C.J. explain anything to you as to

11   which entities would get Green Automotive stock as a

12   result of this reorganization?

13           "A. Yeah, it was planning to sell different

14   bits of stock.

15           "Q. Did he mention any names as to who he

16   was planning to sell it to?

17           "A. No.

18           "Q. Did he disclose to you that some of the

19   stock was going to be distributed to trusts of family

20   members of his?

21           "A. I think so.  I think he mentioned names

22   of trusts and things, yeah.

23           "Q. Does TKY ring a bell?

24           "A. Yes.

25           "Q. TKY Trust ring a bell?

 1                "A. Yes.

 2                "Q. Okay.  And was Daptco D-A-P-T-C-O Trust

 3     another name he mentioned?

 4                "A. Yes.

 5                "Q. What was the purpose for putting the

 6     Green Automotive stock in those trusts?

 7                "A. Sell some stock.

 8                "Q. Okay.  And that was C.J.'s idea to put

 9     it in those trusts?

10                "A. Yes."

11                MR. SAROKHANIAN:  Moving to Page 31, Line

12     15.

13                "Q. As a result of this restructuring did

14     Barclay Group acquire a substantial number of shares of

15     Green Automotive.

16                "A. Yes.

17                "Q. What is your understanding or agreement

18     with C.J. concerning your salary or compensation or

19     partnership interest or whatever it's called?  How are

20     you going to make money by doing business with him and

21     The Barclay Group?

22                "A. I purchased The Barclay Group because I

23     had the intention of doing different types of deals.

24     For me, the states is pretty much offshore.  It's not as

25     offshore as St. Kitts or Nevis, but then to get to St.

1    Kitts and Nevis is, as you know, quite difficult.  It's

2    a plane journey.  It's change at that French colony and

3    then you've got to take a sea plane.  And so for me, a

4    U.S. entity is absolutely worth having especially at

5    that time.

6              So I took The Barclay Group and everything

7    to do with it.  I allowed C.J. to do the green car,

8    because I thought the green car was a great thing, at

9    least worth pursuing at any rate, even though they

10   didn't have the necessary permissions, the safety tests.

11   But as far as I was concerned, I didn't think that would

12   be a problem because the Chinese, I thought, couldn't be

13   so stupid as to put a car in for testing that failed

14   tests.

15             It didn't occur to me.  So I said to C.J.,

16   'look, all right, you can do all that, keep me up to

17   date though.'  We talk every -- every week really.

18   We've met also several times in the last -- we meet

19   several times a year, either in London.  We have met in

20   Spain a few times and France, Austria.  He's over again

21   in Bournemouth soon.  So you know, I see C.J. all the

22   time.  So I now I have forgotten all -- forgotten what

23   the question was.  All right.

24             "Q. Are you aware that The Barclay Group

25   and TKY Trust and Daptco Trust have sold stock totalling

1   some $4 million Green Automotive stock?

2                   "A. Yes.

3                   "Q. And directly or indirectly have you

4   received any of that cash that resulted from those

5   sales?

6                   "A. No, I have drawn some money from The

7   Barclay Group obviously.

8                   "Q. Through what means have you been

9   receiving money from The Barclay Group over, say, the

10  last three years?

11                  "A. I have instructed C.J. to send me some

12  money in the last 12 months, a bit of pocket money.

13                  "Q. How much has that been?

14                  "A. How much has it been?  It's been 20 --

15  20,000, not million.

16                  "Q.  $20,000?  Have you received directly

17  or indirectly any of the nearly $4 million that resulted

18  from --

19                  "A. No.

20                  "Q -- - the sales of Green Automotive?

21                  "A. No.  Unfortunately."

22                  MR. SAROKHANIAN:  Now moving to Page 38,

23  Line 3.

24                  "Q.  Well, let me withdraw that question.

25  Is it a corporation?

1          "A. The Barclay Group is a corporation.

2          "Q. Yes.  And what is the full name?

3          "A. The Barclay Group, Inc.

4          "Q.  Inc.  And what country is it

5    incorporated in?

6          "A. United States.

7          "Q. Okay.  Do you actually have any stock

8    in that company?

9          "A.  95 percent of it.

10         "Q. Okay."

11         MR. OLSON:  You misread.

12         MR. VITAL:  Oh, did I?

13         THE COURT:  99.

14         "A.  99 percent of it."

15         MR. VITAL:  Thank you.

16         "Q.  Okay.  Do you have an actual stock

17    certificate?

18         "A. No, but if I wanted one, I would get

19    one.

20         "Q. Are you a director or officer of The

21    Barclay Group?

22         "A. I am the -- I believe I am the

23    president.

24         "Q. Are there any corporate minutes for The

25    Barclay Group?

1                    "A. Kept by me, no.

2                    "Q. If there are any, who keeps them?

3                    "A. The lawyers of The Barclay Group.

4                    "Q. And do you know who those people are?

5                    "A. I do.  There's two.  But I can't recall

6      their names.

7                    "Q. Are they attorneys in Dallas?

8                    "A. I am not sure if they are based in

9      Dallas.  Probably.

10                    "Q. But are they in the U.S.?

11                    "A. They are in the U.S., yeah, I think

12     they are in Dallas.  Yeah.

13                    "Q. To your knowledge, are you a signatory

14     for any corporate accounts, any checking accounts of The

15     Barclay Group?

16                    "A. Not yet.  Not yet.

17                    "Q. When you got $20,000 from C.J. over the

18     last year, $30,000, in what form did you receive that?

19                    "A. Transfers.  Wires.

20                    "Q. Wire transfers?  More than one?  You

21     need to say --

22                    "A. Yes.  Yes.

23                    "Q. Do you recall what account those came

24     from?

25                    "A. No, I don't.

1                "Q. Into which account did you receive it?

2    Was it one in your name individually or some business of

3    yours?

4                "A. Into someone else's account.  I try and

5    avoid too much going through my accounts for tax

6    reasons.

7                MR. SAROKHANIAN:  Turning to Page 42, Line

8    20.

9                "Q. Well, considering how much I know about

10   Portuguese animal life, which is zero, you could be

11   right.  When did you first meet C.J.?

12               "A. 1996.

