**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | |
|---|---|---|---|
| In Re: Cengiz J. Comu | Debtor | § | Case No. 09-38820 SGJ7 |
| **Cengiz J. Comu, et al** | | § | |
| | Appellant | § | |
| vs. | | § | 10-03269 |
| **King Louie Mining, LLC, et al** | | § | |
| | Appellee | § | |

**148 Judgment revoking discharge of debtor Entered 7/8/14**
**VOLUME 6**
**APPELLANT RECORD**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | | |
|---|---|---|
| DIANE G. REED, TRUSTEE, | § | |
|     Intervenor, Co-plaintiff and | § | |
|     Third-party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CENGIZ J. COMU, | § | |
|     Defendant, | § | |
| | § | |
| and | § | |
| | § | |
| PHYLLIS E. COMU, | § | |
| BERNARD D. BROWN, | § | |
| THE BARCLAY GROUP, INC. AND | § | |
| SUNSET PACIFIC, L.P., | § | |
|     Third-party Defendants. | § | |

_I XIDEX_

**APPELLANT'S FIRST AMENDED DESIGNATION
OF RECORD AND ISSUES ON APPEAL**

Page 1

## APPELLANT'S FIRST AMENDED DESIGNATION OF RECORD
## AND ISSUES ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Cengiz J. Comu, Appellant, and files this his First Amended Designation of Record and Issues on Appeal for the Judgment entered July 8, 2014 [Document No. 148] as follows:

I.    Appellant designates the following documents from the docket sheet in Adversary Case No. 10-03269 for the Record on Appeal:

[Intentionally left blank]

| Filing Date | # | Docket Text |
|---|---|---|
| 08/27/2014 | 164 | Notice of appeal . Fee Amount $298 filed by Defendant Cengiz J. Comu (RE: related document(s)148 Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed)). Appellant Designation due by 9/10/2014. (Moroles, D.) |
| 07/08/2014 | 148 | Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed) (Rielly, Bill). |
| 07/08/2014 | 147 | Findings of fact and conclusions of law in support of judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Rielly, Bill) |
| 09/09/2014 | | Docket Sheet |
| 10/07/2010 | 5 | Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 11/08/2010 | 8 | Motion for leave *to Amend* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/29/2010. (Attachments: 1 First Amended Complaint2 Exhibit A3 Exhibit B4 Exhibit C) (Lippe, Emil) |
| 11/08/2010 | 9 | Response opposed to (related document(s): 5 Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 01/10/2011 | 10 | Order denying motion to dismiss adversary proceeding as moot (related document # 5), granting motion for leave to amend complaint(related document # 8) Entered on 1/10/2011. Case is removed from docket for week of January 11, 2011. Counsel ORDERED to confer and submit proposed amended scheduling order for the trial of this case, to be submitted within 10 days from date of this Order. (Mathews, M.) |

*Vol. 2*
*000211*

*000215*

*000263*

*000273*

_Vol. 2_

| | | | |
|---|---|---|---|
| 006275 | 01/20/2011 | 12 | Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000279 | 02/11/2011 | 16 | Response opposed to (related document(s): 12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000287 | 02/24/2011 | 17 | Order conditionally denying second motion to dismiss adversary proceeding (related document # 12) Entered on 2/24/2011. Plaintiffs are ORDERED to file amended complaint within 20 days of entry of this order. Defedant is ORDERED to file an answeror responsive pleading within 20 days of filing of the amended complaint. (Mathews, M.) |
| 000290 | 03/02/2011 | 19 | Motion for leave *to Prosecute Action* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 3/23/2011. (Lippe, Emil) |
| 000293 | 03/02/2011 | 20 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) (Lippe, Emil) |
| 000340 | 03/23/2011 | 23 | Order denying motion for leave to prosecute action without prejudice (related document # 19) Entered on 3/23/2011. (Simpson, B) |
| 000342 | 03/24/2011 | 24 | Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000345 | 04/19/2011 | 28 | Agreed Order granting 27 Motion to extend time to file response to motion to dismiss until 4/28/2011. Entered on 4/19/2011. (Simpson, B) |
| 000347 | 04/28/2011 | 30 | Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000357 | 05/04/2011 | 31 | Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[Unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |
| 000361 | 05/06/2011 | 32 | Order granting motion to continue hearing on (related document # 31) (related documents Motion to dismiss adversary proceeding*(THIRD)* and 20 Amended Complaint) Entered on 5/6/2011. Hearing to be held on 7/11/2011 at 10:30 AM Dallas Judge Jernigan Ctrm for 24, Trial Docket Call date reset for 9/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Mathews, M.) Modified text on 5/6/2011 (Mathews, M.). |
| 000 363 | 07/06/2011 | 36 | Second Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |

*Vol. 2*

| | | | |
|---|---|---|---|
| 000367 | 07/08/2011 | 37 | Order granting second unopposed motion to continue hearing on (related document # 36) (related documents Amended complaint, Motion to dismiss adversary proceeding(THIRD)) Entered on 7/8/2011. Hearing to be held on 9/15/2011 at 09:30 AM Dallas Judge Jernigan Ctrm for 24 Third motion to dismiss and for Trial Docket Call date set for 12/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. Further conditions per Order. (Mathews, M.) |
| 000369 | 08/24/2011 | 39 | Agreed Motion to Abate Adversary Proceeding (related document(s)1 Complaint) Filed by Interested Party Diane G. Reed (Elmquist, David) Modified TEXT on 8/25/2011 (Blanco, J.). |
| 000374 | 08/31/2011 | 40 | Agreed Order granting motion to abate adversary proceeding (related document # 39) Entered on 8/31/2011. (Mathews, M.) |
| 000377 | 05/24/2012 | 48 | Supplemental Order granting agreed motion to abate adversary proceeding including any hearing on the motion to dismiss, abated until August 1, 2012 further conditions per order (related document # 39 agreed motion to abate ) Entered on 5/24/2012. (Moroles, D.) |
| 000379 | 08/07/2012 | 50 | Order terminating abatement of adversary proceeding and requiring: (A) Trustee's Complaint in Intervention to be filed by August 31, 2012; and (B) parties to upload Agreed Scheduling Order, or in the alternative, Court will enter its own Scheduling Order (related document # 39) Entered on 8/7/2012. Further details per Order. (Mathews, M.) |
| 000381 | 09/05/2012 | 53 | Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) |
| 000395 | 09/06/2012 | 54 | Order granting Trustee's Unopposed Motion to Extend Deadline to File a Complaint in Intervention 52 Motion to extend time. Ordered that the deadline is hereby extended to September 5, 2012. Entered on 9/6/2012. (Tello, Chris) |
| 000397 | 09/20/2012 | 59 | Agreed Scheduling Order Entered on 9/20/2012 (RE: related document(s)20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial Docket Call date set for 7/8/2013 at 01:30 PM at Dallas Judge Jernigan Ctrm. Hearing on Defendant Cengiz J. Comu's Third Amended Motion to Dismiss Case is set for 10/31/2012 at 9:30 AM. (Mathews, M.) MODIFIED hearing dates on 9/21/2012 (Mathews, M.). |
| 000401 | 09/28/2012 | 61 | Supplemental Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding(THIRD) filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000406 | 09/28/2012 | 62 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against |

| | | | |
|---|---|---|---|
| *Vol. 2* | | | Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Lippe, Emil) |
| *000429* | 10/09/2012 | 64 | Answer to Intervenor complaint (Related document: 53 Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) filed by Bernard D Brown, Cengiz J. Comu, Phyllis E. Comu, Sunset Pacific, L.P., The Barclay Group, Inc.. (Olson, Dennis) Modified text on 10/9/2012 (Tello, Chris). |
| *000433* | 10/09/2012 | 65 | Reply to (related document(s): 30 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 61 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Defendant Cengiz J. Comu. (Olson, Dennis) |
| *000437* | 10/26/2012 | 66 | Motion to appear pro hac vice for David H. Wander. Fee Amount $25 filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit) (Lippe, Emil) |
| *000441* | 10/29/2012 | 68 | Motion for leave *to File Third Amended Complaint and Brief in Support* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Lippe, Emil) |
| *Vol. 3* *000451* | 10/30/2012 | 69 | Motion for leave *to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Attachments: # 1 Exhibit A - Surreply# 2 Proposed Order) (Lippe, Emil) |
| *000470* | 10/31/2012 | 70 | Order granting motion to appear pro hac vice adding David H. Wander for Ronald Katz and King Louie Mining, LLC (related document # 66) Entered on 10/31/2012. (Mathews, M.) |
| *000471* | 11/02/2012 | 71 | Order denying Plaintiffs' motion for leave to file Third Amended Complaint (related document # 68) Entered on 11/2/2012. (Mathews, M.) |
| *000473* | 11/02/2012 | 72 | Order denying Plaintiffs' motion for leave to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss (related document # 69) Entered on 11/2/2012. (Mathews, M.) |
| *000475* | 11/14/2012 | 76 | Order denying motion to dismiss adversary proceeding (related document # 24) Entered on 11/14/2012. (Mathews, M.) |
| *000477* | 12/07/2012 | 78 | Answer to complaint *(Second Amended) to Revoke Discharge* filed by Cengiz J. Comu. (Olson, Dennis) |
| *000481* | 06/07/2013 | 88 | Motion to substitute attorney Emil Lippe, Jr., Law Offices of Lippe & Associates with Shari L. Heyen, Kendyl T. Hanks and Charles P. Floyd, Greenberg Traurig, LLP *and for Withdrawal of Attorney Emil Lippe, Jr., Law Offices of Lippe & Associates,* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| 000785 | 06/12/2013 | 89 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Agreed Scheduling Order) (Heyen, Shari) |
| 000795 | 06/21/2013 | 90 | Agreed order granting motion to amend scheduling order (related document # 89) Trial Docket Call date set for 9/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 6/21/2013. (Rielly, Bill) |
| 000799 | 06/21/2013 | 91 | Order granting motion to substitute attorney adding Shari L. Heyen for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Kendyl T. Hanks for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Charles P. Floyd for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, terminating Emil Lippe, Jr.. (related document # 88) Entered on 6/21/2013. (Rielly, Bill) |
| 000562 | 07/19/2013 | 94 | Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order) (Lippe, Emil) |
| 000539 | 08/12/2013 | 96 | Response opposed to (related document(s): 94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Heyen, Shari) |
| 000598 | 08/14/2013 | 97 | Reply to (related document(s): 96 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Lippe, Emil) |
| 000606 | 08/21/2013 | 98 | Order denying motion to intervene (related document # 94) Entered on 8/21/2013. (Rielly, Bill) |
| 000608 | 08/23/2013 | 99 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Agreed Order to Amend Scheduling Order) (Heyen, Shari) |
| 000617 | 09/13/2013 | 101 | Agreed order granting motion to amend scheduling order (related document # 99) Trial Docket Call date set for 12/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 9/13/2013. (Rielly, Bill) |
| 000621 | 11/25/2013 | 103 | Witness and Exhibit List *for Trial, per Scheduling Order* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000624 | 11/25/2013 | 104 | Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Order) (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| *000630* | 11/27/2013 | 105 | Support/supplemental document*(Supplement to Plaintiffs' Motion for Continuance of Scheduling Order Deadlines and Trial)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)104 Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding)). (Heyen, Shari) |
| *000633* | 12/09/2013 | 106 | Agreed order granting motion to amend scheduling order (related document # 104) Entered on 12/9/2013. Trial Docket Call date set for 3/3/2014 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| *000637* | 12/20/2013 | 108 | Motion for preliminary injunction *(expedited)* filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| *000647* | 12/20/2013 | 109 | Motion for expedited hearing(related documents 108 Motion for preliminary injunction) filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| *000651* | 12/20/2013 | 110 | Order granting ex parte motion for expedited hearing (Related Doc# 109)(document set for hearing: 108 Motion for preliminary injunction) Entered on 12/20/2013. Hearing to be held on 12/23/2013 at 09:30 AM Dallas Judge Jernigan Ctrm for 108, (Rielly, Bill) |
| *000653* | 12/20/2013 | 111 | Agreed order granting motion for temporary restraining order (related document 108) Entered on 12/20/2013. Preliminary injunction hearing to be held on 1/3/2014 at 09:30 AM Dallas Judge Jernigan Ctrm (Rielly, Bill) |
| *000656* | 01/03/2014 | 116 | Agreed Order Continuing Temporary Restraining Order (related document # 108) Entered on 1/3/2014. (Jones, A.) |
| *000659* | 02/24/2014 | 118 | Amended Witness and Exhibit List filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)103 List (witness/exhibit/generic)). (Olson, Dennis) |
| *000662* | 02/24/2014 | 119 | Witness and Exhibit List *for Trial* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)62 Amended complaint). (Elmquist, David) |
| *Vol. 4* *000670* | 02/24/2014 | 120 | Witness and Exhibit List filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| *000722* | 02/26/2014 | 121 | Stipulation by Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC and All Defendants. filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)106 Order on motion to amend scheduling order). (Heyen, Shari) |
| *000726* | 03/03/2014 | 124 | Stipulation by Diane G. Reed and Plaintiffs and Defendants. filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint, 62 Amended complaint). (Elmquist, David) |
| *000729* | 03/03/2014 | 125 | Proposed findings of fact and conclusions of law filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint). (Elmquist, David) |

Vol. 4

| | | | |
|---|---|---|---|
| 000741 | 03/04/2014 | 126 | Proposed findings of fact and conclusions of law filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000746 | 03/04/2014 | 127 | Proposed findings of fact and conclusions of law filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000778 | 03/05/2014 | 130 | Order setting trial Entered on 3/5/2014 (RE: related document(s)62 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial date set for 3/17/2014 at 09:30 AM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000780 | 03/11/2014 | 132 | Amended Witness and Exhibit List *for Trial* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)120 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000805 | 03/13/2014 | 134 | Amended Witness and Exhibit List filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)119 List (witness/exhibit/generic)). (Elmquist, David) |
| 000813 | 03/14/2014 | 135 | Amended Witness and Exhibit List *Second Amended* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)118 List (witness/exhibit/generic)). (Olson, Dennis) |
| 000816 | 03/16/2014 | 137 | Amended Witness and Exhibit List *(Second)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)132 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000842 | 03/17/2014 | 138 | First Amended Proposed Joint Pre-Trial order Entered on 3/17/2014. (Rebecek, B) |
| 000871 | 04/04/2014 | 142 | Extended temporary restraining order and mandatory injunction Entered on 4/4/2014. (Rielly, Bill) |
| 000878 | 04/23/2014 | 144 | Notice *of Trustee's Status Report of Compliance* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)142 Temporary restraining order). (Elmquist, David) |
| 000892 | 07/29/2014 | 161 | Motion to extend time to appeal - Rule 8002c (RE: related document(s)148 Judgment) Filed by Defendant Cengiz J. Comu (Blanco, J.) (Entered: 08/20/2014) |
| 000896 | 07/30/2014 | 153 | Application for compensation *Plaintiffs Preliminary Application for Attorneys' Fees and Expenses Awarded in the Court's July 8, 29014 Judgment* for Shari L. Heyen, Creditor's Attorney, Period: 10/26/2011 to 7/28/2014, Fee: $946,504.90, Expenses: $12,800.00. Filed by Attorney Shari L. Heyen (Heyen, Shari) |
| 000906 | 07/30/2014 | 154 | Motion to extend time to To Submit Affidavit and Evidence in Support of Application for Attorneys' Fees & Expenses Awarded in the Court's July 8, 2014 Judgment Filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |
| 000914 | 08/20/2014 | 162 | Order granting motion for leave to file notice of appeal out of time 161 |

*Vol. 4*

*000916*

*000919*

| | | | |
|---|---|---|---|
| | | | Motion to extend time to appeal - Rule 8002c. Entered on 8/20/2014. (Rielly, Bill) |
| | 08/27/2014 | 165 | Order granting motion to extend time to file application for attorney's fees and expenses 154 Motion to extend time. Entered on 8/27/2014. (Rielly, Bill) |
| | 08/29/2014 | 168 | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)164 Notice of appeal filed by Defendant Cengiz J. Comu) (Blanco, J.) |

II.   Appellant also designates all exhibits admitted at trial, March 17 through March 21, 2014.   *Not PROViDED by APPEllant*

III.   Appellant also designates the following transcripts:

*Vol. 5*

| | | | |
|---|---|---|---|
| 000921 | 11/09/2010 | 177 | Hearing held on 11/9/2010. (RE: related document(s)5 Motion to dismiss adversary proceeding Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6) filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) APPEARANCES: D. Olson for Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Announcement of an agreed order having been submitted that contemplates Plaintiff's agreement to file Amended Complaint with Debtor's reservation of right to re-urge motion to dismiss. Court will sign order. (Womack, Jennifer) (Entered: 11/12/2010) |
| 000927 | 02/14/2011 | 178 | Hearing held on 2/14/2011. (RE: related document(s)12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) Appearances: D. Olsen for Defendant/Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Motion denied, conditional on Plaintiff, within 20 days, amending Complaint again to provide more specificity regarding specific provisions of Section 727(d) being alleged, when acts were discovered and how, and addressing his standing, versus the Chapter 7 Trustees, to seek avoidance of alleged fraudulent transfers. If not amendment within 20 days, complaint will be dismissed. If amendment, then Defendant has 20 days thereafter to answer/respond. Counsel to submit order. (Harden, D.) (Entered: 02/18/2011) |
| 000952 | 05/02/2012 | 179 | Status conference held (RE: related document(s)20 Amended complaint) Appearances: E. Lippe and D. Wander (telephonically) for Plaintiffs; D. Elmquist for Trustee; D. Olson for Debtor. Nonevidentiary hearing. Based on statements of counsel, court will continue abatement through 8/1/12 and counsel shall contact courtroom deputy for another status conference the first week of August 2012. Counsel shall upload an order continuing abatement. (Davis, T.) (Entered: 05/14/2012) |
| 000964 | 07/31/2012 | 180 | Hearing held on 7/31/2012. (RE: related document(s)20 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) Appearances: D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff; D. Olson for Debtor. Nonevidentiary status conference. Court heard reports regarding Rule 2004 examinations that have been ongoing and Trustees intention to file a Complaint in Intervention by 8/31/12. Court will enter Order terminating the abatement of this Adversary Proceeding and requiring: (a) Trustees Complaint in Intervention to be filed by 8/31/12; and (b) parties to upload Agreed Scheduling Order by 9/14/12 (inclusive of deadlines pertaining to the pending Rule 12(b)(6) |

*Vol. 5*

| | | | |
|---|---|---|---|
| | | | motion) or, in the alternative, court will enter its own Scheduling Order thereafter setting a January 2013 trial docket call and deadlines pertaining to the Rule 12(b)(6) motion. (Baird, Dennis) (Entered: 08/01/2012) |
| 000975 | 10/31/2012 | 181 | Hearing held on 10/31/2012. (RE: related document(s)24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) Appearances: D. Olson for Movant/Defendant/Debtor; D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff/King Louie Mining. Nonevidentiary hearing. Motion denied. Court also denied a pending Motion for Leave by Plaintiff/King Louie Mining to File Third Amended Complaint. Thus, Second Amended Complaint of King Louie Mining (Section 727 count only) and Complaint in Intervention of Trustee are now governing pleadings in this Adversary Proceeding. Mr. Lippe to upload orders on motion to dismiss and motion for leave. (Baird, Dennis) |
| 001004 | 08/15/2013 | 182 | Hearing held on 8/15/2013. (RE: related document(s)94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order)) Appearances: E. Lippe for his firm; K. Hanks and C. Floyd for Plaintiffs other than the Trustee; D. Elmquist for Trustee; R. Nicoud for Debtor. Nonevidentiary hearing. Motion denied. Ms. Hanks to upload order. (Harden, D.) (Entered: 08/21/2013) |
| 001035 | 03/04/2014 | 183 | Pre-trial conference held on 3/4/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz).) Appearances: K. Hanks and V. Vital for Creditor/Plaintiffs; D. Elmquist for Intervenor/Plaintiff; D. Olson for Defendants. Nonevidentiary status conference. Court will issue order setting trial for March 17, 2014 at 9:30 am, continuing through March 21, 2014. Parties to upload final Pre-Trial Order by March 14, 2014. (Harden, D.) (Entered: 03/06/2014) |
| 001052 | 03/17/2014 | 184 | Trial held on 3/17/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) |

| | | | |
|---|---|---|---|
| *Vol. 6* | | | Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/18/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *001277* | 03/18/2014 | *185* | Trial held on 3/18/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/19/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 7* *001538* | 03/19/2014 | *186* | Trial held on 3/19/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/20/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 8* *001787* | 03/20/2014 | *187* | Trial held on 3/20/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/21/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 9* *001909* | 03/21/2014 | *188* | Trial held on 3/21/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial concluded. Court gave bench ruling: (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it toTtrustee; (b) The Barclay Group, Inc. and Sunset Pacific are the alter |

|  |  | egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific. Counsel will subsequently upload proposed Findings of Fact, Conclusions of Law and Judgment that are consistent with the courts oral ruling and otherwise consistent with the evidence. (Harden, D.) (Entered: 03/25/2014) |
| --- | --- | --- |

IV.    Appellant states the following Issues presented on Appeal:

   1.    The Bankruptcy Judge erred in revoking the Debtor's discharge.

   2.    The Bankruptcy Judge erred in finding that the Barclay Group and Sunset Pacific

are the alter egos of the Debtor.

   3.    The Bankruptcy Judge erred in calculating the amount of the damages for which

the Debtor was found to be liable.


[Signature on following page]

Respectfully submitted,

Cengiz J. Comu
14873 Oaks North Place
Dallas, Texas 75254
(972) 965-2545 – Telephone
Email: cjcomu@gmail.com

By:_____
   Cengiz J. Comu
   *Pro Se*

## CERTIFICATE OF SERVICE

  I hereby certify that on the __11__ day of September, 2014, a true and correct copy of the foregoing document was sent via electronic means or by first class mail, postage prepaid to the persons shown below:

Kendyl T. Hanks
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

David W. Elmquist
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, Texas 75165



By:_____
   Cengiz J. Comu

1           "A. Okay.

2               "Q. In Dahl 1, we saw that at the end of

3       the tax year there was a stated investment of $103,180.

4               "A. Uh-huh.

5               "Q. But in Dahl 2, I'm not seeing that

6       figure at the beginning of the tax year.

7               "A. Reason for that is that 2005 I had one

8       software -- I had a software package with an old

9       dos-based program.  And I could go ahead and put this

10      information in there.  Okay.  When you go to 2006, these

11      people had gone out of business.  And I had to change to

12      a new software provider.  They were a little more up to

13      date.  And when you go in and you look at the questions

14      that are answered in here number -- number five.

15              "Q. Which page are we on?

16              "A. There on Page 3, I think -- 2, Page 2,

17      question five under Schedule B.

18              "Q. Okay.  Open quote, Schedule B, other

19      information, end quote?

20              "A. Yes.

21              "Q. Number five in that section?

22              "A. Yes.  Okay."

23              MR. VITAL:  Or where are we?

24              MR. SAROKHANIAN:  Line 22, Page 15.

25              MR. VITAL:  Oh, okay.  Sorry.

1              "A. Five A, the partnership total receipt

2    for the tax year were less than $250,000.

3              "Q. Uh-huh.

4              "A. B, total assets were less than

5    $600,000.

6              "Q. Okay.

7              "A. In that case you don't have to

8    prepare --

9              "Q. The balance sheet?

10             "A. -- the balance sheet.

11             "Q. Okay.

12             "A. Therefore I didn't.

13             "Q. Take a look at, in Dahl 2 the K-1s --

14   okay.  Before we get to that, let me go back to Dahl 1

15   for a moment, the K-1s there.

16             "A. Okay.

17             "Q. The return you're preparing here is for

18   a limited partnership, right, Sunset, Sunset Pacific,

19   LP?

20             "A. Yeah.

21             "Q. This is a --

22             "A. It's a partnership return.

23             "Q. Partnership return.  It's a 1065 --

24             "A. Yeah.

25             "Q. Which is a partnership return.

1           "A.  Yes.

2           "Q. And do you have -- do you prepare

3  partnership business, partnership returns for other

4  clients?

5           "A. Yes.

6           "Q. Okay.  So you're familiar with the

7  structures of limited partnerships generally --

8           "A. Yes.

9           "Q.-- in terms of ownership.

10           "A. Yes.

11           "Q. Okay.  And you understand that

12  typically a limited partnership would consist of one or

13  more limited partners and a general partner?

14           "A. Right.

15           "Q. And that the limited partners and a

16  general partner together would comprise 100 percent of

17  the ownership.

18           "A. Right.

19           "Q. Is it also the case that a limited

20  partnership can't exist without a general partner, there

21  has to be a general partner and a limited partner, are

22  you aware of that?

23           "A. I think that's true -- I'm not -- I

24  wouldn't make --

25           "Q. Not 100 percent on that?

1               "A. Yeah, not 100 percent on that.

2               "Q. All right.  The reason I ask those

3    questions, I note in the -- in the Dahl 1 return there's

4    two K-1s, one being for Mr. Comu with a 55 -- excuse me

5    -- a 50 percent ownership interest in Bellville

6    settlement with 50 percent LP interest, but there's

7    nothing here for general partner.

8               "A. In --

9               "Q. In Dahl 1.

10              "A. In Dahl 1.

11              "Q. Dahl 1 you see there's 50 percent for

12   Mr. Comu?

13              "A. Uh-huh.

14              "Q. And 50 percent for Bellville

15   settlement, that equals 100 percent.

16              "A. Right.

17              "Q. My question is:  Where is the ownership

18   interest reflected for the general partner?

19              "A. Well, both of them are reflected as

20   general partners.  If you look there on Item H, there's

21   a check says there's an X for general partner.

22              "Q. Okay.  So there's two general partners

23   and no limited partner?

24              "A. Right.

25              "Q. But this is supposed to be a limited

 1  partnership.

 2              "A. Well, okay, I understand.

 3              "Q. Okay.  So I guess my question is:  In

 4  filling out K-1s, are you relying upon information that

 5  you obtained or are you relying on information that

 6  Mr. Comu provided?

 7              "A. I'm relying on information basically

 8  that he provided and I probably made a mistake and

 9  checked the wrong box.

10              "Q. Okay.  So you think that one of these

11  is probably incorrectly noted as a general partner,

12  should have been noted as limited partner?

13              "A. Right, the form partner should also

14  have been -- should have also been -- should have been a

15  limited partner.

16              "Q. Okay.

17              "A. I perhaps made a mistake on that.

18              "Q. Well, do you know that Bellville

19  Settlement LP was a limited partner and not a general

20  partner --

21              "A. Yes.

22              "Q.-- of Sunset?

23              "A. I think that's correct, yes.

24              "Q. How do you know that?

25              "A. I think that would be based on what

1    C.J. told me at the time.

2                "Q. Okay.  And you have a recollection of

3    that discussion?

4                "A. Not -- not really.

5                "Q. Okay.

6                "A. I'm just -- I'm assuming that at this

7    point in time.

8                "Q. All right.  Now let's go back to Dahl 2

9    and the K-1s there.

10               "A. 2006?

11               "Q. Yes, sir, the 2006 return.

12               "A. Okay.

13               "Q. Which is marked as Dahl 2.

14               "A. Okay.

15               "Q. And I'm looking at the K-1.

16               "A. Okay.

17               "Q. And you will note that there are three

18   K-1s attached to this return.

19               "A. Yes.

20               "Q. And now we have Mr. Comu with a one

21   percent interest, his wife with a 98 percent interest

22   and Marathon Management, LLC -- let me start over.

23               "Q. We have Mr. Comu with a one percent

24   limited partnership interest; Mrs. Comu with a

25   98 percent limited partnership interest, equalling

1   99 percent; and then a one percent GP interest held by

2   Marathon Management, LLC.  Do you see that?

3               "A. Yes.

4               "Q. Again, what information would you be

5   provided to mark these or complete these K-1s for

6   purposes of showing these ownership interests.

7               "A. Well, if you will look on the next page

8   schedule, schedule of transfers --

9               "Q. Uh-huh.

10              "A -- that was provided to me.

11              "Q. What was provided to you?

12              "A. The information on that page, I

13  prepared it to show the IRS where the change was.

14              "Q. Let me show you a document that was

15  introduced in Mr. Comu's examination.  Take a look at

16  this document, see if this looks at all familiar to you.

17  This would be Comu Exhibit 3, for the record.

18              "A. Uh-huh, I'm familiar with the part

19  where it matches here.  I don't remember the Comal --

20  the Coral Group.

21              "Q. Okay.  All right.  That document in

22  terms of what it reflects as to the ownership before and

23  after the transfer is not consistent with the return,

24  correct?

25              "A. Well, the portion --

```
 1                    "Q. Let me be more precise.

 2                    "A. Yeah, I'm not sure I understand what

 3       you're saying.

 4                    "Q. Okay.  In the return you show the pre

 5       -- the owner that held a 50 percent interest prior to

 6       this change in ownership that occurred apparently in

 7       2006 to have been Bellville Settlement, LP owning a

 8       50 percent interest, correct?

 9                    "A. Yes.

10                    "Q. And there's no mention in Comu Number 3

11       of Bellville Settlement, correct?

12                    "A. Correct.

13                    "Q. And based on that document it appears

14       that the interests were transferred to Mrs. Comu came

15       from something called Coral Group, not Bellville

16       Settlement, correct?

17                    "A. That's what this indicates, yes.

18                    "Q. So in that respect that document is not

19       consistent with the return?

20                    "A. That's true.

21                    "Q. Okay.  And do you recall seeing Comu 3

22       before?

23                    "A. No.

24                    "Q. Do you think you saw a document at the

25       time that Dahl Number 2 was prepared that reflected
```

1 transfer of interest by Bellville Settlement to

2 Mrs. Comu?

3       "A. I don't recall.

4       "Q. Let me ask you this: In terms of the

5 documents you were provided in preparing returns, do you

6 retain copies of those documents?

7       "A. Normally no. I give them back to the

8 client.

9       "Q. So at this point you don't have any of

10 the documents that you may have been provided by

11 Mr. Comu to prepare any returns you prepared for him?

12       "A. No."

13       MR. SAROKHANIAN: Now, Your Honor, we're

14 going to be returning to Trustee Exhibit Number 32.

15       THE COURT: Okay.

16       "Q. Okay. Mr. Dahl, take a look at Dahl 3

17 and confirm that this is a copy of a tax return you

18 prepared for Sunset Pacific for the 2007 tax year.

19       "A. Yes.

20       "Q. The date on this return is -- shows a

21 date of February 22, 2010. And there appears to be a

22 note written at the bottom, quote, reprinted

23 February 22, 2010, end quote. Do you see that?

24       "A. Yes.

25       "Q. And are those your initials?

1                   "A. Yes.

2                   "Q. Okay.  So does this indicate that this

3       was a copy of the return that you printed off of your

4       electronic system on February 22, 2010?

5                   "A. Yes.

6                   "Q. Do you know why it was printed at that

7       time?

8                   "A. I think we had to -- I think we had to

9       print some for the trustee.

10                  "Q. Okay."

11                  Mr. Olson:  "Off the record".

12                  (Discussion off the record.)

13                  Mr. Olson:  "Back on."

14                  By Mr. Elmquist:

15                  "Q. Okay.  Let's look at the balance sheet

16      on Page 4.  This balance sheet is showing at the

17      beginning of the tax year cash in the amount of

18      $277,750, right?

19                  "A. It's what it looks like, yeah.

20                  "Q. What information would you get from

21      Mr. Comu to reflect that sum as cash held by Sunset

22      Pacific?

23                  "A. Basically probably I think there was an

24      annuity at that point and there was also a -- some cash

25      that was loaned to another company.

1          "Q. Why do you say there was an annuity; is

2    that reflected in the return somewhere?

3          "A. Yeah, there's an overflow statement.

4          "Q. If the annuity was purchased in

5    December 2006, I guess even with that purchase, that

6    would still be below the requirements for --

7          "A. Yeah.

8          "Q -- showing it in a balance sheet, right?

9          "A. Yeah.

10         "Q. Okay.  All right.  Something I will

11   just mention, the returns for 2005 and 2006 and 2007

12   show no income, correct?

13         "A. I have to look and see.  I don't --

14         "Q. Isn't income supposed to be reflected

15   in the first portion of the return under, quote, income,

16   end quote?

17         "A. Not necessarily.  Interest income comes

18   on Lines 5 and 6 under partners distributive share

19   items.  So that would be about the only income.

20         "Q. I'm sorry.  What page are you looking

21   at?

22         "A. Page 3.

23         "Q. Okay.

24         "A. Those are past due amounts so --

25         "Q. Meaning the partnership receives it and

1    passes it through to the partners.

2              "A. Yeah.

3              "Q. Let's go off the record for a second."

4              "(Discussion off the record.)"

5              MR. SAROKHANIAN:  And then, Your Honor,

6    they're going to be referring to Trustee's Exhibit

7    Number 33.

8              THE COURT:  Okay.

9              "Q. Mr. Dahl, I've just handed you what's

10   been marked as Dahl 4.  Can you take a look at that

11   document and confirm that this is the tax return you

12   prepared for Sunset Pacific?

13             "A. Yes, sir.

14             "Q. For the 2008 tax year.

15             "A. Yes.

16             "Q. Okay.  And this, again, shows it was

17   reprinted on February 22, 2010?

18             "A. Right."

19             MR. SAROKHANIAN:  Now, Your Honor, they're

20   referring to Trustee's Exhibit 34.

21             THE COURT:  Okay.

22             "Q.  All right.  Take a look at Dahl 5, if

23   you would, and tell me if you can confirm that this is

24   the return you prepared for 2009 tax year for Sunset

25   Pacific.

1               "A. This appears to be, yes, I think so.

2               "Q. Okay.  In the 2008 return we had the

3   assets of Sunset Pacific but not in 2009.  Is there a

4   reason you chose to omit them?

5               "A. Only the one we described earlier, I

6   don't know why I put them in there on '8.

7               "Q. Okay.  But again, because the assets

8   were less than $600,000, there was -- there's no

9   requirement to do so?

10              "A. Right.

11              "Q. And the partnership did not have

12  $250,000 of income?

13              "A. Right.

14              "Q. On Dahl 5, there's date here of

15  April 18, 2011.  Would that indicate, again, the date it

16  was printed?

17              "A. That was the date of the return, if I'm

18  not mistaken.  I think that '09 and '10 were prepared at

19  the same time.

20              "Q. Okay.

21              "A. I think -- I think '09 was skipped in

22  the year and '10 didn't get prepared.

23              "Q. Do you know why that was?

24              "A. I think it just -- I think it just had

25  to do with all the activity with the bankruptcy, C.J.

1  didn't bring the information in. That's my -- that's my

2  guess, off the top of my head.

3              "Q. Okay.

4              "A. Because I know we did two years of

5  everything at one time.

6              "Q. When you have a regular client like

7  Mr. Comu, do you typically send any kind of reminders to

8  the client about returns that need to be prepared?

9              "A. I think people should know if their

10  taxes are due, and I typically don't send them a

11  reminder.

12              "Q. Okay. So you feel it's up to them to

13  get you --

14              "A. Yeah.

15              "Q.-- information timely?

16              "A. Yeah."

17              MR. SAROKHANIAN: Your Honor, they're going

18  to be referring to Trustee's 35 -- 35.

19              THE COURT: Okay.

20              "Q. Mr. Dahl, can you confirm that Dahl 6

21  is the return you prepared for Sunset Pacific for the

22  2010 tax year?

23              "A. Yes.

24              "Q. And this return was prepared on the

25  date you indicated, April 20th, 2011?

1           "A. It was printed on that date, so it was

2   -- there were several returns.  It took two or three

3   days to get them done, among other business, yeah.

4           "Q. Okay.  But the date that's shown here

5   on Exhibit 6 is the date you printed it for purposes of

6   sending it to the client?

7           "A. Yes.

8           "Q. Is that also true with respect to Dahl

9   5?

