**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | |
|---|---|---|---|
| **In Re: Cengiz J. Comu** | **Debtor** | § | **Case No. 09-38820 SGJ7** |
| **Cengiz J. Comu, et al** | | § | |
| | Appellant | § | |
| vs. | | § | 10-03269 |
| **King Louie Mining, LLC, et al** | | § | |
| | Appellee | § | |

**148 Judgment revoking discharge of debtor Entered 7/8/14**
**VOLUME 7**
**APPELLANT RECORD**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |
| and | § |
| | § |
| PHYLLIS E. COMU, | § |
| BERNARD D. BROWN, | § |
| THE BARCLAY GROUP, INC. AND | § |
| SUNSET PACIFIC, L.P., | § |
|     Third-party Defendants. | § |

*I XIDEX*

**APPELLANT'S FIRST AMENDED DESIGNATION
OF RECORD AND ISSUES ON APPEAL**

Page 1

## APPELLANT'S FIRST AMENDED DESIGNATION OF RECORD
## AND ISSUES ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Cengiz J. Comu, Appellant, and files this his First Amended Designation of Record and Issues on Appeal for the Judgment entered July 8, 2014 [Document No. 148] as follows:

I.    Appellant designates the following documents from the docket sheet in Adversary Case No. 10-03269 for the Record on Appeal:

[Intentionally left blank]

| Filing Date | # | Docket Text |
|---|---|---|
| 08/27/2014 | 164 | Notice of appeal . Fee Amount $298 filed by Defendant Cengiz J. Comu (RE: related document(s)148 Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed)). Appellant Designation due by 9/10/2014. (Moroles, D.) |
| 07/08/2014 | 148 | Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed) (Rielly, Bill). |
| 07/08/2014 | 147 | Findings of fact and conclusions of law in support of judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Rielly, Bill) |
| 09/09/2014 | | Docket Sheet |
| 10/07/2010 | 5 | Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 11/08/2010 | 8 | Motion for leave *to Amend* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/29/2010. (Attachments: 1 First Amended Complaint2 Exhibit A3 Exhibit B4 Exhibit C) (Lippe, Emil) |
| 11/08/2010 | 9 | Response opposed to (related document(s): 5 Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 01/10/2011 | 10 | Order denying motion to dismiss adversary proceeding as moot (related document # 5), granting motion for leave to amend complaint(related document # 8) Entered on 1/10/2011. Case is removed from docket for week of January 11, 2011. Counsel ORDERED to confer and submit proposed amended scheduling order for the trial of this case, to be submitted within 10 days from date of this Order. (Mathews, M.) |

*Vol. 2*
*000211*

*000215*

*000263*

*000273*

_Vol. 2_

| | | | |
|---|---|---|---|
| 006275 | 01/20/2011 | 12 | Motion to dismiss adversary proceeding *(SECOND)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000279 | 02/11/2011 | 16 | Response opposed to (related document(s): 12 Motion to dismiss adversary proceeding *(SECOND)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000287 | 02/24/2011 | 17 | Order conditionally denying second motion to dismiss adversary proceeding (related document # 12) Entered on 2/24/2011. Plaintiffs are ORDERED to file amended complaint within 20 days of entry of this order. Defedant is ORDERED to file an answeror responsive pleading within 20 days of filing of the amended complaint. (Mathews, M.) |
| 000290 | 03/02/2011 | 19 | Motion for leave *to Prosecute Action* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 3/23/2011. (Lippe, Emil) |
| 000293 | 03/02/2011 | 20 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) (Lippe, Emil) |
| 000340 | 03/23/2011 | 23 | Order denying motion for leave to prosecute action without prejudice (related document # 19) Entered on 3/23/2011. (Simpson, B) |
| 000342 | 03/24/2011 | 24 | Motion to dismiss adversary proceeding *(THIRD)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000345 | 04/19/2011 | 28 | Agreed Order granting 27 Motion to extend time to file response to motion to dismiss until 4/28/2011. Entered on 4/19/2011. (Simpson, B) |
| 000347 | 04/28/2011 | 30 | Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding *(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000357 | 05/04/2011 | 31 | Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding) *[Unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |
| 000361 | 05/06/2011 | 32 | Order granting motion to continue hearing on (related document # 31) (related documents Motion to dismiss adversary proceeding *(THIRD)* and *20* Amended Complaint) Entered on 5/6/2011. Hearing to be held on 7/11/2011 at 10:30 AM Dallas Judge Jernigan Ctrm for 24, Trial Docket Call date reset for 9/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Mathews, M.) Modified text on 5/6/2011 (Mathews, M.). |
| 000 363 | 07/06/2011 | 36 | Second Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding) *[unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |

*Vol. 2*

| | | | |
|---|---|---|---|
| **000367** | 07/08/2011 | 37 | Order granting second unopposed motion to continue hearing on (related document # 36) (related documents Amended complaint, Motion to dismiss adversary proceeding*(THIRD)*) Entered on 7/8/2011. Hearing to be held on 9/15/2011 at 09:30 AM Dallas Judge Jernigan Ctrm for 24 Third motion to dismiss and for Trial Docket Call date set for 12/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. Further conditions per Order. (Mathews, M.) |
| **000369** | 08/24/2011 | 39 | Agreed Motion to Abate Adversary Proceeding (related document(s)1 Complaint) Filed by Interested Party Diane G. Reed (Elmquist, David) Modified TEXT on 8/25/2011 (Blanco, J.). |
| **000374** | 08/31/2011 | 40 | Agreed Order granting motion to abate adversary proceeding (related document # 39) Entered on 8/31/2011. (Mathews, M.) |
| **000377** | 05/24/2012 | 48 | Supplemental Order granting agreed motion to abate adversary proceeding including any hearing on the motion to dismiss, abated until August 1, 2012 further conditions per order (related document # 39 agreed motion to abate ) Entered on 5/24/2012. (Moroles, D.) |
| **000379** | 08/07/2012 | 50 | Order terminating abatement of adversary proceeding and requiring: (A) Trustee's Complaint in Intervention to be filed by August 31, 2012; and (B) parties to upload Agreed Scheduling Order, or in the alternative, Court will enter its own Scheduling Order (related document # 39) Entered on 8/7/2012. Further details per Order. (Mathews, M.) |
| **000381** | 09/05/2012 | 53 | Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) |
| **000395** | 09/06/2012 | 54 | Order granting Trustee's Unopposed Motion to Extend Deadline to File a Complaint in Intervention 52 Motion to extend time. Ordered that the deadline is hereby extended to September 5, 2012. Entered on 9/6/2012. (Tello, Chris) |
| **000397** | 09/20/2012 | 59 | Agreed Scheduling Order Entered on 9/20/2012 (RE: related document(s)20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial Docket Call date set for 7/8/2013 at 01:30 PM at Dallas Judge Jernigan Ctrm. Hearing on Defendant Cengiz J. Comu's Third Amended Motion to Dismiss Case is set for 10/31/2012 at 9:30 AM. (Mathews, M.) MODIFIED hearing dates on 9/21/2012 (Mathews, M.). |
| **000401** | 09/28/2012 | 61 | Supplemental Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| **000406** | 09/28/2012 | 62 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against |

| | | | |
|---|---|---|---|
| *Vol. 2* | | | Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Lippe, Emil) |
| *000429* | 10/09/2012 | 64 | Answer to Intervenor complaint (Related document: 53 Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) filed by Bernard D Brown, Cengiz J. Comu, Phyllis E. Comu, Sunset Pacific, L.P., The Barclay Group, Inc.. (Olson, Dennis) Modified text on 10/9/2012 (Tello, Chris). |
| *000433* | 10/09/2012 | 65 | Reply to (related document(s): 30 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 61 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Defendant Cengiz J. Comu. (Olson, Dennis) |
| *000437* | 10/26/2012 | 66 | Motion to appear pro hac vice for David H. Wander. Fee Amount $25 filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit) (Lippe, Emil) |
| *000441* | 10/29/2012 | 68 | Motion for leave *to File Third Amended Complaint and Brief in Support* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Lippe, Emil) |
| *Vol. 3* *000451* | 10/30/2012 | 69 | Motion for leave *to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Attachments: # 1 Exhibit A - Surreply# 2 Proposed Order) (Lippe, Emil) |
| *000470* | 10/31/2012 | 70 | Order granting motion to appear pro hac vice adding David H. Wander for Ronald Katz and King Louie Mining, LLC (related document # 66) Entered on 10/31/2012. (Mathews, M.) |
| *000471* | 11/02/2012 | 71 | Order denying Plaintiffs' motion for leave to file Third Amended Complaint (related document # 68) Entered on 11/2/2012. (Mathews, M.) |
| *000473* | 11/02/2012 | 72 | Order denying Plaintiffs' motion for leave to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss (related document # 69) Entered on 11/2/2012. (Mathews, M.) |
| *000475* | 11/14/2012 | 76 | Order denying motion to dismiss adversary proceeding (related document # 24) Entered on 11/14/2012. (Mathews, M.) |
| *000477* | 12/07/2012 | 78 | Answer to complaint *(Second Amended) to Revoke Discharge* filed by Cengiz J. Comu. (Olson, Dennis) |
| *000481* | 06/07/2013 | 88 | Motion to substitute attorney Emil Lippe, Jr., Law Offices of Lippe & Associates with Shari L. Heyen, Kendyl T. Hanks and Charles P. Floyd, Greenberg Traurig, LLP *and for Withdrawal of Attorney Emil Lippe, Jr., Law Offices of Lippe & Associates,* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| 000785 | 06/12/2013 | 89 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Agreed Scheduling Order) (Heyen, Shari) |
| 000795 | 06/21/2013 | 90 | Agreed order granting motion to amend scheduling order (related document # 89) Trial Docket Call date set for 9/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 6/21/2013. (Rielly, Bill) |
| 000797 | 06/21/2013 | 91 | Order granting motion to substitute attorney adding Shari L. Heyen for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Kendyl T. Hanks for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Charles P. Floyd for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, terminating Emil Lippe, Jr.. (related document # 88) Entered on 6/21/2013. (Rielly, Bill) |
| 000562 | 07/19/2013 | 94 | Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order) (Lippe, Emil) |
| 000539 | 08/12/2013 | 96 | Response opposed to (related document(s): 94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Heyen, Shari) |
| 000598 | 08/14/2013 | 97 | Reply to (related document(s): 96 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Lippe, Emil) |
| 000606 | 08/21/2013 | 98 | Order denying motion to intervene (related document # 94) Entered on 8/21/2013. (Rielly, Bill) |
| 000608 | 08/23/2013 | 99 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Agreed Order to Amend Scheduling Order) (Heyen, Shari) |
| 000617 | 09/13/2013 | 101 | Agreed order granting motion to amend scheduling order (related document # 99) Trial Docket Call date set for 12/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 9/13/2013. (Rielly, Bill) |
| 000621 | 11/25/2013 | 103 | Witness and Exhibit List *for Trial, per Scheduling Order* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000624 | 11/25/2013 | 104 | Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Order) (Heyen, Shari) |

*Vol. 3*

| | 11/27/2013 | 105 | Support/supplemental document *(Supplement to Plaintiffs' Motion for Continuance of Scheduling Order Deadlines and Trial)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)104 Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding)). (Heyen, Shari) |
|---|---|---|---|
| 000630 | | | |
| 000633 | 12/09/2013 | 106 | Agreed order granting motion to amend scheduling order (related document # 104) Entered on 12/9/2013. Trial Docket Call date set for 3/3/2014 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000637 | 12/20/2013 | 108 | Motion for preliminary injunction *(expedited)* filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| 000647 | 12/20/2013 | 109 | Motion for expedited hearing(related documents 108 Motion for preliminary injunction) filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| 000651 | 12/20/2013 | 110 | Order granting ex parte motion for expedited hearing (Related Doc# 109)(document set for hearing: 108 Motion for preliminary injunction) Entered on 12/20/2013. Hearing to be held on 12/23/2013 at 09:30 AM Dallas Judge Jernigan Ctrm for 108, (Rielly, Bill) |
| 000653 | 12/20/2013 | 111 | Agreed order granting motion for temporary restraining order (related document 108) Entered on 12/20/2013. Preliminary injunction hearing to be held on 1/3/2014 at 09:30 AM Dallas Judge Jernigan Ctrm (Rielly, Bill) |
| 000656 | 01/03/2014 | 116 | Agreed Order Continuing Temporary Restraining Order (related document # 108) Entered on 1/3/2014. (Jones, A.) |
| 000659 | 02/24/2014 | 118 | Amended Witness and Exhibit List filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)103 List (witness/exhibit/generic)). (Olson, Dennis) |
| 000662 | 02/24/2014 | 119 | Witness and Exhibit List *for Trial* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)62 Amended complaint). (Elmquist, David) |
| *Vol. 4*<br>000670 | 02/24/2014 | 120 | Witness and Exhibit List filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000722 | 02/26/2014 | 121 | Stipulation by Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC and All Defendants. filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)106 Order on motion to amend scheduling order). (Heyen, Shari) |
| 000726 | 03/03/2014 | 124 | Stipulation by Diane G. Reed and Plaintiffs and Defendants. filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint, 62 Amended complaint). (Elmquist, David) |
| 000729 | 03/03/2014 | 125 | Proposed findings of fact and conclusions of law filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint). (Elmquist, David) |

Vol. 4

| | | | |
|---|---|---|---|
| 000741 | 03/04/2014 | 126 | Proposed findings of fact and conclusions of law filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000796 | 03/04/2014 | 127 | Proposed findings of fact and conclusions of law filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000778 | 03/05/2014 | 130 | Order setting trial Entered on 3/5/2014 (RE: related document(s)62 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial date set for 3/17/2014 at 09:30 AM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000780 | 03/11/2014 | 132 | Amended Witness and Exhibit List *for Trial* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)120 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000805 | 03/13/2014 | 134 | Amended Witness and Exhibit List filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)119 List (witness/exhibit/generic)). (Elmquist, David) |
| 000813 | 03/14/2014 | 135 | Amended Witness and Exhibit List *Second Amended* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)118 List (witness/exhibit/generic)). (Olson, Dennis) |
| 000816 | 03/16/2014 | 137 | Amended Witness and Exhibit List *(Second)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)132 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000842 | 03/17/2014 | 138 | First Amended Proposed Joint Pre-Trial order Entered on 3/17/2014. (Rebecek, B) |
| 000871 | 04/04/2014 | 142 | Extended temporary restraining order and mandatory injunction Entered on 4/4/2014. (Rielly, Bill) |
| 000878 | 04/23/2014 | 144 | Notice *of Trustee's Status Report of Compliance* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)142 Temporary restraining order). (Elmquist, David) |
| 000892 | 07/29/2014 | 161 | Motion to extend time to appeal - Rule 8002c (RE: related document(s)148 Judgment) Filed by Defendant Cengiz J. Comu (Blanco, J.) (Entered: 08/20/2014) |
| 000896 | 07/30/2014 | 153 | Application for compensation *Plaintiffs Preliminary Application for Attorneys' Fees and Expenses Awarded in the Court's July 8, 29014 Judgment* for Shari L. Heyen, Creditor's Attorney, Period: 10/26/2011 to 7/28/2014, Fee: $946,504.90, Expenses: $12,800.00. Filed by Attorney Shari L. Heyen (Heyen, Shari) |
| 000906 | 07/30/2014 | 154 | Motion to extend time to To Submit Affidavit and Evidence in Support of Application for Attorneys' Fees & Expenses Awarded in the Court's July 8, 2014 Judgment Filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |
| 000914 | 08/20/2014 | 162 | Order granting motion for leave to file notice of appeal out of time 161 |

*Vol. 4*

*000916*

*000919*

| | | | |
|---|---|---|---|
| | | | Motion to extend time to appeal - Rule 8002c. Entered on 8/20/2014. (Rielly, Bill) |
| 08/27/2014 | 165 | | Order granting motion to extend time to file application for attorney's fees and expenses 154 Motion to extend time. Entered on 8/27/2014. (Rielly, Bill) |
| 08/29/2014 | 168 | | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)164 Notice of appeal filed by Defendant Cengiz J. Comu) (Blanco, J.) |

II.    Appellant also designates all exhibits admitted at trial, March 17 through March 21, 2014.    *Not Provided by Appellant*

III.    Appellant also designates the following transcripts:

*Vol. 5*

| | | |
|---|---|---|
| 000921 | 11/09/2010<br><br>171 | Hearing held on 11/9/2010. (RE: related document(s)5 Motion to dismiss adversary proceeding Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6) filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) APPEARANCES: D. Olson for Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Announcement of an agreed order having been submitted that contemplates Plaintiff's agreement to file Amended Complaint with Debtor's reservation of right to re-urge motion to dismiss. Court will sign order. (Womack, Jennifer) (Entered: 11/12/2010) |
| 000927 | 02/14/2011<br><br>178 | Hearing held on 2/14/2011. (RE: related document(s)12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) Appearances: D. Olsen for Defendant/Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Motion denied, conditional on Plaintiff, within 20 days, amending Complaint again to provide more specificity regarding specific provisions of Section 727(d) being alleged, when acts were discovered and how, and addressing his standing, versus the Chapter 7 Trustees, to seek avoidance of alleged fraudulent transfers. If not amendment within 20 days, complaint will be dismissed. If amendment, then Defendant has 20 days thereafter to answer/respond. Counsel to submit order. (Harden, D.) (Entered: 02/18/2011) |
| 000952 | 05/02/2012<br><br>179 | Status conference held (RE: related document(s)20 Amended complaint) Appearances: E. Lippe and D. Wander (telephonically) for Plaintiffs; D. Elmquist for Trustee; D. Olson for Debtor. Nonevidentiary hearing. Based on statements of counsel, court will continue abatement through 8/1/12 and counsel shall contact courtroom deputy for another status conference the first week of August 2012. Counsel shall upload an order continuing abatement. (Davis, T.) (Entered: 05/14/2012) |
| 000964 | 07/31/2012<br><br>180 | Hearing held on 7/31/2012. (RE: related document(s)20 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) Appearances: D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff; D. Olson for Debtor. Nonevidentiary status conference. Court heard reports regarding Rule 2004 examinations that have been ongoing and Trustees intention to file a Complaint in Intervention by 8/31/12. Court will enter Order terminating the abatement of this Adversary Proceeding and requiring: (a) Trustees Complaint in Intervention to be filed by 8/31/12; and (b) parties to upload Agreed Scheduling Order by 9/14/12 (inclusive of deadlines pertaining to the pending Rule 12(b)(6) |

*Vol. 5*

| | | | |
|---|---|---|---|
| | | | motion) or, in the alternative, court will enter its own Scheduling Order thereafter setting a January 2013 trial docket call and deadlines pertaining to the Rule 12(b)(6) motion. (Baird, Dennis) (Entered: 08/01/2012) |
| 000975 | 10/31/2012 | 181 | Hearing held on 10/31/2012. (RE: related document(s)24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) Appearances: D. Olson for Movant/Defendant/Debtor; D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff/King Louie Mining. Nonevidentiary hearing. Motion denied. Court also denied a pending Motion for Leave by Plaintiff/King Louie Mining to File Third Amended Complaint. Thus, Second Amended Complaint of King Louie Mining (Section 727 count only) and Complaint in Intervention of Trustee are now governing pleadings in this Adversary Proceeding. Mr. Lippe to upload orders on motion to dismiss and motion for leave. (Baird, Dennis) |
| 001004 | 08/15/2013 | 182 | Hearing held on 8/15/2013. (RE: related document(s)94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order)) Appearances: E. Lippe for his firm; K. Hanks and C. Floyd for Plaintiffs other than the Trustee; D. Elmquist for Trustee; R. Nicoud for Debtor. Nonevidentiary hearing. Motion denied. Ms. Hanks to upload order. (Harden, D.) (Entered: 08/21/2013) |
| 001035 | 03/04/2014 | 183 | Pre-trial conference held on 3/4/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz).) Appearances: K. Hanks and V. Vital for Creditor/Plaintiffs; D. Elmquist for Intervenor/Plaintiff; D. Olson for Defendants. Nonevidentiary status conference. Court will issue order setting trial for March 17, 2014 at 9:30 am, continuing through March 21, 2014. Parties to upload final Pre-Trial Order by March 14, 2014. (Harden, D.) (Entered: 03/06/2014) |
| 001052 | 03/17/2014 | 184 | Trial held on 3/17/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) |

| | | | |
|---|---|---|---|
| *Vol. 6* | | | Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/18/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *001277* | 03/18/2014 | *185* | Trial held on 3/18/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/19/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 7* *001538* | 03/19/2014 | *186* | Trial held on 3/19/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/20/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 8* *001787* | 03/20/2014 | *187* | Trial held on 3/20/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/21/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 9* *001909* | 03/21/2014 | *188* | Trial held on 3/21/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial concluded. Court gave bench ruling: (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it to Trustee; (b) The Barclay Group, Inc. and Sunset Pacific are the alter |

| | | egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific. Counsel will subsequently upload proposed Findings of Fact, Conclusions of Law and Judgment that are consistent with the courts oral ruling and otherwise consistent with the evidence. (Harden, D.) (Entered: 03/25/2014) |
|---|---|---|

IV.    Appellant states the following Issues presented on Appeal:

    1.    The Bankruptcy Judge erred in revoking the Debtor's discharge.

    2.    The Bankruptcy Judge erred in finding that the Barclay Group and Sunset Pacific

are the alter egos of the Debtor.

    3.    The Bankruptcy Judge erred in calculating the amount of the damages for which

the Debtor was found to be liable.

[Signature on following page]

Respectfully submitted,

Cengiz J. Comu
14873 Oaks North Place
Dallas, Texas 75254
(972) 965-2545 – Telephone
Email: cjcomu@gmail.com

By:_____
      Cengiz J. Comu
      *Pro Se*

## CERTIFICATE OF SERVICE

    I hereby certify that on the __11__ day of September, 2014, a true and correct copy of the foregoing document was sent via electronic means or by first class mail, postage prepaid to the persons shown below:

Kendyl T. Hanks
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

David W. Elmquist
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, Texas 75165

By:_____

      Cengiz J. Comu

1    Q.   (BY MS. HANKS) So 78 we see is another document

2    executed by Mr. Comu as president, in this capacity as

3    president of The Barclay Group instead of Ganas; is that

4    correct?

5    A.   Yes, that's what that document reflects.

6    Q.   And in this document Barclay Group, Inc. is

7    identified as the majority stockholder of Ganas; is that

8    correct?

9    A.   That's what the document reflects, yes.

10   Q.   And the purpose of this document is to approve

11   a certificate of amendment in which Ganas Corp will be

12   issuing a certain number of shares; is that correct?

13   A.   That's not correct.

14   Q.   That's not correct?  Please let me know exactly

15   what this document provides.

16   A.   If I recall correctly, when The Barclay Group

17   acquired the 95, roughly 95 million shares of Ganas

18   Corp, it also acquired pursuant to one of the agreements

19   there was one share of preferred stock of Ganas Corp

20   outstanding which had some unusual supermajority voting

21   rights and the purpose of this amendment, if I recall

22   correctly, was to amend Ganas Corp's charter with the

23   Delaware Secretary of State to get rid of that class

24   preferred stock, so that there would not be a potential

25   supermajority class outstanding --

1     Q.   I see.

2     A.   -- with respect to voting rights and so that

3 the common stock would be the only outstanding stock.

4 So Exhibit 79 came first in order.  And that was a

5 unanimous written consent of the two directors

6 approving --

7     Q.   Of Ganas --

8     A.   -- the amendment.

9     Q.   -- of Ganas Corp, correct?

10     A.   Of Ganas Corp.  Approving the amendment.

11 And -- yes, the directors of Ganas Corp, approving the

12 amendment and recommending it be submitted to the

13 stockholders for their approval.

14     Q.   So as a result of these documents then the

15 outstanding shares of Ganas Corp are the approximately

16 95 million shares that are owned by TGB and that is

17 what's going into the merger; is that correct, and

18 they've dispensed with this preferred share outlier?

19     A.   They did get rid of the preferred share.  If I

20 recall correctly, there was -- there was still some

21 additional shares of Ganas Corp held by other

22 stockholders.

23     Q.   A small percentage; is that correct?

24     A.   Relatively small percentage, yes.

25     Q.   And were those shares converted into Green Auto

1  stock when the -- post merger?

2      A.   Yes.

3      Q.   So they just sort of filtered through the

4  merger agreement and they got stock in the new company;

5  is that correct?

6      A.   They were just automatically --

7      Q.   Got it.

8      A.   -- ended up stock in the resulting company.

9      Q.   Now, I want to ask you about that.  You say

10 they automatically ended up being stockholders in the

11 new company.  Was that pursuant to the terms of the

12 merger agreement?

13     A.   Yes.

14          MS. HANKS:  Could you pull up 19, please?

15     Q.   (BY MS. HANKS) Now, if you look at section --

16 first Section 1.01 of the merger agreement.

17 Section 1.01 talks about the surviving corporation.  And

18 that's Ganas; is that correct?

19     A.   That's correct.

20     Q.   Ganas is going to be renamed pursuant to 1.11

21 of the merger agreement to be Green Auto, correct?

22     A.   Yes.

23     Q.   And as of the effective time of the merger, the

24 Ganas stock automatically converted into Green Auto

25 stock?

1          A.    Umm --

2          Q.    Or at least a right to receive Green Auto

3     stock; is that correct?

4          A.    I would have to look further in the document.

5     I don't know if it automatically converted.  It may have

6     just maintained its status, might be a more accurate

7     description.

8          Q.    Well, if I'm one of the small percentage of

9     stockholders who kept my Ganas shares and did not sell

10    to Barclay Group before the reverse merger, then after

11    the reverse merger am I still stockholder in Ganas or am

12    I a stockholder in Green Auto?

13         A.    It's the same company.  It just has a new name.

14         Q.    Right.  So whether it's called Ganas or Green

15    Auto, I am a stockholder in the surviving company which

16    is now known as Green Automotive; is that correct?

17         A.    Correct.

18         Q.    So as of the date of the merger, the effective

19    date of the merger, The Barclay Group was the owner of

20    95 million shares of Green Automotive?

21         A.    Yes, I believe that's correct.

22         Q.    Now, if you will look at KLM Exhibit 255,

23    please.  This is an email from you to C.J. Comu and

24    Steven Fly.  Do you recall Steven Fly?

25         A.    I believe he was one of the individuals at Go

1   Green, LLC.

2      Q.   And so he was one of the individuals with Go

3   Green, USA who -- did he join Green Auto after the

4   merger, did he stay with the company through the merger?

5      A.   I believe he did, yes.

6      Q.   Okay.  And your email's to C.J. Comu as well.

7   And if you could take -- just read the email real quick

8   and tell us what your recollection is about this email.

9      A.   Yes.  The merger becomes effective when mergers

10  or certificate reflecting the merger has been filed and

11  accepted by, in this case Delaware, which was the state

12  of incorporation for Ganas Corp and Nevada which was the

13  state of organization for Go Green Automotive, LLC.

14  Once those two certificates are both filed and accepted

15  by those secretaries, respective secretaries of state

16  then the merger is deemed effective.

17           Under Delaware law any stockholder -- and

18  here would be referring to the number of stockholders

19  other than The Barclay Group at the time of the merger

20  who did not either vote for or sign a written consent

21  approving the merger have rights under Section 262, the

22  Delaware general corporation law, instead of retaining

23  their stock pursuant to the merger agreement in the

24  surviving corporation after the merger to dissent and

25  exercise their appraisal rights pursuant to which the

1   Delaware chance report would hold an appraisal hearing

2   and value their shares as of immediately prior to the

3   effective time without taking into account the

4   anticipation or the value of the merger.  And those

5   stockholders would have the right to receive that value

6   in cash rather than --

7       Q.   They can opt out?

8       A.   They can opt out from the merger, yes.

9       Q.   Okay.  So basically say "I don't like the idea,

10  I don't like the new -- you know, I don't like the

11  parties to the deal, you know, I want my cash out now

12  before whatever happens is going to happen"?

13      A.   They can do it on any basis.

14      Q.   Okay.  But in this case the vast majority of

15  shares, 95 million out of very few more than that, were

16  owned by The Barclay Group, correct?

17      A.   That's correct.

18      Q.   Okay.  And so at this point it's just a matter

19  of getting the physical stock certificates; is that

20  correct?

21      A.   I'm not sure I understand the question.

22      Q.   So if -- well, let me ask you this.  Do you

23  recall when The Barclay Group actually received the

24  physical stock certificates in Ganas Corp which was

25  purchased -- the stock that was purchased in

 1  October 2009?

 2      A.   I believe they were received at the date of --

 3  on the date of those two stock purchase agreements.

 4      Q.   Okay.  So you believe that The Barclay Group

 5  actually received the physical stock certificates for 95

 6  million Ganas Corp shares or at least perhaps the shares

 7  that weren't subject to the Rountree & Associates?  I

 8  believe that was subject maybe to a secured interest

 9  because of the note.

10      A.   That sounds correct.

11      Q.   Does that ring a bell?

12      A.   Yes.

13      Q.   So maybe about 93, 92 million shares under one

14  of those stock purchase agreements, those stock

15  certificates were received in November of --

16      A.   I believe those stock certificates were

17  delivered at the closing.

18      Q.   Okay.  If we could go to Trustee Exhibit 73.

19  Do you recognize this document?

20      A.   I'm not sure if I do.

21      Q.   Okay.  Do you recognize -- well, you see The

22  Barclay Group -- well, first of all, Barclay Group

23  Limited, does that ring a bell?

24      A.   I don't know if The Barclay Group, Limited

25  is --

1          MS. HANKS:  Could you go down to the

2   bottom, please?

3          Q.   (BY MS. HANKS)  Do you recognize the signature

4   on behalf of The Barclay Group, here it says "Barclay

5   Group, Inc."

6          A.   That looks similar to the C.J. signature from

7   the other documents, yes.

8          Q.   Okay.  And this is a memorandum of

9   understanding dated November 24th, 2009; is that

10   correct?

11          A.   That's what it states, yes.

12          Q.   Okay.  Are you familiar with an entity called

13   First Market Services, Inc.?

14          A.   I believe I have heard that name before.

15          Q.   Do you remember anything about the entity?

16          A.   No, not really.

17          Q.   Do you recall a company called the Mayborn

18   Group Limited?

19          A.   That name sounds familiar, but I don't have any

20   specific recollection.

21          Q.   Okay.  You do, of course, recall the 95 million

22   shares acquired in Ganas by Barclay Group, correct?

23          A.   Yes.

24          Q.   Do you recall what The Barclay Group intended

25   to do with those shares upon acquiring them?

1       A.   It was my understanding that it was holding

2   those shares as beneficial or as nominee for additional

3   parties, yes.

4       Q.   As nominee for additional parties, meaning not

5   for value of their own?

6       A.   Yes.  It was holding them in their name, in its

7   name on behalf of other people.

8       Q.   And would that be consistent with the receipt

9   of cash directly into Barclay Group accounts for shares

10  that they were selling in November of 2009?

11      A.   I have no knowledge of that.

12      Q.   Okay.  Well, why don't we look at that then?

13           MS. HANKS:  If you could pull up KLM

14  Exhibit 96, please.

15           Is there an objection?

16           THE COURT:  No.  I show none.

17           MS. HANKS:  Okay.

18      Q.   (BY MS. HANKS) This exhibit that's in front of

19  you right now --

20           MS. HANKS:  Thank you.  That's perfect

21  actually.

22      Q.   (BY MS. HANKS)  -- is a ledger transactions for

23  Barclay Group banking, including the months -- including

24  September -- transactions from September, October and

25  November of 2009, that's about the time of the merger

1  agreement; is that correct?

2      A.   October and November 2009, yes.

3      Q.   Okay.  So the acquisition of the Ganas stock

4  was October 26, 2009; is that correct?

5      A.   Yes.

6      Q.   And the merger agreement was November 5th,

7  2009 -- November 4th, 2009?

8      A.   Yes.

9      Q.   And it became effective November 5th, 2009, by

10  virtue of the filing of the required documents with

11  Nevada and Delaware?

12      A.   Either the 4th or the 5th.  We may not have

13  received confirmation until the 5th.

14      Q.   Okay.

15      A.   I can't remember the -- the effective time

16  would depend on the date stamps on the actual

17  certificates.

18      Q.   Okay.  So one of the two, at least by the 5th?

19      A.   Yes.

20      Q.   Okay.  So now if you look a little bit further

21  down in these November transactions, I would like to

22  note just a couple of names here.  See, we've got Edward

23  Jones there.  And it says H-O-W-A, $50,000 deposit

24  there.  And then a little bit further down there's a

25  group of four deposits on November 27th, a $40,000

1   deposit into Barclay Group's accounts by Kyle Gilbert; a

2   $20,000 deposit by Keith or Marcy Gilbert, a $10,000

3   deposit by Michelle Renner, and a $10,000 deposit by

4   Gene Bacon.  These are wire transfers.  Is that what it

5   looks like you to?

6        A.   It reflects their credits to the account.

7        Q.   Okay and I understand this is not your

8   document.  I'm going to cross reference to something

9   that you may be more familiar with.

10              MS. HANKS:  Now if you could please pull up

11  KLM Exhibit 49.  I know the print is a little small, but

12  if you can increase it a little bit and look about

13  two-thirds down the first page.  Well, first of all,

14  let's -- just if you can go up to the very top.

15       Q.   (BY MS. HANKS)  This is a document that was

16  created by Old Monmouth Stock Transfer Company.  Are you

17  familiar with Old Monmouth?

18       A.   Yes.

19       Q.   And you're aware that they were the stock

20  transfer agent at the time -- or at least they were the

21  stock transfer agent for Ganas and for Green Auto after

22  the merger?

23       A.   I believe that's correct, yes.

24       Q.   Okay.  Now, this is the first page of a

25  transaction journal for 2010.  And you will see there's

1  a whole series of stock transfers that occur on

2  January 13, 2010.

3            MS. HANKS:  If you could zoom out so you

4  can see the numbers.

5       Q.  (BY MS. HANKS)  Does this look like the initial

6  -- I understand that --

7            MS. HANKS:  We need to see the numbers on

8  the right.

9       Q.  (BY MS. HANKS)  Okay.  This is a long

10 transaction so it actually runs over into the next page.

11 And so if you look at Page Number 2, at the very top on

12 the right, on the far right you see this number under

13 the column C-A-N-C, number sign, S-H-S, right?

14      A.  I see that.

15      Q.  And does that column reflect cancelled shares?

16 If you don't know, that's okay.

17      A.  I really don't know.  That would be -- that

18 would just be an educated guess on my part.

19      Q.  But here you have 91,920,116 shares on one side

20 of the transaction and then the same number on the other

21 side of the transaction; is that correct?

22      A.  That's what the document reflects.

23            MS. HANKS:  Now if you move up to the page

24 above.

25      Q.  (BY MS. HANKS)  That transaction is broken down

1  into particular stock certificates; is that right?

2      A.   That appears to be the case, yes.

3      Q.   Okay.  So here on the right, and again, I know

4  it's quite small, but on the right there's a 2 million

5  dollars -- 2 million share stock certificate, number of

6  1080, 10 million share stock certificate, certificate

7  number 1081; does that look right?

8      A.   That's what the document reflects, yes.

9      Q.   Okay.

10          MS. HANKS:  Now if you zoom in a bit -- in,

11  out, whatever, so you can see the -- yeah, I meant the

12  other way.

13      Q.   (BY MS. HANKS)  Some of the smaller purchases

14  there on the left, underneath -- do you see Mr. Comu's

15  name there?

16      A.   I do see that.

17      Q.   C.J. Comu right there?

18      A.   Yes, I see that.

19      Q.   So he's one of the recipients of shares on

20  January 13th?

21      A.   That's what it looks like the document says,

22  yes.

