**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

| | | | |
|---|---|---|---|
| In Re: Cengiz J. Comu | Debtor | § | Case No. 09-38820 SGJ7 |
| **Cengiz J. Comu, et al** | | § | |
| | Appellant | § | |
| vs. | | § | 10-03269 |
| **King Louie Mining, LLC, et al** | | § | |
| | Appellee | § | |

**148 Judgment revoking discharge of debtor Entered 7/8/14**

**VOLUME 8**

**APPELLANT RECORD**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |
| and | § |
| | § |
| PHYLLIS E. COMU, | § |
| BERNARD D. BROWN, | § |
| THE BARCLAY GROUP, INC. AND | § |
| SUNSET PACIFIC, L.P., | § |
|     Third-party Defendants. | § |

*I X I D E X*

**APPELLANT'S FIRST AMENDED DESIGNATION
OF RECORD AND ISSUES ON APPEAL**                          **Page 1**

## APPELLANT'S FIRST AMENDED DESIGNATION OF RECORD
## AND ISSUES ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Cengiz J. Comu, Appellant, and files this his First Amended Designation of Record and Issues on Appeal for the Judgment entered July 8, 2014 [Document No. 148] as follows:

I.      Appellant designates the following documents from the docket sheet in Adversary Case No. 10-03269 for the Record on Appeal:

[Intentionally left blank]

| Filing Date | # | Docket Text |
|---|---|---|
| 08/27/2014 | 164 | Notice of appeal . Fee Amount $298 filed by Defendant Cengiz J. Comu (RE: related document(s)148 Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed)). Appellant Designation due by 9/10/2014. (Moroles, D.) |
| 07/08/2014 | 148 | Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed) (Rielly, Bill). |
| 07/08/2014 | 147 | Findings of fact and conclusions of law in support of judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Rielly, Bill) |
| 09/09/2014 | | Docket Sheet |
| 10/07/2010 | 5 | Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 11/08/2010 | 8 | Motion for leave *to Amend* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/29/2010. (Attachments: 1 First Amended Complaint2 Exhibit A3 Exhibit B4 Exhibit C) (Lippe, Emil) |
| 11/08/2010 | 9 | Response opposed to (related document(s): 5 Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 01/10/2011 | 10 | Order denying motion to dismiss adversary proceeding as moot (related document # 5), granting motion for leave to amend complaint(related document # 8) Entered on 1/10/2011. Case is removed from docket for week of January 11, 2011. Counsel ORDERED to confer and submit proposed amended scheduling order for the trial of this case, to be submitted within 10 days from date of this Order. (Mathews, M.) |

*Vol. 2*
*000211*

*000215*

*000263*

*000273*

_Vol. 2_

| | | | |
|---|---|---|---|
| 006275 | 01/20/2011 | 12 | Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000279 | 02/11/2011 | 16 | Response opposed to (related document(s): 12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000287 | 02/24/2011 | 17 | Order conditionally denying second motion to dismiss adversary proceeding (related document # 12) Entered on 2/24/2011. Plaintiffs are ORDERED to file amended complaint within 20 days of entry of this order. Defedant is ORDERED to file an answeror responsive pleading within 20 days of filing of the amended complaint. (Mathews, M.) |
| 000290 | 03/02/2011 | 19 | Motion for leave *to Prosecute Action* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 3/23/2011. (Lippe, Emil) |
| 000293 | 03/02/2011 | 20 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) (Lippe, Emil) |
| 000340 | 03/23/2011 | 23 | Order denying motion for leave to prosecute action without prejudice (related document # 19) Entered on 3/23/2011. (Simpson, B) |
| 000342 | 03/24/2011 | 24 | Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000345 | 04/19/2011 | 28 | Agreed Order granting 27 Motion to extend time to file response to motion to dismiss until 4/28/2011. Entered on 4/19/2011. (Simpson, B) |
| 000347 | 04/28/2011 | 30 | Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000357 | 05/04/2011 | 31 | Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[Unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |
| 000361 | 05/06/2011 | 32 | Order granting motion to continue hearing on (related document # 31) (related documents Motion to dismiss adversary proceeding*(THIRD)* *and 20 Amended Complaint) Entered on 5/6/2011. Hearing to be held on 7/11/2011 at 10:30 AM Dallas Judge Jernigan Ctrm for 24, Trial Docket Call date reset for 9/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Mathews, M.) Modified text on 5/6/2011 (Mathews, M.).* |
| 000 363 | 07/06/2011 | 36 | Second Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |

*Vol. 2*

| | | | |
|---|---|---|---|
| 000367 | 07/08/2011 | 37 | Order granting second unopposed motion to continue hearing on (related document # 36) (related documents Amended complaint, Motion to dismiss adversary proceeding*(THIRD)*) Entered on 7/8/2011. Hearing to be held on 9/15/2011 at 09:30 AM Dallas Judge Jernigan Ctrm for 24 Third motion to dismiss and for Trial Docket Call date set for 12/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. Further conditions per Order. (Mathews, M.) |
| 000369 | 08/24/2011 | 39 | Agreed Motion to Abate Adversary Proceeding (related document(s)1 Complaint) Filed by Interested Party Diane G. Reed (Elmquist, David) Modified TEXT on 8/25/2011 (Blanco, J.). |
| 000374 | 08/31/2011 | 40 | Agreed Order granting motion to abate adversary proceeding (related document # 39) Entered on 8/31/2011. (Mathews, M.) |
| 000377 | 05/24/2012 | 48 | Supplemental Order granting agreed motion to abate adversary proceeding including any hearing on the motion to dismiss, abated until August 1, 2012 further conditions per order (related document # 39 agreed motion to abate ) Entered on 5/24/2012. (Moroles, D.) |
| 000379 | 08/07/2012 | 50 | Order terminating abatement of adversary proceeding and requiring: (A) Trustee's Complaint in Intervention to be filed by August 31, 2012; and (B) parties to upload Agreed Scheduling Order, or in the alternative, Court will enter its own Scheduling Order (related document # 39) Entered on 8/7/2012. Further details per Order. (Mathews, M.) |
| 000381 | 09/05/2012 | 53 | Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) |
| 000395 | 09/06/2012 | 54 | Order granting Trustee's Unopposed Motion to Extend Deadline to File a Complaint in Intervention 52 Motion to extend time. Ordered that the deadline is hereby extended to September 5, 2012. Entered on 9/6/2012. (Tello, Chris) |
| 000397 | 09/20/2012 | 59 | Agreed Scheduling Order Entered on 9/20/2012 (RE: related document(s)20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial Docket Call date set for 7/8/2013 at 01:30 PM at Dallas Judge Jernigan Ctrm. Hearing on Defendant Cengiz J. Comu's Third Amended Motion to Dismiss Case is set for 10/31/2012 at 9:30 AM. (Mathews, M.) MODIFIED hearing dates on 9/21/2012 (Mathews, M.). |
| 000401 | 09/28/2012 | 61 | Supplemental Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000406 | 09/28/2012 | 62 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against |

| | | | |
|---|---|---|---|
| *Vol. 2* | | | Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Lippe, Emil) |
| *000429* | 10/09/2012 | 64 | Answer to Intervenor complaint (Related document: 53 Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) filed by Bernard D Brown, Cengiz J. Comu, Phyllis E. Comu, Sunset Pacific, L.P., The Barclay Group, Inc.. (Olson, Dennis) Modified text on 10/9/2012 (Tello, Chris). |
| *000433* | 10/09/2012 | 65 | Reply to (related document(s): 30 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 61 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Defendant Cengiz J. Comu. (Olson, Dennis) |
| *000437* | 10/26/2012 | 66 | Motion to appear pro hac vice for David H. Wander. Fee Amount $25 filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit) (Lippe, Emil) |
| *000441* | 10/29/2012 | 68 | Motion for leave *to File Third Amended Complaint and Brief in Support* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Lippe, Emil) |
| *Vol. 3* *000451* | 10/30/2012 | 69 | Motion for leave *to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Attachments: # 1 Exhibit A - Surreply# 2 Proposed Order) (Lippe, Emil) |
| *000470* | 10/31/2012 | 70 | Order granting motion to appear pro hac vice adding David H. Wander for Ronald Katz and King Louie Mining, LLC (related document # 66) Entered on 10/31/2012. (Mathews, M.) |
| *000471* | 11/02/2012 | 71 | Order denying Plaintiffs' motion for leave to file Third Amended Complaint (related document # 68) Entered on 11/2/2012. (Mathews, M.) |
| *000473* | 11/02/2012 | 72 | Order denying Plaintiffs' motion for leave to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss (related document # 69) Entered on 11/2/2012. (Mathews, M.) |
| *000475* | 11/14/2012 | 76 | Order denying motion to dismiss adversary proceeding (related document # 24) Entered on 11/14/2012. (Mathews, M.) |
| *000477* | 12/07/2012 | 78 | Answer to complaint *(Second Amended) to Revoke Discharge* filed by Cengiz J. Comu. (Olson, Dennis) |
| *000481* | 06/07/2013 | 88 | Motion to substitute attorney Emil Lippe, Jr., Law Offices of Lippe & Associates with Shari L. Heyen, Kendyl T. Hanks and Charles P. Floyd, Greenberg Traurig, LLP *and for Withdrawal of Attorney Emil Lippe, Jr., Law Offices of Lippe & Associates,* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| 000785 | 06/12/2013 | 89 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Agreed Scheduling Order) (Heyen, Shari) |
| 000795 | 06/21/2013 | 90 | Agreed order granting motion to amend scheduling order (related document # 89) Trial Docket Call date set for 9/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 6/21/2013. (Rielly, Bill) |
| 000799 | 06/21/2013 | 91 | Order granting motion to substitute attorney adding Shari L. Heyen for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Kendyl T. Hanks for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Charles P. Floyd for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, terminating Emil Lippe, Jr.. (related document # 88) Entered on 6/21/2013. (Rielly, Bill) |
| 000502 | 07/19/2013 | 94 | Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order) (Lippe, Emil) |
| 000539 | 08/12/2013 | 96 | Response opposed to (related document(s): 94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Heyen, Shari) |
| 000598 | 08/14/2013 | 97 | Reply to (related document(s): 96 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Lippe, Emil) |
| 000606 | 08/21/2013 | 98 | Order denying motion to intervene (related document # 94) Entered on 8/21/2013. (Rielly, Bill) |
| 000608 | 08/23/2013 | 99 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Agreed Order to Amend Scheduling Order) (Heyen, Shari) |
| 000617 | 09/13/2013 | 101 | Agreed order granting motion to amend scheduling order (related document # 99) Trial Docket Call date set for 12/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 9/13/2013. (Rielly, Bill) |
| 000621 | 11/25/2013 | 103 | Witness and Exhibit List *for Trial, per Scheduling Order* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000624 | 11/25/2013 | 104 | Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Order) (Heyen, Shari) |

APPELLANT'S FIRST AMENDED DESIGNATION
OF RECORD AND ISSUES ON APPEAL

*Vol. 3*

| | | | |
|---|---|---|---|
| *000630* | 11/27/2013 | 105 | Support/supplemental document*(Supplement to Plaintiffs' Motion for Continuance of Scheduling Order Deadlines and Trial)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)104 Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding)). (Heyen, Shari) |
| *000633* | 12/09/2013 | 106 | Agreed order granting motion to amend scheduling order (related document # 104) Entered on 12/9/2013. Trial Docket Call date set for 3/3/2014 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| *000637* | 12/20/2013 | 108 | Motion for preliminary injunction *(expedited)* filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| *000647* | 12/20/2013 | 109 | Motion for expedited hearing(related documents 108 Motion for preliminary injunction) filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| *000651* | 12/20/2013 | 110 | Order granting ex parte motion for expedited hearing (Related Doc# 109)(document set for hearing: 108 Motion for preliminary injunction) Entered on 12/20/2013. Hearing to be held on 12/23/2013 at 09:30 AM Dallas Judge Jernigan Ctrm for 108, (Rielly, Bill) |
| *000653* | 12/20/2013 | 111 | Agreed order granting motion for temporary restraining order (related document 108) Entered on 12/20/2013. Preliminary injunction hearing to be held on 1/3/2014 at 09:30 AM Dallas Judge Jernigan Ctrm (Rielly, Bill) |
| *000656* | 01/03/2014 | 116 | Agreed Order Continuing Temporary Restraining Order (related document # 108) Entered on 1/3/2014. (Jones, A.) |
| *000659* | 02/24/2014 | 118 | Amended Witness and Exhibit List filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)103 List (witness/exhibit/generic)). (Olson, Dennis) |
| *000662* | 02/24/2014 | 119 | Witness and Exhibit List *for Trial* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)62 Amended complaint). (Elmquist, David) |
| *Vol. 4* *000670* | 02/24/2014 | 120 | Witness and Exhibit List filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| *000722* | 02/26/2014 | 121 | Stipulation by Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC and All Defendants. filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)106 Order on motion to amend scheduling order). (Heyen, Shari) |
| *000726* | 03/03/2014 | 124 | Stipulation by Diane G. Reed and Plaintiffs and Defendants. filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint, 62 Amended complaint). (Elmquist, David) |
| *000729* | 03/03/2014 | 125 | Proposed findings of fact and conclusions of law filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint). (Elmquist, David) |

Vol. 4

| | | | |
|---|---|---|---|
| 000741 | 03/04/2014 | 126 | Proposed findings of fact and conclusions of law filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000746 | 03/04/2014 | 127 | Proposed findings of fact and conclusions of law filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000778 | 03/05/2014 | 130 | Order setting trial Entered on 3/5/2014 (RE: related document(s)62 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial date set for 3/17/2014 at 09:30 AM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000780 | 03/11/2014 | 132 | Amended Witness and Exhibit List *for Trial* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)120 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000805 | 03/13/2014 | 134 | Amended Witness and Exhibit List filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)119 List (witness/exhibit/generic)). (Elmquist, David) |
| 000813 | 03/14/2014 | 135 | Amended Witness and Exhibit List *Second Amended* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)118 List (witness/exhibit/generic). (Olson, Dennis) |
| 000816 | 03/16/2014 | 137 | Amended Witness and Exhibit List *(Second)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)132 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000842 | 03/17/2014 | 138 | First Amended Proposed Joint Pre-Trial order Entered on 3/17/2014. (Rebecek, B) |
| 000871 | 04/04/2014 | 142 | Extended temporary restraining order and mandatory injunction Entered on 4/4/2014. (Rielly, Bill) |
| 000878 | 04/23/2014 | 144 | Notice *of Trustee's Status Report of Compliance* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)142 Temporary restraining order). (Elmquist, David) |
| 000892 | 07/29/2014 | 161 | Motion to extend time to appeal - Rule 8002c (RE: related document(s)148 Judgment) Filed by Defendant Cengiz J. Comu (Blanco, J.) (Entered: 08/20/2014) |
| 000896 | 07/30/2014 | 153 | Application for compensation *Plaintiffs Preliminary Application for Attorneys' Fees and Expenses Awarded in the Court's July 8, 29014 Judgment* for Shari L. Heyen, Creditor's Attorney, Period: 10/26/2011 to 7/28/2014, Fee: $946,504.90, Expenses: $12,800.00. Filed by Attorney Shari L. Heyen (Heyen, Shari) |
| 000906 | 07/30/2014 | 154 | Motion to extend time to To Submit Affidavit and Evidence in Support of Application for Attorneys' Fees & Expenses Awarded in the Court's July 8, 2014 Judgment Filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |
| 000914 | 08/20/2014 | 162 | Order granting motion for leave to file notice of appeal out of time 161 |

*Vol. 4*

*000916*

*000919*

| | | | Motion to extend time to appeal - Rule 8002c. Entered on 8/20/2014. (Rielly, Bill) |
|---|---|---|---|
| 08/27/2014 | 165 | | Order granting motion to extend time to file application for attorney's fees and expenses 154 Motion to extend time. Entered on 8/27/2014. (Rielly, Bill) |
| 08/29/2014 | 168 | | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)164 Notice of appeal filed by Defendant Cengiz J. Comu) (Blanco, J.) |

II.     Appellant also designates all exhibits admitted at trial, March 17 through March 21,
2014.     *Not Provided by Appellant*

III.    Appellant also designates the following transcripts:

Vol. 5

| | | | |
|---|---|---|---|
| 000921 | 11/09/2010 | 177 | Hearing held on 11/9/2010. (RE: related document(s)5 Motion to dismiss adversary proceeding Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6) filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) APPEARANCES: D. Olson for Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Announcement of an agreed order having been submitted that contemplates Plaintiff's agreement to file Amended Complaint with Debtor's reservation of right to re-urge motion to dismiss. Court will sign order. (Womack, Jennifer) (Entered: 11/12/2010) |
| 000927 | 02/14/2011 | 178 | Hearing held on 2/14/2011. (RE: related document(s)12 Motion to dismiss adversary proceeding(SECOND) filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) Appearances: D. Olsen for Defendant/Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Motion denied, conditional on Plaintiff, within 20 days, amending Complaint again to provide more specificity regarding specific provisions of Section 727(d) being alleged, when acts were discovered and how, and addressing his standing, versus the Chapter 7 Trustees, to seek avoidance of alleged fraudulent transfers. If not amendment within 20 days, complaint will be dismissed. If amendment, then Defendant has 20 days thereafter to answer/respond. Counsel to submit order. (Harden, D.) (Entered: 02/18/2011) |
| 000952 | 05/02/2012 | 179 | Status conference held (RE: related document(s)20 Amended complaint) Appearances: E. Lippe and D. Wander (telephonically) for Plaintiffs; D. Elmquist for Trustee; D. Olson for Debtor. Nonevidentiary hearing. Based on statements of counsel, court will continue abatement through 8/1/12 and counsel shall contact courtroom deputy for another status conference the first week of August 2012. Counsel shall upload an order continuing abatement. (Davis, T.) (Entered: 05/14/2012) |
| 000964 | 07/31/2012 | 180 | Hearing held on 7/31/2012. (RE: related document(s)20 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) Appearances: D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff; D. Olson for Debtor. Nonevidentiary status conference. Court heard reports regarding Rule 2004 examinations that have been ongoing and Trustees intention to file a Complaint in Intervention by 8/31/12. Court will enter Order terminating the abatement of this Adversary Proceeding and requiring: (a) Trustees Complaint in Intervention to be filed by 8/31/12; and (b) parties to upload Agreed Scheduling Order by 9/14/12 (inclusive of deadlines pertaining to the pending Rule 12(b)(6) |

*Vol. 5*

| | | | |
|---|---|---|---|
| | | | motion) or, in the alternative, court will enter its own Scheduling Order thereafter setting a January 2013 trial docket call and deadlines pertaining to the Rule 12(b)(6) motion. (Baird, Dennis) (Entered: 08/01/2012) |
| 000975 | 10/31/2012 | 181 | Hearing held on 10/31/2012. (RE: related document(s)24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) Appearances: D. Olson for Movant/Defendant/Debtor; D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff/King Louie Mining. Nonevidentiary hearing. Motion denied. Court also denied a pending Motion for Leave by Plaintiff/King Louie Mining to File Third Amended Complaint. Thus, Second Amended Complaint of King Louie Mining (Section 727 count only) and Complaint in Intervention of Trustee are now governing pleadings in this Adversary Proceeding. Mr. Lippe to upload orders on motion to dismiss and motion for leave. (Baird, Dennis) |
| 001004 | 08/15/2013 | 182 | Hearing held on 8/15/2013. (RE: related document(s)94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order)) Appearances: E. Lippe for his firm; K. Hanks and C. Floyd for Plaintiffs other than the Trustee; D. Elmquist for Trustee; R. Nicoud for Debtor. Nonevidentiary hearing. Motion denied. Ms. Hanks to upload order. (Harden, D.) (Entered: 08/21/2013) |
| 001035 | 03/04/2014 | 183 | Pre-trial conference held on 3/4/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit; (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz).) Appearances: K. Hanks and V. Vital for Creditor/Plaintiffs; D. Elmquist for Intervenor/Plaintiff; D. Olson for Defendants. Nonevidentiary status conference. Court will issue order setting trial for March 17, 2014 at 9:30 am, continuing through March 21, 2014. Parties to upload final Pre-Trial Order by March 14, 2014. (Harden, D.) (Entered: 03/06/2014) |
| 001052 | 03/17/2014 | 184 | Trial held on 3/17/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) |

| | | | |
|---|---|---|---|
| *Vol. 6* | | | Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/18/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *001277* | 03/18/2014 | *185* | Trial held on 3/18/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/19/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 7* *001538* | 03/19/2014 | *186* | Trial held on 3/19/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/20/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 8* *001787* | 03/20/2014 | *187* | Trial held on 3/20/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/21/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 9* *001909* | 03/21/2014 | *188* | Trial held on 3/21/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial concluded. Court gave bench ruling: (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it to Trustee; (b) The Barclay Group, Inc. and Sunset Pacific are the alter |

egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific. Counsel will subsequently upload proposed Findings of Fact, Conclusions of Law and Judgment that are consistent with the courts oral ruling and otherwise consistent with the evidence. (Harden, D.) (Entered: 03/25/2014)

IV.     Appellant states the following Issues presented on Appeal:

1.     The Bankruptcy Judge erred in revoking the Debtor's discharge.

2.     The Bankruptcy Judge erred in finding that the Barclay Group and Sunset Pacific

are the alter egos of the Debtor.

3.     The Bankruptcy Judge erred in calculating the amount of the damages for which

the Debtor was found to be liable.

[Signature on following page]

APPELLANT'S FIRST AMENDED DESIGNATION
OF RECORD AND ISSUES ON APPEAL                                    Page 14

Respectfully submitted,

Cengiz J. Comu
14873 Oaks North Place
Dallas, Texas 75254
(972) 965-2545 – Telephone
Email: cjcomu@gmail.com

By: _____
         Cengiz J. Comu
         *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on the __//__ day of September, 2014, a true and correct copy of the foregoing document was sent via electronic means or by first class mail, postage prepaid to the persons shown below:

Kendyl T. Hanks
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

David W. Elmquist
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, Texas 75165



By: _____
         Cengiz J. Comu

1  correct?

2      A.  Yes, sir.

3      Q.  And it was your view at that time that you

4  weren't obliged to list it because the transaction

5  didn't close until after the filing, and you weren't

6  certain whether or not you had, in fact, received a

7  certificate, so there was no duty to disclose anything

8  about the transaction.  Was that your testimony?

9      A.  I don't know what my testimony was, but the

10  point that I was trying to make in January of 2010 was

11  that the name change and the symbol and the CUSIP and

12  all of that had not been effectuated, so we did not have

13  physical certificates for me to consider this

14  transaction to be officially closed.  So I had nothing

15  to pledge to the trustee.  And when I did get it, I

16  turned it over to the trustee as soon as I received the

17  certificate but --

18      Q.  Mr. Comu, you understand that turning something

19  over to the trustee and disclosing information

20  accurately on your schedules are two different things,

21  right?

22      A.  Yes, absolutely.

23      Q.  And it is undeniably the case is that the

24  merger transaction was effective November 5th before

25  your filing.  That merger transaction, which was

1  completed, according to your December 4, 2009, email,

2  entitled you to receive 300,000 shares of Ganas Corp

3  stock, correct?

4      A.   That is correct.

5      Q.   But it was not listed in your bankruptcy case

6  and has never been listed, correct?

7      A.   I don't know if the amendment has been made.  I

8  know the certificate has been issued.  I don't know what

9  additional documentation to support that has been done

10  or not.

11     Q.   Well, I can tell you --

12          MR. ELMQUIST:  And I would ask the Court to

13  take judicial notice of the fact.

14     Q.   -- that there have been no amendments to the

15  debtor's schedules or statement of financial affairs

16  since they were filed on January 15, 2010.

17          THE COURT:  Court will so notice.

18     Q.   This goes to another point concerning this

19  Turkish Bank account that wasn't scheduled, Mr. Comu.  I

20  want to talk a little bit about that.  You had a bank

21  account in Turkey at the time of the bankruptcy filing?

22     A.   Yes, sir, that's correct.

23     Q.   And that account wasn't listed in your

24  bankruptcy schedules?

25     A.   It was my error, yes, sir.

1    Q.   And you understood that you had a duty to

2   disclose all your assets and liabilities?

3    A.   Yes, absolutely.

4    Q.   And you had been asked on numerous occasions

5   whether your schedules were complete and accurate; is

6   that right?

7    A.   To the best of my recollection, yes, sir.

8    Q.   Okay.  And on each occasion you answered in the

9   affirmative?

10    A.   To the best of my recollection at that time,

11   yes, sir.

12    Q.   But as we stand here or sit here today, your

13   bankruptcy schedules have not been amended to reflect

14   the account in Turkey, correct?

15    A.   I would not know that.  I would have to speak

16   with Counsel.

17    Q.   Okay.  Well, do you recall any discussions with

18   Mr. Olson or anyone about amending your bankruptcy

19   schedules to reflect the account in Turkey?

20    A.   I believe we certainly had conversation about

21   it, and what was done I am certainly not aware of.

22    Q.   I mean, Mr. Comu, do you understand that the

23   bankruptcy schedules are your schedules, not Mr. Olson's

24   schedules?

25    A.   I understand that.

1     Q.   And the duty that is imposed on you, as a

2   debtor, is for you to disclose, not for Mr. Olson to

3   disclose, your assets and liabilities?

4     A.   Correct, I just don't know the proper

5   documentation that I am required to submit to --

6     Q.   Let's talk about the account in Turkey.  Is it

7   still open?

8     A.   I believe, to the best of my recollection, yes.

9     Q.   You understand those are funds of the

10  bankruptcy estate?

11    A.   Yes, sir.

12    Q.   Have you made any effort to turn those funds

13  over to the trustee?

14    A.   I believe my attorney has spoken to the

15  trustee, and we are awaiting instructions.

16    Q.   Okay.  How much money is in the account?

17    A.   I am going to guess between three and 5,000 US

18  dollars.

19    Q.   Have you spent any of that money since the

20  filing of the bankruptcy case?

21    A.   No, sir.

22    Q.   I want to talk to you a little bit about the

23  Barclay Group.  It was formed in 1999, correct?

24    A.   Approximately, I don't know the exact date.  I

25  don't recall.

1        Q.    Was that formed by you and a John Potter?

2        A.    Yes, we were the original two partners.

3        Q.    Okay.  And was its original business purpose to

4   be a holding company?

5        A.    I believe that was the initial structure, yes.

6        Q.    Okay.  When -- Was the Green Auto transaction

7   the first transaction Barclay Group was involved in, in

8   which it served in sort of an investment banking

9   capacity?

10       A.    No, I believe we did a transaction in the year

11  2000, I believe.

12       Q.    After the transaction in 2000, was there any

13  other transaction until the Green Auto transaction?

14       A.    I don't think so.  I can't recall off the top

15  of my head.

16       Q.    Mr. Comu, I will tell you this is a stipulated

17  fact, that you are the sole officer and director of the

18  Barclay Group.  This is a corporation, so it has

19  directors and officers, as opposed to managers.  Do you

20  understand that distinction?

21       A.    Yes.

22       Q.    Okay.  And you understand you are the sole

23  officer and director of the Barclay Group?

24       A.    I may be listed as a director.  I don't know if

25  Mr. Brown is listed as a director or not.

1      Q.   I can tell you -- Without spending time in

2   court here, I can tell you each and every public

3   information report that has been filed lists you as the

4   sole officer and director.  So would you agree that the

5   filings you made are accurate?  The filings you made

6   with the Texas Secretary of State's office, where you

7   filed public information reports, showed you as the sole

8   officer and director.  Do you think those reports were

9   accurate when you submitted them?

10      A.   If I was listed as the sole director, I would

11   have to find out how the equity table was listed as

12   well.  I think the equity owner and the director may be

13   two different things.

14      Q.   Well, they absolutely are.

15      A.   Right.

16      Q.   Do you understand the distinction between an

17   equity holder and a director?  Equity holder would be a

18   shareholder?

19      A.   Correct.

20      Q.   And a director would be a member of the board

21   of directors?

22      A.   That's correct.

23      Q.   Who are elected by the shareholders, right?

24      A.   That's correct.

25      Q.   So you have got shareholders, and you have got

 1  directors?

 2      A.   That's correct.

 3      Q.   I am saying those reports that are submitted to

 4  the state show you as the sole officer and director.

 5  Those reports don't say anything about shareholders,

 6  just officers and directors.  So do you think that is

 7  accurate?

 8      A.   I would have to check the reports, sir.  I

 9  don't know exactly.

10      Q.   So you are not sure?  When you submitted those

11  reports as being the sole officer and director, you are

12  saying you are not sure it was accurate, when you

13  submitted those?

14      A.   Yes, I am not sure if that was accurate or not.

15      Q.   Well, Mr. Comu, why then would you submit them?

16  Why would you submit reports to the State of Texas,

17  stating that you are the sole officer and director, if

18  you weren't certain whether or not that statement was

19  accurate?

20      A.   They were usually prepared by my accountant for

21  my signature.

22      Q.   It doesn't matter who prepared them, Mr. Comu.

23  It is your signature on there that is representing

24  certain facts, those being that you are the sole officer

25  and director, and we have gone so far as to stipulate

1  that that is, in fact, the case.  And you are in court

2  today now questioning whether or not that is true?

3       A.   No, I am not questioning it.

4       Q.   Well, it sounds like you are.  All right.

5  Let's move on.

6            Let's talk about ownership.  I asked you at

7  your examination and I asked Mr. Brown at his

8  examination about documents evidencing ownership.  And I

9  will tell you that what Mr. Brown said is the only

10  document -- the only document that evidenced ownership

11  was the so-called stock swap agreement.  Are you

12  familiar with what that is?

13       A.   The share exchange agreement, yes.

14       Q.   Yeah.  Well, do you agree with him that that is

15  the document that reflects ownership of the Barclay

16  Group, the one and only document?

17       A.   No.

18       Q.   Okay.  What other document do you believe

19  exists that reflects ownership?  Because I asked you for

20  other documents, and I have never been provided any.

21       A.   Tax returns, which have been provided.

22       Q.   Oh, I am talking about corporate document, Mr.

23  Comu, that would be based upon something other than what

24  you might have told your tax preparer.  Is there some

25  form of corporate document that reflects ownership of

1    the Barclay Group?

2         A.   I would have to pull the corporate record book,

3    which I don't know exactly where it is located, to see

4    if I can supply you with additional documents, aside

5    from what has been provided to you, sir.

6         Q.   I can tell you that I have requested and

7    received no documents evidencing ownership, and I have

8    requested that on repeated occasions, including at your

9    2004 examination or in connection with your 2004

10   examination.

11             Let's talk about the acquisition agreement

12   and plan of share exchange, which is Trustee's

13   Exhibit 61.  I asked some questions of Mr. McNeil

14   yesterday about this document.

15             MR. ELMQUIST:  Can you pull that up,

16   Trustee 61?

17        Q.   Can you read that, Mr. Comu?  Make it a little

18   bigger.  I know it is in the book.

19             All right.  You can read it on the screen,

20   or you can turn to Exhibit 61 in the book.

21        A.   I can see it on the screen.  Thank you.

22        Q.   All right.  I am not going to belabor this, but

23   the first paragraph indicates that the parties to this

24   agreement include the shareholders of TBG.  Do you see

25   that in the first paragraph?

1        A.   Yes.

2        Q.   So the party or parties that would be signing

3   this agreement to exchange their shares of stock in the

4   Barclay Group would be the shareholders of the Barclay

5   Group, correct?

6        A.   That's correct.

7        Q.   Now, turn to the signature page of the

8   document, and this agreement is -- Well, first of all,

9   is this signature under Brown and Lampe, PLC, is that

10  Mr. Brown's signature, to the best of your knowledge?

11       A.   Appears to be.

12       Q.   Is the signature for the Barclay Group your

13  signature?

14       A.   Yes, it appears to be.

15       Q.   Were you signing this agreement as the sole

16  shareholder of the Barclay Group?

17       A.   Yes, sir.

18       Q.   So at the time this document was signed, you

19  were the hundred percent owner?

20       A.   Yes, sir.

21       Q.   Did you know at the time this agreement was

22  signed that Brown and Lampe did not legally exist as a

23  corporate entity, that it had never been properly

24  formed?

25       A.   Not at the time of signing the (Inaudible), no,

1    sir.

2        Q.   This agreement was entered into in 2007,

3    correct?

4        A.   That's what the date says at the beginning.

5        Q.   December 30, 2007, so when did you learn that

6    Brown and Lampe had never been formed as a legal entity?

7        A.   In his deposition in Dallas, Texas.

8        Q.   Okay.  And that was taken in August of 2012?

9        A.   I believe so.

10       Q.   So up until that time, you believed that Brown

11   and Lampe was a 99 percent owner?

12       A.   No, after this date Brown and Lampe became

13   99 percent owner.

14       Q.   If you believe that Brown and Lampe was

15   99 percent owner, then why did you list in your

16   bankruptcy schedules that Mr. Brown, individually, was

17   the 99 percent owner?

18       A.   I always refer to Mr. Brown as the owner of

19   Brown and Lampe, so I just assumed that it would be him

20   individually.

21       Q.   Okay.  I am not going to belabor this either,

22   but Ms. Hanks asked you about you are a sophisticated

23   businessman, and you have operated many companies.  You

24   know the difference between an individual and a company,

25   correct?

1          A.    Yes, sir, I do.

2          Q.    You know that Bernard Brown does not equal

3    Brown and Lampe?

4          A.    That is correct.

5          Q.    So if Brown and Lampe were the owner, it should

6    list Brown and Lampe, not Bernard Brown, right?

7          A.    Correct.  I think it might have been perhaps a

8    misinterpretation on my part at that time.

9          Q.    Did you look at -- Let me ask you this:  In

10   connection with the preparation of your bankruptcy

11   schedules, did you look at any documents like the

12   acquisition agreement in the preparation of these

13   papers?

14         A.    Not 100 percent, Mr. Elmquist.  I was in quite

15   a state of shock at that time.

16         Q.    Are you saying you basically relied on your

17   memory in the preparation of these documents?

18         A.    My memory and whatever documents that I had

19   access to at that time.

20         Q.    Okay.  You have mentioned several times the

21   date of December 31, 2009, was a very important date to

22   you because you had an important decision to make.  What

23   important decision were you referring to?

24               I am sorry.  I didn't mean to upset you.

25         A.    A bankruptcy.

1        Q.   Okay.  Well, that's a tough thing for someone

2   who didn't -- When did you first meet with Mr. Olson

3   about the possibility of filing bankruptcy?

4        A.   I don't recall the dates.

5        Q.   Was it weeks before, months before, days

6   before?

7        A.   It may have been months before.

8        Q.   Months before?  When we were talking about --

9   or when you were talking about -- do you need to take a

10  break?

11            THE COURT:  Mr. Comu, do you need to take a

12  break?

13            MR. ELMQUIST:  I think he does.

14            THE COURT:  All right.  We will take a

15  five-minute break.

16            (Recess from 2:22 until 2:34.)

17            THE COURT:  Please be seated.  All right.

18  Are we ready to proceed?

19            MR. ELMQUIST:  I believe we are, Your

20  Honor.

21            THE COURT:  Okay.

22       Q.   (By Mr. Elmquist)  Mr. Comu, I want to go back

23  to Trustee's Exhibit 61, which is the acquisition

24  agreement and plan of share exchange.  Was this

25  transaction completed?

