UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | | |
|---|---|---|---|
| In Re: Cengiz J. Comu | Debtor | § | Case No. 09-38820 SGJ7 |
| **Cengiz J. Comu, et al** | | § | |
| | Appellant | § | |
| vs. | | § | 10-03269 |
| **King Louie Mining, LLC, et al** | | § | |
| | Appellee | § | |

**148 Judgment revoking discharge of debtor Entered 7/8/14**

**VOLUME 9**

**APPELLANT RECORD**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |
| and | § |
| | § |
| PHYLLIS E. COMU, | § |
| BERNARD D. BROWN, | § |
| THE BARCLAY GROUP, INC. AND | § |
| SUNSET PACIFIC, L.P., | § |
|     Third-party Defendants. | § |

*I XIDEX*

**APPELLANT'S FIRST AMENDED DESIGNATION
OF RECORD AND ISSUES ON APPEAL**      Page 1

## APPELLANT'S FIRST AMENDED DESIGNATION OF RECORD
## AND ISSUES ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Cengiz J. Comu, Appellant, and files this his First Amended Designation of Record and Issues on Appeal for the Judgment entered July 8, 2014 [Document No. 148] as follows:

I.      Appellant designates the following documents from the docket sheet in Adversary Case No. 10-03269 for the Record on Appeal:

[Intentionally left blank]

| Filing Date | # | Docket Text |
|---|---|---|
| 08/27/2014 | 164 | Notice of appeal . Fee Amount $298 filed by Defendant Cengiz J. Comu (RE: related document(s)148 Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed)). Appellant Designation due by 9/10/2014. (Moroles, D.) |
| 07/08/2014 | 148 | Judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Related document(s) 20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 53 Intervenor complaint filed by Intervenor-Plaintiff Diane G. Reed) (Rielly, Bill). |
| 07/08/2014 | 147 | Findings of fact and conclusions of law in support of judgment: (A) Revoking discharge of debtor, pursuant to 11 U.S.C. 727(d); (B) Declaring certain property to be "Property of the Estate"; (C) Requiring turnover of certain property to the trustee; (D) Awarding monetary damages to trustee for the benefit of the estate; and (E) Separately awarding reasonable attorney's fees and expenses to plaintiffs Entered on 7/8/2014. (Rielly, Bill) |
| 09/09/2014 | | Docket Sheet |
| 10/07/2010 | 5 | Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 11/08/2010 | 8 | Motion for leave *to Amend* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/29/2010. (Attachments: 1 First Amended Complaint2 Exhibit A3 Exhibit B4 Exhibit C) (Lippe, Emil) |
| 11/08/2010 | 9 | Response opposed to (related document(s): 5 Motion to dismiss adversary proceeding*Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 01/10/2011 | 10 | Order denying motion to dismiss adversary proceeding as moot (related document # 5), granting motion for leave to amend complaint(related document # 8) Entered on 1/10/2011. Case is removed from docket for week of January 11, 2011. Counsel ORDERED to confer and submit proposed amended scheduling order for the trial of this case, to be submitted within 10 days from date of this Order. (Mathews, M.) |

Vol. 2
000211

000215

000263

000273

_Vol. 2_

| | | | |
|---|---|---|---|
| 000275 | 01/20/2011 | 12 | Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000279 | 02/11/2011 | 16 | Response opposed to (related document(s): 12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000287 | 02/24/2011 | 17 | Order conditionally denying second motion to dismiss adversary proceeding (related document # 12) Entered on 2/24/2011. Plaintiffs are ORDERED to file amended complaint within 20 days of entry of this order. Defedant is ORDERED to file an answeror responsive pleading within 20 days of filing of the amended complaint. (Mathews, M.) |
| 000290 | 03/02/2011 | 19 | Motion for leave *to Prosecute Action* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 3/23/2011. (Lippe, Emil) |
| 000293 | 03/02/2011 | 20 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) (Lippe, Emil) |
| 000340 | 03/23/2011 | 23 | Order denying motion for leave to prosecute action without prejudice (related document # 19) Entered on 3/23/2011. (Simpson, B) |
| 000342 | 03/24/2011 | 24 | Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu (Olson, Dennis) |
| 000345 | 04/19/2011 | 28 | Agreed Order granting 27 Motion to extend time to file response to motion to dismiss until 4/28/2011. Entered on 4/19/2011. (Simpson, B) |
| 000347 | 04/28/2011 | 30 | Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000351 | 05/04/2011 | 31 | Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[Unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |
| 000361 | 05/06/2011 | 32 | Order granting motion to continue hearing on (related document # 31) (related documents Motion to dismiss adversary proceeding*(THIRD)* and 20 Amended Complaint) Entered on 5/6/2011. Hearing to be held on 7/11/2011 at 10:30 AM Dallas Judge Jernigan Ctrm for 24, Trial Docket Call date reset for 9/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Mathews, M.) Modified text on 5/6/2011 (Mathews, M.). |
| 000 363 | 07/06/2011 | 36 | Second Motion to continue hearing on (related documents 20 Amended complaint, 24 Motion to dismiss adversary proceeding)*[unopposed]* filed by Interested Party Diane G. Reed, Trustee (Elmquist, David) |

*Vol. 2*

| | | | |
|---|---|---|---|
| 000367 | 07/08/2011 | 37 | Order granting second unopposed motion to continue hearing on (related document # 36) (related documents Amended complaint, Motion to dismiss adversary proceeding*(THIRD)*) Entered on 7/8/2011. Hearing to be held on 9/15/2011 at 09:30 AM Dallas Judge Jernigan Ctrm for 24 Third motion to dismiss and for Trial Docket Call date set for 12/12/2011 at 01:30 PM at Dallas Judge Jernigan Ctrm. Further conditions per Order. (Mathews, M.) |
| 000369 | 08/24/2011 | 39 | Agreed Motion to Abate Adversary Proceeding (related document(s)1 Complaint) Filed by Interested Party Diane G. Reed (Elmquist, David) Modified TEXT on 8/25/2011 (Blanco, J.). |
| 000374 | 08/31/2011 | 40 | Agreed Order granting motion to abate adversary proceeding (related document # 39) Entered on 8/31/2011. (Mathews, M.) |
| 000377 | 05/24/2012 | 48 | Supplemental Order granting agreed motion to abate adversary proceeding including any hearing on the motion to dismiss, abated until August 1, 2012 further conditions per order (related document # 39 agreed motion to abate ) Entered on 5/24/2012. (Moroles, D.) |
| 000379 | 08/07/2012 | 50 | Order terminating abatement of adversary proceeding and requiring: (A) Trustee's Complaint in Intervention to be filed by August 31, 2012; and (B) parties to upload Agreed Scheduling Order, or in the alternative, Court will enter its own Scheduling Order (related document # 39) Entered on 8/7/2012. Further details per Order. (Mathews, M.) |
| 000381 | 09/05/2012 | 53 | Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) |
| 000395 | 09/06/2012 | 54 | Order granting Trustee's Unopposed Motion to Extend Deadline to File a Complaint in Intervention 52 Motion to extend time. Ordered that the deadline is hereby extended to September 5, 2012. Entered on 9/6/2012. (Tello, Chris) |
| 000397 | 09/20/2012 | 59 | Agreed Scheduling Order Entered on 9/20/2012 (RE: related document(s)20 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial Docket Call date set for 7/8/2013 at 01:30 PM at Dallas Judge Jernigan Ctrm. Hearing on Defendant Cengiz J. Comu's Third Amended Motion to Dismiss Case is set for 10/31/2012 at 9:30 AM. (Mathews, M.) MODIFIED hearing dates on 9/21/2012 (Mathews, M.). |
| 000401 | 09/28/2012 | 61 | Supplemental Response opposed to (related document(s): 24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Lippe, Emil) |
| 000406 | 09/28/2012 | 62 | Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against |

| | | | |
|---|---|---|---|
| *Vol. 2* | | | Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G). filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Lippe, Emil) |
| *000429* | 10/09/2012 | 64 | Answer to Intervenor complaint (Related document: 53 Intervenor complaint by Diane G. Reed against Sunset Pacific, L.P., The Barclay Group, Inc., Bernard D Brown, Phyllis E Comu, Cengiz J. Comu. (Elmquist, David) filed by Bernard D Brown, Cengiz J. Comu, Phyllis E. Comu, Sunset Pacific, L.P., The Barclay Group, Inc.. (Olson, Dennis) Modified text on 10/9/2012 (Tello, Chris). |
| *000433* | 10/09/2012 | 65 | Reply to (related document(s): 30 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz, 61 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Defendant Cengiz J. Comu. (Olson, Dennis) |
| *000437* | 10/26/2012 | 66 | Motion to appear pro hac vice for David H. Wander. Fee Amount $25 filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit) (Lippe, Emil) |
| *000441* | 10/29/2012 | 68 | Motion for leave *to File Third Amended Complaint and Brief in Support* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Lippe, Emil) |
| *Vol. 3*    *000451* | 10/30/2012 | 69 | Motion for leave *to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC Objections due by 11/23/2012. (Attachments: # 1 Exhibit A - Surreply# 2 Proposed Order) (Lippe, Emil) |
| *000470* | 10/31/2012 | 70 | Order granting motion to appear pro hac vice adding David H. Wander for Ronald Katz and King Louie Mining, LLC (related document # 66) Entered on 10/31/2012. (Mathews, M.) |
| *000471* | 11/02/2012 | 71 | Order denying Plaintiffs' motion for leave to file Third Amended Complaint (related document # 68) Entered on 11/2/2012. (Mathews, M.) |
| *000473* | 11/02/2012 | 72 | Order denying Plaintiffs' motion for leave to File Surreply to Defendant's Response to Plaintiffs' Supplemental Response to Third Motion to Dismiss (related document # 69) Entered on 11/2/2012. (Mathews, M.) |
| *000475* | 11/14/2012 | 76 | Order denying motion to dismiss adversary proceeding (related document # 24) Entered on 11/14/2012. (Mathews, M.) |
| *000477* | 12/07/2012 | 78 | Answer to complaint *(Second Amended) to Revoke Discharge* filed by Cengiz J. Comu. (Olson, Dennis) |
| *000481* | 06/07/2013 | 88 | Motion to substitute attorney Emil Lippe, Jr., Law Offices of Lippe & Associates with Shari L. Heyen, Kendyl T. Hanks and Charles P. Floyd, Greenberg Traurig, LLP *and for Withdrawal of Attorney Emil Lippe, Jr., Law Offices of Lippe & Associates,* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| 000785 | 06/12/2013 | 89 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Agreed Scheduling Order) (Heyen, Shari) |
| 000795 | 06/21/2013 | 90 | Agreed order granting motion to amend scheduling order (related document # 89) Trial Docket Call date set for 9/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 6/21/2013. (Rielly, Bill) |
| 000799 | 06/21/2013 | 91 | Order granting motion to substitute attorney adding Shari L. Heyen for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Kendyl T. Hanks for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, Charles P. Floyd for King Louie Mining, LLC; Ronald Katz and King Louie Enterprises, LLC, terminating Emil Lippe, Jr.. (related document # 88) Entered on 6/21/2013. (Rielly, Bill) |
| 000562 | 07/19/2013 | 94 | Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order) (Lippe, Emil) |
| 000539 | 08/12/2013 | 96 | Response opposed to (related document(s): 94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC. (Heyen, Shari) |
| 000598 | 08/14/2013 | 97 | Reply to (related document(s): 96 Response filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Lippe, Emil) |
| 000606 | 08/21/2013 | 98 | Order denying motion to intervene (related document # 94) Entered on 8/21/2013. (Rielly, Bill) |
| 000608 | 08/23/2013 | 99 | Agreed Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Agreed Order to Amend Scheduling Order) (Heyen, Shari) |
| 000617 | 09/13/2013 | 101 | Agreed order granting motion to amend scheduling order (related document # 99) Trial Docket Call date set for 12/9/2013 at 01:30 PM Dallas Judge Jernigan Ctrm for 20, Entered on 9/13/2013. (Rielly, Bill) |
| 000621 | 11/25/2013 | 103 | Witness and Exhibit List *for Trial, per Scheduling Order* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000624 | 11/25/2013 | 104 | Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding) filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Attachments: # 1 Exhibit A - Proposed Order) (Heyen, Shari) |

*Vol. 3*

| | | | |
|---|---|---|---|
| *000630* | 11/27/2013 | 105 | Support/supplemental document*(Supplement to Plaintiffs' Motion for Continuance of Scheduling Order Deadlines and Trial)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)104 Motion to amend scheduling order. (related documents 4 Standing scheduling order in an adversary proceeding)). (Heyen, Shari) |
| *000633* | 12/09/2013 | 106 | Agreed order granting motion to amend scheduling order (related document # 104) Entered on 12/9/2013. Trial Docket Call date set for 3/3/2014 at 01:30 PM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| *000637* | 12/20/2013 | 108 | Motion for preliminary injunction *(expedited)* filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| *000647* | 12/20/2013 | 109 | Motion for expedited hearing(related documents 108 Motion for preliminary injunction) filed by Intervenor-Plaintiff Diane G. Reed (Elmquist, David) |
| *000651* | 12/20/2013 | 110 | Order granting ex parte motion for expedited hearing (Related Doc# 109)(document set for hearing: 108 Motion for preliminary injunction) Entered on 12/20/2013. Hearing to be held on 12/23/2013 at 09:30 AM Dallas Judge Jernigan Ctrm for 108, (Rielly, Bill) |
| *000653* | 12/20/2013 | 111 | Agreed order granting motion for temporary restraining order (related document 108) Entered on 12/20/2013. Preliminary injunction hearing to be held on 1/3/2014 at 09:30 AM Dallas Judge Jernigan Ctrm (Rielly, Bill) |
| *000656* | 01/03/2014 | 116 | Agreed Order Continuing Temporary Restraining Order (related document # 108) Entered on 1/3/2014. (Jones, A.) |
| *000659* | 02/24/2014 | 118 | Amended Witness and Exhibit List filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)103 List (witness/exhibit/generic)). (Olson, Dennis) |
| *000662* | 02/24/2014 | 119 | Witness and Exhibit List *for Trial* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)62 Amended complaint). (Elmquist, David) |
| *Vol. 4*<br>*000670* | 02/24/2014 | 120 | Witness and Exhibit List filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| *000722* | 02/26/2014 | 121 | Stipulation by Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC and All Defendants. filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)106 Order on motion to amend scheduling order). (Heyen, Shari) |
| *000726* | 03/03/2014 | 124 | Stipulation by Diane G. Reed and Plaintiffs and Defendants. filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint, 62 Amended complaint). (Elmquist, David) |
| *000729* | 03/03/2014 | 125 | Proposed findings of fact and conclusions of law filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)53 Intervenor complaint). (Elmquist, David) |

Vol. 4

| | | | |
|---|---|---|---|
| 000741 | 03/04/2014 | 126 | Proposed findings of fact and conclusions of law filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)62 Amended complaint). (Olson, Dennis) |
| 000746 | 03/04/2014 | 127 | Proposed findings of fact and conclusions of law filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)62 Amended complaint). (Heyen, Shari) |
| 000778 | 03/05/2014 | 130 | Order setting trial Entered on 3/5/2014 (RE: related document(s)62 Amended complaint filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). Trial date set for 3/17/2014 at 09:30 AM at Dallas Judge Jernigan Ctrm. (Rielly, Bill) |
| 000780 | 03/11/2014 | 132 | Amended Witness and Exhibit List *for Trial* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)120 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000805 | 03/13/2014 | 134 | Amended Witness and Exhibit List filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)119 List (witness/exhibit/generic)). (Elmquist, David) |
| 000813 | 03/14/2014 | 135 | Amended Witness and Exhibit List *Second Amended* filed by Defendants Bernard D Brown, Cengiz J. Comu, Phyllis E Comu, Sunset Pacific, L.P., The Barclay Group, Inc. (RE: related document(s)118 List (witness/exhibit/generic). (Olson, Dennis) |
| 000816 | 03/16/2014 | 137 | Amended Witness and Exhibit List *(Second)* filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (RE: related document(s)132 List (witness/exhibit/generic)). (Heyen, Shari) |
| 000842 | 03/17/2014 | 138 | First Amended Proposed Joint Pre-Trial order Entered on 3/17/2014. (Rebecek, B) |
| 000871 | 04/04/2014 | 142 | Extended temporary restraining order and mandatory injunction Entered on 4/4/2014. (Rielly, Bill) |
| 000878 | 04/23/2014 | 144 | Notice *of Trustee's Status Report of Compliance* filed by Intervenor-Plaintiff Diane G. Reed (RE: related document(s)142 Temporary restraining order). (Elmquist, David) |
| 000892 | 07/29/2014 | 161 | Motion to extend time to appeal - Rule 8002c (RE: related document(s)148 Judgment) Filed by Defendant Cengiz J. Comu (Blanco, J.) (Entered: 08/20/2014) |
| 000896 | 07/30/2014 | 153 | Application for compensation *Plaintiffs Preliminary Application for Attorneys' Fees and Expenses Awarded in the Court's July 8, 29014 Judgment* for Shari L. Heyen, Creditor's Attorney, Period: 10/26/2011 to 7/28/2014, Fee: $946,504.90, Expenses: $12,800.00. Filed by Attorney Shari L. Heyen (Heyen, Shari) |
| 000906 | 07/30/2014 | 154 | Motion to extend time to To Submit Affidavit and Evidence in Support of Application for Attorneys' Fees & Expenses Awarded in the Court's July 8, 2014 Judgment Filed by Plaintiffs Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC (Heyen, Shari) |
| 000914 | 08/20/2014 | 162 | Order granting motion for leave to file notice of appeal out of time 161 |

*Vol. 4*

*000916*

*000919*

| | | | |
|---|---|---|---|
| | | | Motion to extend time to appeal - Rule 8002c. Entered on 8/20/2014. (Rielly, Bill) |
| 08/27/2014 | 165 | | Order granting motion to extend time to file application for attorney's fees and expenses <u>154</u> Motion to extend time. Entered on 8/27/2014. (Rielly, Bill) |
| 08/29/2014 | 168 | | Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s)<u>164</u> Notice of appeal filed by Defendant Cengiz J. Comu) (Blanco, J.) |

II.     Appellant also designates all exhibits admitted at trial, March 17 through March 21, 2014.   *Not Provided by Appellant*

III.    Appellant also designates the following transcripts:

*Vol. 5*

| | | |
|---|---|---|
| 000921 | 11/09/2010 | 171 | Hearing held on 11/9/2010. (RE: related document(s)5 Motion to dismiss adversary proceeding Pursuant to Fed. Rules Civ. Proc. Rule 12(b)(6) filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) APPEARANCES: D. Olson for Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Announcement of an agreed order having been submitted that contemplates Plaintiff's agreement to file Amended Complaint with Debtor's reservation of right to re-urge motion to dismiss. Court will sign order. (Womack, Jennifer) (Entered: 11/12/2010) |
| 000927 | 02/14/2011 | 178 | Hearing held on 2/14/2011. (RE: related document(s)12 Motion to dismiss adversary proceeding*(SECOND)* filed by Defendant Cengiz J. Comu filed by Defendant Cengiz J. Comu) Appearances: D. Olsen for Defendant/Debtor; E. Lippe for Plaintiff. Nonevidentiary hearing. Motion denied, conditional on Plaintiff, within 20 days, amending Complaint again to provide more specificity regarding specific provisions of Section 727(d) being alleged, when acts were discovered and how, and addressing his standing, versus the Chapter 7 Trustees, to seek avoidance of alleged fraudulent transfers. If not amendment within 20 days, complaint will be dismissed. If amendment, then Defendant has 20 days thereafter to answer/respond. Counsel to submit order. (Harden, D.) (Entered: 02/18/2011) |
| 000952 | 05/02/2012 | 179 | Status conference held (RE: related document(s)20 Amended complaint) Appearances: E. Lippe and D. Wander (telephonically) for Plaintiffs; D. Elmquist for Trustee; D. Olson for Debtor. Nonevidentiary hearing. Based on statements of counsel, court will continue abatement through 8/1/12 and counsel shall contact courtroom deputy for another status conference the first week of August 2012. Counsel shall upload an order continuing abatement. (Davis, T.) (Entered: 05/14/2012) |
| 000964 | 07/31/2012 | 180 | Hearing held on 7/31/2012. (RE: related document(s)20 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Cengiz J. Comu No change to nature of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature. filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz). (Attachments: 1 Exhibit A2 Exhibit B) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz) Appearances: D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff; D. Olson for Debtor. Nonevidentiary status conference. Court heard reports regarding Rule 2004 examinations that have been ongoing and Trustees intention to file a Complaint in Intervention by 8/31/12. Court will enter Order terminating the abatement of this Adversary Proceeding and requiring: (a) Trustees Complaint in Intervention to be filed by 8/31/12; and (b) parties to upload Agreed Scheduling Order by 9/14/12 (inclusive of deadlines pertaining to the pending Rule 12(b)(6) |

*Vol. 5*

| | | | |
|---|---|---|---|
| | | | motion) or, in the alternative, court will enter its own Scheduling Order thereafter setting a January 2013 trial docket call and deadlines pertaining to the Rule 12(b)(6) motion. (Baird, Dennis) (Entered: 08/01/2012) |
| 000975 | 10/31/2012 | 181 | Hearing held on 10/31/2012. (RE: related document(s)24 Motion to dismiss adversary proceeding*(THIRD)* filed by Defendant Cengiz J. Comu) Appearances: D. Olson for Movant/Defendant/Debtor; D. Elmquist for Trustee; E. Lippe and D. Wander (telephonically) for Plaintiff/King Louie Mining. Nonevidentiary hearing. Motion denied. Court also denied a pending Motion for Leave by Plaintiff/King Louie Mining to File Third Amended Complaint. Thus, Second Amended Complaint of King Louie Mining (Section 727 count only) and Complaint in Intervention of Trustee are now governing pleadings in this Adversary Proceeding. Mr. Lippe to upload orders on motion to dismiss and motion for leave. (Baird, Dennis) |
| 001004 | 08/15/2013 | 182 | Hearing held on 8/15/2013. (RE: related document(s)94 Motion to intervene filed by Intervenor-Plaintiff Lippe & Perry, P.C., d/b/a Law Offices of Lippe & Associates (Attachments: # 1 Exhibit # 2 Affidavit # 3 Exhibit 1 # 4 Exhibit 2 # 5 Proposed Order)) Appearances: E. Lippe for his firm; K. Hanks and C. Floyd for Plaintiffs other than the Trustee; D. Elmquist for Trustee; R. Nicoud for Debtor. Nonevidentiary hearing. Motion denied. Ms. Hanks to upload order. (Harden, D.) (Entered: 08/21/2013) |
| 001035 | 03/04/2014 | 183 | Pre-trial conference held on 3/4/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit. (RE: related document(s)1 Adversary case 10-03269. Complaint by King Louie Mining, LLC, King Louie Enterprises, LLC, Ronald Katz against Cengiz J. Comu. Fee Amount $250. Nature(s) of suit: 41 (Objection / revocation of discharge - 727(c),(d),(e)). (Lippe, Emil) Modified text on 9/7/2010 (Luna, G.) filed by Plaintiff King Louie Mining, LLC, Plaintiff King Louie Enterprises, LLC, Plaintiff Ronald Katz).) Appearances: K. Hanks and V. Vital for Creditor/Plaintiffs; D. Elmquist for Intervenor/Plaintiff; D. Olson for Defendants. Nonevidentiary status conference. Court will issue order setting trial for March 17, 2014 at 9:30 am, continuing through March 21, 2014. Parties to upload final Pre-Trial Order by March 14, 2014. (Harden, D.) (Entered: 03/06/2014) |
| 001052 | 03/17/2014 | 184 | Trial held on 3/17/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) |

| | | | |
|---|---|---|---|
| *Vol. 6* | | | Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/18/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *001277* | 03/18/2014 | *185* | Trial held on 3/18/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/19/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 7* *001538* | 03/19/2014 | *186* | Trial held on 3/19/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/20/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 8* *001787* | 03/20/2014 | *187* | Trial held on 3/20/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial continued to 3/21/14 at 9:30 am. (Harden, D.) (Entered: 03/25/2014) |
| *Vol. 9* *001909* | 03/21/2014 | *188* | Trial held on 3/21/2014. (RE: related document(s)62 Amended complaint by Emil Lippe Jr. on behalf of Ronald Katz, King Louie Enterprises, LLC, King Louie Mining, LLC against Phyllis E. Comu, Regus Advisors, Inc., Marathon Management Limited Company, Daptco Trust, TKY Trust, The Barclay Group, Inc., Sunset Pacific, L.P., Bernard D Brown, Cengiz J. Comu Adding nature(s) of suit.) Appearances: K. Hanks, V. Vital and N. Sarokhanian for Plaintiffs; D. Elmquist for Trustee; D. Olson for Defendants. Evidentiary trial. Trial concluded. Court gave bench ruling: (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it toTtrustee; (b) The Barclay Group, Inc. and Sunset Pacific are the alter |

egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific. Counsel will subsequently upload proposed Findings of Fact, Conclusions of Law and Judgment that are consistent with the courts oral ruling and otherwise consistent with the evidence. (Harden, D.) (Entered: 03/25/2014)

IV.   Appellant states the following Issues presented on Appeal:

1.   The Bankruptcy Judge erred in revoking the Debtor's discharge.

2.   The Bankruptcy Judge erred in finding that the Barclay Group and Sunset Pacific are the alter egos of the Debtor.

3.   The Bankruptcy Judge erred in calculating the amount of the damages for which the Debtor was found to be liable.

[Signature on following page]

Respectfully submitted,

Cengiz J. Comu
14873 Oaks North Place
Dallas, Texas 75254
(972) 965-2545 – Telephone
Email: cjcomu@gmail.com

By: _____
Cengiz J. Comu
*Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on the __11__ day of September, 2014, a true and correct copy of the foregoing document was sent via electronic means or by first class mail, postage prepaid to the persons shown below:

Kendyl T. Hanks
Greenberg Traurig, LLP
300 West 6th Street, Suite 2050
Austin, Texas 78701

David W. Elmquist
Reed & Elmquist, P.C.
501 N. College Street
Waxahachie, Texas 75165



By: _____
Cengiz J. Comu

1
2

IN THE UNITED STATES BANKRUPTCY
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

3
4

KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC AND
RONALD KATZ,

5              Plaintiffs,

6   V.

7   CENGIZ J. COMU a/k/a CJ COMU,

8              Defendant.

9   DIANE G. REED, TRUSTEE.

10             Intervenor, Co-Plaintiff, and Third-Party
    Plaintiff,
11
    V.
12
    CENGIZ J. COMU, a/k/a CJ COMU,
13
               Defendant,
14
    and
15
    PHYLLIS E. COMU, BERNARD D. BROWN, THE BARCLAY GROUP,
16  INC., AND SUNSET PACIFIC, L.P.,

17             Third-Party Defendants.

18  BANKRUPTCY PETITION NUMBER: 10-03269-sgj

19  _____

20                          TRIAL

21                     MARCH 21, 2014

22                 9:40 A.M. TO 4:46 P.M.

23        HONORABLE STACEY JERNIGAN, PRESIDING

24        TRANSCRIPT FROM AUDIO RECORDING

25  _____

```
 1   Transcript produced from audio recording by:
     CATHY SOSEBEE, RPR, CSR
 2   CSR No. 612, Expiration Date 12/31/14
     Cathy Sosebee & Associates
 3   Firm Registration No. 49
     P.O. Box 86
 4   Lubbock, TX  79408
     806.763.0036
 5
     APPEARANCES:
 6
     FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE
 7   ENTERPRISES, LLC, AND RONALD KATZ:

 8        MS. KENDYL T. HANKS
          - AND -
 9        MR. NICHOLAS SAROKHANIAN
          - AND -
10        MR. VICTOR D. VITAL
          Greenberg, Traurig
11        2200 Ross Avenue
          Suite 5200
12        Dallas, TX  75201
          hanksk@gtlaw.com
13
     FOR THE INTERVENOR CO-PLAINTIFF, AND THIRD PARTY
14   PLAINTIFF, TRUSTEE DIANE REED:

15        MR. DAVID ELMQUIST
          Reed & Elmquist, P.C.
16        501 N. College Street
          Waxahachie, TX 75165
17        972-938-7339
          delmquist@bcylawyers.com
18
     FOR DEFENDANTS CENGIZ J. COMU, SUNSET PACIFIC, L.P., THE
19   BARCLAY GROUP, INC., BERNARD D. BROWN AND PHYLLIS E.
     COMU:
20
          MR. DENNIS OLIVER OLSON
21        Olson, Nicoud & Gueck, LLP
          1201 Main Street, Suite 2470
22        Dallas, TX 75202
          214-979-7300
23        denniso@dallas-law.com

24

25
```

```
 1                        I N D E X

 2                         (TRIAL)

 3                                                    Page
     MARCH 21, 2014
 4
     Appearances                                        4
 5
     DEFENDANT'S WITNESSES:
 6
     C. J. COMU
 7        DIRECT EXAMINATION by Mr. Olson               6
          CROSS EXAMINATION by Ms. Hanks              52
 8        CROSS EXAMINATION by Mr. Elmquist           63
          EXAMINATION by The Court                   113
 9        FURTHER CROSS EXAMINATION by Ms. Hanks     143
          FURTHER CROSS EXAMINATION by Mr. Elmquist  155
10
     Defendant rests                                 161
11   Plaintiffs rest and close                       161

12   Closing Argument by Ms. Hanks                   162
     Closing Argument by Mr. Elmquist                164
13   Closing Argument by Mr. Olson                   175
     Closing Argument by Mr. Elmquist                189
14   Closing Argument by Ms. Hanks                   190

15   Ruling of the Court                             199

16   Adjournment                                     214
     Court Reporter's Certificate                    215
17

18

19

20

21

22

23

24

25
```

Case 10-03269-sgj Doc 188 Filed 10/22/14   Entered 10/22/14 13:51:07   Page 4 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 20 of 231   PageID 2065

4

```
 1                      PROCEEDINGS
 2              THE COURT:  All right.  Day Five of our
 3   trial in King Louie Mining versus Comu, Adversary
 4   10-3269.  Let's go ahead and get all your appearances on
 5   the record, please.
 6              MS. HANKS:  Kendyl Hanks for the
 7   plaintiffs.
 8              MR. SAROKHANIAN:  Good morning, Your Honor,
 9   Nicholas Sarokhanian for the plaintiffs, and Victor
10   Vital is also here, but he is in the hallway.  He will
11   be in a minute.
12              THE COURT:  Okay.
13              MR. ELMQUIST:  Good morning, Your Honor,
14   David Elmquist on behalf of Diane Reed.
15              THE COURT:  Okay.
16              MR. OLSEN:  Good morning, Your Honor,
17   Dennis Olson for the defendants.
18              THE COURT:  Okay.
19              MR. ELMQUIST:  Your Honor, I was working on
20   a demonstrative (Inaudible).  Let's turn this around
21   here.  Mr. Olson (Inaudible) look at it.
22              MR. OLSEN:  Well, I have got to see it when
23   it is completed.
24              THE COURT:  Oh, yeah, and, you know what,
25   we can actually erase that other side if you end up
```

1  needing two sides.  That is a very old -- that is from a

2  case that is about three years old.

3           MR. ELMQUIST:  Well, it says, "Please don't

4  touch."

5           THE COURT:  You know what, yeah, we needed

6  to look at it at every single hearing.

7           All right.  Well, let me give you all some

8  housekeeping matters.  I am going to have to give you

9  all an early lunch break.  I know that might not be

10 great, but I am going to have to stop at 11:30, because

11 my emergency hearing yesterday in our nursing home case

12 did not finish.  We went until 5:15.  I had to go give a

13 speech at 5:30.  And they are coming back at 11:30.  I

14 think they are only going to take 30 minutes or an hour.

15          So that is what we are going to do.  We are

16 going to break at 11:30 today, and we will talk about

17 the length of the break.  It will probably be an hour

18 and a half break.

19          All right.  Where we left off was the

20 trustee had rested, and, Mr. Olson, you were going to

21 call Mr. Comu, I believe.

22          MR. OLSEN:  Yes, ma'am, and we would do

23 that at this time, if everybody is ready.

24          THE COURT:  All right.  Mr. Comu, please

25 come back up to the witness stand, and Dawn will swear

 1  you in again.

 2              (Witness sworn. )

 3                    C. J. COMU,

 4  Having been duly sworn, testified as follows:

 5                 DIRECT EXAMINATION

 6  By Mr. Olson:

 7      Q.   Just to briefly re-plough just a little ground,

 8  your full name, please?