13               "Q. What company was he involved with then?

14               "A. I believe it was Air Tech.  I can't

15   remember what the first deal was.

16               "Q. What was the business of Air Tech as

17   you understand it?

18               "A. The manufacturing of air conditioning

19   units, have them sent to our office in random, pretty

20   good things, pretty good machines.

21               MR. SAROKHANIAN:  Turning to Page 49, Line

22   20.

23               "Q. There's a partnership known as Sunset

24   Pacific.  Have you heard of it?

25               "A. I don't think so.

1                    "Q. In what respect have you met Phyllis

2     Comu, just socially?

3                    "A. She accompanied C.J. to Vienna in 1999,

4     I believe.

5                    "Q. Is she involved in any of his

6     businesses, to your knowledge, other than just being his

7     wife?

8                    "A. I don't know.  I know she -- she has

9     some interest in one of those companies, Sunset --

10    Sunset Pacific, yeah.  Yeah, that's right.  The one you

11    just mentioned --

12                    "Q. Right.

13                    "A -- is one of the companies where some

14    stock was sold, correct.

15                    "Q. But to your knowledge, does she have

16    any active involvement in running any of these

17    businesses --

18                    "A.  I wouldn't know.

19                    "Q -- activities of C.J.'s.?

20                    "A. I wouldn't know.  I think she spends

21    her time involved in some charity work and the usual

22    stuff that women do, like for pleasure."

23                    MR. SAROKHANIAN:  Now, turning to Page 51,

24    Line 1.  And Judge, if you look at Trustee Exhibit

25    Number 16 that's what they're about to refer to.

1                    THE COURT:  Okay.  16?

2                    MR. SAROKHANIAN:  Yes, ma'am.

3                    THE COURT:  I got it.

4                    MR. SAROKHANIAN:  By Mr. Lippe:

5                    "Q.  Exhibit 7, do you recognize that as

6        the 2008 tax return for The Barclay Group?

7                    "A. Yes.

8                    "Q. Did you have any involvement in the

9        preparation of that?

10                   "A. No.

11                   "Q. There were -- there was basically no

12       business activity in 2008; is that correct?

13                   "A. That's what it looks like."

14                   MR. SAROKHANIAN:  Your Honor, the next

15       exhibit they refer to is Trustee 17.

16                   THE COURT:  Okay.

17                   "Q.  2009.  Is Exhibit 8 the 2009 tax

18       return?

19                   "A. Yeah.

20                   "Q. Did you have any involvement in

21       preparing that return?

22                   "A. No.

23                   "Q. Was C.J. the one who handled getting

24       these prepared?

25                   "A. I wouldn't know who it is that did the,

Case 10-03269-sgj Doc 184 Filed 10/22/14   Entered 10/22/14 13:44:35   Page 72 of 225
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 219 of 256   PageID 1212

72

 1    the preparation.

 2              "Q. It reflects that there was a CPA firm

 3    down there.

 4              "A. Yeah.

 5              "Q. Do you know who dealt with Alvin Dahl?

 6              "A. No.

 7              "Q. It was not you then, was it?

 8    Exhibit 9, is that the 2010 tax return for Barclay?

 9              "A. Looks like it.

10              "Q. And the income went up considerably,

11    did it not?

12              "A. Yes.

13              "Q. Do you know what salary or compensation

14    C.J. got from The Barclay Group in 2010?

15              "A. Not in my head, no.

16              "Q. What is the reason for the increase in

17    income comparing 2009 to 2010?

18              "A. I don't know.

19              "Q. Were there any other sources of income

20    for The Barclay Group in 2010 other than sales of Green

21    Automotive stock?

22              "A. Can't remember.

23              "Q. But you do recall that it had income as

24    a result of Green Automotive sales, correct?

25              "A. Oh, yeah.

Case 10-03269-sgj Doc 184 Filed 10/22/14 Entered 10/22/14 13:44:35 Page 73 of 225
Case 3:14-cv-04163-B Document 1-5 Filed 11/21/14 Page 220 of 256 PageID 1213

73

1          "Q. Do you recall as part of reorganization

2     of the relationship between Green Automotive and The

3     Barclay Group in 2009 that there was an agreement that

4     Barclay Group would loan money to Green Automotive?

5          "A. Yes.

6          "Q. And where did that money come from that

7     was going to be lent to Green Automotive?

8          "A. I don't know.

9          "Q. You did not furnish any capital to

10    Green Automotive to fund any loans, did you?

11         "A. No.

12         "Q. Okay.  So would that have been funds

13    generated from C.J. or some of the businesses that he

14    was conducting, the money that was lent to Green

15    Automotive?

16         "A. Presumably.

17         MR. SAROKHANIAN:  Moving to Page 55, Line

18    21.

19         "Q. Were you aware that The Barclay Group

20    and these trusts that C.J. has set up were getting

21    restricted Green Automotive stock?

22         "A. Yeah.

23         "Q. And in laymen's terms, I'm not asking

24    you a legal opinion, but what do you understand that

25    means in terms of your ability to sell the stock?

1              "A. The legends have to be lifted on

2    restricted stock.  It can be various.  Usually it's a

3    time, time limited, but you know the laws change

4    continually.  First of all the company has to become

5    viable before you -- and then you have to do some

6    filings.  And then you can lift the legends.  It varies

7    from company to company.

8              "Q. Yeah.  Has it ever been explained to

9    you that if the purchaser represents that he is a

10   sophisticated investor and a certain net worth

11   requirements that they can purchase the stock even if

12   it's not registered?

13             "A. Yes.

14             "Q. Exhibit 2 to your deposition, do you

15   know who prepared this document?

16             "A. No.

17             "Q. Was it prepared in the United States

18   and then sent to you?

19             "A. Yeah, I believe so.

20             "Q. Yeah, did C.J. arrange to have it

21   prepared?

22             "A. Probably."

23             MR. SAROKHANIAN:  Moving to Page 61, Line

24   5.

25             "Q. I want to go back to the sale of Brown

Case 10-03269-sgj Doc 184 Filed 10/22/14   Entered 10/22/14 13:44:35   Page 75 of 225
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 222 of 256   PageID 1215

75

1   and Lampe in 2004 where B and L was sold, but you

2   retained the name.  Was that a stock transaction, did

3   you sell the stock of Brown and Lampe?