10          "A. Yes.  In other words, if I have six

11  returns for the client and it takes two days, as I

12  finish them, I print them.  They go in the stack and

13  when I'm through, they may have different dates on them.

14          "Q. Understood."

15          MR. SAROKHANIAN:  Now, Your Honor, they're

16  referring to Trustee's 36 -- 3-6.

17          THE COURT:  Okay.

18          "Q.  Okay.  I have handed you what has been

19  marked as Dahl 7.  Can you confirm that this is the -- a

20  copy of the 2011 tax return you prepared for Sunset

21  Pacific?

22          "A. Yes.

23          "Q. Take a look at form 8825, please.

24          "A. Uh-huh.

25          "Q. This return is showing, I believe for

1    the first time, an interest in real estate.  Do you see

2    that?

3                    "A. Yes.

4                    "Q. What does this form 8825 reflect as it

5    relates to Sunset Pacific and the property shown here at

6    5301 Palladium Drive?

7                    "A. It's shown -- it reflects that the

8    partnership owns this real estate and reflects the

9    income and expenses, the rental income and expenses.

10                   "Q. Since the return doesn't show -- since

11   the 2010 return doesn't show ownership of that property,

12   is it your understanding that the property was acquired

13   sometime in the 2011 tax year?

14                   "A. Yes.

15                   "Q. Do you recall seeing a deed conveying

16   it to Sunset Pacific?

17                   "A. No.

18                   "Q. And so how did you know to put this

19   information on the return?

20                   "A.  When C.J. brought the information in,

21   he brought in the information that was the rental

22   property.

23                   "Q. Okay.  Did he also bring you

24   information regarding gross rents that were reflected?

25                   "A. Yes.

1              "Q. In this 8825?

2              "A. Yeah.

3              "Q. And also the expenses shown?

4              "A. Yes.

5              "Q. Do you know anything about the

6    ownership of 5301 Palladium Drive prior to it being

7    acquired by Sunset Pacific?

8              "A. No.

9              "Q. Take a look at form 4562 in Exhibit 7,

10   please.  That's three pages from the back.  Do you see

11   there's a reference here line H, quote, residential

12   rental property, end quote?

13             "A. Uh-huh.

14             "Q. Month and year, place and services

15   January 2011; is that right?

16             "A. Yeah.

17             "Q. Does that refer to the Palladium Drive

18   property?

19             "A. Yes.

20             "Q. And does the basis for depreciation of

21   $200,000 also refer to the Palladium Drive property?

22             "A. Yes.

23             "Q. Do you know how the $200,000 figure was

24   determined?

25             "A. No.

1              "Q. Is that a number that Mr. Comu

2    provided?  You need to speak up a just a little bit

3    because she's --

4              "A. Okay.  I'm sorry.

5              "Q. That's okay.  I've got Mr. Comu's

6    individual returns here, and rather than go through the

7    exercise we just went through with Sunset Pacific, I

8    want to see if we can't address these globally.  I have

9    returns for the years 2005 through 2011.  Can you

10   confirm that you prepared returns for each of those

11   years for the Comus?

12             "A. Yes, I did.

13             "Q. Okay.  And in connection with the

14   preparation of those returns, who did you deal with

15   for --

16             "A. C.J.

17             "Q.  Exclusively Mr. Comu?

18             "A. Yes.

19             "Q. Not Phyllis?

20             "A. I don't know a Phillip.

21             "Q. Phyllis, his wife.

22             "A. Oh, Phyllis?

23             "Q. Yeah.

24             "A. No, no.  Just C.J.  I'm sorry.  I

25   thought you said Phillip.

1              "Q. All right.  I also have returns here

2     for the years 2006 through 2011, for Marathon

3     Management, LLC.  Can you confirm that you prepared

4     returns --

5              "A. Yes.

6              "Q. -- for that entity for those years?

7              "A. Yes.

8              "Q. And who did you deal with in connection

9     with preparation of these returns on behalf of Marathon

10    Management?

11             "A. Well, Marathon Management basically was

12    prepared based on one percent ownership in Sunset

13    Pacific.  So I dealt with that myself primarily because

14    there was no other income for it.

15             "Q. Okay.  So your understanding of

16    Marathon Management business is that it is strictly one

17    percent general partner --

18             "A. Yes.

19             "Q.-- of Sunset Pacific?

20             "A. Yes.

21             "Q. It has no other business?

22             "A. To my knowledge, it has none.

23             "Q. And that's based on what Mr. Comu told

24    you?

25             "A. Yes.  Yes.

1                "Q. Well, in connection with the

2    preparation of Marathon Management returns, you would

3    prepare these for Mr. Comu's signature, correct?

4                "A. Right.

5                "Q. Because he was the member manager of

6    Marathon Management.

7                "A. Yes.

8                "Q. Is that right?

9                "A. Yes.

10               "Q. And there's no one else you dealt with

11   with respect to Marathon Management other than Mr. Comu

12   in preparation of Marathon Management returns?

13               "A. That's correct.

14               "Q. I have returns here for 2010 and 2011

15   for Regus Advisors, Inc., are you familiar with that

16   entity?

17               "A. Yes.  Yes, sir.

18               "Q. And did you prepare federal income tax

19   returns for that entity for those years?

20               "A. Yes, sir.

21               "Q. And did you work with Mr. Comu in the

22   preparation of those returns?

23               "A. Yes, sir.

24               "Q. Did you work with anyone else?

25               "A. Someone else prepared an income

 1   statement and balance sheet for that company, but C.J.

 2   brought it in.

 3              "Q. Do you know --

 4              "A. But I didn't deal with anybody else.

 5              "Q. Okay.  But your recollection of the

 6   income statement and balance sheet for Regus Advisors

 7   was prepared by someone other than Mr. Comu?

 8              "A. Yes.

 9              "Q. What was that based upon?

10              "A. I don't think C.J. has the ability to

11   prepare an income statement and balance sheet.

12              "Q. Okay.

13              "A. He has someone that worked -- that

14   worked with him that prepared it.

15              "Q. All right.  But you -- you had no

16   direct contact with that person?

17              "A. No, I did not.

18              "Q. And, again, in preparing the Regus

19   Advisors tax return, whatever information you were

20   supplied relating to the preparation of the return, you

21   returned back to Mr. Comu?

22              "A. Yes.

23              "Q. So you have no work papers?

24              "A. Right.  These are not complex returns

25   that require a lot of work.

```
1                "Q. I understand.  Okay.  The last entity I
2    want to ask you about is Barclay Group, Inc.  I have
3    returns here for the years 2006 through 2011.  Can you
4    confirm that you prepared the returns --
5                "A. Yes, sir.
6                "Q.-- of Barclay -- I need to finish -- for
7    Barclay Group, Inc., for those years?
8                "A. Yes, sir.
9                "Q. Okay.  Who did you deal with on behalf
10   of Barclay Group in preparation of these returns?
11               "A. C.J.
12               "Q. Anyone else?
13               "A. No.
14               "Q. Were you provided balance sheets and
15   income statements for this entity?
16               "A. For the last -- for 2012, yes, sir.
17               "Q. 2011, you mean?
18               "A. Yeah, I'm sorry, 2011.
19               "Q. How about for earlier years?
20               "A. Earlier years there was not that much.
21               "Q. Let me show you a 2010.
22               "A. Okay.
23               "Q. Let me start with 2009."
24               MR. SAROKHANIAN:  And, Your Honor, they're
25   referring to Trustee 17.
```

```
1                    THE COURT:  Okay.

2                    "Q.  Okay.  I have handed you what's been

3    marked Dahl Number 8.  Take a look at that, Mr. Dahl,

4    and tell me if you can confirm this is the return you

5    prepared for the 2009 tax year for The Barclay Group.

6                    "A.  Yes, sir.

7                    "Q. Okay.  This return does show income,

8    correct?

9                    "A. Yes, sir.

10                   "Q. And if you look at page -- well, look

11   at the supporting statements.  It's the fourth page from

12   the back.

13                   "A. Yeah.

14                   "Q. Do you see there's a reference to

15   consulting?

16                   "A. Uh-huh.

17                   "Q. Is that part of the income reflected in

18   the, quote, income, end quote, line on the first page?

19                   "A. I would say it's expense -- that's an

20   expense.

21                   "Q. Oh, that's an expense.

22                   "A. Yeah.

23                   "Q. Okay.  Where is -- where is there a

24   breakdown or is there a breakdown of the source of the

25   income?
```

1               "A. There's not a breakdown of the source.

2               "Q. So do you recall what kind of

3       information you were provided to set forth this figure

4       as the amount of income received?

5               "A. Probably a QuickBooks statement or

6       something like that.  Nothing -- nothing real fancy.

7               "Q. Okay.  And did Mr. Comu provide that?

8               "A. Yes.

9               "Q.  Did you discuss any of the information

10      set forth on the 2009 tax return for Barclay Group other

11      than Mr. Comu?

12              "A. No, not really, just went over the

13      information and prepared the return.

14              "Q. Are you familiar with an individual by

15      the name of Bernard Brown?

16              "A. No.

17              "Q. And I think you already testified that

18      you are not familiar with a David Parsley?

19              "A. No."

20              By Mr. Olson: "You have to answer audibly.

21      She can't take down the nodding."

22              "A.  Oh, I'm sorry."

23              Mr. Elmquist:  "He did, but it wasn't real

24      audible."

25              "A.  I have one other problem since this

 1   has -- my voice comes and goes.

 2            "Q. Yeah, I understand.  You know, if you

 3   need to take a break at any point --

 4            "A. No, I'm fine.  I just as soon get it

 5   over with.

 6            "Q. Yeah, I understand.  We're getting

 7   close to being done."

 8            MR. SAROKHANIAN:  And, Your Honor, now

 9   they're referring to Trustee Number 9.

10            MR. OLSON:  Sorry.  9?

11            MR. SAROKHANIAN:  Yes, sir.  9.

12            "Q. Okay.  Mr. Dahl, take a look at Dahl 9

13   and confirm for me that this is a copy of the return you

14   prepared for Barclay Group for 2010 tax year.

15            "A. Yes, sir.

16            "Q.  This return is a showing" --

17            THE COURT:  Okay.  We're on the wrong

18   exhibit.

19            UNIDENTIFIED SPEAKER:  Trustee 9 is the

20   certificate.

21            THE COURT:  Trustee 9 is -- yeah.

22            MS. HANKS:  That's because I wrote the same

23   exhibit number as the (inaudible).

24            MR. OLSON:  Look around 17.

25            MR. SAROKHANIAN:  If it's 2010, it would be

```
 1   Exhibit 18.
 2             MS. HANKS:  I apologize, Your Honor.
 3   That's dyslexic slip.
 4             THE COURT:  No problem.  Trustee
 5   Exhibit 18, correct?
 6             MR. SAROKHANIAN:  I believe that's the one
 7   we're talking about.
 8             MS. HANKS:  Is it a 2010 exam (sic) -- yes.
 9             MR. SAROKHANIAN:  Yes, 2010 return.  So,
10   Your Honor, you're saying that's Trustee 19?
11             THE COURT:  18.
12             MR. SAROKHANIAN:  18.  Great.  Okay.
13             "Q. Okay.  Mr. Dahl, take a look at Dahl 9
14   and confirm for me this is a copy of the return you
15   prepared for Barclay Group for 2010 tax year.
16             "A. Yes, sir.
17             "Q.  This return is showing a good amount
18   of income, correct?
19             "A. Yes.
20             "Q. Over about $2 million -- well,
21   $2,366,775 of income, right?
22             "A. Yes, sir.
23             "Q. And it's also showing expenses or
24   deductions of $2,324,571, right, on the 27th line.
25             "A. Yes, sir.
```

1                    "Q.  Of the return?

2                    "A. Yes, sir.

3                    "Q. Okay.  And you have backup for that out

4      of federal -- federal supporting statements, correct?

5                    "A. Yes, sir.

6                    "Q. It shows a consulting expense of

7      $2,137,733, do you see that?

8                    "A. Uh-huh.

9                    "Q. Do you recall what information or

10     documents you were provided to come up with that figure?

11                   "A. No, I don't recall.  I'm sure I had a

12     document, but I don't recall what it was.

13                   "Q. And whatever document you were

14     provided, Mr. Comu provided; is that right?

15                   "A. Yes, sir."

16                   MR. SAROKHANIAN:  Now, Your Honor, they're

17     going to be referring to Trust -- excuse me -- KLM

18     Exhibit 38.

19                   THE COURT:  KLM -- all right.

20                   MR. SAROKHANIAN:  That's KLM 38.

21                   THE COURT:  Uh-huh.

22                   "Let's go off the record a second."

23                   (Discussion off the record.)

24                   By Mr. Elmquist:

25                   "Q.  Take a look at Dahl Number 10,

1  Mr. Dahl, and confirm for me that this is a copy of the

2  return you prepared for the 2011 tax year for Barclay

3  Group?

4           "A. Yes, sir, it is.

5           "Q. Here again the information that's set

6  forth in this return was information that Mr. Comu

7  provided?

8           "A. Yes, sir.

9           "Q. We have $1,373,688 in income, you see

10  that on the first page?

11           "A. Yes, sir.

12           "Q. And we have total deductions of

13  $1,364,675.

14           "A. Yes, sir.  Yes, sir.

15           "Q. And we have a supporting statement with

16  respect to the $1,327,648, correct?

17           "A. Correct.

18           "Q. And do you recall what documents you

19  were provided to prepare the supporting statement with

20  respect to expenses?

21           "A. Income statement and balance sheet

22  that's similar to what I had with Regus.

23           "Q. Okay.  So with respect to the 2011

24  return, you do recall seeing an income statement?

25           "A. Yes, sir.

```
 1                    "Q. And balance sheet?

 2                    "A. Yes, sir.

 3                    "Q. But you don't recall seeing an income

 4     statement and balance sheet for earlier tax years for

 5     Barclay Group?

 6                    "A. No.

 7                    "Q. Let me show you what was marked

 8     yesterday as Comu 54.  Does that document look familiar

 9     to you?

10                    "A. Yes, sir.  Looks like what I used to

11     prepare the return on The Barclay Group.

12                    "Q. Okay.  This is the profit and loss

13     statement for 2011.

14                    "A. Right.

15                    "Q. Take a closer look at 54 and compare it

16     to the income and expense figures in Dahl 10."

17                    MR. OLSON:  Excuse me?  What is 54?

18                    MS. HANKS:  Comu 54, (inaudible.)

19                    MR. OLSON:  Your Honor, one other thing, I

20     didn't want to interrupt.  This is one of the exhibits

21     that I objected to the relevance.

22                    THE COURT:  All right.  So you're

23     continuing to object to the relevance of this?

24                    MS. HANKS:  Comu 54, that's a Trustee

25     exhibit -- (inaudible).
```

1              THE COURT:  Okay.  So now we have an

2    objection to KLM Exhibit 38?

3              MR. OLSON:  Yes, ma'am.  Prepared in 2012.

4    It didn't exist when the complaint was filed.

5              THE COURT:  All right.  Your response to

6    that.

7              MR. SAROKHANIAN:  Well, Your Honor, like

8    the Court stated earlier this morning, we are not

9    cabined necessarily to what our pleadings were as of the

10   second amended complaint.  Obviously, discovery was

11   ongoing, moreover, in addition to what the Court

12   articulated, moreover these documents go toward what

13   Mr. Katz did not have knowledge of.  And it also goes

14   towards 727(d)(1) false oaths, undisclosed assets and

15   also what will support our (d)(2) claims.  So it is

16   relevant.  And of course the Rule 401, it just has to

17   tend to show a relevant fact, so it's a very low burden.

18             THE COURT:  I overrule the objection.

19             MR. SAROKHANIAN:  Okay.  So now we are

20   on --

21             THE COURT:  You, I don't know, I guess

22   earlier offered it, but I didn't allow it.  He's made

23   another objection.  Are you moving to have it admitted?

24   It's sort of an awkward procedural --

25             MR. SAROKHANIAN:  We'll move to offer it

```
 1  since you have overruled his objection on that, Your

 2  Honor.

 3              THE COURT:  Okay.  All right.  So I have

 4  overruled and it will be admitted.  This is KLM

 5  Exhibit 38.

 6              MR. SAROKHANIAN:  Thank you, Your Honor.

 7              MR. SAROKHANIAN:  I'm going to pick back up

 8  on Page 40 at Line 18.

 9              "Q.  Take a closer look at 54 and compare

10  it to the income and expense figures in Dahl 10."

11              THE COURT:  And again, this is Trustee

12  Exhibit 21?

13              MR. SAROKHANIAN:  That's correct, Your

14  Honor.

15              THE COURT:  Okay.

16              "Q.  They're not -- they're close but

17  they're not quite the same, correct?

18              "A. They -- there was a carryforward, a

19  loss carryforward that offset part of this, that income.

20              "Q. One of the things I'm looking at is the

21  amount of --

22              "A. I'm sorry.

23              "Q -- income, other income from stock

24  sales.

25              "A. Yeah.
```

1              "Q. That's not the same as the number shown

2      on the return, is it?

3              "A. No, that's what I'm saying.  There was

4      a loss carryforward from previous years stock that

5      offset part of the gain on the other income stock sales.

6              "Q.  I see.

7              "A. In other words, from 318 to 329 is like

8      11 or $12,000 in loss carryforward in stock sales and

9      previous years.

10             "Q. Okay.  Let me show you Exhibit 55 from

11     the Comu examination.  Do you recall seeing that

12     document before?

13             "A. I may have seen it.  I don't remember

14     it.

15             "Q. Okay.  That's not a document you

16     remember utilizing in connection with the --

17             "A. For 2011?

18             "Q. Preparation of the -- yeah.

19             "A. No, this is what I used.

20             "Q. This being 54, Exhibit 54; is that

21     right?

22             "A. Yes.

23             "Q. All right.  Let me take a quick break,

24     but I think that's all I've got.

25             "A. All right.  Just a few more questions,

1  Mr. Dahl, and we can wrap this up.

2              "A. Okay.

3              "Q. Are there other companies in which

4  Mr. Comu has an interest for which you prepare returns

5  other than those we talked about today?

6              "A. Not in -- the only things I prepare

7  that C.J. has an interest in that I am aware of are

8  these that --

9              "Q. Ones we identified today?

10             "A. Yeah, the 28 returns that I made copies

11  of and --

12             "Q. Okay.

13             "A.-- submitted.

14             "Q. Are you familiar with any -- any

15  interest that Mr. Comu has in any foreign entities?  Do

16  you have any involvement in preparing returns involving

17  foreign entities?

18             "A. Not that I'm aware of.

19             "Q. Okay.  Do you know anything about a

20  company called EuroCap Investments?

21             "A. Never heard of it.

22             "Q. Okay.  Thank you very much.  Thank you

23  for your time today.  That's all I have.  Thank you for

24  getting us these returns."

25             THE COURT:  All right.  I think we did this

```
 1  entire deposition, right?

 2              MS. HANKS:  Yes, Your Honor, we did.

 3              THE COURT:  All right.  So I assume nobody

 4  has anything further on that.  All right.

 5              Your next witness.

 6              MR. VITAL:  I don't believe so I think

 7  they're all back there.

 8              UNIDENTIFIED SPEAKER:  All I have is

 9  partially.

10              MR. OLSON:  Your Honor, housekeeping matter

11  while they're looking for that exhibit.  Over the lunch

12  hour I did look at their additional exhibits.

13              THE COURT:  The court reporter is not

14  picking you up.  Can you get to a mic?

15              MR. OLSON:  Is that better?  Of the

16  Exhibits 337 through the end 368, there was only the

17  relevance objection to one.

18              THE COURT:  Okay.

19              MR. OLSON:  And that is number 337.

20              THE COURT:  337.  All right.  Well, we will

21  pick that up when and if offered.  Thank you.

22              So that means, Dawn, that 338, KLM 338

23  through 368 are additionally admitted by stipulation.

24              MR. SAROKHANIAN:  I'm sorry, Your Honor,

25  which ones are those?
```

1          THE COURT:  KLM Exhibits 338 through 368,

2    the additional ones that y'all submitted last night are

3    admitted by stipulation.

4          MR. SAROKHANIAN:  Thank you, Your Honor.

5          THE COURT:  337 he's carved out as he wants

6    to object on the basis of relevancy if and when offered.

7          MR. SAROKHANIAN:  Your Honor, the

8    plaintiffs will call STEVEN EVANS by deposition if I may

9    approach.

10          THE COURT:  You may.

11          MR. SAROKHANIAN:  We will begin on Page 8,

12    Line 8.

13          THE COURT:  Okay.

14          "Q.  How did you first become involved with

15    the Green Automotive or Go Green USA Company?

16          "A. I met -- I was aware of -- me and Steve

17    Wills -- Steve Wills worked for me back in, I guess it

18    was the late '80s or maybe the early '90s.  And Steve

19    had mentioned that he had a little car coming in from

20    China, which was the -- I don't recall the name, but it

21    was similar to the Smart Car, it was a lot smaller.  And

22    he said it was going to be converted to all electric.

23    He had wanted me to come aboard to help sell it, promote

24    it, create a build a franchise system.  And that started

25    back in '07 I think it was.

1              "Q. Was that the Zoyte Z-O-Y-T-E

2     Automotive?

3              "A. No, Zoyte came about in --

4              "Q. Zoyte?

5              "A. Yeah.  We were working on the -- I want

6     to say the We Go car, which was similar to the Smart

7     Car, only bigger.  And that was '07 to '08.  Then a

8     Chinese company contacted us, had heard about us in

9     California.  And then they contacted Steve Fly, which

10    Steve Fly wanted to go with the Chinese electric.  And

11    they had already produced an electric, little SUV in

12    China.  And they wanted us to be the distributor for

13    their green electric, all electric little SUV.  And they

14    had two other products coming along with it, so...

15             "Q. And that was --

16             "A. And that was approximately latter part

17    of '08, I believe.

18             "Q. Okay.

19             "A. Started up in '08 and that was -- then

20    we changed the name to Green Automotive Company.

21             "Q. Okay.

22             "A. It was Go Green and we also had

23    Greenway Distributors or Greenway -- it was Greenway

24    Automotive -- it was Greenway Automotive, which was the

25    interim.  And then once we got the Chinese involved,

1    which was Zoyte, that went to -- then we changed it to

2    Green Automotive at that point -- at the point of I

3    think we started talking to C.J. around July of -- I

4    want to say it was July of '09."

5              MR. SAROKHANIAN:  Okay.  Now moving to Page

6    11, Line 13.

7              "Q. Had you known C.J. Comu before the

8    Green Automotive arrangement?

9              "A. Yes, uh-huh."

10             MR. SAROKHANIAN:  Moving to Page 12, Line

11   4.

12             "Q. And where did --

13             THE COURT:  I'm sorry.  What page again?

14             MR. SAROKHANIAN:  Page 12.  I will start at

15   Line 3.

16             THE COURT:  Thank you.

17             "Q.  And where did you live at the time?

18             "A. I lived at 5313, about three houses

19   down, same side of the street.

20             "Q. So when you met C.J., what did he tell

21   you he did for business?

22             "A. When I met C.J., he told me that, hey,

23   you need to get involved.  He was doing a franchise

24   business with Sun Enterprise.  I guess it was the Sun

25   organization or something.

1           "Q. Sun Sports.

2           "A. Sun Sports or something like that.

3           "Q. Yeah.

4           "A. He said he was selling franchises to

5    companies or selling to individuals that had the

6    breakdown I think was $25,000 for a franchise and they

7    were providing memorabilia and then also for special

8    events they were having like movie stars and what have

9    you come in and speak or be a draw for an organization."

10          MR. SAROKHANIAN:  Moving to Page 14, Line

11   7.

12          "Q. Okay.  And what was the thinking behind

13   getting C.J. involved with trying to help with financing

14   for Go Green USA?

15          "A. Well, we had talked about it.  And I

16   had mentioned -- we were walking the dogs one day, and I

17   said, hey, I, you know, if you're -- I knew that C.J.

18   took companies public.  And I knew that he was good at

19   it supposably.  And we had talked about what we had done

20   with Sun and said, you know, he was always an upbeat,

21   always positive, and I believed in him, you know.  And I

22   still kind of believe in him.  I mean he's still going

23   at it and evidently very successful at it.  But at that

24   point, I said, "C.J., I've got this Green Automotive

25   Company that we're looking to take public.  And we would

1   like to take it public to raise money."  And it's

2   selling the green aspect of, you know, that was at the

3   point back in -- I think it was like June or July

4   of '09.  And he took it as, I mean it was kind of his

5   eyes lit up when I said green and the green venue of

6   vehicles.  And his eyes lit up.  And he asked me some

7   questions about how it would -- what would I think it,

8   you know, what would I think we could sell them, how

9   many we could sell and that kind of thing.  And I said

10  it could be 10,000.  It could be 100,000, you know,

11  within three to four years, which it very possibly could

12  have been if everything in a perfect world, if you look

13  at the other manufacturers like Tesla, and you know,

14  then in a perfect world, it just didn't happen.

15              "Q. Yeah.

16              "A. But it's still going on.  I mean Green

17  Automotive is a viable company that just had a grand

18  opening in Newport Beach yesterday -- or on the 4th.

19  Had a grand opening of a factory of 423 -- we got an

20  order for 423 buses, which are the Don Brown Bus --

21  which are from the Don Brown Bus Company, which Don

22  Brown is very happy with us.  We've delivered four so

23  far of the 423."

24              MR. SAROKHANIAN:  Now moving to Page 16,

25  Line 23.

1          "Q. Do you still have any kind of business

2     involvement with Green Automotive?

3          "A. Yes.

4          "Q. How would you characterize that?

5          "A. Well, I tried to do marketing for them,

6     tried to publicize, be a publicist for them.  I tried to

7     raise money for them through Addison Motor Car Leasing.

8     We're trying to originate a half million dollar loan for

9     them.  And me and Darren, the CFO, have been in contact

10    with -- have been in contact, which they're still trying

11    to raise a half million dollars for production and on

12    their assets in that Newport Beach Company -- Newport

13    Coach Company.

14         "Q. And do you still have some stock in

15    Green Automotive?

16         "A. Yes, I do.

17         "Q. So trying to go back to July, August

18    of '09, you told C.J. about the Chinese electric car,

19    and his eyes lit up --

20         "A. Uh-huh.

21         "Q -- I think you said.

22         "A. Yeah.

23         "Q. And so did he offer to help y'all with

24    making arrangements to go public?

25         "A. Yes.

1                    "Q.  And so --

2                    "A. I arranged a meeting for him and Steve

3    Fly to talk.  At that point there was a conversation

4    between me and C.J.  I said, 'C.J., if I bring you into

5    the deal,' I said, 'what do you think is compensation

6    for me if I join up with these guys as a director, what

7    do you think compensation would be.'  As this kind of

8    still is my -- still in my craw -- and this is kind of

9    still in my craw a little bit about I sent him a

10   document saying that, I asked him, I said, 'do you think

11   $10,000 -- or $10,000 a month salary plus commissions'."

12                    MR. VITAL:  Are we going to read?

13                    MS. HANKS:  I think it was unintentional.

14                    MR. VITAL:  Unintentional?

15                    MS. HANKS:  To not highlight that.

16                    "A. The deal embodied that I was also a

17   dealer broker and over the years I developed a

18   conglomerate of contacts with dealership owners, which I

19   felt like that I could get them to buy the franchise

20   which you know at that point that's kind of why my --

21   the pay plan that I got from the company was quite

22   lucrative, very lucrative.  If in a perfect world, if

23   C.J. had have done what he said he was going to do,

24   raise the money, and I was also wanting to get paid also

25   at 10 percent of what money was raised and $10,000 a

1  month, which you know, lo and behold the agreement that

2  he had come to have with Steve Fly, which I didn't get

3  anything in writing from C.J. of course, I trusted him.

4  And him and Steve Fly talked.  And they came up with an

5  agreement through Barclay Group that he would be paid

6  $10,000 a month and 10 percent of money raised.

7             "Q. He, Mr. Comu?

8             "A. Yeah".

9             MR. SAROKHANIAN:  Moving to Page 19, Line

10  22.  They are referring to KLM Exhibit 32.

11             And this is by Mr. Lippe.

12             "Q. Let me show you Exhibit 2.  Do you

13  recognize that as a letter and enclosure from C.J. Comu

14  to Steve Fly concerning these beginning discussions?

15             "A. Yes.

16             "Q. Now, what was your understanding -- had

17  there been any agreement before this September 1st

18  letter or just general discussions?

19             "A. General discussions.

20             "Q. Okay.

21             "A. This is when I guess he went and met

22  with -- I think they met once before, and then this is a

23  formality of trying to get Steve Fly committed to using

24  him as the company to take us as a -- take him as a

25  company to take us public."

1          MR. SAROKHANIAN:  Moving to Page 22, Line

2     3.

3          "Q. And what involvement did you have, if

4     any, in putting together the due diligence documents?

5          "A. I merely was a go-between between C.J.

6     Comu and Steve Fly and I just -- if Fly had a question

7     or wanted to know, you know, at that point when this

8     came out, I was the -- I would say, not for lack of a

9     better term, gopher between the two to get the documents

10    done in a timely manner so we could get it going of

11    everything in here.  Of course Steve Fly said, 'why do

12    you need that?  Why do you need this?'  And of course I

13    just said, 'you know, that's what Mr. Comu wants, so

14    that's what he needs to take it public.'"

15         MR. SAROKHANIAN:  Moving to Page 24, Line

16    5.

17         "Q. And although it says The Barclay Group,

18    was there ever anyone else supposedly with the Barclay

19    Group other than C.J. Comu that y'all dealt with?

20         "A. No.  No.  C.J. was Barclay Group."

21         MR. SAROKHANIAN:  Moving to Page 25, Line

22    5.  And Your Honor, they're going to be referring to KLM

23    Exhibit 33.

24         THE COURT:  Okay.

25         "Q.  Yeah, I'll hand you Exhibit 5.  Was

1  this a later copy of the due diligence checklist?

2          "A. Correct.  The notes at the top are of

3  me when I was trying to find out what the tariffs would

4  be on the distributorship of coming into the U.S. from

5  China.  The tariff, it says there are tariffs between

6  China and the U.S. distributorship.  It's like 15 thou

7  -- it was -- I think $1,500 a car or $1,000 a car I

8  think it was.

9          "Q. So the darker handwriting up near the

10  top of page one, that's yours?

11          "A. Right."

12          MR. SAROKHANIAN:  Now moving to Page 29,

13  Line 15.  And here, Your Honor, they're referring to KLM

14  Exhibit 34.

15          THE COURT:  Okay.

16          "Q. I'll show you Exhibit 7.  Are those

17  some handwritten notes of yours?

18          "A. Uh-huh.

19          "Q. You need to say yes or no.

20          "A. Yes.  I'm sorry.

21          "Q. And the date you took those notes was

22  September 8th, 2009?

23          "A. Yes, sir.

24          "Q. What kind of meeting was this?

25          "A. This was a meeting between me, Steve

1   Fly, and C.J.  And this a point where -- this is the

2   breakdown of who was going to have what.  And at that

3   point Steve Fly, COO -- at that point I thought I would

4   be a COO, which I later found out that I -- I was

5   wanting five percent equity at that time.  And the

6   chairman of the board was Steve Fly, CFO.  We didn't

7   have one at the time.  And Steve wanted to end up with

8   60 percent equity.  And this Go Green USA, Number 1,

9   LLC, 100 percent d/b/a we were going to do a doing

10  business as Go Green America at that point.  Steve Fly

11  wanted to be the sole managing partner or proprietor.

12  This was a request by Steve Fly of C.J. Comu of what we

13  anticipated we needed from 9/30/09.  And then this is

14  what they were -- this is what we were requiring to get

15  to $2 million so we could go forward with our plans.

16              "Q. Number four, the financing structure?

17              "A. Yes.  $100,000 first month, a half

18  million the second, 10/30.  And then a half million

19  11/30.  And this was a request by -- at a meeting with

20  Steve Fly to C.J. just what I -- if I remember

21  correctly.

22              "Q. And then explain what you meant in

23  number five there what you wrote down there.

24              "A. Number five would be 10 percent

25  commission to C.J. Comu on the total amount of capital

```
 1  raised."
 2              MR. SAROKHANIAN:  Now, Your Honor, I'm
 3  going to move to Page 32, Line 24, they will be
 4  referring to KLM Exhibit 35.
 5              THE COURT:  Okay.
 6              MR. OLSON:  Which page?
 7              MR. SAROKHANIAN:  Page 32, Line 24.
 8              "Q.  But it was agreed at this meeting on
 9  September 10, 2009 that C.J. Comu would get five percent
10  of the stock of Go Green USA?
11              "A. I believe that was -- yeah, discussed
12  management biographies, yeah, uh-huh, yeah."
13              MR. SAROKHANIAN:  Now jumping to Page 41,
14  Line 17 -- or Line 16.  Excuse me.  Let's go to 13.
15              "Q. And what ever happened in that
16  transaction you just described, you weren't involved in
17  it --
18              "A. No.
19              "Q -- in any way, were you?
20              "A. No, huh-uh.  I did not know about it.
21  I was told that I was -- needed to resign and that was
22  the latter part of '010, which there was a couple of
23  other things and then what happened was is C.J. made it
24  to -- made it his, you know, asked Steve Fly to resign.
25  At that point that's when C.J. captured for Barclay
```

1  Group when I say, quote, unquote, Barclay or, quote,

2  unquote, C.J., they're one in the same to me.  C.J.

3  ended up with another 45 to 50 million shares of stock

4  of Steve Fly's into The Barclay Group.  So at this point

5  I believe latter part of '010 he ended up with about 140

6  something million or 150 million shares of stock, which,

7  you know -- and this all came about -- the lunch all

8  came about because of the fact that I told C.J., I said,

9  'look, you want my voting rights on the board, you know

10  is it worth anything,' because they had a document that

11  said, you know, I had voting rights.  And I said, you

12  know, I was hurting for cash.  I needed money to pay

13  bills to live.  And I went to him.  And then, of course,

14  Steve Fly told Lockhart about what I was doing and

15  Lockhart tells Wells.  And Wells calls me and raising

16  hell because he wanted -- he didn't want me to sell it

17  to C.J. because that would give C.J. control, which

18  unbeknownst to Steve Wells, C.J. controlled anyway

19  because of the free trading and floating shares which

20  they didn't know that.

21          "Q. Okay.

22          "A. From inception, C.J. had control from

23  what I understand."

24          MR. SAROKHANIAN:  We're going to move ahead

25  to Page 61, Line 8.

1                    "Q.  And what was this about?

2                    "A. This Wakabayashi.  This is one of the

3    -- this was from C.J. Comu.  This guy here is from

4    Dallas.  And he started a company.  He left Dallas,

5    started a company in New York and then Japan.  And this

6    Wakabayashi Financial, they went offshore because of the

7    fact they could sell -- they could take unrestricted

8    stock and they would do a letter of opinion in those

9    foreign companies and then sell the stock on the open

10   market and raise money.  That was my understanding.  And

11   that was their way of getting around the U.S. laws, I

12   guess you might say."

13                   MR. SAROKHANIAN:  Moving to Page 62, Line

14   6.  They will be referring to KLM Exhibit 37.

15                   By Mr. Lippe:

16                   "Q. This document marked Exhibit 25 at some

17   point were copies of the private placement memorandum

18   actually numbered up in the upper right-hand side --

19                   "A. Yeah.

20                   "Q -- for showing to potential advisors?

21                   "A. Uh-huh.

22                   "Q. And you had in your files copy 114.

23                   "A. Correct."

24                   MR. SAROKHANIAN:  Moving to Page 64, Line

25   4.

1              By Mr. Lippe:

2              "Q. The company on November 30th, 2010

3      entered into a loan agreement with The Barclay Group."