23      Q.   And then below that you have Sunset Pacific and

24  TKY Trust and Daptco Trust right.  So they're receiving

25  part of these shares from -- that are being converted

 1   from Ganas to Green Auto, correct, or at least that's

 2   what this document reflects?

 3               THE WITNESS:  Could you zoom out a little

 4   bit so I can see the --

 5               MS. HANKS:  Sure.

 6       A.  Yes, I believe that's -- that looks to me like

 7   what the document reflects.

 8       Q.  Okay.  And do you recognize these, underneath

 9   Daptco Trust, do these names ring a bell, Marcy Gilbert

10   Gene Bacon, Kyle Gilbert, Sharon Hyde?

11       A.  No.

12       Q.  They don't?

13       A.  No.

14               MS. HANKS:  Could you please go back to KLM

15   Exhibit 96?

16       Q.  (BY MS. HANKS)  Do they ring a bell now?

17       A.  They match names in this document, yes.

18       Q.  Correct.  So does it appear to you that Barclay

19   Group was selling shares of Ganas in November of 2009

20   before the actual stock certificates were issued or at

21   least receiving money for shares?

22       A.  I see there this document reflects that it

23   received money.  That's all I can say.

24       Q.  Okay.  Were you aware that The Barclay Group

25   was marketing investments or financing opportunities in

1    Green Auto in -- at the end of 2009?

2         A.    No.

3              MS. HANKS:  Can you pull up KLM

4    Exhibit 171?  See if you can go down a bit to the email

5    from Mr. Comu.

6         Q.    (BY MS. HANKS)  Have you ever heard of the name

7    Lawrence Briggs?

8              MR. OLSON:  Pardon me just a minute.  Is

9    this 121?

10             MS. HANKS:  This is 171.

11             MR. OLSON:  I'm sorry.  Go ahead.

12        Q.    (BY MS. HANKS)  If you would read there at the

13   top starting with "The Barclay Group, Inc."

14        A.    Okay -- oh, would you like me to read it out

15   loud?

16        Q.    No, read it to yourself.  And then does this

17   email appear to be seeking potential investors or buyers

18   of Green Auto stock?

19        A.    By reference of a private placement memorandum

20   for credit investors, it would appear so.

21        Q.    Okay.  So that's what a private placement

22   memorandum, generally speaking, that's the purpose of

23   it, right?

24        A.    The purpose would generally be the company

25   raising capital by the sale of new shares to investors,

1  yes.

2       Q.   Okay.

3            MS. HANKS:  And if you go up, please.

4       Q.   (BY MS. HANKS)  The date of this email is

5  November 18th, 2009; is that correct?

6       A.   That's what it states.

7       Q.   So not long after the merger, Mr. Comu is out

8  in the market looking for purchasers of the stock; is

9  that correct?

10      A.   Well, if it was pursuant to a private placement

11 memorandum, I would suspect that it would be looking for

12 purchasers of new stock to be issued by Green Automotive

13 Company Corporation.

14      Q.   Okay.  And the significance of that?

15      A.   Well, it wouldn't be The Barclay Group or any

16 other shareholder selling their existing shares.

17 Typically a private placement memorandum is used by the

18 issuer of the company to bring money into the company by

19 selling additional shares of company stock.

20      Q.   And this, and the fact that -- well, let's go

21 back to Exhibit 19, please.  Remember the 40 percent

22 equity in the company that was mentioned in your email?

23      A.   Yes.

24      Q.   Okay.  That 40 percent equity in the company

25 would be represented by stock, would it not?

1        A.   Yes.

2        Q.   So that stock would not be a company issuance,

3   would it, it would be stock held by The Barclay Group to

4   hold, to sell, to transfer, depending on the rules

5   permitting that, as they saw fit; is that correct?

6        A.   That would be the 40 -- 40 percent was what the

7   shares held by Barclay, the shares that Barclay Group

8   acquired prior to the merger would represent after the

9   merger, yes.

10        Q.   Correct.  So approximately 95 million shares?

11        A.   Yes.

12        Q.   Okay.  So those are Barclay Group shares.  We

13   are not talking about shares that might issue from the

14   company.  We're talking about Green Auto shares held by

15   The Barclay Group as of November of 2009?

16        A.   Okay.

17        Q.   Okay.  And we saw in Exhibit 49 at the

18   beginning at the stock transfer ledger that some of

19   those went to Mr. Comu personally.  Some of those went

20   to Sunset Pacific.  Some of those went to TKY Trust.

21   Some of those went to Daptco Trust.  Do you recognize

22   either of those trusts, by the way, TKY Trust and Daptco

23   Trust?

24        A.   No, I'm not familiar with those names.

25        Q.   And Daptco Trust here, stock certificate 1091,

1    they received 5 million shares.  Doesn't ring a bell?

2        A.   No.

3        Q.   Okay.  And if you actually go up and just look

4    at the amount directly received by The Barclay Group, so

5    January 13th, 2010, actual stock certificates in new

6    Green Auto were issued here.  And three of those stock

7    certificates -- at least three of those stock

8    certificates are going directly to The Barclay Group.

9             And if you look on the right, those stock

10   certificates are in a total amount of three stock

11   certificates that equal 14,890,066 shares; is that

12   correct?

13       A.   That's what this document reflects.

14       Q.   Okay.  Now, the reason I walked through this is

15   because these shares here don't reflect 95 million

16   shares, which was The Barclay Group's 40 percent

17   interest in Green Auto; is that correct?

18       A.   Are you asking if --

19       Q.   Well, there's -- you see the -- these 95

20   million shares, the very shareholders in Ganas are

21   referenced directly above.  And I will represent to you

22   that those numbers there, those shareholders are the

23   shareholders who were in one of the stock purchase

24   agreements for Ganas.

25       A.   Okay.

1      Q.   These are their stock certificates that are

2  being cancelled.

3      A.   Right.

4      Q.   Okay.  Now, what happens after those stock

5  certificates are cancelled is what my question is.  The

6  Barclay Group is not receiving 95 million shares, are

7  they?

8      A.   Not according to this document.

9      Q.   Since you were involved in the drafting of the

10 agreements and you drafted the emails that confirmed

11 Barclay Group would be receiving 40 percent interest and

12 retaining 40 percent in the company, why would they be

13 splitting up their shares like this?

14     A.   I don't know the answer to that question.

15          MS. HANKS:  Could you pull up the

16 antidilution clause agreement, please?

17     Q.   (BY MS. HANKS) Now, the 40 percent interest

18 that we were talking about, is it common in these sorts

19 of mergers to have an antidilution clause?

20     A.   I don't know if it's common or not.

21     Q.   But you're familiar with them?

22     A.   Yes.

23     Q.   What is an antidilution clause?

24     A.   It's a contractual right to maintain or at

25 least have the opportunity to maintain your stock at a

1  certain level, certain percentage, if additional shares

2  are issued by the company in the future.

3      Q.   Okay.  And here if you go to section -- where

4  is my antidilution clause -- 1.12 of the merger

5  agreement, which is I believe on Page 3 or 4 of exhibit

6  -- Trustee Exhibit 19.  It's the bottom of Page 3,

7  Trustee Exhibit 19, Section 1.12 antidilution rights.

8  Do you recall this provision?

9      A.   Yes.

10      Q.   Is this consistent with your emails to Mr. Comu

11  before the merger that talked about The Barclay Group

12  retaining 40 percent interest in the surviving company

13  after the merger?

14      A.   I believe it is, yes.

15      Q.   Now what happens -- how does an antidilution

16  clause work?

17      A.   You know, they may be different.  I mean it's

18  -- there's many different ways they can be drafted or

19  work.  The way --

20      Q.   Well, then let me narrow the circumstances so

21  that we're on the same page.  If I have 100,000 shares

22  of a company and -- or let's actually since I'm terrible

23  at math, let's do it this way.  If I have 40,000 shares

24  in a company and the owners, the other parties to the

25  merger have 60,000 shares, my antidilution clause is

1   40 percent.  I have an assurance that at least for a

2   certain period of time I get to keep 40 percent control

3   over the company's equity; is that right?

4        A.   In general terms, yes.

5        Q.   Okay.  So what happens if the company decides

6   to issue more stock to the public, so the company issues

7   another, you know, 50,000 shares or something like that.

8   And again, I'm not asking to do math but --

9        A.   It would have to issue additional shares to The

10  Barclay Group so that the total number of shares held by

11  The Barclay Group including the shares issued to the

12  public, including the shares issued to Barclay Group

13  reflect 40 percent of the whole pot.

14       Q.   Right.  That is exactly my question.  So the

15  point is here that there are shares either physically --

16  well, it's not physically received, the Ganas shares

17  were physically received in 2009.  But there's also an

18  antidilution clause that gives the promise of additional

19  shares to be issued in the future in the event the

20  company issues more stock to the public; is that right?

21       A.   That's correct.

22       Q.   Okay.  So would you say even if the

23  antidilution provision hadn't produced stock yet, so I

24  still only have my 40,000 shares because nothing's

25  happened yet, it's still a valuable interest, wouldn't

1   you say?

2       A.   I mean it's a contractual right.

3       Q.   Well, contractual right, but if I'm one of the

4   parties to a merger agreement and the parties are

5   ironing out who gets control, who gets what interest,

6   how long they can get control, an antidilution clause

7   can be a pretty big deal, can't it?

8       A.   I'm not sure I understand the question.

9       Q.   Well, you are contractually entitled to

10  maintain 40 percent control over a company for a period

11  of time.  The only other way you can do that without

12  antidilution clause would be to buy shares on the open

13  market; is that correct?

14      A.   Yeah, or get the company to sell new shares to

15  you.

16      Q.   Okay.  One of those two things.  But here they

17  don't have to do anything.  They can passively receive

18  shares in the future in the event the company issues new

19  shares to other shareholders; is that right?

20      A.   Yeah, I agree.  It's an important contractual

21  right.

22      Q.   It's an important contractual right that

23  represented at least -- well it represented an equitable

24  interest in any additional shares that were issued in

25  the company in the next -- well, this is a two-year

1  clause, I will tell you that.  I will represent that to

2  you.  It's in the language -- for the next two years.

3  So that was something that could likely give rise to

4  additional shares in the company over and above the 95

5  million shares already in their possession, right?

6      A.  Yes, to the extent the company issued any new

7  shares.

8      Q.  Okay.

9          THE COURT:  All right.  We're going to have

10  to break for lunch.  It's 1:00.  We're going to break

11  until 2:30.

12          I am going to read the entirety of the

13  Edward Baxter deposition during the lunch break.  You

14  all are going to talk about what exhibit numbers we're

15  going to give to all of the depositions that were put at

16  least partially into the record.

17          And then anything else before we break?

18          MR. OLSON:  No, Your Honor.

19          THE COURT:  All right.  Dawn will lock up

20  the courtroom.

21          THE CLERK:  All rise.

22          (Break taken.)

23          THE COURT:  Be seated.  We've got you back,

24  Mr. Elmquist, good.

25          MR. ELMQUIST:  Just finished, Your Honor.

1   It was great timing.

2                   THE COURT:  All right.  Please be seated.

3   All right.  We are going back on the record in the King

4   Louie Mining, et al versus Comu, et al, Adversary

5   10-3269.

6                   Before we broke for lunch we were having

7   witness testimony of Mr. McNeill.  We still have him on

8   the stand.  I'm required to remind you you're still

9   under oath.  And I, during the lunch break, read the

10  entire deposition of Edward Baxter that was taken

11  May 21st, 2013.

12                  I know we have at least one housekeeping

13  matter.  The actual full deposition transcripts,

14  Mr. Olson, you were wanting in the record, correct?

15                  MR. OLSON:  Yes, ma'am.  And over the lunch

16  hour we marked the oral deposition of Edward Baxter as

17  Trustee's Exhibit Number 92.

18                  THE COURT:  All right.

19                  MR. OLSON:  And we marked the deposition of

20  David Parsley as Trustee's Exhibit 93.  And we have

21  marked the deposition of Steven Evans as Defendant's

22  Exhibit 7, even though we didn't take the deposition.

23                  THE COURT:  Okay.

24                  MR. OLSON:  We would move those at this

25  time.

```
 1                THE COURT:  All right.  So we had Baxter
 2   Trustee 92.
 3                MR. OLSON:  Yes, ma'am.
 4                THE COURT:  We had Evans that was going to
 5   be Defendant's 7?
 6                MR. OLSON:  Yes, ma'am.
 7                THE COURT:  And Trustee 93, that was going
 8   to be whom?
 9                MR. OLSON:  David Parsley.
10                THE COURT:  David Parsley.  Okay.  Well,
11   you may approach, and we will admit those.  But we're
12   still missing a couple, right?
13                MR. OLSON:  Mr. Elmquist had already put
14   two depositions in as part of his first 91 exhibits, so
15   we think we've got five in the record now.
16                THE COURT:  Okay.  Well --
17                MR. ELMQUIST:  Troster 2004 examination is
18   Trustee's Exhibit 42.
19                THE COURT:  Okay.  I knew that one was in.
20   But what about Dahl and Brown?
21                MR. ELMQUIST:  Brown is --
22                (Inaudible).
23                MR. ELMQUIST:  Your Honor, Brown is Trustee
24   Exhibit 60.
25                THE COURT:  Okay.
```

1      MR. ELMQUIST:  And those two are the only

2  ones that we had put in our (inaudible) so we don't have

3  Dahl in our --

4      MR. OLSON:  I don't believe anybody added

5  any pages and lines in Dahl.  It's already in, in its

6  entirety.

7      THE COURT:  All right.  Well, it just seems

8  like it will be cleaner and easier though if we have

9  every one of them in.

10      MR. OLSON:  Yes, ma'am, I agree.

11      THE COURT:  So how about we call this

12  Defendant's 8, whether it was your actual deposition or

13  not.

14      MR. OLSON:  That's fine with me.

15      THE COURT:  All right.  I'm going to call

16  Dahl's Defendant's 8 and admit it.

17      MR. OLSON:  I can bring to you an exhibit

18  label if you like.

19      THE COURT:  Well, that would be nice.

20  Thank you.  That way Dawn doesn't have to read my messy

21  handwriting.

22      (Inaudible).

23      THE COURT:  You got it?

24      MR. OLSON:  Yes, ma'am.

25      THE COURT:  You're the first lawyer in

1    months who's had exhibit labels.  That's not entirely

2    true but it's just true.  Thank you.

3                    All right.  I think we are good to go now.

4                    Ms. Hanks, you may proceed.

5                    MS. HANKS:  Thank you, Your Honor.

6                    DIRECT EXAMINATION (continued)

7    BY MS. HANKS:

8        Q.   Mr. McNeill, I'm going to direct you to KLM

9    Exhibit Number 39 -- and I don't think that's the one

10   that I was thinking it was, so we're not going to look

11   at that.

12                   Okay.  You testified earlier that you --

13   that Block & Garden represented The Barclay Group in the

14   Green Auto merger?

15       A.   Correct.

16       Q.   And that you continue to represent The Barclay

17   Group?

18       A.   Correct.

19       Q.   The Barclay Group is still a functioning

20   business?

21       A.   To my knowledge, yes.

22       Q.   I'm going to ask you about a couple of -- did

23   Block & Garden perform any work on a deal involving T3

24   networks?

25       A.   I don't believe so.

1       Q.    Paragon GPS?

2       A.    That name sounds familiar, but I don't remember

3    if we did any work or not.

4       Q.    But you have worked on a deal involving

5    Puration, haven't you?

6       A.    Yes.

7       Q.    And that's a TBG deal?

8       A.    Yes, I believe so.

9       Q.    Okay.  Would it -- I guess it would surprise

10   you then to learn that Puration is actually listed under

11   a Regus deal publicly?

12      A.    No, now that you -- that sounds correct, yes.

13      Q.    So you represent both Regus and The Barclay

14   Group?

15      A.    Yes, I believe we have engagement letters with

16   both.

17      Q.    And your connection with both entities is C.J.

18   Comu?

19      A.    Yes.

20      Q.    And when did you -- did you start representing

21   Regus in 2010 when it was formed?

22      A.    I don't recall exactly.  I don't know exactly

23   when.

24      Q.    And just clear for the record, we're talking

25   about Regus Advisors, Inc.?

 1          A.   Yes.

 2          Q.   But back in 2009 and 2010 you -- Block & Garden

 3     was paid by The Barclay Group, wasn't it?

 4          A.   To my knowledge, yes.

 5          Q.   Well, that's who you received payment from,

 6     isn't it?

 7          A.   I don't really know.  That's handled by our

 8     office manager.

 9          Q.   Okay.

10               MS. HANKS:  We're going to look at KLM 89.

11     I don't believe there are any objections to this

12     exhibit, Your Honor.

13               THE COURT:  There were not.  So it is in

14     the record.

15          Q.   (BY MS. HANKS) These are checks from The

16     Barclay Group accounts in 2009 and 2010.  You will

17     notice there's quite a few to Phyllis Comu.  Do you know

18     who Phyllis Comu is?

19          A.   I do not.

20          Q.   Phyllis Comu is C.J. Comu's wife.

21          A.   Okay.

22          Q.   Have you ever conducted any business with

23     Phyllis Comu?

24          A.   I don't believe so.

25          Q.   Not on behalf of The Barclay Group?

1      A.   I don't believe I have ever spoken with her.

2      Q.   Okay.

3           MS. HANKS:   And if we get to -- there we

4  go.

5      Q.   (BY MS. HANKS)   Page 18 of KLM Exhibit 89 is a

6  check for $3,000 made out to Block & Garden on

7  December 9th, 2009, correct?

8      A.   I see that, yes.

9      Q.   And that is -- that check is for legal fees in

10 connection with the Green Auto deal, isn't it?

11     A.   I don't know.   It states it's for legal fees.

12     Q.   There weren't any other projects you were going

13 with The Barclay Group in December of 2009, were there?

14     A.   Not that I recall from that time frame.

15     Q.   So that would be a check for services in

16 connection with the Green Auto deal?

17     A.   Most likely, yes.

18     Q.   And another check for $3,000 on December 9th,

19 2009, also for legal fees.   And there's no reason to

20 believe that has anything to do with anything other than

21 Green Auto?

22     A.   I don't have any reason to believe that.

23     Q.   And then curiously in the same month, a check

24 to his wife out of the same account.   Did you understand

25 this to be his business account or his personal account?

1        A.   I have no understanding regarding this account

2   at all.

3        Q.   But clearly he's making payments to Block &

4   Garden for Barclay Group legal services the same account

5   he's writing checks to his wife, correct?

6        A.   That's what it looks like from this exhibit.

7        Q.   And this is in the weeks leading up to his

8   bankruptcy filing, which was on December 31st, 2009?

9        A.   I'm sorry.  Was that a question?

10       Q.   This was in the weeks leading -- he paid Block

11   & Garden $6,000 in check in the weeks leading up to his

12   bankruptcy filing out of his -- out of The Barclay Group

13   account?

14       A.   What was the date of his bankruptcy filing?

15       Q.   December 31st, 2009.

16       A.   Okay.  Yes it looks like checks were paid on

17   The Barclay Group account to Block & Garden in December

18   of 2009.

19       Q.   Okay.

20            MS. HANKS:  And we're going to KLM

21   Exhibit 96, if I can get there.

22       Q.   (BY MS. HANKS)  We looked at this earlier,

23   Mr. McNeill.  This is a Wells Fargo account transaction

24   ledger and it reflects on October 14th, a $15,000

25   payment to Block & Garden, correct?

1         A.    I see that, yes.

2         Q.    And this is the same account we were talking

3    about where payments were made to purchasers of Green

4    Auto stock in November of 2009, correct?

5         A.    That's what this sheet reflects.

6         Q.    Okay.  And we were discussing earlier about the

7    sale of Barclay Group's shares in Green Auto, and isn't

8    it true that Block & Garden, some of Block & Garden's

9    legal fees were paid out of those proceeds actually?

10         A.    I'm sorry.  Could you repeat the question.

11         Q.    Isn't it true that some of Block & Garden's

12    legal service fees were paid out of the proceeds of the

13    sale of stock by The Barclay Group?

14         A.    I don't know.

15         Q.    Okay.  We're going to open KLM Exhibit 43.  And

16    as you noted, Block & Garden has represented The Barclay

17    Group since the Green Auto merger, correct?

18         A.    Yes.

19         Q.    Okay.  So here there is an email dated November

20    10th, 2011, which is approximately two years after the

21    Green Auto transaction; is that correct?

22         A.    Yes.

23         Q.    And the parties to this email include

24    cjcomu@gmail.com, Matt Troster, and it appears to be

25    directions concerning World Wide Auric and TBG.  And

1  here in the distribution instructions there's an

2  instruction to wire $25,000 to Block & Garden out of the

3  proceeds of sales of the TK -- I apologize -- Green Auto

4  stock held by The Barclay Group.  Do you see that

5  $25,000 wire?

6       A.   I do.

7       Q.   Any reason to believe that Block & Garden

8  didn't receive that payment?

9       A.   No.  I would have to check with our office

10 records.  I don't know if it was received or not.

11      Q.   Okay.  So two years later, two years after the

12 Green Auto transaction, The Barclay Group is paying its

13 attorneys out of the proceeds of the sale of the stock

14 that it acquired in October of 2009?

15      A.   I'm not sure if I understand where the proceeds

16 is coming from.

17      Q.   Okay.  Well, if -- assume with me that evidence

18 otherwise establishes that the cash that is reflected in

19 this document reflects cash received from the sale of

20 Green Auto stock.

21      A.   Okay.

22      Q.   So that would be stock that was acquired either

23 by virtue of the Ganas Corp shares that were purchased

24 in October of 2009 or by virtue of the antidilution

25 clause which yielded shares that were subsequently

```
 1    transferred.

 2        A.   Okay.

 3        Q.   Any reason to disagree with that?

 4        A.   If, based on the assumption that the funds

 5    reflected on this document are from sales of Green

 6    Automotive stock, this looked like it reflects that part

 7    of that was directed to be paid to us, yes.

 8        Q.   Great.

 9             MS. HANKS:  We're going to go to KLM

10    Exhibit 91.  And I do believe there may be an objection

11    to this, Your Honor.

12             THE COURT:  There was.

13             MR. OLSON:  There's actually a double

14    objection.

15             THE COURT:  Double?

16             MR. OLSON:  It's mischaracterized.  Those

17    are not my handwritten notes.

18             MS. HANKS:  Then we can pull the

19    deposition, because I believe the deposition reflects

20    that it's yours.

21             MR. OLSON:  I don't care what the

22    deposition reflects.  I'm telling you that's not drawn

23    by me.  That's C.J. Comu's handwriting.  We did that

24    during the course of the deposition, but I am not the

25    one that wrote it, if you will just characterize it --
```

1              THE COURT:  I have never seen this exhibit

2    until right now so I don't know what --

3              MS. HANKS:  Of course.  Well, I was not at

4    the deposition.  My understanding from the deposition

5    transcript was that it was drawn off the record.  It's

6    perfectly fine if this -- was this drafted by Mr. Comu?

7              MR. OLSON:  Yes, that is his handwriting.

8              MS. HANKS:  Okay.  Then we do not offer it

9    as drafted by Mr. Olson.  We offer it as something

10   that's drafted by Mr. Comu.

11             MR. OLSON:  And then the relevancy

12   objection.

13             MS. HANKS:  This --

14             THE COURT:  All right.  You're going to

15   explain what it is?

16             MS. HANKS:  Absolutely, Your Honor.

17             THE COURT:  Okay.

18             MS. HANKS:  This is a sketched out

19   representation of the Green Auto merger and the

20   subsequent transfer of shares.  So if -- in the center

21   you will see a box that says Ganas.  That's the shell

22   corporation.  On -- and then above that you will see 90.

23   That reflects the 90 million.  On the right you will see

24   140.  That reflects the 60 percent ownership stake of

25   the Go Green shareholders.  And to the right the total

1   is 230 million, that was the total share issuance

2   following the merger.  On the far left you will see a

3   circle with an arrow headed toward Ganas.  That's TBG.

4   That reflects The Barclay Group.  And this document was

5   drafted during a break in the deposition to help clarify

6   for Mr. Elmquist the nature of the transaction and we

7   find it to be actually quite illuminating in clarifying

8   how the shares were acquired and where the shares went

9   after the merger.

10             THE COURT:  All right.  Well, it's very

11  hard for me to read --

12             MS. HANKS:  Well, let me see if --

13             THE COURT:  -- but I will overrule the

14  relevance objection.  And --

15             MS. HANKS:  Does that help a little bit?

16             THE COURT:  It does.

17             MS. HANKS:  A little bit.  So if you look

18  at this --

19             THE COURT:  Okay.  So I have overruled the

20  relevance objection.  KLM 91 is admitted.

21     Q.   (BY MS. HANKS)  So as you've just heard, this

22  is -- these are handwritten notes by Mr. Comu and if you

23  will notice TBG on the left, Ganas in the middle, Green

24  on the right.  Or actually I believe it's Go Green.

25  This is just a quick visual representation of this

```
 1  transaction.

 2      A.  Okay.

 3      Q.  Okay.  And we've already talked about the

 4  40 percent, 60 percent that reflects the antidilution

 5  clause and the 95 million shares that TBG acquired

 6  before the merger and had in their possession after the

 7  merger, correct?

 8      A.  Correct.

 9      Q.  Okay.  Now, on the left, the part that I want

10  to focus on now is not the transaction between Ganas and

11  Green but what happened afterward.  So if you look at

12  TBG on the far left, underneath it you will see a series

13  of lines with circles underneath.  They almost look like

14  a swinging pendulum.

15      A.  I see that.

16      Q.  Okay.  In 2009, do you recall any conversations

17  with Mr. Comu concerning the division of shares that TBG

18  had acquired by virtue of the merger agreement?

19      A.  I do.

20          MS. HANKS:  And we are going to go to KLM

21  Exhibit 98.  Are there any objections to this one?

22          THE COURT:  There were not.

23      Q.  (BY MS. HANKS)  Can you please take a look at

24  this email and tell me if that is consistent with the

25  recollection that you just said you had concerning a
```

1  division of the shares that were in TBG's possession?

2      A.  Yes.  This is consistent with my recollection.

3      Q.  All right.  In this document, in this email

4  from C.J. Comu to you on November 30th, 2009, which is

5  almost exactly a month before the bankruptcy filing, he

6  says, "we want to set up a Delaware LLC or corporation.

7  The owners would be Mayborn Limited, a UK corporation,

8  one third; First Market Services, Inc., Texas

9  corporation one-third ownership; and The Barclay Group

10  Inc., Texas corp, one-third ownership.  Is that

11  consistent with your recollection?

12      A.  Yes.

13      Q.  And Mr. Comu says, "our thoughts that we would

14  operate similar to an LLC where the members would have

15  their respective ownership and limited liability, we

16  want to place our equity holdings into one facilitator

17  for privacy, protection and control."  That's what it

18  says, isn't it?

19      A.  That's what it says, yes.

20      Q.  So you received this email and this is an email

21  instructing you to help them set up this entity

22  structure either by virtue of an agreement or by virtue

23  of entity; isn't that right?

24      A.  It's an agreement proposing something of that

25  structure, yes, along that line.

1    Q.    And did you subsequently draft an agreement in

2    accordance with Mr. Comu's request?

3    A.    I don't believe we did.

4    Q.    Going to go to KLM Exhibit 347 -- that's no

5    good.  We're going to try an alternative.  This should

6    be -- okay.  And this is an email on December 15th from

7    you to C.J. Comu, is it not?

8    A.    Yes, it appears to be.

9    Q.    And it says Ganas update, G-N-A-S update.  That

10   refers to Green Auto, does it not?

11   A.    Yes.

12   Q.    And the attachments -- there is an attachment

13   that is identified as Green Holdings Joint Venture,

14   dash, general partnership agreement, B & G draft,

15   correct?

16   A.    Yes.

17   Q.    And B & G reflects Block & Garden, doesn't it?

18   A.    That's correct.

19   Q.    Okay.  On the second sentence, you say, "with

20   respect to the Hong Kong structure," what is Hong Kong

21   structure referring to?

22   A.    I really don't recall.

23   Q.    You don't remember?

24   A.    Huh-uh.

25   Q.    Do you remember any Hong Kong parties to this

1   transaction?

2       A.   No, I don't.

3       Q.   There were no Hong Kong parties to this

4   transaction, were there?

5       A.   I don't recall any Hong Kong connections.

6       Q.   TBG acquired the shares by virtue of the stock

7   purchase agreements on October 26th, 2009, did they not?

8       A.   Correct.

9       Q.   And after that, they had a decision to make

10  about what to do with those shares, did they not?

11      A.   I guess they did.

12      Q.   They had an antidilution clause that guaranteed

13  them 40 percent control over the company.  We already

14  established that, didn't we?

15      A.   That's correct.

16      Q.   Okay.  And that 40 percent control was

17  reflected in the 95 million shares; isn't that correct?

18      A.   As of the time of the closing of the merger, 95

19  million shares was 40 percent, yes.

20      Q.   Okay.  But to retain 40 percent unless they

21  actually took shares off the public market, it was only

22  going to increase; isn't that correct?

23      A.   If the company issued any new shares, that

24  number of shares would increase, yes.

25      Q.   It would either stay the same or it would

1   increase --

2       A.   Yes.

3       Q.   -- correct?  Okay.  You say, "but we have

4   worked" -- you're referring to a Hong Kong law firm.

5   And you say, "we have worked with their Cayman Islands

6   office on several occasions."  Do you frequently do

7   transactions in the Cayman Islands?

8       A.   Not frequently.

9       Q.   Do you set up entities in the Cayman Islands?

10      A.   We worked with Maples and Calder to do that

11  before.

12      Q.   And you are, of course, aware that Cayman

13  Islands is considered a tax haven as well as a place

14  where a lot of entities will put assets to hide them

15  from -- because of their protective laws in the Cayman

16  Islands they're difficult to trace?

17      A.   I'm not familiar with that really.

18      Q.   You would not be familiar, so you would

19  disagree that -- would you disagree that the Cayman

20  Islands is considered to be a tax haven?

21      A.   I really don't have any personal knowledge on

22  that.

23      Q.   You don't?  So what is the purpose of people

24  setting up transactions in the Cayman Islands?

25      A.   The only time we ever did in the Cayman

1  Islands, I don't remember the reason why, but when

2  you -- hedge funds, they'll set up an onshore hedge fund

3  for U.S. investors and they will set up an offshore

4  hedge fund for non-U.S. investors.  And Cayman Islands

5  is a jurisdiction that seems to be popular for those

6  offshore hedge funds.

7       Q.   And you have no opinion about why the Cayman

8  Islands is popular?

9       A.   No.  Really the one time we did that I was an

10  associate and I got the instructions to...

11      Q.   So just practicing law in the United States,

12  you've never heard of the Cayman Islands being a popular

13  location for hiding assets?

14      A.   No.

15      Q.   Okay.  Attached to -- well, if you go down on

16  the second page, Mr. Comu is touching base with you

17  about a symbol name change with FINRA.

18      A.   Yes.

19      Q.   So there was a process, correct, after the

20  Ganas merger was effective, the Green Auto merger was

21  effective and it was already a reporting company in

22  terms of the OTC, correct?

23      A.   I don't know if it was current at that time,

24  but it had previously been, yes.

25      Q.   Okay.  But that's the reason for merging an

1    operating entity into a shell corporation like that, you

2    don't have to do a traditional IPO.  You have a shell

3    that is already structured to be reporting on the pink

4    sheets, right?

5        A.   Yes.

6        Q.   Okay.  So whether or not it was current, it was

7    that Ganas was a reporting entity?

8        A.   It was in that system, yes.

9        Q.   And so what they needed to do is they needed to

10   get a symbol, quote, name change, and that was a matter

11   of filing documents with FINRA to get that just

12   effectuated, correct?

13       A.   Yes.

14       Q.   But that had nothing to do with the

15   effectiveness of the merger, right?

16       A.   No.

17       Q.   Okay.  Merger was effective in November

18   of 2010, it was just a matter of time and red tape to

19   get the name change, correct?

20       A.   Fair enough.

21            MR. OLSON:  I think she misspoke.

22            MR. ELMQUIST:  You said November 2010.

23       Q.   (BY MS. HANKS) 2009.  I apologize.

24   November 2009 was when it was effective.

25       A.   I'm sorry.  Could you start the question over?

1    Q.   Absolutely.  The merger was effective in

2  November of 2009.  Regardless of when the name change

3  ultimately effectuated, November 2009 the equity was

4  issued, the shares in Ganas converted to Green Auto

5  shares.  And it was just a matter of when the new name

6  change came out getting new stock certificates?

7    A.   Yes, I believe that's all correct.

8    Q.   And even if I, as a hypothetical Ganas

9  shareholder who did not sell my shares to TBG, one of

10  that very small percentage, if I did not, I could still

11  hold on to my Ganas stock and elect to either opt out as

12  you mentioned earlier or to trade it in for a new stock

13  certificate at some point in the future, could I not?

14    A.   Yes.

15    Q.   Okay.  So it's up to me what to do with my

16  Ganas stock certificate?

17    A.   Yes.

18    Q.   Okay.  And waiting on the FINRA name change and

19  getting the actual symbol, that doesn't prevent you from

20  selling the shares in a private buyer-seller

21  transaction, does it?

22    A.   No, I don't think it would.

23    Q.   In fact, we know it doesn't prevent it because

24  we saw cash that Barclay Group received from stock

25  purchasers who ultimately did receive stock

1  certificates, didn't we?

2      A.   I'm not sure I saw enough evidence to say that

3  was the source of that cash, but...

4      Q.   But you would agree that four or five people

5  who purchased -- who received stock certificates in

6  January wired money to Barclay Group on the same date in

7  November?

8      A.   That's what the documents reflected, yes.

9      Q.   So it seems a pretty reasonable conclusion that

10 that was a stock purchase?

11     A.   It does.

12     Q.   All right.  Attached to this email is the

13 document that is identified in the email itself and it

14 is called a general partnership agreement for Green

15 Holdings Joint Venture.  Do you recall this document?

16     A.   Yeah.  Now that I see it, I do.

17     Q.   What was the purpose of this document?

18     A.   I believe this was to set up a partnership for

19 The Barclay Group first market and Mayborn to put the

20 Green Automotive stock into.

21     Q.   Okay.  And the purpose of this agreement, this

22 joint venture was to create a structure, as Mr. Comu

23 said in his email, protection and privacy and control so

24 that they had a means of selling these stocks -- the

25 stock that was in TBG's control through various

1    entities.  This is what it does, it splits up The

2    Barclay Group stock and they share in the proceeds in

3    some respect, but they equally share in the control of

4    the stock?

5        A.    Yeah, I would have to refresh my memory of the

6    exact terms of this document, but...

7        Q.    Well, let's go back to KLM Exhibit 73.  We

8    looked at that before lunch.  Oh, that's not right.

9    Actually I believe it's the Trustee Exhibit 73.  Yeah

10   let's try this one more time.  There it is.

11            Do you recall seeing this document earlier?

12       A.    I do.

13       Q.    Here you have the same parties, Mayborn, First

14   Market Services, The Barclay Group, correct?

15       A.    That's what it states, yes.

16       Q.    And Block & Garden is identified as a recipient

17   of funds here?

18       A.    Yes.

19       Q.    For its role in the Green Auto merger, correct?

20       A.    For professional service fees, yes.

21       Q.    And paragraph two says, "division of stock, the

22   parties agree that the stock of Ganas" -- that's Green

23   Auto, correct?

24       A.    Yes.

25       Q.    "Once the acquisition of the company is

1   complete shall be divided as follows:  28,550,011

2   restricted shares to each of the parties or to their

3   designated assignees," correct?