1        A.    Yes, I believe it was.

2        Q.    So by virtue of this -- what was the reason for

3   your -- the Barclay Group entering into this agreement

4   to exchange shares with Brown and Lampe?  What was the

5   business purpose?

6        A.    At the time the Barclay Group was looking to

7   potentially expand into Europe, and Mr. Brown was

8   looking for a US vehicle to seek to make investments in

9   the United States, and so we thought this would be a

10  clean swap of allowing us to exchange corporations and

11  with a -- with the intent to try to see if we can work

12  together in the future.

13       Q.    You testified earlier that you were the sole

14  shareholder in this exchange of the stock of the Barclay

15  Group, so, by virtue of this exchange, you received

16  99 percent of the stock of Brown and Lampe; is that

17  right?

18       A.    The Barclay Group and Brown and Lampe were to

19  exchange shares for 99 percent each of the swap, yes,

20  sir.

21       Q.    But the swap that was occurring was swap of

22  shares that were owned, not by the company, but by the

23  individual shareholders, correct?

24       A.    Yes, that's correct.

25       Q.    Okay.

1          A.    By the individual shareholders.

2          Q.    And your earlier testimony was you were the one

3    and only shareholder of the Barclay Group, which would

4    mean that you would have been entitled to receive the

5    99 percent interest in Brown and Lampe?

6          A.    That's correct.

7          Q.    And you believe this to have been a legally

8    effective transaction at the time the transaction

9    closed?

10         A.    With the exception of the certificates being

11   issued, that's correct.

12         Q.    Why were no certificates issues?

13         A.    We just never got around to doing anything in

14   Europe at that time, so we never sought to request the

15   certificates.

16         Q.    Did you have any assistance in this

17   transaction, in terms of having any advice from a lawyer

18   or financial adviser in the UK, as relates to

19   undertaking this transaction?

20         A.    I don't believe we used UK law at that time.  I

21   believe we used US law, since it was a US corporation.

22         Q.    But Brown and Lampe was a UK corporation,

23   right?  That's the entity you were acquiring?

24         A.    Well, it was a share exchange.

25         Q.    But I mean what this agreement provided for is

1    that you, as the sole shareholder of the Barclay Group,

2    were going to obtain in this share exchange 99 percent

3    of the outstanding shares of Brown and Lampe, right?

4         A.   That's correct.

5         Q.   And so my question to you is:  Did you do any

6    kind of due diligence into Brown and Lampe or consult

7    with anyone in the UK concerning the acquisition of that

8    stock?

9         A.   There may have been some conversations, but we

10   relied on the reps of warranties, per this agreement,

11   that the company was basically empty with no assets or

12   liabilities, which is what we were transferring.

13        Q.   So you did not seek or obtain any kind of

14   independent verification that Brown and Lampe was a

15   legally existing entity at the time this transaction was

16   done?

17        A.   We did not seek a third party, independent

18   report, no, sir.  We relied on the reps and warranties

19   of the agreement.

20        Q.   All right.  I now want to talk about the Green

21   Auto transactions and the transactions following that.

22   On behalf of the Barclay Group, you entered into three

23   separate stock purchase agreements on or about

24   January 10, 2010, correct?

25        A.   Yes, sir.

1     Q.   And those were with Sunset Pacific, LP, TKY

2   Trust and Daptco Trust; is that right?

3     A.   I believe that's correct.

4     Q.   I put in front of you there Trustee's first

5   filing of exhibits, and Exhibits 6, 7 and 8 are those

6   three agreements.  And I am going to discuss each of

7   them in order, but I just wanted you to confirm that

8   those are copies of the agreements I just asked you

9   about.

10     A.   Yes, they appear to be.

11     Q.   Okay.  Let's start with Exhibit 6.  The

12   purchaser here is Sunset Pacific, LP.  What -- tell the

13   Court what you know about Sunset Pacific, LP.

14     A.   Sunset Pacific, LP, was created, I believe,

15   somewhere around 1999 by my attorney, Cecil Mathis.  And

16   after I was married in approximately 2006, there was a

17   financial restructuring and, advice of counsel and

18   financial planners, my wife became the majority owner of

19   Sunset Pacific, and I worked with her on investment

20   decisions going forward.

21     Q.   Your wife was a 98 percent limited partner, I

22   think the document reflects; is that right?

23     A.   I believe that's correct.

24     Q.   And you were -- the general partner of Sunset

25   LP was a company called Marathon Management; is that

1  right?

2      A.   I believe that's correct.

3      Q.   And Marathon Management was under your control?

4      A.   Until January of 2006 when all of the

5  restructuring was done, that's correct.

6      Q.   Okay.  Well, who was the general partner of

7  Sunset Pacific, LP, on January 10, 2010?

8      A.   That would have been, I believe, Marathon

9  Management.

10     Q.   And who was in control of Marathon Management

11 at that time?

12     A.   My brother, Cem Comu.

13     Q.   Why did the management of Sunset Pacific switch

14 from you to your brother in 2006?

15     A.   That was part of the financial and legal

16 structuring.  We got rid of our prenup.  We had a new

17 will.  And it was a lot of discussions with our

18 financial planners and our attorney to restructure how

19 Sunset Pacific and Marathon Management should go

20 forward.

21     Q.   What business activity was Sunset Pacific

22 engaged in, if you know, in January 2010 when it entered

23 into the stock purchase agreement?

24     A.   I believe it was an investment holding company

25 and made investments and was looking for opportunities.

1      Q.    Did it have any income or assets at the time?

2      A.    I don't know what its tax return or financial

3  statement looked like as of that date.

4      Q.    Why did you enter into an agreement to sell two

5  and a half million dollar shares of the Barclay Group

6  stock to Sunset Pacific?

7      A.    Well.  We thought it was the right thing to do.

8  It was a sale against a note, and we thought that we

9  would have the assurance of getting paid, since nobody

10 was cash buyers for the security at the time, since it

11 was completely restricted.

12     Q.    Okay.  So the purchase price of $200,000 was in

13 the form of a promissory note; is that right?  Excuse

14 me, $250,000, that was a promissory note, correct?

15     A.    Yes, that's correct, securitized by the stock.

16     Q.    All right.  Let's look first at the second page

17 of the stock purchase agreement.  The copy that I was

18 provided shows -- I believe it shows you signing on

19 behalf of the Barclay Group; is that right?

20     A.    That appears to be my signature, yes.

21     Q.    Whose signature is that below under Sunset

22 Pacific?

23     A.    I believe that is my wife, Phyllis Comu, who

24 owns 98 percent of Sunset Pacific.

25     Q.    But your wife is a limited partner?

1      A.   That's correct.

2      Q.   So did the general partner approve this

3 transaction?

4      A.   I don't recall.

5      Q.   That would be -- that would have been your

6 brother on behalf of Marathon?

7      A.   That is correct.

8      Q.   And the consideration for the sale of the stock

9 was the $250,000 promissory note, which is the third and

10 fourth page -- a copy of that is the third and fourth

11 page of this exhibit; is that right?

12      A.   That's correct.

13      Q.   Who determined the -- first of all, who

14 determined the purchase price for the stock?

15      A.   I think we looked at market conditions and came

16 up with a number that we thought would be fair and

17 equitable for all parties concerned, considering the

18 risk.

19      Q.   Who is "we" in that sentence?

20      A.   It was a combination of myself at the Barclay

21 Group, Mr. Brown and also my wife at Sunset Pacific and,

22 I believe, my brother at Marathon Management.

23      Q.   So you four got together and decided on doing

24 this sale and the purchase price for the stock?

25      A.   I wouldn't say the four of us got together.  I

1  believe there were independent conversations.  I don't

2  know if the four of us ever had a call together.

3       Q.   All right.  Who determined the payment terms

4  for this note?

5       A.   Well, the Barclay Group was the facilitator of

6  the sale of it, so we managed the process of the

7  repayment program back to the company.

8       Q.   So you are saying you determined the payment

9  terms?

10      A.   Well, we were the one holding the receivable,

11 and we were the one pledging the stock, so we were

12 managing the process of the repayment back to the

13 Barclay Group's account.

14      Q.   When you say "we", it is not helpful, Mr. Comu,

15 because I don't know who you mean by "we"?

16      A.   I am sorry.  The members of the Barclay Group.

17      Q.   And who were those members?

18      A.   At that time would be myself, Mr. Brown,

19 Mr. Parsley and Mr. Baxter.

20      Q.   And when you say members of the Barclay Group,

21 are you referring to them as owners of the Barclay Group

22 or as persons involved in the management of the Barclay

23 Group?

24      A.   More of the management.  They were not owners

25 of the company.  Mr. Brown was the 99 percent owner of

1    the Barclay Group.

2        Q.   I think we earlier established that it wasn't

3    Mr. Brown but Brown and Lampe, right?

4        A.   I am sorry.  You could be correct.  I referred

5    to Mr. Brown, but it could be Brown and Lampe.

6        Q.   Well, based upon the agreement you entered

7    into, it was Brown and Lampe, wasn't it?

8        A.   That's what the contract says.

9        Q.   Have there been any payments on this $250,000

10   note made by Sunset Pacific payable to the Barclay

11   Group?

12       A.   I don't believe so.  I am not 100 percent.

13       Q.   The note required quarterly payments of

14   interest; did it not?

15       A.   I believe that's correct.

16       Q.   In the second paragraph?

17       A.   Yes, sir.

18       Q.   So the note is in default?

19       A.   Yes, sir, I believe we have taken the stock

20   back.

21       Q.   When did you take the stock back?

22       A.   I think within a year of none of the payments

23   or none of the sales occurring, we took the stock.  I

24   believe we are holding it in escrow.

25       Q.   Okay.  Where exactly is it being held?

1        A.    Could be at the offices of the Barclay Group.

2        Q.    Are you talking about a physical stock

3   certificate that was issued to Sunset Pacific?

4        A.    Yes, sir.

5        Q.    Was there -- the stock that we are talking

6   about here was stock initially issued to the Barclay

7   Group by Green Auto, right?

8        A.    It was part of the Barclay Group's equity

9   interest in the transaction that closed in January 13th,

10  2010.

11       Q.    So it was part of the 95 million shares that

12  Green Auto -- excuse me, that the Barclay Group received

13  from Green Auto, correct?

14       A.    Unfortunately, that is incorrect.

15       Q.    Okay.

16       A.    The Barclay Group received one-third of the 95

17  million shares referenced in the closing, which is about

18  31 million shares.

19       Q.    3,100 or 31 million?

20       A.    31 million.

21       Q.    And why did it receive one-third?

22       A.    We were the one-third party to the transaction

23  that is evidenced in a single document that shows three

24  parties and the respective ownership.

25       Q.    You are referring to the memorandum of

1   understanding?

2        A.   Yes, sir.

3        Q.   I thought Mr. McNeill testified yesterday that

4   that transaction never closed?

5        A.   No, I believe he was referring to a partnership

6   agreement that was being discussed, and that partnership

7   agreement was never closed, signed, executed, et cetera.

8        Q.   Okay.  I need you to take a look at Exhibit 73,

9   Trustee's 73, please, Mr. Comu.  It would be in this.

10  So is Exhibit 73 the agreement you are referring to that

11  caused the shares of Green Auto to be divided among the

12  Barclay Group, the Mayborne Group and First Market

13  Securities?

14       A.   Yes, sir.

15       Q.   Okay.  You signed this agreement on behalf of

16  the Barclay Group, correct?

17       A.   Yes, its authorized agent.

18       Q.   Okay.  What does that mean exactly?  What type

19  of agent were you?  I mean you were sole officer and

20  director of the Barclay Group.  Were you signing -- you

21  were signing on behalf of the 99 percent owner, Brown

22  and Lampe?

23       A.   No, I was signing as an authorized agent or

24  officer of the Barclay Group that allowed me powers to

25  enter into contracts like this.

1      Q.   What document evidences that power?

2      A.   I believe the document you reference, which is

3  the franchise filing with the state, that shows myself

4  as the director of the company.

5      Q.   You are saying, based upon the franchise tax

6  filing, you think you have the authority to undertake

7  any action that you deem appropriate on behalf of the

8  Barclay Group?

9      A.   As a director of the corporation, I believe I

10  have those powers.

11      Q.   Without any consultation with the owners?

12      A.   No, I believe I always have consultation, but I

13  only require unanimous shareholder approval at times

14  that requires it, and there has been no cases where I

15  required to have unanimous shareholder approval by the

16  Barclay Group.  I am simply signing these as a director

17  and officer to enter the contract that I am empowered

18  to.

19      Q.   Let's go to the first paragraph of 73,

20  Paragraph One.  It states, "The parties acknowledge that

21  Party A" -- That would be Mayborne Group, Limited --

22  "has paid the following sums for the purchase of GNAS."

23  Do you see that?

24      A.   Yes, sir.

25      Q.   And this agreement is dated November 24, 2009,

1  correct?

2      A.  Yes, sir.

3      Q.  So prior to November 24, 2009, Mayborne Group,

4  LTD, had paid to -- had paid the following sums as

5  indicated in 1(A), $120,000 to Block and Garden for the

6  purchase of GNAS and legal filing fees; is that right?

7      A.  Yes, sir.

8      Q.  Why would Mayborne Group be paying Block and

9  Garden for the purchase of the stock?

10     A.  They were buying GNAS, Ganas Corporation, with

11  $120,000.

12     Q.  Okay.  But why would the payment be made to

13  Block and Garden?

14     A.  They were the law firm that was selected by our

15  company to facilitate the transaction.

16     Q.  So you are saying that Block and Garden was

17  essentially acting as an escrow agent here?

18     A.  No, as a law firm.

19     Q.  Well, what consideration did Block and Garden

20  provide for the $120,000 that you say Mayborne paid to

21  it?

22     A.  The $120,000 is what was paid to the seller of

23  the shell, the Ganas shareholders, and Block and Garden

24  acted as an escrow to facilitate the receipt and then

25  the transfer of the $120,000 from the Mayborne Group to

1  the shareholders of Ganas Corporation.

2      Q.   Okay.  Mr. Comu, I accept that, but that was

3  exactly what I asked you one question ago.  Did Block

4  and Garden act as an escrow agent with respect to the

5  $120,000?

6      A.   I am sorry.

7      Q.   And you answered no.

8      A.   I am sorry.  I thought you said did they just

9  act as an escrow, and I want to say they were the --

10  acted as a law firm.  They also provided escrow service

11  on top of that.

12      Q.   How much of this $120,000 was in payment of

13  legal fees, if you know?

14      A.   I don't believe any of it.

15      Q.   Okay.  But it says, "In legal filing fees."  Do

16  you see that?

17      A.   I see that.  I am not sure if that included the

18  legal and filing or if we had to send them additional

19  funds for that.  I am not 100 percent certain.

20      Q.   Okay.  And then also Paragraph One, $30,000 is

21  paid to the Barclay Group for professional services and

22  fees.  Do you see that?

23      A.   Yes, sir.

24      Q.   So you have got $120,000 being paid by

25  Mayborne, as I am understand you, for the stock.  They

1  are paying a $30,000 fee to the Barclay Group for

2  professional services.  And Mayborne Group is ending up

3  with one-third of the stock that is being issued to the

4  Barclay Group, the Green Auto stock.  What did First

5  Market Securities provide in consideration for its

6  one-third?

7       A.   I believe they were responsible for market

8  support and investor relations.

9       Q.   That is nowhere reflected in this memorandum of

10 understanding, is it?

11      A.   No, it is not.

12      Q.   Is there some other document that reflects that

13 understanding?

14      A.   Not that I am aware of at this time.

15      Q.   So what was -- This transaction, this

16 memorandum of understanding was entered into with the

17 contemplation that this stock that was being sold --

18 well, that is referenced in 2(A) and 2(B), the 28,550.11

19 in restricted shares and the 3,240,016 in nonrestricted

20 shares, would be, in turn, transferred to a new co, a

21 newly formed corporation, that would be equally owned

22 among the three?  Was that the plan?

23      A.   That was the discussion that was had.

24      Q.   Okay.  And did that occur?

25      A.   No, it did not.

1       Q.   So Mayborne Group -- Did the Barclay Group

2  receive the 95 million shares that the merger agreement

3  called for and that the purchase agreements the Barclay

4  Group entered into called for?  There was two

5  transactions that you were asked about, one that was 91

6  million and so, and another was 3 million and so,

7  totaling about 95 million and so.  Did the Barclay Group

8  receive those 95 million shares or certificates

9  evidencing those $95 million shares?

10      A.   I don't believe so.

11      Q.   So what happened that caused the Barclay Group

12  not to receive those shares?

13      A.   We were acting as the agents for the Mayborne,

14  and First Market Services facilitated this transaction,

15  and on closing, as evidenced by this memorandum, we

16  would receive one-third of those 91 million shares.

17      Q.   Okay.  So what you are saying is -- or are you

18  saying that part of the original agreement, separate and

19  apart from this memorandum of understanding, was that

20  the Mayborne Group and First Market Services would

21  receive one-third of the stock that was being issued to

22  the Barclay Group?

23      A.   They would receive one-third of Ganas

24  Corporation stock that was being purchased by Mayborne

25  Group with the $120,000 they were paying the Ganas

1  shareholders.

2  Q.   All right.  Then that stock would then be

3  converted into Green Auto stock?

4  A.   After the name change, symbol change, CUSIP

5  change in January 13th of 2010 is when the certificates

6  were finally ready to be issued.

7  Q.   And they were issued one-third, one-third,

8  one-third?

9  A.   I believe originally that is how they were

10  created.

11  Q.   Okay.  So the total number of shares as of

12  January 2010 that the Barclay Group received, Green Auto

13  stock that the Barclay Group received, was something in

14  the order of 31 million, equal to the 95 million divided

15  by three; is that right; is that what you are saying?

16  A.   I believe it was approximately 30 million.

17  Q.   And from that 30 million shares that it

18  received, it sold two and a half million shares to

19  Sunset Pacific, pursuant to the terms of the stock

20  purchase agreement; is that right?

21  A.   Pursuant to the terms of the stock purchase

22  agreement and then the note, yes, sir.

23  Q.   And it also sold to TKY Trust five million

24  shares, pursuant to Exhibit 7, the stock purchase

25  agreement --

1        A.    Just to clarifies --

2        Q.    -- between the Barclay Group and TKY?

3        A.    Just to clarify, Mr. Elmquist, we did not sell,

4   but we entered into an agreement to sell, based on a

5   note that was to be paid against those shares that were

6   collateralized.

7        Q.    I am glad you mentioned that, because I think

8   you testified yesterday that this sale was conditional

9   upon payment.  I think you testified yesterday that, in

10  your mind, these stock purchase agreements did not

11  effectuate an actual transfer of anything, because the

12  agreement somewhere provided for a right to get the

13  stock back from the buyer if the buyer didn't fulfill

14  the terms of the note obligation.  Is that your

15  testimony?

16       A.    Well, if I can expand on that testimony, these

17  transactions were entered into with parties that we

18  needed to assure that, if they did not pay, they would

19  render the stock back without litigation.  So these were

20  called friendly party transactions.

21       Q.    Well, does the stock purchase agreement -- I

22  couldn't find anywhere in this agreement -- After you

23  gave that testimony, Mr. Comu, I couldn't find anywhere

24  in this agreement or in the note, where it provides that

25  the buyer will return back or return to the seller the

1  stock if the note isn't paid.  I mean where I would

2  expect to see something like that would be in either --

3  you know, some provision of the agreement or in the

4  default and remedy section of the note, but I can't -- I

5  read the entire document.  I didn't see any reference to

6  that.

7       A.   I would assume it should have been included in

8  the default and remedies; you are correct.

9       Q.   So why do you believe that there was that right

10  if it is not in the agreement?

11       A.   Well, if the -- I believe the verbal

12  conversation that was had with the three entities were

13  that, if they were unable to make payments to the

14  Barclay Group to satisfy the note, they would return the

15  securities back to us.

16       Q.   Well, let me posit a hypothetical to you.

17  Let's assume the trustee is given the right to pursue

18  the collection of this note, because the Court finds

19  that this is an asset of the bankruptcy estate.  So Ms.

20  Reed demands payment -- or demands return of the stock

21  that was issued to TKY Trust or Daptco Trust, because

22  they haven't made full payments on these notes.  Are you

23  saying that the Daptco Trust and TKY Trust will return

24  that stock, based upon some verbal agreement they had

25  with you?

1       A.   No, at the time that the TKY made payments and

2   Daptco made payments, they were the only two entities

3   that were making payments against the stock.  At the end

4   of our attempts to sell those positions, there was a

5   final balance that left the position upside-down.  So we

6   basically settled, saying that is all we are going to be

7   able to get for payment of this note, and we wrote the

8   note off.

9       Q.   Okay.  Let's talk about the -- again, before we

10  move on, going back to Exhibit 7, the copy of the stock

11  purchase agreement that I have has no signature for the

12  Barclay Group.  Do you know why that is?

13      A.   It must just be an unexecuted copy, but I would

14  countersign for the Barclay Group for this document.  I

15  don't know why this one is only signed one sided.

16      Q.   Well, it is also not signed -- okay.  Let's see

17  here.  You said it was your wife that signed on behalf

18  of Sunset Pacific on that purchase agreement, right?

19      A.   Exhibit 6?

20      Q.   Exhibit 6, that is your wife's signature on the

21  agreement?

22      A.   Yes, for Sunset Pacific, that's correct.

23      Q.   Is that also her signature on the note?

24      A.   Yes, that's correct.

25      Q.   Exhibit 7, purchase agreement for the TKY

1    Trust, again, has no signature by you?

2        A.   By the Barclay Group.

3        Q.   Is that right?  And, if so, why is that the

4    case?

5        A.   I think it might have been a document that we

6    received, and I didn't get a chance to countersign it

7    before the exhibit was produced for the trustee.

8        Q.   The agreement is dated January 10, 2010.  Are

9    you saying that you didn't sign at the time the

10   agreement was entered into?

11       A.   I am saying that I believe this document that

12   was produced for you did not have my signature, but,

13   yes, the document was signed on that date.

14       Q.   So what you are saying is you provided me with

15   a copy but not with a fully signed copy?

16       A.   I may have provided you the copy that didn't

17   have both signatures on it, yes, sir.

18       Q.   Okay.  Do you recall my asking for signed

19   agreements?

20       A.   Yes, and I was not able to find several

21   documents that were unsigned.

22       Q.   Okay.  The sale of the -- the sale to TKY Trust

23   of five million shares, that is basically for the same

24   consideration, a $500,000 promissory note or basically

25   ten cents a share, right?

1        A.   Yes, sir.

2        Q.   And the payment terms are essentially the same?

3        A.   I believe the promissory note was the same,

4    yes, sir.

5        Q.   Quarterly payments of interest only until March

6    of 2015?

7        A.   Yes, sir.

8        Q.   What did you know, if anything, about the TKY

9    Trust at the time that you entered in this agreement to

10   sell the five million shares of stock to it?  Did you

11   know anything about what assets it had or what its

12   ability to pay for the stock was?

13       A.   I don't have any specific financial details.  I

14   believe it was a new trust that was created in 2010.

15       Q.   Let's take a look at Trustee's Exhibit 27.  Do

16   you recognize that to be a copy of the TKY Trust

17   agreement?

18       A.   I believe so.

19       Q.   Do you recognize your brother's and your

20   mother's and Alan Burdette's signatures on the last two

21   pages?

22       A.   Yes, sir.

23       Q.   The asset that was contributed to the trust at

24   its formation was a single silver coin; is that right?

25       A.   That's my understanding of Canadian law.

1      Q.   Meaning that is what is minimally required to

2  create a trust?

3      A.   I don't know the details of that.

4      Q.   I have seen in other documents that that coin

5  was valued at $30.  Do you recall that?

6      A.   I am sorry.  I do not.

7      Q.   If this trust was formed and it had a single

8  silver coin in it, how was it supposed to repay this

9  $500,000 note?

10     A.   Through the marketing and sales efforts of the

11 Barclay Group.

12     Q.   What marketing and sales efforts?

13     A.   Barclay Group was approached by several

14 syndicate groups that wanted to purchase stock, and we

15 created the syndicate selling organization and helped

16 manage the process and made sure the investors received

17 the certificates and the parties associated with the

18 transaction got paid.

19     Q.   I am not following that.  How does what Barclay

20 Group is doing to generate revenue provide income to TKY

21 Trust to pay the note?

22     A.   TKY Trust purchased the stock, as did Sunset

23 Pacific and Daptco, under terms to pay for that stock

24 under a note.  The only way they were going to pay for

25 that stock is if we can help facilitate the sales of

1  that stock.

2      Q.   So what you are saying is, at the time this

3  agreement was entered into, it was contemplated the

4  stock that Sunset, TKY and Daptco purchasing was going

5  to be paid for by subsequent sales of that stock that

6  had been sold to them?

7      A.   Correct, it is like selling it under terms or

8  selling it under a note.

9      Q.   I am still looking for the terms in any of

10  these agreements or notes that specify that, Mr. Comu.

11  I am just not seeing it.

12      A.   You mean --

13      Q.   So is this all a verbal agreement?

14      A.   No, sir, it is not, if you -- we could go back

15  to the exhibits.

16      Q.   Sure.  Help me find any reference to that in

17  these agreements, that being the contemplation that this

18  stock was being purchased with an intention to

19  subsequently resell it and pay for the note obligation

20  by resales of the note -- excuse me, resales of the

21  stock?

22      A.   Your Section Seven of your exhibit.

23      Q.   Section Seven of what?

24      A.   Of the stock purchase agreement between the

25  Barclay Group and TKY Trust.

1    Q.   There is no Section Seven?

2    A.   In your binder, Section Seven of this binder.

3    Q.   Oh, you mean Exhibit Seven?

4    A.   Exhibit Seven.

5    Q.   Yeah.  I don't see anything here about resale.

6    A.   Right here under the promissory note for

7    $500,000 and then payment.  They agreed to pay $500,000

8    to the Barclay Group as consideration, and payments were

9    to be made quarterly.

10   Q.   What does that have to do with selling the

11   stock?  That is just payment terms?

12   A.   Correct, this is the payment terms that they

13   were obligated to.  The Barclay Group was going to

14   facilitate the marketing and sales efforts.

15   Q.   Okay.  All right.  Did you know anything about

16   the assets of Daptco Trust at the time you entered in

17   the agreement to sell to it two million shares of stock?

18   A.   No, sir, I did not.

19   Q.   And these transactions were done roughly ten

20   days after your bankruptcy filing; is that right?

21   A.   I believe that is when the stock was available

22   from the transfer agent and, in our mind, the

23   transaction was complete.

24   Q.   Did you have -- prior to your filing, you knew

25   you were due to receive, through the Barclay Group, 30

1    million shares of Green Auto stock, correct?

2         A.    Approximately.  That was our intent.

3         Q.    Okay.  Had you, prior to your bankruptcy

4    filing, already had discussions with your wife and your

5    brother about the Barclay Group selling, to Sunset

6    Pacific and the trusts, the stock, pursuant to these

7    stock purchase agreements?

8         A.    No, sir.

9         Q.    So when did you first have discussions with

10   them about that?

11        A.    I believe in 2010, at the beginning of 2010.

12        Q.    Okay.  So basically, I mean, you filed your

13   bankruptcy 12/31/09, and between then and January '10

14   you had discussions with them and entered into these

15   agreements to sell this stock; is that right?

16        A.    Approximately, yes, sir.

17        Q.    Did you confer with anyone like Mr. Olson about

18   doing these transactions before you did them?

19        A.    I am not 100 percent certain exactly my

20   conversations with Mr. Olson.  I did speak to Mr. Brown

21   to receive his approval to do these transactions.

22        Q.    I am talking about your bankruptcy attorney.

23   Did you talk with him about whether or not this was

24   appropriate?

25        A.    I don't recall if I did or not.  I am sorry.

1      Q.   All right.  After these sales, the next

2  significant transaction involving Green Auto stock held

3  by the Barclay Group was the Eurocap share exchange,

4  right?

5      A.   Yes, sir.

6      Q.   I take that back.  Before you got in -- before

7  you did the share exchange, you had -- the Barclay Group

8  had commenced selling to individuals blocks of shares of

9  Green Auto; is that right?  Because that was done

10  starting in June of 2011?

11      A.   I believe that is incorrect.

12      Q.   All right.  Well, take a look at Exhibit 44,

13  Trustee's Exhibit 44, and I will represent to you that

14  this is a stock transfer ledger that was created by

15  Old Monmouth stock transfer.  Are you familiar with that

16  company?

17      A.   Yes, sir, I am.

18      Q.   Okay.  And Old Monmouth's principal or

19  president, Mr. Matthew Troster, was examined by me and

20  by Mr. Lippe and Mr. Olson, I believe, in the summer of

21  2012, before my complaint and intervention was filed.

22      A.   Yes, sir, I recall.

23      Q.   And he provided this spreadsheet reflecting

24  transactions involving the sales of Green Auto stock by

25  the Barclay Group to the individuals named in this

1  document, and the first entry is on June 20, 2011.  Do

2  you see that?

3       A.   Yes, sir, I do.

4       Q.   Okay.  So do you still believe that the

5  individual stock sales -- or you still not believe that

6  the stock sales started in June of 2011?

7       A.   I believe that's correct.  I thought I

8  overheard you say a different year.

9       Q.   Oh, okay.  Now, June 2011 and, according to

10 this, this spreadsheet, the last transaction that is

11 listed is January 4, 2012.  Do you see that?

12      A.   Yes, sir.

13      Q.   This ledger also shows a total amount received

14 through those sales, under the amount received column;

15 do you see that?  If you take a look at the very last

16 page of this document, it is in the first column.  It is

17 hard to deal with but -- (Inaudible) unwieldy.  Take a

18 look at the very last page.  It is almost all blank,

19 except there are numbers right at the top.

20      A.   Yes, I see it.

21      Q.   If you follow those columns to the beginning,

22 the headings aren't on the last page, but if you follow

23 those columns from the beginning, you will see that is

24 the amount received.  Do you see that?

25      A.   Yes, I see that.

1      Q.   And so the total amount received by the Barclay

2   Group through these sales is $2,839,857; is that right?

3      A.   Well, unfortunately, that is not exactly

4   correct.

5      Q.   Well, that is, in fact, the price at which the

6   Barclay Group sold the shares, right?  I am not saying

7   that all the cash went into Barclay Group's hands, but I

8   am saying that is the gross amount that the stock was

9   sold for, correct?

10      A.   Yes, sir, that's correct.  That was the gross

11   amount that the transfer agent received, not the Barclay

12   Group.

13      Q.   But the transfer agent received it on behalf of

14   the Barclay Group for the sales of Barclay Group stock,

15   correct?

16      A.   Correct, but it went to the transfer agent's

17   account, acting as the escrow for the Barclay Group,

18   yes, sir.

19      Q.   And then the moneys were disbursed on each

20   transaction, per your instructions, correct, your or

21   Mr. Baxter's or someone working for you, their

22   instructions, right?

23      A.   They were instructions that were discussed with

24   Mr. Brown, and then instructions were written by either

25   Mr. Baxter or Mr. Parsley or maybe even myself.

1     Q.   But they all came on instructions from someone

2   acting on behalf of the Barclay Group?

3     A.   Yes, sir, that's correct.

4     Q.   Okay.  Now, I want you to take a look at

5   Exhibit 47.  This is similar to the last exhibit we were

6   just looking at.  This is a ledger that was prepared,

7   and I will so represent from Mr. Troster's examination,

8   this is an Old Monmouth business record reflecting sales

9   of stock, of Green Auto stock, owned by Daptco Trust,

10   that were sold through Old Monmouth acting as stock

11   transfer agent and escrow agent.  You understand that

12   sales of stock of Green Auto owned by Daptco Trust were

13   sold in that manner?

14     A.   Yes, sir.

15     Q.   And does this spreadsheet reflect -- well,

16   first of all, I think you earlier testified that the

17   trustee of Daptco Trust is your brother?

18     A.   That's correct.

19     Q.   But instructions with respect to the sales

20   reflected on Exhibit 47 were sent to Old Monmouth by the

21   Barclay Group on behalf of the trust; is that right?

22     A.   Yes, sir, the trust would sign off, and then we

23   would forward their instructions to the transfer agent.

24     Q.   And the total amount of the sales and the

25   moneys received by the escrow agent with respect to

1    sales of Green Auto stock owned by the Daptco Trust, was

2    $211,205; is that right?

3         A.   Yes, sir, that's what it shows.

4         Q.   Okay.  And then some portion of that amount

5    went towards payment of the $500,000 note that was

6    payable to the Barclay Group; is that right?

7         A.   That's correct.

8         Q.   Do you recall about how much was paid?

9         A.   I am sorry.  I don't.

10        Q.   Is there -- but you are saying that all the

11   payments that the Barclay Group will ever receive have

12   been received and that the balance of the note has been

13   written off; is that your testimony?

14        A.   That's correct, yes, sir.

15        Q.   And tell me again why the Barclay Group wrote

16   off the balance of the note?

17        A.   There was no further market left to sell the

18   stock, and subsequently the selling groups were not able

19   to move the stock, so it became an illiquid transaction,

20   and Daptco was unable to pay the balance, so we, as any

21   business owner, wrote the difference off.

22        Q.   But, even though the note says absolutely

23   nothing about the sales of Green Auto stock as being the

24   sole source of payment on the note, you wrote the note

25   off?

1     A.   I will have to check with the accounting at

2 that time, but there was discussions regarding how it

3 was handled at the very end.

4     Q.   Okay.  I have one more ledger to show you.  It

5 is Exhibit 50.  This is similar to the first two ledgers

6 we looked at, Mr. Comu, and this is a ledger that was

7 prepared with respect to sales of Green Auto stock held

8 by TKY Trust.  Do you see that?

9     A.   Yes, sir.

10     Q.   And this, again, was stock sale transactions

11 that were done, with Old Monmouth acting as transfer

12 agent and escrow agent and conducting sales of stock to

13 private individuals in accordance with instructions they

14 had received from the Barclay Group, after

15 authorization, you say, from TKY Trust; is that correct?

16     A.   That was a long question.  Sorry, Mr. Elmquist,

17 if you can repeat that.

18     Q.   Let me break it down.

19     A.   Thank you.

20     Q.   So first of all, this, like other transactions,

21 were being handled by Old Monmouth as escrow agent and

22 stock transfer agent?

23     A.   That's correct.

24     Q.   And sales were made to individuals as reflected

25 on this spreadsheet of Green Auto stock held by TKY

1    Trust, correct?

2        A.    That is correct.

3        Q.    And the stock was sold in the gross sum of

4    1,033,882.95; is that right?

5        A.    That was the gross amount, yes, sir.

6        Q.    Okay.  And some portion of that sum went

7    towards payment of the TKY Trust $500,000 note; is that

8    right?

9        A.    That is correct, yes, sir.

10       Q.    Do you know how much went towards the payment

11   of that note?

12       A.    I do not know offhand.

13       Q.    Are there some records that would reflect that?

14       A.    I believe they were provided through the

15   disclosure requirements you requested.  I believe I saw

16   a two- or three-page document.

17       Q.    So the information we received with respect to

18   the payments made on the notes is all the payments that

19   have or ever will be made; is that right?

20       A.    To the best of my recollection, yes, sir.

21       Q.    Because the notes -- because this note, the TKY

22   Trust note, $500,000 note, has likewise been written

23   off?

24       A.    Whatever balance of the 500,000, less the

25   payments we received, would have been written off, yes,

1  sir.