 9      A.   C. J. Comu.

10      Q.   Date of birth?

11      A.   November 15, 1960.

12      Q.   Place of birth?

13      A.   Istanbul, Turkey.

14      Q.   Citizenship?

15      A.   Canadian.

16      Q.   And when did you first come to the states?

17      A.   Approximately 1976.

18      Q.   And you are here on some sort of permanent

19  visa?

20      A.   I am a resident of the United States.

21      Q.   And a Canadian citizen?

22      A.   And a Canadian citizen, yes, sir.

23      Q.   All right.  Going back to Mr. Katz's testimony

24  on the first day, I guess, there was testimony about a

25  Mr. Perlman.  Who is Mr. Perlman?

Case 10-03269-sgj Doc 188 Filed 10/22/14   Entered 10/22/14 13:51:07   Page 7 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 23 of 231   PageID 2068

7

1      A.    Alan Perlman was a former business partner with

2  the company Humitech International Group.

3      Q.    And when did you first meet Mr. Perlman?

4      A.    I believe it was the summer of 2001

5  approximately.

6      Q.    And under what circumstances did you meet Mr.

7  Perlman?

8      A.    I was introduced to him from a client in

9  Florida that told me about this product that he was

10  marketing in Florida quite successfully, and I started

11  to do a lot of research and became quite intrigued by it

12  and requested to talk to the person that owned the

13  product.

14      Q.    Did that result in the formation of Humitech?

15      A.    After the meeting, yes.

16      Q.    All right.  And Mr. Perlman was the source of

17  the materials that Humitech used?

18      A.    He owned a mine for approximately 20 years in

19  California where the product came from, yes.

20      Q.    And in your discussions with Mr. Perlman in

21  forming Humitech, did he agree to be the source of the

22  material that you were using?

23      A.    Yes, he was the source and offered to continue

24  to be the source of the product.

25      Q.    What if he sold the property?

Case 10-03269-sgj  Doc 188  Filed 10/22/14   Entered 10/22/14 13:51:07   Page 8 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 24 of 231   PageID 2069

8

1      A.   Well, we had to make some kind of arrangement.

2   Otherwise, we would be out of business.

3      Q.   Well, what was the arrangement?

4      A.   The arrangement was I had asked him, when I

5   first started having extensive discussions, I said,

6   "Alan, I will commit every ounce that I can to help

7   build this business, and I will do my very best to try

8   to make it grow as large as I can.  But if you should

9   choose to sell the property, can you and I come to some

10   understanding of what it would be worth to me, since

11   after the sale I may not be in a position to have any

12   further product?"

13      Q.   And what was his response?

14      A.   He stated that he thought the property was

15   worth about $2 million and that he said that, if he did

16   sell it, based on the efforts of our company, that he

17   would take $500,000.

18      Q.   All right.  When did that conversation take

19   place?

20      A.   Probably during the course of 2001 when the

21   company was operating and we were starting to get some

22   traction, some success.

23      Q.   All right.  Now, did there come a time when you

24   met Mr. Katz?

25      A.   Yes, I did.

1      Q.    When?

2      A.    I think it was 2004.  I am not 100 percent

3  certain.

4      Q.    Under what circumstances did you meet Mr. Katz?

5      A.    He was introduced to me from a business

6  associate in New York and said that he was looking to

7  possibly make some investments and wanted to learn more

8  about our business.

9      Q.    Now, did you meet with Mr. Katz?

10      A.    Yes, I did.

11      Q.    Did he learn more about your business?

12      A.    We gave him an enormous amount of information,

13  yes, sir.

14      Q.    What was the result of that information

15  sharing?

16      A.    He wanted to buy the property and control the

17  source of the product from Mr. Perlman.

18      Q.    And did he do that?

19      A.    To the best of my recollection, yes.

20      Q.    And what was the purchase price?

21      A.    I believe it was $2 million was the final

22  negotiated price.

23      Q.    So the sale closed and Mr. Katz put up

24  $2 million, and who actually acquired then the mine

25  property?

1      A.   We formed a new corporation for this

2  transaction.  I believe the name was Humitech

3  Development Corporation.  And I believe the assets of

4  the mine were placed inside it and then were

5  collateralized and secured by Mr. Katz's investment, so

6  he basically owned the property through the $2 million

7  investment.

8      Q.   Well, he invested 2 million and the property

9  was acquired from Perlman?

10      A.   Yes, that's correct.

11      Q.   And was owned by a Humitech subsidiary?

12      A.   It was owned by Mr. Perlman.  He put it into

13  this company.  Mr. Katz invested in that company.

14      Q.   All right.  Now, did you get money from Mr.

15  Katz for doing this?

16      A.   Nothing.

17      Q.   All right.  Did Mr. Perlman keep his agreement

18  with you?

19      A.   Yes, he did.

20      Q.   And you put that money into Sunset Pacific?

21      A.   Yes, sir.

22      Q.   And at the time you did that, what year are we

23  talking about?

24      A.   I believe that is 2005.

25      Q.   All right.  Now, this is the general set of

1    facts that led to the lawsuit against you in New York,

2    correct?

3         A.   I believe that the cause of Mr. Katz's lawsuit

4    was he sued the entire company and all of its board

5    members for what he alleged was misrepresentation on the

6    closing of the acquisition of the mine.

7         Q.   All right.  So you were one of a number of

8    defendants in that suit?

9         A.   I believe I was one of four directors that were

10   named in that lawsuit.

11        Q.   All right.  And one of the allegations against

12   you was this half a million dollars that you got from

13   Mr. Perlman?

14        A.   I believe that was one of his allegations.

15        Q.   Now, did you appear and defend that lawsuit?

16        A.   I did appear and I did attempt to defend it in

17   New York State.

18        Q.   And what was the result?

19        A.   Well, the case went on, I believe,

20   approximately three years, and I did not have the

21   financial resources to defend my case leading up to the

22   date of the trial and, unfortunately, my attorney was

23   not able to represent me, and a default judgment was

24   entered into because I was unable to represent myself at

25   the date of the trial.

1    Q.   All right.  Did Mr. Katz sue Mr. Perlman?

2    A.   I believe he did.

3    Q.   Same suit?

4    A.   I believe it was a similar suit perhaps with

5    different allegations, but it was a different case

6    against Mr. Perlman and his entire family including his

7    mother.

8    Q.   Did Mr. Katz win that suit?

9    A.   I don't believe he won that suit, no, sir.

10   Q.   All right.  Now, in 2005 when the half million

11   dollars was put into Sunset Pacific, what did Sunset

12   Pacific do with that money?

13   A.   I believe in 2005, 250,000 was used towards the

14   purchase of an annuity with Merrill Lynch, and I believe

15   the other balance of the $250,000 was used to make

16   investments into Sun Sports and Entertainment.

17   Q.   Were those capital contributions, loans, what?

18   A.   I believe most of those were loans.

19   Q.   Now, then at the time you got that half million

20   dollars into Sunset Pacific, were you the sole owner of

21   Sunset Pacific?

22   A.   I believe in 2005 I was the sole owner of

23   Sunset Pacific, yes, sir.

24   Q.   All right.  And did there come a time where

25   that changed?

1        A.   Yes, sir, that's correct.

2        Q.   When?

3        A.   I believe that was January 1st of 2006.

4        Q.   Where?

5        A.   In Dallas, Texas, at our attorney's office.

6        Q.   What attorney?

7        A.   Cecil Mathis.

8        Q.   What was done that day?

9        A.   Well, it was a combination of a lot of things.

10  One, my wife and I were married in 2001, and we had a

11  prenup at that time.  And subsequently we dissolved the

12  prenup and received -- wrote a new will for the two of

13  us.

14            We had a financial planner with Merrill

15  Lynch giving us some financial structuring advice, and

16  Mr. Mathis gave us some legal advice and said we should

17  change the structure of Sunset Pacific, and it should

18  have a new ownership, and a gift to your wife would

19  change the ownership of Sunset Pacific from 100 percent

20  me to my wife and LP.

21            MR. ELMQUIST:  Your Honor, I have to object

22  as hearsay.

23            THE COURT:  Response?

24            MR. OLSEN:  Well, I don't know if it is

25  hearsay or an admission against interest exception, but

1    I think we are getting into what the plaintiffs have

2    always wanted to get into, and that is when, where, how

3    did that happen?

4                    THE COURT:   Overrule the objection.

5                    MR. OLSON:   Ma'am?

6                    THE COURT:   I overrule the objection.

7                    MR. OLSEN:   Okay.

8         Q.   Let me back up to when you married your wife.

9    Where you were living?

10        A.   I was living in our home on 5301 Palladium

11   Drive in Dallas, Texas.

12        Q.   And that is a house that you bought before you

13   got married?

14        A.   Yes, sir, I believe I purchased that in April

15   of 1999.

16        Q.   At the time then this gift was made on January

17   1st of '06, what was the value of the house that you

18   owned before you got married?

19        A.   I am going to guess maybe $335,000.

20        Q.   Was there any mortgage on it?

21        A.   In January of 2006?

22        Q.   Yes.

23        A.   I don't believe there was a mortgage at that

24   time.

25        Q.   So it was free and clear?

1      A.   I believe it was, yes, sir.

2      Q.   And it was yours?

3      A.   Yes, sir, I believe so.

4      Q.   Does the gift kind of equalize the fact that

5  she has no interest in the house?

6      A.   I am sorry.  I don't think I fully understand

7  the question.

8      Q.   What was the purpose of the gift?  Why would

9  you make the gift on January 1st of '06?

10      A.   It was a financial restructuring on advice of

11  counsel to -- because of the prenup was dissolved, the

12  new will, and a go forward plan.

13      Q.   Well, do you know why they thought that

14  restructuring was recommended?

15      A.   I think there was a lot of different

16  discussions, a lot of different ideas at that time.

17  Specifically, I don't recall.

18      Q.   All right.  Had the suit against you by Mr.

19  Katz been filed yet?

20      A.   I am not a hundred percent certain the exact

21  date that he filed the suit on me.

22      Q.   The suit was coming or had already arrived?

23      A.   I don't know if it was before or after.  I am

24  not certain of the exact date.

25      Q.   All right.  Now, after you ran out of money to

1  defend the suit and you got his judgment, they came to

2  Texas and domesticated the judgment and started trying

3  to collect it, right?

4      A.   That's correct.

5      Q.   About when did they do that?

6      A.   I am guessing June of 2009.  I am not a hundred

7  percent certain the exact date.

8      Q.   Summer of '09?

9      A.   I believe that's correct.

10     Q.   Why didn't you just file bankruptcy?

11     A.   Well, number one, that is not my character.

12 Number two, I have been successful at trying to resolve

13 business problems, and I thought this might have been an

14 issue that we could have potentially resolved.  And I

15 wanted to obviously look at all options before I looked

16 at the final option, which was filing a Chapter Seven.

17     Q.   So in the summer of '09 when the judgment was

18 domesticated, what were you doing for a living?

19     A.   I believe at that time I was still the CEO of

20 Sun Sports and Entertainment in Dallas.

21     Q.   Did that change?

22     A.   Yes, sir, it did.

23     Q.   When?

24     A.   I think I announced my retirement in August

25 of 2009 is the date I believe the press release went

1   out.

2        Q.   Is that one of those Nolan Ryan deals where you

3   retired, or you were fired?

4        A.   No, I voluntarily stepped down as the chairman

5   and CEO of the company.

6        Q.   But they wanted you out?

7        A.   No, that's not correct.

8        Q.   Didn't they have a turnaround expert in there

9   at that time to try to run it?

10        A.   I actually worked with Tatum Partners to bring

11   in a new interim CEO to help guide Sun Sports forward,

12   so that they could get transition, as I personally had

13   stock in the company and Sunset Pacific had loans to the

14   company, so I wanted to see it successful.

15        Q.   Well, did there come a time when you decided to

16   file bankruptcy?

17        A.   I did file bankruptcy in 2009, yes, sir.

18        Q.   What changed your mind between your thinking at

19   the time they came to domesticate the judgment and the

20   time that you filed?

21        A.   I think a lot of things.  One, as I stated

22   earlier, I thought there might have been a way to

23   potentially settle this litigation with Katz.  I had

24   just fought long and hard and seek counsel from many

25   people.  But at the end of the day I felt that, if he

1  had the foreign judgment in Texas, that I might have a

2  better chance to try to fight it in a Texas court under

3  a bankruptcy plan, is what I was told at that time.

4      Q.   Rather than comply with the motion to compel

5  production of information?

6      A.   I believe that was the business decision that

7  was made at that time.

8      Q.   Now, looking at the schedules that you filed --

9  before I shift gears, let me tie up one loose end.  If

10  you will -- is the trustee's exhibit binder up there?

11      A.   It says volume one of two, volume two of two,

12  intervener's trial exhibits.  I don't know if that's

13  correct.

14      Q.   Yes.

15      A.   Okay.

16      Q.   Volume 1, Exhibit 1, Trustee's Exhibit 1.

17      A.   Yes.

18      Q.   Do you recognize that document?

19      A.   Yes, I do.

20      Q.   What is that?

21      A.   This was the consent of the general partner of

22  Sunset Pacific and the assignment and the sale of the

23  98 percent partnership interest to Phyllis Comu.

24      Q.   Now, what was the consideration for that

25  transfer?

1      A.   The consideration stated here was $980.

2      Q.   All right.  Now, is that a gift or a purchase?

3      A.   I believe this was structured as a gift at that

4  time, the best of my recollection.

5      Q.   All right.  Now, going back to the schedules

6  that you filed, nowhere in those schedules, the Trustee

7  Exhibit 94, is there any reference to Green Auto.  Why

8  is that?

9      A.   I don't believe we physically had, The Barclay

10  Group, any Green Auto shares at that time, and I owned a

11  very small percentage interest in The Barclay Group, and

12  whatever I would have received I would have turned over

13  to the trustee, which is what I did.

14      Q.   All right.  When the stock came in in January

15  of 2010, why didn't you bring me all of the stock that

16  TBG got?

17      A.   The stock is owned by The Barclay Group, not by

18  me.

19      Q.   All right.  Who is the owner of The Barclay

20  Group, the portion you do not own?

21      A.   The majority owner that owns 99 percent of The

22  Barclay Group is Mr. Bernard Brown.

23      Q.   And you put that in your schedules?

24      A.   I believe I did, yes, sir.

25      Q.   Now, when the suit was filed and Mr. Brown was

1   named as a defendant, are you aware that he took the

2   position that that is actually owned by Brown and Lampe,

3   UK?

4        A.   I believe that's correct.

5        Q.   Is that your position?

6        A.   The question one more time so I am specific,

7   please?

8        Q.   Mr. Brown said, well, actually it is --

9   99 percent is owned by Brown and Lampe, UK.  Do you

10  recall him taking that position in the answer?

11       A.   I believe, yes, that's correct.

12       Q.   And your schedules say Bernard Brown is

13  99 percent?

14       A.   Yes, that's correct.

15       Q.   So my question is:  When he says that it is

16  99 percent Brown and Lampe, UK, is that your position?

17       A.   My position is Brown and Lampe, UK, and Bernard

18  Brown are the same person.

19       Q.   Because why?

20       A.   Well, he had owned Brown and Lampe when I had

21  first met him.

22       Q.   Well --

23       A.   And that is what he had -- that is the

24  documents he signed when we did the share exchange.

25       Q.   Well, when you first met Mr. Brown, what was he

1    doing?

2         A.    He was running Brown and Lampe in Austria.

3         Q.    And that was Brown and Lampe, Austria, or

4    something?

5         A.    I believe it was called GMBH at that time.

6         Q.    And he eventually sold that?

7         A.    That is my understanding.

8         Q.    And he didn't have that at the time you did the

9    swap that was introduced into evidence?

10        A.    Not the Austrian company.

11        Q.    He was going to form Brown and Lampe, UK?

12        A.    That's correct.

13        Q.    And at the time that you filed your schedules

14   he had never formed Brown and Lampe, UK?

15        A.    We had not received anything from Brown and

16   Lampe, UK, as the corporate entity.

17        Q.    And as you sit here today you know that to this

18   day it has never been formed?

19        A.    That is what I understood through the testimony

20   at the deposition.

21        Q.    Now, so why didn't you just say, "I am going to

22   give the trustee everything that is in TBG on the day of

23   the filing of the bankruptcy"?

24        A.    Because I wasn't authorized to transfer any of

25   the assets of TBG because I did not own TBG.

1     Q.   Now, at some point very early, and it may have

2  been in the opening statement by the plaintiffs, they

3  read down a long list of names and entities that they

4  say were not on the schedules anywhere.  Do you recall

5  them doing that?

6     A.   I recall hearing some names, yes, sir.

7     Q.   And were there names that were called off that

8  were in existence at the time you filed your schedules?

9     A.   I am not a hundred percent recall of all of the

10  names I have heard in the last few days.

11     Q.   Well, they said Mono Mono.  Was that in

12  existence at the time of the filing of the bankruptcy?

13     A.   I believe it was a trademark that a law firm in

14  Dallas filed, and I later learned that I was listed as

15  the executive officer of it.

16     Q.   Well, it is a trademark?

17     A.   Yes.

18     Q.   Who owns the mark?

19     A.   It should be Sun Sports and Entertainment.

20     Q.   Similarly, was there another trademark listed

21  in that laundry list that was read off?

22     A.   I believe there could have been one more.

23     Q.   What was that?

24     A.   Art of War.

25     Q.   And is that a trademark?

1      A.   It should be a trademark.  That should have

2  been filed and owned by Sun Sports and Entertainment.

3      Q.   All right.  Now, the other names that were

4  rattled off in that opening statement, did they exist on

5  the day of the filing of the bankruptcy?

6      A.   I am not certain which names.  Any names that I

7  was party to I disclosed in my schedules.  Other names

8  that came up thereafter in discovery that I was unaware

9  of, then those were named that I was unaware of that I

10 was listed.

11     Q.   Eurocap, was that in existence at the time you

12 filed your bankruptcy?

13     A.   No, sir, it was not.

14     Q.   Regus Advisers?

15     A.   No, sir, it was not.

16     Q.   Continental Partnership?

17     A.   I don't believe so, no, sir.

18     Q.   Now, at the time that Continental Partnership

19 was formed, did you hear all the evidence that was

20 presented about how it got formed?

21     A.   Yes, I heard the evidence.

22     Q.   What was going on there?

23     A.   I think it was just an entity that was being

24 formed for no particular reason except to have as an

25 entity at the time.

Case 10-03269-sgj Doc 188 Filed 10/22/14   Entered 10/22/14 13:51:07   Page 24 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 40 of 231   PageID 2085

24

1    Q.   Well, at one point you said, "This is my deal,

2   not my brother's."  Do you recall that evidence?

3    A.   I believe that might have been when the entity

4   was first created.

5    Q.   Did that change?

6    A.   Yes, it did.

7    Q.   When?

8    A.   My brother was looking for an entity to make an

9   investment in the United States.

10    Q.   Why?

11    A.   Unfortunately, he was going through a divorce,

12   and he wanted to make an investment and needed a new

13   corporate entity for that particular purpose.

14    Q.   All right.  And who owned Continental

15   Partnership at the time that it contracted to buy the

16   house that you are living in now?

17    A.   Cem Comu.

18    Q.   And who bought the house?  Who came and signed

19   the documents at closing?

20    A.   Cem Comu.

21    Q.   And we looked at the lease for your house to

22   your current tenant the other day.  Do you recall that

23   evidence?

24    A.   Yes, I do.

25    Q.   Is there a lease with Continental Partners for

```
 1   the house that you are in now?

 2        A.   Yes, there is.

 3        Q.   And does it call for rent?

 4        A.   Yes, it does.

 5        Q.   Have you paid rent?

 6        A.   We have made payments of rent, yes, sir.

 7        Q.   About how many months of rent did you pay?

 8        A.   I would guess probably less than a year.

 9        Q.   Four or five?

10        A.   Somewhere in that range.

11        Q.   And why have you not made more rent payments?

12        A.   It is has not been a good financial time for my

13   wife and I, and I asked my brother if he would waive

14   payments until we can -- our financial situation

15   changes, and he said yes.

16        Q.   Meanwhile you are collecting rent on your

17   homestead, correct?

18        A.   That's correct.

19        Q.   And you are living off of that?

20        A.   Parts of that money, yes, sir.

21        Q.   All right.  Are you going to sell that

22   homestead?

23        A.   No, we are not planning on selling the

24   homestead.

25        Q.   What are you going to do with it?
```

 1        A.   Well, we would like to move back to our own

 2   house but --

 3        Q.   When?

 4        A.   Either when the tenants move out or if my

 5   brother sells the house.

 6        Q.   Okay.  Now, at the time you filed your

 7   bankruptcy, what was the business of TBG?

 8        A.   We were an investment banking firm.

 9        Q.   And what deals was TBG working on in the year

10   of 2009?

11        A.   I believe we were working with the energy

12   company called Global Energy.  We were working with Go

13   Green, USA.  We may have been working with T-3 Networks.

14   We may have also had another client called Paragon GPS.

15   I don't know the whole list, but I believe there was a

16   couple of different transactions we were in the middle

17   of.

18        Q.   What do you do for these people?

19        A.   Depends on their circumstances.  We will

20   provide structure, give our professional advice on how

21   to move their business forward.  We may sit in as

22   interim sea level executives.  We will assist them with

23   institutional capital with our institutional partners

24   and generally help grow the business.

25        Q.   Well, when did you first get involved in the Go

1   Green deal?

2        A.   I can't remember the exact date.  I would

3   probably say in the late third quarter of 2009.

4        Q.   All right.  And what led to your having

5   conversations with anybody involved in that?

6        A.   Two things, one, one of my neighbors, Steve

7   Evans, at that time who grew up in the car business, I

8   would see him when I was walking the dogs, had said that

9   he had come across electric car concept and wanted to

10  know if I was interested.  And I had always read and

11  followed business and thought the electric car business

12  was a good business to potentially look at getting into,

13  though it was early.

14             And approximately the time that he was just

15  telling me about this business and I was discussing it,

16  reviewing it, we received a phone call from one of our

17  other clients in Hong Kong that said they were looking

18  to purchase a shell and try to find a business to put

19  into it and would we look around and see if we can

20  assist them.  So the timing of those two happened within

21  a few months of each other.

22        Q.   All right.  And who were the Hong Kong people?

23        A.   They were represented by Mayborne Group.

24        Q.   All right.  And is that what led to the

25  acquisition of the shell?

1    A.   Yes, they wired the money to the law firm of

2  Block and Garden for the purchase of the pink sheet

3  shell, yes.

4    Q.   Now, the people that had the car company, who

5  were the principals of that entity?

6    A.   I believe it was initially an LLC called Go

7  Green, and Steven Fly was the primary member.  He may

8  have had other members, which I believe he did, as we

9  got closer to closing, but I believe the entity was

10  called Go Green USA, LLC.

11    Q.   And after this deal closed and you got the

12  surviving entity renamed Green Auto, who was in control

13  of the day-to-day decision making and operations at

14  Green Auto?

15    A.   Mr. Fly, I believe, was the chairman and CEO.

16    Q.   All right.  And what role did TBG have after

17  the closing on the day-to-day operations of the

18  business?

19    A.   Once again, I think we provided a couple of

20  different things.  One, of course, was assisting them in

21  packaging their corporation for institutional financing

22  with the broker dealer network.  We assisted with any

23  strategic and business and market advice to help in

24  bringing the cars to the United States and working with

25  the dealer network.  And I believe we assisted in some

1   marketing and PR as well.

2        Q.   Now, have you had other situations in the past

3   where TBG represented somebody in a similar transaction

4   and the transaction closed and you got a block of stock?

5        A.   Yes.

6        Q.   And have there been instances where the stock

7   soared in value?

8        A.   I am trying to recollect which cases they may

9   have soared.  I can't give you an exact example.  I am

10  sorry.

11       Q.   What usually happens?

12       A.   Upon closing of a public company reverse?

13       Q.   And you get your block of stock, what usually

14  happens on that stock?

15       A.   Well, if it is restricted you can't do much

16  except to sit on it.

17       Q.   I understand.  Is the success rate high or low?

18       A.   Unfortunately, it is not high.  It is low.

19       Q.   So when TBG got a block of stock after the

20  closing of the deal for Green Auto, why would TBG sell

21  restricted shares of that stock?

22       A.   Well, I think it is for a variety of reasons.

23  One is the uncertainty of the future enterprise value of

24  the company.  Two is the uncertainty of the price of the

25  stock.  Three is just liquidity.  We have a business to

1    run.  We have to pay our bills and operate as a going

2    concern, so we have to make a business decision based on

3    a transaction-by-transaction basis of what to do.

4         Q.   Well, you have seen the exhibit of stock

5    transfers out of TBG after the Green Auto shares were

6    issued?

7         A.   Yes, I have seen them.

8         Q.   And some of the people on there were getting

9    money or getting shares in exchange for money that they

10   had given TBG in 2009, correct?

11        A.   That is what I saw, yes, sir.

12        Q.   And some of the people on there seemed to be

13   familiar names, Baxter and Evans and others.  What were

14   they getting shares for from TBG?

15        A.   A lot of times when companies do not have cash

16   they will pay for services with stock.  Sometimes

17   shareholders may loan the company money in exchange for

18   future consideration.

19        Q.   And how about your vendors?  Are there any

20   vendors on that list?

21        A.   I believe there was also vendors that were paid

22   with stock.  That's correct.

23        Q.   All right.  Now, at some point you began just

24   selling the stock, the restricted stock.  About when did

25   that start?

1      A.   I don't have the exact date, but I would

2  presume it is sometime in 2010 when the certificates

3  were first delivered.

4      Q.   Well, and then it really took off later in the

5  year when you entered into some escrow agreement.  Do

6  you recall that?

7      A.   Yes, we entered into an agreement with a group

8  called World Wide Auric.

9      Q.   And who are they?

10     A.   I don't know exactly who they are, but they

11 represent a group of selling syndicate members that

12 approach companies with large blocks of stock and

13 negotiate a discounted price.

14     Q.   How did you find these people?

15     A.   They contacted me.

16     Q.   Who?

17     A.   I believe it was a Nick Toscano was the

18 gentleman that called or emailed me.  I forgot how.

19     Q.   When?

20     A.   I don't have the exact date in front of me.  I

21 am going to guess sometime in late 2010 I may have

22 received my first contact from him.

23     Q.   Well, whenever it was, what did he say that he

24 could do for you?

25     A.   He said he can help move us out of our

1    restricted stock block position, but it would be at a

2    deep discount.

3         Q.   Well, had you done that before?

4         A.   Yes.

5         Q.   Isn't that how you met Mr. Brown to begin with?

6         A.   I believe that may have been how I met

7    Mr. Brown in 1999.

8         Q.   So you can sell restricted stock in ways other

9    than selling them on the open exchange?

10        A.   Yes.

11        Q.   So you undertook to do that?

12        A.   Yes, we did with World Wide Auric.

13        Q.   Why would you sell stock and take those huge

14   discounts or pay those huge discounts?

15        A.   Traditionally restricted stock is, for all

16   intents and purposes, an unknown commodity and has an

17   unknown liquidity event and also an unknown value.  So

18   you try to negotiate the best price at the time.  And if

19   you recall from Mr. Evans' testimony, he was getting

20   about a penny a share, where we were getting about seven

21   cents a share, seven times more, doing it this way.

22        Q.   So I think the exhibits show that the gross

23   proceeds from those sales of stock during a particular

24   time frame were about $2.8 million.  Did you hear that?

25        A.   Of gross proceeds, yes.

1      Q.   And the proceeds that wound up at The Barclay

2   Group were about 686,000?

3      A.   Approximately, correct.

4      Q.   And so you are saying that that -- for just

5   under 10 million shares, just under $700,000?

6      A.   Yes.

7      Q.   So somewhere around --

8      A.   Somewhere from that range.

9      Q.   Now, why don't you just hold the restricted

10  stock until the restrictions go away?

11     A.   I think for the same reasons, market

12  uncertainty, the potential success of the corporation

13  and the actual -- what the market price could be.

14     Q.   Well, after you got this block of stock in TBG,

15  what kind of success has Green Auto had?

16     A.   It has continued to grow.  It is a going

17  concern.  They are making a lot of very positive public

18  announcements.  So the company appears to be

19  representing themselves as growing.

20     Q.   Well, but why aren't they selling cars in the

21  US?

22     A.   I don't know the exact answer for that.  I know

23  there were some challenges with the Chinese car getting

24  approval by the US EPA and DOT.  Barring that, I think

25  they shifted their business strategies.

1      Q.    And do you recall that there came a time when

2   Mr. Brown became kind of disillusioned with Green Auto?

3      A.    Yes, unfortunately.

4      Q.    And why is that?

5      A.    I had to disclose to them that they did not

6   pass their EPA DOT crash test compliance and were not

7   able to receive their certification.

8      Q.    And this is a car that is smaller than a Smart

9   Car, I think Steve Evans testified to?

10      A.    It is actually a little larger than a Smart

11   Car.

12      Q.    All right.  Now, when the restrictions were

13   listed in December of '13, what was the stock trading at

14   before the restrictions were listed -- lifted?

15      A.    Possibly around five or six cents, I am

16   guessing.

17      Q.    What are they trading for this week?

18      A.    I am going to guess between three and four

19   cents, unfortunately.

20      Q.    Because you have a bunch of additional sellers

21   on the open market?

22      A.    Traditionally prices drop where there is more

23   sellers than there is buyers.

24      Q.    Now, let's go back, though.  You got

25   2.8 million in gross proceeds of the sales of over nine

Case 10-03269-sgj Doc 188 Filed 10/22/14 Entered 10/22/14 13:51:07 Page 35 of 215
Case 3:14-cv-04163-B Document 1-9 Filed 11/21/14 Page 51 of 231 PageID 2096

35

1  million shares of restricted stock.  Who got the other

2  2.1 million?

3      A.   World Wide Auric can and their selling agents.

4      Q.   Now, we have seen a lot of evidence here as to

5  when you would send to Old Monmouth to transfer a number

6  of shares to a particular buyer.  How would you know how

7  many shares to transfer and to what buyer?

8      A.   These were instructions received from World

9  Wide Auric.

10      Q.   And the instructions you gave Old Monmouth also

11  said who to get commission payments, distributions of

12  the gross proceeds?

13      A.   That's correct.

14      Q.   Who determined that?

15      A.   World Wild Auric.

16      Q.   All right.  So Old Monmouth would make the

17  transfer, make those disbursements, and then the net

18  would go to TBG (Inaudible), correct?

19      A.   Whoever was offering the stock for sale.

20      Q.   Whoever the stock was being transferred?

21      A.   That's correct.

22      Q.   So this other 2.1 million that went to World

23  Wide Auric and people affiliated or networked with them,

24  did you get any of that 2.1 million?

25      A.   No, sir.

1    Q.   Did any family member of yours get any of that

2  2.1 million?

3    A.   No, sir.

4    Q.   Did anybody in your extended family get any of

5  that 2.1 million?

6    A.   No, sir.

7    Q.   Did any entity of yours get any of that money?

8    A.   No, sir.

9    Q.   Did any entity controlled by anybody in your

10  family, including your extended family, get any of that

11  2.1 million?

12    A.   No, sir.

13    Q.   Did anybody you know, any friend of yours, get

14  any of that 2.1 million?

15    A.   The only person that I knew by conversation was

16  Mr. Toscano who represented himself as World Wide Auric.

17    Q.   All right.  Well, when this $686,000 comes into

18  TBG, what does it do with that money?

19    A.   Well, it depends on who the selling stockholder

20  is.

21    Q.   Well, in the instance where TBG is the seller,

22  so this 686,000 is TBG's money?

23    A.   Yes, sir.

24    Q.   What became of that money?

25    A.   That is our capital investment to run our

1    business.  We pay our staff, we pay our expenses, and

2    file our tax returns, and look for businesses that we

3    would continue to get involved with that would be part

4    of our GNA expenses.

5         Q.   All right.  And part of that was compensation

6    to C. J. Comu?

7         A.   Yes, sir.

8         Q.   And that was not by way of a payroll check or a

9    W-2, was it?

10        A.   No, sir, it was not.

11        Q.   Sometimes they would pay specific items for

12   you?

13        A.   Yes, I had -- my expenses were covered by the

14   corporation; that's correct.

15        Q.   And you would provide that information to

16   Mr. Dahl, and he could figure out how much of that was

17   compensation to pay to the IRS?

18        A.   Right, I provide the company accountant the

19   bank statements and all the checks every year, in order

20   for him to file the tax returns.