4              "A. Yeah.

5              "Q. And can you tell me the party who

6   bought it?

7              "A. Dr. Carl Dienelt.

8              "Q. Can you spell that last name?

9              "A. D-I-E-N-E-L-T.

10             "Q. How did you -- let's go back.  What did

11  Dr. Dienelt pay for the stock?

12             "A. It was a million.  A million.

13             "Q. A million what?

14             "A. Euro.

15             "Q. And what assets did Brown and Lampe

16  have at the time of the sale?

17             "A. The clients, 2000 clients, its license.

18             "Q. What type of license are you referring

19  to?

20             "A. Trading license and license to be a

21  brokerage.

22             "Q. So a stock trading license?

23             "A. A stock trading license.

24             "Q. Who issued the license?

25             "A. The Austrian financial services.

1          "Q. So were those all the stock

2     transactions, in which Brown and Lampe was involved as a

3     broker, transactions on the Austrian stock exchange?

4               "A. Some.

5               "Q. But not all?

6               "A. We -- most of all our client -- most of

7     our clients held U.S. accounts.

8               "Q. So was Brown and Lampe authorized to

9     act as a broker with respect to U.S. stock transactions?

10              "A. Yes.

11              MR. SAROKHANIAN:  Moving to Page 63, Line

12    10.

13              "Q.  At the time of the sale to Dr. Dienelt

14    were the 100 percent owner Brown and Lampe?

15              "A. Yes."

16              MR. SAROKHANIAN:  Page 64, Line 6.

17              "Q.  What was the consideration you

18    provided for the acquisition of the interest you have in

19    The Barclay Group?

20              "A. The consideration?  Well, it was a

21    share swap so --

22              "Q. But in 2007 Brown and Lampe was a

23    d/b/a, right.

24              "A.  Correct.

25              "Q. So what stock was being swapped?

1              "A. Well, I was going to register the Brown

2    and Lampe, but I haven't done it yet.

3              "Q. So at time of the acquisition

4    agreement -- let's pull that out again, Exhibit 2.  On

5    the effective date of the acquisition agreement,

6    December 30, 2007, there was no stock of Brown and

7    Lampe, correct?

8              "A. Correct.

9              "Q. Take a look at Page 3 of Exhibit 2,

10   there's a heading at the bottom of the page.  It says

11   representations and warranties and says of inside energy

12   corp but that should be Brown and Lampe, correct?

13             "A. Right.

14             "Q. Below that it says B and L represents

15   and warrants TBG and the shareholders that, and there's

16   various representations, do you see that?

17             "A. Yes."

18             MR. SAROKHANIAN:  Moving to Page 66, Line

19   14.

20             "Q. I would like you to read yourself 3.1

21   and tell me when you're done reading that.

22             "A. Okay.

23             "Q. Okay.  At the time you signed this

24   agreement, those representations were not accurate, were

25   they?

Case 10-03269-sgj Doc 184 Filed 10/22/14   Entered 10/22/14 13:44:35   Page 78 of 225
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 225 of 256   PageID 1218

78

1          "A. No, but they were going to be accurate.

2          "Q. They were going to be accurate.  But

3   this is a present tense.  It states, quote, in a

4   corporation duly organized, end quote.  That was not

5   true at the time you signed this agreement, was it?

6          "A. No.

7          "Q. Take a look at 3.2, Page 4 again,

8   Section 3.2.  Read that to yourself and let me know when

9   you're done.

10          "A. 3.2?

11          "Q. Yes.  Quote, unquote, capital.

12          "A. Yeah.

13          "Q. Are those statements accurate as of

14   December 30, 2007, are those statements contained in 3.2

15   accurate?

16          "A. They would have been when the

17   corporation had been formed.

18          "Q. Mr. Brown, listen to my question.  On

19   December 30, 2007, were the representations contained in

20   3.2 accurate?

21          "A. At the moment in time because there was

22   a delay, no.

23          "Q. It refers to -- it states here, quote,

24   at the closing of the transaction contemplated by this

25   agreement, B and L shall have 50 million shares of

1    common stock, end quote.  Who were the contemplated

2    shareholders of that common stock?

3              "A. Myself.

4              "Q. And what about the Series A and the

5    Series B preferred shares reference?  Who was supposed

6    to be on those preferred shares?

7              "A. Well, I mean the corporation would have

8    had those shares.  That would have been the share

9    structure.

10             "Q. It states here that, quote, 1 million

11   shares of Series A preferred stock issued in out

12   standing, end quote.

13             "A. Yes.

14             "Q.  Were there, in fact, Series A

15   preferred shares ever issued?

16             "A. No, they were going to be though,

17   weren't they?

18             "Q. I don't know.  Who would they be issued

19   to?

20             "A. I don't recall at the moment.

21             "Q. Have you retained a copy of the

22   acquisition agreement marked as Exhibit 2?

23             "A. No."

24             MR. SAROKHANIAN:  Moving to Page 69, Line

25   21.

1              "Q.  Take a look at the third page of

2   Exhibit 7, please.

3              "A. Yeah.

4              "Q. Do you see the reference to Brown and

5   Lampe, PLC --

6              "A. Yeah.

7              "Q -- 99 percent ownership; that's not

8   accurate, is it?

9              "A. No.  Well, it's not accurate from the

10  point of view of, you know, as we have discussed the --

11             "Q. The fact that there was no PLC in

12  existence at the time.

13             "A. I would say that there were mere

14  formalities.

15             "Q.  What was mere formalities?

16             "A. Getting the documentation done.

17             "Q. But at the time this return was

18  prepared, Brown and Lampe, PLC did not exist, did it,

19  correct?

20             "A. Correct."

21             MR. SAROKHANIAN:  Line 24.

22             "Q. Take a look at Exhibit 8, please.

23             "A. Yeah.

24             "Q. Take a look at the seventh page of that

25  document.  It has at the top, quote, Schedule G,

1    information on certain persons owning the corporations

2    voting stock, end quote.

3                   "A. What page?