4              By Mr. Elmquist:  "I got it.  I found it.

5      Thanks."

6              "A. Yeah, I recall Steve Fly making a

7      comment that we had to make a loan back to C.J. for any

8      money at that point.  And it was a joke because here we

9      are, he was supposed to have raised us money and paid

10     him a commission.  But yet we had to give him a note

11     back to pay him back for the stock, with stock or cash.

12     I thought that was kind of a joke.

13             "Q. Did you ever --

14             "A. When he was supposed to --

15             "Q. -- come to find out that there were

16     notes signed by Green Automotive to The Barclay Group

17     that had provisions in them that provided for stock to

18     be issued if the notes were in default?

19             "A. Right.  Right.  At that point Steve Fly

20     was desperate because we were running out of money.  We

21     were going to lose our lease on the building.  And

22     that's why it was kind of a joke that C.J. had, you

23     know, had us sign a note back to him when he was, in

24     fact, supposed to be raising us money per Steve Fly.

25     That's not my comment.  That's Steve Fly's comment."

```
 1                    MR. SAROKHANIAN:  Moving to Page 67, line

 2  8.

 3                    "Q. Is C.J. still living at that house on

 4  Palladium?

 5                    "A. The corner house?

 6                    "Q. Yes.

 7                    "A. No.

 8                    "Q. Do you know where he's living these

 9  days?

10                    "A. At the other end of the street.  I

11  don't know the address.  I'm not even sure it's

12  Palladium or Oaks North Drive.

13                    "Q. Has he ever told you anything about

14  that house, who bought it or who financed it or

15  whatever?

16                    "A. Oh, I made a comment to him, I said,

17  'oh, I hear you paid cash for your house.'  And he kind

18  of looked at me.  And I said, 'well, my neighborhood is

19  kind of tight and the guy that sold the house found out

20  that my ex-fiance is in the real estate business.  And

21  she bumped into their neighbor and he said, yeah, they

22  sold it to C.J. Comu for $450,000, he paid cash, wire

23  transfer.'"

24                    MR. OLSON:  Object to the hearsay.  I don't

25  know how you're going to handle it but...
```

1              THE COURT:  Okay.  Well, response.

2              MR. SAROKHANIAN:  Mr. Olson was at this

3      deposition.  There was no objection.

4              THE COURT:  Okay.  I'm going to overrule

5      it.  It's waived.

6              MR. OLSON:  You want us to make evidentiary

7      objections at the time of the deponent's comment?

8              THE COURT:  Well, what was the agreement?

9              MR. OLSON:  Form.

10             THE COURT:  You only would make objections

11     during the deposition as to form --

12             MR. OLSON:  Yes, ma'am.

13             THE COURT:  -- and you reserved all other

14     objections?

15             MR. OLSON:  Yes, ma'am.

16             THE COURT:  All right.  You disagree that

17     that was the agreement?  It should be on the record, I

18     guess.

19             MS. HANKS:  Unfortunately this predates our

20     representation but we will -- my understanding was that

21     there's specific objection -- actually I'll just let Mr.

22     Elmquist -- do you recall what the agreement was,

23     because I was not there.

24             MR. ELMQUIST:  Your Honor, I think our

25     agreement was consistently reserving all objections

1  except as to form.

2          THE COURT:  All right.  Well, I don't see

3  it here at the beginning, but that's what Mr. Elmquist

4  has represented, so therefore, you need to address the

5  hearsay objection.

6          MR. SAROKHANIAN:  Well, my initial thought

7  is that if it's a form objection, that would include

8  lodging objection to hearsay.  But beyond that, it goes

9  to show personal knowledge of the deponent, Mr. Evans,

10  of where C.J. Comu is living.  So he's not saying --

11          MR. OLSON:  I didn't object to that, but

12  the response starting on Line 18 where his ex-fiance

13  says the neighbor says somebody else told him.

14          MS. HANKS:  Your Honor, we wouldn't offer

15  it for the truth of the matter asserted.  I think that

16  really what it's being offered for is that the debtor's

17  living circumstances were not evidenced in his

18  bankruptcy filing and it's evident to people in his

19  neighborhood that he's buying a new house with cash.

20  He's moving in.  He's living in this new place, when

21  that information is not something that's evident in the

22  pleading.  I don't think it's necessary, you know, to --

23  I think this is very helpful context for the Court but

24  it's not something that we need for the truth of the

25  matters that are actually stated in the testimony.

1          THE COURT:  I sustain the objection on the

2    hearsay.  So the hearsay will begin at Line 18 on Page

3    67 of Steve Evan's deposition and go through Page 68,

4    Line 5.

5          MR. SAROKHANIAN:  Okay.  Thank you, Your

6    Honor.  We will move on to Page 69.

7          This is the examination by Mr. Elmquist of

8    Mr. Evans.  I will start on Line 9.

9          "Q. Mr. Evans, my name is David Elmquist.

10   We met before.

11          "A. Yes.

12          "Q.  Last summer, I think, to talk about

13   Green Auto and your involvement with all that.  I'm here

14   today as counsel for the bankruptcy trustee and I have a

15   few questions for you.

16          "A. Okay.

17          "Q. On Exhibit 25 there in front of you,

18   take a look at Page 31 if you would.

19          "A. Okay.

20          "Q. This document indicates that you

21   received 7,181,011 shares of Green Automotive stock; is

22   that right?

23          "A. Correct.

24          "Q. Were you actually issued those shares?

25          "A. Yes.

 1                  "Q. Okay.  How many shares do you hold

 2      today?

 3                  "A. 2 million roughly.

 4                  "Q. Okay.  And did you sell the other

 5      5,181,000 shares?

 6                  "A. Yeah.

 7                  "Q. Okay.  Do you recall when those shares

 8      were sold?

 9                  "A. Just various times to different

10      shareholders or to people, individual friends.

11                  "Q. Okay.  Were the shares restricted?

12                  "A. Yes.

13                  "Q. Did you work through any kind of broker

14      or agent in connection with the sale of those stock?

15                  "A. No, sir.

16                  "Q. Okay.  Were the shares that you sold

17      all sold to individuals that were personally

18      acquaintances of yours or --

19                  "A. Yes.

20                  "Q -- - or friends of yours?

21                  "A. Yes.

22                  "Q. And was the stock that was sold sold at

23      various prices or was it all sold about the same price?

24                  "A. In between a penny and a nickel, I

25      believe."

1          MR. SAROKHANIAN:  Moving to Page 73, Line

2    19.

3          "Q. What I'm trying to understand is what

4    Comu is doing in connection with these transactions.  As

5    I understand -- and as I understand it, he introduced or

6    found for you some of the buyers for the stock you sold;

7    is that right?

8          "A. Correct.

9          "Q.  Did he do anything else other than

10   locate buyers for you in connection with these

11   transactions?

12         "A. At one point he drew me up a document

13   that would allow me to do it in a correct way, which was

14   a stock order, stock purchase agreement.

15         "Q. Okay.

16         "A. Which I used that agreement on three

17   other occasions or four other occasions just to make

18   sure that the buyer knew that it was me, and you know,

19   that gave them something in their hands to know while

20   they were waiting on their certificates to come to them

21   that it was a real deal."

22         MR. SAROKHANIAN:  Moving to Page 79, Line

23   21.

24         "Q.  And are you currently involved with

25   business or possible business transactions with Green

1    Auto through --

2            "A. I'm trying to raise the money.  That's

3    about it.

4            "Q. Trying to raise money for them?

5            "A. Just giving them contacts that I have

6    had over the years.  Consequently, we were on the verge

7    of -- we went to a leasing show in Vegas.  And when I

8    say we, I'm going to say Murray Schwarz and Leon Chester

9    went to Las Vegas.  And they have been working on this

10    loan for Green Automotive for three or four months.  And

11    they found a couple of guys out of Chicago that were

12    very interested in capping the company.  Which after

13    digging into the history of the company back when C.J.

14    was involved in it at the early stages, they found all

15    this negative publicity of the public offering and all

16    the hoopla and everything on the Internet through the

17    principals of the company back then.  So they -- since

18    then have all vanished.  They don't have anything to do

19    with it because of the past history and the players back

20    then."

21            MR. SAROKHANIAN:  Moving to Page 85, Line

22    22.  Well, actually start at Line 20.

23            "Q.  Okay.  And it's your understanding

24    that at this meeting -- well, in your earlier testimony

25    you testified about the fact that Steve Fly basically

1  withdrew inappropriately withdrew $100,000 from the

2  Green or received $100,000 from the sale basically

3  either sale or issuance of what was treasury stock and

4  Mr. Fly --

5            "A. To The Barclay Group.

6            "Q. To The Barclay Group and Mr. Fly ended

7  up with those funds and that those funds should have

8  gone to Green Auto Group?

9            "A. The time frame was approximately

10  October of '010, I believe.

11            MR. SAROKHANIAN:   Okay.  All right.

12  Moving to Page 94, Line 8.

13            And this is the examination by Mr. Olson.

14            "Q. And so I got out and came --"

15            MR. SAROKHANIAN:  Excuse me -- that's the

16  testimony.  Let me back up.  93, Page 93, Line 12.

17            THE COURT:  Okay.

18            "Q. All right.  Just I wouldn't ask that

19  except you kept making a comment about trying to avoid

20  going to jail.

21            "A. Well, the reason -- let me explain that

22  situation too.  When I say 50,000, I had to come up with

23  some cash and I just -- and I had just been -- I didn't

24  know where I was going to come up with the money.  And

25  the judge was adamant about putting me in jail for six

1   months.  And they had me in handcuffs.  And I was

2   sitting in the sheriff's back room.  About that time I

3   get a call from C.J. Comu.  His name come up on my

4   phone.  And I said, 'oh, thank God.'

5              And I answered the phone, I said, 'C.J., I

6   need $50,000.  I need to sell enough stock, you know,

7   whatever you've got to do, do it.'  And he said, 'just

8   tell them it will take seven days.'  I said okay.

9              Well, at that point they released me under

10  that scenario.  But I still had to stay in there two

11  days, and it was awful, you know, I was scared to death.

12  And you know, it's not a good place to be.  So I got

13  out, came home.  C.J. comes to my house and says,

14  'here's how you're going to sell your stock.'  And I

15  said okay.  And I was under the impression that C.J. had

16  somebody buy it.  And he comes in and he says, he pulls

17  up my iPhone and I had about 6- or 700 contacts on

18  there.  He goes, 'well, what I want you to do is I want

19  you to take this agreement and contacts, send out an

20  email or text message in your contact deal and say you

21  will sell them 1,000 shares for $100 and sell 50 -- or

22  what is it -- sell 10,000 shares for $10,000 apiece or

23  whatever it was, a thousand shares and you take, you

24  know, 1,000 per person in your contacts and there's your

25  $50,000."

1          MR. SAROKHANIAN:  And that concludes the

2    excerpts from the plaintiffs of the deposition of Steven

3    A. Evans, Your Honor.

4          THE COURT:  All right.  Does anyone wish to

5    supplement with additional deposition excerpts on this

6    one?

7          MR. OLSON:  Your Honor, just on Page 70,

8    add Lines 22 and 23.

9          THE COURT:  Page 70, you said Lines 22 and

10   23?

11         MR. OLSON:  Yes.  He sold his stock for a

12   penny.

13         THE COURT:  Okay.  "Pretty much a penny."

14   All right.  Anything else?

15         MR. ELMQUIST:  Nothing for the trustee,

16   Your Honor.

17         THE COURT:  All right.  Well, then that

18   concludes the Steven Evans' deposition.

19         Are plaintiffs ready to call another

20   witness?

21         MR. SAROKHANIAN:  Yes, Your Honor, we will

22   now call MATTHEW TROSTER to the stand -- or through

23   deposition.  Excuse me.

24         THE COURT:  All right.

25         MR. VITAL:  Your Honor, if I may, may I

```
 1  have a brief restroom break if that's okay?
 2              THE COURT:  All right.  That's certainly
 3  okay.
 4              MR. VITAL:  I have been drinking a lot of
 5  water.  I'm sorry.
 6              THE COURT:  We will make it a 10-minute
 7  break.  We will come back at 4:00.
 8              MR. VITAL:  Thank you, Your Honor.
 9              (Break taken.)
10              THE COURT:  We are going back on the record
11  in King Louie.
12              All right.  We were about to do plaintiffs'
13  witness number five by deposition.
14              MR. SAROKHANIAN:  Yes, Your Honor, we're
15  going to call MATTHEW TROSTER.
16              Does Your Honor have a copy of the depo
17  transcript or may I approach with one?
18              THE COURT:  Not that I know of.
19              MR. SAROKHANIAN:  Okay.
20              MS. HANKS:  It's also Trustee Exhibit 42,
21  Your Honor.
22              THE COURT:  Oh, the entire deposition is?
23              MS. HANKS:  The entire deposition.
24              THE COURT:  Okay.  Well, you can take this
25  back if you want because I have it at Trustee's 42.
```

1            Thank you.

2            MR. SAROKHANIAN:  And, Your Honor, it's a

3    housekeeping matter, we can take it up once we're done

4    with Troster.  But there might be a chance we can finish

5    with all the deposition reading today, might go past

6    5:00.  Just want to throw that out there and see if

7    you're okay with that.  But we can take it up after

8    Troster is done.

9            THE COURT:  Okay.  Let's see where we are

10   after Troster.

11           MR. SAROKHANIAN:  Okay.  Great.

12           MR. ELMQUIST:  Counsel, I'm sorry.  I

13   missed that.  What were you saying?

14           MR. SAROKHANIAN:  I was asking the Court --

15   I said there's a chance that if we can get done with

16   Troster and everyone's amenable if we're in that

17   situation to go past 5:00 we could wrap up all the

18   deposition reading today and go with live only.  But

19   we'll take it up.

20           THE COURT:  We'll just see.  I'm not going

21   to go much past 5:00 so I mean I would go 5 or

22   10 minutes but not more than that.

23           MR. SAROKHANIAN:  Okay, I understand.

24           If we could start on Page 13 and I will

25   start at Line 6.

1           This is an examination by Mr. Elmquist.

2           "Q. Mr. Troster, I'm David Elmquist.  I'm

3   representing the bankruptcy trustee in a bankruptcy

4   pending in Dallas that Mr. Comu filed several years ago

5   the end of 2009.  In the course of that bankruptcy case

6   a lawsuit was filed by Mr. Lippe on behalf of a company

7   called King Louie Mining and King Louie Enterprises and

8   Ronald Katz.  I then on behalf of my client, the

9   trustee, intervened in that lawsuit with certain

10  additional claims.  But we're here to talk about

11  transactions involving The Barclay Group and

12  transactions involving the purchase and sale of Green

13  Auto stock for which I understand Old Monmouth served as

14  a transfer agent, an escrow agent; is that right?

15          "A. Yes."

16          MR. SAROKHANIAN:  Moving to Page 15, Line

17  14, and they will be referring to Trustee Exhibit 43.

18          THE COURT:  Okay.

19          "Q.  Mr. Troster, this is a copy of an

20  escrow agreement, which is among the documents you sent.

21  This particular copy of the agreement isn't signed.  Do

22  you recall that an agreement like this was entered into

23  between Old Monmouth and The Barclay Group?

24          "A. Yes.

25          "Q. And The Barclay Group was pursuant to

1   this agreement looking to sell 10 million shares of

2   common stock of Green Auto; is that right?

3               "A. Yes.

4               "Q. And for purposes of these transactions,

5   Old Monmouth was going to act as an escrow agent and a

6   transfer agent; is that right?

7               "A. Yes.

8               "Q. Do you know who drafted Exhibit 1, who

9   prepared this document?

10              "A. It was prepared by, I'm assuming The

11  Barclay Group.  I did not prepare it.

12              "Q. Do you remember anything about signing

13  the agreement?  It's shown to -- if you look at the

14  fourth page of the document you will see it's a

15  reference to an execution as of 16th of June, 2011.  Do

16  you remember anything about signing it at that time?

17              "A.  I don't recall specifically, but I am

18  sure that it was signed."

19              MR. SAROKHANIAN:  Moving to Page 18 --

20  actually I will stick with Page 17, Line 20.  17, Line

21  20.

22              "Q. Okay.  Can you tell me what -- let's

23  see -- we have in Paragraph D on the first page, quote,

24  the parties hereto acknowledge that Old Monmouth Stock

25  Transfer Co also serves as transfer agent for GACR, end

1   quote, which is Green Automotive Company.  So what was

2   Old Monmouth doing as a transfer agent under this

3   agreement?

4              "A. We were keeping the shareholder records

5   for that issue -- for the issuer.

6              "Q. Okay.  And was that by virtue of a

7   separate agreement with Green Auto?

8              "A. Yes.

9              "Q. I have not seen any agreement between

10  Old Monmouth and Green Auto.  Can you tell me what that

11  agreement provided for?

12             "A. They would appoint us as transfer agent

13  for their common stock.

14             "Q. And what services would you perform as

15  transfer agent?

16             "A. We were transfer titles of their shares

17  or issue newly registered shares upon their request.

18             "Q. In the documents I reviewed, I noted

19  that -- I noted there was a number of instances in which

20  stock certificates have an issue to The Barclay Group

21  for certain number of shares were stamped cancelled and

22  then there would be a re-issuance of a smaller amount

23  representing the shares they had sold or that difference

24  represented the shares that were sold by The Barclay

25  Group.  So were you also involved in those?

1          "A. We would physically do the transfer of

2     them, whether they were sales or not, that we don't

3     know.

4          "Q. And what records did you maintain with

5     respect to the purchase and sale of shares of Green

6     Auto?

7          "A. In regards to the escrow agreement or

8     in regards to the transfers.

9          "Q. Let's talk about it in regards to the

10    escrow agreement.

11         "A. We would receive I guess a purchase

12    agreement from the buyer along with a check that they're

13    looking to buy or purchase shares.

14         "Q. And you would receive funds from that

15    purchaser and then as stock transfer agent, would you

16    (sic) responsible for issuing the shares?

17         "A. Yes.

18         "Q. And that was with the agreement of

19    Green Auto?

20         "A. Yes."

21         MR. SAROKHANIAN:  Moving to Line 20.  And

22    Your Honor, they're referring to Trustee Exhibit 44.

23         THE COURT:  Okay.

24         MR. OLSON:  And Your Honor, we would urge

25    our relevance objection on the discharge issue.

```
 1              THE COURT:  Okay.  Let me check my list.

 2   This is going to be Exhibit 40, you said?

 3              MR. SAROKHANIAN:  44 of the Trustee's.

 4              MS. HANKS:  This is the Trustee's exhibit.

 5              MR. OLSON:  No objection to the Trustee's

 6   exhibit.

 7              THE COURT:  Oh, okay.  Good.

 8              MR. SAROKHANIAN:  Line 23 on Page 20.

 9              "Q.  Take a look at Exhibit 2, Mr. Troster,

10   and tell me if you're familiar with this document.

11              "A. I am.

12              "Q. To the best of your recollection, does

13   this document reflect all of the share -- all the sales,

14   the purchase and sales of Green Auto stock from June 20,

15   2011 through January 4, 2012?

16              "A. Yes.

17              "Q. And is this the -- do you know whether

18   this document captures all the transactions; in other

19   words, whether this is the complete set of transactions

20   of the Green Auto purchase and sales by The Barclay

21   Group?

22              "A. That I don't know.  It certainly

23   possible they could have had other ones that I'm not

24   aware of.

25              "Q. With respect to transactions in which
```

1  Old Monmouth served as escrow agent, are these the

2  transactions?

3              "A. Yes.

4              "Q. So Exhibit 2 covers all the

5  transactions?

6              "A. Yes."

7              MR. SAROKHANIAN:  Moving to Page 23, Line

8  9.

9              "Q. Look at the last page of the document,

10  if you will.  So it's stated there, quote, total funds

11  received $2,839,857, end quote.  That number represents

12  all of the monies that were received as set forth in

13  this first column?

14              "A. Yes."

15              MR. SAROKHANIAN:  Moving to Page 25, Line

16  10.

17              "Q. Okay.  Thanks.  I overlooked that.

18  This document reflects the amounts that were received

19  and amounts wired in connection with these transactions.

20  Did you keep any kind of tally of where the money was

21  going; in other words, you received money from the

22  buyers and then you -- and then per instructions, you

23  would transfer the -- transfer funds out.

24              "A. Yes.

25              "Q. Did you keep a separate record of where

1  the funds were being sent?

2            "A. Yes.

3            "Q. On each transaction.

4            "A. Yes."

5            MR. SAROKHANIAN:  And Your Honor, they're

6  going to be referring to Trustee Exhibit 45.

7            THE COURT:  Okay.

8            MR. SAROKHANIAN:  45.

9            THE COURT:  Okay.

10            MR. SAROKHANIAN:  Starting on Line 6 on

11  Page 26.  I'm handing you what the reporter has marked

12  as 2A.  It's a letter -- this is a letter from Cengiz

13  Comu as trustee for the trust.  Do you recall this

14  letter in general?

15            "A. Yes.

16            "Q. And this letter was sent to you for

17  purposes of setting up a relationship with the Daptco

18  Trust similar to that which was formed with The Barclay

19  Group?

20            "A. Yes.  I believe so.

21            "Q. Okay.  On the transactions involving

22  The Barclay Group, who was your principal contact in

23  terms of the transactions for which Old Monmouth was

24  serving as escrow agent and transfer agent?

25            "A. I believe it was C.J. Comu.

1              "Q.  Okay.  We'll get to that later.  How

2    about with respect to the Daptco Trust, who was your

3    principal contact with respect to the Daptco trust

4    transactions?

5              "A. I don't recall specifically.  I believe

6    it was C.J."

7              MR. SAROKHANIAN:  Your Honor, they will now

8    be referring to Trustee Exhibit 46.

9              THE COURT:  Okay.

10             "Q. Mr. Troster, you have before you

11   Exhibit 3, which is an escrow agreement between Old

12   Monmouth and a Daptco trust.  If you turn to the fifth

13   page of this document, there's a signature for Old

14   Monmouth.  Is that your signature?

15             "A. Yes.

16             "Q. And this agreement is substantially

17   similar to the one that we looked at earlier for The

18   Barclay Group, correct?

19             "A. Yes."

20             MR. SAROKHANIAN:  Then moving to Line 15.

21             And Your Honor, they're referring to

22   Trustee Exhibit 47.

23             THE COURT:  Okay.

24             "Q.  Are you familiar with Exhibit 4,

25   Mr. Troster?

1              "A. Yes.

2              "Q. Who maintained these records at Old

3      Monmouth?

4              "A. I did.

5              "Q. So this is a document you created?

6              "A. Yes.

7              "Q. And your purpose of keeping this was to

8      keep track of the transaction for which Old Monmouth

9      served as escrow agent or transfer agent, I take it,

10     yes?

11             "A. Yes."

12             MR. SAROKHANIAN:  And then they're

13     referring to Trustee Exhibit 48, 4-8.  And I will move

14     to Line 19 on Page 29.

15             "Q. Do you have any recollection today of

16     ever discussing any of the transactions involving the

17     TKY Trust or the Daptco Trust with Jim Comu as opposed

18     to C.J. Comu?

19             "A. I don't believe so."

20             MR. SAROKHANIAN:  Then they will be

21     referring to Trustee Exhibit 49, 4-9, on Page 30

22     starting at line 4.

23             "Q. Do you recognize Exhibit 5, Mr.

24     Troster, to be a copy of the escrow agreement between

25     TKY Trust and Old Monmouth that was executed on or about

1    September 1, 2011?

2                 "A. Yes.

3                 "Q. Page 5, is that your signature?

4                 "A. Yes.

5                 "Q. And again, this document is

6    substantially similar to the other agreements we looked

7    at?

8                 "A. Yes.

9                 "Q. Let me point out one thing.  Here on

10   the first page subparagraph D, it says here, quote, the

11   parties hereto acknowledge action stock transfer serves

12   as transfer agent, end quote.  Do you know why Old

13   Monmouth was not acting as transfer agent in these

14   deals?

15                "A. Issuers change transfer agents from

16   time to time.

17                "Q. Why is that?

18                "A. Different management or whatever reason

19   they have for changing transfer agents.

20                "Q. That would be Green Auto?

21                "A. Yes.

22                "Q. They would make the decision on who

23   serves as transfer agent?

24                "A. Correct.

25                "Q. I take it with respect to the -- with

1    respect to the TKY Trust and Daptco Trust transactions,

2    all of those were handled in terms of the stock transfer

3    by action stock transfer?

4              "A. I believe so, yes."

5              MR. SAROKHANIAN:  And Your Honor, they're

6    going to refer to Trustee Exhibit 50.

7              THE COURT:  Okay.

8              MR. SAROKHANIAN:  5-0.

9              "Q.  You recognize Exhibit 6?

10             "A. Yes.

11             "Q. And this is again a record you

12   maintained with respect to the purchase and sale of the

13   Green Auto stock pursuant to the TKY Trust, slash, Old

14   Monmouth escrow agreement?

15             "A. Yes."

16             MR. SAROKHANIAN:  And then they're

17   referring to Trustee Exhibit 51, 5-1, starting on Page

18   32, Line 3.

19             "Q.  Do you recognize Exhibit 7,

20   Mr. Troster?

21             "A. Yes.

22             "Q. Is this a record you also maintained?

23             "A. Yes, this is a transaction report.

24             "Q. And this is meant to reflect a stock

25   issued in connection with these particular transactions

1    between The Barclay Group and these purchasers?

2              "A. Yes.

3              "Q. It shows here that there's a

4    certificate for 9,501,000 shares of stock that was

5    cancelled and a new certificate issued for 9,361,000.

6    Do you see that?

7              "A. Yes.

8              "Q. Acting as stock transfer agent, was Old

9    Monmouth involved in the cancellation and issuance of

10   the certificates reflected in Exhibit 7?

11             "A. Yes."

12             MR. SAROKHANIAN:  Moving to Page 34, Line

13   12.

14             "Q.  Okay.  So again, as I understand this

15   process, as sales of stock were being made by The

16   Barclay Group and other groups of stock transactions,

17   existing certificate reflecting the outstanding shares

18   of The Barclay Group held by The Barclay Group would be

19   cancelled, a new one would be issued and a new

20   certificate would reflect the stock that was sold to

21   whomever?

22             "A. Yes.

23             "Q. Is that how it worked?

24             "A. Yes."

25             MR. SAROKHANIAN:  Moving to Page 36, Line

1   -- excuse me -- Page 35, Line 23.

2                    "Q.  And what is the WWA 1548 and the

3   series of numbers after that, do you know?

4                    "A. I don't recall.  I know WWA was World

5   Wide Auric.  I'm not sure which escrow this is from."

6                    MR. SAROKHANIAN:  They'll next be referring

7   to Trustee Exhibit 39, 3-9.  I'll start on Page 36, Line

8   18.

9                    "Q. This Exhibit 12, a letter from Ed

10  Baxter to you concerning the breakdown for today's

11  wires.  Do you see that?

12                   "A. Yes.

13                   "Q. So this was instructing you on how to

14  disburse funds received in connection with the purchase

15  and sale of the Green Auto stock?

16                   "A. Yes.

17                   "Q. And you were referring just a moment

18  ago to World Wide Auric, which is the first name listed

19  here on this Exhibit 12, do you see that?

20                   "A. Yes.

21                   "Q. Do you know what World Wide Auric is?

22                   "A. No.

23                   "Q. Did you ever have any dealings with

24  them?

25                   "A. As far as escrows being sent to them or

1   funds being sent out, yes.

2              "Q. Was that the extent of your involvement

3   with World Wide Auric was wire transferring as

4   instructed by some representative of The Barclay Group?

5              "A. Yes.

6              "Q. That they receive payments or wire

7   transfers as instructed by Ed Baxter or Mr. Comu?

8              "A. Yes."

9              MR. SAROKHANIAN:  And then, Your Honor,

10  they're going to refer to Trustee's Exhibit 40.  That's

11  4-0, Page 38, starting at Line 11.

12             "Q. I want to direct your attention to the

13  second page of Exhibit 13, Mr. Troster.  On the left

14  side there, there's a reference to available funds of

15  $110,000.  Do you know what is meant by that?  What

16  does, quote, available funds, end quote, mean?

17             "A. Those are available funds to be wired

18  out.

19             "Q. It looks like the total amount wired

20  out in this document is $326,491.

21             "A. That's a grand total of everything."

22             MR. SAROKHANIAN:  And Your Honor I'm going

23  to move to Page 40.  I will be starting on Line 14.

24  They will be referring to Trustee's Exhibit 52.

25             MR. OLSON:  5-2?

1           MR. SAROKHANIAN:  Yes, sir, 5-2.

2           "Q.  Exhibit 15 is one of these

3   transactional documents showing stock cancelled and

4   issued.  With respect to the individuals that were

5   receiving restricted shares of Green Auto stock, since

6   this was a Barclay Group transaction, as I understand

7   it, Old Monmouth as stock transfer agent would prepare

8   and issue the shares on behalf of Green Auto; is that

9   right?

10          "A. Yes.

11          "Q. And did you send some kind of record to

12  Green Auto so that they would reflect in their books and

13  records the issuance of these shares to these

14  individuals?

15          "A. Monthly we send out transaction

16  journals which would show this transaction."

17          MR. SAROKHANIAN:  Your Honor, they will be

18  referring to document which is KLM Exhibit 41.

19          THE COURT:  KLM 41?

20          MR. SAROKHANIAN:  Yes, Your Honor.

21          MR. OLSON:  And, again, Your Honor, that's

22  one of them that I objected to for relevance.

23          THE COURT:  All right.  Would you like to

24  respond to that?

25          MR. SAROKHANIAN:  Your Honor, I make

1  reference obviously earlier to your comments.  My

2  previous response to the relevance objection, more

3  specifically these documents that were shown to

4  Mr. Troster, Mr. Troster was the -- he was the escrow

5  agent and transfer agent for an entity called Old

6  Monmouth, which was the main conduit through which C.J.

7  Comu through TBG, his alter ego, was selling these

8  shares.  So as you will hear, and to the extent that you

9  don't think it's relevant now, I ask again for you to

10 carry that because the additional testimony will show

11 why this is relevant.  They were able to trace the Green

12 Auto shares from TBG, which is part of C.J. Comu's

13 control, to various buyers and then show the $3 million

14 or the amount of money that he made from the sale of

15 those shares back through Old Monmouth and action stock.

16 So this is absolutely relevant, because this is

17 undisclosed assets under 727(d)(1) as well as 727(d)

18 (2).  Because these were proceeds that should have been

19 property of the estate had they been disclosed.

20            THE COURT:  I will overrule the objection

21 and admit it.

22            This is KLM 41, Dawn.

23            MR. SAROKHANIAN:  So KLM 41 is admitted,

24 Your Honor?

25            THE COURT:  Yes, it is.

```
 1                    MR. SAROKHANIAN:  Thank you.

 2                    "Q. I'll pick back up Page 41, Line 15.  In

 3        this Exhibit 16, if you take a look at the email address

 4        there, this is -- this document is being sent to you by

 5        C.J. Comu, correct, on behalf of admin.  Do you see

 6        that?

 7                    "A. Yes.

 8                    "Q. So did you from time to time receive

 9        transactions from Mr. Comu as well as Mr. Baxter as far

10        as instructions on how funds were to be wired?

11                    "A. I believe so."

12                    MR. SAROKHANIAN:  And the next document

13        they're referring to, Your Honor, is KLM Exhibit 42.

14                    "Q.  Do you recognize Exhibit 17,

15        Mr. Troster?

16                    "A. Yes.

17                    "Q. Are these wire transfer forms that you

18        have prepared in accordance with instructions received

19        from Mr. Baxter or Mr. Comu as to funds to be wired to

20        various designated parties?

21                    "A. Yes.

22                    "Q. And is that your signature at the

23        bottom of the form where it says sign here?

24                    "A. Yes.

25                    "Q. And this again was all done in
```

1  accordance with instructions that you received?

2          "A. Yes."

3          MR. SAROKHANIAN:  Moving to Page 44.  It

4  will be discussing KLM Exhibit 43.  That's 4-3, KLM 4-3.

5          MR. OLSON:  And that's one of our relevance

6  objections.

7          THE COURT:  That's one of the relevance

8  objections; your response?

9          MS. HANKS:  Your Honor, this is another

10 cash distribution.  It's the proceeds of assets that

11 belonged to the estate.  Cash came in from the sale of

12 those -- of that stock.  It was distributed in

13 accordance with the defendant's instructions to various

14 recipients.

15         THE COURT:  I'm going to overrule the

16 objection.  It's admitted.

17         MR. SAROKHANIAN:  Starting on Line 5 on

18 Page 44.

19         "Q. You have in front of you Exhibit 21 and

20 you will see we've got some numbering at the bottom of

21 the page.  So if you turn to Number 2510, and I'll ask

22 you, there's a couple, three names we haven't addressed

23 yet:  Capital Asset Management Partners, Inc., Five Star

24 Health, LLC, and Millennium Marketing Concepts, Inc.

25 These are recipients of wire transfers in accordance

1  with instructions as set forth in this letter.  Did you

2  have any dealings with any of those entities other than

3  to wire transfer funds in accordance with instructions

4  from Mr. Baxter?

5           "A. No."

6           MR. SAROKHANIAN:  And then they will be

7  referring to Trustee's Exhibit Number 5-3.  Number 53.

8  And I will be on Page 45 starting with Line 13.

9           MS. HANKS:  Actually can you start at

10 the page before?

11          MR. SAROKHANIAN:  I'm going to start back

12 Page 44, pick back up at line -- oh, that's the witness

13 -- excuse me.  I will start on Page 44, Line 22, Your

14 Honor.

15          THE COURT:  Okay.

16          "Q.  You will note at the top of Exhibit 22

17 that this is an email from David Parsley.  Do you recall

18 that name?

19          "A. Yes.

20          "Q. Is that also someone that you received

21 instructions from with respect to these Green Auto

22 transactions?

23          "A. Yes.

24          "Q. And it shows

25 "davidparsley@thebarclaygroup.com."  Do you see that?

1              "A. Yes.

2              "Q. But the instructions pertain to Daptco

3  Trust, correct?

4              "A. Yes.

5              "Q. Do you recall having any -- receiving

6  any instructions directly from, by email, directly from

7  Jim Comu with respect to transfer instructions as

8  opposed to representatives of The Barclay Group to the

9  Daptco Trust transactions?

10             "A. Not that I recall.

11             "Q. If you take a look at the number 544,

12  which is the fourth page of this document, do you know

13  whose signature that is on the fourth page?

14             "A. I'm guessing that is Jim Comu.

15             "Q. You're guessing it's Jim Comu?

16             "A. Or C.J. Comu.

17             "Q. You're not sure which?

18             "A. I'm not sure, no.

19             "Q. Okay.  The second page of Exhibit 23 is

20  a letter from you to Justine Blankenship at Action Stock

21  Transfer; is that right?

22             "A. Yes.

23             "Q. And this was to inform her of shares

24  that could be issued to those individuals named Green

25  Auto stock by Action Stock Transfer as a stock transfer

1    agent for these transactions; is that right?

2              "A. Yes.

3              "Q. So the case of Daptco Trust and TKY

4    Trust it was Action Stock Transfer that issued the

5    shares for the purchasers?

6              "A. I'm not sure the exact dates, but at

7    some point yes, they became the transfer agent for Green

8    Automotive.

9              "Q. Well, the transfer agent would be as

10   reflected in the escrow agreement, correct, whoever was

11   specified in the escrow agreement, but in the case of

12   Daptco and TKY, the specified transfer agent is Action

13   Stock Transfer?

14             "A. Yes.

15             "Q. So that would be the correct, I mean we

16   can rely on that as being the correct transfer agent for

17   those transactions, right.

18             "A.  Yes."

19             MR. SAROKHANIAN:  Moving to Page 49,

20   starting at Line 16.

21             "Q. All the transactions with the exception

22   of Exhibit 25 show the seller to be The Barclay Group

23   and not Daptco Trust.  Did you happen to notice that as

24   you were receiving these agreements?

25             "A. I don't recall it, no.