4        A.   That's what it states, yes.

5        Q.   "3,240,016 nonrestricted shares to each of the

6   parties or their designated assignees," correct?

7        A.   That's what it states, yes.

8        Q.   So the shares, the 95 million, they're getting

9   split out into three tranches, but Paragraph 2C, it says

10  that the parties agree to place all restricted and all

11  free trading into a new corporation for the equal

12  benefit and the equal ownership for all the parties

13  listed?

14       A.   Correct.

15       Q.   Correct.  Okay.  So they're dividing the shares

16  among these entities, but it's not changing the interest

17  that TBG has in those shares, is it?

18       A.   I don't understand that question.

19       Q.   They still have a valuable interest in all 95

20  million shares, don't they?

21       A.   As I read this, it looks like the ownership --

22  or at least the beneficial ownership of the shares will

23  be split three ways.

24       Q.   Well, Paragraph 2C says the parties agree to

25  place all restricted and all free trading shares -- free

1   trading into a new corporation for the equal benefit and

2   equal ownership for all the parties listed.

3        A.   Yes.

4        Q.   Okay.  So TBG retained equal benefit and equal

5   ownership over the entire 95 million tranche of shares,

6   didn't it?

7        A.   That's not how I would read this sentence.

8        Q.   You would interpret equal benefit and equal

9   ownership differently?

10       A.   Each party would own an equal one-third

11  beneficial interest in the 95 million.

12       Q.   Okay.  So you're saying that equal benefit and

13  equal ownership means separate benefit and separate

14  ownership?

15       A.   No.  They would each own the same one-third

16  benefit and one-third ownership.

17       Q.   Now, would it -- if C.J. Comu is making

18  instructions and coordinating with First Market Services

19  in Mayborn regarding the distribution of cash and the

20  trading of shares, would that change your view about

21  continued control over those shares?

22       A.   I'm sorry.  Could you repeat the question?

23       Q.   After the shares are divvied up between the

24  three parties, The Barclay Group continues to exercise

25  control and direction over the movant of shares and

1  receives cash for the disposition of those shares, would

2  that not be consistent with an understanding that all 95

3  million shares were still in equal and were still held

4  for the benefit of TBG?

5      A.   Not depending on, for example, if the general

6  partnership gave Barclay Group management control to

7  sell those shares for the economic equal, you know,

8  one-third economic interest of each of the three

9  parties.  And that wouldn't necessarily contradict my

10  interpretation, but...

11     Q.   Well, it's difficult to reconcile your

12  interpretation with the language "the parties agree to

13  place all restricted and all free trading into a new

14  corporation".

15     A.   Correct.

16     Q.   So there's a single corporation for the equal

17  benefit and equal ownership for all the parties listed?

18     A.   Right.

19     Q.   And not long after this, you, in fact, prepared

20  a document called Green Holdings Joint Venture, didn't

21  you?

22     A.   Yes.

23     Q.   And that was for the equal benefit of all three

24  of these parties, wasn't it?

25     A.   I believe each party was to own one-third of

1    that entity, yes.

2         Q.   Okay.  Well, under either interpretation, here

3    you have C.J. Comu executing a document by which 60

4    million shares are being shared in some respect with two

5    entities, one of which is a foreign corporation,

6    correct?

7         A.   That's what the document reflects, yes.

8         Q.   Now we're going to jump to KLM Exhibit 49.  KLM

9    Exhibit 49 is a document we looked at previously.  This

10   is the Old Monmouth stock transfer ledger.  And the

11   first page reflects the first distribution of those

12   Ganas shares.  And here on the left you see those three

13   entities, don't you, The Barclay Group, First Market

14   Services, and Mayborn, don't you?

15        A.   I do.

16        Q.   Okay.  And those three entities are receiving

17   quite substantial distributions and stock certificates,

18   aren't they?  And I understand you can't see it yet so

19   I'm going to pull it up for you.

20             Stock certificate 1080 for The Barclay

21   Group, 2 million shares; stock certificate 1081, 10

22   million shares, followed by another stock certificate

23   for 2,890,066, correct?

24        A.   I see that.

25        Q.   And then First Market Services gets 20 million

1  shares -- actually 22 million shares by the next two

2  stock certificates, and Mayborn gets approximately 20

3  million shares by virtue of the next two stock

4  certificates?

5       A.   Looks -- yeah, it reflects another 22 million

6  shares to Mayborn.

7       Q.   So that's consistent with this arrangement that

8  you had been asked to assist with.  These parties

9  splitting up the 95 million shares acquired by TBG in

10 October of 2009?

11      A.   Yes.  That's consistent with that arrangement.

12      Q.   Now this group also includes a number of other

13 entities that are not mentioned in that MOU, doesn't it?

14      A.   Yes, this sheet does reflect names not

15 mentioned in that document.

16      Q.   And we talked about a couple of the

17 individuals, and these are the smaller purchases.

18 That's not helpful.  I'll just do this.  Some of these

19 smaller purchases, Waterman Family Trust, Kay Miller,

20 Sharon Hyde, those match up to cash receipts of TBG in

21 2009, November of 2009, correct?

22      A.   I believe they do, yes.

23      Q.   Okay.  But with regard to a lot of these

24 others, you can assume with me for the purpose of this

25 examination that Sunset Pacific, TKY Trust, Daptco, C.J.

1  Comu, Bernard Brown, Energy Farms, Inc., these other

2  entities, there wasn't necessarily any cash transferred.

3  But my question is if you look at the numbers, the

4  distribution of shares between Mayborn, First Market,

5  and TBG, the distribution of stock to Sunset Pacific,

6  which is 5 million shares, 2.5 million shares to TKY

7  Trust, which is 5 million shares, and to Daptco Trust, 2

8  million shares, those are coming out of The Barclay

9  Group's third of the shares, aren't they?

10      A.   I'm not -- I can't tell from this where

11  they're --

12      Q.   Okay.  You see that --

13      A.   -- coming from.

14      Q.   You see that Mayborn at the very bottom has 20

15  million shares.

16      A.   I do.

17      Q.   And then up at the top there's another 20

18  million shares there, right?

19      A.   Looks like another 22.

20      Q.   Another 22.  And then First Market Services has

21  22 million --

22      A.   I see that.

23      Q.   -- correct?  And The Barclay Group only has 14

24  million -- 15 million approximately?

25      A.   Correct.

 1        Q.   Okay.  So the other portion, The Barclay

 2   Group's bucket of stock are being distributed elsewhere,

 3   aren't they?

 4        A.   There are --

 5        Q.   Assuming that MOU is how the stock is being

 6   distributed, something else is happening to that stock?

 7        A.   If the stock was to be distributed one-third,

 8   one-third, one-third, this sheet does not reflect that.

 9        Q.   Okay.  If it was to be distributed one-third,

10   one-third, one-third, then Barclay Group is choosing to

11   send some of its stocks elsewhere, correct?

12        A.   I don't know the answer to that question.

13        Q.   Okay.  If the stock -- if the 95 million shares

14   was split equally, one-third, one-third, one-third, and

15   each one of those parties gets to decide where the stock

16   certificates are issued, then something happened to the

17   additional TBG shares on January 13th, 2010, didn't it?

18        A.   This sheet reflects that some of it went

19   elsewhere.

20        Q.   Okay.

21             MS. HANKS:  So now we're going to go to KLM

22   Exhibit 315.  And I don't know if there's an exhibit to

23   -- an objection to this, Your Honor.

24             THE COURT:  Which one?

25             MS. HANKS:  315.

1             (Inaudible).

2             MS. HANKS:  It's admitted.  Okay.

3             THE COURT:  Yes.

4      Q.   (BY MS. HANKS)  This is an email from C.J. Comu

5  to Dave Welch and Gary Zen.  You have mentioned that you

6  recognize Dave Welch?

7      A.   I recognize the name.

8      Q.   Do you recognize Gary Zen?

9      A.   I don't believe so.

10     Q.   Well, I will tell you that the documents

11 reflect that Dave Welch is associated with First Market

12 Services and Gary Zen is associated with Mayborn.  And

13 in this document he is telling them that he is going to

14 be -- he is attaching documents in transit to Dallas

15 today.  So we're going to look at this attachment, which

16 discusses Ganas shares.

17             And by -- just as a quick aside, do you see

18 this here, C.J. Comu managing partner, The Barclay

19 Group, Inc.?

20     A.   Yes.

21     Q.   And then below that you see, "C.J. Comu, A

22 Venture Capital, LLC, managing partner"?

23     A.   I see that.

24     Q.   Are you familiar with that position of

25 Mr. Comu's?

1     A.   No, I'm not familiar with that company.

2     Q.   So you haven't worked with that company?

3     A.   I don't believe so, no.

4     Q.   Just attached as a transaction journal, within

5  -- and attached to that are -- well, first we have a

6  stock power -- irrevocable stock power.  And this is one

7  of a number attached to this document.  This reflects

8  450,400 shares of Ganas stock, represented by

9  certificate 1077, right?

10     A.   That's what it states, yes.

11     Q.   And it's made out to Barclay Group, Inc., is it

12  not?

13     A.   Yes.

14     Q.   And this basically in -- I believe the language

15  says, sell, assign, transfer to, correct, so this is --

16  by virtue of this document (inaudible) interest in this

17  stock has been assigned over to Barclay Group, right?

18     A.   That's correct.

19     Q.   And that makes sense because Barclay Group

20  purchased the shares by virtue of the stock purchase

21  agreement in October of 2009, didn't they?

22     A.   That's correct.

23     Q.   Okay.  So these are the stock -- this is the

24  stock power that's in Barclay Group's hands.  And we'll

25  go down and we actually have I believe the stock

 1  certificates that are hiding.  Here we go.  I'm going to

 2  try to get to the same one.  Okay.  So that stock power

 3  that we just looked at 450,400 shares, correct?

 4       A.   Yes.

 5       Q.   So this is the stock that it was referencing --

 6       A.   Yes, certificate --

 7       Q.   -- correct?

 8       A.   -- 1077.

 9       Q.   So this is the stock that was assigned over to

10  The Barclay Group in October of 2009?

11       A.   Yes.

12       Q.   Okay.  And same thing, this 85,199,000 shares,

13  assuming there's a stock power attached to this in the

14  same document, same thing?

15       A.   Yes.

16       Q.   That was assigned over to The Barclay Group as

17  of the date of the stock power, correct?

18       A.   Yes, if that assumption is correct.

19       Q.   Now, if you look up, there's a letter attached

20  here on The Barclay Group, Inc. letterhead.  Have you

21  ever heard the name Matt Troster before?

22       A.   I may have.  I recognize Old Monmouth.

23       Q.   So Matt Troster is one of the people at Old

24  Monmouth who handled Green Auto stock transfer.  And

25  right here C.J. Comu is summarizing the stock

1  certificates that TBG received by virtue of the October

2  stock purchase agreements, isn't it?

3      A.   Yes.

4      Q.   And here you have 750,000, 500,000,

5  3.9 million, and then at the bottom 85,199,066 (sic)

6  restricted shares?

7      A.   666, yes.

8      Q.   666 restricted shares.  Okay.  So this is what

9  the Barclays got to contend with, and again, this is a

10  letter by C.J. Comu.  And the following page -- actually

11  let's go back up -- at the bottom of the page at the

12  bottom right, it references 57835 underscore 24.  That's

13  Page 24 of that document, of KLM Exhibit 315.

14      A.   Okay.

15      Q.   At the bottom it says, he's telling Matt

16  Troster, "please find attached list" -- I'm not sure

17  what that is -- well, not quite sure what the first part

18  says, but "kindly return all new" -- in bold caps --

19  "certificates in the FedEx envelope with a prepaid air

20  bill."  Okay.  So by virtue of that, he's asking Old

21  Monmouth to cancel the Ganas stock certificates, issue

22  new Green Auto stock certificates in the new company's

23  name, correct?

24      A.   That's what this appears to request, yes.

25      Q.   And send the stock certificates to C.J.?

1        A.   Well, send it to that air bill completed.

2        Q.   Okay.  Let's look at that.  Here we have an air

3   bill, up here.  There we go.  Matt Troster to C.J. Comu.

4        A.   That's what it states, yes.

5        Q.   Okay.  So the new Green Auto certificates are

6   coming back to C.J. Comu.  And well, note the date of

7   this letter is January 5th, 2010.  That's five or six

8   days after Mr. Comu declared bankruptcy.  Okay.  And in

9   these instructions you will see the same names that we

10   were just talking about with regard to KLM Exhibit 49

11   which is the Old Monmouth stock transfer ledger.  And

12   you see The Barclay Group, correct?

13        A.   I do see that, yes.

14        Q.   And you see Mayborn Limited and First Market

15   Services?

16        A.   I do.

17        Q.   And you see number of shares here.  There's an

18   instruction right there, correct?

19        A.   Yes.

20        Q.   And that's specific to free trading shares,

21   right?

22        A.   That's what it states.

23        Q.   But there's also restricted stock, right?

24        A.   Yes.

25        Q.   And, in fact, down here we've got The Barclay

1    Group discussing 10 million restricted shares that they

2    would like to have issued into a new stock certificate

3    in TBG's name, correct?

4         A.   That's what it states, yes.

5         Q.   Okay.  300,000 of those are to be issued in

6    C.J. Comu's name personally, correct?

7         A.   That's what it states.

8         Q.   And it's C.J. Comu giving this instruction?

9         A.   That's correct, yes.

10        Q.   And we already established that waiting on a

11   FINRA symbol is just a matter of logistics.  I have the

12   stock.  I can sell it in a private transaction.  I can

13   do it whenever I want.  It's just matter of when I

14   decide to request the stock certificate.

15        A.   Generally, yes.

16        Q.   Okay.  We have Sunset Pacific.

17        A.   I see that.

18        Q.   TKY Trust, another First Market Services.  Now

19   Mayborn Limited is in the British Virgin Islands.  Have

20   you done work in the British Virgin Islands?

21        A.   I have not.

22        Q.   And would that be a popular offshore location

23   for businesses to operate?

24        A.   I really don't know.  That's not a part of my

25   practice.

1    Q.   Not a part of your practice.  Okay.  So

2    basically what we know now is that the instructions, the

3    stock certificate transfers that are reflected in the

4    Old Monmouth stock transfer ledger on January 13th were

5    affected in accordance with instructions given by C.J.

6    Comu personally by virtue of this letter on January 5th.

7    And they're split, at least in some respects, according

8    to that memorandum of understanding and the email

9    correspondence with you where he indicates he wants to

10   put these into some sort of structure for the division

11   movement of the stock, correct?

12       A.   Yes, that sounds like a fair summary.

13       Q.   Okay.  Now, TBG's role in the Green Auto merger

14   wasn't its only role when it came to Green Auto, was it?

15       A.   I don't understand the question.

16       Q.   Well, after the merger, they continued

17   performing services for Green Auto, didn't they?

18       A.   I don't know.

19       Q.   Okay.

20            MS. HANKS:  Let's look at KLM Exhibit 253.

21   Is there an objection to this one?

22            THE COURT:  Which one?

23            MS. HANKS:  253.

24            THE COURT:  253.  It's admitted.

25            MS. HANKS:  Okay.

1      Q.   (BY MS. HANKS)  Do you see this right here?

2      A.   I do see that.

3      Q.   This is an email from C.J. Comu to someone

4  named Robert Feeback at Summit Tags -- I'm not quite

5  sure what it is.  But he says, "for the record, The

6  Barclay Group, Inc. owns 99.63 of the public shell that

7  owns 100 percent of Go Green Auto and has an exclusive

8  one-year investment advisory agreement."

9      A.   I see that.

10     Q.   Okay.  So their role was more than just being

11  a, quote, unquote, nominee or assisting with the reverse

12  merger; they were actively involved in providing

13  investment banking advisory services for Green Auto?

14     A.   That's what this reflects.

15     Q.   Okay.  And were you involved in facilitating

16  those services at all in providing legal services to

17  TBG?

18     A.   I don't believe so, no.

19     Q.   Okay.  And then KLM 28.  KLM 28 is, in fact, an

20  advisory agreement between Green Automotive Company

21  Corporation and The Barclay Group, isn't it?

22     A.   That's what it states, yes.

23     Q.   Okay.  And by virtue of this agreement, it

24  looks like TBG is going to continue assisting Green Auto

25  and is going to be getting monthly fees for it, aren't

1   they?

2        A.   That appears to be what this states, yes.

3        Q.   And again, the only person you dealt with over

4   at TBG was C.J. Comu, wasn't it?

5        A.   And Saul Albom.

6        Q.   Saul Albom.  Okay.  Was he -- and he was

7   involved in the Green Auto transaction as well, wasn't

8   he?

9        A.   Yes.

10       Q.   He was elected as one of the directors along

11   with C.J. Comu, wasn't he?

12       A.   That's correct.

13       Q.   And Saul Albom is actually one of the

14   individuals -- he's the only other individual from TBG

15   who executed a document that elected Comu into his

16   position as president and director of Ganas?

17       A.   He executed the board consent as a director of

18   Ganas that appointed the officers, yes.

19       Q.   Okay.  And that would have included appointing

20   C.J. Comu as president of Ganas, correct?

21       A.   It did, yes.

22       Q.   And that was in October of 2009, just barely

23   over two months before he filed for bankruptcy; isn't

24   that correct?

25       A.   I believe that was the date, yes.

1    Q.   Okay.  And it's fair to say that Mr. Comu's

2  role in that Green Auto merger was a significant

3  business transaction, wasn't it?  It was a significant

4  role for a business person to play?

5    A.   I guess so, yeah.

6    Q.   Okay.  If you're an independent consultant, you

7  have your own consulting business; you conduct your

8  reverse merger; you take over the shell as the president

9  and director; you execute all the documents; your entity

10  takes over 95 million shares; that's a pretty big

11  transaction, isn't it?

12    A.   Depending on the value of the shares, yes.

13    Q.   And you would expect that value to be reflected

14  in the individual both running the company and taking

15  the lead role in the deal, wouldn't you?

16    A.   I don't understand that question.

17    Q.   Do you think it's fair to assume that Mr. Comu

18  received no compensation for his role?

19    A.   So you're asking me to make an assumption?

20    Q.   Well, let me ask it a different way.

21    A.   Okay.

22    Q.   The 95 million shares that TBG acquired, those

23  were shares that Mr. Comu enjoyed substantial value in,

24  didn't he?  Barclay Group was his company.  He ran it.

25  He ran this deal.  He put it together.  He executed the

1    documents.  He received the shares.  He issued the

2    shares.  He decided where they went.  Assuming that

3    those shares were sold for cash, that would be a pretty

4    nice deal, wouldn't it?

5         A.  Yes.  Assuming Mr. Comu was the recipient of

6    that cash.

7         Q.  Okay.  Couple of other questions.  Going to go

8    to KLM 212, please.  Well, I say "please", I'm doing it.

9    You're welcome.

10              MS. HANKS:  There's -- is there an

11   objection to this one.

12              THE COURT:  There is not.

13              MS. HANKS:  There is not.  Okay.

14        Q.  (BY MS. HANKS)  Now, in March of 2010 Block &

15   Garden was asked to draft a recommendation letter for

16   Mr. Comu, weren't they -- weren't you?

17        A.  I see this email and I do vaguely remember

18   receiving it, yes.

19        Q.  Okay.  And this was -- you mentioned that you

20   have done some work in the Cayman Islands, correct?

21        A.  We worked with a Cayman Islands firm on one or

22   two occasions, yes.

23        Q.  Okay.  And you said that you hadn't really done

24   much work in the British Virgin Islands though?

25        A.  I don't believe so, no.

1      Q.   Okay.  But this letter reflects a

2  recommendation from Stephen Block -- you were CC'd on

3  the email -- giving a recommendation for Mr. Comu

4  concerning an entity called New Haven Corporate

5  Services, BVI, right?

6      A.   That's what this document is requesting that it

7  reflects, yes.

8      Q.   And this document was created at Mr. Comu's

9  request, wasn't it?

10      A.   I don't know.  This document was received by us

11  originally from Mr. Comu.

12      Q.   Well, by receiving that document from Mr. Comu,

13  did you assume that he was asking for your signature to

14  the letter recommending him?

15      A.   Yes.

16      Q.   Okay.  So it is fair to say that it was

17  prepared -- that this was his request to you?

18      A.   Yes.

19      Q.   Okay.  And again, it relates to this BVI,

20  right?

21      A.   Yes.  That's to whom the letter is addressed.

22      Q.   Okay.  So then we're going to go to KLM 213.

23  Now, this is an email dated March 30th around the same

24  time for Mr. Comu to a woman named Charlotte Jacob.  And

25  it references an entity called West Gate Management

1    Limited.  But in the email string you see below that
2    Charlotte Jacob's email address is New Haven Group,
3    right?
4         A.   I'm sorry.  Where do you see that?  Okay, I see
5    it.  Yes.
6         Q.   You see it, "newhavengroup.com"?
7         A.   Yes, I see that.
8         Q.   Okay.  And we're going to go a little bit
9    further down.  I apologize.  I want to make sure I get
10   the correct -- and just for a little bit of context,
11   this is a couple of months after Mr. Comu declared
12   bankruptcy, and it was before his discharge.
13        A.   Okay.
14        Q.   So on March 12th a couple weeks prior, he gets
15   an email from Charlotte Jacob -- a CC to Charlotte
16   Jacob, but he receives the email from a gentleman named
17   Ruben Anstock.  And it says "West Gate Management
18   Limited.  Dear C.J., I was pleased to meet you earlier
19   today.  I have this afternoon incorporated a BVI company
20   under the above name for you".
21        A.   I see that.
22        Q.   Okay.  And they are in the process of setting
23   up this entity and in that process Charlotte Jacob sends
24   an email on March 15th that says, "Dear C.J., I have the
25   email correspondence between you and Ruben.  I attach a

1  due diligence booklet which you will need to complete,

2  sign and date, and the original must be returned to me

3  with the following."  And the first one is originals of

4  -- they need a reference from an attorney or accountant

5  per the attached specimen and a personal bank reference,

6  correct?

7      A.   Yes, that's what it states.

8      Q.   And he reached out to Block & Garden for that

9  reference, didn't he?

10      A.   Yes -- if the timeline is correct, yes, it

11  looks like he did.

12      Q.   It's on the same day.

13      A.   Okay.

14      Q.   And it's -- the letter that he has drafted for

15  your signature is to the New Haven folks.

16      A.   Okay.

17      Q.   Okay.

18      A.   I don't see that.

19      Q.   So he's setting up a new entity in BVI, and he

20  needs a reference from someone here in the United States

21  who knows his business who's worked with them, and who

22  better than Block & Garden who just completed a big

23  reverse merger in which TBG acquired 95 million shares

24  to recommend him as a successful business person, right?

25      A.   I don't know if that was the recommendation

1   requested.

2       Q.   Well, you certainly didn't say that he was not

3   a successful business person, did you?

4       A.   I don't recall if we actually gave a

5   recommendation or not.

6       Q.   Okay.

7       A.   That probably would have been handled by

8   Mr. Block.

9       Q.   Okay.  So Mr. Block may have given one?

10      A.   He may have.

11      Q.   Okay.  Well, let's look at this then.  C.J.

12  sends an email, "Dear Team New Haven, please find

13  attached following that will be sent via Federal Express

14  tomorrow, C.J. Comu professional bio, passport, bank

15  reference, CPA reference letter."  And you may be

16  correct, perhaps Stephen Block didn't, because it looks

17  like there's a CPA reference letter.  Is there any

18  reason why Mr. Block would not have signed a

19  recommendation letter when requested by Mr. Comu?

20      A.   I couldn't answer that.

21      Q.   Okay.  So not to your knowledge?

22      A.   Not to my knowledge, no.

23      Q.   Okay.  And we are going to go to KLM

24  Exhibit 204.  But clearly with or without Mr. Block's

25  recommendation, he's proceeding with setting up a new

1    entity in BVI, right?

2         A.   That's what it looks like from these documents.

3         Q.   And here above we have some email

4    correspondence with the same Charlotte Jacob, correct?

5         A.   Yes, that's what it states.

6         Q.   August 17th, 2010.  Have you ever heard of an

7    entity called Continental Partnership, Inc.?

8         A.   I don't believe so.

9         Q.   Would it surprise you to know that Continental

10   Partnership, Inc. is the entity that owns Mr. Comu's

11   house?

12        A.   I don't have any information regarding that

13   company at all.

14        Q.   Okay.  So you have never done any business with

15   them and he's never mentioned that entity to you?

16        A.   No.

17        Q.   But here we have a certificate of incorporation

18   for Continental Partnership, Inc. in the British Virgin

19   Islands, right?

20        A.   I see that, yes.

21        Q.   And this was -- this is the entity that with --

22   through New Haven Group that he was requesting a

23   recommendation from Block & Garden for, wasn't he?

24        A.   I don't know.

25        Q.   Okay.  Do you have any reason to believe it

1  wasn't --

2       A.   No.

3       Q.   -- given the fact that we're talking about the

4  same individuals and a BVI entity?

5       A.   No.  Only that the previous documents had the

6  name West Gate on it, so...

7       Q.   It did.  That is correct.  And there is

8  correspondence that reflects that that name was

9  unavailable, so they found another one.

10      A.   Okay.

11      Q.   But here we have -- do you know what a nominee

12  service is, by the way?

13      A.   In general terms, yes.

14      Q.   Okay.  General terms, what is a nominee

15  service?

16      A.   A nominee service is you can hire someone to

17  act in various capacities as your nominee, kind of as

18  your proxy.

19      Q.   Okay.  And so if somebody is acting in your

20  proxy, their name shows up on the corporate documents,

21  not yours, right?

22      A.   That -- typically, yes.

23      Q.   And there's benefits to that, correct?

24      A.   I guess so, yeah.

25      Q.   Not the least of which is that your creditors

1  don't know that the asset is in your name, do they?

2      A.   Typically not.

3      Q.   This is, of course, a long document, and I'm

4  trying to find the -- all right.  So we've got the

5  certificate of incorporation.  We've got the date.  We

6  know that Mr. Comu requested a recommendation from Block

7  & Garden, his attorneys, TBG's attorneys with regard to

8  Green Auto to recommend him as someone who was an

9  upstanding business person so that he could set up this

10  account.  And here he conveys this information to

11  Ms. Jacobs.  They actually ask for additional

12  information, utility bills, things of that nature.

13             And I'm not sure the nature of the

14  correspondence.  But this email is C.J. receiving the

15  certificate of incorporation (inaudible) of CPI.  And I

16  think I skipped over it.  Oh, here we go.

17             August 17th, 2010, "Charlotte, thank you

18  for your mail.  I will gather and deliver the docs you

19  requested.  The account will primarily be U.S. dollars.

20  If I wanted to operate this account personally if this

21  is acceptable, may I get a copy of incorporation docs?

22  Thank you".

23      A.   That's what it says, yes.

24      Q.   And in response she needs the incorporation

25  docs, doesn't she?

1      A.   It appears so, yes.

2      Q.   Okay.  So basically what we have is just a few

3  months after bankruptcy Mr. Comu has set up a BVI

4  entity.  He has asked his lawyers for a recommendation

5  so that he can do so.  And he has instructed New Haven

6  that he wants to operate the bank account in U.S.

7  dollars personally, doesn't it?

8      A.   That appears to be what that email stated, yes.

9      Q.   Okay.  One more.  KLM Exhibit 211.  Now again,

10  you mentioned something about -- you were describing

11  nominee services, correct?

12      A.   Yes.

13      Q.   And so if this woman here Anne Boureau

14  B-O-U-R-E-A-U, if she were acting as a nominee on behalf

15  of Mr. Comu, then her name would appear on certain

16  corporate documents, wouldn't it?

17      A.   Well, it depends on the form of the agreement.

18  And I know that for some -- some of these companies set

19  up in, you know, the Caribbean, oftentimes they require

20  that like a director or an officer be a local resident,

21  so that is the purpose of some of these types of

22  agreements.

23      Q.   Okay.  Would that person be evident on the

24  corporate documents?

25      A.   I don't know exactly where the names might

1  appear in public filings and various jurisdictions.

2       Q.   Are you aware that in 1986 Mr. Comu was the

3  subject of a permanent SEC injunction?

4            MR. OLSON:  Objection, Your Honor.  It's

5  just not relevant.

6            MS. HANKS:  It's already been asked as part

7  of testimony that's come into the record, Your Honor.

8            THE COURT:  Overrule the objection.

9       A.   I'm sorry.  Could you repeat the question?

10      Q.   (BY MS. HANKS)  Are you aware that in 1986

11 Mr. Comu was the subject of a permanent injunction

12 issued by the SEC against trading unregistered shares?

13      A.   No, I don't believe I'm aware of that.

14      Q.   This is the first you have heard of it?

15      A.   I believe so, yes.

16      Q.   And would that affect -- do you think that

17 would affect Mr. Block's willingness to recommend

18 Mr. Comu as to issue a recommendation for Mr. Comu

19 setting up an entity in the Caribbean when asked if he

20 was subject to an SEC injunction?

21           MR. OLSON:  Objection.  Calls for

22 speculation.

23           THE COURT:  Sustained.

24      Q.   (BY MS. HANKS)  Would it affect your

25 willingness to give him a recommendation?

```
 1        A.   Depends on the context of the recommendation
 2   request.
 3        Q.   Well, this context.  He sent an email attaching
 4   a letter to you and Steve Block, didn't he?
 5        A.   He did.
 6        Q.   And that letter asked for the recommendation of
 7   Block & Garden, didn't it?
 8        A.   I believe it did, yes.
 9        Q.   So he was also asking you if you would be
10   willing to recommend him, wasn't he?
11        A.   I was copied on the email.
12        Q.   Okay.  And you didn't, did you?
13        A.   I don't believe I did.
14             MS. HANKS:  Your Honor, I think that's all
15   the questions we have.
16             Thank you, Mr. McNeill.
17             THE WITNESS:  You're welcome.
18             THE COURT:  Okay.  Pass the witness.
19             Mr. Elmquist.
20                    CROSS EXAMINATION
21   BY MR. ELMQUIST:
22        Q.   Good afternoon, Mr. Block (sic).  I'm David
23   Elmquist, I think -- Mr. Block -- Mr. McNeill.  I think
24   we met briefly at -- no, that was -- never mind.  That
25   was Mr. Block we met with.
```

1            All right.  Block & Garden has represented

2  The Barclay Group over an extended period; was that your

3  testimony?

4       A.   Yes, since at least 2009.

5       Q.   And I think you indicated it continues to

6  represent Barclay Group?

7       A.   I don't think we're presently doing anything

8  for them, but yes, we do stuff from time to time.

9       Q.   Do you know who the engagement partner is for

10 that relationship?

11      A.   Mr. Block.

12      Q.   And has Mr. Block been involved in providing

13 legal services to The Barclay Group?

14      A.   Yes.

15      Q.   So who all at Block & Garden, as far as working

16 attorneys, has been involved in that representation?

17      A.   Myself, Mr. Block, and perhaps at some point

18 one of the way -- along the way, one of our prior

19 associates who is no longer with us.

20      Q.   Okay.  Describe for me in general the types of

21 legal services you provided to The Barclay Group?

22      A.   We assisted with this transaction.

23      Q.   This transaction being the Go Green

24 transaction?

25      A.   The Go Green transaction, yes.

1          Q.    Okay.

2          A.    I believe we did some research regarding the

3    ability to trade restricted shares under Rule 144, SEC

4    Rule 144.  And we represented The Barclay Group in a --

5    in some litigation in Salt Lake City, Utah with respect

6    to transfer of some of this stock.

7          Q.    Okay.  Let's talk about the legal services you

8    performed in connection with trading restricted shares.

9    Do you recall about when that work was done?

10         A.    2010 or '11, probably.

11         Q.    There's been a lot of discussion and documents

12   introduced referring to restricted and unrestricted

13   shares.  Can you describe for the Court generally what

14   the difference is between restricted and unrestricted

15   shares in this context?

16         A.    Yes.  Generally if shares were originally

17   issued by the issuer, the company, in this case Ganas

18   Corp, not in a public -- not in a publicly registered

19   offer.  So rather than doing a registration statement

20   with the SEC and registering the shares for sale to the

21   public if they did private placement and privately

22   issued shares to an investor, those are called

23   restricted shares because they were not issued in a

24   public offering.

25              And there are certain restrictions under --

1   well, let me say it differently.  SEC Rule 144 creates a

2   safe harbor rule that if you -- if a holder of

3   restricted stock sells restricted -- the restricted

4   stock in accordance with the Rule 144 safe harbor, he or

5   she or it will not be deemed an underwriter for purposes

6   of the SEC statutes and regulations.

7             So, you know, restricted shares are shares

8   that, hence the name, have certain limitations on the

9   manner or the volume in which they can be sold.

10      Q.   Can restricted shares be sold privately between

11  one individual and another?

12      A.   Yes.

13      Q.   So there are no SEC rules or regulations that

14  would preclude, say, The Barclay Group or Mr. Comu if he

15  owned shares of stock from selling restricted shares to

16  his wife, for instance?

17      A.   No, I don't believe so.

18      Q.   There's reference in the documents to

19  free-trading shares and unrestricted shares.  Are those

20  terms synonymous?

21      A.   I think so.  I mean those are just shares that

22  you could put in your brokerage account and let your

23  broker trade on the public market.

24      Q.   Based upon what you were describing in terms of

25  what services Block & Garden has performed I take it

1  that Block & Garden was not involved in any of the

2  transactions which gave rise to The Barclay Group's sale

3  or transfer of stocks to third parties?

4      A.   No.

5      Q.   Do you recall being contacted by Mr. Comu

6  seeking legal advice with respect to any such

7  transactions?

8      A.   No, not specifically.  I mean we were contacted

9  about Rule 144 in general, but...

10     Q.   Right.  Yeah, let's go back to that.  Did you

11  issue some form of opinion letter or some advice

12  generally with respect to selling restricted shares

13  pursuant to Rule 144?

14     A.   Not an opinion letter.  I think we drafted a

15  memorandum.

16     Q.   Okay.  And do you recall in what context that

17  was prepared?  Was it prepared in connection with the

18  sale of the Green Auto restricted shares?

19     A.   I believe it was, yes.

20     Q.   In discussing your involvement with The Barclay

21  Group, you mentioned that in addition to dealing with

22  Mr. Comu you dealt with a Mr. Album A-L-B-U-M, I think

23  it is?

24     A.   Yes.

25     Q.   And he was initially one of the directors of

1   The Barclay Group; is that correct?

2        A.   No.  He was one of the directors of Ganas Corp.

3        Q.   Oh, Ganas Corp.  Thank you.  Okay.  So let me

4   be clear on this.  You dealt with Mr. Album as an

5   officer or director of The Barclay Group?

6        A.   I understood him to be an employee or --

7        Q.   So you don't know what his capacity was?

8        A.   No, I don't know what formally his capacity was

9   with The Barclay Group.

10        Q.   Do you know -- did you deal -- you understand

11   generally what is meant by corporate compliance issues?

12        A.   In what context?

13        Q.   Well, corporation complying with the laws in

14   terms of reporting requirements, holding board or

15   shareholder meetings, are you generally familiar with

16   what the law requires in that respect?

17        A.   Yes.

18        Q.   Did Block & Garden provide any kind of legal

19   advice for services relating to corporate compliance

20   issues with The Barclay Group?

21        A.   Not that immediately comes to mind, no.

22        Q.   Were there services performed by Mr. Block for

23   The Barclay Group that you would not have been privy to?

24        A.   Perhaps.

25        Q.   Who sent out the billing invoices for Block &

Case 10-03269-sgj Doc 185 Filed 10/22/14   Entered 10/22/14 13:46:11   Page 214 of 261
Case 3:14-cv-04163-B   Document 1-7   Filed 11/21/14   Page 96 of 266   PageID 1611
214

1    Garden with respect to The Barclay Group?

2         A.   Our office manager Fawn Gomez.

3         Q.   Did some attorney review those before they were

4    sent out?