2      Q.   Okay.

3      Q.   Mr. Comu, as of today what are the assets of

4  the Barclay Group?

5      A.   I am sorry.  I don't know offhand.  I could

6  certainly try to find you a financial report.

7      Q.   Can you describe, in general terms, what the

8  Barclay Group owns?

9      A.   We may hold equity in companies.

10     Q.   Do you still own Green Auto stock?

11     A.   I believe we do, yes, sir.

12     Q.   Do you know how much?

13     A.   I am sorry.  I do not have an exact number.

14     Q.   All right.  You have a claim in a pending -- I

15  say, not you, but Barclay Group has a claim in a pending

16  stockbroker insolvency proceeding; is that right?

17     A.   That is correct.

18     Q.   And that is based upon what they commonly call

19  Westor Capital?

20     A.   That's correct.

21          MR. ELMQUIST:  And Westor Capital has a

22  case pending which, Your Honor, is reflected in

23  Trustee's Exhibit 950, under Case Number 13-1331.

24     Q.   Why don't you take a look at that, Mr. Comu?

25  Are you there?

1      A.   Yes, sir.

2      Q.   Do you recognize Exhibit 90 as being a claim

3  form that you completed and submitted in the Westor

4  proceeding on behalf of the Barclay Group?

5      A.   Yes, sir.

6      Q.   And in that claim you are indicating that

7  Westor owes the Barclay Group 37,993.84.  What does that

8  pertain to?

9      A.   I believe that pertains to our first initial

10  sale of our free trading position in Green Auto stock,

11  and I believe that was at the beginning of 2013.  I am

12  not certain exact date.

13      Q.   So the Barclay Group sold to -- or opened a

14  brokerage account with Westor?

15      A.   That's correct.

16      Q.   And Westor was supposed to sell -- well, how

17  many shares of stock were delivered or put into the

18  Barclay Group account with Westor?

19      A.   I am guessing one million shares.

20      Q.   Does the claim reflect -- well, there is two

21  portions of the claim, right, a money amount and then

22  the stock that it received, right?

23      A.   The securities, yes, sir.

24      Q.   And those securities are Green Auto --

25  certificates for Green Auto shares, right?

1      A.    Free trading shares, yes, sir.

2      Q.    How many free trading shares are shown on the

3  claim form that you submitted?

4      A.    On this Document, 991,900.

5      Q.    So those are -- That is 9919 -- say the number

6  again.

7      A.    991,900.

8      Q.    Okay.  So those shares are shares that were

9  issued to the Barclay Group and are now in the

10  possession of the Westor Liquidating Trust (Inaudible)?

11      A.    That's my understanding.

12      Q.    And have you heard anything about that, from

13  the standpoint of what recovery might be received by the

14  Barclay Group, with respect to the shares or the money

15  that Westor is holding?

16      A.    I have written them email correspondence and

17  copied my attorney, asking them when the funds and the

18  securities would be returned, and I have requested they

19  be returned to Mr. Olson's office pending further

20  discussions about this case.

21            MR. ELMQUIST:  All right.  Your Honor, I am

22  about to wrap it up here, but I lost track of a couple

23  of exhibits I need to locate, them being the Barclay

24  Group tax returns.  I had them marked but now I am not

25  finding them.

1              (Inaudible discussion)

2      Q.   Okay.  Here we go.  I found them already.

3  Excuse me.

4              Okay.  Mr. Comu, again, in the notebooks in

5  front of you there, I would like you to take a look

6  at -- Let's start with Trustee's Exhibit 16.  Confirm

7  for me that this is the copy of the 2008 -- I am asking

8  about Trustee's Exhibit 16, and I am asking you to

9  confirm that this is a copy of the tax return that you

10  authorized be filed on behalf of the Barclay Group for

11  that year.

12     A.   It appears to be, yes.

13     Q.   Okay.  And this return reflects total taxable

14  income of $71 at Line 30, right?

15     A.   Yes.

16     Q.   Now, if you will flip to Exhibit 17, we see

17  gross income of $209,930 and a loss for the year of

18  $37,139.  Do you see that?

19     A.   Yes, I do.

20     Q.   Now, we jump to 2010, and this would have been

21  the year that the Barclay Group received the 31 million

22  shares of Ganas or Green Auto stock, and we have gross

23  receipts or sales of 2,366,775, right?

24     A.   Yes, sir.

25     Q.   But you are also showing $2,307,779 in -- I am

1  sorry, looking at the wrong line, $2,324,571 in

2  deductions; is that right?

3       A.   That's what it shows, yes, sir.

4       Q.   If you will turn to the fourth page from the

5  back that is entitled Federal Supporting Statements,

6  Form 1120, Page One, let me know when you are there.

7       A.   I am here.

8       Q.   It shows consulting fees paid of $2,137,733.

9  Do you see that?

10      A.   Yes, I do.

11      Q.   I asked you if the Barclay Group issued -- I

12  asked your tax accountant if any 1099s were issued with

13  respect to the fees that were paid, and he said, no,

14  there is no record of to whom these consulting fees were

15  paid to.  Is that your understanding?

16      A.   I can't verify that.  I have a chief financial

17  officer, a controller and an accountant, so usually one

18  of those people should be responsible for 1099s.

19      Q.   I have examined all three of them, and no one

20  can tell me --

21      A.   All right.

22      Q.   -- who received this $2,137,000.  So as we sit

23  here today, can you tell the Court who testified that

24  $2 million in consulting fees?

25      A.   I can't tell you specifically, but I can tell

Case 10-03269-sgj Doc 186 Filed 10/22/14   Entered 10/22/14 13:48:03   Page 175 of 249
Case 3:14-cv-04163-B   Document 1-8   Filed 11/21/14   Page 68 of 264   PageID 1849
175

1    you where to look to find that information.

2         Q.   Tell me in general terms who you think all that

3    money went to.

4         A.   The selling agents that were selling the Green

5    Auto stock through Old Monmouth transfer agent.

6         Q.   Okay.  How much of that two million did you

7    receive, either directly or through a company you own?

8         A.   I believe zero is the answer.

9         Q.   You believe zero?

10        A.   Yes, sir.

11        Q.   Okay.

12        A.   I had nothing to do with any of the selling

13   agents.  I did not participate in any of their fees.

14        Q.   Now, wait a minute, Mr. Comu.  We can get into

15   the specific documents, and we will, I guess, in closing

16   if we need to.  But the transactional records I have

17   seen shows the Barclay Group receiving payments on every

18   one of those transaction, just not for full gross

19   proceeds, correct?

20        A.   I believe you asked me if I, CJ Como, received

21   any of those payments, and the answer is, no, sir, I did

22   not.

23        Q.   Okay.  But the Barclay Group received in that

24   year -- You don't believve this figure of

25   two-million-three-thirty-six is inaccurate with respect

1  to income received, do you?

2       A.   No, sir, that figure is correct.

3       Q.   But what you are saying is the lion's share of

4  the consulting fees that were paid were paid to these

5  facilitators that handled the sales or located the

6  persons to sell the Green Auto stock to?

7       A.   That's correct, and I was not part of that.

8       Q.   This is like Worldwide Auric and those other

9  companies?

10      A.   That is correct.

11      Q.   Okay.  Getting back to the question I was

12  asking earlier, we have got a claim -- the Barclay Group

13  has a claim in the Westor liquidation proceeding for the

14  stock, Green Auto stock, that is being held by the

15  liquidating trustee and the $37,000 for stock sold,

16  correct?

17      A.   Yes, sir.

18      Q.   What other significant assets come to mind in

19  terms of property that the Barclay Group owns today?

20      A.   I believe we have securities and perhaps a

21  variety of company transactions that are potentially

22  illiquid.

23      Q.   Does it have any cash in the bank?

24      A.   It has some cash in the bank.

25      Q.   Let me ask you this:  Are you actively doing

1  business these days by and through the Barclay Group, or

2  are you conducting business transactions principally

3  through Regus Advisors or some other investment company?

4       A.   We are maintaining Regus Advisors as our

5  primary operating business for financial restructuring

6  and advisory work, but we are keeping the Barclay Group

7  open, because it has been open as a corporation for over

8  ten years now.

9       Q.   But from the standpoint of ongoing business

10 activities, essentially dormant, is that right?

11      A.   For basically operating business these days,

12 yes, the (Inaudible) Group has very little business it

13 is operating in.

14      Q.   All right.  One last area of questioning, Mr.

15 Comu.  Your wife, Phyllis, has received a number of

16 payments from the Barclay Group and Sunset Pacific, and

17 her testimony, when I examined her, she indicated that

18 that was in payment of compensation for administrative

19 services?

20      A.   That's correct.

21      Q.   What types of administrative services had to be

22 done for Sunset Pacific when it wasn't conducting

23 business?

24      A.   Well, Sunset Pacific was looking for

25 opportunities, and part of her role and responsibility

1  in Dallas is she interacts with a lot of very affluent

2  people, and sometimes opportunities come her way, and

3  that is part of the business development that she

4  conducted.

5      Q.   So the administrative work was basically

6  socializing with her friends?

7      A.   I wouldn't say that.

8      Q.   Sounds like what you said.  All right.  Now,

9  what about the Barclay Group; what administrative work

10  did she do for Barclay Group?

11      A.   Well, I wouldn't call it administrative.  I

12  would call it business development.  Once again, her

13  circle of affluent people involve very, very, very

14  wealthy people, and she comes across people that may be

15  looking to buy a business or looking to sell a business,

16  and she will bring those referrals to our firm.

17      Q.   Mr. Comu, the Barclay Group has -- The money

18  that the Barclay Group has had from time to time in its

19  bank account has been used to pay personal living

20  expenses for you and your wife, correct?

21      A.   I would have to see what check you are

22  referring to, sir.

23      Q.   All right.  Well, let me direct you to one --

24  Let me tell you about it, see if you recall it, and then

25  we will get the document up if you need to see it.  Back

1    in February of 2009 the Barclay Group was paying taxes

2    on the house you are living in, $7,000.  Do you have any

3    recollection of that?

4         A.   I do not.

5         Q.   What was -- From the filing of this case to the

6    present, what has been your principal source of income

7    to pay living expenses?

8         A.   Well, I draw a compensation from Regus

9    Advisors.

10        Q.   What about from the Barclay Group; do you

11   receive compensation from the Barclay Group?

12        A.   I take compensation as it is appropriate.  I

13   may take it out in the form of a loan and maybe take it

14   out in the form of fees.  It may be taken out in the

15   form of expenses for travel and for business.  It just

16   depends.

17        Q.   Speaking of loans, other than these three

18   promissory notes we have been talking about, are there

19   any other debts in the way of loans, promissory notes,

20   whatever, that are payable to the Barclay Group by

21   anyone?

22        A.   I would have to really look at the financials.

23   I am not certain.  I can't recall off the top of my

24   head.

25              MR. ELMQUIST:  All right.  I am going to

```
 1   pass the witness?

 2              THE COURT:  Mr. Olson?

 3              MR. OLSON:  I will reserve my questions.  I

 4   don't know if the plaintiffs have any more.

 5              THE COURT:  Well, they only get to go again

 6   if you go.

 7              MR. OLSON:  I am not going to go until our

 8   case in chief.

 9              THE COURT:  All right.  Well, you will have

10   a chance to cross examine when he does his direct.

11              Before you take a seat, Mr. Comu, I have a

12   couple of questions that I want some clarification on.

13   There were questions about the Turkish Bank account that

14   you personally had --

15              THE WITNESS:  Yes, ma'am.

16              THE COURT -- that is not on the bankruptcy

17   schedules.  I just wanted to clarify when that was

18   disclosed to the bankruptcy trustee.

19              THE WITNESS:  Your Honor, I believe when I

20   had my deposition taken, I think it was November

21   of 2013, and that question was asked to me.  It actually

22   triggered a memory that I had this account sitting there

23   that I very rarely use, if ever, and I only use it to

24   exchange money currency when I visit Turkey, and I just

25   completely forgot that I had it sitting there.  And I
```

1  told Mr. Olson right away.

2          I asked for my brother in Istanbul to get a

3  copy of it, because I had never seen a copy of the

4  statement, and I provided that to Mr. Olson, awaiting

5  instructions on what I should do next.

6          THE COURT:  Okay.  So in connection with

7  this particular adversary proceeding you were being

8  deposed in November 2013, and you got a question, and

9  that prompted you to reveal this bank account; is that

10  correct?

11          THE WITNESS:  Yes, ma'am, that's correct.

12          THE COURT:  Now, why would your brother

13  have information concerning this account?

14          THE WITNESS:  Because his office was used

15  as the mailing address.  I never received a statement

16  from there.  And I asked him to look into it for me, and

17  he found a statement, and he goes, "Here it is."

18          THE COURT:  All right.  How do we know how

19  much money it had on December 31st, 2009?

20          THE WITNESS:  I asked them to go back and

21  pull the oldest records they could, and whatever records

22  I gave to Mr. Olson.  I asked for my brother's office to

23  contact the bank and pull as old records as they could

24  find, and whatever the oldest records I could find I

25  produced and gave to Mr. Olson.

1        THE COURT:  All right.  Does the Trustee

2   now have bank account statements from December -- well,

3   we don't know.  You said whatever the oldest is?

4        THE WITNESS:  Right.  I don't believe there

5   was any activity in the account, except when I opened

6   it.  I am guessing that it was $5,000 when the account

7   was opened, and I have never made a withdrawal or a

8   deposit.  It just sat there, so that when I go to

9   Turkey -- you have to have a bank to do currency

10  conversion into local currency.  You can't just walk

11  into a bank.  You have to have an account.  Otherwise

12  they won't convert currency at par, without a premium.

13  So I just forgot that I had opened that account.  I

14  don't even know what year.

15       MR. ELMQUIST:  Your Honor, some months ago,

16  I guess about the time of this deposition, Mr. Olson

17  sent me a document reflecting the account statement.  I

18  don't recall the date of the statement.

19       MR. OLSON:  What we got was the balance in

20  the account in US dollars on three different dates, the

21  petition date and the date of the last banking day, and

22  there was a third date in there, and I don't remember

23  now if that was the date of the filing of the adversary

24  or the date of the deposition, but that is what we were

25  talking about over here.  We will find that document,

1   but the trustee knows the balance in that account, and

2   it has not changed except maybe for conversion rates.

3            THE COURT:  Well, you have seen it on three

4   different dates, it sounds like, seen the balance on

5   three different --

6            MR. OLSON:  We have provided the trustee

7   the balance for three dates, yes.

8            THE COURT:  Okay.

9            MS. HANKS:  Did you guys forward that

10  document to us?

11           Your Honor, this account was discovered in

12  the course of some pretty expensive electronic

13  discovery, is what actually exposed a great deal of what

14  we learned in the course of this adversary, and that

15  question came from the plaintiffs, not in the trustee's

16  exam.  When the trustee had asked the debtor about

17  foreign accounts, he always answered no, but when faced

18  with a document presenting his interaction with the

19  bank, he admitted it, and we still haven't seen any

20  records whatsoever reflecting that bank account or the

21  assets in it.

22           THE COURT:  Why is that, Mr. Olson?

23           MR. OLSON:  I think we sent that to Charlie

24  Floyd, just like the amended tax return and the

25  Continental payments, but I will find what we obtained

1    and what we forwarded.

2              THE COURT:  All right.  Well, that is mind

3    boggling to me, and if we have to allow further

4    examination after the plaintiffs have seen documents, we

5    will permit that.

6              Okay.  Let me jump to something else.  This

7    may be just idle curiosity more than anything else, but

8    Green Auto, what happened to the Chinese electric

9    concept?

10             THE WITNESS:  Unfortunately, the company

11   was unable to obtain its US EPA and DOT inspection

12   certificate, which would allow it to be sold in the

13   United States as the first Chinese electric car in

14   America.  And I believe there was some political

15   influences causing them not to get the certification.

16   And subsequently the company has shifted gears, but it

17   is an exceptional (Inaudible).  It is just sad that it

18   is not running on the streets of Dallas, which I used to

19   drive.

20             THE COURT:  So there was never, never the

21   ability to market in the US this car?

22             THE WITNESS:  Well, they worked on it for

23   almost two years.  There was an enormous amount of work

24   and investment that the company had to make to obtain

25   the certification, but they brought probably 40 or a

1  hundred cars to the United States, and they were used

2  for demo, crash testing, publicity.  There was a lot of

3  work the company did.

4          THE COURT:  How much money did Green Auto

5  get?  The entity, how much money did it actually get?

6          THE WITNESS:  From who?

7          THE COURT:  From investors.

8          THE WITNESS:  I don't know the exact

9  amount.  I know the company has done several different

10  rounds of private financing outside of our efforts, so I

11  don't know the exact amount of paid in capital.

12          THE COURT:  Just your efforts, how much of

13  your efforts -- what have your efforts generated for the

14  company?

15          THE WITNESS:  I believe we provided almost

16  over a million dollars in paid-in capital, in equity.

17          THE COURT:  Okay.  So I was looking at

18  these numbers of the Monmouth stock ledger.

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  I have to go back to my notes.

21  2,839,000 shown that Monmouth sold to TBG, the Barclay

22  Group, Green Auto shares.  2,839,000 is what was

23  received, and another 211,000 was received that the

24  Daptco owned Green Auto shares, and then another

25  1,033,882 received for the TKY Trust Green Auto shares,

1  and that is over $4 million right there.

2                THE WITNESS:  That's correct.

3                THE COURT:  Where did that money go?

4                THE WITNESS:  Well, the $4 million gross

5  went to the transfer agent, and that was sale of

6  restricted stock at a deep discount to accredited

7  investors, of which approximately $200,000 -- sorry,

8  20 percent of that came back to the Barclay Group with

9  respect to its selling agency.  But that was to stock

10 that the Barclay Group owned, not the stock that Green

11 Automotive owned.  Green Automotive sold their stock

12 through a registered offering memorandum to

13 institutional investors.

14               THE COURT:  All right.  Well, what I guess

15 I am getting at is:  These people buying Green Auto

16 stock, do they not have an expect -- well, I guess you

17 are -- do they have an expectation their money is being

18 invested in Green Auto?

19               THE WITNESS:  No, their money is not going

20 to Green Auto.  It is going to the transfer agent who is

21 selling the shares of the Barclay Group that is fully

22 disclosed in advance, but they are buying the shares at

23 a discount from us, instead of buying it at the market

24 from the company.

25               THE COURT:  The Barclay Group gave what to

1    the Green Auto entity?

2                    THE WITNESS:  We have two separate

3    transactions.  We, acting as the investment banking

4    advisor group, put the transaction together and had

5    separate group of investors invest directly in Green

6    Auto, the company, thus a separate transaction.

7    Simultaneously the Barclay Group had its own shares that

8    we owned in Green Auto, which we are free to sell to

9    anybody that we want, and several selling groups lined

10   up to sell those shares directly to their clients at a

11   discount.  So two separate transactions.  Funds were

12   going to Green Auto, and then shares that we owned free

13   and clear that we were able to dispose of at whatever

14   price or negotiation that we chose to do.

15                   THE COURT:  It just seems like a lot of

16   people got a lot of money, except Green Auto didn't get

17   that much money, and its products never got off the

18   ground in the US.  What am I missing?

19                   THE WITNESS:  You are not missing anything

20   at all.  Investors speculate in penny stocks by trying

21   to buy them at a discount to bet --

22                   THE COURT:  When did things go off the rail

23   with Green Auto?

24                   THE WITNESS:  Well, their company is still

25   moving, and they did three million shares they traded

 1   yesterday.  They are making great announcements.  Their

 2   website is thriving.

 3                    THE COURT:  I am wondering what is

 4   happening with the product.  A lot of investors are

 5   investing in this, but what is happening with the

 6   product?

 7                    THE WITNESS:  That's correct.  I am one of

 8   those shareholders, and we are also concerned that we

 9   can't seem to get these electric cars out on the road,

10   like Tesla and the Nissan and the Mitsubishi.

11                    THE COURT:  I know all about Tesla and

12   Nissan.

13                    THE WITNESS:  Right, right.

14                    THE COURT:  Tesla is going bankrupt

15   actually.

16                    THE WITNESS:  It sure is.  The stock is the

17   success story of Wall Street.

18                    THE COURT:  I am talking about the product.

19                    THE WITNESS:  The car is an exceptional

20   car.

21                    THE COURT:  I have seen Teslas driving down

22   the street.

23                    THE WITNESS:  Exceptional car.

24                    THE COURT:  Okay.  Let me ask:  Do I

25   understand you are the only member of the board of

1  directors at Barclay Group?

2              THE WITNESS:  Mr. Brown is the controlling

3  shareholder, and I believe I am the sole director.

4              THE COURT:  So I guess it is fair to say

5  there aren't really board meetings, because you are the

6  only person to meet with?

7              THE WITNESS:  Well, I report to Mr. Brown

8  and advise him and seek his approval before I do

9  anything that would change the capital structure of the

10  company.

11              THE COURT:  All right.  Is there a

12  corporate document anywhere?

13              THE WITNESS:  If I have it, I believe it

14  may have been turned over to the Trustee, the binder.

15              THE COURT:  You don't know, yes or no?

16              THE WITNESS:  I am not certain.  The

17  company was started back in the late '90s.

18              THE COURT:  Okay.  Well, are minutes of

19  your meetings with Mr. Brown kept?

20              THE WITNESS:  Only ones that are relevant

21  to have recorded as a board minute, yes, but otherwise

22  they are just conversations.

23              THE COURT:  Who keeps those minutes?

24              THE WITNESS:  I would presume I would have

25  them.

1        THE COURT:  But, yes or no, do you

2   actually keep minutes?

3        THE WITNESS:  Oh, yes, I would.  I would

4   keep whatever minutes that we were supposed to have,

5   yes.

6        THE COURT:  Do you write them; do you type

7   them?

8        THE WITNESS:  Probably both, it depends on

9   the circumstance.

10        THE COURT:  Okay.  Again, where are they?

11        THE WITNESS:  They would be in our office.

12        THE COURT:  Your office.  Well, were they

13   subject to the document request?

14        THE WITNESS:  Oh, yeah.

15        MR. ELMQUIST:  They were, Your Honor,

16   absolutely.  There were no minutes.

17        THE COURT:  Okay.  So --

18        THE WITNESS:  Whatever they were, we would

19   have disclosed.  I don't have ready access to the file.

20   I have not looked in it in a long time.

21        THE COURT:  You got a document request --

22        THE WITNESS:  Absolutely, yes, ma'am.

23        THE COURT:  -- to produce them?

24        THE WITNESS:  Yes, ma'am.

25        THE COURT:  And they are saying you didn't

 1  produce them, or do they exist or not?

 2              THE WITNESS:  If they existed, I would have

 3  produced and delivered them, but I can't locate them.

 4              THE COURT:  They didn't get them, so is it

 5  fair to assume they don't exist?

 6              THE WITNESS:  I am sorry, Your Honor.  I

 7  don't have the answer, because if I had the documents, I

 8  would turn them over.  I don't really readily know

 9  exactly where they are.  I know where my files are, like

10  for record business keeping, but I would have to look to

11  see if there is anything that I haven't produced for the

12  Court.

13              THE COURT:  Where would they be?

14              THE WITNESS:  In my office in Dallas,

15  Texas.

16              UNIDENTIFIED MAN:  Unbelievable.

17              THE COURT:  In a file cabinet, on a shelf,

18  in a file on your desk?

19              THE WITNESS:  Probably in a file cabinet,

20  yes, ma'am, in a file cabinet, I am guessing.  As I

21  said, I have not looked for any Barclay Group related

22  documents except for financial information.

23              THE COURT:  But they requested them in

24  connection with --

25              THE WITNESS:  And I gave whatever I had,

1    Your Honor.  I gave whatever I had.

2                   THE COURT:  Okay.  You have shareholder

3    consent for different actions taken by Barclay?

4                   THE WITNESS:  We have not used a

5    shareholder consent at all, except for the share

6    exchange done in 2006, I believe.

7                   THE COURT:  All right.  You are excused

8    from the witness stand for now.

9                   MR. ELMQUIST:  In light of your questions,

10   can I ask a couple of questions?

11                  THE COURT:  Well, I guess I should allow

12   redirect from any lawyer who has some follow-up on my --

13                  MR. ELMQUIST:  Only because I think you

14   have been left with a misunderstanding or misimpression

15   about Green Auto.

16                       REDIRECT EXAMINATION

17   Of CJ Comu by Mr. Elmquist:

18       Q.   Is Green Auto right now engaged in another

19   business line?

20       A.   Is Green Auto engaged in a different business

21   line?

22       Q.   Yes.

23       A.   It appears to be, from the press releases that

24   I have read.

25       Q.   They are trying to sell and market green buses,

1  right?

2      A.   I believe they are bringing electric buses

3  right now, yes.

4      Q.   And based upon press reports, they seem to be

5  having some success in them?

6      A.   They show some record of sales is what they are

7  reporting.

8      Q.   Did I not, on behalf of the Trustee, request

9  all of the business records, all the minutes, everything

10  conceivable related to corporate business activities and

11  affairs of the Barclay Group?

12      A.   Absolutely, yes, you did.

13      Q.   And you believe you turned over everything that

14  you could find relating to the Barclay Group?

15      A.   Absolutely, yes, sir, I did.

16          MR. ELMQUIST:  I can tell the Court, as an

17  officer of the Court, I did not receive one board

18  minute.  There is no minutes of board meetings.  There

19  is no minutes of meetings of shareholders, directors,

20  nothing.  The corporate book is empty with respect to

21  the recording of any kinds of meetings.

22          THE COURT:  All right.  Anyone else have a

23  redirect on the Court's questions, just follow-up on the

24  Court's questions, if any?

25          MS. HANKS:  I don't, Your Honor.  I did

1   want to -- Given the Court's questions, I would like to

2   refer you to a couple of our exhibits which have some of

3   the more current Green Auto financial disclosures, which

4   do describe the business.

5              THE COURT:  Okay.  What exhibits are those?

6              MS. HANKS:  Exhibits -- there is a -- well,

7   they span the relevant time period, to give you some

8   context.  It is KLM Exhibit 149.  That is one of the

9   pink sheet disclosures from the end of 2009.

10              THE COURT:  Okay.

11              MS. HANKS:  Then there is Exhibit 150,

12  which is Green Auto's form 10K from December 31, 2012.

13              THE COURT:  Okay.

14              MS. HANKS:  And 151 which is their 10Q from

15  March 31st, 2013.

16              THE COURT:  All right.  Thank you so much.

17              All right.  Mr. Comu, you are excused for

18  now.  It sounds like you are going to be recalled

19  tomorrow or Friday.

20              We will take a ten minute break, and then

21  you are going to call Ms. Comu?

22              MR. VITAL:  Ms. Comu, yes, ma'am.

23              THE COURT:  All right.  Ten minutes.

24              (Recess from 3:48 to 4:02)

25              THE COURT:  All right.  Please be seated.

```
 1   Back on the record in King Louie Mining versus Comu.
 2   Plaintiffs may call your next witness.
 3                 MR. VITAL:  Yes, Your Honor, plaintiffs
 4   call Phyllis Comu.
 5                 THE COURT:  All right.  Ms. Comu, we need
 6   you to come to the witness stand and raise your right
 7   hand.  The court recorder will swear you in.
 8                 (Witness sworn.)
 9                 MR. VITAL:  May I proceed, Your Honor?
10                 THE COURT:  You may.
11                 MR. VITAL:  Thank you kindly.
12                     PHYLLIS COMU,
13   Having been duly sworn, testified as follows:
14                   DIRECT EXAMINATION
15   By Mr. Vital as follows:
16       Q.   Ms. Comu, we have never met before?
17       A.   Hello.
18       Q.   Hello.  Do you recall when your husband filed
19   his bankruptcy case?
20       A.   Yes.
21       Q.   That was December 2009?
22       A.   Yes.
23       Q.   As you recall?
24       A.   Yes.
25       Q.   Now, at the time or during the month or in that
```

1  same month when he filed that bankruptcy case, you and

2  your husband actually took a cruise; is that correct?

3       A.   Yes, sir.

4       Q.   Do you recall where you all went?

5       A.   No.

6       Q.   Was it to the Caribbean somewhere?

7       A.   Uh-huh.

8       Q.   You have to say yes.

9       A.   Yes.  I don't remember specific destinations

10  but, yes, Caribbean.

11       Q.   And the reason I said you have to say yes is

12  because we have to take down verbal answers.  I

13  understood what you were saying just fine.

14       A.   Yes, sir.

15       Q.   Do you recall how that trip was paid for?

16       A.   We put it on a credit card.

17       Q.   Was it an American Express card, right?

18       A.   Probably.

19       Q.   And is it correct or fair, if you know -- if

20  you don't, you can tell me that -- the American Express

21  card that was used to pay for that trip was not

22  disclosed to this bankruptcy court?

23       A.   I do not know.

24       Q.   Okay.  How much money did you all spend on that

25  credit card during that trip?

1       A.   I can't recall.

2       Q.   A hundred dollars?

3       A.   I do not know.

4       Q.   Could it have been 5,000, 10,000?

5       A.   What was the question, what we paid for the

6    cruise?

7       Q.   How much money you spent during the trip.

8       A.   I am uncertain.  It was a long time ago.

9       Q.   Have you seen the bankruptcy schedules and the

10   statement of financial affairs in this case?

11      A.   I am not sure what those are.

12      Q.   Okay.  Oh, I see.  It's the one with the

13   magnifying glass with the plus symbol.

14            THE COURT:  Tricky that way, isn't it?

15            MR. VITAL:  My daughter says she can

16   probably operate this machine better than me.

17      Q.   So have you ever seen this document before?

18   This is Trustee Exhibit 95.

19      A.   Not that I recall.

20      Q.   So what I will tell you is that on this

21   document there is income for an employment or operation

22   of business reflected on this document.  Do you see

23   where I just read from?

24      A.   Yes.

25      Q.   And for 2009 it lists, for the debtor, $20,000

1    for 2009 from the Barclay Group.  Do you see that?

2        A.   Yes.

3        Q.   Now, just from your own recollection from 2009,

4    the life-style that you and Mr. Comu lived in 2009 is

5    way in excess of an annual income of $20,000; is that

6    right?

7        A.   I am not sure.

8        Q.   Have you ever said that before, maybe in a

9    deposition or at some point in this case, that you and

10   Mr. Comu lived a lifestyle that was far in excess of the

11   income reflected a year, $20,000?

12       A.   Is that $20,000 a year?

13       Q.   You see it says 2009, $20,000.  Did I read that

14   right, gross income?

15       A.   Yes, uh-huh.

16       Q.   So my question is, understanding that this says

17   2009, $20,000 in gross income, and that is attributable

18   to the Barclay Group, that is not fairly reflective of

19   the lifestyle that you and Mr. Comu lived in 2009, is

20   it?

21       A.   Probably not.  I am not sure.

22       Q.   Okay.  Do you remember giving a deposition in

23   this case?

24       A.   I have had two depositions.

25       Q.   One of the depositions you gave in this case

1    was on August 27th, 2013; is that right?

2        A.   Yes, sir.

3        Q.   Examination by Mr. Hanks?

4        A.   Yes -- no, no.

5        Q.   I didn't mean anything by it.  I was looking at

6    our client.  It was an examination by Ms. Hanks; is that

7    right?

8        A.   Yes.

9        Q.   So what I am going to do, just for everybody's

10   convenience, is I am just going to put this document

11   under here, so everybody can take a look at what I am

12   looking at, and I am going to do the reading here.

13            And there is a question by Ms. Hanks, and

14   she says, "Does it seem right to you that in 2008 your

15   husband grossed $27,693 per year?"

16            And you answered, "I don't know what my

17   husband made that year."

18            Then you were asked -- I am just going to

19   skip down here to the relevant question, Page 102, Line

20   Six, "If CJ's income for the years 2008 and 2009 are

21   between 20,000 and $30,000 per year, do you think that

22   is enough money to sustain the kind of lifestyle that

23   the two of you had in those two years?"

24            And your answer was what?  It is on the

25   screen, Line Ten.

1      A.   I said yes.

2      Q.   No, no, Line Ten.

3      A.   Line Ten?

4           MS. HANKS:   It is not showing up on the

5  screen.

6      Q.   Oh, I am sorry.   It has got the right --

7           MS. HANKS:   There you go.

8      Q.   Look at Line Ten.   Your answer was?

9      A.   No.

10     Q.   And you saw -- I didn't have the question -- I

11 didn't have the question on the Elmo, so you see the

12 question that I just read from, right?

13     A.   Yes, sir.

14     Q.   And your answer to that was no?

15     A.   I was probably just trying to think logically.

16 I don't know where my mind was at at that point.

17     Q.   At this point?

18     A.   No, at that point.

19     Q.   Okay.

20     A.   Or this point.   I have had a rough day.

21     Q.   So but the deposition that you gave, this is a

22 logical question, was closer in time to 2009 than today

23 is; is that correct?

24     A.   Yes, sir.

25     Q.   And you understand that when you gave this

 1  testimony that you were under oath?

 2       A.   Yes, sir.

 3       Q.   And I don't know if it was explained to you,

 4  but the testimony under oath at a deposition has the

 5  same force and effect as if you were testifying to this

 6  Judge, as you are right now?

 7       A.   Yes, sir.

 8       Q.   And you respected that process when you said

 9  no, didn't you, right?

10       A.   Obviously.

11       Q.   Yes, ma'am.  So through the transcript that I

12  just read to you, we actually got an answer, I believe,

13  to the next question, but I will ask it anyway.

14            In 2008, go back to the schedule or the

15  statement of financial affairs, says that the income

16  from employment or operation of business for 2008 was

17  $27,693, and that was attributable to Sun Sports and

18  Entertainment.  Do you see that?

19       A.   Yes, sir.

20       Q.   Now, again, especially in light of the

21  testimony we just saw in your deposition, for the

22  record, as a substantive answer, I am going to ask you

23  that that number is not fairly reflective of the

24  lifestyle that you and Mr. Comu lived in 2008, is it?

25  It is not.

1        A.   I am not sure.

2        Q.   Okay.  But you were sure enough in 2008 to

3   answer no to that question?  Do you see that on the

4   screen?

5        A.   Yes.

6        Q.   Let's take a look at the schedules in this

7   bankruptcy case.  Have you seen Trustee Exhibit 94

8   before today?

9        A.   Possibly.

10        Q.   This document schedules or purports to schedule

11   a lot of information.  The schedule that I would like to

12   take a look at, that is towards the end of this

13   document, and it is a schedule reflecting current

14   income.  Can you see that good enough, or should I

15   expand this and maybe zoom in?  Can you see that?

16        A.   Yes.

17        Q.   All right.  So as of the filing of this

18   bankruptcy case, these schedules purport to reflect an

19   occupation for your husband as management consultant of

20   the Barclay Group.  Do you see that, right there?

21        A.   Uh-huh, yes.

22        Q.   Yes, ma'am.  And for you there is nothing

23   reflected; is that fair?

24        A.   I don't see anything.

25        Q.   Yeah.  So from 2010 did you have employment?

1      A.   Well, I have a company called Karma for Pets.

2   It is pet charms that I sell.  And I did a little bit of

3   business development and charity work.  That's all I

4   have ever done.

5      Q.   So I think you have given testimony in this

6   case that the work for Karma for Pets did not generate

7   any income of any significance; is that right?

8      A.   Correct.

9      Q.   No more than a thousand dollars?

10      A.   It was for fun.

11      Q.   Okay.  And the charity work, I am assuming that

12   that is not for profit, and you are just a volunteer?