21        Q.   And, for example, TBG has paid the taxes on

22   your homestead on one or more occasions, correct?

23        A.   That was part of the agreement, yes, sir.

24        Q.   And that is part of your compensation?

25        A.   Yes, it is.

1      Q.   You have to pay tax on it?

2      A.   It is filed with my accountant, whatever he

3   advises me to do.  That's correct.

4      Q.   Now, so you are sitting at TBG after the close

5   of the Green Auto deal and the shares get issued so

6   there is stock certificates.  The initial certificates

7   that are issued in January, the trustee received one

8   from you that says Ganas.  Why is that?

9      A.   The company was Ganas Corporation.

10      Q.   All those stock certificates are Ganas?

11      A.   I believe so.

12      Q.   Well, they all came to TBG; did they not?

13      A.   For redistribution to the clients.

14      Q.   And did any of them say Green Auto on that day?

15      A.   I don't believe so.

16      Q.   So how do they wind up with Green Auto

17   certificates?

18      A.   After the formal SEC filing and the name change

19   and everything is effective, then the company's name

20   would change from Ganas Corp to Green Auto.  I don't

21   believe it had happened at that time.

22      Q.   Well, but your stock certificate that you gave

23   to the trustee is listed on the stock ledger as being

24   owned by you?

25      A.   Yes, sir.

1      Q.   So Old Monmouth just picked those names up on

2   the ledger, and it doesn't matter to Old Monmouth that

3   it says Ganas instead of Green Auto?

4      A.   I believe it was Ganas at the time that they

5   printed the certificates.

6      Q.   Well, and you have never had that certificate

7   reissued, have you?

8      A.   I don't have the certificate.  It's in the

9   hands of the trustee.

10     Q.   But if she wants to sell that and sends it to

11  Action, the new transfer agent, is she going to run into

12  any problem that it says Ganas instead of Green Auto?

13     A.   She should not.  I don't believe so.

14     Q.   Do you know whether any of the people, when you

15  distributed the stock to First Market or Mayborne or any

16  of the people that had given you money in November, did

17  any of them have any problem getting those negotiated

18  when they wanted to sell out?

19     A.   Not that I have heard thereafter.

20     Q.   And they could have said, "Old Monmouth, I

21  don't want to sell this, but I would like for it to read

22  Green Auto," could they send it in and get it reissued

23  and say Green Auto?

24     A.   Yes, they can.

25     Q.   Now, this block of stock comes to TBG, and

1  these stock transfer agreements or stock purchase

2  agreements with Sunset Pacific, TKY, Daptco Trust get

3  entered into right away; do you recall that?

4      A.   Yes, sir, I do.

5      Q.   Why do you do that?

6      A.   Variety of reasons.

7      Q.   Okay.

8      A.   One, we consider friendly transactions where we

9  can control the stock and control the price and get the

10  maximum out of price back to The Barclay Group.

11      Q.   All right.  Explain why you would do that

12  instead of just having it all in The Barclay Group?

13      A.   Well, you don't -- first of all, to create a

14  proper market you have to have more than one seller.

15  Otherwise, people will not come to buy from one seller.

16           Two, we felt with a distribution group like

17  World Wide Auric or others, we can get a higher net fee

18  back to us and satisfy the debt obligation that the

19  buyers are making by signing the note.

20      Q.   All right.  Now, we have looked at those stock

21  purchase agreements, and would it be fair to say those

22  were prepared without the benefit of counsel or clergy?

23      A.   Possibly.

24      Q.   They look kind of funky.  What were you doing

25  there in that document?

1      A.    Which particular document?

2      Q.    Stock purchase agreement signed by Sunset

3   Pacific, stock purchase agreement signed by TKY, stock

4   purchase agreement signed by Daptco, how do they work?

5      A.    Well, each one of those entities were

6   purchasing the stock at a price.

7      Q.    All right.

8      A.    Under a note.

9      Q.    All right.

10      A.    With terms.

11      Q.    Now, stop there.  Sunset Pacific gets how many

12   shares?

13      A.    I believe it was 2.5, I am guessing.

14      Q.    All right.  And they sign a note for how much?

15      A.    I think it was eight cents a share, might have

16   been $200,000.  I am guessing.

17      Q.    All right.  Now, if Sunset Pacific thought that

18   the stock was going to go up and they just wanted to

19   hang onto it, they had the right to give you a check for

20   $200,000?

21      A.    That would be correct.

22      Q.    So you would have gotten eight cents a share

23   for that?

24      A.    That's correct.

25      Q.    On the other hand, if, for whatever reason,

1    they decide they don't like the stock, they don't think

2    it is going to go anywhere, they don't do anything, and

3    they don't give you any money, can they just give the

4    stock back?

5        A.   Yes, we can unwind the transaction.  They can

6    give the stock back.

7        Q.   All right.  Now, in the case of Sunset Pacific,

8    they have never sold any of their stock?

9        A.   They have not.

10       Q.   All right.  So that is available to be picked

11   up by TBG if TBG wants to do that?

12       A.   Correct, it is currently in Sunset Pacific's

13   name, but we are holding it for custodian.

14       Q.   That's fine.  What about the deal with TKY?

15   How much stock did TKY get?

16       A.   I believe it was five million shares.  I am not

17   a hundred percent certain.

18       Q.   For a note in what amount?

19       A.   It may have been at ten cents a share for a

20   $500,000 note.  Once again, I am speculating.  I don't

21   have the document in front of me.

22       Q.   So if TKY liked the prospects and so on, they

23   could just write you a check for a half million dollars,

24   and they would have that five million shares?

25       A.   That is correct.

1      Q.    And TBG would have gotten ten cents a share on

2  it?

3      A.    That is correct.

4      Q.    Now, in Daptco's case, how many shares did they

5  get?

6      A.    I believe it was five million shares.  I am not

7  certain.

8      Q.    Do you remember what the amount of the note

9  was?

10      A.    I believe it might have been negotiated in the

11  eight to 10 cent per range.

12      Q.    Whatever the number of shares is, whatever the

13  face of the note is, is the deal any different from the

14  Sunset Pacific or TKY?

15      A.    No, they are usually -- as that point in time

16  that was how we were trying to price the block of stock.

17      Q.    So in the instance of TKY and Daptco, they sold

18  some stock, they made some payments on the notes, and

19  they got some proceeds from sales of the stock, correct?

20      A.    That's correct.

21      Q.    Now, at some point TBG is going to have to

22  settle up with them on getting the stock back and

23  getting additional payments or something.  Do you

24  understand that?

25      A.    Yes, sir.

001951    CATHY SOSEBEE & ASSOCIATES * LUBBOCK, TX * 806-763-0036

1      Q.   Now, your testimony earlier was that you just

2   understood that TBG could forgive that debt?

3      A.   At the time that the note was due, we were

4   unable to collect anymore proceeds because of the drop

5   in the price, so we wrote off the uncollectible portion.

6      Q.   Well, what happened there was the ability to

7   sell the restricted stock the way you were doing it

8   through World Wide Auric, that window had closed?

9      A.   Yes, it has.

10     Q.   So you couldn't do that anymore?

11     A.   That is correct.

12     Q.   Now, if Mr. Brown entered into this stock swap

13   with you as the 100 percent shareholder of TBG and he

14   got 99 percent of the stock of TBG, and you were

15   supposed to get 99 percent of the stock of Brown and

16   Lampe, UK --

17           MS. HANKS:  Your Honor, we have been really

18   tolerant of the leading, but it is getting quite -- we

19   are going to object on the basis of leading.

20           MR. OLSEN:  Well, I think we are trying to

21   rush this along, and I don't think it is a leading

22   question.

23           THE COURT:  Overrule the objection,

24   continue.

25     Q.   If you now know that Brown and Lampe, UK, was

1    never formed, aren't you a little worried about your

2    deal with Mr. Brown?

3        A.    Not particularly, no.

4        Q.    Why?

5        A.    Well, I have known him since 1999.  We have met

6    in different parts of the world.  And he has always been

7    a man of his word, and I think at the time when I say it

8    is time, you know, to produce the UK entity as part of

9    our share exchange, I don't think there will be any

10   issues at all with him producing it.

11       Q.    Well, did you hear his deposition testimony

12   when it was read in court the other day?

13       A.    Parts of it.

14       Q.    Is that your understanding of the arrangement?

15       A.    I think my understanding is, if we need it, he

16   will produce it for us absolutely.

17       Q.    If you got a deal in the UK as far along as the

18   Green Auto deal?

19       A.    Yes, absolutely.

20       Q.    Has that happened yet?

21       A.    We do not have a transaction that warrants that

22   at this time.

23       Q.    All right.  Who or what is Grey Point Partners?

24       A.    I believe that was an LLC that was formed

25   during the time that I was CEO of Sun Sports and

 1   Entertainment as some type of a partnership which I was

 2   unaware of.

 3        Q.   Do you have any ownership interest in Grey

 4   Point Partners?

 5        A.   I don't believe I have any ownership.  If my

 6   name appeared, once again, it was unknown to me.

 7        Q.   Does it exist?

 8        A.   Not -- once again, the best of my recollection,

 9   I did not know the entity that was presented to me.  I

10   have no ownership of it.

11        Q.   What about AJW Partners; what is that?

12        A.   They were an investor in one of my companies

13   that I was running as a CEO.

14        Q.   Do you know what the A or the J or the W stand

15   for?

16        A.   I do not.

17        Q.   Do you have any ownership interest in AJW

18   Partners?

19        A.   No, sir, I do not.

20        Q.   Is there any value in the Paragon GPS

21   ownership?

22        A.   Well, there is not a public market for it, but

23   it can certainly be negotiated under a private sale, if

24   there was a buyer willing to purchase any of that stock.

25        Q.   Does C. J. Comu own stock in Paragon GPS?

1        A.    No, he does not.

2        Q.    Does TBG?

3        A.    I believe TBG does, yes.

4        Q.    Is Paragon GPS operating?

5        A.    Yes, it is.

6        Q.    So there is some potential up side to that

7    stock?

8        A.    Yes, I believe so.

9        Q.    And when you get restricted stock issued to

10   you, you don't report that as income on your tax

11   returns, do you?

12       A.    According to how I have been advised by

13   accountants, no.

14       Q.    So when you sell it, it is all 100 percent

15   gain?

16       A.    Correct.

17       Q.    What is T-3 Networks?

18       A.    I believe they are a client of The Barclay

19   Group.

20       Q.    And does The Barclay Group own any stock in T-3

21   Networks?

22       A.    I believe we do.

23       Q.    And does that have any value?

24       A.    It does not have a public market value.  It

25   would have to be a negotiated private sale transaction.

1      Q.    So there may be some upside to that some day?

2      A.    There could be, yes.

3      Q.    Now, when was Regus Advisers created?

4      A.    Sometime in 2010, don't have the exact date.

5      Q.    Well, was it before or after you got your

6  discharge in this case?

7      A.    I believe it was after the discharge.

8      Q.    Who formed Regus Advisers?

9      A.    An attorney in Dallas named Jay Klein.

10     Q.    Who was involved in the creation of Regus

11 Advisers?

12     A.    Myself, Mr. Price and I believe Mr. Baxter at

13 the time.

14     Q.    What does Regus Advisers do?

15     A.    It is primarily an advisory firm to do

16 restructurings and workouts for private and public

17 companies and also do corporate advance work.

18     Q.    And how much do you own in Regus Advisers?

19     A.    Zero.

20     Q.    Why?

21     A.    It was initially funded by TKY Trust.

22     Q.    And does it have ownership interest in Regus

23 Advisers?

24     A.    Yes.

25     Q.    How much?

 1          A.    100 percent.

 2          Q.    All right.  Now, who do you market yourselves

 3    to at Regus Advisers?

 4          A.    Private and public companies and a couple of

 5    vertical industry sectors who have expertise in consumer

 6    products, in energy, manufacturing and distribution and

 7    also real estate.

 8          Q.    So if somebody asks for help in one of those

 9    areas, you go get them somebody that has got that

10    expertise?

11          A.    We believe we have that expertise to provide

12    our services to those clients.

13          Q.    Through some laundry list of people that you

14    can contact?

15          A.    Either direct or indirect, that's correct.

16          Q.    Well, what is the difference between TBG and

17    Regus Advisers, if any?

18          A.    A lot.  TBG primarily is a transactional

19    company that gets paid equity for closing deals, where

20    Regus Advisers is a fee based firm that is retained by

21    clients to perform services under a fee schedule.

22          Q.    All right.  Now, when was TKY Trust created?

23          A.    I think it is January 5th of 2010.

24          Q.    Why was it created?

25          A.    Well, I think my family was concerned about my

1    bankruptcy, and under advisement of them they wanted to

2    help me going forward and wanted to create this new

3    entity to help manage my affairs.

4         Q.   When did they tell you that they wanted to help

5    you some way with the fact that you were facing this

6    bankruptcy?

7         A.   This was conversations we were having in late

8    2009 when I was looking at all options available to me

9    of what I should do or the ramifications and the effect

10   on my life.

11        Q.   So did there come a time when they said, "Look,

12   we are going to set up a trust for you"?

13        A.   That was the conversation and the inevitable

14   result in January of 2010.

15        Q.   So then did you contact lawyers for them to go

16   see to form that trust?

17        A.   I believe I may have Googled a firm and

18   provided the referral to them, but it was not somebody

19   that I was involved with.

20        Q.   Well, you have seen an exchange of letters

21   between you and the Canadian firm, right?

22        A.   Yes, absolutely.

23        Q.   But you are not the grantor of that trust?

24        A.   No, I am not.

25        Q.   And just one more time, how many beneficiaries

1   are there under that trust?

2         A.   There are seven beneficiaries.

3         Q.   And who are the other six?

4         A.   My brother's three kids, my sister's two kids

5   and my mother.

6         Q.   All right.  So your mother is the grantor and a

7   beneficiary under the trust?

8         A.   I am not 100 percent certain.  To the best of

9   my recollection and the last time I looked at the

10  documents, I don't believe so.

11        Q.   All right.

12              MR. OLSEN:  Your Honor, I think I am ready

13  to pass the witness.  Rather than waste any time, I

14  would go ahead and yield the floor, if I could -- if I

15  have some questions after they are through, even if it

16  is not part of their cross, if I could ask just some

17  follow up.

18              THE COURT:  No, finish your direct.

19              MR. OLSEN:  Bear with me just a minute

20  then.

21        Q.   Mr. Comu, have you told the truth here today?

22        A.   Yes, sir, I have.

23        Q.   You do understand that in the four days of

24  trial here there have been numerous examples where your

25  testimony is not consistent.  Why is that?

1      A.   There has been a lot of information for me to

2   digest over the last four years, and sometimes I just

3   got confused at times, and I just may not have

4   accurately answered a question, but it was never

5   intentional.

6             MR. OLSEN:  I will pass the witness.

7             THE COURT:  All right.  The witness has

8   been passed.  Who is going to cross first?

9             MR. ELMQUIST:  Ms. Hanks, do you want to go

10  first?

11            MS. HANKS:  Yes, I believe I will.

12                  CROSS EXAMINATION

13  Of C. J. Comu by Ms. Hanks:

14     Q.   Mr. Comu, I believe you testified that, of the

15  cash generated from the sale of Green Auto stock by The

16  Barclay Group, neither you nor anyone in your family

17  received any of that cash.  Is that correct?  That was

18  your testimony?

19     A.   Well, no, I believe the answer that I provided

20  was regarding the $2.1 million in commissions that was

21  represented in the 2.6 million gross.  None of those

22  funds were received by any members of me, my family, et

23  cetera.

24     Q.   Okay.  But TBG at your direction did transfer

25  cash to Marathon Management, correct?

Case 10-03269-sgj Doc 188 Filed 10/22/14 Entered 10/22/14 13:51:07 Page 53 of 215
Case 3:14-cv-04163-B Document 1-9 Filed 11/21/14 Page 69 of 231 PageID 2114

53

1     A.   I believe so.

2     Q.   And Marathon Management is an entity that is

3  wholly owned by you, isn't it?

4     A.   That is not exactly correct.

5     Q.   It is not exactly correct?

6     A.   No.

7     Q.   Is it correct or is it not correct?

8     A.   Well, it is not correct.

9     Q.   Okay.  And who owns Marathon Management?

10     A.   My brother does.

11     Q.   Your brother owns Marathon Management.

12  Marathon Management, Inc., or Marathon Management

13  Limited Company?

14     A.   I believe it is Marathon Management, Inc.

15          MS. HANKS:  Okay.  Could we please pull up

16  KLM Exhibit 126, and there is some language highlighted

17  in there.

18     Q.   Mr. Comu, this is a document that you drafted

19  for your attorney in February of 2010.

20          MS. HANKS:  Go to the top, please.

21     Q.   Do you recognize this document?

22     A.   I am looking at it now.

23          MS. HANKS:  Could you please go down to the

24  highlighted language a couple of pages down?

25     Q.   And this is -- these are responses to your

1  schedules, correct?  This corresponds with questions in

2  your schedules for bankruptcy filing, right?

3       A.   I believe that's correct.

4       Q.   Okay.  Could you please read that language that

5  is highlighted?

6       A.   Number 63?

7       Q.   Uh-huh.

8       A.   "Officer, director, Marathon Management, tax ID

9  number, Dallas Parkway, Marathon Management, 100 percent

10 owned by C. J. Comu."

11      Q.   So that would be inconsistent with the

12 testimony you just gave, isn't it?

13      A.   I believe I incorrectly marked that with the

14 wrong percentage.

15      Q.   Well, do you own any -- because you just

16 testified that your brother owns Marathon Management,

17 Inc., but here it says it is 100 percent owned by you?

18      A.   I believe Marathon Management, to the best of

19 my recollection, is owned 99 percent by my brother, if

20 not 100 percent.  I am not certain of the exact number.

21           MS. HANKS:   Okay.  Could you please pull up

22 KLM Exhibit 113, please?

23      Q.   These are the corporate records of Marathon

24 Management, Inc.  Could you please go to Page Five of

25 that document?  Do you recognize your signature there,

1    Mr. Comu?

2         A.    Appears to be, yes.

3         Q.    And you are the president of Marathon

4    Management, Inc., correct?

5         A.    It appears to be on 6/22 of 2005.

6         Q.    But your brother isn't signing this document,

7    is he?

8         A.    Not on this date.

9         Q.    Could you please go to Page Six?  And here this

10   is Marathon Management, Inc., and you are identified as

11   the president, the secretary, the treasurer, and a

12   director, and you signed this document, correct?

13        A.    But this is when it was first formed, I

14   believe, in the year 2000.

15        Q.    Okay.  But you have produced absolutely no

16   document whatsoever that indicates that a change in

17   ownership to your brother has been made?

18        A.    I don't know what document I may have produced.

19   I don't know where the document is.

20        Q.    We have close to 400 exhibits for the

21   plaintiffs here, close to a hundred from the trustee,

22   and five from the defendants, and there is not a single

23   document that suggests that ownership has in any respect

24   been converted to your brother?

25        A.    Obviously --

 1          Q.   Can you point us to a document, Mr. Comu?

 2          A.   I don't have any of the books and records in

 3     front of me.  I am sorry.

 4                    MS. HANKS:  Okay.  Could you pull up KLM

 5     Exhibit 181?

 6          Q.   Mr. Comu, you get alerts directly from Wells

 7     Fargo for Marathon Management, Inc.'s, accounts, don't

 8     you?

 9          A.   I was unaware of this.

10          Q.   Well, this is your email address,

11     CJComu@gmail.com, isn't it?

12          A.   Yes, that's correct.

13          Q.   And this is an alert pertaining to Marathon

14     Management, Inc.'s, bank account at Wells Fargo, isn't

15     it?

16          A.   That's what it appears to be.

17          Q.   And this is in 2010, right?

18          A.   Yes.

19          Q.   Okay.  Any reason why you would be getting

20     account alerts from Wells Fargo if this is an account

21     owned by your brother?

22          A.   Well, I am the director of the company also.

23          Q.   Oh, you are the director of Marathon

24     Management, Inc.?

25          A.   I believe so.

1      Q.   Okay.  Do you own one percent, a hundred

2  percent or zero percent in Marathon Management, Inc.?

3      A.   I would have to look at the tax returns, but I

4  believe I own one percent of the company, because I file

5  the tax returns for the company.

6      Q.   That is new testimony, isn't it, Mr. Comu?  You

7  have never before testified that you own one percent of

8  Marathon Management, Inc.?

9      A.   I don't know what the specific testimony you

10 are referring to.  I am trying to respond to you at this

11 point in time.

12          MS. HANKS:  And if you could go to KLM

13 Exhibit 43, please, the second page.

14     Q.   And Marathon Management, Inc., is, indeed, one

15 of the entities that has received distributions of cash

16 that you suggest was for some sort of third party

17 broker; isn't that right, Mr. Comu?

18     A.   No, I did not say Marathon Management was a

19 third party broker.

20     Q.   Okay.  So here you agree that Marathon

21 Management, Inc., the company that is owned either zero

22 percent, one percent or a hundred percent by you, is

23 receiving $10,000 out of the distributions of cash

24 received by TBG for stock, right?

25     A.   That's what it appears to be.

 1            MR. OLSEN:  Your Honor, I object to that.

 2   I think that mischaracterizes his testimony.  The line

 3   of direct examination had to do with 2.1 million that

 4   was disbursed in accordance with instructions from World

 5   Wide Auric.  You have got that.  The 686,000 that came

 6   to TBG did go to all kinds of things related to

 7   entities --

 8            THE COURT:  Okay.  I overrule the

 9   objection.

10       Q.   Okay.  So agree now that this is cash that is

11   being distributed to you personally or to your family

12   members, right?

13       A.   This is being distributed to Marathon

14   Management.

15       Q.   Okay.  But Marathon Management is either owned

16   by you a hundred percent or one percent or your brother,

17   right?

18       A.   Yes, by my brother.

19       Q.   So this is cash going to you or your brother?

20       A.   It is not going to me.

21       Q.   It is cash going to you or your brother,

22   correct?

23       A.   It is going to my brother.

24       Q.   But there are no documents whatsoever showing

25   that your brother owns Marathon Management, Inc.?

1      A.   I haven't seen the documents here.

2      Q.   I am asking you.  Well, this is your --

3  Marathon Management, Inc., your testimony is that it is

4  your brother's company, right?

5      A.   I believe that was the transfer that was made.

6      Q.   But you haven't produced a single document that

7  shows that, Mr. Comu.  All of the documents, and we have

8  walked through a number of them, and there are more, and

9  we can spend time doing that, but all of the documents

10 show that you own Marathon Management, Inc., a hundred

11 percent.

12     A.   I don't believe all the documents are current.

13     Q.   Are you going to tell this Court that there is

14 a document that you have produced to the trustee or that

15 you have put into evidence that shows that you don't own

16 this company, because the evidence in this record, Mr.

17 Comu, is that you own it a hundred percent, not just in

18 terms of the corporate documents but in terms of your

19 own correspondence that says 100 percent owned by Mr. C.

20 J. Comu?

21     A.   I don't have all of the documents on Marathon

22 Management, but to the best of my recollection in -- I

23 don't know what the years were, but I believe there was

24 a transfer made where my brother took control of

25 Marathon Management.  I became a one percent owner, and

Case 10-03269-sgj Doc 188 Filed 10/22/14   Entered 10/22/14 13:51:07   Page 60 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 76 of 231   PageID 2121

60

1  he became a 99 percent owner.  I don't have that readily

2  in front of me.  I am recalling from the best of my

3  recollection.

4      Q.   Mr. Comu, you have never given that testimony

5  before.  You were deposed in 2011, in 2012 and in 2013,

6  and this is the first time you have ever said that there

7  was a transfer of a 99 percent interest in Marathon

8  Management, Inc., to your brother.

9      A.   I don't recall those testimonies.  I am sorry.

10      Q.   One other question, you have testified that The

11  Barclay Group -- and this is what you disclosed in your

12  schedules -- is owned 99 percent by Bernard Brown or

13  Brown and Lampe?

14      A.   That's correct.

15      Q.   And that has been inconsistent.  It is either

16  Bernard Brown or Brown and Lampe, one of the two, right?

17  And your review is that it didn't matter because he is

18  the owner of Brown and Lampe so you didn't have to be

19  specific about the entity, right?

20      A.   I couldn't give you a legal definition.  I am

21  sorry.

22      Q.   Okay.  Well, let me ask you something.  That is

23  by virtue of a share exchange, right?

24      A.   That is what the document was.

25      Q.   So you were a hundred percent owner of The

1    Barclay Group, and you exchanged with Mr. Brown -- so

2    you became 99 percent owner of Brown and Lampe, right?

3         A.   That's correct.

4         Q.   So why -- well, no I am not even going to ask

5    why.  The truth is that on your schedules you disclosed

6    a one percent interest in The Barclay Group, and you

7    said that it was owned 99 percent by Brown and Lampe,

8    but you only disclosed that side of the transaction.

9    You did not disclose to the Court or to the trustee that

10   you also owned 99 percent of Brown and Lampe, did you?

11        A.   I did not because I did not have any documents

12   of the certificate to give to the trustee that would

13   have been owned by me.  If I had a certificate that

14   represented my 99 percent ownership in Brown and Lampe,

15   I would have absolutely turned it over to the trustee.

16        Q.   But Mr. Brown also didn't have any stock

17   certificates in The Barclay Group, did he?

18        A.   I am not certain of that.

19        Q.   Well, he testified that he didn't?

20        A.   Okay.

21        Q.   But even though no stock certificates were

22   exchanged between Mr. Brown and you, it was important

23   enough for you to disclose that you only had one percent

24   interest because of that transaction, but you felt like,

25   because you didn't have physical stock certificates, you

1  weren't obliged to disclose that you also owned

2  99 percent of Brown and Lampe?

3       A.   No, I don't believe I received a physical

4  certificate of the transfer.

5       Q.   I am not asking you about a physical stock

6  certificate.  I am asking you about an ownership

7  interest.  You were relying on a transaction to claim

8  that you own only one percent of an entity that has a

9  lot of assets that should have been made available to

10  your creditors.  You are relying on that transaction to

11  say you only own one percent, but you did not disclose

12  the other side of that transaction that gave you

13  99 percent of the entity, the very entity that you now

14  claim owned all of those tens of millions of shares, but

15  you owned it.  You owned 99 percent of it.  So either it

16  was a lie that it was a transaction, or it was a lie

17  that you only owned one percent, and you didn't own --

18  and you didn't disclose this other side of the

19  transaction where you owned Brown and Lampe?

20       A.   That is incorrect.  If I can go for the record,

21  the share exchange that I signed and the share exchange

22  document that Mr. Brown signed exchanged 99 percent of

23  The Barclay Group to Mr. Brown and 99 percent of Brown

24  and Lampe to C. J. Comu.  The only reason, and perhaps

25  it was an oversight or error on my part, that I did not

1  transfer any of the ownership of Brown and Lampe is

2  because I had nothing to transfer except the share

3  exchange document, which I disclosed in all of my

4  exhibits.

5      Q.  Mr. Comu, you have disclosed pieces of

6  information to suggest that you have no or little

7  assets, but you do not disclose information that shows

8  you do have assets or you do have interest in entities

9  like Brown and Lampe or Grey Point Partners or Ganas or

10 these other entities that you did not disclose to your

11 creditors or to the trustees.  You are very selective in

12 the information you chose to show your creditors, and

13 you are still being misleading about that information.

14     A.  I believe that is incorrect.

15     Q.  I know you believe that is incorrect, but I

16 think the evidence shows otherwise.

17             MS. HANKS:  I think we will pass the

18 witness Your Honor.

19             THE COURT:  All right.  Mr. Elmquist.

20                 CROSS EXAMINATION

21 Of C. J. Comu by Mr. Elmquist:

22     Q.  Mr. Comu, during Mr. Olson's questioning of

23 you, I want to go back to one of the statements I

24 thought I heard you say.  Was it your testimony that you

25 believe today that the bankruptcy schedules --

```
 1              MR. ELMQUIST:  May I approach, Your Honor?

 2              THE COURT:  You may.

 3       Q.   Make sure you understand what I am referring to

 4  when I say bankruptcy schedules.

 5              MR. ELMQUIST:  Dennis, do you have a copy

 6  of your exhibits there?

 7              MR. OLSEN:  May have 94, do not have 95.

 8       Q.   This has been marked as Exhibit 94, the

 9  schedules, Mr. Comu.  I would like you to take another

10  look at that document and confirm that this is what you

11  filed with the bankruptcy court.  Well, I will tell you

12  it is; this is a copy from the Court, sorry.  I don't

13  need you to confirm it.

14       A.   That's fine.  Thank you.

15       Q.   Did I just hear you testify that you believe

16  today that these bankruptcy schedules are accurate with

17  respect to your ownership interests in various

18  incorporated and unincorporated businesses as of

19  12/31/09?  Was that your testimony here 20 minutes ago?

20       A.   Based on the information and the disclosures

21  that are new to me regarding entities such as Grey Point

22  or Brown and Lampe that were not reflected in here, then

23  I would agree with you, Mr. Elmquist, that this document

24  should have been amended at that time as that

25  information was made available.
```

1    Q.   It should have been amended as soon as you

2    became aware it was not accurate?

3    A.   Absolutely, yes, sir, you are correct.

4    Q.   And you were admonished a couple of times,

5    during the meeting of creditors by the trustee, to make

6    a careful review of these filings because she believed

7    the statements were inaccurate, correct?

8    A.   I remember her testimony, yes, sir.

9    Q.   Did you understand what she was telling you?

10   A.   I think she was advising me to, you know,

11   continue to check my records and make sure that the

12   information that was being provided was accurate, yes,

13   sir.

14   Q.   Okay.  And did you attempt to do so?

15   A.   Obviously I didn't do a very good job of it.

16   Q.   Exhibit KLM 126, was exhibit KLM Exhibit 126 --

17        MR. ELMQUIST:  May I approach, Your Honor?

18        THE COURT:  You may.

19   Q.   I want to show you a paper copy, and I am going

20   to ask you if you recall this document.  Is that a

21   document you prepared at Mr. Olson's request to

22   address -- ensure that all the information in your

23   schedules and statement of financial affairs were

24   accurate?

25   A.   Appears to be, yes, sir.

1      Q.   But that list is not accurate either, is it?

2  For instance, it doesn't reflect your 99 percent

3  ownership in Brown and Lampe, does it?

4      A.   You are correct.

5      Q.   And according to your testimony today, it

6  inaccurately states your ownership of Marathon

7  Management, Inc., correct?  Your testimony today is that

8  you did not, in fact, own a hundred percent Marathon

9  Management, Inc., although that is what that document

10  reflects, correct?

11      A.   Yes, sir, should have been one percent, not

12  100 percent.

13      Q.   That doesn't show a lot of care, Mr. Comu, does

14  it, in terms of preparing this list, if you have

15  actually one percent interest but you showed a

16  100 percent interest?

17      A.   It is an unfortunate error, Mr. Elmquist; you

18  are correct.  I tried to be as diligent as I could and

19  researching as much as I could at the time this event

20  was going on and --

21      Q.   All right.  I want to go back to this.  We

22  talked about -- when I examined you initially we talked

23  a good bit about this acquisition plan of share

24  exchange, but we need to talk about it again because

25  there is testimony today that is quite troubling, so I

1    would like you to take a look on two of your exhibits,

2    61 and the bottom of Exhibit 202.  Now, we confirmed

3    through your testimony previously in this document that

4    you were the sole shareholder of The Barclay Group when

5    you signed this agreement, and it is your testimony

6    that, in exchange for 99 percent ownership in The

7    Barclay Group that Brown and Lampe would receive, not

8    Bernard Brown but Brown and Lampe according to this

9    agreement, you were to receive 99 percent interest in

10   Brown and Lampe, correct?

11        A.   Yes, sir, that's correct.

12        Q.   But you subsequently learned, you testified,

13   for the first time when Mr. Brown was deposed that, in

14   fact, Brown and Lampe had never been legally formed; is

15   that right?

16        A.   That was his testimony.

17        Q.   And that, I think you stated, was a surprise to

18   you because you did not know that, in fact, the business

19   entity that you were supposed to be acquiring 99 percent

20   of, in fact, never existed; is that right?

21        A.   At that time, yes, sir.

22        Q.   Despite that fact -- and do you recall -- you

23   attended Mr. Brown's examination; did you not?