4                   "Q. It's seven pages in."

5                   MR. SAROKHANIAN:  Page 72, Line 5 by

6    Mr. Elmquist.

7                   "Q. Do you see the reference there on the

8    seventh page.  It's Schedule G information on certain

9    persons owning the corporation's voting stock.  And

10   there's a reference to Brown and Lampe, PLC as owning

11   99 percent interest, yes?

12                  "A. Yes.

13                  "Q. It's not accurate, correct?

14                  "A. It's not accurate insofar as the

15   paperwork is concerned except I am Brown and Lampe, PLC.

16                  "Q. But it doesn't show you as an owner.

17   It shows Brown and Lampe, PLC, right?

18                  "A. Yeah, if you want to split hairs.

19                  "Q. The accurate statement of ownership

20   should be Bernard Brown d/b/a Brown and Lampe.

21                  "A. Yes, if you want to split hairs.

22                  "Q.  Did you inform Mr. Dahl and Mr. Comu

23   of the inaccuracy contained in the 2010 return?

24                  "A. Don't recall."

25                  MR. SAROKHANIAN:  Page 73, Line 9.

 1   Actually I will go to Line 3.

 2              "Q. I was asking you, Mr. Brown, about the

 3   2009 return.  I misspoke.  Inaccuracy contained in the

 4   2009 return, which is Exhibit 8.  Do you recall any

 5   discussions with Mr. Dahl or Mr. Comu concerning that

 6   inaccuracy?

 7              "A. No.

 8              "Q. All right.  Now I would like you to

 9   look at Exhibit 9 which is the 2010 return."

10              MS. HANKS:  I will just direct you to

11   Trustee's Exhibit 18.

12              THE COURT:  Okay.  All right.  Got it.

13              "Q.  All right.  Now I would like you to

14   look at Exhibit 9 which is the 2010 return.  This time

15   Schedule G is the eighth page of the document.  Can I

16   find it -- directing your attention to the eighth page,

17   which is Schedule G, information on certain persons

18   owning the corporation's voting stock.  Again, there's a

19   reference to Brown and Lampe, PLC, do you see that?

20              "A. Yeah."

21              MR. SAROKHANIAN:  Turning to Page 82, Line

22   11.

23              "Q. The Barclay Group did -- has The

24   Barclay Group since you've been involved with it had any

25   board meetings?

1                    "A. Board meetings?

2                    "Q. I mean a meeting of the board of

3       directors -- well, do you know who the board -- excuse

4       me -- well, do you know who the director or directors of

5       The Barclay Group are?

6                    "A. I -- I'm not -- I don't know them

7       personally.  Whether they have had board meetings, I

8       don't know, presumably that they have.

9                    "Q. Have there been any shareholder

10      meetings of The Barclay Group?

11                   "A. I am not aware of any, but presumably.

12                   "Q. Have you seen any corporate bylaws for

13      The Barclay Group?

14                   "A. I have looked at them, received them, I

15      believe some of the documents come my way.

16                   "Q. And I think you testified earlier that

17      you believe that you were the president of The Barclay

18      Group?

19                   "A. Yes.

20                   "Q. Is there some document that reflects

21      that appointment as president of The Barclay Group such

22      as a board resolution or any document that would

23      indicate that you have been named president?

24                   "A. I haven't seen any.  I know that I have

25      seen my title, I believe, on emails, that sort of stuff

1    or business cards.  I believe I have got business cards

2    at the time.

3                "Q. Have you seen any documents that would

4    have been filed on behalf of The Barclay Group of Texas

5    Secretary of State.

6                "A. No, not that I recall.  It's possible.

7                "Q. When did you become president of The

8    Barclay Group?

9                "A. The date, I don't recall.

10               "Q. Well, were you the president of The

11   Barclay Group in 2011?

12               "A. By then, yeah.

13               "Q. How about 2010?

14               "A. Couldn't tell you.

15               "Q. But you're fairly definite about 2011

16   you were president?

17               "A. I think so."

18               MR. SAROKHANIAN:  Now, Your Honor, the next

19   exhibit is marked as Trustee Exhibit 63.

20               THE COURT:  Okay.  I'm there.

21               MR. SAROKHANIAN:  Line 12.

22               "Q. Take a look at Exhibit 12, Mr. Brown,

23   and tell me if you have seen this document before.

24               "A. I can't recall.

25               "Q. About a third way down under Section A,

1  this form shows a listing of the -- each officer,

2  director, member, do you see that?

3              "A. Yes.

4              "Q. The only name listed there is Mr. Comu

5  as president, do you see that?

6              "A. I see a, quote, P-R-E-S, period, end

7  quote.

8              "Q. That's short for president, I believe.

9  So based on your understanding of officers of The

10  Barclay Group, is this statement by Mr. Comu accurate?

11             "A. It would imply that I wasn't the

12  president myself.

13             "Q. Okay.  Tell me about the circumstances

14  surrounding your being appointed as president or elected

15  as president, how did that come about?

16             "A. It came about that in that I thought I

17  was the president.

18             "Q. Well, I appreciate --

19             "A. But I don't know when that happened.

20             "Q. Okay.  How did you come to the belief

21  that you were president of The Barclay Group?

22             "A. I must have been told that.  I must

23  have appointed C.J. as my temporary president for

24  purposes of this document."

25             MR. SAROKHANIAN:  We're moving -- we're

1  almost through with this.  I know we have lunch coming

2  up.

3              THE COURT:  Okay.

4              MR. SAROKHANIAN:  Moving to Page 87, Line

5  6.

6              "Q. As it relates to the business and

7  management of U.S. corporations, do you know who is

8  responsible for the business and management of a U.S.

9  corporation under --

10              "A. The president or chief executive

11  officer.

12              "Q. What about what is the role of a

13  director, a board of directors for a U.S. corporation?

14              "A. The board of directors, chairman of the

15  board I believe that -- that will be set out in some

16  kind of memorandum specifying who can do what.

17              "Q. Have you seen any such memorandum as

18  relates to The Barclay Group?

19              "A. I have probably seen documents, but I

20  haven't like spent -- I would rather read a book or

21  something else than study documents of this nature.