1          "Q. Did you have any discussions with Jim

2    Comu or C.J. Comu about the fact that the agreements you

3    were receiving for the stock purchase and sales by

4    Daptco Trust or the TKY Trust were in the name of The

5    Barclay Group and not the trust?

6          "A. I don't recall, no."

7          MR. SAROKHANIAN:  Then they will be

8    referring to KLM Exhibit 45.

9          MR. OLSON:  And again, we object to that as

10   having nothing to do with the motion to revoke the

11   discharge.

12         MR. SAROKHANIAN:  Your Honor, this document

13   is just like the last two that we just went over.  It's

14   a distribution instructions.  It goes to 721(d)(1) and

15   (d)(2).

16         THE COURT:  I overrule the objection.  It's

17   admitted.

18         MR. SAROKHANIAN:  Thank you, Your Honor.

19         Picking up on Page 50, Line 13.

20         "Q. The instruction here for Mr. Comu is to

21   have $500,000 restricted shares from Daptco Trust, as I

22   understand it, issued to World Wide Auric International,

23   do you see that?

24         "A. Yes.

25         "Q. Do you know why these certificates were

1    being transferred -- were being transferred to World

2    Wide Auric?

3                 "A. No, I do not."

4                 MR. SAROKHANIAN:  Then they will be

5    referring to Trustee Exhibit 54, 5-4.  And I will be

6    going to Page 52, starting on Line 2.

7                 "Q.  Other than you, who else was involved

8    in these transactions or who else also at Old Monmouth

9    was involved in these transactions that were done

10   pursuant to these escrow agreements?

11                "A. It was 99 percent me."

12                MR. SAROKHANIAN:  Moving to Page 53,

13   starting at Line 11.  They will be referring to Trustee

14   Exhibit 55.  Trustee 5-5.

15                "Q. Take a look at the signature on the

16   second page of this document where it says, quote, for

17   or on behalf of TKY Trust, end quote.  Do you see that?

18                "A. Yes.

19                "Q. Do you recognize that signature?

20                "A. I'm not sure.  It looks like it's

21   C.J.'s, but it could be C. Jones -- I don't...

22                "Q. This pertains to the TKY Trust,

23   correct?

24                "A. Yes.

25                "Q. By the way, I did not see in the

1   documents you provided copies of any trust agreements

2   for either the TKY or Daptco Trust.  Do you recall

3   seeing trust agreements for those entities?

4          "A. No."

5          MR. SAROKHANIAN:  And they will be

6   referring to KLM Exhibit 46.  Exhibit 4-6.

7          MR. OLSON:  That's another one that we

8   objected to for relevance on the discharge issue.

9          THE COURT:  Response?

10          MR. SAROKHANIAN:  The response, Your Honor,

11  is similar to the last three.  This is wire instructions

12  to Matt Troster of Old Monmouth again which is the

13  escrow agent and the stock transfer agent for TBG for

14  the Green Auto shares, and this is pertaining to the TKY

15  Trust, which we contend had the undisclosed assets.  So

16  it is relevant under 727(d)(1) and (d)(2).

17          THE COURT:  Overrule the objection.  46 is

18  admitted.

19          MR. SAROKHANIAN:  Picking up on Page 54,

20  Line 10.

21          "Q.  You will see in Exhibit 30 that

22  there's some handwritten notations, some numbers written

23  there to the right of some of the listings.  Do you know

24  what those -- let's start with the first one on Page 1

25  under The Barclay Group.  It says, quote, plus 10,000,

1    end quote, and looks like quote in parenthesis, TBG,

2    which I presume is The Barclay Group equals, which I

3    presume is The Barclay Group, open quote, equals 11,000,

4    closed quote.  Do you know what that references?

5                 "A. It's my handwriting, but I don't recall

6    it off the top of my head, no.

7                 "Q. So the handwriting is yours?

8                 "A. Yes.

9                 "Q. As we sit here today, you can't recall

10   exactly what that meant or referred to?

11                "A. From what I recall of it, I believe

12   there were two of the escrows going on at one time.

13   Instead of sending The Barclay Group two separate wires,

14   we combined them.

15                "Q. Okay.

16                "A. Yeah, The Barclay Group.

17                "Q. It would have been outgoing wires

18   combined, it would have been The Barclay Group and TKY

19   instead of sending two for each one --

20                MR. SAROKHANIAN:  Oh, excuse me --

21                MR. VITAL:  That was me.

22                MR. SAROKHANIAN:  On Line 9.

23                MR. VITAL:  Starting at Line 9 of Page 55.

24                "A. It would have been outgoing wires

25   combined.  It would have been The Barclay Group and TKY

1  instead of sending two for each one.

2          "Q. Okay.  So this would involve sales of

3  stock by The Barclay Group and sales of stock by TKY

4  Trust and in each instance The Barclay Group was

5  receiving some of the proceeds from those sales?

6          "A. Well, that would have been the outgoing

7  wires that would have been from the -- from incoming.

8  So it would have been TKY Trust and The Barclay Group

9  instead of sending them two separate outgoing wires they

10 would get one with the combined two accounts.

11         "Q. Okay.  So the handwritten portion of

12 this reflect money due to Barclay Group from sales of

13 stock by The Barclay Group or do you know?

14         "A.  Repeat that again.

15         "Q. Well, in the printed portion of this

16 document, we're talking about stock sales by TKY Trust,

17 correct?

18         "A. TKY, yes.

19         "Q. And what you have written to the right

20 here are additional amounts to be paid to The Barclay

21 Group presumably for sales of stock by it.

22         "A. There would be another -- in addition

23 there would be another from The Barclay Group.

24         Right.

25         "A. The same format.

1                  "Q. Right.  Where it had sold stock it

2     owned as opposed to receiving proceeds of stock that TKY

3     Trust sold?

4                  "A. Correct.

5                  "Q. And that's what you're reflecting by

6     your handwritten notations?

7                  "A. Yes."

8                  MR. SAROKHANIAN:  They will be referring to

9     KLM Exhibit 47, Exhibit 4-7.

10                 THE COURT:  Okay.  There's a relevancy

11    objection.

12                 MR. OLSON:  Objection on relevance.

13                 THE COURT:  Response?

14                 MR. SAROKHANIAN:  The response, Your Honor,

15    is this is additional evidence relating to the Green

16    Auto funneling of shares and monies by C.J. Comu, TBG,

17    and Old Monmouth is irrevocable stock power reportedly

18    from the TKY Trust which Mr. Troster will explain in

19    more detail.  So it's undisclosed assets under 727(d)(1)

20    and proceeds that should be part of the estate under

21    (d)(2).

22                 MR. OLSON:  And my point is it's not

23    supported by their pleading.

24                 THE COURT:  I overrule the objection.  KLM

25    47 is admitted.

1          MR. SAROKHANIAN:  Now, starting on Page 57,

2     Line 6.

3          "Q.  Do you have any recollection of

4     Exhibit 32, Mr. Troster?

5          "A. Not specifically.

6          "Q. Do you recognize the signatures that

7     appear on this document?

8          "A. No.

9          "Q. If you would pull out Exhibit 5 again

10    which is the escrow agreement between Old Monmouth and

11    TKY Trust.  Do you see on the first page of TKY Trust

12    there's a reference there.  It says, quote, seller is

13    selling a total of 5 million shares of restricted common

14    stock, end quote.  Do you see that?

15         "A. Yes.

16         "Q. And if you look at Exhibit 32, it's

17    referring to $5 million shares of common stock.  Does

18    that tell you that this agreement was prepared in

19    connection with the TKY Trust stock sales?

20         "A. I'm not certain, but it could be.

21         "Q. Do you recall any discussions with

22    anyone regarding Exhibit 32?

23         "A. No, I don't recall."

24         MR. SAROKHANIAN:  And they will be

25    referring to KLM Exhibit 48, Exhibit 4-8.

1           THE COURT:  Once again, that's one of their

2  relevance objections.

3           MR. OLSON:  Yes, ma'am, re-urged.

4           MR. SAROKHANIAN:  And this document, Your

5  Honor, purports to be a corporate resolution on behalf

6  of TKY Trust.  This is relevant because it's showing,

7  again, the use of TKY Trust, TBG through this Old

8  Monmouth escrow and transfer agent of undisclosed

9  assets.  So it's relevant under 727(d)(1) and under

10  (d)(2) because it's proceeds of property that should

11  have been part of the estate.

12          THE COURT:  Overrule the objection.  48 is

13  admitted.

14          MR. SAROKHANIAN:  Thank you, Your Honor.

15          Starting on Page 58, Line 19.

16          "Q.  Do you recognize Exhibit 33; is this

17  another form that Old Monmouth uses?

18          "A. Yes.

19          "Q. Do you know why it was prepared?

20          "A. It's a corporate resolution.  It's

21  telling me who has signing power for TKY Trust.

22          "Q. Well, let's go back to 32.  Although

23  the information set forth on this document, although

24  what is handwritten on this is not something you recall,

25  this is a form that is typically used by Old Monmouth,

 1   irrevocable stock power.

 2              "A. Yes.

 3              "Q. And what is the purpose of this

 4   Exhibit 32?

 5              "A. It's a -- telling me who the authorized

 6   signer is for TKY Trust.

 7              "Q. So the authorized signer for TKY Trust

 8   would be whoever's signature shows up on Exhibit 32?

 9              "A. Yes.

10              "Q. And Exhibit 33 is another document that

11   you obtained in connection with Old Monmouth serving as

12   an escrow agent for stock transactions; is that right?

13              "A. These are ways I can transfer

14   documents.  Any time a corporate entity is transferring

15   shares, they would need either to sign the back of the

16   certificate or use a blank stock power, which is done

17   here.  And if it's a corporate entity, they need a

18   corporate resolution as well.

19              "Q. Okay.  Do you know whether TKY Trust

20   was a corporate entity?

21              "A. It's not an individual so...

22              "Q. Okay.  So this is the form -- you

23   basically have two forms, one for individuals and one

24   for business entity?

25              "A. An individual wouldn't need a corporate

1    resolution.  They would just use the stock power.

2                 "Q. When you were dealing with a business

3    entity, you would get a stock power and a resolution?

4                 "A. Yes.

5                 "Q. Signed on behalf of the entity?

6                 "A. Yes.

7                 "Q. On Exhibit 33, there's a signature here

8    under the title secretary, do you see that?

9                 "A. Yes.

10                "Q. Do you know whose signature that is?

11                "A. I don't recall, no.

12                MR. SAROKHANIAN:  Moving to Page 62, Line

13   20.

14                Examination is now by Mr. Lippe.

15                "Q.  Mr. Troster, what type of entity is

16   Old Monmouth Stock Transfer Company, Inc., is that a

17   corporation?

18                "A. Yes.

19                "Q. Are there any shareholders other than

20   you?

21                "A. Shareholder, we're not a publicly

22   traded -- we're not publicly traded.  We're a private

23   company.

24                "Q. Okay.  What is your title with Old

25   Monmouth?

1           "A. Vice president and second.

2           "Q. Who is the president.

3           "A. John Christopher Troster, my brother.

4           "Q. Okay.  So you were the one that was

5    primarily dealing with Mr. Comu and The Barclay Group?

6           "A. As far as the escrow goes, yes.

7           "Q. And AST, American Stock Transfer, they

8    have taken over as transfer agent; is that correct?

9           "A. Yes."

10          MR. SAROKHANIAN:  Moving to Page 65, Line

11   7.

12          "Q.  So you and your brother acquired a

13   company that was pre-existing under another name?

14          "A. As relates to Green Automotive, yes.

15   We've probably been agent for that particular entity

16   when it was Green Auto since the '90s, late '90s, maybe,

17   and I'm guessing."

18          MR. SAROKHANIAN:  Moving to Page 68, Line

19   1.

20          "Q. If you would look at Exhibit 19 at the

21   very top of Page 2, the document discusses, quote, on

22   November 4, 2009, the issuer acquired Go Green USA, LLC,

23   a Nevada limited liability company, by virtue of the

24   terms of a merger and plan of reorganization.  Does that

25   ring a bell at all for any significant changes in the

1    history of Green Automotive as far as you're aware?

2                   "A. Not that I'm aware of.  Typically we

3    would do a filing with FINRA stating the company is

4    doing a name change.  As far as there being a merger,

5    it's not material.  We just consider it a name change."

6                   MR. SAROKHANIAN:  Moving to Page 69, Number

7    16, Line 16.

8                   "Q. Okay.  So Old Monmouth has been in

9    existence since 1992.  Is it registered with any

10   regulatory agencies?

11                  "A. The SEC.

12                  "Q. And how -- what type of registration do

13   you have with the SEC?

14                  "A. We file a TA2 form yearly with the SEC

15   and we're subject to yearly audits from them.

16                  "Q. And what's --

17                  "A.  Outside" --

18                  MR. VITAL:  Sorry.

19                  "Q. And what I'm specifically trying to

20   find out is as what type of entity are you registered

21   with the SEC, you're not a broker dealer, for example.

22                  "A. We are a registered stock transfer

23   agent.

24                  "Q. Okay.  And that's what the TA form

25   refers to.

1           "A. Yes.

2               "Q. So recognizing that you're not an

3   attorney, just generally can you describe a laymen's

4   concept of what a transfer agent is as far as being a

5   registered transfer agent with the SEC?

6               "A. Well, like I said, we're subject to TA

7   reportings to the SEC on a yearly basis.

8               "Q. What type of information do you send on

9   your TA form?

10              "A. I don't personally send out the TA

11  forms but from what I understand they typically look at

12  how many shareholders we have in total turnaround times

13  on transfers.

14              "Q. Do you report to the SEC the companies

15  for whom you're acting as transfer agent?

16              "A. Yes.

17              "Q. Okay.  Are there any reporting

18  requirements that your company has as transfer agent

19  either with the SEC or any other U.S. governmental

20  entity concerning reporting by concerning transfers to

21  insiders of the company?

22              "A. Transfers to -- well, if they were

23  removing legends on shares, they would have to file

24  forms.  But that's done by their broker.  It would be

25  144 forms.

1          "Q. Do you have to report transfers of

2    stock to non-U.S. citizens to persons or entities

3    outside the U.S.?

4               "A. No.

5               "Q. Do you have any reporting requirements

6    concerning disbursement of monies?  For example, do you

7    send out 1099s?

8               "A. No.

9               "Q. Do you have any specialized reporting

10   duties for wire transfers sent overseas?

11              "A. Not that I'm aware of.

12              "Q. Okay.  Now before the switch to AST was

13   Old Monmouth actually performing the physical transfer

14   of certificates and issuance of new certificates?

15              "A. Yes."

16              MR. SAROKHANIAN:  Moving to Page 74, Line

17   13.

18              "Q.  Okay.  What were the requirements that

19   you had The Barclay Group satisfy in order to accomplish

20   a stock transfer?  Was there a mental checklist you had

21   like you need to sign a stock purchase agreement, a

22   securities purchase agreement, you need the money and

23   then you need the transactions instructions as to how to

24   disburse the money?

25              "A. Generally, yes."

 1                    MR. SAROKHANIAN:  Moving to Page 76, Line

 2     16.  It will be discussing Trustee Exhibit Number 44.

 3     Trustee 4-4.

 4                    "Q.  If you would look at Exhibit 2, do you

 5     have that there?  Okay.  Exhibit 2, I think, you

 6     previously identified.  That's a spreadsheet that you

 7     prepared showing disbursement of escrow funds from

 8     Barclay Group sales; is that accurate?

 9                    "A. I don't know if it's the disbursement

10     of going out, or what's coming in.  It does reference,

11     yes, we had a total going out.

12                    "Q. Okay.  So it's an accounting of escrow

13     funds, correct?

14                    "A. Yes.

15                    "Q. And it shows incoming and outgoing?

16                    "A. Yes.

17                    "Q. So these disbursements were done

18     usually on a weekly basis, would you say?

19                    "A. Around about."

20                    MR. SAROKHANIAN:  Moving to Page 80,

21     starting at Line 5.  They will be discussing Trustee

22     Exhibit 44, which should be the one we just discussed.

23                    "Q. I note that on the first page of

24     Exhibit 2, all of these reference numbers begin with

25     WWA.  You are aware, aren't you, that the WWA initials

1  were used in communications with him to refer to World

2  Wide Auric, are you not?

3           "A. Yes.

4           "Q. Did anyone ever tell you what kind of

5  entity World Wide Auric was?

6           "A. No.

7           "Q. Or who owned it?

8           "A. No.

9           "Q. Is it typical to deal with companies

10  that have bank accounts in Lichtenstein for your

11  business?

12           "A. It's not typical."

13           MR. SAROKHANIAN:  Moving to Page 81, Line

14  13.

15           "Q. Would you have a general stock ledger

16  for Green Automotive stock transfers for the year 2010,

17  2011 and 2012?

18           "A. We would have the current shareholder

19  list up to date -- up to the date we sent the records to

20  Action Stock Transfer.

21           "Q. If I wanted to find out who the

22  shareholders of record were as of December 2010, would

23  you have that information in your records?

24           "A. As long as we were agent at that time

25  and I believe we were, yes."

1          MR. SAROKHANIAN:  Page 82, Line 1.

2          "Q. And I know you have been very helpful

3    and very cooperative with Mr. Elmquist in furnishing

4    documents.  Would you be agreeable to generating, if

5    it's possible from your records, the stock transfer

6    ledger for the year 2010 and '11 and for 2012 as three

7    separate records reports?

8               "A. I think I can do that, yes.

9               "Q. And I would ask the court reporter to

10   reserve numbers 37, 38, and 39.  And if you could just

11   furnish those to the court reporter, that would be

12   helpful."

13          MR. SAROKHANIAN:  And Your Honor, those

14   will be KLM Exhibit 49, KLM Exhibit 50, and KLM

15   Exhibit 51.

16          MR. OLSON:  And we have the same relevance

17   objection to all three.

18          THE COURT:  Response?

19          MR. SAROKHANIAN:  These, Your Honor, are

20   the transaction journals for the years 2010, 2011, and

21   2012 maintained by Old Monmouth.  These documents are

22   extremely relevant because they show the ledger, the

23   incoming and outgoing for the shares of Green Auto, by

24   The Barclay Group, by TKY Trust, Daptco Trust, et

25   cetera, and the monies returned.  So this is extremely

1  relevant under 727(d)(1) as undisclosed assets and

2  727(d)(2) for property that -- for proceeds that should

3  have been property of the estate.

4           MR. OLSON:  And again --

5           MS. HANKS:  Actually let me clarify real

6  quick.  This is actually the stock transfer journals so

7  it will reflect stock certificates that are cancelled

8  and new issuances.  But it doesn't reflect money

9  exchanged.  And for example, I mean the relevance of

10 them, for example, the first page of Exhibit 49 shows

11 the 300,000 stock certificate received by C.J. Comu on

12 January 13th, less than two weeks after he filed for

13 bankruptcy.

14           THE COURT:  Overrule the objection.  49, 50

15 and 51 of KLM are admitted.

16           MR. SAROKHANIAN:  Thank you, Your Honor.  I

17 will pick up the questioning on Page 83, starting at

18 Line 8.

19           "Q.  Right.  We're going back to Exhibit 2.

20 And looking at the reference numbers for the

21 transactions, I believe we have side (sic) that all the

22 transactions on Page 1 have a WWA reference, correct?

23           "A. Yes.

24           "Q. And then on Page 2 most but not all of

25 them have WWA references.  Is that also correct?

1              "A. Yes.

2              "Q. And there are a few of TBG references?

3              "A. Yes.

4              "Q. In going through the rest of the

5    document we find later on in the document on the pages

6    were all TBG reference numbers, correct?

7              "A. Yes.

8              "Q. And I believe you have testified

9    already that those designations were just designations

10   that Barclay Group had furnished you?

11             "A. Yes."

12             MR. SAROKHANIAN:  Moving to Page 87, Line

13   -- Page 87, Line 7.  They will be discussing KLM

14   Exhibit 5-5, Exhibit 55.

15             THE COURT:  Okay.  I know that was one of

16   the objections of Mr. Olson, KLM 55.

17             MR. OLSON:  Correct.

18             THE COURT:  Response to the relevancy

19   objection?

20             MR. SAROKHANIAN:  This is similar to the

21   earlier emails we saw in the Matt Troster deposition

22   where these are instructions to distribute shares.  This

23   is with regard to TKY Trust.  So just like those emails

24   were relevant and admitted, this is relevant under

25   727(d)(1) as undisclosed assets and (d)(2) as proceeds

1   for property that should have been part of the estate.

2                  THE COURT:  Okay.  Overruled.  55 is

3   admitted.

4                  MR. SAROKHANIAN:  Starting at Page 87, Line

5   7.

6                  "Q.  I don't understand; maybe you do.  At

7   the bottom of Exhibit 44 there appears to have been an

8   email from you to Nick asking, quote, are they asking

9   you to take 500,000 shares of the 2 million shares of

10  Daptco and transfer them to World Wide and have it sent

11  to Portugal, end quote.  And Nick's response was --

12                 "A. It looks like it's clarifying what

13  they're asking me to do.

14                 "Q. Do you understand him to be saying that

15  these were shares of stock for him?

16                 "A. It looks like for World Wide Auric,

17  quote, please issue the following 500,000 restricted

18  from the Daptco Trust World Wide Auric, closed quote."

19                 MR. SAROKHANIAN:  And moving to Page 89

20  starting at Line 3.

21                 "Q. So the fact that you don't show money

22  in Exhibit 4 --

23                 "A. I don't believe there was any funds

24  received for that.  And they were just requesting that I

25  send 500,000 shares out.  Whether they collect funds on

1  it or not, I don't know.

2           "Q. But you do know that Old Monmouth did

3  not collect funds for them?

4           "A. I'm pretty certain we did not.

5           "Q. Otherwise you would have put it on

6  Exhibit 4?

7           "A. Absolutely.

8           "Q. Exhibit 45, March 22 email from

9  consultant to you, while Nick was instructing you to

10  send it out with today's instructions to AST, correct?

11          "A. Yes.  I would have gotten the

12  distribution on the wires.  In addition to that, it was

13  issuing or having Action Stock Transfer issue the

14  500,000 for the world -- for World Wide Auric."

15          MR. SAROKHANIAN:  And moving to Page 91,

16  Line 4, they will be discussing KLM Exhibit 56.  Exhibit

17  5-6.

18          THE COURT:  Okay.  That's another relevance

19  objection.

20          MR. OLSON:  On the issue of discharge.

21  They did not know this at the time they filed their

22  complaint and it's not covered by their pleading.

23          THE COURT:  Your response?

24          MR. SAROKHANIAN:  To relevance or to the

25  rest of it?

1           THE COURT:  All of it.

2           MR. SAROKHANIAN:  Well, Your Honor, this,

3   again, goes -- this is still part of the Matthew Troster

4   deposition.  This is still a document that was sent to

5   Old Monmouth, which was the transfer agent and the

6   escrow agent.  These are instructions regarding The

7   Barclay Group, the Daptco Trust, and I believe the TKY

8   Trust of wire transfers.  And so again, this evidence

9   tends to show that there were undisclosed assets; that

10  being, among other things, the Green Auto shares held by

11  Mr. Comu and The Barclay Group and these trusts I just

12  referred -- referenced to.

13          It goes to the undisclosed assets so that's

14  relevant under 727(d)(1) and it's also relevant under

15  727(d)(2) as proceeds of property that should have been

16  disclosed in part of the estate.  So they are relevant.

17          MS. HANKS:  Your Honor, we would also add

18  -- if you scroll to the last page of that document --

19  this is one of the documents that really reflects the

20  intermingling of these entities that were used to move

21  assets, both move assets and dissipate assets.  And so

22  this was an email coming from The Barclay Group that was

23  sending a letter of instruction to a Canadian trust,

24  Daptco Trust, telling them how to distribute money that

25  had come in from stock that was sold through Old

1  Monmouth through -- for their Green Auto shares.  So

2  ostensibly these shares were in Daptco Trust's name and

3  this is one of Mr. Comu's brother's trusts in Canada.

4  Daptco Trust sells the shares at Mr. Comu's

5  instruction.  The cash comes in through Old Monmouth and

6  then The Barclay Group, Mr. Comu's company, sends Old

7  Monmouth instructions about where to send the cash and

8  some of that cash comes back to Barclay Group.  And so

9  this is more than -- this is more than just a particular

10 asset.  This is also part of a much broader scheme to

11 move and secret assets away from the estate that should

12 have been made available to creditors.

13 THE COURT:  All right.  I'm going to

14 overrule the objection.  56 is admitted.

15 MR. SAROKHANIAN:  Picking up on Page 91,

16 Line 4.

17 "Q. Okay.  And nowhere on Exhibit 46 does

18 it make reference to disbursement of monies relating to

19 500,000 shares for World Wide Auric, does it?

20 "A. No, I don't believe there was any

21 disbursement of funds regarding that.  It was just an

22 issuance of shares to be sent out.

23 "Q. Was it typical that each week when you

24 send out disbursement of funds, you would also send

25 instructions to AST to issue so many shares to this

```
 1   person?

 2              "A. I would send out the instructions to

 3   AST prior to this.  I would need confirmation from AST

 4   that, yes, here's copies of the certificates.  Here's

 5   copies of the FedEx.  So I know these shareholders are

 6   going to receive the shares and then I release the

 7   funds."

 8              MR. SAROKHANIAN:  Moving to Page 92,

 9   starting on Line 20.  They will be referring to KLM

10   Exhibit 57.  Number 5-7.

11              MR. OLSON:  Same objection.

12              THE COURT:  All right.  Response?

13              MR. SAROKHANIAN:  This here is another

14   email from The Barclay Group to Matt Troster of Old

15   Monmouth, which again is the escrow agent and the stock

16   transfer agent.  These are instructions to hold wires

17   and not just for TBG but also for the TKY Trust.  So

18   this, like my colleague just told you about the last

19   exhibit, is evidence that's relevant and tends to show

20   this larger overall scheme as well as the particular

21   transfers that we mentioned earlier.

22              THE COURT:  Okay.  Objection.  Overruled.

23   It's admitted.

24              MR. SAROKHANIAN:  Starting on Line 20 on

25   Page 92.
```

1          "Q.  Exhibit 48, is this an email you got

2     on December 30, 2011 from admin at The Barclay Group

3     instructing you to hold certain wires for TBG and TKY

4     but to release all the other wires?

5          "A. It looks like that, yes."

6          MR. SAROKHANIAN:  And moving to Line 14 on

7     Page 93.  This will be referring to KLM Exhibit 5-8.

8     Number 58.

9          THE COURT:  Okay.  That's one of the

10    carried relevance objections.

11         MR. OLSON:  Yes.

12         MR. SAROKHANIAN:  This document in

13    particular is relevant on similar grounds.  These are --

14    this is a conversation between The Barclay Group and

15    Matt Troster, who is the Old Monmouth stock transfer

16    agent.  And he's asking essentially whether they should

17    move credits from The Barclay Group to TKY Trust, which

18    again, is probative, Your Honor, of showing this overall

19    scheme, lack of formalities and alter ego.  So all the

20    things that Ms. Hanks articulated earlier and it is

21    indicative of the particular transaction we were talking

22    about under 727(d)(1) and (d)(2).

23         THE COURT:  Objection overruled.  58 is

24    admitted.

25         MR. SAROKHANIAN:  Page 93, Line 14.

1          "Q. Exhibit 49, I'm sorry I only have one

2    copy, January 10, 2012 from "cjcomu@gmail.com".  You're

3    communicating with him about what subject?

4          "A. It looks like the two escrows, The

5    Barclay Group had a remaining balance left of 407, I

6    guess probably at the close of the escrow it looks like

7    the 407 was moved over to the new escrow for TKY.

8          "Q.  So Mr. Comu just advised you to

9    transfer that balance over to TKY Trust, Mr. C.J. Comu.

10          "A. Yes, it looks that way."

11          MR. SAROKHANIAN:  We will next be

12    discussing KLM Exhibit 59, Number 5-9.

13          THE COURT:  That's --

14          MR. OLSON:  Same objection.

15          THE COURT:  Response.

16          MR. SAROKHANIAN:  This one in particular,

17    Your Honor, again is probative of the overall collusion

18    and scheme to hide assets from the Court.  The email in

19    the bottom, however, it looks like one of the entities

20    has, quote, run out of shares and so they need to

21    transfer shares from one to the other in order to

22    continue making these sales and making this undisclosed

23    income.  So this is probative relevant under (d)(1) and

24    (d)(2), Your Honor.

25          THE COURT:  Objection overruled.  59 is

1  admitted.

2                MR. SAROKHANIAN:  And I'm cognizant of the

3  time limit.  Do you want me to just go right up to 5:00?

4                THE COURT:  Well, you think you can finish

5  or no?

6                MR. SAROKHANIAN:  We're getting close, but

7  I don't want to promise that we can finish by 5:00.  I

8  don't want to hold us late either.  But I think that

9  there's 121 pages and we're on 95.

10                THE COURT:  146, I think.

11                MR. SAROKHANIAN:  Well, I'm not counting

12  the word index, Your Honor.

13                THE COURT:  Okay.  Let's just see if we can

14  get through.

15                MR. SAROKHANIAN:  Yes, Your Honor.  Thank

16  you.

17                Page 94, Line 7.

18                "Q.  Exhibit 50, on January 4, 2012, you

19  communicated with C.J. Comu about transferring some

20  45,000 shares of stock; is that correct?

21                It appears to be, yes.

22                "Q. And what was it that had occasioned

23  that situation?

24                It's just -- it looks like they wanted me

25  to have the other transfer agent or Action Stock

1  Transfer issue 45,471 shares to The Barclay Group."

2        MR. SAROKHANIAN: Did you get that number

3  right, 45,471?

4        MR. VITAL: I thought so. I may have

5  misspoke.

6        MR. SAROKHANIAN: I think you added a

7  little bit. 45,471.

8        "A. 45,471 shares to The Barclay Group."

9        MR. SAROKHANIAN: Now, going to Page 95,

10  they're going to discuss two different exhibits, one of

11  which is not objected to. It's a trustee Exhibit Number

12  56. They refer to it within the deposition as

13  Exhibit 51. So Troster Exhibit 51 equals Trustee

14  Exhibit 56, which is already admitted. And then Troster

15  Exhibit 53 equals KLM Exhibit 60, which may have an

16  objection to it.

17        THE COURT: There is an objection.

18        MR. OLSON: There is. And again, it's just

19  that this was written in January of 2012. It couldn't

20  be the basis for the second amended complaint. They

21  have the burden of saying, here's what we have learned

22  since the discharge that's the reason for the filing of

23  the complaint.

24        MR. SAROKHANIAN: Your Honor, this

25  particular document deals with money and not necessarily

1  just transfer of shares.  These are breakdowns for

2  wires.  It's probative of the overall fraud and

3  collusion between World Wide Auric, The Barclay Group,

4  and another entity as well as Marathon Management, which

5  you have heard some about.  It's also probative of the

6  undisclosed assets and the proceeds.  Here we're talking

7  about funds, you know, 8,000, 10,000 that are proceeds

8  of sales of that Green Auto stock that weren't disclosed

9  so it's relevant under 727(d)(1) and (d)(2).

10            THE COURT:  Objection overruled.  60 is

11  admitted.

12            MR. SAROKHANIAN:  Page 95, starting at Line

13  12.

14            "Q. Exhibit 51, 52 and 53 all have a date

15  of January 5, 2012.  The first one shows some 7,700

16  going to World Wide Auric.  And then the second one says

17  that it's been corrected, Exhibit 52.  Then Exhibit 53

18  has some handwritten notations on it.  By looking at

19  those, does that help you understand better what was

20  going on?

21            "A. It looks like the overlapping.  They

22  had wires going out and they said, 'instead of sending

23  two wires to World Wide Auric for The Barclay and TKY

24  escrows, combine them and send just one wire out.'"

25            MR. SAROKHANIAN:  Moving to Page 96, Line

1   4.

2                "Q.  In the last page of Exhibit 51 you're

3   saying that Barclay will have 45 and something shares

4   left over?

5                "A. It would have been the end of the

6   escrow.  They had no more shares left.  After that last

7   distribution The Barclay Group would only have 4,529

8   shares remaining.

9                "Q. And you were looking to The Barclay

10  Group to tell you how to allocate these as between

11  Barclay, TKJ and Daptco, were you not?

12               "A. I believe so.

13               "Q. Let me show you Exhibit 26 again.  I

14  think you identified this in answering Mr. Elmquist's

15  questions.  It's an email from C.J. Comu to you dated

16  March 15, 2012.  Does that help explain any details from

17  the 500,000 share transfers sent to Portugal?

18               "A. Yeah, we wouldn't have received any

19  funds on that.  It would have been them saying issue the

20  500,000 under the escrow certificate."

21               MR. SAROKHANIAN:  And moving to Page 98,

22  Line 8.  They will be referring to KLM Exhibit 61.

23  Number 6-1.

24               MR. OLSON:  Same objection.

25               THE COURT:  Same objection.  Response?

 1              MR. SAROKHANIAN:  This is probative again

 2   of the overall collusion of the different entities and

 3   of course the proceeds of these undisclosed assets.

 4   Here there is a communication between The Barclay Group

 5   and Matt Troster of Old Monmouth asking how to allocate

 6   the funds received.  And I won't go into it more than

 7   that.  But that's probative under 727(d)(1) and (d)(2).

 8              THE COURT:  Objection overruled.  61 is

 9   admitted.

10              MR. SAROKHANIAN:  Starting at Page 98, Line

11   8.

12              "Q. Exhibit 55, in December 2011, did you

13   ask Mr. Comu as to how to allocate certain transfers?

14              "A. Yes, it looks that way.

15              "Q.  Okay.  And the response back was to

16   apply them to TBG, The Barclay Group?

17              "A. Yes."

18              MR. SAROKHANIAN:  Moving to Page 102, Line

19   1 -- excuse me -- 101 page -- sorry -- Page 101, Line

20   22.

21              "Q. Exhibit 61 is an email dated June 6,

22   2012, and 62 is an email dated July 5, 2012.  They're

23   from your records, are they not?

24              "A. Yes.

25              "Q. And what do those relate to?

1               "A. 61 looks like we're closing one of the

2   escrow accounts, Daptco Trust.

3               "Q. Why was it being closed?

4               "A. I don't know.

5               "Q. Had they sold all their stock?

6               "A. I don't know.

7               "Q. I will show you Exhibit 4.  Does that

8   help you any by looking at your escrow analysis for

9   Daptco?

10              "A. We certainly closed the account --

11  closed out the account.

12              "Q. But that doesn't help you answer the

13  question as to why it was closed, does it?

14              "A. No.

15              "Q. Okay.

16              "A.  Mostly out of shares or they requested

17  that it be closed.  I don't know.

18              "Q. As far as you know, there was no

19  dissatisfaction with Old Monmouth's work, was there?

20              "A. No."

21              MR. SAROKHANIAN:  Moving to Page 103.  And

22  Judge, it's 5:00, I want to give you the opportunity to

23  cut me off.

24              THE COURT:  Are you five minutes away from

25  finishing?  If not, we will go ahead.

1           MR. VITAL:  I would think about 10.

2           MR. SAROKHANIAN:  I think it might take

3    more like 10.  You want to do it tomorrow morning?

4           THE COURT:  Let's just stop.  It will take

5    a while to wrap up the courtroom and shut everything

6    down.  So all right we are stopping at Page 103 of the

7    Troster deposition.  We will reconvene at 9:30 in the

8    morning.

9           MR. SAROKHANIAN:  Thank you, Your Honor.

10          THE COURT:  All right.  Thank you.

11          (Adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

COUNTY OF LUBBOCK  )

STATE OF TEXAS      )

          I, Linda York, Registered Professional

Reporter and Certified Shorthand Reporter in and for the

State of Texas, do hereby certify that the foregoing

pages contain a full, true and correct transcript, to

the best of my ability, of audiotape furnished by the

Clerk of the Bankruptcy Court.

          Given under my hand this the 17th day of

October, 2014.