5         A.   Yes, the billing partner would.

6         Q.   Were you the billing partner?

7         A.   No.  Mr. Block's the billing partner for The

8    Barclay Group.

9         Q.   Were you asked to review the bills before they

10   were sent out?

11        A.   Only if there was a question.  Only if

12   Mr. Block had a question regarding one of my time

13   entries.

14        Q.   Okay.  I want to talk to you about Trustee's

15   Exhibit 73.  That's back up on the screen there,

16   Mr. McNeill.  If you'd go back and take a look at

17   Paragraph 1A.

18        A.   Yes.

19        Q.   And it says the parties acknowledge that party

20   A, which is the Mayborn Group, you see that -- the

21   reference to party A is defined in --

22        A.   Yes, I see that.

23        Q.   Okay.  So the parties acknowledge that party A

24   has paid the following sums for the purchase of Ganas

25   and says 120,000 USD, I take that to be U.S. dollars, do

1  you agree, USD would be U.S. dollars?

2       A.   I would assume so, yes.

3       Q.   To Block & Garden, LLP, for the purchase of

4  Gnas -- I think that's supposed to be Ganas and legal

5  filing fees.  That indicates to me that the Mayborn

6  Group was paying legal fees that Block & Garden had

7  billed to The Barclay Group for the work it had done for

8  The Barclay Group.  Is that your reading of it?

9       A.   That's my reading of this, yes.

10       Q.   Do you know whether in fact the Mayborn Group

11  paid legal fees in connection with the services you

12  performed for The Barclay Group?

13       A.   I don't know for a fact, but I would be very

14  surprised if we received any payment from the Mayborn

15  Group.

16       Q.   Did you indicate that the memorandum of

17  understanding that's reflected here was not implemented

18  or do you know one way or another?

19       A.   I don't -- my recollection is that the

20  formation of the company, the joint venture document

21  that I sent out, prepared and sent out in December 2009,

22  my recollection that that was -- that was never

23  effectuated.

24       Q.   Never effectuated.  Okay.

25       A.   To my knowledge.

```
 1        Q.   I would like to ask you about Trustee's
 2   Exhibit 61.
 3             MR. ELMQUIST:  Thanks.  Will you blow that
 4   up?
 5        Q.   (BY MR. ELMQUIST)  Okay.  Are you familiar with
 6   Exhibit 61, or stating it another way, is this an
 7   agreement you drafted?
 8        A.   No, I don't believe so.
 9        Q.   Have you ever seen it before?
10        A.   I don't believe so.
11        Q.   Okay.  If you would take a moment to read the
12   first paragraph of this document to yourself and let me
13   know when you're done.
14        A.   I have read that first paragraph.
15        Q.   Well, first of all, I will represent to you
16   that this agreement supposedly involves the exchange of
17   all of the outstanding common stock of The Barclay Group
18   in exchange for 99 percent of ownership of a -- of what
19   was supposed to be a UK formed entity called Brown and
20   Lampe.  Okay?
21        A.   Okay.
22        Q.   In the first paragraph it states that the
23   person's executing this agreement referred to
24   collectively as shareholders, do you see that?
25        A.   I see that.
```

1       Q.    Who own at least 80 percent of the outstanding

2   shares of TBG.  Let me first of all ask you, based upon

3   your knowledge of corporate transactions and mergers, if

4   there was to be 100 percent exchange of all of the

5   issued stock of The Barclay Group in exchange for

6   99 percent of this UK company, would that typically

7   require the approval of all shareholders of Barclay

8   Group?

9       A.    If it was a voluntary exchanges or tender

10  offer, yes.

11      Q.    Could you take -- I want you to look at the

12  last page of this document.  You will see the signature

13  page is signed by Brown and Lampe, PLC and by Mr. --

14  appears to be Mr. Comu on behalf of The Barclay Group,

15  correct?

16      A.    I see that, yes.

17      Q.    There's no indication that any shareholders

18  signed this agreement; is that right?

19      A.    Not on this page, no.

20      Q.    Would you expect based upon the first paragraph

21  of the document and what would be required for a share

22  exchange, for the shareholders, not Mr. Comu in capacity

23  as chairman and CEO, to sign this agreement?

24      A.    Sir, could you take it back to the first

25  paragraph?

1    Q.   Yeah.   This agreement indicates it's an

2  agreement between Brown and Lampe and the shareholders

3  of The Barclay Group, correct?

4    A.   That's what it states, yes.

5    Q.   Yet the shareholders did not -- unless Mr. Comu

6  is the sole shareholder, the shareholders didn't sign

7  this agreement, correct?

8    A.   I didn't see a separate signature line for

9  that.

10    Q.   I can tell you there's no separate signature

11  page.

12    A.   Okay.

13    Q.   If, in fact, this was to be a legally effective

14  document in terms of a share exchange, it would require

15  a signature by the shareholders of The Barclay Group and

16  not by Mr. Comu as president and CEO, correct?

17    A.   That's -- could be splitting hairs.  I don't

18  know if I --

19    Q.   Well --

20    A.   You would expect that.  I mean would that make

21  it ultimately unenforceable if the person who signed it

22  in one capacity also held the other capacity, I couldn't

23  answer that without doing some research.

24    Q.   Well, let's -- okay.  If Mr. Comu was

25  100 percent owner of The Barclay Group, it would be

1  legally effective, wouldn't it?

2      A.   I suspect it would be upheld.

3      Q.   I mean that would be -- I mean in terms of the

4  manner in which he signed it, if he was 100 percent

5  owner than to say he didn't sign it in the correct

6  capacity would be splitting hairs, would be sort of form

7  over substance, right, because he owns the company --

8      A.   Correct.

9      Q.   -- right?  But if he doesn't own all the

10 shares, then this agreement couldn't be legally

11 effective if it's an agreement supposedly between the

12 shareholders, all the shareholders of The Barclay Group

13 and Brown and Lampe, right?

14     A.   I would not expect it to be effective to

15 transfer 100 percent ownership of TBG if it was not

16 signed by any other shareholder who held any TBG.

17     Q.   So in order for this to be a legally effective

18 document, Mr. Comu would have had to have been

19 100 percent shareholder?

20     A.   Again, that's...

21     Q.   You're not willing to speculate on that?

22     A.   Yeah, that -- without reviewing the whole

23 document, that would require speculation.

24     Q.   Okay.  Mr. McNeill, do you have any knowledge

25 of the ownership of The Barclay Group, who owns The

1    Barclay Group?

2        A.   I have been told that Mr. Comu owns one percent

3    and I believe a UK individual owns the rest.

4        Q.   Have you heard the name Bernard Brown?

5        A.   Only in this litigation.

6        Q.   Was there any legal work that you can think of

7    that you or anyone at Block & Garden did that would have

8    caused you to determine the legal ownership of The

9    Barclay Group?

10       A.   Not to my knowledge, no.

11       Q.   Do you have any knowledge of who the corporate

12   officer and directors of The Barclay Group --

13       A.   Only --

14       Q.   -- are today or have been at any time other

15   than Mr. Comu?

16       A.   No.  Other than Mr. Comu, no.

17       Q.   Based upon the documents you've seen, you

18   believe Mr. Comu to be the sole officer and director of

19   The Barclay Group?

20       A.   I don't know if I could -- I couldn't tell you

21   that he is the sole one.

22       Q.   Well, from the standpoint of a corporate

23   officer, have you ever dealt with anyone other than

24   Mr. Comu as a corporate officer of The Barclay Group?

25       A.   No.

```
1        Q.   Have you ever performed any legal work for a
2   company called -- or partnership called Sunset Pacific?
3        A.   I don't believe so.
4        Q.   Do you know anything about Sunset Pacific from
5   any discussions with Mr. Comu?
6        A.   I don't believe I have ever heard that name.
7             MR. ELMQUIST:  That's all.  Pass the
8   witness.
9             THE COURT:  All right.  Mr. Olson -- Ms.
10  Hanks?
11            MS. HANKS:  I was just going to ask
12  Mr. Olson if he also needs help with the exhibits.
13            MR. OLSON:  No, I don't think so.
14            (Inaudible).
15            THE COURT:  I've got them up here if I need
16  them.
17                    CROSS EXAMINATION
18  BY MR. OLSON:
19       Q.   Have you represented Mr. Comu personally?
20       A.   No, I don't believe we have.  And I checked to
21  see if we had any personal engagement letters with him
22  and my office manager didn't find any.
23       Q.   All right.  So you don't represent C.J. Comu?
24       A.   No.
25       Q.   Was this Ganas transaction done for C.J. Comu
```

1    or for The Barclay Group?

2         A.    We represented The Barclay Group.

3         Q.    And we were looking at the documents that were

4    signed to appoint directors and then to appoint a

5    president of Ganas, correct?

6         A.    Correct.

7         Q.    And I don't remember now.  I think they're 80

8    and 81 or 81 and 82.  But did you prepare these

9    documents?

10        A.    I did.

11        Q.    And why were those documents prepared?

12        A.    The company needed to have officers and

13   directors in order to prove and execute merger agreement

14   with Go Green USA, LLC, whatever the name of that

15   company was.

16        Q.    Because when they bought the stock from the

17   people that owned the shell, the officers and directors

18   that existed before that were no longer officers and

19   directors?

20        A.    I believe they resigned as part of that sale.

21        Q.    So you had to prepare a document for somebody

22   to be appointed in order to close the sale?

23              MS. HANKS:  Your Honor, we are going to

24   object to leading.  This is Mr. Comu's attorney, The

25   Barclay Group's attorney.

1          THE COURT:  Sustained.

2          MR. OLSON:  Your Honor, first of all, I

3  didn't call this witness.  Second, she has already heard

4  the testimony that he doesn't represent Comu.  We've

5  already waived any privilege that there is, so that he

6  can testify about what he knows.

7          THE COURT:  I sustain the objection.

8     Q.   (BY MR. OLSON)  When you prepared the documents

9  to appoint directors, who did you submit those to?

10    A.   It was either Mr. Comu or Mr. Albom.

11    Q.   And did you tell them why you prepared them

12 that way?

13    A.   We had discussion about why we were preparing

14 those -- why we needed those documents, yes.

15    Q.   And so they agreed to execute them?

16    A.   Yes.

17    Q.   And after the closing of that transaction on

18 November 4th then who were the officers and directors of

19 the surviving entity?

20    A.   That should have been stated in the merger

21 agreement.  Typically it would be -- well, if we went to

22 the merger agreement, I could tell you.  I believe it

23 was the officers and managers of Go Green.

24    Q.   Mr. Fly?

25    A.   Yes.  And some others or perhaps --

1          Q.   Mr. Wells?

2          A.   -- some others.

3          Q.   So how long was Mr. Comu a director or a

4    president of Ganas?

5          A.   About a week.

6          Q.   Not before that and not after that?

7          A.   Not to my knowledge, no.

8          Q.   What do you know about TBG and its business and

9    number of people that work there and what they do?

10         A.   Very little.

11         Q.   Have you been to their offices?

12         A.   I am trying to recall.  I know which building

13   they office in.  I have been to that building.  And I

14   was trying to remember had I been to their suite or not.

15   I think I have one time.

16         Q.   Okay.  And were there people up there besides

17   Mr. Comu?

18         A.   There were other people up there, yes.

19         Q.   All right.  Now, when you have somebody like

20   TBG put together and close one of these deals, is there

21   a term for what TBG's role is in this?

22         A.   No, not one that immediately comes to mind.

23         Q.   Do you call them a broker or a banker or some

24   other --

25         A.   An investment banker or broker, something along

1  those lines, yes.  That would be a common umbrella for

2  these types of services.

3       Q.   And is that commonly done by an individual?

4       A.   No.

5       Q.   Why is that?

6       A.   Well, because these types of transactions carry

7  risks, so you usually do that through a company to

8  protect yourself from personal liability.

9       Q.   And people in the shoes of Ganas shareholders

10  and Go Green would expect to deal with an entity as

11  opposed to an individual?

12      A.   I don't know what they would expect.

13      Q.   But that's typically what happens, isn't it?

14      A.   Yeah.  It's usually you acquire a shell like

15  this from a -- a company would hold it.

16      Q.   And is it fair to sum up your 144 memorandum

17  that it's legal to sell restricted stock as long as the

18  newly issued certificate continues to carry the

19  restriction legend?

20      A.   Yes.

21      Q.   And are you familiar with the value to place on

22  the restricted stock when you receive it?

23      A.   I'm sorry.  Could you repeat the question?

24      Q.   Do you do any IRS tax work with Section 83 of

25  the Internal Revenue Code?

 1          A.   No, I don't personally.

 2               MR. OLSON:  All right.  I'll pass the

 3     witness.

 4               THE COURT:  All right.

 5               Redirect?

 6               MS. HANKS:  Just a few short questions,

 7     Your Honor.

 8               THE COURT:  Okay.

 9                    REDIRECT EXAMINATION

10     BY MS. HANKS:

11          Q.   Mr. McNeill, you were asked I believe by

12     Mr. Elmquist if Block & Garden was involved in

13     transferring any shares to third parties with regard to

14     the TBG's interest in Ganas, right?

15          A.   Yes.

16          Q.   And I believe that your answer was no?

17          A.   I believe that was my answer, yes.

18          Q.   I just want to clarify that, because how I

19     understood your testimony was you had assisted in

20     drafting a Green Holdings Joint Venture agreement,

21     correct?

22          A.   Yes, we did assist in drafting that.

23          Q.   And that involved the question of dividing

24     these 95 million shares among three parties, correct?

25          A.   I believe that was part of that, yes.

1    Q.    Okay.  So you may not have been involved in the

2    far down the river distributions to various third

3    parties, but you were involved at least in some level in

4    TBG's efforts to shift those or to break out that 95

5    million tranches of shares into three groups, right?

6        A.    Yes, that's fair.

7        Q.    Okay.  I just wanted to clarify that.

8        A.    Thank you.

9        Q.    The second thing I would like to clarify is you

10   said that you have been told that TBG is owned one

11   percent by C.J. Comu.  By whom?

12       A.    Mr. Comu.

13       Q.    Mr. Comu.  And in what context did he tell you

14   that?

15       A.    I guess what do you mean by what context?

16       Q.    Did he tell you that recently?

17       A.    Yes.

18       Q.    When?

19       A.    Last week.

20       Q.    You spoke with Mr. Comu last week about your

21   testimony?

22       A.    No, not about my testimony.

23       Q.    Okay.  Well, why was he talking to you about

24   his percentage ownership in Barclay Group?

25       A.    He was talking about the upcoming trial.

1    Q.   Okay.  And had he ever raised the issue of his

2    ownership interest in The Barclay Group before a week

3    ago?

4    A.   I'm trying to remember.  I don't remember.  I

5    remember he has said in the past that he has an investor

6    in UK who he has to run stuff by.

7    Q.   But this is the first time you've had a

8    conversation with Mr. Comu a week before trial where he

9    tells you he owns one percent in The Barclay Group?

10   A.   It's the first time he's named a percentage,

11   yes.

12   Q.   Okay.  One other quick question.  Mr. Olson

13   asked you about the timing of Mr. Comu's appointment as

14   Ganas president and director, correct?

15   A.   Yes.

16   Q.   And it was only approximately a week,

17   correct --

18   A.   I believe --

19   Q.   -- that he served in those positions?

20   A.   -- I believe that's correct, yes.

21   Q.   And then when the merger agreements were

22   effectuated in November of 2009, there were new Green

23   Auto executives installed in those positions, correct?

24   A.   We would have to check the merger agreement,

25   but I believe that's the case, yes.

1    Q.   Okay.  Does that render those -- those

2  appointments as director and president irrelevant or

3  unimportant?

4    A.   Umm --

5    Q.   Well, let me rephrase the question.  I don't

6  think that's a very good question.

7           As a lawyer who deals with these kinds of

8  transactions and who has clients who engage in these

9  kinds of transactions and presumably because you have

10  clients who pay you for your services with regard to

11  these kinds of transactions, they have value, right?

12    A.   Presumably.

13    Q.   It's a significant fact to you as a lawyer who

14  works in these areas to know who it is and what entity

15  serves in these roles as sole shareholder, president,

16  director, these positions when a reverse merger takes

17  place?

18    A.   We need to make sure the documents are prepared

19  with the proper authority, yes.

20    Q.   Okay.  And so you would want to know who did

21  that, wouldn't you?

22    A.   I think so, if I understand your question.

23    Q.   Okay.  It's -- as somebody who's trying to

24  learn something about the Green Auto transaction, it's

25  of interest that Mr. Comu was appointed as president and

1    director of Ganas in order to effectuate all of the

2    merger agreements, all of the documents, the stock

3    purchase agreements with Ganas, those are significant

4    facts, are they not?

5        A.   Those were significant pieces of the

6    transaction, yes.

7        Q.   Okay.  Significant pieces of the transaction, a

8    transaction that yielded 95 million shares, right?

9        A.   Yes.

10       Q.   Okay.  Now, even if Mr. Comu was only in that

11   position for a week and even if that position was never

12   intended to last longer than a week, wouldn't you think

13   that that information would be disclosed to Mr. Comu's

14   creditors when he filed for bankruptcy because that

15   information is relevant to his business activities?

16       A.   I am not familiar with the bankruptcy

17   disclosure rules.

18       Q.   Okay.  You don't need to be.  My question is,

19   is Mr. Comu's appointment as director and president of

20   Ganas and his authority and actual use of that authority

21   in effectuating all of those corporate documents, is

22   that relevant to his business activity and his interest?

23   It's a very simple question, Mr. McNeill.  It's --

24       A.   It's relevant to --

25       Q.   -- not a trick question.

1       A.   Okay.  It's relevant to his business

2  activities.  I don't know what you mean by interests.

3       Q.   Okay.  Would someone who is involved in a

4  transaction of this magnitude, who is involved with the

5  parties like this, who is working on PPMs, who is

6  working on financing, who is working on investors, who

7  is working on foreign entities, do you think that is

8  relevant to the value of his assets or his debt, his

9  position in the business community, his potential

10 income, his actual income from that time period when he

11 conducted that transaction, would it be relevant to you?

12      A.   Not really.

13      Q.   No.  If you wanted to know something about

14 Mr. Comu's business situation, his professional

15 affiliation, and his financial situation, you wouldn't

16 care that he spearheaded this whole transaction a month

17 -- like two months before he filed bankruptcy?

18      A.   The transaction as a whole I think might be

19 relevant.  The fact that he served as an officer or

20 director in and of itself isn't -- that was -- in my

21 view, with my knowledge of the transaction, rather

22 ministerial part of the entire transaction.

23      Q.   Okay.  Well, then two quick follow-up

24 questions.

25           Number one, if he disclosed nothing about

1   that transaction, would that make it more difficult to

2   understand what his real financial situation was and his

3   real professional situation was when he was headed into

4   bankruptcy?

5        A.   I --

6        Q.   He didn't tell you anything about the

7   transaction at all?

8        A.   I don't understand the question.

9        Q.   Okay.  I'll withdraw that question and ask you

10  this.  If there is a document that requires Mr. Comu to

11  tell the Court, to tell the trustee, to tell his

12  creditors under penalty of perjury all of the executive

13  positions that he has held in the last six years as

14  officer, director, president, CEO, anything of that

15  nature, would you expect his appointment as president

16  and director of Ganas in this transaction to be included

17  on that list?

18       A.   Yes.  I would expect so.

19            MS. HANKS:  Thank you.  I will pass the

20  witness, Your Honor.

21            THE COURT:  All right.

22            Any recross?

23                 RECROSS EXAMINATION

24  BY MR. ELMQUIST:

25       Q.   Mr. McNeill, I want to go back to this

1    conversation you had recently with Mr. Comu concerning

2    his ownership --

3         A.   Yes.

4         Q.   -- in The Barclay Group.  Tell me more about

5    that conversation.  How did it come about?  Did you call

6    him or did he call you?

7         A.   It was Friday --

8         Q.   Was it -- I'm sorry.  Was it a telephone

9    conversation?

10        A.   Yes, it was a telephone conversation.

11        Q.   So do you recall who called whom?

12        A.   I think he called me.

13        Q.   Okay.  And did he say the reason for his call?

14        A.   It was a response actually to some of our

15   collection efforts on some of The Barclay Group's

16   outstanding balances.

17        Q.   Okay.  And in the course of that discussion, he

18   talked to you about the trial?

19        A.   Very briefly.  It was perhaps a one-minute

20   discussion.

21        Q.   Okay.  So what did he tell you that this trial

22   concerned?

23        A.   Bear with me.  I have had quite a busy week.

24   So I'm trying to remember specifically.

25                   He just said it had to do with The Barclay

1  Group, which he only owns one percent of.

2       Q.   Did he tell you about that ownership

3  interest -- when he told you about that, was he telling

4  you in the context of what he expected to be -- what you

5  expected to be testifying about at trial?

6       A.   No, I didn't get the impression that that was

7  why he was saying it.

8       Q.   So why was he saying it?

9       A.   You would have to ask Mr. Comu.

10      Q.   Okay.  So did you have any response or reaction

11  or say anything in response to his statement about his

12  ownership of The Barclay Group?

13      A.   I told him that I really didn't want to know

14  anything about, you know -- I didn't want to discuss

15  the, you know, anything relating to the trial and the

16  testimony I would be giving.

17      Q.   Did Mr. Comu talk to you about his ownership

18  interest in such a way that you perceived that his

19  ownership in The Barclay Group would be one of the

20  issues at trial?

21      A.   No.

22      Q.   So just out of the blue he said "I have one

23  percent interest in The Barclay Group"?

24      A.   He just said something like, you know, "this

25  all deals with The Barclay Group, and you know, I don't

1    know what the big deal is.  I only own one percent of

2    it."

3        Q.   Okay.  So he was talking to you about it in the

4    context of what the trial was about?

5        A.   Yes.

6        Q.   Okay.

7              MR. ELMQUIST:  Nothing further.  Thank you.

8              THE COURT:  Any recross?

9                    RECROSS EXAMINATION

10   BY MR. OLSON:

11       Q.   Mr. McNeill, didn't Mr. Comu tell you that he

12   was calling you to ask you to call me?

13       A.   On Friday?

14       Q.   The day that he called you and was saying "I've

15   got this upcoming trial", did he say, "I was asked to

16   call you and have you call my lawyer"?

17             MS. HANKS:  Objection.  Leading, Your

18   Honor.

19             MR. OLSON:  You bet.

20             THE COURT:  Sustained.

21       Q.   (BY MR. OLSON)  Let me ask it this way.  As a

22   result of that conversation, did you call me?

23       A.   We spoke on Friday.  I don't know if it was as

24   a result of that conversation or not.

25       Q.   Didn't I tell you that I wanted you to contact

1   Ms. Hanks because she wanted to call you as a witness?

2           MS. HANKS:  Objection.  Leading, Your

3   Honor.

4           THE COURT:  Overruled.

5       A.   Yeah, we did speak regarding me contacting

6   Ms. Hanks for my availability.

7       Q.   (BY MR. OLSON)  And to the best of your

8   recollection, tell the Court and Ms. Hanks and

9   Mr. Elmquist what you said and I said?

10      A.   We spoke a couple times; which time are we

11  talking about?

12      Q.   I asked you to contact Ms. Hanks.  Did you do

13  that?

14      A.   Yes.  You sent --

15      Q.   Contact information?

16      A.   -- contact information by email and then I

17  replied and I believe Ms. Hanks contacted me.  And I

18  told her --

19      Q.   I don't care what you told her.

20      A.   Okay.

21      Q.   But that's how you came here without a

22  subpoena, right?

23      A.   Yes.

24      Q.   Now, one last question.  On this joint venture

25  agreement that you drafted so that the stock would be

1    divided a third, a third, a third, was it your prior

2    testimony here today that that agreement was never

3    signed as far as you know?

4        A.   As far as I know.

5              MR. OLSON:  No further questions.

6              THE COURT:  All right.  Thank you, Mr. O'

7    Neill - or excuse me -- McNeill.  Does anyone anticipate

8    perhaps recalling him or -- he technically doesn't have

9    a subpoena to release him from.  But I want him clear

10   whether or not he may be recalled this week.

11             MR. ELMQUIST:  Your Honor, I don't

12   anticipate recalling him.

13             THE COURT:  Okay.

14             MR. OLSON:  No, ma'am.

15             MS. HANKS:  No, Your Honor.

16             THE COURT:  All right, Mr. McNeill, you are

17   excused for the week.

18             THE WITNESS:  Thank you, Your Honor.

19             THE COURT:  All right.  Thank you.

20             All right.  Let's talk about can we

21   accomplish anything more today.  If we're going to

22   continue going forward, I need a 10-minute break, but I

23   do need to stop at 5:00.  I have got a 5:30 meeting.

24             So what is plaintiff's intention as far as

25   next evidence?

1    MS. HANKS:  We would like to call Mr. Comu

2    next and we would like to get started.  We don't need to

3    go past 5:00 but we would like to get started.

4    THE COURT:  All right.  We'll take a

5    10-minute break.  Come back about 4:28.

6    THE CLERK:  All rise.

7    (Break taken.)

8    THE COURT:  Be seated.  All right.

9    Plaintiffs, your next witness.

10    MS. HANKS:  We call Mr. Comu.

11    THE COURT:  All right.  Mr. Comu, please

12    raise your right hand.

13    CENGIZ COMU,

14    having been first duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MS. HANKS:

17    Q.   Mr. Comu, could you for the record, tell us how

18    to pronounce your first name, your full first name?

19    A.   Genghis Khan (phonetic).

20    Q.   And it's spelled, the spelling of your first

21    name?

22    A.   C-E-N-G-I-Z J-A-N.  Last name is C-O-M-U.

23    Q.   Okay.  And you live on Oaks North Drive, is

24    that correct, currently?

25    A.   14873 Oaks North Drive, Dallas, Texas, 75254.

1    Q.   And you moved into that home with your wife at

2    the end of 2010; is that correct?

3    A.   Approximately December 2010.

4    Q.   Okay.  December 2010.  And that home is owned

5    by an entity called Continental Partnership, Inc.?

6    A.   That's correct.

7    Q.   And you have testified a number of times that

8    that entity is owned by your brother Jim Comu; is that

9    correct?

10   A.   To the best of my recollection, yes.

11   Q.   To the best of your recollection about your

12   testimony or about the ownership of the company?

13   A.   About the ownership of the company.

14   Q.   Okay.  So you're not sure who owns Continental

15   Partnership, Inc., are you?

16   A.   I don't know who else my brother may have

17   partners with or not.

18   Q.   And this is the entity that owns the home you

19   live at?

20   A.   That is correct.

21   Q.   And your testimony is still that you own no

22   interest in the Continental Partnership, Inc.?

23   A.   I own no interest in Continental Partnership,

24   Inc.

25   Q.   And have you ever owned an interest in

1   Continental Partnership, Inc.?

2       A.   I may have been involved in the initial

3   formation of the corporation.

4       Q.   And you understand that that would be

5   inconsistent with your prior testimony?

6       A.   I would have to see what my prior testimony

7   was.

8       Q.   I will be glad to show it to you, but you've

9   previously testified that you had no involvement with

10  Continental Partnership, Inc. that is owned by your

11  brother and that the house was purchased by your brother

12  through that entity.

13      A.   That's correct.

14      Q.   And now you're saying that you may have had an

15  interest but you're not sure?

16      A.   I'm saying I may have been involved in

17  assisting him form the corporation.

18      Q.   Would you not remember assisting him in the

19  corporation?

20      A.   Not particularly.

21      Q.   And is that because there's just a lot of

22  different corporations you're involved in so you can't

23  recall them all?

24      A.   I'm just involved in a lot of different things.

25      Q.   Okay.   I buy that.   So your previous home was

1    Palladium Drive until October 2010; is that correct?

2        A.    My home is 5301 Palladium Drive --

3        Q.    But you don't --

4        A.    -- Dallas, Texas.

5        Q.    -- live there, do you?

6        A.    No.  The house is currently rented.

7        Q.    You rent it.  So you're generating income off

8    the home, aren't you, rental income?

9        A.    Rental income.

10       Q.    And you have been generating rental income

11   since the end of 2010, have you not?

12       A.    Approximately.

13       Q.    Okay.  And this is the home that you owned

14   without any debt, it was entirely paid off when you

15   filed your bankruptcy petition; isn't that right?

16       A.    I believe it's my homestead, and I believe that

17   the house has --

18       Q.    That was not my question --

19       A.    -- been paid for.

20       Q.    -- Mr. Comu.

21       A.    Please repeat your question.

22       Q.    My question was you owned the home 100 percent

23   with no debt when you filed bankruptcy, didn't you?

24       A.    My wife and I own the home.

25       Q.    The home is in your wife's name as well?

1     A.    It's community property.

2     Q.    Oh, it is community property?  I thought that

3  there was no community property in this case?

4     A.    To the best of my recollection, I thought it

5  was myself and my wife were listed as the owners of the

6  house.

7     Q.    Okay.  And this is the house that you claimed

8  as your homestead on your bankruptcy schedules, which is

9  docket number 11, filed on January 15th; is that right?

10    A.    Yes.

11    Q.    And you understand -- or do you understand that

12  a property does not qualify as homestead if you are

13  renting it out to other people?

14              MR. OLSON:  Objection.  That's not the law.

15              THE COURT:  Sustained.

16              You all can argue about the law later, but

17  I -- there's nuance there so I don't want the witness

18  confused.

19              MS. HANKS:  Well, then, I will rephrase my

20  question.

21    Q.    (BY MS. HANKS) The home that you claim as your

22  homestead, you have rented out since 2010; is that

23  correct?

24    A.    Approximately.

25    Q.    And you've moved into a home that was purchased

1  by your brother for your benefit the same year; is that

2  correct?

3      A.   Incorrect.

4      Q.   How is that incorrect?

5      A.   My brother purchased the home as an investment

6  in Texas.

7      Q.   I see.  And you -- I believe you produced a

8  lease agreement for the Oaks North property?

9      A.   Yes.

10     Q.   But you have not produced any evidence of

11  payments that you have actually made on that lease?

12     A.   That's incorrect.

13     Q.   You've produced documents reflecting payments

14  to Continental Partnership?

15     A.   Yes.

16          MS. HANKS:  We have not seen those

17  documents so we will ask Mr. Olson to provide them to

18  us.

19          MR. OLSON:  Actually I think that you've

20  got those in the deposition.  The payments stopped.

21  There have been no payments in some time but you have

22  got the payments that were made.

23          MS. HANKS:  Payments on the Oaks North

24  property?

25          MR. OLSON:  The rent.

1          MS. HANKS:  I will take a look for those.

2     We have not seen them.

3          Q.   (BY MS. HANKS)  Mr. Comu, you're a Canadian

4     citizen; is that correct?

5          A.   Yes.

6          Q.   And how long have you lived in the United

7     States?

8          A.   Probably over 30 years.

9          Q.   And have you always lived in Dallas?

10         A.   No.

11         Q.   Where did you live prior to Dallas?

12         A.   Los Angeles.

13         Q.   But you still have family in Canada; is that

14    correct?

15         A.   Yes.

16         Q.   Including your brother?

17         A.   No.

18         Q.   Is your brother in Istanbul?

19         A.   Yes, that's his primary residence.

20         Q.   And does he have a secondary residence?

21         A.   He also has a home in Vancouver.

22         Q.   So he does have a home in Vancouver, but he has

23    primary residence is in Turkey?

24         A.   In Istanbul.

25         Q.   Okay.  And you do business with your brother

1    frequently, don't you?

2         A.    My brother and I discuss a lot of business.

3         Q.    That wasn't my question.  My question was:  You

4    do a lot of business with your brother, don't you?

5         A.    I don't understand the question.

6         Q.    Well, are you engaged in any business ventures

7    with your brother?

8         A.    I am involved in some business ventures with my

9    brother.

10        Q.    Okay.  Is one example of those business

11   ventures TKY Trust?

12        A.    No.

13        Q.    Are you not a beneficiary under the TKY Trust

14   documents?

15        A.    I believe I'm listed as one of seven

16   beneficiaries.

17        Q.    Okay.  My question was:  Are you a beneficiary?

18   So the answer is yes, right?

19        A.    I'm one of seven beneficiaries.

20        Q.    Okay.  You are a beneficiary under the TKY

21   Trust documents.  And that trust was set up, I believe

22   the documents were signed the first week of

23   January 2010; is that correct?

24        A.    I can't recall.

25        Q.    There's a trust for which you're a beneficiary

1  and you don't recall when it was set up?

2      A.   I don't recall the exact date.

3      Q.   Do you recall asking an attorney to set it up

4  for you?

5      A.   I believe my brother and sister asked me to do

6  some research on this behalf.

7      Q.   So your testimony is that your brother -- that

8  TKY Trust was your brother and sister's idea, not yours?

9      A.   I believe it was conversation that the whole

10 family had, because I was about to make a very difficult

11 decision in my life on December 31st of 2009.  So I

12 seeked counsel from a lot of people, including my

13 family.

14     Q.   And so one of the decisions you made was to set

15 up a trust in Canada coincident with your filing of

16 bankruptcy?

17     A.   That was a decision with my conversations with

18 my attorney and my family.  That was set up after I

19 filed for my bankruptcy.

20     Q.   A couple of days after perhaps?

21     A.   I don't have the exact date.

22     Q.   Well, if it was in January, then it was quite

23 close to the filing of your bankruptcy, was it not?

24     A.   I would presume so.

25     Q.   Okay.  And the planning of the creation of TKY

1    Trust was already in the works before you filed

2    bankruptcy, wasn't it?

3          A.    That's incorrect.

4          Q.    Okay.  And so your testimony is that you were

5    not already in the process of creating TKY when you

6    filed bankruptcy on December 31st, 2009?

7          A.    My testimony is I was having conversation with

8    my attorney and my family members regarding what it

9    would involve to create a trust since our family had

10   never created one.

11         Q.    What about Daptco Trust?

12         A.    That's my brother's trust.

13         Q.    How is that not your family's trust?  You just

14   testified that your family had never created one before.

15         A.    For our family.  That includes all the

16   children.  The Daptco Trust is my brother's personal

17   trust for just his children.

18         Q.    And you transferred a substantial amount of

19   assets to TKY Trust, didn't you?

20         A.    That's incorrect.

21         Q.    The Barclay Group did, didn't it?

22         A.    That's incorrect.

23         Q.    So the transfer of 2 million shares or 5

24   million shares in January -- on January 13th of 2010

25   from The Barclay Group to TKY Trust is not a transfer of

```
 1  asset?

 2       A.   No, it is not.

 3       Q.   And how do you justify that statement?

 4       A.   It was a sale negotiated by The Barclay Group

 5  under payment terms against a note.

 6       Q.   Okay.

 7       A.   Unless -- may I finish?  Unless the note was

 8  paid for, the stock was not transferred.  If the note

 9  was not paid for, the stock would get returned back to

10  The Barclay Group.

11       Q.   My question was:  Was there a transfer of

12  assets?

13       A.   No.

14       Q.   And I will remind you that you are under oath.

15  And you understand that you are testifying under penalty

16  of perjury?

17       A.   Yes.  May I answer your question for you?

18       Q.   Sure.

19       A.   The definition of transfer is clear title with

20  no obligations.  There was no transfer, because there

21  was an underlying note obligation which required the

22  trust to make payments against the stock, therefore --

23            MS. HANKS:  I object to the.

24       A.   -- it is not --

25            MS. HANKS:  I object to the response of the
```

1   witness.  It is a legal statement and it misstates the

2   law to boot.