13   You are not doing charity work for pay, are you?

14      A.   I am on a few boards and committees and things

15   like that, that nature.

16      Q.   But you don't take a salary for that?

17      A.   No, sir.

18      Q.   That is just volunteer work?

19      A.   Right.

20      Q.   So let's talk about the business development.

21   You said you do business development, and who is that

22   for?

23      A.   Well, I would go to social events and meet

24   people and, you know, refer them to the Barclay Group.

25      Q.   So you are a consultant for the Barclay Group?

1       A.   Not that sophisticated.

2       Q.   So what would you call it?

3       A.   Just meet people who may want to buy or sell a

4  business or affluential (sic) people that are looking to

5  make investments.

6       Q.   And I don't suppose you have -- or I know for a

7  fact, so let me just ask it this way:  You don't have a

8  written agreement or contract for the performance of

9  that work, do you?

10      A.   No, sir.

11      Q.   Okay.  The fact is that you don't have any

12 connection with the Barclay Group regarding the payment

13 of expenses or things of that nature; is that right?

14      A.   Repeat the question.

15      Q.   You don't have any connection with the Barclay

16 Group, for instance, regarding the payment of the

17 expenses or things of that nature for the Barclay Group,

18 do you?

19      A.   I did not write any checks.

20      Q.   Okay.  But you receive checks from the Barclay

21 Group; do you know?

22      A.   I did at one time, yes, sir.

23      Q.   Okay.  We will get to that in a second.  Let me

24 ask you about Sunset Pacific.  Sunset Pacific is an

25 entity.  Is it a limited partnership or general

1   partnership, or do you know?

2       A.   Well, back in 2006, just like my husband said

3   earlier, we made me 98 percent owner, only because we

4   just went to our financial adviser and attorney, and he

5   wanted to make some changes, dissolved our prenuptial

6   agreement, and we did a new will, and we just made some

7   changes and decided I should be 98 percent owner.

8       Q.   I take responsibility for this.  It may have

9   been my question, and so I apologize.  But what I am

10  wanting to know is:  Is it a general partnership or a

11  limited partnership?

12      A.   Limited.

13      Q.   Okay.  And you just talked about a transfer of

14  interest to you; is that correct?

15      A.   Yes.

16      Q.   And what is your position or ownership status

17  within Sunset Pacific?

18      A.   Just to look for investments, it is kind of

19  like just a little holding company, hasn't done much.

20      Q.   Are you a partner?

21      A.   Well, my husband owns one percent, and Marathon

22  Management owns the other one percent, and I am

23  98 percent.

24      Q.   What kind of partner are you?

25      A.   I am not quite sure.

1      Q.    Okay.  Now, this transfer, purported transfer

2  of ownership to you for a partnership, whatever type of

3  partnership that is, was done without you paying any

4  money of any kind; is that right?

5      A.    Correct.

6      Q.    Was it just -- it was just a gift, right?  Is

7  that what your testimony is; it was just a gift to you?

8      A.    Kind of just something for me to do, work on.

9  And incorporate my charity work, socializing with

10  people, kind of connecting people together.

11      Q.    So if you didn't pay for it, that would make it

12  a gift; is that right?

13      A.    I suppose, if you want to call it that.

14      Q.    Tax returns have been asked for in this case.

15  Is it fair that there is no gift tax return for this

16  purported transfer or this purported gift of the

17  98 percent of whatever the partnership interest is to

18  you?

19      A.    Will you repeat the question?

20      Q.    There have been tax returns asked for in this

21  case.  You just testified that you didn't pay anything

22  for the purported transfer of these interests to you.

23  My question is:  Isn't it fair that there is no gift tax

24  return for this purported transfer of the 98 percent

25  interest to you, whatever that partnership interest is?

1      A.   Well, I will say that we do file our taxes.

2      Q.   Is there a gift tax return that perhaps I have

3 missed?

4      A.   I am uncertain of that.  Our accountant files

5 our tax returns.

6      Q.   Do you know why -- or let me ask you this way:

7 You don't know why this purported transfer to you

8 happened, do you?

9      A.   It was a long time ago.  I just know that we

10 talked over with our financial adviser and our attorney,

11 did lots of things, dissolved our prenup, got a will,

12 and then created this new, you know, partnership, if you

13 wanted to call it that.

14      Q.   Let me take you to your deposition testimony so

15 we can see what you said at deposition regarding the

16 transfer of this interest to you.  There was a question

17 and it is here.  I will start here.

18           "Okay.  Is one of the reasons why it is --

19 it's curious to me that the entity was transferred

20 98 percent into your name, and I understand the purpose

21 of it is to make investments, but I guess I still don't

22 understand the reason for that change in 2006, I believe

23 it was, you said; is that right?

24           "Answer:  Uh-huh, yes."

25           Have I read that correctly so far?

1        A.    Yes.

2        Q.    So the next question is -- He was saying speak

3   up, and you did.  "I mean could you elaborate on that?

4   I mean -- I mean is this -- you mention something about

5   a holding company, you know.  Was this -- was this

6   entity -- was this shift in an effort to protect assets

7   from a lawsuit, for example?"

8              And your answer was, "You could ask my

9   husband about that."

10             Did I read that right?

11       A.    Yes, sir.

12       Q.    The answer that you just gave to this Court

13  regarding the conversation with the tax consultant and

14  all of that was not your answer.  Your answer was, "You

15  could ask my husband about that"?  Did I read that

16  right?  Is that what it says right there?

17       A.    Yes, but there was nothing mentioned about

18  taxes in that paragraph.  You brought up taxes just a

19  minute ago.  That is why I brought up our accountant.

20       Q.    So the accountant was which accountant?

21       A.    Al Dahl.

22       Q.    So if there was a gift tax return, that is who

23  we should have seen a gift tax return from Al Dahl?

24       A.    I am not sure that it was given to me as a

25  gift.

1     Q.   But you didn't pay for it, right?

2     A.   I am not knowledgeable enough to answer that

3  question about would I have to pay for something like

4  that.

5     Q.   Well, I mean you either paid for it or you

6  didn't.  Did you pay for it?

7     A.   No, sir.

8     Q.   Okay.  With respect to Sunset Pacific, you

9  don't have an employment agreement, do you?

10    A.   No.

11    Q.   And, in fact, you don't have an official title

12 in Sunset Pacific, do you?

13    A.   No.

14    Q.   You have never seen any corporate filings for

15 this entity that you claim to own 98 percent interest

16 in, have you?

17    A.   What do you mean by corporate filings?

18    Q.   Do you know what a corporate filing is?

19    A.   Not necessarily.

20    Q.   Okay.  That answers my question.  You perform

21 no management functions for Sunset Pacific, do you?

22    A.   No, sir.

23    Q.   In fact, you can't remember the last time you

24 did work for Sunset Pacific, can you?

25    A.   No, I cannot.

1      Q.   Now, Sunset Pacific has something to do with

2  your house on Palladium Drive in Preston Hollow; is that

3  correct?

4      A.   I live in Addison.

5      Q.   So I may have that wrong.  Palladium Drive is

6  in Addison?

7      A.   Yes, sir.

8      Q.   Okay.  Palladium Drive is a house that Sunset

9  Pacific has something to do with?

10          MR. OLSON:  Objection.

11     A.   Not that I know of.

12          THE COURT:  There is an objection.  Just a

13  moment.  What was the objection?

14          MR. OLSON:  It assumes facts not in

15  evidence.

16          THE COURT:  The question again, okay, was

17  whether Sunset Pacific has something to do with

18  Palladium?  That was the question.

19          MR. OLSON:  Yes, Your Honor.

20          THE COURT:  So I overrule the objection.

21     A.   Not when I was married to CJ Comu.  I mean I

22  don't know.

23     Q.   Well, isn't it a fact that checks for rent that

24  are paid by the current tenant are to be paid to Sunset

25  Pacific?

1       A.   No, they are paid to me.

2       Q.   I understand that might be paid to you.  My

3   question is a little different.  My question to you is:

4   Are the checks to be made to Sunset Pacific?

5       A.   The people who lease our home on Palladium make

6   their rent check monthly to Phyllis Comu.

7               MR. VITAL:  Now, Judge, I will be referring

8   to KLM Exhibit 137.

9               THE COURT:  Okay.  (Inaudible) relevancy

10  objection.

11              MR. VITAL:  I am looking to see if that has

12  been resolved.  It has not, Your Honor.

13              THE COURT:  Okay.

14              MR. VITAL:  I assume it is the same

15  relevance objection I can give you --

16              MR. OLSON:  Well, it may be -- I will have

17  to look it up.

18              MR. VITAL:  Okay.

19              MR. OLSON:  The objection is that it is not

20  relevant on the issue of the discharge.  That's right.

21  I was looking to see if this was the tax return, but it

22  is not.  This is the lease.

23              THE COURT:  All right.  This is the lease

24  agreement on the Palladium property dated August 1st,

25  2012.  What is the relevance?

1          MR. VITAL:  The relevance, Your Honor, is

2   that it is part of the continuation of the long-running

3   fraud, bankruptcy fraud, that the plaintiffs commit, I

4   believe, and I think are demonstrating was committed on

5   this Court, and the various schemes and structures that

6   took place from 2009 through the date of this lease

7   demonstrate that this house -- and we are glad to

8   connect this up in closing argument and supplemental

9   briefing, but I think we have already demonstrated that

10  this house at Palladium is able to be rented because of

11  the fraudulent or sham purchase of another home at Oaks

12  North that was paid for by Continental Partnership,

13  purportedly by Cem Comu, but, as we will argue and I

14  hope will demonstrate to this Court, is actually through

15  CJ Comu.

16          Because of that, the use of moneys from the

17  Barclay Group and other sources, particularly and

18  substantially from the Green Auto transaction, during

19  the administration of this bankruptcy case, this debtor

20  and his wife are able to, in essence, make money on this

21  property, which we deem and argue to be property of the

22  estate.

23          So this would particularly be relevant to

24  727(D)(2), because we believe that this property, the

25  rents therefrom, as well as the Continental Partnership

1  owned property are property of the estate that this

2  debtor is concealing through various obfuscation and

3  complex structures.

4              THE COURT:  Mr. Olson?

5              MR. OLSON:  Your Honor, this property is

6  exposed on Schedule A as a homestead.  It is claimed on

7  Schedule C as exempt.  The exemption was allowed.  It is

8  no longer property of the estate, and they can do with

9  it as they please.

10             THE COURT:  I am going to overrule the

11 objection and allow it.

12             MR. VITAL:  So is it admitted, Your Honor,

13 137?

14             THE COURT:  It is admitted, 137.

15             (Plaintiff's Exhibit KLM 137, offered and

16              admitted.)

17             MR. VITAL:  Thank you very kindly.

18    Q.   So 137 is -- KLM 137 is the residential lease

19 agreement, and this is for the Palladium Drive property.

20 Do you see that?

21    A.   Yes.

22    Q.   All right.  Now, on the second page am I

23 reading this correctly, that the place of payment is to

24 the name of Sunset Pacific, LP?

25    A.   Yes, but we changed it.

1    Q.   Okay.  But the document I have says Sunset

2  Pacific, LP; is that right?

3    A.   Yes, sir.

4    Q.   And 18208 Preston Road, Number 9314, is the

5  place of business for Sunset Pacific, LP?

6    A.   Yes, sir.

7    Q.   All right.  Now, the fact is, Ms. Comu, the

8  check is -- the checks for rent at Sunset Pacific are

9  made to you personally, as opposed to Sunset Pacific as

10  an entity, because it is more convenience for you to

11  cash checks in your personal bank account versus having

12  to go to North Dallas Bank to cash a Sunset Pacific

13  check; is that right?

14    A.   Correct.  There is nothing fraudulent about any

15  of this check writing.  I would not participate in

16  something like that.

17         MR. VITAL:  Objection, move to strike

18  everything after the answer yes, Your Honor.

19         THE COURT:  Sustained.

20    Q.   Now, both the -- just so it is clear for the

21  Court, the Sunset Pacific limited partnership entity has

22  has a bank account at North Dallas Bank; is that

23  correct?

24    A.   Yes, sir.

25    Q.   And you, Phyllis Comu, have a personal account

1  at Compass Bank; is that correct?

2      A.  Yes.

3      Q.  But both of those accounts are used for the

4  same thing; are they not?

5      A.  I use Compass all the time.  North Dallas Bank,

6  I have not looked at it in over six months.

7      Q.  That was not my question.  Maybe I can give it

8  to you a little better.  You use both of those accounts

9  for the same thing; is that right?

10     A.  No.

11     Q.  Okay.

12         MR. VITAL:  Your Honor, I am going to be

13 turning to that same deposition that Ms. Hanks took of

14 Ms. Comu.  For opposing counsel, I will be at Page 45.

15         THE COURT:  All right.

16     Q.  Actually I will start at 44, Line 21, where it

17 reads "yes" -- or "I see" -- or Line 18, "I see.  So for

18 you it sounds like it was more convenient to have the

19 checks made out to you directly -- made out directly to

20 you personally and to this Compass account; is that

21 correct?  "

22         Your answer was, "Yes, because if it was

23 made out to Sunset Pacific, I would have to go to North

24 Dallas Bank, make the deposit, then write a check for

25 cash, put it in my checking account or whatever.

1           "Question:  Right."

2      A.   Uh-huh, yes.

3      Q.   Have I read all that right?

4      A.   Yes.

5      Q.   All right.  I will keep going.  Now we are on

6  Page 45, Line One.  Your answer, "I don't use the North

7  Dallas Bank very often."  And, to be fair to you, that

8  is what you just said?

9      A.   Right.

10     Q.   But we will get to why I am reading this in a

11 second:

12          "Question:  Because it is not as

13 convenient?

14          "Answer:  Right.

15          "But if it were convenient for you, would

16 it make much of a difference if you used Sunset or if

17 you used your personal checking account?

18          "Answer:  A difference in what?

19          "Question:  Do you see -- do you use them

20 for the same purposes?

21          "Answer:  Yes.

22          "Same purposes?

23          "Yes."

24          Did I just read that right?

25     A.   Yes, you did.

1    Q.   Okay.  So the same purposes that you use both

2  of these accounts for are for living expenses; is that

3  right?

4    A.   Right now, yes.

5    Q.   When you gave this deposition that was the same

6  answer; is that right?

7    A.   Yes, sir.

8    Q.   In fact, as far as you can remember back in

9  time, the North Dallas bank account and the Compass Bank

10  account have been used by you and Mr. Comu for his

11  benefit and for the same purposes; is that right?

12    A.   Sunset Pacific was supposed to be used

13  initially for investments and in that nature, but then

14  it became more of just a personal checking account

15  through time.

16    Q.   So and I think that was my question, so let me

17  make sure I got it, just so the record is clear.  I

18  think what you just said is that the North Dallas Bank

19  account and the Compass Bank account have been used for

20  the same purpose going back to this deposition in August

21  of 2013 and even further back in time to the past before

22  that; is that right?

23    A.   A little bit back, yes.  I don't remember the

24  dates, or I should say years.

25    Q.   You just said years?

1      A.    Years.

2      Q.    Is that the word you just used?

3      A.    Yes.

4      Q.    Okay.

5      A.    I said or years.

6      Q.    Okay, okay.  And the accounts are used for the

7  living expenses of you and Mr. Comu; is that right?

8      A.    Yes, sir.

9      Q.    For the joint benefit of you and Mr. Comu; is

10  that right?

11      A.    Yes, sir.

12      Q.    But you also use both of those accounts for

13  more than just living expenses; is that right?

14      A.    Sometimes.

15      Q.    Like maybe getting your hair done?

16      A.    Yes.

17      Q.    And getting your nails done?

18      A.    Yes.

19      Q.    And expenses associated with your dog?

20      A.    Yes.

21      Q.    Now, the dog is owned by you personally, not by

22  Sunset Pacific, right?

23      A.    Dogs, plural.

24      Q.    Dogs, plural, you like dogs?

25      A.    Yes.

1    Q.   I do, too.  They are owned by you; they are not

2    owned by Sunset Pacific; is that right?

3    A.   Right.

4    Q.   Okay.  But both of these accounts are not only

5    used for hair, nails and the dog, but also the vet

6    expenses, right?

7    A.   Yes.

8    Q.   And for groceries?

9    A.   Yes.

10    Q.   And for gas for your car?

11    A.   Yes.

12    Q.   Which is what kind of car?

13    A.   I have a '08 Mercedes SUV ML.

14    Q.   Oh, ML, I am sorry.  I don't drive Mercedes.  I

15    thought you were going to --

16    A.   SUV.

17    Q.   -- add something on the end of that.  I am

18    sorry.  The SUV, whatever it was, ML, is titled in your

19    name personally; is that right?

20    A.   Yes, sir.

21    Q.   Not Sunset Pacific?

22    A.   Correct, my name.

23    Q.   Okay.  I want to take a look at Trustee Exhibit

24    Number -- We will get to that one in a second.  Let me

25    take a look at Trustee Exhibit Number 29.  Attorneys

1  like to kill a lot of trees.  This is Mr. Elmquist's

2  tree killing.  This is Trustee Exhibit Number 28 and --

3  Oh, I am sorry.  I should be looking at -- I have 29.

4  We will get to this one in a second, but I am too early.

5          Number 28 reflects -- and you have seen

6  this document before, because it was shown to you in

7  your deposition; is that right?  Do you remember that?

8      A.  Yes.

9      Q.  And this shows a number of transfers to you,

10  Phyllis Comu, from Sunset Pacific.  Do you see that?

11      A.  Yes.

12      Q.  Now, without seeing one of those checks there,

13  who is writing those checks?  Do you know who is writing

14  those checks?

15      A.  My husband wrote them out to me.

16      Q.  And these will be some of the checks that were

17  written out of the Sunset Pacific account for all of the

18  purposes that you just gave testimony to this Court

19  about moments ago; is that right?

20      A.  Yes.

21      Q.  Let's talk about the Barclay Group.  Barclay

22  Group is an entity that you also receive money from; is

23  that right?

24      A.  Yes.

25      Q.  And, in fact, you just told the Court that you

1   receive moneys from Sunset Pacific for living expenses

2   for you and Mr. Comu, also for personal expenses of your

3   own that we just itemized, and, in fact, you use and

4   receive other sources of money for similar personal

5   purposes as well from an entity other than Sunset

6   Pacific; is that right?

7        A.   If these are them, yes.

8        Q.   Like the Barclay Group?

9        A.   Uh-huh.

10       Q.   You have to say yes.

11       A.   Yes.

12       Q.   Okay.

13       A.   Yes.

14       Q.   Let's take a look at one of the these checks in

15   particular that you received from the Barclay Group.

16   Here this is KLM 88, for the Court and opposing counsel.

17   This would be a check that you received December 31st,

18   2009.  Do you see that?

19       A.   Yes.

20       Q.   Did you know that that is the exact same date

21   that your husband filed this bankruptcy case or the

22   bankruptcy case that this adversary is under?

23       A.   Yes, yes.

24       Q.   Okay.

25       Q.   And you got that check, because you must have

1    needed something along the lines of what we talked about

2    earlier, maybe to get your hair done or some type of

3    event or something like that; is that fair?

4        A.   Yes.

5        Q.   Okay.  There are also some other checks that I

6    would like to go through just as quickly as we can.

7    These are from --

8        A.   Excuse me.  Why would it have "void" written on

9    it?

10       Q.   Oh, I am not sure.  You all produced those.  Do

11   you have an answer --

12       A.   Well, it must have been voided, and I didn't

13   use it.

14       Q.   Okay.  That may be so.

15       A.   I probably used a credit card.  You can't use a

16   check with "void" on it so --

17       Q.   I am not in banking.  I just try cases.  I

18   don't know.

19       A.   Okay.

20       Q.   But the fact is that it is not unusual to see

21   your name on a Barclay Group check; is that right?

22       A.   Occasionally.

23       Q.   Occasionally?

24       A.   Uh-huh.

25       Q.   I don't know what "void" means, but I do know,

1  from what I have seen, that you get a lot of checks

2  written to you from the Barclay Group.  Does that sound

3  right?

4       A.   Not anymore.  I did at one time.  Yeah.  And

5  "void" would mean this check is not any good.  I must

6  have used some other means of paying for whatever I

7  wanted at that day.

8       Q.   I got you, because back in December of 2009 you

9  and Mr. Comu had various means and methods of getting

10  satisfied of things that you needed to have taken care

11  of; is that right?  Obviously, you could have just

12  written "void" on the check and go somewhere else.  You

13  get $2,000 from somewhere else (Inaudible).

14       A.   I probably put it on a credit card.

15       Q.   Do you understand that?  I just saw a

16  bankruptcy today of a young lady who probably wishes she

17  had free access to $2,000.  You understand that is a lot

18  of money?

19       A.   Yes, sir.

20       Q.   Thank you.  All right.  So here is a thousand

21  dollars right here that is written to you.  This is from

22  KLM 89.  Do you see that, Check Number 5077?

23       A.   Yes, sir.

24       Q.   And here is another check, Number 5078, to you,

25  Phyllis Comu.  Do you see that?

1        A.    Yes.

2        Q.    For a thousand dollars?

3        A.    Yes.

4        Q.    Still in the same exhibits, Your Honor, there

5   is a thousand dollar check to you.  Do you see that?

6        A.    Yes.

7        Q.    There is another thousand dollar check.  Do you

8   see that?

9        A.    Yes.

10       Q.    There is another thousand dollar check.  Do you

11  see that?

12       A.    Yes.

13       Q.    And then there is two thousand; is that right?

14       A.    Yes.

15       Q.    Then we have got another thousand; is that

16  right?

17       A.    Yes.

18       Q.    Do you remember what you are spending all this

19  money on from the Barclay Group?

20       A.    It was a long time ago.  Various things.  This

21  is before I get any income from our house that we were

22  leasing.

23       Q.    Yes, but let me ask you this question:  Do you

24  understand the broader picture; do you understand what

25  was happening in 2009 vis-a-vis the Barclay Group?

1          A.   I am not certain.

2          Q.   So you don't know where this money is coming

3    from; you are just spending it, right?

4          A.   I don't know the details of it.

5          Q.   Did you just get the check written to you and

6    just put it right back in the bank?

7          A.   No, I used it for something that I needed.

8          Q.   Yes, ma'am.  And the broader picture is what I

9    am getting at.  Do you have any idea where those moneys

10   came from that came to you through the Barclay Group?

11         A.   I did not inquire.

12         Q.   Okay.  So here is another check, a thousand

13   dollars.  That is about a month before the bankruptcy.

14   Do you see that?

15         A.   Yes.

16         Q.   There is another check in that same month for a

17   thousand dollars.  Do I have that amount right?

18         A.   Yes.

19         Q.   So this one was November 1st, 2009, for a

20   thousand dollars; is that right?

21         A.   Yes.

22         Q.   And this one was the next day for a thousand

23   dollars.  Do you see that?

24         A.   Yes.

25         Q.   Then 18 days later you got another one for

1   $2,000 in that same month; is that right?

2        A.   Yes.

3        Q.   And two weeks before Christmas you got $2,000;

4   is that right?

5        A.   Yes.

6        Q.   And there is that voided check again.  I don't

7   know what that was about.  But there is another one.

8   5101 was a voided one.  Then there is another one for

9   that same date that is voided.  Do you see that?

10       A.   Yes.

11       Q.   So you probably got that money from somewhere

12   else, too, since you didn't -- since that check got

13   voided?

14       A.   Yes.

15       Q.   And after the filing of this bankruptcy from

16   TBG, you got another thousand dollars?

17       A.   Yes.

18       Q.   And if there are any others in here -- I just

19   found one, December, rounded off the year of 2010 with a

20   $3,000 check.  Do you see that?

21       A.   Yes.

22       Q.   I don't know if there are any others in here,

23   but they are in evidence, and the Court will see them,

24   as the Court will see that one for $2,000 in May

25   of 2010.  Do you see that?

1        A.   Yes.

2        Q.   And all of these checks we just saw were

3   written to you because you must have needed money for

4   some reason; is that right?

5        A.   Yes.

6        Q.   And what you did is you would ask CJ for those

7   moneys, and he would give you those moneys.  You saw

8   them, not only from Sunset Pacific, but also from the

9   Barclay Group, right?

10       A.   Yes.

11       Q.   Personal expenses?

12       A.   Not always.  I mean I don't remember.  It was

13  2009, five years ago.  I don't remember specifically.

14       Q.   Okay.  That's why it is good that we take these

15  depositions.

16            MR. VITAL:  I will be at 93 in the 2013

17  deposition.  I will put it on the Elmo for the witness.

18       Q.   "Question:  The same with the next page,

19  Phyllis Comu, September 11, 2009, $1,000?

20            "Answer:  Yes."

21            Do you see that?

22       A.   Yes.

23       Q.   Now, I will represent to you that the person

24  asking you the questions is going through that big stack

25  of checks that I just went through.

```
 1        A.   Uh-huh.

 2        Q.   "Question:  Would you have deposited this into

 3   your personal checking account?

 4             "Answer:  Yes:

 5             "Then I will just skip down along

 6   (Inaudible) stack of checks?

 7             "Answer:  Yes.

 8             "And a number of them are made out to you?

 9             "Answer:  Yes.

10             And we just saw that a number of them were

11   made out to you, right?

12        A.   Yes.

13        Q.   And the question to you, specifically for the

14   reason that I pulled out this transcript, was, "And

15   these would have all been for personal expenses; is that

16   correct?"

17             Your answer was what, on the screen?

18        A.   "Yes."

19        Q.   Okay.  Now, some of those personal expenses

20   would have been like charity events, like Cattle Barons'

21   Ball?

22        A.   That would be one.

23        Q.   Paws in the City, which is another charitable

24   group?

25        A.   Yes.
```

1      Q.   Personal medical care?

2      A.   Yes.

3      Q.   Now, these checks from the Barclay Group that

4   we are going over, for the benefit of the record and Her

5   Honor, are checks that were written to you from the

6   Barclay Group, in essence checks that made your

7   lifestyle possible during the time that those checks

8   were written; is that right?

9      A.   Yes.

10     Q.   Okay.  Like your membership with the

11   Prestonwood Country Club?

12     A.   I don't go to the country club.  You would have

13   to ask my husband about that.

14     Q.   I will go to Page 103 of your deposition to see

15   what you have to say about that.

16          "Do you belong -- do you and CJ belong to

17   any country clubs?

18          "Answer:  Yes.

19          "Question:  And which country club is that?

20          "Answer:  Prestonwood Country Club.

21          Do they take dues?

22     A.   I am sure I never paid them.

23     Q.   How long have you all been members?

24     A.   I am uncertain.

25     Q.   All right.  You all have been members since

1  your husband was writing all those checks from the

2  Barclay Group?  Have you all been members during that

3  same period of time?

4       A.  Yes.

5       Q.  Okay.  Now, it is fair, is it not, that all of

6  the checks that we went through and just put on the Elmo

7  for you and for the Judge, are checks that will count as

8  income for bankruptcy disclosure purposes, right?

9       A.  Ask the question again.  I am sorry.

10      Q.  It is fair, is it not, that the checks that we

11  just went through, all of the checks that the Judge just

12  saw and that I showed you on screen there, are checks

13  that will count as income for bankruptcy disclosure

14  purposes; is that correct?

15      A.  I don't understand the question.

16      Q.  Okay.  Well, let's expedite it just so we can

17  just get the testimony into the record.  I am just going

18  to ask you to confirm that I am reading this correctly.

19           MR. VITAL:  For opposing counsel, looking

20  at Page 105.

21      Q.  I will start at Page 20.  Says, "Question:

22  Exhibit Number 13, and it is the stack of checks that we

23  looked at just a moment ago?

24           "Answer:  Right.

25           "From the Barclay Group, is that correct?

 1                "Answer:  Yes.

 2                "So in 2010 can you -- would you expect

 3     that that money coming from the Barclay Group with

 4     whom -- that entity with whom he was working would

 5     qualify as income?"

 6                And your answer was yes, wasn't it?

 7        A.   Yes, I see that, yes.

 8        Q.   Is that what it says?

 9        A.   Yes.

10        Q.   Okay.  "Question:  Okay.

11                "Answer:  It is pretty obvious with the

12     checks.  I see that in front of you, right."

13                Is that your testimony?

14        A.   Yes.

15        Q.   Now, I went to this a long time ago, and I was

16     just jumping the gun, but we are going to go to this

17     document.  Well, let's go to 85 first, KLM 85.  KLM 85

18     is a document that I believe is in evidence, with no

19     objection having been made to it.  I am going to put it

20     up here on the Elmo.

21                These are some more Barclay Group checks,

22     right?  Do you see that?

23        A.   Yes.

24        Q.   Now, the last one in this stack here says

25     Phyllis Comu.  Do you see that?

1       A.   Yes.

2       Q.   That one is for $2,000.  Do you see that?

3       A.   Yes.

4       Q.   January 14, 2009?

5       A.   Uh-huh.

6       Q.   Right?

7       A.   Yes.

8       Q.   You have to say yes?

9       A.   Yes.

10      Q.   You said yes?

11      A.   Yes.

12      Q.   Okay.  Is that your signature there?

13      A.   Yes.

14      Q.   All right.  Now, it says office expenses on the

15  back of this check.  Do you see that?

16      A.   Yes.

17      Q.   Is that your handwriting?

18      A.   I am not sure.  It doesn't look like it.

19      Q.   It looks like CJ's writing, right?

20      A.   Possibly.

21      Q.   Says office expenses, though, right?

22      A.   Yes.

23      Q.   Now, it says office expenses, but you don't

24  have anything to do with office expenses for the Barclay

25  Group, do you?

1    A.   Not that I know of.  I might have bought

2    something.

3    Q.   You don't have any responsibility for paying

4    expenses for the Barclay Group, do you?

5    A.   No.

6    Q.   Now, I am going to go to Trustee 29.  This is a

7    document that the Trustee prepared to reflect checks

8    that went from the Barclay Group to you, Phyllis Comu.

9    Do you see that?  Do you see that?

10   A.   Yes.

11   Q.   Now, a number of these checks have a stated

12   purpose associated with them, office expenses.  Do you

13   see that?

14   A.   Yes.

15   Q.   Now, we just went over that, and you just

16   testified that you have no responsibility for paying

17   office expenses, right?

18   A.   Right.

19   Q.   But you do know that these checks,

20   notwithstanding the fact that they say office expenses,

21   were used for your personal purposes; is that right?

22   Well, let me give it to you another way:  Hair is not an

23   office expense, right?

24   A.   Right.

25   Q.   Nor are your dogs, right?

1      A.   Right.

2      Q.   Okay.  So one of these I am curious about says

3  advisory fees.  That was few months after the discharge

4  granted in this case.  And I believe the answer is going

5  to be, no, you have no idea what these advisory fees are

6  about; is that right?

7      A.   Correct.

8      Q.   Okay.

9           MR. VITAL:  May I have a moment, Your

10  Honor?

11           THE COURT:  You may.

12           MR. VITAL:  I pass the witness, Your Honor.

13           THE COURT:  All right.

14           MR. ELMQUIST:  I just have a few questions.

15           THE COURT:  Go ahead.

16                CROSS EXAMINATION

17  Of Phyllis Comu by Mr. Elmquist:

18      Q.   Good afternoon, Ms. Comu.  I talked to you back

19  in -- a year or so ago.  It was August 2012?

20      A.   Yes.

21      Q.   I want to ask you about a couple of documents I

22  asked your husband about.  It is going to be --

23           MR. ELMQUIST:  May I approach, Your Honor?

24           THE COURT:  You may.

25      Q.   If you would, please turn to Tab Six in that

 1  book.

 2       A.   Yes.

 3       Q.   That should be a stock purchase agreement.  Is

 4  that what you have?

 5       A.   Yes.

 6       Q.   Okay.  On the second page you recognize your

 7  signature?

 8       A.   Yes.

 9       Q.   Ma'am, do you recall anything about this

10  agreement?

11       A.   Not right offhand.

12       Q.   Do you recall having any discussions with your

13  husband about Sunset Pacific buying two million shares

14  of stock of -- excuse me, 2,500,000 shares of -- 500,000

15  shares of Green Auto stock that the Barclay Group had

16  obtained?

17            Let me ask the question again.  This stock

18  purchase agreement relates to Sunset Pacific purchasing

19  from the Barclay Group 2,500,000 share of Green Auto

20  stock.  Do you remember talking to your husband about

21  that?

22       A.   We usually discuss most everything.

23       Q.   Okay.  But do you recall having discussions

24  about this particular transaction?

25       A.   Not right offhand, no.

1        Q.   If you will turn --

2        A.   But I obviously signed it, so we must have.

3        Q.   Okay.  Do you remember anything about it, one

4    way or another, in terms of why you were doing it or

5    what the terms were?

6        A.   We thought it was a good investment.

7        Q.   I see.  Turn to the third page of this document

8    that is entitled promissory note.

9        A.   Yes.

10       Q.   If you turn the page, you will see a signature

11   there.  Is that your signature?

12       A.   Yes.

13       Q.   Did you understand you were signing a

14   promissory note on behalf of Sunset Pacific to pay the

15   Barclay Group $250,000?

16       A.   Was it for something specific like Algae or

17   another investment that we made?

18       Q.   This had to do -- this was the companion piece

19   to the stock purchase agreement.  This was in payment

20   for that Green Auto stock.  Do you remember signing this

21   promissory note?

22       A.   Yes.

23       Q.   You do?

24       A.   Yes.

25       Q.   Okay.  Tell me what you remember about it.  Do

1  you remember talking to your husband about the

2  transaction in terms of --

3      A.   I don't remember specifics.

4      Q.   I see.  All right.  Now, I would like you to go

5  to exhibit -- in that same book, go to Tab 33, please.

6           MR. ELMQUIST:  Your Honor, may I approach

7  to help her find the page?

8           THE COURT:  You may.

9      Q.   Ms. Comu, turn to the last page of that

10 Exhibit 33, which has, as the title, overflow statement.

11 Do you see that?

12     A.   I am sorry.  I don't.

13     Q.   I have you on the wrong page here.  Now, do you

14 see the page that is entitled overflow statement?

15     A.   Yes, I do.

16     Q.   Okay.  And then we have two categories of what

17 is referred to as other investments.  Do you see that?

18     A.   Yes.

19     Q.   And the first item listed under other

20 investments is an annuity for $250,000.  Do you see

21 that?

22     A.   Yes.

23     Q.   Do you know anything about that annuity?

24     A.   Yes.

25     Q.   Tell me what you know about it.  Does it still

1   exist?  Does Sunset Pacific still own the $250,000

2   annuity?

3        A.   I think this is the old one and we acquired a

4   new one.

5        Q.   Who is we?

6        A.   My husband and I, Sunset Pacific.

7        Q.   Sunset Pacific?

8        A.   Yes.

9        Q.   Okay.  Let's be clear on that, because it is

10   important to distinguish between you and your husband

11   individually and the company we are talking about.  So

12   when you say "we", you mean here Sunset Pacific?

13        A.   Yes, I mean Sunset Pacific.

14        Q.   So Sunset Pacific exchanged the annuity that is

15   shown on this Exhibit 33 for a new annuity?

16        A.   This is -- yes, this is our first life

17   insurance that we got.

18        Q.   How can you tell that from just the description

19   here?  Can you tell by the date?

20        A.   Well, it says annuity --

21        Q.   Right, okay.

22        A.   -- date.  Well, Sun Sports underneath it,

23   that's how I know.