24        A.   Yes, sir, I was there.

25        Q.   And do you recall Mr. Brown testifying during

1    the course of his deposition that -- do you recall me

2    asking him about the representations and warranties that

3    were contained in Exhibit 61, representations like the

4    legally existing entity, representations like there are

5    shareholders that exist for the company, representations

6    like there are preferred shares issued for the company?

7    Do you recall me asking all those questions of

8    Mr. Brown?

9         A.   Unfortunately, not all the questions, but I

10   remember being at the deposition.

11        Q.   Well, do you recall representations made in

12   this agreement that were completely false, correct,

13   representations about existing -- that the Brown and

14   Lampe entity existed when, in fact, it did not exist?

15   That was a bold-faced misrepresentation; was it not?

16        A.   I don't know how to answer that.

17        Q.   Well, okay.

18        A.   They were representations made by Mr. Brown.

19        Q.   They were representations made in Exhibit 61,

20   the acquisition and share agreement, that were false,

21   correct, false with respect to the existence of Brown

22   and Lampe as a legal entity, correct?

23        A.   I was told that the entity was not formed at

24   that time and that Mr. Brown would go ahead and form it

25   thereafter.

 1        Q.   The agreement doesn't say anything about

 2   forming thereafter.  It says that the entity exists at

 3   the day the agreement is signed, doesn't it?  Take a

 4   look at 3.1 of the agreement, please.

 5        A.   Yes, I see it.

 6        Q.   Okay.  And at Mr. Brown's examination -- Take a

 7   look at Exhibit 40, please.  It is in the other book,

 8   Page 66, Line 18.

 9        A.   Did you say Exhibit 40?

10        Q.   Exhibit 40, Page 66, Exhibit 40.  Wait a

11   minute.  Maybe I misspoke.  I am sorry.  It is

12   Exhibit 60.  All right.  Exhibit 60, please, Page 66,

13   Line 18.

14             I asked, "At the time you signed this

15   agreement" -- I am asking Mr. Brown this question.  This

16   agreement being the stock exchange share agreement,

17   Exhibit 61.  "At the time you signed this agreement,

18   those representations," referring to 3.1 what we just

19   looked at, "about the existence of Brown and Lampe were

20   not accurate, were they?"  And what was his response?

21        A.   He says, "No, but they were going to be

22   accurate."

23        Q.   "No, but they were going to be accurate"?  You

24   were supposed to close on a transaction where you are

25   buying assets from a company, and the party who is

1  signing that agreement making representations about

2  ownership is telling you the company doesn't exist, and

3  you find out after the fact it doesn't exist, and this

4  is the business partner you trust?  Is that what you are

5  telling this Court?

6        A.   I do trust him as a business partner, yes, sir.

7        Q.   Even though he is misrepresenting to you the

8  ownership of an entity you are acquiring in exchange for

9  transferring 99 percent of the stock of The Barclay

10 Group?  That is the business partner you trust?

11       A.   I believe, if I recall from his testimony, that

12 he said that he just didn't get around to it, but

13 because we had a business relationship of trust, I

14 didn't distrust that he wouldn't deliver the entity.

15       Q.   But he never has, has he, because it has never

16 been legally formed, has it?

17       A.   I believe he offered to form it, and he was

18 told it's not required at this time.

19       Q.   And it wasn't required because you basically

20 treated Brown and Lampe, the so-called UK entity, and

21 Mr. Brown as one in the same, just the way you treat The

22 Barclay Group and you as being one in the same, correct?

23       A.   No, that is incorrect.  Mr. Brown would deliver

24 the corporation to us when we had a reason to do

25 something with it.  At this point in time we have never

1   had a reason to do anything with Brown and Lampe, UK, so

2   it has not been an issue at all.

3        Q.   Okay.  Let's talk about Sunset Pacific a little

4   bit.  You indicated that the 98 percent interest that

5   you -- that your wife has as a limited partner of Sunset

6   Pacific was a gift.  What document have you provided to

7   the trustee that evidences you made a gift of that

8   limited partnership interest to your wife in 2006?

9        A.   Whatever corporate documents that have been

10  turned over to the trustee.

11       Q.   Well, I can represent to you that there is no

12  document that I have seen that reflects any such gift.

13  All we have is the consent of general partner that says

14  nothing about your conveying that interest as a gift to

15  your wife.  If you can show me something in that

16  document, please do, but I see nothing in that document

17  that says anything other than the general partner

18  consents to the transfer.  That is not an individual

19  gift or transfer by you individually to your wife, Mr.

20  Comu.

21       A.   I don't have the document in front of me, but

22  that was my understanding that that document was either

23  presented or was seen previously.  I don't have a copy

24  of it in front of me.

25       Q.   At the time that your wife received this

1   98 percent interest in 2006, what assets, if any, did

2   Sunset Pacific own?

3       A.   I believe there may have been an annuity -- I

4   am not sure -- and maybe some investment in Sun Sports

5   at the time.

6       Q.   Well, let's take a look at -- would you agree

7   with me that the stock certificate -- or, excuse me, the

8   tax returns for Sunset Pacific would be the best place

9   to determine whether, in fact, it owned any assets at

10  any given point in time?

11      A.   That would be a good one avenue, yes, sir.

12      Q.   Well, do you think it is an avenue that would

13  accurately reflect ownership of assets?

14      A.   I would say a financial statement, but I mean

15  the tax return is probably a good start.

16      Q.   All right.  You have there the binder of the

17  trustee's first exhibits.  Take a look at Exhibit 30

18  which is the 2005 tax return.

19            This is 2005 tax return -- well, do you

20  have the 2005 tax return there, Mr. Comu?

21      A.   Exhibit 30, yes.

22      Q.   Does the 2005 tax return reflect any ownership

23  of any asset?

24      A.   Some.

25      Q.   Oh, yeah?  Where?

1        A.    It says assets under Column B on Page Four.

2        Q.    Okay.  And that would be what?

3        A.    I don't recall.  I don't have the financial

4  statements in front of me.

5        Q.    Okay.  Well, at some point Sunset Pacific

6  acquired a $250,000 annuity; is that right?

7        A.    I believe that's correct.

8        Q.    Take a look at the return for 2007, which is

9  Exhibit 32.  This is the first time I see an annuity

10  shown on the tax return.  It shows up on the overflow

11  statement, the sixth page of the exhibit.  Do you see

12  that overflow statement, annuity, $250,000, purchased

13  December 2006?  I am looking at the 2007 tax return,

14  Exhibit 32, and I am looking at the sixth page of that

15  document entitled overflow statement?

16        A.    Oh, I see it, yes, yes.

17        Q.    And you see the annuity purchased there is

18  December 2006?

19        A.    Yes.

20        Q.    So the annuity we are talking about was

21  purchased after your wife acquired a 98 percent interest

22  in the entity?

23        A.    I don't have the exact date.

24        Q.    Was this also after you had been sued in New

25  York?

1      A.   I don't have the exact dates.

2      Q.   I will tell you that there is a stipulated fact

3  that tells us when that lawsuit was filed, and the

4  lawsuit was filed July 20, 2006.  After you had been

5  sued in New York, you purchased, with the money you

6  received from the Humitech transaction, right, a

7  $250,000 annuity and put it into Sunset Pacific; is that

8  right?

9      A.   The funds were received by Mr. Perlman that

10 Sunset Pacific received.

11     Q.   I am saying that the source of the funds to

12 purchase the annuity was the $500,000 you received from

13 Mr. Perlman?

14     A.   A portion of it, yes, sir.

15     Q.   Most of it, right?

16     A.   250,000, I believe.

17     Q.   Right, and that is the amount of the annuity?

18     A.   Correct.

19     Q.   So the source of the funds to purchase the

20 annuity was the money you received from Mr. Perlman, and

21 that annuity was put into Sunset Pacific after you had

22 made your wife a 98 percent owner of that entity and

23 after you had been sued in New York?

24     A.   The date appears to be December 2006 is the

25 purchase of the annuity.  Is that what you are referring

1    to?

2         Q.   Well, listen to my question, please.  After you

3    were sued in New York, which was in July 2006?

4         A.   Right.

5         Q.   In December of 2006 you purchased and put into

6    Sunset Pacific, that is transferred or put in the name

7    of the entity Sunset Pacific this $250,000 annuity?

8         A.   Right, but I believe the date of the transfer

9    was January 1, 2006.

10        Q.   I am not talking about when -- Mr. Comu, you

11   did not listen to my question.  I am not talking about

12   when your wife acquired the interest in Sunset Pacific.

13        A.   Okay.

14        Q.   I am talking about when you purchased on behalf

15   of the Sunset Pacific a $250,000 annuity, and that

16   annuity was purchased in December of 2006, after you had

17   been sued in New York?

18        A.   I think that's what this is.

19        Q.   Okay.  This loan to Sun Sports and

20   Entertainment that is also shown on Exhibit 32, what

21   was -- tell me about that loan.  What was the purpose of

22   the loan to Sun Sports?

23        A.   Primary operating capital.

24        Q.   Was the source of the loan proceeds, again,

25   principally the money you received from Mr. Perlman?

1  A. I believe so.  I am not 100 percent certain.

2  Q. And was there a note executed in connection

3 with that loan by Sun Sports?

4  A. Numerous notes, yes, sir.

5  Q. Okay.  Why did you have Sunset Pacific loan

6 this money to Sun Sports, as opposed to your making the

7 loan to Sun Sports?  Since you were the owner of Sun

8 Sports, why would Sunset Pacific, who had no interest in

9 Sun Sports, make a loan to that company?

10  A. Well, I was not the owner of Sun Sports.  I was

11 the CEO.

12  Q. Okay.  Well, explain it to me then why -- what

13 business purpose did it serve, other than to shield

14 assets, for Sunset Pacific to loan $277,000 to Sun

15 Sports?

16  A. I believe at the time I had confidence in the

17 business, and the decision to make the loans were valid

18 loans with a good interest rate that, if they would have

19 been paid back, I think Sunset Pacific would have

20 received a good yield on that investment.

21  Q. Wasn't the real purpose, Mr. Comu, to put these

22 funds that you had received, this $500,000 you had

23 received, into some other form of asset into some other

24 entity that wasn't readily reached by your creditors?

25  A. No, that is totally incorrect.

1    Q.   All right.  I want to talk about Eurocap for a

2  minute.  You were questioned about it by Mr. Olson.  I

3  want to understand it better.  Eurocap is an entity in

4  which you are a director, correct?

5    A.   I am the chairman of the board.

6    Q.   Eurocap is also an entity -- and you became a

7  director shortly before and incident to the exchange of

8  stock between Eurocap and -- the swap of interest in

9  Eurocap in exchange for 10 million shares of Green Auto

10  stock that The Barclay Group held, correct?

11    A.   I believe that is the approximate -- the nature

12  of the transaction.

13    Q.   So you became a director of Eurocap, and then

14  you transferred to Eurocap, on behalf of The Barclay

15  Group, 10 million shares of this Green Auto stock that

16  had been issued to The Barclay Group, in exchange for

17  what?

18    A.   In exchange for the shares of Eurocap.

19    Q.   100 percent of Eurocap?

20    A.   No, I don't know the exact percent swap.  I

21  would have to look at the documents again.

22    Q.   Let's take a look at Exhibit 20, I am sorry,

23  Trustee's Exhibit 20.  It is in the first volume.  Tell

24  me when you are there.

25    A.   I am here.

1    Q.    All right.  This document states, and this --

2    well, first of all, this agreement was done -- let's

3    look at the next to last page.  The agreement isn't

4    signed, is it?

5    A.    Not this document.

6    Q.    Was it ever signed?

7    A.    Yes, sir, it was.

8    Q.    Why didn't the trustee get a signed copy?

9    A.    I don't know.

10    Q.    Okay.  This document represents that the

11    agreement is made and entered into on October 31, 2011.

12    Were you at that time an officer or director of Eurocap?

13    A.    I don't know if I became a director or officer

14    of Eurocap on that date or thereafter.  I am not certain

15    the exact date.

16    Q.    Okay.  Now, this agreement is between Eurocap

17    and, as it states in the body of the first paragraph,

18    "The persons executing this agreement listed on the

19    signature page hereto, referred to as the TBG-GACR

20    shareholders, who own 100 percent of the outstanding

21    shares of TBG-GACR."  Do you see that?

22    A.    Yes, I do.

23    Q.    And you signed this document as that purported

24    shareholder, correct?

25    A.    I signed that as the owner of the TABC -- of

1   The Barclay Group's Green Auto shares owned by The

2   Barclay Group, not by C. J. Comu.  These were shares

3   owned by The Barclay Group.  These are The Barclay Group

4   shares, not C. J. Comu shares.

5        Q.   Okay.

6        A.   So the 100 percent represents -- those are

7   owned 100 percent by The Barclay Group.

8        Q.   So you are conveying to Eurocap 10 million

9   shares of Green Auto shares after you have conveyed to

10   Brown and Lampe 99 percent of the ownership of The

11   Barclay Group; is that right?

12        A.   I am not following you a hundred percent.

13        Q.   2007 transaction where you did the swap, after

14   that agreement was done where Brown and Lampe supposedly

15   acquired 99 percent ownership of The Barclay Group,

16   after that transaction was done, then you signed this

17   agreement on behalf of The Barclay Group to transfer 10

18   million shares; is that right?

19        A.   Yes, as a director of The Barclay Group, that's

20   correct.

21        Q.   And what consideration -- what was Eurocap

22   Investments doing at the time this transaction was done?

23   What value did the company have?

24        A.   It was a public holding company.

25        Q.   Did it have any assets?

1        A.    Not at the time.

2        Q.    Has it ever had any assets?

3        A.    I would have to check the financials.

4        Q.    Take a look at KLM Exhibit 82, please.  It will

5    be on the screen.

6        A.    Yes.

7        Q.    Are you familiar with this document?

8        A.    I believe so, yes.

9        Q.    Can you turn to the sixth page, the one that

10   shows the balance sheet.  Do you have the balance sheet

11   in front of you?

12       A.    It is coming up.  It is on Page Eight -- Page

13   Six?

14       Q.    What is the balance sheet?  What does the

15   balance sheet show as of 12/31/12 as being the current

16   assets of Eurocap?

17       A.    It shows cash in bank.

18       Q.    Of 13,553 pounds, appears, correct?

19       A.    Yes, sir.

20       Q.    And it shows debt of 27,012 pounds; is that

21   right?

22       A.    Yes, sir.

23       Q.    For a net liability of -- and net shareholders'

24   deficit of 13,459?

25       A.    Yes.

Case 10-03269-sgj Doc 188 Filed 10/22/14 Entered 10/22/14 13:51:07 Page 81 of 215
Case 3:14-cv-04163-B Document 1-9 Filed 11/21/14 Page 97 of 231 PageID 2142

81

1      Q.   Has there ever been a time when Eurocap had a

2  better looking balance sheet that would justify your

3  paying 10 million shares of Green Auto stock to it in

4  exchange for ownership of Eurocap?

5      A.   I am sorry.  I don't understand your question.

6      Q.   I am showing you a balance sheet as of 2012.

7  Do you recall ever seeing a balance sheet for Eurocap

8  where Eurocap was showing that there was equity in the

9  company?

10      A.   This is the only balance sheet I have seen for

11  Eurocap.  I don't believe there was one in 2011.

12      Q.   Okay.

13           THE COURT:  Mr. Elmquist, we are going to

14  have to break for my 11:30 hearing so we will resume at

15  one o'clock with whatever --

16           MR. ELMQUIST:  I have just a short piece

17  left.  I can wrap it up in 10 or 15 minutes.

18           THE COURT:  All right.  Okay.  So we will

19  resume with that at one o'clock.  All right.  Thank you.

20           (Recess from 11:29 to 1:16)

21           THE COURT:  All right.  We are going back

22  on the record in the King Louie Mining/Comu matter,

23  Adversary 10-3269.

24           When we broke for lunch Mr. Elmquist was

25  doing cross examination.  Mr. Comu, are you ready to

Case 10-03269-sgj Doc 188 Filed 10/22/14   Entered 10/22/14 13:51:07   Page 82 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 98 of 231   PageID 2143

82

```
 1    proceed?

 2                 THE WITNESS:  I am, Your Honor.

 3                 THE COURT:  All right.  Mr. Comu, you know

 4    the drill; I am required to remind you you are still

 5    under oath.  You may proceed, Mr. Elmquist.

 6                 MR. ELMQUIST:  Thank you.

 7                 CROSS EXAMINATION (CONTINUED)

 8    Of C. J. Comu by Mr. Elmquist:

 9        Q.   Mr. Comu, before the break we were talking

10    about Sunset Pacific and its tax returns.  I have got on

11    the table there a copy of the amended 2011 return for

12    Sunset Pacific, which has been marked as Defendant's

13    Exhibit 9.  Could you take a look at that and confirm

14    that that return reflects no income or assets?

15        A.   It appears to be.

16        Q.   It appears to be that it shows no income or

17    assets?

18        A.   That is what it appears to show.

19        Q.   The 2007 return we were looking at before the

20    lunch break, which is Trustee's Exhibit 32, showed an

21    annuity and a loan.  Do you recall that?

22        A.   Yes.

23        Q.   Do you know what happened to the annuity?  Was

24    it cashed in at some point?

25        A.   I believe it matured, yes.
```

1    Q.   It matured?  Okay.  Was a replacement annuity

2  purchased?

3    A.   I believe so, yes.

4    Q.   Is that also owned by Sunset Pacific?

5    A.   Yes, sir, I believe so.

6    Q.   Do you know when it was purchased?

7    A.   I don't have the exact date.

8    Q.   Is that annuity still owned by Sunset Pacific?

9    A.   To the best of my knowledge, yes.

10   Q.   Do you know the face amount of the annuity?

11   A.   I am not 100 percent certain.

12   Q.   Is it 250,000 or thereabouts?

13   A.   I don't believe so.

14   Q.   Can you give me a ball park?  Was it more or

15  less than a hundred thousand?

16   A.   It may be a hundred thousand.

17   Q.   What about the loan owed to Sunset Pacific by

18  Sun Sports; was that repaid?

19   A.   I don't recall what was repaid or not.

20   Q.   Does Sun Sports have the ability to repay the

21  loan?

22   A.   I don't know their financial condition at all.

23   Q.   Okay.  Did you indicate that the loan made

24  by -- or let me just ask, because I don't remember your

25  answer.  Sunset Pacific, the loan to Sun Sports, is

1  there any note or any other document that evidences that

2  loan that Sunset Pacific made to Sun Sports?

3      A.    I believe there are several.

4      Q.    Promissory notes?

5      A.    I believe that is what they are called, okay?

6      Q.    Where are the originals of those promissory

7  notes that are payable to Sunset Pacific?

8      A.    I presume the originals would be with Sun

9  Sports.

10     Q.    But Sun Sports is the maker.  It is typical for

11 the payee to hold the original.  So do you know whether

12 the notes that Sun Sports made were delivered to some

13 representative of Sunset Pacific?

14     A.    I am not 100 percent certain.

15     Q.    Was your wife involved in any of those loan

16 transactions?

17     A.    She was well aware of all of them.

18     Q.    Let me be more precise.  Did your wife

19 negotiate, from a business standpoint, the terms of

20 those loans?

21     A.    I don't think she specifically negotiated them,

22 but she was aware of all of them.

23     Q.    Who did negotiate those loans on behalf of

24 Sunset Pacific?

25     A.    Myself or my wife jointly.

1      Q.   And who negotiated the loans on behalf of Sun

2  Sports?

3      A.   Either myself or the president.

4      Q.   Does Sun Sports acknowledge remaining

5  indebtedness owed to Sunset Pacific, to your knowledge?

6      A.   That I cannot answer.

7      Q.   Do you know what efforts have been made by

8  Sunset Pacific to collect this loan?

9      A.   I believe there may have been some notices

10  issued, but I believe the company ceased operations, I

11  think, at the end of 2009, I am guessing.

12      Q.   The company meaning Sun Sports?

13      A.   Sun Sports, yes, sir.

14      Q.   So if Sun Sports discontinued operations in

15  2009, there is not much chance that any remaining debt

16  on this loan would be repaid, right?

17      A.   Not necessarily.

18      Q.   Not necessarily what?

19      A.   Because the debts and the liabilities of the

20  corporation carry on.

21      Q.   I appreciate that, but if Sun Sports has no

22  business operations and ceased operating, how would it

23  be able to pay this $277,000 loan?

24      A.   If the company is reorganized with a new

25  business incorporated into it, the liabilities would

1   stay.

2        Q.   Has there been any discussions that you are

3   aware of among the management of Sun Sports to do that?

4        A.   Not currently.

5        Q.   Has there ever been?

6        A.   Yes.

7        Q.   When?

8        A.   I believe it was sometime in 2010.  I don't

9   have the exact dates in front of me.

10        Q.   So there has been nothing recent discussed

11   about Sun Sports recommencing business operations?

12        A.   Not in the last 12 months, I would probably

13   say.

14        Q.   So, again, there is really no realistic

15   prospect -- whatever the outstanding loan balance was

16   owed to Sunset Pacific, there is no realistic prospect

17   of that debt being paid?

18        A.   I still believe there is a chance that a

19   portion of that debt could get paid, yes, sir.

20        Q.   I said realistic prospect.

21        A.   I believe there is a realistic prospect, but

22   not all of it.  I believe a realistic prospect that some

23   of it could be repaid back to Sunset Pacific.

24        Q.   How much of that debt do you think could be

25   repaid?  What do you think realistic is -- realistic

1    prospect of repayment is?

2         A.   I would guess 25 percent of the face value.

3         Q.   Face value being $277,750?

4         A.   Approximately.

5         Q.   So was there any repayment of this debt before

6    Sun Sports ceased operations?

7         A.   I do not recall.

8         Q.   Okay.  We have got the outstanding loan owed to

9    Sunset Pacific.  We have an annuity that you think is

10   around $100,000.  And we have a 2012 Mercedes owned by

11   Sunset Pacific, right?

12        A.   That is incorrect.

13        Q.   Okay.  Take a look at the certificate of title

14   on the screen here, which is KLM Exhibit 337.  Are you

15   saying -- well, first of all, that is a certificate of

16   title issued to Sunset Pacific for a 2010 Mercedes,

17   correct?

18        A.   2010, that's correct.

19        Q.   Are you saying -- and it is dated July 23,

20   2012, right?

21        A.   That's correct.

22        Q.   Are you saying that that vehicle is no longer

23   owned by Sunset Pacific?

24        A.   No, I am saying the vehicle is not a 2012.

25        Q.   Okay.  I misspoke then.  It is a 2010 Mercedes

1  and the date of the title is July 23, 2012?

2       A.   That's correct.

3       Q.   Okay.  So is the vehicle that is identified in

4  Exhibit 337 still owned by Sunset Pacific?

5       A.   Yes, sir.

6       Q.   And is that a vehicle driven by you or your

7  wife?

8       A.   Either/or.

9       Q.   Okay.  Is it used for personal activities?

10      A.   Business and personal.

11      Q.   What is the business of Sunset Pacific today?

12      A.   It is a holding company that is always seeking

13  to look for opportunities that it may possibly engage

14  in.

15      Q.   Other than the Mercedes and the loan balance

16  owed to it and the annuity, what does Sunset Pacific

17  own?

18      A.   I believe it has the ownership in the algae

19  limited partnership.

20      Q.   What is the name of that business?

21      A.   I think it is called Algae Biofuel Joint

22  Venture, I am guessing, or maybe it is limited

23  partnership.

24      Q.   What is the nature of Sunset Pacific's interest

25  in that entity?

1       A.   I believe it owns one or two units in that

2   partnership.

3       Q.   And how did it acquire those units?

4       A.   It was a transaction that was negotiated at

5   the -- sometime back, several years ago.

6       Q.   And who negotiated that transaction?

7       A.   I believe myself and my wife negotiated that

8   with the company.

9       Q.   What did Sunset Pacific pay for these one or

10  two units in this joint venture?

11      A.   I am guessing 200,000.

12      Q.   Are there documents that evidence this

13  transaction, this purchase and sale transaction for the

14  acquisition of these units by Sunset Pacific?

15      A.   Yes.

16      Q.   Do you know whether those documents have been

17  provided to the trustee or plaintiffs?

18      A.   To the best of my recollection, yes, sir.

19      Q.   What is the status of this -- I am sorry.  You

20  said algae what?

21      A.   Biofuel.

22      Q.   Is it engaged in business?

23      A.   It is not operating, but, yes, it is in

24  business.

25      Q.   What is it doing?

1       A.   It is trying to get equipment financing to

2  establish its biofuel operations.

3       Q.   Where is this business located?

4       A.   At Tulare, California.

5       Q.   Say that name again?

6       A.   Tulare, T-U-L-A-R-E.

7       Q.   What is the eventual business plan for Algae

8  Biofuel?  What is it going to do?

9       A.   Convert biofuel from algae is the basic

10  premise.

11       Q.   But right now there has been no commercial use

12  of this process by this venture; is that right?

13       A.   There is no current cash flow from it, yes,

14  sir.

15       Q.   Have you received any type of financials or

16  prospectus to indicate when income might be received

17  from this business?

18       A.   They have not projected any income streams yet.

19       Q.   Do you know what this one or two units interest

20  in Algae Biofuel entitles Sunset Pacific to, when and if

21  there is income derived from the business?  Is there

22  some kind of -- did the terms of the purchase

23  transaction indicate how purchasers of these units would

24  be repaid on their investments?

25       A.   There was a projected cash flow on a per unit

1  holder basis, yes.

2      Q.   So that is included in the prospectus you

3  received when you purchased the units, when Sunset

4  purchased the units?

5      A.   I believe so.

6      Q.   Do you know whether that prospectus has been

7  provided to the trustee or the plaintiffs?

8      A.   I can't recall.  There are so many exhibits.

9      Q.   Tell me again when this was acquired.

10     A.   I cannot recall the exact date.  I am sorry.

11     Q.   Okay.  Well, it doesn't show up on your 2011 --

12 or the 2011 tax return for Sunset Pacific, does it?

13 There is nothing shown there.

14     A.   It does not appear to.

15     Q.   Okay.  Do you know whether it shows up on the

16 2012 return?

17     A.   I do not know that.

18     Q.   Have we covered all the assets that Sunset

19 Pacific owns today that you know about?

20     A.   The ones you have listed, I believe, to the

21 best of my recollection, those are correct.

22     Q.   So everything you have testified about right

23 here and now is everything you know about as far as

24 assets that Sunset Pacific owns; is that right?

25     A.   To the best of my recollection, at this point

1    in time, Mr. Elmquist, yes, sir.

2         Q.   Is there anyone that you know that would be

3    more knowledgeable than you regarding the assets

4    currently owned by Sunset Pacific?

5         A.   Unfortunately, yes.

6         Q.   Who is that?

7         A.   Mr. Dahl.

8         Q.   Mr. Dahl is dead, isn't he?

9         A.   That's the unfortunate part.

10        Q.   Okay.  Well, let me try again.  Is there a

11   living person that you know of that knows more about the

12   assets of Sunset Pacific than you?

13        A.   Everything was shared with our accountant who

14   filed our tax return, so I would only assume it would be

15   in our accountant's recordkeeping somewhere.

16        Q.   Who is doing your accounting now?

17        A.   I have not selected an accounting firm yet.  We

18   are interviewing.

19        Q.   Okay.  Now, here we go.  You just stated that

20   someone is out there that is an accountant that would

21   know as much as you do about the current state of

22   affairs of Sunset Pacific insofar as the assets owned,

23   and your response indicated to me that there is a live

24   person out there right here and now that you have

25   selected, an accountant that has certain records, that

Case 10-03269-sgj Doc 188 Filed 10/22/14 Entered 10/22/14 13:51:07 Page 93 of 215
Case 3:14-cv-04163-B Document 1-9 Filed 11/21/14 Page 109 of 231 PageID 2154

93

1   would be equally knowledgeable as you with respect to

2   the assets of Sunset Pacific. That is what I heard?

3       A.   I am sorry. That is incorrect, and I can

4   correct you.

5       Q.   So let's try again.

6       A.   Okay. Mr. Alvin Dahl --

7       Q.   Putting Mr. Dahl aside, because he is dead --

8       A.   Correct.

9       Q.   -- is there anyone else today, existing today,

10  that has a better, more complete knowledge of the assets

11  and liabilities of Sunset Pacific, other than you?

12      A.   There is not.

13      Q.   Thank you. All right. During Mr. Olson's

14  examination I thought I heard you say that the sales

15  that occurred -- The Barclay Group sales of Green Auto

16  stock that occurred that involved World Wide Auric were

17  done in accordance with an escrow agreement with World

18  Wide Auric. Did I hear that correctly?

19      A.   That is incorrect.

20      Q.   So there was no escrow agreement between World

21  Wide Auric and TBG?

22      A.   No, the escrow agreement was with Old Monmouth.

23      Q.   Okay. But what the I heard in your testimony

24  is that there was some form of agreement between The

25  Barclay Group and World Wide Auric, where the allocation

Case 10-03269-sgj Doc 188 Filed 10/22/14   Entered 10/22/14 13:51:07   Page 94 of 215
Case 3:14-cv-04163-B   Document 1-9   Filed 11/21/14   Page 110 of 231   PageID 2155

94

1  of proceeds from the sale of that stock was agreed to?

2       A.   There was a percentage allocation agreement,

3  yes, sir.

4       Q.   And was that agreement in writing?

5       A.   No, sir.

6       Q.   So this is an oral agreement you made with

7  Mr. Toscano?

8       A.   That's correct.

9       Q.   And who negotiated those terms on behalf of The

10 Barclay Group?

11      A.   On behalf of the -- I would probably say that I

12 made the final decision after conferring with Mr. Brown

13 and Mr. Baxter and Mr. Parsley.

14      Q.   Okay.  That wasn't my question.  My question

15 was:  Who negotiated with Mr. Toscano the terms of the

16 allocation between The Barclay Group and World Wide

17 Auric with respect to those sales?

18      A.   I believe that was me.

19      Q.   Okay.  And it was Mr. Toscano that contacted

20 you regarding the possibility of selling restricted

21 shares of Green Auto stock held by The Barclay Group?

22      A.   That's correct.

23      Q.   Had you done business with Mr. Toscano in the

24 past?

25      A.   Never.

1      Q.   How did Mr. Toscano come to learn of The

2   Barclay Group's ownership of the Green Auto shares and

3   know about you?

4      A.   I don't know.

5      Q.   So he didn't indicate how he had reached out to

6   you for purposes of offering these services?

7      A.   He just reached out to me, said, "I hear your

8   firm has a large block of stock in Green Auto."

9      Q.   Okay.  World Wide Auric is based in the Turks

10   and Caicos, right?

11      A.   According to the invoice I have seen, yes.

12      Q.   Well, when you spoke to Mr. Toscano, did he

13   indicate where he was residing or where his offices were

14   located?

15      A.   He had multiple offices.

16      Q.   Why did you think that World Wide Auric was the

17   appropriate party to undertake this service on behalf of

18   The Barclay Group to sell these restricted sales, if you

19   had no prior business dealings with World Wide Auric or

20   Mr. Toscano?

21      A.   For the primary reason there was going to be an

22   escrow involved, so that way I knew that everybody would

23   always get paid and the investors would get their

24   certificates, so I didn't feel there was a lot of risk

25   in the transaction.

1          Q.   So without any prior business dealings, you

2     struck a deal with Mr. Toscano to divvy up the proceeds

3     of the sale of the stock, 80 percent to World Wide Auric

4     and 20 percent to The Barclay Group, who was the owner

5     of the shares; is that --

6          A.   I can't testify exactly what the percentage,

7     but that is very close.

8          Q.   But my point is:  Did you investigate other

9     potential brokers that might provide this type of

10    service?

11         A.   Yes, I did.

12         Q.   Okay.  And you determined that this proposal

13    that Mr. Toscano was making was the best you could do;

14    is that your testimony?

15         A.   At the time, yes, sir.

16         Q.   And you sold this stock at the time because you

17    were in need of cash, right?

18         A.   It was a security that we needed to convert to

19    cash to run our business.

20         Q.   Well, it was a security that you needed to

21    convert because you had living expenses that you had no

22    means to pay, correct?

23         A.   That is incorrect.

24         Q.   Well, what other source of income did you have

25    that were paying your bills, Mr. Comu?

Case 10-03269-sgj Doc 188 Filed 10/22/14 Entered 10/22/14 13:51:07 Page 97 of 215
Case 3:14-cv-04163-B Document 1-9 Filed 11/21/14 Page 113 of 231 PageID 2158

97

1      A.   I was also working for Regus Advisers at the

2   time.

3      Q.   Uh-huh.  Was it generating any income that

4   could be used to pay your bills?