22              "Q. Okay.  Well, this all goes back to the

23  belief that you were president of The Barclay Group.  I

24  will tell you that as a matter of U.S. corporate law,

25  the officers of a corporation are typically appointed to

```
 1   the board of directors.

 2              "A. Okay.

 3              "Q. And so my question is, do you recall

 4   there being any kind of meeting or discussion with any

 5   board members as relates to your appointment as

 6   president of The Barclay Group?

 7              "A. I don't recall that specifically, no.

 8              "Q. All right.  So your belief that you

 9   were president of The Barclay Group is essentially based

10   on -- upon some conversation you had with Mr. Comu?

11              "A. It is.

12              "Q. You have never seen any writing

13   indicating you were appointed as president; is that

14   right?

15              "A. I may have done -- I don't recall it

16   though."

17              MR. SAROKHANIAN:  Page 89, Line 14.

18              "Q. Right.  Let me ask you this before I

19   introduce a bunch more documents you haven't seen or

20   don't recall.  Mr. Lippe asked you about stock purchase

21   agreements between The Barclay Group and several

22   companies, Daptco Trust.

23              "A. That's right.

24              "Q. TKY Trust and Sunset Pacific.  And

25   there are stock purchase agreements pertaining to those
```

 1  transactions?

 2              "A. Yes.

 3              "Q. Do you recall seeing those agreements

 4  at or about the time they were prepared in January 2010?

 5              "A. I don't specifically remember seeing

 6  individual agreements, but I remember him talking about

 7  the transactions.

 8              "Q. Okay.  What do you recall him telling

 9  you about the transactions?

10              "A. The selling of shares.

11              "Q. Did you and Mr. Comu discuss the terms

12  upon which The Barclay Group would sell these shares to

13  these entities?

14              "A. The detail, no.  I don't recall

15  discussing the detail.

16              MR. SAROKHANIAN:  Page 92, Line 16.

17              "Q. In connection with The Barclay Group

18  sales of Green Auto stock, you yourself -- you earlier

19  testified you yourself received none of the proceeds of

20  those sales; is that right?

21              "A. Correct.

22              "Q. And is it also true that no company in

23  which you have any affiliation or connection with

24  received any of the proceeds of those sales?

25              "A. Correct."

1    MR. SAROKHANIAN:  Page 94, Line 11.  And

2    this, Your Honor, is Trustee's Exhibit 65 for your

3    reference.

4            THE COURT:  Okay.

5            "Q. Take a look at Exhibit 17, please, and

6    tell me if you recall seeing this document before.

7            "A. No, I haven't.

8            "Q. Excuse me?

9            "A. I haven't.

10            "Q. Have you ever been sent any type of

11   financial statements for The Barclay Group?

12            "A. Not that I can specifically recall, no.

13            "Q. Do you recall having any discussions

14   with anyone who has prepared financial statements or

15   account statements for The Barclay Group?

16            "A. Don't think so."

17            MR. SAROKHANIAN:  Moving along to Page 100,

18   Line 6.

19            "Q. Mr. Lippe was asking you about the

20   stock that was issued by Green Auto and indicated in

21   that testimony that the stock that was issued was

22   restricted stock.  Do you recall that?

23            "A. The stock issued to?

24            "Q. The Barclay Group.

25            "A. Yes.

1           "Q. Are you aware that there's also

2   unrestricted stock issued to The Barclay Group?

3           "A. Yes.

4           "Q. Okay.  What are the plans with respect

5   to that unrestricted stock?

6           "A. Sell it."

7           MR. SAROKHANIAN:  Page 101, Line 5.

8           "Q. Okay.  Have you talked about a specific

9   number of sales that you would contemplate selling at

10  this time?

11          "A. Not really.

12          "Q. Have you discussed in the sale of that

13  stock who would receive the proceeds from that sale?

14          "A. We've talked about it, yes.

15          "Q. Tell me what you have discussed.

16          "A. Investing the money for the future.

17          "Q. Investing it in where?

18          "A. Well, part might be invested in Spain

19  in property perhaps.

20          "Q. Okay.  So what you have discussed with

21  Mr. Comu would be to use the proceeds from those sales

22  to acquire an interest in property?

23          "A. A villa.

24          "Q. Okay.  In Spain?

25          "A. Correct."

```
1                    MR. SAROKHANIAN:  Page 103, Line 2.

2                    "Q. Well, have you a timetable in mind as

3    to when you think some of the stock should be sold?

4                    "A. Sooner rather than later.

5                    "Q. And just so I'm clear on this, to the

6    point you have -- to this point you have had no

7    discussions with Mr. Comu about the allocation of the

8    proceeds of the sale of this common stock between

9    Mr. Comu and you or some entity or interest you own?

10                   "A. I'm sorry.  Regarding the sale -- the

11   sale of the common stock?

12                   "Q. Yes.  No.  Yeah.  The sale of the Green

13   Auto stock, the unrestricted stock.

14                   "A. Right.

15                   "Q. You have had no conversations with

16   Mr. Comu regarding how the proceeds of the sale of that

17   stock would be allocated between Mr. Comu and you?

18                   "A. No, we haven't.  We have discussed it,

19   but we haven't come to any cut yet.  We haven't cut the

20   cake.

21                   "Q. What have you discussed in terms of an

22   allocation?

23                   "A. We haven't."

24                   MR. SAROKHANIAN:  Page 104, Line 5.

25                   "Q. If the we (sic) are selling the Green
```

1   Auto stock owned by The Barclay Group --

2           "A. Correct.

3           "Q -- - and as between you and Mr. Comu, if

4   he owns one percent of The Barclay Group and you own

5   99 percent of The Barclay Group, would you expect that

6   the proceeds from the sale of that Green Auto stock

7   would be one percent to Mr. Comu and 99 percent to you?

8           "A. No, no, because Mr. Comu has been the

9   person who's been most involved in the deals running

10  through The Barclay Group.  He's been doing the work

11  there.  And I have said I don't mind that.  I liked it

12  except when they failed the tests.  And the question now

13  is where we proceed from here.  Now he got some shares,

14  which is normal.  They are deposited in The Barclay

15  Group.  I suppose because he didn't want to hide things,

16  he's kept it all where it should be, where all the

17  transactions were done.  And at some point now I

18  understand the stock is coming up to be sold and as I

19  say this was mostly his deal.  So there's no 99 to one

20  split.