                              /s/_____
                              LINDA YORK, CSR No. 4899
                              Expiration Date: 12/31/15
                              Cathy Sosebee & Associates
                              Firm Registration No. 49
                              P.O. Box 86
                              Lubbock, TX  79408
                              806.763.0036

```
1                 IN THE UNITED STATES BANKRUPTCY
                    NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION

3
  KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4 RONALD KATZ,

5           Plaintiffs,

6 V.

7 CENGIZ J. COMU a/k/a CJ COMU,

8           Defendant.

9 DIANE G. REED, TRUSTEE.

10          Intervenor, Co-Plaintiff, and Third-Party
   Plaintiff,
11
   V.
12
   CENGIZ J. COMU, a/k/a CJ COMU,
13
           Defendant,
14
   and
15
   PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16 INC., AND SUNSET PACIFIC, L.P.,

17          Third-Party Defendants.

18 BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19 _____

20                         TRIAL

21                    MARCH 18, 2014

22               9:36 A.M. TO 5:00 P.M.

23        HONORABLE STACEY JERNIGAN, PRESIDING

24        TRANSCRIPT FROM AUDIO RECORDING

25 _____
```

```
 1   Transcript produced from audio recording by:
     LINDA YORK, RPR, CSR
 2   CSR No. 4899, Expiration Date 12/31/15
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC, AND RONALD KATZ:
 8        MS. KENDYL T. HANKS
          - AND -
 9        MR. NICHOLAS SAROKHANIAN
          - AND -
10        MR. VICTOR D. VITAL
          Greenberg, Traurig
11        2200 Ross Avenue
          Suite 5200
12        Dallas, TX  75201
          hanksk@gtlaw.com
13
     FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
14   PLAINTIFF, TRUSTEE DIANE REED:
15        MR. DAVID ELMQUIST
          Reed & Elmquist, P.C.
16        501 N. College Street
          Waxahachie, TX 75165
17        972-938-7339
          delmquist@bcylawyers.com
18
     FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
19   BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
     COMU:
20
          MR. DENNIS OLIVER OLSON
21        Olson, Nicoud & Gueck, LLP
          1201 Main Street, Suite 2470
22        Dallas, TX 75202
          214-979-7300
23        denniso@dallas-law.com
24
25
```

1                             INDEX
                                                        PAGE
2    Appearances......................................... 2

3    WITNESS BY DEPOSITION

4        MATTHEW TROSTER (continuation).................. 6

5    WITNESSES:

6    CHRISTOPHER MCNEILL

7        DIRECT EXAMINATION BY MS. HANKS.................114
         EXAMINATION (CONTINUED) BY MS. HANKS...........161
8        CROSS EXAMINATION BY MR. ELMQUIST..............208
         CROSS EXAMINATION BY MR. OLSON.................221
9        REDIRECT EXAMINATION BY MS. HANKS..............226
         RECROSS EXAMINATION BY MR. ELMQUIST............232
10       RECROSS EXAMINATION BY MR. OLSON...............235

11   CENGIZ COMU
         DIRECT EXAMINATION BY MS. HANKS................238
12

13
     Certification of Transcriptionist.............    261
14

15

16

17

18

19

20

21

22

23

24

25

```
 1              * * * P R O C E E D I N G S * * *

 2              THE COURT:  All right.  We're here for day

 3    two -- please be seated -- of our King Louie Mining, et

 4    al versus Comu, et al, trial in Adversary 10-3269.

 5              Let's start out by getting our lawyer

 6    appearances on the record again today.

 7              MS. HANKS:  Kendyl Hanks and Victor Vital

 8    and Nick Sarokhanian for the plaintiffs, Your Honor.

 9              THE COURT:  Okay.  Good morning.

10              MR. VITAL:  Your Honor, I'm going to take

11    the podium and introduce myself at the insistence and

12    wise advice of the court reporter.  Victor Vital for the

13    plaintiffs.

14              UNIDENTIFIED SPEAKER:  (Inaudible).

15              THE COURT:  Oh, you didn't get it

16    yesterday?  I'm sorry.  I wasn't aware of that.  Okay.

17              MR. SAROKHANIAN:  Nicholas Sarokhanian for

18    the plaintiffs.

19              THE COURT:  Okay.  Good morning.

20              MR. ELMQUIST:  Good morning, Your Honor,

21    David Elmquist on behalf of Diane Reed, Trustee.

22              THE COURT:  Good morning.

23              MR. OLSON:  Good morning, Your Honor,

24    Dennis Olson for the defendants.

25              THE COURT:  Good morning.
```

```
 1              All right.  Where we left off yesterday --
 2              MR. ELMQUIST:  Excuse me, Your Honor.
 3  Before we start, may I address a housekeeping matter?
 4              THE COURT:  You certainly may.
 5              MR. ELMQUIST:  As I mentioned yesterday
 6  there's a lift stay docket today, and unfortunately, the
 7  movant wants to go forward.  So I would like to request
 8  a late lunch as we did yesterday.
 9              THE COURT:  Okay.
10              MR. ELMQUIST:  I'm confident that if we can
11  break from 1:00 to 2:30 I will be done by then.
12              THE COURT:  Okay.  So your hearing is at
13  1:15 next door?
14              MR. ELMQUIST:  Yes, in Judge Houser's
15  court.
16              THE COURT:  All right.  So same as
17  yesterday, 1:00 to 2:30 for lunch.
18              MR. ELMQUIST:  If that's acceptable to
19  everyone.
20              MR. VITAL:  Yes.
21              THE COURT:  Okay.  That's what we will do
22  then.  Thank you.
23              MS. HANKS:  Your Honor, I also wanted to
24  let you know that Christopher McNeill who is under
25  subpoena, we spoke with him last night.  He will be
```

```
 1   coming at 10:30.

 2             THE COURT:  Okay.  10:30.

 3             MS. HANKS:  We just wanted to advise the

 4   Court that he had conferred with us and we said that was

 5   okay.

 6             THE COURT:  Okay.  All right.  That is

 7   fine.

 8             MS. HANKS:  He's actually not under

 9   subpoena but he's under oath.

10             THE COURT:  Got you.  All right.  Well, we

11   have invoked the rule in this matter, and I assume we

12   don't have any witnesses, nonparty representative

13   witnesses in the courtroom.  If not, let's go ahead and

14   resume.

15             We were on witness number five when we

16   broke last night, which was MATTHEW TROSTER by

17   deposition excerpt.

18             Are you all ready to proceed with finishing

19   that deposition?

20             MR. SAROKHANIAN:  Yes, Your Honor, we are.

21             THE COURT:  Okay.  You may.

22             MR. SAROKHANIAN:  Thank you, Your Honor.

23   And we left off at Page 103.  If I could please start

24   back at Page 85 and cover a little ground and we will

25   move forward.
```

1          THE COURT:  Okay.  Could you remind which

2    trustee exhibit that was?

3          MS. HANKS:  42, I believe, Your Honor.

4          THE COURT:  42?

5          MS. HANKS:  I believe so, Your Honor.

6          THE COURT:  Okay.  Let me...

7          MR. SAROKHANIAN:  Are you referring to the

8    exhibit on Page 103 where we left off?

9          THE COURT:  Yeah, on this particular one I

10   didn't get a hard copy because we had it already in the

11   record as a trustee exhibit.  And it is indeed Trustee

12   Exhibit 42.

13         MR. SAROKHANIAN:  Great.

14         THE COURT:  All right.  So we're at Page 85

15   is where you wanted to go.

16         MR. SAROKHANIAN:  Yes, Your Honor.

17         THE COURT:  All right.

18         MR. SAROKHANIAN:  Okay, Your Honor, I would

19   like to start at Page 85.  I'll start at Line 13.  They

20   will be referring to three exhibits, KLM 52, that's 5-2;

21   KLM 53, 5-3; and KLM 54, 5-4.

22         THE COURT:  Okay.  KLM 52, 53, and 54.

23   Those are subject to Mr. Olson's relevancy objection and

24   have not previously been admitted as I recall.

25         MR. OLSON:  That's correct.

```
 1              MR. SAROKHANIAN:  I believe that's right.

 2              MR. OLSON:  We re-urge the objection.

 3              THE COURT:  Okay.

 4              MR. SAROKHANIAN:  Can you pull those up,

 5  Number 52?

 6              And again, this is in the context of

 7  Matthew Troster, who is the Old Monmouth stock transfer

 8  person.  And so this document is a stock transfer

 9  ledger, which is showing the transfers of the Green Auto

10  shares.  So this is relevant under 727(d)(1), which is

11  the undisclosed assets, and under 727(d)(2), the

12  proceeds of property that ought to have been part of the

13  estate.

14              THE COURT:  All right.  So this one is 52.

15  I will overrule the objection and admit that.

16              MR. SAROKHANIAN:  And the next document is

17  KLM 53.  And this again, like KLM 52, is another Old

18  Monmouth stock transfer ledger demonstrating the

19  transfers of the Green Auto shares, so that's relevant

20  under 727(d)(1) as undisclosed assets and 727(d)(2) as

21  proceeds of property of the estate.

22              MS. HANKS:  Your Honor, I would just like

23  to clarify.  These are actually, all three of them, I

24  believe, are escrow ledgers.  Old Monmouth played two

25  roles that are relevant to this case.  They were the
```

 1  stock transfer agent for Green Auto, the company.  They

 2  were also an escrow agent for Daptco Trust, TKY Trust

 3  and The Barclay Group.  So as transfer agent, the stock

 4  certificates would go in and out.  They would issue new

 5  stock certificates, cancel old ones.  What these reflect

 6  are the cash proceeds of sales from those entities.  And

 7  they actually reflect the stock price at which they were

 8  sold.  And so these show money coming into Old Monmouth

 9  as the stock transfer agent after which The Barclay

10  Group, C.J. Comu or one of his colleagues would give

11  instructions about where to wire the cash.

12              THE COURT:  I overrule the objection and

13  will admit KLM 53.

14              MR. SAROKHANIAN:  And then with regard to

15  KLM 54.  Pull that up.

16              And this is similar to KLM Exhibit 52 and

17  53.  This is the Old Monmouth ledger and it's relevant

18  just like 52 and 53 under 727(d)(1) and (d)(2)

19  reflecting what my colleague just told the Court about

20  KLM 53.

21              THE COURT:  All right.  Objection

22  overruled.  It will be admitted.

23              MR. SAROKHANIAN:  Okay.  Starting at Page

24  85, Line 13.

25              "Q. Exhibit 41."

```
 1                MR. SAROKHANIAN:  And for the record,
 2   that's referring to KLM 52, which was just admitted.
 3                "Q.  What is that document?"
 4                MR. VITAL:  One moment.  I'm Victor right
 5   now.  Where am I?
 6                MR. SAROKHANIAN:  We're on Page 85 at Line
 7   13.
 8                MS. HANKS:  Which exhibit?
 9                MR. SAROKHANIAN:  And we're referring to
10   KLM Exhibit 52, which was just admitted.
11                "A.  It looks like a bad print.  Did I
12   supply this to you?
13                "Q.  Is that a partial listing of monies
14   received?
15                "A. Yeah, it looks like definitely partial.
16                "Q.  Is that something you recall
17   preparing?
18                "A. It's certainly part of my form, but it
19   looks like it's -- it doesn't have all the detail on it.
20                "Q. Can you tell what the purpose would
21   have been for preparing that form of document?
22                "A. This particular one, it's incomplete.
23                "Q. Exhibit 42 and 43."
24                MR. SAROKHANIAN:  And for the convenience
25   of the Court, that's referring to KLM Exhibits 53 and 54
```

1   which were just admitted.

2                   THE COURT:  Okay.

3                   "Q.  Could they have been working drafts

4   perhaps where you started doing something and then

5   didn't finish?

6                   "A. I don't think so.

7                   "Q. Exhibit 44, parenthetically withdrawn,

8   is that an email that you sent to Irving Rothstein on

9   March 5, 2012?

10                  "A. This has nothing to do with this

11  company.  This is World's, Inc.  It must have just

12  gotten in there somehow.  It's a different issue.

13  World's online."

14                  MR. SAROKHANIAN:  And I'm going to move to

15  Line 22.  Before I do that, Your Honor, KLM 55 is what

16  they're referring to, and my record shows that's already

17  been admitted.

18                  THE COURT:  Yes, it has.

19                  MR. SAROKHANIAN:  Starting at Line 22.

20                  "Q. Exhibit 44 is an email string with the

21  top one being an email from "consultant@snbry.com" to

22  you dated March 15, 2012.  Can you identify that as an

23  email string that you had?

24                  "A. Yes.

25                  "Q. Did Dominic sometimes go by Nick?

1                    "A. Yeah, I believe so.

2                    "Q. I don't understand, maybe you do.  At

3      the bottom of Exhibit 44 there appears to have been an

4      email from you to Nick asking, quote, are they asking

5      you to take 500,000 shares of the 2 million shares of

6      Daptco and transfer them to World Wide and have it sent

7      to Portugal, end quote.  And Nick's response was?

8                    "A. Looks like it's clarifying what they're

9      asking me to do.

10                    "Q.  Do you understand him to be saying

11     that these were shares of stock for him?

12                    "A. It looks like World Wide Auric, quote,

13     please issue the following 500,000 restricted from the

14     Daptco Trust to World Wide Auric."

15                    MR. SAROKHANIAN:  Moving --

16                    "A.  End quote."

17                    MR. SAROKHANIAN:  Moving to Page 89, Line

18     3.

19                    "Q.  And so the fact that you don't show

20     money in Exhibit 4 --

21                    "A. I don't believe there was any funds

22     received for that.  And they were just requesting that I

23     send 500,000 shares out.  Whether they collect funds on

24     it or not, I don't know.

25                    "Q.  But you do know that Old Monmouth did

1    not collect funds for them?

2                "A. I'm pretty certain we did not.

3                "Q.  Otherwise you would have put it on

4    Exhibit 4?

5                "A. Absolutely."

6                MR. SAROKHANIAN:  Moving down to Line 23.

7                MR. OLSON:  Your Honor, I don't have an

8    objection, but I think we read all of this yesterday.  I

9    think they lost their place.  I think when we stopped

10   yesterday we were farther along.

11               THE COURT:  We were farther along, but I

12   think you have gone back --

13               MR. SAROKHANIAN:  I have --

14               THE COURT:  -- to uncovered materials.

15               MR. SAROKHANIAN:  I have, but Mr. Olson is

16   right.  I'm going to skip ahead to 103.  I covered the

17   ground I wanted to.

18               THE COURT:  You did cover this yesterday?

19               MR. SAROKHANIAN:  Yes.  That's correct.

20               MR. OLSON:  The first part that he read was

21   not read yesterday.

22               THE COURT:  Okay, but this was?

23               MR. OLSON:  Yes, ma'am.

24               THE COURT:  Okay.

25               MR. SAROKHANIAN:  That's right.  Mr. Olson

1   is correct.  Thank you.

2                  THE COURT:  All right.  So we're going to

3   skip ahead to what?

4                  MR. SAROKHANIAN:  We'll skip ahead to Page

5   103, starting on Line Number 1.  And I will start on

6   Line 1.

7                  "Q.  I think these are all pretty much the

8   same type of distribution requests.  I tried to put them

9   in chronological order.  I'm just going to ask you to

10  identify these as being such.  Mr. Troster, you have

11  handed us two printouts for 2010 which the court

12  reporter has marked 37A and 37B.  Are these the stock

13  transfer records for the year 2010 for Green Automotive,

14  correct?

15                 "A. Yes."

16                 MR. SAROKHANIAN:  And this is referring,

17  Your Honor, to Exhibits KLM 49 and 50, which according

18  to my records, have been admitted.

19                 THE COURT:  Correct.  Okay.

20                 "Q.  And then she's marked as Exhibit 38

21  the stock transaction reports for 2011, correct?

22                 "A. Yes.

23                 "Q. And there's no 39 because of what

24  reason?

25                 "A. We were no longer agent.

1          "Q. For 2012?

2          "A. Correct."

3          MR. SAROKHANIAN:  And, Your Honor, after

4    this, they enter several exhibits, and I believe there

5    are objections to those.  So if you'd like we can take

6    them one after another, because they will be referred to

7    in the testimony I would like to read in in a minute.

8          THE COURT:  All right.  Go ahead.

9          MR. SAROKHANIAN:  Troster Exhibit Number 63

10   is KLM Exhibit Number 62.  So if we could pull that up,

11   please.

12          And I'm assuming there's still an objection

13   pending?

14          MR. OLSON:  Yes.  And again, Your Honor, I

15   don't care how you handle this.  Mr. Elmquist could get

16   every one of these exhibits in, so they're going to come

17   in anyway.  I'm just trying to figure out how we protect

18   the record, that I don't think it has anything to do

19   with the revocation of discharge issue.  So if you want

20   to withhold ruling or if you want to rule on all of them

21   at this point, I really don't care.  I will have my

22   record.

23          THE COURT:  All right.  Well, again, to be

24   clear, the whole bundle, 62 -- well, up through it looks

25   like 81 -- I don't know how far up you're going to go,

1    are subject to a relevancy objection by the defendants.

2                    MR. SAROKHANIAN:  Uh-huh.

3                    THE COURT:  Again, as I understand it, they

4    think the Court should not consider this evidence in

5    connection with the 727(d) revocation of discharge

6    issues.  So I don't know -- can you just address one by

7    one --

8                    MR. SAROKHANIAN:  Yes.

9                    THE COURT:  -- why you think they should be

10   considered in connection with 727(d), why they're

11   relevant?

12                   MR. SAROKHANIAN:  Absolutely, Your Honor.

13                   MS. HANKS:  Your Honor, I would like for

14   Mr. Sarokhanian to address the exhibits one by one.  But

15   one thing I would just like to say, generally speaking,

16   with the -- when it was determined that the creditor

17   lacked standing to proceed with regard to fraudulent

18   transfers, the trustee was asserting alter ego claims.

19   There are co-plaintiffs, basically, co-challengers to

20   the debtor's status in some respects.  And a lot of

21   these facts overlap that support both alter ego and

22   revocation.  And so I'm not quite sure I understand

23   either the nature or the grounds for an objection when

24   there is a standing -- there is no question we have

25   alleged 727(d)(1) and (d)(2) as grounds for revocation.

1   And that a lot of the same facts have been alleged by

2   both the trustee and the plaintiff.  So I just want to

3   make it clear on the record that I don't think that

4   there is a justifiable basis to object that certain

5   exhibits are relevant for the trustee's claims and not

6   for the plaintiffs.

7               THE COURT:  Okay.  Understood.  But we will

8   hear the more specific response to each exhibit.

9               MR. SAROKHANIAN:  Yes, Your Honor.

10  Starting with KLM Exhibit Number 62, which is on the

11  screen, that's a letter from TBG to Old Monmouth.  And

12  it pertains to the distribution instructions for a

13  $25,000 wire transfer that came in.

14              So again, Old Monmouth is acting as escrow

15  agent.  So as they're selling shares on behalf of TBG

16  and the other C.J. Comu entities, monies come in.  And

17  as escrow agent, they're awaiting instructions on how to

18  distribute it.  So this document here is a TBG letter

19  instructing them to distribute $25,000 among various

20  entities such as World Wide Auric, TBG itself, and Bois

21  d'Arc partners, which you will hear about in the next

22  deposition, as well as Marathon Management, which is

23  another C.J. Comu related entity.  So it's relevant

24  under 727(d)(1) and (d)(2).

25              THE COURT:  Okay.  Objection overruled.

1    It's admitted.

2                    MR. SAROKHANIAN:  The next document is KLM

3    Exhibit 63.  I'll wait for it to be displayed.

4                    KLM 63 is another letter from TBG to Old

5    Monmouth stock transfer.  Similar to Exhibit Number 62,

6    it's instructing them to distribute an incoming wire

7    among Marathon Management, Bois d'Arc, World Wide Auric,

8    and therefore, is relevant under 727(d)(1) as well as

9    (d)(2).

10                   THE COURT:  Objection overruled.  It's

11   admitted.

12                   MR. SAROKHANIAN:  The next one is KLM

13   Exhibit 64 -- if we could display that.

14                   And like the previous two exhibits, Your

15   Honor, this is a letter from TBG to Old Monmouth, again

16   with distribution instructions for an incoming wire

17   transfer, telling the escrow agent, Old Monmouth, how to

18   distribute the wire among TBG, Marathon, World Wide

19   Auric, and others, including Bois d'Arc, and therefore,

20   it is relevant under 727(d)(1) and (d)(2).

21                   THE COURT:  Objection overruled.  It's

22   admitted.

23                   MR. SAROKHANIAN:  The next exhibit is KLM

24   Exhibit Number 65 -- if we could display that.

25                   Similar to the previous exhibits, this

1   particular letter is from TKY Trust to Old Monmouth

2   stock transfer.  And similar to the TBG letters that we

3   just showed you, this is, again, instructions on how to

4   distribute an incoming wire.  And it's telling Old

5   Monmouth to distribute it among TKY Trust, The Barclay

6   Group.  And this also has handwriting, which is

7   additionally relevant, because it's showing how

8   formalities are ignored and they were combining wire

9   transfers among different entities, which the testimony

10  will explain.  And so therefore, it's relevant under

11  727(d)(1) as well as (d)(2).

12          THE COURT:  Objection overruled.  65 is

13  admitted.

14          MR. SAROKHANIAN:  The next exhibit is KLM

15  66.  And I will wait for it to be displayed.

16          Just like KLM 65, Your Honor, this is

17  another letter from TKY Trust to Old Monmouth

18  instructing Old Monmouth on how to distribute the

19  incoming wire transfer among TKY Trust and other

20  entities.  The Barclay Group, therefore, it's relevant

21  under 727(d)(1) and (d)(2).

22          THE COURT:  Objection overruled.  66 is

23  admitted.

24          MR. SAROKHANIAN:  The next exhibit that's

25  been challenged is KLM 67.  We have that displayed now.

```
 1              Just like KLM 66 and 65, this is a letter
 2    from TKY Trust with wire distribution instructions, but
 3    interestingly, this is sent by C.J. Comu at The Barclay
 4    Group -- I believe if you scroll down to one of the last
 5    pages, you will see that email.  And so this is relevant
 6    under 727(d)(1) and (d)(2).
 7              THE COURT:  Objection overruled.  67 is
 8    admitted.
 9              MR. SAROKHANIAN:  The next challenged
10    exhibit is KLM 68.  I will wait for that to be
11    displayed.
12              KLM 68 is a Matthew Troster, which is the
13    deponent that we're reading excerpts from, an email to
14    C.J. Comu with TKY Trust wire instructions to Old
15    Monmouth about distribution of the wire transfers.  This
16    exhibit also asks from Mr. Troster to C.J. Comu asking
17    for a signature.  There apparently in the testimony I
18    believe will explain that there was a question about the
19    proprietary of the instructions without a signature.  So
20    it's relevant under 727(d)(1) and (d)(2).
21              THE COURT:  Objection overruled.  It's
22    admitted, 68.
23              MR. SAROKHANIAN:  The next challenged
24    exhibit is KLM 69.  Wait for that to be displayed.
25              Like previous exhibits, this is a letter
```

1  from TKY Trust to Old Monmouth stock transfer.  This one

2  is from Mr. Parsley, who is affiliated both with TBG and

3  with Regus, which is the successor in interest, if you

4  will, to TBG.  It's where the assets were moved after

5  TBG.

6            So this is an email from Mr. Parsley at

7  Regus sending instructions for TKY Trust, of all things,

8  instructing them to distribute monies to TBG, World Wide

9  Auric, and others.  And so it's relevant under 727(d)(1)

10  and (d)(2).

11            THE COURT:  Objection overruled.  69 is

12  admitted.

13            MR. SAROKHANIAN:  The next challenged

14  exhibit is KLM 70.  I will wait for that to show up on

15  the screen.

16            Like KLM 69, this is another wire

17  instruction from Mr. Parsley to TKY, but this time it's

18  on behalf of or from a TBG email account as opposed to

19  the Regus account in KLM 69.  This is again instructing

20  Old Monmouth to distribute the incoming wire transfer

21  from sales of shares of Green Auto among TBG and World

22  Wide Auric; therefore, it's relevant under 727(d)(1) and

23  (d)(2).

24            THE COURT:  All right.  Objection

25  overruled.  70 is admitted.

 1              MR. SAROKHANIAN:  The next challenged

 2   exhibit is KLM 71.  Wait for that to show up.

 3              And KLM 71 is another instruction from

 4   Mr. Parsley at The Barclay Group to Old Monmouth stock

 5   transfer pertaining to the distribution of an incoming

 6   wire among TBG and World Wide Auric.  It's relevant

 7   under 727(d)(1) and (d)(2).

 8              THE COURT:  All right.  Objection

 9   overruled.  71 is admitted.

10              MR. SAROKHANIAN:  The next challenged

11   exhibit is KLM 77.  Wait for 77 to come up here.

12              THE COURT:  Wait, are we already up to --

13   are we on 72?

14              MR. SAROKHANIAN:  We were, but the next

15   thing that's challenged in this transcript is 77, Your

16   Honor.

17              And KLM 77 is a letter from Daptco Trust to

18   Old Monmouth stock transfer.  Like the TKY Trust, this

19   time they're dealing with Daptco Trust.  Daptco Trust

20   instructions to distribute monies among TBG and World

21   Wide Auric, and so therefore, it's relevant under

22   727(d)(1) and (d)(2).

23              THE COURT:  Objection overruled.  77 is

24   admitted.

25              MR. SAROKHANIAN:  The next challenged

1    exhibit is KLM 78.  We're almost done here.  I will wait

2    for that to come up.

3                    And this is an instruction from

4    Mr. Parsley, again, on behalf of Daptco Trust to Old

5    Monmouth stock transfer about the distribution of

6    monies, incoming monies to TBG and World Wide Auric, and

7    therefore, is relevant under 727(d)(1) and (d)(2).

8                    THE COURT:  Objection overruled.  78 is

9    admitted.

10                    MR. SAROKHANIAN:  The next challenged

11   exhibit is KLM 79.  I will wait for that.

12                    This is another Daptco letter instructing

13   the Old Monmouth stock transfer to distribute incoming

14   wires to TBG and other entities.  And so this is

15   relevant under 727(d)(1) and (d)(2).

16                    THE COURT:  Objection overruled.  79 is

17   admitted.

18                    MR. SAROKHANIAN:  And the last exhibit in

19   this bunch, Your Honor, is KLM Number 80.

20                    And this, Your Honor, is a FedEx label from

21   Justine Blankenship, who is the Action Stock Transfer

22   Corp, which as you'll recall from previous testimony,

23   took over the stock transfer aspects but did not take

24   over the escrow agent aspects of this scheme.  And this

25   is a FedEx label showing that stock certificates of

1    Green Auto -- if you look at the top, you will see a

2    reference to Green Auto shares -- are being sent to

3    World Wide Auric in Lisbon, Portugal.  And so this is

4    relevant under 727(d)(1) and (d)(2).

5                    THE COURT:  All right.  Objection

6    overruled.  80 is admitted.

7                    MR. SAROKHANIAN:  Thank you, Your Honor.

8                    And now I will proceed to Page 108, Line 3.

9    Some of the exhibits that they're referring to, and I

10   will point it out for the Court, are trustee's exhibits

11   that have already been admitted.  I will be sure for the

12   record to point that out to avoid any confusion.

13                   THE COURT:  Okay.

14                   MR. SAROKHANIAN:  Page 108, Line 3.

15                   "Q.  And whenever there were escrow --

16   whenever there were stock transfer fees from these

17   transactions, they were all billed to C.J. Comu at The

18   Barclay Group, were they not?

19                   "A. For that particular one, yes, it would

20   have been sent to The Barclay Group under C.J.  This is

21   Old Monmouth's bill.

22                   "Q. Right.  So Old Monmouth would bill C.J.

23   even for transactions relating to Daptco Trust, would it

24   not?

25                   "A. I assume so.  It looks like The Barclay

```
 1   Group here.
 2                "Q. Yeah, now we've got a stack of
 3   documents here starting with Exhibit 63 through
 4   Exhibit 89.  And I have tried to put them in
 5   chronological order.  Are those all copies of
 6   distribution instructions that Old Monmouth received on
 7   for the dates indicated?
 8                "A. Yes.
 9                "Q. And directing your attention to
10   Exhibit 74."
11                MR. SAROKHANIAN:  And for that record, that
12   is referring to KLM Exhibit 67, which has been admitted.
13                THE COURT:  Okay.
14                "Q.  Which is the distribution instructions
15   for January 25, 2012, relating to TK Trust.  That set of
16   instructions for TKY Trust was actually sent to Old
17   Monmouth by C.J. Comu, was it not, if you look at the
18   last page?
19                "A. Yes.
20                "Q. And generally, was it your
21   understanding that C.J. Comu was directing how all the
22   different distributions were being made?
23                "A. Yes."
24                MR. SAROKHANIAN:  Moving to Line 17.
25                "Q. The stock that you were dealing with
```

1  for Green Automotive was known as Rule 144 stock.

2                "A. I believe it's restricted shares, yes.

3                "Q. Meaning stock that had not been

4  registered with the SEC?

5                "A. Correct.

6                "Q. Did Old Monmouth make any determination

7  as to how to comply with the law in making these sales

8  of stock?

9                "A. We were just acting as escrow agent.

10  We weren't part of the sale.

11                "Q. Was it part of your understanding and

12  agreement with Mr. Comu that it would be up to him to

13  make sure that the law's complied with in these sales?

14                "A. That's certainly my feelings on it.

15                "Q. And did any employee on behalf of Old

16  Monmouth ever get involved in making representations to

17  purchasers as to whether this was a good or bad

18  investment?

19                "A. No, we would not."

20                MR. SAROKHANIAN:  Moving to Page 112, Line

21  6.

22                "Q.  Okay.  If I understood you correctly,

23  at the time the Green Auto stock came out of that

24  merger, Old Monmouth was also the transfer agent for the

25  publicly traded common stock?

1              "A. We've been agent for quite some time

2    for the original company.  What the name was, I don't

3    recall.

4              "Q. So over the 20 years or so that you

5    have been in business, your company has transferred both

6    publicly traded common stocks and also transferred

7    restricted stocks?

8              "A. Yes.

9              "Q. Okay.  And it's not at all unusual for

10   a restricted stock to get sold and transferred on your

11   books, is it?

12             "A. As far as sales?  We usually don't know

13   if it's a sale, we consider it a transfer.

14             "Q. The 144 rule basically is if it's

15   restricted struck" --

16             MR. SAROKHANIAN:  I think it's supposed to

17   say "stock".

18             "Q -- has a legend after the transfer, the

19   new certificate is supposed to keep the legend?

20             "A. Yes.

21             "Q. And if you do that, then you can

22   transfer the stock and it goes out as restricted stock

23   bearing that same legend?

24             "A. Yes."

25             MR. SAROKHANIAN:  Moving to Page 117, Line

1   11.

2              "Q. And there come a time in -- I guess in

3   November of 2011 when Green Auto decided to transfer the

4   transfer agent responsibility to Action?

5              "A. Action Stock Transfer.

6              "Q. That was a decision made by Green Auto?

7              "A. Yes.

8              "Q. And not by The Barclay Group or Comu?

9              "A. Yes.

10             "Q. And, in fact, after that was done The

11  Barclay Group and Daptco and TKY kept their escrow

12  agreements with Old Monmouth?

13             "A. Yes.

14             "Q. If you would look at Exhibit 24 just to

15  clarify for the Court the process.  The particular stock

16  certificate is dated what date?

17             "A. April 19, 2012.

18             "Q. So this is after Old Monmouth was no

19  longer the transfer agent?

20             "A. Correct.  It would have been Action

21  Stock Transfer.

22             "Q. So when a sale of the restricted Green

23  Auto stock took place, you testified earlier I think,

24  you would notify Action Stock Transfer that you had

25  gotten the proceeds from the sale of the stock and you

1  would hold the proceeds in escrow until the stock

2  certificate got issued and you could tell that the buyer

3  received the stock and then you would release the funds

4  pursuant to the instructions you had gotten?

5          "A.  As soon as I received confirmation

6  from the transfer agent that the shares had been sent

7  out, then I can release the funds, right."

8          MR. SAROKHANIAN:  Moving to Page 119,

9  starting at Line 1.

10          "Q.  And when you got notified that this

11  had not only been prepared but also sent to the buyer,

12  then you would release the funds you were holding in

13  escrow?

14          "A. Yes.

15          "Q.  All right.  Let me show you

16  Exhibit 25.  Mr. Elmquist had some questions about this

17  particular stock transfer agreement.  Do you recall

18  looking at it and him asking you questions about it?

19          "A. Yes."

20          MR. SAROKHANIAN:  And that concludes the

21  excerpts from Matthew Troster's deposition, Your Honor.

22          THE COURT:  All right.

23          MS. HANKS:  Your Honor, there are a number

24  of exhibits that I believe were introduced into the

25  deposition that were either not discussed in a way that

1  was amenable to deposition excerpts, that we have either

2  offered or that have been designated as plaintiff's

3  exhibits.  So we would like at this time to specifically

4  offer those and raise those.  I believe there have been

5  relevance objections to them.

6           THE COURT:  All right.  Which one are

7  those?

8           MS. HANKS:  The first one is KLM

9  Exhibit 39.

10           THE COURT:  Okay.

11           MS. HANKS:  Yes.  This is very similar to a

12  lot of the exhibits that the Court has already seen.

13  This is a distribution instruction letter regarding

14  funds, in this case particularly significant funds,

15  upwards of $100,000 to World Wide Auric out in Portugal

16  or I believe the account was actually in Lichtenstein,

17  and The Barclay Group, and therefore, relevant under

18  both 727(d)(1) and (d)(2).

19           THE COURT:  All right.  Objection

20  overruled.  39 is admitted.

21           MS. HANKS:  The next is KLM Exhibit 40.

22           THE COURT:  Okay.

23           MS. HANKS:  This is a document prepared by

24  Old Monmouth.  It is a ledger of escrow funds deposited

25  into The Barclay Group escrow account and actually --

1   actually, no, I apologize, Your Honor -- no, that's

2   correct.  This reflects wire transfers received, if you

3   look at the top, amount received and how received.  So

4   it's either by check or by wire transfer and the date on

5   which the wire was either sent or the check was

6   received.  And particular purchasers of stock through

7   The Barclay Group account with Old Monmouth, and

8   therefore, this is relevant both to the extent that it

9   is the dissipation of assets belonging to the estate as

10  well as the concealment of assets that are being moved.

11              THE COURT:  All right.  Objection is

12  overruled.  KLM 40 is admitted.

13              MS. HANKS:  The next is KLM Exhibit 44.

14  And this is an email dated April 19th, 2012.  And just

15  to give the Court a little bit of a bookend context,

16  this is after the transfer of stock transfer duties to

17  Action Stock Transfer -- I had too many "transfers" in

18  one sentence.  And so Matt Troster from Old Monmouth is

19  coordinating with Justine Blankenship in order to make

20  sure that the stock certificates are distributed

21  according to the instructions from, in this case this is

22  Daptco.

23              THE COURT:  Okay.  Objection overruled.

24  KLM 44 is admitted.

25              MS. HANKS:  The next KLM exhibit, I believe

1   this has actually already been offered, but I'm not sure

2   there's been a ruling on it.  This is KLM Exhibit 72.

3                 THE COURT:  No, we have not discussed 72.

4                 MS. HANKS:  Okay.  Great.  And this is

5   another stock transfer instruction -- I apologize --

6   distribution instruction -- that came from David Parsley

7   at The Barclay Group and was instructing Old Monmouth

8   how to distribute funds received from the TKY Trust for

9   the sale of stock that had been issued in TKY Trust's

10  name.  And those distributions are going both to Barclay

11  Group, TKY Trust, and a number of other regular

12  recipients of substantial cash infusions from Barclay

13  Group funds.

14                THE COURT:  All right.

15                MS. HANKS:  And Daptco funds and TKY funds.

16                THE COURT:  Objection overruled.  72 will

17  be admitted.