3                    THE COURT:  Sustained.

4        Q.  (BY MS. HANKS) You are not a judge in this

5   circumstance.  You are a witness.  It is a simple

6   question.  A movant of something of value from one place

7   to another.  There are no technicalities to that

8   transfer.  There are no technicalities or

9   justifications.  One way or another those shares either

10  stayed with Barclay Group or they went to TKY.  And I do

11  not understand how you can deny that --

12                   MR. OLSON:  Objection, Your Honor, we don't

13  need a lecture.  She needs to ask a question.

14                   THE COURT:  Sustained.

15                   MS. HANKS:  I'll withdraw it.  I apologize,

16  Your Honor.

17       Q.  (BY MS. HANKS) On January 5th, 2010, did you

18  not send instructions to Matt Troster at Old Monmouth

19  Stock Transfer Company regarding the issuance of stock

20  certificates that were formally held by The Barclay

21  Group to new recipients of Green Auto stock?

22       A.  I sent a large number of documents to Matt

23  Troster.  I don't know what specifically you're

24  referring to.

25       Q.  So in sending a large number of documents to

1   Matt Troster, those documents would include instructions

2   as to how to distribute Barclay Group shares to

3   recipients, would they not?

4        A.   Possibly.

5        Q.   Okay.  And is it not true that a stock

6   certificate was issued by Old Monmouth on January 13th,

7   2010 for 5 million shares of Green Auto stock in the

8   name of TKY Trust?

9        A.   Subject to payment.

10        Q.   Was a stock certificate issued in the name of

11   TKY Trust or was it not?

12        A.   Counselor, it's clear that it was issued.  I'm

13   trying to make a point --

14        Q.   Thank you.

15        A.   -- that the stock that was issued was subject

16   to a payment of a note.  I would just like to go for on

17   the record.

18        Q.   Now, in 19 -- October 31st, 1989, you were the

19   subject of a permanent injunction by the Securities and

20   Exchange Commission, were you not?

21        A.   I can't recall.

22        Q.   You can't recall if you're subject to a

23   permanent injunction by the Securities and Exchange

24   Commission?

25        A.   I can't recall the date.

1      Q.   Okay.  Well, then let's separate them out.

2    Forget the date.  Have you been the subject of a

3    permanent injunction by the Securities and Exchange

4    Commission?

5      A.   I agreed to a no contest plea, yes.

6      Q.   So yes.  Okay.  And -- but you don't remember

7    the date of that injunction?

8      A.   Not particularly.  It's never been an issue for

9    me.

10     Q.   Okay.  Is it still in -- are you still subject

11   to that injunction?

12     A.   Yes, but I think you should read the injunction

13   before you come to any conclusions.

14     Q.   Okay.  Then why don't we do that?  Mr. Comu,

15   can you see on your screen --

16          MS. HANKS:  Your Honor, this has not been

17   offered as an exhibit, but we will do so in light of

18   Mr. Comu's request that we take a look at the actual

19   document.  And we'll have to bring physical copies in

20   the morning.  This is a Securities and Exchange -- this

21   is a pleading, an order of permanent injunction against

22   C.J. Comu filed in the Northern District of Texas,

23   Dallas Division, on October 31st, 1989; is that correct?

24     A.   That's what it appears to be.

25     Q.   Do you have any reason to believe it's not?

1     A.   I haven't seen this document in many, many

2   years.

3     Q.   But you saw it a number of years ago when it

4   was entered?

5     A.   I believe so.

6     Q.   And you still work with securities, don't you?

7     A.   Sometimes.

8     Q.   Okay.  With regard to the Green Auto

9   transaction, you were working with securities, weren't

10  you?

11    A.   I was working with a public company.

12    Q.   And that involved working with securities,

13  didn't it?

14    A.   That was a part of the transaction.

15    Q.   Okay.  And so you were probably keeping this in

16  your mind to make sure that you're not violating the

17  terms of this permanent injunction; is that correct?

18    A.   I have never violated the terms of that

19  injunction.

20    Q.   That was not my question.  My question was:

21  You're probably well aware of the terms of this because

22  in the business that you're conducting involving

23  securities, you don't want to violate it; is that a fair

24  statement?

25    A.   I don't think anyone should violate the

 1  securities laws.

 2      Q.   I would not suggest otherwise.  If you will

 3  look on the screen in front of you, this is Page 2 of

 4  the permanent injunction against C.J. Comu.  And it says

 5  "it is hereby ordered, adjudged and decreed that

 6  defendant Comu, his agents, servants, employees,

 7  attorneys, and all persons in active concert or

 8  participation with him who receive actual notice of the

 9  order by personal service or otherwise are permanently

10  enjoined and restrained from directly or indirectly, A,

11  making use of any means or instruments of transportation

12  or communication in interstate commerce or of the mails

13  to sell any security in the form of investment contracts

14  or any other security for the use or medium of any

15  prospectus or otherwise unless and until a registration

16  statement is in effect with the commission as to such

17  security."

18          What is your understanding about what that

19  Section A prohibits you from doing?

20      A.   Acting as a statutory underwriter.

21      Q.   Acting as a statutory underwriter.  Does that

22  Subsection A prohibit you from transferring unregistered

23  securities?

24      A.   Subsection A doesn't apply to me.

25      Q.   Subsection A does not apply to you?

1        A.    I do not buy or sell securities.

2        Q.    The Barclay Group buys and sells securities?

3        A.    On occasion.

4        Q.    And it certainly did in the Green Auto merger,

5    didn't it?

6        A.    There were some transactions.

7        Q.    Including the acquisition of 95 million shares

8    on October 28th, 2009; isn't that correct?

9        A.    That's incorrect.

10       Q.    How is that incorrect?

11       A.    The Barclay Group did not purchase 95 million

12   shares.

13       Q.    Okay.  I'm going to pull up Trustee's

14   Exhibit 75 and 74.  Do you recognize this -- this is the

15   stock purchase agreement between Barclay Group, Inc. and

16   the stockholders of Ganas Corp effective as of

17   October 26, 2009, isn't it?

18       A.    That's what this cover sheet represents.

19       Q.    Okay.  Tell you what, I'm going to give you the

20   physical document.

21       A.    Thank you.

22             MS. HANKS:  Do I have a physical copy of

23   your exhibits?

24             (Inaudible).

25       Q.    (BY MS. HANKS)  Please flip to Exhibit 75.

1          Have you had an opportunity to look at

2    Trustee's Exhibit 75, Mr. Comu?

3          A.   There's 81 pages.  I haven't read all of them,

4    but I am looking at it now.

5          Q.   Okay.  And do you recognize this document?

6          A.   Faintly.

7          Q.   Well, let's look on Page 12.  Notices regarding

8    this stock purchase agreement are to be given to Barclay

9    Group, Inc., Dallas, Texas, attention C.J. Comu.  Does

10   that ring a bell?

11         A.   Yes.

12         Q.   Okay.  So you received notices pertaining to

13   the stock purchase agreement?

14         A.   I don't believe I received notices.  I'm

15   looking at this document.

16         Q.   Okay.  Well, let's look at Page 17.  Did you

17   sign this document as president of Barclay Group, Inc.?

18         A.   Not on Page 17.

19         Q.   On Page 16.  I apologize.

20         A.   Yes.  Our firm was hired to do this

21   transaction.

22         Q.   Okay.  And you executed this document as

23   president of Barclay Group, Inc., didn't you?

24         A.   I believe it was prepared for me to sign this

25   on behalf of the investors as such.

1    Q.   You executed this document as president of

2   Barclay Group, Inc., did you not?

3    A.   I believe I answered your question.

4         MS. HANKS:  Objection.  Nonresponsive, Your

5   Honor.

6         THE COURT:  Sustained.

7    Q.   (BY MS. HANKS) You executed this document as

8   president of Barclay Group, Inc., did you not?  It's a

9   yes or no question, Mr. Comu.

10    A.   I executed this document on behalf of The

11   Barclay Group and its investors.  I was asked to be

12   signing it as a president.

13    Q.   At the time, were you the president of The

14   Barclay Group?

15    A.   If it was required to be that position for

16   signatory purposes, I would.

17    Q.   Again, it is a yes or no question.  Were you

18   president of Barclay Group, Inc. at the time this

19   document was signed?

20    A.   If I was required to be and it was prepared

21   that way, then yes.

22         MS. HANKS:  Objection.  Nonresponsive.

23         THE COURT:  Sustained.

24    Q.   (BY MS. HANKS) Yes?

25         THE COURT:  The date of this document is

 1  what, October --

 2              MS. HANKS:  October 26, 2009.

 3              THE COURT:  All right.  So simple yes or no

 4  question.  Were you president of Barclay Group on that

 5  date?

 6              THE WITNESS:  Your Honor, I would sign as

 7  president if I was asked to by the investors.  So on

 8  this date if they asked me to act as president, then the

 9  answer is yes.

10              THE COURT:  Okay.  That's not an answer to

11  the question.  On October 26th, 2009, were you president

12  of Barclay Group, Inc.?

13              THE WITNESS:  No, I was not carrying that

14  title.

15      Q.   (BY MS. HANKS) Okay.  So then your signature on

16  this document which executes this merger agreement as

17  president of Barclay Group, Inc. is not truthful then?

18      A.   That is incorrect.

19      Q.   Okay.  Well, one is truthful.  One is

20  unfortunately there doesn't seem to be an in between.

21  Either you were or were not president.  You're saying

22  you're not president but you executed as president and

23  you're saying it's not untruthful?

24      A.   I'm the managing partner of The Barclay Group.

25      Q.   Okay.  But you didn't execute this document as

1  the managing partner of The Barclay Group, did you?

2      A.  I didn't get a chance to finish my statement.

3      Q.  Okay, please.

4      A.  At times if I'm asked to sign as the president

5  of the corporation then I'm granted those powers to sign

6  as the president, but my real title is managing partner.

7              MS. HANKS:  I'm going to object as

8  nonresponsive and just move on, Your Honor.

9              THE COURT:  Okay.  Overruled.  Just move

10  on.

11      Q.  (BY MS. HANKS) On Page 1 of this agreement at

12  the top, Barclay Group, Inc. is identified by the buyer

13  in this stock purchase agreement, is it not?

14      A.  That's what it says.

15      Q.  Okay.  And by virtue of this agreement, the

16  buyer purchased 91,920,116 shares of common stock of

17  Ganas Corp, correct?

18      A.  Well, the buyer was acting on behalf of

19  investors.

20      Q.  You just testified that Barclay Group, Inc. is

21  identified as the buyer in the stock purchase agreement,

22  didn't you?

23      A.  I did, yes.

24      Q.  And what's being purchased in that document is

25  over 90 million shares of Ganas Corp stock, isn't it?

1          A.   On behalf of investors, yes.

2          Q.   Barclay Group purchased over 90 million shares

3     of Ganas corp stock as the buyer in that document,

4     didn't they?

5          A.   I believe I answered your question.

6               THE COURT:  Answer the question.

7               THE WITNESS:  The Barclay Group purchased

8     the stock on behalf of its investors, Your Honor.

9          Q.   (BY MS. HANKS) But there are no investors

10    identified in that agreement.  You -- The Barclay Group

11    is identified as the purchaser.

12         A.   In this agreement, yes.

13         Q.   Okay.  Thank you.

14              MS. HANKS:  Your Honor, it's 4:59.  I

15    believe we're going to reserve for tomorrow.

16              THE COURT:  All right.  Let's do break for

17    the day.

18              Mr. Comu, I don't know how often you have

19    testified, but it seems to me we kind of got off to a

20    rough start here.

21              Maybe, Mr. Olson, you can talk to Mr. Comu.

22    But we really need direct yes or no answers to

23    questions.  And you were testifying in narrative at

24    times.  You were not really directly answering the

25    questions at times.  So I want you to talk to your

1  lawyer and maybe get a better handle on how this goes

2  so we can clip through a little more efficiently

3  tomorrow.  Okay?

4              THE WITNESS:  I apologize, Your Honor.

5  It's a little complicated, so I want to be real specific

6  with my answers and I apologize if they came across the

7  wrong context.  But these are complicated transactions.

8              THE COURT:  All right.  Well, I understand.

9  And I am sure tomorrow we'll get going at a more

10  efficient clip.  Okay?

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  We will be back at

13  9:30 in the morning.

14             (Adjourned.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                       CERTIFICATE

 2

 3   COUNTY OF LUBBOCK  )

 4   STATE OF TEXAS      )

 5

 6          I, Linda York, Registered Professional

 7   Reporter and Certified Shorthand Reporter in and for the

 8   State of Texas, do hereby certify that the foregoing

 9   pages contain a full, true and correct transcript, to

10   the best of my ability, of audiotape furnished by the

11   Clerk of the Bankruptcy Court.

12

13          Given under my hand this the 17th day of

14   October, 2014.

15

16

17

18                        /s/
                           LINDA YORK, CSR No. 4899
19                         Expiration Date: 12/31/15
                           Cathy Sosebee & Associates
20                         Firm Registration No. 49
                           P.O. Box 86
21                         Lubbock, TX  79408
                           806.763.0036
22

23

24

25
```

1              IN THE UNITED STATES BANKRUPTCY
                NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3
KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4  RONALD KATZ,

5           Plaintiffs,

6  V.

7  CENGIZ J. COMU a/k/a CJ COMU,

8           Defendant.

9  DIANE G. REED, TRUSTEE,

10          Intervenor, Co-Plaintiff, and Third-Party
   Plaintiff,
11
   V.
12
   CENGIZ J. COMU, a/k/a CJ COMU,
13
            Defendant,
14
   and
15
   PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16  INC., AND SUNSET PACIFIC, L.P.,

17          Third-Party Defendants.

18  BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19  _____

20                     TRIAL

21                 MARCH 19, 2014

22            9:40 A.M. TO 5:07 P.M.

23        HONORABLE STACEY JERNIGAN, PRESIDING

24        TRANSCRIPT FROM AUDIO RECORDING

25  _____

```
 1   Transcript produced from audio recording by:
     CATHY SOSEBEE, RPR, CSR
 2   CSR No. 612, Expiration Date 12/31/14
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC, AND RONALD KATZ:

 8        MS. KENDYL T. HANKS
          - AND -
 9        MR. NICHOLAS SAROKHANIAN
          - AND -
10        MR. VICTOR D. VITAL
          Greenberg, Traurig
11        2200 Ross Avenue
          Suite 5200
12        Dallas, TX  75201
          hanksk@gtlaw.com
13
     FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
14   PLAINTIFF, TRUSTEE DIANE REED:

15        MR. DAVID ELMQUIST
          Reed & Elmquist, P.C.
16        501 N. College Street
          Waxahachie, TX 75165
17        972-938-7339
          delmquist@bcylawyers.com
18
     FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
19   BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
     COMU:
20
          MR. DENNIS OLIVER OLSON
21        Olson, Nicoud & Gueck, LLP
          1201 Main Street, Suite 2470
22        Dallas, TX 75202
          214-979-7300
23        denniso@dallas-law.com

24

25
```

```
 1                      I N D E X
                         (TRIAL)
 2
                                                    Page
 3  MARCH 19, 2014

 4  APPEARANCES                                       4

 5  PLAINTIFF'S WITNESSES:

 6  CJ COMU
         DIRECT EXAMINATION (CONT) by Ms. Hanks     10
 7       CROSS EXAMINATION by Mr. Elmquist          114
         COURT'S EXAMINATION                        180
 8       REDIRECT EXAMINATION by Mr. Elmquist       192

 9  PHYLLIS COMU
         DIRECT EXAMINATION by Mr. Vital            195
10       CROSS EXAMINATION by Mr. Elmquist          234
         CROSS EXAMINATION by Mr. Olson             241
11
    Plaintiff rests...............................246
12
    Adjournment...................................248
13
    Court Reporter's Certificate..................249
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          PROCEEDINGS

 2                THE COURT:  All right.  Let's go ahead and

 3  get lawyer appearances.  On the record, again, in King

 4  Louie Mining, et al, versus Comu, et al, adversary

 5  10-3269.

 6                MS. HANKS:  Kendyl Hanks for the

 7  plaintiffs.

 8                THE COURT:  Okay.

 9                MR. VITAL:  Victor Vital, Your Honor, for

10  the plaintiffs.

11                MR. SAROKHANIAN:  Nicholas Sarokhanian,

12  Your Honor, for the plaintiffs.

13                THE COURT:  Okay.

14                MR. ELMQUIST:  Good morning, Your Honor,

15  David Elmquist on behalf of Diane Reed, trustee.

16                THE COURT:  Okay.

17                MR. OLSON:  Good morning, Your Honor,

18  Dennis Olson for the defendants.

19                THE COURT:  Okay.

20                MR. OLSON:  And in anticipation of the

21  examination of Mr. Comu, we have added one exhibit, if I

22  can hand that up now.  Copies have been provided to

23  counsel.

24                THE COURT:  All right.  Is there going to

25  be a stipulation as to admissibility or --
```

1           MR. OLSON:  I don't believe there is any

2    problem.

3           MR. VITAL:  Yes, Your Honor.  There

4    would -- no objection.

5           THE COURT:  No objections from the

6    plaintiffs?  Mr. Elmquist, anything?

7           MR. ELMQUIST:  I just need to know what it

8    is.

9           MR. OLSON:  It is the amended return.

10          MR. ELMQUIST:  Oh, yeah, yeah.

11          THE COURT:  He has no problem.  All right.

12   So this has been marked as exhibit what?

13          MR. OLSON:  Nine.

14          THE COURT:  Defendant's Nine, and so it is

15   admitted by stipulation.

16          (Defendant's Exhibit 9, offered and

17           admitted.)

18          All right.  We will --

19          MR. VITAL:  Your Honor, I do have one

20   housekeeping matter.

21          THE COURT:  Okay, go ahead.

22          MR. VITAL:  The schedules of the debtor and

23   the statement of financial affairs have not been marked

24   as exhibits by any party, so at this time I would ask,

25   on behalf of plaintiffs, that Your Honor take judicial

1  notice of Docket Number 11, which are the schedules of

2  the debtor in this case filed on January 15th, 2010, and

3  ask Your Honor to also take judicial notice of Docket

4  Number 12 in this case, filed on that same date, which

5  is the statement of financial affairs.

6              THE COURT:  Okay.  The Court will take

7  judicial notice of those two filed items.

8              MR. VITAL:  Thank you, Your Honor.

9              THE COURT:  All right.

10             MR. ELMQUIST:  Your Honor, just so it is

11  easier to refer to during the course of this trial,

12  could we go ahead and get them marked as exhibits,

13  Trustee's 94 and 95?

14             THE COURT:  All right.  I am sure no one

15  has a problem with that.

16             UNIDENTIFIED MAN:  (Inaudible), Your Honor.

17             THE COURT:  Okay, thank you.

18             (Trustee's Exhibits 94 and 95, offered and

19              admitted.)

20             MR. VITAL:  One last housekeeping matter.

21  We have better, I guess, copies of exhibits, KLM

22  Exhibits 114 and 117, if I could approach and give that

23  to you and your clerk.

24             THE COURT:  Okay.  These are which?

25             MR. VITAL:  KLM 114 and KLM 117.

1              THE COURT:  Okay.  You are just giving me

2    easier to read --

3              Mr. Vital:  Yes, just swap out in your

4    binders.

5              MS. HANKS:  I will clarify, Your Honor.

6    Actually, one of them was just the cover sheet of the

7    corporate documents, as opposed to the actual corporate

8    filings.  That is 114.  And 117 only had -- it's one of

9    the long stock ledgers, and it only had half of the

10   ledger.

11             THE COURT:  Okay.

12             MS. HANKS:  And so we have completed 117,

13   and we have already provided copies to counsel.

14             THE COURT:  All right.  We will be able to

15   use those in substitution.  KLM 114 --

16             (Off the record discussion)

17             THE COURT:  So does this mean our

18   electronic copies are the old version?

19             MS. HANKS:  Yes, Your Honor.  We will need

20   to provide, upload, new versions for you.

21             THE COURT:  Okay, thanks.  All right.

22             Mr. Elmquist, you are going --

23             MR. ELMQUIST:  Yes, ma'am.

24             THE COURT:  All right.  So for the record,

25   Don, I have admitted -- What is it? -- five new

1  exhibits, two of which are really replacement exhibits.

2  Okay.  So we have Defendant's Exhibit 9, which is newly

3  admitted.  We have Trustee's Exhibits 94 and 95, newly

4  admitted.

5              And then we have KLM 114 and KLM 117, we

6  have replacements.  Those were already exhibits that

7  were admitted, and we have filed replacement exhibits.

8              (Plaintiff KLM 114 and 117, replacement of

9               previously admitted exhibits.)

10             THE COURT:  All right.  Any other

11  housekeeping matters?

12             MR. VITAL:  No, Your Honor.

13             THE COURT:  All right.  Well, Mr. Comu was

14  being examined on direct examination by the plaintiffs.

15  We will need you to go ahead and take your seat on the

16  witness stand, and I will remind you you are under oath

17  from your swearing in yesterday.

18             THE WITNESS:  Yes, Your Honor.

19             You may be seated.  And, Ms. Hanks, I am

20  ready when you are.

21             MS. HANKS:  Thank you, Your Honor.

22             THE COURT:  Now, we have invoked the Rule

23  in this adversary proceeding.  Do we have any witnesses

24  in the room that need to be excused?

25             MR. OLSON:  No, ma'am.  Ms. Comu is here.

1  She is a defendant.

2                THE COURT:  Okay.  Thank you.

3                MS. HANKS:  Now, Your Honor, yesterday we

4  were talking a little bit about the order of permanent

5  injunction with regard to Mr. Comu, and at this time we

6  would like to offer that as KLM Plaintiff's Exhibit 369.

7                THE COURT:  All right.  Any objection?  I

8  guess the document I can take judicial notice of, but

9  any objection (Inaudible) authentic?

10               MR. OLSON:  No, ma'am, that was one that

11 was admitted without objection on the first day.

12               MS. HANKS:  I don't think it has been

13 admitted, no.

14               MR. OLSON:  Well, it was in your group 336

15 through 360 or 380.

16               MS. HANKS:  I don't think we actually had

17 it included.

18               MR. OLSON:  It wasn't in the binder.

19               MS. HANKS:  I don't think we actually had

20 it on our list.  If we did then --

21               MR. OLSON:  If it is not on the list, it is

22 still fine with me.

23               THE COURT:  All right.  So it shall be

24 admitted.

25               (Plaintiff's Exhibit KLM 369, offered and

```
 1                         admitted.)

 2                THE COURT:  Thank you.

 3                MS. HANKS:  Your Honor, may I approach the

 4  witness?

 5                THE COURT:  You may.

 6                         CJ COMU,

 7  Having been previously sworn, testified as follows:

 8                DIRECT EXAMINATION (CONTINUED)

 9  By Ms. Hanks:

10      Q.   Mr. Comu, I am handing you a copy of the order

11  of permanent injunction that we spoke about yesterday.

12  Do you recall this document?

13      A.   Yes.

14      Q.   Okay.  As I understand, this injunction is

15  still in effect; is that correct?

16      A.   I am not certain of that.

17      Q.   Do you have any reason to believe it is not in

18  effect?

19      A.   I am not certain of that.

20      Q.   You are not certain?  Do you have any reason to

21  believe that this order is no longer in effect?

22      A.   I can't render an opinion on that.  I am sorry.

23      Q.   Could you please turn to -- and the pages are

24  not numbered, but I will tell you that it is Page Five

25  of that -- they are numbered at the top in the center.
```

1    It is Page Five of that document.  And at the bottom

2    this order says that -- well, beginning in the middle of

3    the page under III it says, "It is further ordered,

4    adjudged and decreed that Defendant Comu, his agents,

5    servants, employees, attorneys, and all persons in

6    active concert or participation with him," and there is

7    language at the bottom that starts with "b".  Do you see

8    that language?

9        A.   Yes.

10       Q.   And it says that, "This order prohibits, by use

11   of any means or instrumentality of transportation or

12   communication in interstate commerce off of the mails or

13   of any facility of any national securities exchange

14   from, directly or indirectly, make any untrue statement

15   of a material fact or omitting to state a material fact

16   necessary in order to make the statements made, in light

17   of the circumstances which they were made, not

18   misleading."

19            Do you understand that language, Mr. Comu?

20       A.   I am not an attorney, so I can't give you a

21   legal answer.

22       Q.   I am not asking you for a legal answer.  As a

23   business person, as a layperson, as someone who deals in

24   securities, do you understand that language?

25       A.   I understand the general philosophy of it, yes.

1      Q.   Okay.  So would you agree that the general

2   philosophy is that sometimes partial disclosures or

3   specific pieces of information without the full picture

4   can be misleading?

5      A.   That could be one conclusion.

6      Q.   Okay.  Now, do you understand, Mr. Comu, that

7   bankruptcy discharge is a privilege and not a right?

8      A.   Yes.

9      Q.   And you understand that you are under an

10   obligation to make complete and full disclosures of your

11   business activities, your assets and your debts?

12      A.   Yes.

13      Q.   And you understand that that duty is

14   continuing?  It doesn't end on a particular day until

15   this bankruptcy is resolved and your estate has been

16   fully administered by the trustee?

17      A.   Yes.

18      Q.   And that that duty does not end on the date of

19   discharge?

20      A.   I am sorry I don't have the legal definition of

21   when it ends, but if that is what you claim, yes.

22      Q.   Well, this bankruptcy is still ongoing,

23   correct, even though there has been a discharge?

24      A.   Absolutely, yes.

25      Q.   Okay.  And you are still under a duty to speak

1  truthfully, to make full disclosures, to make accurate

2  disclosures, and to provide information about your

3  business activities and your assets, particularly when

4  asked by the trustee and by your creditors; is that

5  correct?

6       A.   Yes.

7       Q.   Okay.  Yesterday we were talking.  I think you

8  probably heard some questions of Mr. McNeill concerning

9  an entity called Continental Partnership, Inc., and we

10  discussed it as well; is that correct?

11      A.   I recall something, yes.

12      Q.   Okay.  And that is not an identity that you

13  disclosed any interest in or position with in your

14  schedules and your statement of financial affairs,

15  correct?

16      A.   To the best of my recollection.

17      Q.   Okay.  Well, I tell you what, I think this is

18  probably a good opportunity to hand you a copy of the

19  statement of financial affairs that you filed on

20  January 15th, and I believe this has been marked as

21  Trustee Exhibit -- 94 are the schedules, okay, and 95 is

22  the statement of financial affairs.

23            MS. HANKS:  May I approach the witness,

24  Your Honor.

25            THE COURT:  You may.

1    Q.   Mr. Comu, I am handing you a copy of Trustee

2   Exhibit 94 and a copy of Trustee Exhibit 95.  Do you

3   recognize those documents?

4    A.   I haven't seen these in many years, but I

5   recall something like this.

6    Q.   Okay.  So 94 is a copy of the schedules that

7   you filed in this -- in your bankruptcy case, which is

8   related to this adversary proceeding, on January 15th,

9   2010, correct?

10   A.   That's what this document says.

11   Q.   And if you will flip to the last page of that

12  document, you are aware that, when you signed this

13  document and filed this document, you did so under oath

14  and under penalty of perjury, correct?

15   A.   Yes.

16   Q.   Okay.  And subsequently in your -- in the first

17  creditors' meeting on February 9th, 2010, you verified

18  that the information contained in that document was

19  correct?

20   A.   I don't recall if I had this document with me.

21       MS. HANKS:  Okay.  Well, if we can pull up

22  on the screen Defendant's Exhibit 4.  That is going to

23  be on the thumb drive.  Has it changed?  These are not

24  correctly marked.  Do you have a copy of Defendant's

25  Exhibit 4?

1          UNIDENTIFIED MAN:  Yes, I have one for him,

2    too.  Here it is.  That is that email that you got,

3    right.

4          MS. HANKS:  Okay.  May I approach the

5    witness, Your Honor?

6          THE COURT:  You may.

7      Q.   I hand you a notebook of defendant's exhibits,

8    and it is open to Defendant's Exhibit Number 4, and

9    that's an unofficial transcript of the first creditors'

10   meeting which occurred on February 9th, 2011.  Do you

11   recall that meeting?

12     A.   Not exactly.

13     Q.   Do you recall it at all?

14     A.   I recall the meeting, yes, but I don't recall

15   the contents of it.

16     Q.   Okay, okay.  Do you recall some questions being

17   asked of you about your assets and your business

18   activities?

19     A.   Not specifically.

20     Q.   You don't recall specifically, okay.  Do you

21   recall that you gave your testimony at this meeting

22   under oath?

23     A.   Yes.

24     Q.   Okay.  And we are going to look for that

25   specific pinpoint site, and I will revisit that, but

 1   I -- what?  Okay.  But you did understand that you were

 2   testifying under oath at that meeting, February 9th?

 3         A.   Yes.

 4         Q.   Okay.  And if you will look at Page Three of

 5   that transcript of Defendant's Exhibit Number 4, and you

 6   were asked, I believe, by one of your attorneys about

 7   meeting with them regarding your possible bankruptcy

 8   filing and providing information concerning your assets,

 9   liabilities, income and expenses.  Do you see that

10   language there?

11         A.   I see the language here.

12         Q.   And you were asked, "And all of the information

13   that was incorporated into the bankruptcy papers that

14   were filed in this case."

15              And you said, "I believe so."

16              And you were asked, "And did you have a

17   chance to review them?"

18              And you said, "Yes, I did."

19              "And to the best of your knowledge is

20   everything in there true and correct?"

21              And you said, "Yes, I believe so."

22              Does that accurately state your testimony

23   at the creditors' meeting?

24         A.   According to this transcript, yes.

25         Q.   Do you have any recollection different?

1          A.    I just don't recall the date.  I am sorry.

2          Q.    Okay.  But you have no reason to believe what

3    is reflected in this transcript is not accurate?

4          A.    I have no reason to believe it is not accurate,

5    no.

6          Q.    Okay.  So you have -- you filed these schedules

7    on January 15th, verifying them under oath as true and

8    correct and accurate, and then you verified them again

9    on February 9th, 2010, and you never filed any amended

10   schedules, did you?

11         A.    I am not aware of that.

12         Q.    Okay.  You don't believe you did file amended

13   schedules, do you?

14         A.    I am not aware if it were or were not.  I just

15   don't recall or have any evidence of that in front of

16   me.

17         Q.    Okay.  And you didn't file an amended statement

18   of financial affairs, did you?

19         A.    I am not aware if it was or if it was not

20   filed.  I am sorry.

21         Q.    But you do understand that it is your -- we

22   spoke of this earlier, that it is your obligation, if

23   there is something that is not accurate, that it is your

24   duty to update it and to make that information

25   available, not just to the trustee but to your

1   creditors, right?

2        A.   Yes.

3        Q.   Okay.  And you understand that there is a

4   difference between providing information to the trustee,

5   for example, in the form of documents and putting

6   something in your schedules, in your bankruptcy

7   schedules or your statement of financial affairs, which

8   gets filed with the Court and is delivered to your

9   creditors?

10       A.   I am sorry.  I don't have knowledge of that.

11  That is why I have counsel.  I just do what I am asked

12  to do by counsel, but I am not formally aware of the

13  process and the documents, but whatever I am asked to

14  do, I provided.

15            MS. HANKS:  I am going to object as

16  nonresponsive, Your Honor.

17            THE COURT:  Overruled.

18       Q.   So we have just established that you verified

19  that the information contained in these documents was

20  correct as of February 9th, 2010, and January 15th,

21  2010, when they were filed, but later on in 2013 when

22  you were deposed you admitted that they were not

23  complete when they were filed, didn't you?

24       A.   I don't recall what was filed and what wasn't

25  filed and what was amended.  I am sorry.

1    Q.  Well, you are looking at what was filed in

2  front of you, Defendant's Exhibits -- the first two that

3  I gave you, your statement of financial affairs and your

4  schedules, those are the two documents that you filed

5  that verified your business activities, your business

6  affiliations, your creditors, your debts, your assets?

7    A.  Are you referring to Exhibits 94 and 95?

8    Q.  Correct.

9    A.  If I recall, these were the exhibits that were

10  prepared on December 31st of 2009, when I met with

11  Mr. Olson in his office to file my bankruptcy.

12    Q.  Okay.  So your testimony is that you prepared

13  those on what date?

14    A.  December 31st of 2009.

15    Q.  And how are you so certain of that date?

16    A.  It was a very important date for me.  It was

17  the date I had to make a very difficult decision.

18    Q.  Okay.  And is it your testimony that you did

19  not provide these -- your draft of these schedules to

20  your attorney after that date?

21    A.  I am sorry.  I don't know if these are the

22  documents that were provided or if there was any

23  amendments made.  I just do not recall.

24       MS. HANKS:  Okay.  Could we please pull up

25  KLM Exhibit 312?

1     Q.   Do you recognize this email, Mr. Comu?

2     A.   I am seeing it right now.

3     Q.   This is a January 11, 2010, email from you to

4  Mr. Olson, attaching answers to Schedules A through J

5  and statement of financial affairs; is that correct?

6     A.   Yes, that's what it says.

7     Q.   Okay.  So in this -- by this email you are

8  transmitting your responses to the schedules on January

9  11th, not December 31st; isn't that correct?

10     A.   I am sorry.  I can't come to any conclusion.  I

11  am just looking at this email, but I can't arrive at any

12  conclusion.

13     Q.   Okay.  Well, there is an email here from your

14  email address to your attorney, attaching answers to

15  Schedules A and J, and that is dated January 11th, and

16  that is not December 31st, is it?

17     A.   According to the date of the email, that is

18  January 11th.

19     Q.   Okay.  Now, the reason that date is important

20  is because a number of times you ever testified that the

21  reason you did not disclose the shares that you received

22  in Ganas or the Green Auto transaction was because you

23  prepared your schedules in December, not in January.  Do

24  you recall that testimony?

25     A.   I am sorry.  I do not.

```
 1        Q.   Okay.  Mr. Comu, I am pulling up your

 2   deposition from 2013.  And you stated in your deposition

 3   that your schedules, "Probably appeared to be incomplete

 4   if the Green Automotive stock" which was not listed in

 5   here, and that is --

 6              MS. HANKS:  Okay.  May I approach the

 7   witness, Your Honor?

 8              THE COURT:  You may.

 9        Q.   I am showing you Page 163 of the transcript of

10   your deposition that was taken in November of last year.

11   Do you see where you testified that it, "probably

12   appears to be incomplete if the Green Automotive stock

13   is not listed in here"?

14        A.   I am sorry.  Your questions?

15        Q.   Do you see that testimony, Mr. Comu?

16        A.   Yes, I do.

17        Q.   Okay.  So you admitted in your deposition that

18   your schedules were not complete when they were filed.

19              Now, if you will turn to Page 172 of your

20   deposition, again, you are being asked about why you

21   didn't disclose those shares in the Green Auto

22   transaction in your schedules, in your bankruptcy

23   filings, on January 15.