24        Q.   So the $250,000 annuity that is shown on the

25   2008 tax return was later exchanged by Sunset Pacific

1   for a new annuity; is that what you are saying?

2        A.   Well, the annuity matured.

3        Q.   Okay.

4        A.   And to like 300.

5        Q.   Okay.

6        A.   And then we bought a new annuity, and the money

7   that was left over we put into Algae International, I

8   think is the name of it.

9        Q.   I see.  And when you say the money left over,

10  you are saying the difference between --

11       A.   With the maturity of the annuity.

12       Q.   Okay.  So is there any annuity at this time

13  owned by Sunset Pacific?

14       A.   Repeat the question.

15       Q.   Sure.  Is there any annuity owned at this time

16  by Sunset Pacific?

17       A.   Yes.

18       Q.   And what is the amount of that annuity?

19       A.   Not certain.

20       Q.   Okay.  I can tell you I have looked at the tax

21  returns that have been supplied by your husband's

22  attorney going through 2011, and none of those

23  subsequent tax returns reflect that annuity.  So I am

24  wondering if the annuity is still owned, but you don't

25  know offhand whether it is or isn't?  Excuse me, you --

1      A.   I don't know how much it is.

2      Q.   But you don't know how much it is?

3      A.   Correct.

4      Q.   Okay.  Let me ask you this:  In connection with

5  the Sunset Pacific tax returns, do you recall being

6  asked to review those returns for any purpose before

7  they were sent to the government?

8      A.   Yes, I would have looked them over.  I probably

9  would have signed them.

10      Q.   Who provided those returns to you?

11      A.   Our accountant.

12      Q.   Mr. Dahl?

13      A.   Yes.

14      Q.   Mr. Dahl has passed away, right?

15      A.   Just a few weeks ago.

16      Q.   Right.  So has the Sunset Pacific return been

17  prepared for 2013?

18      A.   Because he is deceased, I don't know what --

19      Q.   I am just asking if the return --

20      A.   Oh, I don't know.  I think we are getting a new

21  accountant.

22      Q.   Let me reask the question.  Has the 2013

23  Federal income tax return for Sunset Pacific been

24  prepared?

25      A.   Working on it now.

1      Q.   Who is working on it?

2      A.   My husband and I.

3      Q.   Okay.  Do you have any idea what the income of

4   Sunset Pacific was in 2013?

5      A.   No, sir.

6           MR. ELMQUIST:  That's all I have.  Thank

7   you.

8           THE COURT:  Mr. Olson?

9           MR. OLSON:  Yes, ma'am.  I know you wanted

10   to leave early today, and I think I can get you out of

11   here unless I trigger some questions.

12           THE COURT:  Okay.

13                   CROSS EXAMINATION

14   Of Phyllis Comu by Mr. Olson:

15      Q.   Let me go to some different topics.  Who is

16   Steve Evans?

17      A.   The son of a car dealership, maybe Steve Evans

18   Senior.  I don't remember his name.  Here prominent, big

19   car dealership back in the '80s, and his son is Steve

20   Evans.

21      Q.   Okay.  When did you first meet Steve Evans?

22      A.   College.

23      Q.   Where?  Do you remember where or what

24   circumstances?

25      A.   At a fraternity party.

1    Q.   Okay.  And does Steve Evans live in the

2  neighborhood where you live?

3    A.   He used to be our neighbor several years ago.

4    Q.   All right.  Now, the testimony today about the

5  Palladium house and the Oaks North house, those houses

6  are just a few blocks apart, aren't they?

7    A.   Twelve houses away from each other.

8    Q.   All right.  And where are they located?

9    A.   Addison, Texas.

10    Q.   In Preston Hollow?

11    A.   Nowhere near Preston Hollow.

12    Q.   All right.  And the house that you are in now,

13  I think the testimony is that you signed a lease, you

14  and your husband, to move into that house?

15    A.   Repeat the question again.

16    Q.   The house you are living in now?

17    A.   Yes.

18    Q.   You signed a lease to move into that house?

19    A.   Yes.

20    Q.   All right.  And you are leasing from

21  Continental Partnership, Inc.?

22    A.   Yes, sir.

23    Q.   All right.  And you are leasing out your house

24  on Palladium that you claimed as homestead?

25    A.   Yes.

```
 1        Q.   And are you going to sell that homestead house?

 2        A.   Probably move back in it.

 3        Q.   When?

 4        A.   The tenants signed a five year lease, and they

 5   have been there about two and a half years or maybe

 6   three now, and when -- maybe we will move back in.

 7             MR. OLSON:  All right.  I don't have any

 8   other questions.

 9             MR. VITAL:  No more questions, Your Honor.

10             THE COURT:  Any redirect on that?

11             MR. ELMQUIST:  No, Your Honor.  Thank you.

12             THE COURT:  I have just one question for

13   you, Ms. Comu.  I noticed the tenants in the Palladium

14   property were Mervin Price.

15             THE WITNESS:  Yes, ma'am.

16             THE COURT:  Is that the same Mervin Price

17   who is an employee of Barclay Group, or has been in the

18   past?

19             THE WITNESS:  I am not aware of that.

20             THE COURT:  How did the tenants come to

21   you?

22             THE WITNESS:  Mervin works at Regus

23   Advisors.

24             THE COURT:  All right.  So I said the

25   Barclay Group.  I was basing that on some earlier
```

1  testimony that he had been an employee or consultant for

2  Barclay, but now he is an employee or consultant for

3  Regus?

4              THE WITNESS:  Right, they are our second

5  set of tenants.  We had another set of tenants for a

6  couple of years, and then they are our new ones.

7              THE COURT:  When did you start leasing the

8  house?

9              THE WITNESS:  December 2010.  The first

10  tenants only lived there for a year.

11              THE COURT:  Who were the first set of

12  tenants?

13              THE WITNESS:  Lonergans, Dan Lonergan.

14              THE COURT:  All right.  And then Mervin

15  Price, who has worked for Barclay Group and now Regus --

16              THE WITNESS:  I don't recall him ever

17  working for Barclay Group.

18              THE COURT:  And he works with your husband

19  now at Regus, and he is leasing the house?

20              THE WITNESS:  Yes, ma'am.

21              THE COURT:  Do they actually live in the

22  house?

23              THE WITNESS:  Yes, ma'am.

24              THE COURT:  Any follow-up on the Court's

25  questions?

```
 1              MR. ELMQUIST:  No, Your Honor.

 2              MR. VITAL:  No, Your Honor.

 3              THE COURT:  Thank you, Ms. Comu.  You are

 4   excused.

 5              THE WITNESS:  Thank you.

 6              THE COURT:  All right.  We are going to

 7   wrap it for today, and let me tell you about a timing

 8   problem I have tomorrow afternoon.

 9              You may remember I had told you probably

10   back at the docket call that I had a 1:30 p.m. lift stay

11   docket on Thursday that I didn't think would last very

12   long, and we would just arrange lunch around it.  I

13   still have that, only I have an emergency hearing that I

14   had to set at 2:30 tomorrow.  A chain of nursing homes

15   filed bankruptcy, they have emergencies that are, trust

16   me, genuine emergencies.  You know, it is a nursing home

17   chain, so you can imagine.  So anyway, I apologize for

18   having to interrupt this trial, but it really is a

19   necessary interruption.

20              So I may have a 1:30 docket tomorrow that

21   is going to last probably 30 minutes, and then the 2:30

22   docket, at one time they was saying they might take two

23   hours.  Do you still think that --

24              If we get in a different word overnight or

25   tomorrow morning that it is going to be shorter than two
```

1  hours, we will let you know.  But all this to say we may

2  have only half a day tomorrow, 9:30 to one o'clock or

3  something like that.

4              MR. VITAL:  Your Honor, we have finished

5  our case in chief.  The only thing that remains is the

6  offer of documents, and that could take some time with

7  the arguments back and forth.  I have not consulted with

8  Ms. Hanks about this, so I hope she doesn't slap me, but

9  what I would suggest is perhaps we could just offer them

10  and maybe submit something in writing for you and your

11  clerk --

12              THE COURT:  Okay.

13              MR. VITAL:  -- about what the offer is for,

14  so that you can just look at them all at one time,

15  rather than us going back and forth and consuming the

16  Court's time.

17              THE COURT:  All right.  So that is one

18  possibility.  Okay.  Plaintiffs have rested.

19              Mr. Elmquist, you are going to have your

20  client presumably.

21              MR. ELMQUIST:  I am, and Mr. Olson and I

22  are visiting just now about Ms. Reed's availability.  I

23  think she is available until three tomorrow, and you are

24  going to be tied up tomorrow afternoon anyway.

25              THE COURT:  So we can start with her in the

1  morning perhaps and then stop one-ish and either finish

2  her Friday, or then you will put on your case, and that

3  will be Mr. Comu.

4           MR. OLSON:  Yes.  I doubt if Ms. Reed's

5  testimony is going to take until one o'clock.

6           MR. ELMQUIST:  Likewise.

7           THE COURT:  All right.  All right.  So we

8  potentially can finish Friday.

9           MR. OLSON:  Yes, ma'am.

10           MR. ELMQUIST:  Yes, ma'am.

11           MR. VITAL:  I think so.

12           THE COURT:  All right.  And then there may

13  be some post closing briefing or submissions.

14           MR. VITAL:  Yes, Your Honor.

15           MR. ELMQUIST:  If I understand correctly,

16  Mr. Olson is going to call Ms. Reed as a witness.  I am

17  going to have some examination of her, and then you are

18  going to call Mr. Comu, and that will be it.

19           UNIDENTIFIED MAN:  I think so.

20           THE COURT:  Okay.  Well, very good.  I was

21  afraid we weren't going to finish, but it sounds like we

22  probably will.  All right.  So --

23           MR. VITAL:  Just to make it clear, I will

24  have examination of Ms. Reed, too, but I don't expect it

25  to throw off the time estimate that was just given.

1        THE COURT:  Okay.  All right.  Well, I am

2   thinking, if there is any chance we are not going to

3   finish, a week from Friday you could come back.  It

4   sounds like, at worst, that might be closing argument.

5   It sounds like you all are probably going to even be

6   able to work in closing arguments.

7        MR. VITAL:  Yes, Your Honor.

8        UNIDENTIFIED MAN:  If you have all Friday,

9   I don't think so.

10        THE COURT:  Yeah, I mean I would love to

11   not go all day Friday, but I can go all day Friday if

12   we -- so all right.  We will see you at 9:30 --

13        (Adjournment)

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2    COUNTY OF LUBBOCK          )

3    STATE OF TEXAS             )

4            I, Cathy Sosebee, Certified Court Reporter in

5    and for the State of Texas, do hereby certify that the

6    foregoing pages contain a full, true and correct

7    transcript, to the best of my ability, of audio file

8    furnished by the United States Bankruptcy Court,

9    Northern District of Texas, Office of the Clerk.

10           Given under my hand this the 20th day of

11   October, 2014.

12

13

14                    ____/s/Cathy Sosebee____
                      CATHY SOSEBEE, CSR, No. 612
15                    Expiration Date:  12/31/14
                      Cathy Sosebee & Associates
16                    Firm Registration No. 49
                      P. O. Box 86
17                    Lubbock, TX   79408
                      806 763-0036
18

19

20

21

22

23

24

25

001786   CATHY SOSEBEE & ASSOCIATES * LUBBOCK, TX * 806-763-0036

1                    IN THE UNITED STATES BANKRUPTCY
                       NORTHERN DISTRICT OF TEXAS
2                            DALLAS DIVISION

3
    KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
4   RONALD KATZ,

5              Plaintiffs,

6   V.

7   CENGIZ J. COMU a/k/a CJ COMU,

8              Defendant.

9   DIANE G. REED, TRUSTEE.

10             Intervenor, Co-Plaintiff, and Third-Party
    Plaintiff,
11
    V.
12
    CENGIZ J. COMU, a/k/a CJ COMU,
13
               Defendant,
14
    and
15
    PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16  INC., AND SUNSET PACIFIC, L.P.,

17             Third-Party Defendants.

18  BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19  _____

20                            TRIAL

21                      MARCH 20, 2014

22                  9:35 A.M. TO 12:25 P.M.

23          HONORABLE STACEY JERNIGAN, PRESIDING

24            TRANSCRIPT FROM AUDIO RECORDING

25  _____

```
 1   Transcript produced from audio recording by:
     CATHY SOSEBEE, RPR, CSR
 2   CSR No. 612, Expiration Date 12/31/14
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC, AND RONALD KATZ:

 8       MS. KENDYL T. HANKS
         - AND -
 9       MR. NICHOLAS SAROKHANIAN
         - AND -
10       MR. VICTOR D. VITAL
         Greenberg, Traurig
11       2200 Ross Avenue
         Suite 5200
12       Dallas, TX  75201
         hanksk@gtlaw.com
13
     FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
14   PLAINTIFF, TRUSTEE DIANE REED:

15       MR. DAVID ELMQUIST
         Reed & Elmquist, P.C.
16       501 N. College Street
         Waxahachie, TX 75165
17       972-938-7339
         delmquist@bcylawyers.com
18
     FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
19   BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
     COMU:
20
         MR. DENNIS OLIVER OLSON
21       Olson, Nicoud & Gueck, LLP
         1201 Main Street, Suite 2470
22       Dallas, TX 75202
         214-979-7300
23       denniso@dallas-law.com

24

25
```

```
 1                        I N D E X

 2                          (TRIAL)

 3                                                      Page
      MARCH 20, 2014
 4
      APPEARANCES                                         4
 5
      TRUSTEE'S WITNESSES
 6
      DIANE REED
 7        DIRECT EXAMINATION by Mr. Elmquist              7
          CROSS EXAMINATION by Mr. Olson                 41
 8        CROSS EXAMINATION by Mr. Vital                 51
          FURTHER CROSS EXAMINATION by Mr. Olson         85
 9
      Trustee rests                                      89
10
      Adjournment                                       121
11    Reporter's Certificate                            122

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          PROCEEDINGS
2              THE COURT:  All right.  Day four of our
3    trial in King Louie Mining versus Comu, Adversary
4    10-3269.  Let's go ahead and get appearances on the
5    record for the attorneys once again.
6              MS. HANKS:  Kendyl Hanks for the
7    plaintiffs.
8              THE COURT:  Okay.
9              MR. VITAL:  Good morning, Your Honor.
10   Victor Vital for plaintiffs.
11             THE COURT:  Okay.
12             MR. SAROKHANIAN:  Good morning, Nicholas
13   Sarokhanian for the plaintiffs.
14             THE COURT:  Okay.
15             MR. ELMQUIST:  Good morning, Your Honor,
16   David Elmquist on behalf of Diane Reed, trustee.
17             MR. OLSON:  Good morning, Your Honor,
18   Dennis Olson for the defendants.
19             THE COURT:  Good morning to all of you.
20   All right.  Where we left off yesterday the plaintiffs
21   had rested on their case in chief, and Mr. Elmquist was
22   about to put on Ms. Reed.  Do we have housekeeping
23   matters?
24             MR. OLSON:  Just a couple quickly, Your
25   Honor.  In connection with the Court's questions of Mr.
```

1    Comu about corporate documents for The Barclay Group, we

2    did another search last night, and literally the only

3    things that we have are the certificate of incorporation

4    and the articles of incorporation.  There is no minute

5    book, no organizational meeting, no minutes, no share

6    certificates issued, nothing to that effect.

7                    THE COURT:  Okay.

8                    MR. OLSON:  And I think counsel on the

9    plaintiff and the intervenor's side had already

10   downloaded these documents from the Secretary of State.

11                   THE COURT:  I think we may have seen them

12   in evidence.

13                   MR. OLSON:  Yes.  That's all.

14                   THE COURT:  All right.

15                   MR. OLSON:  Now, in connection with the

16   questions about the Turkish bank account, I stated to

17   the Court that we had provided to the other side the

18   snapshots for the balances in that account on three

19   specific dates.  That is not true.

20                   When the issue came up in the deposition at

21   Greenberg Traurig in November, Mr. Comu sent me an

22   email, which I have marked as Defendant's Exhibit 10,

23   that shows the balance in the account on a specific

24   date.  I never forwarded that to either side.

25                   I asked him for a snapshot bank statement

1    that would show the balance, the date of the filing, the

2    date of the filing of the adversary, and the most

3    current statement.  We have requested that again.

4              This is all I have got, and it was provided

5    to counsel this morning, and I have marked it as

6    Defendant's Exhibit 10.

7              THE COURT:  All right.  You may approach

8    with that.

9              All right.  Well, is there any objection to

10   this Defendant's 10 being in the record?

11             MS. HANKS:  No.  We would like it to be in

12   the record.

13             MR. ELMQUIST:  I am sorry, Your Honor.  I

14   didn't hear what 10 is.

15             THE COURT:  It is the --

16             MR. ELMQUIST:  Bank statement?

17             THE COURT:  -- a couple of emails regarding

18   the bank balance.

19             MR. ELMQUIST:  Email of the account

20   information?

21             THE COURT:  Yes.

22             MR. ELMQUIST:  Fine.  In fact, I need to

23   ask Ms. Reed about that exhibit so I need it.

24             THE COURT:  Defendant's Exhibit 10 is

25   admitted.

 1                   (Defendant's Exhibit 10, offered and

 2              admitted.)

 3                   (Indecipherable discussion between Ms.

 4               Hanks and Mr. Elmquist.)

 5              THE COURT:  All right.  If there are no

 6    other housekeeping matters, are you ready to call your

 7    witness, Mr. Elmquist?

 8                   MR. ELMQUIST:  I am, Your Honor.  The

 9    trustee calls the trustee.

10                   THE COURT:  All right.  Welcome, Ms. Reed.

11    If you could approach the witness stand, we will go

12    ahead and swear you in, although you are an officer of

13    the Court.  Given the significance of this adversary, we

14    will go ahead and swear you in.

15                   (Witness sworn.)

16                        DIANE REED,

17    Having been duly sworn, testified as follows:

18                   DIRECT EXAMINATION

19    By Mr. Elmquist:

20        Q.   Good morning, Ms. Reed.

21        A.   Good morning.

22        Q.   You are the duly appointed Chapter Seven

23    Trustee in the bankruptcy estate of C. J. Comu; is that

24    correct?

25        A.   Correct.

1    Q.   And you were appointed shortly after the case

2    was filed, case being filed on December 31, 2009?

3    A.   Yes.

4              MR. ELMQUIST:  May I approach, Your Honor?

5              THE COURT:  You may.

6    Q.   Ms. Reed, you have in front of you the

7    defendant's exhibits, and I want to direct your

8    attention to Exhibit 4.

9    A.   Yes.

10   Q.   This has been introduced into the record, and

11   it has been admitted by the Court.  This is an

12   unofficial transcript of the meeting of creditors.  It

13   indicates it was held February 9, 2011, but that is a

14   misprint.  It should be February 9, 2010.  And that

15   would be consistent with when the meeting should have

16   occurred, based upon the case being filed 12/31/09,

17   correct?

18   A.   Yes.

19   Q.   And you attended that meeting as trustee?

20   A.   I did.

21   Q.   Do you recall this meeting?

22   A.   I do.

23   Q.   Have you had an opportunity to review this

24   transcript recently?

25   A.   I have reviewed it, I haven't studied it, but I

Case 10-03269-sgj Doc 187 Filed 10/22/14   Entered 10/22/14 13:50:01   Page 9 of 122
Case 3:14-cv-04163-B  Document 1-8  Filed 11/21/14  Page 151 of 264  PageID 1932

9

1   have reviewed it briefly.

2       Q.   You have reviewed portions with me this

3   morning, correct?

4       A.   I have.

5       Q.   Okay.  And was Mr. Comu in attendance at the

6   meeting?

7       A.   Yes, he was.

8       Q.   Was Mr. Olson there?

9       A.   I don't believe Mr. Olson was there.  I think

10  his partner Mr. Nicoud was there.

11      Q.   And were there creditors' representatives,

12  creditors or creditors' representatives in attendance?

13      A.   Yes.

14      Q.   Was Emil Lippe on behalf of King Louie Mining

15  in attendance?

16      A.   Yes, he was.

17      Q.   And was there an individual creditor there by

18  the name of Buckeye --

19      A.   Buckeye Epstein.

20      Q.   Buckeye Epstein?  Thank you.

21      A.   Yes, he was there.

22      Q.   Okay.  And at the meeting you were asked

23  various questions of Mr. Comu concerning his schedules

24  and statement of financial affairs?

25      A.   Yes, I did.

1    Q.   All right.  I would like you to take a look at

2    Trustee's Exhibit 94, which you can do with the book or

3    on the screen, whichever you prefer.  Ms. Hanks is about

4    to pull up --

5              MS. HANKS:  If I can get my computer to

6    work.

7              MR. ELMQUIST:  Since I am technologically

8    challenged, of which the Court can take judicial notice.

9              THE COURT:  I will.

10              MS. HANKS:  Trustee Exhibit what?

11              MR. ELMQUIST:  It is the schedules.

12              MS. HANKS:  It's the schedules.  Then I

13    will do this.  Wrong one.  I have the docket number

14    wrong.

15    Q.   Okay.  What you see on the screen there would

16    be Schedule A.  Let me ask you generally, Ms. Reed, in

17    connection with and prior to the meeting of creditors,

18    did you have an opportunity to review the debtor's

19    filing schedules?

20    A.   Yes, I did.

21    Q.   And one of your objectives as the trustee at a

22    341 meeting is to question the debtor concerning the

23    debtor's filed schedules and statement of financial

24    affairs; is that right?

25    A.   Yes, it is.

1      Q.   And part of that is to assess the completeness

2   and accuracy of those filings; is that right?

3      A.   Yes, it is.

4      Q.   So you asked various questions of Mr. Comu

5   concerning the schedules and statement of financial

6   affairs?

7      A.   Yes.

8      Q.   I would like to direct your attention to Page

9   Three of the schedule, Schedule B, that pertains to

10  stock and interest in incorporated and unincorporated

11  businesses.  Do you see that reference at Paragraph 13?

12     A.   Paragraph 13, yes, I do.

13     Q.   And did you generally inquire of Mr. Comu

14  concerning various stock listed or equity interest

15  listed in Number 13?

16     A.   Well, it is my practice to allow the debtor's

17  counsel to make a record first, and I do think that

18  Mr. Nicoud went through that list to discuss with me

19  the -- to discuss on the record the things Mr. Comu said

20  he owned, the business interests, and the values that he

21  placed on them.

22     Q.   And based upon the 341 transcript, you believe

23  it was also the case that Mr. Lippe, on behalf of King

24  Louie Mining, also asked questions concerning those

25  assets or those listings?

1      A.   Yes.

2      Q.   If you take a look at the fourth page -- I am

3   sorry, fifth page of 94, where it lists interest in

4   partnerships or joint ventures, do you see there, "Own

5   one percent The Barclay Group, Inc."?

6      A.   I do.

7      Q.   And also take a look at Page Four, the

8   beginning -- or in that Category 13 do you see a

9   reference, just below the line, to "one percent

10  ownership The Barclay Group, 99 percent owned by Bernard

11  Brown"?

12     A.   Yes.

13     Q.   Okay.  Were there questions at the meeting

14  concerning that ownership and who Mr. Brown is?

15     A.   Yes.

16     Q.   And did Mr. Comu testify that Mr. Brown was a

17  resident of France?

18     A.   Yeah, I believe he did, yes.

19     Q.   Okay.  Now, there were questions asked at the

20  meeting concerning The Barclay Group, and I would like

21  to now go back to Exhibit 4 at Page Four, and I would

22  also like you to compare -- I want to talk to you about

23  Page Four, but I also want to talk to you about the

24  answer to Question 18 on the statement of financial

25  affairs, which is Exhibit 95.

1      A.   Do you mean Trustee's Exhibit?

2      Q.   Yes, I meant Trustee's Exhibit 95, the SOFAs.

3  Based upon your review of this transcript, Ms. Reed, do

4  you believe the unidentified speaker is Mr. Nicoud at

5  Page Four?

6      A.   I do think that's the case.

7      Q.   Okay.  And towards the top there you see where

8  it says, "You listed several of item -- are you the

9  officers of any of these companies?"  And see Mr. Comu's

10  response, "Of which company?"

11      A.   Yes.

12      Q.   And he goes on, "Well, we have got The Barclay

13  Group."  And what was Mr. Comu's response?

14      A.   Mr. Comu said, "I am not an officer The Barclay

15  Group.  I am an employee The Barclay Group."

16      Q.   Now, take a look at 95, answer to 18.  Is that

17  consistent with what he represented in his SOFA?

18      A.   I am sorry.  I don't have the statement of

19  financial affairs.  I can't read it.  It is so small.

20      Q.   You can take a look at mine.

21      A.   Okay.  I see it now.  Is this consistent with

22  what?

23      Q.   If you look at the response to 18, Question 18,

24  you see The Barclay Group there listed?

25      A.   Managing partner The Barclay Group.

1      Q.   Inc.?

2      A.   Inc.

3      Q.   Okay.  So his testimony at the 341 meeting was

4   not consistent with what he filed with the Court?

5      A.   No, it was not.

6      Q.   All right.  Now, I would like to direct your

7   attention to Page Six of Defendant's Exhibit 4 where

8   Mr. Lippe is asking questions.

9      A.   Yes.

10      Q.   And the questioning starts out with, "What is

11   the business The Barclay Group"?  And what was Mr.

12   Comu's response?

13      A.   "It is a consulting firm."

14      Q.   And then Mr. Lippe asks, "What kind of

15   consulting?"  And what was Mr. Comu's response?

16      A.   "Provides business plans, provides professional

17   advice to companies."

18      Q.   And Mr. Lippe asked, "What do you do for The

19   Barclay Group?"  And he answers what?

20      A.   "I consult with clients on opportunities that

21   come up."

22      Q.   And Mr. Lippe asks, "Who originates the clients

23   for The Barclay Group?"  And what does Mr. Comu state?

24      A.   "Originates from various sources."

25      Q.   And Mr. Lippe asks, "Are you on a salary

1    commitment?"  And Mr. Comu responds how?

2         A.   "No, sir."

3         Q.   And Mr. Lippe asks, "How are you compensated

4    right now?"  And what does Mr. Comu state?

5         A.   "I," unintelligible apparently, "on an hourly

6    basis."

7         Q.   "And who are the others in The Barclay Group?"

8         A.   "Mr. Bernard Brown owns 99 percent of the

9    company."

10        Q.   Now, I want to turn the page to Page Eight,

11   continuing questioning by Mr. Lippe.  Towards the bottom

12   he asks, "Does The Barclay Group have any assets?"

13        A.   "I don't believe so unless whatever has been

14   disclosed in the bankruptcy filing and stock in The

15   Barclay Group."

16        Q.   Having reviewed the schedules that Mr. Comu

17   filed, is there anything listed in the way of assets of

18   The Barclay Group?

19        A.   I couldn't find anything about assets The

20   Barclay Group.

21        Q.   Given the fact that this is an individual case,

22   there wouldn't be assets listed The Barclay Group, would

23   there, because this is supposed to list his assets, not

24   the assets The Barclay Group?

25        A.   That's correct.

1    Q.   Unless Barclay Group were a dba or the alterego

2  of Mr. Comu?

3    A.   Well, the --

4    Q.   Is that right?

5    A.   Well, that's correct, technically correct, but

6  if The Barclay Group had been shown -- if his interest

7  in The Barclay Group had been shown as having a value,

8  many times the debtors will list what the assets and

9  liabilities are to show whether there is any net value

10  or the -- but, no, it is not required that the Barclay

11  Group's assets be disclosed in the schedules.

12    Q.   But in response to Mr. Lippe's question, he is

13  saying, "I don't believe it has any assets," correct?

14    A.   Correct.

15    Q.   Does Mr. Comu, at this 341 meeting, contradict

16  himself in later questioning with respect to whether or

17  not The Barclay Group has assets?

18    A.   I am not sure what you are referring to

19  essential.

20    Q.   Take a look at Page Nine, bottom of the page,

21  where Mr. Lippe asks, "And the stock Nano Taylor (phon)

22  that you are referencing in your form, is that owned by

23  The Barclay Group or by you?"  And what is his answer?

24    A.   Find it.  Sorry.

25    Q.   Bottom of Nine, bottom of Page Nine.

1          A.    I see it.

2          Q.    Okay.

3          A.    At the top of Page Ten he responds, "No, it is

4     owned by The Barclay Group."

5          Q.    And then at the bottom of Page 11 Mr. Lippe

6     asks, "Did The Barclay Group ever loan any money to Sun

7     Sports?"

8          A.    "I believe they have."

9          Q.    Is there anything in this examination where the

10    business of The Barclay Group is discussed and the

11    assets of The Barclay Group is discussed where Mr. Comu

12    discloses the ownership of 95 million shares of Green

13    Auto stock?

14         A.    Absolutely not.

15         Q.    Is there anything in this transcript that

16    describes the business activity of The Barclay Group in

17    acting as an investment banker to effectuate a reverse

18    merger between Go Green and Ganas?

19         A.    No.

20         Q.    All right.  Did you, during the course of this

21    examination or the questioning, have some concern about

22    the completeness and accuracy of the schedules?

23         A.    Yes, I did.

24         Q.    Did you admonish Mr. Comu with respect to the

25    need for him to review the schedules and statement of

1  financial affairs that he had filed to assure their

2  accuracy?

3       A.   I did.

4       Q.   Take a look at Page 28, please.  I would like

5  you to read into the record your admonishment to Mr.

6  Comu that begins towards the bottom of the page with the

7  words, "Make sure."  "Make sure to put that down."  Do

8  you see that on Page 28?

9       A.   Yeah.

10      Q.   If you would, just read that into the record,

11 please?

12      A.   "Make sure to put that down here that you --

13 $600 or more to one credit card, other things, too, so

14 that there is one thing that looks odd -- so you may

15 need to amend your statement of financial affair with

16 that.  And while we are doing it, I also urge you to

17 review all of the questions and make sure you haven't

18 left anything off.  For example, you have indicated that

19 within the past year you have not made any gifts to

20 anyone of a value of more than $200.  So I urge you to

21 consider whether that is the case, whether you have

22 family and may have made gifts to and anything else that

23 you may not have answered correctly, because this

24 requires some thought, and you did sign these under

25 penalty of perjury."

1    Q.  All right.  And then I want you to also turn

2    the page to Page 29 and read into the record your

3    statement that begins, "I want him to be sure."  And you

4    are speaking to Mr. Comu's counsel at this point; is

5    that correct?

6    A.  Yes, that's correct.

7    Q.  Read that into the record, please.

8    A.  "I want him to be sure and look and see if he

9    has answered the statement of financial affairs

10   questions correctly, because it does -- I mean it

11   just -- in a case of this size and complexity, some of

12   these questions indicate that there were none, and it

13   just kind of looks like something he needs to revisit, I

14   think."

15   Q.  All right.  Ms. Reed, is it your customary

16   practice as a trustee to maintain internal notes

17   relating to a case as the case progresses?

18   A.  Yes.

19   Q.  Is Defendant's Exhibit 5 a copy of the notes

20   you maintained for this case from 2/23/2010 through

21   February 7, 2014?

22   A.  You mean Trustee's Exhibit 5?

23   Q.  No, Defendant's Exhibit 5 in that --

24        MR. ELMQUIST:  May I approach?

25        THE COURT:  You may.

1     Q.   This here, this is defendants.

2     A.   Oh, I am sorry.  I didn't know what we were --

3  Oh, Defendants, I see, Defendant's 5, yes, that is a

4  printout from my computer.  Everything is kept

5  electronically.  It is a printout of all the notes in

6  the file.

7     Q.   And this is from February 23, 2010, to

8  February 7, 2014; is that right?

9     A.   I don't know if there is anything after

10  February 7, but that sounds about right.

11     Q.   Look at the top of the document.

12     A.   Well, there is -- but, yes, that seems to be

13  the last entry.

14     Q.   Okay.  Are these records -- Are these notes

15  maintained contemporaneously?

16     A.   Yes.

17     Q.   So you made the notes at or about the date that

18  that is entered?

19     A.   Exactly, yes.

20     Q.   There is -- Let's go to the first page so we

21  explain something to the Court here.  You have a heading

22  called previous status memos.  Do you see that?

23     A.   Yes.

24     Q.   Does that refer to the status memos that are

25  filed with the Court?

1          A.   They are not always filed with the Court.  We

2     got various requests for status reports from --

3     sometimes with Federal court, sometimes from the United

4     States Trustee, and some of those get filed with the

5     Court; some of them just go to the US Trustee.

6          Q.   I asked the wrong question.  These status memos

7     are invariably sent to the US Trustee's office at their

8     request.  Sometimes they are filed and sometimes they

9     are not filed with the Court; is that right?

10         A.   Correct.

11         Q.   Let's go to Page Three, Three of Three, and you

12    will see there is a reference there to -- on 3/1/10 that

13    debtor -- you understand that to be the debtor's

14    attorney?  Who would that be, Mr. Olson?

15         A.   Yes, this is a memo made by my assistant,

16    Regina Burton, thus the RB on that note.  "Debtor

17    attorney to come meet with Diane and bring documents on

18    Monday, 3/8/10, at 3:00 p.m. -- three o'clock."

19         Q.   And did Mr. Olson come and meet with you that

20    day, to the best of your knowledge?

21         A.   He did.

22         Q.   Okay.  And do you recall that meeting at all?

23         A.   I do.

24         Q.   Okay.  Tell the Court the purpose of that

25    meeting so far as -- well, did Mr. Olson request the

1   meeting, or did you request the meeting, or do you

2   remember?

3       A.   I had asked Mr. Olson to provide me with

4   certain documents and information, and he called me up

5   and said, "I have everything together.  It is kind of

6   complicated.  I would like to bring it to you instead of

7   just sending it to you."  And I said fine.

8       Q.   Do you generally recall what documents and

9   information you asked Mr. Olson to provide?

10      A.   Oh, I asked for bank statements, tax returns on

11  all the companies that he had an interest in.  I don't

12  recall.  I think there were three or four specific

13  things I asked for.

14      Q.   In a case like this and a meeting like this,

15  you would typically ask for information relating to the

16  debtor's business interests and stock and what have you?

17      A.   All the assets in general.

18      Q.   And so you would also ask for tax returns for

19  companies in which the debtor had a significant

20  interest; is that right?

21      A.   I did, in fact, do that, yes.

22      Q.   Okay.  And did Mr. Olson comply with your

23  request?

24      A.   He did.

25      Q.   So he brought you various documents?

1      A.   He did.

2      Q.   All right.  Do you remember him bringing to you

3  a stock certificate issued to Mr. Comu by a company

4  called Ganas Corp?

5      A.   I do.

6      Q.   Take a look at Trustee's Exhibit 3, either in

7  my book or on the screen or both.

8      A.   Oh, okay.

9      Q.   Take a look at the Exhibit 3, Ms. Reed, and

10  tell me if you believe this to be a copy of the

11  certificate that was delivered to you?

12      A.   It is.

13      Q.   Was the original certificate delivered to you?

14      A.   Yes.

15      Q.   Do you recall having any discussions -- let me

16  back up a second.  Was Mr. Comu at this meeting?

17      A.   No.

18      Q.   Okay.  Do you recall having any discussions

19  with Mr. Olson concerning this certificate?