5      A.   There was -- the company was generating some

6   income, yes.

7      Q.   But not sufficient to pay your expenses?

8      A.   I would have to see what the financials looked

9   like, but my expenses were relatively minor at the time.

10      Q.   These expenses I am talking about were not just

11   your expenses, but you or your wife's expenses and your

12   pets' expenses and all your household living expenses.

13   Those were paid to a goodly measure by The Barclay Group

14   through the sales of the stock; were they not?

15      A.   My expenses were covered by the company, per my

16   agreement with Mr. Brown.

17      Q.   And that was an oral agreement, right?

18      A.   Yes, it was an oral agreement that all my

19   expenses would be covered by the company.

20      Q.   Okay.  All right.  I want to ask you a few

21   questions about KLM Exhibit 336, which I believe is a

22   ledger you prepared on behalf of The Barclay Group, TKY

23   and Daptco Trust.  Do you see it?

24      A.   Yes.

25      Q.   Paper copy there, too, if you need it.

1          A.   I can see this.

2          Q.   Okay.  You can see that, great.  Can you

3    confirm that this is a ledger you prepared to reflect

4    the sales of Green Auto stock by The Barclay Group, TKY

5    and Daptco Trusts?

6          A.   It appears to be.

7          Q.   And this, in fact, is a document you prepared

8    at the trustee's request, correct?

9          A.   I believe so.

10          Q.   And was introduced at your deposition.  See the

11    deposition exhibit sticker there?

12          A.   Yes.

13          Q.   And this document reflects that between

14    June 23, 2011, and January 2012 there was almost a

15    million shares of Green Auto stock sold, 9,998,091 to be

16    exact, and that, according to your information, the net

17    paid to The Barclay Group was $686,476; is that right?

18          A.   That's what this shows.

19          Q.   And do you believe that to be accurate?

20          A.   To the best of my recollection, yes.

21          Q.   Okay.  Now, at the bottom of the page there is

22    a reference to TKY.  Do you see there a hundred percent

23    sold, five million shares issued, note $500,000; do you

24    see that?

25          A.   I see that.

1      Q.   If you turn the page, the ledger relates to

2    sales of stock issued -- Green Auto stock issued to TKY

3    Trust that was sold between 12/23/11, and -- I think

4    there is a misprint there.  That should be 3/16/2012,

5    correct, not 2019.  Do you see that?

6      A.   The one that is highlighted?

7            MR. ELMQUIST:  Can you enlarge that a

8    little bit, please?

9      Q.   Yeah, I am talking about the date range there,

10   Mr. Comu.  Those transactions occurred --

11     A.   Yes, that's an incorrect date.

12     Q.   And that should be 3/16/2012, right?

13     A.   I believe so.

14     Q.   And down in the column that is net to TBG, that

15   would indicate the net sum that TBG received from the

16   sale of the stock; is that what your -- is that what

17   that number is meant to reflect?

18     A.   I believe that's correct.

19     Q.   And that $116,500 was applied to the TKY

20   $500,000 note; is that right?

21     A.   That's correct.

22     Q.   So that would leave a balance of around --

23   well, would leave a balance of $383,500 on that note,

24   correct?

25     A.   Approximately.

1    Q.   And this is -- this exhibit reflects all the

2    sales that occurred, all the stock that TKY owned and

3    was sold by and through Reid Alrick, correct?

4    A.   I believe that was the only block of stock that

5    TKY purchased under a note agreement.

6    Q.   That wasn't my question.  My question was:

7    Does this listing of shares purchased represent all the

8    sales of the TKY Green Auto stock that was sold?

9    A.   To the best of my recollection, because the

10   numbers match up to the five million shares that were

11   issued to him, and this says 4.8 million shares here at

12   the bottom.

13   Q.   So there was 200,000 -- After these

14   transactions were completed, there was 200,000 shares of

15   Green Auto stock issued to -- well, let me back up.

16   This stock, the five million shares we are talking

17   about, were the shares that TKY purchased from The

18   Barclay Group pursuant to the January '10 stock purchase

19   agreement, correct?

20   A.   That is correct.

21   Q.   After that transaction -- well, following the

22   closing or in connection with the closing of that

23   transaction, was a new certificate issued to TKY to

24   reflect their ownership of those five million shares, or

25   did the shares remain in the name of The Barclay Group?

1      A.   I don't know what happened to the other 200,000

2  shares.

3      Q.   I am not talking about the 200,000.  I am

4  talking about the time the transaction took place in

5  January 2010, where The Barclay Group sold five million

6  shares of its Green Auto stock to TKY, was there a

7  certificate issued to TKY for those five million shares?

8      A.   It would have to be, yes.

9      Q.   Okay.  And as these sales were occurring, was

10  that certificate turned in to reflect the reduced

11  numbers of shares owned by TKY by virtue of these sales?

12      A.   The certificate, to the best of my

13  recollection, was provided to the transfer agent in

14  acting as escrow and trustee for the stock and the

15  investment and would reduce those shares from the main

16  certificate until it was at zero, so they kept a running

17  balance, not us.

18      Q.   But according to this ledger, there were

19  200,000 shares of Green Auto stock that were not sold,

20  correct?

21      A.   That's what appears to be.

22      Q.   So there should be a stock certificate issued

23  in the name of TKY Trust for Green Auto shares, for

24  200,000 Green Auto shares, correct?

25      A.   Only if it is requested by TKY.  Otherwise it

1 would be sitting in an escrow depository at the transfer

2 agent.

3     Q.  Okay.  So as I understood your testimony, after

4 these sales were completed, you concluded there was no

5 longer an opportunity to make additional sales of Green

6 Auto stock and, therefore, the efforts to sell the stock

7 should be concluded; is that right?

8     A.  I believe the price was dropping, and it wasn't

9 an economically viable transaction for the benefit of

10 the company, so I believe that is probably why we

11 discontinued sales.

12     Q.  But I think you also said that, in connection

13 with discontinuing the efforts to sell the stock, you

14 also wrote off the note balance?

15     A.  After all of those shares were sold and it was

16 basically --

17     Q.  Wait a minute, wait a minute.  Were all the

18 shares sold?  Were the entire five million shares sold

19 or 4,800,000 shares?

20     A.  According to this exhibit that I am looking at,

21 Mr. Elmquist, it appears 4.8 million shares have been

22 sold, and that would remain 200,000 shares would be

23 remaining.

24     Q.  Okay.  So there was 200,000 shares remaining

25 which could -- according to the way you looked at the

1    note, could have been used to pay down an additional

2    amount on that note, but at the time these sales

3    concluded, where there were still 200,000 shares

4    outstanding, at that time you wrote off the entire

5    remaining balance of the TKY note; is that your

6    testimony?

7        A.   To the best of my recollection, I believe

8    that's correct.

9        Q.   Why did you do that?  Why did you write off the

10   note?

11       A.   It could have been a year-end financial plan

12   for accounting or tax purposes, and it may have just

13   been a judgment call on behalf of management or the

14   controlling shareholders of The Barclay Group at that

15   time.

16       Q.   Say that last part again.  It was a decision of

17   who?

18       A.   Either management or the controlling

19   shareholder of The Barclay Group.

20       Q.   Have we -- Through four days of testimony, Mr.

21   Comu, are you prepared to acknowledge that you are the

22   hundred percent owner of The Barclay Group?

23       A.   That is false.

24       Q.   You still believe that Mr. Brown owns

25   99 percent of the business?

1      A.   That is 100 percent correct.

2      Q.   All right.  Now, let's talk about Daptco on

3   this same ledger.  According to this ledger, between

4   March and June of 2012, June 1 of 2012, 1,400,000 shares

5   of Green Auto stock issued in the name of Daptco Trust

6   were sold; do you agree with that?

7      A.   Yes, sir.

8      Q.   And in the net to TBG column, there is shown a

9   total amount of 30,185 that was paid to TBG, correct?

10      A.   Yes, sir, I see that.

11      Q.   Now, let me ask you this question.  Were all of

12   the proceeds payable to Daptco for this 1,400,000 shares

13   of stock, were all those proceeds that were payable to

14   Daptco paid to TBG, or were some of those proceeds paid

15   to Daptco?

16      A.   I am sorry.  I don't understand your question a

17   hundred percent.

18      Q.   Okay.  We have got a share of stock, and I

19   think the map on this one is easy.  We are selling at 20

20   cents a share, so we are looking at $280,000 gross,

21   right?

22      A.   Yes.

23      Q.   You are saying 20 percent of that amount, based

24   upon your agreement with Toscano, would have gone to

25   TBG, so that would be 56,000, right?

1      A.   Not necessarily.

2      Q.   Why not necessarily?

3      A.   Sometimes there was circumstances that would

4  cause that percentage to change.

5      Q.   All right.  So let me ask the question again.

6  Did all of the proceeds that would be payable to the

7  owner of the stock, in this instance Daptco, would all

8  of those proceeds that were payable pursuant to any

9  agreement with World Wide Auric, did all those proceeds

10  go to TBG to be applied to the note, or did some of

11  those proceeds go to Daptco?

12      A.   I can't answer that question a hundred percent.

13  I would have to look back to the original invoices.

14      Q.   So you don't know whether any of that money

15  went for Daptco?  Is that also true with respect for the

16  TKY proceeds?  You don't know whether some of those

17  proceeds went to TKY?

18      A.   No, I believe some of those proceeds did go to

19  TKY and did go to Daptco.  I just don't have the exact

20  percentages.

21      Q.   And why would that be, if the proceeds from the

22  sale of that stock were meant -- according to your

23  understanding, the proceeds of that stock were meant to

24  repay the note obligation, why would you have allowed

25  proceeds from those sales to go to Daptco, TKY?

1      A.   Well, because it is a moving target and a

2  sliding scale.  We don't know, A, what the price of the

3  stock will be week to week and, B, what it could be

4  sold.  So there was an understanding of a percentage of

5  the net proceeds to either TKY or Daptco would be

6  received, and then a distribution payment against the

7  note.

8      Q.   Isn't the real reason, Mr. Comu, because these

9  notes and these sales of stock were operated as an

10  accommodation between you and your family members, and,

11  likewise, distribution of these proceeds were made as an

12  accommodation between you and your brother?

13      A.   That is 100 percent incorrect.

14      Q.   All right.  At the conclusion of the sales on

15  behalf of Daptco in June of 2012, there were 600,000

16  shares of stock that had not been sold, correct?

17      A.   Yes, sir.

18      Q.   And did you, in this instance, also conclude

19  that there was no longer an opportunity to sell the

20  remaining shares at a price that was worth pursuing?

21      A.   I believe at that time.

22      Q.   And did you, therefore, likewise decide at this

23  point in time, in June of 2012, to write off the balance

24  of the $250,000 Daptco note?

25      A.   I am not certain of that.

1    Q.   So your testimony now is you don't know that

2  you wrote off that balance?

3    A.   Right, because I believe there was still enough

4  shares that we might have been able to increase our

5  payment back to The Barclay Group.

6    Q.   With respect -- you do recall distinctly

7  writing off the balance of the TKY Trust note, right?

8  You just testified to that five minutes ago.

9    A.   Yes, sir, I do.

10   Q.   How did you effectuate that?  Did you

11  physically write "Paid in Full", "Canceled", "Return the

12  note to Daptco"?  What did you do to evidence the fact

13  that you were writing off the debt to the maker?

14   A.   I don't know how it was finally communicated to

15  TKY Trust.

16   Q.   Hold it.  That would have been communicated to

17  your brother, right?

18   A.   From The Barclay Group to TKY Trust or TKY's

19  Trust accountants.

20   Q.   Who made the decision to write off the balance

21  of the note?

22   A.   It could have been a mutual conversation

23  between The Barclay Group and TKY Trust.

24   Q.   I am not talking about the entity.  I am

25  talking about the people.  Who with The Barclay Group

1  made the decision to write off the balance of the TKY

2  note?

3        A.   The owners of The Barclay Group, myself and

4  Mr. Brown, decided that it did not make much sense to

5  hold off 200,000 shares for the balance of the note.

6        Q.   So even though there was 200,000 shares of

7  stock remaining on the TKY note and $383,000 owing still

8  on that note, and even though the note has no provision

9  in it that says anything about that transaction being

10  conditional on sales of stock, you are telling me

11  Mr. Brown, who you believe to be an astute businessman,

12  agreed with you to write off a promissory note because

13  there was, at present, no commercial viable sale for the

14  stock?  Is that what you are telling this Court?

15        A.   Yes, what I am telling the Court and yourself,

16  Mr. Elmquist, is we did not believe that, A, we could

17  market the securities any longer and, B, we did not feel

18  that this was a collectible note, so we thought it in

19  the best interest of the company to write the balance

20  off.

21        Q.   Have the shares that remain outstanding been

22  reissued in the name of The Barclay Group?

23        A.   That I don't know.

24        Q.   Have you asked that the shares be reissued in

25  the name of The Barclay Group?

1      A.   I don't believe any instructions have been

2  issued at this time yet.

3      Q.   Was it -- did you make an agreement with your

4  brother on behalf of the TKY Trust that the balance of

5  the note would be written off in exchange for his

6  returning those shares to The Barclay Group?

7      A.   That was the general understanding, yes, sir.

8      Q.   Was that the general or the precise and

9  specific understanding?

10     A.   That was the precise and specific understanding

11 is that, if we wrote the note off, those shares would be

12 returned back for The Barclay Group.

13     Q.   What did you do to effectuate the return of

14 those shares?  Did you ask your brother to return those

15 to the transfer agent, so they could be reissued in the

16 name of The Barclay Group?

17     A.   I don't believe any further action was taken as

18 a result of this pending case, but we would be more than

19 willing to follow the trustee's lead on that.

20     Q.   Wait a minute.  You are saying no further

21 action was taken as a result of this pending case?  What

22 do you mean by that?

23     A.   This case that we are trying right now,

24 Mr. Elmquist.

25     Q.   This lawsuit has been pending since 2009?

1           MS. HANKS:  2010.

2      A.   2010.

3      Q.   2010?

4      A.   Yes, sir.

5      Q.   December 2010.  So most of the transactions

6  that I think you have come to realize the plaintiffs and

7  trustee are complaining about occurred after, long after

8  this lawsuit was filed.  Are you now saying, because of

9  this lawsuit, you feel that the trustee or the

10  plaintiffs must have something to say about the

11  disposition of these assets?

12      A.   No, sir, I am saying that, if the trustee gives

13  us a notice to have those shares taken out of TKY's name

14  and issued to The Barclay Group, we can absolutely

15  facilitate that.

16      Q.   Why would you do so if you believe the stock of

17  Green Auto is owned by The Barclay Group and only one

18  percent of that entity is owned by you?  Why would you

19  do as instructed by the trustee if you are only a one

20  percent owner of The Barclay Group?

21      A.   Well, The Barclay Group is named in this

22  lawsuit.

23      Q.   Okay.  So you are saying, because The Barclay

24  Group is named this lawsuit now, if the trustee said

25  turn over the shares, you believe that you would and

1  Mr. Brown would agree to turn over the shares to the

2  trustee; is that what you are saying?

3       A.   That is not what I am saying.

4       Q.   Okay.  I guess I misunderstood.

5       A.   I am saying that The Barclay Group is named in

6  this case, and until a final order has been issued we

7  are cooperating with the trustee.

8       Q.   Okay.  All right.  Okay.  So going back to the

9  Daptco note, you are saying you have a distinct

10 recollection of writing off the balance of the TKY note,

11 but you have no recollection of talking to your brother

12 about doing that on the Daptco note; is that your

13 testimony?

14      A.   Yes, I believe we have not arrived at any final

15 conclusions with respect to Daptco's obligation and/or

16 its disposition.

17      Q.   Do you know where the original Daptco and TKY

18 Trust notes are, the ones that were originally signed by

19 you and your brother?

20      A.   I do not know where the originals are.  I tried

21 to provide the best signed copies that we have.

22      Q.   Have you looked for them?

23      A.   I believe I have, yes, sir.

24      Q.   Have you -- you feel like you have exhaustively

25 looked for them, such that you just simply can't find

1   the original notes?

2        A.   I have done everything that I can to try to

3   find them in my possession, yes, sir.

4        Q.   And you have checked with everyone who you

5   think might have them, like your brother?

6        A.   Unfortunately, my brother travels extensively,

7   so I have no idea, if he has them, where they would be.

8        Q.   Well, let me ask it this way.  Have you asked

9   your brother whether he has the originals of those

10  notes?

11       A.   He said he would look for them.

12       Q.   When did you ask him?

13       A.   At the time that you had asked me.

14       Q.   Okay.  And about when was that?

15       A.   Probably three years ago or whenever you were

16  asking me questions regarding this transaction.

17       Q.   Okay.

18       A.   And we provided copies to you.

19       Q.   Has your brother ever gotten back to you on

20  that?

21       A.   He has not.

22       Q.   You might want to ask him again?

23       A.   I will, yes, sir.

24            MR. ELMQUIST:  Pass the witness.

25            THE COURT:  Pass the witness?

```
 1          MR. ELMQUIST:  Yes, I am sorry, yes, Your
 2   Honor, pass the witness.
 3          THE COURT:  All right.  Mr. Olson redirect.
 4          MR. OLSEN:  No further questions, Your
 5   Honor.
 6          THE COURT:  All right.  Well, I have a few
 7   follow-up questions and certainly, if anyone has cross
 8   based on what I ask, they will be given that
 9   opportunity.
10                    EXAMINATION
11   Of C. J. Comu by The Court:
12      Q.  Do you, Mr. Comu, file joint, individual tax
13   returns with Phyllis, or do you all file separate
14   individual tax returns?
15      A.  No, ma'am, we file jointly.
16          THE COURT:  All right.  The lawyers can let
17   me know.  Do I have the Comu's individual tax returns in
18   evidence?  I remember seeing TBG's and Sun Pacific's --
19          MS. HANKS:  Yes, Your Honor.
20          THE COURT:  Can you --
21          MR. ELMQUIST:  They are -- Your Honor,
22   Trustee's Exhibits 68, 69 and 70 are respectively the
23   2009, 2010 and 2011 returns.
24          MS. HANKS:  And KLM Exhibit 124 is the
25   Comu's 2005 return.  KLM Exhibit 125 is the 2006 return.
```

1    And KLM 128 is the 2007 return that includes W-2s.

2                    MR. ELMQUIST:  And, Your Honor, I believe

3    Mr. Comu testified that there is no 2012 return.

4                    THE COURT:  Okay.  What about 2008?

5                    MS. HANKS:  We should have 2008.

6                    MR. ELMQUIST:  68 is 2009.

7                    (Inaudible discussion between counsel)

8                    MR. ELMQUIST:  These are all the exhibits

9    from both examination.  Is Dahl still here?

10                   I don't see that we have 2008 in the

11   record, Your Honor.  That is oversight.  There is a good

12   chance that there is a copy of that with the transcript

13   of Mr. Dahl, who was the tax accountant, but we don't

14   have that transcript here in Court.

15                   THE COURT:  Okay.

16                   MS. HANKS:  Your Honor, we will find that

17   and provide it to the Court as soon as possible, if that

18   is acceptable to the Court.  I thought it was in our --

19   I tried to designate all of the tax returns of the Comus

20   that weren't designated with the trustee.  I truly

21   thought it was in here, but it may have been taken out

22   accidentally when we reduced our exhibit list.

23                   THE COURT:  Okay.

24                   MR. ELMQUIST:  I feel pretty certain, Your

25   Honor, we have a copy of that with Mr. Dahl's

1    deposition.  If Mr. Olson is okay with that, we will

2    provide that to the Court.

3                THE COURT:  All right, because I do have

4    Mr. Dahl's deposition in evidence so --

5                MR. ELMQUIST:  We don't have his exhibits.

6                THE COURT:  The copy I have doesn't have

7    the exhibits.

8                MR. ELMQUIST:  There may well be a

9    reference to that in my questions of Mr. Dahl.

10               THE COURT:  Certainly I know the trustee

11   would have gotten it during the case.

12               MR. ELMQUIST:  Yes, I am confident we have

13   it.  I just didn't realize it wasn't part of the record.

14               MS. HANKS:  Actually hold on a second.

15   129.  These are tax documents or information given to

16   Dahl, but I don't think it includes the tax returns.

17               MR. ELMQUIST:  We can deliver that in

18   whatever manner, Your Honor, electronically or by

19   courier.

20               THE COURT:  All right.  Electronically,

21   again, just make sure everyone is copied on this.

22               MS. HANKS:  Right.

23               THE COURT:  And you can send it to my

24   courtroom deputy's SGJ settings email.

25               MR. ELMQUIST:  Will do.

```
 1              THE COURT:  All right.  Let me -- let me --
 2   where are my questions here?
 3              MR. ELMQUIST:  Excuse me, Your Honor.  Just
 4   so the record is clear, what I would propose to do is
 5   send that to Your Honor marked as Trustee Exhibit 97 and
 6   request that it be admitted.
 7              THE COURT:  All right.  And we have no
 8   objection.  97 will be respectively admitted.
 9              (Trustee's Exhibit 97, offered and
10                 admitted.)
11        Q.   (By The Court)  All right.  Mr. Comu, let me
12   ask again what -- I know you have been asked, but I am
13   still not a hundred percent clear.  Could you explain to
14   me -- I want to compare Barclay Group and Regus -- the
15   type of services offered by The Barclay Group to
16   clients, okay?  Just tell me afresh what those are?
17        A.   Yes, ma'am.  The Barclay Group is a
18   transactional investment banking firm that predominantly
19   gets paid in equity in the form of stock for the
20   completion of a transaction that is predetermined,
21   pre-negotiated in advance.
22        Q.   Okay.  So by way of example, a client comes to
23   The Barclay Group, give me just two or three
24   representative examples of, as a client, what you get
25   and what you got paid.
```

1       A.   My pleasure.

2       Q.   You being The Barclay Group.

3       A.   Yes, ma'am, thank you.  One client was Paragon

4    GPS.  They are a GPS locater service for children and

5    for pets.  We helped basically structure a reverse

6    merger into a potential public company.  Though the

7    public company transaction did not close, we had them

8    prepared to go into a public company, and for that we

9    received a piece of equity in the form of stock issued

10   to The Barclay Group for that particular transaction.

11            Similarly T-3 Networks --

12      Q.   Let me back up.  So corporate officers of

13   Paragon GPS.

14      A.   Yes, ma'am.

15      Q.   Whatever these (Inaudible) have been called,

16   they come to you, and they say, "We would like to become

17   a public company."

18            And so when you say you structure a reverse

19   merger, what, you go out, and you find a shell, you

20   identify a shell, and hire corporate lawyers to do the

21   paperwork for a reverse merger?  Is that what you are

22   saying you do?

23      A.   That is part of our service.  It is either a

24   shell or an operating company that is willing to pay for

25   the acquisition in cash and some stock or a shell, which

1 they will give up the majority of the equity interest in

2 the shell for the private company to move into the

3 public arena. It is for the structure, the guidance,

4 and hire counsel for what we do in our business to put

5 these transactions together.

6     Q. All right. So you gave that one example, but

7 you said it actually never came to fruition?

8     A. Yes, it did not happen at that time, and I

9 believe the company, Paragon, has just recently

10 completed a transaction with a public company, so The

11 Barclay Group shares will now be -- we convert our

12 privately held shares of Paragon into the publicly

13 traded shares of the public company.

14     Q. All right. So as far as the compensation, how

15 it works, you are saying when Paragon first came to you,

16 even though this never came to fruition, they went ahead

17 and compensated TBG with shares of their equity, private

18 equity?

19     A. Yes, yes, it is negotiated in advance until

20 we -- since we are not getting fees with The Barclay

21 Group, we are getting equity, we have to negotiate our

22 equity position in advance for the services we are going

23 to render, so we have the certificate issued to our

24 firm, and then we move forward with the transaction.

25     Q. So in a situation like you described, where it

 1   didn't happen but now it is about to happen, you have

 2   still gotten the compensation.

 3        A.   Correct, because, the transaction we put

 4   together, the two parties could not agree on terms, so

 5   it was not due to our fault.  It was the public company

 6   and the private company could not agree to terms, so

 7   that transaction stopped, but we did our service by

 8   putting the deal together.

 9        Q.   Okay.  We, the human beings participating in

10   that, are whom, whom, whom?

11        A.   The members of The Barclay Group management

12   team, which would be myself, and at that time Mr. Baxter

13   and Mr. Parsley were acting in the management team with

14   also, I believe, a Robert Feeback was acting with us,

15   and a John Harris was acting with us.  And then also,

16   once the transaction was completed, we would require

17   unanimous approval by our majority shareholder,

18   Mr. Brown.

19        Q.   Okay.  But who are the human beings that are

20   actually meeting with Paragon GPS and giving them advice

21   and making phone calls for them and doing the services?

22        A.   Right, the names I had just mentioned to you,

23   Your Honor, myself, C. J. Comu, Edward Baxter, David

24   Parsley, John Harris, Robert Feeback.  Those were

25   members of The Barclay Group at the time the transaction

1  with Paragon GPS, but on Paragon GPS --

2      Q.   Okay.  But you have lawyers working on the

3  transaction?

4      A.   We have in-house counsel and then we retain --

5      Q.   Okay.  In-house counsel.

6      A.   Yes.

7      Q.   Who is in-house counsel?

8      A.   Jay Kline was our in-house counsel.

9      Q.   Okay.  He wasn't an employee.

10     A.   No, he was not.

11     Q.   That is what in-house counsel implies.

12     A.   Right, he is -- we call him general counsel to

13  the company.  He is a licensed Texas attorney, and he

14  would basically watch over us on our documentation, our

15  contracts.

16     Q.   Watch over or prepare it?

17     A.   Both, yes, we would have form documents, and

18  then he would look at them and make sure these documents

19  we were presenting were accurately represented.

20     Q.   All right.  So give me another couple of

21  examples.

22     A.   Okay.  A company called Spectrum Biometrics,

23  they are involved in facial recognition software.  They

24  were a client of ours here.  We put together, again, a

25  similar transaction with a public company out of New

1  York.  We had received shares in the transaction.  It

2  was ready to close and, unfortunately, again the public

3  company and the private company could not agree to

4  terms.

5       Q.   Okay.  So did TBG nevertheless get compensation

6  for the tasks it did in the form of private equity of

7  Spectrum Biometrics?

8       A.   Unfortunately, in that transaction we did not

9  receive our shares in advance, which is customary for

10  how The Barclay Group transactions work.  It was moving

11  so fast that we just assumed we would all, upon closing,

12  whenever the transaction was completed, receive our

13  equity fees.  Since that transaction did not complete,

14  it was probably fair for us not to take our equity piece

15  at the time because it happened so -- it did not happen

16  so quickly.

17       Q.   Another example.

18       A.   T-3 Networks.

19       Q.   Okay.  And what was done for them?

20       A.   We looked for a suitable public company to try

21  to structure a similar transaction to move T-3 Networks

22  from being a privately held company to being a public

23  company in the US markets, and the company,

24  unfortunately, failed to deliver on their business plan,

25  so we got nervous and were afraid of what the

1  shareholders could experience, so we stopped the

2  transaction, didn't go forward.

3      Q.  Okay.  So compensation paid?

4      A.  Yes, ma'am, we received shares in the company.

5      Q.  And TBG still has them or no?

6      A.  I believe we still have the shares, yes, ma'am.

7      Q.  Okay.  Other examples.

8      A.  Top of my head at this point in time, Your

9  Honor, those are the only ones I can think of quickly to

10  give you relevant data.

11      Q.  All right.  So it sounds to me that the

12  services that Barclay Group was offering was:  You are

13  company looking to go public.  We will find a public

14  shell for you to merge into.  We will try to find the

15  right fit for you and make it happen.

16      A.  That's the general, broad stroke description,

17  Your Honor, yes, that's correct.

18      Q.  I am really trying to drill down.  If it is

19  broad, tell me more specifically what I am missing.

20      A.  Okay.  The actual offering documents, most all

21  of these companies are in some type of a capital

22  financing mode, so they need to race capital, so we

23  would help the companies with a draft of an offering

24  document subject and pursuant --

25      Q.  Well, you are not a lawyer.

 1      A.   Yes, ma'am.

 2      Q.   That is what lawyers do.

 3      A.   Correct, I was just about to add that, Your

 4  Honor.  I apologize.

 5           We would give a draft of what a document

 6  needs to look like to the client to have their law firm

 7  sign off on it, because we cannot sign off on these

 8  documents, because we are not the issuer.  So we give

 9  them structure on how to do cap tables, how to put

10  together proper offering documents.

11      Q.   Okay.  But, once again, this is actually more

12  of the same.  It is just your service provided is:  We

13  will find a shell for you to merge into, a public shell.

14      A.   Right.

15      Q.   And here are all the details involved that we

16  will help you with along the way.

17      A.   That's correct, and help you in the financing

18  structure with the documentation package.

19      Q.   Okay.  Is there any example you can give me,

20  other than Ganas, Green Auto, where it happened at the

21  end of the day?

22      A.   I can give you two more examples if you would

23  like.

24      Q.   Okay.

25      A.   These are Regus Advisers clients, by the way.

1       Q.   Okay.

2       A.   Okay.  And the clients are Puration.

3       Q.   Okay.

4       A.   Which is a portable, filtered water bottle

5  company.  We took them public to reverse merger and

6  listed them on the pink sheets and also involved in

7  their international expansion strategies by setting up

8  foreign license distributors World Wide to assist them

9  with their products.

10      Q.   And Regus got shares in the new public company?

11      A.   In Puration, Incorporated, the public company,

12  yes, ma'am.

13      Q.   And still has them?

14      A.   Yes, it does.

15      Q.   Okay.  You said you could give me a couple of

16  examples.  What else?

17      A.   Algae International Group.

18      Q.   In that a reverse merger did happen; there is a

19  public company name?

20      A.   Yes, ma'am, that's correct.

21      Q.   And Regus has shares?

22      A.   Yes, it does.

23      Q.   All right.  Well, help me understand then how

24  these two companies are different, Barclay Group and

25  Regus.

1        A.    The most important part about the difference

2   between Regus and Barclay Group, Barclay Group is really

3   designed to be a transactional company.  We come in, we

4   do a deal, we leave.

5              Regus Advisers is a true advisory form that

6   does structure and restructure and provides advice to

7   corporations from private or public, not in the go

8   public business.  We actually help them in the structure

9   of turning their business model and making them more

10  profitable.

11       Q.    Okay.  Tell me how you do that.

12       A.    We have a wholly owned subsidiary underneath

13  Regus Advisers called First Tier Profit, which was the

14  reason that Regus was created, because my business

15  partner, Mervin Price, who is the president of Regus

16  Advisers and was the former president of First Tier

17  Profit, had done over 135 reorganizations and

18  restructurings of companies.

19       Q.    Okay.  Who is he with?

20       A.    He was with Price and Associates, prior to

21  joining me and bringing First Tier Profit, the company,

22  that became a wholly-owned sub of Regus Advisers.

23       Q.    Okay.  Give me some examples of companies that

24  Regus through First Tier Profit has provided

25  restructuring advice to.

1      A.   Sure, one was Acme Paper in Baltimore,

2  Maryland.  It is a $126 million -- one of the largest

3  paper product manufacturing companies in the United

4  States, and they were operating at $112 million and

5  losing two.

6      Q.   Okay.  I am more interested in what you are

7  doing.

8      A.   I was just about to get to that, Your Honor.

9  Can I give the short version?

10      Q.   (Inaudible) talking about.  I deal with these

11  people on a daily basis, restructuring advisers.  So I

12  am trying to figure out what type exactly of

13  restructuring advisers.

14      A.   Perfect, I will give you a one sentence answer.

15  This company was doing 112 million of revenue, losing

16  two million.  After we did our restructuring they went

17  to plus seven million.  That is the restructure we do.

18      Q.   What are you doing?

19      A.   It is a management science of a restructuring

20  of a bottom line, increasing the profit percentile of a

21  corporation by division.

22      Q.   Let me back up.  Again, I have witnesses on the

23  stand every day that are -- they either call themselves

24  financial advisers to distressed companies and

25  investment bankers for distressed companies, TRO, chief

1   restructuring officers.  There is a lot of nuance.  And

2   I am trying to understand the nuance here, because the

3   examples you have given me are the same kind of stuff

4   that TBG did.

5       A.   Actually they are not at all.  We didn't

6   provide --

7       Q.   Well, I am talking about the reverse merger in

8   a troubled company.

9       A.   Yes.

10      Q.   But you are saying Regus is different because

11  it provides restructuring advice?

12      A.   Correct.

13      Q.   Okay.  So I am wanting to know what exactly are

14  the services?