21          "Q. Okay.  So you're saying for the work

22  that Mr. Comu has done individually with respect to the

23  Green Auto transactions, he would be due some portion of

24  the sale of the stock over and above his ownership

25  interest?

1           "A. Would you repeat that?

2           "Q. Sure.  Basically what you're saying is

3   that because Mr. Comu has provided services to The

4   Barclay Group in connection with Green Auto transactions

5   that you feel it fair that Mr. Comu receive something

6   more than his one percent of the sale proceeds because

7   of his services?

8           "A. Oh, yes.

9           "Q. Is that right?

10          "A. Correct.

11          "Q. But you have not struck a deal with

12  Mr. Comu as it relates to that split?

13          "A. Not yet.

14          "Q. Do you have a timetable in mind for

15  selling the stock and reaching agreement on this?

16          "A. No real timetable."

17          That concludes the excerpts from

18  Mr. Brown's deposition, Your Honor.

19          THE COURT:  All right.  Does any other

20  lawyer want to add excerpts to the record for

21  consideration?  No?  All right.  I'm sorry?

22          MR. OLSON:  Just one, Your Honor.

23          THE COURT:  You did?  Okay.

24          MR. OLSON:  I will have to find my place.

25  (Inaudible).

```
 1                    THE COURT:  Sure.

 2                    MR. OLSON:  (Inaudible) find it faster --

 3   where no proceeds of any of the sales went into any

 4   entity that you had any ownership interest in and the

 5   next one (inaudible) except TBG and he said --

 6                    MS. HANKS:  I actually marked that as well.

 7   (Inaudible).

 8                    MR. OLSON:  (Inaudible).

 9                    MS. HANKS:  I marked it.  Just give me a

10   second.

11                    MR. OLSON:  Do we know what page that was?

12                    MS. HANKS:  Here it is.  It's on Page 53.

13                    MR. SAROKHANIAN:  Do you want me to read it

14   in, Mr. Olson?

15                    THE COURT:  53.

16                    MS. HANKS:  You should read the whole.

17                    MR. OLSON:  No, that's not the one.

18                    MS. HANKS:  Is that not it?

19                    MR. OLSON:  It was just a real quick -- on

20   Page 92, Your Honor, Line 25.

21                    THE COURT:  92.  Okay.  So I think Line 16

22   through 24 were read into the record.

23                    MR. OLSON:  Yes.

24                    THE COURT:  And you want to supplement

25   your --
```

Case 10-03269-sgj Doc 184 Filed 10/22/14   Entered 10/22/14 13:44:35   Page 95 of 225
Case 3:14-cv-04163-B   Document 1-5   Filed 11/21/14   Page 242 of 256   PageID 1235

95

1          Question:

2          "With the exception of The Barclay Group?"

3          Mr. Elmquist:

4          "Q. Right, with the exception of The

5  Barclay Group."

6          The witness:  "Yeah."

7          MR. OLSON:  Through Line 4 on Page 93.

8          THE COURT:  All right.  That is added to

9  the record.  Anything else?

10          All right.  Well, very good.  It is one

11  minute until 1:00 so Mr. Vital you can run down the

12  street now.

13          MR. VITAL:  Thank you, Your Honor.  Thank

14  you very kindly.

15          THE COURT:  Reconvene at 2:30 today.

16          (Break taken.)

17          THE COURT:  Be seated.  We will be going

18  back on the record now in King Louie Mining versus Comu,

19  Adversary 10-3269.

20          Are plaintiffs ready to call their next

21  witness?

22          MS. HANKS:  Yes, Your Honor, we are.  We're

23  going to --

24          MR. VITAL:  We're going to do more

25  deposition testimony.

```
 1              THE COURT:  All right.  Well, let's go
 2   ahead -- and who's going to be the witness.
 3              MR. VITAL:  I will be the witness again.  I
 4   really enjoyed that.
 5              THE COURT:  Okay.  Well, you were missing a
 6   British accent and I had a feeling that witness probably
 7   had a British accent, so you need to work on that.
 8              MR. VITAL:  I got (inaudible) my British
 9   accent, I think.
10              THE COURT:  All right.  I'm ready for
11   witness number three.
12              MR. SAROKHANIAN:  Thank you, Your Honor.
13   We will call ALVIN DAHL by deposition.
14              THE COURT:  All right.  Is it Alvin Dahl?
15              MR. SAROKHANIAN:  Yes, Your Honor, Alvin
16   Dahl.
17              THE COURT:  Okay.
18              MR. SAROKHANIAN:  This is a short
19   deposition, so I will just be going through it
20   chronologically, Your Honor.
21              THE COURT:  Okay.  I don't -- do I have
22   that deposition, copy of it?
23              MS. HANKS:  Your Honor, if you don't, I
24   have a copy of it right now.
25              THE COURT:  Is it already -- is it actually
```

1  an exhibit in the record or no?

2                    MS. HANKS:  Did you make it an exhibit?

3                    MR. VITAL:  No, that's your copy.  That has

4  the exhibit and the (inaudible).

5                    MS. HANKS:  This is the transcript.

6                    THE COURT:  Okay.  Thank you.  Dawn, this

7  is Alvin A-L-V-I-N Dahl D-A-H-L.  You may proceed.

8                    MR. SAROKHANIAN:  Thank you, Your Honor.

9  By Mr. Elmquist on Page 3, Line 4.

10                    "Q.  Good morning, Mr. Dahl.  I'm here as

11  an attorney for the bankruptcy trustee in pending

12  bankruptcy case of Mr. Comu.  And I'm here to ask you

13  some questions.  There's no lawsuit this relates to.

14  This is simply an open-ended examination of the debtor,

15  Mr. Comu's financial affairs, assets and liabilities.

16  And since you prepare tax returns for Mr. Comu and his

17  wife and for various business entities, you're here

18  today to give testimony with respect to that.

19                    "A. Okay.

20                    "Q.  You understand all that?

21                    "A. Yes.