18                MS. HANKS:  And the next one is exhibit KLM

19  Exhibit 73.

20                THE COURT:  Okay.

21                MS. HANKS:  This is the March 8th, 2012

22  letter to Old Monmouth stock transfer concerning

23  distribution of funds in the TKY Trust escrow account.

24  And it is attached to a transmittal letter from C.J.

25  Comu's personal email account, which both supports

1   disposition of assets belonging to the estate as well as

2   Mr. Comu's control over the Canadian trust that he has

3   alleged to be both belonging to his brother and a

4   separate entity not related to his own business, and

5   yet, it's distributing funds.  He is instructing the

6   distribution of cash funds from the sale of allegedly

7   TKY assets.

8               THE COURT:  All right.  Objection

9   overruled.  73 is admitted.

10              MS. HANKS:  The next exhibit, it's KLM

11  Exhibit 74.  This is same thing as 73, Your Honor, but a

12  couple of days later.  This is March 12th, 2012.  And at

13  this point the -- and I think this is what the exhibits

14  reflect, the holdings of stock in these particular

15  accounts of Old Monmouth are starting to dwindle.  And

16  so there becomes a question of whose -- of where the

17  stock is going and where the cash is being attributed to

18  and so you start seeing some overlap.

19              In this particular exhibit, this is a

20  transmittal email from C.J. Comu's TBG email account but

21  the email is actually signed by David Parsley.  And it

22  concerns TKY Trust funds.

23              THE COURT:  Objection overruled.  KLM 74 is

24  admitted.

25              MS. HANKS:  KLM Exhibit 75 is the next,

 1   Your Honor.

 2              MR. OLSON:  Your Honor, I may be living

 3   groundhog day, but I thought we admitted all of these

 4   through 80 just a few minutes ago.

 5              THE COURT:  There was some skipping around.

 6   There was a gap.

 7              MR. OLSON:  All right.

 8              THE COURT:  From 72 to I forget what.

 9              MR. SAROKHANIAN:  77.

10              THE COURT:  77, that wasn't.

11              MR. OLSON:  All right.  And again, the only

12   objection to these was they happened after the second

13   amended complaint was filed or they deal with events

14   that we only learned after that.  So any way to speed

15   that up is fine with me.  I've got my record.  And

16   again, Mr. Elmquist will get them all in anyway.

17              THE COURT:  All right.  I think we're

18   almost there, so just -- we're at 75 now?

19              MS. HANKS:  Yes.  KLM Exhibit 75 is a

20   March 15th, 2012 instruction letter from TKY Trust, just

21   to distribute assets or to distribute cash proceeds

22   received from the sale of stock through Old Monmouth.

23   And I believe that this may only reflect wire transfer

24   instructions, but it includes wire transfer instructions

25   pertaining to World Wide Auric in the account in

Case 10-03269-sgj Doc 185 Filed 10/22/14   Entered 10/22/14 13:46:11   Page 35 of 261
Case 3:14-cv-04163-B   Document 1-6   Filed 11/21/14   Page 167 of 266   PageID 1416

35

1  Lichtenstein as well as the physical location in

2  Portugal.  And TKY Trust and Barclay Group overlap.

3              THE COURT:  All right.  Objection

4  overruled, 75 is admitted.

5              MS. HANKS:  KLM Exhibit 76.  It is the week

6  after KLM Exhibit 75.  It is a March 22nd, 2012

7  instruction letter, but this one is from Daptco Trust,

8  which is the other Canadian trust that is in Mr. Comu's

9  brother's name.  And again, cash proceeds to -- although

10  this one reflects Turks and Caicos and as well as the

11  Lichtenstein account.  And again, it's a lot of the same

12  entities.  It's the overlapping instructions.  It's the

13  assets that originated with the estate and should have

14  been made available to estate creditors.

15              THE COURT:  Objection overruled.  KLM 76 is

16  admitted.

17              MS. HANKS:  Just a couple more, Your Honor.

18  Thank you for your patience.  KLM Exhibit 80.

19              THE COURT:  We have already done 80.

20              MS. HANKS:  We have?

21              THE COURT:  Uh-huh.

22              MS. HANKS:  And just confirm that's been

23  admitted?

24              THE COURT:  It has been admitted.

25              MS. HANKS:  And KLM 81, Your Honor.

```
 1              THE COURT:  Okay.

 2              MS. HANKS:  This is in addition to

 3   transferring cash proceeds from the sale of stock in

 4   either TKY, Daptco or Barclay Group through Old

 5   Monmouth, there were actually substantial stock

 6   transfers by virtue of stock certificates to World Wide

 7   Auric.  And I believe these were sent to Portugal to the

 8   physical address in Portugal, although I believe the

 9   correspondence will shed some light on that.  But that's

10   why it's relevant, Your Honor.

11              THE COURT:  All right.  Objection

12   overruled.  81 is admitted.

13              MS. HANKS:  Your Honor, those are all the

14   Troster exhibits that I believe have been either

15   designated by KLM, and the remainder have either been

16   designated by the trustee or by another party.

17              THE COURT:  All right.  Thank you.

18              Does any other counsel wish to add

19   deposition excerpts to the record from the Matthew

20   Troster deposition?

21              MR. ELMQUIST:  No, Your Honor, none from

22   the trustee.

23              THE COURT:  All right, Mr. Olson.

24              MR. OLSON:  Yes, Your Honor, on Page 28.

25              THE COURT:  All right.
```

```
1              MR. OLSON:  Lines 4 through 9.
2              THE COURT:  28, Lines 4 through 9, I have
3    read them.
4              MR. OLSON:  All right.  On Page 98, Lines
5    17 through -- trying to figure out where to cut it
6    off -- Line 1 on Page 99.
7              THE COURT:  All right.  I have read them.
8              MR. OLSON:  And if I may have just a
9    moment.  There's a place where my examination of the
10   witness started and we read some of that in.
11             Page 113, Line 13 through Page 114, Line
12   16.
13             THE COURT:  Okay.
14             MR. OLSON:  I think that will cover it,
15   Your Honor.
16             THE COURT:  All right.  I have read that.
17   Anything further on Matthew Troster?
18             All right then, that concludes witness
19   number five.
20             Plaintiffs, you may call your next witness.
21             MR. SAROKHANIAN:  Your Honor, we call
22   Edward Baxter through deposition.  And if I may approach
23   and distribute highlighted transcripts.
24             THE COURT:  You may.
25             MR. SAROKHANIAN:  Thank you, Your Honor.
```

1   Disregard the paperclips, pull them out.

2                 MR. OLSON:  I don't think we've got ours

3   yet.

4                 MR. SAROKHANIAN:  No, I will bring it to

5   you.

6                 MR. OLSON:  That's fine.

7                 MR. SAROKHANIAN:  I'm just giving you

8   advance notice that they look a little strange.

9                 MR. OLSON:  All right.  Thanks.

10                THE COURT:  Okay.

11                MR. SAROKHANIAN:  I will begin the excerpts

12  from Mr. Baxter's deposition on Page 4, Line 8.  The

13  questioning is by Mr. Elmquist.

14                THE COURT:  Okay.

15                "Q. Good morning, Mr. Baxter.  Thank you

16  for coming this morning.  I am here to take your

17  deposition in a lawsuit that's been pending for some

18  time in the bankruptcy case of Mr. C.J. Comu.  And do

19  you know anything about that lawsuit?

20                "A. I didn't know about it until just

21  before I left.  It was one of those things that came up

22  that I found out about the end of 2010, early 2011,

23  somewhere in that range."

24                MR. SAROKHANIAN:  Moving to Page 5 -- or

25  excuse me -- I will start at Line 22 on Page 4.

1              "Q.  Okay.  I have handed you what's been

2    marked Exhibit 1.  I would just like you to confirm that

3    you received a copy of this deposition notice and

4    subpoena.

5              "A. Yes, I received a copy.

6              "Q. Okay.  And we talked the other day, but

7    I just want to confirm on the record.  If you will take

8    a look at the last two pages of Exhibit 1, we discussed

9    the list is the last two pages where it says, quote,

10   documents to be produced, end quote.

11             "A. Okay.

12             "Q. You and I discussed on the phone the

13   other day the fact that you have none of the documents

14   described there; is that right?

15             "A. Those documents never existed.  I never

16   had any relationship with -- well, the relationship with

17   TBG was verbal.  Daptco, nothing there.  TKY, don't know

18   anything about them.  Don't have any written agreements

19   as far as BDP is concerned with any affiliate of him or

20   otherwise.  The only documents evidencing payment would

21   have been just deposits to my account, which are part of

22   the Troster roster, because every one of them went

23   through that scenario.

24             "Q. Okay.  Do you recall there being any

25   kind of written communications with Mr. Comu or anyone

1   at The Barclay Group about these stock transactions at

2   the time they were occurring other than in relation to

3   payments being made?

4           "A. No.

5           "Q. So there were no discussions about

6   terms of what consideration any of the individuals who

7   facilitated the transaction would have received for

8   those services?

9           "A. No, those were all things I wasn't

10  privy to."

11          MR. SAROKHANIAN:  Jumping to Line 25.

12          "Q.  Okay.  Where did you go to work after

13  that?

14          "A. Actually I did not work.  I kind of

15  took a sabbatical and '89 was the first year I actually

16  met C.J.

17          "Q. Okay.  Was that in a business context?

18          "A. Friendly and business.

19          "Q. Okay.  Did you go to work for him in

20  some capacity?

21          "A. For about three months, yeah.

22          "Q. What did you do?

23          "A. At that time he was setting up

24  corporations for people who wanted to have foreign

25  resided corporations.

1          "Q. Okay.  And what kind of work did you do

2    in that regard?

3          "A. My job was to find clients who wanted

4    to have a foreign corporation."

5          MR. SAROKHANIAN:  Moving to Page 8, Line

6    11.

7          "Q.  Okay.  All right.  Tell me about what

8    you did in '94.

9          "A. From '94 to 2007 I ran my own small

10   financial practice.

11         "Q. What was the name of that business?

12         "A. Brook Street Securities.  Brook Street

13   was a broker dealer that failed in '07 for a variety of

14   reasons.  But they wouldn't allow you to have your own

15   name.  You had to use the company name.

16         "Q. I see.  Was anyone else associated with

17   you in that business?

18         "A. No, I was self-employed, ran my own

19   shop for, I guess, 13 years.

20         "Q. Did you have any business interaction

21   with Mr. Comu while you were with Brook Street

22   Securities?

23         "A. No.  Never saw him again after the

24   original engagement in '89.  I haven't seen him for

25   almost 20 years."

1            MR. SAROKHANIAN:  And this is by Mr. Olson.

2            "Q. Take a look at Exhibit 2 and tell me if

3    you recognize that document.

4            "A. Yeah.  This is my incorporation of Bois

5    d'Arc partners.  Bois d'Arc is a street I grew up on in

6    Tyler.

7            "Q. Okay.  We were all wondering because

8    the name has come up and we were wondering how that came

9    to be.

10           "A. Okay.  So what did Bois d'Arc partner

11   do or does?

12           MR. OLSON:  Your Honor, objection.  That's

13   my question and in West Texas that's "Bo Dark"

14   (phonetic).

15           THE COURT:  His objection to pronunciation.

16   All right.  I don't think I need to rule on that.  You

17   may proceed.

18           MR. SAROKHANIAN:  Line 13, Victor.

19           "A.  Well, pretty much it wasn't dormant.

20   Bois d'Arc Partners couldn't be used as a business

21   ownership (inaudible) company while I was at Brook

22   Street.  What it was designed to do was a couple of

23   things.  One, hold my intellectual property.  I knew

24   that I would be writing a book and I actually ended up

25   writing a book.  Two, I was buying and collecting

1   websites or web addresses and essentially Bois d'Arc

2   Partners was designed to be a holding pool for all the

3   different intellectual properties I would have had -- I

4   would have in anything else I bought.

5             "Q.  Okay.  Has it ever operated for those

6   purposes?

7             "A. Yeah, I mean buy cars in Bois d'Arc

8   Partners' name, a couple of them are.  All of my

9   websites, they are all part of -- they're all part --

10  well, the ones I have are part of Bois d'Arc Partners

11  ownership.  So it's kind of a dormant company.  It

12  didn't have any revenue at all up until, you know,

13  recently.

14            "Q. When did Bois d'Arc Partners have or

15  commence any type of business relationship with

16  Mr. Comu?

17            "A. Let me go back and remember the exact

18  date.  Probably either 2009 or early 2010, somewhere in

19  that range.

20            "Q. Okay.  And how did that come about, how

21  did you -- how did Bois d'Arc Partners and you, on

22  behalf of Bois d'Arc Partners, have a business

23  relationship with Mr. Comu?

24            "A. I was at a mixer at Brookhaven Country

25  Club and there was a guy there named Saul Album.  And at

1    the time I think Saul was working with C.J., and we were

2    looking for new projects.  And we knew that we knew that

3    they were starting a new project and Saul asked me if I

4    was interested in getting involved in a new project.

5    And C.J.'s name came up.

6                    "Q. What type of project were you

7    discussing, do you recall?

8                    "A. Electric car company.

9                    "Q. So was this something relating to Green

10   Automotive Company?

11                   "A. Yes, it was the genesis of Green Auto.

12   I think it already existed at the time.  It just -- it

13   was a scenario where they were looking to put together a

14   syndicate to try to raise the seed capital for Green

15   Auto.

16                   "Q. So after that mixer did you get

17   involved with the efforts to raise capital for Green

18   Automotive Company?

19                   "A. Yes, I had people I knew who were

20   interested in investing in small companies and were

21   interested in a startup.  And a number of those people

22   came aboard and decided to invest in the company.

23                   "Q. In what manner did they invest in the

24   company?

25                   "A. They bought stock in the company.

1              "Q. From The Barclay Group or others?

2              "A. The only one I know was The Barclay

3    Group."

4              MR. SAROKHANIAN:  And, Your Honor, they're

5    going to refer to KLM Exhibit 39, which I believe has

6    been previously admitted.

7              THE COURT:  It has.

8              "Q.  Let me show you what has been

9    previously marked -- we're marking it today as Baxter

10   Exhibit 3.  It's previously marked in the deposition of

11   Matt Troster at Exhibit 12.  Are you familiar with that

12   name, Matt Troster?

13             "A. Matt Troster is the -- I don't know if

14   he's the owner -- one of the managers of Old Monmouth.

15             "Q. Okay.  And this letter appears to be

16   signed by you as managing partner of The Barclay Group,

17   do you see that?

18             "A. Right.  Everybody at The Barclay Group

19   was a managing partner.  Anybody who came here with C.J.

20   had that title.

21             "Q. So what did you do at The Barclay Group

22   in July of 2011?

23             "A. This is pretty much it.  Any time that

24   there was a transaction where there was a sale of stock

25   of The Barclay Group, it was my job to create this type

1    of report.

2              "Q. But at this time you were also

3    connected with the principal of Bois d'Arc Partners,

4    correct?

5              "A. Well, Bois d'Arc Partners is the -- it

6    was the recipient of what I used as far as money was

7    concerned.  Bois d'Arc Partners was the bank account I

8    used to take in the money that I received from anybody

9    that I got any money from.

10             "Q. My question is in January -- or excuse

11   me -- July of 2011 you were the sole owner of Bois d'Arc

12   Partners; is that right?

13             "A. I have always been the sole owner of

14   Bois d'Arc Partners.

15             "Q. Okay.  So the $27,000 payment that is

16   addressed here as a payment to Bois d'Arc Partners would

17   be a payment to your company Bois d'Arc Partners and --

18   first of all, is that correct?

19             "A. Yes.

20             "Q.  Okay.  What did Bois d'Arc Partners do

21   to receive this 25 -- $27,000 payment in connection with

22   the sale of Green Auto stock?

23             "A. I was told that this was my portion of

24   the sale of the company stock.  I didn't ask

25   specifically any particular type of requirement or

1    whatever.  He had said, well, whatever comes in, I will

2    give you a piece of it.

3              "Q. Okay.  So are you saying that the

4    $27,000 fee that Bois d'Arc Partners received was

5    something that Mr. Comu solely determined?

6              "A. For the most part, yes.

7              "Q. You don't recall having any discussions

8    or negotiations regarding a fee that Bois d'Arc would

9    receive in connection with these transactions?

10             "A. It varied.  There was no specific

11   discussion about what the actual fees would be, because

12   they varied, depending on what the amount of money that

13   came in was.  We had no idea what that would be.

14             "Q. Well, would it be based on a percentage

15   of the money coming in.

16             "A. Somewhere -- it was usually somewhere

17   around 50, you know, in that range.  It was in that

18   range, but it wasn't guaranteed.

19             "Q. 50 what.

20             "A. 50 percent.

21             "Q. So who was entitled to receive

22   50 percent of whatever was coming in?

23             "A. Bois d'Arc Partners was entitled to

24   receive a percentage up to 50 percent of whatever came

25   in, but that number would change based on if there was a

1   need elsewhere.

2                   "Q. And what services did Bois d'Arc

3   Partners provide to receive this fee?

4                   "A. Well, my job was to manage these types

5   of transactions to make sure that all the parties that

6   were a party to creating these transactions received

7   what they were supposed to receive.

8                   "Q. Did Bois d'Arc Partners locate the

9   purchasers of stock in connection with these

10  transactions, some or all of the purchasers --

11                  "A. No.

12                  "Q -- of Green Auto stock?

13                  "A. No.  We didn't locate these purchasers

14  at all.

15                  "Q. Okay.  So I'm not clear then of what

16  Bois d'Arc Partners did for the fee it received.  Would

17  you explain that to me?

18                  "A. Well, Bois d'Arc Partners received its

19  fee for, I guess for lack of a better term, the clerical

20  aspects of this transaction.  If he was not around, if

21  he was traveling or whatever, my job was to make sure

22  that all these things were done.  I received a report

23  or, you know, a verbal information.  We would take that

24  verbal information, put it in this particular form, and

25  it would be approved by C.J.

1              "Q. There's another company listed here as

2    receiving the wire transfer called World Wide Auric.  Do

3    you see that?

4              "A. See it.

5              "Q. Do you know anything about World Wide

6    Auric?

7              "A. I only know it by its name and one guy

8    who was involved with the company.

9              "Q. Who was that?

10             "A. Nick Toscano.

11             "Q. Would you spell the last name, please?

12             "A. T-O-S-C-A-N-O.

13             "Q. Did you or Bois d'Arc Partners have any

14   business dealings with World Wide Auric?

15             "A. Other than this, no.  What would happen

16   was Auric and C.J. or whoever Auric was, they

17   communicated amongst themselves.  And I was essentially

18   told that the instructions were with regard to how this

19   particular format would be created."

20             MR. SAROKHANIAN:  Now moving to Page 11,

21   Line -- sorry -- Page 16, Line 11.  They will be

22   referring to what's been admitted as Trustee's

23   Exhibit 67.

24             THE COURT:  Okay.

25             MR. SAROKHANIAN:  And this is a question by

1   Mr. Elmquist.

2              "Q.  Take a look at what's been marked as

3   Baxter Number 4.  This letter appears to be similar in

4   nature to Baxter 3 in that it is a document sent to or

5   instruction letters essentially sent by you to Old

6   Monmouth regarding instructions on payment of wire

7   transfers; is that right?

8              "A. Right.  They were all the same.  They

9   are all essentially the same format.

10             "Q. Okay.  And you signed it as managing

11  partner.  Would that again be managing partner of

12  Barclay Group?

13             "A. Managing partner of Barclay Group is

14  the way it's signed.  It's kind of a misnomer.  Like I

15  said, everybody who worked at TBG was a managing

16  partner.  C.J. gave us all that -- all the same title.

17             "Q. Did you receive any compensation from

18  The Barclay Group separate and apart from what Bois

19  d'Arc Partners was receiving in these transactions?

20             "A. No.

21             "Q. And if I don't (sic) mention already

22  this is Troster 14.  Take a look at the second page if

23  you will and tell me if you will recognize any of the

24  companies that are listed on the second page as far as

25  your having any kind of business dealings or interaction

1   with any of those companies.

2           "A. The only interactions we had with these

3   companies was we were told to pay them by World Wide

4   Auric.  To my knowledge, they were agents of World Wide

5   Auric.  And this is why we were given instructions to

6   pay them for any activity they had with regard to TBG

7   and World Wide Auric.  The specifics of the transactions

8   themselves I wasn't necessarily privy to.  My job was to

9   make sure that the reports -- that the report got out.

10          "Q. And what services did Bois d'Arc

11  Partners provide for the $25,000 fee it received in this

12  transaction?

13          "A. They were all the same.  This was an

14  arbitrary number in most cases.  It was identified by

15  him and, quote, him being C.J.  With regard to what he

16  thought BDP's portion of whatever the sale was that

17  particular week.

18          "Q. So again the amount that Bois d'Arc

19  Partners received in this transaction was something that

20  Mr. Comu determined?

21          "A. Well, yes.  He's the leader of the

22  company so he determined, you know, what we received.

23  He didn't determine what these guys received.  He

24  determined anything I received was, you know, quote,

25  unquote, on approval by him."

1          MR. SAROKHANIAN:  And, Your Honor, they're

2    going to be referring to KLM Exhibit 41, which has been

3    previously admitted.  And I will be moving to Page 19,

4    Line 24.

5          THE COURT:  All right.

6          "Q.  So once again this is a situation in

7    which Bois d'Arc Partners received a fee that Mr. Comu

8    determined and you had no involvement in determining the

9    amount of that fee?

10          "A. No, the figure again would be arbitrary

11   in the sense that we never knew what the number would be

12   until we got the report from all these guys.

13          "Q. And there is no written communication

14   of any kind that you're aware of that addressed the

15   amount of fees Bois d'Arc Partners would receive in

16   these transactions?

17          "A. Didn't need to.  I was sitting right

18   next to the guy in the office.  But the answer to that

19   is no, not to my knowledge."

20          MR. SAROKHANIAN:  Moving to Page 21, Line

21   12.  They are referring to what's been previously

22   admitted as KLM Exhibit 42.

23          THE COURT:  Okay.

24          "Q. I hand you what's been" --

25          MR. SAROKHANIAN:  Has 42 been admitted,

1    Your Honor?

2              THE COURT:  Well, wait.  42 was actually

3    not objected to by Mr. Olson, so it's admitted.

4              MR. SAROKHANIAN:  Okay, great.

5              "Q.  I hand you what's been marked as

6    Baxter Number 6, which has previously been marked as

7    Troster 17.  These are outgoing wire transfer forms that

8    Mr. Troster filled out for purposes of the wire

9    transfers that were made in accordance with the

10   instructions he received.  If you will turn to the third

11   page of this document you will see there's a page here

12   for Bois d'Arc Partners.  The address you just gave me,

13   is this address shown on Exhibit 6 on Huffines Drive?

14             "A. Yeah.

15             "Q. Is the account number list, is that a

16   Bois d'Arc Partners account 7783959005.

17             "A. That's my account."

18             MR. SAROKHANIAN:  Moving to Page 22, Line

19   1.

20             "Q. Was that your personal account or is

21   this an account of Bois d'Arc Partners.

22             "A. That account's in the name of Bois

23   d'Arc Partners."

24             MR. SAROKHANIAN:  Your Honor, they're

25   referring now to KLM Exhibit 62, which I believe has

```
 1   been admitted.

 2              THE COURT:  Yes, it has.

 3              "Q.  Take a look at Exhibit 7, please.

 4   That's Troster Exhibit 63.  Do you recognize the stamped

 5   signature there to be the one that was affixed there by

 6   you on Page 2?

 7              "A. Yes.  That would have been me.  This

 8   would have been one of the last ones I did, I think.

 9              "Q. Is your answer on this transaction the

10   same, that Mr. Comu determined the fee paid to Bois

11   d'Arc Partners?

12              "A. Correct.

13              "Q. And you had no involvement in

14   determining that fee?

15              "A. Correct.

16              "Q. And did you have any business

17   interaction with any of the entities listed in Baxter

18   Number 7?

19              "A. None."

20              MR. SAROKHANIAN:  They will next be

21   referring to KLM Exhibit 63, which I believe has been

22   previously admitted.

23              THE COURT:  Yes, it has.

24              "Q.  Take a look at Baxter Number 8, if you

25   would, which is previously marked as Troster 64.  The
```

```
 1   stamped signature is one you affixed there; is that
 2   correct?
 3                 "A. That would be correct.
 4                 "Q. And the fee that was set forth here for
 5   Bois d'Arc Partners is a fee that Mr. Comu determined?
 6                 "A. Correct.
 7                 "Q. With no involvement by you in
 8   determining that fee?
 9                 "A. That's correct.
10                 "Q. Take a look at the name on the second
11   page, Capital Asset Management Partners, Inc.  Did you
12   have any business dealings with that company?
13                 "A. No."
14                 MR. SAROKHANIAN:  And they will next be
15   referring to KLM Exhibit 64, which I believe has been
16   previously admitted.
17                 THE COURT:  It has.
18                 "Q.  All right.  Take a look at Baxter 9,
19   which was previously marked as Troster 66.  Are your
20   answers on this document the same, the affixed signature
21   is one you affix there?
22                 "A. Yes.
23                 "Q. The fee that was set forth here for The
24   Barclay Group was determined by Mr. Comu with no
25   involvement by you; is that correct?
```

1          "A. That's correct.

2          "Q. Let me ask you, with respect to all

3    these documents that we have been looking at that show

4    instructions for fee paid to The Barclay Group, is your

5    answer the same in terms of the services performed that

6    these would have been simply clerical services that were

7    performed by you in connection with these transactions?

8          "A. Yes.

9          "Q. How was it that the fees were being

10   paid to Bois d'Arc Partners and not to you individually?

11         "A. It's an LLC.  It's a business.  It's

12   designed to be like any other corporation.  I mean I

13   don't really know how to answer that question.

14         "Q. All right.  Well, did you indicate to

15   Mr. Comu that the payments that were to be made for the

16   services you performed should be made payable to Bois

17   d'Arc Partners and not you individually?

18         "A. Yes.  In the broker -- in the

19   broker/dealer community you can't pay an LLC.  You can

20   only pay an individual as, quote, unquote, the

21   independent contractor for TBG.  That's the role that

22   Bois d'Arc Partners played.

23         "Q. Say that again.  The role that Bois

24   d'Arc Partners played for The Barclay Group was?

25         "A. An independent contract operating in

1  this realm.  That was the way I received my payment."

2              MR. SAROKHANIAN:  Moving to Page 25, Line

3  11.

4              "Q. Okay.  So tell me about what you did to

5  ensure that the transaction went as it was supposed to

6  go.  What did you actually do to assure that?

7              "A. Again, whenever these were done,

8  typically he was sitting next to me, he would say you

9  need to do this, this, this, this, and this.  That's

10 what I did.

11             "Q. So you would receive instructions from

12 Mr. Comu with respect to the transactions that are

13 reflected in these exhibits we have been looking at?

14             "A. Correct.

15             "Q. Were the instructions you received oral

16 instructions or written instructions?

17             "A. Probably 90 percent of the time they

18 were oral.

19             "Q. Did the instructions include the

20 parties that were to receive payments from the stock

21 sales insofar as who was to receive the payments and the

22 amounts received?

23             "A. Exactly.  They were very precise.  All

24 the companies you see on this page were all companies

25 that were receiving the compensation for the transaction

1  and the instructions with regard to how the payments

2  were given to me and my job was to execute that.

3          "Q. On average how much time would you

4  estimate you spent putting these transactions together

5  or basically fulfilling the instructions that you

6  received from Mr. Comu?

7          "A. Typically it took about two hours.  The

8  rest of the day was spent doing other things that were

9  about other projects.  This was not my own project."

10          MR. SAROKHANIAN:  Moving to Page 27,

11  starting on Line 3.

12          "Q. Starting with the email at the bottom

13  of the page where it shows from "admin@thebarclaygroup",

14  do you know who that is?

15          "A. That's just a general address for The

16  Barclay Group.

17          "Q.  Did you receive -- did you personally

18  receive emails that were sent to that email address?

19          "A. I had access to it, but other people

20  had access to it also.

21          "Q. Did you have a personal email address

22  at The Barclay Group --

23          "A. Yes.

24          "Q -- that was individualized?

25          "A. Ebaxter@thebarclaygroup .com."

1          MR. SAROKHANIAN: Moving to Page 33, Line

2     20.

3          "Q. Well, I guess what you're saying is

4     you're not sure whether these investors that you brought

5     to the table, so to speak, were buying stock directly

6     from Green Auto or buying it through Barclay Group?

7          "A. You know, the stock was delivered from

8     Green Auto so I assumed it was from Green Auto.

9          "Q. But you don't know whether it was stock

10    that had been initially issued to The Barclay Group?

11         "A. No, I would haven't known that at the

12    time -- at that time.

13         "Q. And was the fee that Mr. Comu was

14    paying to Bois d'Arc Partners that we have addressed in

15    these earlier exhibits, was that fee paid to Bois d'Arc

16    Partners in partial consideration for bringing these

17    investors to the table, bringing these investors and the

18    capital that you raised?

19         "A. It was described to me as consulting

20    fee for assisting the company.

21         "Q. And not for raising capital?

22         "A. No."

23         MR. SAROKHANIAN: Moving to Page 35, Line

24    25. And they will be referring to what had been

25    previously admitted without objection, I believe, KLM

1   Exhibit 31.

2                THE COURT:  That has not yet been admitted

3   and there is an objection.

4                MR. SAROKHANIAN:  There is an objection?

5   Thank you.  Can we pull up 31, please?

6                Your Honor, this is an instruction from

7   Mr. Baxter, the deponent that we're excerpting from his

8   deposition, instruction from Mr. Baxter on behalf TBG

9   telling Old Monmouth stock transfer, stock and escrow

10  agent we were discussing earlier, to combine the wires

11  and to release them at the same time.  So this is

12  probative and relevant under 727(d)(1) and (d)(2).

13               THE COURT:  All right.  Objection

14  overruled.  KLM 31 is admitted.

15               MR. SAROKHANIAN:  Starting back at Page 35,

16  Line 25.

17               "Q.  So this instruction letter is the same

18  as those we've looked at which is letters you sent out

19  for instructions to Old Monmouth on fees to pay or

20  amounts to wire to the various entities listed; is that

21  right?

22               "A. That's correct.

23               "Q.  This was again based upon instructions

24  received by Mr. Comu; is that correct?

25               "A. That's correct."

 1          MR. SAROKHANIAN:  Your Honor, I'm going to

 2    move to Line 21.  They are referring to what's been

 3    previously admitted as Trustee's 56.

 4          THE COURT:  Okay.

 5          "Q.  Okay.  I think you stated a moment ago

 6    that you resigned about a week after this letter; is

 7    that right?

 8          "A. That's correct.  January 11th, I

 9    believe.

10          "Q. You resigned from The Barclay Group; is

11    that what you're saying?

12          "A. The Barclay Group, all companies

13    associated with The Barclay Group, Regus, any others

14    that were involved or were that part of his

15    organization.

16          "Q. And why did you resign?

17          "A. It was just time to go a different

18    direction.  I wanted to go -- to get my securities

19    licenses back and do more what I consider more pure

20    investment banking.

21          "Q. During this time period, that is, when

22    you first started doing work for The Barclay Group in

23    2009 up to January 2012, were you also performing any

24    services for other businesses of Mr. Comu?

25          "A. I was evaluating projects.  We had

1  other projects that came in.  A lot of people were

2  seeking his services at that time to raise capital for

3  them or help them structure transactions.  And part of

4  my job was to do that, too.

5           "Q. What particular companies associated

6  with Mr. Comu were you working for in addition to The

7  Barclay Group?

8           "A. Puration, which I think was a water

9  bottle company.  There was a company that did some type

10  of -- I don't remember the name of it -- did some type

11  of electronic surveillance.  I can't remember the name

12  of that company, a GPS tracking company.  I can't

13  remember the name of that company either.  Let me think.

14           "Q. These were all companies that Mr. Comu

15  had some involvement with in terms of --

16           "A. Usually companies that were seeking an

17  engagement.

18           "Q. With whom?

19           "A. Either The Barclay Group or Regus or

20  one of the others."

21           MR. SAROKHANIAN:  Moving to Page 41, Line

22  15.

23           "Q.  How was it you found out about this

24  lawsuit?

25           "A. Email -- oh, the case itself?

1          "Q. Yeah, the lawsuit.  You said you didn't

2    find out about it until shortly after you left.

3          "A. Well, no, shortly before I left.

4          "Q. Okay.  Shortly before.

5          "A. Shortly before I left.  What happened

6    was one day he was on the phone with someone and it just

7    came out.  I said, 'what is that?'  And he mentioned,

8    you know, the case.  I didn't know the specifics of the

9    case but he said, you know, I have a case before the

10   bankruptcy court.  And I didn't know that up to that

11   point.

12         "Q. Did that have anything to do with your

13   leaving C.J.'s companies?

14         "A. Can't say totally, but you know, I'm

15   sure somewhere in the back of my mind it may have had

16   something to do with it.

17         "Q. Did he ever tell you that he was the

18   subject of a permanent SEC injunction?

19         "A. Didn't know that until June 2012."

20         MR. SAROKHANIAN:  Moving to Page 43, Line

21   7.

22         "Q.  And so what was it you actually saw, a

23   copy of the actual injunction, or a news release, or

24   what?

25         "A. Well, simply the guy Googled him and

1    all these things came up.  I never Googled the guy

2    before so just never even thought about it.

3                   "Q. Okay.

4                   "A. So he did some exploration from that

5    point.

6                   "Q. You mentioned Regus; is that Regus

7    Advisors?

8                   "A. Yes.  That was his other company, you

9    know, whoever owned it.  I'm not sure who owned it.  I'm

10   not sure who owns TBG.

11                  "Q. Yeah.  When did Regus Advisors come

12   about, to your knowledge?

13                  "A. Some time in 2011.

14                  "Q. And did C.J. ever tell you why he was

15   starting to use Regus instead of Barclay Group?

16                  "A. No, I never asked.

17                  "Q. He never gave you a reason for this new

18   company name?

19                  "A. No."

20                  MR. SAROKHANIAN:  Moving to Line 15.

21                  "Q.  Okay.  What was C.J.'s relationship

22   with Puration?

23                  "A. He was one of the investors in Puration

24   also.

25                  "Q. Has Puration ever done any business as

1    far as you know?

2              "A. It's starting to get better, I mean I'm

3    not attached to the company per se, but you know, from

4    the things I read and the musings on the street, you

5    know, they are starting to get themselves together.

6    Initially they had some issues with regard to the

7    product -- product launch.  But I think they're past

8    that.

9              "Q. Do you have any idea how much capital

10   was raised for Puration with the assistance of The

11   Barclay Group and/or you?

12             "A. The Barclay Group, to my knowledge,

13   didn't participate at all in Puration's raise.  It was

14   primarily through Regus.  I personally raised about

15   probably 300 for them, including the 50 I put in myself.

16             "Q. Were there any LG bio fuel companies

17   that you were aware of that C.J. had any involvement in?

18             "A. I am aware of them, but I never had any

19   involvement in them.

20             "Q. I think there was one that was having

21   an algae farm with a solar device next to it and

22   desalination plant like every combined alternative

23   method of power altogether.

24             "A. Well, it was a sustainability project.

25   I know about the project because I do speeches around

1  different investment conferences on sustainability

2  investments.  That's a project we never took any money

3  to."

4              MR. SAROKHANIAN:  Moving to Page 46, Line

5  3.

6              "Q. Have you ever met C.J.'s brother or Jim

7  or Chem Comu?

8              "A. I met him at his birthday party.

9  That's the only time I have ever seen him.

10              "Q. And when was that?

11              "A. Wow.  The only way I can go back and

12  find it is whenever the Pacquiao/Margarito fight was.

13  That was -- the party was that weekend.  I don't know

14  what date that was.  That's as close as I can get to it.