24              And you said, "It was obviously a mistake,

25   and it was corrected right away."
```

1            Do you see that testimony?

2        A.   I am sorry.  I don't.  Where are you?

3        Q.   I am on Page 172 of your deposition, starting

4   at Line 12.

5        A.   Yes.

6        Q.   That was your testimony, correct?

7        A.   Appears to be, yes.

8        Q.   Okay.  And then on Page 201 of your deposition

9   starting at Line 11, your testimony was, "It was proper

10  to disclose the whole transaction." Is that correct?

11       A.   I am sorry.  I am on Page 211.  What line?

12       Q.   I apologize.  It is 201, Line 11, 201, Line 11.

13       A.   It says, "No, it is just an assignment."

14       Q.   If you go further down, does it say, "It was

15  proper to disclose the whole transaction"?

16       A.   I apologize.  I may not be seeing the same

17  thing.

18       Q.   I may not have the -- I may not have the right

19  reference.  Okay.  Turn to Page 211, Line 16.  Could you

20  read that language, please?

21       A.   "If they are part of the schedule, then they

22  should have been included in there, and I believe they

23  were."

24       Q.   Okay.  But they weren't included in your

25  schedule, were they?

 1          A.    What exactly are you referencing?

 2          Q.    The 300,000 shares you received in Green

 3    Automotive stock.

 4          A.    I am not certain, but I believe they were

 5    transferred to the trustee.

 6          Q.    That is not my question.  My question is

 7    whether they were included in your schedules.

 8          A.    I am sorry.  I do not know.

 9          Q.    Okay.  Now, given your acknowledgment in your

10    deposition that the information concerning the

11    transaction and the shares was not included in your

12    schedules, and given your testimony that you understood

13    that it was your obligation to continue to disclose and

14    disclose complete information about your financial

15    situation and about your business activities, you

16    would -- well, it was misleading to your creditors that

17    you did not supply that information in your schedules?

18          A.    I believe that's incorrect.

19          Q.    Well, your creditors aren't going to get the

20    same information that is delivered by hand to the

21    trustee, if you are not disclosing it in your schedules

22    as you are obliged to do; isn't that correct?

23                MR. OLSON:  Your Honor, I don't agree with

24    that.

25                THE COURT:  Is there an objection?

1          MR. OLSON:  I do.  I think that

2    mischaracterizes the facts of the case.  Mr. Libby went

3    out and physically sat down with the trustee and went

4    over these documents.

5          THE COURT:  Okay.  Your response to the

6    objection?

7          MS. HANKS:  Your Honor, my response is that

8    the defendants have made the argument that a disclosure

9    to the trustee is tantamount to a disclosure to

10   creditors in the schedules in the statement of financial

11   affairs, and that is simply not correct.

12         MR. OLSON:  The position of the defendants

13   is the disclosure to the attorney for the plaintiffs

14   meets the test.

15         MS. HANKS:  And that is --

16         THE COURT:  Overrule the objection.

17   Proceed.

18         MS. HANKS:  Thank you, Your Honor.

19   Q.   Okay.  Now, I believe you testified yesterday

20   that you may have been involved with Continental

21   Partnership, Inc., but you weren't sure in what respect;

22   is that right?

23   A.   I do not own Continental Partnership, Inc.

24   Q.   Okay.  Were you involved in setting up the

25   entity?

1        A.   I believe I contacted the law firm to request

2   an entity to be created, but not for my personal use or

3   benefit.

4        Q.   Okay.  And do you recall, at the February 9th

5   creditors' meeting, you were asking whether you had any

6   brokerage accounts, bank accounts, or depository

7   accounts of any sort, outside of the borders of the

8   United States, and you said no, sir?

9        A.   I am sorry.  I don't recall that statement.

10       Q.   Okay.  Can you please look at Defendant's

11  Exhibit Number 4, at Page 13?

12       A.   Is that in this document?

13       Q.   It is in Defendant's Exhibit Number 4.  It is

14  the notebook of defendants' exhibits, the white notebook

15  to your left.

16       A.   Yes.

17       Q.   Page 13, do you see where you are asked whether

18  you have any brokerage accounts, bank accounts or

19  depository accounts of any sort outside the borders of

20  the United States?

21       A.   Yes.

22       Q.   And you said, "No, sir," right?

23       A.   That was an incorrect statement.

24       Q.   That was an incorrect statement.  So when you

25  were asked under oath about whether you had accounts or

1  deposit -- outside the borders of the United States, you

2  did not give a truthful answer?

3      A.   I gave an answer to the best of my

4  recollection.  Unfortunately, I forgot there was an

5  account, which we have disclosed to the trustee.  I

6  apologize.

7      Q.   And what account did you disclose to the

8  trustee that is outside the borders of the United

9  States?

10     A.   A personal bank account in the country of

11 Turkey, which I have had for a very long time, that I

12 was unaware of.

13     Q.   And is that an account with Turkish Bank?

14     A.   I believe that is what it is called.

15     Q.   So that is an asset that you did not disclose

16 in your statement of financial affairs or in your

17 schedules, and you did not disclose it at the creditors'

18 meeting, correct?

19     A.   It was an error, yes, which we corrected.

20     Q.   You didn't correct that error before discharge,

21 did you?

22     A.   I don't recall.

23     Q.   Now, the Turkish Bank account is particularly

24 material to this case, because wasn't that account used

25 to -- in the purchase of your Oaks North home not long

1  after your bankruptcy discharge?

2      A.   That is incorrect.

3           MS. HANKS:  Okay:  If we could pull up

4  Plaintiff's Exhibit 320, please.  Is there an objection,

5  Your Honor?

6           MR. VITAL:  Not to 320.

7           MR. OLSON:  No, it is admitted.  320 is

8  admitted.

9           MS. HANKS:  320, if you could scroll down,

10  please.

11     Q.   We are on the second page of that email, and

12  could you -- as I understand, the recipient of this --

13  and this is an email from you, correct?

14     A.   It appears to be.

15     Q.   On July 31, 2009?

16     A.   Yes.

17     Q.   Correct?  Which coincidentally is not long

18  after the judgment in New York was entered against you,

19  correct?

20     A.   I don't recall the date.

21     Q.   All right.  And who is Cigdem -- I cannot

22  pronounce the name.  Do you know how to pronounce the

23  recipient's name?

24     A.   I do not.

25     Q.   Do you speak Turkish?

1      A.   Yes, I do.

2      Q.   Well, recipient of the email -- and I will

3  spell the name, C-I-G-D-E-M, last name

4  B-E-Y-K-O-Y-O-U -- and you say, "Greetings from Dallas,

5  hope all is good in the UK.  I wanted to advise change

6  of address for both my account and Sunset Pacific, LP,"

7  right?

8      A.   That's what it says.

9           MS. HANKS:  Okay.  Move up, please.

10     Q.   And in the responsive email you see in the

11  signature line that this individual, the recipient, is

12  the main branch manager at Turkish Branch UK?

13     A.   Yes.

14     Q.   And this is the account that you did not

15  disclose to the trustee or to your creditors, correct?

16     A.   This is the account that we referenced after I

17  recalled that there was an account.

18     Q.   This is an account that you did not disclose in

19  your schedules or your statement of financial affairs

20  and you did not disclose, when asked, at the creditors'

21  meeting, correct?

22     A.   That was an error, yes.

23           MS. HANKS:  Could you go up, please?

24     Q.   They tell you they need to receive an instruct,

25  an instruction?

1          MS. HANKS:  If you could maybe close it a

2     little bit please and read it.

3        Q.   So they are asking for specific instructions

4     from you for an address change; is that correct?

5        A.   That's what the letter says.

6        Q.   Okay.  And the address --

7          MS. HANKS:  Let's see.  Can you zip down on

8     the bottom where the address is included for the change?

9        Q.   New mailing address, this is your email from

10    July 31st, 2009, "New mailing address, 18208 Preston

11    Road, Suite D9314, Dallas, Texas 75252."  That was the

12    Barclay Group's address, wasn't it?

13       A.   I believe that is an address for the Barclay

14    Group.

15       Q.   That was the Barclay Group's address at the

16    time, wasn't it?

17       A.   I believe so.  I am not certain.

18       Q.   Okay.  Now, if we could go to -- and you refer

19    to it, by the way, you refer to this account as your

20    account, correct?

21       A.   Yes.

22       Q.   And you refer to it as -- and you also refer to

23    Sunset Pacific, correct?

24       A.   That's what it appears to be.

25       Q.   Does Turkish Bank also have an account for

1    Sunset Pacific?

2         A.   I don't think so.

3         Q.   Then why would you be talking to Turkish Bank

4    about Sunset Pacific?

5         A.   I may have been confused over how the account

6    was set up.

7         Q.   Do you normally get confused over your offshore

8    accounts?

9         A.   I don't have offshore accounts.

10        Q.   Well, you have one offshore account, at least?

11        A.   I have an offshore account, yes.

12        Q.   What about an account in the Channel Islands

13   with HSBC?

14        A.   I have no account in Channel Islands under

15   HSBC.

16        Q.   Okay.

17             MS. HANKS:   Could we go to KLM Exhibit 96?

18        Q.   This is that Barclay Group banking ledger from

19   2009 to 2010, and you were examined about this in your

20   deposition.  Do you recall this document?

21        A.   Not exactly.

22        Q.   Okay.  Well, you verified previously that this

23   reflects cash transactions in and out of Barclay Group's

24   accounts, right around the time you were both preparing

25   to file for bankruptcy, around the time you did file

1   bankruptcy, and in the months following your petition.

2   And if you will look up at the top, the second entry on

3   September 16th, 2009, and then a couple of days further

4   down there is another credit.  There is two $20,000

5   credits received from an entity called Newhaven

6   Nominees?

7        A.   Yes.

8        Q.   And Newhaven Nominees is another off shore

9   entity, isn't it?

10       A.   I don't believe so.

11       Q.   Is it your testimony that you don't know what

12  Newhaven Nominees is?

13       A.   I am not clear on what Newhaven Nominees'

14  business is, but it is not my business.

15       Q.   Newhaven Nominees is depositing $40,000 into

16  the Barclay Group account, and you don't know what it

17  is?

18       A.   I don't know who they represent, but they do

19  not represent me.

20            MS. HANKS:  Okay.  Can we go to KLM

21  Exhibit 263, please?  By the way, actually, could we

22  stay there for just one second?  Would you move down a

23  bit.

24       Q.   Now, do you see these entries in November

25  of 2009 of $40,000, $20,000, $10,000, $10,000, and the

1   names are Kyle Gilbert, Marcie Gilbert, Michelle Renner,

2   Jean Bacon, right?

3        A.   I see that.

4        Q.   Those are stock purchasers of Green Auto

5   shares, aren't they?

6        A.   I don't believe so.

7             MS. HANKS:  Okay.  Just real quick can we

8   go to the first page of KLM Exhibit 49?

9        Q.   Now, the Green Auto transaction had closed in

10  November of 2009.  That has already been established by

11  testimony.  So if you go down, please, you will see

12  these names, Kyle Gilbert, Jean Bacon, Marcie Gilbert.

13  Those are the names we just read off the TBG bank

14  ledger, aren't they?

15       A.   I believe so.

16       Q.   Okay.  So it is not just a coincidence that

17  these individuals are receiving stock from the Barclay

18  Group, and the Barclay Group is receiving substantial

19  cash payments to their account, is it?

20       A.   I am not certain the nature of why the

21  transactions happened.  They might have been loans.

22  They might have been equity.  But I don't have the exact

23  reference to what they were for at the time.

24       Q.   Is it your testimony that you believe it is

25  possible that this $80,000 deposit into Barclay Group

1    accounts on November 27th, 2009, might have been a loan

2    from these individuals?

3         A.   They could have been.

4              MS. HANKS:   Okay.   Could we go to KLM

5    Exhibit 263, please?

6         Q.   And Cem Comu is your brother; is that correct?

7         A.   Yes.

8         Q.   And you testified previously that he lives in

9    Istanbul, but he also has a residence in Canada,

10   correct?

11        A.   Yes.

12        Q.   And Canada is where TKY Trust and Daptco Trust

13   were established, correct?

14        A.   I believe so.

15        Q.   Okay.   And I have seen his name spelled C-E-M

16   as well as G-E-M.   What is the correct spelling of his

17   name?

18        A.   C-E-M.

19        Q.   But it is pronounced "Jim"; is that correct?

20        A.   Yes.

21        Q.   Now, you said earlier that you speak Turkish,

22   correct?

23        A.   Yes.

24        Q.   What is this email?   Again, this is the main

25   manager from Turkish Bank with whom you were

1    corresponding back in July of 2009; is that correct, the

2    email that we looked at earlier?

3         A.   It was an email --

4         Q.   It was an email?

5         A.   -- I believe from --

6         Q.   Corresponding?

7         A.   -- the same person possibly.

8         Q.   Well, it is the same person, isn't it, at

9    Turkish Bank?

10        A.   It appears to be.

11        Q.   Okay.  And this was the person who you

12   instructed that you wanted to change the address for

13   your account and for Sunset Pacific with Turkish Bank,

14   correct?

15        A.   Either mine or Sunset, I wasn't sure what

16   exactly the account name was in.

17        Q.   So you knew you had an account at Turkish Bank,

18   but you didn't know what entity or name it was under?

19        A.   Correct.

20        Q.   Does that happen often?

21        A.   Sometimes.

22        Q.   Okay.  Could you please -- here at the bottom

23   of that email --

24             MS. HANKS:  Why don't you make it a little

25   bit smaller?  There you go.  There you go.

1      Q.   -- they are talking about -- there are some

2   numbers, there are some references to euros, there is

3   some references to US dollars, and then there is some

4   language in that email that is in Turkish.  Would you

5   please translate that language for us, for the Court?

6      A.   You took that away.

7      Q.   Oh.

8      A.   I believe it says, "Below is some information

9   that you requested that I am sending."

10      Q.   Okay.  So there had been -- so this is to your

11   brother, correct?   This email from the manager at

12   Turkish Bank is to your brother, not to you?

13      A.   That's correct.

14      Q.   So your brother had requested information from

15   Turkish Bank as well, correct?

16      A.   That's what appears to be.

17           MS. HANKS:   Okay.  And if you can move up,

18   please.

19      Q.   Now, why -- here your brother is forwarding

20   this information about Turkish Bank to you, correct?

21      A.   That is what it shows.

22      Q.   Okay.  Do you -- was your -- is your brother a

23   signatory on your Turkish Bank account?

24      A.   I can't recall.  He may be.

25      Q.   Is he now?

1        A.    I can't recall.

2        Q.    You don't know if your brother is a signatory

3   on a bank account of yours?

4        A.    The only account that I had, which is disclosed

5   to the trustee, I am not sure if my brother is also

6   signatory on that account.

7        Q.    But let's be clear.  You didn't disclose that,

8   that account, to the trustee in your schedules, in your

9   statement of financial affairs, or when asked about it

10  at the creditor's meeting, right?

11       A.    That was an error on my part, which we

12  corrected, yes.

13       Q.    Okay.  So at some point later you believe you

14  disclosed it, but when you were asked about it under

15  oath, you said no?

16       A.    I just completely forgot.  I apologize.

17       Q.    Do you think that an offshore account is

18  something that would be important for the trustee and

19  your creditors to know about.

20       A.    Any assets of my personal should be transferred

21  to the trustee, yes.

22             MS. HANKS:  Okay.  Could we go to KLM

23  Exhibit 178, please?

24       Q.    Okay.  This is an email dated March 18, 2010.

25  This is before discharge, correct?

1          A.    I believe it is.

2          Q.    The email is addressed to you, and the email

3    says, "We are pleased to advise you that your company,

4    Continental Investments Holding Company Limited, has

5    been accepted for incorporation by Companies House,"

6    right?

7          A.    That's what it says.

8          Q.    And Companies House is the entity in the UK

9    that posts, receives and hosts corporate filings for UK

10   corporations, correct?

11         A.    I believe so.  I am not 100 percent certain.

12         Q.    Well, you are an officer or director of a

13   number of UK entities, aren't you?

14         A.    I believe I am currently.  I just don't recall

15   exactly which one.

16         Q.    So as an officer or director of a UK company,

17   you have filed things with your name on them with

18   Companies House, haven't you?

19         A.    I don't recall.

20         Q.    Okay.  Well, let's look at an example real

21   quick.

22               MS. HANKS:  Would you please pull up KLM

23   Exhibit 82?  Hold the other one.  We are going to come

24   back to it.

25         Q.    In fact, you are chairman or director of an

1   entity called Eurocap Investments, aren't you?

2        A.   Yes.

3        Q.   And this is an example of a document filed with

4   Companies House, isn't it?

5        A.   It appears to be.

6        Q.   Okay.  And, again, what we were talking about

7   earlier, Companies House is where these public filings

8   are filed and available to the public, if they know

9   where to look, and it reflects officers, directors and

10  sometimes financial information for entities that supply

11  information to Companies House, correct?

12       A.   I am not aware of that information.  I just

13  understand that they are a registrar of companies.  I

14  don't know the extent of what they offer.

15       Q.   And here you are identified as a company

16  director of Eurocap Investments, correct?

17       A.   Yes.

18       Q.   Okay.  And you have also identified yourself,

19  in fact, you testified that you are chairman of Eorucap,

20  right?

21       A.   Yes.

22       Q.   And when did you -- when did you take that

23  position with Eurocap?

24       A.   I would have to reference the documents that

25  you, I am sure, have access to.

```
 1        Q.   You don't remember when you were elected as
 2   chairman of a UK entity?
 3        A.   Not the exact date.  I am sorry.
 4        Q.   Do you remember the year?
 5        A.   It could have been late 2011 or late 2012.  I
 6   am not a hundred percent certain.
 7        Q.   Here it looks like January 1st, 2012.  Is
 8   that -- Actually, that is your brother, Cem Comu.  This
 9   is another business that you are in with your brother,
10   correct?
11        A.   My brother is a director, yes.
12        Q.   He is a director, okay.  And we also see Ex
13   Baxter there, correct?
14        A.   He was a director pro tem for a period of time,
15   yes.
16        Q.   Okay.  And Mr. Baxter is someone who worked
17   with you on the Barclay Group, correct?
18        A.   Yes.
19        Q.   And he also worked with you at Regus, correct?
20        A.   Yes.
21        Q.   Okay.  So here it says you were appointed
22   November 3rd, 2011, as a director of Eurocap, right?
23        A.   Yes.
24        Q.   And Eurocap received a substantial amount of
25   Green Auto shares, didn't it?
```

1      A.   I believe we have disclosed the share exchange,

2  yes.

3           MS. HANKS:   Okay.   If we could go back to

4  KLM Exhibit 178, please.

5      Q.   All right.   So "We are pleased to advise" --

6  This is KLM Exhibit 178.   This is the email from Mansion

7  House Capital to CJComu@Gmail.com, and it is advising

8  you that "your company, Continental Investments Holding

9  Company Limited, has been accepted for corporation by

10  Companies House."

11           This is not a company that you disclosed in

12  any of your bankruptcy filings, is it?

13      A.   I don't believe that is a company I have

14  anything to do with.

15      Q.   Did you respond to Mansion House Capital and

16  tell them that they had a mistake, that this wasn't your

17  company?

18      A.   If I recall, back on March 18th of 2010, I

19  believe that Patrick Kelly asked our firm to form a

20  corporation with him under that name.   It was not a

21  company that I was a director of, nor an owner of.   And

22  if that is the case, that was incorrect.   I believe we

23  were requested to form this corporation for Mr. Kelly,

24  which I believe is the accurate name and the company

25  identification.

1    Q.   So your testimony is that you believe it is

2  possible, though you are not sure, that you may have set

3  up an entity in UK for somebody else, even though it was

4  set up in your name?

5    A.   I believe we had a request to form a company

6  for a client, and part of our services was to form this

7  entity and transfer it to the client.

8    Q.   And is this similar to your testimony yesterday

9  that, even though you signed the documents for the Green

10  Auto transaction as president of the Barclay Group and

11  president and director of Ganas, you weren't really --

12  you really didn't have those roles?

13    A.   I am sorry.  I would have to see the documents

14  you are referencing.  You have described several

15  transactions; that's right.

16    Q.   I am just talking about one transaction.  I am

17  talking about the Green Auto merger in November of 2009.

18  And you executed those documents as a director of Ganas

19  and as president of Ganas, didn't you?

20    A.   Without having to review the documents, if the

21  signature requirement was prepared that way by the

22  attorneys, then I may have signed it accordingly, yes.

23    Q.   But your testimony yesterday was that doesn't

24  necessarily mean that you were president or a director

25  of Ganas; is that right?

1        A.    Sometimes, when legal documents are prepared,

2   they have titles and, depending the transaction, I may

3   sign it in that particular capacity at that time for

4   that transaction.

5        Q.    Okay.  So your testimony to the Court is that

6   you signed legal documents in a capacity, but that

7   really wasn't the capacity in which you signed it?

8        A.    I don't think that's a correct definition.  I

9   am sorry.

10       Q.    Okay.  So what the contract says, what you

11  wrote when you signed your name, isn't what was

12  intended?

13       A.    No, I don't think that is correct either.

14             MS. HANKS:  Could we go to --

15       Q.    Oh, by the way, let me --

16             Ms. Hanks:  Okay.  If we could go to KLM

17  Exhibit 211, please.

18       Q.    Okay.  So if you look below, there is the email

19  that we just looked at a moment ago from Mansion House

20  Capital on March 18th, right?

21       A.    That's the date of the email, yes.

22       Q.    But this is the same email that we were just

23  looking at in KLM Exhibit -- Plaintiff's Exhibit 78; it

24  is just a string -- There is a subsequent response, but

25  it is the same date, it is the same sender, it is the

1   same body of the email, correct?

2        A.   It appears to be.

3        Q.   Okay.  So if we can look at 211, this is your

4   response to -- and your response is not, "Thanks, I will

5   send it to my client," or, "There is a mistake; this

6   shouldn't be issued in my name."

7             Your response is, "You're the best.  Please

8   send invoice and bank wire information," right?

9        A.   That is what it says.

10       Q.   And you say -- Well, not what it says.  It is

11   what you say.  You say, "looking forward to the many

12   deals in front of us!!"  Right?

13       A.   That's what it says.

14       Q.   So this is an entity that you have set up in

15   the UK to do business, isn't it?

16       A.   That's incorrect.

17       Q.   Okay.  But that is what the email says, isn't

18   it?

19       A.   No, I believe the email just confirms a company

20   being formed in the United Kingdom.  It was not for my

21   benefit, nor was I the purchaser of it.  I believe it

22   was a transaction that we facilitated for a client.

23             MS. HANKS:  I believe 178.

24       Q.   Let's look at the attachments.  These are the

25   articles, the corporate documents that are attached to

1  Plaintiff's Exhibit 178, right?

2           Okay.  So you believe that this is possibly

3  a client of yours that you were having it formed for?

4  What client is that?

5      A.   I believe this is for Mr. Patrick Kelly.

6      Q.   Okay.  And who is Patrick Kelly?

7      A.   He is a businessman based in London.

8           MS. HANKS:  Okay.  All right.  Let's go to

9  KLM Exhibit 180, please.

10     Q.   Okay.  And here is an email from -- it is

11 actually from Mansion House Capital, correct?

12     A.   That is what it appears to be.

13     Q.   And it says, "Continental Bank letter signed."

14          MS. HANKS:  Could you go down, please, to

15 the attachment?

16     Q.   Okay.  And here we have that same individual we

17 were discussing earlier from Turkish Bank, the manager

18 from Turkish Bank UK, correct?

19     A.   Appears to be the same person, yes.

20     Q.   Okay.  And it is a letter signed by Ann

21 Boureau, B-O-U-R-E-A-U, correct?

22     A.   That's what it says, yes.

23     Q.   And this woman, Ann Boureau, is the woman who

24 has served as nominee for entities that you have

25 established, hasn't she?

1      A.   No, I have never met Ann Boureau.

2      Q.   I didn't ask you if you had met Ann Boureau.

3      A.   I don't know who Ann Boureau is.

4      Q.   Do you know what a corporate nominee is?

5      A.   Yes, I do.

6      Q.   Have you ever used a corporate nominee to

7  represent -- to serve as an officer or director of an

8  entity that is controlled or owned by you?

9      A.   No, I am familiar with what a nominee is and

10  I --

11      Q.   Okay.  Have you ever used one?

12      A.   We may have, yes.

13      Q.   Okay.  And --

14      A.   We also provided that, as a service, through

15  our firm.

16      Q.   Okay.  And did you ever -- did you have Ann

17  Boureau or any other corporate nominee acting on your

18  behalf or TBG's behalf in 2009 or 2010?

19      A.   I can't recall.

20      Q.   So your testimony is that it is possible you

21  may have a nominee working on behalf of one of your

22  entities; you just don't know?

23      A.   It is a possibility, yes.

24      Q.   Is it common to have corporate nominees have

25  their names on your corporate information and you not

1   remember?

2       A.   There may have been transactions where we were

3   required to help a client form an entity, and we may

4   have used a nominee for that purpose.

5       Q.   But we are not talking about corporations for

6   your clients.  We are talking about you and your company

7   TBG, correct?

8       A.   I am sorry.  I don't understand the question.

9       Q.   My question to you earlier was:  Have you or

10  has the Barclay Group used a nominee service for a

11  corporation, and did they do that in 2009 or 2010?  And

12  you said maybe?

13      A.   Possibly, yes.

14      Q.   Okay.  But you said you didn't remember?

15      A.   I don't recall.

16      Q.   And my question was:  Is it common for you not

17  to remember setting up entities in other people's names

18  for either yourself or the Barclay Group?

19      A.   I wouldn't say it is common.  I would say it is

20  unfortunate, but I apologize, because sometimes I have

21  too many things going on.

22           MS. HANKS:  Okay.  Would you go up, please?

23  Okay and could you pull up KLM Exhibit 214, please?

24      Q.   Okay.  So if you look at the recipient of this

25  email, Ann Boureau -- Ann@Boureau.com, and you are

1  sending the email to her; isn't that right?

2      A.   That's what it appears to be.

3      Q.   And this is the woman that you said a moment

4  ago that you hadn't met, but apparently you have

5  corresponded with her, haven't you?

6      A.   It appears to be.

7      Q.   Okay.  And you are attaching information for

8  her regarding the bank account for Continental, aren't

9  you?

10     A.   I believe it says, "Please find attached

11 letter."

12     Q.   If you look at the attachment, what does it

13 say?  When it says attachments, how is it described?

14     A.   May I see the attachment?

15     Q.   No, I am asking you to look on the email, how

16 the attachment is described.

17     A.   It says Continental Bank.

18     Q.   Okay.  And the prior correspondence between you

19 and the representative of Turkish Bank and other -- and

20 Ann Boureau previously, has been concerning Continental

21 Investment holdings (Inaudible)?

22     A.   I can't recall the exact name of the company,

23 if you can bring it back to me.

24     Q.   Let's just go to the attachment, please.

25     A.   Okay.

1      Q.   Okay.  Now, this is a letter -- you sent this

2  letter to Ms. Boureau for her signature, didn't you?

3      A.   I believe that's correct.

4      Q.   Okay.  So in this circumstance, she is acting

5  as nominee?  She is acting as the person who is

6  representing Continental Investments, isn't she?

7      A.   I am not certain exactly if she is the director

8  or the nominee of the company, but she is the signatory.

9      Q.   Well, let's look at how she is described.

10      A.   It states that she is a director.

11      Q.   Okay.  And why would you need to send a letter

12  for her signature to authorize access to your Turkish

13  Bank account?

14      A.   I don't believe I was giving her access to my

15  Turkish Bank account.

16      Q.   Okay.  You -- the email -- the letter that is

17  being drafted is being drafted to the individual with

18  whom you were corresponding a couple of months prior

19  concerning your account at Turkish Bank?

20      A.   I believe that is an officer of Turkish Bank

21  contact information, and according to this letter it is

22  an authorization to open up a bank account for my

23  brother on behalf of Ann Boureau, I guess her name is.

24      Q.   Okay.  All right.  Then let's look at -- see if

25  we can get some clarification.  Look at KLM Exhibit 217,

1    please.   All right.  This is an email.  Well, actually,

2    if you go down, Ms. Boureau is sending you her new

3    office address, correct?

4         A.   That's what it appears to be.

5         Q.   Okay.  If you go up, "Hello, Ann.  Thank you

6    again for your emails and assistance in opening a new

7    bank account for Continental," correct?

8         A.   That is what it says.

9         Q.   And your testimony is still that this was not

10   an account for you; this was for a client, correct?

11        A.   This account was not for me.

12        Q.   Okay.  And you are familiar with an entity

13   called Newhaven Nominees, right?

14        A.   Yes.

15        Q.   And this is the entity that deposited $40,000

16   into TBG's account in late 2009, right?

17        A.   I can't recall.

18        Q.   Do you recall the exhibit that we looked at a

19   couple of moments ago reflecting TBG account

20   transactions?

21        A.   Yes.

22        Q.   Okay.  And do you recall the $40,000 that

23   Newhaven Nominees deposited into TBG's account in

24   September of 2009?

25        A.   I am seeing that here in front of me.

1          MS. HANKS:  Okay.  So if you will go to KLM

2    Exhibit 206, please.  Let's go down to the bottom,

3    please.  Access the bottom of the email, please.  Okay.

4       Q.   Is that the first email in the communication?

5    Here we go.  Okay.  See this email with Mr. Reuben

6    Anstock?  Do you recall Mr. Anstock?

7       A.   Yes.

8       Q.   You were corresponding with him quite a bit in

9    2009 and 2010, correct?

10      A.   I believe I had correspondence with him.

11      Q.   Okay.  And in this -- in this email he is

12   communicating with you about a COI for Continental,

13   Partnership, Inc., correct?

14      A.   That's what it says.

15      Q.   And what is a COI?

16      A.   I have no idea.

17      Q.   Certificate of incorporation?

18      A.   That could be one version.

19      Q.   Okay.  Would it make sense that a COI would

20   refer to a certificate of incorporation that is actually

21   attached regarding Continental Partnership?

22      A.   I have no reference of that.  I am sorry.

23      Q.   Okay.  But you see under the attachments that

24   there is a certificate of incorporation for Continental

25   Partnership, Inc., right?

1      A.   That is what it says in the attachment file.

2      Q.   Okay.  So let's look down.  This is a BVI

3  entity, isn't it, British Virgin Islands, correct?

4      A.   That is what it appears to be.

5      Q.   Do you do much business in the British Virgin

6  Islands?

7      A.   No.

8      Q.   You don't?  Do you do much business in the

9  Channel Islands?

10      A.   Not that I am aware of.

11      Q.   Isle of Man?

12      A.   I don't believe so.

13           MS. HANKS:  Okay.  Let's go down, please.

14      Q.   Okay.  Now, we spoke earlier about corporate --

15  about nominee services, and you say you provide some of

16  those services through Regus Advisors or through the

17  Barclay Group?

18      A.   Primarily Regus Advisors.

19      Q.   Primarily, so do you mean you provide them

20  through both?

21      A.   No, I believe that is a service that Regus

22  Advisers offers.

23      Q.   Okay.  But at the time of this document in

24  2010, was Barclay Group providing nominee services?

25      A.   I am not a hundred percent certain.

1      Q.   Are you 75 percent certain?

2      A.   I am sorry, Counselor.  I don't really know the

3   percentage.

4      Q.   So you can't answer yes or no, as to whether

5   the company of which you were the chairman and CEO was

6   providing nominee services?

7      A.   No, I am saying I can't recall the date that we

8   were providing those services.

9      Q.   Okay.  So here they are referencing a company

10   called West Point Advisors, Inc., right?

11      A.   Yes.

12      Q.   What is West Point Advisors, Inc.?

13      A.   I believe it was a holding company formed for

14   something that I don't believe there was any business

15   in.

16      Q.   But this was your company, wasn't it?

17      A.   I believe we formed the company for a client.

18      Q.   Your testimony is you formed West Point

19   Advisors for a client?

20      A.   I am not a hundred percent certain.  It was

21   obviously another transaction that I don't have the

22   exact details of what it was for.

23      Q.   Mr. Comu, have we discussed a single entity

24   here where you knew for sure if it was yours or someone

25   else's?

1    A.   I believe we have discussed what was mine and

2    what was somebody else's.

3    Q.   Well, we have heard a lot about how you weren't

4    sure if it was yours or someone else's, but you don't

5    seem to have a lot of certainty about a lot of these

6    offshore transactions that you are involved in either,

7    in whatever capacity.

8    A.   Well, the ones we reference, Continental

9    Investment Holding Company Limited is not a company I

10    have any ownership in, and Continental Partnership,

11    Inc., is not a company I have any ownership in.  I

12    believe those are the only two referenced so far.

13    Q.   Well, we also have West Point Advisors, Inc.,

14    don't we?

15    A.   Yes.

16    Q.   And Continental Partnership, Inc., you have

17    previously testified that you don't have any ownership

18    interest in it, don't you?

19    A.   I have no ownership interest in it.

20    Q.   And that is very important to this case,

21    because that is the entity that purchased the house that

22    you moved into shortly after your discharge, isn't it?

23    A.   It is my brother's company.

24    Q.   That is not my question.

25    A.   Could you repeat your question?

1    Q.   That is the entity that purchased the home in

2  which you moved into not long after discharge, isn't it?

3    A.   That is the company that owns the home that we

4  rent, yes.

5    Q.   Okay.  And that entity purchased that house

6  with cash, didn't it?

7    A.   I believe so.

8    Q.   Okay.  And actually you know so, don't you,

9  because you were involved in that transaction in terms

10  of the negotiation and communication, weren't you?

11    A.   I communicated with my brother to assist him in

12  that acquisition, yes.

13    Q.   So you knew full well that that house was paid

14  for in cash, didn't you?

15    A.   I don't know exactly how the funds were

16  transferred, but my brother's company, Continental

17  Partnership, did acquire the property, yes.

18    Q.   Mr. Comu, please listen to my question.  My

19  question is:  Did you know that it was paid for in cash?

20    A.   I believe it was a wire.

21    Q.   So your answer is yes?

22    A.   By bank wire, not by cash.

23         MS. HANKS:  Okay.  Can you go down, please.

24  All right.

25    Q.   Here we go.  Definition of principals is a

1   business person who deals with companies on a regular

2   basis.  What does the term principal, P-R-I-N-C-I-P-A-L,

3   mean to you?

4        A.   Somebody party to a transaction?

5        Q.   Actually it is defined here, so why don't we

6   look at the definition.  Here it refers to beneficial

7   owners and controllers, doesn't it?

8        A.   That's the definition they have here.

9        Q.   Okay.  And who is identified as a principal of

10  West Point Advisors?

11       A.   It appears as my name.

12       Q.   Okay.  So this is your company, isn't it?

13       A.   I don't know if this is my company or if I was

14  listed as a director for formation of the company.

15       Q.   Mr. Comu, that is not what it says there, is

16  it?  It says principal, doesn't it?  It doesn't say

17  director.  It says principal, and it specifically

18  defines principal as beneficial owner or controller,

19  doesn't it?

20       A.   That is what it says.

21            MS. HANKS:  Okay.  Go up, please.

22       Q.   So here you are using -- or at least

23  coordinating -- please stop there -- Newhaven Nominees

24  Limited in British Virgin Islands, correct?  Regarding

25  West Point Advisors, right?

1        A.   I don't understand your question.

2        Q.   Okay.  Well, the correspondence, these are all

3   the corporate documents pertaining to West Point

4   Advisors, and this is a letter in Newhaven Nominees

5   Limited that is one of the attachments to the email that

6   you received, concerning West Point Advisors, Inc., in

7   which you are identified as a principal, meaning

8   beneficial owner or controlling person, of West Point

9   Advisors, right?

10       A.   Or director.

11       Q.   That is not what it said, Mr. Comu.  Please go

12  back down.

13       A.   It says that right there.

14       Q.   No, it doesn't.  Mr. Comu, where in this

15  section does it say anything about a director?

16       A.   Not in this section, but in the section you

17  just had it says that, if you can go back --

18       Q.   Where you are identified it is the section

19  discussing principals, isn't it?

20       A.   Yes, that's what this shows.

21            MS. HANKS:  Please go up.  All right.

22       Q.   So Newhaven Corporate Services, they are one of

23  these nominee services, correct?

24       A.   I believe they offer that as service.

25       Q.   Okay.  They offer nominee services.

1          MS. HANKS:  You can go up, please, all the

2    way up to the original email, please.  All right.

3          Q.   Now, the email to which this is attached, the

4    corporate documents we were just looking at, is actually

5    email from Mr. Anstock at Newhaven Group, okay?  And

6    Mr. Anstock at Newhaven Group is saying, "I have been

7    under the impression that you required nominee services

8    and a bank account.  It is not possible for us to grant

9    control over the bank account unless we are the nominees

10   of the company."  Right?

11         A.   That's what it says.

12         Q.   So according to this email, you were reaching

13   out to the Newhaven Group, both for nominee services and

14   a bank account, right?

15         A.   I don't see that there.

16         MS. HANKS:  Okay.  Can you go down to the

17   email immediately preceding?  Okay.  Go up.  There we

18   go.

19         Q.   This is an email on August 23rd, 2010, from you

20   to Ian Gander regarding Continental Partnership, Inc.,

21   correct?

22         A.   I believe that's what it says.

23         Q.   It says, "I appreciate your follow-up.  Could

24   you please check with Fergus on the matter?  I recently

25   acquired a full operating entity, West Point Advisors,

 1   Inc.," right?  That is what it says?

 2        A.   Yes.

 3        Q.   Okay.  And that is consistent with the document

 4   that identifies you as a principal of West Point

 5   Advisors, Inc., isn't it?

 6        A.   I think it identifies an acquisition made of an

 7   entity called West Point Advisors.

 8        Q.   Okay.  The document below, that we reviewed

 9   just a moment ago, identified you as a principal of West

10   Point Advisors?

11        A.   That's what it shows.

12        Q.   Okay.  And now here it says -- this is you

13   telling Ian in an email, "Thanks for your help with West

14   Point Advisors."  Actually it says, "I recently acquired

15   a full operating entity, West Point Advisors."  And then

16   you are saying, you know, "I then requested another new

17   entity, Continental.  The price I paid for that was

18   750."

19             You are asking about the difference between

20   the cost in the two services they are providing, aren't

21   you?

22        A.   Could be.

23        Q.   Okay.  Go up.  And Mr. Anstock says, "Please

24   accept my apologies for the miscommunication on fees,"

25   doesn't he?

1       A.   Yes, he does.

2       Q.   Okay.  And he explains the reason for the

3   difference in the price is because, in one, there wasn't

4   nominee services, but here you are asking for both, and

5   that is why it is more expensive, right?

6       A.   That is what it says.

7            MS. HANKS:  Okay.  Let's go to exhibit --

8   KLM Exhibit 204, please.  Okay.

9       Q.   This is another individual that you had quite a

10  bit of correspondence with in 2010, Charlotte Jacob of

11  the Newhaven Group.  Do you recognize that name?

12      A.   Faintly.

13      Q.   Okay.  She is with the same group that the

14  gentleman in the prior email we were looking at is from,

15  right?

16      A.   I am not sure.

17      Q.   Newhaven Group, it is the same web address,

18  right?

19      A.   I believe it is a different company.

20           MS. HANKS:  206, please.  Okay.

21      Q.   Reuben Anstock at NewhavenGroup.net, right?

22      A.   I see that.

23           MS. HANKS:  Please go to 204, please.

24      Q.   Charlotte Jacob, NewhavenGroup.net, right?

25      A.   Yes.

1      Q.    They are from the same company, aren't they?

2      A.    It appears to be, but I have also heard

3   Newhaven Nominees, and I don't know if that is different

4   than Newhaven Group.

5      Q.    Okay.  But these individuals are both emailing

6   from NewhavenGroup.net?

7      A.    That's correct.

8      Q.    Okay.  Now, this has attached -- the "re" line

9   is CPI.  That refers to Continental Partnership, Inc.,

10  doesn't it?

11     A.    I don't know.

12     Q.    Okay.  It attaches CPI certificate of

13  incorporation and MNAs of CPI, doesn't it?

14     A.    That's what it says.

15     Q.    Okay.  Same company we were talking about a

16  moment ago.

17           MS. HANKS:  You go down, please?

18     Q.    All right.  Again, we have the certificate of

19  incorporation for the BVI entity Continental

20  Partnership, Inc.  This is the entity that purchased

21  your home (Inaudible), and that you have told this Court

22  is owned by your brother, right?

23     A.    Yes.

24           MS. HANKS:  Okay.  Let's go down.

25     Q.    And here we have got Newhaven Corporate