20      A.   Yes.

21      Q.   Tell me what you recall discussing about it.

22      A.   Mr. Olson told me that he did not believe this

23  was property in the bankruptcy estate, because this deal

24  didn't close until January of 2010, at which time Mr.

25  Comu had earned this.  But he felt like Mr. Lippe, who

1  at that time was representing Mr. Katz but also had

2  offered to be my special counsel, he felt like Mr. Lippe

3  was going to probably take issue with the question of

4  whether this was actually property of the estate.  And

5  he said that that is why he wanted to hand it to me, and

6  he didn't want anybody thinking that Mr. Comu was doing

7  anything he shouldn't do with what might be alleged to

8  be property of the estate.  And he said it didn't have

9  any value anyway because this was a start-up company and

10  there was no value and the shares were restricted for

11  several years, and that he just wanted me to have them

12  so that nobody would accuse Mr. Comu of any, you know,

13  anything he wasn't allowed to do with that.

14      Q.   Okay.  Based upon what Mr. Olson had reported

15  to you at that meeting, was it your understanding that

16  the transaction that gave rise to the issuance of this

17  certificate did not close until the date this

18  certificate was issued?

19      A.   Yes.

20      Q.   And that date on the certificate is January 13,

21  2010?

22      A.   Yes, I didn't recall.  For some reason I

23  thought it was January 10th of 2010, but, at any rate,

24  it was January of 2010 was the date that the deal

25  supposedly closed and he earned his shares, share

1  certificate.

2      Q.   Again, that was based upon what Mr. Olson

3  understood at the time?

4      A.   Mr. Olson said that Mr. Comu had told him that.

5      Q.   Okay.  And is it the case that this certificate

6  -- the original certificate was given to you by

7  Mr. Olson, basically for safekeeping pending a

8  determination of whether it was property of the estate?

9      A.   That was my understanding, yes.

10      Q.   At that time did you have any further

11  information concerning Ganas Corp or the interest of The

12  Barclay Group in Green Auto?

13      A.   No.

14      Q.   In fact, based upon the representations made by

15  Mr. Comu in his schedules and at the 341 meeting, you

16  believe him to have owned one percent of that company,

17  correct?

18      A.   The Barclay Group?

19      Q.   Yes?

20      A.   Yes, Mr. Comu had told me he owned one percent

21  of The Barclay Group.

22      Q.   And when did you discover that that might not

23  be the case?  Was it after you learned about the fact

24  that the stock swap with Brown and Lampe was a sham

25  transaction?

1        A.   It was -- I believe that is when we began to

2   believe that we -- that there really had not been --

3   that it was not accurate for Mr. Comu to say that he

4   only owned one percent, but that was far down the road

5   in discovery before we got that information.

6        Q.   Okay.

7             MR. VITAL:   Your Honor, I have an

8   objection.  It is just in the nature of a clarification

9   regarding foundation on the date that the testimony

10  relates to.

11            MR. ELMQUIST:   I am sure I can tie that up.

12            THE COURT:   Sustained.

13       Q.   Ms. Reed, let's look at Exhibit 61.

14       A.   Trustee's?

15       Q.   Yes.

16       A.   Okay.

17       Q.   Now, this document, which has been admitted

18  into evidence, is the acquisition and plan of shared

19  exchange between Brown and Lampe and The Barclay Group.

20  Do you see that?

21       A.   I do.

22       Q.   And you will see at the bottom of the exhibits

23  there is a deposition stick marked Brown 2?

24       A.   Yes.

25       Q.   That, I will represent to you that that sticker

1   was affixed to this document in connection with my

2   examination of Bernard Brown.  Do you recall having any

3   knowledge of this document or anything about it prior to

4   my discussion with you at his examination?

5        A.   Absolutely not.

6        Q.   I am not sure the exhibit number.  My paralegal

7   will find it.  But we have in the record Mr. Brown's

8   examination that was conducted on March 18, 2013.  Take

9   a look at Exhibit 60, Trustee's Exhibit 60, Ms. Reed.

10        A.   Okay.

11        Q.   Turn to Page 10 of that transcript, Line 10,

12   and you see I am referring to, I state, "Take a look at

13   Exhibit 2 and tell me if that is the document you are

14   referring as the share swap.  This is the one that is

15   marked."

16             And does Mr. Brown further down on Line 22

17   acknowledge that that is, in fact, the agreement?

18        A.   Yes.

19        Q.   Look at my question at Line 22.  I ask, "And so

20   this acquisition and plan of share exchange is the only

21   document that evidences Brown and Lampe's or your

22   ownership in The Barclay Group; is that what you are

23   saying?"

24             Yeah -- and his answer is what?

25        A.   "Yeah, I thought there was another one as

1   well."

2        Q.   And I asked, "Another one of what?"

3        A.   "Another document.  Is there another document

4   or is this the only one?"

5        Q.   And my question is what?

6        A.   You said, "You" -- is that what you --

7        Q.   Yes.

8        A.   "You tell me.  I don't know what documents

9   there are.  What other document are you thinking about?

10  Let's go off the record a second."

11       Q.   Have you ever seen any other document that

12  would indicate any ownership interest by Mr. Brown in --

13  or Brown and Lampe in The Barclay Group?

14       A.   No.

15       Q.   So this examination was done at March of 2013.

16  Is that at or about the time that you learned from your

17  counsel that, in fact, this transaction that supposedly

18  gave rise to a 99 percent interest to Brown and Lampe

19  was a sham transaction?

20       A.   I believe that's correct, although I don't know

21  if that is the first date -- I don't quite understand

22  whether this document was produced by him at his

23  deposition.  Is that what you are representing to me?

24       Q.   I guess what I am representing to you is the

25  first time we had any understanding of it was at that

1    deposition.

2         A.   Oh, well, that's the first time I recall your

3    suggesting to me that it was a sham transaction and that

4    you believed Mr. Comu still owns 100 percent of The

5    Barclay Group.

6         Q.   So let me posit a hypothetical.  If Mr. Comu

7    was the sole shareholder of The Barclay Group when that

8    sham transaction was done, and this transaction was

9    supposed to be an exchange with 100 percent of the

10   shares of The Barclay Group owned by Mr. Comu in

11   exchange for 99 percent of the stock in Brown and Lampe

12   in that exchange, and Brown and Lampe didn't exist, it

13   was not a legally existing entity, such that the

14   transaction was a sham, who then would be the 100

15   percent owner of The Barclay Group?

16        A.   Mr. Comu.

17        Q.   Okay.  Ms. Reed, if you had known, back in

18   February 2010 when you conducted the 341 exam, that Mr.

19   Comu owned 100 percent of The Barclay Group and that The

20   Barclay Group had just completed a transaction which

21   gave rise to its right to receive 95 million shares

22   roughly of public -- of stock of a public company, would

23   you have administered this case and this estate

24   differently than you have?

25        A.   Absolutely.

1     Q.   Tell the Court in what respects you would have

2   administered the case differently?

3     A.   Well, I certainly would have taken steps to

4   assess whether I needed to take control of The Barclay

5   Group or, at least, freeze its assets so that those

6   assets couldn't be transferred out of The Barclay Group.

7     Q.   Okay.  I would like you to take a look at

8   Trustee's Exhibit 18.  This is the 2010 tax return.

9   Actually let's look at 17 first.  That is the 2009 tax

10   return for The Barclay Group.  Are you there?

11     A.   I am.

12     Q.   Okay.  Take a look at the fifth page of the tax

13   return and tell me whether there is a balance sheet

14   completed for this return?

15     A.   There is not.

16     Q.   And it is your understanding that there is no

17   balance sheet completed for Exhibit 17 because no

18   balance sheet was required, given the fact that there

19   was only 209 or $210,000 of income that year?

20     A.   Yes.

21     Q.   Now, let's take a look at Exhibit 18, which is

22   the 2010 return for The Barclay Group.  And the reported

23   income or reported gross receipts that year was

24   2,366,775, correct?

25     A.   Yes.

1      Q.   Given that income, a balance sheet was

2  required, correct?

3      A.   That's my understanding.

4      Q.   Okay.  Take a look at Page Five.

5      A.   Okay.

6      Q.   You see that there is a balance sheet completed

7  for the beginning of the tax year and the end of the tax

8  year?

9      A.   Yes.

10     Q.   For this return the beginning of the tax year

11  would be 1/1/10, correct?

12     A.   Correct.

13     Q.   So that would effectively have been the date,

14  more or less, that the bankruptcy case was filed?

15     A.   It was the following day, yes.

16     Q.   And what does the balance sheet show as far as

17  assets of The Barclay Group?

18     A.   At the beginning of the year it says it has

19  48,000 in trade notes and accounts receivable.

20     Q.   And what does it show for liability?

21     A.   Only the thousand dollars common stock.

22     Q.   If the Green Auto transaction closed effective

23  November 2019 (sic) and The Barclay Group was entitled

24  to receive 95 million shares of Green Auto stock, should

25  that stock have been listed in this balance sheet as an

1   asset --

2        A.   Which asset again?

3        Q.   Yes, if The Barclay Group was entitled to

4   receive 95 million shares of Green Auto stock as of

5   1/1/10, should that entitlement, that asset, that right

6   to receive those certificates, been listed as an asset

7   of The Barclay Group?

8        A.   I don't know the answer to that.  If it had not

9   been received, I don't know that, at the beginning of

10  the year, it would have been required.

11       Q.   What about at the end of the year, if the stock

12  was still owned?

13       A.   I would think that it needed to be listed.

14       Q.   Okay.  From the standpoint of your liquidating

15  the stock of The Barclay Group, at which -- well, let me

16  ask you this question.  If Mr. Comu owned 100 percent

17  The Barclay Group and The Barclay Group had 95 million

18  shares of Green Auto stock, what would you have done, as

19  it relates to liquidating the assets of The Barclay

20  Group, if anything, in administering this estate?

21       A.   Well, barring any -- a trustee has to be

22  careful when there is a separate business entity owned

23  by the debtor, because you don't know what kind of

24  liabilities you might be bringing into your estate,

25  along with the assets of the company, if you take steps

1    to bring the company basically into the -- into the

2    bankruptcy estate.  So barring any discovery of

3    significant liabilities or debts -- and I mean

4    liabilities like, you know, potential claims or anything

5    that could be brought into the estate -- I would

6    liquidate The Barclay Group, liquidate the assets of The

7    Barclay Group for the benefit of Mr. Comu's creditors.

8         Q.   So, in other words, you would have taken steps

9    in your regional business judgment to sell the stock of

10   Green Auto that had been issued to The Barclay Group?

11        A.   I would or to sell the shares of The Barclay

12   Group.

13        Q.   Okay.  And you didn't do that in this case

14   because you didn't know that Mr. Comu owned 100 percent

15   of the company; is that right?

16        A.   Correct.

17        Q.   Ms. Reed, as this case progressed, you obtained

18   information concerning Green Auto stock and its

19   tradability or restrictions and impediments to sell on a

20   public market, correct?

21        A.   Yes.

22        Q.   Okay.  And through the course of obtaining

23   information about that, did you learn that the stock

24   that had been issued in connection with the merger --

25   that the restrictions on that stock would lift on or

1  about December 23, 2013?

2      A.  I did become aware of that.  It wasn't that --

3  Let me just add that that date had not been established

4  when the bankruptcy case was first filed.  The

5  restriction on the face of the shares of stock doesn't

6  contain that date.  Mr. Olson told me it would be

7  several years, because certain things had to happen

8  before the stock could be publicly traded.

9      Q.  How did you learn that a restriction on the

10  trading of the stock would be lifted on December 23,

11  2013?

12      A.  I learned somehow through this litigation -- I

13  can't tell you exactly -- that there was litigation in

14  Arizona where Mr. Comu had been causing some shares of

15  stock, I believe, to be sold, some restricted shares of

16  stock to be sold, but the restriction was not printed on

17  the face of the certificates.  And so Mr. Comu or The

18  Barclay Group or various business entities had been sued

19  to stop the sale of the restricted shares and caused

20  them to return the shares and have the restriction

21  printed on the face of it.  And in the course of that

22  litigation the Judge --

23      Q.  Ms. Reed, let me interrupt, just so the Court

24  understands.  Was that lawsuit brought by Green Auto?

25      A.  I believe it was, yeah.

1      Q.   And it was brought to enjoin the sale of that

2  stock?

3      A.   Exactly.

4      Q.   Okay.

5      A.   And so, during the course of that litigation,

6  the Judge found that all the reporting requirements to

7  the SEC to make these shares become unrestricted had

8  been -- I forget the terminology as far as what was

9  filed, but the papers had been filed that would cause

10 these shares of stock to be unrestricted as of December

11 2013.

12     Q.   Okay.  And so did you have some concern about

13 the stock that was in the control of Mr. Comu, either

14 through The Barclay Group, with other business entities?

15 When I say this stock, I am referring to Green Auto

16 stock.  That that stock that would become unrestricted

17 would be sold by Mr. Comu before this trial would

18 determine ownership?

19     A.   I did.

20     Q.   Did you, by virtue of that concern, ask me to

21 seek, through agreement or otherwise, an injunction

22 against the sale of that stock by Mr. Comu and

23 affiliated entities?

24     A.   I did.

25     Q.   And was an agreed injunction entered in the

1  case by December 20, 2013?

2      A.   I don't remember if that is the vehicle that

3  was used, but I do know that there was an agreement

4  reached and the --

5      Q.   But there was, in fact, an injunction issued.

6           MR. ELMQUIST:  Ask the Court to take

7  judicial notice of that injunction, for purposes of this

8  record.

9           THE COURT:  The Court will do so.

10     Q.   Okay.  So an injunction was issued upon --

11 well, actually initially a TRO and then a preliminary

12 injunction.

13          MR. ELMQUIST:  And, Your Honor, if I might

14 ask that the Court take judicial notice of both the

15 original TRO and the preliminary injunction that was

16 later entered.

17          THE COURT:  The Court will do so.

18     Q.   And so, based upon that injunction, it is your

19 belief that there would be no stock sold by Mr. Comu or

20 any affiliated entities because of that injunction; is

21 that correct?

22     A.   No Green Automotive stock, that's correct.

23     Q.   Okay.  Ms. Reed, you are not -- in this lawsuit

24 that has been filed -- And we have filed a complaint and

25 intervention, correct?

1      A.   Correct.

2      Q.   Or you have filed.  And the complaint and

3  intervention is essentially to have this Court determine

4  that Mr. Comu is the de facto owner of The Barclay Group

5  and that Sunset Pacific is also an asset of the estate

6  because of joint control of that partnership; is that

7  right?

8      A.   Correct.

9      Q.   And that you are seeking the alterego

10 determination that would hold The Barclay Group, Sunset

11 Pacific and Mr. Comu, jointly and severally, liable for

12 the obligations of this estate?

13     A.   Yes.

14     Q.   You did not, based upon information you had at

15 the time the complaint and intervention was filed, you

16 did not chose to joint in the relief sought by the

17 plaintiffs to have Mr. Comu's discharge revoked; is that

18 right?

19     A.   That's correct.

20     Q.   Based upon what you have learned -- let me back

21 up a second.  This morning we discussed evidence from

22 the standpoint of what had been learned about the

23 effective date of the merger, right?

24     A.   Yes, yes.

25     Q.   And I informed you that there were several

1   pieces of clear evidence that indicated the merger was

2   closed in November of 2009?

3        A.   Correct.

4        Q.   And you recall that Mr. Olson, basically

5   representing what his client had told him, was that that

6   merger had not closed until January and that that was,

7   in fact, Mr. Comu's testimony throughout this case; is

8   that right?

9        A.   Correct.

10        Q.   And that that -- those representations

11   materially affected the manner in which you handled this

12   case?

13        A.   Yes.

14        Q.   Knowing what you know today, that, in fact, the

15   merger closed prior to the filing and Mr. Comu knew that

16   it closed prior to the filing, has your position changed

17   with respect to whether or not you feel Mr. Comu's

18   discharge should be revoked?

19        A.   If I knew then what I know now, I would have

20   joined in the request to revoke the discharge, yes.

21             MR. ELMQUIST:  All right.  Do we have the

22   email marked as an exhibit?

23             MS. HANKS:  No, I don't have it out.  We

24   didn't -- I don't have it on my system.

25             MR. OLSON:  The bank statement?

```
 1                MR. ELMQUIST:  Yeah.

 2                MR. OLSEN:  December '10?

 3                MR. ELMQUIST:  (Inaudible)

 4                MS. HANKS:  It is not uploaded yet.

 5                MR. ELMQUIST:  Your Honor, do you have a

 6     copy of (Inaudible)?

 7                THE COURT:  I do.

 8                MR. ELMQUIST:  May I approach, Your Honor.

 9                THE COURT:  You may.

10         Q.   I am handing you what has been marked as

11     Defendant's 10, Exhibit 10.  Take a moment to review

12     this, Ms. Reed, and tell me whether you have seen this

13     document before today, before now.

14         A.   Is there a question coming?

15         Q.   My question was:  Have you seen this document

16     before?

17         A.   I have not.

18         Q.   I will represent to you that this pertains

19     to -- well, take a look at the second page, and you will

20     see, towards the middle of the page, there is the

21     debtor's name and a line and then a figure below it of

22     5,037, looks like, 85.  Do you see that?

23         A.   I do.

24         Q.   I will represent to you, because Mr. Olson has

25     represented it to me on behalf of his client, that this
```

1 figure represents, as of February 13, 2012, or, I guess,

2 as of July 24, 2012, the balance of an account in

3 Istanbul, Turkey, in Mr. Comu's name.  And my question

4 to you is:  Prior to receiving this document, were you

5 aware that Mr. Comu had an offshore account in Turkey

6 with $5,000, roughly, in it?

7      A.   Not until today.

8      Q.   Had you been informed of this previously, what

9 would you have done?

10      A.   I would have made demand, either directly to

11 the bank or demand of Mr. Comu, that he get that money

12 to me.

13      Q.   And that would be because this $5,000 is

14 property of the bankruptcy estate?

15      A.   It is an undisclosed asset of the bankruptcy

16 estate, yes.

17      Q.   And, well, let me back up and tell you that it

18 has been further represented to me and perhaps Mr. Comu

19 that this account has been open for ten years --

20      A.   I see that in there, in the cover statement

21 from Mr. Comu to Mr. Olson.

22      Q.   Which would immediately, without any question,

23 be property of the estate?

24      A.   Yes.

25      Q.   Is this another reason why you believe, in this

1  instance, Mr. Comu's discharge should be revoked?

2      A.   It is.

3      Q.   Okay.

4           MR. ELMQUIST:  Pass the witness.

5           THE COURT:  Mr. Olson.

6                CROSS EXAMINATION

7  Of Diane Reed by Mr. Olson:

8      Q.   Ms. Reed, you and I have visited two or three

9  times during the course of this case; is that right?

10      A.   Yes, that's right.

11      Q.   And I was not able to attend the meeting of

12  creditors, but I have read the transcript, and I assume

13  you have, too, or replayed the audio.  Would it be fair

14  to say that Mr. Lippe and Mr. Epstein were very dubious

15  about the testimony that Mr. Comu gave at the meeting of

16  creditors?

17      A.   I think that is accurate, yes.

18      Q.   In fact, it was confrontational at times?

19      A.   Yes.

20      Q.   And the Court can read the transcript, and it

21  had been admitted in evidence, and I don't want to go

22  over it line by line, but I want to highlight a couple

23  of things for you.

24           Let me start with when we get to

25  Mr. Epstein.  Look at Page 14 of the transcript in the

```
 1  middle of the page where you ask Mr. Epstein, "Do you
 2  believe you have a claim against Mr. Comu personally
 3  individually?"  Have you found that?
 4       A.   I see it, yes.
 5       Q.   He told you, "I actually think that Mr. Comu
 6  has not been truthful in his testimony here or in the
 7  documents that I looked at, and I believe that he has
 8  bilked the shareholders and just taken the money
 9  personally, a lot of these companies he said he started,
10  ma'am."
11              Mr. Lippe was present for that; was he not?
12       A.   He was.
13       Q.   In fact, he and Mr. Epstein were sitting
14  together, weren't they?
15       A.   Yes.
16       Q.   Did you see him arrive at the meeting of
17  creditors?
18       A.   I don't recall that, no.
19       Q.   All right.  Now, also at the bottom of that
20  page you see Mr. Epstein say, "Mr. Comu, in these
21  documents where he claims he only owns one percent, I
22  believe he owns more than one percent, and those moneys
23  or those shares should be available to creditors, which
24  the shareholders will be asking for their money."  Do
25  you remember that?
```

1           MR. VITAL:  Excuse me, what page are you

2    at?

3           MR. OLSEN:  Bottom of Page 14.

4           MR. VITAL:  Thank you.

5     A.   I see that.

6     Q.   Do you recall that testimony?

7     A.   I do.  That's in reference to the Sun entities.

8     Q.   Yeah.  And, again, down at the bottom of Page

9    15, Mr. Epstein, "You will see that Mr. Comu, if you

10   look at his background, has been on a spree bilking

11   investors"?

12    A.   I see that.

13    Q.   And Mr. Epstein says, on Page 16 in the middle

14   of the page, "Well, I want to ask him about why are all

15   the books and records that would be held under one

16   company at Sun Sports, including The Barclay Group, and

17   all that, why he is on every contract that has to do

18   with The Barclay Group and, of course, Sunset Pacific."

19   Do you see that?

20    A.   I do.

21    Q.   And Mr. Lippe was present for all of that?

22    A.   Yes.

23    Q.   And Epstein goes on, "Anything that he has done

24   I have a record of, though, you know, and he shows up on

25   all the records of all the contracts for The Barclay

1   Group, and he is doing business, not one signature of

2   Bernard Brown."

3        A.   I see that.

4        Q.   Do you see that?  On Page 17 you see where

5   Mr. Epstein says, "I have never seen Phyliss Comu ever.

6   I guess she wouldn't know anything about any one of

7   these companies.  Same thing to do with Bernard Brown

8   who lives in France; the only deals he has ever done

9   with C.J. is converting C.J.'s stock into cash and

10  sending him back cash."

11       A.   I see that.

12       Q.   And Mr. Lippe heard all that?

13       A.   Yes.

14       Q.   And then on the bottom of Page 18 you see where

15  you told Mr. Lippe you wanted to talk to him about the

16  causes of action that he believes he has, and you wanted

17  to see if there was any interest in the estate to lay

18  claim to any of those?

19       A.   I see that.

20       Q.   And then on Page 19 you are saying that, "There

21  appears to be things that need to be looked into as to

22  dischargeability issues."

23            Do you see Mr. Lippe's comment, "Well, we

24  will be"?

25       A.   I see that.

1    Q.   And then on Page 21 do you see where you

2  invited Mr. Epstein to let you know what causes he

3  thought he had, and he said he would put them in writing

4  and send them to you?

5    A.   Yes.

6    Q.   And then do you see where you said you would be

7  delighted to look at that and see if there is any claims

8  that you could make?

9    A.   Yes.

10   Q.   And then on Page 23 do you see where you asked,

11  "Mr. Lippe, do you know of anything else I should be

12  asking for?"

13            And Lippe says, "No, we are trying to -- we

14  will do a lot of exploring in Sunset Pacific.  We

15  believe it has been used to hide assets from creditors"?

16   A.   Yes.

17   Q.   Do you remember that?

18   A.   Yes.

19   Q.   And on Page 27 by that point you are starting

20  the list of things that you wanted the debtor to produce

21  for you?

22   A.   Okay, yes.

23   Q.   Now, when I came out and met with you on

24  March 8th, I guess, of 2010, and brought you the stock

25  certificates, the cash, the bank statements and tax

1    returns and whatever else it was that you had asked for,

2    if you look at your case notes, Defendant's Exhibit 5,

3    did you contact Mr. Lippe and invite him to come out and

4    look at all of that?

5        A.  I did.

6        Q.  Did he do that?

7        A.  Yes, he did.

8        Q.  What date did he come out and review those

9    documents?

10       A.  I believe it was March -- Let's see.  You came

11   out on March --

12       Q.  8th, I believe.

13       A.  -- 8th, and Mr. Lippe came on March 24th.

14       Q.  And that was before the deadline to object to

15   the discharge?

16       A.  Yes.

17       Q.  And just tell us what you recall about that

18   meeting with Mr. Lippe on March 24th?

19       A.  Mr. Lippe and I looked at all the documents and

20   things you had delivered.  I had already put the money

21   in the bank, of course.  I didn't have the check but --

22       Q.  Right.

23       A.  -- all the rest of the things, we looked

24   through those, and I told him about your comments about

25   the Ganas stock and why it had no value, and he asked

1  for copies.  I didn't keep any record of exactly what he

2  wanted copied, but he went through all of the documents

3  and things that you -- and he may have asked for just a

4  copy of everything.  I just don't recall.  I know I

5  transmitted some copies to him, but I don't remember

6  what they are.

7           And we talked about him being my special

8  counsel, because he obviously was farther along than I

9  was on the asset discovery and things like that.  And he

10  indicated he was very interested in being my special

11  counsel.

12      Q.  Well, and at the meeting of creditors, I didn't

13  go over it, but I think you will find in the transcript

14  there was discussion of whether there were going to be

15  2004 examinations and so on.  Do you recall that?

16      A.  I think so, yes.

17      Q.  And for a trustee to encounter that type of

18  creditor interest in a Chapter Seven case, is it fairly

19  typical for the trustee to say, "If you want to be my

20  special counsel and run with that, I will consider

21  that"?

22      A.  Absolutely.

23      Q.  Because you don't have the resources or the

24  time to run down every allegation that comes up?

25      A.  Well, I mean I certainly could employ some

1   other attorney, but in a case as complicated as this,

2   where there were clearly assets that needed to be

3   explored, I need counsel.

4        Q.   Sure.

5        A.   And Mr. Lippe, as I said, was so far ahead of

6   the curve with respect to asset discovery that I -- it

7   is not at all unusual for the trustee to use creditors'

8   counsel that is so far ahead on the curve.

9        Q.   Sure.  And, again, it is just a better use of

10  your resources and time?

11       A.   Right.

12       Q.   Did he tell you in that meeting on March 24th

13  the types of things that he thought should be pursued?

14       A.   Well, my recollection is that Mr. Lippe and

15  Mr. Epstein, though, were focused so much on the Sun

16  Sports and Sun Pacific aspects of the case, they felt

17  that -- of course, Mr. Epstein's interest in this case

18  was through the Sun Sports and Sun Pacific --

19       Q.   Right.

20       A.   -- entities.  So they both were very interested

21  in that.  And Mr. Lippe, when I told him -- when I

22  showed him the stock certificate and told him I didn't

23  think it had any value for the reasons that you had

24  explained to me -- shares were restricted, couldn't

25  really be sold on an active market unless you had a

1    private sale, and they weren't property of the estate

2    anyway -- and he sort of analyzed that a little bit and

3    said he agreed with me that that probably didn't have

4    any value, but he was glad to know, you know, where it

5    was, where the share certificates were -- share

6    certificate is, but that he believed the real value in

7    this estate was in this Sun Pacific interest that he

8    thinks should not -- I mean that they should be brought

9    into the estate, that they should not be the wife's

10   separate property.

11        Q.   Now, he also, by that time, had filed a proof

12   of claim based on their fraud judgment in New York?

13        A.   I don't recall when he filed his proof of

14   claim.

15        Q.   But was there any discussion of that fraud

16   judgment, the background for his claims?

17        A.   I don't recall.

18        Q.   Well, if he wanted to get an exception to

19   discharge for that, he certainly could do that?

20        A.   Yes.

21        Q.   And trustee's don't file 523s; they file 727s?

22        A.   That's correct.  That's correct.

23        Q.   And did you tell him, you know, that he needed

24   to do something before the deadline?

25        A.   No.

1      Q.   But you all had had that discussion at the

2  meeting of creditors as to the deadline?

3      A.   I don't know that we ever discussed the

4  deadline.  I do -- I did see the reference in the

5  transcript that he said he would be filing a

6  dischargeability complaint.

7      Q.   But he never went forward with any Rule 2004

8  exams?

9      A.   To my knowledge, no.

10     Q.   Never requested any extension of the deadline

11  to object to the discharge?

12     A.   No.

13     Q.   And you never told him to submit an application

14  to be employed as your special counsel?

15     A.   I actually did prepare and file an application

16  to employ him as my special counsel.

17     Q.   Well, the Court's docket sheet will show

18  whatever it shows, but wasn't that sometime after the

19  discharge was issued?

20     A.   Oh, yes.

21     Q.   So not before the discharge deadline?

22     A.   Not before the discharge deadline, no.

23     Q.   So I have done this in depositions.  I haven't

24  done this necessarily in a court proceeding, but I think

25  it is fair in this case.  Is there anything else you

1  would like to tell the Judge about this case that maybe

2  the lawyers haven't asked you yet?

3      A.   I can't think of anything, no, thank you.

4              MR. OLSEN:  You bet.  I pass the witness.

5              THE COURT:  Do plaintiffs have any

6  examination?

7              MR. VITAL:  Yes, Your Honor.

8              THE COURT:  You may proceed.  Are you

9  ready?

10             MR. VITAL:  May I proceed, Your Honor?

11             THE COURT:  You may.

12             MR. VITAL:  Thank you.

13                    CROSS EXAMINATION

14  Of Diane Reed by Mr. Vital:

15     Q.   My name is Victor Vital, Ms. Reed.  You and I

16  have never met before.

17     A.   That's right.

18     Q.   I would like to start with the -- one of the

19  last things you were asked about the objection to

20  discharge and to 523.  Do you know what the exception or

21  objection to discharge would have been on behalf of our

22  client KLM or King Louie Mining?

23     A.   It is my understanding that there was a fraud

24  complaint as a part of the lawsuit and that the Court

25  had found fraud, and so that judgment would be excepted

1  from discharge on the basis of fraud.

2        Q.   Do you know if that fraud judgment had anything

3  to do with The Barclay Group?

4        A.   I do not know.

5        Q.   Or Go Green or Ganas or Green Auto?

6        A.   I am sure it did not.

7        Q.   And you are sure it did not, because Go Green,

8  Ganas and Green Auto were things that you, yourself,

9  indeed, did not know about before discharge; is that

10  right?

11        A.   Certainly any sort of fraud with respect to Go

12  Green or Ganas I didn't know about.

13        Q.   Yes, ma'am.

14        A.   I did know about that share certificate.

15        Q.   Now, that share certificate is interesting.  We

16  don't necessarily have to pull it up because we have

17  seen it, but it is a Ganas share certificate, right?

18        A.   Correct.

19        Q.   Did Mr. Olson explain to you, on behalf of his

20  client or as communicated by his client, that there was

21  some transaction for that Ganas certificate that related

22  to something called Green Auto?

23        A.   I don't recall any specifics about how the

24  share certificate was earned.

25        Q.   So, so it is clear for the Court, your

1    testimony, for the record, is that you don't recall

2    specifically Mr. Olson communicating to you on behalf of

3    his client that there was some transaction called Green

4    Automotive, right?

5         A.   No, my recollection of Mr. Olson's statement to

6    me was something like:  This is a company that he did

7    some work for, and he did a deal, put a deal together

8    for them, and it closed in January, and he got this as

9    his fee.  It is not worth anything, but I mean that -- I

10   don't recall that there was specifically any mention of

11   anything except Ganas.

12        Q.   Ganas?

13        A.   Ganas name.

14        Q.   And to that point, Ms. Reed, you don't recall

15   trying to transport yourself back to 2010 in February,

16   as best as you can, that there was any reference in that

17   meeting, that February 2010 meeting with Mr. Olson, to

18   an entity called Green Automotive?

19        A.   It was March of 2010.

20        Q.   March, I am sorry.

21        A.   But I don't -- I don't recall any mention of

22   Green Automotive at that time.  I mean I am not saying

23   it didn't happen.  He could have mentioned it in

24   passing, that this is the old name and now there is a

25   new name.

1      Q.   But you just don't recall?

2      A.   I just don't recall, huh-uh.

3      Q.   Certainly it is not reflected in any notes you

4  have?

5      A.   Right.

6      Q.   And I have read that transcript, the creditors'

7  meeting transcript that Mr. Olson took some time to go

8  over with you, and I don't remember any reference to

9  anything called Go Green.  Do you remember that in

10 there?

11     A.   No.

12     Q.   And Mr. Comu was at that meeting, right?

13     A.   Yes.

14     Q.   And as you understand it through your

15 testimony -- as you understand it --

16     A.   Let me make sure.  When you say that meeting,

17 you mean the meeting of creditors?

18     Q.   Yes, ma'am, on February 9th, 2010.

19     A.   Yes, he was at the meeting of creditors.  He

20 testified.

21     Q.   And as you understand it right now, based upon

22 all the discovery that has been amassed by your able

23 counsel as well as our law firm and Mr. Lippe, Mr. Comu

24 knew quite a bit about Go Green; is that right?

25     A.   Yes.

1      Q.   And that didn't make it into the record of that

2   meeting, did it?

3      A.   That's correct.

4      Q.   That is not something he volunteered, is it?

5      A.   That's correct.

6      Q.   And that is something that you certainly would

7   have wanted to know; is that right?

8      A.   Yes, and he -- I mean, most importantly to me,

9   is I cautioned him that there were several things in his

10  schedules that appeared to be blank that should not have

11  been blank.  There were things that needed to be

12  disclosed, and I cautioned him to be sure and look at

13  every single question and make sure that he had answered

14  completely.

15          And to this day he has never amended the

16  schedules to show either the shares of Ganas stock or

17  his right to receive the shares of Ganas stock, which is

18  my understanding now that, as of December 31, 2010, he

19  might not have had the share certificate in his hand,

20  but he did have the right to receive that share

21  certificate, and it has never been disclosed in his

22  schedules.

23          MR. ELMQUIST:  Just a second.  I think she

24  misspoke.  I think she meant December 31, 2009.

25      A.   I don't know what I said.  I am sorry.

1      Q.   December 31, 2010, I think.

2      A.   2009, on the day he filed bankruptcy, he

3   already had a right, at least a right, to that share

4   certificate, and he has never amended his schedules to

5   disclose that asset.

6      Q.   So, in fact, what we have learned and what you

7   have learned as well is that there were sales of Green

8   Auto stock or there were transactions being set up even

9   before the bankruptcy was filed, right?

10     A.   Sales by The Barclay Group, is that what you

11  are talking about?

12     Q.   Yes, Green Automotive shares?

13     A.   Yes.

14     Q.   All right.

15     A.   I believe The Barclay Group -- for some reason

16  I don't know why Mr. Comu's stock certificate says

17  Ganas, but I believe some of the share certificates

18  issued to The Barclay Group say Green Automotive.

19     Q.   Have you seen any other share certificates that

20  have Ganas on them, as opposed to Green Automotive?

21     A.   I don't recall ever seeing any others with that

22  name on it.

23     Q.   Now, you know, I liked to read this book when I

24  was a little kid.  It is called Encyclopedia Brown.  It

25  was a little mystery type book.  I just like mysteries

1    personally.

2                    Do you find it curious, as I do, that those

3    share certificates -- that share certificate for the

4    300,000 shares is in the name of Ganas and not Green

5    Automotive?  Has that crossed your mind?

6        A.    I think it is curious, yes.

7        Q.    And that has crossed your mind as curious

8    before I asked you that question, right?

9        A.    Absolutely.

10       Q.    Would you explain to the Court why you find

11   that curious?