15      A.   Would you like it by client or just broad

16  stroke?  How would you like me to answer that?

17      Q.   I would like very specific answers and how you

18  are compensated, too.

19      A.   Okay.  A client called Bud Patch, consumer

20  product, they approached us, established business, good

21  distribution.  They need to know:  How do we obtain

22  financing?  How do we do evaluation?  How do we go to

23  the market?  How do we do a private round of financing

24  before going public?  What does our documentation need

25  to look like?  What changes to management do we need to

1    make?  How do we package ourselves so we can talk to the

2    institutional markets and ask for capital?

3              That is a process that takes time and

4    energy, and we charge a retainer fee, and we take a

5    success fee, and we take equity in that deal.

6         Q.   Okay.  That is investment banking.

7         A.   That's correct.  That is Regus Advisers,

8    investment banking advisory firm.

9         Q.   But that is not restructuring.  That is

10   investment banking.

11        A.   Correct.  First Tier Profit, a company that I

12   do not get involved in the day-to-day restructuring with

13   the bench consultants, is run by Ms. Crystal Haag

14   Morris, the new president of First Tier Profit about a

15   year ago.  Prior to that, Mr. Price was running First

16   Tier Profit, while I was operating Regus Advisers.  He

17   is now the president of Regus Advisers.  Crystal Haag

18   Morris is the president of First Tier Profit.  They are

19   two complete, separate, different companies.  You are

20   right, Your Honor.

21        Q.   So what restructuring services can you tell me

22   are performed by Regus?

23        A.   Regus does not do restructuring.  First Tier

24   Profit does restructuring.

25        Q.   All right.  Well, then how is Regus different

1   from The Barclay Group?

2        A.   Regus, first of all, charges a retainer to

3   package a company for institutional financing in the

4   private sector.  We don't do reverse mergers unless a

5   specific client comes to us with that structure.  Most

6   of the people that are part of the Regus team have

7   expertise in certain industries, health care, real

8   estate, technology, consumer products, that would be the

9   account manager for that particular client, based on

10  what we have to do to get them ready for institutional

11  financing.

12       Q.   Okay.  So -- but it is investment banking.  You

13  just charge -- you charge for your services differently.

14  It may or may not involve a reverse merger.

15       A.   Right, you are correct.  We are a fee based

16  firm, with an equity participation on each deal.

17       Q.   Okay.  But Regus itself is providing investment

18  banking services?

19       A.   It is a private advisory investment banking

20  firm, merchant banking we like to call it, yes, ma'am.

21       Q.   Okay.  Then at the risk of repeating myself,

22  help me to understand why it was formed if it is really

23  doing the same thing.

24       A.   I think it was formed at a time where the

25  gentleman Mervin Price and I met, and he was telling me

 1  what he was doing, and I was sort of describing Barclay

 2  Group, but I told him, "I want to get back more to a fee

 3  based advisory work with clients, and not just being

 4  known as a reverse merger candidate," because that is

 5  not all we did.  So we created Regus --

 6       Q.   Actually, you didn't do it at all?

 7       A.   I am sorry?

 8       Q.   You didn't ultimately do it at all?

 9       A.   Which transaction?

10       Q.   Barclay Group.

11       A.   Oh, yes, we did, Green Auto, Your Honor.  So

12  when I met with Mr. Price, I said, "Let the (Inaudible)

13  create a new entity for the purpose of creating a real

14  advisory network, and I have clients and partners around

15  the world that we can all plug in together, so we can

16  share in deal flow."  And that was the purpose of why

17  Regus Advisers was created.

18       Q.   All right.  Let me ask you to look at your

19  statement of financial affairs, which is Trustee

20  Exhibit 95.

21            THE COURT:  Can someone tell me:  Does he

22  have that handy up there?

23            MS. HANKS:  Yes, I can put it on the

24  screen, Your Honor.

25            THE COURT:  Okay.

1          MS. HANKS:  Statement of financial affairs,

2    Your Honor.

3          THE COURT:  Yes, all right.

4      Q.   Do you see Question Number One where the

5    question is income from employment or operation of

6    business?

7      A.   Yes, Your Honor, I do.

8      Q.   Where did that $20,000 number come from for

9    2009?

10     A.   I don't know exactly where it came from, Your

11   Honor.  It could have been fees charged, what is called

12   a due diligence fee before an engagement, just to scope

13   out the project to see if that is something we should be

14   doing.  And I believe it may have been charged to

15   clients before we get fully engaged.

16     Q.   Okay.  This was your income, your income from

17   Barclay from 2009.

18     A.   That is correct, yes, Your Honor.

19     Q.   How were you compensated by Barclay?

20     A.   I would take a professional services fee for my

21   time for The Barclay Group.

22     Q.   What does that mean?

23     A.   I would invoice for my time, and I would be

24   paid a flat fee for whatever time I charged.

25     Q.   Okay.  How was that computed?

 1        A.    On a project by project basis.  Depending how

 2   many hours I would have to spend with the client, I

 3   determined what my time would be worth, and I would take

 4   that as my portion, my compensation.

 5        Q.    Okay.  So, again, I will ask for examples.

 6        A.    Let me think quickly.  I am trying to give you

 7   exact references of clients that we may have had a

 8   transaction with that we did do due diligence and

 9   determined, for whatever reason, that that was not a

10   transaction we should go forward with.  I spent quite a

11   bit of time in researching the renewable energy sector,

12   and there may have been an energy client that might have

13   retained us and paid our due diligence fee to do an

14   evaluation.

15        Q.    Okay.  Let me back up.  I thought that The

16   Barclay Group was paid in equity?

17        A.    Yes.

18        Q.    Okay.  What is this due diligence?

19        A.    Due diligence is, before we get engaged, we

20   charge a 5,000 to 7500 due diligence fee to evaluate the

21   company and the client.  We have to check out the

22   financials and determine if this is a worthiness --

23        Q.    So, again, I asked, well, I don't understand

24   why Regus is different.  You said you were wanting to

25   get away from getting equity and --

1      A.    Right.

2      Q.    -- wanted to get retainers and fees?

3      A.    Yes.

4      Q.    But, in fact, The Barclay Group is getting

5  fees, right?

6      A.    Well, we call that a due diligence fee, versus

7  a monthly retainer.  When we have Regus Advisers sign up

8  with us, the clients will pay us between 10 to $15,000 a

9  month every month as a fixed fee, retainer for our

10  services.  A due diligence fee is we charge upfront to

11  spend the time involved to check out a company to

12  determine --

13      Q.    Okay.  That's due diligence fee versus a

14  retainer.  How is that different?

15      A.    Because the due diligence fee is a one-time,

16  one fixed number for one limited scope of services.  A

17  retainer is an ongoing relationship.  Every month we

18  have lots of interaction with our clients.  A due

19  diligence fee is just to -- we have a due diligence

20  booklet.

21      Q.    Okay.  So give me some examples of clients that

22  Barclay Group got due diligence fees from.  You said the

23  renewable energy maybe?

24      A.    Yes.

25      Q.    A company in that sector?

1      A.   Right.  We were -- I was leaving the sport of

2  MMA at the time, and I was approached by other MMA

3  companies to potentially be involved in doing some work

4  with them, and I may have, through The Barclay Group,

5  charged a fee, a due diligence fee, to evaluate.  One of

6  them was Revolution Fight Club, which was a firm out of

7  Florida that was looking to expand, and I said, "Before

8  we do anything, I have got to find out who you people

9  are, what you have, et cetera."  And that is one other

10  client reference that you may note.

11      Q.   When you were leaving the MMA field?

12      A.   Yes, ma'am, I retired from Sun Sports, I

13  believe, sometime around June, July, August of 2009.

14      Q.   Now, how long were you there?

15      A.   Approximately three years.

16      Q.   Did you have income from Sun Sports and

17  Entertainment in 2009?

18      A.   Not much.

19      Q.   But you did have some?

20      A.   I can't recall.  In 2009 it was a difficult

21  year for the company.

22      Q.   Well, you show none on the statement of

23  financial affairs for 2009 for Sun Sports, and you

24  showed none on the tax return, I don't think.

25      A.   That is probably correct.

1    Q.   But you are CEO of a company, a public company,

2    and you got no income from it?

3    A.   Unfortunately, that's correct, Your Honor.  The

4    company was financially upside-down.  I was trying to

5    turn the company around.

6    Q.   All right.  Well, again, I am trying to

7    understand the way you were compensated from Barclay

8    Group.

9    A.   For example, if there was a $7,500 due

10   diligence fee that we charged a client, traditionally my

11   role as the managing partner, I would be entitled to

12   probably 50 percent of that fee for my time and energy

13   putting the due diligence package together, which was

14   about a 30 page report.

15   Q.   So it was basically a percentage of the due

16   diligence fee?

17   A.   Correct, because there was a certain model we

18   followed on how much time and effort it takes to

19   build --

20   Q.   Again, I am trying to understand that.  What is

21   the model?

22   A.   We have a 30 page checklist where we -- it is a

23   question/answer, and it is a combination of models, that

24   we build that, and we deliver that to the client.  That

25   is called a due diligence report.

1      Q.   Okay.  You give them a check list?

2      A.   Correct.

3      Q.   They fill it out, they send it back to you, and

4  how do you decide what needs to be paid for that?

5      A.   We make that judgment call before we give them

6  the due diligence checklist, and it is usually around

7  5,000, 7,500.

8      Q.   Okay.  I am talking about you personally.  How

9  do you decide what you bill Barclay Group for?

10      A.   Because I have done this before, I usually know

11  how much time it takes me to do it, and usually my time

12  will be between 2500 to $5,000, so the fee will be

13  50 percent.  For example, if it is $5,000 fee to the

14  client, then I will know that my time will be 2,500.

15      Q.   Do you have an hourly rate?

16      A.   Not an hourly rate, I have a project rate.

17      Q.   Okay.  The transcript that is Defendant's

18  Exhibit 4 from the first meeting of creditors, if you

19  turn to Page Six -- are you there?

20      A.   I am sorry.  I don't have the document, Your

21  Honor.

22      Q.   Okay.  Ms. Hanks, I think, is pulling it up.

23           MS. HANKS:  This is one of the defendant's

24  exhibits, so it is not -- I am afraid we don't have

25  that.  You have got it on paper.

1      Q.    Okay.  Exhibit 4, Page Six.

2      A.    Thank you.  Yes, Your Honor.

3      Q.    Okay.  Let's start at the second line.

4            "What is the business of The Barclay Group?

5            "It is a consulting firm.

6            "What kind of consulting?

7            "Provides business plans, provides

8  professional advice to companies.

9            "And what do you do for The Barclay Group?

10           "I consult with clients on opportunities

11 that come up.

12           "Who originates the clients for The Barclay

13 Group?

14           "Originates from numerous sources.

15           "Are you on a salary commitment?

16           "No, sir.

17           "How are you compensated right now?

18           "I 'blank' on an hourly basis."

19     A.    Yes, ma'am.

20     Q.    So what does that mean?

21     A.    I think I was trying to come up with a number

22 for an hourly basis based on the project that I quote.

23 In other words, if it was ten hours and it was $2,500,

24 then that figure would be $250 per hour, but I don't

25 market myself on a per hour basis.  We market ourselves

1    on a project basis as a firm.

2        Q.    But that is not what you said here.

3        A.    It says an hourly basis; you are right, Your

4    Honor.

5        Q.    Okay.  And, again, I am kind of confused why

6    you are calling yourself a consultant providing business

7    plans.

8        A.    That is probably the best term -- That is a

9    part of our work.  We are not too rigid.  We are not

10   just a one service firm.  People come to us in different

11   shapes and sizes so we --

12       Q.    You are finding financing for them; you are

13   finding a company for them to merge with?

14       A.    That is part of our services, yes, Your Honor.

15       Q.    Well, again, I tried to get at:  Is there more

16   to it?

17       A.    As I mentioned before, we do due diligence in

18   advance before engagement.  That is part of our

19   services.

20       Q.    (Inaudible) a suitable candidate to merge into

21   a public company?

22       A.    Yes, Your Honor, that's correct.

23       Q.    That is not consulting, though, is it?

24       A.    I am sorry, Your Honor, but in our world we

25   sometimes use that as a term.

1    Q.   Okay.  On Trustee's Exhibit 94 --

2    A.   I have a hard copy here.

3    Q.   -- if you turn to Schedule I within that

4 document, which is four pages from the back, okay, do

5 you see where it has:  Employment/occupation, management

6 consultant; name of employer, The Barclay Group; how

7 long employed, five months.

8         Why do you have five months there?

9    A.   Well, I had just left Sun Sports as its CEO,

10 and I was sort of reengaging back with my time and

11 service with The Barclay Group.  But, of course, The

12 Barclay Group has been operating as a corporation for

13 many years.

14   Q.   All right.  And where did you get that number

15 $5,000 for your monthly wages, salary, commissions?

16   A.   I believe, Your Honor, it was an estimate.  I

17 was following the terms as estimate average projected

18 monthly income, and I believe that was a figure that I

19 had chosen at the time.

20   Q.   All right.  Well, let me ask you this.  I mean

21 am I correct that it is not disclosed in here anywhere

22 that Barclay Group was paying expenses for you?

23   A.   Barclay Group pays my professional and personal

24 expenses as deemed necessary.  I don't know where that

25 is in the document, Your Honor.

1     Q.   And let's just be clear.  For example, what

2   would be the expenses?

3     A.   It would pay a car payment or for car repairs

4   and for fuel.  It would pay any business travel, of

5   course, business meals.  It would pay country club dues

6   to host client meetings there.  It would --

7     Q.   The country club membership is yours, right?

8     A.   Yes, ma'am, but it is a business expense that I

9   claimed with Mr. Brown.

10     Q.   Did you disclose the country club membership in

11   your bankruptcy schedules?

12     A.   I believe it came out in some testimony.  I

13   don't know exactly where it is, but I believe it is

14   listed somewhere.

15          THE COURT:  Mr. Olson, is it in here?  I

16   don't think it is.

17          MR. OLSEN:  No, ma'am.

18     Q.   All right.  So car payment, car repairs, fuel,

19   business meals, country club dues.  What else?

20     A.   Basically, Your Honor, anything that was

21   required of me as an expense to conduct my day-to-day

22   affairs in looking for new business.

23     Q.   Well, but it sounds like it is a combination of

24   personal and business, true?

25     A.   Not exactly.  I would attend conferences,

1    memberships in different organizations that I am a

2    member of, all of those things are part of my expenses

3    that are covered by the company.

4        Q.    Like car payment?

5        A.    Yes, Your Honor.

6        Q.    That is a personal expense?

7        A.    Well, my vehicle is used for business, so I

8    guess my accountant would determine what percentage --

9        Q.    How do you use your car for business?

10       A.    I travel to and from my office.  I travel to

11   and from meetings.  I am pretty much gone six a.m. to

12   six p.m.

13       Q.    Whoa, whoa, whoa.  To and from office, don't I

14   wish I could just deduct that?

15       A.    I meant from the time I got to the office, my

16   business to the time I left the office and headed back

17   home, not to the office and not back to my residence.  I

18   am talking from the time I got to the office, which was

19   almost 12 hours.

20       Q.    Okay.  What else?

21       A.    Your Honor, anything that would be deemed

22   appropriate for my normal day-to-day activities in

23   looking for new opportunities for The Barclay Group.  It

24   may involve advances to other staff members, hiring of

25   people, anything that was relevant that was acceptable

1  and appropriate, by the way, for the business.

2       Q.   Okay.  Well, let me, for example, ask you this.

3  If you look at your Schedule J, which is the next page

4  in Trustee 94?

5       A.   Yes, Your Honor.

6       Q.   All right.  Go down to transportation, not

7  including car payments.  You deducted $150, or you put

8  down $150.  See that?

9       A.   Yes, Your Honor, I do.  Thank you.

10      Q.   Am I -- then go on down to auto insurance,

11  $200.  Do I understand you are paying that personally,

12  and not the company?

13      A.   Your Honor, I am not 100 percent certain if the

14  company is currently paying it or if I was paying it.  I

15  may have paid it and then expensed it, or the company

16  may have paid it directly.  I am not certain which

17  direction.

18      Q.   What about the $500 for recreational clothes,

19  entertainment, et cetera, et cetera; what kind of

20  expense are we talking --

21      A.   That would probably be the membership, I

22  believe, at the country club and/or memberships of other

23  associations, professional associations, that I am a

24  member of.

25      Q.   Okay.  But, again, Barclay was paying these?

 1  You put them down as your own personal expenses?

 2      A.   I don't know which ones were my personal and

 3  which ones were company related, Your Honor.

 4      Q.   So you were CEO of Sun Sports for three years?

 5      A.   Approximately, Your Honor.

 6           THE COURT:  All right.  I am going to stop

 7  there.  I did promise that if any attorney wants to

 8  follow up on what I asked, you may.  Mr. Elmquist?  No?

 9  All right.

10           MR. ELMQUIST:  I think we all have

11  questions, Your Honor.

12           MS. HANKS:  I do, Your Honor.

13           THE COURT:  Okay.

14           MS. HANKS:  And these are specific to some

15  of the questions that you have asked.

16                FURTHER CROSS EXAMINATION

17  Of C. J. Comu by Ms. Hanks:

18      Q.   Mr. Comu, you were asked by the Court about the

19  difference between Barclay Group and Regus, but you

20  previously testified that there really wasn't much of a

21  difference, didn't you?

22      A.   I can't recall exactly the testimony.

23           MS. HANKS:  May I approach the witness,

24  Your Honor?

25           THE COURT:  You may.

1    Q.   I am handing you a copy of the transcript of

2    your deposition.  It is actually the 2004 exam that was

3    conducted by Mr. Elmquist in this case.  And I will

4    refer you to Page 112 of that transcript.

5            If you will see, starting at Line 15 of

6    Page 112, you were asked, "What is the difference

7    between the work you do through The Barclay Group and

8    the work you do through Regus Advisers?"

9            And would you please read your response?

10    A.   "There isn't a big difference.  It is just new

11    people want to start a new business so we created a new

12    name in 2010."

13    Q.   Thank you.  And you testified that Mr. Baxter

14    and Mr. Parsley were both at The Barclay Group.  They

15    also were at Regus Advisers, correct?

16    A.   Mr. Parsley is the controller for Regus

17    Advisers and The Barclay Group; that's correct.

18    Q.   And Mr. Baxter is also with the Regus Advisers?

19    A.   He was formerly with Regus Advisers, yes,

20    ma'am.

21    Q.   Okay.  All right.  You also testified in

22    response to the Court's questions that you don't believe

23    you had any income from Sun Sports in 2009, which is why

24    you didn't include it in your statement of financial

25    affairs; is that correct?

1      A.   To the best of my recollection, I don't believe

2  Sun Sports was in any position to do any type of a

3  payroll at the time.

4      Q.   You testified that you didn't think you had any

5  income, and that is why you didn't disclose it on your

6  statement of financial affairs?  Yes or no?  Did you

7  have income from Sun Sports in 2009 or not?

8      A.   I am not certain.  I am sorry.

9      Q.   Okay.  If you will look at Page 17 of that

10  transcript that is in front of you, you were asked about

11  your salary for Sun Sports in 2009.

12           Page 17, Line 16, "Question:  And did you

13  receive a salary from Sun Sports and Entertainment?"

14           18, your answer was, "Not initially, later

15  on, yes."

16           Question, at Line 19, "Okay, at the time of

17  your departure in 2009 what was your salary?"

18           And what is your answer, Mr. Comu?

19      A.   I said, "I believe it was 60,000."

20      Q.   So at the time of your departure in the middle

21  of 2009, you were making $60,000 a year at Sun Sports,

22  and you disclosed zero income for Sun Sports in 2009 in

23  your bankruptcy filings?

24      A.   That is incorrect.

25      Q.   Where did you disclose 2009 income for Sun

1    Sports in your bankruptcy filing?

2        A.   I don't --

3             MS. HANKS:  Could you please bring that

4    actually to the first page of the document that is on

5    the screen?  No, the one that was just up there.

6             MR. VITAL:  Schedule I.

7             MS. HANKS:  Actually, I am looking for the

8    statement of financial affairs.

9             THE COURT:  Trustee's 95.

10            MR. VITAL:  Looking for an exhibit that is

11   95.

12            MS. HANKS:  Right there, right there, there

13   you go, top page.

14       Q.   Do you disclose, in response to Question Number

15   One, any income at all from Sun Sports in 2009?

16       A.   Yes, I believe that number of 27,000 --

17       Q.   Mr. Comu, it says 2008 you made $27,693 in the

18   year of 2008?

19       A.   That sounds about right.

20       Q.   So where is your disclosure for income from Sun

21   Sports in 2009?

22       A.   I don't believe I was making any income in

23   2009.

24       Q.   So were you lying in 2011 at your deposition

25   when you said you were making 60,000 a year, or were you

1  lying in your statement of financial affairs?

2      A.   I believe what I was trying to explain and say,

3  Counselor, is the $60,000 was supposed to be my salary,

4  but I never got it.

5      Q.   Okay.

6          MS. HANKS:   Can you go to Defendant's

7  Exhibit Number Four please which is -- which is the

8  creditors' meeting?

9      Q.   You were also asked about your salary at Sun

10 Sports at the February 9th creditors' meeting, weren't

11 you?

12     A.   I believe so.  I am not 100 percent certain.

13         MS. HANKS:   And if you could, go to -- if

14 you could, scroll to Page 11 of that document, please.

15     Q.   You were asked, "What was your total

16 compensation from Sun Sports for 2009?"  And Mr. Lippe

17 asked again, "It is a lot more than what your schedules

18 show, isn't it?"

19         And, Mr. Comu, you say, "No, I believe in

20 the 2009 Sun Sports compensation -- I don't have it in

21 front of me, but I would probably say that it is around

22 $30,000."

23         Is that discussing what you think your

24 salary was theoretically, or what you are responding

25 here is that you made $30,000 in 2009 from Sun Sports?

1      A.    Candidly, I think I was just guessing.  I don't

2   really know if I had the right answer.

3      Q.    You were guessing about your salary in 2009;

4   the year that you filed bankruptcy you are guessing?

5      A.    Correct, I didn't have the exact statement in

6   front of me because we were not running any proper

7   payroll that I was being paid every week or every month

8   with.

9      Q.    Uh-huh, and, Mr. Comu, this, the $20,000 you

10  disclosed from The Barclay Group, the $30,000 to $60,000

11  from Sun Sports that you don't disclose, none of that

12  includes the thousands of dollars in checks that you

13  were writing to your wife out of TBG accounts, does it?

14     A.    There was three questions there, I believe,

15  Counselor.  Can you repeat them one at a time?

16     Q.    The amounts that you disclosed on your

17  statement of financial affairs, the amounts that you did

18  not disclose on your statement of financial affairs from

19  Sun Sports, none of those numbers even include the

20  additional thousands of dollars that you wrote to your

21  wife out of TBG accounts, does it?

22     A.    My personal financial returns and information

23  provided to the trustee and to the Court, I have

24  provided as much back up information.  Some of these

25  were just questions that I was trying to answer as close

1   as I could.  Any checks written by The Barclay Group to

2   Phyllis Comu were either for services, for advance or

3   for expenses.  They are two complete separate subject

4   matters.

5        Q.   But you wrote checks to your wife, for example,

6   in case she needed a new dress, a new outfit, for an

7   event, right?

8        A.   If it was for a business purpose and she was

9   looking to potentially bring business to The Barclay

10  Group, then that would be considered to be an expense of

11  the business.

12       Q.   Her outfit for an event was considered a

13  Barclay Group business expense?

14       A.   To look for business opportunities, yes, ma'am.

15       Q.   And you also paid -- in 2009, the year that you

16  declared bankruptcy, you also paid your personal

17  property taxes on the Palladium home that is your

18  homestead, you paid those out of Barclay Group accounts,

19  didn't you?

20       A.   It may have been a loan from The Barclay Group.

21  That's a possibility.

22       Q.   Is there any documentation of a loan to you

23  from The Barclay Group for your personal property taxes,

24  or is it just a check that was made out to David Childs,

25  tax assessor, for your Palladium home address?

1       A.   No, I believe I would have cleared that with

2  Mr. Brown, asking him if this would be appropriate.  And

3  I don't think Mr. Brown had any problem with that.

4       Q.   That is not my question.  Did you write a check

5  out of Barclay Group accounts to David Childs, tax

6  assessor, in 2009 for your home property taxes?

7       A.   If that check was written, it was based on the

8  approval of the majority shareholder of The Barclay

9  Group to take out an advance of a loan to pay those

10  taxes at that time.

11       Q.   Mr. Comu, I will tell you that, in all of the

12  volumes of paper that we have provided to the Court and

13  that we have reviewed with the trustee, there is

14  absolutely no documentation of a loan between you and

15  The Barclay Group for the personal taxes that you paid

16  on your home, but there is documentation of a payment

17  you made out of Barclay Group accounts to David Childs,

18  tax assessor, for your home property taxes.

19       A.   Counselor, I think you might have misunderstood

20  me.  I said I received the approval in conversation with

21  Mr. Brown, that did not require written documentation,

22  evidencing my ability to write that check as a loan for

23  C. J. Comu for that particular isolated purpose.

24       Q.   So you have no verification of that, other than

25  your word that you are giving the Court today, that you

1  think the Court should accept?

2      A.   I am just telling you the facts, Counselor.  I

3  am not trying to make any statements except for what

4  they are, which are the facts.  I was granted power of

5  attorney by Mr. Brown for anything he deemed

6  appropriate.

7      Q.   Where is that power of attorney, Mr. Comu?

8      A.   I don't have it with me.

9      Q.   But you surely provided it to the trustee,

10 didn't you?

11     A.   It may be in some of the documents related to

12 The Barclay Group's brokerage account.  You may want to

13 check that.

14     Q.   Again, Mr. Comu, I will tell you that, in the

15 volumes of paper that we have reviewed, that the trustee

16 has provided to us, and based on the verification that I

17 just got from the trustee, that has never been provided

18 in this case.  You have never produced a document

19 indicating that you have power of -- you have power of

20 attorney for Mr. Brown.

21     A.   That is incorrect.  I believe I can evidence

22 that in an email to my attorney, and that was also

23 provided to the brokerage firm when The Barclay Group

24 first opened up its trading account in January of 2013,

25 I believe.

1         MS. HANKS:  I will trust, Your Honor, that

2    given his insistence that it has been provided to the

3    trustee, that it will be produced.  I will tell you that

4    it is not anywhere in the documents that have been

5    provided to the Court or to the creditors.

6              THE COURT:  All right.

7         Q.   The last question I have, the Court asked you

8    about Schedule I in your schedules.

9         A.   I have a hard copy.

10        Q.   Okay.  Would you look at Schedule I, please?

11   The Court asked you about your estimated income, and you

12   estimated $5,000 a month, right, which is just above

13   your estimated expenses, correct?

14        A.   Approximately, yes.

15        Q.   But that is not really what you estimated you

16   were going to be making in 2010, is it?

17             MS. HANKS:  Would you please pull up KLM

18   Exhibit 312?

19        Q.   You actually estimated, in your draft documents

20   to your attorney, that you were going to be making

21   between five and $10,000 a month, didn't you?

22        A.   I don't know, Counselor.  I don't have the

23   document in front of me.

24             MS. HANKS:  Can you go to Page Seven of KLM

25   Exhibit 312?

1        THE WITNESS:  Could you go to the top of

2   the document, please?

3        Q.   Here you go.  So this is a document, and we

4   have already been through it in testimony, but KLM 312

5   is a draft memo to your attorney, where you say that

6   your average monthly income projected is $10,000 a

7   month, not $5,000 a month, and that would have left

8   approximately at least $4,000 a month for your

9   creditors, wouldn't it have?

10       A.   If I was making $10,000 a month, Counselor,

11  that would be a correct assessment.

12       Q.   Okay.  But that is not what you put into your

13  final schedules, is it?

14       A.   That document, I believe, is asking for some

15  general estimates, and I believe, to the best of my

16  recollection, that was the best guess estimate that I

17  could come up with.

18       Q.   And this was -- well, and, of course, the

19  amount of your income is entirely up to your discretion,

20  wasn't it, because you are self-employed?  You are the

21  one who makes the decisions about how much you make from

22  The Barclay Group?

23       A.   That is incorrect.  That is incorrect.

24            MS. HANKS:  Your Honor, the last thing I

25  will do is refer the Court to the docket sheets in the

1   main bankruptcy case.  On January 15th, the same day

2   that the debtor filed his statement of financial affairs

3   and his schedules, one of the things that is very

4   glaringly missing in all this documentation is any sort

5   of tax reporting statement or indication of the amount

6   of his income from The Barclay Group.  And the

7   explanation for that is:  "Debtor is self-employed and

8   is unable to provide copies of pay stubs from 60 days

9   prior to the petition date.  Name of business, The

10  Barclay Group, Inc."

11       Q.   Mr. Comu, you are the one who made the decision

12  about how much you made.  You are the one who paid taxes

13  on your home out of Barclay Group accounts.  You are the

14  one who wrote checks to your wife for things like a

15  dress as a business expense, for Prestonwood Country

16  Club, one of the expenses you listed on your bankruptcy

17  schedules.

18            Basically you were using The Barclay Group

19  as a personal piggy bank, and it was good enough to buy

20  Cowboys tickets and to pay for your country club, but it

21  wasn't good enough to pay your creditors, was it?

22       A.   That is 100 percent false.

23       Q.   I think the documentation and the real evidence

24  shows otherwise, Mr. Comu.

25            MS. HANKS:  Thank you, Your Honor.

```
 1            THE COURT:  All right.  Any other follow
 2   up?
 3            MR. ELMQUIST:  Your Honor, I just have a
 4   couple of questions.
 5                 FURTHER CROSS EXAMINATION
 6   Of C. J. Comu by Mr. Elmquist:
 7       Q.  I want to talk to you a little bit more, Mr.
 8   Comu, about Trustee's Exhibit 94, which are the
 9   bankruptcy schedules, and I want to ask you about
10   Schedule I.  I would like you to read the instructions
11   in the first sentence under Schedule I, current income
12   of individual.  Would you please go ahead and read that
13   out loud?
14       A.  Could you please magnify that.  I didn't bring
15   my glasses.  I apologize.  Would you like me to read it
16   out loud?
17       Q.  Yes, sir.
18       A.  "The column labeled spouse must be completed in
19   all cases filed by joint debtors and by every married
20   debtor, whether or not a joint petition is filed, unless
21   the spouses are separated and joint petition is not
22   filed.  Do not state the name of any" --
23       Q.  Just the first sentence will do.
24       A.  Okay.
25       Q.  Were you and your wife separated at the time
```

1  this bankruptcy was filed?

2      A.   No, sir.

3      Q.   So did you understand then that Schedule I was

4  supposed to reflect not only your income but your wife's

5  income?

6      A.   Yes, sir.

7      Q.   There is no income shown to your wife?

8      A.   That's correct.

9      Q.   Is that because your wife was receiving no

10  income?

11      A.   To the best of my recollection, I don't believe

12  she was actually drawing any income at the time I

13  completed this document.

14      Q.   Did you hear her testimony in court the other

15  day?  Did you hear that she was receiving income from

16  The Barclay Group and Sunset Pacific for services?

17      A.   I think it was misclassified.  They weren't

18  income.  They were either advance or expenses.

19      Q.   Misclassified by whom?

20      A.   Ms. Comu.

21      Q.   So you disagree with your wife's testimony that

22  she was receiving income from The Barclay Group?

23      A.   I am not disagreeing.  I think I am just trying

24  to clarify the proceeds that were being disbursed at

25  that time.

1    Q.   Well, Mr. Comu, it was either income or it

2    wasn't.  Is it your testimony it was simply

3    reimbursement of expenses and, therefore, not income?

4    Is that your testimony?

5    A.   No, my testimony is they were either expenses

6    which she is being reimbursed for, an advance which she

7    may have requested, or income with respect to fees for

8    her time in doing business development, one of those

9    three categories.

10   Q.   So you are acknowledging during 2009 there was

11   some income received by her for services rendered to The

12   Barclay Group and/or Sunset Pacific?

13   A.   No, sir, that is not what I am saying.  I am

14   saying that any checks written to her -- and I don't

15   have any specific history in front of me -- were either,

16   A, for an expense, B, a request for an advance or, C,

17   fees paid to her for business development.  I don't know

18   what each category and how that falls at the time that

19   those checks were written.