22                    "Q. Okay.  Have you ever been deposed

23  before?

24                    "A. Oh, yes.

25                    "Q. Okay.  So you understand how it works?

1                    "A. Yes.

2                    "Q. Okay.  Let's start with just a brief

3       account of education after high school.

4                    "A. Tyler Junior College, associate of arts

5       degree; University of Texas at Austin, bachelor of

6       business administration; and University of Texas at

7       Dallas.  36 hours beyond a bachelor's degree, most of it

8       in accounting.

9                    "Q. Okay.  And when did you get your degree

10      at UT?

11                   "A. Austin?

12                   "Q. Yes.

13                   "A. '66.

14                   "Q. When did you start working -- are you a

15      licensed CPA?

16                   "A. Yes.

17                   "Q. Okay.  When did you start working as an

18      accountant?

19                   "A. '92.

20                   "Q. Okay.  What did you do after you

21      graduated from UT?

22                   "A. I was in the savings and loan business.

23                   "Q. An accounting function or finance

24      function?

25                   "A. I was president and chairman of the

```
 1   board of two of them.
 2               "Q. Okay.
 3               "A. So I did -- they were small new
 4   charters, and I did -- I did accounting functions there
 5   also.
 6               "Q. Okay.  When did you start working as an
 7   accountant where you would prepare tax returns for
 8   individuals or companies.
 9               "A. '92.
10               "Q. And -- okay.  So starting in '92, give
11   me a brief account of your employment history.
12               "A. I did some part-time tax returns in
13   '92.  And '92 to '93 I was a CFO of a manufacturing
14   company and then in late '93 I went into partnership
15   with an existing firm, and --
16               "Q. Where was that?
17               "A. At that time it was Ray Dahl and
18   Associates.
19               "Q. Okay.  Was that here in the Dallas
20   area?
21               "A. It was here in Dallas, yes.  And we had
22   an office in Phoenix.  And then I pulled out in '95 to
23   open my own firm.
24               "Q.  That's Alvin Dahl & Associates?
25               "A. Yeah.
```

1                    "Q. And you have been employed in that

2       capacity since '95?

3                    "A. Yes.

4                    "Q. Doing what kind of work?

5                    "A. Well, we did tax returns.  We did -- up

6       until 2001 we did audits.  In 2001 I sold that half of

7       the practice that included all the audit work.

8                    "Q. Since 2001, it's been strictly doing

9       tax returns?

10                   "A. Of that -- oh, sorry, tax returns and

11      in '93 and '94 I was CFO of a small public company.

12                   "Q. Of that --

13                   "A. Along with that.

14                   "Q. Once you started your business in '95,

15      you then sold the audit side in 2001.  So 2001 forward

16      it was principally doing tax returns?

17                   "A. Yes.

18                   "Q. Okay.  Do you have anyone that you work

19      with at Alvin Dahl & Associates, another professional?

20                   "A. Not any more.  I used to have two

21      auditors that worked for me.

22                   "Q. Was that prior to selling the audit

23      practice?

24                   "A. Yeah.

25                   "Q. All right.

1          "A. They were both CPAs and had a lot of

2    experience in auditing.

3          "Q. Do you recall when you first started

4    doing tax work for Mr. Comu?

5          "A. It would have probably been '95,

6    something like that.

7          "Q. Okay.  And you have been doing returns

8    for him continuously since '95?

9          "A. Yes.

10         "Q. Have you also done returns for any of

11   his businesses in which he's been involved since then?

12         "A. Some of them, yes.

13         "Q. Which ones come to mind?

14         "A. Well, the Sunset Pacific and Marathon

15   which is a -- which is the --

16         "Q. Management company?

17         "A. Management company operation.  Since I

18   have been sick, I -- sometimes I have trouble finding

19   words and I just --

20         "Q. As we get older, we all have that

21   difficulty."

22         MR. SAROKHANIAN:  And by Mr. Olson, "may

23   just be function of aging."

24         "A.  Could be.  Could be."

25         MR. SAROKHANIAN:  By Mr. Elmquist:

1          "Q. Affectionately known as senior moments,

2    I guess, but anyway happens to me a lot.  All right."

3              MR. ELMQUIST:  You didn't have to read that

4    in.

5          "Q. Let's talk about Sunset Pacific real

6    quick.

7          "A. Okay.

8          "Q. In the preparation -- well, with

9    respect to Sunset Pacific, did you do any kind of

10   accounting work for that entity other than preparing tax

11   returns?

12         "A. No.

13         "Q. And in the preparation of returns for

14   Sunset Pacific, who did you work with at that company?

15         "A. C.J.

16         "Q. Anyone else?  David Parsley?

17         "A. No.

18         "Q. Strictly Mr. Comu?

19         "A. Yeah.

20         "Q. Okay.  Describe for me the process, the

21   typical process in preparing a federal income tax return

22   for Sunset Pacific as it relates to how you would go

23   about gathering information for purposes of preparing a

24   return?

25              "A. Basically in any case the client would

1  bring in information, their income, expense items, which

2  could be substantial, could be not much and usually an

3  income statement, balance sheet or something of that

4  nature.

5          "Q. Okay.  And did Mr. Comu provide income

6  statements and balance sheets for Sunset Pacific, to

7  your recollection?

8          "A. I don't think back in the period that

9  we talked about here.

10          "Q. Well, I'm sorry.  Let's -- because of

11  the time period, I'm focusing on necessarily really

12  starts around 2005, so in that time frame.

13          "A. 2005.  In 2005 there was very little

14  information necessary to prepare the return.  I think

15  there was -- I looked at it yesterday.  It's the only

16  one of these that I have looked at since, since I

17  printed them, and I think there was like $11- or $12,000

18  income total for that year.