15              "Q. I don't either so --

16              "A. But that was that weekend.

17              "Q. All right.  Do you know anything at all

18  about these trusts that were involved in the

19  distributions, money from Old Monmouth sales?

20              "A. No, the trusts -- the trusts, I didn't

21  even know they existed until we saw some of this stuff.

22  I mean I've heard -- I mean I've talked to Matt.  I've

23  talked to his brother, you know, because those guys are

24  friends of mine.  And they called me and said, 'hey, you

25  know, what do you know about this?'  I don't know

1  anything about that.  Plus I was gone, you know.  It

2  made no sense for me to have any knowledge of the trusts

3  or relationships or anything else.  I had no knowledge

4  of any of that."

5              MR. SAROKHANIAN:  Moving to Line 11.

6              "Q. When you were working with C.J. back in

7  the '80s, '90s setting up foreign corporations, what

8  kind of countries were these corporations being set up

9  in?

10             "A. Mostly tax haven.  We never actually

11  set up one though.

12             "Q. Okay.  What were the tax havens that

13  you were talking about or considering?

14             "A. Caymans.

15             "Q. Did C.J. ever mention to you any

16  foreign, and by quote foreign, end quote, I mean out of

17  the U.S. companies or entities that he had an interest

18  in?

19             "A. One.

20             "Q. What was that?

21             "A. Euro American Capital Corp, which was

22  formed while I was at the firm, but it never had

23  anything in it.  It was pretty much an empty company so

24  it had no assets, had nothing, for the most part.

25             "Q. Was that the same as Eurocap.

1          "A. Yeah, that's the same name.

2          "Q. Okay.  Have you ever met anyone else

3    that supposedly owned an interest in The Barclay Group

4    other than C.J.?

5          "A. Kindly rephrase.  I'm not sure what you

6    mean by that one.  I never asked him who owned the

7    company or who owned stock in the company or who or what

8    the ultimate management of the company was.  I just

9    never asked.  I'll be honest.  I trusted C.J.

10   implicitly, because I had known him for years.  And I

11   didn't know all the other stuff.  Obviously I trusted

12   him too much.

13          But all of these things right here -- all

14   of these things right here unknown to me at the time

15   until late -- well, when you saw that January 5 number,

16   that's when these things started coming to light.  Still

17   at that point I didn't know the extent of what the

18   bankruptcy was, didn't know anything about the trusts,

19   so -- and I was pretty much gone by then."

20          MR. SAROKHANIAN:  Moving to Page 49, Line

21   4.

22          "Q.  Okay.  And you previously mentioned

23   that when you used the title, quote, managing partner of

24   The Barclay Group, end quote, that was just for what

25   purpose?

1              "A. Everybody gave that name to everybody,
2    you know, a guy that got recruited, that was their
3    title.
4              "Q. And how many were there that were in
5    the office there at The Barclay Group during the period
6    of time that you were there?
7              "A. Just three.
8              "Q. Just you, C.J., and who else?
9              "A. Mervyn Price.
10             "Q. Who?
11             "A. Mervyn Price.
12             "Q. Mervyn Price.  Do you have any idea
13   where Mervyn -- Mr. Price is these days?
14             "A. He should be somewhere around Dallas.
15   I haven't talked to Mervyn in two years, almost two
16   years."
17             MR. SAROKHANIAN:  Moving to Page 51,
18   picking up at Line 5.
19             "Q.  Do you know who the provider was for
20   the cell phone for the email service for The Barclay
21   Group?
22             "A. GoDaddy.
23             "Q. Did you have any administrative
24   involvement with GoDaddy?
25             "A. No, he set up all the emails.  He set

1   up all the email protocols, and he set up all the

2   passwords.

3               "Q. And by he you mean C.J.?

4               "A. Right."

5               MR. SAROKHANIAN:  Moving to Page 52,

6   picking up at Line 14.

7               "Q.  Now I think you were explaining,

8   correct me if I'm wrong, that there were some actual

9   sales of Green Automotive stock before the series of

10  transactions with Old Monmouth, was that correct?

11              "A. That's correct.

12              "Q. Okay.  And when you were assisting in

13  those, was there a private placement memorandum that was

14  being distributed?

15              "A. To my knowledge, there was.

16              "Q. Okay.  Did you ever see the private

17  placement memorandum for Green Automotive?

18              "A. No -- well, let me think for a moment.

19  I saw what appeared to be one, I'll put it that way, or

20  what I was told, but I'm not sure if it would be -- if

21  it actually was one or not.  That's what I thought it

22  was, I'll put it that way."

23              MR. SAROKHANIAN:  Moving to Line 16.

24              "Q.  Okay.  What recordkeeping was there,

25  if any, to determine who got copies of this batch of

1   papers relating to Green Automotive that was shown to

2   prospective buyers stock investors?

3                "A. That would have been TBG itself at the

4   time.  C.J. kept all the records."

5                MR. SAROKHANIAN:  Moving to Page 54, Line

6   1.

7                "Q.  Did C.J. have someone handling the IT,

8   the technical aspects of running his computer system

9   there at the office?

10               "A. No.

11               "Q. So as far as you know he was managing

12  it himself?

13               "A. That's all I ever saw."

14               MR. SAROKHANIAN:  Moving to Page 55, Line

15  4.

16               "Q.  I believe you told us that during this

17  period of time that y'all were selling stock -- strike

18  that.

19               "A. I believe you told us that during this

20  period of time when y'all were raising capital for Green

21  Automotive and before the Old Monmouth transactions that

22  Barclay Group was getting between 20 and 25 percent as

23  his compensation for --

24               "A. I don't think it was as high as

25  25 percent.

1                    "Q. Okay.  What would be the correct

2      number?

3                    "A. As far as I knew the maximum number was

4      20 percent.  I didn't have any -- I don't have any proof

5      one way or the other what that number was, just --

6      that's just what I was told.

7                    "Q. So you were told they were getting

8      20 percent in that -- out of the percentage that Barclay

9      Group -- The Barclay Group received, what would you

10     receive during that period of time?

11                    "A. Anywhere from 10 to 50 percent of the

12     net fee."

13                    MR. SAROKHANIAN:  Moving to Page 56, Line

14     4.

15                    "Q. When you were acting as a broker/dealer

16     in regular stock transactions, was there any kind of

17     legal maximum you're allowed to charge as a brokerage

18     commission?

19                    "A. 15 percent.

20                    "Q. Did it trouble you that you were told

21     Barclay was getting 20 percent --

22                    "A. Not necessarily.

23                    "Q. -- in its capital that was being

24     raised?

25                    "A. They were doing a private transaction

1   of what people consider to be an aggressive position or

2   an aggressive investment.  So my job was not to question

3   what he negotiated for himself.  The company and him

4   negotiated together.  Whatever they negotiated is what

5   the company paid, so I don't have -- I don't have any

6   say in that."

7                MR. SAROKHANIAN:  Moving to Page 58, Line

8   7.

9                "Q. How many shares of Green Automotive

10  stock do you have?

11               "A. I don't know exactly.  I have a bunch

12  of different certificates.  I can go home and count them

13  up.  I would say less than 300,000 or somewhere.  I know

14  it's below that.

15               "Q.  Are they being held in your name or

16  some other name?

17               "A. They are Bois d'Arc Partners name.

18               "Q. Okay.

19               "A. And they are restricted.

20               "Q. And who did you acquire those shares

21  from?

22               "A. C.J.

23               "Q. And what reporting, if any, was made to

24  the IRS for the value of those shares when they were

25  received?

1              "A. They were shown on the shares, I mean

2       they don't have a value for the most part.  I mean as

3       far as I know the stock is worth nothing."

4              MR. SAROKHANIAN:  Moving to Page 59, Line

5       1.

6              "Q. So you didn't report that as any

7       income, in other words, assess a dollar figure that,

8       quote, I received this amount of value, end quote?

9              "A. I will tell you what happened as far as

10      the stock is concerned.

11             "Q.  All right.

12             "A. I paid $78,000 to the IRS with regard

13      to taxes as far as the stock is concerned.  So me and

14      the IRS are pretty square, because obviously you can't

15      sell the stock.  As far as reporting is concerned, I

16      don't know what was put down.  I just signed the tax

17      return and wrote the check.  I'm not sure exactly what

18      the reporting technique is for stock compensation,

19      because I had never had any before.

20             "Q. When -- strike that.  When did you

21      become aware that C.J. was planning to start using Old

22      Monmouth to assist in the stock sales for Green

23      Automotive?

24             "A. Probably the summer of maybe 2011.

25      That's just a guess.  I'm not sure exactly what the date

1    was.  It was one of those things where, you know, send

2    this to these guys."

3                   MR. SAROKHANIAN:  Moving to Page 60, Line

4    2.

5                   "Q.  Now, when you were answering some of

6    Mr. Elmquist's questions, there were a number of times

7    where you -- I think you used the phrase, quote, I

8    received a report, end quote, concerning how the money

9    was to be distributed.  What form was this report?

10                  "A. It came from C.J.  Usually it was

11   verbal.

12                  "Q. Okay.  I think another time you said

13   90 percent of the time it was verbal.

14                  "A. If it wasn't verbal, it meant that we

15   got a report from whoever he had as far as the selling

16   was concerned, whether it came from one of these guys or

17   Auric or whoever and then he passed it on to me.

18                  "Q. Okay.  And what happened to those

19   reports that were in writing or email communication that

20   he, C.J., passed on to you, what happened to those?

21                  "A. He should have them, or you know, Matt

22   should have them."

23                  MR. SAROKHANIAN:  Moving to Page 61

24   starting on Line 1.

25                  "Q. Okay.  What about the ownership of the

1    stock.  Were you aware that while the stock was being

2    cleared through Old Monmouth as transfer agent that some

3    of the transactions for selling stock owned by The

4    Barclay Group, some were by this entity, some were by

5    that entity?

6              "A. The only entity that I knew that was

7    actually selling stock was The Barclay Group.  We had

8    gone to Block & Garden and received a legal opinion with

9    regard to the sale of the stock as far as Barclay Group

10   is concerned.  And we were just following counsel's

11   orders at that point."

12             MR. SAROKHANIAN:  Moving to Page 62, Line

13   19.

14             "Q.  Did C.J. ever mention passwords for

15   Barclay Group information --

16             "A. No.

17             "Q -- that he kept on his computer?

18             "A. No.  He had his own passwords.  And

19   what he would do is create another user password for

20   anybody else that wanted to use it.  But he had his own

21   password for his own stuff.

22             "Q. And he never shared those with you?

23             "A. I don't think he would share that with

24   anybody."

25             MR. SAROKHANIAN:  Now, Your Honor, they're

Case 10-03269-sgj Doc 185 Filed 10/22/14   Entered 10/22/14 13:46:11   Page 77 of 261
Case 3:14-cv-04163-B   Document 1-6   Filed 11/21/14   Page 209 of 266   PageID 1458

77

1   going to be referring to Trustee's Exhibit 67, which

2   should be admitted.

3               THE COURT:  Okay.  It is.

4               "Q. Exhibit 4, if you want to look at it

5   there, please, sir, on the second page, there's a

6   reference for $24,500 to Capital Asset Management

7   Partners, Inc.  Did you ever talk to anybody with that

8   company?

9               "A. No.

10              "Q. Do you know who owns that company?

11              "A. I have no idea.

12              "Q. American Wealth Management Group, Inc.,

13  did you ever talk to anyone from that company?

14              "A. No.

15              "Q. And do you have any idea who owns that

16  company?

17              "A. No.

18              "Q. How about Millennium Marketing

19  Concepts, Inc., you ever talk to them --

20              "A. No.

21              "Q -- or know who owns that entity?

22              "A. No.

23              "Q. R Gallick, LLC, do you know who that

24  is?

25              "A. No."

1           MR. SAROKHANIAN: Moving to Page 65,

2    starting at Line 7.

3           "Q. All right. So if you were in New

4    York, how would you have gotten the information from

5    C.J.?

6           "A. Probably by phone.

7           "Q. Okay. And then you would have drafted

8    up something and sent it to C.J. and then he sent it on

9    to Matt, is that how you believe the sequence occurred

10   in this case?

11          "A. Yeah. This is a template. The only

12   thing I had to do -- excuse me -- was put the number --

13   put in the number.

14          "Q. Okay.

15          "A. All this other information was already

16   available in the template and we just changed the

17   template -- or changed the numbers in the template.

18          "Q. And then this has a so-called signature

19   for Edward Baxter. Is that an electronic facsimile that

20   would have been affixed by the program?

21          "A. I would say so, yes."

22          MR. SAROKHANIAN: Moving to Page 67,

23   starting on Line 24.

24          "Q. Yeah, I was going to ask you, Page 2

25   of the letter says this leaves such and such for fees.

1    Quote, we are in London, so we are a few hours ahead,

2    end quote.  Who is we?  Who were you in London with?

3                    "A. C.J.

4                    "Q. Okay.  Why were y'all in London in

5    December of 2011?

6                    "A. We were trying to take Eurocap public.

7    We were meeting with agents over there who could assist

8    us in that process.

9                    "Q. Did anything ever come of that attempt?

10                   "A. No.

11                   "Q. What were the problems that you ran

12   into?

13                   "A. Just couldn't capitalize the company.

14   That and he couldn't get liquidity as far as the company

15   was concerned.  It was just not a good situation.

16                   "Q. How was he trying to get liquidity for

17   Eurocap?

18                   "A. I wasn't sure.  He had a bunch of

19   meetings with guys that I wasn't with.  You know, he had

20   this -- he had his meetings.  I had my meetings.  They

21   weren't necessarily together."

22                   MR. SAROKHANIAN:  Page 69, Line 20.

23                   "Q. Okay.  Did you ever discuss Eurocap

24   with C.J. after this trip to London?

25                   "A. No.  What happened was it just wasn't

1  working.  And at that point, you know, I had already

2  made the decision, I was ready to go a different

3  direction anyway.  It just happened a few weeks later."

4             MR. SAROKHANIAN:  Moving along to Page 73,

5  Line 2.

6             "Q.  I hand you Exhibit 13, which is

7  Troster Exhibit 8.  Is that -- the top email there dated

8  June 30th, 2011, is that an email you sent to Matt

9  Troster?

10            "A. I'm assuming so.  Looks like something

11  I would have written.  It's a little bit different

12  format though.

13            "Q. In looking at this exhibit, can you

14  explain the sequence?  First of all, on the top, was

15  that giving Matt the buyers for different wires that

16  were coming in?

17            "A. Yes.

18            "Q. Okay.  So that was in response to his

19  email to you, 'Ed, who are the buyers associated with

20  these wires?'

21            "A. Yes.

22            "Q. Okay.  Now, beside these buyers names

23  are some WWA numbers.  Larkin is WWA 1534.  Schweitzer

24  is 5591538.  What did those WWA numbers signify?

25            "A. That would have been corresponding to a

1    report probably given to us from World Wide Auric.

2              "Q. So World Wide Auric would arrange a

3    sale and it would send a report to Barclay Group saying

4    we sold X number of shares to Larkin, he's paying such

5    and such, and this is transaction WWA 1534?

6              "A. Correct.

7              "Q. Did you ever receive any of those

8    instructions or reports from World Wide Auric?

9              "A. No.  They came into the admin group and

10   then they were passed to me by C.J. Comu.

11             "Q. So did you ever see them, the

12   communications from World Wide Auric?

13             "A. There was no need to.  I just got them

14   from C.J., and I did them.

15             "Q. Okay.  But when you say you got them,

16   you mean he told you the numbers?

17             "A. Yes, you know, he would say, you know,

18   do this, this, and this, and that's what I did."

19             MR. SAROKHANIAN:  Moving to Page 77, Line

20   18.

21             "Q. Now, there's a couple of new names here

22   Emanuel Unmouth (phonetic) Kohler at Banco National de

23   Costa Rica.  Do you have any idea who Mr. Kohler is?

24             "A. Personally, no.  He was just a new name

25   that showed up on the distribution list.  And I recall

 1  this one because it was a hassle getting ahold of that
 2  bank.
 3               "Q. Okay.
 4               "A. It was difficult getting ahold of to
 5  verify the banking information for these people, but you
 6  know, subsequently it was verified.
 7               "Q. Did C.J. ever tell you anything about
 8  Emanuel Kohler, who he was or what he was doing?
 9               "A. As far as I was concerned, he was part
10  of the network and I was just told to pay him.
11               "Q. And then on the next page of the
12  exhibit it says, 'please wire $2,000 to Malcolm Van
13  Gelder.'  And it's got an address in Spain.  Do you know
14  who Malcolm Van Gelder is?
15               "A. Personally, no.  As far as --
16  personally no.  As I said, another guy, who I assume is
17  part of the network, and I was told to pay him."
18               MR. SAROKHANIAN:  Now, Your Honor, they're
19  going to be referring to KLM Exhibit 43, which I don't
20  believe we have addressed yet.  If we could have that
21  pulled up.
22               THE COURT:  It has been.
23               MR. VITAL:  No.  It's admitted.
24               MR. SAROKHANIAN:  It is admitted?  Great.
25  Thank you, Your Honor.

1            "Q.  Okay.  Exhibit 16, is that another

2    distribution -- a set of distribution instructions you

3    sent to Matt Troster on November 10th, 2011?

4            "A. Yes, it is.

5            "Q. Now, this includes, if you look at Page

6    2, $25,000 going to Block & Garden for their bank

7    account.  Did C.J. tell you that there was some Barclay

8    Group legal fees that needed to be paid?

9            "A. Up until this point I don't think I had

10   heard of Block & Garden, but they were added to the

11   list, and I assumed that they had -- I assumed that they

12   had those fees, and that's what they were there for, so

13   I sent the money.

14           "Q. Did you ever talk to any of the

15   attorneys from Block & Garden?

16           "A. I talked to Chris McNeill.

17           "Q. In what connection did you talk to

18   Mr. McNeill?

19           "A. We were negotiating a poison pill that

20   was incorporated in one of the companies separate from

21   any of this that we felt like was cumbersome regarding

22   any investment.  We wanted them to change that.  Block &

23   Garden obviously was representing our side of that

24   point, so he negotiated that.

25           "Q. And what company did that involve?

1            "A. Puration.

2            "Q. Puration?"

3            MR. SAROKHANIAN:  And I will move -- I will

4    strike that last one, Your Honor, on Line 16, and I will

5    move to Page 80, Line 4.

6            THE COURT:  Okay.

7            "Q.  And who is Dominic?

8            "A. He's the guy that ran World Wide Auric,

9    to my knowledge.  He's kind of a guy you don't see or

10   hear from.  He and C.J. have -- I assume they have some

11   kind of relationship because he's the guy who put

12   together the syndicate for these transactions or at that

13   time was attempting to.

14           "Q. Did you ever talk to Dominic on the

15   phone?

16           "A. Only when there was a problem with

17   money.  He would call the office and C.J. would pass me

18   the phone and say, 'fix this'.

19           "Q. Okay.  And what was his last name?

20           "A. Toscano.

21           "Q. Okay.  Do you have any idea where he

22   was located, what country?

23           "A. He could have been in anywhere.  He was

24   in Spain.  He was in Germany.  He was in the UK.  He was

25   in Italy.  I don't know how many residences he had.  I

1   don't know what the physical address -- what his

2   physical address.  Obviously, it was on a phone call

3   so..."

4                  MR. SAROKHANIAN:  Moving to Page 81, Line

5   8.

6                  "Q. Did you ever meet -- did you ever meet

7   David Parsley?

8                  "A. Yes.

9                  "Q. Was he at The Barclay Group when you

10  were there?

11                 "A. Yes.  He came and went.  I don't know

12  if he was actually there or not.

13                 "Q. And what did Mr. Parsley do?

14                 "A. He did accounting.

15                 MR. SAROKHANIAN:  Moving to Page 86, Line

16  10.

17                 "Q. Here's a document that I don't have a

18  copy of, but it's Exhibit 68 to the Troster deposition.

19  It appears to be a letter dated December 29th, 2011 from

20  TKY Trust to Matt Troster.  I do not see that it says a

21  copy to you.  Did you ever see that or know anything

22  about TKY Trust giving instructions to Mr. Troster?

23                 "A. No, because if I was on this one, one,

24  I would have gotten money out of it.  Two, that font

25  doesn't look that familiar.  So I'm not sure who that's

1   from or where it came from."

2                MR. SAROKHANIAN:  Moving to Page 87, Line

3   3.

4                "Q. Why is it -- why is it you left Barclay

5   Group?

6                "A. Two things.  Number one, I felt like it

7   was the time to go a different direction.  I just didn't

8   -- I was getting to the point I didn't feel comfortable

9   where I was.  Because, like I said, I'm the author of a

10  certain book, and I didn't know everything.  So I was in

11  the dark about stuff.  Two, statute of limitations for

12  my securities licenses was coming up in December 2011.

13  And I either had to make an application to FINRA to

14  continue to have them or just let them completely drop

15  off.  And I would have to re-qualify for six or seven

16  licenses or never have them again.  So I made the

17  decision that I wanted to keep my licenses and go back

18  into the, quote, unquote, regulated world, and make sure

19  -- that was the only way I could keep my license.  I

20  disavowed any connection to any non-FINRA related

21  organizations.

22                "Q. Were there any concerns that you had

23  about C.J. and the way he was doing business?

24                "A. No, I don't think so.  I think that

25  after the fact, you know, March, February, April, you

1   know, at that point I realized that there might be some

2   issues.  But I didn't know that -- what they were.  But

3   that was after I found out about this, you know, once I

4   found out about this, I figured for some reason, you

5   know, this is occurring.  I just didn't really

6   understand why.  I didn't want to know why, because I

7   didn't feel like it was any of my business.  And I

8   thought it was a personal issue."

9                MR. SAROKHANIAN:  And I'm going to move to

10  Page 92, starting on Line 11.  This is an examination by

11  Mr. Olson.

12                "Q. And it was the first time you had seen

13  him in approximately how long?

14                "A. Since '99.

15                "Q. Okay.  How -- now, this mixer was when?

16                "A. Wow, I have no idea.

17                "Q. Ballpark.

18                "A. I would say late winter of 2009,

19  January, February, somewhere in that range."

20                MR. SAROKHANIAN:  Moving to Page 93, Line

21  6.

22                "Q. And at that time what we now call Green

23  Auto actually had a different name, right?

24                "A. I think it did.

25                "Q. And at that time it was still private?

1           "A. Yes.

2           "Q. And at that time they wanted you to

3    help them raise capital for the company?

4           "A. Bear with me a second here.

5           "Q. Sure.

6           "A. I'm assuming so.  Like I say, I don't

7    remember the exact date.

8           "Q. No, no, no.  The point is when you

9    started working with them it was to raise capital for

10   the company?

11          "A. Right."

12          MR. SAROKHANIAN:  Moving to Page 94, Line

13   12.

14          "Q. I understand.  But at some point there

15   was some sort of merger.  Do you remember that?

16          "A. He did that.  It just kind of occurred

17   and all of a sudden it was there.

18          "Q. And now it's a public --

19          "A. Right.

20          "Q. -- company.  And after it became a

21   public company, I believe your testimony to Mr. Lippe

22   was that after you never tried to sell any more

23   investors on putting capital into the company?

24          "A. No.  There was no reason to do that at

25   that time.

1          "Q. But after the merger, TBG had a block

2    of Green Auto stock that it was holding that was

3    restricted, right?

4              "A. Correct.

5              "Q. And at some point TBG started selling

6    their stock?

7              "A. Correct.

8              "Q. And these exhibits that we have been

9    looking at today are instances where they were selling

10   stock?

11             "A. Correct.

12             "Q. Now, you got some money when the stock

13   was sold and that money went into Bois d'Arc?

14             "A. Correct.

15             "Q. Who was actually selling the stock for

16   TBG?

17             "A. That's what World Wide Auric did.

18             "Q. All right.  And do you know how World

19   Wide Auric came to be involved in selling the stock?

20             "A. No.  They just showed up one day.  It

21   was a connection of his, and I have no idea how they

22   connected.

23             "Q. All right.  Then as you look at the

24   distribution on these exhibits where you see the names

25   of other entities are getting money, other than the

1  sellers, what's those names relationship to World Wide

2  Auric?

3              "A. I have to assume they are part of his

4  syndicate."

5              MR. SAROKHANIAN:  Moving to Line 14.

6              "Q. Yeah.  Did C.J. have any connection

7  with World Wide Auric or any of those groups in that

8  syndicate?

9              "A. Not to my knowledge.

10              "Q. I think your testimony to Mr. Lippe was

11  sometimes the names under that selling group would

12  change because apparently they were involved or not

13  involved in a particular week's sales.

14              "A. Correct.  They would come and go.

15              "Q. But that would just be given to you by

16  World Wide Auric?

17              "A. Whoever was selling that week, they

18  would give it to C.J.  He would tell me what to do.

19              "Q. All right.  Now, I believe your

20  testimony to Mr. Elmquist was during this time frame --

21  and we're in 2010, '11, you were doing other things for

22  The Barclay Group?

23              "A. Right.

24              "Q. About how much time a week did you

25  spend total doing various Barclay Group projects?

```
1                    "A. Pretty much all of every day.

2                    "Q. It was a full-time job.

3                    "A. Yeah.

4                    "Q. And yet the only time you got paid was

5     with commissions off of these sales of stock?

6                    "A. Correct.

7                    "Q. And sometimes Block & Garden got paid

8     with commissions or with proceeds from the sale of

9     stock?

10                   "A. I don't know if that's the right

11    terminology, I think.

12                   "Q. It wasn't a commission.

13                   "A. Yeah.

14                   "Q. But they got money from a sale?

15                   "A. Yeah.  Their fees were paid for

16    whatever we owed them or out of whatever we had.

17                   "Q. The Barclay Group was having to sell

18    stock in order to keep going, to pay its overhead,

19    right?

20                   "A. Yeah.

21                   "Q. I mean you didn't have any other

22    money --

23                   "A. No.

24                   "Q. -- coming into The Barclay Group --

25                   "A. No.
```

```
 1                "Q. -- from anything else?"

 2                MR. SAROKHANIAN:  Can you answer that on

 3     Line 7?

 4                "A.  No.  There were no retainers.  There

 5     was no other form of income coming in at any time.

 6     That's why we were scrambling to get other projects so

 7     we could, you know..."

 8                MR. SAROKHANIAN:  Now, moving to Page 101.

 9     And this is almost the end, Your Honor.

10                THE COURT:  Okay.

11                MR. SAROKHANIAN:  This is a question by

12     Mr. Elmquist.

13                "Q. Mr. Baxter" --

14                MR. SAROKHANIAN:  And I'm starting on Line

15     15, Page 101.

16                "Q. Mr. Baxter, I just have a few more

17     questions.  Okay.  Nick and Dominic Toscano are the same

18     individual, right?

19                "A. To my knowledge, yes.

20                "Q. Okay.  And is the address for World

21     Wide Auric in the Turks and Caicos Islands, do you know

22     anything about that location?

23                "A. No.

24                "Q. Okay.

25                "A.  We never saw that address -- we never
```

1    saw the address."

2              MR. SAROKHANIAN:  That concludes the

3    excerpts from Edward Baxter from the plaintiffs, Your

4    Honor.

5              THE COURT:  All right.  Does any other

6    party wish to put in deposition excerpts from the Edward

7    Baxter deposition?

8              MR. ELMQUIST:  None from the trustee, Your

9    Honor.

10             THE COURT:  All right.  Mr. Olson.

11             MR. OLSON:  Yes, ma'am.  Several.

12             THE COURT:  All right.  You may proceed.

13             MR. OLSON:  Starting with Page 4, Line 17

14   to 20.

15             THE COURT:  All right.  I have read those.

16             MR. OLSON:  Page 6, Line 6 through 24.

17             THE COURT:  Okay.  I have read it.

18             MR. OLSON:  Page 7, Line 17 through Page 8,

19   Line 10.

20             THE COURT:  All right.  I read it.

21             MR. OLSON:  Page 20 -- I'm sorry -- I think

22   it would be Page 19 -- they've read that.  Page 24.

23             THE COURT:  Wait.  Was there anything on

24   Page 19?

25             MR. OLSON:  No, ma'am.  They read that in.

```
 1                    THE COURT:  Page 24.
 2                    MR. OLSON:  Line 22 through Page 25, Line
 3   10.
 4                    THE COURT:  Okay.  All right.  I have read
 5   it.
 6                    MR. OLSON:  Page 26, Line 17 through Line
 7   22.
 8                    THE COURT:  Okay.  I have read it.
 9                    MR. OLSON:  Page 27, Line 17 through Page
10   33, Line 19.
11                    THE COURT:  All right.  I have gone through
12   Page 33.
13                    MR. OLSON:  Page 34, Line 15 through Page
14   35, Line 24.
15                    THE COURT:  Let me ask -- I mean are you
16   wanting me basically to read the entire deposition?
17                    MR. OLSON:  That would suit me just fine,
18   yes, ma'am.  I have skipped very little.
19                    MS. HANKS:  I wish we had done this, we
20   would have --
21                    THE COURT:  All right.  Well, I tell you
22   what, during the lunch break I will read the entire
23   deposition.
24                    MR. OLSON:  Thank you.
25                    THE COURT:  All right.  So all of the Ed
```

1  Baxter deposition will be considered by the Court.

2              All right.  Let's take a 10-minute break.

3  And then I assume you're going to call a live witness

4  after this?

5              MR. SAROKHANIAN:  We have one last short

6  deposition, and then we will be live.

7              THE COURT:  All right.  We'll take a

8  10-minute break.  Come back at 11:30.

9              THE CLERK:  All rise.

10             (Break taken.)

11             THE COURT:  All right.  Mr. Olson, you're

12  still standing.  Did you have something you wanted to

13  say?

14             MR. OLSON:  Yes, ma'am.  It was pointed out

15  to me during the break that in these instances where

16  we're adding pages and lines to read, at least in the

17  depositions of Evans, Baxter, and Parsley, those were

18  not designated as exhibits by anybody.  We just want to

19  make sure that they get into the record.

20             THE COURT:  Well, I -- okay.  But by

21  admitting them, are you wanting to expand what I

22  consider?

23             MR. OLSON:  Well, for example, what

24  prompted that was when we took the break, you were going

25  to read Baxter in its entirety.

 1                 THE COURT:  Correct.

 2                 MR. OLSON:  But it wouldn't be in the

 3      record because it wasn't read in.  And again, I don't

 4      care how we handle it, whatever is the most expeditious

 5      way to make sure that we've got a record.

 6                 THE COURT:  All right.  Well, if you want

 7      them marked and admitted as exhibits just to be sure

 8      they make it into the record as opposed to just the

 9      transcript of the reading by Mr. Vital, we can do that.

10                 MR. OLSON:  All right.

11                 THE COURT:  So I have -- again, I have

12      Bernard Brown.  I have Steven Evans.  I have Alvin

13      Dahl --

14                 MR. OLSON:  And those were all designated.

15                 THE COURT:  -- Edward Baxter.  Those are

16      the four -- no --

17                 MR. OLSON:  Troster was designated.

18                 THE COURT:  And Troster.

19                 MR. OLSON:  Troster was an exhibit.

20                 THE COURT:  Troster was already an exhibit.

21                 MR. OLSON:  Dahl was an exhibit.

22                 MS. HANKS:  No.

23                 MR. OLSON:  No?  We didn't read any

24      excerpts either from Dahl, did we?

25                 THE COURT:  From what?

 1              MR. OLSON:  Did we?

 2              MR. SAROKHANIAN:  We read some from Dahl.

 3              MR. OLSON:  No, but I mean I didn't ask for

 4   any that weren't read aloud, I don't think.

 5              THE COURT:  All right.  Well, just to make

 6   it absolutely clear, I guess these get into the record.

 7   Do you want to just -- we'll make these defendant's

 8   exhibits, how's that, just to --

 9              MR. OLSON:  Well, I would like to make the

10   exhibit the exhibit by the party that took the

11   deposition.  I didn't take any of these.  But Evans, for

12   example, would be a plaintiff's exhibit.  I think all

13   the rest of them are going to be trustee's exhibits.

14              MR. SAROKHANIAN:  Your Honor, so we don't

15   take up additional time on this now, may I suggest that

16   we over lunch --

17              THE COURT:  And decide what exhibit numbers

18   you want to give them.

19              MR. SAROKHANIAN:  And how we want to --

20              THE COURT:  Yeah, that's fine.  All right.

21              Are plaintiffs ready to call their next

22   witness?

23              MR. SAROKHANIAN:  We are, Your Honor.  We

24   call David Parsley by deposition.  And I promise it's

25   the last one.

```
 1                    THE COURT:  All right.  Now do I have a
 2   copy of this?
 3                    MR. SAROKHANIAN:  I can approach with a
 4   copy.  Thank you, Your Honor.
 5                    THE COURT:  All right.  Thank you.
 6                    MR. SAROKHANIAN:  I'll be starting on Page
 7   4, Line 15.
 8                    THE COURT:  Okay.  All right.
 9                    "Q.  Yeah, that's not a problem.  We will
10   be done before that.  Okay.  Let's start with a little
11   background.  First of all, where are you currently
12   employed or with whom are you -- by whom are you
13   employed?
14                    "A. I work really as a consultant, a 1099
15   employee for Mr. Comu -- or actually not for Mr. Comu,
16   but for the Regus Advisors.
17                    "Q. Okay.
18                    "A. And I also do the monthly accounting
19   workup for Regus and for The Barclay Group.
20                    "Q. Okay.  So you say you're a 1099
21   employee?
22                    "A. I'm not on a payroll.
23                    "Q. You're not on a payroll.  But you
24   basically -- but you do basically contract work?
25                    "A. Correct.
```

```
 1              "Q. For Regus Advisors?

 2              "A. Part-time, yes.

 3              "Q. Okay.  Part-time work?

 4              "A. Right.

 5              "Q. Okay.  Do you have other employment

 6   beyond the work you do for Regus?

 7              "A. Not currently.  But I can pick up other

 8   jobs from time to time, but I don't currently."

 9              MR. SAROKHANIAN:  Moving to Page 6, Line 4.

10              "Q.  Okay.  And are you responsible for

11   maintaining any kind of business records or documents on

12   behalf of Regus Advisors or The Barclay Group?

13              "A. I'm responsible to prepare the monthly

14   financials."

15              MR. SAROKHANIAN:  Moving to Page 8, Line

16   19.

17              "Q.  And when did you start -- when did you

18   first start doing work for Mr. Comu?

19              "A. I actually started doing work, he asked

20   me in February of 2011 to help him assemble his

21   accounting data so he could prepare his taxes for 2010.

22   And then we also went back into 2009.  So that's the

23   first time I actually did work for him, but I have known

24   him for a long time.

25              "Q. Okay.  When did you first meet
```

001375 CATHY SOSEBEE & ASSOCIATES * LUBBOCK, TEXAS * 806.763.0036

1   Mr. Comu?

2                   "A. 1985."

3                   MR. SAROKHANIAN:  Moving to Page 10, Line

4   7.

5                   "Q.  So the first time that you actually

6   worked with him after the time 1985 and '86 was in

7   February of 2011?

8                   "A. Yes.  When I prepared his -- helped do

9   his books for the first time.

10                  "Q. And when you say, quote, his books, end

11  quote, what books?

12                  "A. Well, I say the companies he was

13  associated with.

14                  "Q. Okay.

15                  "A. The Barclay Group.

16                  "Q. Let's go through them.

17                  "A. Okay.

18                  "Q. Barclay Group.

19                  "A. Yes.

20                  "Q. Regus Realty Partners, LLC.

21                  "A. Yes.

22                  "Q. Regus Advisors --

23                  "A. Yes.

24                  "Q. -- Inc.

25                  "A. Yes.

1          "Q. Regus Capital Fund, LP.

2          "A. Yes."

3          MR. SAROKHANIAN: Moving to Page 12, Line

4     2.

5          "Q. So the only ones you have done any work

6     for is The Barclay Group and various Regus entities?

7          "A. Right. Yes, sir.