```
 1    Services, BVI Limited?
 2         A.   Yes.
 3              MS. HANKS:  Okay.  Go on down.  I wish I
 4    had that.  Okay.  Let's go to 202, please.  All right.
 5         Q.   And your testimony is that this is not your
 6    company; you don't own it; you don't control it, right?
 7         A.   That is correct.
 8         Q.   Okay.  We are back with Mr. Reuben Anstock,
 9    right, Newhaven Group, same company, correct?
10         A.   Appears to be.
11         Q.   Okay.  And he is responding to your comments.
12    Here he says something about CPI.  He also says
13    something about WPA.  That refers to Continental
14    Partnership, Inc., and West Point Advisors, right, the
15    two entities that you have been communicating about?
16         A.   I am not certain what his references are.
17              MS. HANKS:  Okay.  I think I am off to the
18    documents.  Let's go down.  Okay.
19         Q.   Here is this email from Mr. Anstock on
20    July 19th, says, "Hi, CJ, wanted to ensure that this was
21    progressing smoothly for you.  Perhaps you will kindly
22    let me know where you have got to.  Am I correct in
23    understanding that the funds will move into Newhaven
24    Nominees' account, corporate and chancery will be
25    organizing the escrow agency administration services,
```

 1   and NNL will release the funds when instructed to do so

 2   by yourself or them."  And he asks you how you would

 3   like to proceed with Continental; is that right?

 4        A.   That's what it appears.

 5        Q.   Okay.  Continental -- well, it says -- did I

 6   not read it correctly?

 7        A.   You read it perfect.

 8             MS. HANKS:  Okay.  Go up, please.  All

 9   right.

10        Q.   And your response, could you please read that

11   sentence for the Court?

12        A.   "On to business, in the matter of Continental

13   Partnership, please note this entity will be strictly

14   under my ownership and control and, therefore, no

15   further need for my brother.  If this changes in the

16   future, I will advise accordingly.  As such, I would

17   like to activate some banking for this and transfer

18   funds.  Is this something I can operate individually, or

19   must everything go through your firm like WP?"

20        Q.   Now, that is inconsistent with what you just

21   told the Court, isn't it?  You just testified you had no

22   ownership and no control over Continental Partnership,

23   Inc., and this email is clarifying unequivocally that it

24   is under your strict control and ownership, isn't it?

25        A.   That is incorrect.

1    Q.   What is confusing about, "This entity will be

2  strictly under my ownership and control"?

3    A.   I believe Continental Partnership was an entity

4  that was getting ready to be formed, and until that was

5  completed I believe I was saying basically let me handle

6  everything until this transaction of this corporation

7  has been put together.

8    Q.   Mr. Comu, the truth is you set up this entity,

9  and you put your brother in there temporarily, so that

10 he could purchase the house in a name when it is really

11 your entity; isn't that what happened?

12   A.   That is totally incorrect.

13   Q.   Okay.  Let's keep looking at the documents

14 then.  Now, just real quick before we move on, not only

15 do you say in this document, "This entity will be

16 strictly under my ownership and control and, therefore,

17 no further need for my brother," meaning Cem Comu,

18 right?

19   A.   That's the only brother I have.

20   Q.   Okay.  The brother who you say owns and

21 controls Continental Partnership, Inc., right?

22   A.   My brother does own and does control

23 Continental Partnership, Inc.

24   Q.   Okay.  Not what this document says, but let's

25 keep looking at it.  You tell them that you want to

1   activate some banking for this, for this -- assuming

2   this entity and transfer funds. "Is this something I

3   can operate individually, or must everything go through

4   your firm like WP?"

5            You are talking to them about operating the

6   accounts for this entity on your own, aren't you?

7       A.   No, that is incorrect.

8            MS. HANKS:  Okay.  Let's look at 203,

9   please, Plaintiff's Exhibit 203.

10      Q.   The same individuals we have seen previous

11  correspondence with, Charlotte Jacob and Reuben Anstock

12  of Newhaven Group, regarding CPI, and CPI is Continental

13  Partnership, Inc., isn't it?

14      A.   I can't verify that.

15      Q.   Of the last ten documents we have looked at,

16  have you seen any other reference to any entity that

17  could possibly be CPI?

18      A.   CPI could be an acronym for anything.  I am

19  sorry I can't speculate.

20      Q.   Okay.

21           MS. HANKS:  Could you go down a little bit

22  to the forwarding email?

23      Q.   Okay.  This is just an email from Charlotte

24  Jacob.  Okay.  Charlotte Jacob from Newhaven Group, is

25  emailing you, says, "Hi, CJ, I understand an account is

1   required for the above," and the above is CPI which, as

2   the previous documents establish, is Continental

3   Partnership, Inc.  "On the basis that is correct, I

4   attach additional customer info forms, which need to be

5   printed, completed, signed, and dated, and the originals

6   sent to me.  At the same time would you please confirm

7   the currencies the account is to hold?"  And she is

8   asking for your passport, utility bills at your

9   residential address, right?

10       A.   That's what the email says.

11       Q.   And if this isn't your account, you are going

12  to send your client's information, aren't you?

13       A.   I may sometimes record my information for the

14  purpose of forming the corporation, just for the purpose

15  of forming the corporation, because they will need a

16  contact person.

17       Q.   You would provide your home utility bills and

18  your passport for someone else's account, even though it

19  is in your name?

20       A.   No, as part of our nominee services is we may

21  do that on occasion to create a corporate entity for a

22  client.

23       Q.   Okay.  But that is not what is happening here,

24  is it?  You are talking to Newhaven Group about them

25  providing nominee services.  They are not talking to you

1   about you providing nominee services?

2        A.   I believe we are talking to each other about

3   both.

4        Q.   Okay.  Well, none of the documents that we have

5   looked at so far in any respect ask you about the

6   services you are providing.  All of the documents we

7   have looked at are you asking them about the services

8   they are providing you for your company, aren't they?

9        A.   That is incorrect.  Would you like me to

10  answer?

11       Q.   Pardon me?

12       A.   Would you like me to answer?

13            MS. HANKS:  Exhibit 203, please.  Is this

14  203?  Oh, okay, sorry, 204.

15       Q.   And this is a document we looked at before.

16            MS. HANKS:  Can you please go up to the

17  email?

18       Q.   So this is your response actually to Charlotte

19  Jacob's email, when you looked at it previously.  Go up.

20  And again you say, "If I wanted to operate this account

21  personally, may I get a copy of the incorporation

22  documents?"  You are operating an account personally.

23  You are not operating this account as a nominee, are

24  you?

25       A.   I believe the statement is "if" I wanted to.

1      Q.   So you are asking her for information to make

2   it possible for you to operate the account personally,

3   aren't you?

4      A.   No, I am just trying to get educated on the

5   process.

6      Q.   Oh, you are getting educated on the process of

7   operating an account at Turkish Bank regarding

8   Continental Partnership, Inc., the entity that bought

9   your home?

10      A.   That is incorrect.

11      Q.   You are just getting educated on the process?

12      A.   I am trying to learn how the whole process

13   works so we can advise our clients.

14      Q.   So this is a learning exercise?

15      A.   No, I believe I am trying to be clear on what

16   the services are, so that, in turn, we can offer them to

17   our clients.

18      Q.   Okay.  So you are just generally asking them

19   information about the kind of services they provide, and

20   it just so happens to involve the entity that purchased

21   your home, that you live in, with cash?

22      A.   It's an entity that my brother purchased.

23      Q.   All right.  Now, your brother isn't on any of

24   these emails here, is he, about "under my ownership and

25   control," that email; he is not CCed on that email, is

1    he?

2        A.    We have seen a lot of emails counselor.  I

3    don't know which one you are referring to.

4        Q.    Okay.  Let's go back to -- let's go back to

5    that email then.

6              MS. HANKS:  Exhibit 202, please,

7    plaintiff's.

8        Q.    In the matter -- Again, this is Page Two of KLM

9    Exhibit 202, "In the matter of Continental Partnership,

10   Inc., please note that this entity will be strictly

11   under my ownership and control and, therefore, no

12   further need for my brother."  And this was your email.

13   Now, your brother is not CCed on that email, is he?

14       A.    He may be BCCed.

15       Q.    No, he is not.  Do you see the BCC line?

16       A.    It doesn't appear on an email.

17       Q.    So you are suggesting that he might be BCCed,

18   he is just not identified on the email?

19       A.    It's a possibility, yes.

20       Q.    That is not what the document reflects, and

21   there is nothing in this document to indicate that he is

22   a party to any of this correspondence, there?

23       A.    BBCs don't appear when you print out an email.

24       Q.    They do when there is a line that says BCC, Mr.

25   Comu?

```
 1        A.    I am sorry.  Mine don't, I guess.

 2              MS. HANKS:  Please go up.

 3        Q.    Now, in the --

 4              THE COURT:  We are going to take a

 5  ten-minute break.  We will come back at 11:30.  No one

 6  has any lunch afternoon conflicts today, correct?  All

 7  right.  Well, I am thinking we will break for lunch at

 8  12:30 today.

 9              (Recess from 11:20 to 11:33)

10              THE COURT:  All right.  Going back on the

11  record now in the King Louie Mining versus Comu matter.

12              Mr. Comu, I am required to remind you you

13  are still under oath.

14              THE WITNESS:  Yes, Your Honor.

15              THE COURT:  All right.  You may proceed.

16              MS. HANKS:  This is KLM Exhibit 202, right?

17  And if we could go to 203 again quickly, please.

18        Q.    (By Ms. Hanks)  Okay.  This is Plaintiff's

19  Exhibit 203, and this is an email from Charlotte Jacob,

20  also with the Newhaven Group, same group of documents we

21  have been talking about, and it references CPI, which,

22  again, is Continental Partnership, Inc., just as the

23  prior document referred to.

24              And in this document Charlotte Jacobs says,

25  "At the same time, would you please confirm the
```

1    currencies the account is to hold?"  Correct?  She is

2    asking you about the Continental Partnership, Inc.,

3    accounts, right?

4        A.   That's what it appears to be.

5              MS. HANKS: Okay.  And would you please go

6    to KLM Exhibit 204?  Would you go down, please?  Okay.

7    KLM Exhibit 272, please, and we will move to KLM

8    Exhibit 275, please.  Okay.

9        Q.   This is an email chain between you and Reuben

10   Anstock -- again, Reuben Anstock is with Newhaven

11   Group -- regarding Continental Partnership, Inc.,

12   correct?

13       A.   Yes.

14             MS. HANKS:  Could you go down please to the

15   (inaudible)?

16       Q.   So we previously saw this email from

17   Mr. Anstock to you, apologizing for the confusion

18   regarding the fees.  Do you recall that email from

19   earlier?

20       A.   Yes.

21       Q.   Okay.  If you go up, your response to this

22   email, "In regards to CPI," which, again, is Continental

23   Partnership, Inc., "I would like to open and operate a

24   bank account and look to make investments of real estate

25   and/or stock.  As such, would you please provide me the

1  necessary docs or resolutions that would allow me to

2  have such authority.  Thank you again, CJ."

3              So not only are you setting up an account

4  with regard to CPI, Continental Partnership, Inc., but

5  you would like to use Continental Partnership, Inc., to

6  make investments in real estate, correct?

7      A.   I believe I am just inquiring about the

8  corporation, what it can and cannot do.

9      Q.   So your testimony is that in this email you are

10  not informing Reuben Anstock of your intent to use

11  Continental Partnership, Inc., for investments in real

12  estate or stock?

13      A.   I don't know exactly what your question is.

14      Q.   Okay.  Is it your testimony that it was not

15  your intent, as reflected in this email, to open and

16  operate a bank account to make investments in real

17  estate with regard to CPI?

18      A.   If CPI was looking to do that, yes.

19      Q.   Of course, your email, your words, do not say

20  "my client."  They do not say CPI.  They say, "In

21  regards to CPI, I would like to open and operate an

22  account for making real estate investments," doesn't it?

23      A.   Well, I think it says right there, in regards

24  to CPI.

25      Q.   Okay.  We are going to move on then.

1              MS. HANKS:  Exhibit 334, please.

2        Q.    In the prior email, I apologize, 275, that

3   email correspondence is in September, early September

4   of 2010.  When did you move into your home, the Oaks

5   North home?

6        A.    I believe it was December 2010.

7        Q.    And it was purchased in October of 2010, wasn't

8   it?

9        A.    I don't have the exact date.

10       Q.    Okay.  You don't need the exact date.  It was

11  purchased in October 2010, wasn't it?

12       A.    I am sorry, Counsel.  I don't know the exact

13  date.

14       Q.    You don't remember if your house was purchased

15  in October of 2010 or not?

16       A.    I don't remember the date that my brother

17  purchased the home.

18             MS. HANKS:  Exhibit 334, please.

19       Q.    Okay.  And another email from -- this one is

20  from Fergus Anstock of Newhaven Group, the same company,

21  and it reflects a subject of Continental Partnership,

22  Inc.  And in the body of the email --

23             MS. HANKS:  Actually if you go down to Mr.

24  Comu's email from September 1st, 2010.

25       Q.    I believe Mr. Anstock had sent you an email at

1    the end of August, right?  If you could go down to the

2    body of that email.  Where he is asking -- this is where

3    he asks you how you would like to proceed, and your

4    response.

5              So previously we are talking about whether

6    or not or to what extent there was going to be a nominee

7    service, and you say, "At this time I think I will not

8    require, in addition, the addition of nominee and

9    banking services for CPI."

10             Does this resolve any doubt in your mind

11   about whether or not you were discussing using them for

12   nominee services?

13        A.   I think I was discussing that with them.

14        Q.   Okay.  So you were.  And here you decide not to

15   use them for nominee and banking services at this time,

16   correct?

17        A.   Appears to be, yes.

18        Q.   Okay.  But you say, "If that changes, I will

19   contact you to get the account adjusted accordingly,"

20   right?

21        A.   That's what it says.

22        Q.   So you are the one making the decision about

23   CPI's accounts here, right?

24        A.   I believe the correspondence says, "I will not

25   require any additional nominee or banking services for