12       A.    Well, just because I have seen, you know,

13   some -- I have seen the litigation, for example, out in

14   Arizona and some things that The Barclay Group has done,

15   and I wondered because a part of this -- a part of the

16   merger and acquisition was that Ganas would actually

17   become Green Automotive, change its name, by change of

18   name become Green Automotive.

19                   And so far as I know the share certificate

20   -- I mean I know there were some share certificates

21   issued later that probably said Green Automotive, and so

22   the explanation might be that this particular share

23   certificate was issued before they got their new share

24   certificates issued in the new name.  That may be the

25   answer.  But I have been curious about why everyone else

1  seems to have gotten Green Automotive stock, and Mr.

2  Comu got Ganas stock.

3       Q.   So what I find interesting, let me ask you if

4  you agree, is that that certificate could have been

5  issued in the name of Ganas and handed to you, to the

6  extent you say it was handed to you, to throw you off

7  the trail, so to speak, so that you did not like connect

8  any dots and figure out, well, what is this Green

9  Automotive, as opposed to this Ganas entity that was not

10 actually on the open market making share transactions?

11      A.   I have no idea why, why that happened.

12      Q.   So let's talk a little bit more about the

13 February 9, 2010, creditors' meeting.  I asked you

14 specifically about whether Mr. Comu, after your caution

15 to him, made reference to Go Green and you said no.

16 Also let me ask you if there was any reference to Ganas

17 at that meeting?

18      A.   No.

19      Q.   Was there any reference to Green Automotive?

20      A.   No.

21      Q.   Now, there was reference to The Barclay Group

22 at that creditors' meeting; is that right?

23      A.   Yes.

24      Q.   But there was no reference in that creditors'

25 meeting, by Mr. Comu or anybody else, about the Barclay

1    Group's involvement with Go Green, right?

2         A.   Correct, he told me -- in essence he told me --

3    he didn't say -- he didn't answer as directly as I would

4    like to have people answer my questions, but he, in

5    essence, told me that The Barclay Group didn't have any

6    assets.

7         Q.   Okay.  So you certainly didn't know and had no

8    idea that The Barclay Group had any interaction with Go

9    Green, right?

10        A.   Exactly, or owned $95 million shares.

11        Q.   Or Ganas?

12        A.   Right.

13        Q.   Or Green Automotive?

14        A.   Correct.

15        Q.   Now, there has been a lot of -- Epstein,

16   Buckeye Epstein, is that his name?

17        A.   That's his name.

18        Q.   Is that his real name?

19        A.   That's his real name.

20        Q.   That's a curious name.  I wonder if he went to

21   Ohio State.  Anyway --

22        A.   I had to ask him that on the record, too.

23        Q.   Did you?  Yeah, all right.  Here is the

24   question I have:  What did Buckeye --

25        A.   Buckeye.

1        Q.   What did Buckeye say about Green Automotive?

2        A.   Nothing.

3        Q.   What did Buckeye say about Ganas?

4        A.   Nothing.

5        Q.   What did Buckeye say about Go Green?

6        A.   Nothing.

7        Q.   What did Mr. Lippe say about Go Green?

8        A.   Nothing.

9        Q.   What did Mr. Lippe say about Ganas?

10        A.   Nothing.

11        Q.   Green Automotive?

12        A.   Nothing.

13        Q.   Now, I took some notes when you were testifying

14   and you made reference to the meeting that you had with

15   Mr. Lippe in your offices.  I think that meeting was

16   March 24, 2010, right?

17        A.   Yes, uh-huh.

18        Q.   Now, during that meeting Mr. Lippe was

19   saying -- was talking about what he thought -- or where

20   he thought the real value to be in this case, right?

21        A.   Yes.

22        Q.   And I wrote this down.  I just wanted to make

23   sure I had it right, that Mr. Lippe said the real value

24   was in Sunset Pacific?

25        A.   I don't know --

1        Q.   Or Sun Sports?

2        A.   The Sun entities seemed to be where he thought

3   Mr. Comu had managed to get assets transferred to his

4   wife so that he didn't have to list them in his

5   bankruptcy schedules.

6        Q.   Now, during that meeting, just to be clear,

7   just like at the creditors' meeting -- or let me give

8   you a better question, and this is more for the record.

9   So at the March 24, 2010 meeting, just as was the case

10  at the creditors' meeting, Mr. Lippe said nothing to you

11  regarding anything concerning Green Automotive, right?

12       A.   Correct.

13       Q.   Or Ganas?

14       A.   Well, we discussed the share certificate.

15       Q.   But other than that, there was no discussion?

16       A.   No.

17       Q.   Certainly no discussion about Mr. Comu's

18  personal involvement with Green Automotive?

19       A.   Nothing.

20       Q.   Or The Barclay Group's involvement with Go

21  Green, Ganas or Green Automotive?

22       A.   Nothing.

23       Q.   Now, I also took some notes about what

24  Mr. Olson communicated to you, and just to be clear

25  these are not Mr. Olson's representations; this is what

1   he is telling you from his client, right?

2       A.   Exactly.

3       Q.   So you understand that, when Mr. Olson is

4   communicating to you, these are not his representations;

5   these are his clients?

6       A.   Mr. Olson was -- I think Mr. Olson is a careful

7   attorney, and I think he was careful to say to me, "C.J.

8   says that" --

9       Q.   That's right, and I just want to be clear

10  because this is not Mr. Olson's -- this is not him at

11  issue; this is his client, right?

12      A.   That is correct.  I don't think Mr. Olson did

13  any personal investigation of these facts.  He was just

14  telling me what his client represented.

15      Q.   And that is all he can do is ask his client,

16  right?

17      A.   Correct.

18      Q.   Just like we ask the debtor in these schedules

19  to, in essence, do the same thing, to tell us what is

20  here, right?

21      A.   Correct.

22      Q.   So either through his lawyer or through

23  schedules, that is what we have to go on is what he

24  says, right?

25      A.   Correct.

1      Q.    That is where the focus is, right?

2      A.    Correct.

3      Q.    All right.  So what Mr. Olson communicated to

4   you from his client is that he did not -- that his

5   client did not believe that these Ganas shares were

6   property of the estate, right?

7      A.    Correct.

8      Q.    He did not think they had any value, right?

9      A.    Correct.

10      Q.    Because it was a start-up company, right?

11      A.    Several reasons.

12      Q.    And the shares were restricted, right?

13      A.    Correct.

14      Q.    So -- and that was communicated to you before

15   you met with Mr. Lippe, right?

16      A.    Correct.

17      Q.    So when you met with Mr. Lippe what you did, as

18   a careful trustee, is communicate to Mr. Lippe, who is

19   like curious about what is going on, what is

20   communicated by C.J. Comu, right?

21      A.    Exactly.

22      Q.    And you relayed very carefully exactly what

23   C.J. Comu had communicated to you through his lawyer,

24   right?

25      A.    I believe so.

1      Q.    And it appears to me from listening to your

2  testimony that Mr. Lippe reached the same conclusion

3  that you reached after analyzing the information

4  communicated to you by Mr. Olson, right?

5      A.    Correct.

6      Q.    And that conclusion was, well, we are glad to

7  have these shares here, but they don't seem to mean

8  anything; is that right?

9      A.    I think not that they don't seem to mean

10 anything, but that maybe down the road, you know, if

11 this case stays open long enough, maybe these shares

12 will have some value, and we may want to focus on some

13 way to try to liquidate them for the benefit of the

14 estate.

15     Q.    But at the present time that you and Mr. Lippe

16 were having a conversation, the gist of the analysis

17 that Mr. Lippe reached in your presence was the same

18 analysis that you reached that at that present time they

19 had no value?

20     A.    Exactly.

21     Q.    And that is exactly the message that Mr. Comu

22 wanted communicated; is that right?

23     A.    Exactly.

24     Q.    So did Mr. Lippe seem to -- let me ask you

25 this:  Do you have that same belief right now about

1 these shares not having value and just sticking them in

2 a cabinet and not doing anything, because of what was

3 communicated to you by Mr. Olson on behalf of his

4 client?  Let me give you a --

5     A.   Today I think the answer is completely

6 different.

7     Q.   There you go.  Could you tell me about it?

8     A.   I think at that time when we made the analysis

9 I think it was a valid analysis that the shares of stock

10 probably didn't have a lot of value and that the -- I am

11 not a securities attorney, I am a bankruptcy attorney,

12 so the fact that the shares would be restricted for a

13 number of years, I probably gave too much weight to

14 that, in terms of whether or not I would be able to

15 liquidate them for anything.  But the whole -- all those

16 facts together made me believe that, you know, this was

17 just a minor asset that we might some day be able to

18 administer.

19     Q.   And the restricted issue was something that

20 C.J. Comu injected into the analysis; is that right?

21     A.   Well, he did, but it is also stated right on

22 the face of the certificate.

23     Q.   I understand that.

24     A.   But he did say -- he did represent through his

25 attorney that the fact that they were restricted caused

1   them to have no value.

2       Q.   Now, have you come to understand that there

3   were shares that were purportedly or actually restricted

4   that were being sold on the open markets?

5                   MR. OLSEN:  Objection, I think that

6   mischaracterizes the testimony.

7                   THE COURT:  Response?

8                   MR. VITAL:  I can rephrase it.

9                   THE COURT:  Sustained.

10      Q.   Do you know whether there are actually -- there

11  were actually shares that were purportedly or actually

12  restricted that were being sold by The Barclay Group on

13  the open market?

14      A.   It is my understanding --

15                  MR. OLSEN:  Objection, the thing that we

16  complain about is these shares were never sold on the

17  open market.

18                  MR. VITAL:  I can still rephrase it, yeah,

19  because I think we are just talking about -- quibbling

20  about words.

21                  THE COURT:  Sustained.

22      Q.   I will just give it to you real plain like

23  "Dick saw Jane."  Do you know whether there were Green

24  Automotive shares that were purportedly or actually

25  restricted that were being sold?

1     A.   Could I just answer that in a little bit

2   narrative?

3     Q.   Yes, ma'am, please.

4     A.   It is my understanding from the litigation out

5   in Arizona that there were some shares of stock that

6   were actually restricted, but they didn't have the

7   restricted covenant placed on the face of the shares of

8   stock, and those were being sold, and Green Automotive

9   moved to -- complained to enjoin the sale of those

10   shares of stock.

11     Q.   And that is the Utah litigation?

12     A.   I am sorry.  Was it Utah?

13     Q.   Yes, ma'am.

14     A.   Okay.  I said Arizona earlier, too, I was

15   thinking.  So I don't know if that answers your question

16   or not.

17     Q.   It does.  It answers it perfectly.  I

18   appreciate it.

19          So I am going to the Docket Number 11 in

20   this case, and I am going to put it on the Elmo.  I like

21   the name Elmo; I just like that.  So right here there is

22   a disclosure in the schedules by the debtor of a one

23   percent ownership in Sunset Pacific.  Do you see that?

24     A.   I do.

25     Q.   Now, regardless of who owns Sunset Pacific --

1  and that is not something we need to get into because

2  the Judge has heard testimony about that -- what this

3  disclosure purports to disclose is that Sunset Pacific

4  owns shares in Sun Sports; is that right?  Is that how

5  you read that, same way I read it, that there is some

6  common stock in Sun Sports and Entertainment that are

7  being held by the Sunset Pacific, LP?

8       A.   That is not the way I would read that, no.

9       Q.   How would you read that?

10      A.   I would read that to say Mr. Comu -- between

11 those two long lines, Mr. Comu has listed four assets --

12 no, I don't know.  One of his assets is a one percent

13 ownership in Sunset Pacific, LP, and his wife owns the

14 other -- as an explanation, his wife owns the other --

15 it is 98 percent and one percent by his brother.

16           The second thing is common stock of Sun

17 Sports and Entertainment, Inc., 77,760 share -- thousand

18 497 shares at a price of .0001 shares at Titan

19 Securities, Inc.

20           And then a third asset he has listed is the

21 common stock of Global Energy Technology Group, Inc.

22           That is not totally consistent, I

23 understand, with the far right column, because he only

24 puts values on the one percent ownership of Sunset

25 Pacific and the common.  So I don't know what the

1    correct reading is, but as trustee, if I were looking at

2    this, I would think he meant to say he owns 77,000

3    shares of common stock of Sun Sports.

4        Q.    Okay.   In any event, whether the shares are

5    purportedly what is being represented here is ownership

6    of Sun Sports by Sunset or ownership of Sun Sports and

7    Entertainment by Mr. Comu, the fact is that those shares

8    are on this schedule, right?

9        A.    Correct.

10       Q.    With a value of zero?

11       A.    Correct.

12       Q.    And as you go down -- and I have highlighted

13   them -- there are a number of stocks in various entities

14   on here, Global Energy Technology, and then, if you look

15   after The Barclay Group, there are a number of shares of

16   common stock in different entities being disclosed.   Do

17   you see that?

18       A.    Yes.

19       Q.    And the value is zero.   Do you see that?

20       A.    Correct.

21       Q.    Now, on these schedules, notwithstanding the

22   fact that Mr. Comu chose to disclose assets in -- assets

23   in the form of shares in various entities that had a

24   value of zero, he didn't do that with Green Automotive,

25   did he?

1          A.    No.

2          Q.    Or Ganas?

3          A.    No.

4          Q.    And, in fact, has not done that to this day?

5          A.    Right.

6          Q.    I am going to put on the Elmo KLM Exhibit

7     Number 126.  This is a memorandum to Dennis Olson by

8     C.J. Cumo.  Do you see that?

9          A.    Yes.

10         Q.    And that, the subject is his Chapter Seven

11    bankruptcy or the Chapter Seven dash, it says Phyliss

12    Comu.  Do you see that?

13         A.    Correct.

14         Q.    And the date is February 10, 2010.  Do you see

15    that?

16         A.    Yes.

17         Q.    Now, that is the date that -- that is a date --

18    appears to be the date after the creditors' meeting,

19    right?

20         A.    Correct.

21         Q.    And --

22              MR. OLSEN:  Objection, Your Honor.

23              THE COURT:  Basis.

24              MR. OLSEN:  The exhibits filed by

25    plaintiffs contain a number of memos from Mr. Comu to me

1   where the privilege was waived, because I forwarded them

2   to Mr. Elmquist, and we had no objection to those.

3   Similarly, as we hurriedly looked through several

4   hundred exhibits in our rush to get to trial here, I saw

5   another memo that was from C.J. to me that was not ever

6   forwarded to Mr. Elmquist, and I went ahead and let that

7   one go, because I felt we are trying to do transparent

8   proceeding here.

9              But we keep seeing memos to me from Mr.

10  Comu that they got in their electronic discovery where

11  the agreement was that those would not be.  And I just

12  object to this continuing crossing beyond the

13  attorney-client privilege, beyond any agreements that we

14  have, beyond their pleadings, beyond the pretrial order.

15  I object to this or any other memo from my client to me

16  being used as evidence in this case.

17             THE COURT:  Why am I just now hearing about

18  this?

19             MR. OLSEN:  It is the first time he has

20  brought it up.  I told you in your exhibits.

21             THE COURT:  This is KLM 126 that was

22  offered on the first day of trial.

23             MR. VITAL:  I think it is actually in

24  evidence.

25             THE COURT:  It is in evidence.

1        MR. VITAL:  I think it is too late, Judge.

2   It is in evidence.  Sorry.

3        MR. OLSEN:  Well, all right.  All right.

4   It is too late.  That's fine.  That is the deal.  It is

5   too late.  That's fine.

6        THE COURT:  Waived, waiver, overruled.  You

7   may proceed.

8   Q.   Now, we were talking about the date is

9   February 10, 2010.  Do you see that?

10  A.   Yes.

11  Q.   Now, February 10, 2010, was the day after the

12  creditors' meeting?

13  A.   Yes.

14  Q.   And actually it says, "Below are answers from

15  the meeting of the trustee on February 9th, 2010."  Do

16  you see that?

17  A.   Yes.

18  Q.   Now, under personal property, personal property

19  is not real property; it is things like blue jeans and

20  rings and things like that, right?

21  A.   It is everything that is not real estate, in my

22  view.

23  Q.   That's right.  So here you actually see, under

24  Phyliss Comu, there is a reference to 98 percent of

25  Sunset Pacific.  Do you see that?

1        A.    Yes.

2        Q.    Now, not saying whether or not that actually is

3   a valid and/or accurate statement, the fact is that it

4   is listed here.  Do you see that?

5        A.    I do see it.

6        Q.    Now, do you remember seeing or receiving from

7   Mr. Olson, Mr. Comu, or anybody else a listing of assets

8   that would have included anything referencing Green

9   Automotive, Ganas or Go Green, on or before March

10  of 2010?

11       A.    No.

12       Q.    Okay.  And here, even though we saw on that

13  memorandum that I just put on the Elmo that Sunset

14  Pacific purportedly has no value, just like in the

15  memorandum that I showed you on the schedules, it is

16  listed here with an asset value of purportedly zero; is

17  that right?

18       A.    Yes.

19       Q.    Okay.  I want to go to the transcript of the

20  meeting of creditors to point out a few things that were

21  not pointed out in previous examinations of you.  This

22  is on Page 18 of the transcript at Defendant's 4.  You

23  see here a reference to a statement by Mr. Comu that,

24  "It is my Bank of America Visa card that I have had for

25  over ten years, Ms. Trustee.  Mr. Epstein is attempting

1    to confuse you."  Do you see that?

2         A.   Yes.

3         Q.   And do you see on Page 21 there is a reference

4    to Mr. Epstein, and it says, "Mr. Epstein continues to

5    lie." Do you see that?  I am sorry.  Do you see that?

6         A.   I haven't found it yet.

7         Q.   It is on your screen.

8         A.   Oh, I see it.  Yes.

9         Q.   Now, when you were at this meeting and those

10   statements were being made by Mr. Comu, did you reach

11   the conclusion that perhaps whatever Mr. Epstein was

12   saying was not something that Mr. Comu believed to be

13   accurate?

14        A.   Yes.

15        Q.   And not withstanding what Mr. Epstein knew or

16   didn't know or was trying to figure out, the fact

17   remains that the person who knew absolutely everything

18   and could have given full disclosure to everyone so that

19   everyone is on the same page that everybody is on right

20   now with all this evidence was Mr. Comu; is that right?

21        A.   Correct.

22        Q.   And Mr. Comu didn't volunteer any of this

23   stuff, did he?

24        A.   No, he didn't.

25        Q.   Now, Page 27 of this Defendant's Exhibit Number

Case 10-03269-sgj Doc 187 Filed 10/22/14   Entered 10/22/14 13:50:01   Page 75 of 122
Case 3:14-cv-04163-B   Document 1-8   Filed 11/21/14   Page 217 of 264   PageID 1998

75

1  4, there is a request by you.  I am going to read the

2  whole thing.  It says, "Yeah, me too.  Okay, Mr. Comu,

3  what I like to do, so that we don't delay your cake" --

4  I think he meant to say case?

5       A.   Uh-huh.

6       Q.   -- "I am going to need to look at more

7  paperwork that I have asked for.  Why don't you go ahead

8  and put on there six months of bank statements, any

9  account Mr. Comu has signatory authority on or any

10 control over."  Did I read that right?

11      A.   Yes.

12      Q.   And in response to that, we got nothing along

13 the lines of what is now in evidence, Defendant's

14 Exhibit Number 10.  I think it is this right here?

15      A.   Oh, this, uh-huh.

16      Q.   You didn't get anything about a Turkish bank

17 account, did you?

18      A.   We did not.

19      Q.   And I think I heard either Mr. Elmquist or

20 Mr. Olson say that the first time you ever got anything

21 regarding a Turkish bank account was today, right?

22      A.   First time I ever heard about of the Turkish

23 bank account was today, and this is the first time I

24 have seen this paper is after I sat down in this chair.

25      Q.   Now, what I looked at on here, and I am putting

1   it on the Elmo, was here is some reference or

2   representation of what purports to be the funds on hand

3   in that account as of July 2, 2012, right?

4        A.   I think it is July 24, 2012.

5        Q.   Okay.  In any event, it is in 2012?

6        A.   Yes.

7        Q.   In summer?

8        A.   Yes.

9        Q.   Okay.  Question I have for you is:  What does

10  the trustee know about the asset value at any point in

11  2009 regarding this account?

12       A.   All I know sitting here where I am is that Mr.

13  Comu has represented that -- he says, "I can attest it

14  is the same US dollar 5,000 that was placed in the

15  account over ten years ago and has not change.  There

16  has been no deposit or withdrawal since then."

17       Q.   But have you seen any bank account statements

18  for this account for 2009?

19       A.   No.

20       Q.   Or '10?

21       A.   No.

22       Q.   Or '11?

23       A.   No.

24       Q.   So you have nothing against which to judge or

25  verify that statement; is that right?

1    A.    That's correct.

2    Q.    Based upon what you know right now, would you

3  prefer to have Mr. Comu's word about what was in that

4  account, or would you like to see what the statements

5  were?

6    A.    Well, I say I would like to see bank

7  statements.

8    Q.    So as between Mr. Comu's word in this Court

9  right now versus the bank statements, you prefer to have

10  the bank statements?

11    A.    Yes.

12    Q.    Which you don't have?

13    A.    Right.

14    Q.    So we have no idea of asset transactions or

15  activities in that account for any time immediately

16  prior to or since this case has been administered; is

17  that right?

18    A.    Except this one month.  This is the one month

19  period -- no, it is a two week period -- no, I am sorry.

20  This is several months, February 13 to July 24, 2012.

21  Actually, you are right; it doesn't show any activity,

22  although the one above -- the one for the brother shows

23  the activity for the month.  The one for the money

24  market in this Mr. Comu's account doesn't show any

25  activity.  So I assume it would have been -- if there

1  had been activity, it would have been reported the same

2  way the activity in the other account was reported up

3  above.

4      Q.   Certainly, all of the activity statements or

5  purported activity in that account, as disclosed in

6  Defendant's Exhibit Number 10, is in -- from July

7  of 2012 through, it appears, February of 2013; is that

8  right?

9      A.   I read it the other way.  I think it is

10  February -- oh, no, February 2012.

11      Q.   That's right.

12      A.   Through July of 2012.

13      Q.   Can you show me where you are --

14           MR. VITAL:  May I approach, Your Honor?

15           THE COURT:  You may.

16      A.   This date is February 13, 2012, through

17  July 24, 2012.

18      Q.   Okay.  I just got a note from my able counsel.

19  Does it appear to you that the $5,000 is interest on

20  whatever is in the account, as opposed to the principal

21  itself, or do you know one way or another?

22      A.   No, I can't tell.

23      Q.   The fact is the best evidence would be -- or

24  more accurate evidence would be actual statements, which

25  we don't have; is that right?

1        A.    Correct.

2        Q.    And to tie this back, just so it doesn't look

3   like I am meandering, I put this up here because you

4   asked for things like Defendant's Exhibit Number 10 way

5   back before discharge, right?

6        A.    That would certainly have been responsive to my

7   request for documents, yes.

8        Q.    And you did not get this until three years or

9   so or more than three years after discharge, correct?

10       A.    Correct.

11       Q.    Now, I don't do a lot of these cases.  You guys

12  are in bankruptcy court much more than I am.  But I know

13  enough to know that there are people that don't like

14  debtors.  That happens in a lot of cases where you get

15  these upset, mad people coming to creditors' meeting,

16  throwing allegations or anything like that; is that

17  right?

18       A.    Yes.

19       Q.    And sometimes what they are throwing around is

20  substantiated, right?

21       A.    Right.

22       Q.    And sometimes it is not substantial or not

23  credible, right?

24       A.    Right.

25       Q.    Sometimes you just get people who don't like

1   somebody else, and they come in and they vomit and spit

2   all over the debtor; is that right?

3       A.   Right.

4       Q.   So the fact that Mr. Epstein came into this

5   meeting and was spitting mad about a fraudster, Mr.

6   Comu, that happens in a lot of single debtor cases; is

7   that right, where you have folks like Mr. Comu who are

8   sophisticated persons using the auspices of Chapter

9   Seven?

10      A.   Yes.  May I enlarge on that just a little bit?

11      Q.   Please.

12      A.   Mr. Epstein, I think -- the biggest problem

13  with trying to work with information from Mr. Epstein is

14  that he is not an attorney, and he doesn't understand

15  the difference between things that are of moment or

16  actionable by the trustee and things that don't give

17  rise to any claims.  And so a lot of the things he

18  complained about are nothing that I could do anything

19  about, and he swamped me with that kind of information.

20  I mean he would hear Mr. Comu speak on the radio, and he

21  would send me recordings, and he was incensed that Mr.

22  Comu was still out there giving financial advice to

23  people on the radio and apparently trying to put deals

24  together post discharge.

25           And it was just nothing I could do anything

1  about.  It wasn't -- what he was mad about was that Mr.

2  Comu would still hold himself out as this financial guru

3  when he had filed his own bankruptcy, and Mr. Epstein, I

4  don't think, has ever understood that that is not --

5  there is nothing illegal about that.

6       Q.   And further to that point, that happens a lot

7  in Chapter Seven cases with sophisticated business

8  people who use the auspices of Chapter Seven.  You get

9  people coming in, spitting mad that the person is still

10  walking and breathing God's air and living in affluent

11  places.  How can they do this when they are in Chapter

12  Seven, right?

13      A.   Right.

14      Q.   And Buckeye Epstein was no different than any

15  of those folks doing that, right?

16      A.   Yes, I think Mr. Epstein really was trying to

17  give factual information to me, but most of it, the vast

18  majority of the things Mr. Epstein was giving to me was

19  of no help or value to me in assessing the estate's

20  claims or causes of action.

21      Q.   And you understand the information that was

22  being provided to you by Mr. Lippe, some of that

23  information came from Mr. Epstein, or do you know one

24  way or another?

25      A.   I don't know.

1      Q.   Okay.  But regardless, Mr. Lippe was having

2   conversations with you about being special counsel, I

3   think I heard that earlier, right?

4      A.   Yes.

5      Q.   And you did not hear anything that Mr. Lippe

6   was communicating to you that would have caused you to

7   join a revocation of discharge action back in 2010,

8   right?

9      A.   That is correct.

10      Q.   So notwithstanding any information from Buckeye

11   Epstein or provided to you by Mr. Lippe, who was

12   insistent on reaching you,  -- He was contacting you,

13   right?

14      A.   Correct.

15      Q.   -- those fellows, Mr. Epstein and Mr. Lippe,

16   did not tell you anything that would have caused you to

17   have joined Mr. Katz's current 727 action; is that

18   right?

19      A.   At that time, that is correct.

20      Q.   But since the filing of this action and the

21   voluminous discovery that has taken place and the

22   discovery that we have had a chance to bring to your

23   attention, to Mr. Elmquist's attention, it is my

24   understanding that you, in retrospect, would have joined

25   this revocation of discharge account, right?

1      A.   Yes.

2      Q.   Because you believe that there has been a fraud

3   committed on this bankruptcy court in a case that you

4   were administering that you wish you would have known

5   about if he would have been forthcoming, right?

6      A.   Correct, he continued --

7      Q.   He being Mr. Comu?

8      A.   Excuse me.

9      Q.   And he being Mr. Comu?

10      A.   Yes.

11      Q.   And I cut you off.  Please.

12      A.    I was just going to say continuing

13   misrepresentation in the form of uncorrected testimony

14   and non-disclosed assets.

15                  MR. VITAL:  I pass the witness, Your Honor.

16                  THE COURT:  All right.  Do we need to take

17   a break?  How long do you think redirect will take?

18                  MR. ELMQUIST:  I have nothing further, Your

19   Honor.

20                  THE COURT:  You have nothing further?  All

21   right.

22                  MR. OLSEN:  I have a few minutes.

23                  THE COURT:  Okay.  Actually, wait, let

24   me -- if you have no redirect, then no one can get

25   recross, okay?  So you have no redirect?

1          MR. ELMQUIST:  That's the way it works,

2   Your Honor.

3          THE COURT:  All right.  Thank you, Ms.

4   Reed.  You are excused.

5          MR. OLSON:  But, Your Honor, just a moment,

6   please.  We said before we started that we would try to

7   get the witness to come in one round so that they

8   wouldn't have to come back.

9          THE COURT:  Okay.  So you would be

10  recalling her if I --

11         MR. OLSON:  I would call her in my defense

12  to ask her these questions.

13         THE COURT:  All right.  Well, then you may

14  go ahead, and then they can go after you.

15         MR. OLSEN:  Right.

16         THE COURT:  All right.  Let's take a ten

17  minute break.  How long do you think you are going to

18  be, Mr. Olson?

19         MR. OLSEN:  Just a few minutes.

20         THE COURT:  Well, let's go ahead and take a

21  ten minute break.

22         (Recess from 11:21 to 11:34.)

23         THE COURT:  Be seated.  All right.  Ms.

24  Reed, I am required to remind you you are still under

25  oath.

```
 1                   THE WITNESS:  Thank you.

 2                   THE COURT:  Mr. Olson, you may submit your

 3     questioning.

 4                   MR. OLSEN:  Thank you, Your Honor.

 5                      FURTHER CROSS EXAMINATION

 6     Of Diana Reed by Mr. Olson:

 7          Q.   Ms. Reed, just a few quick questions.  And

 8     correct me if I am wrong, but I believe in your

 9     testimony this morning when I was asking you questions

10     you said that I told you I anticipated that Lippe would

11     not agree with my characterization of that 300,000 share

12     stock certificate that I was giving you?

13          A.   You said you expected him to attack that, yes.

14          Q.   When you met with Mr. Lippe and showed him that

15     certificate, do you recall whether you told him that I

16     thought that he was going to attack that?

17          A.   I don't know that I -- I probably did not

18     specifically tell him that, that you thought he was

19     going to attack that.  I think what I told him was that

20     you expected it to be an issue and that there would be

21     some disagreement on that, and so you just wanted me to

22     hold the share certificate until that happened.

23          Q.   What was his reaction to that?

24          A.   There was no real reaction to that.

25          Q.   Okay.  Also the testimony, I believe, you gave
```

1  was that I said that the stock certificate didn't have

2  any value, and then I think later on examination by

3  plaintiff's lawyer you said there was some anticipation

4  it would be worth something some day.  Do you recall

5  exactly what I said or what you said?

6      A.   I don't know that you, Mr. Olson, said anything

7  along those lines.  It was my own discussion with

8  Mr. Lippe, at which I said, "Well, it may not have any

9  value now but maybe some day it will and it will be

10 worth the candle."

11     Q.   Well, do you recall in our meeting that I told

12 you that there was obviously a lot of nonexempt property

13 here that we would be interested in trying to buy back?

14     A.   Yes, absolutely.

15     Q.   And that there would come a day when we would

16 try to figure out what stuff was worth?

17     A.   Yes.

18     Q.   And we haven't gotten to that point, have we?

19     A.   Right.

20     Q.   All right.  Now, in that regard, that

21 conversation was March 8 of 2010?

22     A.   Right.

23     Q.   And the restrictions lifted in December of '13?

24     A.   I think that's correct, yes.

25     Q.   A little over three and a half years later?

1        A.    Right.

2        Q.    So the several years has come and gone?

3        A.    Yes.

4        Q.    And now that stock is unrestricted and can be

5    sold?

6        A.    Well, again, I am not a securities attorney.  I

7    have not gone through the process of getting the

8    notation, the restrictive notation, removed from the

9    shares of stock so technically -- this is a technical

10   question.  I don't know if they are unrestricted until I

11   go through that process.

12       Q.    Well, you have hired Baker McKenzie to deal

13   with how you can sell that?

14       A.    I have, but it is my understanding the process

15   is I have to send these in to the transfer agent, or I

16   think it is called the transfer agent, along with

17   certain documentation, and then they will issue new

18   certificates without the restrictive language on the

19   front.

20       Q.    Without the legend on it?

21       A.    And then it will be unrestricted.

22       Q.    Right.  I don't know how much you know about

23   the Utah litigation, but the litigation was filed by

24   Green Auto; is that correct?

25       A.    That's my understanding.

1      Q.   And they were attacking attempts to sell stock

2   that they said was restricted?

3      A.   That is my understanding.

4      Q.   And they got a TRO?

5      A.   Yes.

6      Q.   And then Mr. McNeill, representing The Barclay

7   Group, testified earlier this week, and I don't know if

8   you have heard any of that, but are you aware that the

9   TRO expired, and then the lawsuit became moot when the

10   restrictions were lifted?

11      A.   No.

12      Q.   All right.  You testified at one point just

13   before we took the recess that Buckeye Epstein bombarded

14   you with communications for a while.  Those stopped at

15   some point pretty abruptly, didn't they?

16      A.   In retrospect, you are probably right.  I

17   didn't miss it very much.

18      Q.   Do you remember why that was, or have you

19   learned?

20      A.   No, no, don't recall.

21      Q.   I am thinking they stopped when he started

22   serving his prison sentence in the Federal prison

23   system?

24      A.   Oh --

25              MR. VITAL:  Objection, Your Honor, question

1   assumes facts.  There is no proof of that.

2             THE COURT:  Sustained.

3        Q.  Have you learned that?

4        A.  No, I have not heard that.

5        Q.  All right.

6             MR. VITAL:  The same objection, Your Honor,

7   move to strike.  There is no foundation.

8             THE COURT:  Sustained.

9             MR. OLSEN:  No further questions.

10            MR. VITAL:  None for me, Your Honor.

11            MR. ELMQUIST:  None.

12            THE COURT:  All right.  Thank you, Ms.

13  Reed.  You are excused.

14            THE WITNESS:  Thank you.

15            THE COURT:  All right.  Anything else from

16  the trustee?

17            MR. ELMQUIST:  No, Your Honor.

18            THE COURT:  All right.  Well, Mr. Olson,

19  what are you going to have?

20            MR. OLSEN:  Well, I need to put Mr. Comu

21  back on, and I don't know that I can finish today.  I

22  don't know what your pleasure is.  I can certainly -- if

23  we break here for an early lunch so that you can handle

24  your emergency hearings, if we start at the normal time

25  tomorrow morning I will pass the witness by the morning

1  recess, and I have no other witnesses to call.  So I

2  think we can finish their cross before lunch and maybe

3  argue after lunch.

4              THE COURT:  All right.  Does that sound

5  okay, or are you all thinking there is any scenario you

6  might have a rebuttal witness or --

7              MS. HANKS:  I don't think so, Your Honor.

8  I think we need to finally confirm but, no, I don't

9  believe so.

10             MR. VITAL:  I really don't believe so.

11             MS. HANKS:  Which is my co-counsel telling

12  me, "Hell no."

13             THE COURT:  For lack of a better word,

14  okay.

15             MS. HANKS:  But perhaps what we might do

16  with the time we have right now is that we do have some

17  exhibits that have been offered but are still subject to

18  the relevancy.  And so, instead of dealing with it

19  tomorrow to the extent they come up or dealing with it

20  afterwards, so that everyone can get out, perhaps we

21  could do that now?

22             MR. ELMQUIST:  Just to speak to the

23  scheduling, Your Honor, number one, I have rested.

24  Number two, I don't expect to call any rebuttal

25  witnesses.  Number three, Mr. Olson's projected time

 1  table tomorrow makes sense to me in terms of when we

 2  would wrap all this up.  I may have limited questions

 3  when he recalls Mr. Comu that will be very limited.

 4           THE COURT:  All right.  Very good.  Let's

 5  proceed then in that manner.  We will start at 9:30

 6  tomorrow with Mr. Comu's testimony, and then let's go

 7  ahead with the housekeeping matter --

 8           UNIDENTIFIED MAN:  Your Honor, may I ask a

 9  question of the recorder?