20   Q.   I counted -- you can do this as well.  I

21   counted 11 checks issued to your wife as reflected in

22   Exhibits 85 and 90 totaling $15,000, and each check is

23   written in the amount of either 1,000 or $2,000.  So you

24   are saying those $15,000 that was paid to her those 11

25   checks were issued to her as an advance?

1      A.   I would presume so, yes, sir.

2      Q.   Okay.  What was this advance all about?  That

3  was advance against income, correct?

4      A.   No, sir, they are just an advance that need to

5  be paid back to The Barclay Group.

6      Q.   So what they really are then are loans?

7      A.   Correct, a loan would be an advance, yes, sir.

8      Q.   Well, no, in my mind advance is advance against

9  future services or advance against salary, not a loan?

10      A.   Well, I think you could put that should be

11  categorized as either/or.  You are right.  I don't want

12  to be argumentative.

13      Q.   So which one was it, a loan or an advance

14  against income?

15      A.   I am calling it an advance loan, because no

16  services have been rendered, so it is not income.

17      Q.   I thought you just testified that services were

18  rendered?

19      A.   No, sir, I said there is either one of --

20      Q.   You said three categories?

21      A.   Yes, sir.

22      Q.   You said it three times?

23      A.   Yes, sir.

24      Q.   You said an advance?

25      A.   Yes, sir.

1      Q.    You said reimbursement of expenses?

2      A.    Yes, sir.

3      Q.    Or for services rendered?

4      A.    Correct, and the advance is what I am referring

5   to as the loan.

6      Q.    Okay.  And my question to you:  How much of

7   this 15,000 that she received during 2009 was for

8   services rendered?

9      A.    To the best of my recollection, and I would

10   have to literally look at each one individually and try

11   to match up the dates, I couldn't tell you a correct

12   answer today, Mr. Elmquist.

13      Q.    Take a look at KLM Exhibit 85, and this is

14   representative -- I represent to you, Mr. Comu, that

15   this is representative of all the checks issued to your

16   wife on The Barclay Group account.  And this is

17   Exhibit 85.  That is check 5074 at the bottom of the

18   page.

19           THE WITNESS:  Could you pull that up for

20   me, please?  Thank you.

21      Q.    The last check written there is for $2,000.

22   There is no memo line, nothing to indicate the purpose

23   of the check, is there?

24      A.    Not on the memo line, yes, sir.  It says office

25   expense on the right-hand side.

1    Q.   Okay.  All right.  So this would be office

2  expense.  What would that entail as it relates to your

3  wife?  Why would you be writing a check for $2,000 for

4  office expense?

5    A.   I don't want to split hairs.  I don't think it

6  is necessarily the office as much as it is expenses

7  related to the office.

8    Q.   Okay.  Okay.  All right.  Now, with respect to

9  this payment on your house that was made in 2009, you

10  are calling that a loan made by The Barclay Group to

11  you; is that right?

12    A.   It was a loan I requested in order to make the

13  payment at the time, yes, sir.

14    Q.   Was that loan repaid?

15    A.   I don't recall at this point in time,

16  Mr. Elmquist.  I don't know.

17    Q.   If it wasn't repaid, it would be listed in your

18  bankruptcy schedules, correct?

19    A.   That would probably be a contingent liability.

20  I don't know how to answer that.  I am sorry.

21    Q.   So you don't know whether it is or it isn't?

22    A.   I am sorry.  I do not at this time.

23           MR. ELMQUIST:  Nothing further, Your Honor.

24           THE COURT:  All right.  Mr. Olson, I will

25  ask you again, anything?

1          All right.  You are excused from the

2     witness stand, Mr. Comu.

3               THE WITNESS:  Thank you, Your Honor.

4               THE COURT:  All right.  Anything else in

5     the way of evidence?  Does the defendant have anything

6     further?

7               MR. ELMQUIST:  Trustee is done.

8               MR. OLSEN:  Defense rests.

9               THE COURT:  Any rebuttal from plaintiff?

10              MR. VITAL:  No, Your Honor, we rest and

11    close.

12              THE COURT:  All right.  Well, we will take

13    a short break and come back for closing argument.  Let's

14    talk about timing.  It is just about 3:00.  Can I ask

15    you all to keep it to 15 minutes each?

16              MS. HANKS:  Yes, Your Honor, I can do that.

17              THE COURT:  Anybody feels that is unfair?

18              MR. ELMQUIST:  No.

19              THE COURT:  All right.  15 minutes each.

20              (Recess from 2:58 to 3:16.)

21              THE COURT:  All right.  We will now have

22    closing argument in King Louie Mining versus Comu,

23    Adversary 10-3269.

24              Plaintiffs, are you ready?

25              MS. HANKS:  We are, Your Honor.  Thank you.

1            THE COURT:  All right.

2            MS. HANKS:  First, on behalf of the

3    plaintiffs and particularly Mr. Katz, we would like to

4    thank the Court for taking the time this week and the

5    incredible attention that it takes to weed through some

6    of these documents and to connect the dots.

7            I think that the Court has gotten a taste

8    of what Mr. Katz has been dealing with for the better

9    part of the last decade in this litigation with Mr.

10   Comu.  And I think that Mr. Comu confirmed in his

11   testimony, when asked about the reason for his

12   bankruptcy, what it was, and it was to basically

13   continue fighting this debt of Mr. Katz.  This was not

14   about a personal insolvency.  This was about his

15   continued efforts to not pay a debt that was the subject

16   of a final judgment in New York.

17           And the documents that we have supplied to

18   the Court, which we haven't had a chance to finish going

19   through but will show that, for example, some of the

20   substantial judgments that Mr. Comu claims as debts were

21   not judgments against him.  Not only that, but he had --

22   those judgments had been the subject of assignments to

23   Sun Sports when he was CEO, and he sued Mr. Katz in the

24   beginning of 2009 to recover those debts that he

25   actually claimed as personal debts on his bankruptcy

1 case.

2          So the $6.2 million in debts that he claims

3 in his schedules is a fabrication, an absolute

4 fabrication. This whole bankruptcy was about getting

5 out of paying his debt to Mr. Katz, and after ten years

6 of litigation almost.

7          I think it is absolutely clear that Mr.

8 Comu is not entitled to the privilege of bankruptcy. He

9 has lied to this Court. He has lied to the trustee. He

10 continues to conceal and to misrepresent the facts here.

11          In the middle of trial, the third day of

12 trial, he finally discloses one little sliver of

13 information about a Turkish bank account that appears to

14 be -- to have assets he admits were assets at the

15 beginning of this bankruptcy that he never disclosed,

16 despite repeated attempts, requests by the creditors and

17 the trustees.

18          More importantly, there are a number of

19 entities, not just TBG and Regus, The Barclay Group and

20 Regus and Sunset Pacific, but Marathon Management, Inc.,

21 Eurocap, Continental Partnership, a number of entities

22 that Mr. Comu has used to siphon and dissipate assets

23 that belong to this estate, that belong to the creditors

24 and the 95 percent member of this estate, Mr. Katz and

25 the King Louie Enterprise -- or the King Louie entities.

1          We thank the Court for the time that the

2   Court has given, and as much detail as we could continue

3   to provide, I think the Court sees the picture pretty

4   plainly.  Revocation is appropriate when there has been

5   a fraud committed on the Court, on the bankruptcy court,

6   when there has been fraud in the receipt and refusal to

7   turn over or disclose assets to the estate.  And, as in

8   this case, the continued refusal to make clear, full,

9   accurate disclosures to the Court and the continued

10  concealment of the truth about his assets mean that it

11  doesn't matter what little bits of information were

12  slowly trickled out to the creditors.  He engaged in an

13  active and fraudulent scheme to hide his assets and

14  continue to enjoy the benefits of them to the detriment

15  of this estate, to the great frustration of the trustee

16  and to the incredible detriment of this creditor.

17          And for that reason we do ask that the

18  Court revoke discharge and that Mr. Katz and the King

19  Louie entities be entitled to all equitable relief that

20  the Court feels is just.

21          THE COURT:  Thank you.  Mr. Elmquist.

22          MR. ELMQUIST:  Thank you, Your Honor.

23          Your Honor, I have -- I say my paralegal

24  has written out basically a summary, and Mr. Olson is

25  welcome to come around and look over this, but I think

1  he is very familiar with the numbers. But I basically

2  summarized here The Barclay Group's shares that were

3  issued to us and the disposition of those shares. We

4  have additionally 95,420,116 shares, representing

5  20 percent of Green Auto, being issued to The Barclay

6  Group on November 5, 2009, obviously a very significant

7  date from the standpoint of the filing of this

8  bankruptcy case. That was a date not appreciated by the

9  trustee, Your Honor, until, frankly, this trial. And it

10 is very disturbing -- was very disturbing to the trustee

11 to hear the evidence relating to the issuance of those

12 shares effective as of that date, but, in fact, the

13 merger was effective that date.

14          That would be one thing, if Mr. Comu wasn't

15 really aware of the fact that the merger was effective

16 that date, as he represented to -- well, he represented

17 to the trustee and did so, shamefully, through his

18 counsel, by using his counsel as an instrument for

19 misrepresentations to the trustee. Represented to the

20 trustee that the transaction was not effective until

21 after the petition date and, therefore, the stock issued

22 to the Ganas Corp was not property of the bankruptcy

23 estate. He made that representation. His counsel, in

24 turn, made it to the trustee, knowing that on 11/24/2009

25 he had signed memorandum of understanding where he had

1 agreed to the transfer of 63,613,000 of this 95 million

2 shares to the Backwater Limited, a UK company with whom

3 he expected to do business in the future, and to another

4 entity, the business purpose of that I can't discern.

5 But the point being, that transaction was completed,

6 according to his own testimony, as of 11/24/09, and he

7 signed that agreement on behalf of The Barclay Group.

8          In the same time frame, Your Honor, he made

9 arrangements with his brother, through the TKY and

10 Daptco Trusts, and essentially with himself -- although

11 he testified his wife was involved, that is hard to

12 believe -- to sell nine and a half million shares of The

13 Barclay Group stock, pursuant to stock purchase

14 agreements that provided for notes of 500,000, 200,000

15 and $250,000, respectively.  And, Your Honor, I

16 (Inaudible) the trustee's exhibits or the stipulated

17 facts that correspond with the summary.

18          And the terms of those notes, Your Honor,

19 are ones the Court should review.  The notes basically

20 provide for quarterly payments of interest and a blanket

21 maturity date in, I believe it is, September/October of

22 2015.  Only interest is due until then.

23          Now, Mr. Comu represented to this Court

24 that the agreement of the parties was these notes were

25 payable strictly out of the stock that was sold to --

1   the Green Auto stock that was sold to each of these

2   entities, and that, if the stock was not sold, the buyer

3   and maker of the note had the right to rescind the

4   transaction and return the note.

5               There is nowhere in those agreements, there

6   is nowhere in those notes, where that is remotely

7   reflected.  This is all part of an agreement made with

8   his brother to, I believe, provide for funds that he

9   borrowed from his brother and that he would then make

10  arrangements to repay through this structure he created

11  to sell the stock and eventually, hopefully, liquidate

12  the stock and get some money to himself and to his

13  brother.

14              Your Honor, between March and December

15  of 2010, The Barclay Group was issued another 38,800,000

16  shares, pursuant to the antidilution provision of the

17  merger agreement, and that is reflected and stipulated

18  facts 48 and 52.

19              Thereafter, Mr. Comu, with the company he

20  was also intending to do business with and was, in fact,

21  the CEO of and a director, Eurocap, he did a share

22  exchange, where he transferred 10 million shares of The

23  Barclay Group stock to a company that had virtually no

24  assets, no income, never has, never will, but it was a

25  vehicle by which Mr. Comu could conduct business in

1    Europe and essentially do the types of reverse merger

2    transactions, targeting shell companies in great

3    Britain, that he conducted through The Barclay Group in

4    the US.

5              Then he finally had an opportunity to start

6    liquidating some of this stock, and he arranged with

7    some company called World Wide Auric, on which we have

8    been provided absolutely no information.  All we know

9    that it is someone by the name of Rick Toscano made an

10   agreement, supposedly, a verbal agreement, with Mr. Comu

11   where essentially 10 million shares of Barclay Group

12   stock was sold over a period of six or seven months,

13   from June '11 to January '12, where Mr. Comu or The

14   Barclay Group allegedly had reached an agreement with

15   World Wide Auric to receive 20 percent of the proceeds

16   and World Wide Auric 80 percent.

17             So in this transaction, according to Mr.

18   Comu, of the 2.8 -- of the $2,839,857 that was received

19   from that sale of those 10 million shares, World Wide

20   Auric, by agreement, received around $2,100,000, and The

21   Barclay Group received about $700,000.  And we are

22   supposed to take that on faith from an individual who

23   cannot tell the truth.

24             Your Honor, the next transaction that Mr.

25   Comu engaged in was the disposition of the remaining

1  shares and the disposition of the notes.  After he

2  determined that there was no longer a market for the

3  Green Auto shares through sales by World Wide Auric, he

4  basically canceled, unilaterally canceled, the

5  promissory notes payable to The Barclay Group and thus

6  allegedly became entitled to return of the 3.3 million

7  shares that were still outstanding in TKY, Daptco and

8  Sunset Pacific.

9          And, Your Honor, I might note that none of

10  the Sunset Pacific shares were sold through this

11  arrangement.  My surmise is those weren't sold because

12  he had a first duty to reimburse his brother for the

13  moneys his brother had paid earlier on.

14          So at this juncture, based upon the

15  information we have, there should still be something in

16  the order of 44 million shares of Green Auto stock,

17  hardly the 130 or 143 million shares it started with,

18  but that 44 million shares of stock, Your Honor, is

19  stock that belongs to this estate, because the evidence

20  is unquestionable that The Barclay Group is 100 percent

21  owned by Mr. Comu.

22          Let's talk about the money received from

23  the sales of stock.  We have the $120,000 that The

24  Barclay Group received in November 2009 in the

25  memorandum of understanding that was paid, according to

1    that document, by the Mayborne Limited.  We have the

2    2,839,857 that The Barclay Group received from the sale

3    of the stock to the -- or that was received from the

4    sale of that stock.  Again, according to Mr. Comu, only

5    700,000 of that went to The Barclay Group, but who

6    knows?

7                    The $211,000, Your Honor, is -- $211,205 is

8    the amount that Daptco received from the 1,400,000

9    shares of its stock that was sold and the 1,033,833 was

10   the amount received from TKY sales of its stock when it

11   was 4.2 million.

12                   So what we have in total in moneys received

13   from the sales of the Green Auto stock that were under

14   the control of Mr. Comu, as a 100 percent owner of The

15   Barclay Group, is $4,204,945.

16                   Your Honor, you heard the testimony of Ms.

17   Reed, and her testimony being that, had she known at the

18   commencement of this case that, in fact, The Barclay

19   Group was 100 percent owned by Mr. Comu or, frankly, had

20   she known that Brown and Lampe was 99 percent owned by

21   Mr. Comu, the trustee could and would have undertaken

22   investigation, seen to it that the assets of the estate

23   represented by those equity interests were protected.

24   But the first time Ms. Reed knew about it was only after

25   these transactions had occurred and the money was out

1  the door and the stock was sold, because the first time

2  the trustee learned about it was not from Mr. Comu.  It

3  was from Mr. Troster, who was the principal of the stock

4  transfer agent Old Monmouth, when Mr. Troster was

5  deposed.

6              Your Honor, I indicated -- or Ms. Reed

7  indicated, had she known at the beginning of this case

8  or at the time this complaint was filed what she learned

9  during the trial of this action, she would have had a

10  much different attitude about what claims to assert in

11  this lawsuit.  In fact, she would have joined in the

12  effort to have Mr. Comu's discharge revoked.

13              It is to me quite clear, based upon Mr.

14  Comu's testimony before this Court and the numerous

15  documents that have flatly contradicted his testimony

16  time and time again, that Mr. Comu has, in the most

17  charitable way you can phrase it, a reckless disregard

18  for the truth.  This man has committed a fraud on this

19  Court, he has committed a fraud on the trustee, and he

20  deserves to have his discharge revoked.  And I

21  understand that is the plaintiff's claims, but the

22  trustee wholeheartedly endorses it.

23              The relief, Your Honor, the trustee is

24  seeking is to have this Court invoke the remedy of

25  reverse corporate veil piercing, a doctrine I know the

1    Court is familiar with because Your Honor wrote an

2    opinion on it in the Cadle Company versus Brunswick

3    Homes case, which I refer to in my opening statements.

4              We have here, Your Honor, an individual who

5    is the actual owner of the corporation The Barclay

6    Group.  This corporation was operated by Mr. Comu for

7    years as a tool or business conduit to defraud his

8    creditors and to use the corporation to shield personal

9    assets from preexisting personal liability.  This is a

10   classic example.  This is why the whole concept, the

11   equitable doctrine of veil piercing or reverse veil

12   piercing exists, Your Honor, is to address and afford

13   remedies to creditors and trustees in these very

14   circumstances.

15             And the evidence is abundantly clear that

16   Mr. Comu has used The Barclay Group in this fashion and

17   that, therefore, this Court should hold that The Barclay

18   Group and Mr. Comu are jointly and severally liable for

19   the obligations of this -- obligations that Mr. Comu

20   owes to his creditors, which, as Ms. Hanks indicates, is

21   95 percent the claims of King Louie Mining and the other

22   plaintiffs.  The told debt in this case, Your Honor, as

23   reflected in the schedules is $2,394,773.21 based upon

24   ten claims filed.

25             I would ask the Court take judicial notice

1  of that claims register.

2          The other entity that is the subject of the

3  trustee's request for reverse veil piercing is Sunset

4  Pacific.  The evidence, Your Honor, is very clear that

5  Sunset Pacific has done absolutely nothing as a business

6  enterprise.  It has conducted no business.  Every time

7  Mr. Comu was asked about the nature of the business, he

8  said it was a holding company.  Well, that is simply a

9  way for Mr. Comu to describe what Sunset Pacific was

10  really all about, which was to hold or conceal assets

11  that he personally owned, to take them or to try to keep

12  them away from his creditors.  Again, it is an entity

13  that was formed and used for the purpose of shielding

14  personal assets.  He was clearly in control of that

15  entity.  Yes, Phyllis Comu may have had a 98 percent

16  limited partnership interest, but as the Court knows, a

17  limited partner doesn't manage or control the business

18  affairs of the partnership.  The general partner does.

19  And the evidence is clear that Mr. Comu controlled the

20  general partner and controlled all aspects of the

21  business of Sunset Pacific.

22          He was the recipient of the $500,000 that

23  was placed into Sunset Pacific through the purchase of

24  the annuity and the loans to the other company he was

25  involved in, Sun Sports.  He was the one that controlled

1  Marathon Management that was the source of funds for the

2  $50,000 or whatever the cost was for the Mercedes that

3  was placed in the company.  He was the individual that

4  was responsible for placing the current annuity in the

5  company.  He, therefore, is the individual that was

6  utilizing the company to perpetrate fraud on his

7  creditors, and he, therefore, should be held jointly

8  liable, along with Sunset Pacific, for the debts that he

9  owes to his creditors as reflected in the claims

10  register.

11           Your Honor, I want to finally address this

12  issue of the undisclosed bank account.  We have no idea

13  what is actually in that account.  All we know that is

14  that, based upon the statement, I believe, June of 2012,

15  that there is a number shown there of around $5,000.

16  That number could represent the balance, or it could

17  represent interest earned on the account.  We have no

18  idea.  But I am going to be contacting or immediately

19  insisting that Mr. Olson, through his client, get those

20  funds to the trustee with a full accounting for six

21  months preceding the petition date through the present

22  date, so we know exactly what has been going on with

23  those funds.  And we may have further action to take on

24  that, separate and apart from this lawsuit, if we find

25  that Mr. Comu has knowingly used those funds during the

 1    course of this bankruptcy case.

 2              Your Honor, in closing I want to thank the

 3    Court for Your Honor's attention.  I know there is a lot

 4    of evidence presented, a lot of testimony, a lot of

 5    things to sort through, and I appreciate Your Honor's

 6    questions to get to the truth of this case, the

 7    questions she asked Mr. Comu.

 8              I think this is a case in which there is

 9    clearly a basis for holding Mr. Comu and the companies

10    he controlled as joint obligors to the debts of this

11    estate, and I think this is clearly a case in which the

12    discharge should be revoked for fraud.  Thank you.

13              THE COURT:  You are welcome.

14              Mr. Olson?

15              MR. OLSON:  May it please the Court, I am

16    aware the hour is late, and it has been a long week.

17    And I have been practicing law 40 years.  I am under no

18    allusions about what this evidence looks like, but Mr.

19    Comu and the other defendants are entitled to a defense,

20    and I would ask that the Court not engage in a rush to

21    judgment because, as you sift and sort with the pieces

22    of evidence here and kind of get over the initial shock

23    of dealing with it -- some of us have had the

24    opportunity to deal with it for several years now --

25    there are some things that don't quite fit.  And I ask

1    the Court not to kill the messenger, but I want to try

2    to take as an objective look as I can at this mess.

3            And I started out on Monday by saying we

4    have got two distinctly different lawsuits here, and I

5    really think that is important.  Again, all of this

6    evidence is admissible on the allegations by the

7    trustee, and I will come back to that.  But with regard

8    to the motion to revoke the discharge, I want to start

9    with Neely versus Murchison.  When Clint Murchison, Jr.,

10   filed bankruptcy, Mr. Neely, of the Locke, Purnell,

11   Boren and Neely law firm, had a personal $3.3 million

12   fraud judgment against Clint Murchison, Jr., out of Joe

13   Fish's court, I believe.

14           And the personal injury attorney that got

15   the judgment sent over a baby lawyer to attend the

16   meeting of creditors and so on, and they missed the

17   deadline to file the exception to discharge.  And then

18   they came to me and said, "Mr. Palmer filed a 12(B)(6)

19   motion, and Judge Agrison (phon) granted it."  You know,

20   hell.

21           Well, long story made short, the Fifth

22   Circuit said it is an absolute bar.  You just missed it.

23           Now, you start with that, and 727 clearly

24   contemplates that you can bring a motion to revoke -- or

25   an application to revoke, but two wrongs don't make a

1    right, and you have got to bear in mind that revocation

2    of the discharge might not be the correct remedy.

3                It doesn't mean that the Court and the

4    trustee and the creditors are without a remedy.  And the

5    trustee is pursuing viable remedies, and he gets the

6    trustee where the trustee needs to go.  It may not get

7    Mr. Katz the opportunity to pursue Mr. Comu to the ends

8    of the earth for the rest of his life, or whatever Mr.

9    Katz's testimony was Monday morning.  But that is kind

10   of Mr. Katz's fault.

11               We have got a tremendous amount of smoke

12   and heat and evidence of almost anything you can think

13   of in this case, but you have got to start with the fact

14   that Emil Lippe had been chasing Mr. Comu for a few

15   months, at least, himself and had been at the meeting of

16   creditors and announced.  And, you know, his knowledge

17   is imputed to his client, and his statements are his

18   client's representations through his lawyer.  And he

19   said, "We are going to be digging and we are going to be

20   doing these things and we are going to object to the

21   discharge and they are hiding assets in Sunset Pacific

22   and" --

23               THE COURT:  Do you have authority for your

24   statement that Emil Lippe's knowledge is imputed to his

25   client?  Because there is certain authority in different

 1   contexts in bankruptcy that would suggest otherwise.

 2             MR. OLSEN:  Well, I think that when he is

 3   standing there saying, "We are going to do these things.

 4   We are going to object to the discharge.  We are going

 5   to try to be special counsel for the trustee.  We are

 6   going to do these investigations.  We are going to

 7   be" -- I think that that is his client.  That is Mr.

 8   Katz's words through his lawyer.  And I think that is

 9   what sauce for the goose is sauce for the gander.

10             THE COURT:  So you don't have a case to

11   point me to?

12             MR. OLSEN:  Well, Your Honor, I will

13   certainly find you one.

14             THE COURT:  I really -- as probably

15   Mr. Elmquist knows, I pretty severely popped a creditor

16   in a case not too long ago.  By popped I imposed what is

17   known as a death penalty sanction on their lawsuit.  And

18   I separately dealt with a lawyer who I felt like engaged

19   in some bad conduct on behalf of the creditor.  Fifth

20   Circuit reversed me on the client.  Bad, bad acts by the

21   lawyer, but you can't impute that to the client.  Do you

22   know which case I am talking about?

23             MR. OLSEN:  Yes, Mr. Akerly --

24             THE COURT:  Mr. Akerly and the Cadles.

25             MR. OLSON:  We are not talking about bad

1 acts by Mr. Katz. We are talking about he has a lawyer

2 attending that meeting of creditors saying, "We are

3 going to do all these things," and at that meeting --

4 THE COURT: Okay. What about -- if you

5 don't think that case is square on or analogous, what

6 about the US Supreme Court Pioneer Investment case?

7 MR. OLSEN: I literally am blank about the

8 case at the moment. I will just have to look at it and

9 I will address it. As I understand, the plaintiffs

10 wanted to submit post trial briefs.

11 THE COURT: Well, we may or may not.

12 MR. OLSEN: I understand.

13 THE COURT: But I just wondered if you had

14 any authority, because I have got those two cases, among

15 others, going through my brain.

16 MR. OLSEN: Well, I have got --

17 THE COURT: Can't always tag the client

18 through the lawyer.

19 MR. OLSEN: No, but I am familiar with the

20 line of Fifth Circuit cases where people are appealing,

21 and their appeal point is: My lawyer malpracticed, and

22 I want to readdress this, I want a do-over.

23 And the Fifth Circuit said, "No, you can't

24 do that. You can sue your lawyer for the malpractice."

25 And they have done that. So they have got a partial

1    remedy there.

2              But Mr. Elmquist came in after the deadline

3    and after the second amended complaint and at some point

4    began doing the 2004s that Emil Lippe could have done in

5    February of 2010 and found all of this.  It was

6    disclosed, it was learned, it was not timely disclosed.

7              I am not putting up any defense, but to

8    revoke a discharge it is not enough to be able to

9    establish that a discharge would not have been granted

10   in the first place.  You also have to show, with

11   particularity, the fraud and why you didn't know those

12   things before the discharge.

13             And I do have some cases, and I gave the

14   Court a couple before we started, that said you have got

15   the obligation to do that due diligence before the

16   discharge deadline if there is any indication of fraud.

17             And there is a line of cases on the "We did

18   not know this specific fraud."  And the majority of the

19   court said, "No, if you had any idea of fraud at all,

20   you should have been running those rabbit trails down."

21             And he didn't do 2004s, and he didn't ask

22   for an extension, and if he had of we could have saved a

23   lot of time, but that is a problem that the plaintiffs

24   have with their case.

25             And when you get to the trustee's case, now

1  there is a lot of merit to the trustee's case, but there

2  are some things that trouble me about it.  You know, if

3  you have a situation where you have got more than one

4  owner of a business, an enterprise or something, and

5  they don't have it formed properly, you know, what are

6  the rights of Mr. Brown on the day of the filing of the

7  bankruptcy by Mr. Comu?

8          I honestly don't think it is fair for the

9  Court or the trustee or the creditors to say that Mr.

10  Comu's obligation is to say, "It is 100 percent mine and

11  I don't have any fiduciary obligation to Mr. Brown."

12          I do think it is entirely appropriate for

13  the trustee to bring the complaint that she did.  She

14  can take the position that Mr. Comu can't.  But I don't

15  think it is fair to make Mr. Comu perform an act that

16  creates postpetition liability, and so I have got a

17  problem with that.

18          And then I have got this problem.  If the

19  trustee had gotten every one of those shares of stock

20  that TBG was entitled to -- and TBG was not entitled to

21  95 million.  TBG was entitled to a third of that and got

22  it.

23          But if the trustee was holding all those

24  shares of stock today, they are not worth as much as Mr.

25  Comu netted selling the stock the way he did, and the

 1    price of that stock continues to drop.  So the measure

 2    of damages is something that we have got to look at.

 3              And, again, the testimony also of

 4    Mr. Baxter -- it is not just Mr. Comu -- is that when

 5    World Wide Auric called and said, "All right, we have

 6    got somebody that will take X number of shares, if you

 7    are going to sell them at the price that they are

 8    offering, then here is who gets commissions."  And

 9    Baxter says that in his deposition, too.  World Wide

10    Auric said who got the commissions and how those were to

11    be disbursed.

12              Then the communique to Old Monmouth adds to

13    it, not only that, but what to do with the net and the

14    2.1 million that went out to World Wide Auric and its

15    network.  And so that is what Mr. Comu is saying.  "None

16    of that 2.1 million went to me in any way, shape or

17    form."

18              The distributions down here to the net, if

19    you will, sure, that went into these entities that we

20    have been spending time on all week.  But to say that

21    there is a liability for the gross on the sale of that

22    stock I think is not fair.

23              I think you are talking about, at most,

24    what is the damages for what happened to the net?

25    And -- which gets around to this:  At the time of the

1  filing of the petition, if TBG is not 100 percent owned

2  by Comu and Mr. Brown has some rights, whether it is a

3  corporation, which actually was in good standing at the

4  time and had segregated bank account, had tax returns,

5  but let's say that it is not really a 99/1 corporate

6  shareholder situation, because there is no bylaws, there

7  is no organizational meeting, there is no -- still, if

8  two guys are in business and they think that they have

9  split the ownership of the business and they are

10  carrying on a business, again, I don't think that when

11  one of them goes into bankruptcy he can just say to the

12  trustee, "Here, you got the whole business and tell my

13  partner that I -- you know, he is out because we didn't

14  document it right."

15            Now, the trustee can do that, and the

16  trustee is doing that.  But when does it become property

17  of the estate?  I think it is when it is recovered.  And

18  so the damages have to be addressed kind of as to the

19  value if and when it comes into the estate.  There

20  hasn't been a finding yet.

21            THE COURT:  Mr. Elmquist?

22            MR. ELMQUIST:  Yes, Your Honor.

23            THE COURT:  Have you asked this Court to

24  award monetary damages or just the equitable relief?

25            MR. ELMQUIST:  I have asked the Court for

1   both, Your Honor.  I have asked for recovery with --

2   based upon the --

3                   THE COURT:  Forgive me for not knowing that

4   off the top of my head.

5                   MR. ELMQUIST:  Let me read you my prayer.

6                   THE COURT:  I have been thinking in terms

7   of verification of discharge, veil piercing, turn over

8   of property.  I haven't been --

9                   MR. ELMQUIST:  Right.

10                  MR. OLSEN:  And declaratory judgment as

11  well.

12                  MR. ELMQUIST:  Your Honor, that is the more

13  correct way to characterize it.  I have asked that this

14  direct a turnover of the assets of Sunset Pacific and

15  The Barclay Group, based upon the fact that those

16  entities are the alteregos of Mr. Comu.  And more to the

17  point, with respect to Barclay Group, despite counsel's

18  statements, the evidence clearly shows that Mr. Comu was

19  and has always been, through the relevant time period,

20  the owner of The Barclay Group.  All the assets benefit

21  him.

22                  THE COURT:  All right.  Well, I mainly just

23  wanted to be clear.  Was there or was there not a

24  request for monetary damages?

25                  MR. ELMQUIST:  There is no request for

1 monetary damages as such. There is request for turnover

2 of property.

3          THE COURT: Okay. All right.

4          MR. OLSEN: Now, some other things that I

5 think require us all to take an objective look at it is

6 what kind of a creature is Sunset Pacific, because the

7 testimony, in the light most favorable to the defendant,

8 shows people that should be limited partners operating

9 the business in one phrase and making decisions and so

10 on. Again, I don't know what that is, and I don't -- to

11 concede to the Court, even if the gift January 1, '06,

12 was made and it became the separate property of Phyllis

13 Comu on that date, I don't think the parties treated it

14 that way after that.

15          And it is not a transfer that would block a

16 discharge. It is just a situation, and we have seen a

17 lot of that here where he used C-corp language when you

18 have got an LLC or vice versa or you use LP language

19 when you don't have one.

20          So the question becomes, well, what, what

21 do you have, and what are the rights there? And, again,

22 I started out saying I just -- I don't think we want to

23 have a rush to judgment here. I think it takes an

24 objective look at, you know, what really happened.

25          The witness for the defense speaks in use

1  of terms that, from a legal standpoint, you know, are

2  not technically correct, and it just gets downhill from

3  there when you try to explain what really happened.  But

4  I think it is incumbent on us to try to figure out what

5  really happened here.