19          "Q. I'm going to start over.  Because at

20  different examination so we can go ahead and use" --

21          By Mr. Olson:  "Yeah".

22          Mr. Elmquist:  "Dahl 1."

23          Mr. Olson:  "That's fine.  Just be Dahl 1."

24          MR. SAROKHANIAN:  And Your Honor, for your

25  convenience, we're referring to Trustee Exhibit

```
 1    Number 30.
 2                THE COURT:  Okay.  I'm there.
 3                "Q.  Mr. Dahl, take a look at what's been
 4    marked as Dahl 1 and tell me if you recognize this to be
 5    a copy of the --
 6                "A. Yes.
 7                "Q -- 2005 tax return you prepared for
 8    Sunset Pacific?
 9                "A. Yes.
10                "Q. This copy is not signed by you or
11    Mr. Comu, so let's talk about that for a minute.  Do you
12    have copies of the returns that are signed?
13                "A. No, my process typically is I do three
14    returns, three copies.  I give one is prepared signed by
15    me and I give to the client and they -- that they can
16    sign at their leisure or whatever.  They file the
17    return.  I don't file the return for them.
18                "Q. So you prepare the return and sign it
19    indicating that you're done with it?
20                "A. Yeah.
21                "Q. And it's up to the client to sign it
22    and send it in?
23                "A. Yes.
24                "Q. For filing?
25                "A. Yes.  And then I give him a signed,
```

1   himself a signed copy for his use, and I just put a -- I

2   have a -- keep an electronic, electronic copy now.  I

3   didn't always but I do now.  And I have a hard copy in

4   the file.  And it's not signed by either one of us.

5            "Q. Okay.

6            "A. It's just a -- just a copy.

7            "Q. So the one we're looking at here that's

8   been marked as Dahl 1, I note a date here of 8/6/12 --

9   2012.

10           "A. That's when I ran it off.

11           "Q. Okay.  So this would have been an

12  electronic copy --

13           "A. Yes.

14           "Q -- that you had in your files?

15           "A. Yes.

16           "Q. But it's the same as the return that

17  was --

18           "A. Yes.

19           "Q. I need to finish.

20           "A. I'm sorry.

21           "Q. It's the same return you sent to

22  Mr. Comu for filing with the IRS?

23           "A. Yes.

24           "Q. If you would, turn to Page 4 of the

25  return.  There's a -- and I'm looking at the balance

1  sheet, item eight says, quote, other investments, end

2  quote, in parentheticals, quote, parenthesis, attached

3  statement, period, parenthesis, end quote. There's an

4  amount showing $16,000 -- excuse me -- $162,010. I

5  didn't see a statement attached to this return.

6           "A. There may not have been one. I don't

7  -- I don't remember whether there was one or not.

8           "Q. Okay. So simply -- simply because it

9  indicates in parentheticals, quote, open parenthesis,

10 attached statement, closed parenthesis, end quote, that

11 doesn't mean that you necessarily would attach a

12 statement?

13          "A. Yes, right.

14          "Q. The -- the item referenced is assets as

15 other investments. Do you have any idea what those are?

16          "A. No, sir.

17          "Q. At the time you prepared a -- at the

18 time you prepared the 2005 tax return, did you receive

19 documents from Mr. Comu to substantiate the numbers put

20 forth in the return?

21          "A. Yeah, that's --

22          "Q. So the numbers that are set forth here

23 are numbers that Mr. Comu provided?

24          "A. Yes.

25          "Q. These are not numbers that you would

1   have derived?

2               "A. No.

3               "Q. The figures shown in Line 8 show other

4   investments of $162,010, and then that's the beginning

5   of the tax year.  End of the tax year is 103 thousand

6   dollars 180 -- $103,180 indicating a loss with respect

7   to that investment of --

8               "A. 58.

9               "Q. I think it's indicated $58,830.

10              "A. Yes, sir.

11              "Q. Let's turn to form 4797, sales of

12  business property.  It's two pages back from the page we

13  were just looking at.

14              "A. Yes.

15              "Q. This shows, quote, loan to Humitech,

16  end quote.  And there's a date of December 31, 2005.

17  What does that date indicate?

18              "A. That would indicate that there was --

19  when that loan was written off apparently.

20              "Q. Why do you say that?

21              "A. Well, it's showing as a $25,000 loss

22  and has no value under the sales price.  Date sold are

23  written off in my area would be 12/31/05.  Gross sales

24  price would be zero.  Cost or other basis would be

25  $25,000, which would be the amount of the loan.

1              "Q. Okay.  So this is telling you that

2    basically there was a $25,000 loan that existed in 2005

3    but was written off that year?

4              "A. Yes.

5              "Q. Resulting in a $25,000 loss?

6              "A. Right.

7              "Q. All right.  Let's turn to the last two

8    pages of the return, which are K-1s.  Do you prepared

9    the K-1s --

10             "A. Yes.

11             "Q -- to go with the return?  What is the

12   source of information with respect to the indication of

13   ownership as set forth in the K-1?

14             "A. Those would be -- that would be what

15   C.J. gave me as the owners at that point in time.

16             "Q. Do you make any independent

17   investigation of business entity ownership in connection

18   with preparing returns or do you just rely on the tax

19   payer to provide that?

20             "A. Yeah.

21             "Q. The answer is you rely on the taxpayer?

22             "A. I rely on the taxpayer, yes.

23             "Q. The -- I take it the beginning capital

24   account figure would simply be the amount of this

25   investment we talked about earlier divided by two,

```
 1  that's shown on this $81,105 on the K-1.

 2                  "A. Uh-huh.

 3                  "Q. Is that right?

 4                  "A. I think that's right, yeah.

 5                  "Q. Okay.  So if you will turn to the last

 6  page, the other 50 percent owner here is shown as

 7  Belleview -- Bellville Settlement, LP.

 8                  "A. Yes, sir.

 9                  "Q. Are you familiar with that entity at

10  all?

11                  "A. No.

12                  "Q. Not done any tax work for it?

13                  "A. No."

14                  MR. SAROKHANIAN:  And Your Honor, now we're

15  going to be referring to Trustee's 31.

16                  THE COURT:  Okay.

17                  "Q. Take a look at Dahl Number 2, please.

18                  "A. Okay.

19                  "Q. And keep Dahl 1 close at hand.  I have

20  a question I want to finish about that -- in fact, go

21  ahead and turn to Page 4 of Dahl 1.

22                  MR. SAROKHANIAN:  Which would be Trustee's

23  30.

24                  "Q. And Page 4 of Dahl 2.

25                  MR. SAROKHANIAN:  Which is Trustee's 31.
```