8          "Q. Tell me what you did in connection with

9     getting the books and records of Barclay Group in order

10    to prepare tax returns.

11         "A. Well, I worked for the bank statements

12    and started with spreadsheets. That's the only thing I

13    had. Started entering every item from the bank

14    statements onto spreadsheets and then categorized

15    putting them into accounting categories as best I could.

16    And then I would ask him questions about, well, what is

17    this for, what is that for.

18         "Q. Were there business records to look at?

19         "A. He had sent no accounting records, per

20    se.

21         "Q. Okay. Were there any kind of business

22    records like billing invoices or --

23         "A. Not that I looked at I mean. I was

24    primarily doing this for the tax preparation and really

25    didn't need that information to do this for his

1  accounting."

2          MR. SAROKHANIAN:  Your Honor, I'm going to

3  move to Page 16, starting on Line 23.  They will be

4  referring to a document that has been previously

5  admitted as Trustee's Exhibit 24.

6          THE COURT:  Okay.

7          MR. SAROKHANIAN:  Trustee 24.

8          THE COURT:  Okay.

9          "Q.  And I think you indicated that in

10  terms of your preparing this spreadsheet, there were no

11  billing invoices associated with these payments?

12          "A. I did not have access to them, no.

13          "Q. Did you request those?

14          "A. No, I didn't even know there was --

15  there were such a thing at that time.  I was working off

16  of basically trying to just assemble this for the

17  client's purposes.

18          "Q. All right.  Well, let me ask you this:

19  Do you recall having any discussion with Mr. Comu one

20  way or another about whether there were backup documents

21  to support the payments that were made?

22          "A. No, I don't remember having any

23  discussions.  I mean he had a lot of -- he would give me

24  a lot of information that he could remember but...

25          MR. SAROKHANIAN:  Moving to Page 33, Line

```
 1   20.  And they are going to be referring, Your Honor, to

 2   a document marked as Trustee 26 that's been previously

 3   admitted.

 4                   THE COURT:  Okay.

 5                   MR. VITAL:  What page are we on?

 6                   MR. SAROKHANIAN:  We're on Page 33,

 7   starting Line 20.

 8                   "Q.  On the first page of 59, on

 9   September 13, 2011, there's an entry for a wire transfer

10   to Marathon Management.  It says, quote, consulting fees

11   expenses, $100,000, end quote.  Do you see that?

12                   "A. Yes, sir.

13                   "Q. Do you have any information about that

14   expense from the standpoint of what, for instance, do

15   you know whether there's any kind of invoice or anything

16   that would indicate what the consulting fee expense was?

17                   "A. I understand there was an agreement,

18   but I did not see it.  The reason I had Marathon

19   Management consulting fees was because I asked what it

20   was for.  But I did not take the time to actually look

21   at the source documents.

22                   "Q. Okay.  So the information here is

23   basically what Mr. Comu told you?

24                   "A. Yes, sir."

25                   MR. SAROKHANIAN:  Moving to Line 21.
```

1          "Q. What about in general, the category of

2     consulting fee expense?  Did you ever see any kind of

3     invoice or any document to substantiate the consulting

4     fee expense that was being paid to Marathon?

5          "A. No, sir.  I didn't actually physically

6     see the document, no."

7               MR. SAROKHANIAN:  On Page 35 we will be

8     going to Line 12.

9          "Q. In the name of -- in the name column

10    you have, quote, key man life, end quote.  Do you know

11    what that refers to.

12         "A. That was for an insurance -- he told me

13    it was for an insurance policy he was buying.  I know

14    what key man life is as a type of policy.

15         "Q. Did you see the policy?

16         "A. No, sir, I did not."

17              MR. SAROKHANIAN:  Moving to Page 39, Line

18    17.

19         "Q.  Are you familiar with what

20    professional services are performed by Marathon

21    Management?

22         "A. No, sir, I do not.

23         "Q. Are you familiar with what professional

24    services are provided by Regus Advisors?

25         "A. Yes, sir, I know what they -- I know

1   what kind of services they provide.

2                "Q. We will get to that.  I tell you what,

3   let's go ahead and talk about it now.  Tell me what

4   services are performed by Regus Advisors.

5                "A. From what I understand and have seen,

6   Regus Advisors works with companies that want to raise

7   money, that want to take their company public.  And they

8   basically help them package this.  They are very good at

9   their business, but they don't know how to approach and

10  take their company into public market -- into the public

11  market.  And a lot of times they do need to be evaluated

12  in other words, what's your company worth.  And other

13  times they will need somebody to come in and just

14  straighten out a problem.  We also have quite a bit of

15  -- quite a list of experts that work in specific areas

16  that can go in and help solve problems.  So it's not

17  just to help them move their company forward.  But if

18  they do move their company forward, we want to make sure

19  it's working.  So they will put people into positions on

20  their board of directors to help them get the company

21  cleaned up.  A lot of documentation needs to be done.

22  And so there's various phases of that.  They also work

23  on deals, fund-raising deals.  There are a number of

24  different kinds of businesses from algae to Puration

25  water to -- so I would call it Rolodex.  But group of

1    associates in business and he reaches out to them when

2    he needs an expert in this or he needs somebody that has

3    expertise in that.  So that's kind of what Regus does.

4    It helps businesses when they don't have the internal

5    expertise.  They can't afford it due to their size."

6              MR. SAROKHANIAN:  Moving to Line 11 on Page

7    41.  Okay.  Let's talk about that a little bit.

8              "Q. Other man Mr. Comu, who have you dealt

9    with or interacted with as relates to Regus Advisors?

10             "A. Well, there's a Mervyn Price who has

11   quite an extensive business background.  He's the

12   president of Regus Advisors."

13             MR. SAROKHANIAN:  Moving to Page 42, Line

14   6.

15             "Q.  The names you just mentioned, do you

16   know whether these individuals are employees of Regus

17   Advisors or are they just consultants?

18             "A. They are consultants right now.  The

19   company is not big enough to -- just doesn't have -- we

20   don't have any formal payroll yet."

21             MR. SAROKHANIAN:  Moving to Line 25.

22             "Q. How does the -- well, you gave me a

23   description of what Regus does.  Are you familiar what

24   Barclay Group does?

25             "A. Not as much depth because it hasn't

1   been as active.  It's primarily an investment banking

2   raising money and investing money in entities.  It has a

3   different function than Regus.  I mean it has a lot of

4   activity and traveling around, but as far as the deals,

5   they are more -- I call it beat on the street actively

6   pursuing work with Regus than with Barclay at the

7   moment.

8              "Q. Is there anyone at The Barclay Group

9   that you would interact with other than Mr. Comu?

10             "A. Not presently, no."

11             MR. SAROKHANIAN:  Moving to Line 21.

12             "Q. What did Mr. Baxter do?

13             "A. In detail?

14             "Q. Well, in general.

15             "A. Well, he was -- he was part of the

16  fund-raising process for Barclay."

17             MR. SAROKHANIAN:  Moving to Line 40 --

18  excuse me -- Page 45, Line 25.

19             "Q.  Since you became more actively

20  involved in -- you had testified earlier about the fact

21  that you have starting in August of last year become

22  more actively involved in maintaining accounting records

23  for -- well, let's go back to that -- maintaining

24  accounting records for what entities?

25             "A. For The Barclay Group and Regus

1   Advisors.

2              "Q. Regus Advisors, Inc.?

3              "A. Yes, sir.

4              "Q. What do you know about the other Regus

5   entities?  Have you had any -- have you been asked to

6   perform any services for Regus Realty Partners, LLC?

7              "A. And let's combine that with the other

8   Regus capital fund.

9              "Q. Right.

10             "A. Those were entities that were set up

11  for a project that never came to fruition.  There's no

12  activity in either of those accounts.  We set up bank

13  accounts, but it had no activity.

14             "Q. Okay.

15             "A. So yes.  Yes and no.  Yes, I helped set

16  them up, but no, there's been nothing to record."

17             MR. SAROKHANIAN:  Moving to Page 53, Line

18  6.

19             "Q.  Well, let me just ask this question.

20  With respect to cash withdrawals where there would be a

21  money order purchase, is there some kind of bank record

22  reflecting the remitter or, you know, what the purpose

23  was for that cash transaction that you have access to?

24             "A. No, that's been a problem that I have

25  been trying to solve, you know, it's -- you will see

1 it's happening less and less as time goes by."

2         MR. SAROKHANIAN: Moving to Page 61, Line

3 12.

4         "Q. Okay. Going back to the amount to

5 distribute. How was the amount determined? How was the

6 allocation determined between The Barclay Group and TKY

7 Trust?

8         "A. There was a percentage agreed upon and

9 we usually tried to keep it as close to those

10 percentages. Sometimes we got rounded numbers.

11         "Q. You say there was a percentage agreed

12 upon. Tell me what you know about that.

13         "A. I was just told it would be between 12

14 and 15 percent, depending on the amount for TBG.

15         "Q. So it's your understanding that there

16 was a predetermined percentage allocation between The

17 Barclay Group and TKY Trust?

18         "A. Yes.

19         "Q. As relates to how to distribute the net

20 proceeds from the stock sale?

21         "A. Yes.

22         "Q. And that was based on a conversation

23 you had with Mr. Comu?

24         "A. Yes, sir."

25         MR. SAROKHANIAN: Moving to Page 63, Line

```
 1  22.

 2               "Q.  On the right side you have a comment,

 3  "must tie to total ISO distribution report".  Do you see

 4  that?

 5               "A. Yes, sir.

 6               "Q. What is the ISO distribution report?

 7               "A. Well, that's on this -- that's what

 8  these two are.  One is from the ISOs and one's from the

 9  Old Monmouth.  That's why you will notice they are not

10  in the same order."

11               MR. SAROKHANIAN:  Moving to Line 10.

12               "Q. Do you know how the amount due each ISO

13  was determined from transaction to transaction?  Was it

14  a percentage?

15               "A. It's a percentage of the sale they have

16  based on, I think, price.

17               "Q. Was there a predetermined and agreed

18  upon percentage fee payable to each ISO?

19               "A. I believe there was.  I have not ever

20  seen that agreement, but I believe there was.

21               "Q. In part four there's a net to

22  distribute to The Barclay Group and Daptco Trust.  How

23  was the amount of the -- how was this allocation

24  determined, if you know?

25               "A. I was actually told in these cases when
```

1  they are very small amounts, they weren't done by

2  percentage.  They would agree on how much would be split

3  -- I mean we would have to get a minimum just to cover

4  our expenses.  So it was not always a solid percent like

5  it would be on a large transaction.  Doesn't have to

6  have a minimum.

7               "Q. So the numbers reflected here were

8  basically the numbers you were provided by Mr. Comu?

9               "A. Yes, sir.  He would always review this

10  and talk to Mr. Jim and they would work out -- work that

11  out between them.

12               "Q. Was a distribution spreadsheet prepared

13  in advance of the disbursement of funds?

14               "A. Oh, yes.  That's how we calculated the

15  distribution.

16               "Q. So basically you would start with the

17  spreadsheet as a means for determining who got what?

18               "A. Yes, sir.

19               "Q. And you would review that with Mr.

20  Comu?

21               "A. Yes, sir.

22               "Q. And he would provide input with respect

23  to allocation between The Barclay Group and the Daptco

24  Trust or the TKY Trust?

25               "A. Yes, sir."

 1              MR. SAROKHANIAN:  That concludes the

 2   excerpts from Mr. Parsley's deposition from the

 3   plaintiffs, Your Honor.

 4              THE COURT:  All right.  Any other party

 5   wish to put in additional excerpts?

 6              MR. ELMQUIST:  Your Honor, actually I do.

 7   On page 58, Line 20 through 23.

 8              THE COURT:  Okay.  All right.  I have

 9   reviewed that.

10              Mr. Olson.

11              MR. OLSON:  Yes, ma'am, I have several.

12              THE COURT:  All right.

13              MR. OLSON:  Not the entire deposition.

14              THE COURT:  Okay.  You may proceed.

15              MR. OLSON:  Page 5, Line 14 through Page 6,

16   Line 3.

17              THE COURT:  All right.  What else?

18              MR. OLSON:  Page 6, Line 9 through Page 7,

19   Line 8.

20              THE COURT:  Okay.

21              MR. OLSON:  Page 34, Line 13 through Line

22   20.

23              THE COURT:  All right.

24              MR. OLSON:  Page 41, Line 5 through Line

25   10.

```
 1                    THE COURT:  Okay.
 2                    MR. OLSON:  Page 41, Line 17 through Page
 3  42, Line 5.
 4                    THE COURT:  Okay.
 5                    MR. OLSON:  Page 43, Line 13 through Line
 6  20.
 7                    THE COURT:  Okay.
 8                    MR. OLSON:  Page 44, Line 1 through Line 9.
 9                    THE COURT:  Okay.
10                    MR. OLSON:  Page 65, Line 22 through Page
11  66, Line 12.
12                    THE COURT:  All right.
13                    Plaintiffs, are you ready to call your next
14  witness?
15                    MS. HANKS:  We are, Your Honor.
16                    MR. VITAL:  It's not me.
17                    THE COURT:  Good.  We need a break from
18  you.
19                    MR. VITAL:  I need a break from myself.
20                    THE COURT:  Okay.
21                    MR. SAROKHANIAN:  Your Honor, the
22  plaintiffs are calling Christopher McNeill.
23                    THE COURT:  All right, Christopher McNeill.
24  All right.  Welcome back, Mr. McNeill.  If you could
25  approach the witness stand and raise your right hand to
```

 1   be sworn.

 2                    THE WITNESS:  Right here?

 3                    THE COURT:  Yes.

 4                        CHRISTOPHER MCNEILL,

 5   having been first duly sworn, testified as follows:

 6                    THE COURT:  All right.

 7                        DIRECT EXAMINATION

 8   BY MS. HANKS:

 9       Q.    Mr. McNeill, could you please state your name

10   for the record?

11       A.    Christopher Mills McNeill.

12       Q.    And how do you spell your last name?

13       A.    M-C-N-E-I-L-L.

14       Q.    And you are an attorney; is that correct?

15       A.    That's correct.

16       Q.    And with whom do you work?

17       A.    Block & Garden, LLP.

18       Q.    Are you a partner with Block & Garden?

19       A.    Yes.

20       Q.    And how long have you been with Block & Garden?

21       A.    Since the firm was established in May 2007.

22       Q.    And in your role at Block & Garden, have you

23   had occasion to do business with Mr. Comu, Mr. C.J.

24   Comu?

25       A.    Yes, we represent The Barclay Group.

1      Q.   Do you currently represent The Barclay Group?

2      A.   Yes.

3      Q.   You do?  And when did that representation

4  begin?

5      A.   I don't know the exact date.  Probably 2008 or

6  2009.

7      Q.   And what was the first project that you did for

8  The Barclay Group?

9      A.   I don't recall specifically.  It could have

10 been -- could have been a project relating to Green

11 Automotive.

12     Q.   And that would be referencing the Green

13 Automotive merger that occurred in late 2009?

14     A.   Yes.

15     Q.   And in that capacity, are you testifying that

16 you represented The Barclay Group?

17     A.   Correct.

18     Q.   Okay.  And you were retained in advance of the

19 merger transaction by The Barclay Group?

20     A.   I believe that's correct, yes.

21     Q.   And what services did Block & Garden perform on

22 behalf of The Barclay Group, specific to the Green Auto

23 transaction, if you can recall?

24     A.   Okay.  Can we clarify for the record?  Has The

25 Barclay Group waived the attorney/client privilege with

1  respect to my testimony?

2      Q.   Most of what we're asking about is a matter of

3  public record.  In fact, some of it is a matter of

4  stipulation, but I assume if there's an issue that's

5  subject to privilege that Mr. Olson will object.

6             MR. OLSON:  We will waive it, if that makes

7  anybody feel better.

8             THE COURT:  All right.

9      Q.   (BY MS. HANKS)  I don't think we will ask you

10  anything that's not -- I mean all of these are public

11  transactions, are they not?

12      A.   No, not necessarily.

13      Q.   Was Green Auto a public transaction?

14      A.   Part of it.

15      Q.   Part of it?

16      A.   Yes.

17      Q.   Okay.  And what part of it was not a public

18  transaction?

19      A.   The initial acquisition of the controlling

20  stock of Ganas Corp.

21      Q.   It's pronounced Ganas?

22      A.   I don't know for sure.

23      Q.   I've always said Ganas, but tomato-tomato.  So

24  you're referencing The Barclay Group's acquisition of

25  Ganas Corp. in October of 2009; is that correct?

1     A.   Yes.

2     Q.   Okay.  What I'm going to do is move a little

3  bit ahead here since you have raised this, and I will

4  tell you that a number of these, you know, are subject

5  -- that I'm going to ask you about are the subject of

6  stipulated facts.

7     A.   Okay.

8     Q.   And so -- but I do think that it's helpful to

9  the Court and to the parties since you were involved in

10 this transaction -- is that correct -- you assisted

11 Barclay Group personally in this transaction with the

12 documents and all of that?

13    A.   That's correct.

14    Q.   So I would just like to walk through it real

15 quick to get, you know, a little context for the Court

16 regarding the transaction.  Now, you referred to a

17 corporation called Ganas.  As I understand it that's

18 G-A-N-A-S Corp; is that correct?

19    A.   Yes.

20    Q.   And that was a Delaware corporation?

21    A.   I believe so.

22    Q.   And they were a reporting corporation, but they

23 weren't operating at the time, is that correct?

24    A.   I believe they may have been reporting under

25 the pink sheets.

1    Q.   Okay.

2    A.   I don't believe they were reporting with the

3 SEC.

4    Q.   Okay.  And could you just describe the --

5 explain the distinction.

6    A.   Yes.  There's what's known as the pink sheet

7 markets, over-the-counter markets I think is the formal

8 term, where stock although not registered with the SEC

9 may be traded between buyers if certain information

10 required under SEC rules is made available under the

11 purview of a broker.

12    Q.   Okay.  And what is the difference between just,

13 generally speaking, a company that reports on the OTC

14 bulletin -- is that the correct term?

15    A.   Yes.

16    Q.   On the pink sheets versus a company that's SEC

17 reporting.

18    A.   Typically the SEC reporting requirements are

19 much more comprehensive.

20    Q.   Okay.  And when you say comprehensive, do you

21 mean more volume or more rigor?

22    A.   You have more frequent filings typically.  Also

23 you have more items that you may need to disclose.

24    Q.   I see.  So there's less disclosure requirements

25 for a company that's reporting on the OTC?

1        A.    I believe so.

2        Q.    (Inaudible).

3        A.    I'm not -- wouldn't hold myself out to be an

4    OTC disclosure expert.

5        Q.    Okay.  And is that one of the reasons that you

6    tend to see stocks with -- well, you hear penny stocks,

7    that term sort of thrown around.  Stocks that have very

8    small price but high volume of trading.  Do you tend to

9    see those a lot on the pink sheets?

10       A.    Again, I don't closely follow pink sheets, but

11   that's my understanding.

12       Q.    Okay, thanks.  And now, the Green Auto merger

13   was a reverse merger; is that correct?

14       A.    Bear with me a second.  It's been several

15   years.

16       Q.    Of course.  In fact, tell you what --

17              MS. HANKS:  If we could pull up Trustee

18   Exhibit 19, please.

19       Q.    (BY MS. HANKS)  It will come up on the screen.

20   Do you recognize this document?

21       A.    Yes.

22       Q.    And do you recognize this to be the merger

23   agreement and plan of reorganization between Go Green,

24   LLC and Ganas Corp with The Barclay Group, Inc., as a

25   party?

1        A.   That's what it looks like from the first page,

2   yes.

3        Q.   Okay.

4             MS. HANKS:   And could you scroll to the

5   signature page, please?

6        Q.   (BY MS. HANKS)   And here we have the signature

7   page.  Do you recognize the signatories to the

8   agreement?

9        A.   Yes, I recognize these names.

10       Q.   And so please correct me if I'm stating this

11   not correctly, but C.J. Comu here is executing this

12   document as president of Ganas Corp.; is that correct?

13       A.   That's what it reflects.

14       Q.   And he is also executing this merger agreement

15   as president of The Barclay Group; is that correct?

16       A.   That's what the document reflects, yes.

17             MS. HANKS:   Okay.  Could you go to the top,

18   please?

19       Q.   (BY MS. HANKS)   And the date of this agreement

20   is November 4th, 2009; is that correct?

21       A.   Yes, that's what the document reflects.

22       Q.   Okay.  Does this refresh your recollection at

23   all with regards to the nature of the merger?

24       A.   Yes.  But I don't -- the term reverse merger is

25   a tax term which --

1      Q.   I tell you what, let me offer a more lay law

2    term and see if this comports with your understanding.

3    Go Green, LLC, an operating entity, was merged into the

4    operating shell of Ganas Corp.  Ganas Corp. changed its

5    name to Green Automotive Company Corporation immediately

6    following the merger and then issued stock certificates

7    to the former Go Green shareholders and to new

8    shareholders, including The Barclay Group.  Does that

9    sound familiar?

10     A.   Yes, I'm not -- I don't recall specifically

11   about issuing new shares to shareholders, but yes, Go

12   Green LLC was merged into Ganas Corp.  Ganas Corp.

13   survived the merger under the new name Green Automotive

14   Company Corporation, and shares of stock were issued to

15   the equity owners or members of Go Green, LLC, yes.

16     Q.   Okay.  So I'm going to back up a little bit to

17   the weeks leading up to the merger.  As I understand,

18   you assisted with the drafting and revision of the

19   merger agreement documents; is that correct?

20     A.   That's correct.

21          MS. HANKS:  Could you please pull up KLM

22   Exhibit 249?

23          I'm not sure if there's an objection to

24   this, Your Honor.

25          MR. VITAL:  What's the number?

1           MS. HANKS:  KLM Exhibit 249.

2           MR. VITAL:  There's no objection.

3           THE COURT:  It's been admitted.

4      Q.  (BY MS. HANKS) Do you recognize this email,

5  Mr. McNeill?

6      A.  I don't recall this one specifically, but I see

7  that it appears that I sent it out in October 2009.

8      Q.  Okay.  And what does the subject of the email

9  appear to be?

10      A.  Ganas Corp.

11      Q.  And this is the shell that we were just

12  speaking of; is that correct?

13      A.  Yes.

14      Q.  And based on your email, the language in your

15  email, what is the purpose, what is attached to it and

16  what is this agreement supposed to be?

17      A.  A stock purchase agreement pursuant to which

18  The Barclay Group would acquire 100 percent of the issue

19  in outstanding capital stock of Ganas Corp.

20      Q.  Okay.  And is this the private side of the

21  transaction you referred to just a bit ago?

22      A.  Yes.

23      Q.  Okay.  So The Barclay Group acquired or

24  intended to acquire 100 percent of the outstanding

25  common stock of this shell entity called Ganas Corp., a

 1   Delaware corporation; is that correct?

 2       A.   Yes.

 3       Q.   Okay.  And what was the purpose of acquiring

 4   that stock?

 5       A.   So that it would control the shell and it could

 6   then use it to conduct the merger with Go Green or

 7   another company like Go Green that was looking to go

 8   public through the pink sheets.

 9       Q.   Okay.  And I don't think we need to look at the

10   agreement on this one.

11            MS. HANKS:  Actually if you will go to KLM

12   Exhibit 250, please.

13       Q.   (BY MS. HANKS)  And KLM Exhibit 250 is an email

14   from you to C.J. Comu and Stephen Block.  As I

15   understand he's one of your partners; is that correct --

16       A.   That's correct.

17       Q.   -- at Block & Garden.  Dated October 15th,

18   2009, and it's CC'd to Dave Welch.  Who is Dave Welch,

19   do you recall?

20       A.   If I recall correctly, he was one of the

21   individuals involved with Green Automotive.

22       Q.   He was -- when you say Green Automotive -- when

23   you say Green Automotive, do you mean Green Automotive

24   the surviving company after the merger or do you mean

25   before the merger?

 1        A.   At this time it would have been the Go Green,

 2   LLC prior to the merger.

 3        Q.   Okay.  So you think that Dave Welch was

 4   involved with Go Green, LLC?

 5        A.   Best I recall, yes.

 6        Q.   If you could look at the body of your email,

 7   please.  And your email is directed to C.J.; is that

 8   correct?

 9        A.   Yes.

10        Q.   And it says "at the closing of the merger, The

11   Barclay Group, Inc. will own the 95,746,817 shares

12   currently outstanding?

13        A.   I see that.

14        Q.   And is that referring to the outstanding common

15   stock in Ganas Corp.?

16        A.   That would have been the shares that The

17   Barclay Group purchased that were already outstanding in

18   Ganas Corp., yes.

19        Q.   And if I understand correctly, those are

20   different from -- those are the shares in Ganas Corp.,

21   the shell, that's different from the equity held by the

22   owners of Go Green, LLC that was going to be merged into

23   the shell; is that correct?

24        A.   Correct.

25        Q.   Okay.  So we've got two different buckets.

1   We've got the Go Green owners, you know, shares,

2   whatever percentage that is and we've got TBG's Ganas'

3   shares; is that correct?

4        A.   Correct.

5        Q.   Okay.  Now here you say -- and I think the

6   second sentence there is talking about what I just

7   mentioned about there being a distinction between the

8   shares owned by Go Green, LLC and the shares acquired by

9   TBG?

10       A.   Yes.  The Barclay Group would retain the shares

11  that it owned and then new shares would be issued to Go

12  Green's members in connection with the merger.

13       Q.   Okay.  Thank you.  Now, the last sentence in

14  that first paragraph starting with, "accordingly", could

15  you please read that?

16       A.   "Accordingly, if the 95,746,817 shares held by

17  Barclay will represent 40 percent post merger then the

18  Go Green members must receive 143,620,225 newly issued

19  shares for a total of 239,367,042 shares issued in

20  outstanding post merger.

21       Q.   Okay.  Now, why -- do you recall why there was

22  a discussion about 40 percent post merger?

23       A.   Not specifically, no.

24       Q.   You don't?  Okay.

25            MS. HANKS:  If you could please pull up KLM

1  Exhibit 251.  And could you please scroll down a bit to

2  the beginning of that email string?  Okay.

3      Q.   (BY MS. HANKS)  And just for context here,

4  earlier in the email string there's an email from you to

5  C.J. Comu at gmail.com.  That's C.J.'s email address,

6  Mr. Comu's email address; is that correct?

7      A.   I believe so, yes.

8      Q.   And it is attaching an initial draft of the

9  merger agreement between Ganas Corp. and Go Green, USA?

10     A.   That's what the email states, yes.

11     Q.   And in response to this email --

12          MS. HANKS:  If you could please move up.

13     Q.   (BY MS. HANKS)  Or a subsequent email indicates

14 that you made some revisions to the stock purchase

15 agreement whereby Barclay Group was going to be

16 acquiring stock; is that correct?

17     A.   No, I don't believe so.  I believe this refers

18 to a change I made to the merger agreement.

19     Q.   Okay.  And this is where you reference "I

20 deleted one clause that contemplated that Ganas

21 stockholder approval is required" and your -- and that's

22 referencing stockholder approval of the merger

23 agreement?

24     A.   Yes.

25     Q.   Okay.

1           MS. HANKS:  And if you could go up to see

2    Mr. Comu's response and the final reply by Mr. McNeill.

3           Q.  (BY MS. HANKS)  Mr. Comu acknowledges this.

4    And I'm -- I would like to understand what you meant by

5    this -- by your response, if you can remember.  You said

6    that there was a minor drafting inconsistency when you

7    were looking at suggestions from Mr. Comu.  And that

8    your -- I believe what this is trying to say, and I'm

9    not trying to testify, but it was a strategic way to

10   minimize The Barclay Group's risk and maximize the value

11   of its 40 percent in Go Green post merger.  Do you have

12   any recollection about what that's referring to?

13          A.  I truly don't.

14          Q.  But there was a strategy to make sure that TBG

15   retained 40 percent interest in Green Auto?

16          A.  I do recall that was one piece of the document,

17   yes.

18          Q.  Okay.  And all this was happening in October

19   of 2009?

20          A.  Yes.

21          Q.  Okay.  And Mr. Comu was actively involved in

22   that process?

23          A.  Yes.

24          Q.  Was he the point person in the merger

25   discussions?

1      A.   He was my point person.

2      Q.   Okay.  Did he bring the deal to Block & Garden

3  and retain you to help with the agreement?

4      A.   Yes.

5      Q.   Did he facilitate communication with the other

6  parties in terms of distributing agreements and drafts?

7      A.   I don't recall.

8           MS. HANKS:  If you go to 291, please.

9      Q.   (BY MS. HANKS)  And before I do this, let me

10  ask you a question.  There were some -- your

11  understanding of The Barclay Group's legal name, is it

12  The Barclay Group, Inc.?

13     A.   That's my understanding, yes.

14     Q.   There were some documents that were drafted for

15  "Barclay Group, Inc.", and some that were drafted for

16  "The Barclay Group, Inc.", was that intentional or a

17  mistake, do you remember?

18     A.   That would likely have been an unintentional

19  discrepancy.

20     Q.   Okay.  This is Mr. Comu's response to your

21  email concerning the outstanding shares the segregation

22  of shares between Go Green owners and TBG or the Ganas

23  shares, which had been -- which were going to be

24  acquired by TGB if I understand your previous testimony,

25  the documents correctly.

 1        A.   Yes.  At this point it may have already been
 2   acquired, I don't remember the exact date.
 3        Q.   I'm not sure it has, but we will get to that in
 4   just a second.  Okay.
 5             MS. HANKS:  So just one more.  If you go to
 6   292, please, and then we will quickly walk through the
 7   documents on the merger.
 8        Q.   (BY MS. HANKS)  Okay.  Here Mr. Comu -- well,
 9   please read the email and tell us what this email is
10   telling you.
11        A.   Okay.
12        Q.   This is getting close to closing; is that
13   correct?
14        A.   Yes, closing or at least finalization of the
15   former, the documents for closing.
16        Q.   Okay.  And Mr. Comu's meeting with both -- he's
17   obviously discussing with you contracts to purchase the
18   Ganas shares, but he's also meeting with the Go Green
19   management team which is the entity that's merged into
20   Ganas; is that correct?
21        A.   Yes, that's what the email reflects.
22        Q.   So he's taking a significant role on both sides
23   of the transaction; is that correct?
24        A.   Yes.
25        Q.   I think we've shown you Exhibit 19, which is

1    the merger agreement that was dated on November 4th.

2                    MS. HANKS:  But quickly, if we could go to

3    Trustee Exhibit 78 -- or actually, I'm sorry -- Trustee

4    Exhibit 74.  It's up here.

5        Q.   (BY MS. HANKS)  This is a stock purchase

6    agreement with respect to Ganas Corp. between Barclay

7    Group, Inc. and Rountree & Associates.  Do you recall

8    this agreement?

9        A.   Yes.

10       Q.   And it's dated October 26, 2009; is that

11   correct?

12       A.   Yes.  That's what it reflects.

13                   MS. HANKS:  Could you go down please.

14       Q.   (BY MS. HANKS)  And could you identify the

15   amount of shares that are being purchased by The Barclay

16   Group, Inc. by virtue of this agreement?

17       A.   It reflects $3.5 million shares.

18       Q.   And do you know the return consideration for

19   that?

20       A.   I would have to look further along in this

21   document.

22                   MS. HANKS:  The top of the next page.

23   There we go.

24                   THE WITNESS:  Would you mind scrolling up

25   so it covers that entire sentence?

1      A.   It looks like the consideration was a

2  promissory note in the original principal amount of

3  $25,000.

4      Q.   Okay.  And by virtue of that, acquires

5  3.5 million shares?

6      A.   Yes.

7      Q.   Is that correct?

8      A.   That was the consideration for those shares.

9      Q.   Okay.

10         MS. HANKS:  Trustee Exhibit 75, please.

11     Q.   (BY MS. HANKS)  This is the second stock

12 purchase agreement regarding Ganas Corp., again, with

13 Barclay Group, Inc.  And in your view, you think that's

14 probably a mistake that it was identified as "Barclay

15 Group, Inc." and not "The Barclay Group, Inc."?

16     A.   Yes, the two names are interchangeable in my --

17 as far as I know.

18     Q.   Okay.  And again, this is dated October 26,

19 2009; is that correct?

20     A.   That's what it states, yes.

21         MS. HANKS:  Could you move down a little

22 bit, please?

23     Q.   (BY MS. HANKS) And what is the total number of

24 shares being acquired by virtue of this agreement?

25     A.   91,920,116.

1        MS. HANKS:  And if you could go down,

2   please, to the next page, please.

3        Q.   (BY MS. HANKS)  And the purchase price?

4        A.   $75,000 in the aggregate.

5        Q.   So with the addition of the $25,000 that was

6   being paid to Rountree & Associates, there's about

7   $100,000 being paid for the outstanding shares of Ganas

8   Corp.; is that correct?

9        A.   That's what these two documents reflect.

10       Q.   Okay.

11            MS. HANKS:  And could you go to the

12   signatory page, please?

13       Q.   (BY MS. HANKS) Do you recall this document

14   being executed by Mr. Comu?

15       A.   Yes, I believe so.

16            MS. HANKS:  There we go.

17       Q.   (BY MS. HANKS)  And the buyer's identified as

18   Barclay Group, Inc., C.J. Comu, president?

19       A.   That's what this reflects, yes.

20       Q.   Okay.  And so we've got two stock purchase

21   agreements 95 million shares approximately in Ganas

22   Corp. on October 26; is that correct, summarizing?

23       A.   Yes, that's what these documents reflect.

24            MS. HANKS:  Okay.  If we could go to

25   Trustee Exhibit 80 and 81, please.

1    Q.   (BY MS. HANKS) Okay.  If you can take a quick

2  look at KLM Exhibit 80 and KLM Exhibit 81 and describe

3  for the court what these documents are doing.

4    A.   Okay.  This was after The Barclay Group had

5  acquired ownership of a majority of the outstanding

6  stock of Ganas Corp.  Exhibit 81 is The Barclay Group in

7  its capacity as the majority stockholder electing two

8  directors, C.J. Comu and Saul -- I can't quite.

9    Q.   Albom, is that possible A-L-B-O-M?

10    A.   Yes, something like that, as the two directors

11  of the company.

12    Q.   Okay.  So Mr. Comu is executing a document as a

13  director of Ganas Corp. that elects him as president of

14  Ganas Corp.?

15    A.   Sorry.  I was looking at 81 first.

16    Q.   I apologize.

17    A.   Because actually 81 comes first in the time

18  line.

19    Q.   Okay.

20    A.   In 81, The Barclay Group -- Mr. Comu is

21  executing on behalf of The Barclay Group in his capacity

22  as the majority stockholder to elect Mr. Comu and

23  Mr. Albom as directors.

24    Q.   Okay.

25    A.   Then next in sequence is Exhibit 80 pursuant to

1  which those two individuals as the directors of Ganas

2  Corp. appointed Mr. Comu as president and Mr. Albom as

3  secretary of Ganas Corp..

4      Q.   Okay.  So how do you know which one does come

5  first, because Mr. Comu executes the document that

6  appoints -- in which he's appointed as a director and he

7  also executes the document in which he's appointed as

8  president and he executes in the alternative capacity?

9      A.   Well, Exhibit 80 reflects Mr. Comu's and

10  Mr. Albom's -- are citing in their capacity as

11  directors.

12      Q.   Okay.

13      A.   And they would not have the authority to sign

14  in that capacity but for Exhibit 81 which was signed

15  first which designated them as directors.

16      Q.   Okay.  Thank you.  So as of October 28th, 2009,

17  Mr. Comu has been elected president and director of

18  Ganas Corp.; is that correct?

19      A.   Yes, that's correct.

20      Q.   Okay.  Now we have looked at Trustee Exhibit 19

21  which is the merger agreement.

22          MS. HANKS:  If we could look at Trustee

23  Exhibit 79 and 78, please.

24          And if you would show the signature line on

25  both of those documents, if possible.