```
 1   CPI."
 2        Q.   Okay.  But the next sentence says, "However,
 3   should that change, I will contact you and get the
 4   account adjusted accordingly," right?
 5        A.   That's what it says.
 6        Q.   Okay, thanks.
 7             MS. HANKS:  Please go up.
 8        Q.   And Mr. Anstock responds -- well, Fergus
 9   Anstock says, "Reuben is on vacation.  Will you kindly
10   let me have the details of the directors you wish to
11   appoint in place of nominees, together with the standard
12   due diligence."
13             So as the principal of Continental
14   Partnership, Inc., they are asking you who you would
15   like to appoint as a director of the company, aren't
16   they?
17        A.   That is what they are asking.
18             MS. HANKS:  Okay.  So let's go to KLM
19   Exhibit 90, please.  No, I apologize, KLM Exhibit 207.
20        Q.   Again, in early September 2010, and here we are
21   back to the representative from Turkish Bank.  Do you
22   remember that person from the email we first started
23   with?
24        A.   Yes.
25        Q.   Okay.  And here you have an email from your
```

1   brother, if you go down, please, further on.  Okay.  And

2   here your brother is contacting Turkish Bank regarding

3   purchasing a home in Texas, okay?

4        A.   Yes.

5             MS. HANKS:  Okay.  208, please.

6        Q.   And Turkish Bank responds to your brother and

7   says, "Dear Mr. Comu, I can provide the reference letter

8   tomorrow.  Unfortunately, we cannot address 'to whom it

9   may concern' due to our bank procedures.  Kind regards,

10  Cigdem," right?

11       A.   Yes.

12       Q.   And above, your brother is forwarding this

13  email to you, isn't he?

14       A.   Yes.

15       Q.   He says, "I need a name"?

16       A.   Yes.

17       Q.   Why does he need a name?

18       A.   I believe he is looking for a corporate entity

19  to make this purchase with.

20       Q.   If he is the one making the purchase, why is he

21  asking you for a name?

22       A.   He is asking me.  That is what we do for a

23  business.

24             MS. HANKS:  Okay.  Can we go to KLM

25  Exhibit 276, please?

1    Q.   All right.  And you respond Andrea Whalen.  You

2  don't respond with the name of a company, do you?  You

3  respond with your real estate broker, don't you?

4    A.   That's what it appears to be.

5    Q.   So your brother was not the one purchasing this

6  house; you were?

7    A.   That is incorrect.  That was the agent

8  representing the house.

9         MS. HANKS:  All right.  Let's go to KLM

10  209, please.

11    Q.   On September 15th you started the negotiations

12  for purchasing the house, didn't you?

13    A.   I believe that my brother was purchasing the

14  house, and I was assisting him in any way that I could.

15         MS. HANKS:  Okay.  Can you go down to the

16  bottom, please?  There we go.  Okay.  Move it down.

17    Q.   So here is an email from Turkish Bank UK,

18  Limited, and it references your brother, Cem Comu,

19  correct?

20    A.   Cem.

21    Q.   Cem Comu, I apologize.

22         MS. HANKS:  Okay.  And then let's go up.

23  Keep going up.  All right.

24    Q.   And she sends a reference letter regarding your

25  brother, "our mutual client," quote, unquote, correct?

1          A.   I am sorry.  What is the question?

2          Q.   From Turkish Bank they are responding -- they

3     are sending email to the real estate broker, correct?

4          A.   Yes, that's what it appears to be.

5               MS. HANKS:  Okay.  Let's go to 333, please.

6     Oh, okay.  277, please.  All right.

7          Q.   And your brother forwards it to you regarding

8     14873 Oaks North Place, and you say, "Many thanks, Cem."

9     What are you thanking him for here; do you remember?

10         A.   Maybe just keeping me posted.  I don't know.

11         Q.   Well, if he is buying the house, why is he

12    keeping you posted?

13         A.   Well, it is a significant transaction.  I think

14    he would like to see it completed.

15         Q.   He was really putting his name in here to

16    purchase the house on your behalf, wasn't he?

17         A.   That's incorrect.

18              MS. HANKS:  Okay.  Let's go to KLM

19    Exhibit 210, please.

20         Q.   Now, previously we saw the document in which

21    you were identified as a principal of Continental

22    Partnership, Inc., right?

23         A.   Yes.

24         Q.   Okay.  Now, here in September of 2010 Newhaven

25    Nominees sends you a document -- Charlotte Jacob at

1   Newhaven Nominees in London has sent documents to your

2   brother, Cem, for his signature, and she says, "Dear

3   Cem, CJ has asked me to contact you direct regarding the

4   above.  I attach a resolution undated for you to print,

5   sign, and scan back to me, along with a letter of

6   consent to act as a director with regard to Continental

7   Partnership," correct?

8       A.   That is what it says.

9       Q.   Okay.  So here your brother is being appointed

10  as a director to the entity that you set up and with

11  regard to which you are a principal, right?

12      A.   I believe at this time I stepped down to allow

13  my brother to take control of Continental Partnership,

14  Inc.

15      Q.   Okay.  So now your testimony is you did set up

16  the company, and you did have control over it, but you

17  stepped down so that your brother could take over?

18      A.   I created a company that I was doing nothing

19  with, and my brother was looking for a corporate entity

20  so he could do something with it, so I stepped down to

21  allow my brother to have the company.

22      Q.   Okay.  Even though you told Newhaven Group that

23  you would have exclusive control and ownership over the

24  company?

25      A.   When it was first created until something was

1   decided what to do with it, it was just an empty shell.

2        Q.   Okay.  So now your testimony is that this was

3   not just due diligence, finding out information about

4   their services.  This was specific to a company you set

5   up.  You just decided to step down and let your brother

6   take over?

7        A.   No, I believe it is both.

8             MS. HANKS:  Okay.  So let's go to

9   exhibit -- Oh, hold on a second.  Can you go up to the

10  top, please?  Okay.  And if you could go to 266, please.

11  Okay.

12       Q.   Charlotte Jacob, the Newhaven Group, sends a

13  share transfer form to your brother for execution,

14  correct?

15       A.   That's what it says.

16       Q.   Now, this is the process by which your

17  brother's name appears on the corporate records for

18  Continental Partnership, Inc., the entity you set up,

19  right?

20       A.   Continental Partnership, Inc., was formed, and

21  I believe I stepped down.  I believe my brother took

22  control over the company at this time.

23       Q.   You formed it, you testified.  You stepped

24  down, and you had your brother's name put on the

25  company.  That is what you testified to?

1    A.   No, I think I was the initial incorporator

2  until the business determined what it was going to do.

3  I had no further interest in the business, and I believe

4  my brother decided to move forward with it.

5    Q.   And the first choice he made as the head of

6  that business was to buy the home, that you currently

7  live in, with cash?

8    A.   He purchased a piece of real estate in Dallas,

9  Texas, yes, ma'am.

10    Q.   Okay.  Let's go to -- On October 15th the Oaks

11  North property was purchased for approximately $397,000.

12  Whether by wire or check, it was a cash transaction that

13  did not involve any debt, correct?

14    A.   I believe so.

15    Q.   Okay.  So it is approximately about a $400,000

16  property, and that was in 2010.  Has the property

17  appreciated since then?

18    A.   I don't have any idea.

19    Q.   But you pay taxes on the property, don't you?

20    A.   No.

21    Q.   Okay.  So October 15th was the purchase date.

22         MS. HANKS:  Could we please pull up PLM

23  Exhibit 269?  Go down, please.

24    Q.   This is a couple of days after the purchase of

25  the Oaks North property.  And this is an email from --

1  Again, some of this is in Turkish.  Some of the
2  correspondence on the email is from Turkish Bank,
3  correct?  Is this the same entity that we started out
4  with in the beginning, Turkish Bank?
5      A.   It appears to be.
6      Q.   The entity that you asked to change your
7  account address for Sunset Pacific and your account,
8  right?
9      A.   It is a different contact person from the bank,
10  I believe.
11      Q.   Okay.  But it is still Turkish Bank, right?
12      A.   It appears to be, yes.
13      Q.   Okay.  And in the October 19th email down
14  below -- and its subject, by the way, which is here in
15  the middle, that refers to you, doesn't it?
16      A.   That's my name.
17      Q.   That's your name, so it refers to you.  And
18  could you please translate that email that is in Turkish
19  there in the middle that is about to be highlighted?
20      A.   I don't understand the dialect they are using.
21  I think it is something about confirming an address.
22      Q.   Okay.  Isn't it confirming the change of
23  address, because you changed the address with your
24  Turkish Bank account to the Palladium Drive address,
25  right?

1        A.   Yes.

2        Q.   And doesn't this request that it be changed to

3   an address in Istanbul?

4        A.   I can't decipher that.  I am sorry.

5        Q.   All right.  And you say that you rent out the

6   Oaks North property from Continental Partnership for

7   $1,500 a month?

8        A.   Yes, that's correct.

9        Q.   So the entity you formed, you are making

10  decisions on the account, you were the principal, you

11  stepped down.  Your brother purchased a home, and you

12  are now paying him rent for that property?

13       A.   We are paying Continental Partnership, Inc.,

14  yes.

15       Q.   And do you also collect rent on your Palladium

16  home address, correct?

17       A.   Yes, we do.

18       Q.   And how much is that per month?

19       A.   Approximately 2500.

20       Q.   Okay.  Newhaven Nominees, the entity that we

21  were talking about earlier, they have also been involved

22  in the Green Auto transactions, haven't they?

23       A.   They may have had a client involved in that.

24  I'm not a hundred percent certain.

25       Q.   Have they represented the Barclay Group or

1   Regus as a client in effecting transactions with regard

2   to Green Auto shares?

3        A.   I don't believe so, no.

4        Q.   So a 14 million share purchase of -- or

5   transfer of Green Auto shares that was affected in

6   January of 2014 by Newhaven Nominees, would that have

7   been conducted on behalf of you or the Barclay Group?

8        A.   No, I believe that might have been one of their

9   clients that gave us instructions to issue shares to.

10       Q.   Just recently.

11       A.   What date are you referring to?  I am sorry.

12       Q.   January 2014.

13       A.   That would be something I would have to see the

14   records on.  I don't know what the reference is.

15       Q.   But you would remember if you or your company

16   were involved in the acquisition of 14 million shares

17   just a month or two ago; would you know?

18       A.   Which company?

19       Q.   Green Auto.  You knew with regard to your

20   company, Regus, the Barclay Group.  Are there others?

21       A.   I don't believe Regus or the Barclay Group

22   acquired 14 million shares in January of 2014.  Is that

23   what you are saying?

24       Q.   Uh-huh.

25       A.   I don't believe that's a transaction that I

1    have knowledge of.  I would like to see the records for

2    that if I could, please.

3         Q.   I am asking if you recall it.

4         A.   I do not recall it.  I am sorry.  I don't

5    believe that's a transaction we are party to.

6         Q.   Okay.  But you have actually been involved in

7    recent -- you have actually requested recent transfers

8    and sales of Green Auto shares, haven't you?

9         A.   Not in 2014.

10        Q.   Have you in 2013?

11        A.   There may have been, yes.

12        Q.   Did you in December of 2013?

13        A.   I can't recall any date specific.

14        Q.   Well, you know, of course, that there is a

15   restraining order in this case, right?

16        A.   Yes, I am well aware of that.

17        Q.   And the restriction date, I believe, on some of

18   these shares of Green Auto stock was lifted on

19   December 23rd, 2013; is that correct?

20        A.   I don't know the exact date.  That could be

21   correct.

22        Q.   And the date that the restraining order was

23   entered into in this case was December 20th, right?

24        A.   I am guessing.  I don't have the record in

25   front of me.

1       Q.   I tell you what.  I think I might have a copy

2   of the docket sheet for you.

3       A.   Thank you.

4            MS. HANKS:  May I approach the witness,

5   Your Honor?

6            THE COURT:  You may.

7       Q.   Mr. Comu, I am handing you a copy of the docket

8   sheet.  This is actually a docket sheet in the

9   bankruptcy so it will not (Inaudible).

10           I tell you what, Mr. Comu, I will just tell

11  you.  I am looking at the docket sheet, and the TRO, the

12  agreed TRO, in this case was entered -- an agreed order

13  was entered on December 20th, 2013, and it is Docket

14  Number 11, okay?

15      A.   Yes.

16      Q.   And you recall agreeing to that, right?

17      A.   I spoke with my attorney and I said, yes, we

18  would agree to that.

19      Q.   You did, okay.  So your attorney talked to you

20  about it and you agreed to it, right?

21      A.   Yes.

22      Q.   And you agreed to it sometime before the 20th

23  when it was actually signed by the Court, right?

24      A.   I believe so, yes.

25      Q.   Okay.  In fact, it was actually early December

 1  when you talked to your attorney about it and agreed to

 2  it, right?

 3      A.   Once again, I can't recall the exact date,

 4  Counselor.

 5      Q.   If you will look at Plaintiff's Exhibit 236,

 6  please.  In fact, it was sometime before December 4th of

 7  2013 when you talked with your attorney about it, and

 8  you said that you were agreeable to those terms, right?

 9      A.   I am sorry.  This is September 2009.

10           MS. HANKS:  That's not the right document.

11  I must have the wrong reference.  Here we are.  Here we

12  go, 346, Plaintiff's Exhibit 346, please.

13      Q.   Okay.  This is an email from Mr. Olson, your

14  attorney, to David Elmquist, correct?  And it is dated

15  December 4th, right?

16      A.   Yes.

17      Q.   And it says, "CJ and I think we can agree to

18  that," right?

19      A.   Yes.

20      Q.   So you were amenable to the idea of an agreed

21  TRO, right?

22      A.   Yes.

23      Q.   Now, you testified previously that you are

24  chairman of Eurocap, right?

25      A.   Yes.

1      Q.   And Eurocap has a lot of Green Auto shares,

2  doesn't it?

3      A.   It has some.

4      Q.   And Eurocap received those shares from the

5  Barclay Group, didn't it?

6      A.   Through share exchange, yes.

7      Q.   As the chairman of Eorucap, you control what

8  happens to those shares, don't you?

9      A.   That is incorrect.

10          MS. HANKS:   Okay.   KLM Exhibit 153 and 154,

11  please.

12      Q.   Let's look at 153, please, first.   On

13  December 17th, 2013, -- and you understand, of course,

14  that the restraining order does not just apply to you

15  individually or to the Barclay Group; it applies to your

16  affiliates as well?

17      A.   Yes, I understand.

18      Q.   So you understand and agree that it would apply

19  to Eurocap's transferring of shares, right?

20      A.   That's my understanding.

21      Q.   Okay.  And on December 17th, right before the

22  agreed restraining order gets signed by the Court, you

23  are instructing -- you are making more transfers of

24  Eurocap holdings of Green Auto shares, aren't you?

25      A.   If I recall correctly -- I don't have the files

1   in front of me -- I believe a transfer was made prior to

2   the TRO.

3        Q.   It was a couple of days prior, but it was after

4   the parties were discussing it, wasn't it?

5        A.   I have no knowledge of when the parties were

6   discussing it.

7        Q.   Well, we just showed you an email that

8   indicated that you did discuss it with your attorney and

9   said that you were amenable to it, didn't you?

10       A.   Right, but I believe these transactions -- and

11  I apologize.  I don't have the copy of the certificates

12  in front of me.

13       Q.   Well, we have got the certificates in that --

14  in the document we just had up a moment ago.

15       A.   May I see the certificate?

16       Q.   We are pulling it up.

17       A.   Thank you.

18            MS. HANKS:  Go down, please.  Go back up to

19  the Fed Ex.

20       Q.   Here on December 18th, Justine Blankenship had

21  actually stock transferred.  She is sending those stock

22  certificates back to you at Eurocap here in Dallas,

23  isn't she?

24       A.   Yes.

25       Q.   Okay.  Go down, and that would have happened in

1    accordance with your instructions, right?

2        A.   I believe so.

3        Q.   So here is your letter, December 12th, 2013,

4    which is eight days after -- at least eight days after

5    you discussed a temporary restraining order with your

6    attorney in this case, isn't it?

7        A.   I believe there was a conversation regarding a

8    TRO, but I don't believe there was any action taken on

9    that.  So it was just something that was being

10   discussed.

11       Q.   So you wanted to take the opportunity that you

12   had, before the TRO went into effect, to move some

13   shares, didn't you?

14       A.   That is incorrect.  I was simply operating our

15   business under normal conditions, as I was told to do

16   until a formal order was entered.

17       Q.   And by virtue of this transaction, you are

18   actually selling shares, aren't you?

19       A.   I believe there were some trades made, yes.

20            MS. HANKS:  Can we go down, please?

21       Q.   That is your handwriting, isn't it, Mr. Comu?

22       A.   It appears to be.

23       Q.   330,000 shares, and that just happens to be

24   30,000 more than the stock certificate that is in your

25   name, right?

1      A.   I presume so.

2      Q.   Well, there is 300,000 Green Auto shares in

3  your name, correct?

4      A.   That is correct.  I believe that is correct.

5      Q.   Okay.  So in one trade you transfer out 330,000

6  shares of the very stock that our TRO is meant to

7  prevent you from trading, didn't you?

8      A.   That is incorrect.

9      Q.   It was before the TRO went into effect, but

10  that is what you are trading, isn't it?

11     A.   That's incorrect.  Those are not my shares.

12     Q.   They are shares under your control, though,

13  aren't they?

14     A.   They are shares of the Barclay Group.

15     Q.   I thought they were shares of Eurocap.  Is

16  there a difference?

17     A.   I would have to see the original certificate

18  where the shares came from.

19          MS. HANKS:  Okay.  Can we go to the other

20  Eurocap trade, please?

21     Q.   But if a TRO had been signed a couple of days

22  earlier, the TRO that the parties all agreed to, this

23  would have violated it, wouldn't it?

24     A.   Absolutely.

25     Q.   And you understand, of course, that the reason

1    for that TRO is to stop the movement of this Green Auto

2    stock certificate, these stock certificates, until this

3    dispute is resolved, right?

4        A.    That is my understanding, yes.

5        Q.    Okay.  And assuming that the restriction on the

6    trading of these stocks was listed on December 23rd, it

7    would have been reasonable for the trustee and for your

8    creditors to assume that you weren't trading this

9    restricted stock; that is why December 23rd was so

10   important to your creditors and to the trustee?

11       A.    I am sorry.  I didn't understand if there was a

12   question there.

13       Q.    You knew that the other parties to this

14   litigation were not expecting these transfers to occur

15   before December 23rd, didn't you?

16       A.    I don't know what the other parties were

17   thinking.  I am sorry.

18       Q.    Oh, so it didn't occur to you that this

19   happened to be a couple of days before the TRO went into

20   effect, and you wouldn't be able to do it a couple of

21   days later; just a coincidence?

22       A.    It may be a coincidence.  We were not looking

23   at anything except following instructions from Counsel.

24   And if there was a TRO that was entered into, then we

25   would oblige and agree by the rules of the TRO.  There

1  was conversation going on, and at that point in time we

2  had no indication of what was going to be finalized.

3       Q.   But you knew that there was -- you knew the

4  parties were discussing a TRO, and you had already said

5  that you were amenable to it, correct?

6       A.   The parties were also discussing a settlement

7  to this case, Counselor.

8       Q.   I am sorry.  Could you repeat that, please?

9       A.   I said there was also conversations regarding a

10 settlement to this lawsuit.

11      Q.   And when did that happen?

12      A.   It happened in 2013.

13      Q.   With whom?

14      A.   Whoever the parties were.

15      Q.   Well, you understand, of course, that I

16 represented the plaintiffs in 2013.  We have never had a

17 conversation about settlement.  You have never

18 approached us about settlement.

19      A.   I said there was conversations regarding

20 settlement.

21      Q.   With whom?  You understand, KLM, Mr. Katz and

22 KOE are plaintiffs in this action, correct?

23      A.   Correct.

24      Q.   Okay.  With whom were you discussing

25 settlement?

1    A.   I wasn't discussing them.  I believe the

2    attorneys were discussing it.  That is what I was told.

3                MS. HANKS:  Okay.  Could we please go to

4    the other Eurocap?

5    Q.   Here is another trade that you affected on

6    behalf of Eurocap Investments, also involving Green Auto

7    stock that originally came from the Barclay Group,

8    correct?

9    A.   I see, appears to be, an invoice from Action

10   Star Transfer.  I don't have all the details.

11   Q.   Would you like for us to walk through page by

12   page to confirm that this is a document you sent to

13   Eurocap with instructions to transfer stock?

14   A.   If I could just see the cover letter, I would

15   appreciate that.  Thank you.

16   Q.   Sure, let's go.

17               MS. HANKS:  Okay, go one back up.

18   Q.   Here Eurocap Investments is transferring two

19   million shares of Green Auto to the Barclay Group,

20   correct?

21   A.   Yes.

22   Q.   And this transaction was affected in accordance

23   with your instructions, wasn't it?

24   A.   I believe so, yes.

25   Q.   And you are the chairman and CEO of the Barclay

1    Group, aren't you?

2         A.   I serve as its chairman, yes.

3         Q.   And at the time you filed bankruptcy you were a

4    managing partner, correct?

5         A.   At the time of my bankruptcy I served in

6    whatever capacities were required through our normal

7    course of business, but, yes, I was chairman.

8         Q.   Well, what was your title when you filed

9    bankruptcy on December 31, 2009?

10        A.   I was the chairman of the Barclay Group, and I

11   was also managing partner.

12        Q.   Okay.  Would you please look at the statement

13   of financial affairs, Defendant's Exhibit -- Trustee's

14   Exhibit 95 that is on your desk?  And, again, this is

15   another document that you executed under oath of

16   perjury, correct?

17        A.   I believe that's correct.

18        Q.   Would you look at Page Five of that document?

19   Here you say that you are the managing partner of the

20   Barclay Group, Inc., correct?

21        A.   Yes.

22        Q.   You do not say that you are chairman of the

23   Barclay Group, Inc., do you?

24        A.   Not to this document.

25        Q.   Okay.  But you just testified a moment ago

1   that, when you declared bankruptcy on December 31st,

2   2009, you were the chairman of Barclay Group?

3        A.   There are two distinct titles.

4        Q.   I understand that, but both of them were

5   required to be disclosed on your statement of financial

6   affairs.  Why would you not have disclosed that

7   information?  Would you agree that there is a difference

8   between a chairman and a managing partner?

9        A.   Not necessarily.

10        Q.   Would you agree that there might be an

11   important difference between those two titles?

12        A.   I think there could be some importance between

13   the two titles, yes.

14        Q.   Would you find it reasonable that it would be

15   important to know -- for your creditors to know that

16   information?

17        A.   No, I don't think that would be of any

18   relevance.

19        Q.   Is it your decision to make as to whether or

20   not it is relevant, or does this document require that

21   you disclose all relevant information, so that the

22   trustee and your creditors can make that assessment for

23   themselves?

24        A.   I believe I followed the letter of what I was

25   told to do through counsel and, most importantly,

1    disclosure of the assets.  The title of my role with the

2    company that I was working with, I didn't realize the

3    extreme sensitivity of the relevance.  I am sorry.

4         Q.    Okay.  Let's look at Number 18.  And you read

5    this document before you filled it out, didn't you?

6         A.    I believe so.

7         Q.    Could you please read the language, Section

8    18(a) that starts with, "If the debtor is an

9    individual"?

10        A.    Would you like me to read out loud?

11        Q.    I would like for you to read it out loud.

12        A.    "If the debtor is an individual, list names,

13   address, tax payer ID number, nature of the business and

14   beginning and ending dates of all businesses in which

15   the debtor was an officer, director, partner or managing

16   executive of a corporation, partner in a partnership,

17   sole proprietor, or was self-employed in trade,

18   profession, or other activity, either full or part-time,

19   within six years immediately preceding the commencement

20   of this case, or in which the debtor owned five percent

21   or more of the voting or equity securities within six

22   years immediately preceding the commencement of this

23   case."

24        Q.    Okay.  So for six years, six years preceding

25   bankruptcy -- which goes back to December 31st, 2003,

1    is that correct?

2         A.    That would be correct.

3         Q.    -- you are required to disclose all entities in

4    which -- and the nature of their businesses and their

5    tax ID numbers and their addresses, all businesses in

6    which you held a position as an officer, director,

7    partner, managing executive, correct?

8         A.    That's what it says.

9         Q.    And you did not do this on this form, did you?

10   You did not provide complete and accurate information,

11   did you?

12        A.    To the best of my recollection, I thought I

13   did.

14        Q.    Well, did you disclose your position as

15   president and director of Ganas Corp?

16        A.    I don't believe I showed that on this document.

17   I believe that was an error on our part, yes.

18        Q.    Okay.  So that was an error, not including that

19   information?

20        A.    I believe, now that the information is

21   disclosed, I think you are correct.

22        Q.    Okay.  So your position as president and

23   director of Ganas should have been on there.  Okay.  Is

24   there anything else that you did not include on these

25   disclosures that would have been relevant to your

1    creditors or to the trustee?

2        A.   Once again, Counselor, to the best of my

3    recollection, I assume that this was all the

4    information, unless I completely overlooked something.

5        Q.   How about Grey Point Partners, LLC?

6        A.   I have no recollection of that entity.

7        Q.   Okay.  And you were asked about this entity in

8    December of 2011, and you claimed to have zero interest

9    in Grey Point Partners?

10       A.   That would be a correct statement.

11       Q.   Okay.  And having been asked about it, did you

12   go back and check, just to make sure that you didn't

13   have an interest or a position with Grey Point Partners

14   that should have been disclosed?

15       A.   I don't believe I did any research, because I

16   don't believe I had anything to do with the company.  It

17   could have been an entity that an attorney formed for us

18   at one time, but I don't recall we did anything with it,

19   so I didn't even realize my name was attached to it.

20       Q.   Okay.  KLM Exhibit 138, please, at Page Two.

21   Does it happen often in your profession that you end up

22   on public corporate documents, your name with a title,

23   without you knowing it?

24       A.   Unfortunately, yes.

25       Q.   Really?  So you are saying that someone else

Case 10-03269-sgj Doc 186 Filed 10/22/14   Entered 10/22/14 13:48:03   Page 99 of 249
Case 3:14-cv-04163-B   Document 1-7   Filed 11/21/14   Page 242 of 266   PageID 1757

99

1  filed this document and named you --

2          MS. HANKS:  Could you please go down?

3      Q.   -- a managing member of this entity without

4  your knowledge?

5      A.   I believe that's a correct statement.

6      Q.   And you will note --

7          Ms. Hanks:  Please go down to the date,

8  please.

9      Q.   -- Grey Point Partners, LLC.  There you go.

10  This is an entity that was formed in May of 2009, not

11  long before you filed your bankruptcy petition, about

12  six, seven, eight months, correct?

13     A.   That's what it appears to be, yes.

14     Q.   Okay.  And just had no idea that you were a

15  member of this LLC?

16     A.   Yes, I had no idea that I was named in it.

17     Q.   Okay.  So then -- but it was -- but this

18  clearly is information that qualified under Section 18

19  that you read?  If you had known about it, you would

20  have included it on these schedules?

21     A.   Absolutely.

22     Q.   Okay.  So we will add that.  And Clyde Gentry

23  is one of your former colleague from Sun Sports, isn't

24  he?

25     A.   He is the former president of Sun Sports.

1      Q.   Okay.  And Mr. Cole also, correct?

2      A.   He was the vice-president.

3      Q.   Okay.  And this entity actually involved MMA

4  Fighting, correct?  That was the purpose of it when it

5  was formed?

6      A.   I don't recall.  I believe there was a

7  conversation regarding this.  I had no idea the entity

8  was formed.

9      Q.   So you had a conversation about it; you just

10 didn't know it was actually formed?

11     A.   Yes, ma'am, that's correct.

12     Q.   Okay.  So there was a conversation about maybe

13 forming this entity, but they did it without your

14 knowledge and named you one of shareholding members of

15 the LLC?

16     A.   Yes, I was unaware I was listed until I heard

17 about it in a deposition.

18     Q.   But you answered no, and you didn't go look to

19 check and see if you actually were listed as a member on

20 the entity?

21     A.   I felt, since I had no knowledge of it, I

22 wasn't a party to it, so I did no further research.

23     Q.   So you didn't have any knowledge of it; your

24 creditors were asking about it; so you didn't feel like

25 it was your obligation to confirm?

1          A.   At the time that I filed my paperwork I had no

2    knowledge of this entity, and I did not learn of it

3    until well after, in depositions when it was presented

4    to me.

5          Q.   Okay.  So president director of Ganas, member

6    of Grey Point Partners, all of which are just from 2009,

7    and, again, this goes back -- the obligation goes back

8    six years, correct?

9          A.   That's what it says.

10         Q.   How about Sun Management Group, Inc.?

11         A.   That is part of Sun Sports.  That is disclosed.

12         Q.   Please show me on your schedules where an

13   entity called Sun Management Group, Inc., is identified

14   and disclosed?

15         A.   It was a wholly-owned subsidiary of Sun Sports.

16         Q.   And you disclosed an interest in stock of Sun

17   Sports, correct?

18         A.   Yes, ma'am.

19         Q.   But you did not identify your interest in Sun

20   Management Group, Inc., did you?

21         A.   It was a wholly-owned subsidiary of Sun Sports.

22         Q.   Please answer my question yes or no.  You did

23   not disclose your interest in Sun Management Group,

24   Inc., did you?

25         A.   I did not have an interest in Sun Management.

 1            MS. HANKS:  Could you please go to KLM

 2   Exhibit 152?

 3       Q.   Mr. Comu, this is a Texas franchise tax public

 4   information report from 2006 which, as we have

 5   established, falls within the date range that you are

 6   required to disclose your business affiliations,

 7   correct?

 8       A.   Yes.

 9       Q.   Can you please tell me who it identifies as the

10   CEO of Sun Management Group, Inc.?

11       A.   It identifies me.

12       Q.   Okay.  Would you agree that this is also an

13   undisclosed executive position that should have been

14   disclosed on Section 18 of your statement of financial

15   affairs?

16       A.   I disagree.

17       Q.   You believe you were not required to disclose

18   this position on your statement of financial affairs?

19       A.   I believe I did, and I believe I am trying to

20   explain that Sun Sports had two wholly-owned

21   subsidiaries, and this was one of wholly-owned

22   subsidiaries, and I disclosed the parent company, which

23   I owned stock in.  The parent company owns the

24   wholly-owned subsidiaries.  It was disclosed as Sun

25   Sports and Entertainment, Inc.

1     Q.   But there is nothing in the statement of

2   financial affairs that allows you to group different

3   entities, subsidiaries, affiliates, together into one,

4   so that you don't disclose your specific position with

5   others, correct?

6     A.   My understanding was disclosing my holdings in

7   the parent company that owned the two wholly-owned

8   subsidiaries was correct.  If I didn't do it properly,

9   then perhaps I didn't understand the parent company and

10  the subsidiary relationship.

11    Q.   And you work with corporations and entities and

12  mergers quite a bit, don't you?

13    A.   A fair amount.

14    Q.   And, in fact, your defense against the

15  trustee's claim is that corporate entities are separate,

16  isn't it?

17    A.   I wouldn't be able to comment on that.

18    Q.   Mr. Comu, does it mean something to you that

19  entities are in different corporate names and formed

20  under different structures, or doesn't it?

21    A.   Of course, it does.

22    Q.   If it does, why didn't you disclose it here?

23    A.   In the world that I live in, parent companies

24  that own wholly-owned subsidiary companies, you simply

25  state the parent company, since it owns all the subs.

1  Everything goes up to the parent.  That has been my 30

2  years of experience.

3      Q.   So you can treat a parent company and its subs

4  as all one entity; is that what you are saying?

5      A.   In my last 30 years of experience, that is

6  traditionally how it has been done.

7      Q.   Okay.  And let's talk about parent companies

8  and subs.  You formed Regus Advisers, Inc., in the

9  summer of 2010; is that right?

10     A.   I don't have the exact date, but that sounds

11  correct.

12     Q.   And you formed it as a continuation of the

13  Barclay Group business, didn't you?

14     A.   That is incorrect.

15     Q.   And, again, you just testified that, for the

16  purposes of your disclosures, you believed they should

17  all be treated as one, correct?

18     A.   That was my understanding at the time.

19          MS. HANKS:  Can you please pull up

20  Plaintiff's Exhibit 150?

21     Q.   Regus is doing pretty well, isn't it?

22     A.   Not necessarily.

23     Q.   You have done a number of reverse mergers,

24  Curation, Algae International, just recently just

25  made -- you have acquired a bottling company; is that

 1  correct?

 2      A.  We syndicated the acquisition I have just made.

 3  We did not acquire it.

 4      Q.  Okay.  But business seems to be pretty good for

 5  Regus.

 6          MS. HANKS:  That is not the right Document.

 7  222, please.  Sorry, I gave you the wrong number.  I

 8  gave you the footnote number.  222.  Go down, please.

 9      Q.  Mr. Comu, this is a series of office emails

10  involving -- concerning Regus office space from June

11  of 2002, and you are corresponding on these emails; are

12  you not?

13      A.  It appears to be, yes.

14      Q.  June of 2010?

15          UNIDENTIFIED MAN:  You said '02.

16      Q.  Oh, did I?  2010, I apologize.  June of 2010.

17  And you are asked, "I need a different address than our

18  office for your record.  Normally people use their home

19  address"?

20      A.  That is incorrect.

21      Q.  Well, that is what he is saying in his email?

22      A.  That is what he is saying.  That is not what I

23  am saying.

24      Q.  I am not asking you if you are saying that.

25      A.  Well, you said I am saying.

1      Q.   Please look above.  Your response is, "Parent

2   company, the Barclay Group, Inc.," so is the Barclay

3   Group, Inc., parent company of Regus Advisers?

4      A.   That is incorrect.

5      Q.   Okay.  Is the Regus Advisers owned by TKY

6   Trust?

7      A.   Yes, I believe that's correct.

8      Q.   And TKY Trust is your brother's Canadian trust

9   in Canada, right?

10      A.   That is not correct.

11      Q.   TKY Trust is not a Canadian trust of which your

12   brother is the trustee?

13      A.   My brother and my sister are the trustees of

14   the TKY Trust.  That's correct.

15      Q.   And you are a beneficiary of it, aren't you?

16      A.   I am one of seven beneficiaries.

17      Q.   You are a beneficiary of it, aren't you?

18      A.   I am one of seven beneficiaries.

19      Q.   All right.

20           THE COURT:  All right.  We are going to go

21   ahead and take a break.  We have been taking hour and a

22   half breaks, so any problem if I say it is going to be

23   an hour and 15 minutes today?

24           MS. HANKS:  No, Your Honor.  Thank you.

25           THE COURT:  All right.  We will be back at

1  2:15 -- I am sorry, 1:45, we will come back at 1:45.  I

2  am getting a little concerned about time.  Can you tell

3  me -- can you give me a guesstimate how much longer you

4  are going to go?

5           MS. HANKS:  I hope no more than another

6  hour and a half, two hours, but it should be less, I

7  hope less than that, Your Honor, with Mr. Comu.  I need

8  to sit down with my team and walk through a couple of

9  things.

10          THE COURT:  How many more witnesses are the

11 plaintiffs going to have?

12          MR. VITAL:  Just one, Your Honor.

13 Ms. Comu, well, I don't expect her, on my examination,

14 to be more than an hour, really more than 45 minutes.

15          THE COURT:  Okay.  Mr. Elmquist, what about

16 you?  How many witnesses are you going to have?

17          MR. ELMQUIST:  I am going to be calling

18 only the two Comus, and I am going to put my questioning

19 in as soon as Ms. Hanks is done, likewise with Ms. Comu.

20 I am guesstimating at this point about two hours with

21 Mr. Comu and probably half an hour with Ms. Comu.

22          THE COURT:  All right.  And, Mr. Olson, on

23 your defense case, what are you anticipating?

24          MR. OLSON:  The Trustee and then some

25 examination of the Comus.  I suspect that my direct of

 1   those three witnesses will be an hour and a half.  I

 2   suspect it will trigger questions that will take some

 3   more time.

 4              THE COURT:  Okay.  Well, you all can do the

 5   math.  It doesn't sound like we are going to be finished

 6   in five days.

 7              All right.  We will come back and talk

 8   about timing a little more this afternoon.  I will see

 9   you at 1:45.

10              (Recess from 12:31 until 1:49.)

11              THE COURT:  We are going back on the record

12   in King Louie Mining versus Comu, Adversary 3269.

13              All right.  Before the lunch break we were

14   having examination of Mr. Comu.  Are we ready to

15   proceed?

16              MS. HANKS:  Yes, Your Honor, and I believe

17   that we can wrap this up quite quickly, at least with

18   regard to the plaintiff's examination.

19              THE COURT:  All right.  Mr. Comu, if you

20   could take the stand.

21              MR. ELMQUIST:  Your Honor, in light of

22   discussions we have had over the lunch hour, my time

23   estimate has gone from two to one hour.  So we think it

24   is highly likely that we can get the examination done

25   for Mr. Comu for everyone.

```
 1              MR. OLSON:  Well, I think I will probably
 2   reserve mine, so that we can get Ms. Comu on and off
 3   today as well.
 4              THE COURT:  All right.  So you will --
 5              MR. OLSON:  So we won't run out of
 6   witnesses and maybe won't have to have her come back.
 7              MR. ELMQUIST:  The point is, I think we are
 8   going to move things along much quicker than we were
 9   estimating before lunch.
10              THE COURT:  Very good.  Thank you.
11              All right.  Mr. Comu, I am required to
12   remind you you are still under oath.
13              THE WITNESS:  Thank you.  Yes.
14              DIRECT EXAMINATION (CONTINUED)
15   By Ms. Hanks:
16       Q.   Mr. Comu, I have one question.  I believe
17   earlier in your testimony I asked you about any HSCC
18   accounts in the Channel Islands, and you said
19   unequivocally no.  Is that correct?
20       A.   I don't recall an HSBC account that I may have
21   in the Channel Islands.  I don't believe so.
22       Q.   Okay.  Let's take a look at Plaintiff's
23   Exhibit 365, which is on your screen in front of you.
24   Notice an email from Charlotte Jacob.  She is one of the
25   individuals that you previously corresponded with, and
```

1  this concerns West Point Advisors, Inc., and it concerns

2  an HSBC account opened for the company.  Could you

3  please scroll through the attachment?

4            And you will note that this is a US dollar

5  account for West Point Advisors, one of the entities

6  that we were discussing earlier in the Channel Islands.

7  Would you like to change your testimony, Mr. Comu?

8       A.   I don't believe that is an account I set up.  I

9  believe that is an account that Newhaven Nominee set up

10  for that particular corporation.

11      Q.   At your request, correct, Mr. Comu?

12      A.   I don't recall whose request.  I believe that

13  was a corporation that was created, and I don't know

14  what the final disposition of it was for.

15            MS. HANKS:  Thank you, Your Honor.  We will

16  pass the witness at this point.  We do have a couple

17  of -- we will pass the witness subject -- what we would

18  like to do is, because there are some relevancy

19  objections, make sure that we have an opportunity to

20  address those, because I believe we can address --

21  obviously this is a complicated ongoing long-term sort

22  of fact pattern, and we are happy to address it in

23  briefing without going through witnesses, but we want to

24  make sure we have an opportunity to get those documents

25  before the Court, since there are relevancy objections.

1        THE COURT:  All right.  So you are talking

2    about the KLM exhibits that have not been specifically

3    offered through witness testimony, which Mr. Olson made

4    a relevancy objection to.

5        MR. VITAL:  Yes, Your Honor, I think what

6    we are communicating is that we can offer those exhibits

7    before we close our evidence.  And without examining

8    witnesses about those particular documents, it has been

9    our understanding that we would submit like a post trial

10   brief to you, letting us know where the evidence leads

11   Your Honor, and without going into the particulars of

12   those documents through witnesses, we could just talk

13   about those in the brief, which is why we have been able

14   to cut what we thought was two and a half hours to no

15   more questions.

16       THE COURT:  All right.  All right.  So,

17   Mr. Olson, you agree to this?  The issue is just

18   relevancy and not authenticity or anything else.

19       MR. OLSON:  No, the only objection is

20   relevance.  As I said on Monday, I didn't mind if you

21   carried it on, and when you got through you could say,

22   "I excluded these because I didn't find them to be

23   relevant," or let them all in or whatever your ruling --

24       THE COURT:  Okay.  Well, that sounds like a

25   fine procedure to deal with it then through briefing.

1  All right.  Thank you.

2              MS. HANKS:  And we do have three exhibits

3  that we have already shown to defendants that we are

4  going to offer.

5              THE COURT:  Okay.

6              MS. HANKS:  The first is just marked, well,

7  sticky marked as Plaintiff's Exhibit 371.

8              THE COURT:  Okay.  371.

9              MS. HANKS:  Which is a payment history

10 report for the Palladium Drive address.

11             The second exhibit is marked as Plaintiff's

12 Exhibit 372.  It is the account Mr. (Inaudible)

13 Palladium property.

14             And as the third exhibit is Mr. Comu's

15 Canadian -- a copy of his Canadian passport.

16             THE COURT:  Okay.  That will be 373?

17             MS. HANKS:  Yes, Your Honor.

18             THE COURT:  All right.  And there is no

19 objection to those?  Yea or nay, any objection?

20             MR. ELMQUIST:  No objection.

21             MR. OLSON:  I don't have an objection.  I

22 don't have the copy of the passport.

23             MS. HANKS:  Oh, of the passport.

24             UNIDENTIFIED MAN:  I need all four

25 exhibits.

1            MS. HANKS:  Do you need them right now?  We

2    will provide a copy, Your Honor.

3            THE COURT:  Okay.  Do you want to go ahead

4    and approach with those?

5            MS. HANKS:  I am sorry, Your Honor?

6            THE COURT:  Do you want to approach with

7    the copies?

8            MS. HANKS:  Oh, yes.

9            THE COURT:  Okay.  Thank you.

10           Now, someone correct me if I am wrong.  I

11   don't seem to have the tail end, Exhibit 370.  Did I

12   miss -- yeah, I go from 369 now to 371.

13           MS. HANKS:  Your Honor, I may have skipped

14   over a number accidentally.

15           THE COURT:  Okay.  As long as I am not

16   missing --

17           MS. HANKS:  But we will confirm and let you

18   know before we recess today, if that is acceptable.

19           THE COURT:  That will work.  All right.  So

20   with that, are we passing the witness?

21           MS. HANKS:  Yes, Your Honor.  Thank you.

22           THE COURT:  All right.  Mr. Elmquist.

23           MR. ELMQUIST:  Thank you, Your Honor.

24                    CROSS EXAMINATION

25   Of CJ Comu by Mr. Elmquist:

1      Q.    Mr. Comu, we have met a number of times, right?

2      A.    Yes, sir.

3      Q.    And understand I represent the bankruptcy

4  trustee in this case, Diane Reed?

5      A.    Yes, sir.

6      Q.    And do you recall that we did a couple of what

7  are called bankruptcy oral 2004 examinations, or I did,

8  of you back in November of 2011 and then in August

9  of 2012?

10     A.    Yes, sir.

11     Q.    Okay.  I want to go over something that haven't

12  really addressed here, and that is your education after

13  high school and your -- and a brief account of your

14  employment history, okay?

15     A.    Yes, sir.

16     Q.    You graduated from Langara, L-A-N-G-A-R-A,

17  College in business administration, and you pursued some

18  post academic studies in marketing, finance, and real

19  estate, is that right, and law?

20     A.    That's correct.

21     Q.    Okay.  Then from 1980 to -- when did you

22  graduate from Langara?

23     A.    I believe it was 1981, '2.

24     Q.    Okay.  From '80 to '86 you were the founder and

25  executive vice-president of MBA Corporate Group?

1        A.   That's correct.

2        Q.   And then from '98 -- 1986 to 1990 you were

3   founder, chairman, CEO of Credit America Holdings.

4   Excuse me.  Let me go back to MBA Corporate Group.  That

5   was a financial application software company that

6   developed the Wall Street Analyst?

7        A.   Yes, sir, that's correct.

8        Q.   All right.  And then from 1986 to 1990 you were

9   the founder and chairman and CEO of Credit America

10  Holdings, a private management and consulting firm

11  involved in corporate advisory services, turnaround

12  management, financial restructuring and the financing of

13  private equity finances; is that right?

14       A.   That's correct.

15       Q.   Then from '90 to '95 you were the founder,

16  chairman and CEO of Transworld Leasing, a full service

17  equipment leasing and finance company; is that right?

18       A.   That's correct.

19       Q.   And then in '95 to 2001 you were the founder,

20  chairman, CEO of Airtech International Group, a public

21  company that manufactured indoor air purification

22  systems and its franchise division, Airpospure; is that

23  correct?

24       A.   Airsopure, that's correct.

25       Q.   Airsopure, thank you.  All right.  Then from

1    2001 to 2005, you were founder and chairman and CEO of a

2    company we have been talking about a little bit,

3    Humitech International Group, an international

4    environmental company that manufactured and distributed

5    humidity control products for commercial, residential,

6    refrigeration applications; is that right?

7        A.   Yes, sir.

8        Q.   And then from 2005 to 2009 you were the

9    founder, chairman, CEO of Sun Sports and Entertainment,

10   a public company that produced live mixed martial arts

11   and boxing events at the facilities such as American

12   Airlines Center; is that right?

13       A.   Yes, that's correct.  Thank you.

14       Q.   Then finally in your CV that was part of the

15   2004 examination record, you stated that you were

16   currently the managing partner of the Barclay Group, a

17   private international consulting firm for private and

18   public companies providing advisory services for complex

19   restructuring, contract negotiations, private equity,

20   debt (Inaudible) financings; is that right?

21       A.   Yes, sir.

22       Q.   And this CV was given to me in 2011, so at that

23   time in your opinion that position was with Barclay

24   Group; is that right?

25       A.   Yes, sir.

1    Q.   So, Mr. Comu, you have a very extensive

2    background in business of various types and are familiar

3    with business structures and organizations; is that

4    right generally speaking?

5    A.   Generally speaking, yes.

6    Q.   Okay.  At your 2004 examination in November

7    of 2011 -- Let me back up a second.  I think I heard you

8    testify when Ms. Hanks was asking you about your

9    bankruptcy schedules, which is Trustee's Exhibit 94 --

10            MR. ELMQUIST:  May I approach, Your Honor?

11            THE COURT:  You may.

12   Q.   Take another look at that.

13   A.   Thank you.

14   Q.   That is a document (Inaudible) copy.  Yes, this

15   is 94.  This is 95.  It has the dirty yellow on it.

16            So Ms. Hanks was asking you about

17   Exhibit 94, and those are your bankruptcy schedules,

18   correct?

19   A.   Yes, sir.

20   Q.   Please turn to the fourth page of Schedule B,

21   which lists interests -- Thanks for the B.  The question

22   at Number 13 is stock and interest in incorporated and

23   unincorporated businesses, and you are supposed to

24   itemize those, right?

25   A.   Is this Page Four?

1    Q.   Well, go back to Page Three where Number 13 is

2    on the document.  Do you see where it says stock and

3    interest in incorporated and unincorporated businesses?

4    A.   Yes.

5    Q.   And that you are to itemize those?

6    A.   Yes, I see that.

7    Q.   Okay.  And do you recall me asking you at your

8    2004 examination about those bankruptcy schedules?

9    A.   I believe so faintly.

10   Q.   Okay.  Let me hand you what has been marked as

11   Trustee's Exhibit 96.

12             MR. ELMQUIST:  May I approach, Your Honor?

13             THE COURT:  You may.

14             MR. ELMQUIST:  May I hand up?

15             THE COURT:  You may.

16   Q.   Trustee's Exhibit 96, I direct your attention

17   to --

18             MR. ELMQUIST:  First of all, Your Honor,

19   Trustee's Exhibit 96 is the cover page and two pages

20   from my examination of Mr. Comu on November 30, 2011.

21   This is the transcript that was prepared.

22             THE COURT:  Any objection to this?

23             UNIDENTIFIED MAN:  None.

24             THE COURT:  It is admitted and, again, just

25   to be clear, I don't have a Trustee's Exhibit -- No, I

```
 1   do have 94 and 95.
 2                (Trustee's Exhibit 96, offered and
 3                 admitted.)
 4                MR. ELMQUIST:  Yeah, that's the schedules
 5   and so forth.
 6                THE COURT:  Okay, thank you.
 7        Q.   Okay.  Mr. Comu, I want to direct your
 8   attention to Line 16 on the second page of this
 9   document, which is paginated at the top as Page 77.  Do
10   you see that?
11        A.   Page 78?
12        Q.   77, Line 16 I am asking you about.  So at the
13   examination I say, "Exhibit 11 is a copy of the
14   bankruptcy schedules that were filed in the bankruptcy
15   case.  If you will take a look at Schedule B, which
16   starts on the second page of this document, and then to
17   the listing of stock and interest in incorporated and
18   unincorporated businesses."
19                And your answer was yes.
20                Then I go on, "Which is -- starts on the
21   second page of Schedule B.  I am not seeing in here any
22   reference to Ganas Corp.  Do you know what -- do you
23   know why Ganas Corp wasn't listed?"
24                And Mr. Olson responded, "The date of the
25   petitioner is 12/31/09."
```

```
 1                    I answered in the affirmative.

 2                    Then Mr. Olson asked, "What is the date of

 3       the stock certificate?"

 4                    And I responded, "January 13th."

 5                    Then your answer was, "I don't believe I

 6       have the -- I don't believe I have.  The transaction was

 7       not closed at that time."

 8                    Was that your testimony at that time?

 9          A.   At that time, yes, sir.

10          Q.   And I go on, "Okay.  There is no reference in

11       here to Ganas Corp, period.  I mean at the time you

12       filed you had a right to receive this stock; is that

13       right?"

14                    And your answer was, "At the time I filed

15       my bankruptcy?"

16                    "Question:  Yes, sir."

17                    And your answer was, "There was a

18       transaction process.  We didn't know if it was going to

19       close or not."

20                    Then I said, "Okay.  When did the

21       transaction close?"

22                    And you state, "The date of the

23       certificate."

24                    Did you mean the date of the certificate,

25       January 13th?
```

1    A.   Yes, sir.

2    Q.   So it was your testimony at that time that the

3 Ganas Corp, the Green Automotive transaction, did not

4 close until January 13, 2010?

5    A.   It was my understanding that, until we

6 physically received the certificates and through all of

7 the activities that needed to be completed by

8 (Inaudible) and the SEC, that the transaction was still

9 subject to close.

10    Q.   But were you not aware back in November of 2009

11 that the certificate of merger had been issued, and had

12 you not, in fact, sent out emails about the fact that

13 the transaction had closed?  Ms. Hanks went over those

14 earlier.

15    A.   Yes, sir, the transaction was signed, and there

16 was a variety of additional documents that needed to

17 follow that to complete the transaction.

18    Q.   But the transaction had closed?  The effective

19 date of the merger had occurred, correct?

20    A.   Yes, there is a document evidencing that in

21 2009.

22    Q.   Again, we can go to it, but there is an email

23 Ms. Hanks asked you about that was dated December 5th, I

24 think, where you had sent an email to a colleague

25 indicating the transaction had closed.  Do you recall

1   that.

2        A.   I don't recall the specific email.

3        Q.   Okay.

4             (Inaudible)

5        Q.   That's in the affirmative.  Yeah, well, there

6   was actually two.  The November 5 was when the merger

7   took effect, but did you not send out, subsequent to

8   that, an email in early December about the fact that the

9   transaction had closed?

10       A.   I don't have the exact email.  I may have made

11  reference.  I am not certain.

12       Q.   Okay.  I want to direct your attention, Mr.

13  Comu, to Plaintiff's Exhibit 256, and I am directing

14  your attention to the email that you sent, which starts

15  in the middle of the page.  It is dated December 4,

16  2009.  Can you read that email that begins, "Troy"?

17             Well, first of all, that is an email from

18  you to Troy Phillips; is that right?

19       A.   Yes, sir.

20       Q.   And it is dated December 4, 2009?

21       A.   Correct.

22       Q.   Just read that, if you wouldn't mind, read the

23  first sentence.

24       A.   "Troy, greetings.  Hope all good at your end.

25  As you know, 60 days ago we started and completed a

1   reverse merger of the first major 100 percent electric

2   car company to go public in the USA.  Attached is some

3   in for on Green Automotive Company, Inc., GNAS."

4       Q.   And you go on to say, "Our funding group is now

5   ready to proceed with the reverse merger and listing for

6   T-3 Networks."  Is that a different transaction?

7       A.   That is a different proposed transaction, yes,

8   sir.

9       Q.   So at the time you sent this email, you were

10  stating that the -- that, "We have started and completed

11  a reverse merger."  That was on December 4, right?

12      A.   I think I was making a general comment, yes.

13      Q.   All right.  Well, let me ask you this, Mr.

14  Comu, in light of everything you have heard, is it still

15  your testimony today that the Green Auto transaction --

16  Let me back up again.  In connection with the Green Auto

17  transaction you received 300,000 shares of Ganas Corp

18  stock, correct?

19      A.   Yes, sir.

20      Q.   And that stock had an issuance date of

21  January 13, 2010?

22      A.   Yes.

23      Q.   So the discussion I had with you at your 2004

24  examination had to do with the fact that you had not

25  scheduled that as an asset in your bankruptcy case,