10           THE COURT:  You may.

11           (Off the record discussion)

12           MS. HANKS:  As you know, Your Honor, there

13  are a number of exhibits that we haven't necessarily

14  reached with a particular witness and that are subject

15  to relevance objections.  We will take them one by one.

16           THE COURT:  Okay.

17           MS. HANKS:  The first one is Plaintiff's

18  Exhibit 12.  I believe you have heard the trustee

19  mention a couple of things about the Utah litigation,

20  which initially she mistakenly referred to as Arizona,

21  but that is the Utah litigation.  This regards the

22  injunction that was entered against The Barclay Group

23  against trading restricted shares, and we have supplied

24  the Court, frankly, more for the purpose of providing

25  context with regards to activity, The Barclay Group's

1  activity, with those restricted shares, which should

2  have been assets of the estate.  And so we have supplied

3  both, I believe, the petition, as well as the order

4  granting the injunction, and we do think it is quite

5  helpful to the Court.

6  THE COURT:  And that is all collectively at

7  KLM 12.

8  MS. HANKS:  No, I believe it is 12 and 13,

9  so KLM 12 -- could you go to the heading on the

10  pleading, please?

11  KLM 12, just getting to my -- oh, that is

12  actually The Barclay Group's verified memorandum in

13  opposition to the motion for temporary restraining

14  order.

15  THE COURT:  Okay.

16  MS. HANKS:  So this was actually a document

17  filed by the defendant -- I mean, yes, by The Barclay

18  Group, in which certain facts were verified.

19  THE COURT:  All right.  And then 13 is also

20  from that litigation; is that correct?

21  MS. HANKS:  Yes, Your Honor, 13 is the

22  memorandum decision and order granting the preliminary

23  injunction.

24  THE COURT:  All right.  Your relevance

25  objection, Mr. Olson?

1          MR. OLSEN:  Just the same, these are events

2   that occurred long after the complaint was filed and not

3   something that is fairly contained in the second amended

4   complaint.

5          THE COURT:  All right.  But no objection as

6   to the authenticity of these documents?

7          MR. OLSEN:  No, ma'am.

8          THE COURT:  All right.  And then,

9   Ms. Hanks, your response to the relevance objection

10  again?

11         MS. HANKS:  It is that these reflect --

12  first of all, they have verified facts in here,

13  particularly regarding the effective date of the merger.

14  But, in addition, this litigation concerns the continued

15  efforts of The Barclay Group to trade these restricted

16  shares that were assets of the estate, and this was

17  disposition of -- dissipation of assets of The Barclay

18  Group that belong to the estate.

19         THE COURT:  All right.  I overrule the

20  objection.  I will admit those, KLM 12 and KLM 13.

21             (KLM Exhibits 12 and 13, offered and

22              admitted.)

23         MS. HANKS:  Yes, Your Honor.  The next

24  document that we have on our list is Plaintiff's

25  Exhibit 30.  We have been over quite a few of these,

1   Your Honor.  This is one of the distribution letters

2   from The Barclay Group to Olde Monmouth Stock Transfer,

3   with instructions regarding how to send this -- the

4   cash.  Now, this one is actually of particular interest

5   because this was one of the original -- this was a

6   document that was produced by Mr. Comu in response to

7   the trustee's requests.  And if you will notice, the

8   recipients of all of the transfers of cash except for

9   The Barclay Group are marked out.  In documents we

10  received subsequently from Olde Monmonth Stock Transfer

11  these were actually -- we could see the recipient, and

12  some of those recipients were -- and I believe Mr. Comu

13  testified that he didn't receive any of the cash, but

14  one of them was, for example, Marathon Management, Inc.,

15  which the documents establish is another wholly owned

16  entity of Mr. Comu's, and that was one of the avenues

17  through which he was receiving cash, but he continued to

18  conceal from the trustee and his creditors.

19          THE COURT:  All right.  Mr. Olson, do you

20  have anything else you want to say about your relevance

21  objection on this?

22          MR. OLSEN:  No, ma'am.

23          THE COURT:  All right.  I overrule the

24  relevance objection, and admit it.

25          (KLM Exhibit 30, offered and admitted.)

1             MS. HANKS:  KLM Exhibit 95 is the next we

2    have on our list -- I am sorry, 94.  This is, I believe

3    you have heard testimony concerning Regus Advisers,

4    Inc., which was an entity Mr. Comu started up in the

5    middle of 2010.  He has actually represented that he has

6    been the chairman of that business for quite a few years

7    longer.  And the reason for that is because Regus

8    Advisers is actually the continuation of The Barclay

9    Group business.  And you will see evidence that we

10   supplied to the Court in briefing, as well as that is

11   evidence in our exhibits, that Regus Advisers picked up

12   Barclay Group deals, started receiving payment and deals

13   The Barclay Group was working on before the petition

14   date, and that they have actually continued The Barclay

15   Group business as part of this effort to conceal assets

16   of the estate.  And so not only this is one of the

17   reverse mergers that the Regus Advisers did after, this

18   was a deal that occurred after the petition date.  They

19   received shares in the stock.  And you will also see

20   stock that was received by Regus Advisers in Green Auto

21   at the behest of Mr. Comu.

22             THE COURT:  All right.  Mr. Olson, anything

23   you want to elaborate on?

24             MR. OLSEN:  No, same objection.

25             THE COURT:  All right.  Overruled.  KLM 94

 1    is admitted.

 2              (KLM Exhibit 94, offered and admitted.)

 3              MS. HANKS:  Okay.  So the next we have on

 4    our list is KLM Exhibit 100.

 5              THE COURT:  Okay.  I have 95 as the next

 6    one on my list that was marked.

 7              MS. HANKS:  Yes, I am not sure -- I don't

 8    think it is actually necessary to what -- I mean I think

 9    we are probably not going to be citing to it, but if the

10    Court would like us to address it, we would be happy to.

11              THE COURT:  I am sorry.  Are you offering

12    it or not?

13              MS. HANKS:  We are not.  We are going over

14    to 100.

15              THE COURT:  Okay.

16              MR. OLSEN:  Then would you sustain the

17    objection on relevance, if they are not going to use it?

18              THE COURT:  Well, you are withdrawing the

19    offer; is that correct?

20              MS. HANKS:  We are withdrawing the offer.

21              THE COURT:  So I am just crossing it off as

22    a withdrawn exhibit.

23              MS. HANKS:  Okay.  KLM Exhibit 100, email

24    from C.J. Comu to Chris Troster, Olde Monmouth.  This

25    is -- these are instructions concerning where to send

1    the certificates that are being issued to Mayborne.  If

2    the Court will recall, Mayborne was one of the parties

3    to that memorandum of understanding that was receiving

4    one-third of the 95 million shares that were issued to

5    The Barclay Group.  And Mr. Comu gave instructions to

6    Olde Monmouth about how to split up those 95 million

7    shares.  Part of those were to Mayborne, and here this

8    email tells Olde Monmouth to "send all cert's back to me

9    to Dallas."  So, for example, even though the

10   certificates -- the stock certificates were being issued

11   to Mayborne and First Market Services, he is instructing

12   the stock transfer agents to send the stock certificates

13   to him in Dallas.  And if you will recall Mr. Comu's

14   testimony, it is the physical possession of stock

15   certificates that seemed significant to him as being

16   relevant to his duty to disclose assets.  And here he is

17   keeping all the stock certificates in his personal

18   possession.

19              THE COURT:  All right.  Mr. Olson, do you

20   have anything to elaborate on?

21              MR. OLSEN:  Same objection.

22              THE COURT:  Overruled.  KLM 100 is

23   admitted.

24              (KLM Exhibit 100, offered and admitted.)

25              MS. HANKS:  KLM Exhibit 101, here is an

1  email with Dave Welch, if the Court will go a little bit

2  down.  Dave Welch was the person who was running First

3  Market Services, which was one of the three parties to

4  that big -- they were divvying it up, and here Mr. Comu

5  tells Mr. Welch that, "The TBG books and bank account

6  are open for you any time."  And they are also

7  discussing how these assets are going to get split up.

8  So it is relevant to both the postpetition activity that

9  was the fraudulent disposition of assets, as well as Mr.

10 Comu's control over that process and asset.

11             THE COURT:  All right.  Mr. Olson, anything

12 to add?

13             MR. OLSEN:  Same objection.

14             THE COURT:  Overruled.  KLM 101 is

15 admitted.

16             (KLM Exhibit 101, offered and admitted.)

17             MS. HANKS:  KLM 102, okay, this is a

18 business plan for an entity called global Energy

19 Technology Group, and we -- as we told the Court

20 yesterday, we will give a full account of the evidence

21 that we have in our briefing, but we didn't get to a lot

22 of this information with Mr. Comu.  One of the documents

23 that we have supplied to the Court are filings with the

24 Texas Secretary of State, indicating that Mr. Comu was

25 also a director with this entity called Global Energy

1    Technology Group that -- and that is a position that he

2    did not disclose on his statement of financial affairs.

3                   His business with the Global Energy

4    Technology Group, which is often described as GETG,

5    started before the petition date, was not disclosed in

6    the petition, in his schedules.  In fact, the only thing

7    that he disclosed in his schedules was that Sunset

8    Pacific owns 10 million shares of Global Energy

9    Technology Group, but just like the Green Auto

10   transaction, he did not disclose any of his interest

11   whatsoever in this entity.

12                  And not only is there -- were there

13   interest in this entity and related affiliates, but some

14   of those affiliates are still to this day trading and

15   receiving Green Auto shares that originated from The

16   Barclay Group.  So that is how it is relevant and how it

17   will be borne out in the briefing, although it hasn't

18   shown up in the testimony, Your Honor.

19                  THE COURT:  All right.  Ms. Hanks, this is

20   a business plan or a --

21                  MS. HANKS:  If you will go to the top, it

22   is a business plan for an entity in which Mr. Comu was a

23   director prepetition that he did not disclose.

24                  THE COURT:  All right.  Mr. Olson, do you

25   have --

```
 1              MR. OLSEN:  Same objection.

 2              THE COURT:  All right.  Overruled.  This is

 3    102.  KLM 102 is admitted.

 4              (KLM Exhibit 102, offered and admitted.)

 5              MS. HANKS:  KLM 106, this is a -- so Regus

 6    Advisers is the entity that we have supplied evidence to

 7    the Court is the continuation of The Barclay Group

 8    business and is being used to hide and dissipate Mr.

 9    Comu's assets and is actually continuing to be quite

10    successful in that respect.  If you will look quite at

11    the bottom -- this is a document produced by the

12    debtors.  It is a power point concerning Regus Advisers.

13              And if you will look at the last page,

14    please, the reason it is particularly relevant is

15    because it -- a little bit -- one more up -- is that Mr.

16    Comu has been -- I am not sure exactly which page it is,

17    but it does represent that Regus has been in business

18    since 2009 and that it has -- here, go down -- that it

19    has got offices all over the world, providing services

20    to investment clients.  And there is other evidence, in

21    fact, that will -- and Mervin Price, I think as the

22    Court noted, is Mr. Comu's tenant in his Palladium Drive

23    house.  Anyway, there is a number of different

24    connections, both to personal assets as well as the

25    assets of Barclay Group.
```

 1               I am not sure we found the actual page, but

 2  this one does say that they have been in business --

 3  that they have been providing these services since 2009,

 4  which is before the petition date.

 5               There it is.  Regus Advisers, Inc., was

 6  founded in 2009 as a global advisory firm.

 7               THE COURT:  Mr. Olson, do you have any

 8  elaboration on the relevance objection?

 9               MR. OLSEN:  No, ma'am.

10               THE COURT:  Okay.  Overruled.  KLM 106 is

11  admitted.

12               (KLM Exhibit 106, offered and admitted.)

13               MS. HANKS:  KLM 115 is the next one we

14  have, Your Honor.  This is a promissory note executed

15  June 23rd, 2012, by which Mr. Comu pulled $50,000 from

16  Marathon Management, Inc.  And Marathon Management,

17  Inc., is an entity he actually -- he discloses on his

18  statement of financial affairs that he was, I believe,

19  an officer or a member of Marathon Management, Inc., but

20  what he did not disclose is that he owns the entity

21  100 percent, and he has used that entity to move cash

22  and assets around.

23               And this particular example is he takes

24  $50,000 out of Marathon Management, Inc., to buy a

25  Mercedes that is held in the name of Sunset Pacific.

1  And that cash, actually we have records of TBG cash

2  transfers to Marathon Management.  For example, there is

3  a $225,000 cash transfer, I believe, in 2011, and that

4  cash is coming from this -- from the proceeds of stock

5  sales that The Barclay Group is making over the course

6  of -- that started in 2009 and are continuing to this

7  day.

8            THE COURT:  All right.  Understood.

9  Mr. Olson, any elaboration on the relevancy objection.

10           MR. OLSEN:  Nothing additional.

11           THE COURT:  Overruled.  KLM 115 is

12  admitted.

13           (KLM Exhibit 115, offered and admitted.)

14           MS. HANKS:  KLM 116.

15           THE COURT:  There was no objection that I

16  show on that one.

17           MS. HANKS:  Okay.  So that is in.  So KLM

18  121, I believe.  This is a finder's fee agreement.  This

19  is just relevant to -- and there has been plenty of

20  testimony about The Barclay Group's role with Green

21  Auto, but after the merger, so TBG was involved in the

22  merger, but then, after the petition date, there were a

23  number of different agreements signed, a couple of

24  different agreements signed, concerning TBG's continuing

25  role with Green Auto, and this is one of them.

1          THE COURT:  This is dated what?

2          MS. HANKS:  I believe it is dated in

3  January.  Can you go down to the date, please?  This is

4  in 2011 it is signed, and I believe the Court was asking

5  how much money The Barclay Group actually raised for

6  Green Auto.  This finder's fee is relevant to that.  It

7  is about the -- I don't know if -- I don't think there

8  is evidence that TBG actually raised a million in

9  financing for Green Auto, but that is certainly

10  something we can try to flesh out in the documents that

11  have been introduced for the Court.

12          THE COURT:  The first page again?

13          MS. HANKS:  Uh-huh.

14          THE COURT:  Mr. Olson, any elaboration on

15  the relevancy objection?

16          MR. OLSEN:  Nothing additional.

17          THE COURT:  Overruled.  KLM 121 is

18  admitted.

19          (KLM Exhibit 121, offered and admitted.)

20          MS. HANKS:  We are going to withdraw 122,

21  Your Honor.

22          THE COURT:  Okay, withdrawn.

23          MS. HANKS:  KLM Exhibit 134, this is -- I

24  believe this pertains to the annuity.  This is the life

25  insurance policy for Mr. Comu that is owned by Ms. Comu,

1   but it is a life insurance policy that, I believe, was

2   moved to the annuity; does it not, that is held by

3   Sunset Pacific?  And it is one of the assets of Sunset

4   Pacific that both the trustee and the plaintiffs contend

5   should be considered part of the estate.

6                   THE COURT:  Okay.  A life insurance policy

7   on the debtor.  All right.  Mr. Olson, any elaboration

8   on the relevancy objection?

9                   MR. OLSEN:  Nothing additional.

10                  THE COURT:  Overruled.  KLM 134 is

11  admitted.

12                  (KLM Exhibit 134, offered and admitted.)

13                  MS. HANKS:  KLM Exhibit 142.

14                  THE COURT:  Okay.

15                  MS. HANKS:  This is a -- and we actually --

16  this is a -- there are two websites.  There is actually

17  three websites that I believe may be subject.  They are

18  in a row, 142, 143 and 144.  And the reason these are

19  supplied is this concerns The Barclay Group's

20  continuation through Regus, and 142 is The Barclay Group

21  website, 144 is Regus website.

22                  Oh, I am sorry.  Okay.  And the documents

23  that we have put into evidence and that we will flesh

24  out in our briefing indicate that Mr. Comu personally

25  drafted the contents of the Regus website and, in fact,

1  instructed the individuals who were putting the website

2  together to just basically cut and paste from Barclay

3  Group into Regus.

4          And so if you compare the pages between

5  Barclay Group and Regus, they have almost verbatim

6  exactly the same language, and that is because, as the

7  email communications that we have supplied to the Court

8  show, Mr. Comu literally just transferred the language

9  from The Barclay Group website over to Regus. And you

10 know, for example, here The Barclay Group talks about

11 how for over 20 years TBG has provided this language.

12 And then, if you go to Plaintiff's Exhibit 144, you have

13 exactly the same language, because Mr. Comu just cut and

14 pasted into the new website.

15          THE COURT: And what is 143?

16          MS. HANKS: 143 is a single page from The

17 Barclay Group and we -- it is actually -- not long

18 before trial, we realized that The Barclay Group website

19 is now holding itself out as The Barclay Group, LLC,

20 which is a new entity that we did not know about.

21          Now, we have done a little bit of research,

22 and we couldn't find any corporate filings for anything

23 called The Barclay Group, LLC. But for obvious reasons

24 it concerned us that there was a representation that

25 there was a limited liability company, when Barclay

1    Group, Inc., is the entity that we are concerned with

2    here in the case, and this is its website.  And so I am

3    not quite sure it is necessarily relevant, because I

4    think if there is --

5              MR. OLSEN:  Which proves my point.

6              MS. HANKS:  Well, frankly, we were

7    concerned that there was a new entity being set up under

8    this name that now is being represented by the website,

9    and we were doing additional research.  So we included

10   this in here to make sure that -- frankly, I was

11   intending to ask Mr. Comu questions about it, but I

12   didn't think it was necessary, given what was already

13   adduced in evidence.

14             THE COURT:  Well, I sustained the objection

15   to 143.  If you want to try to offer it up tomorrow --

16             MS. HANKS:  No, Your Honor, I think we are

17   fine without it.

18             THE COURT:  I am going to overrule the

19   objection on 142 and 144.  Those are admitted.

20             (KLM Exhibits 142 and 144, offered and

21              admitted.)

22             MS. HANKS:  Exhibit 135.

23             UNIDENTIFIED MAN:  I think you mean 145.

24             MS. HANKS:  Oh, I think we skipped 135

25   accidentally.  This is a 2012 tax statement for Mr.

1   Comu's Palladium Drive home, and we have been able to

2   connect through The Barclay Group record that Mr. Comu

3   actually pays the property taxes on his Palladium Drive

4   home through Barclay Group accounts.  This, of course,

5   supports the trustee's alterego and sham claims, as well

6   as our fraud on the bankruptcy Court claims.  And this

7   is one of the documents that we rely on to connect up.

8   We connect it to The Barclay Group bank records.

9              THE COURT:  All right.  What am I seeing on

10  here other than just the property tax statement?

11             MS. HANKS:  Okay, so there are a number of

12  documents in the record that we haven't gone through in

13  testimony.  The Court -- what we will do in our briefing

14  is show that in 2009 Mr. Comu paid his property taxes on

15  the Palladium Drive house.  That is his alleged

16  homestead.  He paid the property taxes through The

17  Barclay Group.  Okay.  Then what we will also show is

18  that those payments continued postpetition, and this is

19  the tax assessment bill.  Of course, we have to connect

20  it to various other statements, but that's the purpose

21  of it.

22             THE COURT:  Okay.  Well, I can take

23  judicial notice of it anyway.  It is a public record,

24  right?

25             MS. HANKS:  Yes, Your Honor.

1          THE COURT:  Okay.  I overrule the

2    objection.  I will admit 135.

3          (KLM Exhibit 135, offered and admitted.)

4          MS. HANKS:  We already have 142, 144.  145,

5    Your Honor, this is a public filing with the OTC

6    bulletin board for Puration, Inc.  It is one of the

7    deals that Mr. Comu has worked on through Regus.  And if

8    you will go down to -- and this is, for example, you

9    know, again, this is the continuation of The Barclay

10   Group business, but if you -- this is another reverse

11   merger.  And Mr. Comu, if you will look on Page 24 of

12   this document, which I believe is on the screen, and he

13   was identified as chairman of the board and director for

14   this entity.  And if you go a little further down, this

15   is postpetition, but this is continuation of Barclay

16   Group business through Regus.

17          Keep going down to where it disposes of the

18   shares.  And Mr. Comu personally received, this document

19   discloses, 4.2 million shares in Puration, in its

20   capacity as having worked on this deal through Regus

21   Advisers, which is really Barclay Group under a very

22   different name.

23          THE COURT:  Go back up to the top of the

24   document again.

25          MS. HANKS:  Top of the document, please.

 1          THE COURT:  Okay.  All right.  Any

 2  elaboration on your relevancy objection, Mr. Olson?

 3          MR. OLSEN:  No, ma'am.

 4          THE COURT:  KLM 145 is admitted.  I

 5  overrule the objection.

 6          (KLM Exhibit 145, offered and admitted.)

 7          MS. HANKS:  We will withdraw 146.

 8          THE COURT:  Okay.

 9          MS. HANKS:  150.

10          THE COURT:  Okay.

11          MS. HANKS:  I believe we pointed the

12  Court's attention to this yesterday.  They objected to

13  it on relevance basis, but the Court expressed some

14  interest in what -- how the company has been doing.

15  This is one of the corporate filings of the SEC that we

16  supplied exactly for that purpose.

17          THE COURT:  Okay.  Any elaboration on your

18  relevancy objection?

19          MR. OLSEN:  No, ma'am.

20          THE COURT:  All right.  Overruled.  150 is

21  admitted.

22          (KLM Exhibit 150, offered and admitted.)

23          MS. HANKS:  The same with 151, it is a 10 Q

24  from March 31st, 2013.

25          THE COURT:  All right.  Anything else,

1  Mr. Olson, on that one?

2           MR. OLSEN:  No, ma'am.

3           THE COURT:  Overruled, 151 is admitted.

4           (KLM Exhibit 151, offered and admitted.)

5           MS. HANKS:  The one thing we will add is

6  that those two documents are also relevant because they

7  reflect over a hundred thousand in loans from The

8  Barclay Group to Green Auto in 2010, and, of course,

9  this was very, very shortly after or even before the

10 time when Mr. Comu represented to the trustee that The

11 Barclay Group had no assets.

12          Okay.  152, I believe 152 should be

13 admitted, but --

14          THE COURT:  I don't show it is.

15          MS. HANKS:  It is not?  Okay.  152, we

16 discussed it with Mr. Comu actually.  This is a Texas

17 franchise tax public information report that identifies

18 Mr. Comu as CEO of Sun Management Group, Inc.  This was

19 one of the entities that was not disclosed on his

20 statement of financial affairs in response to Question

21 Number 18.

22          THE COURT:  He lists himself as an officer

23 or -- that is Sun Sport and Entertainment, Inc.

24          MS. HANKS:  This is Sun Management Group,

25 Inc.

 1                    THE COURT:  That's a different entity.

 2                    MS. HANKS:  It is a different entity, Your

 3     Honor.  His testimony was that, because it was an owned

 4     subsidiary, that he didn't have to disclose it.

 5                    THE COURT:  All right.  Any elaboration on

 6     the relevancy objection?

 7                    MR. OLSEN:  Nothing additional.

 8                    THE COURT:  Okay.  That is overruled.  This

 9     is admitted, and again it is KLM 152?

10                    MS. HANKS:  Yes, Your Honor.

11                    (KLM Exhibit 152, offered and admitted.)

12                    THE COURT:  Uh-huh.

13                    MS. HANKS:  KLM 153, I believe we also

14     talked to Mr. Comu about this yesterday.  This is --

15     these are stock transfer instructions to Action Stock

16     Transfer by Mr. Comu, that are set by Mr. Comu, in the

17     days before the agreed restraining order went into

18     affect but after the parties had already discussed it,

19     and he is actually continuing to sell shares of Green

20     Auto through the entity Eurocap Investments, of which he

21     is the chairman.

22                    These represent -- for example, here is the

23     email that's the -- okay.  Here we go.  Here is the

24     instruction letter, and these -- he is asking Action

25     Stock Transfer to issue new stock certificates to the

1   purchasers, so he sold more of these shares, and he just

2   needs to be sure that they get the stock certificates

3   out to the new shareholders.

4            Again, this is just continued disposition

5   of assets that belong to the estate that never should

6   have been -- that certainly shouldn't still be in his

7   control and possession and that he is still using to

8   make money that should be available to his creditors.

9            THE COURT:  All right.  Mr. Olson, any

10  elaboration on the relevancy objection?

11           MR. OLSEN:  Nothing additional.

12           THE COURT:  This is 153; is that correct?

13           MS. HANKS:  Yes, Your Honor.

14           THE COURT:  Objection overruled.  It is

15  admitted.

16           (KLM Exhibit 153, offered and admitted.)

17           MS. HANKS:  154 is another Eurocap

18  Investments instruction to Olde Monmouth.  This was also

19  sent by Mr. Comu, and this one actually transfers stock

20  from Eurocap to Barclay Group, I believe two million

21  shares of Green Auto stock.

22           But it is the same as 153, Your Honor.  It

23  is just a couple of days before.  It is about a month

24  before.

25           THE COURT:  All right.  Anything to add,

1    Mr. Olson?

2              MR. OLSON:  Nothing additional.

3              THE COURT:  Objection overruled.  154 is

4    admitted.

5              (KLM Exhibit 154, offered and admitted.)

6              MS. HANKS:  155, okay, we spoke a couple of

7    moments ago about an entity called Global Energy

8    Technology Group as being one of the entities that Mr.

9    Comu does business with and has an interest in but

10   hasn't disclosed that to either the trustee or his

11   creditors.  Here there are significant -- or, in fact,

12   there is a number of other transactions showing this,

13   but Bioglobal Resources, Inc., is one of the entities

14   that is receiving shares from First Market Services,

15   Inc., which, as the Court will recall, is one of the

16   three parties to that memorandum of understanding.

17             Bioglobal Resources, Inc., we have other

18   documents in the record that reflect Mr. Comu's

19   relationship and interest in Bioglobal Resources, Inc.,

20   which is an entity affiliated with Global Energy

21   Technology Group.  And those affiliations relate back

22   prepetition date.

23             So essentially what is happening is we have

24   got TBG shares in Green Auto, these 95 million shares

25   that originated back in -- you know, before the petition

1  date, and they go through a quite convoluted series of

2  transfers, all for no consideration, but they ultimately

3  end up in the name of entities with which Mr. Comu is

4  either affiliated or he wholly owns or controls.  And

5  this is just one example, Your Honor.

6              THE COURT:  All right.  Mr. Olson, anything

7  to add?

8              MR. OLSEN:  Nothing additional.

9              THE COURT:  All right.  Objection

10  overruled, 155 is admitted.

11              (KLM Exhibit 155, offered and admitted.)

12              MS. HANKS:  156, Your Honor, is essentially

13  the same thing, but this is sale of the stock through

14  Mayborne Limited, which is one of those entities.  And

15  if you will notice, Mayborne Limited is care of Newhaven

16  Nominees Limited, which that is that nominees group that

17  Mr. Comu used when he was working with his accountant,

18  setting up West Point Advisers and setting up

19  Continental Partnership, Inc.  That was those emails we

20  talked to Mr. Comu about yesterday.

21              THE COURT:  Mr. Olson, anything else?

22              MR. OLSEN:  Nothing additional.

23              THE COURT:  Objection overruled.  156 is

24  admitted.

25              (KLM Exhibit 156, offered and admitted.)

```
 1              MS. HANKS:  On 157 this is -- these reflect
 2    instructions to Action Stock Transfer from TKY Trust
 3    which, as the Court will recall, is the trust that is
 4    allegedly controlled by Mr. Comu's brother, but the
 5    evidence that we will put together for the Court is that
 6    Mr. Comu really set it up in order to hide his assets.
 7              And here this is an example of one of the
 8    transactions by which TKY Trust was selling the stock in
 9    its possession.  So these are stock certificates that
10    are getting issued out to purchasers.
11              We later show distribution instructions
12    received from either TKY or from Mr. Comu that show
13    where the cash goes, but --
14              If you will go down, please -- if you will
15    look -- it is close to the end.  It is the last FedEx
16    cover sheet.  There we go, one more up.
17              But as you will see, the TKY Trust
18    certificates are being kept at The Barclay Group.  And
19    so after one stock certificate is canceled, the new
20    stock certificates are issued out, the remainder is sent
21    back to TKY Trust in the form of a stock certificate.
22    And here it is being sent back to Mr. Comu at The
23    Barclay Group, and if you -- again, as you will recall,
24    Mr. Comu's version of having assets that need to be
25    disclosed is having them in his possession.  And here he
```

1    is instructing the stock transfer agent to send him the

2    stock certificates for TKY Trust.

3                    THE COURT:  Mr. Olson, anything to add?

4                    MR. OLSEN:  Nothing additional.

5                    THE COURT:  Objection overrule.  157 is

6    admitted.

7                    (KLM Exhibit 157, offered and admitted.)

8                    MS. HANKS:  158, this is the same thing.

9    This is a 2012 instruction pertaining to Daptco Trust, I

10   believe.  Hold on.  Oh, yes, this is Daptco Trust.

11   Daptco Trust is again -- and, in fact, this is the first

12   time we see transfer of shares from Daptco Trust.  I

13   think perhaps Mr. Comu testified that all of those

14   shares may have been returned to The Barclay Group.

15                   MR. OLSEN:  No, that is Sunset.

16                   MS. HANKS:  Oh, Sunset Pacific, okay, so

17   Sunset Pacific.

18                   Well, with regards to Daptco, here we see

19   the two million share certificate being canceled and a

20   14 -- 1.4 million share being issued back.  But 500,000

21   of those shares go to World Wide Auric International.

22   And the correspondence that we will connect it with

23   shows that World Wide Auric is another place that Mr.

24   Comu has accounts and interest he uses to basically move

25   these assets out of the reach of his creditors and the

```
 1   trustee.
 2              THE COURT:  Mr. Olson, any elaboration on
 3   your objection?
 4              MR. OLSEN:  Nothing additional.
 5              THE COURT:  Objection overruled.  158 is
 6   admitted.
 7              (KLM Exhibit 158, offered and admitted.)
 8              MS. HANKS:  159, this is another 2010
 9   Action Stock Transfer record.  This New Haven Nominees
10   Limited, the entity we spent quite sometime with Mr.
11   Comu on, here they are transferring -- they are
12   combining five different stock certificates into one
13   that are being issued to Seed and Company, which is
14   another entity.  Again, it is a series of very
15   complicated transactions that move assets and shares
16   belonging to TBG that, if you are willing to spend an
17   incredible amount of hours to trace, you can find.  But
18   this is one exact where we can start seeing where the
19   assets actually went, Your Honor.
20              THE COURT:  Okay.  I am trying to glean
21   where there is an exfoliation --
22              MS. HANKS:  Okay.  New Haven Nominees
23   Limited -- of course, New Haven Nominees Limited is --
24   we spent quite a bit of time yesterday on this entity.
25              THE COURT:  Right.
```

1          MS. HANKS:  The TBG shares, New Haven

2   Nominees was one of the entities, offshore entities,

3   that would receive shares and money, okay, that were TBG

4   assets.  This, here New Haven Nominees is combining

5   those shares and shifting them yet to another entity,

6   Seed and Company.

7          THE COURT:  CD and Company.

8          MS. HANKS:  Yes, I am not sure how to

9   pronounce it.  Is it CD?

10          THE COURT:  Okay.  Isn't that just a common

11   street name holder?

12          MS. HANKS:  I am -- frankly, Your Honor,

13   there is -- first of all, this evidence is already --

14   there are other ways to trace it, so I am not sure this

15   is necessary, but --

16          THE COURT:  I am not finding the relevance

17   on this exhibit.

18          MS. HANKS:  Okay.  So we will withdraw it,

19   Your Honor.

20          THE COURT:  All right.  Well, sustain the

21   objection.

22          MS. HANKS:  Okay.

23          THE COURT:  This was 159.

24          MS. HANKS:  Was that 159?  Okay.

25          Okay.  160, Action Stock Transfer produced

```
 1   to us an individual share report for Green Automotive

 2   Company as of -- so this is actually -- this doesn't

 3   show transfers.  It shows a snapshot as of February 18,

 4   2014, for Green Automotive shareholders, and, of course,

 5   the first is Mr. Comu.  It also reflects the other

 6   entities and their actual holds as of February.

 7               THE COURT:  Any elaboration on your

 8   objection, Mr. Olson?

 9               MR. OLSEN:  No, Your Honor.

10               THE COURT:  Overruled, 160 is admitted.

11               (KLM Exhibit 160, offered and admitted.)

12               MS. HANKS:  And 161 is sort of a companion

13   to 160.  This actually shows -- reflects transfer

14   report.  This is a transfer report.

15               If you could, make that just a little bit

16   bigger, please.

17               So as of February 17, 2014, what it does is

18   it shows certificates that are being transferred --

19   canceled and transferred elsewhere, and it is one of the

20   ways that we connect The Barclay Group's activity to

21   particular entities and individuals and show where these

22   shares have been sent.

23               THE COURT:  Mr. Olson, any elaboration on

24   your objection?

25               MR. OLSEN:  No, ma'am.
```

1          THE COURT:  161, the objection is

2    overruled, it is admitted.

3          (KLM Exhibit 161, offered and admitted.)

4          MS. HANKS:  Last, I believe, Your Honor is

5    337.

6          THE COURT:  Okay.

7          MS. HANKS:  I am taking a look at it right

8    now.  Yes, 337, and if you will recall the visual, the

9    demonstrative that I have Mr. Sarokhanian used in his

10   opening statement, this is the Mercedes that Mr. Comu

11   drives but does not own.  It is owned by Sunset Pacific,

12   and -- but this is, again, the Court will recall that

13   Mr. Comu disclosed a Mercedes that was allegedly owned

14   by Sunset Pacific in his schedules.  Well, he has since

15   traded that -- he has since gotten a new Mercedes that

16   was purchased with funds from Marathon Management, Inc.,

17   which is an entity he owns and controls, and then he put

18   it in the name of Sunset Pacific again.

19          And so this is a pattern that he -- this is

20   what he does.  He buys valuable assets with money held

21   in accounts by other entities.  Then he puts them in the

22   name in Sunset Pacific so they are beyond the reach of

23   his creditors.

24          THE COURT:  Mr. Olson, any elaboration on

25   your objection?

1          MR. OLSEN:  Nothing additional.

2          THE COURT:  Overruled.  337 is admitted.

3          (KLM Exhibit 337, offered and admitted.)

4          MS. HANKS:  I believe that is all we have

5  on our list, Your Honor.

6          THE COURT:  All right.  Any other

7  housekeeping matters before we recess for the day?  All

8  right.  I will see you all at 9:30 in the morning then.

9  Thank you.

10          (Adjournment)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                           CERTIFICATE

 2   COUNTY OF LUBBOCK          )

 3   STATE OF TEXAS             )

 4           I, Cathy Sosebee, Certified Court Reporter in

 5   and for the State of Texas, do hereby certify that the

 6   foregoing pages contain a full, true and correct

 7   transcript, to the best of my ability, of audio file

 8   furnished by the United States Bankruptcy Court,

 9   Northern District of Texas, Office of the Clerk.

10           Given under my hand this the 20th of October,

11   2014.

12

13

14                        _____/s/Cathy Sosebee_____
                          CATHY SOSEBEE, CSR, No. 612
15                        Expiration Date:  12/31/14
                          Cathy Sosebee & Associates
16                        Firm Registration No. 49
                          P. O. Box 86
17                        Lubbock, TX   79408
                          806 763-0036
18

19

20

21

22

23

24

25
```