6             And I think there are a couple of red

7  herrings.  The demonstrative exhibit that set me off on

8  Monday, it still is just so unfair.  The house is not in

9  Preston Hollow, which connotes millions.  The house is

10  homestead.  It is separate property of C. J. Comu.  It

11  was bought before he got married.  It had no debt on it

12  at the time of the bankruptcy.  It was claimed as

13  exempt.  The exemption was allowed, and it drops out of

14  541 at that point.

15            And you can rent your house out and still

16  have a homestead, and I don't know if the plaintiffs

17  know that, but it just stirs up things that don't need

18  to be dealt with.

19            The objection to the privileged memo to me

20  set me off the other day; it is true.  They said, you

21  know, it is too late.  You waived it.  Okay, fine.  It

22  is too late to file a motion to revoke the discharge.

23  You waived it.  You don't have the second lick.

24            You do enough to be put on inquiry when you

25  are sitting right there and you listen to Buckeye

1  Epstein say, "He owns a lot more than one percent of

2  these companies, he runs them all, he operated them

3  all."  It is not something you can ignore.

4            If you look at those cases that I gave you,

5  that is enough evidence of fraud you need to be doing

6  your due diligence before the deadline.  And you don't

7  have to be able to describe exactly what it was, and

8  that is the point that these cases say.  You may not

9  have known exactly the name, the date, the time, the

10  place, but they didn't believe a word he was saying long

11  before he filed bankruptcy, and they have been making

12  those accusations about Sun Sports and Sunset Pacific

13  long before he filed bankruptcy, and they came to the

14  meeting of creditors complaining about that and asking

15  about that and The Barclay Group and, "We are going to

16  get to the bottom of this, we are going to object, we

17  are going to do 2004s, we are going to work with the

18  trustee."  That's the point that I want to make about

19  that.

20            Now, get back to the draft of Schedule I

21  that I objected to, Mr. Comu may have a problem with the

22  IRS about the tax returns we have been looking at, in

23  that it doesn't seem to me that all of the income is

24  reported.  Now, that, however, is contrasted with what

25  he put on Schedule I.

1      "Well, I hope to make five to 10,000 a

2  month this year."

3      "Well, what did you make before?"

4      Frankly, with the returns he has filed

5  since, he hasn't shown 5,000 a month on any of those

6  returns.  So if the returns are correct, then the

7  Schedule I is correct.  It is a red herring.

8      Whatever the real income is it is, but the

9  belief that he couldn't tell the truth, the belief that

10  his schedules weren't accurate, the belief that he had a

11  greater ownership interest and all these other things

12  was there and known before the discharge.  I think that

13  it is a waste of time to spend on that.

14      I think the better thing to do is to try to

15  figure out what does the estate get?  And, again, I

16  think that there has got to be a settling up with Daptco

17  and TKY, who I don't represent, but it appears to me

18  that you can't forgive the debt and let them keep the

19  stock, and I understand that.

20      But that gets back to Diane Reed's comments

21  to Epstein at the meeting of creditors.  "It sounds to

22  me like you are talking about causes of action these

23  entities might have against Mr. Comu."

24      These payable may not have standing.  Diane

25  Reed may not have standing.  It is something that has

1   got to be thought through.

2            If The Barclay Group is not the alterego of

3   Mr. Comu, then none of these accusations fall.  And I

4   think that we just need to figure out and not just be in

5   a rush -- you know, everybody loves to give a shove to a

6   falling wall, but I don't think that Diane Reed is out

7   the millions of dollars that the first blush look would

8   give.

9            If The Barclay Group is the alterego of Mr.

10  Comu and it has operated for four years since the filing

11  of the case, then some allowance has got to be made for

12  the legitimate business expense, the compensation to

13  other people, the rents that it has had to pay, the

14  taxes it has had to pay.  It is going to take some

15  crafting to figure out where we really are here.

16            Thank you.

17            MR. ELMQUIST:  Your Honor, I need to

18  clarify, because I think I misled the Court on the issue

19  of the relief requested.  In the Count Three we did ask

20  for turnover, but we also stated that, "In addition, to

21  the extent of assets of TBG and/or Sunset Pacific have

22  been sold or otherwise disposed of since the petition

23  date, the trustee requests that this Court enter

24  judgment against Comu, TBG and Sunset Pacific, jointly

25  and severally, for the value of the assets that existed

1  on the petition date and that are not turned over to the

2  trustee because they have been sold or otherwise

3  disclosed of by Comu." So we are seeking monetary

4  relieve.

5         From the standpoint of the trustee's

6  position at the time this complaint was filed, we did

7  not know, and I think the evidence -- Your Honor will

8  decide, but I think the evidence is very clear that Mr.

9  Comu did own and has owned throughout this case

10 100 percent of the stock of The Barclay Group and,

11 therefore, he wrongfully and knowingly wrongfully

12 dissipated the Green Auto stock. He should be held in

13 The Barclay Group should be held monetarily accountable

14 for that, based upon the moneys actually received, not

15 the net money The Barclay Group received.

16         MR. OLSEN: And that was my comment. I

17 think he is seeking both forms of relief, and I am

18 saying I am not sure that that is the correct measure of

19 the monetary damages.

20         THE COURT: Okay. Ms. Hanks?

21         MS. HANKS: May we just very briefly

22 address Mr. Olson's comments with regard to the

23 discharge objection?

24         THE COURT: Yes, you only used four minutes

25 of your 15 minutes, so you can --

1          MS. HANKS:  And I don't intend to use all

2    15 minutes, Your Honor.

3          It is a pretty galling thing to hear for my

4    client to hear that Mr. Comu, who has continued to lie

5    to the trustee and this Court until this very trial,

6    when faced with undeniable evidence of this Turkish bank

7    account, finally admits and finally discloses it.  I

8    mean Mr. Olson claims that it had been disclosed to us

9    and then says, "No, sorry, I was wrong, I didn't

10   disclose it to you, we didn't get it until the third or

11   fourth day of trial."

12         That evidence alone is an undisclosed asset

13   at the time of the petition date that Mr. Comu lied

14   about at the creditors' meeting, he didn't disclose in

15   his filings, he lied about in subsequent depositions,

16   and only admitted it when he was faced with a document

17   that he couldn't deny.  That is the quintessential

18   fraudulent scheme that constitutes concealment of facts.

19         This is not a question of mistakenly

20   undisclosed information.  This is active, ongoing lying

21   and concealment of facts that must have been disclosed

22   to the creditors and to the trustee.  And to say that

23   there was a suspicion that Mr. Comu was acting

24   fraudulently and that that suspicion put Mr. Katz and

25   the plaintiffs on sufficient notice to now bar a

1    revocation claim -- because Mr. Olson is essentially

2    admitting Mr. Comu has committed fraud.  There doesn't

3    seem to be a question about that.  He is lying.  He has

4    lied repeatedly to this Court.  He comes up and, when

5    faced with documentary evidence, he comes up with an

6    entirely new explanation that no one has ever heard in

7    this case before.

8              But the answer from the defendants now is

9    that, "Well, you know, their prior counsel missed a

10   deadline, and even though revocation" -- We filed a

11   revocation claim timely, no question about that, under

12   727(E).

13             Even though we have met the elements of

14   those claims, just because our prior counsel -- our

15   client's prior counsel missed that deadline, Mr. Comu

16   should be absolved of his essentially undenied fraud, it

17   is appalling, and it is absolutely inconsistent with the

18   duties that Mr. Comu has in this bankruptcy court.  He

19   is not entitled to discharge unless he comes to the

20   Court, open kimono, honestly, with clean hands and full

21   disclosure, and he has never done that.  He is still not

22   doing it.

23             And Mr. Katz is the only innocent fully --

24   I mean he is the only person in this courtroom, of all

25   the parties, with really clean hands.  He is the only

1  one who has come here -- you have heard from the trustee

2  that, if she had known the full facts, she would have

3  joined this revocation claim.  If Mr. Comu had disclosed

4  full facts, this would be a very different case.

5              But Mr. Katz, who has been fighting to get

6  this debt recovered for years, and this debt being the

7  only reason Mr. Comu filed for bankruptcy, the answer

8  from the defendants now is, "Yeah, we committed fraud,

9  but we should be able to get away with it because his

10  prior counsel made a mistake."

11             That is not what this bankruptcy process is

12  about, and that is not a bar to a 727 claim,

13  particularly under (D)(2), which does not, on the face

14  of the statute, have any language regarding the

15  claimant's knowledge.

16             727(D)(1) concerning undisclosed assets at

17  the petition date and false oaths asks about the

18  claimant's knowledge before discharge.  And, first of

19  all, I think it is absolutely clear that we did not have

20  knowledge of the full scope of Mr. Comu's fraud,

21  particularly because he was actively concealing it, and

22  I don't think that it is available to Mr. Comu to argue

23  that there was some sort of insufficient due diligence

24  when he was actively, in an ongoing manner, concealing

25  his fraud.

1          But in any event, under 727(D)(2), "The

2    receipt of assets that belong to the estate and the

3    failure to disclose those to the trustee or to turn them

4    over is not subject to an element that the plaintiff has

5    to show that they did not know of it or conduct

6    sufficient due diligence before discharge."

7          And the evidence is legion here.  I mean 38

8    million shares received by The Barclay Group, in which

9    Mr. Comu himself has admitted to owning at least a one

10   percent stake, but on the stand he also admitted that he

11   was the 99 percent owner of Brown and Lampe by virtue of

12   that share exchange.

13         So whether you believe the truth or the

14   lie, Mr. Comu owned these shares, either as the

15   99 percent owner of Brown and Lampe, which he didn't

16   disclose, or as the full 100 percent owner of The

17   Barclay Group.

18         And these shares right here, this 38

19   million shares, these all came either right before

20   discharge or right after discharge in 2010, almost 39

21   million shares, in addition to the 95 million shares,

22   that were undisclosed.

23         So whether it is under (D)(1) or (D)(2),

24   Mr. Lippe's undeniably, inexcusable mistake in missing

25   that discharge deadline, which was objecting to

1  discharge on the basis of the underlying fraud judgment,

2  not Mr. Comu's ongoing fraud in the bankruptcy court,

3  this is a separate, independent and absolutely valid and

4  viable grounds for revoking discharge and ultimately

5  goes to the question of whether or not Mr. Comu is

6  entitled to the privilege of discharge, not whether the

7  plaintiff's prior counsel missed a deadline.

8            Thank you, Your Honor.

9            THE COURT:  Thank you.  Mr. Olson, that

10  Neely versus Murchison case you mentioned, I am trying

11  to remember.  My recollection of that famous case, if

12  you will, is that it was a 523 objection to

13  dischargeability at issue, and the clerk's office had

14  put the wrong date on a notice it sent out --

15            MR. OLSEN:  Left it blank.

16            THE COURT:  Or left it blank, and the Fifth

17  Circuit basically said the deadline is the deadline

18  under 523.  You can't rely on the clerk's office to

19  say --

20            MR. OLSEN:  And a lawyer is supposed to

21  know that.

22            THE COURT:  And a lawyer is supposed to

23  know it.  I just wanted to make sure I remembered the

24  right decision.

25            MR. OLSEN:  No, that's the case.  My

```
 1   (Inaudible) had blank in there.
 2               THE COURT:  Yeah.
 3               MR. OLSEN:  I get chewed out by my partner
 4   Nicoud every time that case comes up, because he thinks
 5   that somehow I should have gotten the Fifth Circuit to
 6   make it clear in their opinion that we were not the ones
 7   that missed the deadline.
 8               THE COURT:  No.  Okay, well, I never really
 9   knew who.  I just hate -- my buddy over in Fort Worth,
10   Judge Mike Lynn, was the trustee for that case, as I
11   recall.
12               MR. OLSEN:  It wound up that way.
13               THE COURT:  It wound up that way, yeah.
14   Anyway, I just -- I understand the argument that it
15   isn't 1770 revocation of discharge.
16               MR. OLSEN:  The deadline is the same and
17   the problem is the same.  If you miss the deadline, you
18   can't come in later and just meet the standard that you
19   would have had to meet if you had filed timely.
20               THE COURT:  You can on a 523, but on a 727
21   if we didn't know --
22               MR. OLSEN:  But you have got to prove and
23   plead specifically what it is that you didn't know, and
24   my point is you have got to keep a chronology here
25   because they knew some things enough to be on diligence.
```

1         THE COURT:  Okay.  We are done with oral

2    argument.  I just wanted to make sure I was remembering

3    correctly the case, because you have got copies of the

4    other ones, and I just hadn't read it in a few years, so

5    I wanted to make sure.

6         MR. OLSEN:  No.  That's the one.

7         THE COURT:  All right.  Well, I am going to

8    start out by saying a few things.

9         The lawyers, you have all been gracious in

10   your closing argument to thank the Court, and I expect

11   that is also thanks to people like Dawn and my staff who

12   worked overtime for free.  I didn't know that until I

13   became a judge, but these guys don't get overtime when

14   they stay late, which is bothersome to me.

15        But, anyway, I appreciate your gracious

16   comments, and I will reflect some thanks back to you all

17   because, while there have been some unpleasant moments,

18   let's say, for, you know, especially for the clients, I

19   think you all have been very professional on when you

20   needed to be professional and tried to, you know, stick

21   to business and whatnot.  And, you know, I observed some

22   courtesies in situations where, you know, I don't always

23   observe courtesy in this courtroom.  So I commend you

24   for that, and I commend you for a lot of patience and, I

25   know, hard work all across the board.  And, you know,

1  you are probably all very physically tired as well.

2           So I wanted to say that, and I want to also

3  compliment you on all your pretrial submissions.

4  Certainly a very good job was done by all on that, and

5  that is so helpful, so that I come in here not utterly

6  clueless.  I come in here with an idea of, okay, here is

7  what they say they are going to show me, and then it

8  kind of helps me organize my thoughts better as I hear

9  evidence.

10           You know, many times after a multi-day

11  trial, I will take something under advisement and

12  promise a written ruling in a few days or weeks.  But I

13  have really been studying the exhibits as hard as I

14  could up here.  When you see me looking through papers

15  or looking at the computer, trust me, I am not

16  distracted by something else.  I am looking at the

17  exhibits and maybe double checking something I saw

18  yesterday or refreshing my memory.  And so I know there

19  are hundreds of exhibits, but I have really endeavored,

20  as I have sat up here and sometimes during breaks, to go

21  back and make sure I am carefully considering everything

22  that you all thought was important to put into the

23  record.  I have got pages and pages of detailed notes.

24           And last but not least, I feel pretty

25  comfortable on the legal standard, the law that I am

1    supposed to apply here, because not only have I done

2    trials involving 727(D) and reverse veil piercing

3    before, but that's just the regular stuff that a

4    bankruptcy judge makes herself or himself knowledgeable

5    about.  So I know the law on this subject well enough

6    where I don't think I need to take this under advisement

7    for days or weeks.

8            I am prepared to give a ruling now.  It is

9    going to be just an oral, quick, bench ruling followed,

10   of course, by more detailed findings of fact and

11   conclusions of law.  But, again, this is going to be

12   very, very abbreviated, because it is late and I know

13   you want to get out of here and, frankly, I think, after

14   as hard as you all have worked, you are entitled to a

15   ruling now and not have to wait a few weeks for me to

16   have the perfect written ruling done.

17           First, with regard to the 727(D)(1) and (D)

18   (2) request for revocation of discharge, that section of

19   the bankruptcy code is intended for a situation where a

20   creditor or trustee or US Trustee has let the deadline

21   for bringing an objection to discharge or

22   dischargeability pass but then learns of some sort of

23   fraud after the deadline and asks for the Court to

24   revoke the discharge already granted.

25           Again, the standards are that, "On request

1  of a trustee, creditor or United States Trustee, and

2  after notice and a hearing, the Court shall revoke the

3  discharge if such discharge was obtained through fraud

4  of the debtor and/or a requesting party did not know of

5  such fraud until after the granting of such discharge."

6          Then we have another situation described,

7  "Or the debtor acquired property that is property of the

8  estate or became entitled to acquire property that would

9  be property of the estate and knowingly and fraudulently

10  failed to report the acquisition or entitlement to such

11  property or to deliver or surrender such property to the

12  trustee."

13          There are a few other examples, but these

14  are the two that plaintiffs King Louie Mining, et al,

15  have cited.

16          The Court finds that the plaintiffs have

17  met the standard for revocation of discharge.  The fraud

18  that the Court has found exists here was the widespread

19  concealment of assets and rather significant numerous

20  false oaths that were made on the debtors' forms,

21  schedules and statement of financial affairs that were

22  never amended.

23          The Court is going to specifically find in

24  detail in its written findings and conclusions that the

25  plaintiffs, and specifically Mr. Katz, did not know of

1  the fraud and concealment prior to the discharge order

2  being granted.  The fact that his former lawyer, Emil

3  Lippe, had concerns about Sun Sports and Entertainment

4  and Sun Pacific and the fact that Buckeye Epstein had

5  concerns and asked heated, pointed questions at the 341

6  meeting in the presence Emil Lippe, this was not enough

7  to put the plaintiffs on notice of all of the fraud and

8  concealment that ended up being presented at trial the

9  last five days.

10          Among the fraud and concealment and false

11  oaths that the Court finds here, and I am going to

12  simply list a half dozen or so examples here, failure to

13  schedule the debtor's Turkish bank account until --

14  well, ever and, in fact, failure to disclose it until

15  three years and 11 months after filing bankruptcy in

16  November 2013.  This Court still has no credible

17  evidence.  Parties, the trustee, the creditors still

18  have no credible evidence of what was in it on the

19  petition date.

20          Number Two, failure to schedule accurate

21  information about debtor income.  Failure to schedule

22  any information about the nondebtor spouse's income, and

23  I point to bankruptcy Schedule I, as well as statement

24  of financial affairs, Question One.

25          Next, failure to schedule all entities in

1  which the debtor was an officer or director on the

2  petition date.

3          Next, concealment of the debtor's true

4  interest in The Barclay Group.  Even if the debtor

5  believed he may own only one percent of it, then in that

6  event he failed to disclose his interest in Brown and

7  Lampe or the to be formed Brown and Lampe, the

8  99 percent interest.  But certainly the evidence was

9  that the debtor did not act like a one percent owner of

10  The Barclay Group, and certainly the evidence did not

11  support that he was only a one percent owner of The

12  Barclay Group.

13          Next, failure to disclose the Ganas Green

14  Auto stock that the debtor had an interest in, as well

15  as The Barclay Group's own stock or right to receive it.

16  Again, the evidence was that the debtor separately had

17  some stock that was not scheduled, and certainly The

18  Barclay Group had an enormous amount of Green Auto stock

19  that it had the right -- the rights in as of November

20  2009.  The fact that there was not some discussion of

21  this in the schedules and statements and Section 341

22  meeting is inexplicable.  It was a valuable transaction.

23  Even in the best light on it, there was contingent value

24  that the debtor was soon to enjoy, and it was

25  concealment, in this Court's view, of the totality of

1  the evidence.

2          Additional concealment and nondisclosures,

3  the failure to disclose the Prestonwood Country Club

4  membership. Next, inaccurate disclosure of the debtor's

5  job, profession, and, again, I mentioned compensation

6  arrangements that were not accurately or fully disclosed

7  and, again, just the lack of full disclosure of the

8  debtor's control and ownership of numerous entities.

9  Numerous entities were not the schedules or statement of

10  financial affairs that the debtor was either an officer,

11  director of, according to public filing, or would appear

12  from the evidence to have had some significant control

13  over.

14          Again, the Court expects to have a much

15  more detailed written set of findings of fact and

16  conclusions of law, but the Court believes that there

17  has been ample evidence of fraud that the creditor, the

18  plaintiffs, as well as the trustee, did not know about

19  until after the granting of discharge, and you cannot

20  impute some knowledge of some facts in Emil Lippe's mind

21  to the plaintiffs.

22          I think Mr. Elmquist was the one who said

23  at best there has been a reckless disregard of the truth

24  here, and I would agree with that statement, that that

25  is the best way you can describe it. But the Court

 1  specifically will find intent to defraud and mislead

 2  creditors can be inferred from the magnitude of

 3  nondisclosure.

 4              Next, the Court is going to grant the

 5  request of the trustee that there be the equitable

 6  remedy of reversed veil piercing with regard to The

 7  Barclay Group and Sunset Pacific.  The Court finds that

 8  The Barclay Group was operated as a conduit to defraud

 9  the debtor's creditors and to shield debtor's income and

10  assets.  The debtor controlled it.  The debtor was the

11  de facto 100 percent owner of it.

12              The evidence was overwhelming that there

13  has been a failure by the entity to keep corporate

14  records.  There has been a disregard of corporate

15  formalities, the debtor had total control over it before

16  and after the bankruptcy filing.  The debtor used it, as

17  I think Ms. Hanks said, as his and his wife's personal

18  piggy bank, using it to pay personal expenses.

19              It should be and will be held jointly and

20  severally liable for the debtor's -- to the debtor's

21  creditors, along with the debtor, and the Court finds it

22  to be the alterego of the debtor.

23              The Court will make all the same findings

24  with regard to Sunset Pacific entity, specifically, once

25  again, the Court is finding that it has been operated as

1 a conduit to defraud the debtor's creditors and to

2 shield the debtor's income and assets. The debtor, not

3 Ms. Comu, was in control of it and was using it to

4 conceal assets and to defraud creditors, once again, a

5 disregard of corporate formalities, no corporate

6 records.

7        The Court will order the turnover of these

8 two entities, the equity interest, the assets of the

9 entities, to Ms. Reed for her to administer and use the

10 assets of these companies to satisfy the creditors of

11 the Comu bankruptcy estate. The Court is specifically

12 also going to add that the Turkish bank account be

13 turned over. Quite obviously, that wasn't addressed in

14 the complaint; no one knew about it in time, but I think

15 it is clear, under 542 and 105 of the bankruptcy code, I

16 can order that.

17        Again, the Court is going to supplement

18 this, but I have a couple of housekeeping matters, and

19 that is this: Mr. Elmquist, as you can tell, I was sort

20 of thrown for a loop on the monetary damages, and I am

21 not really prepared to rule on that, so I am scratching

22 my head on whether we want to allow post trial

23 submissions on that or sort of bifurcate that and have a

24 separate trial, go ahead and do findings and conclusions

25 and a judgment ordering these things, revocation of

1    discharge and the veil piercing.  So I will ask what the

2    lawyers want to propose on that.

3              I really don't feel like -- I certainly

4    today am not in a position to do the math and figure out

5    what is appropriate, and it is going to require a lot of

6    sifting through the evidence again, so on --

7              MR. ELMQUIST:  Your Honor, I understand the

8    dilemma for the Court in terms of addressing that today

9    and in terms of any kind of bench ruling.  I would be

10   happy, and I am sure Mr. Olson would also be happy, to

11   provide the Court with briefing on the issues of what

12   exactly can the Court award, and how does the Court, in

13   these circumstances, determine the value of the assets

14   that have been dissipated, the trustee contends, assets

15   of the estate, and what kind of monetary recovery the

16   estate should have by virtue of that dissipation.

17             I do think it is extremely important, based

18   upon the track record with Mr. Comu, that we get an

19   order of this Court entered immediately that we can

20   enforce with respect to the turnover of assets that are

21   out there and that this Court has ordered from her bench

22   ruling.  So I would ask that the Court consider some

23   kind of judgment, have a final judgment that we can get

24   entered and address the full ambit of the Court's ruling

25   after we address the damages question.

1          THE COURT:  All right.  Well, I actually

2   was going to get to that point.  Did we need something

3   like a TRO pending final judgment?  I know we already

4   have the TRO on the Green Auto stock.

5          MR. ELMQUIST:  Right.

6          THE COURT:  And I don't know if we can take

7   that and perhaps expand on that, or have you all thought

8   through this at all?

9          MR. ELMQUIST:  Have not, but I think that

10  what the Court is suggesting, I think, is an excellent

11  way to approach it, because it gives us immediate relief

12  and gets us a vehicle by which we can have an order to

13  enforce this action pending entry of final judgment.

14         MS. HANKS:  If I may, Your Honor, we agree.

15  We would suggest that the current agreed TRO be extended

16  to prohibit the transfer of any TBG -- any Green Auto

17  shares held by The Barclay Group or any affiliate.  That

18  would include Eurocap.

19         We would also ask that it be expanded to

20  cover -- to request a turnover of any escrow funds held

21  at Old Monmouth Stock Transfer Company.  There may not

22  be any but, as the Court knows, Barclay Group had an

23  escrow agreement with Old Monmouth, whereby funds would

24  be received into that escrow account and then

25  distributed pursuant to Mr. Comu's request.

1          And then we would also request that -- we

2    have included in the record a number of statements,

3    including for two different accounts The Barclay Group,

4    for the Comu's for Sunset Pacific.  There is also an

5    account for Marathon Management which is 100 percent

6    owned by Mr. Comu.  And the Regus bank accounts actually

7    go to Mr. Comu at the Oaks North Place home address.

8    And there is hundreds of thousands of dollars that have

9    gone through those accounts.

10          And so I understand that the Court's order

11   today with regards to veil piercing and alterego

12   specific to Sunset Pacific and to Barclay Group, but we

13   would ask for the opportunity to explore those assets

14   going through Regus, because we do believe and we do

15   believe the evidence has shown that this is a

16   continuation of The Barclay Group business in a specific

17   effort to continue concealing those assets from the

18   creditors of the estate.

19          THE COURT:  All right.  Well, I think you

20   all are going to have to maybe get together next week

21   and talk about the mechanics as far as what we can do

22   and what we can't do on that front.

23          MR. VITAL:  Your Honor, may I approach just

24   briefly?

25          THE COURT:  Yes.

1      MR. VITAL:  And I indicated I make my way

2  to these courts very infrequently, so what Your Honor

3  said may be encompassed in what I would like to say, but

4  with respect to that Turkish bank that you have ordered

5  turnover over, I wonder if, implicit in your order, is

6  essentially like a TRO, freezing any activity by Mr.

7  Comu in this account, for instance, after he leaves

8  here, or does Your Honor need to specifically say,

9  "Pending turnover, Mr. Comu, you are not to engage in

10  any transactions."

11      If that is not implicit, we would ask that

12  Your Honor make an order specifically demanding or

13  ordering or enjoining Mr. Comu from conducting any

14  business activity in that account, with respect to that

15  account, other than turning it over to the Court, so

16  that in the interim of it being turned over, he does not

17  dissipate or deplete assets.

18      THE COURT:  All right.  Well, here is what

19  I am going to do.  Okay.  Number One, let me back up.

20  The proposed findings of fact and conclusions of law

21  that I know you all submitted prior to trial, I would

22  like to -- Did the trustee and plaintiffs jointly

23  propose that, or did you each --

24      MR. ELMQUIST:  They are separate, Your

25  Honor.  What I would like to do is get with Ms. Hanks

1   and submit to Your Honor amended proposed findings and

2   conclusions based upon the evidence presented, so that

3   you are looking at one set consistent with the Court's

4   rulings.

5              THE COURT:  All right.  I would like you

6   all to do that next week, and I will he -- if you could

7   submit them to my courtroom deputy, copy Mr. Olson, in

8   Word or Word Perfect, I don't care, just something that

9   I can edit.  But I want to let you all submit what you

10  think the evidence reflected, and then I will go through

11  it and tweak as I think necessary.  I would appreciate

12  exhibit references.

13             MS. HANKS:  Absolutely, Your Honor.

14             THE COURT:  So I will be looking for that

15  next week.

16             Second, I would like you all to submit a

17  form of amended TRO in writing as early as possible next

18  week, because I recognize it may be a few days before

19  the findings and conclusions and judgment are submitted

20  to me, but I would like you to, hopefully by Monday,

21  submit the amended form of TRO.  And I will look at it

22  and decide, you know, who I think is appropriate.

23             If I think it is too expansive, I might set

24  a status conference, and we will talk about is it too

25  far reaching or not?

1            But if you could submit that Monday, and

2    then my courtroom deputy will notify you all if I think

3    I need to have a status conference on the form of it.

4            But taking the queue from Mr. Vital's

5    comments, I do think it is appropriate, Mr. Comu and

6    Mr. Olson, for you, to say on the record that I am going

7    to orally order today that, Mr. Comu, you take all

8    efforts -- and I realize, the weekends, there is only so

9    much you can do, but make all efforts to immediately get

10   control, whatever mechanically -- Mr. Elmquist will let

11   him know, whatever mechanically he needs to do, in

12   coordination with you on Monday morning, to turn over

13   that account and not spend anything, not do anything,

14   not transfer, not wire, not do anything.

15           He is also going to need to get full and

16   complete records, and you need to cooperate and do what

17   needs to be done, so that they can go back and look at

18   all activity.  I guess it is going to have to be not

19   just back to the petition date but before.  There could

20   be transfers on the eve of the petition date that could

21   bring about whole new causes of actions.  So I am going

22   to order basically a freeze on that account and

23   immediate turnover of that.

24           I am going to order a freeze on all of the

25   assets and activities of The Barclay Group and Sunset

1  Pacific, and those assets and equity interest to be

2  turned over to the trustee.  And I am specifically also

3  going to put a freeze on all of the Green Auto Ganas

4  stock.  And I think, wherever it happens to be held

5  right now, there is a freeze on it from being

6  transferred, and, again, I will cite Section 105 of the

7  Bankruptcy Code as giving me the power to immediately

8  order this, even before I have a judgment issued in the

9  underlying adversary proceeding, and I find that it is

10 necessary to order this to avoid immediate and

11 irreparable harm to the bankruptcy estate.  I think it

12 is in the (Inaudible) interest.

13          I think that there is a probability of

14 success on the merits for this estate, if there is an

15 appeal of this judgment that it would be affirmed, and I

16 think the balance of harms weighs in favor of trustee

17 and creditors of the estate having this freeze equitable

18 remedy and restraining order put in place.

19          So this is an oral statement today, an oral

20 order, but you are here to hear it, your counsel is here

21 to hear it.  If it is not complied with, it would be

22 contempt of court, okay?  And we don't want to get into

23 that.

24          All right.  So we will look for the written

25 order, though, hopefully, Monday.  All right.  Anything

 1  else?

 2              MR. ELMQUIST:  Your Honor, just one last

 3  thing.  The injunctive relief that we contemplate would

 4  include all the defendants, individual defendants, Mr.

 5  Comu, Ms. Comu, Mr. Brown.  They are not here today, but

 6  based on the injunction we are seeking, we plan to

 7  including them as well.

 8              THE COURT:  Okay, good point.  It does

 9  apply to the other defendants who had notice obviously

10  of these proceedings and were represented by Mr. Olson

11  in the proceeding, all of them.  All right.  And so we

12  will -- the damages, you all, we need to address timing

13  on that.  You know what --

14              MR. ELMQUIST:  I can have a brief in a

15  week.  Your Honor.

16              THE COURT:  A brief in a week?

17              MR. ELMQUIST:  Yes.

18              THE COURT:  Okay.  And then you can have a

19  week after his brief, and then you will just have -- I

20  will have it on my tickler system to check the docket in

21  two weeks.

22              MS. HANKS:  Your Honor, I will confer with

23  Mr. Elmquist, but I am not entirely sure that it is

24  necessary to have a judgment for a particular amount of

25  damages, now that the judgment has been revoked -- I

1   mean the discharge has been revoked.  The creditors are

2   able to go forward and collect toward their claims.

3             THE COURT:  Yeah, that is only the

4   trustee's monetary damages.

5             MS. HANKS:  I understand.

6             THE COURT:  But your client has his

7   judgment.  The discharge is revoked.

8             MR. ELMQUIST:  Yeah, we will confer on

9   that.

10            MS. HANKS:  We will confer, and we will

11  address this in our amended proposed findings.

12            THE COURT:  He can pursue state law --

13            MS. HANKS:  Okay, perfect.  Thank you very

14  much.

15            MR. OLSEN:  Thank you, Your Honor.

16            (Adjournment)

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2    COUNTY OF LUBBOCK          )

3    STATE OF TEXAS             )

4           I, Cathy Sosebee, Certified Court Reporter in

5    and for the State of Texas, do hereby certify that the

6    foregoing pages contain a full, true and correct

7    transcript, to the best of my ability, of audio file

8    furnished by the United States Bankruptcy Court,

9    Northern District of Texas, Office of the Clerk.

10          Given under my hand this the 20th day of

11   October, 2014.

12

13

14                       _____/s/Cathy Sosebee_____
                         CATHY SOSEBEE, CSR, No. 612
15                       Expiration Date:  12/31/14
                         Cathy Sosebee & Associates
16                       Firm Registration No. 49
                         P. O. Box 86
17                       Lubbock, TX   79408
                         806 763-0036
18

19

20

21

22

23

24

25