UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | | | |
|---|---|---|---|
| In Re: Cengiz J. Comu | Debtor | § | Case No. 09-58820 SGJ7 |
| Cengiz J. Comu, et al | | § | |
| | Appellant | § | |
| vs. | | § | 10-03269 |
| King Louie Mining, LLC, et al | | § | |
| | Appellee | § | |

**148 Judgment revoking discharge of debtor Entered 7/8/14**
**VOLUME 10**
**APPELLEE RECORD**

David W. Elmquist – SBT #06591300
REED & ELMQUIST, P.C.
501 N. College Street
Waxahachie, TX 75165
(972) 938-7339
(972) 923-0430 (fax)

ATTORNEYS FOR DIANE REED, CHAPTER 7 TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |
| and | § |
| | § |
| PHYLLIS E. COMU, | § |
| BERNARD D. BROWN, | § |
| THE BARCLAY GROUP, INC. AND | § |
| SUNSET PACIFIC, L.P., | § |
|     Third-party Defendants. | § |

*INDEX*

**APPELLEE'S DESIGNATION OF ADDITIONAL ITEMS FOR INCLUSION IN THE
RECORD ON APPEAL** – Page 1

## APPELLEE'S DESIGNATION OF ADDITIONAL ITEMS
## FOR INCLUSION IN THE RECORD ON APPEAL

TO THE CLERK OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION:

Diane Reed, Chapter 7 Trustee, Plaintiff and Appellee herein, files this Appellee's Designation of Additional Items for Inclusion in the Record on Appeal in connection with the Notice of Appeal filed August 29, 2014 by Defendant, Cengiz J. Comu (Doc. No. 168), as follows:

| Docket No. | | Document | Filed Date |
|---|---|---|---|
| *Vol. 10* | | | |
| *002124* 1 | | Complaint to Revoke Discharge Pursuant to Section 727(d) of the United States Bankruptcy Code | 09/03/2010 |
| *002131* 27 | | Unopposed Motion for Extension of Time to File Response | 04/18/2011 |
| *002134* 52 | | Trustee's Unopposed Motion to Extend Deadline to File a Complaint in Intervention | 08/31/2012 |
| *002138* 129 | | Joint Pre-Trial Order [Proposed] | 03/04/2014 |
| *002148* 136 | | First Amended Proposed Joint Pre-Trial Order | 03/16/2014 |
| *—* 140 | | Court admitted exhibits | 03/17/2014 |
| *002177* 141 | | Trustee's Post-Trial Brief in Support of Recovery Under 11 U.S.C. § 542(a) | 03/28/2014 |
| *002182* 145 | | Plaintiffs' and Trustee's Joint Proposed Findings of Fact and Conclusions of Law | 06/16/2014 |
| *002225* 146 | | Plaintiffs' and Trustee's Brief in Support of Joint Proposed Findings of Fact and Conclusions of Law | 06/16/2014 |

Dated:  September 25, 2014.

Respectfully submitted,

REED & ELMQUIST, P.C.
501 N. College Street
Waxahachie, TX 75165
(972) 938-7339
(972) 923-0430 (fax)

By:_____/s/ David W. Elmquist_____
        David W. Elmquist – SBT #06591300

ATTORNEYS FOR DIANE REED, CHAPTER 7
TRUSTEE, PLAINTIFF/APPELLEE

## CERTIFICATE OF SERVICE

This is to certify that on September 25, 2014, a copy of the foregoing Designation was mailed to Appellant by first class mail.

Cengiz J. Comu
14873 Oaks North Place
Dallas, Texas 75254

/s/ David W. Elmquist_____
David W. Elmquist

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | CASE NO.  09-38820-sgj7 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC, AND RONALD KATZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADVERSARY NO. _____ |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO
SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE**

TO THE HONORABLE JUDGE OF SAID COURT:

King Louie Mining, LLC, King Louie Enterprises, LLC, and Ronald Katz, Plaintiffs,

pursuant to Section 727(d) of the United States Bankruptcy Code (11 U.S.C.§§101, *et seq.,* the

"Bankruptcy Code") and Rules 7001, *et seq.* of the Federal Bankruptcy Rules, complain of Debtor,

Cengiz J. Comu a/k/a CJ Comu("Debtor"), as Defendant, and hereby file this Complaint to Revoke

Discharge Pursuant to Section 727(d) of the United States Bankruptcy Code, and in support thereof

would respectfully show as follows:

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO
SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE          - PAGE 1**

## A.  PARTIES, JURISDICTION AND VENUE

1.      Plaintiff King Louie Mining, LLC, is a Delaware limited liability company with principal offices and place of business at 8 Wheatley Avenue, Albertson, New York 11507.

2.      Plaintiff King Louie Enterprises, LLC, is a Delaware limited liability company with principal offices and place of business at 8 Wheatley Avenue, Albertson, New York 11507.

3.      Ronald Katz is a resident of the State of New York and is a creditor herein.

4.      Debtor, Cengiz Jan Comu a/k/a C.J. Comu, is an individual residing in Dallas County, Texas.  Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on December 31, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), and was granted a discharge on April 14, 2010.

5.      Debtor may be served with process by serving his attorney of record in this bankruptcy case, Dennis Oliver Olson, Olson, Nicoud & Gueck, LLP, 1201 Main Street, Suite 2470, Dallas, TX 75202.

6.      This Court has jurisdiction over the parties and this controversy under 28 U.S.C. §§157 and 1334.  Although Debtor has been granted a discharge, his discharge must be set aside pursuant to 11 U.S.C. §§727(d)(1) and (2).  This adversary proceeding is a core proceeding under 28 U.S.C.§157(b)(2)(J).

7.      Venue of this proceeding is proper under 28 U.S.C.§1409.

## B.  FACTUAL BACKGROUND

8.      On January 15, 2010, Debtor filed his Schedules, Statement of Financial Affairs, Chapter 7 Individual Debtor's Statement of Intention, and Chapter 7 Statement of Current Monthly Income and Means-Test Calculation(collectively, the "Bankruptcy Filings").  On April 14, 2010,

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO**
**SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE            - PAGE 2**

in reliance upon the schedules filed by the Debtor, the Court granted a discharge.

9.     Comu was the founder and CEO of a company known as Humitech International Group, Inc. ("Humitech").  Humitech was a publicly-owned company.

10.    Comu had a long record of white-collar crimes and nefarious business practices, and is subject to a permanent injunction issued by the United States Securities and Exchange Commission ("SEC").  On November 1, 1989, the SEC entered an Order of Permanent Injunction against Comu based on his dealings with a company called Oreo Mines, Inc., prohibiting him from selling unregistered securities.  The SEC order also demanded that Comu disgorge $80,000, but waived this demand because of his inability to pay.

11.    On April 9, 1999, the State of Wisconsin – Division of Securities found that Comu had sold unregistered securities in violation of Wisconsin securities law and entered a permanent injunction barring Comu from selling unregistered securities in Wisconsin.  Also, Comu was placed on criminal probation for two years in Texas in or around the early 1990s in connection with a car leasing operation he started under the name of Transworld Leasing.  In or around 2002, Comu was investigated by the SEC in connection with his activities as chief executive officer in a company called AirTech International Group, Inc., and he invoked his Fifth Amendment right against self-incrimination during testimony taken by the SEC.

12.    Humitech was in the business of selling humidity control products for refrigeration units  to regulate humidity, reduce temperatures, and absorb odors.   The principal component of Humitech's products was a type of diatomaceous earth, which Humitech referred to as "Sorbite," contained in panels installed in the refrigeration units.

13.    In 2003, through an introduction by a mutual acquaintance,  Comu approached

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO
SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE         - PAGE 3**

Ronald Katz ("Katz") to obtain funds for Humitech to purchase the Defendants' purported mining rights. This ultimately led to Katz's company, King Louie Mining, LLC ("KLM"), lending money to Humitech for this purpose.

14.    On May 21, 2004, in a simultaneous closing, KLM loaned $3,000,000 to Humitech, and HDC purchased certain worthless mining rights for $1,940,000, and Comu received a $500,000 kickback from the seller. Although Comu owed fiduciary duties to his employer, Humitech, and its lender, KLM, to fully disclose such kickback, he fraudulently withheld such information.

15.    For years, Comu has operated, as his alter ego, a partnership known as Sunset Pacific, LP, to shield his assets from creditors, knowing that eventually he would be sued for the fraudulent practices he conducted on a routine basis. On information and belief, Comu caused the $500,000 kickback to be paid to Sunset Pacific, thereby diverting the fruits of his illegal actions into this alter ego of his to shield it from those whom he had defrauded.

16.    Throughout his tenure at Humitech, Comu diverted monies from the company for his own use and benefit, causing substantial damages to the corporation and its shareholders. As a result of his fraudulent conduct and mismanagement of Humitech, it defaulted on its obligations to King Louie Mining, causing over $2,000,000 in damages to KLM.

17.    On April 30, 2009, KLM obtained a Judgment in New York state court against Comu for a total of $2,279,265.16. KLM subsequently domesticated this as a Texas judgment, and was pressing for postjudgment discovery from Comu when he filed this bankruptcy proceeding.

18.    At the First Meeting of Creditors herein, Comu testified that he had fully disclosed his assets and liabilities on his Schedules. He further claimed that his interest in certain corporations, partnerships, and other entities was correctly disclosed in his Schedules.

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO
SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE          - PAGE 4**

19. In truth and in fact, however, Plaintiffs have determined that Comu has hidden, through a complex corporate structure involving Sunset Pacific, and a company that he controls through his control of Sunset Pacific, known as The Barclay Group, numerous business interests, valuable stock, and other assets. Although other people, including Comu's wife, are listed as having controlling interests in Sunset Pacific and The Barclay Group, Comu actually directs and controls such entities for his personal use and benefit.

20. Among other things, Comu transferred nominal controlling interests in Sunset Pacific, L.P., to his wife for no consideration, and has utilized his wife as a front for continuation of his management of assets which he indirectly owns and controls, in an effort to hide the same from his creditors. At the time of such transfer, there were numerous claims pending against Comu. The interests in Sunset Pacific were transferred to his wife, on information and belief, for no value, and were for the purpose and intent of defrauding creditors, in violation of 11 U.S.C. §544(b)(1) and the Texas Uniform Fraudulent Transfer Act ("TUFTA"), specifically §24.005(a)(1), TEX. BUS. AND COMM. CODE.

21. Plaintiffs were not aware of these fraudulent transfers, hidden assets and employment positions of Comu prior to the Discharge herein. Such assets and fraudulent transfers were material and materially impacted the true net worth of the Debtor, and were fraudulently concealed in violation of law.

22. On information and belief, through his control of The Barclay Group, Comu has hidden substantial assets and has failed properly and fully to disclose the full extent of such assets, and the fact that he actually controls The Barclay Group for his own use and benefit. He has concealed interests in various business enterprises owned through The Barclay Group which should

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO**
**SECTION 727(d) OF THE UNITED STATES BANKRUPTCY CODE          - PAGE 5**

have been fully disclosed herein.

## COUNT I.

23.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 22 above as if the same were fully set forth herein.

24.     Debtor has committed fraud by concealing and failing to disclose assets and sources of income which he was required by law to disclose, and has obtained a discharge by fraud.

25.     This Complaint is being filed within one year after the date of discharge.  Plaintiffs are, therefore, entitled to an Order of this Court revoking the Debtor's discharge, pursuant to 11 U.S.C. §727(e)(1), and declaring that all assets of Sunset Pacific and The Barclay Group shall be considered assets of the Debtor.  Plaintiffs further pray for an order revoking all fraudulent transfers of the Debtor's assets, pursuant to 11 U.S.C. §544(b)(1) and the Texas Uniform Fraudulent Transfer Act ("TUFTA"), §24.005(a)(1), TEX. BUS. AND COMM. CODE.

26.     Plaintiffs further request recovery of their reasonable and necessary attorney fees, expert witness fees, costs for copies of deposition, and costs of court for all proceedings in the Bankruptcy Court, the District Court, the Court of Appeals, and the Supreme Court.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that, upon final judgment of the Court herein, that judgment be entered against Defendant Debtor revoking his discharge, that all fraudulent transfers be revoked, and that Plaintiffs recover their reasonable attorney's fees for all proceedings in the Bankruptcy Court, the District Court, the Court of Appeals, and the Supreme Court, and that Plaintiffs recover their costs of court, and general relief.

Respectfully submitted,

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO**
**SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE          - PAGE 6**

**LAW OFFICES OF LIPPE & ASSOCIATES**

By:      /s/  Emil Lippe, Jr.
            Emil Lippe, Jr.
            State Bar No. 12398300
            Law Offices of Lippe & Associates
            Plaza of the Americas, South Tower
            600 N. Pearl Street, Suite S2460
            Dallas, Texas  75201
            Telephone:      (214) 855-1850
            Facsimile:      (214) 720-6074
            Email:          emil@texaslaw.com

            ATTORNEYS  FOR  PLAINTIFFS  KING  LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC, AND RONALD KATZ

**COMPLAINT TO REVOKE DISCHARGE PURSUANT TO**
**SECTION 727(d)  OF THE UNITED STATES BANKRUPTCY CODE          - PAGE 7**

002130

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| IN RE: | § § § | CHAPTER 7 |
| CENGIZ J. COMU a/k/a CJ COMU, | § § § § | CASE NO.  09-38820-sgj7 |
| Debtor. | § | |

---

|  |  |  |
|---|---|---|
| KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC, AND RONALD KATZ, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | ADVERSARY NO. 10-03269-sgj |
| CENGIZ J. COMU a/k/a CJ COMU, | § § § | |
| Defendant. | § | |

**UNOPPOSED MOTION FOR EXTENSION
OF TIME TO FILE RESPONSE**

TO THE HONORABLE STACEY G.C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs King Louie Mining, LLC, King Louie Enterprises, LLC, and Ronald Katz, hereby

file this their motion for extension of time to response to Defendant CJ Comu's Third Motion to

Dismiss Complaint, and state the following.

1.      Plaintiffs move that the Court grant an extension of time to respond to Defendant C.J.

Comu's Third Motion to Dismiss Complaint, up to and including April 28, 2011, due to counsel's

involvement in emergency matters which make it impossible to finalize the necessary instruments.

2.      This motion is not being made for delay only but so that justice may be done.

**UNOPPOSED MOTION FOR EXTENSION
OF TIME TO FILE RESPONSE – Page 1**

WHEREFORE, Plaintiffs King Louie Mining, LLC, and King Louie Enterprises, LLC, and Ronald Katz, pray that the Court extend the time, up to and including April 28, 2011, to submit Plaintiffs' response to C.J. Comu's Third Motion to Dismiss Complaint,  and that Plaintiffs be granted general relief.

Respectfully submitted,

**LAW OFFICES OF LIPPE & ASSOCIATES**

By:    /s/  Emil Lippe, Jr.
Emil Lippe, Jr.
State Bar No. 12398300
Law Offices of Lippe & Associates
Plaza of the Americas, South Tower
600 N. Pearl Street, Suite S2460
Dallas, Texas  75201
Telephone:    (214) 855-1850
Facsimile:    (214) 720-6074
Email:        emil@texaslaw.com

ATTORNEYS FOR PLAINTIFFS KING LOUIE MINING, LLC, KING LOUIE ENTERPRISES, LLC, AND RONALD KATZ

**UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE RESPONSE – Page 2**

002132

## CERTIFICATE OF CONFERENCE

The undersigned certifies that he has conferred with counsel of record for the Defendant concerning the substance of the motion, and has been advised that this motion is unopposed.

Signed this _____ day of April, 2011.


/s/ Emil Lippe, Jr. _____


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this __18th__ day of April, 2011, I electronically submitted the foregoing document with the Clerk of the Court for the U.S. Bankruptcy Court, Northern District of Texas, using the electronic case filing system of the Court, which will then send a notification of such filing to the following:

Dennis Olson
Olson, Nicoud & Gueck, L.L.P.
1201 Main St., Ste 2470
Dallas, TX 75202


_/s/_ Emil Lippe, Jr. _____
Emil Lippe, Jr.


**UNOPPOSED MOTION FOR EXTENSION
OF TIME TO FILE RESPONSE – Page 3**

David W. Elmquist - SBT #06591300
Tina E. Tuccelli – SBT #24042067
**REED & ELMQUIST, P.C.**
604 Water Street
Waxahachie, Texas 75165
(972) 938-7339
1+(972) 923-0430 (fax)

**ATTORNEYS FOR DIANE G. REED,
CHAPTER 7 TRUSTEE FOR CENGIZ J. COMU**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
| | § | |
| Defendant. | § | |

**TRUSTEE'S UNOPPOSED MOTION TO EXTEND DEADLINE TO FILE A
COMPLAINT IN INTERVENTION**

Diane G. Reed, Chapter 7 Trustee of the estate of Cengiz J. Comu, Defendant herein (the

"Trustee"), files this Unopposed Motion to Extend Deadline to File a Complaint in Intervention, and

in support thereof would show the Court as follows:

1.     This adversary proceeding was commenced on September 3, 2010.

002134

2.       On August 24, 2011, the Trustee filed an agreed motion to abate the Adversary Proceeding (the "Motion to Abate"). An agreed order on the Motion to Abate was entered on August 31, 2011, abating the Adversary Proceeding until further order of the Court.

3.       On May 2, 2012, a status conference was held in the Adversary Proceeding during which the Court further considered the Motion to Abate. The parties agreed to continue to abate the Adversary Proceeding and a supplemental order was entered on May 24, 2012 abating the Adversary Proceeding until August 1, 2012.

4.       This Court conducted another status conference on July 31, 2012 following which this Court entered on August 7, 2012 its Order Terminating Abatement of Adversary Proceeding and Requiring: (A) Trustee's Complaint in Intervention to be Filed by 8/31/2012; and (B) Parties to Upload Agreed Scheduling Order, or in the Alternative, Court Will Enter its Own Scheduling Order [Docket No. 50] (the "Order Terminating Abatement"). The Order Terminating Abatement set a deadline of August 31, 2012, among other things.

5.       The purpose of the Motion to Abate was to provide the Trustee's counsel the time needed to conduct a Bankruptcy Rule 2004 examination of the Debtor. Pursuant to an order of this Court, the Bankruptcy Rule 2004 examination of the Debtor was commenced on November 30, 2011. As a result of such exam, numerous documents were requested from the Debtor by the undersigned counsel to the Trustee and they were slow in forthcoming. The Debtor's Bankruptcy Rule 2004 examination resumed and concluded on August 8, 2012. The Debtor's exam and the documents produced prompted the need for three subsequent Bankruptcy Rule 2004 examinations of persons connected to the Debtor.

6.       The continued examination of the Debtor, the subsequent exams, and the review of documents both pre- and post-exam in connection therewith, took longer than anticipated. The

002135

undersigned counsel has just now received all the requested documents and requires additional time for the preparation of a complaint in intervention.

7.     The Trustee submits that good cause exists to warrant a short extension of the deadline to file a complaint in intervention until September 5, 2012. The Trustee is not seeking an extension of any of the other deadlines set forth in the Order Terminating Abatement.

8.     Plaintiffs and Defendant do not oppose this request for extension of the August 31, 2012 deadline for the filing of a complaint in intervention as evidenced by the certificate of conference below.

WHEREFORE, Diane G. Reed, Trustee respectfully requests that the Court extend the deadline for the Trustee to file a complaint in intervention until September 5, 2012, and grant the Trustee such other and further relief to which she may be entitled.

Dated: August 31, 2012.

Respectfully submitted,

**REED & ELMQUIST, P.C.**
604 Water Street
Waxahachie, TX 75165
(972) 938-7339
1+(972) 923-0430 (fax)

By:/s/ David W. Elmquist
          David W. Elmquist – SBT #06591300
          Tina E. Tuccelli – SBT #24042067

**ATTORNEYS FOR DIANE REED, TRUSTEE
FOR THE ESTATE OF CENGIZ J. COMU**

## CERTIFICATE OF CONFERENCE

The undersigned counsel for the Trustee certifies that prior to the filing of this Motion he conferred by email with Dennis Olson, counsel to Defendant, and Emil Lippe, counsel to Plaintiffs, who both stated they are unopposed to the extension requested herein.

/s/ David W. Elmquist
David W. Elmquist

002136

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 31, 2012, a true and correct copy of the foregoing Motion was served electronically on counsel to Plaintiffs and Defendant in this case.

*/s/ David W. Elmquist*
David W. Elmquist

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

---

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

---

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |
| and | § |

|  |  |  |
|---|---|---|
| PHYLLIS E. COMU, | § | |
| BERNARD D. BROWN, | § | |
| THE BARCLAY GROUP, INC. AND | § | |
| SUNSET PACIFIC, L.P., | § | **Trial Docket Call: March 4, 2014** |
| Third-party Defendants. | § | **at 2:30 p.m.** |

### JOINT PRE-TRIAL ORDER [PROPOSED]

Pursuant to the Agreed Amended Scheduling Order entered December 9, 2013 (Docket No. 106), King Louie Mining, LLC ("KLM"), King Louie Enterprises, LLC ("KLE"), and Ronald Katz ("Katz;" jointly the "Plaintiffs"), Diane G. Reed, Trustee (the "Trustee"), Intervenor, Co-Plaintiff and Third-Party Plaintiff herein, and Cengiz J. Comu ("Comu"), Phyllis E. Comu, Bernard D. Brown ("Brown"), The Barclay Group, Inc. ("TBG"), and Sunset Pacific, L.P. ("Sunset Pacific;" collectively the "Third-Party Defendants;" collectively with the Debtor, the "Defendants"), file this proposed Joint Pre-Trial Order as follows:

1. **Summary of the Claims and Defenses of Each Party**

    a. **Plaintiffs' Contentions:**

    Plaintiffs seek revocation of discharge pursuant to 11 U.S.C. § 727(d)(1), due to "fraud of the debtor," and under §727(d)(2), due to Comu's failure to report or deliver property of the estate. Plaintiffs contend that Comu, through intentional fraudulent conduct, using TBG and other entities under his control as conduits and fronts to orchestrated a scheme to conceal his assets, business interests, and professional affiliations – both pre-petition and post-petition – in a manner that created an illusion of indebtedness, and enabled Comu to receive, enjoy, and dissipate substantial assets that constituted property of the bankruptcy estate.

    Pursuant to § 727(d)(1), Plaintiffs seek revocation on two grounds: (a) undisclosed pre-petition assets, and (b) false oaths. First, Plaintiffs contend that revocation of discharge is warranted because Comu, with fraudulent intent, failed to disclose substantial pre-petition assets and valuable interests that were material to the bankruptcy estate.

Second, Plaintiffs seek revocation under § 727(d)(1) due to Comu's false and misleading statements, incomplete or inaccurate disclosures, and omissions of material information subject to the Bankruptcy Code's mandatory and continuing disclosure requirements, which were made in Comu's Schedules and Statement of Financial Affairs (as well as in the failure to amend or supplement such filings with complete and accurate information), in addition to other deliberately false and misleading statements and omissions made by Comu during the course of the bankruptcy proceedings. Comu's misrepresentations and omissions were made knowingly and with fraudulent intent, and were material to the bankruptcy estate.

Plaintiffs contend in support of both grounds from revocation under § 727(d)(1) that they did not know of Comu's fraud until after discharge, and that Comu's deliberate concealment and partial disclosure of misleading information regarding his assets and business activities prevented the Trustee and Comu's creditors from discovering Comu's fraudulent conduct before discharge.

Finally, Plaintiffs seek revocation under § 727(d)(2) because Comu acquired property of the estate, or became entitled to acquire property that would be property of the estate, and Comu knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the Trustee.

In support of their revocation claims, Plaintiffs contend that Comu falsified or exaggerated debts on his Schedules, and deliberately omitted or misrepresented valuable assets and business interests at the commencement of his bankruptcy case, in order to convey a false impression that he was unable to pay the claims of his creditors. Plaintiffs further contend that Comu intentionally failed to disclose or deliberately misled his creditors regarding his professional involvement and substantial valuable interests (whether direct or indirect, immediate or equitable) in TBG and Sunset Pacific, Marathon Management, TKY Trust, DAPTCO Trust, Regus Advisors,

Inc., Global Energy Technology Group, EuroCap Investments, Green Automotive Company Corporation f/k/a GANAS, Corp. and other entities, affiliates, projects and accounts created or controlled by Comu, or utilized by Comu for the purposes of concealing, transferring, and dissipating assets of the estate.   Plaintiffs contend that Comu created and/or used these and other entities, accounts and affiliates to receive, conceal, transfer, dissipate and liquidate millions of shares of stock and other assets that should have been included in the bankruptcy estate.

**b.**     **The Trustee's Contentions:**

In her Complaint in Intervention the Trustee has asserted three causes of action:  a request for several declaratory judgments (count 1); imposition of reverse corporate veil piercing as to TBG and Sunset Pacific (count 2); and turnover of property of the estate (count 3).

**Count 1 (Declaratory Judgment)**

The Trustee contends and seeks a declaratory judgment that the 300,000 shares of Ganas Corp. stock issued to Comu on January 13, 2010 (the "Comu Green Auto Stock") is property of the Comu bankruptcy estate because Comu was entitled to receive these shares as of December 31, 2009, the date his bankruptcy case was commenced (the "Petition Date").

The Trustee further contends that Comu is the *de facto* owner of TBG.  This contention is based on the fact that the transaction that supposedly gave rise to the 99% shareholder interest of Brown & Lampe, PLC ("Brown & Lampe"), purportedly a United Kingdom corporation, is a sham.

The Trustee further contends and is entitled to a declaratory judgment that TBG is the alter ego of Comu.  This contention is based on the fact that from at least 2009 to the present Comu has completely dominated and controlled the business and affairs of TBG and that Comu utilized TBG as an instrument or means to hinder, delay or defraud his creditors.

The Trustee further contends and is entitled to a declaratory judgment that Phyllis Comu's purported ninety-eight percent (98%) limited partnership interest in Sunset Pacific is property of the Comu bankruptcy estate pursuant to § 541(a)(2)(A).  This contention is based on the fact that this partnership interest was and is under the exclusive control of Comu or, alternatively, under the joint management and control of Comu and Phyllis Comu.

The Trustee further contends and is entitled to a declaratory judgment that the assets of TBG that existed as of the Petition Date were and are property of the Comu bankruptcy estate. This contention is based upon the fact that prior to the commencement of this case Comu utilized TBG as an instrument or means to hinder, delay or defraud his creditors.

## Count 2 (Reverse Corporate Veil Piercing)

The Trustee contends there is a legal basis to reverse-veil pierce TBG (*i.e.*, to hold it liable for the debts of Comu) on the grounds that this entity is the alter ego of Comu; that there is such unity between Comu and TBG that the separate corporate existence of TBG does not exist; and that TBG was used as a means to hinder, delay or defraud Comu's creditors, including, in particular, the Plaintiffs in this adversary proceeding.

The Trustee likewise contends there is a legal basis to reverse-veil pierce Sunset Pacific (*i.e.*, to hold it liable for the debts of Comu) on the grounds that this entity is the alter ego of Comu; that there is such unity between Comu and Sunset Pacific that the separate corporate existence of Sunset Pacific does not exist; and that Sunset Pacific was used as a means to hinder, delay or defraud Comu's creditors, including, in particular, the Plaintiffs in this adversary proceeding.

## Count 3 (Turnover of Property of the Estate)

The Trustee is entitled to an order pursuant to § 542 of the Bankruptcy Code directing the turnover of all property and assets of TBG and Sunset Pacific that still exist.  In

addition, to the extent the assets of TBG and/or Sunset Pacific have been sold or otherwise disposed of since the Petition Date, the Trustee is entitled to a judgment against Comu, TBG and Sunset Pacific, jointly and severally, for the value of the assets that existed on the Petition Date and that are not turned over to the Trustee because they have been sold or otherwise disposed of by Comu.

      c.    **Defendants' Contentions:**

      1.    **Response to Plaintiffs' Claims.**

Plaintiffs missed the deadline to object to Comu's discharge, and the Plaintiffs have sued their former attorney for missing the deadline. Plaintiffs cannot demonstrate a basis to revoke Comu's discharge. Plaintiffs lack standing to pursue the transfers which they want to pursue.

      2.    **Response to Trustee's Claims.**

Defendants deny that the Trustee is entitled to the declaratory relief, reverse corporate veil piercing and property turnovers sought in the Trustee's complaint.

      3. To the extent that Plaintiffs' contentions or the Trustee's contentions stated herein are not supported by their respective Complaints, Defendants do not agree that this Pretrial Order permits an amendment of their respective Complaints or permits the trial of issues unsupported by their respective Complaints.

**2.**    **Stipulations of Fact**

[On or before March 14, 2014, the parties will amend this pre-trial order to include stipulations of fact.]

**3.**    **Contested Issues of Fact**

      1)    Were the material terms and conditions of the Merger Agreement and Plan of Reorganization dated as of November 4, 2009, by and among Ganas, Go Green, and solely for

the purpose of Section 1.12 of the agreement TBG (the "Merger Agreement"), satisfied as of the Petition Date?

2)       Were all of the consulting fees paid by TBG paid to Comu through one or more business entities that Comu owns and/or controls, including but not limited to Marathon Management Limited Company ("Marathon") and Regus Advisors, Inc. ("Regus")?

3)       As the sole officer and director of TBG has Comu completely dominated and controlled the business activities of TBG?

4)       As the sole officer and director of Sunset Pacific has Comu completely dominated and controlled the business activities of Sunset Pacific?

5)       What is the total amount of income received by TBG from its sales of the Green Automotive Company, Inc. ("Green Automotive") stock?

6)       Has all or substantially all of the income received by TBG from the sale of Green Automotive stock been transferred to Comu, or to entities he owns and/or controls?

To the extent that any of the above foregoing issues of fact constitute issues of law, they are deemed issues of law and shall be incorporated herein as such.

**4.    Stipulations of Law**

1)       This Court has jurisdiction over this adversary proceeding and the parties to this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2)       The claims asserted in this proceeding concern the administration of the Debtor's bankruptcy estate and are, therefore, core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A).

3)       Venue for this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409.

5.    **Contested Issues of Law**

1)    Was TBG used by Comu as a means to hinder, delay or defraud the payment of Comu's creditors?

2)    Was Sunset Pacific used by Comu as a means to hinder, delay or defraud Comu's creditors?

3)    Is TBG the alter ego of Comu?

4)    Is Comu the *de facto* owner of TBG?

5)    Is Sunset Pacific the alter ego of Comu?

6)    Is Phyllis Comu's purported ninety-eight percent (98%) limited partnership interest in Sunset Pacific property of the Comu bankruptcy estate pursuant to § 541(a)(2)(A)?

7)    Was Phyllis Comu's partnership interest in Sunset Pacific under the joint management and control of Comu and Phyllis Comu?

8)    Is the Comu Green Automotive stock property of the bankruptcy estate?

9)    Were the assets of TBG as of the Petition Date property of the Comu bankruptcy estate?

10)    Were the assets of Sunset Pacific as of the Petition Date property of the Comu bankruptcy estate?

11)    Does a substantial controversy exist with respect to the declaratory relief sought by the Trustee?

12)    Is the Trustee seeking to establish ownership rights and interests in TBG which are inconsistent with the ownership claims of Comu and Phyllis Comu?

13)    Is there such unity between Comu and TBG that the separate corporate existence of TBG does not exist?

14)     Is there such unity between Comu and Sunset Pacific that the separate corporate existence of Sunset Pacific does not exist?

15)     Is the Trustee entitled to the remedy of reverse-veil piercing of the corporate veil of TBG?

16)     Is the Trustee entitled to the remedy of reverse-veil piercing of the business entity veil of Sunset Pacific?

17)     Is the Trustee entitled to a judgment directing the turnover of all property and assets of TBG that still exist pursuant to 11 U.S.C. § 542?

18)     Is the Trustee entitled to a judgment directing the turnover of all property and assets of Sunset Pacific that still exist pursuant to 11 U.S.C. § 542?

19)     To the extent the assets of TBG and/or Sunset Pacific have been sold or otherwise disposed of since the Petition Date, is the Trustee entitled to a judgment against Comu, TBG and Sunset Pacific, jointly and severally for the value of the assets that existed on the Petition Date?

To the extent that any of the above foregoing issues of law constitute issues of fact, they are deemed issues of fact and shall be incorporated herein as such.

**6.    Estimated Length of Trial**

The Plaintiffs, Intervenor and Defendants estimate the trial of this adversary proceeding will take five (5) days.

**7.    Additional Matters That May Require the Court's Attention and/or Aid in the Disposition of the Action**

None.

### END OF ORDER ###

**SUBMITTED BY:**

**REED & ELMQUIST, P.C.**
501 N. College Street
Waxahachie, TX 75165
(972) 938-7339
(972) 923-0430 (fax)


By */s/  David W. Elmquist*_____
    David W. Elmquist, SBT #06591300

**ATTORNEYS FOR DIANE G. REED, TRUSTEE**


**OLSON NICOUD & GUECK, L.L.P.**
1201 Main Street, Suite 2470
Dallas, Texas 75202
(214) 979-7302
(214) 979-7301 (fax)


By */s/  Dennis Olson* (*with permission)*_____
    Dennis Olson, SBT #15273500

**ATTORNEYS FOR DEFENDANTS**

**GREENBERG TRAURIG, LLP**
300 West 6th Street, Suite 2050
Austin, TX 78701
(512) 320-7200
(512) 320-7210 (fax)


By: *Kendyl T. Hanks* (*with permission)*_____
    Kendyl T. Hanks, SBT #24032273

**ATTORNEYS FOR PLAINTIFFS**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

---

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

---

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
|     Intervenor, Co-plaintiff and | § |
|     Third-party Plaintiff, | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
|     Defendant, | § |
| | § |

002148

and                                          §
                                             §
PHYLLIS E. COMU,                             §
BERNARD D. BROWN,                            §
THE BARCLAY GROUP, INC. AND                  §
SUNSET PACIFIC, L.P.,                        §        **Trial Setting: March 17, 2014**
        Third-party Defendants.              §        **at 9:30 a.m.**

## <u>FIRST AMENDED PROPOSED JOINT PRE-TRIAL ORDER</u>

Plaintiffs King Louie Mining, LLC ("KLM"), King Louie Enterprises, LLC ("KLE"),

and Ronald Katz ("Katz;" jointly with KLM and KLE the "Plaintiffs"), Diane G. Reed, Trustee,

Intervenor, Co-Plaintiff and Third-Party Plaintiff herein (the "Trustee"), and Debtor Cengiz J.

Comu a/k/a CJ Comu ("Comu" or "Debtor"), Phyllis E. Comu ("Phyllis Comu"), Bernard D.

Brown ("Brown"), Barclay Group, Inc. a/k/a The Barclay Group, Inc. ("TBG"), and Sunset

Pacific, L.P. ("Sunset Pacific;" collectively the "Third-Party Defendants;" collectively with the

Debtor, the "Defendants"), file this First Amended Proposed Joint Pre-Trial Order as follows:

1.      **<u>Summary of the Claims and Defenses of Each Party</u>**

        a.      **<u>Plaintiffs' Contentions:</u>**

Plaintiffs seek revocation of discharge pursuant to 11 U.S.C. § 727(d)(1), due to "fraud of

the debtor," and under §727(d)(2), due to Comu's failure to report or deliver property of the estate.

Plaintiffs contend that Comu, through intentional fraudulent conduct, and using TBG and other

entities under his control as conduits and fronts, orchestrated a scheme to conceal his assets,

business interests, and professional affiliations – both pre-petition and post-petition – in a manner

that created an illusion of indebtedness, and enabled Comu to receive, enjoy, and dissipate

substantial assets that constituted property of the bankruptcy estate.

Pursuant to § 727(d)(1), Plaintiffs seek revocation on two grounds: (a) undisclosed pre-

petition assets, and (b) false oaths.  First, Plaintiffs contend that revocation of discharge is warranted

002149

because Comu, with fraudulent intent, failed to disclose substantial pre-petition assets and valuable interests that were material to the bankruptcy estate.

Second, Plaintiffs seek revocation under § 727(d)(1) due to Comu's false and misleading statements, incomplete or inaccurate disclosures, and omissions of material information subject to the Bankruptcy Code's mandatory and continuing disclosure requirements, which were made in Comu's Schedules and Statement of Financial Affairs (as well as in the failure to amend or supplement such filings with complete and accurate information), in addition to other deliberately false and misleading statements and omissions made by Comu during the course of the bankruptcy proceedings.  Comu's misrepresentations and omissions were made knowingly and with fraudulent intent, and were material to the bankruptcy estate.

Plaintiffs contend in support of both grounds for revocation under § 727(d)(1) that they did not know of Comu's fraud until after discharge, and that Comu's deliberate concealment and partial disclosure of misleading information regarding his assets and business activities prevented the Trustee and Comu's creditors from discovering Comu's fraudulent conduct before discharge.

Finally, Plaintiffs seek revocation under § 727(d)(2) because Comu acquired property of the estate, or became entitled to acquire property that would be property of the estate, and Comu knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the Trustee.

In support of their revocation claims, Plaintiffs contend that Comu falsified or exaggerated debts on his Schedules, and deliberately omitted or misrepresented valuable assets and business interests at the commencement of his bankruptcy case, in order to convey a false impression that he was unable to pay the claims of his creditors. Plaintiffs further contend that Comu intentionally failed to disclose or deliberately misled his creditors regarding his professional involvement and substantial valuable interests (whether direct or indirect, immediate or equitable) in TBG and Sunset

Pacific, Marathon Management, TKY Trust, DAPTCO Trust, Regus Advisors, Inc., Global Energy Technology Group, EuroCap Investments, Green Automotive Company Corporation f/k/a GANAS, Corp., and other entities, affiliates, projects and accounts created or controlled by Comu, or utilized by Comu for the purposes of concealing, transferring, and dissipating assets of the estate.  Plaintiffs contend that Comu created and/or used these and other entities, accounts and affiliates to receive, conceal, transfer, dissipate and liquidate millions of shares of stock and other assets that should have been included in the bankruptcy estate.

  **b.**  <u>**The Trustee's Contentions:**</u>

   In her Complaint in Intervention the Trustee has asserted three causes of action:  a request for several declaratory judgments (count 1); imposition of reverse corporate veil piercing as to TBG and Sunset Pacific (count 2); and turnover of property of the estate (count 3).

      <u>**Count 1 (Declaratory Judgment)**</u>

   The Trustee contends and seeks a declaratory judgment that the 300,000 shares of GANAS, Corp. ("Ganas") stock certificate issued to Comu on January 13, 2010 (the "Comu Green Auto Stock") is property of the Comu bankruptcy estate because Comu was entitled to receive these shares as of December 31, 2009, the date this bankruptcy case was commenced (the "Petition Date").

   The Trustee further contends that Comu is the *de facto* owner of TBG.  This contention is based on the fact that the transaction that supposedly gave rise to the 99% shareholder interest of Brown & Lampe, PLC ("B&L"), purportedly a United Kingdom corporation, is a sham.

   The Trustee further contends and is entitled to a declaratory judgment that TBG is the alter ego of Comu.  This contention is based on the fact that from at least 2009 to the present Comu has completely dominated and controlled the business and affairs of TBG and that Comu utilized TBG as an instrument or means to hinder, delay or defraud his creditors.

The Trustee further contends and is entitled to a declaratory judgment that Phyllis Comu''s purported ninety-eight percent (98%) limited partnership interest in Sunset Pacific is property of the Comu bankruptcy estate pursuant to § 541(a)(2)(A). This contention is based on the fact that this partnership interest was and is under the exclusive control of Comu or, alternatively, under the joint management and control of Comu and Phyllis Comu.

The Trustee further contends and is entitled to a declaratory judgment that the assets of TBG that existed as of the Petition Date were and are property of the Comu bankruptcy estate. This contention is based upon the fact that prior to the commencement of this case Comu utilized TBG as an instrument or means to hinder, delay or defraud his creditors.

## Count 2 (Reverse Corporate Veil Piercing)

The Trustee contends there is a legal basis to reverse-veil pierce TBG (*i.e.*, to hold it liable for the debts of Comu) on the grounds that this entity is the alter ego of Comu; that there is such unity between Comu and TBG that the separate corporate existence of TBG does not exist; and that TBG was used as a means to hinder, delay or defraud Comu's creditors, including, in particular, the Plaintiffs in this adversary proceeding.

The Trustee likewise contends there is a legal basis to reverse-veil pierce Sunset Pacific (*i.e.*, to hold it liable for the debts of Comu) on the grounds that this entity is the alter ego of Comu; that there is such unity between Comu and Sunset Pacific that the separate corporate existence of Sunset Pacific does not exist; and that Sunset Pacific was used as a means to hinder, delay or defraud Comu's creditors, including, in particular, the Plaintiffs in this adversary proceeding.

## Count 3 (Turnover of Property of the Estate)

The Trustee is entitled to an order pursuant to § 542 of the Bankruptcy Code directing the turnover of all property and assets of TBG and Sunset Pacific that still exist. In

addition, to the extent the assets of TBG and/or Sunset Pacific have been sold or otherwise disposed of since the Petition Date, the Trustee is entitled to a judgment against Comu, TBG and Sunset Pacific, jointly and severally, for the value of the assets that existed on the Petition Date and that are not turned over to the Trustee because they have been sold or otherwise disposed of by Comu.

      c.    **Defendants' Contentions:**

      1.    **Response to Plaintiffs' Claims.**

Plaintiffs missed the deadline to object to Comu's discharge, and the Plaintiffs have sued their former attorney for missing the deadline. Plaintiffs cannot demonstrate a basis to revoke Comu's discharge. Plaintiffs lack standing to pursue the transfers which they want to pursue.

      2.    **Response to Trustee's Claims.**

Defendants deny that the Trustee is entitled to the declaratory relief, reverse corporate veil piercing and property turnovers sought in the Trustee's complaint.

      3.    To the extent that Plaintiffs' contentions or the Trustee's contentions stated herein are not supported by their respective Complaints, Defendants do not agree that this Pretrial Order permits an amendment of their respective Complaints or permits the trial of issues unsupported by their respective Complaints.

**2.**    **Stipulations of Fact**

The Parties stipulate to the following facts:

1)    Plaintiffs KLM and KLE are privately-held Delaware limited liability companies. Plaintiff Katz, a resident of the State of New York, owns 75% of KLM and 100% of KLE.

2)    Defendant Comu is a Canadian citizen and resident of Dallas, Texas, and the Debtor in Bankruptcy Case No. 09-38820-sgj7 (the "Bankruptcy Case").

3)    The Trustee is the duly appointed Chapter 7 Trustee in the Bankruptcy Case for the Comu bankruptcy estate.

002153

4)      On July 20, 2006, Plaintiffs Katz, KLM and KLE commenced an action in the Supreme Court of the State of New York, County of New York to recover damages against Comu for, among other things, common law fraud and securities fraud, *Humitech Int'l Group, Inc., et al. v. Comu, et al*, Index No. 06-602567 (the "New York Action"). (KLM Exhibit 1; KLM Exhibit 340.)

5)      After the commencement of the New York Action, Comu defended Plaintiffs' claims by filing, *inter alia*, a verified motion to dismiss (KLM Exhibit 338), verified answers asserting various affirmative defenses to Plaintiffs' claims (KLM Exhibit 339; KLM Exhibit 341), and affirmative counterclaims for breach of fiduciary duty and tortious interference contract, seeking $1 million in actual damages, plus punitive damages (KLM Exhibit 339).  (*See also* KLM Exhibit 2.)

6)      Comu did not appear for trial in the New York Action, which was set in Febrary, 2009.  The court in the New York Action signed a default judgment against Comu on April 30, 2009, awarding the Plaintiffs obtained a judgment against Comu in the aggregate amount of $2,279,265.16 (the "New York Judgment").   (KLM Exhibit 3.)   The New York Judgment was entered on June 9, 2009.  (*Id.*)

7)      On June 2, 2009, Plaintiffs commenced a new Texas state court action against Comu in Dallas, Texas seeking to collect on the New York Judgment (the "Texas Domestication Action").   *King Louie Mining, LLC, et. al v. Cengiz Jan Comu*, Cause No. 09-0680891, in the 134th Judicial District Court, Dallas County, Texas. (KLM Exhibit 4; *see also* KLM Exhibit 5.)

8)      Plaintiffs filed a Motion to Compel in the Texas Domestication Action on November 23, 2009, which was set for hearing on December 14, 2009.  (KLM Exhibit 6.)  The court entered an agreed order granting the Motion to Compel, awarding $350 for Plaintiffs' fees

incurred with respect to the motion, and ordering Comu to appear for deposition on January 5, 2010.  (KLM Exhibit 7.)

9)      Comu filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the Bankruptcy Case on December 31, 2009 (the "Petition Date").  (Bankr. Doc. No. 1.)

10)     On January 4, 2010, Comu filed a "Suggestion of Bankruptcy" staying the Texas Domestication Action pursuant to 11 U.S.C. § 362.  (KLM Exhibit 8.)

11)     KLM, KLE and Katz each timely filed claims in the Bankruptcy Case, seeking to recover their share of the New York Judgment from the bankruptcy estate.  (Bankr. Claims No. 2-1, 3-1, and 4-1.)  Plaintiffs' claims represent approximately 95% of the claims filed in this case.

12)     On January 15, 2010 Comu filed his bankruptcy schedules (the "Schedules"), Statement of Financial Affairs ("SOFA"), Chapter 7 Individual Debtor's Statement of Intention, and Chapter 7 Statement of Current Monthly Income and Means-Test Calculation ("Statement of Current Monthly Income") (collectively, the "Bankruptcy Filings").

13)     On April 14, 2010, the Debtor was granted a discharge (the "Discharge").

14)     In Comu's Schedule B he listed a one percent (1%) ownership interest in TBG, and listed Brown as the other ninety-nine percent (99%) owner.  In the Answer to the Trustee's Complaint in Intervention, Defendants alleged the other ninety-nine percent (99%) owner of TBG is B&L, which Defendants alleged is a "United Kingdom Corporation."

15)     TBG was incorporated on or about March 7, 1996 by John Potter ("Potter").  The original Directors of TBG, as listed in the Articles of Incorporation, are Comu and Potter.  (KLM Exhibit 24.)

16)     On or about February 11, 2000, the Texas Secretary of State ("SOS") forfeited TBG's authority to transact business in Texas due to TBG's failure to file franchise tax returns and/or to pay state franchise taxes.  (KLM Exhibit 24.)

17)     On or about January 18, 2008, TBG filed an "Application for Reinstatement and Request to Set Aside Revocation or Forfeiture" with the Texas SOS, which was executed by CJ Comu as Chief Executive Officer of TBG, and as a result of which TBG's corporate charter was reinstated. (KLM Exhibit 24.)

18)     In 2007, 2008, 2009, and 2011, Comu filed with the Texas SOS, on behalf of TBG, Texas Franchise Tax Public Information Reports. In each of these reports Comu listed himself as the President, sole officer and director of TBG. (KLM Exhibit 24; Trustee Exhibit 63.)

19)     TBG and B&L executed an Acquisition Agreement and Plan of Share Exchange dated December 30, 2007 (the "Acquisition Agreement") pursuant to which all of the outstanding shares of TBG were to be transferred to B&L in exchange for one million shares of B&L common stock. (Trustee Exhibit 61.)

20)     Comu's Schedules did not disclose any ownership interest held by Comu in B&L.

21)     At the time the Acquisition Agreement was signed B&L had not been formed as a U.K. corporation and has not been formed since that time.

22)     The Acquisition Agreement is the basis upon which Comu contends that B&L is a 99% owner of TBG.

23)     On October 26, 2009, Comu executed two stock purchase agreements on behalf of TBG, by virtue of which TBG acquired 95,420,116 out of 95,746,817 outstanding shares of Ganas common stock (the "Ganas Stock"). (Trustee Exhibit 74; Trustee Exhibit 75.) First, TBG acquired 91,920,116 shares of Ganas common stock from Ganas shareholders in return for $75,000. (Trustee Exhibit 75.) By virtue of irrevocable stock power assignments executed by Ganas's former shareholders on October 26, 2009, TBG received Ganas stock certificates representing 91,920,116 shares of Ganas stock (the "Ganas Certificates"). (Trustee Exhibit 76.) Second, TBG acquired an additional 3,500,000 shares of Ganas common stock from Ganas

shareholder Roundtree & Associates, LLC, in return for a $25,000 promissory note, which was secured by stock certificates reflecting the 3,500,000 shares (the "R&A Shares"). (Trustee Exhibit 74.)

24)    On October 28, 2009, Comu was elected as "President" and "Director" of Ganas. (Trustee Exhibit 80; Trustee Exhibit 81.)

25)    Comu caused TBG to participate in and help facilitate a corporate merger transaction ("Green Auto Merger") by and between Go Green USA, LLC ("Go Green"), a Nevada limited liability company, and Ganas, a Delaware corporation. The terms of the merger transaction were set forth in a Merger Agreement and Plan of Reorganization dated as of November 4, 2009 by and among Ganas, Go Green, and, solely for purposes of Section 1.12 of the agreement, TBG (the "Merger Agreement"). (Trustee Exhibit 19.)

26)    The Merger Agreement provided that Go Green would be merged with and into Ganas, and Ganas would be the surviving corporation, which would be re-named Green Automotive Company Corporation ("Green Automotive").

27)    At the time the Merger Agreement was entered into, Ganas was a shell corporation in that it conducted no business operations, but its stock could be publicly traded through brokers/dealers registered with certain over-the-counter ("OTC") stock markets.

28)    Section 3.04 of the Merger Agreement acknowledged that 95,746,817 shares of GANAS common stock were outstanding at the time of the merger (95,420,116 of which had been acquired by TBG on October 26, 2009, as described above).

29)    Pursuant to Section 1.01 and Section 1.11 of the Merger Agreement, Ganas became the "Surviving Corporation" on the effective date of the Green Auto Merger, after which Ganas became known as Green Automotive.

30)     Section 1.12 of the Merger Agreement granted TBG "anti-dilution rights" in Green Automotive, which ensured TBG would retain – with no further consideration – 40% of Green Auto for two years after the Green Auto Merger.

31)     Comu approved the Green Auto Merger, and executed the Merger Agreement, as "President" of TBG and as "President" and "Director" of Ganas. (Trustee Exhibit 19 at 26; *see also* Trustee Exhibit 83; Trustee Exhibit 87.)

32)     On November 4, 2009, a Certificate of Merger for Ganas and Go Green was filed with the Delaware SOS (Trustee Exhibit 89), and on November 5, 2009 a certified copy of the Articles of Merger between GO Green and Ganas were filed with the Nevada SOS (Trustee Exhibit 88).  Comu executed both documents on behalf of Ganas.

33)     The effective date of the Green Auto Merger was November 5, 2009.  (*See, e.g.*, KLM Exhibit 255.)

34)     As of the effective date of the Green Auto Merger, TBG had the right to receive new stock certificates reflecting 95,420,116 shares of Green Automotive stock.

35)      In accordance with Section 1.04 of the Merger Agreement, Green Automotive issued 143,620,223 shares of common stock to the former members of Go Green, representing a sixty percent (60%) ownership interest in Green Automotive.  (*See also* KLM Exhibit 49 at 2.).

36)     Comu caused TBG to enter into three separate Stock Purchase Agreements dated January 10, 2010, by which TBG purported to sell certain restricted stock of Green Automotive acquired by TBG in connection with the Green Auto Merger.

37)     The purported purchasers of this stock under the Stock Purchase Agreements were Sunset Pacific, the TKY Trust and the DAPTCO Trust.  (*See* Trustee Exhibit 6 (the "Sunset Pacific SPA"); Trustee Exhibit 7 (the "TKY Trust SPA"); Trustee Exhibit 8 (the "DAPTCO Trust SPA").

38)     TKY Trust and DAPTCO Trust are Canadian family business trusts.  DAPTCO Trust was formed by Comu's brother, Cem Comu, who is also the Trustee of the DAPTCO Trust.  Under the TKY Trust documents, Cem Comu is the Trustee and Comu is a named beneficiary.

39)     On January 13, 2010, Comu caused TBG to transfer to Sunset Pacific 2,500,000 shares of restricted Green Automotive common stock, which is reflected in Green Auto certificate #1091.  (KLM Exhibit 49 at 1.)  Comu alleges this transfer was made pursuant to the Sunset Pacific SPA, in return for a purchase price of $200,000, which was to be paid through a promissory note dated January 10, 2010, executed by Sunset Pacific and payable to TBG in the amount of $200,000 (the "Sunset Pacific Note").

40)     The Sunset Pacific Note provides that it is payable in quarterly installments of interest only, commencing on June 1, 2010 and continuing quarterly until maturity of the note on March 1, 2015 (when all principal and interest is due and payable.)

41)     No payments have been made on the Sunset Pacific Note.

42)     On January 13, 2010, Comu caused TBG to transfer to TKY Trust 5,000,000 shares of restricted Green Automotive common stock, which is reflected in Green Auto certificate #1092.  (KLM Exhibit 49 at 1.)  Comu alleges this transfer was made pursuant to the TKY Trust SPA, in return for a purchase price of $500,000, which was to be paid pursuant to a $500,000 promissory note dated January 10, 2010 (the "TKY Trust Note").

43)     The TKY Trust Note was payable on the same terms as the Sunset Pacific Note.

44)     On January 13, 2010, Comu caused TBG to transfer to DAPTCO Trust 2,000,000 shares of restricted Green Automotive common stock, which is reflected in Green Auto certificate #1093.  (KLM Exhibit 49 at 1.) Comu alleges this transfer was made pursuant to the

DAPTCO SPA, in return for a purchase price of $200,000, which was to be paid pursuant to a $200,000 promissory note dated January 10, 2010 (the "DAPTCO Trust Note").

45)     The DAPTCO Trust Note was payable on the same terms as the Sunset Pacific Note and the TKY Trust Note.

46)     The first stock certificates for Green Automotive were issued to shareholders on January 13, 2010 by Olde Monmouth Stock Transfer ("OMST"), the stock transfer agent for Green Automotive.  (KLM Exhibit 49 at 1.)

47)     On January 13, 2010, OMST cancelled TBG's Ganas Certificates, and issued 91,920,116 new Green Automotive stock certificates to various recipients.  (KLM Exhibit 49 at 1 – 2.)

48)     On March 9, 2010, TBG received stock certificate #1130 reflecting the 3,500,000 R&A Shares TBG acquired by TBG on October 26, 2009.  (KLM Exhibit 49 at 3.)

49)     On March 25, 2010, TBG received stock certificates #1157, #1158, #1159, #1160, #1161, and #1162, reflecting the issuance of 13,000,000 new shares of restricted Green Auto stock accordance with the anti-dilution clause in the Merger Agreement.  (KLM Exhibit 49 at 4.)

50)     On July 31, 2010, TBG received stock certificate #2504 reflecting the issuance of 2,000,000 new shares of restricted Green Auto stock in accordance with the anti-dilution clause in the Merger Agreement.  (KLM Exhibit 49 at 11.)

51)     On August 13, 2010, TBG received stock certificate #2531 reflecting the issuance of 10,000,000 new shares of restricted Green Auto stock in accordance with the anti-dilution clause in the Merger Agreement.  (KLM Exhibit 49 at 12.)

52)     On December 30, 2010, TBG received stock certificate #3431 reflecting the transfer of 11,000,000 shares of Green Auto stock from Steven Fly to TBG.  (KLM Exhibit 49 at 51.)

53)      On or about June 16, 2011, Comu caused TBG to enter into a certain Escrow Agreement (the "TBG Escrow Agreement") with OMST.

54)      Pursuant to the terms of the TBG Escrow Agreement, OMST agreed to serve as escrow agent and, in that capacity, agreed to maintain an escrow account to hold funds to be received from purchasers of the Green Automotive stock and to also hold in escrow the shares of stock to be transferred to the purchasers.

55)      As of February 18, 2014, TBG remained in possession of 3,804,529 Green Auto shares.  (KLM Exhibit 160 at 2 – 3.)

56)      According to an escrow ledger prepared by OMST, between June 20, 2011 and January 4, 2012, OMST collected over $2.7 million in gross cash proceeds from the sale of TBG's Green Auto stock.  (KLM Exhibit 52.)

57)      Based on a ledger of equity transactions prepared by Comu and produced in response to the Trustee's request in this Adversary (the "Equity Ledger"), Comu claims that TBG sold 9,998,019 shares of Green Auto stock between June 23, 2011 and January 10, 2012.  (KLM Exhibit 336 at 1.)  Comu claims that after paying commissions to various agents involved in these purchase and sale transactions, the net amount received by TBG from the sale of these shares was $686,476.  (KLM Exhibit 336 at 1.)

58)      According to the Equity Ledger, between December 23, 2011 and March 16, 2012, Comu arranged for the sale of 4,800,000 of the 5,000,000 shares of the Green Automotive restricted stock that the TKY Trust obtained from TBG.  (KLM Exhibit 336 at 2.)

59)      According to Comu, TBG received $116,500 of proceeds from the TKY Trust's sales of the Green Automotive stock, which Comu applied to the TKY Trust Note.  These proceeds are the only payments TBG has received on the TKY Trust Note.  (KLM Exhibit 336 at 2.)

60)     According to an escrow ledger prepared by OMST, between December 23, 2011 and March 13, 2012, TKY Trust received $1,048,972.95 in gross proceeds from the sale of Green Auto stock.  (KLM Exhibit 54.)

61)     According to the Equity Ledger, between March 22, 2012 and June 1, 2012, Comu arranged for the sale of 1,400,000 of the 2,000,000 shares of Green Automotive restricted stock that the DAPTCO Trust obtained from TBG.  (KLM Exhibit 336 at 2.)

62)     According to Comu, TBG received $30,185 of the proceeds from the DAPTCO Trust's sales of the Green Automotive stock, which Comu applied to the DAPTCO Trust Note. These proceeds are the only payments TBG has received on the DAPTCO Trust Note.  (KLM Exhibit 336 at 2.)

63)     According to an escrow ledger prepared by OMST, between March 16 and April 17, 2012, DAPTCO Trust received $222,980 in gross proceeds from the sale of Green Auto stock.  (KLM Exhibit 53.)

64)     In its 2010 federal income tax return, TBG reported total income of $2,366,775 and total expenses of $2,324,571, resulting in taxable income of $42,204.  Of the $2,324,571 in reported operating expenses, $2,137,733 was purportedly for consulting fees and expenses.  In their 2010 federal income tax return, Comu and his wife, Phyllis Comu, reported total income of $16,584.

65)     In its 2011 federal income tax return, TBG reported total income of $1,373,688, of which $318,072 was reported as a capital gain from the sale of Green Automotive stock.  TBG reported deductions or operating expenses totaling $1,327,648, of which approximately $500,000 was for consulting, approximately $236,000 was for "advisory services," $178,200 was for "business analysis," $125,000 was for "exchange registration expense," and approximately $68,550 was for "valuation services."

66)     On or about January 1, 2013, TBG opened a brokerage account with Westor Capital Group, Inc. ("Westor") and deposited with Westor 1,000,000 shares of Green Automotive stock. After the account was opened, Westor sold on behalf of TBG 8,100 shares of Green Automotive stock.

67)     On or about April 16, 2013, the Securities Investor Protection Corporation ("SIPC") commenced an action under the Securities Investor Protection Act ("SIPA") in the United States District Court for the Southern District of New York.

68)     On April 16, 2013, the District Court entered a liquidation order pursuant to the provisions of SIPA.  The District Court then transferred the action to the United States Bankruptcy Court for the Southern District of New York.

69)     On May 17, 2013, Comu caused to be filed on behalf of TBG a claim form in which Comu claimed on behalf of TBG a claim in the amount of $37,993.84, and a claim for the 991,900 shares of Green Automotive stock that was transferred to Westor for sale. In Comu's Schedule B he claimed to own a one percent (1%) ownership interest in Sunset Pacific, and listed Phyllis Comu as a ninety-eight percent (98%) owner, and Gem Comu (Comu's brother, a/k/a Cem Comu) as the owner of the remaining one percent (1%) interest in Sunset Pacific.

70)     Sunset Pacific was formed as a Texas limited partnership on or about October 30, 1996 by Cecil S. Mathis ("Mathis").

71)      In the Certificate of Limited Partnership for Sunset Pacific, Mathis was listed as the original limited partner of Sunset Pacific, and Coral Group, LLC ("Coral Group") was listed as the initial general partner of Sunset Pacific.

72)     On July 7, 2005 and August 1, 2005, Comu filed corporate documents for Coral Group with the Nevada SOS, in which he identified himself as the sole member of Coral Group.

(KLM Exhibit 21 at 7 – 8.)

73)      On July 28, 2005, Comu filed on behalf of Sunset Pacific an amendment to Sunset Pacific's certificate of limited partnership, whereby Marathon Management Limited Company, a Nevada limited liability company ("Marathon Management Ltd") replaced Coral Group as the general partner of Sunset Pacific. (KLM Exhibit 22 at 8.)   Comu executed the amendment on behalf of Marathon Management Ltd.

74)      On September 28, 2007, Comu filed on behalf of Sunset Pacific a Period Report with the Texas Secretary of State, which Comu executed as a "Member" of Sunset Pacific's general partner, Marathon Management Ltd.  (KLM Exhibit 22 at 10 – 11.)   On November 25, 2008, Cecil Mathis resigned as the registered agent for Sunset Pacific, and was replaced by CJ Comu.  (KLM Exhibit 22 at 12.)

75)      Marathon Management Ltd. and Coral Group are wholly-owned and/or controlled by Comu.

76)      With an effective date of January 1, 2006, the Sunset Pacific limited partnership agreement was amended to reflect that Marathon Management Ltd. holds a one percent (1%) interest as general partner, Comu holds a one percent (1%) interest as limited partner, and Phyllis Comu holds a ninety-eight percent (98%) interest as limited partner.  The amendment states that it is effective as of January 1, 2006, but the amendment was not notarized until September 14, 2007.

77)      On March 16, 2012, the Texas SOS terminated Sunset Pacific's certificate of limited partnership due to Sunset Pacific's failure to file periodic reports with the Texas SOS.

78)      Sunset Pacific's limited partnership certificate has not been reinstated.

79)      Throughout its existence Sunset Pacific has conducted virtually no business operations.

80)      Between 2005 and 2011 Sunset Pacific's federal income tax returns reflect no income or expenses.

81)      The 2007 federal income tax return for Sunset Pacific reflects assets totaling $527,750, consisting of a $250,000 annuity and a loan to Sun Sports Entertainment, Inc. ("Sun Sports") in the amount of $277,750.

82)      Subject to relevance objections, KLM Exhibits 1 –371, Trustee's Exhibits 1 – 91, and Defendants' Exhibits 1 – 6 are admitted for all purposes.

**3.      Contested Issues of Fact**

1)      Did Comu deliberately delay discovery in the Texas Domestication Action while preparing the Bankruptcy Petition with the intent of avoiding Plaintiffs' efforts to obtain discovery into his assets and business activities?

2)      Was the information contained in Comu's Bankruptcy Filings complete and accurate?

3)      Did Comu exaggerate, misrepresent, or make misleading partial disclosures regarding the nature and amount of his debts in his Bankruptcy Filings?

4)      Did Comu fail to disclose, misrepresent, or make misleading partial disclosures regarding the nature and amount of his assets, income, employment history, executive positions, business interests or affiliations in his Bankruptcy Filings?

5)      Did Comu fail to disclose, or deliberately conceal, equitable or contingent interests in property or assets in his Bankruptcy Filings?

6)      Did Comu intentionally or recklessly fail to amend or update his Bankruptcy Filings prior to discharge?

7)     Did Comu make false statements or misleading partial disclosures, or fail to disclose information material to the bankruptcy estate, at the February 9, 2010 Creditors Meeting?

8)     Prior to discharge, did Comu misrepresent, conceal, or make deliberately incomplete or misleading disclosures regarding the nature and scope of his ownership of, position with, and/or interest in businesses, joint ventures, partnerships, assets or accounts?

9)     Did Comu make false statements or misleading partial disclosures, or fail to disclose information material to the bankruptcy estate, during the course of this Adversary Proceeding?

10)     Did Comu actively conceal his assets and business interests from his creditors and the Trustee, or deliberately mislead his creditors and the Trustee regarding his assets and business interests?

11)     Did Comu's omissions, misrepresentations, partial disclosures, and acts of concealment concern matters that were material to the bankruptcy estate?

12)     Did Comu's conduct hinder any reasonable due diligence, or prevent Plaintiffs from learning, before discharge, the truth about Comu's assets and true financial condition?

13)     Did Comu operate and/or utilize TBG and/or related accounts as part of a scheme to conceal and dissipate assets of the estate?

14)     Did Comu operate and/or utilize Sunset Pacific and/or related accounts as part of a scheme to conceal and dissipate assets of the estate?

15)     Did Comu establish, operate and/or utilize Regus Advisors, Inc. and/or related Regus entities and accounts as part of a scheme to conceal and dissipate assets of the estate?

16)     Did Comu establish, operate and/or utilize Electronic Registry, Inc. and/or related accounts as part of a scheme to conceal and dissipate assets of the estate?

17)     Did Comu establish, operate and/or utilize Continental Partnership, Inc. and/or related accounts as part of a scheme to conceal and dissipate assets of the estate?

18)     Did Comu establish, operate and/or utilize TKY Trust and related accounts as part of a scheme to conceal and dissipate assets of the estate?

19)     Did Comu operate and/or utilize DAPTCO Trust and related accounts as part of a scheme to conceal and dissipate assets of the estate?

20)     Did Comu acquire or have the right to receive property of the estate that was not disclosed to the Trustee or turned over to the estate?

21)     Did Comu act with fraudulent intent, or with reckless disregard for the truth?

22)     Did Defendants knowingly participate or assist in Comu's fraudulent concealment of material information pertaining to the bankruptcy estate?

23)     Was discharge granted in reliance on the truthfulness, completeness, and accuracy of Comu's Bankruptcy Filings?

24)     Is Plaintiffs' lawsuit against their former counsel, Emil Lippe, for failing to object to discharge of the New York Judgment (which was predicated on fraud that predated the Petition Date) relevant to Plaintiffs' request for revocation (which is based on fraud in the Bankruptcy Case and the Adversary)?

25)     If Plaintiffs' malpractice claims against Lippe are relevant, can Comu rely on those claims to excuse his fraud on the Court, particularly where Plaintiffs are innvocent of wrongdoing?

26)     Were the material terms and conditions of the Merger Agreement satisfied as of the Petition Date?

27)     Were any or all of the consulting fees paid by TBG paid to Comu through one or more business entities that Comu owns and/or controls, including but not limited to Marathon Management Limited Company ("Marathon") and Regus Advisors, Inc. ("Regus")?

28)     As the sole officer and director of TBG has Comu completely dominated and controlled the business activities of TBG?

29)     By virtue of his control of Marathon Management Ltd, the general partner of Sunset Pacific, does Comu control Sunset Pacific?

30)      Has Comu completely dominated and controlled the business activities of Sunset Pacific?

31)     What is the total amount of Green Automotive Stock that TBG has transferred or sold since the Petition Date?

32)     What is the total amount of income received by TBG from its sales of the Green Automotive Stock?

33)     Has all or substantially all of the income received by TBG from the sale of Green Automotive stock been transferred to Comu, or to entities he owns and/or controls?

34)     Did Comu directly or indirectly receive income after the Petition Date for services provided prior to the Petition Date?

35)     Has B&L ever owned any stock in TBG?

36)     Has Brown ever owned any stock in TBG?

37)     In Comu's Schedule B did he misrepresent his ownership interest in TBG?

38)     Was Comu's misrepresentation of his ownership interest in TBG a knowing misrepresentation?

39)     In Comu's Schedule B did he misrepresent the ownership interest of Brown in TBG?

40)     Was Comu's misrepresentation of Brown's ownership interest in TBG a knowing misrepresentation?

41)     Was the Acquisition Agreement a sham transaction?

42)     Has Comu violated the Agreed Temporary Restraining Order entered in this Adversary Proceeding on December 20, 2013?

43)     Prior to the entry of the Debtor's discharge in this case, did the Plaintiffs know of, or fail to exercise due diligence to learn of, the matters alleged in their Second Amended Complaint?

44)     What specific fraud did Plaintiffs discover after the discharge and include in their Second Amended Complaint?

To the extent that any of the above foregoing issues of fact constitute issues of law, they are deemed issues of law and shall be incorporated herein as such.

**4.     Stipulations of Law**

1)     This Court has jurisdiction over this adversary proceeding and the parties to this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2)     The claims asserted in this proceeding concern the administration of the Debtor's bankruptcy estate and are, therefore, core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A).

3)     Venue for this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409.

4)     This Adversary Proceeding is timely because it was filed within (1) one year of the Discharge being granted in accordance with 11 U.S.C. §727(e)(1) and (e)(2).

5)     Under both 11 U.S.C. §§727(d)(1) and (d)(2), Plaintiffs must establish Debtor's fraudulent intent by a preponderance of the evidence.

6)      "Fraudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth."  *Reed v. Cooper (In re Cooper)*, 426 B.R. 227, 239 (Bankr. N.D. Tex. 2010), *aff'd*, 443 F. App'x 888 (5th Cir. 2011); *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 504 (Bankr. N.D. Tex. 2006); *see also Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382–83 (5th Cir. 2001).

7)      Fraudulent intend may be inferred from a course of conduct.  *Reed v. Cooper*, 426 B.R. at 227, 238.

8)      Under Section 727(d)(1) of the Bankruptcy Code, the Court "shall revoke a discharge" if "such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge." 11 U.S.C. § 727(d)(1).  There are two subsets of "fraud of the debtor" under § 727(d)(1) – the failure to disclose assets at the time of the bankruptcy Petition ("undisclosed assets"), and "false oaths."

9)      The first subset of "fraud by the debtor" under § 727(d)(1) is undisclosed assets at the commencement of the bankruptcy.  A debtor's failure to disclose the existence of assets in his bankruptcy filings support revocation under § 727(d)(1) if the omissions were knowingly and fraudulently made, they were material, and Plaintiffs were unaware of the facts at issue when the Debtor sought his discharge.  *See, e.g.*, *Neary v. Darby (In re Darby)*, 376 B.R. 534, 539-40 (Bankr. E.D. Tex. 2007).

10)     The second subset of "fraud by the debtor" under § 727(d)(1) is false oaths. The elements of a false oath claim for revocation include a statement that: (1) was made under oath; (2) was false; (3) Debtor knew was false; (4) was made with fraudulent intent; and (5) related materially to the bankruptcy case.  *See, e.g.*, *Lightfoot v. Landry (In re Landry)*, 350 B.R. 51, 58 (Bankr. E.D. La. 2006).  "False oaths may be in the form of either false statements or omissions

on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings." *Id.*

11)    Under both subsets of § 727(d)(1), an omission is material "if it bears a nrelationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992); *see also Neary v. Darby (In re Darby)*, 376 B.R. 534, 542 (Bankr. E.D. Tex. 2007).  A finding of materiality is not dependent upon the value of the omitted assets or whether the omission was detrimental to creditors.  *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005).

12)    Under Section 727(d)(2)., "the court shall revoke a discharge" if "the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee."  11 U.S.C. § 727(d)(2).

13)    Plaintiffs "bear the burden to establish that the Debtors acquired or became entitled to acquire property of the estate, and knowingly and fraudulently failed to report or deliver the property to the trustee." *Reed v. Cooper*, 426 B.R. at 238.

14)    "Property of the estate" includes "[a]ll legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a).  It also includes "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case" that is "under the sole, equal or joint management and control of the debtor," 11 U.S.C. § 541(a)(2)(A), and any "[p]roceeds, … rents, or profits of or from property of the estate, except such as are earning from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6).

15)     "[A]n interest of the debtor in property becomes property of the estate …
notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy
law … that restricts or conditions transfer of such interest by the debtor."  11 U.S.C. § 541(c)(1).
But, a "restriction on the transfer of a beneficial interest of the debtor in a trust that is
enforceable under applicable nonbankruptcy law is enforceable in a case under this title."  11
U.S.C. § 541(c)(2).

## 5.     <u>Contested Issues of Law</u>

1)     Given the truth regarding Comu's assets and liabilities on the Petition Date, did he
qualify for the relief of discharge from his debts under Chapter 7?

2)     Was Comu required to disclose his direct or indirect interests in Ganas and Green
Automotive, or in the Merger Agreement's anti-dilution clause, in his Bankruptcy Filings?

3)     Did the fact that Comu had not received physical stock certificates reflecting
Green Automotive Stock as of the Petition Date excuse him from disclosing his direct and
indirect, legal or equitable interest in that stock in his Bankruptcy Filings?

4)     Did the Ganas Stock or the Ganas Certificates constitute property of the estate?

5)     By virtue of the Merger Agreement, did TBG's 95 million shares of stock in
Ganas – acquired on October 26, 2009 – automatically convert into a right to received Green
Auto stock certificates as of November 5, 2009?

6)     Did stock received after the Petition Date pursuant to the Merger Agreement's
anti-dilution clause constitute property of the estate?

7)     Did TBG's pre-petition expectancy interest in Green Auto stock certificates that
were issued by OMST after the Petition Date constitute property of the estate?

8)     By virtue of the MOU by and between Maybourne, FMS, and TBG, did the Green
Auto stock issues to Maybourne and FMS constitute property of the estate?

9)      Was Comu required to disclose to the Trustee or turn over to the estate all or part of the Green Auto stock received by TBG pursuant to the Merger Agreement's anti-dilution clause after the Petition Date?

10)     Does the fact that a stock certificate is restricted, standing alone, affect the stock's nature as property of the bankruptcy estate?

11)     Did Comu have a duty to disclose his interests as a beneficiary of the TKY Trust in his Bankruptcy Filings?

12)     Does Comu's active concealment of his assets and business interests bar any claim that Plaintiffs knew or should have known of Comu's fraud before discharge?

13)     Was TBG used by Comu as a means to hinder, delay or defraud the payment of Comu's creditors?

14)     Was Sunset Pacific used by Comu as a means to hinder, delay or defraud Comu's creditors?

15)     Is TBG the alter ego of Comu?

16)     Is Comu the *de facto* owner of TBG?

17)     Is Sunset Pacific the alter ego of Comu?

18)     Is Phyllis Comu's purported ninety-eight percent (98%) limited partnership interest in Sunset Pacific property of the Comu bankruptcy estate pursuant to § 541(a)(2)(A)?

19)     Was Phyllis Comu's partnership interest in Sunset Pacific under the joint management and control of Comu and Phyllis Comu?

20)     Is the Comu Green Auto Stock property of the bankruptcy estate?

21)     Were the assets of TBG as of the Petition Date property of the Comu bankruptcy estate?

22)      Were the assets of Sunset Pacific as of the Petition Date property of the Comu bankruptcy estate?

23)      Does a substantial controversy exist with respect to the declaratory relief sought by the Trustee?

24)      Is the Trustee seeking to establish ownership rights and interests in TBG which are inconsistent with the ownership claims of Comu and Phyllis Comu?

25)      Is there such unity between Comu and TBG that the separate corporate existence of TBG does not exist?

26)      Is there such unity between Comu and Sunset Pacific that the separate corporate existence of Sunset Pacific does not exist?

27)      Is the Trustee entitled to the remedy of reverse-veil piercing of the corporate veil of TBG?

28)      Is the Trustee entitled to the remedy of reverse-veil piercing of the corporate veil of Sunset Pacific?

29)      Is the Trustee entitled to a judgment directing the turnover of all property and assets of TBG that still exist pursuant to 11 U.S.C. § 542?

30)      Is the Trustee entitled to a judgment directing the turnover of all property and assets of Sunset Pacific that still exist pursuant to 11 U.S.C. § 542?

31)      To the extent the assets of TBG and/or Sunset Pacific have been sold or otherwise disposed of since the Petition Date, is the Trustee entitled to a judgment against Comu, TBG and Sunset Pacific, jointly and severally for the value of the assets that existed on the Petition Date?

32)      May the Plaintiffs and/or the Trustee introduce evidence and pursue matters unsupported by their respective Complaints?

002174

33)    Do the Plaintiffs have standing to pursue any alleged transfers, especially in light of this court's previous Orders in this adversary proceeding?

34)    Are any facts which happened after the filing of the Plaintiffs' Second Amended Complaint relevant on the issue of whether to revoke the Debtor's discharge?

35)    Are any facts discovered after the filing of the Plaintiffs' Second Amended Complaint relevant on the issue of whether to revoke the Debtor's discharge, if the newly discovered facts are not supported by the pleadings in the Plaintiffs' Second Amended Complaint?

36)    Is the Debtor entitled to a judgment that affirms his discharge?

37)    Should the Debtors discharge be revoked?

To the extent that any of the above foregoing issues of law constitute issues of fact, they are deemed issues of fact and shall be incorporated herein as such.

**6.    Estimated Length of Trial**

The parties estimate the trial of this Adversary Proceeding will take five (5) days.

**7.    Additional Matters That May Require the Court's Attention and/or Aid in the Disposition of the Action**

None.

### END OF ORDER ###

**SUBMITTED BY:**

**REED & ELMQUIST, P.C.**
501 N. College Street
Waxahachie, TX 75165
(972) 938-7339
(972) 923-0430 (fax)


By */s/  David W. Elmquist*
    David W. Elmquist, SBT #06591300

**ATTORNEYS FOR DIANE G. REED, TRUSTEE**


**OLSON NICOUD & GUECK, L.L.P.**
1201 Main Street, Suite 2470
Dallas, Texas 75202
(214) 979-7302
(214) 979-7301 (fax)


By */s/  Dennis Olson\* (\*with permission)*
Dennis Olson, SBT #15273500

**ATTORNEYS FOR DEFENDANTS**


**GREENBERG TRAURIG, LLP**
300 West 6th Street, Suite 2050
Austin, TX 78701
(512) 320-7200
(512) 320-7210 (fax)


By: *Kendyl T. Hanks\* (\*with permission)*
    Kendyl T. Hanks, SBT #24032273

**ATTORNEYS FOR PLAINTIFFS**

David W. Elmquist - SBT #06591300
**REED & ELMQUIST, P.C.**
501 N. College St.
Waxahachie, Texas 75165
(972) 938-7339
1+(972) 923-0430 (fax)

**ATTORNEYS FOR DIANE G. REED, TRUSTEE
INTERVENOR, CO-PLAINTIFF AND THIRD PARTY PLAINTIFF**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     Defendant. | § | |

| | | |
|---|---|---|
| DIANE G. REED, TRUSTEE, | § | |
|     Intervenor, Co-plaintiff and | § | |
|     Third-party Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CENGIZ J. COMU, | § | |
|     Defendant, | § | |
| | § | |
| and | § | |
| | § | |
| PHYLLIS E. COMU, | § | |
| BERNARD D. BROWN, | § | |
| THE BARCLAY GROUP, INC. AND | § | |
| SUNSET PACIFIC, L.P., | § | |
|     Third-party Defendants. | § | |

**TRUSTEE'S POST-TRIAL BRIEF IN SUPPORT OF RECOVERY UNDER 11 U.S.C. § 542(a)** - Page 1

002177

**TRUSTEE'S POST-TRIAL BRIEF**
**IN SUPPORT OF RECOVERY UNDER 11 U.S.C. § 542(a)**

Diane G. Reed, Chapter 7 Trustee (the "Trustee") of the bankruptcy estate of Cengiz J. Comu

("Comu" or the "Debtor"), files this her Post-Trial Brief in Support of Recovery Under 11 U.S.C.

§ 542(a), and in support thereof would show this Court as follows:

**I.     Argument and Authorities**

**A.     The Trustee Is Entitled to Recover From Comu the Value of the Green Automotive Stock Sold by TBG, TKY Trust and DAPTCO Trust.**

In Count 3 of the Trustee's Complaint in Intervention (Docket No. 53), the Trustee seeks a

turnover of all assets of Defendants The Barclay Group, Inc. ("TBG") and Sunset Pacific, L.P. ("SP")

pursuant to § 542 of the Bankruptcy Code. In addition, "to the extent the assets of TBG and/or

Sunset Pacific have been sold or otherwise disposed of since the Petition Date, the Trustee requests

that the Court enter a judgment against Comu, TBG and Sunset Pacific, jointly and severally for the

value of the assets that existed on the Petition Date and that are not turned over to the Trustee

because they have been sold or otherwise disposed of by Comu."[1]

Under § 542(a) of the Bankruptcy Code, an entity (here the Debtor) has an affirmative

obligation to turn over to the trustee any property that was in such entity's possession, custody or

control during the pendency of the case, and must account for such property or the value of such

property unless it is of inconsequential value.[2] If the entity is no longer in possession of the property

of the estate or its value at the time of the turnover action, then the trustee is entitled to recovery of a

money judgment for the value of the property of the estate that was disposed of by such entity.[3] As

the Bankruptcy Court in *In re Borchert* explained:

---

[1] Trustee's Complaint in Intervention (Docket No. 53, at ¶ 61).
[2] 11 U.S.C. § 542(a).
[3] *In re USA Diversified Products, Inc.*, 100 F.3d 53, 55 (7th Cir. 1996); *In re Newman*, 487 B.R. 193, 199 (B.A.P. 9th Cir. 2013) (quoting *Rynda v. Thompson (In re Rynda)*, 2012 Bankr. LEXIS 688); *In re Calvin*, 329 B.R. 589, 602 (Bankr. S.D. Tex. 2005); *In re Pilate*, 487 B.R. 345, 349 (Bankr. D.C. 2013) (and cases cited therein); *In re Borchert*, 143 B.R. 917, 919 (Bankr. N.D. 1992).

002178

The section provides for more than turnover of the actual property. It also provides that:

"… an entity … in possession … *during the case* of property that the trustee may use, sell or lease under section 363 … shall deliver to the trustee, *and account for*, such property, *or the value of such* property…."

The foregoing is applicable to any entity that possessed property belonging to the debtor at any time during case pendency, whether or not it had possession at the time a demand for turnover was made. It means that such entity must account to the trustee for the property itself or be prepared to surrender its value if for some reason the property itself no longer exists. What this means in a Chapter 7 is that if an entity in possession of estate property receives notice of the bankruptcy filing but nonetheless transfers the property to anyone other than the trustee, it does so at its peril. In the absence of the property itself the trustee in such instance is entitled to recover the value of the estate property from the entity making the transfer.[4]

In this Court's bench rulings the Court found that Comu fraudulently concealed his actual 100% ownership of TBG, as well as TBG's ownership of over 95 million shares of stock issued to TBG by Green Automotive Company. The undisputed evidence at trial established that in January 2010 Comu caused TBG to sell five million shares of Green Automotive stock to TKY Trust[5] and two million shares of Green Automotive stock to DAPTCO Trust.[6] The evidence also established that from June 23, 2011 through June 1, 2012, Comu caused TBG, TKY Trust and DAPTCO Trust to sell approximately 16.2 million shares of Green Automotive stock, and that the amount received from these sales totaled $4,084,944.95.[7]

The amounts received from the foregoing sales of Green Automotive stock represent its value at the time of the transfer of these assets from the estate. The Trustee is therefore entitled to recover under § 542(a) of the Bankruptcy Code the amount received from the sales of the Green Automotive stock by TBG, TKY Trust and DAPTCO Trust, as reflected in Trustee's Exhibit Nos. 44, 47 and 50, in the amount of $4,084,944.95.

---

[4] *In re Borchert*, 143 B.R. at 919.
[5] Trustee's Exhibit No. 7.
[6] Trustee's Exhibit No. 8.
[7] Trustee's Exhibit Nos. 44, 47 and 50.

**TRUSTEE'S POST-TRIAL BRIEF IN SUPPORT OF RECOVERY UNDER 11 U.S.C. § 542(a)** - Page 3

**B.    In the Alternative, the Trustee Is Entitled to Recover the Amount Received By TBG From the Sale of the Green Automotive Stock.**

In the alternative, the Trustee is entitled to recover under the equitable doctrine of unjust enrichment the amount that TBG received from the sales of Green Automotive stock by TBG, TKY Trust and DAPTCO Trust in the amount of $833,160.00.

The unjust enrichment doctrine in Texas is summarized in *Burlington Northern Railroad Co. v. Southwestern Electric Power Co.*, as follows:[8]

> The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution....

> The unjust enrichment doctrine applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties.... When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon the defendant to restore the benefits to the plaintiff.... Unjust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress or the taking of undue advantage....[9]

The Court's bench rulings included a finding that TBG was operated by Comu as a conduit to shield and dispose of assets in fraud of creditors' rights. The evidence also established that Comu, who was in sole control of TBG, caused TBG to sell almost 10 million shares of Green Automotive stock and that TBG received from those sales $686,476.00.[10]  The undisputed evidence also established that Comu orchestrated the sale of 1.4 million shares of Green Automotive stock that TBG transferred to DAPTCO Trust, and that TBG received $30,185.00 from the sale of this stock.[11] The undisputed evidence also established that Comu orchestrated the sale of Green Automotive stock transferred to TKY Trust and that TBG received $116,000 from the sales of this stock.[12] The Court also found that TBG was used by Comu and Defendant Phyllis Comu as their "personal piggy bank."

---

[8] *Burlington Northern Railroad Co. v. Southwestern Electric Power Co.*, 925 S.W.2d 92, 96-97 (Tex. App. – Texarkana 1996).
[9] *See also Ed & F Man Biofuels v. MV Fase*, 728 F.Supp.2d 862, 868-69 (S.D. Tex. 2010).
[10] Plaintiff's Exhibit No. 336.
[11] *Id.*
[12] *Id.*

<u>**TRUSTEE'S POST-TRIAL BRIEF IN SUPPORT OF RECOVERY UNDER 11 U.S.C. § 542(a)**</u> - **Page 4**

002180

Based upon this evidence and the Court's bench rulings, the equitable doctrine of unjust enrichment should be applied in this case. Accordingly, in the event the Court does not award damages based on the value of the stock sold by TBG, TKY Trust and DAPTCO Trust, the Court should award damages to the Trustee under the equitable doctrine of unjust enrichment in the amount of $833,160.00.

## II.    Conclusion

Based upon the foregoing argument and authorities, the Trustee is entitled to recover from Comu under 11 U.S.C. § 542(a) the value of the Green Automotive stock sold by TBG, DAPTCO Trust and TKY Trust in the amount of $4,084,944.95, or, in the alternative, under the unjust enrichment doctrine the sum of $833,160.00.

Dated: March 28, 2014.

Respectfully submitted,

**REED & ELMQUIST, P.C.**
501 N. College St.
Waxahachie, TX 75165
(972) 938-7339
1+(972) 923-0430 (fax)

By:_/s/ David W. Elmquist_
David W. Elmquist – SBT #06591300

**ATTORNEYS FOR DIANE REED, TRUSTEE
INTERVENOR, CO-PLAINTIFF
AND THIRD PARTY PLAINTIFF**

### CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2014, a true and correct copy of the foregoing Post-Trial Brief in Support of Recovery Under 11 U.S.C. § 542(a) was served electronically on all counsel of record in this adversary proceeding.

_/s/ David W. Elmquist_
David W. Elmquist

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

---

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
|     *Plaintiffs,* | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
|     *Defendant.* | § | |

---

_

| | | |
|---|---|---|
| DIANE G. REED, TRUSTEE, | § | |
|     *Intervenor, Co-Plaintiff and* | § | |
|     *Third-party Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| CENGIZ J. COMU, | § | |
|     *Defendant,* | § | |
| | § | |
| *and* | § | |
| | § | |
| PHYLLIS E. COMU, | § | |
| BERNARD D. BROWN, | § | |
| THE BARCLAY GROUP, INC. AND | § | |
| SUNSET PACIFIC, L.P., | § | |
|     *Third-Party Defendants.* | § | |

## PLAINTIFFS' AND TRUSTEE'S
## JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE STACEY G.C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs King Louis Mining, LLC, King Louis Enterprises, LLC, and Ronald Katz (together, "Plaintiffs"), together with Diane G. Reed, Chapter 7 Trustee of the bankruptcy estate of Cengiz J. Comu *a/k/a* CJ Comu ("Debtor" or "Comu"), Bankruptcy Case No. 09-38820-SGJ-7 (the "Bankruptcy Case"), as Intervenor, Co-Plaintiff and Third-Party Plaintiff in the above-captioned adversary proceeding ("Intervenor" or "Trustee"), hereby submit their *Joint Proposed Findings of Fact and Conclusions of Law*.

Contemporaneously with these proposed findings and conclusions, Plaintiffs and Trustee shall provide the Court with *Plaintiffs' and Trustee's Brief in Support of Joint Proposed Findings of Fact and Conclusions of Law* (the "Joint Brief"), which details the evidence admitted at trial (supported by record cites) and the legal authorities supporting the proposed findings and conclusions set forth below, and warranting judgment in favor of Plaintiffs and Trustee.

## I.      FINDINGS OF FACT

1.      Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law.

### A.      HISTORY AND CONTEXT

2.      Plaintiffs King Louis Enterprises, LLC ("KLM") and King Louis Mining, LLC ("KLE") are privately-held Delaware limited liability companies owned (respectively) 75% and 100% by Plaintiff Ronald Katz ("Katz").[1]

3.      By this adversary proceeding, Case No. 10-03269 (the "Adversary"), Plaintiffs seek an order revoking discharge under Section 727(d) of the United States Bankruptcy Code,

---

[1]      Joint Brief ¶ 1; *see also First Amended Joint Pre-Trial Order*, entered March 17, 2014 (Adv. Doc. No. 138) (herein, "JPTO"), Stip. Fact ¶ 1.

11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), specifically pursuant to § 727(d)(1) due to "fraud of the debtor," and under § 727(d)(2), due to Comu's failure to report or deliver property of the estate.[2]  In addition to revocation, Plaintiffs seek reasonable attorney's fees and court costs, and any additional relief to which they may be entitled.[3]

      4.     Intervenor is the duly-appointed Chapter 7 Trustee in Comu's Bankruptcy Case.[4]  Trustee asserts declaratory judgment, alter ego, reverse veil-piercing, and turnover claims against Debtor and Third-Party Defendants Phyllis Comu ("Phyllis"), Bernard D. Brown ("Brown") (a resident of the United Kingdom ("UK")), Barclay Group, Inc. *d/b/a* The Barclay Group, Inc. ("TBG")[5] and Sunset Pacific, LP ("Sunset Pacific").[6]  Trustee further seeks an award of joint and several damages against Comu, TBG and Sunset Pacific for the value of assets that have been sold or otherwise dissipated since the Petition Date.[7]

      5.     Comu, a foreign national and permanent U.S. resident,[8] filed his *Voluntary Petition* (the "Petition") for bankruptcy relief on December 31, 2009 (the "Petition Date").[9] Comu is a sophisticated businessman who holds himself out as an experienced investor and

---

[2]     JPTO at 2–4; *see also* Plaintiffs' *Complaint to Revoke Discharge Pursuant to Section 727(d) of the United States Bankruptcy Code*, filed September 3, 2010 (Adv. Doc. No. 1). Plaintiffs filed their *Second Amended Complaint to Revoke Discharge Pursuant to Section 727(d) of the United States Bankruptcy Code* on March 2, 2011 (Adv. Doc. No. 20) (the "KLM Complaint," cited as "KLM Compl."). Plaintiffs' specific contentions regarding revocation are detailed in the Joint Brief ¶¶ 2–3.

[3]     Joint Brief ¶ 3; KLM Compl. at 15.

[4]     Joint Brief ¶ 4; JPTO Stip. Fact ¶ 3.

[5]     TBG is a privately-held financial consulting firm that, among other things, advises companies undergoing "reverse mergers" and other corporate transactions. Joint Brief ¶ 12 & n.35–36. The facts pertaining to TBG's corporate history are set forth in JPTO Stip. Fact ¶¶ 15–18, and in Joint Brief ¶¶ 139–140.

     It is unclear whether TBG's legal name is The Barclay Group, Inc. (as Comu claims) or "Barclay Group, Inc." (as corporate documents indicate). While these inconsistencies are not immaterial, the Court need not resolve them for the purposes of this Adversary because the parties, by stipulation, refer to TBG as "Barclay Group, Inc. a/k/a The Barclay Group, Inc." JPTO at 1; *see also* Joint Brief ¶ 12.

[6]     Joint Brief ¶¶ 4, 13; JPTO at 4–6; *see also Trustee's Complaint in Intervention*, filed September 5, 2012, Adv. Doc. No. 53 (the "Trustee Complaint," cited herein as the "Trustee Compl."). The facts pertaining to Sunset Pacific's partnership history are set forth in Joint Brief ¶¶ 112–120, and JPTO Stip. Fact ¶¶ 70–81.

[7]     Joint Brief ¶¶ 4, 47; JPTO at 6; *see also Trustee's Post-Trial Brief in Support of Recovery Under 11 U.S.C. § 542(a)*, filed March 28, 2014, Adv. Doc. No. 141 ("Trustee's Damages Brief").

[8]     Joint Brief ¶ 5; *see also* JPTO Stip. Fact ¶ 2.

[9]     JPTO Stip. Facts ¶ 2, ¶ 9; Bankr. Doc. No. 1; *see also* Joint Brief ¶ 5.

financial consultant who advises corporate clients and investors in a variety of securities-related transactions.[10]  Comu is subject to an *Order of Permanent Injunction* entered in a civil enforcement action brought by the Securities and Exchange Commission ("SEC"), dated November 1, 1989 (the "SEC Injunction").[11]

6.    On the Petition Date, Phyllis and Comu resided at 5301 Paladium Drive, Dallas, Texas, 75254 (the "Paladium Residence"), for which Comu claims a homestead exemption.[12]  Phyllis and Comu currently reside at 14873 Oaks North Place, Addison, Texas, 75254 (the "Oaks North Residence").[13]  Although Phyllis and Comu have been married at all times relevant to the Bankruptcy Case, Phyllis is not identified as a codebtor in the Bankruptcy Case.[14]

7.    Plaintiffs timely filed proofs of claim in the Bankruptcy Case.[15]  Plaintiffs' claims constitute at least 95% of the total debt owed by Comu, as evidenced by the total creditor claims filed in the Bankruptcy Case.[16]

8.    Plaintiffs' claims in the Bankruptcy Case arise from a final judgment entered against Comu on June 9, 2009, awarding Plaintiffs the aggregate amount of $2,279,265.16 plus interest accruing at 9% (the "New York Judgment"),[17] in a state court action (the "New

---

[10]    Joint Brief ¶ 7.

[11]    Joint Brief ¶ 8 & n.20 (detailing terms of SEC Injunction).

[12]    Joint Brief ¶¶ 6, 9.  Comu has given inconsistent and misleading testimony regarding the ownership of the Paladium Residence.  Although Comu claims the Paladium Residence as his homestead, Paladium Residence property taxes for 2009 and 2010 were paid by TBG before the Petition Date.  Joint Brief ¶ 353 & n.920.  After moving to the Oaks North Residence in late 2010, Comu leased the Paladium Residence to a tenant (Mervyn Price, an insider of TBG and Regus Advisors (Joint Brief ¶¶ 161, 172, 352), who made rent payments (the "Paladium Rents") to Sunset Pacific.  Joint Brief ¶ 353.  Sunset Pacific's 2011 tax return declares $27,500 in gross Paladium Rents as income, and claims a $6,970 depreciation deduction and other "rental real estate expenses" as deductions (totaling $22,470) against the gross Paladium Rents, resulting in a claimed $5,030 in net rental income.  Joint Brief ¶ 353 & n.922.  Sunset Pacific's 2010 tax return declares no income from Paladium Rents, and Comu's 2010 and 2011 personal tax returns do not claim any Paladium Rents as income.  Joint Brief ¶ 353 & n.923.

[13]    Joint Brief ¶¶ 6, 9.

[14]    Joint Brief ¶ 9.

[15]    JPTO Stip. Fact ¶ 11; Joint Brief ¶ 35 & n.86.

[16]    JPTO Stip. Fact ¶ 11; Joint Brief ¶¶ 17, 57.

[17]    JPTO Stip. Fact ¶ 6; Joint Brief ¶ 16.

York Action"), in which Plaintiffs sought damages arising from Comu's common law fraud and securities fraud with respect to business dealings dating back to 2003.[18]

9.      The New York Judgment was entered by default when Comu failed to appear for trial, although he had aggressively litigated the New York Action for almost three years (by, *inter alia*, defending Plaintiffs' claims and asserting counterclaims, including a claim for $1 million in punitive damages against Katz).[19]

10.     Accrued interest on the New York Judgment as of March 17, 2014 (the first day of trial in this Adversary) is $1,002,064.88, and thus the total debt owed by virtue of the New York Judgment is currently at least $3,281,330.04 (the "Judgment Debt").[20]

11.     Plaintiffs retained Emil Lippe, Jr. ("Prior Counsel"), and, on June 2, 2009, commenced a state court action in Dallas, Texas to domesticate the New York Judgment and recover the Judgment Debt from Comu (the "Collection Action").[21]

12.     Between September of 2009 and the Petition Date, Comu resisted or delayed Plaintiffs' discovery efforts in the Collection Action and, unbeknownst to Plaintiffs, was preparing to file bankruptcy.[22]  Comu filed a motion staying the Collection Action due to his bankruptcy on January 4, 2010 – the day before his court-ordered deposition.[23]

13.     Before the Petition Date, Comu forwarded certain tax information (the "Undisclosed Tax Documents")[24] and information concerning his debts and liabilities (the

---

[18]      JPTO Stip. Fact ¶ 4; Joint Brief ¶ 14.
[19]      JPTO Stip. Fact ¶¶ 5–6; Joint Brief ¶¶ 15–16.
[20]      Joint Brief ¶ 17.
[21]      JPTO Stip. Fact ¶ 7; Joint Brief ¶ 18.
[22]      Joint Brief ¶¶ 19–21, 24; *see also* JPTO Stip. Fact ¶ 8.  While Comu was delaying discovery in the Collection Action and preparing to file his bankruptcy Petition, he and his wife took a Royal Caribbean vacation cruise one week before the Petition Date, which Comu paid for with a credit card. Joint Brief ¶ 22 & n.61.
[23]      JPTO Stip. Fact ¶ 10; *see also* Joint Brief ¶ 24.
[24]      KLM Ex. 231 (The "Undisclosed Tax Documents" – September 17, 2009 email forwarding "C. 7 Docs").

"Debts Memo")[25] to his bankruptcy counsel, both of which contained information that was omitted or modified[26] in his bankruptcy schedules (the "Schedules")[27] or his *Statement of Financial Affairs* ("SOFA")[28] (together with the Schedules, the "Bankruptcy Filings").

14.     Based on the findings herein and Comu's own testimony, the Court finds that Comu filed his bankruptcy Petition with specific intent to avoid Plaintiffs' efforts to recover the Judgment Debt in the Collection Action.[29]

15.     After the Petition Date, Comu forwarded to his bankruptcy counsel documents containing information (the "Draft Bankruptcy Filings")[30] that was either omitted or modified in his Bankruptcy Filings.[31]

16.     Comu verified under oath the information provided to the Court in his Bankruptcy Filings (dated February 15, 2010) and other information he was required to disclose or file with the Court.[32]

17.     At the § 341 Meeting of Creditors on February 9, 2010 (the "Creditors Meeting") Comu was questioned under oath by his own counsel, Trustee, and Prior Counsel, and again verified that his Bankruptcy Filings were true and correct.[33]

18.     Although Prior Counsel was aware of relevant deadlines and announced at the Creditors Meeting that he intended to file an objection to discharge on behalf of Plaintiffs because the New York Judgment was based on Comu's fraud, Prior Counsel did not file an

---

[25]     KLM Ex. 310 (December 30, 2009 email forwarding Debts Memo, which Comu described as a summary of "outstanding debts and 'potential' debts").
[26]     Joint Brief ¶¶ 20, 23; ¶ 60 & n.146; ¶¶ 62–63; ¶ 74 & n.181–182; ¶ 79 n.196; ¶ 106 & n.28; *see also* JPTO Stip. Fact ¶ 12; *see also generally* Joint Brief FOF Section B(1)–(2).
[27]     Trustee Ex. 94 (Debtor's *Schedules A through J with Summary of Schedules*, Bankr. Doc. No. 11, filed January 15, 2010).
[28]     Trustee Ex. 95 (SOFA admitted as exhibit).
[29]     Joint Brief ¶¶ 25, 59 & n.145; *see also generally* Joint Brief FOF Section B(1), (4).
[30]     KLM Ex. 312 (attaching Draft Bankruptcy Filings).
[31]     Joint Brief ¶ 28; ¶ 75 & n.184; ¶ 103; ¶ 125; *see also generally* Joint Brief FOF Section B(2).
[32]     Joint Brief ¶¶ 26, 29.
[33]     Joint Brief ¶ 30; *see also generally* Def. Ex. 4 (unofficial transcript of Creditors Meeting).

objection to Comu's discharge by April 12, 2010, the deadline for objecting to discharge (the "Discharge Objection Deadline").[34]

19.    At the Creditors Meeting, Trustee suggested Comu amend his Bankruptcy Filings after noting certain inconsistencies in his testimony and omissions in his Bankruptcy Filings – including the omission of information regarding Phyllis's separate property – and requested Comu provide additional information regarding Phyllis's separate property.[35]

20.    After the Creditors Meeting, Comu emailed to his bankruptcy counsel a memorandum listing certain assets (the "Phyllis Memo"),[36] which contained information regarding Phyllis and Comu's finances that was not included in his Bankruptcy Filings.[37]

21.    Trustee's internal notes related to the Bankruptcy Case ("Trustee's Notes")[38] indicate that, in response to Trustee's request, Comu delivered in March of 2010 certain assets and documents (the "March 2010 Production"), which included information that was not included in Comu's Bankruptcy Filings (which Comu never amended).[39]

22.    In the absence of objections from Trustee or creditors, Debtor was granted a discharge (the "Discharge") on April 14, 2010 (the "Discharge Date").[40]

23.    Plaintiffs commenced this Adversary on September 3, 2010 (less than one year after the Discharge Date) seeking revocation of Comu's discharge,[41] in response to which

---

[34]    Joint Brief ¶¶ 27, 31, 38.
[35]    Joint Brief ¶ 32 & n.80.
[36]    KLM Ex. 126 (attaching Phyllis Memo).
[37]    Joint Brief ¶¶ 33; ¶ 80 & n.201; ¶ 103; *see also* Joint Brief FOF Section B(1)–(2).
[38]    Def. Ex. 5 (admitting Trustee's Notes as exhibit).
[39]    Joint Brief ¶¶ 34, 36–37; ¶¶ 235–237 & n.651.
[40]    Joint Brief ¶ 38; JPTO Stip. Fact ¶ 13.
[41]    Plaintiffs subsequently sought leave to pursue claims against certain Comu affiliates, which the Court denied without prejudice to the Trustee's right to assert such claims. Joint Brief ¶ 41 & n.102–104.

Comu filed three successive motions to dismiss (which this Court denied), and ultimately filed Debtor's Answer on December 7, 2012.[42]

24.    Trustee joined this Adversary by filing the Trustee Complaint on September 9, 2012, to which Defendants filed an answer on October 9, 2012 ("Defendants' Answer").[43]

25.    In June of 2013, Greenberg Traurig, LLP replaced Prior Counsel as Plaintiffs' counsel, and Plaintiffs commenced an action against Prior Counsel (the "Malpractice Action"),[44] alleging negligence in his failure to object to Comu's Discharge because the New York Judgment was non-dischargeable as a debt for money obtained by fraud.[45]

26.    In 2013, Comu made available to Plaintiffs certain electronic discovery (the "2013 Electronic Production"), which was collected at Plaintiffs' expense, and which contained previously-undisclosed documents and information relevant to Comu's pre-petition assets and business activities, as well as asset transfers made before and after the Petition Date and the Discharge Date.[46]

27.    Trial in this Adversary commenced March 17, 2014, and concluded March 21, 2014, on which date the Court issued from the Bench certain findings of fact (the "Bench Findings"), and ruled that Plaintiffs' claim to revoke Comu's Discharge should be granted, and otherwise ruled in favor of Trustee's claims (the "Bench Ruling").[47]

---

[42]    Joint Brief ¶ 39; *see also Defendant CJ Comu's Original Answer to Plaintiffs' Second Amended Complaint to Revoke Discharge*, filed December 7, 2012 (Adv. Doc. No. 79) (herein, "Debtor's Answer").

[43]    Joint Brief ¶ 40; *see also Answer by Defendant and All Third-Party Defendants to Trustee's Complaint in Intervention*, filed December 7, 2013 (Adv. Doc. No. 64).

[44]    Joint Brief ¶ 42.  At trial, Defendants admitted into evidence as a defense exhibit Plaintiffs' Petition filed in the Malpractice Action.  Def. Ex. 6 at 1–6 (*Plaintiffs' Original Petition and Request for Disclosure*, filed in the Malpractice Action on July 19, 2013).

[45]    Joint Brief ¶ 42 & n.106–107 (describing allegations in Malpractice Action).

[46]    Joint Brief ¶ 43 & n.110.

[47]    Joint Brief ¶¶ 45–46 & n.115 (quoting Bench Ruling).

B.    COMU SECURED DISCHARGE THROUGH FRAUD AND BAD FAITH

28.    Comu secured his Discharge through widespread fraud, including the deliberate concealment of assets and significant and numerous false oaths regarding Comu's debts, assets, income, employment circumstances, and professional activities.[48]

29.    Comu falsified information about his expenses, debts and liabilities in his Bankruptcy Filings in order to create a knowingly false appearance of insolvency and secure discharge in the Bankruptcy Case.[49]   For example, Comu falsely claimed ongoing monthly expenses for Paladium Residence property taxes that Comu had already paid via TBG accounts,[50] and knowingly duplicated his personal debts and liabilities, perpetuating a false appearance of indebtedness.[51]

30.    In Schedule F, Comu claimed debts and liabilities of over $6.2 million, the vast majority of which ($6,011,407.02) relates to alleged judgments and potential claims.[52]

31.    Only approximately $2.4 million in creditor claims were filed in the Bankruptcy Case (about 38% of Comu's scheduled debts) – 95% of which is attributable to Plaintiffs' claims arising from the Judgment Debt.[53]

32.    In Schedule F, Comu knowingly and deliberately fabricated information by claiming he was personally liable for two substantial civil judgments (the "AJW Judgments"), together totaling $1,907,462.[54]   Comu undeniably knew he had no liability for the AJW Judgments, and should not have included them in Schedule F, because he was not a party to

---

[48]    *See generally* Joint Brief FOF Section B; *see also* Joint Brief ¶¶ 50–51.

[49]    *See generally* Joint Brief FOF Section B(1); *see also* Joint Brief ¶ 98.

[50]    Joint Brief ¶ 55 & n.135, 137.

[51]    Joint Brief ¶¶ 62–63 & n.153 (identifying specific examples of duplicated debts).

[52]    Joint Brief ¶¶ 56, 59.  Comu did not indicate, as required in Schedule F, whether any of these judgments and claims were contingent, unliquidated, or disputed.  Joint Brief ¶ 59 & n.145; *see also* Trustee Ex. 94 at 12–15.  By failing to provide this information, Comu gave Trustee and Creditors the false impression that the debts were undisputed, and thus it would not benefit any single creditor to spend money pursuing assets for the bankruptcy estate.  Joint Brief ¶ 59 & n.145.

[53]    Joint Brief ¶ 57; *see also* JPTO Stip. Fact ¶ 11.  Other than Plaintiffs (who are the only judgment creditors to file claims), seven creditors filed claims in the Bankruptcy Case, which together total $115,508.05 (84% of which is credit card debt).  Joint Brief ¶¶ 58–59 & n.142.

[54]    Joint Brief ¶¶ 64–70.

one AJW lawsuit,[55] he was not named as a liable defendant in either AJW Judgment,[56] and he personally executed settlement agreements in 2008 (resulting in the dismissal of both underlying lawsuits), and the assignment of the AJW Judgment debts to his own company, SUN Sports & Entertainment, Inc. ("SUN Sports") (an entity Comu owned and operated as CEO until mid-2009).[57]

33.     Comu's claim that the AJW Judgments constituted personal debts demonstrates his specific and willful intent to avoid the claims of Plaintiffs (and Katz in particular), because after the settlements and assignments – and before the Petition Date – Comu caused SUN Sports to filed a federal lawsuit against KLE and Katz individually (the "SUN Sports Suit") attempting to enforce the AJW Judgments against them (which, if a legitimate claim, would have benefitted Comu).[58]

34.     Even if Comu believed he had any personal liability arising from the AJW Judgments, he failed to disclose the entities that were actually held liable under those judgments as required in Schedule H.[59]

35.     Comu also failed to schedule and made knowingly false statements regarding numerous and substantial pre-petition interests and assets, and deliberately concealed or misrepresented information about those assets when questioned under oath.[60]

36.     Comu deliberately concealed the existence of numerous accounts held by Sunset Pacific and Comu personally at Turkish Bank (the "Turkish Bank Accounts") (which

---

[55]     Joint Brief ¶ 65 & n.155, 158.
[56]     Joint Brief ¶¶ 65–66 & n.158, 160, 162.
[57]     Joint Brief ¶ 67 & n.163–166.
[58]     Joint Brief ¶ 70 & n.169–171, 173. The SUN Sports Suit was pending on the Petition Date and was dismissed after the Discharge Date. Joint Brief ¶ 70 & n.173.
[59]     Joint Brief ¶ 69 & n.167–168. In Schedule H, Comu denied under oath the existence of "any person or entity … that is also liable on any debts listed by the debtor in the schedules of creditors." Trustee Ex. 94 at 17. Comu therefore either misrepresented his debts in Schedule F, or he omitted codebtors he was required to disclose in Schedule H. Comu also failed to identify codebtors with regard to credit card debt, as reflected in the Debts Memo. *See* KLM Ex 310 at 2 (identifying debt accounts for which Comu is a "guarantor"). Joint Brief ¶ 69 n.168
[60]     *See generally* Joint Brief Section B(2); *see also* Joint Brief ¶ 51.

Comu used to conceal and dissipate assets), and lied under oath at the Creditors Meeting and at his 2013 deposition by unequivocally denying the existence of foreign accounts (specifically including accounts at Turkish Bank).[61]  Trustee testified that she learned of the Turkish Bank Accounts only at trial, and that if she had known earlier of Comu's concealment of the accounts she would have joined Plaintiffs' revocation claims.[62]

37.    Comu also failed to disclose income he received in 2008 and 2009 from numerous sources;[63] he knowingly underestimated his anticipated income in Schedule I (further perpetuating a false impression that insufficient assets existed to satisfy creditor claims);[64] he concealed his substantial direct and indirect pre-petition equity interest in GANAS, Corp. ("GANAS"), and Green Automotive Company Corporation ("Green Auto");[65] he falsely denied under oath having signatory authority over accounts held by any entity (when he had such authority for numerous entities, including but not limited to TBG, Marathon Management,[66] and Sunset Pacific);[67] and he failed to disclose or misrepresented facts about numerous other pre-petition assets (including intellectual property) and accounts.[68]

---

[61]    Joint Brief ¶¶ 71–73 & n.176–177, 180; *see also* Joint Brief ¶ 51.  Comu unequivocally denied the existence of the Turkish Bank Accounts at his deposition, and admitted their existence only when confronted at trial with documents from the 2013 Electronic Production.    Joint Brief ¶¶ 71–72.  Following trial, on April 4, 2014, the Court entered an *Extended Temporary Restraining Order and Mandatory Injunction* (the "Mandatory Injunction," Adv. Doc. No. 142), ordering, *inter alia*, Comu to immediately produce information about the Turkish Bank Accounts and turnover assets held therein. Mandatory Injunction at 4.  Joint Brief ¶ 48 & n.121.  On April 23, 2014, Trustee filed a report on the status of Comu's compliance with the Mandatory Injunction (the "Injunction Status Report," Adv. Doc. No. 144, cited herein as "Inj. Status Report"), confirming the existence of at least three undisclosed Turkish Bank Accounts. Inj. Status Report at 4; *id.* at 12–14 (item # 39, 54, 55, 79); *see also* Joint Brief ¶ 49.

[62]    Joint Brief ¶ 73 & n.180.

[63]    Joint Brief ¶ 74 & n.181–182.

[64]    Joint Brief ¶ 75 & n.184.

[65]    Joint Brief ¶ 77; ¶ 97 & n.259; ¶¶ 184, 185–188; ¶¶ 195–199; JPTO Stip. Fact ¶¶ 23–25, 30–34; *see also generally* Joint Brief FOF Section D, E(1)–(2).

[66]    "Marathon Management" herein refers to and includes three *dba*s of the same entity – Marathon Management Limited Company ("Marathon Limited"), Marathon Management, Inc. ("Marathon Inc."), and Marathon Management LLC ("Marathon LLC").    Joint Brief ¶¶ 105, 107 & n.278, 288, 291.

[67]    Joint Brief ¶ 79 & n.195–196; ¶ 110 & n.292; ¶ 124; ¶ 148; JPTO Stip. Fact ¶ 75; *see also generally* Joint Brief FOF Section C(1)–(3), E(3)(b).

[68]    Joint Brief ¶ 81 & n.202, 204, 206, 208–210; ¶ 125; *see also* Joint Brief ¶¶ 20, 23, 33.

38.    Comu also falsely claimed in Schedule B §§ 19–20 that he owned no equitable or future interests, or any interests in trusts, when in fact he admittedly had at least the right to receive millions of shares of Green Auto stock (directly or indirectly through TBG),[69] and he knew he was a beneficiary of the TKY Trust ("TKY Trust") – a Canadian family business trust that Comu personally organized before the Petition Date (and, conveniently, formally established shortly after the Petition Date) for the purpose of concealing and dissipating assets.[70]

39.    Comu's Bankruptcy Filings and testimony at the Creditors Meeting also omit or misrepresent information about the assets of his wife Phyllis, who was not identified as a codebtor as required in Schedule H, despite the fact she was married to Comu and had no discernible separate income or property at all relevant times.[71] Comu also failed to schedule any information regarding Phyllis's income or occupation as required in Schedule I,[72] and concealed or misrepresented other information regarding assets held in Phyllis's name that Comu falsely claimed were Phyllis's sole separate property.[73]

40.    Comu also deliberately concealed or misrepresented, under oath in his Bankruptcy Filings or in sworn testimony, a variety of important details he was obligated to disclose in SOFA § 18 regarding his interests in lucrative and ongoing business ventures.[74]

---

[69]    JPTO Stip. Fact ¶ 34; Joint Brief ¶ 78, ¶ 184; ¶¶ 195–200 n.575, 580; ¶ 202.

[70]    JPTO Stip. Fact ¶ 38; Joint Brief ¶ 78; ¶¶ 268–270 & n.697–698; ¶¶ 274–275 & n.710–711; ¶ 278; *see also generally* Joint Brief FOF Section D, E(1)–(2), E(4)(a). In December of 2009, Comu retained Synergy Business Lawyers in Vancouver, Canada ("Synergy") for the express purpose of establishing TKY Trust; and in particular, he selected the trust's name, directed Synergy regarding the details of TKY Trust's control and beneficiaries, and approved the final trust documents. Joint Brief ¶ 269 & n.697. Although Comu could have retained control over TKY Trust, he specifically instructed Synergy to prepare the TKY Trust documents to reflect it was controlled by Cem Comu as trustee. Joint Brief ¶ 269 & n.698.

[71]    Joint Brief ¶¶ 32–33; ¶ 51; ¶ 61 & n.147; ¶ 80 & n.197, 200–201.

[72]    Joint Brief ¶ 76 & n.186.

[73]    Joint Brief ¶ 80 & n.197, 200–201; ¶ 111 & n.299; ¶¶ 123–124 & n.336–337.

[74]    *See generally* Joint Brief FOF Section (B)(3); *see also* Joint Brief ¶ 83 (quoting SOFA § 18, which expressly details Comu's disclosure obligations regarding his business activities and affiliations for the six years preceding Petition Date).

41. Specifically, in Schedule B, SOFA § 18, and in sworn testimony, Comu omitted or misrepresented his numerous interests in, and assets held by, various partnerships and joint ventures (and, in particular, falsely denied involvement in any new business ventures at the Creditors Meeting),[75] and he concealed, or provided insufficient, false and misleading information about, his interests in TBG, Sunset Pacific, and Marathon Management (all which he used to conceal and dissipate personal assets).[76]

42. Comu also deliberately concealed and made false misleading disclosures about his ongoing affiliation with and valuable equity stake in Global Energy Technology Group, Inc. ("GETG") (for which Comu was a principal and director) and related entities XL Biofuels, Inc. ("XL Biofuels"), Bio-Global Resources, Inc. ("Bio-Global"), and Biofuel Development Joint Venture (the "Biofuel JV") (together with GETG, the "GETG Entities")[77] – more entities Comu has used as conduits to conceal and dissipate assets[78] – and failed to disclose interests in Global Energy Group, Inc.[79]

43. Comu further failed to schedule or disclose before the Discharge Date his pre-petition executive and partnership positions and/or equity interests in valuable ongoing business ventures, including T3 Networks, Inc. ("T3 Networks") and Paragon GPS, Inc. ("Paragon") (with regard to both Comu received undisclosed income after the Petition Date, which was not disclosed until after the Discharge Date);[80] Revolution Fight Club LLC ("RFC") (a Florida entity in which Comu was a Director and Partner, which was actively

---

[75] Joint Brief ¶ 51 & n.132; ¶ 82; ¶¶ 85–86 & n.217, 219–221; ¶ 88 & n.223–225; ¶ 89 & n.228–231; ¶ 92 & n.237–238 ; ¶ 95 & n.247; ¶ 96 & n.254–256; ¶ 97 & n.260–267; ¶ 103; ¶ 106; ¶ 111; ¶ 113 & n.304; *see also generally* Joint Brief FOF Sections B(3) & C(1)–(3).
[76] Joint Brief ¶ 51 & n.128; ¶ 84; ¶ 90 & n.232; ¶ 106 & n.284, 286–287; ¶ 110 & n.293–294, 297; ¶ 111 & n.299; ¶¶ 115–116; ¶ 120; ¶¶ 125–128 & n.350; ¶¶ 131–138 & n.383; ¶ 142; ¶ 147; ¶¶ 149–152; ¶ 157; *see also generally* Joint Brief FOF Sections C(1)–(4) & E(1)–(3).
[77] Joint Brief ¶¶ 85–91 & n.217–225 & n.228–232.
[78] Joint Brief ¶ 91; *see also generally* Joint Brief FOF Section E(5)(h).
[79] Joint Brief ¶ 92 & n.237–238.
[80] Joint Brief ¶¶ 93–94 & n.240–241 & n.245–246.

engaged in lucrative mixed martial arts ("MMA") events before and after the Petition Date;[81] Campus Investments PLC ("Campus Investments") (a UK company that Comu used to receive, transfer and dissipate assets after the Petition Date);[82] GANAS (to which Comu elected himself as President and Director on October 29, 2009);[83] and numerous other entities in which Comu held undisclosed valuable pre-petition interests and/or executive positions, many of which Comu used as alternative and overlapping vehicles for the business of TBG (and other Comu affiliates), and as conduits to conceal or dissipate assets.[84]

44.     In addition to the numerous undisclosed pre-petition assets and business interests described *supra*, after the Petition Date, Comu received or became entitled to receive (either individually or through alter egos and affiliates) substantial assets arising from or related to his undisclosed and ongoing pre-petition business ventures, which assets were not disclosed before the Discharge Date or ever turned over to Trustee.[85]

45.     Based on the above, the Court finds that Comu's bankruptcy was motivated not by a legitimate need for relief from debts he was unable to pay, but by a willful and malicious desire to create a knowingly false perception of insolvency, and to thwart Plaintiffs' pursuit of state court remedies, which constitutes bad faith abuse of the bankruptcy process and the judicial system.[86]

46.     The myriad false oaths and undisclosed assets described in this Section B (as well as undisclosed facts regarding Comu's assets and business ventures addressed *infra* in Sections C, D and E) are "material" because they relate to Comu's business transactions and

---

[81]     Joint Brief ¶ 81 & n.208; ¶ 95 & n.247–248 & n.250–252.
[82]     Joint Brief ¶ 96 & n.254–256; *see also* Joint Brief FOF Section E(5)(g).
[83]     JPTO Stip. Fact ¶ 24 (stipulating previously undisclosed pre-petition positions as GANAS President and Director); Joint Brief ¶¶ 189–191 & n.561.
[84]     Joint Brief ¶ 97 & n.260–267; *see also generally* Joint Brief FOF Sections D(1), E(5).
[85]     *See generally* Joint Brief FOF Section (B)(3), C(1)–(4), (D)(1)–(2), E(1), E(2)(c)–(e), E(3)–(6); *see also, e.g.*, Joint Brief ¶ 52; ¶ 90 & n.232; ¶ 93 & n.241; ¶ 94 & n.246; ¶ 95 & n.248, 250–252; ¶ 96 & n.256.
[86]     Joint Brief ¶ 98; ¶ 100 & n.270; *see also generally* Joint Brief FOF Section B(4).

estate, or they concern the discovery of assets, business dealings, or the existence and disposition of Comu's property.[87]

### C.    USE OF ALTER EGOS TO CONCEAL AND ENJOY ASSETS

47.    Before and after both the Petition Date and the Discharge Date, Comu used entities he owns or controls (herein, the "Comu Alter Egos," including Marathon Management,[88] Sunset Pacific,[89] TBG,[90] and Regus Advisors, Inc. ("Regus Advisors")[91]), and other domestic and foreign affiliates in which he holds interests,[92] to conceal, dissipate and enjoy assets that should have been available to creditors in the Bankruptcy Case.[93]

48.    Various Comu Alter Egos and affiliates – including but not limited to Sunset Pacific, TBG, Marathon Management, SUN Sports, the GETG Entities, Regus Advisors, and EuroCap Investments PLC ("EuroCap") (a UK entity formed by Comu after the Petition Date, which he has used to sell stock owned by TBG[94]) – and numerous bank accounts held by Comu personally or Comu Alter Egos, share or have various common addresses (including on occasion Comu's personal addresses at the Paladium Residence and Oaks North Residence).[95]

49.    Comu omitted, deliberately concealed, knowingly misrepresented, and made inaccurate and misleading disclosures about his 100% ownership of and executive titles with *dba*s Marathon Inc., Marathon Management Limited Company ("Marathon Limited"), and

---

[87]    Joint Brief ¶ 53.
[88]    *See generally* Joint Brief Section C(1).
[89]    *See generally* Joint Brief Section C(2).
[90]    *See generally* Joint Brief Section C(3).
[91]    *See generally* Joint Brief Section C(4).
[92]    *See generally* Joint Brief Section E(1)–(6).
[93]    Joint Brief ¶¶ 101–102.
[94]    *See generally* Joint Brief FOF Section E(5)(f).
[95]    Joint Brief ¶¶ 11–12; ¶ 67 n.166; ¶ 72 n.176; ¶ 85 n.217; ¶ 92; ¶ 97 n.261, 263; ¶ 104 & n.275; ¶ 105 & n.279; ¶ 107 & n.289; ¶ 113 n.304; ¶ 118; ¶ 124 & n.344; ¶ 137; ¶ 148; ¶ 159; ¶¶ 162–163; ¶ 170 n.530; ¶ 213; ¶ 340.

Marathon Management LLC ("Marathon LLC") (together, "Marathon Management")[96] – a fact he now stipulates.[97]

50.     Comu has used Marathon Management to conceal, transfer, and enjoy assets that should have been included in the bankruptcy estate.[98]

51.     The sole purpose of Marathon Management, which conducts no independent business, is to hold Comu's personal assets and serve as general partner of Sunset Pacific,[99] and the sole purpose of Sunset Pacific is to hold Comu's personal assets.[100]

52.     Comu also made false, misleading, and inconsistent statements under oath regarding his ownership interest in Sunset Pacific, and has deliberately omitted or misrepresented facts for the purpose of concealing his interest in Sunset Pacific and the assets it holds.[101]

53.     In his Schedules, at the Creditors Meeting, and at trial, Comu attested under oath that he owns only 1% of Sunset Pacific, with the remainder being owned by Comu's brother (1%), Gem C. Comu *a/k/a* Cem Comu ("Cem Comu"), and his wife Phyllis (98%) – which Comu claims is Phyllis's separate property.[102]   Contrary to these oaths, Defendants now stipulate that Marathon Management (which Comu wholly-owns) has held a 1% partnership interest in Sunset Pacific since 2006.[103]

---

[96]     Joint Brief ¶¶ 103–110 & n.276, 278–280, 284, 286–289, 291–292; ¶ 114.
[97]     JPTO Stip. Fact ¶ 75; *see also* Joint Brief ¶ 106 & n.282.
[98]     Joint Brief ¶¶ 109–110 & n.292–294, 296; ¶ 128.
[99]     Joint Brief ¶¶ 109, 114–115, 117, 121–122, 128; *see also* JPTO Stip. Fact ¶¶ 75–76.
[100]    Joint Brief ¶ 120 & n.324; *see also* JPTO Stip. Fact ¶¶ 79–81.
[101]    *See generally* Joint Brief FOF Section C(2); *see also* Joint Brief ¶ 106 & n.287; ¶ 177.  Comu has always claimed that Sunset Pacific is owned 98% by Phyllis and 1% by Comu (*see, e.g.*, JPTO Stip. Fact ¶ 76) – but he has alternatively claimed or stipulated – even at trial – that the remaining 1% of Sunset Pacific is owned by Cem Comu (*see* Def. Ex. 4 at 5; JPTO Stip. Fact ¶ 69), or by Marathon Management (JPTO Stip. Fact ¶ 73, ¶ 74) – an entity that Comu stipulates he (not Cem) owns 100% (JPTO Stip. Fact ¶ 75).  Therefore, by his own admission, Comu owns at least 2% of Sunset Pacific – not 1% – which contradicts his Bankruptcy Filings and his testimony at trial.  Joint Brief ¶ 115.
[102]    JPTO Stip. Fact ¶ 69; Joint Brief ¶ 10; ¶ 106 n.287; ¶ 111 & n.299.  Cem Comu is a Canadian citizen who resides in Burnaby, British Columbia, and has at least one address in Istanbul, Turkey. Joint Brief ¶ 10.
[103]    JPTO Stip. Fact ¶ 76; *see also* Joint Brief ¶¶ 106, 115.

54.     Further contrary to his sworn testimony, the evidence confirms that Comu has owned and controlled Sunset Pacific since 1996, and that he continues to own and control 100% of Sunset Pacific and its assets.[104]

55.     There is no objective evidence to support Comu's representation that Cem Comu has ever owned an interest in Sunset Pacific,[105] and insufficient evidence to support Comu's claim that Phyllis owns 98% of Sunset Pacific or, if she did, that such ownership was her separate property or subject to her exclusive control.[106]

56.     Irrespective of Sunset Pacific's ownership, Comu deliberately concealed information, or made inconsistent and misleading disclosure about Sunset Pacific's assets that created the false impression that Comu's interest in Sunset Pacific – whatever it might be – held no potential recovery for creditors.[107]

57.     Moreover, Comu has used Sunset Pacific, both before and after the Petition Date, as a conduit to conceal and dissipate assets that should have been included in the bankruptcy estate and made available to satisfy creditor claims – including $500,000 that Comu received in the fraudulent transaction that was the subject of the New York Action, and which constitutes a portion of the damages awarded to (but not yet recovered by) Plaintiffs in the New York Judgment.[108]

58.     Based on the above, and contrary to Comu's sworn oaths, the Court finds that Comu owns and/or controls 100% of Sunset Pacific, and Comu and Phyllis, knowingly and in concert with each other and with Sunset Pacific, fraudulently exploited the Sunset Pacific

---

[104]     Joint Brief ¶ 124; *see also* Joint Brief ¶¶ 112–119 & n.302, 304, 314–315, 318 (detailing Sunset Pacific's corporate history and Comu's direct or indirect control since 1996); *see also* JPTO Stip. Fact ¶¶ 70–81 (stipulated facts pertaining to Sunset Pacific's corporate history and control).
[105]     Joint Brief ¶ 116 & n.315.
[106]     Joint Brief ¶¶ 121–124 & n.336–337.
[107]     Joint Brief ¶¶ 125–126 & n.350; *see also* JPTO Stip. Fact ¶ 81.
[108]     Joint Brief ¶¶ 127–128; *see also geneally* Joint Brief FOF Section E(1)(e).  Thus, Comu has used Sunset Pacific to conceal assets derived from the very fraud perpetrated against Plaintiffs before the Petition Date, which is the basis of the Judgment Debt, reflecting Comu's willful and malicious intent to hinder, delay and defraud Plaintiffs' claims as creditors.  Joint Brief ¶ 127.

corporate form both before and after the Petition Date for the purpose of concealing Comu's assets and avoiding creditor claims (and in particular, Plaintiffs' claims).[109]

59.    Comu also deliberately omitted and misrepresented material facts, or made misleading disclosures, in order to conceal his interest in TBG and the assets it holds, and to further his fraudulent scheme to hinder, delay and defraud his creditors.[110]

60.    Comu unequivocally claimed in sworn testimony and verified court filings that he owns only a one percent (1%) ownership interest in TBG, and that the remaining 99% of TBG is owned by Third-Party Defendant Brown.[111]  Brown contradicted Comu's sworn oaths by claiming in court filings and his deposition that 99% of TBG is owned not by Brown, but by Brown & Lampe PLC ("B&L"), a UK entity[112] – a material inconsistency Comu never corrected in his Bankruptcy Filings and failed to explain credibly in his trial testimony.[113]

61.    Comu also made knowingly false and inconsistent statements regarding his various executive positions with TBG by, *inter alia*, unequivocally claiming in sworn testimony to be a mere employee of TBG, which is flatly contradicted by TBG's corporate filings with the Texas Secretary of State ("SOS"), federal tax records, and Comu's internal correspondence produced in the 2013 Electronic Production, and sworn affidavits, all of which confirm Comu is TBG's sole officer President, Chairman, Chief Executive Officer, and

---

[109]    Joint Brief ¶¶ 129–130 & n.365–365.

[110]    *See generally* Joint Brief FOF Section C(3); *see also, e.g.*, Joint Brief ¶¶ 131, 177.

[111]    JPTO Stip. Fact ¶ 14; Joint Brief ¶ 13; ¶ 40 & n.100; ¶ 132; *see also, e.g.*, Def. Ex. 4 at 6 (Comu testifying at Creditors Meeting that "Mr. Bernard Brown owns 99% of" TBG).

[112]    JPTO Stip. Fact ¶ 14; Joint Brief ¶ 13; ¶ 40; ¶ 132; *see also, e.g.*, Defendants' Answer ¶ 4 (alleging on behalf of Brown that 99% of TBG "is actually owned by a United Kingdom Corporation named Brown and Lampe, PLC").

[113]    Joint Brief ¶¶ 34, 132, 142; *see also* JPTO Stip. Fact ¶ 20.

Director.[114] Despite his sworn testimony, Comu has now stipulated that his prior sworn statement that he was a mere TBG employee was false.[115]

62. In addition to his misrepresentations regarding his positions with TBG, Comu deliberately concealed his true ownership interest (which the Court finds to be 100%) and complete control over TBG's business, assets, and accounts.[116]

63. The Court finds no credible evidence to support Comu's allegation that Bernard Brown (or B&L) has ever held a 99% interest in TBG,[117] a finding that is supported by Brown's own deposition testimony (which confirms, among other things, that Brown has had virtually no involvement in, or knowledge of, TBG's management and operations,[118] and Comu's own trial testimony, which was contradictory and lacked credibility.

64. Nor is there credible evidence that B&L – which Defendants now stipulate did not exist as a UK corporation at any time relevant to this dispute[119] – has ever owned any real equity interest in TBG. The only document supporting the allegation B&L holds an equity stake in TBG is an agreement between B&L and TBG (the "B&L Share Exchange") – which was never disclosed in Comu's Bankruptcy Filings – purporting to exchange TBG's outstanding stock for one million shares of B&L common stock.[120]

65. The Court finds based on the evidence presented at trial – including Brown's deposition testimony, and Comu's inconsistent testimony – that the B&L Share Exchange was a sham transaction contrived by Comu, with Brown's knowledge, with the fraudulent intent to

---

[114]   Joint Brief ¶¶ 133–137 & n.383; ¶¶ 139–140; ¶ 191.

[115]   Joint Brief ¶ 136; *see also* JPTO Stip. Fact ¶ 15 (Comu as an original TBG Director); JPTO Stip. Fact ¶ 17 (Comu executing corporate documents filed with SOS as TBG's CEO); JPTO Stip. Fact ¶ 18 (Comu executing corporate reports filed with Texas SOS as TBG's President, sole officer and director of TBG); *see also* JPTO Stip. Fact ¶ 31.

[116]   Joint Brief ¶¶ 134–140 & n.383; ¶ 157 & n.463 (referencing Court's relevant Bench Findings); *see also* JPTO Stip. Fact ¶¶ 15–18 (stipulated facts regarding Comu's historical control over TBG).

[117]   Joint Brief ¶¶ 141–147.

[118]   Joint Brief ¶¶ 144–145 & n.401.

[119]   JPTO Stip. Fact ¶ 21; Joint Brief ¶ 144.

[120]   JPTO Stip. Fact ¶¶ 19–22; *see also* Joint Brief ¶¶ 141–143.

conceal Comu's true ownership of TBG from Trustee and creditors.[121]   (Even if the B&L Share Exchange had been a legitimate transaction, Comu failed to disclose his purported ownership of one million B&L shares – further reflecting his intent to conceal assets).[122]

66.    Regardless of any legal partnership structure, at all times relevant to the Bankruptcy Case, Comu did not observe corporate formalities or separateness for TBG, and it is undisputed that, both before and after the Petition Date, Phyllis and Comu habitually used TBG accounts as a personal "piggy bank" to sustain their luxurious lifestyle despite Comu's bankruptcy, through substantial and unexplained cash withdrawals, and to pay personal expenses (including, but not limited to property taxes on the Paladium Residence, country club dues, international travel, "outfits" for Phyllis, and other luxuries).[123]

67.    In an effort to conceal these available assets from his creditors (and enjoy them himself), Comu failed to disclose, and made deliberately false and misleading statements under oath regarding, TBG's pre-petition assets and equitable interests[124] (although he now stipulates numerous facts confirming TBG's valuable pre-petition holdings).[125]

68.    Comu also exploited TBG after the Petition Date as a conduit to receive, transfer, dissipate, and liquidate millions of dollars in cash and other assets attributable to the bankruptcy estate.[126]

69.    Based on the foregoing, the Court finds that Comu, knowingly and in concert with Brown and TBG, disregarded and exploited TBG's corporate form in order to fraudulently conceal and dissipate estate assets both before and after the Petition Date and the Discharge Date.[127]

---

[121]    Joint Brief ¶¶ 142–146 & n.401.
[122]    Joint Brief ¶¶ 142, 147; JPTO Stip. Fact ¶ 21.
[123]    Joint Brief ¶ 55 & n.137; ¶ 137; ¶ 148; ¶¶ 151–154 & n.419, 424, 454–455; ¶ 353 & n.920.
[124]    Joint Brief ¶¶ 149–150, 152, 154; *see also generally* Joint Brief FOF Section D & E(1).
[125]    JPTO Stip. Fact ¶¶ 23, 28, 30, 33–34.
[126]    Joint Brief ¶¶ 150–153 & n.454–455; ¶¶ 155–156; *see also* JPTO Stip. Fact ¶ 36, 39, 42, 44, 49–52, 55–59, 62, 64–65; *see also generally* Joint Brief FOF Section E(2)–(3).
[127]    Joint Brief ¶¶ 157, 171; *see also generally* Joint Brief FOF Section D, E(1)–(3).

70.     To further his scheme to defraud his creditors, using TBG resources that should have been included in the bankruptcy estate, Comu formed Regus Advisors and at least two other Regus Advisors affiliates (Regus Realty Partners, LLC and Regus Capital Fund, LP.) in mid-2010 to assume to take over TBG's lucrative ongoing business ventures (commenced prior to the Petition Date), and to conceal and dissipate assets of the estate received after the Petition Date.[128]

71.     Although Comu testified at trial that Regus Advisors is owned by TKY Trust (a claim that has not been corroborated by any document or other testimony), the evidence presented at trial confirms to the contrary that – like TBG and Sunset Pacific – Regus Advisors is wholly-owned and/or controlled by Comu, who is Regus Advisor's President and Chairman, and runs its business using many of the same offices and insiders used for TBG and GETG Entities business (as well as other Comu affiliate entities).[129]   This finding is supported by undisputed evidence that Comu (who described Regus Advisors to one of his TBG partners as the "next Chapter"),[130] personally set up and controlled Regus Advisors' bank accounts[131] and its website – which was, quite literally, cut and pasted from the TBG website.[132]

72.     Evidence further confirms that, like the other Comu Alter Egos, Comu fraudulently used Regus Advisors to conceal, transfer and dissipate assets of the estate (including, but not limited to TBG assets and ongoing business – including millions of Green

---

[128]     *See generally* Joint Brief FOF Section C(4); *see also, e.g.*, Joint Brief ¶ 158 & n.465; ¶¶ 160–161; ¶ 163; ¶ 166; ¶¶ 168–174.
[129]     Joint Brief ¶¶ 159–165 & n.471, 479, 484; ¶ 167; *see also, in particular*, KLM Ex. 222 at 1 (Comu identifying TBG as Regus Advisors' "Parent Company").
[130]     Joint Brief ¶ 165.
[131]     Joint Brief ¶ 170 & n.530.
[132]     Joint Brief ¶ 166 & n.508.

Auto shares) that should have been turned over to Trustee and made available to satisfy creditor claims.[133]

73.    Based on the above, the Court finds that Comu (with the willing participation of various insiders from TBG and the GETG Entities) established Regus Advisors, of which Comu owns or controls 100%, for the specific purpose of continuing TBG's business (while maintaining the same measure of personal ownership and control), and in furtherance of his fraudulent scheme to hinder, delay and defraud his creditors by concealing and dissipating assets, and to receive and enjoy property of the estate after the Petition Date that remained undisclosed to Trustee or creditors.[134]

### D.    COMU'S SECRET PRE-PETITION EQUITY STAKE IN GREEN AUTO

74.    Before the Petition Date, Comu played an instrumental role in effecting a lucrative – and deliberately concealed – reverse merger (the "Green Auto Merger") by virtue of which TBG and Comu acquired over 151 million shares of stock, which Comu liquidated through TBG and other affiliates for millions of dollars in cash that should have been used to satisfy creditor claims in the Bankruptcy Case.[135]

75.    On October 26, 2009 (just over two months before the Petition Date – and while Comu was preparing to file his bankruptcy Petition),[136] Comu used TBG to acquire over 95 million shares of GANAS stock (representing almost 100% of the shell company's outstanding stock) by virtue of two agreements Comu executed as TBG's President.[137]

---

[133]    Joint Brief ¶¶ 168–173 & n.523, 529; *see also* ¶ 306 & n.726 and ¶ 331 & n.844–845 (9 million Green Auto shares liquidated for cash through Regus Advisors).

[134]    Joint Brief ¶¶ 173–174.

[135]    *See generally* Joint Brief FOF Section D(1)–(3) (detailing facts regarding, and stock acquired as a result of, the Green Auto Merger); JPTO Stip. Fact ¶¶ 23–35 (stipulated facts regarding pre-petition Green Auto Merger); *see also, in particular*, Joint Brief ¶¶ 184–185; ¶ 190; ¶ 192 & n.566; ¶ 199.

[136]    Joint Brief ¶ 19.

[137]    Joint Brief ¶¶ 186–188 & n.559; JPTO Stip. Fact ¶ 23.

76. After Comu executed documents electing himself President and Director of GANAS,[138] he executed documents on November 4, 2009, authorizing GANAS (a shell corporation with publicly-tradable stock) to enter into a reverse merger with Go Green USA, LLC ("Go Green"), and, acting as President of both GANAS and TBG, Comu executed a merger agreement among GANAS, Go Green and TBG by which Go Green merged into GANAS, with Green Auto emerging as the surviving entity (the "Merger Agreement).[139]

77. Comu enlisted insiders from TBG, Regus Advisors, and the GETG Entities (in particular, Dave Welch), to assist him with the Green Auto Merger.[140]

78. Comu steadfastly maintained in sworn testimony and documents filed with this Court (and even suggested in his trial testimony) that the Green Auto Merger was not effective until after the Petition Date, which, in his wrongly-held view, excused him from any duty to disclose his or TBG's interests in the transaction.[141] Contrary to his sworn testimony, Comu now stipulates that the "effective date" of the Green Auto Merger was November 5, 2009 – on which date TBG had the right to receive over 95 million shares of Green Auto stock (plus additional future shares pursuant to a valuable anti-dilution clause).[142]

79. Moreover, Comu's own internal correspondence from 2009 – obtained only through the 2013 Electronic Production – confirms that *before the Petition Date*, Comu was actively publicizing the merger's closing, marketing Green Auto stock to potential investors, and collecting cash through the sale of TBG's Green Auto stock to private investors – uncontested facts that establish Comu undeniably knew the Green Auto Merger closed before

---

[138] Joint Brief ¶ 189 & n.561; JPTO Stip. Fact ¶ 24.
[139] Joint Brief ¶ 191 & n.564; ¶ 194 & n.569; JPTO Stip. Fact ¶¶ 25–27, 29, 31.
[140] Joint Brief ¶ 191 & n.567; *see also* Joint Brief ¶ 167; ¶ 213 & n.604–606.
[141] Joint Brief ¶ 39 & n.97; ¶ 200 & n.579–580; *see also generally* Comu's trial testimony.
[142] JPTO Stip. Fact ¶ 30 (TBG's anti-dilution rights); JPTO Stip. Fact ¶ 33 ("The effective date of the Green Auto Merger was November 5, 2009."); JPTO Stip. Fact ¶ 34 ("As of the effective date of the Green Auto Merger, TBG had the right to receive new stock certificates reflecting 95,420,116 shares of Green Automotive stock"); Def. Pretrial Br. at 4 (admitting Comu "knew or should have known that TBG was going to receive stock in Green Auto soon after the" Petition Date); *see also* Joint Brief ¶¶ 195–196 & n.570–571, 574; ¶ 200.

the Petition Date, and exhibit Comu's willful intent to conceal his interests in Green Auto from Trustee and creditors.[143]

80.    In any event, even if the Green Auto Merger had not been effective until January 2010, Comu was still obliged to disclose his involvement and interest in the transaction in his Schedules and at the Creditors Meeting, which – as Comu concedes – gave rise to substantial assets after the Petition Date based on services performed before the Petition Date.[144]

81.    Defendants further stipulate that, as of the effective date of the Green Auto Merger, TBG had the right to receive new stock certificates reflecting over 95 million shares of Green Auto stock, which automatically converted from GANAS stock per the Merger Agreement.[145]  Defendants also now stipulate that, as of the effective date of the merger, TBG acquired valuable anti-dilution rights in Green Auto guaranteeing TBG would retain at least 40% equity in Green Auto for two years[146] – which gave rise to the issuance of an additional 36 million Green Auto shares in 2010 to TBG for no further consideration, resulting in a total of over 131 million Green Auto shares issued to TBG (the "Green Auto Stock") as a result of the 2009 Green Auto Merger.[147]

82.    Starting before the Petition Date and continuing through late 2013, Comu (through TBG and other affiliates), has generated millions of dollars in cash by selling Green Auto Stock at between $0.10 and $0.50 per share.[148]

---

[143]    Joint Brief ¶ 201; ¶¶ 203–205 & n.584, 586–587, 589–590, 593; *see also, e.g.*, KLM Ex. 172 at 1 (December 13, 2009 Comu email regarding Green Auto Merger: "Check out my latest gig…. Lots in motion for new year – let's go make a whole lotta dough!!!!"); *see also generally* Joint Brief FOF Section E(1).

[144]    Joint Brief ¶ 202; *see also generally* Joint Brief FOF Section E(2)

[145]    JPTO Stip. Fact ¶ 34; Joint Brief ¶ 195 & n.570–571.

[146]    JPTO Stip. Fact ¶ 30; Joint Brief ¶ 196 & n.574.

[147]    JPTO Stip. Fact ¶¶ 47–52; Joint Brief ¶¶ 196–198 & n.574–575; ¶¶ 221–225 & n.625, 627–628, 630; *see also generally* Joint Brief FOF Section E(2)(a).

[148]    Joint Brief ¶¶ 207 & n.595; *see also, e.g.*, Joint Brief ¶¶ 251 & n.668; ¶ 252 & n.670; ¶ 253 & n.673; ¶ 254 & n.675; ¶ 263; ¶ 277; ¶ 286; ¶ 305 n.759; ¶ 317; ¶ 327; ¶ 329 n.833 (all specific transactions, or calculations based on stipulated facts, reflecting Green Auto stock sales by TBG and other Comu affiliates at between $0.10 and $0.50 per share).

83.     In a recent Utah lawsuit between Green Auto and TBG over improper sales of restricted Green Auto stock,[149] Comu submitted a sworn affidavit to the Utah Court in 2013 valuing TBG's shares of Green Auto stock at $0.30 per share (the "Comu Value").[150]

84.     Based on these actual stock sales and Comu's sworn statement, TBG's undisclosed pre-petition interest in the Green Auto Stock was worth between approximately $13 million (at $0.10 per share) and, at the Comu Value, over $39.4 million.[151]

### E.     FRAUDULENT CONCEALMENT AND DISSIPATION OF ESTATE ASSETS

85.     Beginning before the Green Auto Merger was consummated, Comu deployed an elaborate scheme – perpetrated through and with the assistance of a network of affiliates and accounts controlled by Comu and/or Comu affiliates and insiders[152] – to conceal and dissipate the Green Auto Stock, and collect millions of dollars in cash proceeds, acquired by virtue of the 2009 Green Auto Merger.[153]

86.     On November 24, 2009, Comu executed on behalf of TBG a *Memorandum of Understanding* (the "Green Auto MOU"), between TBG, First Market Services, Inc., ("FMS") (a Texas corporation controlled by insiders of TBG, Regus Advisors and GETG, including Dave Welch), and Maybourne Ltd ("Maybourne"), an offshore entity, establishing a joint venture that effectively shifted two-thirds of TBG's pre-petition Green Auto stock to other entities – without depriving TBG of its valuable interest in the stock.[154]

87.     Comu further concealed TBG's Green Auto Stock holdings before the Discharge Date by creating and utilizing offshore entities (including "Green Car Automotive International Limited," a BVI corporation ("Green Car")), and corporate "nominee" services

---

[149]     *See* Joint Brief ¶¶ 208 n.596 (summarizing dispute in Utah lawsuit).
[150]     Joint Brief ¶ 208.
[151]     Joint Brief ¶ 209. Even at 2014 trading prices of $0.02 and $0.25, the Green Auto Stock was worth between $2,628,402 and $32,855,029.
[152]     Joint Brief ¶ 193 & n.567; ¶ 210; ¶ 211 & n.598; ¶ 213 & n.604–606; ¶ 227; ¶ 260; ¶ 289; ¶ 303; ¶ 307; ¶ 318; *see also generally* Joint Brief FOF Section E(5).
[153]     *See generally* Joint Brief FOF Section E(1)–(5).
[154]     Joint Brief ¶¶ 212–214 & n.600, 604–606; *see also generally* Joint Brief FOF Section E(1)(a).

(including Newhaven Nominees Limited ("Newhaven")), to hide TBG's ownership and subsequent transfers of the Green Auto Stock.[155]

88. Shortly after the Petition Date, Comu instructed Green Auto's stock transfer agent, Olde Monmouth Stock Transfer ("OMST") to cancel Green Auto stock certificates held by TBG, and issue new stock certificates transferring huge amounts of TBG's Green Auto Stock to various insiders and affiliates,[156] none of which was disclosed to Trustee or creditors before the Discharge Date.[157]

89. Out of TBG's Green Auto Stock – over 131 million total shares acquired by TBG (either before or after the Petition Date) by virtue of the Green Auto Merger – certificates representing 54,390,099 shares of Green Auto stock were issued directly to TBG (the "TBG Shares").[158] Comu has either sold for cash or transferred to affiliates the remaining approximately 77 million shares.[159] TBG remained in possession of 3,804,538 shares as of February 18, 2014,[160] and only approximately 1.8 million shares have been turned over to Trustee.[161] At the Comu Value, the TBG Shares were worth approximately $16,317,029, and at $0.10 per share, they were worth approximately $5,439,009.[162]

90. Between 2009 and 2010, TBG collected at least $3,736,826.60 in cash (a conservative estimate) for the sale of almost 20 million out of the approximately 54 million

---

[155]    Joint Brief ¶¶ 215–218 & n.608 – 615, 617 – 618; *see also generally* Joint Brief FOF Section E(1)(b), E(5)–(6).

[156]    Joint Brief ¶¶ 219–220 & n.619–621; *see also* JPTO Stip. Fact ¶¶ 39, 42, 44, 47.

[157]    Joint Brief ¶ 199.

[158]    JPTO Stip. Fact ¶¶ 47–52; Joint Brief ¶¶ 221–225 & n.625, 627–628, 630, 635.

[159]    Joint Brief ¶ 227; *see also generally* Joint Brief FOF Section E(1)(c)–(e) & E(3)–(5).

[160]    JPTO Stip. Fact ¶ 55; Joint Brief ¶ 226.

[161]    Per the Mandatory Injunction, Comu has turned over only 1,804,439 Green Auto shares out of the original TBG Shares. Joint Brief ¶ 226 & n.635; Inj. Status Report at 11 (items #1, #5–#9). Approximately 1 million additional Green Auto shares held by TBG are held by Westor Capital Group, Inc. ("Westor"), and are being administered by the trustee appointed in an action by the Securities Investor Protection Corporation ("SIPC"), which is pending in the United States Bankruptcy Court for the Southern District of New York. JPTO Stip. Fact ¶¶ 66–69; *see also generally* Joint Brief FOF Section E(2)(b).

[162]    Joint Brief ¶ 221.

TBG Shares, which includes at least $974,616 in direct TBG sales,[163] and $2,762,220 in cash sales (which Comu stipulates) through an escrow account held at OMST[164] (which does not include proceeds from the sale of the remaining 34 million TBG Shares, or sale proceeds from tens of millions of shares of the remaining Green Auto Stock effected through brokers or affiliates).[165]

91.    The remaining approximately 77 million shares acquired by TBG by virtue of the Green Auto Merger were sold for cash (through affiliates or brokers), or transferred to affiliates or corporate nominees, concealing TBG's beneficial interests in the stock.[166]

92.    In January of 2010, consistent with the Green Auto MOU, Comu instructed OMST to issue 42 million shares acquired by TBG by virtue of the Green Auto Merger to Maybourne, either directly or through its corporate nominee, Newhaven (the "Maybourne Shares") (worth between $4.2 and $12.6 million),[167] and another 22 million shares to FMS (the "FMS Shares") (worth between $2.2 and $6.6 million).[168]

93.    Evidence indicates that, in addition to TBG's cash receipts for direct sales and sales through OMST, both TBG and FMS (controlled by TBG insider Dave Welch) received cash proceeds for the sale of Green Auto stock through Maybourne.[169]   None of the Maybourne Shares or FMS Shares have been turned over to Trustee.[170]

94.    Comu further transferred millions of Green Auto shares held by TBG to (among other affiliates and insiders) Comu personally (300,000 shares) (the "Comu

---

[163]    *See generally* Joint Brief FOF Section E(3)(a) (detailing evidence of TBG's direct stock sales); *see also, e.g.*, Joint Brief ¶¶ 250–257 & n.668–679.

[164]    JPTO Stip. Fact ¶¶ 53–54, 56–57.  *See generally* Joint Brief FOF Section E(3)(b) (detailing evidence of TBG's stock sales through OMST escrow account); *see also, e.g.*, Joint Brief ¶¶ 258–264 & n.680.

[165]    *See generally* Joint Brief FOF Section E(3) & E(4)–(5); *see also, e.g.*, Joint Brief ¶ 264.

[166]    *See generally* Joint Brief FOF Section E(2)(c)–(e), E(3)–(5); *see also, e.g.*, Joint Brief ¶ 227.

[167]    *See generally* Joint Brief FOF Section E(5)(a); *see also, e.g.*, Joint Brief ¶¶ 290–291 & n.735; ¶¶ 293–296 & n.743.

[168]    *See generally* Joint Brief FOF Section E(5)(b); *see also, e.g.*, Joint Brief ¶¶ 297–301 & n.749.

[169]    Joint Brief ¶ 292 & n.737.

[170]    Joint Brief ¶¶ 296, 301.

Certificate");[171] Brown (200,000 shares) (the "Brown Shares");[172] Sunset Pacific (2,500,000 shares) (the "Sunset Pacific Shares");[173] TKY Trust (5,000,000 shares) (the "TKY Shares");[174] and DAPTCO Trust ("DAPTCO Trust," together with TKY Trust, the "Canadian Trusts"), a Canadian trust controlled by Comu's brother, Cem Comu (2,000,000 shares) (the "DAPTCO Shares").[175]

95.     Comu claims that the 2.5 million Sunset Pacific Shares were transferred pursuant to a Stock Purchase Agreement ("SPA") and related promissory note (for $250,000 accruing at 6% interest) (the "Sunset Pacific Note") between TBG and Sunset Pacific, dated January 10, 2010, in return for a purchase price of $200,000 (the "Sunset Pacific SPA").[176] No payments were ever made on the Sunset Pacific Note, which Comu elected (according to his trial testimony) to write off, and the Sunset Pacific Shares were returned to TBG (and have now been turned over to Trustee).[177]

96.     Comu also alleges the TKY Shares and DAPTCO Shares were transferred pursuant to SPAs in return for promissory notes similar to the Sunset Pacific SPA and the Sunset Pacific Note.[178]

97.     Although Cem Comu is trustee for both Canadian Trusts, Comu controlled and directed, either personally or through insiders at TBG or Regus Advisors, transfers of the TKY Shares and DAPTCO Shares, as well as the distribution of cash proceeds received by the Canadian Trusts from the sale of Green Auto stock.[179]

---

[171]     Joint Brief ¶ 234; *see also generally* Joint Brief FOF Section E(2)(c).
[172]     Joint Brief ¶ 244; *see also generally* Joint Brief FOF Section E(2)(d).
[173]     Joint Brief ¶ 245; *see also generally* Joint Brief FOF Section E(2)(e).
[174]     Joint Brief ¶ 270; *see also generally* Joint Brief FOF Section E(4)(a).
[175]     JPTO Stip. Fact ¶¶ 38, 44; Joint Brief ¶¶ 279–280; *see also generally* Joint Brief FOF Section E(4)(b).
[176]     JPTO Stip. Fact ¶¶ 36–40; Joint Brief ¶¶ 246–247.
[177]     Joint Brief ¶¶ 248–249 & n.666; JPTO Stip. Fact ¶ 41.
[178]     JPTO Stip. Fact ¶¶ 36–37, 42–45; *see also generally* Joint Brief FOF Section E(4)(1)–(2); *see also, in particular*, Joint Brief ¶¶ 271, 282.
[179]     Joint Brief ¶¶ 265–270 & n.697–698; ¶¶ 272–276 & n.710 – 711; ¶ 278; ¶¶ 280–281 & n.719; ¶¶ 284–287; *see also* JPTO Stip. Fact ¶¶ 38, 42, 44, 58–59, 61–62.

98.     Comu stipulates that out of the original 5 million TKY Shares, Comu directed the sale of all but 22,533 shares, in return for which TKY Trust received at least $1,048,972.95 in cash proceeds.[180] Comu applied (allegedly) only $116,500 received by TKY Trust toward the $500,000 TKY Note and directed the distributions of the remaining cash proceeds to other recipients, and Comu testified at trial that he elected to write off the remaining balance of $383,500 (excluding interest on the note).[181]

99.     Out of the original 2 million DAPTCO Shares, Comu directed the sale of 1.4 million shares, in return for which DAPTCO Trust received at least $222,980 in cash proceeds.[182] Comu applied only $30,185 received by DAPTCO Trust toward the $200,000 DAPTCO Note and directed the distributions of the remaining cash proceeds to other recipients, and Comu testified at trial that he elected to write off the remaining balance of $169,815 (excluding interest on the note).[183]

100.    Out of the original 7 million shares that Comu transferred to the Canadian Trusts, certificates reflecting 622,533 shares were turned over to Trustee after trial.[184]

101.    In addition to the stock described above, Comu concealed, dissipated or sold millions of shares of TBG's Green Auto Stock, and moved cash, through a complex network of domestic and offshore affiliates that he controls, in which he holds an undisclosed interest, or which are controlled by Comu insiders (including, but not limited to, the Comu Alter Egos) (Comu's "Conduits").[185]

102.    In addition to stock transferred and sold through TBG, Maybourne and FMS (the parties to the Green Auto MOU),[186] and the Canadian Trusts, one of the primary domestic Conduits used to conceal and liquidate millions of shares of TBG's Green Auto Stock was

---

[180]     JPTO Stip. Fact ¶¶ 58, 60; Joint Brief ¶¶ 276–277 & n.715; ¶ 288.
[181]     Joint Brief ¶¶ 271–272 & n.705; JPTO Stip. Fact ¶ 59.
[182]     JPTO Stip. Fact ¶¶ 61, 63; Joint Brief ¶ 286 & n.731.
[183]     Joint Brief ¶¶ 282–283 & n.705; JPTO Stip. Fact ¶ 62.
[184]     Joint Brief ¶ 288; *see also generally* Joint Brief FOF Section E(4)(c).
[185]     *See generally* Joint Brief FOF Section E(5) and Joint Brief ¶ 289.
[186]     *See generally* Joint Brief FOF Section E(5)(a)–(b), and *supra.*

Electronic Registry, Inc. ("ERI"), a Wyoming or Nevada corporation with offices in Porter Ranch, California (which Comu helped form, and which is controlled by Comu and other insiders TBG, Regus Advisors and GETG).[187]

103.    After instructing colleagues at TBG that all future stock sales by or on behalf of TBG would be conducted through ERI,[188] Comu transferred over 23 million TBG Shares to ERI for liquidation through cash sales.[189] ERI also received at least 25 million shares from FMS, and 14.5 million shares from Maybourne.[190]

104.    After receiving the above shares from TBG, FMS and Maybourne, ERI liquidated much of the Green Auto Stock for cash in sales to private purchasers.[191] TBG account ledgers and internal correspondence obtained by Plaintiffs as part of the 2013 Electronic Production confirm that TBG received hundreds of thousands of dollars (**at least $850,000 in 2010 alone**), and that Comu directed additional cash realized from ERI sales to various offshore accounts – making it impossible to calculate the total cash proceeds TBG actually received from ERI sales.[192]

105.    Comu also established a BVI entity, West Point Advisors, Inc. ("WPA"), which he owned and controlled, to further conceal and dissipate TBG's Green Auto Stock.[193] Comu enlisted Newhaven to serve as corporate nominee to hide Comu's beneficial ownership and control of WPA, and to establish offshore accounts in the Channel Islands and London to conceal cash received from the sale of Green Auto stock (which he continued to deny at

---

[187]    *See generally* Joint Brief FOF Section E(5)(c); *see also, e.g.*, Joint Brief ¶¶ 302–309 & n.751–753, 755–759, 761–762, 765–767, 769–770.

[188]    Joint Brief ¶ 305 & n.759 (quoting KLM Ex. 218 at 1 (email from Comu instructing colleagues that "for all future agents & transactions TBG is not offering any stock and all future orders to go thru ERI. We will process this one to close our books.")).

[189]    Joint Brief ¶ 302 & n.751; ¶¶ 304–306 & n.755–759, 761–762.

[190]    Joint Brief ¶¶ 307–308 & n.765–767.

[191]    Joint Brief ¶¶ 304–305 & n.755–759; ¶ 307–308 & n.765–767; ¶ 309 & n.769–770.

[192]    Joint Brief ¶ 309 & n.769–770.

[193]    *See generally* Joint Brief FOF Section E(5)(d).

trial).[194] Comu established these entities and offshore accounts for the specific purposes of concealing and liquidating the Green Auto stock held by TBG, FMS, and Maybourne (with their offshore Green Car joint venture).[195]

106. TBG and the other parties to the Green Auto MOU used World-Wide Auric International ("WWA"), which has addresses and accounts in Lisbon, Portugal, Liechtenstein and Turks & Caicos, to liquidate their Green Auto stock and divert cash proceeds to overseas accounts (including to accounts in Liechtenstein and Mauritius).[196] At least one WWA and Regus Advisors insider expressed concern that Comu's plan to use offshore accounts for sales of restricted Green Auto stock would raises suspicions in the marketplace.[197]

107. To further conceal and liquidate his Green Auto stock holdings, Comu also set up UK Conduit EuroCap, which shares offices with Regus Advisors and is controlled by Comu (with the assistance of other TBG insiders), to conceal and dissipate his Green Auto stock holdings.[198] According to the limited records supplied by Comu prior to trial, Comu caused TBG to transfer at least $125,000 in cash and 10 million Green Auto shares to EuroCap, which Comu was liquidating for cash through at least late 2013 – which Comu admitted would have violated the Agreed TRO entered by this Court[199] had the sales been consummated a few days later.[200] None of the 10 million Green Auto shares held by EuroCap have been turned over to Trustee.[201]

---

[194]    Joint Brief ¶¶ 310–314 & n.771–777, 779–781, 783–785; ¶¶ 316–317.
[195]    Joint Brief ¶¶ 314–317 & n.783–786, 789.
[196]    *See generally* Joint Brief FOF Section E(5)(e); *see also, e.g.*, Joint Brief ¶¶ 318–323 & n.797, 800 – 806, 808, 810–814.
[197]    Joint Brief ¶ 321 & n.806.
[198]    *See generally* Joint Brief FOF Section E(5)(f); *see also, e.g.*, Joint Brief ¶¶ 324–325 & n.817–818.
[199]    From December 20, 2013 through trial, Defendants (as well as their agents and affiliates) were subject to an agreed temporary restraining order (the "Agreed TRO") prohibiting the sale or transfer of Green Auto stock. Joint Brief ¶ 44 & n.111–113 (detailing terms of Agreed TRO); *see also* Adv. Doc. Nos. 111, 116.
[200]    Joint Brief ¶¶ 326–327.
[201]    Joint Brief ¶ 328.

108. Comu also used Campus Investments – another UK entity in which he was actively involved as of the Petition Date – to conceal and liquidate TBG's Green Auto Stock.[202] TBG accounts reflect direct cash payments to TBG for stock sales effected through Campus Investments.[203] No Green Auto shares held by Campus Investments have been turned over to Trustee.[204]

109. In addition to the above, TBG (as well as Maybourne and FMS) have transferred tens of millions of Green Auto shares to various insiders and other Conduits (both domestic and offshore) that are affiliated with or controlled by Comu and insiders from TBG, Regus Advisors, the GETG entities,[205] and/or ERI, which has further concealed Comu's interest in the Green Auto Stock and the cash proceeds of stock sales.[206] These additional Conduits include, but are not limited to, ("Brand Marketing"), First Orient Holdings Limited ("First Orient"), and Equity Market Development, Inc. ("EMD");[207] affiliated entities Global Market Advisors, Inc. ("GMAI"), Global Trade Finance, Inc. ("Global Trade"), and Eurasia Finance and Development Corp. ("Eurasia Finance");[208] Relaunch Consulting Group ("Relaunch");[209] Vertex International Group LLC ("Vertex");[210] affiliated entities Diversified Equities Inc. ("Diversified Equities") and Diversified Services Group Inc. ("Diversified Services");[211] Independent Asset Group, Inc. ("IAG");[212] offshore entity Investment and Finance Company Limited ("IFC");[213] Smarter, Inc. ("Smarter");[214] and various brokers and

---

[202]    *See generally* Joint Brief FOF Section E(5)(g).
[203]    Joint Brief ¶ 329 & n.831, 833; *see also generally* Joint Brief FOF Section B(3).
[204]    Joint Brief ¶ 329.
[205]    Joint Brief ¶ 340 & n.873–887 (detailing the transfer of millions of Green Auto shares to insiders of TBG, Regus Advisors, and GETG Entities).
[206]    *See generally* Joint Brief FOF Section E(5)(h).
[207]    Joint Brief ¶ 330 & n.835–836, 838–840.
[208]    Joint Brief ¶ 331 & n.843–847.
[209]    Joint Brief ¶ 332 & n.849–850.
[210]    Joint Brief ¶ 333 & n.851, 853–854.
[211]    Joint Brief ¶ 334 & n.855–856.
[212]    Joint Brief ¶ 335 & n.857.
[213]    Joint Brief ¶ 336 & n.859–861.
[214]    Joint Brief ¶ 337 & n.863–863, 865.

clearing companies that held and sold the stock on the parties' behalf, including Greenstar Financials, Inc. ("Greenstar"), First Clearing LLC ("First Clearing"), and Cede & Co.[215] Out of the millions of Green Auto shares transferred through these Conduits, Comu has turned over only 200,000 shares (held in the name of Smarter) to Trustee.[216]

110. Comu also used various offshore entities and accounts – in addition to TBG, Sunset Pacific, and the undisclosed Turkish Bank Accounts described *supra* – to conceal and enjoy substantial personal assets – including cash received from the sale of Green Auto stock as described above.[217]

111. Specifically, before the Discharge Date, Comu incorporated Continental Investments Holding Company Limited, a UK company ("CIHC"), and at least one related foreign bank account – the existence of which Comu unequivocally denied when questioned under oath.[218] Comu also enlisted the nominee services of Newhaven to incorporate a BVI entity called Continental Partnership, Inc. ("CPI"), which Comu expressly instructed Newhaven would remain "strictly under my ownership and control" – another fact that is confirmed by documentary evidence, but which Comu denied under oath (falsely maintaining that his brother owns CPI).[219]

112. Comu used CPI and (undisclosed) CPI-related offshore accounts under his control to purchase – with $397,000 in cash – a new home in October of 2010 (the Oaks North Residence).[220] After moving to the Oaks North Residence, Comu leased the Paladium Residence to Mervyn Price, a Regus Advisors insider for $2,500 per month (the "Paladium Rents"), thereby converting his purported homestead into a cash-producing asset.[221]

---

[215]    Joint Brief ¶¶ 338–339 & n.866–872.
[216]    Joint Brief ¶ 337 & n.864.
[217]    *See generally* Joint Brief FOF Section E(6).
[218]    Joint Brief ¶¶ 341–344 & n.889–890, 892–896.
[219]    Joint Brief ¶¶ 345–347 & n. 897, 899, 901, 903–904.
[220]    Joint Brief ¶¶ 348–350 & n.905–908, 911–912.
[221]    Joint Brief ¶¶ 351–353 & n.913, 916, 919–920, 922–923.

E.    COMU'S FRAUDULENT INTENT AND PLAINTIFFS' KNOWLEDGE OF FRAUD

113.    Comu – a sophisticated businessman – was undeniably aware of his continuing duty in the Bankruptcy Case to disclose complete, detailed and accurate information regarding his creditors, assets, liabilities, income, expenses, business affiliations and ventures, and general financial condition (as well as that of his wife, Phyllis).[222]

114.    Comu's own testimony – which was evasive and contradictory, and otherwise lacks credibility – is virtually the only evidence Comu offered in support of his defense to Trustee's and Plaintiffs' claims.  Numerous witnesses who could have, at least in theory, corroborated Comu's testimony were unavailable or unwilling to testify at trial.[223]

115.    The Court finds based on the facts set forth herein that Comu secured his Discharge through widespread fraud, including the deliberate concealment of pre-petition assets and ongoing business ventures, and significant and numerous false oaths in Bankruptcy Filings and testimony.[224]   The magnitude of Comu's nondisclosure reflects conscious disregard for the truth or, at the very least, reckless disregard for the truth.[225]

116.    By these false oaths, Comu deliberately created a false impression of indebtedness in order to secure his Discharge, and knowingly and willfully concealed pre-

---

[222]    Joint Brief ¶¶ 26, 29; ¶ 59 & n.145; ¶ 61 & n.147; ¶ 69; ¶ 76 n.186; ¶¶ 82–83; ¶ 202 (quoting or summarizing various documents, which Comu verified and filed with this Court, in which Comu was admonished regarding his disclosure duties and the penalties of perjury); *see also* Joint Brief ¶¶ 30, 32, 56 (Comu verifying, under oath and in response to his own counsel's queries, that his Bankruptcy Filings were true and correct, after which Trustee specifically asked Comu to provide further information and update his Bankruptcy Filings).

[223]    *See, e.g.*, Joint Brief ¶¶ 112–113 & n.302, 304; ¶ 118; JPTO Stip. Fact ¶ 70 (Cecil Mathis, an attorney identified as a trial witness for Defendants, who assisted Comu with corporate matters regarding Sunset Pacific and related entities); Joint Brief ¶ 87 n.222; ¶ 116 n.314; ¶ 148 & n.407; ¶ 340 n.882 (Alvin Dahl, a defense witness who passed away prior to trial, who was CPA for Comu's personal tax filings, and for Sunset Pacific, TBG and other Comu affiliates); Joint Brief ¶¶ 134, 161, 169; ¶ 253 n.672; ¶ 256 n.678; ¶¶ 260, 266, 325; ¶ 340 & n.878–879 (Edward Baxter, a TBG Managing Partner who assisted Comu with stock transactions and held positions with numerous other Comu affiliates); Joint Brief ¶¶ 161, 260, 266 (David Parsley, a TBG insider who, like Baxter, assisted Comu with stock transactions and held positions with numerous other Comu affiliates).  Baxter and Parsley were identified as witnesses for Trustee and Plaintiffs (by cross-reference), but could not be located for service of trial subpoenas, and thus portions of their prior deposition testimony were admitted at trial.

[224]    Joint Brief ¶ 98; *see also generally* Joint Brief FOF Section B, C(5).

[225]    Joint Brief ¶ 98; *see also generally* Joint Brief FOF Section B, C(5).

petition business activities and assets – many of which gave rise to millions of dollars in income shortly after the Petition Date – that should have been disclosed to creditors and included in the bankruptcy estate.[226]

117.    The Court further finds that Comu acted with willful and subjective fraudulent intent with regard to the false oaths and undisclosed assets found herein, and such fraudulent intent was specifically directed, in bad faith, toward evading Plaintiffs' efforts to collect the Judgment Debt.[227]

118.    Comu's failure to disclose his interests in the Green Auto Stock described herein had no good faith basis, but was part of his deliberate effort to conceal assets from Trustee and Plaintiffs, which the Court finds constitutes bad faith abuse of the bankruptcy process.[228]

119.    Comu's false oaths were deliberately calculated to mislead Trustee and Plaintiffs regarding the true nature and scope of Comu's financial circumstances, and to knowingly create a false impression that Comu was unable to honor his debts.[229]

120.    The fact that Comu now stipulates numerous facts that he previously denied or failed to disclose does not mitigate his fraud – but only adds insult to creditor injury by further confirming Comu's willful and fraudulent intent to shield substantial assets from legitimate creditor claims (particularly because if such facts had been disclosed or admitted in 2010, Trustee would have had access to substantial assets to satisfy creditor claims, which Comu has now attempted to dissipate beyond the reach of Trustee and creditors, dramatically

---

[226]    Joint Brief ¶ 50; *see also generally* Joint Brief FOF Section B(4), C(5)
[227]    *See generally* Joint Brief FOF Section B(4).
[228]    Joint Brief ¶ 185.
[229]    Joint Brief ¶ 98.

exacerbating the harm to Comu's creditors and the expense of locating and recovering those assets, in addition to wasting the valuable judicial resources of this Court).[230]

121.    There is ample evidence (particularly in light of Comu's ongoing concealment and misrepresentation of material facts, and his deliberate efforts to mislead Trustee and creditors regarding his business ventures and financial circumstances), that Plaintiffs "did not know" of Comu's fraud until after the Discharge Objection Deadline.[231]

122.    To the extent Comu made any partial disclosure of facts to Trustee or Plaintiffs prior to the Discharge Date, such disclosures were incomplete, inaccurate and misleading, and calculated to deflect investigation by creditors and Trustee into Comu's true financial circumstances and assets.[232]

123.    Specifically, although Comu apparently delivered the Comu Certificate to Trustee before the Discharge Date as part of the March 2010 Production (but never disclosed it in his Bankruptcy Filings), that disclosure to Trustee was manifestly insufficient to put either Trustee or Plaintiffs on notice of Comu's substantial pre-petition involvement in the 2009 Green Auto Merger, or the Green Auto Stock Comu acquired before and after the Petition Date as a result of that transaction.[233]

124.    Moreover, any suspicions Trustee or Plaintiffs may have had prior to the Discharge Date regarding Comu's activities does not constitute knowledge of Comu's secret ongoing fraud,[234] nor is Comu's failure to make full and accurate disclosures excused by Prior Counsel's failure to timely object to Comu's Discharge (which would have relied on Comu's

---

[230]    Joint Brief ¶ 39; ¶ 99; ¶ 106 & n.287; ¶¶ 113, 115, 136, 144; ¶ 195 & n.570; ¶¶ 200, 206, 277, 286; *see also* JPTO Stip. Fact ¶¶ 15, 17–18, 21, 23–24, 28, 30, 33–34, 38, 60–61, 71–73, 75–76, 81 (facts stipulated for purposes of trial that Comu either previously denied or failed to disclose prior to the Discharge Date).
[231]    *See generally* Joint Brief FOF Section C(5); *see also, e.g.*, Joint Brief FOF ¶ 54; ¶ 175; ¶ 183 & n.551–552.
[232]    Joint Brief ¶ 54; ¶ 177; ¶ 182.
[233]    Joint Brief ¶¶ 235–243 & n.651.
[234]    Joint Brief ¶¶ 176–178.

fraud that was the subject of the New York Action – not Comu's ongoing fraud in the Bankruptcy Case).[235]

## II.   CONCLUSIONS OF LAW

1.      The determinations, findings, judgments, decrees, and orders set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Bankruptcy Rule 7058.  The Court hereby orders all of the findings of fact and conclusions of law contained herein.[236]

2.      Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.[237]

3.      The parties stipulate this is a core proceeding[238] over which this Court has jurisdiction,[239] that venue is proper,[240] and that this Adversary was timely filed.[241]

4.      On April 4, 2014, the Court entered an *Extended Temporary Restraining Order and Mandatory Injunction* (the "Mandatory Injunction"),[242] which applies to Defendants and various affiliates, and which prohibits the transfer or disposition, and mandates the turnover, of certain assets to Trustee.[243]

5.      Trial commenced March 17, 2014, and concluded March 21, 2014, at which point the Court issued a bench ruling (the "Bench Ruling") in favor of Plaintiffs and Trustee, and against Defendants as follows:

> (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware

---

[235]    Joint Brief ¶¶ 179–181 & n.549.
[236]    Joint Brief ¶ 354.
[237]    Joint Brief ¶ 355.
[238]    JPTO Stip. Law ¶ 2 (citing 28 U.S.C. § 157(b)(2)(A)); Joint Brief ¶ 357.
[239]    JPTO Stip. Law ¶ 1 (citing 28 U.S.C. § 157 and 28 U.S.C. § 1334(b)); Joint Brief ¶ 356.
[240]    JPTO Stip. Law ¶ 3 (citing 28 U.S.C. § 1409); Joint Brief ¶ 5.
[241]    JPTO Stip. Law ¶ 4 (citing 11 U.S.C. §727(e)(1) and (e)(2)); Joint Brief ¶ 364.
[242]    Adv. Doc. No. 142.
[243]    Joint Brief ¶ 48 & n.121.

until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it [to Trustee]; (b) The Barclay Group, Inc. and Sunset Pacific are the alter egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific.[244]

6.      Consistent with and in addition to the above, the Court makes the following conclusions of law:

A.      PLAINTIFFS' REVOCATION CLAIMS[245]

7.      Under Section 727(d)(1) of the Bankruptcy Code, the Court "shall revoke a discharge" if "such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge."[246] Fraud under § 727(d) may be shown by the same grounds that would prevent discharge under § 727(a).[247]

8.      Comu had an affirmative and continuing duty to make complete and accurate disclosures regarding his assets and business affairs; failure to comply with that duty, which is often described as the "quid pro quo" for the privilege of discharge, may result in denial or revocation of discharge.[248]

9.      The parties agree there are two subsets of "fraud of the debtor" under § 727(d)(1) – the failure to disclose assets at the time of the bankruptcy Petition ("undisclosed

---

[244]      *See* Clerk's Docket Entry in Adversary Proceeding, entered March 25, 2014; *see also* Joint Brief ¶ 45.

[245]      *See generally* Joint Brief COL Section C (detailing legal authorities supporting revocation).

[246]      11 U.S.C. § 727(d)(1); *see also* JPTO Stip. Law ¶ 8; Joint Brief ¶¶ 380–381 & n.971.

[247]      Joint Brief COL ¶ 10 & n.936.

[248]      *See generally* Joint Brief COL Section C(1) (detailing, with reference to authorities, broad scope of a debtor's duty to disclose complete and accurate information to creditors in order to be entitled to discharge).

assets"), and "false oaths."[249]   The first subset of "fraud by the debtor" under § 727(d)(1) is undisclosed assets at the commencement of the bankruptcy.[250]   A debtor's failure to disclose the existence of assets in his bankruptcy filings support revocation under § 727(d)(1) if the omissions were knowingly and fraudulently made, they were material, and plaintiffs were unaware of the facts at issue when the debtor sought his discharge.[251]

10.     The second subset of "fraud by the debtor" under § 727(d)(1) is false oaths.[252] The elements of a false oath claim for revocation include a statement that: (1) was made under oath; (2) was false; (3) the debtor knew was false; (4) was made with fraudulent intent; and (5) related materially to the bankruptcy case.[253]   "False oaths may be in the form of either false statements or omissions on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings."[254]

11.     Under both subsets of § 727(d)(1), an omission is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[255]   A finding of materiality is not dependent upon the value of the omitted assets or whether the omission was detrimental to creditors.[256]

12.     Plaintiffs also seek revocation under Section 727(d)(2), which states: "the court shall revoke a discharge" if "the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and

---

[249]     JPTO Stip. Law ¶ 8; Joint Brief ¶ 382 & n.973.
[250]     JPTO Stip. Law ¶ 9; Joint Brief ¶ 383.
[251]     JPTO Stip. Law ¶ 9; Joint Brief ¶ 383& n.975.
[252]     JPTO Stip. Law ¶ 10; Joint Brief ¶ 384.
[253]     JPTO Stip. Law ¶ 10; Joint Brief ¶ 384 & n.976.
[254]     JPTO Stip. Law ¶ 10; Joint Brief ¶ 384 & n.977.
[255]     JPTO Stip. Law ¶ 11; Joint Brief ¶ 385 & n.978.
[256]     JPTO Stip. Law ¶ 11; Joint Brief ¶ 385 & n.979.

fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee."[257]

13.    The parties stipulate that, under Section 541(a), "property of the estate" includes all legal or equitable interests in property, including rents and profits from property, held by a debtor at the commencement of the bankruptcy case, wherever located and by whomever held, including community property held by a debtor's spouse, and notwithstanding any agreement that restricts or conditions transfer of the debtor's interest in the property.[258]

14.    The parties stipulate that, for the purposes of § 727(d)(1) and (d)(2), a debtor's fraudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth, and that fraudulent intent may be inferred from a course of conduct.[259]

15.    Plaintiffs bear the burden of establishing the elements of their revocation claims, including Debtor's fraudulent intent, by a preponderance of the evidence.[260]

16.    As a matter of law, Comu's fraud is not excused by his partial and misleading disclosure of limited facts to Trustee before the Discharge Date, nor is his fraud excused by Prior Counsel's failure to object to Discharge.[261]

17.    Based on the findings set forth *supra*, Plaintiffs have met their burden of proof under both § 727(d)(1) and (d)(2) of establishing fraud of the Debtor, and thus the Court concludes that Comu's Discharge shall be revoked.[262]

---

[257]    JPTO Stip. Law ¶ 12; Joint Brief ¶ 389 & n.981.
[258]    JPTO Stip. Law ¶¶ 14–15; Joint Brief ¶¶ 359–361; *see also generally* Joint Brief COL Section B.
[259]    JPTO Stip. Law ¶¶ 6–7 (citing cases); *see also generally* Joint Brief COL Section C(2) (setting forth detailed authorities governing issue of fraudulent intent).
[260]    JPTO Stip. Law ¶¶ 5, 13; Joint Brief ¶ 365 & n.938 (citing cases).
[261]    *See generally* Joint Brief COL Section C(4).
[262]    Joint Brief ¶¶ 388, 392.

18.     It is well-established that, under § 105(a) of the Bankruptcy Code, the Court has authority to award attorneys' fees as a sanction for Debtor's bad faith conduct, *i.e.*, abuse of the judicial process.[263]

19.     Based on the evidence set forth above, the Court specifically finds that Comu has engaged in bad faith abuse of the judicial system, and that Plaintiffs – who, at their expense, uncovered the broad scope of Comu's fraud – should be awarded attorneys' fees as a sanction for Comu's bad faith, in an amount to be subsequently determined by the Court.

**B.     TRUSTEE'S CLAIMS**[264]

20.     Comu is the *de facto* owner of TBG.

21.     Phyllis Comu's purported ninety-eight percent (98%) limited partnership interest in Sunset Pacific is property of the Comu bankruptcy estate pursuant to § 54l(a)(2)(A).

22.     TBG is the alter ego of Comu.

23.     Sunset Pacific is the alter ego of Comu.

24.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Trustee is entitled to a judgment declaring that, as of the Petition Date, the assets of TBG and Sunset Pacific are property of the Debtor's bankruptcy estate.

25.     Pursuant to 11 U.S.C. § 542, the Trustee is entitled to an order directing the turnover of all property and assets of TBG that still exist.

26.     Pursuant to 11 U.S.C. § 542, the Trustee is entitled to an order directing the turnover of all property and assets of Sunset Pacific that still exist.

27.     To the extent the assets of TBG and/or Sunset Pacific have been sold or otherwise disposed of since the Petition Date, the Trustee is entitled to a judgment pursuant to

---

[263]     *See generally* Joint Brief COL Section F.

[264]     *See generally* Joint Brief COL Section D (detailing legal authorities supporting Trustee's claims).

11 U.S.C. § 542 against Comu, TBG and Sunset Pacific, jointly and severally for the value of the assets that existed on the Petition Date and that are not turned over to the Trustee because they have been sold or otherwise disposed of by Comu.

28.     Based on the value of the assets of the estate that Comu wrongfully dissipated, either individually or through business entities he controlled, including, *inter alia*, TBG and Sunset Pacific, Trustee is entitled to recover from Comu, TBG and Sunset Pacific (jointly and severally) damages in the amount of $5,858,779.55.[265]

*[end]*

---

[265]     *See generally* Joint Brief COL Section E; *see also, e.g.*, Joint Brief ¶¶ 414–415.  This damages calculation reflects actual cash proceeds from the sale of Green Auto stock, and specifically includes: (1) TBG direct sales (conservatively, $974,616.60) (*see* Joint Brief FOF Section E(3)(a)); TBG sales effected through OMST ($2,762,220) (*see* Joint Brief FOF Section E(3)(b)); sales effected through TKY Trust ($1,048,973) (*see* Joint Brief FOF Section E(4)(a)); sales effected through DAPTCO Trust ($222,980) (*see* Joint Brief FOF Section E(4)(b);  and cash received by TBG for stock sales effected through ERI (conservatively, $850,000) (*see* Joint Brief FOF Section E(5)(c), ¶ 309 & n.769).

Dated: June 16, 2014.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**
300 West 6th Street, Suite 2050
Austin, TX 78701
(512) 320-7200
(512) 320-7210 (fax)


By:_____
Kendyl T. Hanks, SBT #24032273

**ATTORNEYS FOR PLAINTIFFS**


**REED & ELMQUIST, P.C.**
501 N. College Street
Waxahachie, TX 75165
(972) 938-7339 (direct)
(972) 923-0430 (fax)

By: _/s/ David W. Elmquist*_  (*with permission
     David W. Elmquist – SBT #06591300

**ATTORNEYS FOR INTERVENOR, CO-PLAINTIFF,
AND THIRD-PARTY PLAINTIFF DIANE G. REED,
CHAPTER 7 TRUSTEE**


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 16, 2014, a true and correct copy of the foregoing Proposed Findings of Fact and Conclusions of Law has been served electronically on Dennis Olson, counsel of record for the Defendants, and on David Elmquist, attorney of record for the Trustee.


By:_____
Kendyl T. Hanks, SBT #24032273

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-38820-SGJ-7 |
| | § | |
| CENGIZ J. COMU, | § | CHAPTER 7 |
| | § | |
| DEBTOR. | § | |

---

| | | |
|---|---|---|
| KING LOUIE MINING, LLC, | § | |
| KING LOUIE ENTERPRISES, LLC, AND | § | |
| RONALD KATZ, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | ADV. NO. 10-03269-sgj |
| | § | |
| CENGIZ J. COMU a/k/a CJ COMU, | § | |
| *Defendant.* | § | |

---

| | |
|---|---|
| DIANE G. REED, TRUSTEE, | § |
| *Intervenor, Co-Plaintiff and* | § |
| *Third-party Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| CENGIZ J. COMU, | § |
| *Defendant,* | § |
| | § |
| *and* | § |
| | § |
| PHYLLIS E. COMU, | § |
| BERNARD D. BROWN, | § |
| THE BARCLAY GROUP, INC. AND | § |
| SUNSET PACIFIC, L.P., | § |
| *Third-Party Defendants*. | § |

## PLAINTIFFS' AND TRUSTEE'S BRIEF IN SUPPORT OF
## JOINT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

I.   EVIDENCE SUPPORTING PROPOSED FINDINGS OF FACT ..................................... 12

    A.   History and Context ................................................................................. 12

        1.   The Adversary Parties ................................................................. 12
        2.   Plaintiffs' Collection Efforts Triggered Bankruptcy ................. 17
        3.   Comu's Inadequate Pre-Discharge Disclosures .......................... 20
        4.   The Adversary Proceeding ........................................................... 23

    B.   Comu Secured Discharge Through Fraud and Bad Faith ....................... 27

        1.   Comu Deliberately Fabricated Debts and Liabilities. ................. 29
        2.   Comu Concealed Assets and Income. ......................................... 34
        3.   Comu's Undisclosed Interests in Lucrative and Ongoing Ventures. ........ 38
        4.   Comu's Fraudulent Intent was Specifically Directed at Plaintiffs. ........... 45

    C.   Comu Used Alter Egos to Conceal and Enjoy Assets .......................... 46

        1.   Marathon Management ................................................................. 46
        2.   Sunset Pacific ................................................................................ 49
        3.   The Barclay Group ....................................................................... 57
        4.   Regus Advisors – TBG's "Next Chapter" ................................. 66
        5.   Deliberate Concealment of Facts Thwarted Plaintiffs' Knowledge ......... 73

    D.   Comu's Secret Pre-Petition Equity Stake in Green Auto ..................... 76

        1.   GANAS – Comu's Pre-Petition Acquisition and Control (95 Million Shares) ...... 77
        2.   Green Auto Stock – Pre-Petition Equity *Plus* Anti-Dilution Rights ......... 78
        3.   Thirty Cents Per Share – the Verified "Comu Value" ............................. 83

    E.   Comu's Fraudulent Concealment and Dissipation of Estate Assets ..................... 84

        1.   Pre-Petition Division and Concealment of Green Auto Stock ................. 84

            (a)   The Green Auto MOU ................................................. 84
            (b)   Green Car Automotive International – BVI ................................. 85

        2.   Defendants' Green Auto Shares ................................................... 87

            (a)   The TBG Shares (54,390,099 Received – 1,804,439 Turned Over) ................................................................ 88
            (b)   The Utah Shares (1,000,000 Shares Outstanding) ...................... 89
            (c)   The Comu Certificate (300,000 Shares Turned Over) ................. 91
            (d)   The Brown Shares (200,000 Shares Turned Over) ...................... 93
            (e)   The Sunset Pacific Shares (2,500,000 Shares Turned Over) ........ 93

3.   TBG's Direct Cash Proceeds ($3,736,826 – *At Least*) ............................ 94

(a)   TBG – Direct Cash Sales ($974,616.60 or More) ........................ 94
(b)   TBG – OMST Escrow Sales ($2,762,220) .................................... 97

4.   Canadian Trust Proceeds ($1,271,953) ...................................................... 99

(a)   The TKY Shares ($1,048,973).................................................... 99
(b)   The DAPTCO Shares ($222,980) ............................................... 102
(c)   Remaining Canadian Trust Shares (622,533 Turned Over)........ 105

5.   Dissipation & Liquidation of Stock Through Comu's Conduits ............ 105

(a)   Maybourne ................................................................................. 105
(b)   First Market Services ................................................................. 107
(c)   Electronic Registry.................................................................... 107
(d)   West Point Advisors ................................................................. 110
(e)   World-Wide Auric ..................................................................... 114
(f)   EuroCap Investments ................................................................ 116
(g)   Campus Investments ................................................................. 118
(h)   Other Conduits for Liquidating Stock........................................ 118

6.   Other Offshore Accounts to Conceal and Enjoy Undisclosed Assets .... 124

(a)   Continental Investments – UK.................................................... 124
(b)   Continental Partnership – Comu BVI ......................................... 125

II.   AUTHORITIES SUPPORTING PROPOSED CONCLUSIONS OF LAW ...................... 130

A.   Jurisdiction and Venue........................................................................... 130
B.   Property of the Estate............................................................................. 130
C.   Plaintiffs' Revocation Claims ................................................................. 131

1.   Comu had a continuing duty to make complete and accurate
disclosures.................................................................................... 132
2.   Fraudulent Intent Supporting Revocation ................................... 135
3.   Revocation is Warranted Under § 727(d)(1) and § 727(d)(2) ............... 137
4.   Comu's Objections to Revocation ............................................... 141

D.   Trustee's Claims ................................................................................... 143
E.   Damages and Equitable Relief............................................................... 145
F.   Debtor's Bad Faith Abuse of the Bankruptcy Process........................ 148

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                    **PAGE 3 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002227

## TABLE OF AUTHORITIES

CASES

*Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd*.,
 876 F. Supp. 482 (S.D.N.Y. 1994) .......................................................159

*In re Am. Telecom Corp*.,
 304 B.R. 867 (Bankr. N.D. Ill. 2004) ...................................................162

*In re Arkansas Communities, Inc*.,
 827 F.2d 1219 (8th Cir. 1987) ...............................................................161

*Banc One, Texas, N.A. v. Braymer (In re Braymer)*,
 126 B.R. 499 (Bankr. N.D. Tex. 1991).......................................143, 144, 145, 146

*In re The Bankruptcy Link*,
 Bankruptcy Case No, 95-88888 ...............................................................95

*Beaubouef v. Beaubouef (In re Beaubouef)*,
 966 F.2d 174 (5th Cir. 1992) .................................................................150

*Beer Sheva Realty Corp. v. Pongvitayapanu (In re Pongvitayapanu)*,
 487 B.R. 130 (Bankr. E.D.N.Y. 2013).....................................................154

*Berkery v. Commissioner, Internal Revenue Service*,
 192 B.R. 835 (E.D. Pa. 1996) ................................................................146

*Blue Bell Bio–Medical v. Cin–Bad, Inc*.,
 864 F.2d 1253 (5th Cir. 1989) ...............................................................159

*In re Borchert*,
 143 B.R. 917 (Bankr. N.D. 1992) ....................................................156, 157

*Boroff v. Tully (In re Tully)*,
 818 F.2d 106 (1st Cir. 1987)..................................................................154

*Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*,
 179 F.3d 197 (5th Cir. 1999) .................................................................142

*Burlington Northern Railroad Co. v. Southwestern Electric Power Co*.,
 925 S.W.2d 92 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex.
 1998) ................................................................................................157

*Bynum v. Am. Airlines, Inc*.,
 166 Fed. App'x 730 (5th Cir. 2006) .......................................................162

*Cadle Co. v. Brunswick Homes, LLC (In re Moore)*,
 379 B.R. 284 (Bankr. N.D. Tex. 2007)...................................................155

*In re Calvin*,
 329 B.R. 589,602 (Bankr. S.D. Tex. 2005) ............................................156

*Chambers v. NASCO, Inc*.,
 501 U.S. 32 (1991)...............................................................................161

*In re Chavin*,
 150 F.3d 726 (7th Cir. 1998) .................................................................145

*Chemlawn Services Corp. v. GNC Pumps, Inc.*,
690 F. Supp. 1560 (S.D. Tex. 1988), *aff'd*, 856 F.2d 202 (5th Cir. 1988) ...........................160

*Cho v. Itco, Inc.*,
782 F. Supp. 1183 (E.D. Tex. 1991) ...................................................................................159

*Cinema Service Corp. v. Edbee Corp.*,
774 F.2d 584 (3d Cir. 1985) ...............................................................................................162

*Citibank, N.A. v, Emery (In re Emery)*,
132 F.3d 892 (2nd Cir. 1998)...............................................................................................149

*In re Collins*,
250 B.R. 645 (Bankr. N.D. Ill. 2000) ...........................................................................161, 162

*Collins v. Aggreko, Inc.*,
884 F. Supp. 450 (D. Utah 1995) ........................................................................................159

*Croge v. Katz (In re Katz)*,
203 B.R. 227 (Bankr. E.D. Pa. 1996) .................................................................................145

*Crowe v. Smith*,
261 F.3d 558 (5th Cir. 2001) ..............................................................................................162

*D.A.N. Joint Venture v. Cacioli (In re Cacioli)*,
285 B.R. 778 (Bankr. D. Conn. 2002) ................................................................................145

*In re David*,
487 B.R. 843 (Bankr. S.D. Tex. 2013) ...............................................................................163

*Dixie Carriers, Inc. v. Channel Fueling Service, Inc. (In re Fredeman Litigation)*,
843 F.2d 821 (5th Cir. 1988) ..............................................................................................160

*Ed & F Man Biofuels Ltd. v. MV Fase*,
728 F. Supp. 2d 862 (S.D. Tex. 2010) ................................................................................157

*Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir.1985) ................................................................................................160

*In re Feit & Drexler, Inc.*,
760 F.2d 406 (2d Cir. 1985)................................................................................................159

*FIA Card Services, N.A. v. Cengiz J. Comu (In re Comu)*, Adversary No. 10-
03068-sgj (Doc. No. 1 & Doc No. 6)....................................................................................13

*First Tex. Svgs. Ass'n v. Reed (In re Reed)*,
700 F.2d 986 (5th Cir. 1983) ..............................................................................................146

*In re Focus Media Inc.*,
387 F.3d 1077 (9th Cir. 2004), *cert. denied*, 544 U.S. 923 (2005)......................................159

*In re Gartner*,
326 B.R. (Bankr. S.D. Tex. 2005) ................................................................................153, 154

*In re Global Int'l Airways Corp.*,
76 B.R. 700 (Bankr. W.D. Mo. 1987)..................................................................................160

*In re Gober*,
    100 F.3d 1195 (5th Cir. 1996) .................................................................................153

*Golden v. Zwickler*,
    394 U.S. 103, 89 S. Ct. 956 (1969).........................................................................156

*Goldin v. Bartholow*,
    166 F.3d 710 (5th Cir. 1999) .................................................................................162

*In re Gorshtein*,
    285 B.R. 118 (Bankr. S.D.N.Y. 2002).....................................................................162

*Green Automotive Company v. The Barclay Group, Inc.*,
    Case No. 130902103 ................................................................................................88

*Grogan v. Garner*,
    498 U.S. 279 (1991)...............................................................................................153

*In re Gupta*,
    394 F.3d 347 (5th Cir. 2005) .................................................................................153

*In re Hayes*,
    270 B.R. 183 (Bankr. S.D.N.Y. 2001).....................................................................146

*In re Hicks*,
    184 B.R. 954 (Bankr. C.D. Cal. 1995).....................................................................143

*Hill v. Muniz (In re Muniz)*,
    320 B.R. 697 (Bankr. D. Col. 2005) ................................................................143, 151

*In re Huff*,
    349 B.R. ..................................................................................................................153

*Hughes v. Wells (In re Wells)*,
    426 B.R. 579 (Bankr. N.D. Tex. 2006)....................................................................143

*Humitech Int'l Group, Inc., et al. v. Comu, et al*,
    Index No. 06-602567 ...............................................................................................11

*J.P. Morgan Chase Bank v. Hobbs (In re Hobbs)*,
    333 B.R. 751 (Bankr. N.D. Tex. 2005)....................................................................143

*Johnson v. Meabon (In re Meabon)*,
    NO. 10-30455, ADV 12-3218, 2014 WL 1371583 (Bankr. W.D.N.C. Apr. 8,
    2014) ......................................................................................................................141

*Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd.)*,
    40 F.3d 1084 (10th Cir. 1994) ...................................................................43, 161, 162

*Keeney v. Smith (In re Keeney)*,
    227 F.3d 679 (6th Cir. 2000) .................................................................................145

*King Louie Mining, LLC, et al v. Cengiz Jan Comu*,
    Cause No. 09-0680891.............................................................................................12

*Lakedreams v. Taylor*,
    932 F.2d 1103 (5th Cir. 1991) ...............................................................................159

*Lightfoot v. Landry (In re Landry),*
    350 B.R. 51 (Bankr. E.D. La. 2006) ...............................................................144, 146, 150

*Lincoln Nat. Life Insur. Co. v. Silver (In re Silver),*
    367 B.R. 795 (Bankr. D.N.M. 2007) .............................................................................152

*In re Loew,*
    No. 11–13339–JNF, 2012 WL 1229904 (Bankr. D. Mass. Apr. 11, 2012).........................144

*Lowe v. King (In re King),*
    Bankr. No. 05–56485–C, Adv. No. 06–5122–C, 2006 WL 3861097 (Bankr.
    W.D. Tex. Dec. 29, 2006)...............................................................................143, 144

*In re M.M. Winkler & Assocs.,*
    239 F.3d 746 (5th Cir. 2001) .........................................................................................153

*Malicki v. Bernstein (In re Bernstein),*
    447 B.R. 684 (Bankr. D. Conn. 2011) .............................................................................146

*Marshall v. Wilson (In re Wilson),*
    Nos. 99–13695–JMD, 01–1058–JMD, 2002 WL 1067450 (Bankr. D.N.H. May
    28, 2002) ......................................................................................................................149

*Matta v. May,*
    118 F.3d 410 (5th Cir. 1997) .........................................................................................162

*Mazer v. Jones (In re Jones),*
    178 B.R. 1 (Bankr. D.N.M. 1995) ...................................................................................149

*McNally v. Echart (In re Echart),*
    374 B.R. 596 (Bankr. E.D. Tex. 2007) ...............................................................141, 143, 146

*Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg.
    Corp.),*
    25 F.3d 1132 (2d Cir. 1994)...........................................................................................158

*Morton v. Dreyer (In re Dreyer),*
    127 B.R. 587 (Bankr. N.D. Tex. 1991)...................................................................143, 144

*In re Moss,*
    258 B.R. 405 (Bankr. W.D. Mo. 2001)...........................................................................159

*Neary v. Darby (In re Darby),*
    376 B.R. 534 (Bankr. E.D. Tex. 2007) ...............................................................144, 146, 149, 150

*Neary v. Hughes (In re Hughes),*
    353 B.R. 486 (Bankr. N.D. Tex. 2006)...................................................................142, 145

*New Millennium Capital Partners II, LLC and AJW Partners, LLC v. Airtech
    Group, Inc.,*
    Civil Action No. 1:01-CV-10841-RCC .............................................................................27

*New Millennium Capital Partners II, LLC and AJW Partners, LLC v. Humitech
    International Group Inc. and CJ Comu,*
    Case No. 3:06-cv-01180-L...............................................................................................28

*In re Newman*,
  487 B.R. 193 (B.A.P. 9th Cir. 2013)................................................................156

*In re Newman*,
  6 B.R. 798 (Bankr. S.D. N.Y. 1980) .................................................................159

*Oldendorf v. Buckman*,
  173 B.R. 99 (E.D. La. 1994) .............................................................................146

*Pepper v. Litton*,
  308 U.S. 295 (1939)..........................................................................................160

*In re Pilate*,
  487 B.R. 345 (Bankr. D.C. 2013) .....................................................................156

*Pipkin v. JVM Operating, L.C.*,
  197 B.R. 47 (E.D. Tex. 1996) ...................................................................157, 160

*In re Pratt*,
  411 F.3d 561 (5th Cir. 2005) .....................................................................144, 150

*Razzaboni v. Schifano (In re Schifano)*,
  378 F.3d 60 (1st Cir. 2004)...............................................................................142

*Reed v. Cooper (In re Cooper)*,
  426 B.R. 227 (Bankr. N.D. Tex. 2010), *aff'd*, 443 Fed. App'x 888 (5th Cir.
  2011) .................................................................142, 143, 145, 146, 148, 151

*Rezin v. Barr (In re Barr)*,
  207 B.R. 168 (Bankr. N.D. Ill. 1997) ...............................................................148

*Roberts v. McVay (In re Roberts)*,
  NO. CIVA SA-07-CV583-XR, 2010 WL 376399 (W.D. Tex. Jan. 25, 2010)..............143, 145

*Ronald Katz, et al v. Emil Lippe, Jr., et al*,
  Cause No. DC-13-0782.......................................................................................19

*Royal Ins. Co. of America v. Quinn–L Capital Corp.*,
  3 F.3d 877 (5th Cir. 1993), *cert. denied*, 511 U.S. 1032 (1994)...........................160

*Satriale v. Mumin (In re Mumin)*,
  No. 97–14424DAS, 1998 WL 160992 (Bankr. E.D. Pa. April 1, 1998) ...............154

*Schott v. McLear (In re Larry Koenig & Assoc., LLC)*,
  No. 01–12829, 03–1063, 2004 WL 3244582 (Bankr. M.D. La. March 31,
  2004) ..................................................................................................................35

*Securities Investor Protection Corp. v. Westor Capital Group, Inc.*,
  Case No. 1:13-cv-02531-HB ...............................................................................95

*Sholdra v. Chilmark Fin., LLP (In re Sholdra)*,
  249 F.3d 380 (5th Cir. 2001) .............................................................145, 147, 153

*In re Silver*,
  46 B.R. 772 (D. Colo. 1985)..............................................................................161

*In re Spectee Group, Inc.*,
  185 B.R. 146 (Bankr. S.D.N.Y. 1995)...............................................................162

*Steinberg v. Esposito,*
    33 B.R. 812 (N.D. Ill. 1983) ................................................................................159

*SUN Sports & Entertainment Inc. v. Humitech International Group, Inc., Ronald
    Katz, and King Louie Enterprises LLC,*
    Case No. 3:09-cv-00063-O .....................................................................................30

*Tow v. Henley (In re Henley),*
    480 B.R. 708 (Bankr. S.D. Tex. 2012) ........................................................153, 154

*United States v. Cluck,*
    87 F.3d 138 (5th Cir. 1996) ..................................................................................142

*United States v. Walker,*
    29 F.3d 908 (4th Cir. 1994) ..................................................................................146

*In re USA Diversified Products, Inc.,*
    100 F.3d 53 (7th Cir. 1996) ..................................................................................156

*In re Volpert,*
    110 F.3d 494 (7th Cir. 1997) ................................................................................161

*Walton v. Staub (In re Staub),*
    208 B.R. 602 (Bankr. S.D. Ga. 1997) ...................................................................149

*Woodson v. Fireman's Fund Insurance Co. (In re Woodson),*
    839 F.2d 610 (Bankr. 9th Cir. 1988)......................................................................144

*Wright v. Tackett,*
    39 F.3d 155 (7th Cir. 1994) ..................................................................................162

*Matter of Yonikus,*
    974 F.2d 901 (7th Cir. 1992) ........................................................................144, 146

*Yoppolo v. Sayre (In re Sayre),*
    321 B.R. 424 (Bankr. N.D. Ohio 2004) ........................................................147, 148

*Zahra Spiritual Trust v. United States,*
    910 F.2d 240 (5th Cir. 1990) ................................................................................155

## RULES

FED. R. BANKR. P. 7054(a)..........................................................................................157

FED. R. BANKR. P. 7052................................................................................................140

FED. R. BANKR. P. 7058................................................................................................140

FED. R. CIV. P. 54(c) ...................................................................................................157

FED. R. EVID. 201 ....................................................................11, 27, 28, 30, 95, 138

## STATUTES

11 U.S.C. § 101..............................................................................................................5

11 U.S.C. § 105(a) ................................................................................158, 160, 161

11 U.S.C. § 301...................................................................................................7

11 U.S.C. § 362.................................................................................................14

11 U.S.C. § 521(1)..........................................................................................143

11 U.S.C. § 521(3)..........................................................................................143

11 U.S.C. § 523(a)(2)......................................................................................153

11 U.S.C. § 541(a)(1)......................................................................................140

11 U.S.C. § 541(a)(2)(A)...............................................................7, 19, 141, 152

11 U.S.C. § 541(a)(2)(B).................................................................................141

11 U.S.C. § 541(a)(6)......................................................................................141

11 U.S.C. § 541(c)(1).......................................................................................141

11 U.S.C. § 542(a)...................................................................................156, 158

11 U.S.C. § 727(d)......................................................................................5, 152

11 U.S.C. § 727(d)(1)..........................................................21, 141, 142, 148, 149

11 U.S.C. § 727(d)(2)........................................................................21, 141, 142

11 U.S.C. §727(e)............................................................................................142

18 U.S.C. § 152................................................................................................161

28 U.S.C. § 157................................................................................................140

28 U.S.C. § 157(b)(2).......................................................................................140

28 U.S.C. § 1334(b)..........................................................................................140

28 U.S.C. § 1409...............................................................................................140

28 U.S.C. § 2201...............................................................................................155

Tex. Prop. Code §§ 41.001-.002......................................................................138

## OTHER AUTHORITIES

David Barboza & Azam Ahmed, *China to Wall Street: The Side-Door Shuffle*,
N.Y. TIMES (July 23, 2011), *available at*
http://www.nytimes.com/2011/07/24/business/global/reverse-mergers-give-
chinese-firms-a-side-door-to-wall-st.html?pagewanted=all&_r=2& (last
visited May 29, 2014)...........................................................................10

Freeman, *Internet Domain Name Security Issues: Why Debtors Can Grant Then
and Lenders Can Take Them in This New Type of Hybrid Property*, 10 AM.
BANKR. INST. L. REV. 853 (Winter 2002)...............................................35

Jerry W. Markham & Thomas Lee Hazen, *Clearing and Settlement – Transfer
Agents*, *in* 23A BROKER-DEALER OPERATIONS SEC. & COMM. LAW § 13:12....................92

SEC, Office of Investor Educ. & Advocacy, *Investor Bulletin: Reverse Mergers* 1,
*available at* http://www.sec.gov/investor/alerts/reversemergers.pdf (last
visited May 29, 2014)...........................................................................10

Tex. Const. art. 16, § 50...........................................................................................138

Tex. Const. art. 16, § 51...........................................................................................138

William Campbell Ries, *Corporate Trust Services – Agency Roles*, *in* 1 REG. OF
    INVEST. MGMT. & FIDUCIARY SERV. § 12:17.........................................................92

TO THE HONORABLE STACEY G.C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:

Plaintiffs King Louis Mining, LLC, King Louis Enterprises, LLC, and Ronald Katz (together, "Plaintiffs"), together with Diane G. Reed, Chapter 7 Trustee of the bankruptcy estate of Cengiz J. Comu, Bankruptcy Case No. 09-38820-SCJ-7 (the "Bankruptcy Case"), as Intervenor, Co-Plaintiff and Third-Party Plaintiff in the above-captioned adversary proceeding ("Intervenor" or "Trustee"), hereby submit their *Brief in Support of Joint Proposed Findings of Fact and Conclusions of Law*, and in support would respectfully show the Court as follows:

## I.    EVIDENCE SUPPORTING PROPOSED FINDINGS OF FACT

### A.    HISTORY AND CONTEXT

#### 1.    The Adversary Parties

1.    Plaintiffs King Louis Enterprises, LLC ("KLM") and King Louis Mining, LLC ("KLE") are privately-held Delaware limited liability companies.[1]   Plaintiff Ronald Katz ("Katz") owns 75% of KLM and 100% of KLE.[2]  Plaintiffs are creditors in the Bankruptcy Case.

2.    Plaintiffs commenced this adversary proceeding, Case No. 10-03269 (the "Adversary") on September 3, 2010 against Defendant Cengiz J. Comu *a/k/a* CJ Comu ("Debtor" or "Comu"), by which they seek revocation of discharge under Section 727(d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code").[3]  Plaintiffs seek an order revoking discharge pursuant to § 727(d)(1) due to "fraud of the debtor" (based on

---

[1]    *First Amended Joint Pre-Trial Order*, entered March 17, 2014 (Adv. Doc. No. 138) (herein, "JPTO"), Stip. Fact ¶ 1.
[2]    JPTO Stip. Fact ¶ 1.
[3]    *See Complaint to Revoke Discharge Pursuant to Section 727(d) of the United States Bankruptcy Code*, filed September 3, 2010 (Adv. Doc. No. 1).  Plaintiffs filed their *Second Amended Complaint to Revoke Discharge Pursuant to Section 727(d) of the United States Bankruptcy Code* on March 2, 2011 (Adv. Doc. No. 20) (the "KLM Complaint," cited as "KLM Compl.").

undisclosed pre-petition assets and false oaths), and under §727(d)(2), due to Comu's failure to report or deliver property of the estate.[4]

3.      Plaintiffs specifically contend that Comu "procured [discharge] through a fraud upon the Court" by concealing and misrepresenting his pre-petition debts, assets and business interests, and that Comu has orchestrated a fraudulent and ongoing scheme to conceal, transfer, and dissipate property of the estate through domestic and foreign affiliates for the purpose of evading creditors (in particular, Plaintiffs).[5]  In addition to revocation, Plaintiffs seek "their reasonable attorney's fees [and] costs of court," as well as any additional "general relief" to which they may be entitled.[6]

4.      Intervenor is the duly-appointed Chapter 7 Trustee in the Bankruptcy Case for the Comu bankruptcy estate.[7]  Trustee alleges[8] fraud and asserts claims for declaratory relief, alter ego, and reverse corporate veil piercing.[9]  Trustee specifically alleges that Third-Party Defendants Barclay Group, Inc. *d/b/a* The Barclay Group, Inc. ("TBG") and Sunset Pacific, LP ("Sunset Pacific"), are alter egos owned or controlled by Comu, which Comu has used to hinder, delay or defraud Comu's creditors, including, in particular, the Plaintiffs in this Adversary.[10] Trustee asserts that all property and assets of TBG and Sunset Pacific constitute property of the estate pursuant to 11 U.S.C. § 541(a)(2)(A), and seeks a turnover of "all property and assets" of TBG and Sunset Pacific (in addition to any assets Comu failed to previously deliver to

---

[4]      JPTO at 2–4.
[5]      KLM Compl. at 3, 7, 9–15; *see also* JPTO at 2–4.
[6]      KLM Compl. at 15.
[7]      JPTO Stip. Fact ¶ 3.
[8]      *See Trustee's Complaint in Intervention*, filed on September 5, 2012 (the "Trustee Complaint"), Adv. Doc. No. 53 (cited as the "Trustee Compl.").
[9]      Trustee Compl. at 12–14; *see also* JPTO at 4–6.
[10]      JPTO at 4–5; *see also* Trustee Compl. at 12–14.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                              **PAGE 13 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002237

Trustee).[11]   Trustee further seeks a judgment against Comu, TBG and Sunset Pacific, jointly and severally for the value of estate assets that have been sold or otherwise disposed of by Comu.[12]

5.     Comu is a Canadian citizen and permanent United States resident, originally from Turkey.[13]  Comu has represented in corporate filings for at least two foreign entities that his usual place of residence is Canada.[14]  Comu filed his *Voluntary Petition* (the "Petition") for bankruptcy relief under 11 U.S.C. § 301 on December 31, 2009 (the "Petition Date").[15]

6.     On the Petition Date, Comu resided at 5301 Paladium Drive, Dallas, Texas, 75254 (the "Paladium Residence"), which Comu owns without debt,[16] and for which Comu claims a homestead exemption.[17]  Comu currently resides at 14873 Oaks North Place, Addison, Texas, 75254 (the "Oaks North Residence").[18]

7.     Comu holds himself out as an experienced investor and financial consultant who advises corporate clients and investors in a variety of securities-related transactions.  Comu has held (and currently holds) numerous executive positions, including President, Chief Executive Officer ("CEO"), and Director in domestic and foreign entities doing business in a wide range of industries, including alternative energy and biofuel, financial services, water purification, mixed martial arts ("MMA") sporting event promotion, and commercial real estate, among others.[19]

---

[11]     JPTO at 5–6; *see also* Trustee Compl. at 12, 14.
[12]     JPTO at 6; *see also* Trustee Compl. at 14.
[13]     KLM Ex. 373 at 3; KLM Ex. 206 at 15346_7; *see also* JPTO Stip. Fact ¶ 2.
[14]     KLM Ex. 83 at 6; KLM Ex. 84 at 5.
[15]     JPTO Stip. Fact ¶¶ 2, 9; *see also* Bankr. Doc. No. 1.
[16]     Def. Ex. 4 at 22.
[17]     Trustee Ex. 94 at 1, 8 (Debtor's *Schedules A through J with Summary of Schedules*, Bankr. Doc. No. 11, filed January 15, 2010).
[18]     KLM Ex. 136 (lease for Oaks North Residence).
[19]     *See infra* Section B(3).

8.      Comu is subject to an *Order of Permanent Injunction* entered in a civil enforcement action brought by the Securities and Exchange Commission ("SEC"), dated November 1, 1989 (the "SEC Injunction").[20]

9.      Third-Party Defendant Phyllis Comu ("Phyllis") is Comu's wife, who resided with Comu at the Paladium Residence on the Petition Date, and currently resides with Comu at the Oaks North Residence.[21]   As of the Petition Date, Phyllis and Comu had been married for approximately ten years, during which time they have resided in Dallas.[22]   Phyllis is not identified as a codebtor in the Bankruptcy Case.[23]

10.      Defendants claim Phyllis owns 98% of Sunset Pacific, and that the remaining shares of Sunset Pacific are owned by Comu (1%) and his brother (1%), Gem C. Comu *a/k/a* Cem Comu ("Cem Comu").[24]   Cem Comu is a Canadian citizen who resides in Burnaby, British Columbia, and has at least one address in Istanbul, Turkey.[25]

11.      Multiple addresses have been identified in Dallas, Texas for Sunset Pacific, including 18352 Dallas Parkway, Suite 136-484[26] (the "18352 Dallas Parkway Address"); 18208 Preston Road, Suite 9314[27] (the "18208 Preston Address"); 14180 Dallas Parkway, Suite 508[28] (the "14180 Dallas Parkway Address"), 5430 LBJ Freeway, Suite 1200[29] (the "5430 LBJ

---

[20]      KLM Ex. 369 (SEC Injunction).  The SEC Injunction permanently enjoins Comu and his agents from, among other things, selling unregistered securities, making false statements, or making misleading partial disclosures in any securities transaction involving interstate commerce.  KLM Ex. 369 at 2, 4, 5–6. The SEC Injunction further prohibits Comu from omitting material information, or making false or misleading statements, regarding the "actual roles of persons involved in ownership, direction and operation of the issuer, and their backgrounds and personal histories."  KLM Ex. 369 at 5.

[21]      *See generally* trial testimony of Phyllis Comu.

[22]      *See, e.g.*, Def. Ex. 4 at 12.

[23]      Trustee Ex. 94 at 5.

[24]      JPTO Stip. Fact ¶ 69; Trustee Ex. 94 at 4–5; Def. Ex. 4 at 5.

[25]      KLM Ex. 132 at 5–7.  Cem Comu's legal address is 3002-2138 Madison Avenue in Burnaby.

[26]      KLM Ex. 22 at 12–13; *see also* Trustee Ex. 30 at 1; Trustee Ex. 31 at 1–2; Trustee Ex. 32 at 2.

[27]      Trustee Ex. 34 at 1 (2009 tax return); Trustee Ex. 35 at 1 (2010 tax return); Trustee Ex. 36 at 1 (2011 tax return).

[28]      KLM Ex. 22 at 6.

[29]      Trustee Ex. 36 at 3.

Freeway Address"), 5735 Pineland Drive, Suite 215[30] (the "Pineland Address"), and 4505 Ratliff

Lane[31] (the "Ratliff Address").

  12.  TBG is a Texas corporation that shares or has shared offices with Sunset Pacific

at the 18208 Preston Address,[32] the 18352 Dallas Parkway Address,[33] and the Ratliff Address.[34]

TBG is a privately-held financial consulting firm that, among other things, advises companies

undergoing "reverse mergers"[35] and other corporate transactions.[36] Comu maintains in

documents filed with this Court, and testified at trial, that the legal name of TBG is "The Barclay

Group, Inc."  On its company website, TBG alternatively holds itself out as "The Barclay Group,

LLC."[37] Texas Secretary of State ("SOS") filings indicate that TBG's actual legal name is

---

[30]  KLM Ex. 22 at 5.

[31]  Trustee Ex. 32 at 1 (2007 tax return).

[32]  Trustee Ex. 17 (2009 tax return); *see also generally* KLM Ex. 18–20; KLM Ex. 24; *see also* KLM Ex. 38; KLM Ex. 142 at 12.

[33]  *See, e.g.*, KLM Ex. 129 at 26.

[34]  Trustee Ex. 15 at 1 (2007 tax return).

[35]  The SEC has defined reverse mergers as follows:

> In a reverse merger transaction, an existing public "shell company," which is a public reporting company with few or no operations, acquires a private operating company— usually one that is seeking access to funding in the U.S. capital markets.  Typically, the shareholders of the private operating company exchange their shares for a large majority of the shares of the public company.  Although the public shell company survives the merger, the private operating company's shareholders gain a controlling interest in the voting power and outstanding shares of stock of the public shell company.   Also typically, the private operating company's management takes over the board of directors and management of the public shell company.  The assets and business operations of the post-merger surviving public company are primarily, if not solely, those of the former private operating company.

SEC, Office of Investor Educ. & Advocacy, *Investor Bulletin: Reverse Mergers* 1, *available at* http://www.sec.gov/investor/alerts/reversemergers.pdf (last visited May 29, 2014).  The New York Times has described this process as "the Wall Street equivalent of 'Invasion of the Body Snatchers,'" which enables companies to "avoid reviews with state and federal regulators that are normally required for initial public stock offerings."  David Barboza & Azam Ahmed, *China to Wall Street: The Side-Door Shuffle*, N.Y. TIMES (July 23, 2011), *available at* http://www.nytimes.com/2011/07/24/business/global/reverse-mergers-give-chinese-firms-a-side-door-to-wall-st.html?pagewanted=all&_r=2& (last visited May 29, 2014).

[36]  *See generally* KLM Ex. 142 (TBG website capture from August 23, 2013); *see also* http://thebarclaygroup.com/ (last visited May 29, 2014).

[37]  KLM Ex. 142 at 1, 20–11.

"Barclay Group, Inc."[38]  While these inconsistencies are not immaterial, the Court need not resolve them for the purposes of this Adversary because the parties, by stipulation, refer to TBG as "Barclay Group, Inc. a/k/a The Barclay Group, Inc."[39]

13.  Comu claims in testimony and court filings that he owns only a one percent (1%) ownership interest in TBG.[40]  Defendants allege that the remaining 99% of TBG is owned either by Third-Party Defendant Bernard D. Brown ("Brown"), a resident of the United Kingdom ("UK"), or by Brown & Lampe PLC ("B&L"), a UK entity.[41]

### 2.  Plaintiffs' Collection Efforts Triggered Bankruptcy

14.  On July 20, 2006, Plaintiffs Katz, KLM and KLE commenced a New York state court action (the "New York Action") against Comu to recover damages arising from Comu's common law fraud and securities fraud with respect to business dealings dating back to 2003.[42]

15.  After the commencement of the New York Action, Comu challenged Plaintiffs' claims with a verified motion to dismiss[43] (which was unsuccessful), two verified answers asserting a variety of affirmative defenses,[44] and counterclaims against Katz individually for breach of fiduciary duty and tortious interference with a contract, seeking "not less than $1 million" in actual damages – plus punitive damages and attorneys' fees.[45]  Despite having

---

[38]    *Compare* KLM Ex. 23 *with* KLM Ex. 24; *see also* Trustee Ex. 18 at 1 (TBG tax return filed in the name of "Barclay Group, Inc.").

[39]    JPTO at 1.

[40]    JPTO Stip. Fact ¶ 14; Trustee Ex. 94 at 4.

[41]    JPTO Stip. Fact ¶ 14; Defendants' Answer ¶ 4; *see also* Trustee Ex. 94 at 4.

[42]    JPTO Stip. Fact ¶ 4; *see also* KLM Ex. 1 (Complaint); KLM Ex. 340 at 4–12.  The New York Action is styled *Humitech Int'l Group, Inc., et al. v. Comu, et al*, Index No. 06-602567, in the Supreme Court of the State of New York, County of New York.  The Court may take judicial notice of the pleadings and procedural history in the New York Action.  *See* Fed. R. Evid. 201.

[43]    JPTO Stip. Fact ¶ 5; KLM Ex. 338.

[44]    JPTO Stip. Fact ¶ 5; KLM Ex. 339; KLM Ex. 341.

[45]    JPTO Stip. Fact ¶ 5; *see also* KLM Ex. 2 (docket sheet); KLM Ex. 339 at 8–14.

aggressively litigated the New York Action for almost three years, Comu failed to appear for the February 23, 2009 trial setting.[46]

16.     The New York court signed a default judgment against Comu on April 30, 2009, awarding Plaintiffs the aggregate amount of $2,279,265.16 plus interest accruing at 9% (the "New York Judgment").[47]  The New York Judgment was entered by notice of entry filed on June 9, 2009.[48]  Comu filed a notice of appeal on August 6, 2009,[49] but did not perfect or prosecute an appeal.

17.     Accrued interest on the New York Judgment as of March 17, 2014 (the first day of trial in this Adversary) is $1,002,064.88, and thus the total debt owed by virtue of the New York Judgment is currently at least $3,281,330.04 (the "Judgment Debt").  Plaintiffs' Judgment Debt represents at least 95% of the total debt owed by Comu, as evidenced by the total creditor claims filed in the Bankruptcy Case.[50]

18.     Seeking to collect the Judgment Debt, Plaintiffs retained Emil Lippe, Jr. ("Prior Counsel"), and, on June 2, 2009, commenced a state court action in Dallas, Texas to domesticate the New York Judgment and pursue recovery from Comu (the "Collection Action").[51]

19.     Plaintiffs served Comu with a subpoena on August 2, 2009, which sought discovery regarding Comu's assets and noticed his deposition for August 19, 2009.[52]  Comu did not object to the subpoena.[53]

---

[46]     KLM Ex. 2 (docket sheet); *see also* JPTO Stip. Fact ¶ 6.
[47]     JPTO Stip. Fact ¶ 6; *see also* KLM Ex. 3.
[48]     JPTO Stip. Fact ¶ 6; *see also* KLM Ex. 3.
[49]     KLM Ex. 2 at 3.
[50]     JPTO Stip. Fact ¶ 11.
[51]     JPTO Stip. Fact ¶ 7; *see also* KLM Ex. 4 (Notice of Filing Foreign Judgment); KLM Ex. 5 (docket sheet).  The Collection Action is styled *King Louie Mining, LLC, et al v. Cengiz Jan Comu*, Cause No. 09-0680891, in the 134th Judicial District Court, Dallas County, Texas.
[52]     KLM Ex. 6 at 6–15.
[53]     KLM Ex. 5.  Comu waited until the day before his deposition was to be taken to inform Plaintiffs through counsel that he was unavailable, and asked to reschedule the deposition.  KLM Ex. 6 at 1.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                    **PAGE 18 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002242

20.     Comu was preparing to file bankruptcy at least by September 17, 2009, when he forwarded certain "Ch. 7 Docs" – which included a W-2 from Odyssey One Source, Inc. ("Odyssey One") and Sunset Pacific's 2007 tax return (the "Undisclosed Tax Documents") – to his bankruptcy counsel.[54]    As set forth *infra*,[55] the Undisclosed Tax Documents contain information regarding Comu's finances that was either omitted or modified in his bankruptcy schedules (the "Schedules")[56] or his *Statement of Financial Affairs* ("SOFA")[57] filed in the Bankruptcy Case on January 15, 2010 (together, the "Bankruptcy Filings").

21.     Plaintiffs filed a motion to compel Comu's deposition in the Collection Action on November 23, 2009,[58] to which Comu did not respond.[59]   At a hearing on December 14, 2009, the court entered an agreed order compelling Comu's deposition on January 5, 2010.[60]

22.      Approximately one week before the Petition Date, Comu and his wife took a Royal Caribbean vacation cruise that Comu paid for with a credit card.[61]

23.     On December 30, 2009 – the day before the Petition Date – Comu emailed a memorandum to his bankruptcy counsel (the "Debts Memo"), which he described as a summary

---

[54]     KLM Ex. 231 (email and attachments).
[55]     *See infra* Section B(1)–(2).
[56]     Trustee Ex. 94.
[57]     Bankr. Doc. No. 12; Trustee Ex. 95 (SOFA admitted as exhibit).
[58]     JPTO Stip. Fact ¶ 8.  Plaintiffs filed their motion to compel after three months of what was described in the Collection Action as "repeated attempts to obtain an available date to take [Comu's] deposition," to which Comu failed to respond.  KLM Ex. 6 at 1–4.
[59]     KLM Ex. 5.
[60]     JPTO Stip. Fact ¶ 8; *see also* KLM Ex. 7 (Order).  The court also awarded Plaintiffs $350 in attorneys' fees.  KLM Ex. 7 at 1.
[61]     Def. Ex. 4 at 17; KLM Ex. 309 at 2 (vacation photo).  Comu charged the cruise to his MBNA America credit card, giving rise to a separate fraud adversary proceeding by that creditor, which was resolved by settlement in 2009, at a 50% discount.  *See FIA Card Services, N.A. v. Cengiz J. Comu (In re Comu)*, Adversary No. 10-03068-sgj (Doc. No. 1 & Doc No. 6).

of "outstanding debts and 'potential' debts."[62]  As discussed *infra*, the Debts Memo contains

information regarding Comu's finances that was omitted or modified in his Bankruptcy Filings.[63]

24.     Comu filed his voluntarily Petition on December 31, 2009.[64]  On January 4, 2010

(the day before his court-ordered deposition), Comu filed a *Suggestion of Bankruptcy* staying the

Texas Collection Action pursuant to 11 U.S.C. § 362.[65]

25.     According to his own testimony, Comu's bankruptcy filing was prompted by the

New York Judgment and Plaintiffs' collection efforts.  Comu admitted in his Answer[66] to the

KLM Complaint that Plaintiffs were "pressing for postjudgment discovery from Comu when he

filed this bankruptcy proceeding."[67]  When asked at the § 341 Meeting of Creditors on February

9, 2010 (the "Creditors Meeting") why he filed bankruptcy, Comu cited "large judgments."[68]

And at trial in this Adversary, Comu admitted his bankruptcy was prompted by Plaintiffs' pursuit

of Comu's assets in the Collection Action.

### 3.     Comu's Inadequate Pre-Discharge Disclosures

26.     Attached to Comu's Petition is a § 342(b) notice – which Comu verified having

read – cautioning that "Section 521(a)(1) of the Bankruptcy Code requires that you promptly file

detailed information regarding your creditors, assets, liabilities, income, expenses and general

financial condition."[69]

---

[62]     KLM Ex. 310 (attaching Debts Memo).  In the process of electronic discovery, the date on the Debts Memo was automatically updated to the date of printing (March 11, 2014), but the email transmitting the Debts Memo is dated December 30, 2009.

[63]     *See infra* Section B(1).

[64]     Bankr. Doc. No. 1.

[65]     JPTO Stip. Fact ¶ 10; *see also* KLM Ex. 8 (Suggestion of Bankruptcy).

[66]     *See Defendant CJ Comu's Original Answer to Plaintiffs' Second Amended Complaint to Revoke Discharge*, filed December 7, 2012 (Adv. Doc. No. 79) (herein, "Debtor's Answer").

[67]     *Compare* KLM Compl. ¶ 20 *with* Debtor's Answer ¶ 2 (admitting allegation).

[68]     Def. Ex. 4 at 2.

[69]     Bankr. Doc. No. 1 at 6, 8.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                    **PAGE 20 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002244

27.     On December 31, 2009 and January 4, 2010, the Clerk of the Bankruptcy Court issued notices that the Creditors Meeting was scheduled for February 9, 2010, and set the deadline for objecting to discharge for April 12, 2010 (the "Discharge Objection Deadline").[70]

28.     On January 11, 2010, Comu emailed to his attorney a document containing information to be included in his Schedules and SOFA (the "Draft Bankruptcy Filings").[71]  As discussed *infra*, the Draft Bankruptcy Filings contain information regarding Comu's finances that was either omitted or modified in his Bankruptcy Filings.[72]

29.     Comu filed his Bankruptcy Filings on January 15, 2010.[73]  By executing and filing his Schedules, Comu "declare[d] under penalty of perjury that I have read the foregoing summary and schedule … and that they are true and correct to the best of my knowledge, information, and belief."[74]  Comu also declared, with regard to his SOFA, "under penalty of perjury that I have read the answers contained in the foregoing statement of financial affairs and attachments thereto and that they are true and correct."[75]

30.     The Creditors Meeting, at which Comu was questioned under oath by his own counsel, Trustee, and Prior Counsel, was held on February 9, 2010.[76]  Comu verified, in response to prompting by his own counsel, that his Bankruptcy Filings were true and correct.[77]

31.     Prior Counsel stated at the Creditors Meeting that he intended to file an objection to discharge on behalf of Plaintiffs on the basis of fraud.[78]  Defendants rely on this statement as evidence that Plaintiffs were aware of Comu's fraud prior to the Discharge Objection Deadline.[79]

---

[70]     Bankr. Doc. 4; Bankr. Doc. 7.
[71]     KLM Ex. 312 (attaching Draft Bankruptcy Filings).
[72]     *See infra* Section B(2).
[73]     JPTO Stip. Fact ¶ 12; *see also* Trustee Ex. 94 (Schedules); Trustee Ex. 95 (SOFA).
[74]     Trustee Ex. 94 at 22.
[75]     Trustee Ex. 95 at 8.
[76]     *See generally* Def. Ex. 4 (unofficial transcript of Creditors Meeting).
[77]     Def. Ex. 4 at 3.
[78]     Def. Ex. 4 at 19.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                                          **PAGE 21 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002245

32.    After noting certain inconsistencies in Comu's testimony and omissions in his Bankruptcy Filings, including the omission of information regarding Phyllis's separate property,[80] Trustee suggested at the Creditors Meeting that Comu amend his Bankruptcy Filings.[81]  Trustee also asked Comu to provide a "list of everything your wife owns that you consider to be her separate property."[82]

33.    On February 10, 2010, Comu emailed a memorandum to his bankruptcy counsel with a subject line, "Chapter 7 – Phyllis Comu," listing certain assets (the "Phyllis Memo").[83] As discussed *infra*, the Phyllis Memo contained information regarding Comu's finances that was omitted or modified in his Bankruptcy Filings.[84]

34.    Comu never amended his Bankruptcy Filings.[85]

35.    On February 11, 2010, Plaintiffs timely filed proofs of claim in the Bankruptcy Case, seeking to recover their share of the New York Judgment from the bankruptcy estate.[86]

36.    Trustee's internal notes related to the Bankruptcy Case (the "Trustee's Notes")[87] indicate that in response to Trustee's request, Comu's counsel delivered certain documents to Trustee in March of 2010 that bear upon Comu's assets and business interests (the "March 2010

---

[79]    *See Defendants' Pretrial Brief*, filed March 4, 2014, at 2 (Adv. Doc. No. 128) (herein, "Def. Pretrial Br.").
[80]    Def. Ex. 4 at 24 (*Comu*: "This is my wife's account at Compass Bank. This is not my account." *Trustee*: "Mr. Comu, I asked you specifically does your wife own anything that you did not list in your schedules.  Does she have anything that you consider to be her separate property and you said No." *Comu*:  "She has her own personal belongings and she has her own personal banking account."  *Trustee*: "[S]he's not employed?"  *Comu*: "She is not employed."  *Trustee*: "Where does she get the money for her personal bank account?"  *Comu*: "She gets it from either money that I give her or money that she gets from family.").
[81]    Def. Ex. 4 at 28–29.
[82]    Def. Ex. 4 at 25; Def. Ex. 5 at 3.
[83]    KLM Ex. 126 (attaching Phyllis Memo).
[84]    *See infra* Section B(1)–(2).
[85]    Bench Finding No. 2.
[86]    JPTO Stip. Fact ¶ 11; *see also* Bankr. Claim No. 2-1 (KLM's claim for $2,003,945.84); Bankr. Claim No. 3-1 (KLE's claim for $199,811); Bankr. Claim No. 4-1 (Katz's claim for $75,508.22).
[87]    *See generally* Def. Ex. 5.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                    **PAGE 22 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002246

Production").[88]  Although he never amended his Bankruptcy Filings to reflect new information included in the March 2010 Production, Comu claims that the March 2010 Production included documents that put Plaintiffs "on inquiry" notice of Comu's ongoing fraud.[89]

37.    On March 8, 2010, Comu delivered to Trustee a check for $12,000 in bank account funds that were not disclosed in Comu's Bankruptcy Filings.[90]

38.    Despite having announced his intention to do so at the Creditors Meeting, Prior Counsel failed to file an objection to discharge before the Discharge Objection Date.  In the absence of objections from Trustee or creditors, Debtor was granted a discharge (the "Discharge") on April 14, 2010 (the "Discharge Date").[91]

### 4.    The Adversary Proceeding

39.    Plaintiffs filed this Adversary on September 3, 2010.[92]  Comu filed three successive motions to dismiss between October 7, 2010 and March 24, 2011,[93] which this Court denied.[94]  Comu filed the Debtor's Answer on December 7, 2012, in which he alleged, *inter alia*, the "Green Auto Merger," discussed *infra*,[95] "occurred post-petition"[96] – a statement Comu now stipulates was false.[97]

40.    Trustee filed the Trustee Complaint on September 9, 2012.[98]  Defendants filed an answer to the Trustee Complaint on October 9, 2012 ("Defendants' Answer").[99]  While Comu

---

[88]    Def. Ex. 5 at 3.
[89]    *See, e.g.*, Debtor's Answer at 2–3.
[90]    Def. Ex. 5 at 3; *compare* Trustee Ex. 94 at 2.
[91]    JPTO Stip. Fact ¶ 13; *see also* Order Granting Discharge of Debtor (Bankr. Doc. No. 23).
[92]    *See* Adv. Doc. No. 1.
[93]    Adv. Doc. No. 5 (October 7, 2010); Adv. Doc. No. 12 (January 1, 2011); Adv. Doc. No. 24 (March 24, 2011).
[94]    Adv. Doc. No. 10; Adv. Doc. No. 17; Adv. Doc. 76.
[95]    *See infra* Section D.
[96]    Debtor's Answer ¶ 9.
[97]    JPTO Stip. Fact ¶ 33 ("The effective date of the Green Auto Merger was November 5, 2009."); *see also* JPTO Stip. Fact ¶¶ 23–34 (setting forth details of 2009 Green Auto Merger).
[98]    Adv. Doc. 53.

unequivocally maintained in his Schedules and at the Creditors Meeting that TBG is owned 99%

by Brown,[100] Defendant's Answer contradicts those statements by alleging on behalf of Brown

that 99% of TBG "is actually owned by a United Kingdom Corporation named Brown and

Lampe, PLC."[101]

       41.     Plaintiffs filed a *Motion for Leave to File Third Amended Complaint* on October

29, 2012 (the "Motion for Leave"),[102] seeking to pursue claims directly against Comu-related

entities TKY Trust ("TKY Trust"), DAPTCO Trust ("DAPTCO Trust," together with TKY

Trust, the "Canadian Trusts"), Marathon Management Limited Company ("Marathon Limited"),

and Regus Advisors, Inc. ("Regus Advisors").[103] The Court denied Plaintiffs' Motion for Leave

on November 2, 2012, without prejudice to Trustee's right to assert such claims.[104]

       42.     On June 21, 2013, Greenberg Traurig, LLP replaced Prior Counsel as counsel for

Plaintiffs.[105] On July 19, 2013, Plaintiffs commenced an action against Prior Counsel (the

"Malpractice Action"),[106] alleging negligence in the failure to timely object to Comu's Discharge

on behalf of Plaintiffs because the New York Judgment was non-dischargeable under

---

[99]    *See Answer by Defendant and All Third-Party Defendants to Trustee's Complaint in Intervention*, filed December 7, 2013 (Adv. Doc. No. 64).
[100]    Def. Ex. 4 at 6 ("Mr. Bernard Brown owns 99% of the company."); *see also* JPTO Stip. Fact ¶ 14; Trustee Ex. 94 at 4.
[101]    Defendants' Answer ¶ 4.
[102]    Adv. Doc. No. 68.
[103]    Adv. Doc. No. 62.
[104]    Adv. Doc. No. 71.
[105]    *See* Bankr. Doc. 58; Adv. Doc. 88; Adv. Doc. 91.
[106]    *See generally* Def. Ex. 6. The Malpractice Action is styled *Ronald Katz, et al v. Emil Lippe, Jr., et al*, Cause No. DC-13-0782, filed in the E-101st Judicial District Court of Dallas, County.

Bankruptcy Code § 523(a)(2)(A) as a debt for money obtained by fraud.[107]  At trial, Defendants

admitted into evidence as a defense exhibit Plaintiffs' Petition filed in the Malpractice Action.[108]

43.    In 2013, Comu made available to Plaintiffs certain electronic discovery (the

"2013 Electronic Production"),[109] which was collected at Plaintiffs' expense, and which

contained previously-undisclosed documents and information relevant to Comu's pre-petition

assets and business activities, as well as asset transfers made before and after the Petition Date

and the Discharge Date.[110]

44.    In early December, 2013, the parties negotiated an agreed restraining order

prohibiting Defendants and their agents or affiliates from selling or transferring any stock of

Green Automotive Company Corporation ("Green Auto") pending trial.[111]  On December 20,

2013, the Court entered an *Agreed Temporary Restraining Order* (the "Agreed TRO").[112]  On

January 3, 2014, the Court entered an order extending the Agreed TRO through trial.[113]

---

[107]    Def. Ex. 6 at 1–2.  In the Malpractice Action, Plaintiffs seek damages exceeding $1,000,000 resulting from the "potential loss of the value" of the New York Judgment as "a result of increased difficulties in collecting" the Judgment Debt, and due to "significant additional attorneys' fees and litigation expenses" incurred by Plaintiffs in prosecuting their revocation claims in this Adversary.  Def. Ex. 6 at 3–6.  Plaintiffs allege a timely objection to Comu's Discharge "would have permitted Plaintiffs to immediately pursue collection of the damages awarded" in the New York Judgment, "would have prohibited Comu from transferring assets during the pendency of the [Bankruptcy Case] or the Adversary," and "effectively creat[ed] a more than two-year window of opportunity for Comu to secret substantial assets in new entities in other states and abroad."  Def. Ex. 6 at 4.

[108]    Def. Ex. 6 at 1–6 (*Plaintiffs' Original Petition and Request for Disclosure*, filed on July 19, 2013 in the Malpractice Action).

[109]    Exhibits admitted by Plaintiffs at trial that reflect bates references at the bottom right corner (*i.e.*, "12345_6"), were produced as part of the 2013 Electronic Production.

[110]    Testimony from Katz and Trustee confirms that many details regarding Comu's pre-petition assets and pre-discharge transfers were learned only after the 2013 Electronic Production.

[111]    KLM Ex. 346 (December 4, 2013 email from Comu's counsel to Trustee's counsel re: Agreed TRO: "CJ and I think we can agree to that.").

[112]    The Agreed TRO ordered as follows:

> Defendants, and their respective officers, agents, servants, employees, attorneys, affiliates, or other persons acting in concert or participating with them (including, but not limited to, the DAPTCO Trust, the TKY Trust and Regus Advisors, Inc.) who receive actual notice of this Agreed Temporary Restraining Order by personal service or otherwise, be and are hereby enjoined from (1) selling, transferring, exchanging or encumbering any shares of stock of Green Automotive Company Corporation (f/k/a

45.     Trial commenced March 17, 2014, and concluded March 21, 2014, at which point the Court issued a bench ruling (the "Bench Ruling") in favor of Plaintiffs and Trustee, and against Defendants as follows:

> (a) revocation of discharge shall be ordered as to the Debtor, pursuant to Section 727(d)(1) & (2) of the Bankruptcy Code, based on fraud and concealment of assets of which Plaintiffs (and Trustee) were unaware until after the granting of discharge, and also based on Debtors acquiring or becoming entitled to acquire property that was or would be property of the estate and knowingly and fraudulently failing to report, deliver and surrender it [to Trustee]; (b) The Barclay Group, Inc. and Sunset Pacific are the alter egos of Debtor and their veil should be pierced; (c) Debtor should turnover previously undisclosed Turkish Bank Account and the equity/asset-control of The Barclay Group, Inc. and Sunset Pacific to Trustee; (d) parties may submit post-trial briefing regarding possible monetary damages to the estate. Counsel will upload an amended restraining order and injunction, as soon as possible, to protect dissipation of Green Auto stock or other assets of The Barclay Group, Inc. and Sunset Pacific.[114]

46.     On March 21, 2014, the Court also issued from the Bench certain findings of fact (the "Bench Findings"),[115] which are individually incorporated below.

47.     On March 28, 2014, Trustee filed *Trustee's Post-Trial Brief in Support of Recovery Under 11 U.S.C. § 542(a)* ("Trustee's Damages Brief"),[116] in which Trustee requests an award of joint and several damages against Comu, TBG and Sunset Pacific for the value of assets that have been sold or otherwise dissipated since the Petition Date.[117] By Trustee's calculation, Trustee is entitled to a judgment for $4,084,944.95, which reflects the proceeds from

---

> Ganas Corp.; "Green Automotive") that has been issued or sold to one or more of the Defendants (the "Green Auto Stock"); (2) entering into any agreement to sell, transfer, exchange or encumber the Green Auto Stock; and (3) spending, transferring or encumbering any proceeds received by any one of the Defendants from the prior sale or sales of Green Auto Stock.

Adv. Doc. No. 111 at 2.
[113]     Adv. Doc. No. 116 at 2.
[114]     *See* Clerk's Docket Entry in Adversary Proceeding, entered March 25, 2014.
[115]     Citations to the Bench Findings herein are numbered according to notes taken by Trustee's counsel at trial on March 21, 2014 when they were issued from the bench.
[116]     Adv. Doc. No. 141.
[117]     Trustee's Damages Brief at 2.

the sale of approximately 16.2 million shares of Green Auto stock since the Petition Date.[118]

Alternatively, Trustee seeks $833,160.00 under the equitable doctrine of unjust enrichment.[119]

48.　On April 4, 2014, the Court entered an *Extended Temporary Restraining Order and Mandatory Injunction* (the "Mandatory Injunction"),[120] which the Court found to be necessary to preserve and protect property of the bankruptcy estate, and to prevent irreparable harm to the Plaintiffs and the Debtor's bankruptcy estate, pending entry of the Court's written findings of fact and conclusions of law and the Court's Judgment.[121] The Mandatory Injunction applies to Defendants and their agents and affiliates, including the Canadian Trusts, Marathon Management, Inc. ("Marathon Inc."), Continental Partnership, Inc. ("CPI"), Continental Investments Holding Company ("CIHC"), West Point Advisors, Inc. ("WPA"), EuroCap Investments Plc (UK) ("EuroCap"), and Regus Advisors.[122]

49.　On April 23, 2014, Trustee filed a report on the status of Comu's compliance with the Mandatory Injunction (the "Injunction Status Report").[123]

### B.　COMU SECURED DISCHARGE THROUGH FRAUD AND BAD FAITH

50.　Comu secured Discharge through widespread fraud, including the deliberate concealment of assets and significant and numerous false oaths.[124]

---

[118]　Trustee's Damages Brief at 3, 5.
[119]　Trustee's Damages Brief at 4–5.
[120]　Adv. Doc. No. 142.
[121]　Mandatory Injunction at 2. The Mandatory Injunction prohibits the "selling, transferring, exchanging or encumbering any non-exempt assets," "entering into any agreement to sell, transfer, exchange or encumber any non-exempt assets," and "spending, transferring or encumbering any proceeds received by any one of the Defendants from the prior sale or sales of any non-exempt assets" of Defendants Comu, Phyllis, Sunset Pacific, and TBG. *Id.* at 3. The Mandatory Injunction further ordered the turnover of certain assets and account records on or before April 14, 2014. *Id.* at 3–6.
[122]　Mandatory Injunction at 3.
[123]　*Trustee's Status Report of Compliance with Extended Temporary Restraining Order and Mandatory Injunction*, filed April 23, 2014 (Adv. Doc. No. 144) (cited herein as "Inj. Status Report").
[124]　Bench Finding No. 1.

51.     In particular, Comu's Bankruptcy Filings, which were never amended,[125] reflect inaccurate disclosures regarding Comu's employment circumstances, compensation and professional activities,[126] and inaccurate information about his assets and income and that of his wife, Phyllis.[127]  Comu's Bankruptcy Filings also misrepresented or failed to schedule numerous pre-petition interests and assets, including but not limited to Comu's true interests in Sunset Pacific and TBG,[128] various equity holdings,[129] a country club membership,[130] Turkish Bank accounts,[131] and ownership and/or control of numerous entities.[132]

52.     Comu received or became entitled to receive substantial assets after the Petition Date from or related to his undisclosed pre-petition business activities, none of which were turned over to Trustee before the Discharge Date.

53.     The false oaths and undisclosed assets described herein are "material" because they relate to Comu's business transactions and estate, or they concern the discovery of assets, business dealings, or the existence and disposition of Comu's property.

54.     There is ample evidence that Plaintiffs and Trustee did not know the true facts pertaining to Comu's false oaths and undisclosed assets until after the Discharge Date,[133] and that Plaintiffs did not know about Comu's fraud prior to the Discharge Objection Deadline.[134] To the extent Comu disclosed some information before Discharge, such disclosure was misleading because it was inaccurate, incomplete, and/or untimely.  Comu's ongoing subterfuge

---

[125]     Bench Finding No. 2.
[126]     Bench Finding No. 14.
[127]     Bench Finding No. 7.
[128]     Bench Finding No. 9.
[129]     Bench Finding No. 8.
[130]     Bench Finding No. 13.
[131]     Bench Finding No. 5.
[132]     Bench Finding No. 15.
[133]     Bench Finding No. 16.
[134]     Bench Finding No. 3.

hindered any reasonable effort by Trustee or creditors to discover the truth about Comu's financial condition and resources before the Discharge Date.

### 1.    Comu Deliberately Fabricated Debts and Liabilities.

55.    In Schedule J, Comu attested under oath that his "current expenditures," calculated on an average monthly basis, were $4,950, which included $625.00 per month for "Property taxes."[135]  Because Comu has disclosed no other properties subject to property taxes, this disclosure apparently refers to Comu's Paladium Residence, which Comu claims is exempt from creditor claims under Texas homestead rules.[136]  This was a knowingly false oath because, for tax years 2009 and 2010, Comu paid the property taxes for the Paladium Residence out of TBG bank accounts before the Petition Date.[137]   When confronted at trial with documentary evidence of these tax payments, Comu claimed, for the first time since the Petition Date, that they were "loans" from TBG.  Comu did not list any debts to TBG in his Schedules, and TBG did not file a claim in the Bankruptcy Case.

56.    In Schedule F, Comu claimed debts totaling $6,211,868.71,[138] which he verified at the Creditors Meeting in response to prompting by his attorney.[139]

57.    The claims register in the Bankruptcy Case reflects total creditor claims of $2,394,773.21 – about 38% of Comu's scheduled debts.[140]  Plaintiffs' claims constitute at least 95% of creditor claims in the Bankruptcy Case.[141]

---

[135]    Trustee Ex. 94 at 19 § 18.  Over the course of this Bankruptcy Case, this alleged monthly expenditure totals over $30,000.
[136]    Trustee Ex. 94 at 1, 8.
[137]    In early 2009, Comu paid the 2009 Dallas County property taxes for the Paladium Residence directly out of TBG's bank account.  *Compare* KLM Ex. 371 at 1 ($6,988.80 taxes paid January 31, 2009), *with* Trustee Ex. 24 at 1 ($6,988.80 check to David Childs Tax Assessor). And on December 17, 2009 – two weeks before the Petition Date – Comu again paid property taxes for the Paladium Residence out of TBG's account, in a transaction described in the TBG ledger Comu produced to the Trustee as a "Fee Expense."  *Compare* KLM Ex. 371 at 1 ($7483.11 taxes paid December 21, 2009), *with* Trustee Ex. 24 at 2 ($7,483.11 payment made for "Fee Expenses" on December 17, 2009), *and* KLM Ex. 18 at 2.
[138]    Trustee Ex. 94 at 15.
[139]    Def. Ex. 4 at 2.

58.     Other than Plaintiffs, seven creditors filed claims in the Bankruptcy Case, which together total $115,508.05 (84% of which is credit card debt).[142]

59.     The vast majority of debt listed in Schedule F relates to judgments and potential claims ($6,011,407.02),[143] which is consistent with Comu's testimony that he filed bankruptcy due to "large judgments."[144] Comu did not indicate, as required in Schedule F, that any of these judgments and claims were contingent, unliquidated, or disputed.[145] Plaintiffs are the only judgment creditors to file claims in the Bankruptcy Case.

60.     The Debts Memo reflects numerous debts and credit accounts that were not listed in Comu's Bankruptcy Filings.[146]

61.     Comu was required in Schedule H to identify Phyllis as a codebtor, which he failed to do,[147] and at the Creditors Meeting he denied that Phyllis was liable on any of the debts in his Schedules.[148] Comu has not alleged that any creditor has agreed to pursue satisfaction of its debt solely from Comu's separate property (nor is there evidence of any such agreement).

---

[140]    *See* Claims No. 1-1 through 10-1.

[141]    JPTO Stip. Fact ¶ 11.

[142]    *See* Claim No. 1-1 ($350, claim filed by Emil Lippe for sanctions awarded in the Collection Action), Claim No. 5-1 ($27,825.06, Citibank credit card debt), Claim No. 6-1 ($3,119.31, Capital One Bank credit card debt), Claim No. 7-1 ($2,464.35, Capital One Bank credit card debt), Claim No. 8-1 ($20,288.03, Wells Fargo Bank credit card debt), Claim No. 9-1 ($43,372.70, JP Morgan Chase Bank credit card debt), and Claim No. 10-1 ($18,088.60, claim for attorneys' fees by Glast, Phillips & Murray).

[143]    Trustee Ex. 94 at 12–15.

[144]    Def. Ex. 4 at 2 (Comu citing "large judgments" as the reason for his bankruptcy).

[145]    Trustee Ex. 94 at 12–15. The purpose of identifying whether debits and liabilities in Schedule F are "disputed, unliquidated or contingent" is so that trustee and creditors can better understand whether the Debtor actually owes all the debts. By not marking those columns, Comu misled Trustee and creditors into believing that he was insolvent, and that it would not greatly benefit any single creditor to spend money bringing assets into the estate.

[146]    *Compare* KLM Ex. 310 at 2–4, *with* Trustee Ex. 94. These include a potential lawsuit by Titan Securities, Inc. ($2,000,000), a Capital One Visa ($981), an American Express account ($53,726), a debt to Debt Resolution Partners ($38,000), a potential claim by attorney Robert Clark ($25,000), and Wells Fargo accounts held by Sunset Pacific and Marathon, Inc.

[147]    Trustee Ex. 94 at 17 ("If the debtor resides or resided in a community property state … (including … Texas…) within the eight year period immediately preceding the commencement of the case, identify the name of the debtor's spouse.").

[148]    Def. Ex. 4 at 28–29.

Comu's expenses – such as the Comus' December, 2009 Caribbean cruise – before and after the Petition Date benefit both Comu and Phyllis.[149]

62.   Schedule F lists a $27,563 debt to LVNV Funding that is duplicated as a $26,991.69 debt to Citibank (both accounts ending *7618).[150]   Both of these entries relate to a single Citibank account listed in the Debts Memo.[151]

63.   Schedule F lists a judgment held by Anne F. McCaughey for $1,960,000,[152] which Comu's Debts Memo acknowledges is a duplicate of Plaintiffs' New York Judgment.[153]

64.   Schedule F also lists two civil judgments in favor of AJW Partners, LLC ("AJW") – respectively dated August 6, 2002 ($1,234,766), and July 19, 2007 ($672,696) (the "AJW Judgments").[154]  No claims pertaining to the AJW Judgments were filed in the Bankruptcy Case.

65.   The first AJW Judgment refers to a 2001 federal lawsuit in the Southern District of New York (the "First AJW Suit") filed by AJW against Airtech Group, Inc. ("Airtech").[155] Although Comu was Airtech's CEO and Chairman at times relevant to the case,[156] he was never a party to the First AJW Suit.[157]   The August 6, 2002 judgment to which Comu refers in

---

[149]     *See* Trustee Ex. 94 at 19.
[150]     Trustee Ex. 94 at 13–14.
[151]     KLM Ex. 310 at 2.
[152]     Trustee Ex. 94 at 12
[153]     KLM Ex. 310 at 4.  McCaughey is an attorney at Wachtel & Masyr, LLP, counsel for Plaintiffs in New York.
[154]     Trustee Ex. 94 at 12.
[155]     The First AJW Suit is styled *New Millennium Capital Partners II, LLC and AJW Partners, LLC v. Airtech Group, Inc.*, Civil Action No. 1:01-CV-10841-RCC, filed in the United States District Court for the Southern District of New York.  KLM Ex. 342.  The complete docket sheet for the First AJW Suit is available on Pacer.  Plaintiffs ask Court to take judicial notice of the pleadings and procedural history in the First AJW Suit.  *See* FED. R. EVID. 201.
[156]     Def. Ex. 4 at 22; *see also* KLM Ex. 145 at 24.
[157]     KLM Ex. 342 (docket sheet).

Schedule F was entered by default only against Airtech – the sole defendant in the First AJW Suit.[158]

66.    The second AJW Judgment listed in Schedule F[159] refers to a 2006 lawsuit in the Northern District of Texas (the "Second AJW Suit"), in which AJW pursued successor liability claims against Humitech International Group Inc. ("Humitech") arising from the First AJW Suit.[160]   At times relevant to the Second AJW Suit, Comu was operating Humitech as its Chairman and CEO.[161]   Although Comu was sued individually in the Second AJW Suit, the July 19, 2007 judgment to which Schedules F refers was entered against Humitech only, and makes no rulings regarding the claims against Comu.[162]

67.    Comu was fully aware he had no liability under either AJW Judgment.   On October 23, 2008, Comu executed a settlement agreement[163] resulting in the agreed dismissal of the Second AJW Suit with prejudice,[164] in connection with which the parties executed a

---

[158]    KLM Ex. 342 at 3 (docket entry reflecting default judgment that "plaintiff New Millenium Capital Partners II, L.P. recover of the defendant [Airtech] the amount of $659,424, plus $13,122.20, representing per diem interest at the rate of $127.40 from 4/25/02 through the date of judgment, plus $150 in costs, for a total of $672,696.20, with interest thereon at the rate of 1.82 percent, as provided by 28 USC 1961.  The plaintiff AJW Partners, LLC shall recover of the defendant [Airtech] the amount of $1,210,423, plus $24,343.02, representing per diem interest at the rate of $236.34 from 4/25/02 through the date of judgment, for a total of $1,234,766.02.").

[159]    Trustee Ex. 94 at 12.

[160]    The Second AJW Suit is styled *New Millennium Capital Partners II, LLC and AJW Partners, LLC v. Humitech International Group Inc. and CJ Comu*, Case No. 3:06-cv-01180-L, filed in the U.S. District Court for the Northern District of Texas (Hon. Sam Lindsay)·.  *See* KLM Ex. 343 (docket sheet). The docket sheet and court filings in the Second AJW Suit are available online via Pacer.  Plaintiffs ask the Court to take judicial notice of the pleadings and procedural history in the Second AJW Suit.  FED. R. EVID. 201.

[161]    Second AJW Suit, Doc. No. 18 at 4; *see also* Def. Ex. 4 at 8; KLM Ex. 145 at 24.

[162]    KLM Ex. 11 at 22; *see also* Second AJW Suit, Doc. No. 20 (entering judgment that "Humitech International Group, Inc., pay damages to Plaintiff AJW Partners, LLC in the amount of $1,234,76 and post judgment interest at the applicable federal rate from the date of judgment until the judgment is paid; that Humitech International Group, Inc., pay damages to Plaintiff New Millennium Capital Partners II, LLC, in the amount of $672,696.").

[163]    KLM Ex. 344 at 10 (*Settlement Agreement and Mutual Release*, by and between Comu, New Millennium Capital Partners II, LLC, AJW Partners, LLC, AJW Offshore Ltd, AJW Qualified Partners, LLC, and SUN Sports, dated October 23, 2008).

[164]    *See* KLM Ex. 9 (*Notice of Settlement*, filed September 9, 2008 in the Second AJW Suit); KLM Ex. 10 (*Stipulation of Dismissal*, filed October 24, 2008 in the Second AJW Suit).

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                    **PAGE 32 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002256

financing agreement[165] related to SUN Sports & Entertainment, Inc. ("SUN Sports") (an entity Comu owned and operated as CEO until mid-2009).[166]

68.   Based on the above, the AJW Judgments were improperly included in Schedule F because Comu had no personal liability related to them.

69.   Even if Comu believed he had any personal liability arising from the AJW Judgments, in Schedule H he denied under oath the existence of "any person or entity … that is also liable on any debts listed by the debtor in the schedules of creditors."[167]  Because Airtech and Humitech were held liable in the AJW Judgments, Comu either misrepresented his debts in Schedule F, or he omitted codebtors in Schedule H.[168]

70.   Comu's claim that the AJW Judgments constituted personal debts demonstrates his specific and willful intent to avoid the claims of Plaintiffs (and Katz in particular).   On November 25, 2008, Comu executed two agreements by which AJW assigned its rights with regard to both AJW Judgments to SUN Sports.[169]  On January 12, 2009, Comu caused SUN Sports to file a federal lawsuit in the Northern District of Texas (the "SUN Sports Suit")[170] against KLE and Katz individually seeking to enforce the AJW Judgments against them (even

---

[165]      KLM Ex. 235 at 33152 – 33152_25 (*Financing Agreement* by and between SUN Sports, AJW Partners, LLC, AJW Master Fund, Ltd, and New Millennium Capital Partners II, LLC, dated September 19, 2008).

[166]      Def. Ex. 4 at 2; *see also* KLM Ex. 145 at 24.  SUN Sports shared the Ratliff Address with Sunset Pacific and other TBG affiliates.  *See, e.g.*, KLM Ex. 129 at 21.

[167]      Trustee Ex. 94 at 17.

[168]      Comu also failed to identify codebtors with regard to credit card debt, as reflected in the Debts Memo.  *See* KLM Ex 310 at 2 (identifying debt accounts for which Comu is a "guarantor").

[169]      *See* KLM Ex. 11 at 20 (*ASSIGNMENT – Airtech*, by and between AJW Partners, LLC, New Millennium Capital Partners II, LP, and SUN Sports, dated November 25, 2008); *id.* at 21 (*ASSIGNMENT – Humitech*, by and between AJW Partners, LLC, New Millennium Capital Partners II, LP, and SUN Sports, dated November 25, 2008).

[170]      The records of the SUN Sports Suit are available on Pacer.  *See SUN Sports & Entertainment Inc. v. Humitech International Group, Inc., Ronald Katz, and King Louie Enterprises LLC*, Case No. 3:09-cv-00063-O, in the U.S. District Court for the Northern District of Texas.  Plaintiffs ask the Court to take judicial notice of the pleadings and procedural history in the SUN Sports Suit.  FED. R. EVID. 201.

though neither KLE nor Katz was a party to either AJW Suit).[171]  The SUN Sports Suit against Katz and KLE was dismissed without prejudice on November 3, 2010 "for failure to prosecute or for failure to follow orders of the Court,"[172] and thus was still pending on the Petition Date.[173]

### 2.    Comu Concealed Assets and Income.

71.    Comu did not disclose any assets or interests in foreign accounts or businesses in his Bankruptcy Filings.  Comu was asked at the Creditors Meeting whether he had "any brokerage accounts, bank accounts, or depository accounts of any sort outside the borders of the United States," Comu responded: "No, sir."[174]  When asked specifically at his 2013 deposition whether he had "any account at Turkish Bank," Comu responded: "No."[175]

72.    Contrary to the above, Comu has held at least two accounts at Turkish Bank since before the Petition Date (the "Turkish Bank Accounts").[176]  Comu admitted the existence of the Turkish Bank Accounts only when confronted at trial with documents from the 2013 Electronic Production.[177]  Comu never scheduled the Turkish Bank Accounts,[178] and at the time of trial, he had not produced any statements or evidence of the total funds in the Turkish Bank Accounts.[179]

---

[171]    *See generally* KLM Ex. 11; *id.* at 6–8.  SUN Sports was represented in the SUN Sports Suit by Lloyd Ward, an attorney who has assisted Comu with other business entities.  *See, e.g.*, KLM Ex. 138 at 2–3 (Grey Point Partners).

[172]    SUN Sports Suit, Doc. No. 16.

[173]    If legitimate, the SUN Sports Suit was a potential source of recovery for Comu, who owned SUN Sports.  Def. Ex. 4 at 2.  Comu did not disclose the SUN Sports Suit in his Bankruptcy Filings, and testified at the Creditors Meeting that there were no claims or lawsuits in which he might receive any recovery.  Def. Ex. 4 at 4.

[174]    Def. Ex. 4 at 13.

[175]    KLM Ex. 345 at 2.

[176]    KLM Ex. 320 at 1 (August 4, 2009 email from Comu to Turkish Bank (UK) in London, to "advise of a Change in Address for *both My Account and Sunset Pacific LP*" to the 18208 Preston Address shared by Sunset Pacific and TBG) (emphasis added).

[177]    Comu claimed at trial that he had previously produced statements for the Turkish Bank Accounts – which counsel for both Plaintiffs and Trustee denied.  At the next trial day, Comu's counsel informed the Court that he had reviewed his file, and confirmed that no information had previously been produced about the Turkish Bank Accounts.  Comu then produced to the Court a one-page email appearing to reflect a snapshot of either a balance or accrued interest for a six-month period from 2012 in one Turkish Bank account held in Comu's name, but which did not disclose any information about account holdings or transfers.  *See* Def. Ex. 10.

73.     Trustee testified that she learned of the Turkish Bank Accounts only at trial, and that if she had known earlier of Comu's concealment of the accounts she would have joined Plaintiffs' revocation claims.[180]

74.     Comu's Bankruptcy Filings omit 2008 and 2009 income from various sources,[181] including $30,000 received from SUN Sports in 2009.[182]  Comu's Schedules also omit 2008 income ($18,461.52) Comu received from Odyssey One, which was included in the Undisclosed Tax Documents forwarded to Comu's bankruptcy counsel before the Petition Date.[183]

75.     Comu's Schedules deliberately underestimate his projected 2010 income.  In his Draft Bankruptcy Filings, Comu "projected" between $5,000 and $10,000 in monthly income from professional fees and "stock equity,"[184] but Comu's Schedule I estimated income of only $5,000 per month, and only from monthly "gross wages, salary, and commissions."[185]

76.     Comu failed to include any information regarding Phyllis's income or occupation as required in Schedule I.[186]

---

[178]     Bench Finding No. 5.

[179]     Bench Finding No. 6.

[180]     As set forth *infra*, Comu controlled and utilized numerous other foreign bank accounts – including at least one additional Turkish Bank account (related to CIHC) – after the Petition Date to conceal and dissipate cash.  *See infra* Section E(5).

[181]     For example, Comu claimed in his Schedules that TBG's 105,000 shares of stock in Artfest International Inc. ("Artfest") was worth $0 (Trustee Ex. 94 at 4), and at the Creditors Meeting, Comu denied having any income from ArtFest (Def. Ex. 4 at 9).  Artfest stock held by TBG was sold in 2008 for $46,844.62.  KLM 129 at 28–29.

[182]     Def. Ex. 4 at 11 (admitting Comu received "around $30,000" from SUN Sports in 2009).

[183]     KLM Ex. 231 at 1–2; *see also* KLM Ex. 129 at 21, 23.

[184]     Comu's Draft Bankruptcy Filings "projected" his monthly income to include "Consulting/Advisory Services@ $5,000/month" and "Monthly (Stock Equity) Earned in Consulting & Advisory Services@ $5,000/month," which "can vary based on business from $5,000/month to $10,000/month."  KLM Ex. 312 at 7.

[185]     Trustee Ex. 94 at 18.

[186]     Trustee Ex. 94 at 18 ("The column labeled 'Spouse' must be completed … by every married debtor, whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.").

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                              **PAGE 35 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002259

77. Comu's Bankruptcy Filings and testimony at the Creditors Meeting failed to disclose Comu's pre-petition equity interest in GANAS, Corp. ("GANAS") and Green Auto, which was acquired in November, 2009.[187]

78. Comu claimed in his Schedules that he owns no equitable or future interests,[188] or any interests in any trusts.[189] As discussed *infra*, Comu now admits that he had at least the right to receive millions shares of stock in Green Automotive Company Corporation ("Green Auto"), which were in fact received in 2010.[190] Comu also knew when he filed his Schedules that he was (and is) a beneficiary of TKY Trust, which Comu personally established in late 2009.[191]

79. At the Creditors Meeting, Comu denied having signatory authority for any depository accounts held by any entity.[192] Contrary to this testimony, Comu had signatory authority over, and controlled, bank accounts held by TBG,[193] Marathon Management,[194] and Sunset Pacific,[195] among others (in addition to credit accounts for these entities).[196]

---

[187]  *See infra* Section D; *see also* Bench Finding No. 11–12.
[188]  Trustee Ex. 94 at 5, §19.
[189]  Trustee Ex. 94 at 5, §20.
[190]  *See infra* Section D, E(1)–(2).
[191]  Trustee Ex. 27 at 1–2; *see* JPTO Stip. Fact ¶ 38; *see also infra* Section E(4)(a).
[192]  Def. Ex. 4 at 13.
[193]  *See infra* Section C(3), E(3)(b); *see also, e.g.*, KLM Ex. 18–19; KLM Ex. 85–86, 88–89; KLM Ex. 96; KLM Ex. 129 at 26.
[194]  *See infra* Section C(1); *see also, e.g.*, KLM Ex. 129 at 1; KLM Ex. 181; KLM 301 at 2; KLM Ex. 349. As set forth below, "Marathon Management" herein refers to and includes three *dbas* of the same entity – Marathon Limited, Marathon Inc., and Marathon Management LLC ("Marathon LLC"). *See infra* ¶¶ 105, 107 & n.278, 288, 291.
[195]  *See infra* Section C(2); *see also, e.g.*, Def. Ex. 4 at 5 (admitting being a signor on Sunset Pacific accounts); KLM Ex. 107; KLM Ex. 310 at 2.
[196]  Comu's Debts Memo lists credit accounts held by various entities for which Comu was guarantor, but which were not disclosed in his Bankruptcy Filings. KLM Ex. 310 at 1.

80.    Comu failed to schedule numerous assets held by Phyllis – including a Compass Bank account that earned $1,408 in interest alone in 2008[197] – and has claimed that all assets held by Phyllis (*e.g.*, in Sunset Pacific) are her sole separate property.[198]  Phyllis and Comu have at all times relevant to the Bankruptcy Case been married and filed joint tax returns,[199] and Phyllis, who is not employed, relies on Comu for income.[200]  At the Creditors Meeting, Comu omitted or was evasive about the details of Phyllis's assets.[201]

81.    Comu's Schedules failed to disclose or misrepresented other pre-petition assets and accounts, including Immediatek stock acquired before the Petition Date that Comu sold in 2011,[202] an e*Trade Financial account,[203] a Wachovia Securities account that, as of January 23, 2009, held almost $50,000 in cash and stock,[204] Comu's Prestonwood Country Club membership,[205] and various intellectual property interests[206] – including a "Mano-A-Mano"

---

[197]    KLM Ex. 129 at 3.  The Trustee examined Comu about Phyllis's Compass account at the Creditors Meeting, but Comu only disclosed interest income from 2007 – he did not disclose the 2008 interest income or balance.  Def. Ex. 4 at 29 (Trustee: "[O]n the 2008 tax return I did not see the Compass Bank dividend or interest information…. I would like to know what happened to that Compass Bank account or whatever it was at Compass Bank.").

[198]    *See, e.g.*, Trustee Ex. 94 at 4.

[199]    Trustee Ex. 68; Trustee Ex. 69; Trustee Ex. 70.

[200]    Def. Ex. 4 at 24 (Phyllis "is not employed"); *id.* at 12 (her sole activity outside the home is working with charities); *id.* at 24 (admitting the money in Phyllis's bank account comes at least in part from "money that [Comu] give[s] her").

[201]    When asked at the Creditors Meeting about Phyllis's assets, Comu responded, "Just her personal belongings.  The car I suppose."  Def. Ex. 4 at 12.  Phyllis's car was not disclosed in Bankruptcy Filings.  Comu also did not disclose in his Schedules a Compass Bank one-year CD for $20,000 that was held in Phyllis's name, and which was reflected in the Phyllis Memo.  KLM Ex. 126 at 1.  At the Creditors Meeting, Comu denied having any funds with Compass Bank.  Def. Ex. 4 at 21.

[202]    Comu's 2011 personal tax return reflects Immediatek stock as a personal asset that was acquired in 2007 and sold in 2011.  Trustee Ex. 70 at 7.

[203]    KLM Ex. 129 at 2.

[204]    KLM Ex. 129 at 12.  Comu disclosed the Wachovia account in Schedule B (Trustee Ex. 94 at 2), but claimed it held only approximately $2,000, and has never explained where the balance went.

[205]    Bench Finding No. 13; *see also generally* Trustee Ex. 94.

[206]    Comu alleged in his Schedules that he owned no interest in any intellectual property.  Trustee Ex. 94 at 6 §22.

trademark application,[207] which was relevant to Comu's ongoing business activities producing MMA events,[208] and domain names[209] owned by Comu through a GoDaddy.com account.[210]

### 3.   Comu's Undisclosed Interests in Lucrative and Ongoing Ventures.

82.    In Schedule B, Comu was required to itemize and disclose the value of his interests in any "partnerships or joint ventures."[211]  The only interests Comu listed were his alleged 1% interests in TBG (value "$0") and Sunset Pacific (value "unknown").[212]  When asked at the Creditors Meeting whether he was "organizing any new business venture now," Comu responded: "nothing specific."[213]

83.    Section 18 of Comu's SOFA required Comu to disclose

> the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which

---

[207]    KLM Ex. 27.

[208]    *See, e.g.*, KLM Ex. 316 (January 18, 2010 email contacting potential investor regarding an MMA "investment/acquisition opportunity"); KLM Ex. 242 at 1 (discussing plans for a "March 2010 Mayweather/Pacquio TX Fight"); KLM Ex. 230 (attaching proposal for MMA event in Russia); KLM Ex. 356 at 1 (November 3, 2010 email mentioning "a new MMA Concept"); *see also* KLM Ex. 147 at 1; KLM Ex. 148; KLM Ex. 257; KLM Ex. 290; KLM Ex. 299; *see also* Def. Ex. 4 at 10, 26 (Comu's company, SUN Sports, produced MMA events).

[209]    Domain names are assets that must be disclosed in bankruptcy.  *See, e.g.*, Freeman, *Internet Domain Name Security Issues: Why Debtors Can Grant Then and Lenders Can Take Them in This New Type of Hybrid Property*, 10 AM. BANKR. INST. L. REV. 853, 855 n.13 (Winter 2002).  The right to use a domain name can have significant value, in much the same way that a unique telephone number can for a business.  *Id.* at 857; *see also Schott v. McLear (In re Larry Koenig & Assoc., LLC)*, No. 01–12829, 03–1063, 2004 WL 3244582, at *6–7 (Bankr. M.D. La. March 31, 2004).

[210]    KLM Ex. 174 at 1 (sunorganization.com); KLM Ex. 179 at 1 (givpro.com & givspro.com); KLM Ex. 185 at 1 (thebarclaygroup.com); KLM Ex. 196 at 1 (renewal of same).  Comu continued after the Petition Date to renew or acquire domain names that are relevant to his pre-petition business activities.  KLM Ex. 184 at 1 (ballsoffaith.com); KLM Ex. 189 at 1 (cjcomu.com and CJCLLC.com); KLM Ex. 190 at 1 (same); KLM Ex. 191 at 1 (regusadvisors.com); KLM Ex. 193 at 1 (same); KLM Ex. 205 at 1 (artofwarlive.com).  Shortly before the Petition Date, Comu was engaged in negotiation to purchase "artofwar.com," which would have been a valuable addition to his Mano-A-Mano trademark and MMA projects.  KLM Ex. 243; KLM Ex. 247.

[211]    Trustee Ex. 94 at 5 §14.

[212]    Trustee Ex. 94 at 5 §14.

[213]    Def. Ex. 4 at 13.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                          **PAGE 38 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002262

the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.[214]

84.　　Comu listed four entities in SOFA § 18 – SUN Sports, TBG, Sunset Pacific, and Marathon Inc. – but provided no information about the nature of these businesses, or the beginning or ending dates of his involvement.[215]  As set forth *infra*, the above disclosures were material false oaths regarding Comu's substantial interests in TBG, Sunset Pacific, and Marathon Inc., all of which he has used as conduits in to fraudulently conceal and dissipate assets.[216]

85.　　Comu concealed or made misleading disclosures about his ongoing affiliation with and equity stake in Global Energy Technology Group, Inc. ("GETG").[217]  Comu's Schedules disclosed that Sunset Pacific owns 10 million shares of GETG stock, which Comu claimed to be worthless.[218]  Comu claimed at the Creditors Meeting that he had no knowledge of GETG's assets,[219] and he was evasive about GETG's operations.[220]

86.　　Comu did not disclose his active positions as GETG principal and director.[221]

---

[214]　　Trustee Ex. 95 at 5.

[215]　　Trustee Ex. 95 at 5.

[216]　　*See infra* Sections C(1)–(4) & E(1)–(3).

[217]　　GETG, a Nevada corporation, is a renewable energy company with offices at 15950 Dallas Parkway, Suite 400 (the "15950 Dallas Parkway Address").  Def. Ex. 4 at 7; KLM Ex. 327 at 69116_5 (GETG is "is focused on acquiring high-growth firms, assets and properties in the Green & Renewable Energy industry"); *see also* KLM Ex. 321 at 60037.  According to a summary dated January 15, 2010, the GETG Entities are involved in jatropha farming (a source of biodiesel).  KLM Ex. 220 at 20206_9 – 10; *see also* KLM Ex. 102 at 1; KLM Ex. 119 at 9; KLM Ex. 260; KLM Ex. 289 at 54398_1–26.

[218]　　Trustee Ex. 94 at 4; Trustee Ex. 2 (GETG stock certificate dated December 11, 2008).

[219]　　Def. Ex. 4 at 8 ("I don't know what assets Global Energy specifically has.").

[220]　　When asked whether GETG was "operating," Comu responded, "In some regard, yes…. The doors are open, they have a phone."  Def. Ex. 4 at 7.

[221]　　KLM Ex. 321 at 1 (August 5, 2009 email from Comu identifying himself as a "Principle" [sic] of GETG); *see also* KLM Ex. 25 at 3 (2009 Nevada SOS filing identifying Comu as a "Director"); KLM Ex. 103 at 1 (December 8, 2009 email from CJ Comu identifying himself as a GETG "Director"); KLM Ex. 104 at 1 ("Director Global Energy Development Group); KLM Ex. 319 at 59918_13 ("Director").  In connection with this position, Sunset Pacific received 10 million shares of GETG stock.  Trustee Ex. 2 (GETG stock certificate for 10 million shares issued to Sunset Pacific on December 11, 2008).

87. GETG conducts business with or through XL Biofuels, Inc. ("XL Biofuels"), Bio-Global Resources, Inc. ("Bio-Global"), and Biofuel Development Joint Venture (the "Biofuel JV") (together with GETG, the "GETG Entities").[222]

88. Comu did not disclose his active and ongoing business with the GETG Entities.[223] Comu was involved in GETG management[224] and soliciting investors for GETG Entities.[225] Comu took the lead in pursuing a $5 – $10 million dollar loan for GETG,[226] during which process, he confirmed that GETG "has approximately 500K in paid in capital,"[227] which directly contradicts his claim to have no knowledge of GETG's assets.

89. Comu either did not disclose or he misrepresented his pre-petition equity stake in the GETG Entities.[228] In correspondence with Comu, for example, GETG's CEO Perry West

---

[222]    *See generally* KLM Ex. 199; *see also, e.g.*, KLM Ex. 164; KLM Ex. 324 at 1; KLM Ex. 325 at 1; KLM Ex. 326 at 1. Insiders from other Comu affiliates (including, but not limited to, TBG, Sunset Pacific, and Regus Advisors) also control or hold interests in the GETG Entities, including **John Potter** (President and Secretary – GETG) (KLM Ex. 119 at 16; *see also infra* Section C(3)), **David Knight** (President – XL Biofuels) (KLM Ex. 104 at 1; KLM Ex. 220 at 20206_11; *see also infra* Section C(4)), **Dave Welch** (President – Bio-Global) (KLM Ex. 101; KLM Ex. 104 at 1; *see also infra* Section C(4), D(2), E(1), E(5)), **Alvin Dahl** (Treasurer – GETG) (KLM Ex. 104 at 1; *see also infra* Section C(2)–(3). Dahl is the accountant who prepared all of Comu's personal and business tax returns), and **Peter Knight** (GETG marketing) (KLM Ex. 104 at 1; KLM Ex. 321 at 1; *see also infra* Section C(4), E(5)(c)).
[223]    On the Petition Date, for example, Comu received an email from GETG's Chairman and CEO, Perry West (KLM Ex. 119 at 16), attaching a draft Memorandum of Understanding ("MOU") pertaining to the GETG Entities that "puts something down in writing about the operation of the entities that we have going." KLM Ex. 260 at 1.
[224]    *See* KLM Ex. 104 at 1 (meeting agenda); KLM Ex. 162 at 1 (recruiting GETG's CEO); KLM Ex. 321 (August 5, 2009 email from Comu as "Principle" [sic] of GETG attaching draft corporate filings and due diligence list).
[225]    KLM Ex. 355 at 22734 ("I have been involved in putting together (Global Energy) and have attached some docs for your review and comment. The attached Docs are a DRAFT and strictly for your review. We are just getting ready to launch and seek financing. Let me know if you have an interest and time to play a role in this venture. "); *see also* KLM Ex. 298 at 1.
[226]    KLM Ex. 105; KLM Ex. 328 at 1–2.
[227]    KLM Ex. 328 at 1.
[228]    On August 29, 2009, GETG's CEO Perry West sent an email to Comu and others in which West brings up the "end focus" for GETG, and acknowledges that "[y]ou guys put together the deal and certainly have right to the lions share." KLM Ex. 354 at 1. On April 1, 2010, shortly before the Discharge Date, GETG-interested individuals, discussed a merger by which "each of the XL shareholders" … "will end up with 125,000,000 shares of GETG and GETG will end up with all of the shares of XL." KLM Ex. 325 at 66263.

confirmed that Comu held a 25% stake in at least one GETG Entity.[229] As of the Petition Date, Comu expected to generate income from his interests in the GETG Entities.[230] A GETG "Corporate Overview" from 2009, for example, projected millions of dollars in profits through 2013.[231]

90. Comu (either directly, or via TBG or Sunset Pacific) received undisclosed compensation before and after the Petition Date from one or more GETG Entities.[232] In September of 2010, "as compensation for efforts for the company in 2009 and 2010," Sunset Pacific received five-year options for 5,000,000 GETG shares (in addition to the 10 million shares received in 2008).[233] A Private Placement Memorandum ("PPM") for GETG dated February 20, 2011 offered 10 million shares of GETG stock at $5.50 per share.[234] The GETG PPM also identified TBG has an advisor pursuant to a "consulting advisory agreement" reflecting ongoing income for TBG.[235]

91. As set forth *infra*, Comu used one or more of the GETG Entities as a conduit to receive, transfer and dissipate TBG's stock in Green Auto.[236]

92. Comu also acquired a new shell company in 2009[237] called Global Energy Group, Inc., which was never disclosed.[238] After the Petition Date, Comu held himself out as "Director, Global Energy Group, Inc.," which shares the 15950 Dallas Parkway Address.[239]

---

[229]   In correspondence from April 1, 2010, West summarized plans to "distribut[e] the interests for **CJ**/DW/DK/PW," to which Comu responded: "100% agreed." KLM Ex. 324 at 1 (emphasis added); *see also* KLM Ex. 325 at 2 ("XL is a private company with 1000 shares … equally owned by DK/DW /**CJC**/PW.") (emphasis added).

[230]   In a November 17, 2009 email, for example, Comu referenced a GETG deal as follows: "Let's make some money broh!! The Global deal is rolling – we just acquired 880 Acres and start planting trees December 2009!!" KLM Ex. 172 at 1.

[231]   KLM Ex. 329 at 70848_18–19 (projecting profits of $6 million for 2010, over $8 million for 2011, over $15 million for 2012, and over $20 million for 2013).

[232]   Trustee Ex. 3 (certificate for 10 million shares of GETG stock issued December 11, 2008 to Sunset Pacific).

[233]   KLM Ex. 335.

[234]   KLM Ex. 119.

[235]   KLM Ex. 119 at 15.

[236]   *See, e.g.*, KLM Ex. 155; *see also infra* Section E(5)(h).

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                                    **PAGE 41 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002265

93.     As of the Petition Date, Comu was actively involved in a potential reverse merger for T3 Networks, Inc. ("T3 Networks"),[240] from which he expected income after the Petition Date.[241]  On May 5, 2011, TBG received 10 million shares of T3 Networks stock,[242] (which was offered to investors at $0.25 per share),[243] and a T3 Networks PPM identifies TBG as a 10% shareholder.[244]  Comu did not disclose this interest before the Discharge Date.

94.     As of the Petition Date, Comu was also actively involved in a deal for Paragon GPS, Inc. ("Paragon"),[245] for which he received, via TBG, compensation after the Petition Date.[246]  Comu did not disclose this interest before the Discharge Date.

95.     Comu failed to disclose his interests as a "Director and Partner" of Revolution Fight Club LLC ("RFC"), a Florida entity in the MMA business for which Comu was actively

---

[237]    In a December, 2009 email Comu wrote: "**_I own a new shell_** that has had an effective S-1 and about a year's worth of 10-Q's and a K…..  **_I did it from the ground up_** so I know all of the pieces." KLM Ex. 304 at 1 (emphasis added).

[238]    KLM Ex. 165 at 1 (email correspondence from August 2, 2009, reflecting investigation into Global Energy Group's status).

[239]    KLM Ex. 216 at 1; KLM Ex. 368 at 1.

[240]    For example, Comu wrote in a December 4, 2009 email: "Our funding group is NOW ready to proceed with the Reverse Merger & Listing T3 Networks." KLM Ex. 300 at 1.  *See also* KLM Ex. 168 ("Re: T3 – IPO"); KLM Ex. 169 ("Please see attached Advisory Agreement…. We have a Shell ready to go, as well as short term working capital, and a long term financing plan."); KLM Ex. 295 at 1 (instructing Heather Jackson to add T3 Networks to TBG's "Deal Flow"); KLM Ex. 297 at 1 ("We are looking to place $250K for 10% Equity in Company."); KLM Ex. 302 (December, 2009 email re: 2010 IPO: "The Money Boys want to GIVE YOU$$$$$$$$$$!!!!!!!!!!!!!!!!!!!!!!!"); *see also generally* at 2–6 (T3 Networks Executive Summary).

[241]    KLM Ex. 265 at 1–2 (correspondence from January, 2010 discussing plans to sell T3 Networks stock at $0.10 per share); *see also* KLM Ex. 311 at 1 (January 6, 2010 email from Comu: "Lets go make a whole lotta money this year !!!!!!!").

[242]    KLM Ex. 26.

[243]    KLM Ex. 118.

[244]    KLM Ex. 118 at 16.

[245]    Comu received a business plan for Paragon on February 13, 2009.  KLM Ex. 229; *see also* KLM Ex. 228 at 1 (Paragon a new TBG client).

[246]    A Paragon PPM dated December 1, 2010 offers 10 million shares of stock at $0.25 per share. KLM Ex. 120.  The Paragon PPM discloses that TBG is "the exclusive Investment Banking & Advisory firm" for Paragon (KLM Ex. 120 at 18), and confirms that TBG has an anti-dilution clause that ensures TBG will retain 10% equity in Paragon for two years (KLM Ex. 120 at 20).  In 2011, TBG received cash payments from Paragon.  KLM Ex. 19 at 2 ($600); KLM Ex. 19 at 3 ($2,143 check deposit); KLM Ex. 19 at 7 ($12,500 wire); KLM Ex. 19 at 14 ($12,500 wire); KLM Ex. 19 at 50 ($820 wire).

seeking investors in late 2009.[247]   Comu was actively engaged in lucrative RFC projects on the

Petition Date.[248]   Between December, 2009 and January, 2010, Comu was "working and pitching

RFC on a constant basis,"[249] and promoting one RFC project – "a FOUR Fight Deal with Hard

Rock Hotel/Casino" – to investors as "the #1 Best MMA Deal in USA."[250]   Comu knew his

ongoing RFC business would produce income.[251]   TBG accounts reflect at least $225,000 in

income from "Rock Group" after the Petition Date in 2010 and 2011.[252]   Comu has never

disclosed any details regarding his interest in or income from RFC or related MMA events.

96.     Comu failed to disclose any interest in or affiliation with Campus Investments

PLC ("Campus Investments"), a UK company that was incorporated in 2004.[253]   Comu identified

himself in pre-petition correspondence as "Chairman" of Campus Investments,[254] and a draft

*Pre-Offering Summary for Campus Investments* (the "Campus POS"), from June of 2009

identified Comu as a "Director to be appointed."[255]   Campus Investments' business was active

---

[247]     KLM Ex. 242 at 1 (September 24, 2009 email from Comu to potential investor stating, "I am joining [RFC] as a Partner and looking to produce MMA in Texas."); KLM Ex. 290 at 1 (October 13, 2009 email from Comu soliciting investment holding and himself out as a "Director and Partner"); KLM Ex. 316 (January 18, 2010 email soliciting investment for RFC); *see also* KLM Ex. 238; KLM Ex. 257; KLM Ex. 290; KLM Ex. 301; KLM Ex. 303.

[248]     KLM Ex. 257 (December, 2009 email announcing Hard Rock deal); *see also* KLM Ex. 299; KLM Ex. 301 at 1.

[249]     KLM Ex. 264 at 1.

[250]     KLM Ex. 318 at 1 (In late January of 2009, Comu was "in South Florida for the Herschel Walker MMA Event which will be on PPV as well as many other MMA Legends.").

[251]     In a January 20, 2010 email exchange with Reed Wallace (Comu's partner and RFC's Chairman and CEO) (KLM Ex. 290 at 1), Comu stated: "There is crazy money out there – and my Mission is to put it in YOUR Bank Account!!!!"   KLM Ex. 264 at 1.   In response, Wallace corrected Comu: "OUR bank account!;-)."   *Id.*; *see also* KLM Ex. 318 at 1 (telling a potential investor that RFC hoped "to take $3M and turn it into (hopefully) $30M over a solid period of growth").

[252]     *See* KLM Ex. 96 at 1 ($12,763); *see also* 2011 Rock Group wire transfers to TBG: KLM Ex. 19 at 7 ($12,480); *id.* at 8 ($24,980); *id.* at 14 ($24,980); *id.* at 20 ($24,980); *id.* at 26 ($24,980); *id.* at 32 ($24,980); *id.* at 39 ($37,480); *id.* at 46 ($37,480); *see also generally* Trustee Ex. 23.

[253]     KLM Ex. 163 at 71_2.

[254]     KLM Ex. 232 at 1 (August 20, 2009 email in which Comu identifies himself as "Chairman" of Campus Investments).

[255]     KLM Ex. 163 at 71_3 ("Mr. Comu has a long history in the development of public companies both here and abroad.   His involvement will add value to all aspects of the business.").

and ongoing as of the Petition Date,[256] and the Campus POS estimated substantial revenue for

2010 – 2014.[257]  As set forth *infra*, Comu has used Campus Investments to receive, transfer and

liquidate TBG's stock in Green Auto.[258]

97.    Other positions and interests Comu was required, but failed, to disclose in SOFA

§ 18 include: GANAS,[259] the InvestIN Forum,[260] Grey Point Partners, LLC,[261] Harpcrest Ltd.,[262]

A-Venture Capital, LLC ("A-Venture"),[263] Sun Management Group, Inc.,[264] and MMA Games,

L.L.C.[265]  Comu's business among these entities (including with respect to the Green Auto

Merger) often overlapped,[266] and he used some of these entities, including A-Venture[267] and

---

[256]    The Campus POS identified ten companies in which Campus Investments had acquired, or was in the process of acquiring, "strategic Shareholdings and Interests," including The League Ltd, World Sports Congress, and resort developments in Cyprus, among others.  KLM Ex. 163 at 71_4–10.

[257]    KLM Ex. 163 at 71_11.

[258]    *See infra* Section E(5)(g).

[259]    JPTO Stip. Fact ¶ 24; *see also* Trustee Ex. 80; Trustee Ex. 81; *see also infra* Section D(1).

[260]    *See, e.g.*, KLM Ex. 315 at 4 ("Founding Member").

[261]    KLM Ex. 138 at 2 (2009 Texas SOS filing identifying Comu as "Managing Member").  Grey Point Partners shares the 18352 Dallas Parkway Address with Sunset Pacific and TBG.  KLM Ex. 138 at 5–6.

[262]    KLM Ex. 296 at 1 (November 5, 2009 email resigning as Harpcrest Director); *see also* KLM Ex. 241 at 1; KLM Ex. 245 at 1 (October 1, 2009 email suggesting that Comu would receive "6.5m" shares); KLM Ex. 246 at 1 (emails with Simon Ferguson discussing the terms of Comu's and TBG's arrangement with Harpcrest, which included Comu's appointment as Director); KLM Ex. 248 at 2 (October 9, 2009 resolution authorizing Comu, as TBG agent, to purchase 15% of Harpcrest).

[263]    KLM Ex. 252 at 3 (business card commissioned by Comu identifying him as an A-Venture "Managing Partner"); KLM Ex. 294 at 1–2 (November 4, 2009 email identifying himself as a "Managing Partner," with attachment identifying himself as "Partner"); KLM Ex. 298 at 1; *see also* KLM Ex. 244 at 1 (September 29, 2009 email in which Comu states that he is "opening the Dallas Branch Office of A-Venture Capital").  Comu's A-Venture offices share the 18208 Preston Road Address with Sunset Pacific, TBG and Marathon Management.  *See, e.g.*, KLM Ex. 294 at 2.

[264]    KLM Ex. 152 (December 11, 2006 Texas Franchise Tax report filed with Texas SOS, and signed by Comu as "CEO").

[265]    KLM Ex. 147 at 1 (2007 Certificate of Formation filed with Texas SOS identifying Comu as a "Manager").

[266]    *See, e.g.*, KLM Ex. 313 at 1–2 (email to OMST regarding distribution of TBG's Green Auto Stock including signature lines for Comu's positions at TBG, A-Venture, and InvestIn Form); *see also* KLM Ex. 311 at 1.

[267]    *See, e.g.*, KLM Ex. 289 at 1 (October 9, 2009 email attaching information regarding tree deals, and stating "if there is anything I can run through The Barclay Group or A Venture-Capital (VC) let me know"); KLM Ex. 298 at 1 (November 16, 2009 email pitching Green Auto and GETG stock to potential investor, using TBG and A-Venture credential); *see also* KLM Ex. 288 at 2; KLM Ex. 312 at 2.

Regus Advisors (an entity formed after the Petition Date to take over TBG's ongoing business)[268] – as alternative vehicles for TBG and GETG business.

### 4. Comu's Fraudulent Intent was Specifically Directed at Plaintiffs.

98. Comu acted with willful and subjective fraudulent intent with regard to the false oaths and undisclosed assets found herein. In particular, Comu's Bankruptcy Filings and sworn testimony deliberately created a false impression of indebtedness in order to secure his Discharge, and knowingly and willfully concealed pre-petition business activities and assets that should have been disclosed and included in the bankruptcy estate. Comu's numerous and ongoing false oaths were deliberately calculated to mislead Trustee and Plaintiffs regarding the true nature and scope of Comu's financial circumstances, and reflect a conscious disregard for the truth. The magnitude of Comu's nondisclosure reflects *far more* than a reckless disregard for the truth.[269]

99. The numerous facts that Comu stipulated for the purpose of trial, but which he previously denied or concealed, do not mitigate his fraud, but only add insult to injury by demonstrating his actual and subjective intent to hinder, delay and defraud his creditors, and Plaintiffs in particular.

100. Comu's bankruptcy was plainly motivated not by a legitimate need for relief from debts he was unable to pay, but by a willful and malicious desire to thwart Plaintiffs' pursuit of state court remedies.[270] With regard to both the Bankruptcy Case and this Adversary, Comu's ongoing scheme to defraud his creditors – and Plaintiffs in particular – constitutes bad faith abuse of the bankruptcy process and the judicial system.

---

[268] *See infra* Section C(4), E(5)(c).

[269] *Cf.* Bench Finding No. 18.

[270] *Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd.)*, 40 F.3d 1084, 1089–90 (10th Cir. 1994).

## C. COMU USED ALTER EGOS TO CONCEAL AND ENJOY ASSETS

101. Before and after the Petition Date and the Discharge Date, Comu used entities he owns or controls (the "Comu Alter Egos") to conceal and enjoy assets that should have been available to creditors in the Bankruptcy Case.

102. The Comu Alter Egos include Sunset Pacific and its general partner, Marathon Management (which, as detailed *infra*, refers to and includes three *dba*s for the same entity), TBG, and Regus Advisors – an entity Comu established in 2010 to take over TBG's business and conceal its assets.

### 1. Marathon Management

103. Comu also omitted, or made inaccurate and misleading disclosures about his interests in Marathon Management. Comu disclosed in Schedule B an account in the name of Marathon Inc., with a claimed value of $78.50.[271] In his SOFA, Comu also disclosed that within the last six years he had been an "Officer/Director" of Marathon Inc.[272] But Comu's Bankruptcy Filings omitted the fact that Marathon Inc. is "100% owned by CJ Comu," a detail reflected in Comu's Draft Bankruptcy Filings and the Phyllis Memo.[273]

104. Marathon Inc. is a Nevada corporation that was incorporated on October 9, 2000,[274] and which shares or has shared offices with Sunset Pacific, TBG and other Comu affiliates.[275] Comu is Marathon Inc.'s President, Secretary, Treasurer, and the sole Director and sole Shareholder.[276]

---

[271] Trustee Ex. 94 at 2.
[272] Trustee Ex. 94 at 2.
[273] KLM Ex. 312 at 57702_9; KLM Ex. 126 at 6.
[274] KLM Ex. 113 at 1–2.
[275] Shared offices include the 18208 Preston Address (KLM Ex. 31 at 1; KLM Ex. 43 at 2), the 18352 Dallas Parkway Address (Trustee Ex. 95 at 5; KLM Ex. 114 at 3–4), and the 14180 Dallas Parkway Address (KLM Ex. 113 at 6–7).
[276] KLM Ex. 113 at 5–10 ("President," "Secretary," "Treasurer," and "Director"); *see also* KLM Ex. 109 at 4, 17 ("President"); *id.* at 15 (sole shareholder and sole director).

105. Pursuant to "Articles of Conversion" executed by Comu and filed with the Nevada SOS on July 7, 2005, Marathon Inc. was converted to Marathon Limited, a Nevada limited liability company.[277] Marathon Inc. and Marathon Limited share the same Nevada SOS entity number.[278] Marathon Limited also shares or has shared offices with Sunset Pacific, TBG and other Comu affiliates.[279] Comu is Marathon Limited's sole Member.[280]

106. Comu did not disclose any information about his interest in Marathon Limited in his Bankruptcy Filings or at the Creditors Meeting.[281] Defendants now stipulate that Marathon Limited is wholly-owned and/or controlled by Comu.[282] Defendants also now stipulate that Marathon Limited has held a 1% partnership interest in Sunset Pacific since 2006.[283] This fact was reflected in the Undisclosed Tax Documents[284] but omitted in Comu's Schedules,[285] misrepresented at the Creditors Meeting,[286] and the subject of misleading testimony from Comu throughout the course of this Adversary.[287]

107. The full legal name of Marathon Limited is sometimes abbreviated by Comu (e.g., in tax returns) as "Marathon Management LLC"[288] (herein, "Marathon LLC"). Marathon

---

[277] KLM Ex. 109 at 3–5, 15–17; see also KLM Ex. 113 at 4.

[278] KLM Ex. 113 at 4 (E0430072005-6); KLM Ex. 114 at 1 (same).

[279] Shared offices include the 18352 Dallas Parkway Address (Trustee Ex. 22 at 8, 10), and the 18208 Preston Address (Trustee Ex. 36 at 10).

[280] JPTO Stip. Fact ¶ 73, ¶ 74; see also KLM Ex. 22 at 8 ("Member"); KLM Ex. 109 at 13 ("Managing Member"); id. at 17 ("Sole Member").

[281] See generally, Trustee Ex. 94; Trustee Ex. 95; Def. Ex. 4.

[282] JPTO Stip. Fact ¶ 75.

[283] JPTO Stip. Fact ¶ 76; see also Trustee Ex. 34 at 10.

[284] KLM Ex. 231 at 10 (Sunset Pacific 2007 federal tax return identifying Marathon Management as general partner).

[285] Trustee Ex. 94 at 4.

[286] Def. Ex. 4 at 5 ("My wife who owns 98%, my mother who owns 1% and I own 1%.").

[287] Comu has always claimed that Sunset Pacific is owned 98% by Phyllis and 1% by Comu (see, e.g., JPTO Stip. Fact ¶ 76) – but he has alternatively claimed or stipulated – even at trial – that the remaining 1% of Sunset Pacific is owned by Cem Comu (see Def. Ex. 4 at 5; JPTO Stip. Fact ¶ 69), or by Marathon Inc. (JPTO Stip. Fact ¶ 73, ¶ 74) – an entity that Comu stipulates he (not Cem) owns 100% (JPTO Stip. Fact ¶ 75).

[288] See, e.g., KLM Ex. 109 at 16 (Plan of Conversion, referring to Marathon Limited as the "LLC").

LLC uses the same addresses as Marathon Inc. and Marathon Limited,[289] was incorporated on the same date as Marathon Inc. (October 9, 2000),[290] and has the same Federal Tax Employer Identification Number ("EIN") as Marathon Limited.[291]

108. Based on the above, Marathon Limited, Marathon Inc. and Marathon LLC (jointly, "Marathon Management") are all *d/b/a*s for the same legal entity, which at times relevant to this Adversary has operated under or held assets in each of these names.

109. The sole purpose of Marathon Management, which conducts no independent business, is to hold Comu's personal assets and serve as general partner of Sunset Pacific.

110. Comu has used Marathon Management to transfer, conceal and enjoy assets that should have been included in the bankruptcy estate. Comu controls Marathon Management accounts.[292] Since the Petition Date, Comu has transferred at least $245,000 to Marathon Management from TBG accounts,[293] and Marathon Management received at least $22,880 in cash distributions[294] from the sale of TBG's Green Auto stock, discussed *infra*.[295] Marathon Management also received income from Sunset Pacific.[296] Comu used some of this cash in 2012 to purchase a Mercedes Benz S-550 for his personal use.[297]

---

[289] KLM Ex. 110 at 1 (2008 tax return); KLM Ex. 111 a 1 (2009 tax return); KLM Ex. 112 at 1 (2010 tax return); *see also* Trustee Ex. 31 at 7; Trustee Ex. 33 at 8; Trustee Ex. 34 at 8; KLM Ex. 60 at 1.

[290] KLM Ex. 111 at 1.

[291] KLM Ex. 109 at 18 (EIN: 76-079700); KLM Ex. 112 at 6 (same)

[292] *See* JPTO Stip. Fact ¶ 75. Comu signs Marathon Management tax returns. KLM Ex. 110 at 7; KLM Ex. 129 at 1. Comu controls at least two Marathon Management bank accounts. Trustee Ex. 56 at 1 (Wells Fargo account ending in *0325); KLM Ex. 348. (Wells Fargo account ending in *5194). Comu receives notifications at his personal email account when deposits are made into Marathon Management's account – including one notice in April of 2010, the month in which Discharge was granted. KLM Ex. 181.

[293] Trustee Ex. 26 at 1, 9 ($225,000 wire transfers from TBG in September of 2011); Trustee Ex. 26 at 6 ($20,000 TBG "loan" to Marathon Management on December 23, 2011).

[294] Trustee Ex. 57 at 1 ($2,000); KLM Ex. 43 ($10,000); KLM Ex. 60 at 1 ($2,400); KLM Ex. 62 at 1 ($1,000); KLM Ex. 63 at 1 ($1,480); KLM Ex. 64 at 1 ($4,500); KLM Ex. 31 at 1 ($1,500).

[295] *See infra* Section E(1)(3).

[296] KLM Ex. 112 at 1, 7 (2010 tax return reporting income from Sunset Pacific).

[297] KLM Ex. 115.

## 2. Sunset Pacific

111. Comu deliberately omitted or misrepresented facts to conceal his interest in Sunset Pacific and the assets it holds. In his Schedules, at the Creditors Meeting, and at trial, Comu attested under oath that he owns only 1% of Sunset Pacific, with the remainder being owned by his wife (Phyllis – 98%) and his brother (Cem – 1%).[298] Comu also asserts that Phyllis's 98% interest in Sunset Pacific is her separate property.[299] Comu claimed in Schedule B that the assets held by Sunset Pacific were worth $0, and, where he was required to disclose his "interests in partnerships or joint ventures," he alleged the current value of his interest in Sunset Pacific was "unknown."[300]

112. Sunset Pacific, a Texas limited partnership, was formed on or about October 30, 1996 by Comu's attorney, Cecil Mathis ("Mathis").[301] The original *Agreement of Limited Partnership* for Sunset Pacific, dated October 30, 1996, designated Coral Group as Sunset Pacific's initial general partner (with a 1% interest), and Comu as Sunset Pacific's limited partner (with the remaining 99% interest).[302]

113. Comu did not disclose his interest in or affiliation with Coral Group, LLC ("Coral Group") in his Bankruptcy Filings or at the Creditors Meeting[303] – a fact he was required to disclose in Section 18 of his SOFA, and which is relevant to Sunset Pacific's ownership

---

[298]    JPTO Stip. Fact ¶ 69; Trustee Ex. 94 at 4–5; Def. Ex. 4 at 5.
[299]    *See* Def. Pretrial Br. at 5 (arguing that "Sunset Pacific is the separate property of Phyllis Comu").
[300]    Trustee Ex. 94 at 5 §14.
[301]    JPTO Stip. Fact ¶ 70; KLM Ex. 22 at 3.
[302]    KLM Ex. 109 at 51–62. A *Certificate of Limited Partnership of Sunset Pacific, LP*, dated October 30, 1996, was filed with the Texas SOS, and listed Mathis – Comu's attorney – as Sunset Pacific's "original limited partner." *See* JPTO Stip. Fact ¶ 71; *see also* KLM Ex. 2 at 3.
[303]    *See generally* Trustee Ex. 94–95; Def. Ex. 4.

structure.[304]  At trial, however, Comu stipulated that Coral Group is "wholly-owned and/or controlled by Comu,"[305] and that at times relevant to this Adversary, Coral Group has held a partnership interest in Sunset Pacific.[306]  Comu has not explained why this now-stipulated fact was not disclosed in his Bankruptcy Filings.

114.    On July 7, 2005, Marathon Management and Coral Group entered a *Revised and Restated Agreement of Limited Partnership* for Sunset Pacific (the "Revised Partnership Agreement"),[307] designating Marathon Management as general partner (1% ownership), and Coral Group as limited partner (99% ownership).[308]  On July 28, 2005, Comu filed with the Texas SOS an *Amendment to the Certificate of Limited Partnership of Sunset Pacific, L.P.* (the "First Sunset Amendment"), whereby Marathon Management replaced Coral Group as Sunset Pacific's general partner.[309]  Comu executed the Revised Partnership Agreement, which was notarized, and the First Sunset Amendment as a "Member" of both Marathon Management and Coral Group.[310]

115.    Defendants now stipulate that, like Coral Group, Comu owns 100% of Marathon Management,[311] which they admit, in turn, owns a 1% general partnership interest in Sunset

---

[304]        Coral Group was initially formed as a Texas limited liability company on October 4, 1996 (shortly before Sunset Pacific) by Cecil S. Mathis ("Mathis").  KLM Ex. 21 at 2; *see also* KLM Ex. 22 at 3; JPTO Stip. Fact ¶ 70. (Defendants identified Mathis as a witness for the defense in their Second Amended List of Witnesses and Exhibits (Adv. Doc. No. 135 at 2), but Mathis was ultimately not called to testify.)  Comu and John Potter were the "initial members" of Coral Group.  KLM Ex. 21 at 2.  Comu reestablished Coral Group as a Nevada limited liability company on July 7, 2005.  KLM Ex. 109 at 19, 21.  Comu identified himself in Nevada SOS filings as Coral Group's sole organizer and sole member. JPTO Stip. Fact ¶ 72; *see also* KLM Ex. 109 at 21–22; KLM Ex. 21 at 7–8.  At relevant times, Coral Group has shared addresses with TBG, Sunset Pacific, and other Comu affiliates.  Shared addresses include the Pineland Address (KLM Ex. 22 at 3), the 14180 Dallas Parkway Address (KLM Ex. 22 at 6), and the 18352 Dallas Parkway Address (KLM Ex. 21 at 7–8).
[305]        JPTO Stip. Fact ¶ 75.
[306]        JPTO Stip. Fact ¶ 71, ¶ 73; *see also* KLM Ex. 109 at 30–31.
[307]        KLM Ex. 109 at 29–42.
[308]        KLM Ex. 109 at 30–31.
[309]        JPTO Stip. Fact ¶ 73; KLM Ex. 22 at 1, 8.
[310]        KLM Ex. 22 at 1, 8; KLM Ex. 109 at 41–42; *see also* JPTO Stip. Fact ¶ 73.
[311]        JPTO Stip. Fact ¶ 75.

Pacific.[312] Therefore, by his own admission, Comu owns at least 2% of Sunset Pacific – not 1% – which contradicts his Bankruptcy Filings and his testimony at trial.

116.   Other than Comu's unsubstantiated testimony, there is no evidence that Cem Comu has ever held a 1% partnership interest in Sunset Pacific. Sunset Pacific's SOS filings[313] and tax returns (which Comu filed on behalf of Sunset Pacific)[314] do not reflect any interest held by Cem (a foreign national) in Sunset Pacific or any of its entity partners.[315] Therefore, Comu's testimony that Cem Comu holds a partnership interest in Sunset Pacific was also false.

117.   On December 13, 2006, the Texas SOS cancelled Sunset Pacific's certificate of limited partnership due to Sunset Pacific's failure to file periodic reports with the Texas SOS.[316] Comu rectified this on September 28, 2007 by filing a periodic report, which Comu executed as a "Member" Sunset Pacific's general partner, Marathon Management.[317]

118.   In November of 2008, Mathis tendered his resignation as Sunset Pacific's registered agent to the Texas SOS, and sent written notice of his resignation to Sunset Pacific's "last known address," which Mathis identified as "c/o CJ Comu" at TBG's 18352 Dallas Parkway Address.[318]

---

[312]     JPTO Stip. Fact ¶ 73, ¶ 76; *see also* Trustee Ex. 31 at 7; Trustee Ex. 32 at 7; Trustee Ex. 33 at 8; Trustee Ex. 34 at 8; Trustee Ex. 36 at 10.
[313]     *See generally* KLM Ex. 22; KLM Ex. 109.
[314]     Trustee Ex. 30–36 (Sunset Pacific tax returns prepared by Alvin Dahl for Comu's signature).
[315]     As discussed above, Comu controls Sunset Pacific's current general partner, Marathon Management, as well as its prior general and limited partner, Coral Group. *See supra* Section C(1).
[316]     KLM Ex. 22 at 9.
[317]     JPTO Stip. Fact ¶ 74; KLM Ex. 22 at 10–11.
[318]     JPTO Stip. Fact ¶ 74; KLM Ex. 22 at 12–13. Marathon Management designated another Comu attorney, Lloyd Ward, as Sunset Pacific's registered agent in a June 6, 2009 filing with the Texas SOS. KLM Ex. 22 at 14. Ward represented SUN Sports in the SUN Sports Suit against Plaintiffs. *See supra* Section B(1).

119.    The Texas SOS terminated Sunset Pacific's certificate of limited partnership on March 16, 2012, due to failure to file periodic reports.[319]  Sunset Pacific's limited partnership certificate has not been reinstated since its termination on March 16, 2012.[320]

120.    Sunset Pacific's "purpose and business" is "to acquire, hold, manage and dispose of real and personal property."[321]  Throughout its existence Sunset Pacific has conducted virtually no business operations.[322]  Between 2005 and 2011 Sunset Pacific's federal income tax returns reflect only held assets, but no income or expenses.[323]  When asked at the Creditors Meeting about Sunset Pacific's business, Comu stated, "It's just a partnership.  It doesn't have any particular business."[324]

121.    In support of their claim that Phyllis owns 98% of Sunset Pacific, Defendants rely on a document entitled *Consent of General Partner of Sunset Pacific* (the "Sunset Consent"), which states it is "EXECUTED EFFECTIVE as of" January 1, 2006.[325]  Phyllis signed the Sunset Consent on her own behalf, and Comu signed as a "Member" of Marathon Management and Coral Group.[326]  Pursuant to the Sunset Consent, which is not notarized, Coral Group purportedly resigned as a limited partner of Sunset Pacific and was replaced by Marathon Management, Comu was admitted as a one percent (1%) limited partner, and Phyllis was admitted as a ninety-eight percent (98%) limited partner.[327]  The Sunset Consent further claims

---

[319]    JPTO Stip. Fact ¶ 77; KLM Ex. 22 at 15.
[320]    JPTO Stip. Fact ¶ 78.
[321]    KLM Ex. 109 at 29.
[322]    JPTO Stip. Fact ¶ 79.
[323]    JPTO Stip. Fact ¶ 80; Trustee Ex. 30–36.
[324]    Def. Ex. 4 at 5.  As stated in Sunset Pacific's Revised Partnership Agreement, the "purpose and business of the Partnership shall be to acquire, hold, manage and dispose of real and personal property." KLM Ex. 109 at 29.
[325]    JPTO Stip. Fact ¶ 76; Trustee Ex. 1.
[326]    Trustee Ex. 1.
[327]    JPTO Stip. Fact ¶ 76; Trustee Ex. 1.

the partners each made "capital contributions" (Marathon Limited – $100; Comu – $10; and Phyllis Comu – $980).[328] The Sunset Consent was not filed with the Texas or Nevada SOS.[329]

122. Defendants also rely on a document entitled *Amendment to Revised and Restated Agreement of Limited Partnership* for Sunset Pacific (the "Second Sunset Amendment"), which states it is "effective the 1st day of January, 2006," but was notarized more than twenty months later, on September 14, 2007[330] – approximately the same time Comu filed a periodic report reinstating Sunset Pacific's status with the Texas SOS, which made no mention of a change in partnership interests.[331] Comu executed the Second Sunset Amendment on his own behalf and as "Member" of Marathon Management, and Phyllis executed on her own behalf.[332] The Second Sunset Amendment states an intent to "alter" the Revised Partnership Agreement's previous allocation of partnership interests (which, as of July 7, 2005, was Marathon Management (1%), and Coral Group (99%))[333] to replace Coral Group with Marathon Management as general partner, and add Comu as a 1% partner and Phyllis as a 98% partner.[334] According to an index of Sunset Pacific filings from the Texas SOS, the Second Sunset Amendment has not been filed with the Texas SOS.[335]

123. Even if the Court agreed that Phyllis owns 98% of Sunset Pacific, there is no evidence to support Comu's claim that Sunset Pacific's assets are her separate property. Defendants previously alleged there was a document purporting to "gift" Comu's ownership

---

[328]    Trustee Ex. 1.
[329]    *See generally* KLM Ex. 21; KLM Ex. 22.
[330]    JPTO Stip. Fact ¶ 76; KLM Ex. 109 at 26–28.
[331]    KLM Ex. 22 at 1, 10–11; *see also* JPTO Stip. Fact ¶ 74.
[332]    KLM Ex. 109 at 27.
[333]    KLM Ex. 109 at 30–31.
[334]    KLM Ex. 109 at 26.
[335]    KLM Ex. 22 at 1.

interests in Sunset Pacific to Phyllis as of January 1, 2006,[336] but Defendants did not produce this purported document at trial.[337] There is no evidence Phyllis Comu contributed any funds or assets to Sunset Pacific that were derived from her sole separate property. Phyllis is not employed and relies on Comu's income,[338] and there is no evidence she brought any separate assets to the marriage over ten years ago. When asked whether Phyllis does "anything to advance the business of Sunset Pacific," Comu responded: "I think she does a lot of things," such as helping with "client development."[339] But Sunset Pacific has no clients because, as Comu admitted, it "doesn't have any particular business."[340]

124. In addition, Comu controls, either individually or jointly with Phyllis, Sunset Pacific's finances. Comu admitted at the Creditors Meeting that he shares banking privileges with his wife for Sunset Pacific's bank account.[341] Comu was the "Designated Tax Matters Partner" for Sunset Pacific,[342] in which capacity he has alternatively used the Paladium Residence address,[343] and addresses shared with TBG, Regus Advisors, and Marathon Management.[344]

---

[336] *See* Debtor's Answer at 2 ("Defendant transferred to his wife her current ownership interest in Sunset Pacific three years and 364 days before the filing of his bankruptcy petition, and the documentation of the transfer was provided to the Trustee after the meeting of creditors, and Plaintiffs and their attorney physically examined the documents before the deadline for objecting to discharge."); Def. Pretrial Br. at 5 (referencing a January 1, 2006 "gift of Sunset Pacific to Phyllis Comu").

[337] Defendant's First Amended List of Witnesses and Exhibits, filed February 24, 2014 (Adv. Doc. No. 118), identifies as Defendants' "Exhibit 1" a document purporting to reflect "C. J.'s gift of Sunset Pacific to Phyllis on January 1, 2006." However, Defendants deleted this exhibit from their Second Amended List of Witnesses and Exhibits, filed March 14, 2014 (Adv. Doc. No. 135), and did not offer any such document at trial.

[338] Def. Ex. 4 at 5, 12, 24; *see also generally* Phyllis Comu trial testimony.

[339] Def. Ex. 4 at 12–13.

[340] Def. Ex. 4 at 5.

[341] Def. Ex. 4 at 5–6.

[342] Trustee Ex. 31 at 2; Trustee Ex. 32 at 2; Trustee Ex. 33 at 3; Trustee Ex. 34 at 3; Trustee Ex. 35 at 3; Trustee Ex. 36 at 3; KLM Ex. 231 at 4.

[343] Trustee Ex. 30 at 2.

[344] Shared addresses include the 18208 Preston Address (Trustee Ex. 34 at 3; Trustee Ex. 35 at 3), and the 5340 LBJ Freeway Address (Trustee Ex. 36 at 3).

125. Irrespective of Sunset Pacific's ownership, Comu concealed information, or made inconsistent and misleading disclosure about Sunset Pacific's assets that constitute false oaths. Although Comu disclosed numerous Sunset Pacific assets that he believed to be worthless to him[345] he failed to itemize numerous valuable assets held by Sunset Pacific[346] – including a $250,000 annuity[347] and a Sunset Pacific account at Turkish Bank.[348] As of the Petition Date, Comu had the use of a 2002 Mercedes Benz S-500 that he claimed was owned by Sunset Pacific,[349] but Comu deducted use of the Mercedes in his 2010 tax return as a sole proprietor.[350] Comu's Draft Bankruptcy Filings also reflect a $20,000 pre-petition loan to Comu by Sunset Pacific,[351] which was not disclosed in Comu's Bankruptcy Filings. Sunset Pacific's 2007 federal income tax return reflects assets totaling $527,750, consisting of a $250,000 annuity and a loan to SUN Sports in the amount of $277,750.[352] (Comu admitted at the Creditors Meeting that he owned SUN Sports.)[353]

126. Comu also concealed information on Sunset Pacific's 2009 tax return. While Sunset Pacific's 2009 tax return reflects no assets,[354] its returns from 2008 and 2010 both reflect $522,776 in assets.[355] Comu has never explained or corrected this discrepancy. The above disclosures gave the false impression that Comu's interest in Sunset Pacific – whatever it might be – held no potential recovery for creditors.

---

[345] Trustee Ex. 94 at 4–6.
[346] Bench Finding No. 11–12.
[347] KLM Ex. 90; *see also* JPTO Stip. Fact ¶ 81.
[348] KLM Ex. 320 at 1.
[349] Trustee Ex. 94 at 6.
[350] Trustee Ex. 69 at 4; *see also* KLM Ex. 357 (November 2009 email responding to TBG's announcement of the Green Auto Merger: "Does this mean you will sell the Mercedes and start driving an electric car????).
[351] KLM Ex. 312 at 10.
[352] JPTO Stip. Fact ¶ 81.
[353] Def. Ex. 4 at 2.
[354] Trustee Ex. 34 at 1.
[355] Trustee Ex. 33 at 1; Trustee Ex. 35 at 1.

127.    Comu has also exploited Sunset Pacific as a conduit to conceal and dissipate assets.  As noted *supra*, Sunset Pacific received 10 million shares of GETG stock related to Comu's pre-petition services to GETG.[356]  Sunset Pacific also received a $500,000 payment from Alan Perlman in connection with the purchase of mining rights[357] – a payment that Plaintiffs alleged in the New York Action to be a fraudulent kickback.[358]   Thus, Comu has literally used Sunset Pacific to conceal assets derived from the very fraud perpetrated against Plaintiffs, which is the basis of the Judgment Debt, reflecting Comu's willful and malicious intent to hinder, delay and defraud Plaintiffs' claims as creditors.

128.    Comu continued to use Sunset Pacific to conceal assets after the Petition Date.  In addition to the 5 million GETG shares granted to Sunset Pacific in September of 2010 "as compensation for Comu's services to GETG in 2009 and 2010,"[359] Sunset Pacific also received 2,500,000 shares of Green Auto stock on January 13, 2010 in connection with the Green Auto Merger,[360] discussed *infra*.[361]   And on June 23, 2012, Comu executed a Promissory Note for $50,000 in favor of Marathon Management for the purchase of a 2010 Mercedes Benz S-550.[362] Title for this new Mercedes is held in the name of Sunset Pacific.[363]

129.    Based on the above, and contrary to his Bankruptcy Filings and testimony, Comu owns and/or controls 100% of Sunset Pacific.[364]

---

[356]    Trustee Ex. 2; *see also* Def. Ex. 4 at 8–9.
[357]    Def. Ex. 4 at 5.
[358]    KLM Ex. 340 at 2, 7–8.
[359]    KLM Ex. 335.
[360]    KLM Ex. 49 at 1; *see also* Trustee Ex. 5.
[361]    *See infra* Section E(1)(e).
[362]    KLM Ex. 115.
[363]    KLM Ex. 337.
[364]    Bench Finding No. 24.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                        **PAGE 56 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002280

130.    Comu and Phyllis, knowingly and in concert with each other and with Sunset Pacific, exploited the Sunset Pacific corporate form both before and after the Petition Date for the purpose of concealing Comu's assets and avoiding creditor claims.[365]

### 3.    The Barclay Group

131.    Comu deliberately omitted and misrepresented material facts in order to conceal his interests in TBG and its assets it holds, and to further his scheme to hinder, delay and defraud his creditors.

132.    Comu's Schedule B claims that Comu owns only 1% of TBG, and that Brown owns the remaining 99% interest.[366]    Comu verified this claim under oath at the Creditors Meeting, where he testified unequivocally that "Mr. Bernard Brown owns 99% of" TBG.[367] After the Discharge Date, Defendants took the inconsistent position that the 99% ownership in TBG attributed to Brown "is actually owned by a United Kingdom Corporation named Brown and Lampe, PLC."[368]    Comu offered no reasonable explanation at trial for this material inconsistency, which Comu never corrected in his Bankruptcy Filings.

133.    Comu claimed in his SOFA he was a "Managing Partner" of TBG, and disclosed no other positions for the preceding six years.[369]   At the Creditors Meeting, Comu unequivocally testified, "I am not an officer of The Barclay Group.   I am [an] employee of The Barclay Group."[370]  He also claimed he was paid on an "hourly basis" for his work at TBG.[371]

---

[365]    Bench Finding No. 23 (Sunset Pacific was operated as a conduit to shield Comu's assets from creditors).
[366]    JPTO Stip. Fact ¶ 14; Trustee Ex. 94 at 4.
[367]    Def. Ex. 4 at 6.
[368]    JPTO Stip. Fact ¶ 14; Defendants' Answer ¶ 4.
[369]    Trustee Ex. 95 at 5.
[370]    Def. Ex. 4 at 4.
[371]    Def. Ex. 4 at 6.

134.     According to the deposition testimony of Edward Baxter ("Baxter") presented at trial, Comu has complete authority over titles for TBG executives and employees of, including his own.[372]  Comu's own testimony at trial confirmed this discretion.

135.     Both before and after the Petition Date, Comu has held TBG titles as "Principle [sic],"[373] "Chairman/CEO,"[374] "Chief Executive Officer,"[375] "President,"[376] "Director,"[377] and "Manager."[378]  In 2007, 2008, 2009, and 2011, Comu executed and filed reports with the Texas SOS verifying he is the sole officer (President) and sole Director of TBG,[379] and TBG's 2010 tax return identifies Comu as an officer of TBG.[380]  In the Utah Action, Comu executed an affidavit in which he attested that "I am, and have been at all times since prior to [sic] October 2009, a Director of TBG."[381]

136.     Contrary to his testimony at the Creditors Meeting, and despite having never amended his SOFA, Comu now stipulates that before and after the Petition Date he acted as President, sole officer and director of TBG.[382]

137.     Comu was not a mere "employee" of TBG before or after the Petition Date.[383] Comu's 2009 and 2010 personal tax returns disclose no TBG wages, and claim his income was derived from a "sole proprietorship" based at the Paladium Residence.[384]  Comu did not produce

---

[372]     *See* Baxter Exam 12:1–6; *see also* KLM Ex. 278.
[373]     KLM Ex. 289 at 54399_32.
[374]     *See, e.g.*, KLM Ex. 162 at 1; KLM Ex. 228 at 2.
[375]     JPTO Stip. Fact ¶ 17; KLM Ex. 24 at 10.
[376]     KLM Ex. 24 at 5–9.
[377]     Trustee Ex. 63; KLM Ex. 24 at 4, 8–9.
[378]     KLM Ex. 24 at 5–6; *see also* KLM Ex. 145 at 25.
[379]     JPTO Stip. Fact ¶ 18; *see also* KLM Ex. 24 at 5–8; Trustee Ex. 63.
[380]     Trustee Ex. 18 at 2.
[381]     KLM Ex. 12 at 14.
[382]     JPTO Stip. Fact ¶ 17, ¶ 18; *see also* JPTO Stip. Fact ¶ 15.
[383]     *See, e.g.*, KLM Ex. 298 at 1 (November 16, 2009 email to potential investor, stating: "I run a private investment advisory firm and we have a few deals that may be of interest to you."); *see also infra* Section D(1)–(2).
[384]     Trustee Ex. 68 at 3; Trustee Ex. 69 at 3.

any TBG pay stubs at the commencement of the Bankruptcy Case because he claimed to be "self-employed and … unable to provide copies of pay stubs."[385]

138.    In addition to his misrepresentations regarding his positions with TBG, Comu deliberately concealed his true ownership interest and control over TBG business and assets.

139.    TBG was incorporated on or about March 7, 1996 by John Potter.[386]    TBG's Articles of Incorporation list Comu and Potter as TBG's original Directors.[387]    On February 11, 2000, the Texas SOS forfeited TBG's authority to transact business in Texas due to failure to file franchise tax returns and/or pay franchise taxes.[388]

140.    Approximately eight years later (on January 18, 2008), the Texas SOS reinstated TBG's corporate charter after TBG filed an *Application for Reinstatement and Request to Set Aside Revocation or Forfeiture*, which Comu executed as TBG's CEO.[389]    In 2007, 2008, 2009, and 2011, Comu executed and filed with the Texas SOS, on behalf of TBG, *Texas Franchise Tax Public Information Reports* that identify Comu as TBG's President, and as the sole officer and director of TBG.[390]

141.    The only document cited in support of Defendants' contention that B&L owns 99% of TBG (or that Comu owns only 1%), is an *Acquisition Agreement and Plan of Share Exchange* dated December 30, 2007 (the "B&L Share Exchange"),[391] pursuant to which all of the outstanding shares of TBG were to be transferred to B&L in exchange for one million shares of B&L common stock.[392]

---

[385]    *See* Bankr. Docket Entry 1/15/2011 (Bankruptcy Case Docket Sheet at 3).
[386]    JPTO Stip. Fact ¶ 15; *see also* KLM Ex. 24.
[387]    JPTO Stip. Fact ¶ 15; *see also* KLM Ex. 24 at 1–4.
[388]    JPTO Stip. Fact ¶ 16; *see also* KLM Ex. 24 at 10, 12.
[389]    JPTO Stip. Fact ¶ 17; *see also* KLM Ex. 24 at 10.
[390]    JPTO Stip. Fact ¶ 18; *see also* KLM Ex. 24 at 5–8; Trustee Ex. 63.
[391]    JPTO Stip. Fact ¶ 22; KLM Ex. 61.
[392]    JPTO Stip. Fact ¶ 19; *see also* Trustee Ex. 60 (Transcript of Trustee's 2004 Exam of Bernard D. Brown, dated March 18, 2013, herein, "Brown Exam"), at 9:25 – 11:15.

142. Comu's Bankruptcy Filings did not disclose any ownership interest or affiliation held by Comu in B&L,[393] nor was B&L mentioned at the Creditors Meeting.[394]

143. The B&L Share Exchange provided that the "closing" was to occur at B&L's offices by December 30, 2007.[395] At the closing, Comu was to present his shares in SUN Sports and other entities for endorsement over the B&L, Comu was to receive "a certificate or certificates representing the number of shares of B&L Preferred Stock for which the shares of TBG common stock shall have been exchanged," and the parties were to exchange signed "officer's certificates" on behalf of each entity.[396] There is no evidence that any of these events occurred. Comu admitted at trial, and Brown admitted when examined by the Trustee, that no shares were ever actually exchanged relating to the B&L Share Exchange.[397]

144. TBG's 2008 corporation income tax return (dated February 22, 2010) claimed there were two shareholders of TBG, and that B&L owned 99% of TBG.[398] Brown admitted this return was false because B&L did not exist.[399] Defendants now stipulate that when the B&L Share Exchange was purportedly signed, B&L had not been formed as a UK corporation, and that B&L has not been formed since that time.[400]

---

[393] JPTO Stip. Fact ¶ 20; *see also generally* Trustee Ex. 94; Trustee Ex. 95.
[394] *See generally* Def. Ex. 4.
[395] Trustee Ex. 61 § 7.1
[396] Trustee Ex. 61 § 7.1(a)–(f).
[397] Brown Exam 37:25 – 38:13.
[398] Trustee Ex. 16 at 3-4.
[399] Brown Exam 25:5–11, 69:21 – 70:13, 99:19 – 100:2.
[400] JPTO Stip. Fact ¶ 21.

145.    Brown's testimony reflects that he has little knowledge and virtually no involvement with TBG operations or management.[401]

146.    The B&L Share Exchange is a sham transaction contrived by Comu, with Brown's knowledge, with the fraudulent intent to conceal Comu's true ownership of TBG from Trustee and creditors. Comu's efforts to conceal his true interest in TBG continued through trial. Christopher McNeill ("McNeill") of the law firm of Block & Garden (B&G) testified that Comu contacted him a week before trial and told him TBG was owned 99% by Brown.

147.    Even if Comu believed he was a 1% owner in TBG by virtue of the B&L Share Exchange, he was required to schedule his 99% ownership interest in B&L.[402]

148.    At all times relevant to the Bankruptcy Case, Comu has not acted as if he were only a 1% owner in TBG, and the evidence does not support this alleged interest.[403] No corporate records were kept by TBG and corporate formalities were not followed.[404] TBG has used the Paladium Residence as its mailing address for bank account statements,[405] and bank statements for Comu's personal account at Wells Fargo have been sent to TBG's 18208 Preston Address.[406] Alvin Dahl,[407] a CPA connected to the GETG Entities who prepared the Comu's

---

[401]    Brown had no written communications with Comu or TBG or other documents that would substantiate the existence of the B&L Share Exchange. Brown Exam 11:11 – 12:19. Although the B&L Agreement states it is effective as of December 30, 2007, Brown did not remember when he actually signed it. Brown Exam 57:4 – 25. When asked if he was an officer or director of TBG, Brown responded "I believe I'm the president," Brown Exam 38:14 – 16, but he could not identify any document reflecting any such appointment, nor could he recall the date on which he was allegedly elevated to president. Brown Exam 83:7 – 84:10, 87:22 – 7. Brown did not know what salary or compensation Comu received from TBG. Brown Exam 52:7 – 9.
[402]    Bench Finding No. 9.
[403]    Bench Finding No. 10.
[404]    Bench Finding No. 20.
[405]    KLM Ex. 18 at 5.
[406]    *See generally* KLM Ex. 20.
[407]    Defendants identified Dahl as a trial witness in their Second Amended List of Witnesses and Exhibits (Adv. Doc. No. 135 at 2), but Dahl passed away before trial. The transcript of Dahl's 2004 Exam, which was taken on August 9, 2012, was read into the trial record.

personal tax returns,[408] as well as the tax returns for TBG,[409] Sunset Pacific,[410] Marathon Management,[411] and Regus Advisors,[412] was paid or his services out of TBG accounts.[413] The only evidence Comu offers regarding the legitimacy and separateness of TBG's business and accounts is his own testimony, which facially lacks credibility.

149. In addition to the concealment of his ownership interests, Comu made deliberately false and misleading statements regarding TBG's assets. In his Bankruptcy Filings, Comu disclosed only those TBG assets that he believed to be worthless, and claimed his interest in TBG was worth $0.[414] When asked at the Creditors Meeting if TBG had "any assets," Comu claimed: "I don't believe so unless whatever has been disclosed in the bankruptcy filing."[415]

150. As set forth further below, TBG acquired over 95 million shares of stock in Green Auto in late 2009, and as of the Petition Date and continuing through the Creditors Meeting, Comu was actively engaged in selling or transferring these TBG assets.[416] Comu concealed TBG's substantial valuable interest in GANAS and the Green Auto Stock, which was acquired before the Petition Date, and was distributed in accordance with Comu's instructions to TBG and other Comu affiliates before the Creditors Meeting.[417]

151. Regardless of the legal ownership of TBG, there is clear and convincing evidence that, both before and after the Petition Date and the Discharge Date, Phyllis and Comu used TBG accounts as personal "piggybank."[418] TBG accounts were used to pay personal expenses,

---

[408] *See, e.g.*, Trustee Ex. 68 at 2.
[409] *See, e.g.*, KLM Ex 38 at 1.
[410] *See, e.g.*, KLM Ex. 34 at 1.
[411] *See, e.g.*, KLM Ex. 111 at 1.
[412] *See, e.g.*, KLM Ex. 108 at 1.
[413] Trustee Ex. 23 at 4; Trustee Ex. 25 at 1, 5; KLM Ex. 89 at 3, 33.
[414] Trustee Ex. 94 at 4–5.
[415] Def. Ex. 4 at 6.
[416] *See infra* Section D, E.
[417] *See infra* Section D, E; *see also* Bench Finding No. 11–12.
[418] Bench Finding No. 22; *see also* KLM Ex. 18; KLM Ex. 85–86, 88–89; KLM Ex. 96; Trustee Ex. 28.

including taxes for the Paladium Residence,[419] membership dues for Prestonwood Country Club,[420] charitable donations (*e.g.*, Cattle Baron's Ball,[421] Ronald McDonald House,[422] and Paws in the City),[423] medical expenses,[424] fitness club dues,[425] drugstore purchases,[426] Wal-Mart,[427] Best Buy,[428] Bed Bath & Beyond,[429] over $10,000 for Cowboys tickets (plus $1,200 for a "limo to the game"),[430] "Mega Gems,"[431] premiums for an insurance policy held by Comu,[432] substantial domestic and international travel (including trips to London,[433] Las Vegas casinos,[434] a Disney vacation in Florida,[435] Ft. Lauderdale,[436] Palm Springs,[437] Palm Desert,[438] Vancouver,[439] Toronto,[440] Turkey,[441] London,[442] Fuengirola, Spain,[443] Hawaii,[444] San

---

[419]    *Compare* KLM Ex. 371 at 1 ($6,988.80 taxes paid January 31, 2009), *with* Trustee Ex. 24 at 1 ($6,988.80 check to David Childs Tax Assessor); *and compare* KLM Ex. 371 at 1 ($7483.11 taxes paid December 21, 2009), *with* Trustee Ex. 24 at 2 ($7,483.11 payment made for "Fee Expenses" on December 17, 2009).

[420]    Trustee Ex. 23 at 4; Trustee Ex. 24 at 1; Trustee Ex. 26 at 1, 4, 10; KLM Ex. 18 at 2, 25; KLM Ex. 19 at 50, 58.

[421]    KLM Ex. 89 at 71.

[422]    KLM Ex. 19 at 51.

[423]    Trustee Ex. 25 at 2, 4; KLM Ex. 19 at 7; KLM Ex. 89 at 76.

[424]    *See, e.g.*, Trustee Ex. 26 at 5 ($225 payment to Dr. Jane Admire).  Dr. Admire practices otolaryngology and plastic surgery.  *See* http://janeadmire.md.com/.

[425]    *See, e.g.*, KLM Ex. 19 at 50, 56; Trustee Ex. 26 at 2–3, 10.

[426]    *See, e.g.*, KLM Ex. 19 at 46; Trustee Ex. 23 at 9.

[427]    *See, e.g.*, KLM Ex. 18 at 2.

[428]    *See, e.g.*, KLM Ex. 19 at 46.

[429]    *See, e.g.*, KLM Ex. 19 at 46; Trustee Ex. 23 at 9.

[430]    Trustee Ex. 25 at 2, 4.

[431]    Trustee Ex. 26 at 3.

[432]    KLM Ex. 19 at 3, 39, 58.

[433]    Trustee Ex. 26 at 4.

[434]    KLM Ex. 19 at 52; Trustee Ex. 26 at 2.

[435]    KLM 19 at 2.

[436]    Trustee Ex. 23 at 9; KLM Ex. 19 at 45.

[437]    *See, e.g.*, KLM Ex. 18 at 2.

[438]    *See, e.g.*, KLM Ex. 19 at 24.

[439]    *See, e.g.*, KLM Ex. 19 at 13.

[440]    *See, e.g.*, KLM Ex. 19 at 56.

[441]    *See, e.g.*, KLM Ex. 19 at 24.

[442]    *See, e.g.,* KLM Ex. 19 at 58.

[443]    *See, e.g.*, KLM Ex. 19 at 43.

[444]    *See, e.g.*, KLM Ex. 19 at 14.

Francisco,[445] New York,[446] and a charge for "AA vacations"),[447] and other everyday personal expenses such as restaurants, mobile phone charges, tolltag expenses, and gas.[448]

152.    Comu also admitted at trial that he frequently advanced cash to Phyllis out of TBG accounts for such personal expenses as an "outfit for an event," which Comu testified was, in his view, a legitimate business expense, even though Phyllis holds no position with TBG. Both before and after the Petition Date and the Discharge Date, Comu frequently wrote checks for thousands of dollars to Phyllis out of TBG accounts to Phyllis for personal expenses[449] – including two checks for $2,000 each that Comu made out to Phyllis on the Petition Date[450] – and signed checks to himself for $3,000 - $10,000.[451]  Between 2009 and 2011, Phyllis received over $60,000 out of TBG accounts, which funds she deposited into her personal checking account and used for personal expenses.[452]  Ledgers produced to Trustee attempt to conceal these payments to Phyllis by describing them as "office expenses."[453]

153.    TBG accounts for 2010[454] and 2011[455] reflect unexplained "counter debits" and other cash withdrawals for hundreds of thousands of dollars for unknown purposes.[456]

---

[445]    *See, e.g.*, KLM Ex. 19 at 31.
[446]    *See, e.g.*, KLM Ex. 19 at 39.
[447]    Trustee Ex. 23 at 9; KLM Ex. 19 at 45.
[448]    *See generally* Trustee Ex. 23; Trustee Ex. 24; Trustee Ex. 25; Trustee Ex. 26; KLM Ex. 18; KLM Ex. 19.
[449]    *See generally* KLM Ex. 89; KLM Ex. 96; *see also* Trustee Ex. 24 at 1; KLM Ex. 18 at 13; KLM Ex. 88.
[450]    KLM Ex. 88; KLM Ex. 89 at 25.
[451]    KLM Ex. 89 at 55, 92.
[452]    KLM Ex. 85–87; Trustee Ex. 28–29.
[453]    *See, e.g.*, Trustee Ex. 25 at 2.
[454]    Unexplained 2010 cash withdrawals and "counter debits" include: $50,000 (September 23); $100,000 (September 25); $56,250 (October 12); $44,000 (October 26); $38,000 (October 28); $100,000 (October 29); $86,000 (November 1); $100,000 (November 3); $58,000 (November 4); $49,000 (November 19); $55,000 (December 13).  Trustee Ex. 25 at 3–4.
[455]    Unexplained 2010 cash withdrawals and "counter debits" include: KLM Ex. 348 at 2 ($40,000); Trustee Ex. 23 at 5 ($100,000); KLM Ex. 19 at 36 ($50,000); Trustee Ex. 23 at 9 ($50,000).
[456]    *See generally* Trustee Ex. 23; Trustee Ex. 24; Trustee Ex. 25.

154.    In her 2013 deposition (which Phyllis confirmed when cross-examined at trial),

Phyllis Comu admitted that she and Comu used TBG accounts to sustain their lifestyle:

> Q.  [W]ith all of these checks being written for personal expenses, for charitable events, does it surprise you that your husband didn't write checks to his creditors from that same account?
>
> A.  I could see how you would ask me that question.
>
> Q.  If CJ's income for the years 2008 and 2009 are between $20,000 and $30,000 per year, do you think that's enough money to sustain the kind of lifestyle the two of you had in those two years?
>
> A.  No.
>
> Q.  Do you think that -- did CJ make it possible to sustain the lifestyle that you had as a couple by writing checks from his business to supplement the income that was coming in directly?
>
> A.  I suppose.  It's sitting right here in front of me, so – I'm assuming.
>
> Q.  You're assuming what?
>
> A.  That he wrote checks from this to –
>
> Q.  When you say "this," do you mean The Barclay Group's account?
>
> A.  The Barclay Group – well, this is where the checking account is from.
>
> Q.  And he wrote them in order to make it possible to maintain a certain standard of living.
>
> A.  Yes.[457]

155.    A TBG balance sheet for 2010 reflects over $2.3 million in income,[458] and TBG's

2010 federal income tax return reflects income of $2,366,775.[459]

156.    A TBG "General Ledger" for 2011 reflects year-to-date income, as of August 31,

2011, of $1,055,615.90 for "professional services,"[460] and $329,743 for "stock sales" between

September and December of 2011.[461]    TBG's 2011 tax return reported total income of

$1,373,688, of which $329,743 was reported as a capital gain from Green Auto stock sales.[462]

---

[457]    Phyllis Comu 2013 Depo at 102:6 – 25 (emphasis added).
[458]    Trustee Ex. 25.
[459]    JPTO Stip. Fact ¶ 64; Trustee Ex. 18 at 1.
[460]    Trustee Ex. 26 at 7.
[461]    Trustee Ex. 26 at 6–7.
[462]    JPTO Stip. Fact ¶ 65; KLM Ex. 38 at 1, 7.

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                                    **PAGE 65 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002289

157.    Based on the above, the evidence established that TBG was as of the Petition Date, and currently remains, 100% owned or controlled entirely by Comu.[463]  Comu and Brown, knowingly and in concert with each other and with TBG, exploited TBG's corporate form as a conduit to conceal and transfer assets of the estate both before and after the Petition Date and the Discharge Date.[464]

### 4.      Regus Advisors – TBG's "Next Chapter"

158.    Comu formed Regus Advisors, a Wyoming corporation,[465] in mid-2010 as a new vehicle for conducting TBG business.  The incorporating documents for Regus Advisors were filed with the Texas SOS on June 24, 2010[466] by Dallas attorney Jay Kline.[467]  Kline was paid out of TBG accounts both before and after Regus Advisors was formed.[468]

159.    Regus Advisors is registered to do business in Texas, and currently has or has had offices at Galleria Tower III, 24th Floor, 13155 Noel Road (the "Galleria Address"),[469] and the 5430 LBJ Freeway Address[470] (which is shared with Sunset Pacific).[471]  Regus Advisors has also used the Oaks North Residence as its mailing address for bank statements.[472]

---

[463]    Bench Finding No. 9–10, 20–21.

[464]    Bench Finding No. 19.

[465]    *See generally* KLM Ex. 14.  Comu also formed related entities Regus Realty Partners, LLC and Regus Capital Fund, LP.  *See generally* KLM Ex. 15 (Certificate of Formation of Regus Capital Fund, LP, executed by Comu as "registered agent," and "manager."); KLM Ex. 16 (Certificate of Formation of Regus Realty Partners, LLC, executed by Comu as a "manager" and "organizer.").  Regus Advisors has a wholly-owned subdivision called First Tier Profit Group, Inc. ("FTP").  KLM Ex. 106 at 14; *see also* www.firsttierprofit.com.

[466]    KLM Ex. 14 at 2, 10–12.

[467]    KLM Ex. 14 at 3, 7, 11.

[468]    *See, e.g.*, KLM Ex. 89 at 36, 56, 60, 64, 67; *see also* Trustee Ex. 23 at 3; Trustee Ex. 25 at 1–2; Trustee Ex. 26 at 2, 10.

[469]    KLM Ex. 14 at 2–3.

[470]    KLM Ex. 108 at 1 (2010 tax return); KLM Ex. 123 at 1 (2011 tax return); *see also* KLM Ex. 17 at 1 (bank statements).

[471]    Regus Advisors advertises that it is headquartered in Dallas, and has offices in numerous foreign countries, including the UK, Canada, Turkey, Panama, Switzerland, and other countries.  KLM Ex. 106 at 13; *see also* KLM Ex. 144 at 22–25.

[472]    KLM Ex. 17 at 17, 19.

160.    Regus Advisors has represented publicly that it has been conducting business since before the Petition Date.  A powerpoint produced by Comu represents that Regus Advisors was "founded in 2009,"[473] and Regus Advisors' website claims that it has provided "consulting and advisory services" for "over twenty years."[474]   Similarly, a public disclosure filed for Puration, Inc., relating to a 2011 reverse merger in which Comu was involved, claims:

> Since January, 2005, Mr. Comu has been the Chairman for Regus Advisors Inc., a private international consulting firm for private and public company's providing advisory services for complex restructuring, contract negotiations, private equity, debt and mezzanine financings, operations, marketing and business development.[475]

161.    TBG and Regus Advisors share executives and insiders.  Comu holds himself out as the Chairman of Regus Advisors,[476] and SOS filings and other evidence identify Comu as President,[477] Managing Partner,[478] and Director of Regus Advisors.[479]   SOS filings also identify David Parsley and Mervyn Price (Comu's tenant at the Paladium Residence)[480] as Regus Advisors officers and/or directors.[481]   David Parsley was paid out of TBG accounts both before and after Regus Advisors was formed.[482]   Edward Baxter, a TBG Managing Partner[483] who was

---

[473]        KLM Ex. 106 at 2.
[474]        KLM Ex. 144 at 6.
[475]        KLM Ex. 145 at 24.
[476]        *See, e.g.*, KLM Ex. 322.
[477]        KLM Ex. 223 at 2.
[478]        *See, e.g.*, KLM Ex. 274 at 1; KLM Ex. 285 at 1.
[479]        KLM Ex. 14 at 3, 5; *see also* KLM Ex. 145 at 24–25 (identifying Comu as Chairman and Director of Regus Advisors).
[480]        KLM Ex. 137 at 1.
[481]        KLM Ex. 14 at 3–5; *see also* KLM Ex. 106 at 11.
[482]        Trustee Ex. 23 at 4; Trustee Ex. 26 at 1, 5, 10.
[483]        *See, e.g.*, KLM Ex. 30 at 3.

paid substantial fees out of TBG accounts before and after Regus Advisors was formed,[484] was named a Managing Partner with Regus Advisors.[485]

162.    In June and July of 2010, Comu arranged for Regus Advisors' office space with a July 1, 2010 move-in date.[486]  In correspondence with the landlord, Comu stated, "I have a client and am a shareholder of a Company that currently offices at your 15950 Dallas Parkway location and (due to potential conflict of interest) I would need to set up our offices in a different location."[487]  This is the 15950 Dallas Parkway Address used by GETG.[488]

163.    When the landlord asked for an alternative address for Regus Advisors, Comu provided: "Parent Company; The Barclay Group Inc." and referenced TBG's 18208 Preston Road Address.[489]  TBG paid rent for Regus Advisors.[490]

164.    Comu testified at trial that Regus Advisors is wholly-owned by TKY Trust, the Canadian trust Comu set up prior to the Petition Date.[491]  There is no evidence corroborating Comu's claim, and Regus Advisors' SOS filings and tax returns do not disclose any ownership interest held by TKY Trust.[492]

165.    Comu used Peter Knight at dMedia LLC ("dMedia"), an entity located in Park City, Utah,[493] to set up and populate a new website for Regus Advisors in June and July of

---

[484]    KLM Ex. 89 at 40 ($10,000); KLM Ex. 89 at 41 ($2,500); KLM Ex. 89 at 45 ($19,000); KLM Ex. 89 at 46 ($3,500); KLM Ex. 89 at 52 ($12,500); KLM Ex. 89 at 59 ($11,500); KLM Ex. 89 at 61 ($12,500); Ex. 89 at 74 ($5,000); KLM Ex. 89 at 82 ($12,500); KLM Ex. 89 at 84 ($12,500); Trustee Ex. 23 at 1 ($6,250); Trustee Ex. 23 at 2 ($6,250); Trustee Ex. 23 at 3 ($6,250); Trustee Ex. 23 at 8 ($1,000); Trustee Ex. 25 at 1 ($35,000); Trustee Ex. 25 at 2 ($51,500); Trustee Ex. 25 at 3 ($12,500)
[485]    *See, e.g.*, KLM Ex. 286 at 1.
[486]    KLM Ex. 197 at 1; *see also generally* KLM Ex. 222.
[487]    KLM Ex. 222 at 21106_5.
[488]    *See, e.g.*, KLM Ex. 102 at 1.
[489]    KLM Ex. 222 at 1.
[490]    Trustee Ex. 25 at 2; KLM Ex. 89 at 66.
[491]    *See infra* Section E(4)(a).
[492]    KLM Ex. 108; KLM Ex. 123.
[493]    *See, e.g.*, KLM Ex. 313 at 7.

2010.[494]  On June 22, 2010, Comu registered the domain name "regusadvisors.com" via a GoDaddy account held in Comu's name.[495]  Comu forwarded the new website information to TBG Managing Partner and GETG insider Dave Welch[496] – "The next Chapter - kimmosabe!!" – and instructed that the new Regus Advisors website "should be a transfer of the TBG site.  Just change TBG."[497]  In July of 2010, Comu worked on the Regus Advisors logo,[498] and personally gave instructions regarding the content of the Regus Advisors website.[499]  The "contact us" link for Regus Advisors connects directly to Comu's personal gmail account.[500]  Comu instructed Peter Knight to make the exact same edits to the TBG and Regus Advisors websites.[501]  The GoDaddy charges for setting up the Regus Advisors website were paid out of TBG's Wells Fargo account.[502]

166.  The TBG and Regus Advisors websites are virtually identical.[503]  The web pages describing services related to "Consulting,"[504] "Mergers,"[505] "Finance,"[506] and "Divestiture,"[507] for example, for both TBG and Regus Advisors websites are exact duplicates (except where the

---

[494]  *See, e.g.*, KLM Ex. 198; KLM Ex. 225.
[495]  KLM Ex. 191 at 1; *see also* KLM Ex. 192 at 1; KLM Ex. 193 at 1.
[496]  *See, e.g.*, KLM Ex. 273; *see also supra* n.222.
[497]  KLM Ex. 194 at 1.
[498]  *See, e.g.*, KLM Ex. 198 at 1–3.
[499]  KLM Ex. 225; KLM Ex. 227 at 1.
[500]  KLM Ex. 227 at 1.
[501]  KLM Ex. 227 at 1.
[502]  Trustee Ex. 23 at 4; Trustee Ex. 25 at 2.
[503]  *Compare* KLM Ex.144 *with* KLM Ex. 142.
[504]  *Compare* KLM Ex. 142 at 3 *with* KLM Ex. 144 at 14.
[505]  *Compare* KLM Ex. 142 at 4 *with* KLM Ex. 144 at 16.
[506]  *Compare* KLM Ex. 142 at 6 *with* KLM Ex. 144 at 18–19.
[507]  *Compare* KLM Ex. 142 at 7 *with* KLM Ex. 144 at 20.

company is named). Numerous other pages from the Regus Advisors website duplicate the TBG website language verbatim.[508]

167. On June 13, 2010, Welch (a TBG Managing Partner) pointed out that Comu needed to stop using his "cjcomu" email address because it would "be picked up by Buckeye [Epstein] at some point," and that he should "set up another email address with out his name of TBG immediately [sic]."[509] On July 4, 2010, Comu assigned new Regus Advisors email addresses to various individuals associated with other Comu affiliates and offshore entities providing nominee services for Comu,[510] including himself, Dave Welch (TBG Managing Partner, Regus Advisors Insider, GETG officer, and key player in the Green Auto Merger),[511] David Knight (dMedia, GETG Entities and offshore entities),[512] Tunch Kashif (Campus Investments),[513] Peter Knight (GETG Entities, dMedia and ERI),[514] Simon Ferguson

---

[508]    *Compare* KLM Ex. 144 at 6 ("For over twenty years Regus Advisors has provided consulting and advisory services to development stage and emerging market companies.") *with* KLM Ex. 142 at 9 ("For over twenty years TBG has provided consulting and advisory services to development stage and emerging market companies."); *compare* KLM Ex. 144 at 6 ("Our experienced team has honed its skills so that it can show clients a level of service that they deserve. Regus Advisors has built a firm foundation on its ability to treat every client as though they were the only client.") *with* KLM Ex. 142 at 9 ("Our experienced team has honed its skills so that it can show clients a level of service that they deserve. TBG has built a firm foundation on its ability to treat every client as though they were the only client."); *compare* KLM Ex. 144 at 14 ("Success in business is as much about being able to adapt swiftly and anticipate change as it is about having good ideas. Companies the world over have to focus not only on the task at hand, but also on planning and developing immediate and long-term goals.") *with* KLM Ex. 142 at 3 ("Success in business is as much about being able to adapt swiftly and anticipate change as it is about having good ideas. Companies the world over have to focus not only on the task at hand, but also on planning and developing immediate and long-term goals."); *compare* KLM Ex. 144 at 8 ("Business strategies can change in the new economy almost as fast as they appear. In today's marketplace, companies need a strong, diverse team to navigate the vast possibilities and opportunities before them. Development stage and emerging market companies require a team of time-tested professionals who understand their goals and dreams.") *with* KLM Ex. 142 at 1 (same).
[509]    KLM Ex. 187 at 1.
[510]    KLM Ex. 226.
[511]    KLM Ex. 221; *see also supra* Section B(3) & *infra* Section E(1).
[512]    *See supra* Section B(3).
[513]    *See supra* Section B(3); *infra* Section E(5)(g); *see also* KLM Ex. 163.
[514]    *See supra* Section B(3); *infra* E(5)(c).

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                                    **PAGE 70 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002294

(Harpcrest),[515] Bernard Brown,[516] Patrick Kelly (Mansion House Capital and Harpcrest),[517] and Nick Toscano (World Wide Auric and ERI).[518]

168.  In response to questions from the Court at trial, Comu attempted to distinguish between the business of TBG and Regus Advisors.  This testimony was inconsistent with Comu's sworn prior testimony that "[t]here isn't a big difference.  It's just new people wanted to start a new business, so we created a new name in 2010."[519]

169.  Evidence confirms that Comu moved TBG projects to Regus Advisors.  In September through November of 2010, Comu sent emails identifying valuable pre-petition TBG business – including Green Auto,[520] T3 Networks,[521] GETG,[522] Paragon,[523] and Campus Investments[524] – as part of Regus Advisors' ongoing "deal flow."[525]  On August 31, 2010, Comu asked Ed Baxter to revise a February 12, 2010 "Advisory Agreement" drafted for TBG to reflect Regus Advisors instead.[526]  A TBG ledger for 2010 reflects the receipt of $24,000 in fees from "Chatsworth."[527]  On January 3, 2011, Regus Advisors received a $38,750 wire transfer from "Chatsworth," reflecting this TBG income stream had been shifted to Regus Advisors accounts.[528] Comu also treated Regus Advisors and TBG business relationships as fungible.[529]

---

[515]     *See, e.g.*, KLM Ex. 241 at 1.
[516]     A Third-Party Defendant herein.
[517]     KLM Ex. 211 at 1; KLM Ex. 248.
[518]     *See infra* Section E(5)(e).
[519]     Comu 2011 Exam 112:15–20.
[520]     *See infra* Section D–E.
[521]     *See supra* Section B(3).
[522]     *See supra* Section B(3).
[523]     *See supra* Section B(3).  In correspondence November 9, 2010 from Comu's gmail account regarding Paragon, Comu's credentials from both TBG and Regus Advisors overlap in the same email string.  KLM Ex. 285 at 1–2.
[524]     *See supra* Section B(3); *infra* Section E(5)(g).
[525]     *See, e.g.*, KLM Ex. 280; KLM Ex. 286 at 1.
[526]     KLM Ex. 274.
[527]     Trustee Ex. 25 at 3.
[528]     KLM Ex. 17 at 2.

170. Comu controlled Regus Advisors accounts, and moved money between Regus Advisors and accounts held by TBG and Comu personally.[530] Although it had no role in the transaction, Regus Advisors received estate assets derived from Comu's pre-petition business interest in the Green Auto reverse merger, as discussed *infra*.[531]

171. Through Regus Advisors – using resources poached from TBG – Comu embarked upon other lucrative transactions similar to the Green Auto Merger, including a 2011 reverse merger for Puration, Inc.[532] Christopher McNeill testified at trial that B&G represents both TBG and Regus Advisors. McNeill understood the Puration, Inc. transaction was a TBG deal instead of Regus Advisors. B&G was at relevant times paid out of TBG accounts or out of the proceeds of Green Auto stock sales.[533]

172. Puration, Inc. filed a public report dated December 31, 2011 disclosing that Comu had been appointed "Chairman of the Board, Director" for Puration, Inc., and that he had personally received 4,000,000 shares of common stock, and 200,000 Preferred Shares.[534] A stock certificate reflecting 5,000,000 shares of Puration, Inc. common stock was issued to Regus

---

[529] In a September 13, 2010 email with a new potential business partner, for example, Comu stated: "Few options I wanted to present for you.... If you would like we can set you up as a Partner for the Beverly Hills office of (TBG) The Barclay Group Inc. www.thebarclaygroup.com or as (RAI) Regus Advisors Inc. www.regusadvisors.com. We can print cards, set up your email and take care of your banking, etc...... all you gotta do is 'do the magic that you do' and we will provide you deal flow and back office support." KLM Ex. 278.

[530] On July 2, 2010, Comu set up a new Regus Advisors bank account at Bank of America, and arranged for email notifications regarding the account to be sent to his personal email account. KLM Ex. 199 at 1. Comu had bank statements for Regus Advisors sent to his Oaks North Residence in November, 2011. KLM Ex. 17 at 19. On January 28, 2011, Comu transferred $10,000 from Regus Advisor' bank account to his personal checking account. KLM Ex. 17 at 2; KLM Ex. 141 at 2. And on June 1, 2011, Comu wrote a $20,000 check to Regus Advisors out of TBG's account. KLM Ex. 89 at 106; *also compare* Trustee Ex. 23 at 5 *with* KLM Ex. 17 at 12.

[531] *See infra* ¶ 306 & n.762 and ¶ 331 & n.844–845 (9 million shares to Regus Advisors, then liquidated for cash through other conduits).

[532] KLM Ex. 145 at 3.

[533] Trustee Ex. 24 at 1; Trustee Ex. 25 at 1; Trustee Ex. 67 at 2; KLM Ex. 89 at 18–19, 34–35, 48.

[534] KLM Ex. 145 at 24–25.

Advisors on August 23, 2011.[535]  In 2012, Comu formed a related entity, Puration UK Plc *a/k/a* Unione Technology Plc. ("Puration UK"), in which he is a shareholder and serves as Chairman and Director.[536]  Mervyn Price – a Regus officer and director[537] who was paid out of TBG accounts[538] – is also a Puration UK Director and Shareholder.[539]

173.    Based on the evidence set forth above – which is almost entirely uncontested by any contrary documentary evidence or testimony – the record confirms that Comu (with the willing participation of various TBG insiders) established Regus Advisors, which he owns 100% or controls, with the specific fraudulent intent of continuing TBG's lucrative business under a new alter ego in furtherance of his scheme to hinder, delay and defraud his creditors by concealing and dissipating assets attributable to the estate.

174.    Through Regus Advisors, Comu acquired or became entitled to acquire property of the estate, and knowingly failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the Trustee.

### 5.    Deliberate Concealment of Facts Thwarted Plaintiffs' Knowledge

175.    Trustee and Katz testified at trial that they did not know of Comu's fraud before Discharge.  They also both testified that they did not learn the truth of Comu's financial situation, and uncovered the scope of Plaintiffs' fraud, only after reviewing documents produced in the 2013 Electronic Production.  Trustee testified at trial that if she had she known the truth about Comu's pre-petition assets and business activities earlier, she would have joined Plaintiffs' revocation claims.

---

[535]    KLM Ex. 94.
[536]    KLM Ex. 84 at 1, 3, 5, 7–8, 10–11.
[537]    *See, e.g.*, KLM Ex. 14 at 3, 5.
[538]    *See, e.g.*, Trustee Ex. 26 at 1.
[539]    KLM Ex. 85 at 6–7.

176. Comu argues that revocation is not available because "Plaintiffs demonstrably knew about [their] allegations before the discharge was entered."[540] In support of this argument, Comu claims that the transcript of the Creditors Meeting "shows that there was extensive questioning about Comu's relationship to Sunset Pacific and [TBG], and various specific allegations were made that Comu dominated the companies and had a larger ownership interest that [sic] was stated in his schedules."[541]

177. The Creditors Meeting transcript reflects Comu was asked questions about his positions with and ownership interests in TBG[542] and Sunset Pacific,[543] but in response to these questions Comu reiterated the same statements made in his Bankruptcy Filings, disclosed no new information, and, as described above, gave misleading testimony regarding his interests and the entities' assets. The transcript also reflects that John Buckeye Epstein ("Epstein"), a former business associate of Comu who is not a creditor in the Bankruptcy Case, attended the Creditors Meeting and alleged that Comu had not been truthful in his testimony, with specific reference to TBG and Sunset Pacific, and that Comu "has since 1998 been on a spree of bilking investors."[544] Comu denied Epstein's allegations, and claimed that Epstein was a disgruntled former employee who was trying to "disrupt [Comu's] life"[545] and "confuse" Trustee.[546]

178. Prior Counsel's concerns and Epstein's questions and concerns at the Creditors Meeting were insufficient to put the Plaintiffs on notice of the scope or nature of Comu's fraud with regard to Sunset Pacific and TBG.[547]

---

[540]    Debtor's Answer ¶ 4.
[541]    *See* Def. Pretrial Br. at 2.
[542]    Def. Ex. 4 at 4, 6–12, 16–17, 25.
[543]    Def. Ex. 4 at 5, 8–9, 11–13, 16–17, 23.
[544]    Def. Ex. 4 at 13–15.
[545]    Def. Ex. 4 at 14.
[546]    Def. Ex. 4 at 18.
[547]    Bench Finding No. 4.

179.    Comu also relies on Prior Counsel's statement at the Creditors Meeting that he intended to object to discharge as evidence of Plaintiffs' pre-discharge knowledge of Comu's fraud.[548]   Comu further relies on the Plaintiffs' petition filed in the Malpractice Action, and argues that Prior Counsel's "[m]issing the deadline to object to discharge" based on Comu's fraud "is an absolute bar" to Plaintiffs' revocation claims in this Adversary.[549]

180.    Katz testified at trial that he had instructed Prior Counsel to object to discharge, and that he believed, based on Prior Counsel's representations, that an objection to Comu's Discharge would be filed on behalf of Plaintiffs on or before the Discharge Objection Deadline. Katz understood Plaintiffs' claims in the Bankruptcy Case to be non-dischargeable not based on Comu's ongoing fraud in the Bankruptcy Case, but because they were predicated on the New York Judgment in which the New York court awarded damages based on Plaintiffs' successful claims for common law fraud and securities fraud.[550]   Katz also testified at trial that Prior Counsel's failure to file a timely objection occurred without his knowledge or consent.

181.    Prior Counsel's statement at the Creditors Meeting that he intended to file an objection to discharge on behalf of Plaintiffs on the basis of "fraud" pertained to Comu's prior fraud established by the New York Judgment (which arose from Comu's common law and securities fraud in transactions occurring before 2007), and did not exhibit knowledge by Plaintiffs of Comu's ongoing fraud in the Bankruptcy Court.

182.    To the extent Comu made any partial disclosures of facts to Trustee or Plaintiffs prior to the Discharge Date, such disclosures were incomplete, inaccurate and misleading, and calculated to deflect investigation by creditors and Trustee into Comu's true financial

---

[548]    Def. Ex. 4 at 19.

[549]    *See* Def. Pretrial Br. at 2–3; *see also* JPTO at 6 (Defendants' Contentions) ("Plaintiffs missed the deadline to object to Comu's discharge, and the Plaintiffs have sued their former attorney for missing the deadline.").

[550]    JPTO Stip. Fact ¶ 4; *see also* KLM Ex. 1; KLM Ex. 340 at 4–12.

circumstances and assets. Comu's deliberate efforts to conceal the truth prevented the Plaintiffs from discovering the truth about Comu's business activities, assets and interests before the Discharge Date. Therefore, to the extent Comu partially disclosed any facts pertaining to the above false oaths and undisclosed assets, such disclosures do not constitute knowledge on the part of Plaintiffs of Comu's fraud before the Discharge Date.

183. Based on the above, there is ample evidence that Plaintiffs and Trustee did not know the true facts pertaining to Comu's false oaths and undisclosed assets until after the Discharge Date,[551] and that Plaintiffs "did not know" about Comu's fraud prior to the Discharge Objection Deadline.[552]

## D. COMU'S SECRET PRE-PETITION EQUITY STAKE IN GREEN AUTO

184. Comu's substantial and valuable interest in the Green Auto Stock, acquired in November 2009, was not disclosed in Comu's Bankruptcy Filings,[553] and was not discussed at the Creditors Meeting.[554] As the Court noted in its Bench Findings, it is inexplicable that there is no discussion in Comu's Schedules or at the Creditors Meeting of the GANAS Stock received in 2009 or the Green Auto Stock or its value Comu would soon enjoy.[555]

185. Comu's failure to disclose his interests in the Green Auto Stock described herein was not based on any good faith basis, but was part of a deliberate effort to conceal assets from Trustee and Plaintiffs, which constitutes bad faith abuse of the bankruptcy process.

---

[551] Bench Finding No. 16.

[552] Bench Finding No. 3.

[553] Bench Finding No. 11; *see also generally* Trustee Ex. 94; Trustee Ex. 95.

[554] *See generally* Def. Ex. 4.

[555] Bench Finding No. 12.

1. **GANAS – Comu's Pre-Petition Acquisition and Control (95 Million Shares)**

186. On October 26, 2009 Comu executed two stock purchase agreements by which TBG acquired 95,420,116 out of 95,746,817 outstanding shares of GANAS common stock (the "GANAS Stock").[556]

187. *First*, TBG acquired 91,920,116 shares of GANAS common stock from GANAS shareholders in return for $75,000.[557]  By virtue of irrevocable stock power assignments executed by GANAS's former shareholders on October 26, 2009, TBG received GANAS stock certificates representing 91,920,116 shares of GANAS stock (the "GANAS Certificates").[558] Comu had the physical GANAS Certificates in his possession as of November 18, 2009.[559]

188. *Second*, TBG acquired an additional 3,500,000 shares of GANAS common stock (the "R&A Shares") from GANAS shareholder Roundtree & Associates, LLC ("R&A"), in return for a $25,000 promissory note secured by a stock certificate reflecting the 3,500,000 shares.[560]

189. On October 28, 2009, Comu elected himself "President" and "Director" of GANAS (which is a Delaware corporation).[561]

190. Comu did not disclose any information in his Bankruptcy Filings or at the Creditors Meeting about GANAS.  Comu deliberately and with fraudulent intent concealed his executive positions with GANAS, and his interest in the GANAS Stock acquired in October of 2009, which were plainly material to the bankruptcy estate.

---

[556]     JPTO Stip. Fact ¶ 23; *see also* Trustee Ex. 74; Trustee Ex. 75.
[557]     JPTO Stip. Fact ¶ 23; Trustee Ex. 75.
[558]     JPTO Stip. Fact ¶ 23; Trustee Ex. 76.
[559]     Trustee Ex. 76 at 1 (handwritten note on GANAS stock power assignments and stock certificates – "picked up by CJ Comu on 11/18/09").
[560]     JPTO Stip. Fact ¶ 23; Trustee Ex. 74; *see also* KLM Ex. 167 at 1.
[561]     JPTO Stip. Fact ¶ 24, ¶ 25; *see also* Trustee Ex. 78–81; KLM Ex. 237 at 3 (pre-merger GANAS term sheet providing that "GNAS's existing officers and directors shall resign in favor of officers and directors to be designated by TBG.").

### 2.    Green Auto Stock – Pre-Petition Equity *Plus* Anti-Dilution Rights

191.    On November 4, 2009, Comu executed documents authorizing GANAS to enter into a reverse merger with Go Green USA, LLC ("Go Green"), a Nevada limited liability company.[562]  Then, acting as President of both GANAS and TBG, Comu executed the *Merger Agreement and Plan of Reorganization* dated as of November 4, 2009 (the "Merger Agreement") between GANAS, Go Green, and TBG.[563]  Green Auto was the surviving entity of the merger.[564]

192.    Christopher McNeill from B&G represented TBG in the Green Auto Merger.  As McNeill testified at trial, and as the merger documents reflect, Comu played a key role in the transaction.[565]  Comu was personally involved in drafting and revising the Green Auto Merger documents.[566]

193.    Dave Welch, an insider of TBG, Regus Advisors, and GETG, worked closely with Comu on the Green Auto project.[567]  As set forth *infra*, Welch took a substantial stake in TBG's equity in Green Auto through his company, First Market Services, Inc.[568]

194.    At the time of the Green Auto Merger, GANAS was a publicly reporting, but non-operating shell company that, according to Comu, could be publicly traded through broker-dealers registered with certain over-the-counter ("OTC") stock markets.[569]

---

[562]    JPTO Stip. Fact ¶ 25, ¶ 31; Trustee Ex. 83; Trustee Ex. 87.
[563]    JPTO Stip. Fact ¶ 25, ¶ 31; *see also* Trustee Ex. 19 at 26; Trustee Ex. 83; Trustee Ex. 87.
[564]    JPTO Stip. Fact ¶ 26, ¶ 29; *see also, e.g.*, KLM Ex. 150 at 4 (Green Auto SEC Form 10-K for the Fiscal Year ended December 31, 2012, summarizing corporate history, including Green Auto Merger).
[565]    *See also generally* Brown Exam.
[566]    KLM Ex. 234 at 1 (email from Comu stating, "we will be drafting for the closing docs"); *see also* KLM Ex. 236 (attaching draft documents); *see also* Trustee Ex. 62; KLM Ex. 251; KLM Ex. 292.
[567]    *See, e.g.*, KLM Ex. 237 at 1 (September 13, 2009 email from Comu to Welch attaching GANAS term sheet, and saying: "This is a draft of the Term Sheet for OUR deal. ....."); *see also* KLM Ex. 233 at 1; KLM Ex. 236 at 1.
[568]    *See infra* Section E(1)(a), E(5)(b).
[569]    JPTO Stip. Fact ¶ 27 ("At the time the Merger Agreement was entered into, GANAS was a shell corporation in that it conducted no business operations.").  Contrary to this stipulation, Comu verified in the Utah Action that GANAS "was an ongoing concern with meaningful operations" prior to the Green Auto Merger.  KLM Ex. 12 at 7.

195.    Defendants now stipulate that as of the "effective date" of the Green Auto Merger, TBG had the right to receive new stock certificates reflecting 95,420,116 shares of Green Auto stock,[570] which arose from the automatic conversion of TBG's GANAS Stock into 95,420,116 shares of Green Auto stock (the "Conversion Shares").[571]

196.    TBG also acquired, as of the effective date, a substantial pre-petition interest in future and additional issuances of Green Auto stock pursuant to TBG's "anti-dilution" clause in Section 1.12 of the Merger Agreement,[572] which ensured TBG would retain – with no further consideration – a 40% equity stake in Green Auto for two years after the Green Auto Merger.[573] This was a valuable interest negotiated by Comu through B&G before the merger.[574]

---

[570]    JPTO Stip. Fact ¶ 34 ("As of the effective date of the Green Auto Merger, TBG had the right to receive new stock certificates reflecting 95,420,116 shares of Green Automotive stock"); Section 3.04 of the Merger Agreement acknowledged that 95,746,817 shares of GANAS common stock were outstanding at the time of the merger (95,420,116 of which had been acquired by TBG on October 26, 2009 from GANAS shareholders as described above). JPTO Stip. Fact ¶ 28; Trustee Ex. 19 at 14.

[571]    Pursuant to Section 1.01 and Section 1.11 of the Merger Agreement, at the "Effective Time" of the merger Go Green was merged with and into GANAS, and GANAS became the "Surviving Corporation," meaning that GANAS's "existence, and all its purposes, powers, and objectives will continue unaffected and unimpaired by the Merger." JPTO Stip. Fact ¶ 26, ¶ 29; Trustee Ex. 19 at 1. But "[t]he name of the Surviving Corporation from and after the Effective Time shall be 'Green Automotive Company Corporation.'" JPTO Stip. Fact ¶ 26, ¶ 29; Trustee Ex. 19 at 3.

[572]    Trustee Ex. 19 at 3–4.

[573]    JPTO Stip. Fact ¶ 30; see also Trustee Ex. 19 at § 1.12.

[574]    McNeill sent an email to Comu on October 15, 2009 discussing "a strategic way to minimize The Barclay Group's risk and maximize the value of its 40% in Go Green post-merger," and outlining TBG's post-merger interests:

> At closing of the merger, The Barclay Group, Inc. will own the 95,746,817 shares currently outstanding. The shares to be issued to Go Green's members in exchange for their Go Green membership interests will be shares newly issued by GANAS, not shares transferred from Barclay. Accordingly, if the 95,746,817 shares held by Barclay will represent 40% post-merger, then the Go Green members must receive 143,620,225 newly issued shares, for a total of 239,367,042 shares issued and outstanding post-merger.

KLM Ex. 251 at 1.

197.    By virtue of the anti-dilution clause or in relation to certain loans, TBG received another 36,000,000 Green Auto shares in 2010 (the "Dilution Shares"),[575] which were in addition to TBG's 95,420,116 Conversion Shares acquired before the Petition Date.

198.    Thus, based on facts Comu now stipulates (but which he previously concealed or denied), between 2009 and 2010, TBG received or had a right to receive 131,420,116 Green Auto shares (the "Green Auto Stock") stemming from pre-petition interest in the Green Auto Merger.

199.    Comu did not disclose his or TBG's pre-petition interests in the Green Auto Stock in his Bankruptcy Filings or at the Creditors Meeting.[576]

200.    Although Defendants now stipulate that the Green Auto Merger was effective on November 5, 2009,[577] Comu has maintained for the last four years that he did not disclose the Green Auto Stock because the Green Auto Merger was not effective until January, 2010 (after the Petition Date), when Comu received the physical Green Auto Stock certificates.  Comu took this position in Debtor's Answer,[578] at his 2011 deposition,[579] in Defendants' Pretrial Brief,[580] and (contradicting the JPTO) testified at trial that the transaction was not complete until after the Petition Date because he did not yet have new physical Green Auto stock certificates.

201.    Comu's position exhibits a willful intent to conceal the Green Auto Stock from creditors.   Documents produced in the 2013 Electronic Production confirm that Comu

---

[575]    JPTO Stip. Fact ¶ 49 (13,000,000 shares); ¶ 50 (2,000,000 shares); ¶ 51 (10,000,000 shares); ¶ 52 (11,000,000 shares); *see also infra* Section E(2)(a).

[576]    Bench Finding No. 11–12; *see also generally* Trustee Ex. 94; Trustee Ex. 95; Def. Ex. 4.

[577]    JPTO Stip. Fact ¶ 33.

[578]    Debtor's Answer ¶ 9.

[579]    Trustee Ex. 96 at 2–3 (in response to Trustee counsel's question regarding why GANAS was not listed in his Schedules, Comu testified: "There was a transaction in progress.  We didn't know if it was going to close or not."); *id.* at 3 (claiming that the Green Auto Merger closed on the "date of the certificate" – or January 13, 2010).

[580]    Def. Pretrial Br. at 4 (admitting that "[i]t is true that Comu knew or should have known that TBG was going to receive stock in Green Auto soon after the [Petition Date]," but arguing there was "nothing [Comu] could have done to speed up the issuance of the [Green Auto] stock, and a mere expectation that he was going to receive stock does not make that stock property of the estate.").

undeniably knew before the Petition Date that the Green Auto Merger was effective in November of 2009, and that he benefitted from that fact before the Petition Date.

202. *First*, Comu was required to disclose in his Schedules all "[e]quitable or future interests."[581] Comu admits that he "knew or should have known that TBG was going to receive stock in Green Auto soon after the" Petition Date.[582] Thus even if Comu had a "mere expectation,"[583] he was required to disclose it, and he has offered no reasonable explanation for failing to do so.

203. *Second*, by the Merger Agreement's terms, the Green Auto Merger was effective on November 5, 2009,[584] which is confirmed by Green Auto's SEC filings.[585] Comu received an email from McNeill, TBG's lawyer, on November 10, 2009, confirming this fact: "We have received confirmation that the merger certificates have been accepted by both Delaware and Nevada, with an effective date for the merger of November 5, 2009."[586]

204. *Third*, Comu began publicizing the merger's closing, and soliciting buyers for the Green Auto Stock, as early as November 4, 2009.[587] In a November 18, 2009 email, Comu wrote that TBG was "pleased to announce the completion" of the merger, and offered to forward

---

[581]    Trustee Ex. 94 at 5 §19.
[582]    Def. Pretrial Br. at 4; *see also generally* Section E(2).
[583]    Def. Pretrial Br. at 4.
[584]    By the Merger Agreement' plain terms, the Green Auto Merger became effective "at the date and time the Merger Certificates are filed with the latter of the respective offices of the Secretary of State of the State of Delaware and the Secretary of State of the State of Nevada (the '**Effective Time**')." Trustee Ex. 19 § 1.02 (emphasis in original). On November 4, 2009, the Certificate of Merger for GANAS and Go Green was filed with the Delaware Secretary of State. JPTO Stip. Fact ¶ 32; Trustee Ex. 89. On November 5, 2009 a certified copy of the Articles of Merger between GO Green and GANAS was filed with the Nevada Secretary of State. JPTO Stip. Fact ¶ 32; Trustee Ex. 88. Comu executed both documents on behalf of GANAS. JPTO Stip. Fact ¶ 32; Trustee Ex. 88 at 8; Trustee Ex. 89 at 2. By virtue of these filings the "Effective Date" of the Green Auto Merger was November 5, 2009. *See* JPTO Stip. Fact ¶ 33; *see also* KLM Ex. 255 at 1.
[585]    *See, e.g.*, KLM Ex. 150 at 4.
[586]    KLM Ex. 255 at 1 (attaching accepted corporate filings).
[587]    Comu wrote in a November 4, 2009 email: "[F]or the record. The Barclay Group Inc. owns 99.63% of the Public Shell that owns 100% of Go Green Auto [GANAS Corp.] and has an exclusive one year Investment Advisory Agreement." KLM Ex. 253 at 2.

a Green Auto PPM upon request.[588]  The Green Auto PPM that Comu forwarded to investors

identified TBG as a "Principal Stock Holder" that owned 96,227,725 shares.[589]  Comu continued

to pursue investors through the Petition Date, as evidenced by Comu emails produced in the

2013 Electronic Production, many of which refer to the merger's November effective date.[590]

These communications with potential investors would violate the SEC Injunction if the Green

Auto Merger was not yet effective, as Comu claimed in this Adversary.

205.    *Fourth*, TBG arranged to transfer millions of shares to affiliates, and received at

least $155,000 from the sale of Green Auto Stock to private buyers before the Petition Date.[591]

These buyers and transferees all received Green Auto certificates from Green Auto's designated

stock transfer agent, Olde Monmouth Stock Transfer ("OMST")[592] on January 13, 2010,[593]

which certificates were issued according to Comu's instructions.[594]

206.    Comu's trial stipulation that the Green Auto Merger was effective before the

Petition Date does not mitigate his fraud – it adds insult to injury.  Had Comu disclosed his

interests in Green Auto in his Bankruptcy Filings based on the facts he now stipulates, the Green

Auto Stock could have been made available to satisfy claims without the necessity of this

Adversary.  Instead, as described below, Defendants used the time between the Petition Date and

---

[588]      KLM Ex. 171 at 1–2.

[589]      KLM Ex. 300 at 56609_31.  A January 1, 2010 Green Auto summary also identified TBG as a major "stakeholder," and listing TBG is listed as Green Auto's investor contact.  KLM Ex. 356 at 52360, 52360_6.  Notably, a draft PPM for Green Auto forwarded to Comu on November 8, 2009, identified "C.J. Comu" as a "Principal Stock Holder."  KLM Ex. 254 at 1; *id.* at 36697_17–18.

[590]      KLM Ex. 300 at 1 (December 4, 2009 email: "60 days ago, we started and completed a Reverse Merger of the First major 100% Electric Company to go public in the USA."); KLM Ex. 309 at 1 (December 29, 2009 email: "[I'm] back in corporate finance and just recently listed another company Green Automotive Company (Symbol: GNAS) in November with three more in new year"); *see also* KLM Ex. 172 at 1 (December 13, 2009 email: "Check out my latest gig….  Lots in motion for new year – let's go make a whole lotta dough!!!!").

[591]      *See infra* Section E(1), E(3)(a).

[592]      JPTO Stip. Fact ¶ 46.

[593]      KLM Ex. 49 at 1 (identifying recipients of first Green Auto stock issue).

[594]      *See* KLM Ex. 313 at 3–8.

---

**PLAINTIFFS' & TRUSTEE'S BRIEF IN SUPPORT**                                                    **PAGE 82 OF 151**
**OF JOINT PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW**

002306

trial to transfer and sell the Green Auto Stock, in a deliberate attempt to place them out of creditors' reach. This conduct reflects Comu's willful intent to defraud his creditors.

### 3. Thirty Cents Per Share – the Verified "Comu Value"

207. At Comu's direction, starting before the Petition Date and continuing until at least December of 2013, Comu has been selling Green Auto Stock for between $0.10 and $0.50 per share.[595]

208. In a 2013 lawsuit filed by Green Auto against TBG in Utah (the "Utah Action"),[596] Comu submitted an affidavit dated March 25, 2013, verifying that Green Auto shares held by TBG was valued at $0.30 per share (the "Comu Value"), and specifically valued 1,000,000 restricted shares held by TBG at $300,000.[597]

209. Based on the Comu Value, TBG's Green Auto Stock (131,420,116 shares) was worth approximately $39,426,232, and at $0.10 per share, TBG's Green Auto Stock was worth approximately $13,142,011.

---

[595]  KLM Ex. 201 at 1 (June 30, 2010 Comu email informing nominee company that TBG's Green Auto stock shares "are currently quoted @ .50/sh"); *see also* KLM Ex. 52 (TBG: $0.20 to $0.50 per share); Trustee Ex. 47 (DAPTCO Trust: $0.20 per share); Trustee Ex. 50 (TKY Trust: $0.20 to $0.50 per share); *see also infra* Section E(3) (TBG's direct and indirect sales of Green Auto Stock for $0.10 - $0.50 per share).

[596]  *See generally* KLM Ex. 12; KLM Ex. 13. *Green Automotive Company v. The Barclay Group, Inc.*, Case No. 130902103, in the Third Judicial District Court for Salt Lake County, Utah. In the Utah Action, Green Auto sought a preliminary injunction prohibiting TBG from transferring the Utah Shares, which TBG received by virtue of the Green Auto Merger except under certain terms in compliance with SEC rules. KLM Ex. 13 at 2. The Utah Court issued a Temporary Restraining Order on March 22, 2013 prohibiting TBG from transferring the Utah Shares, KLM Ex. 13 at 2–3, and granted Green Auto's request for a preliminary injunction on May 6, 2013 (the "Utah Injunction"), KLM Ex. 13 at 5. Based on evidence that TBG's trading of the Utah Shares jeopardized Green Auto's ability to obtain financing and threatened to devalue its stock, KLM Ex. 13 at 3–4, the Utah court concluded that the Utah Shares "were restricted, and should have had a restrictive legend, but did not." KLM Ex. 13 at 4. Comu verified under oath the statements of fact set forth in TBG's opposition to Green Auto's request for a TRO. KLM Ex. 12 at 14.

[597]  KLM Ex. 12 at 10, 14.

E.    COMU'S FRAUDULENT CONCEALMENT AND DISSIPATION OF ESTATE ASSETS

1.    Pre-Petition Division and Concealment of Green Auto Stock

210.    Beginning before the Petition Date, Comu deployed an elaborate scheme to dissipate TBG's Green Auto Stock – and collect millions of dollars in cash proceeds – that should have been available to his creditors.  Comu perpetrated this fraud through an international network of affiliates and accounts controlled by Comu or Comu insiders.

(a)    The Green Auto MOU

211.    Comu began preparations to dissipate and conceal TBG's Green Auto Stock before the Green Auto Merger was consummated.[598]

212.    On November 24, 2009, Comu executed on behalf of TBG a *Memorandum of Understanding* (the "Green Auto MOU"),[599] between First Market Services, Inc., a Texas corporation ("FMS"), and Maybourne Ltd ("Maybourne"), an offshore entity.[600]

213.    Dave Welch, an insider of TBG, GETG and Regus Advisors,[601] executed the Green Auto MOU on behalf of FMS,[602] which has offices at 11700 Preston Road in Dallas (the "11700 Preston Road Address"),[603] and is (or was at the time) actively involved with GETG and

---

[598]    *See, e.g.*, KLM Ex. 352 at 1–2 (November 1, 2010 email from Comu to B&G seeking assistance with establishing an escrow account for Green Auto stock).

[599]    Trustee Ex. 73.

[600]    Maybourne has addresses in Portola, BVI (*see, e.g.*, KLM Ex. 117 at 106), and Port-Louis, Mauritius (*see, e.g.*, KLM Ex. 156 at 4).  Gary Zinn ("Zinn") executed the Green Auto MOU for Maybourne (Trustee Ex. 73), and attorney Robert Kasprzak ("Kasprzak") holds an interest in the Green Auto MOU via Maybourne (*see, e.g.*, KLM Ex. 352 at 1–2).

[601]    *See supra* Section B(3), C(4).

[602]    Trustee Ex. 73.

[603]    KLM Ex. 117 at 51.

TBG business.[604] Comu and Welch worked closely together to complete the Green Auto Merger in 2009,[605] and sell TBG's Green Auto Stock after the Petition Date.[606]

214. Per the Green Auto MOU, the parties intended to divide TBG's Conversion Shares equally (31,790,027 shares each), and place the shares into a new entity for their "equal benefit and equal ownership,"[607] effectively shifting two-thirds of TBG's Conversion Shares to other entities before the Petition Date without depriving TBG of its valuable interest in the stock.

### (b)  Green Car Automotive International – BVI

215. To effectuate the Green Auto MOU, Comu asked B&G for assistance forming a "facilitator" entity for "privacy," and to hold the parties' respective "equity holdings" pending sale.[608] In December of 2009, B&G drafted a partnership agreement documenting TBG's "joint venture" with Maybourne and FMS,[609] which proposed TBG as controlling partner of the joint venture's holdings.[610]

---

[604]     KLM Ex. 104 at 1 (GETG); KLM Ex. 265 at 1 (January 28, 2010 email from Comu regarding TBG's work on the T3 Networks project noting that "ALL INVESTOR calls are managed by" FMS, and directing "all potential investors" to an FMS email);

[605]     As noted *supra*, correspondence between Comu and Welch in September of 2009 refers to the Green Auto Merger as "OUR deal." KLM Ex. 237 at 1.

[606]     *See, e.g.*, KLM Ex. 101 at 1 (March 16, 2010 email from Comu to Welch discussing Green Auto sales proceeds, stating: "TBG books and bank acct open 4U anytime.").

[607]     Trustee Ex. 73.

[608]     KLM Ex. 98 at 1–2 (November 30, 2009 email from Comu to McNeill requesting assistance forming a new entity in which to pace the respective "equity holdings," of TBG, FMS and Maybourne, which Comu wanted to "operate similar to a LLC where the members would have their respective ownership and limited liability.  We want to place our equity holdings *into one facilitator for privacy, protection and control*.") (emphasis added).

[609]     KLM Ex. 305 at 1 (with joint venture agreement attached, drafted for Comu, Welch and Zinn signatures).

[610]     The draft partnership agreement proposed the formation of a Texas partnership called "Green Holdings Joint Venture," with a principal place of business at TBG's 18208 Preston Road Address, in which TBG would serve as "Managing Partner" with the "exclusive authority, duty, and responsibility to manage, supervise, operate, and control the business, affairs, and property of the Partnership," including the right to "control and manage the Partnership's assets."  KLM Ex. 305 at 57093_1–3.

216. Shortly before or after the Petition Date, "Green Car Automotive International Limited," a BVI corporation ("Green Car"), was formed for the purpose of carrying out the Green Auto MOU.[611]

217. Newhaven Nominees Limited ("Newhaven"),[612] a London-based firm that provides corporate fiduciary services,[613] was appointed as nominee[614] to serve as Green Car's sole officer and director, and to serve as escrow agent, which concealed the parties' beneficial ownership of the stock held by Green Car.[615]

218. As discussed further *infra*,[616] after the Petition Date, Comu also used corporate nominees to conceal TBG's share of the "Green Car business"[617]under the Green Auto MOU, as well as to conceal assets held in other entities that Comu controls individually.[618]

---

[611] KLM Ex. 362 at 21082 _1–9 (SPA and escrow agreement, both dated February 12, 2010, by which Maybourne transferred to Green Car 20 million Green Auto shares received from TBG by virtue of the Green Auto MOU, and through which Green Car facilitated the sale of Maybourne's Green Auto stock). Other than the November 24, 2009 Green Auto MOU, Comu did not produce any final agreement or corporate documents reflecting TBG's joint venture with Maybourne and FMS, but documents obtained in the 2013 Electronic Production, which are addressed herein, indicate the parties created Green Car and used it to house and sell Green Auto stock.

[612] Newhaven Group *a/k/a* Newhaven Registrars Limited ("Newhaven Group"), is a foreign corporate services firm based in London, UK that operates through various offshore affiliates and subsidiaries, including British Virgin Islands ("BVI") entities Newhaven Nominees Ltd. ("Newhaven Limited"), Newhaven Corporate Services (B.V.I.) Limited ("Newhaven Corporate"), and Newhaven Registrars Ltd – BVI ("Newhaven Registrars"). *See, e.g.*, KLM Ex. 362 at 21080; *see also generally* Newhaven websites referenced in Comu's correspondence: http://www.newhavengroup.net/ (Newhaven Group); http://www.newhavenlimited.net/ (Newhaven Limited); www.Newhavenbvi.com (Newhaven's BVI entities). The various Newhaven entities are referred to herein jointly as "Newhaven."

[613] Newhaven provides a variety of corporate fiduciary services, including "nominee" shareholders and directors, and the establishment of escrow bank accounts held in the nominee's name for the benefit of the entity's principals, which effectively conceals the true beneficial owner's identity in corporate documents. *See, e.g.*, KLM Ex. 177 at 1 (bank account); KLM Ex. 275 at 1 (nominee services); *see also generally* http://www.newhavenbvi.net/services/directorsshareholders/;

[614] Comu testified at trial that, through TBG or Regus, he provides such nominee services to clients. But when he set up the Regus Advisors website in July of 2010, Comu instructed Peter Knight to remove "nominee services" from both TBG's and Regus Advisor's website because he was "concerned there is too much mention of securites etc .... [sic]." KLM Ex. 227 at 1.

[615] KLM Ex. 362 at 21082_4, 9 (Newhaven executing SPA and escrow agreement as "Director," "President," and "Escrow Agent" for Green Car).

[616] *See infra* Section E(5)–(6).

[617] KLM Ex. 195 (June 28, 2010 email from Newhaven: "Please find below the details of the nominee company to be used for the purposes of WP''s Green Car business.").

## 2.    Defendants' Green Auto Shares

219.    TBG's Green Auto Stock transfers are traceable through stock transfer ledgers produced by Green Auto's registered transfer agents,[619] OMST and Action Stock Transfer[620] ("AST").[621]  Matt Troster from OMST testified via deposition regarding OMST's role as transfer agent for Green Auto stock.[622]

220.    In accordance with Comu's instructions in a letter dated January 5, 2010 (shortly after the Petition Date, but before Comu filed his Bankruptcy Filings) (the "January 5 Instruction Letter"),[623] OMST cancelled TBG's GANAS Certificates (reflecting 91,920,116 GANAS shares), and issued 91,920,116 new Green Auto stock certificates to various recipients (including the private buyers above) on January 13, 2010.[624]

---

[618]    KLM Ex. 195 (June 28, 2010 Newhaven email to Comu relating the "details of the nominee company to be used for" TBG's transfer of Green Auto stock through WPA, *i.e.*, "WPA's Green Car business."); *see also* KLM Ex. 176 at 1 (Westgate – BVI); KLM Ex. 272 (CPI – BVI, and WPA – BVI); KLM Ex. 206 at 13542 (WPA and CPI).  Comu's primary Newhaven contacts were Reuben Anstock, Fergus Anstock, and Charlotte Jacob.  *See, e.g.*, KLM Ex. 175; KLM Ex. 176 at 1.

[619]    Generally speaking, a transfer agent is an entity that is retained by a corporation to maintain records of investors and account balances and transactions, to cancel and issue certificates, to process investor mailings and to deal with any associated problems (i.e., lost or stolen certificates).  *See generally, e.g.*, William Campbell Ries, *Corporate Trust Services – Agency Roles*, *in* 1 REG. OF INVEST. MGMT. & FIDUCIARY SERV. § 12:17 ("Transfer Agent") ("The transfer agent is responsible for the transfer of registered securities from one holder to another…. [T]he transfer agent records changes in ownership by cancelling old certificates and issuing new ones and records the information in its shareholder files."). Transfer agents are required to register with the Securities and Exchange Commission ("SEC"), and they are subject to certain SEC recordkeeping rules.  *See generally, e.g.*, Jerry W. Markham & Thomas Lee Hazen, *Clearing and Settlement – Transfer Agents*, *in* 23A BROKER-DEALER OPERATIONS SEC. & COMM. LAW § 13:12; *see also* Troster Exam 69:16 – 71:21.

[620]    AST replaced OMST as Green Auto's transfer agent at the end of 2011.  *See, e.g.*, KLM Ex. 161 at 1 (AST began handling stock transfers for Green Auto on November 29, 2011); Troster Exam 64:16 – 19, 117:11 - 18.

[621]    *See* KLM Ex. 49 (OMST Green Auto 2010 stock transfer ledger); KLM Ex. 51 (OMST 2011 Green Auto transfer ledger); KLM Ex. 117 (OMST list of active Green Auto shareholders as of October 3, 2011); KLM Ex. 160 (AST report reflecting active shares for certain Defendants as of February 18, 2014); KLM Ex. 161 (AST Green Auto stock transfer ledger for November 29, 2011 through February 17, 2014).

[622]    *See generally* Trustee Ex. 42 (Transcript of Trustee's 2004 Exam of Matthew Troster, dated March 6, 2013) (herein, "Troster Exam").

[623]    KLM Ex. 313 at 3–8; *see also* JPTO Stip. Fact ¶ 47.

[624]    KLM Ex. 313 at 3–8; KLM Ex. 49 at 1; *see also* JPTO Stip. Fact ¶ 47.

### (a)     The TBG Shares (54,390,099 Received – 1,804,439 Turned Over)

221.   In 2010, TBG received new stock certificates from OMST reflecting a total of 54,390,099 Green Auto shares (the "TBG Shares").[625]   At the Comu Value, the TBG Shares were worth approximately $16,317,029, and at $0.10 per share, they were worth approximately $5,439,009.

222.   Pursuant to Comu's January 5 Instruction Letter,[626] OMST sent new Green Auto stock certificates to TBG reflecting 2,000,000 free trading shares and 12,890,099 restricted shares,[627] which reflects a portion of the GANAS Certificates (91,920,116 shares) that TBG acquired on October 26, 2009.[628]

223.   On March 9, 2010, TBG received a single certificate reflecting the conversion of the 3,500,000 R&A Shares that TBG acquired on October 26, 2009.[629]

224.   Over the remainder of 2010, TBG received an additional 25,000,000 Dilution Shares, which include: 13,000,000 shares on March 25;[630] 2,000,000 shares on July 31;[631] 10,000,000 shares on August 13.[632]

225.   TBG received an additional 11,000,000 shares on December 30, 2011.[633]   This stock was issued as part of a recapitalization transaction in which TBG agreed to forgive

---

[625]     This reflects 18,380,099 out of the Conversion Shares (14,890,099 from the GANAS Certificates plus the 3,500,000 R&A Shares), and an additional 36,000,000 Dilution Shares.

[626]     KLM Ex. 313 at 4, 8.

[627]     KLM Ex. 49 at 1.  These 14,890,099 shares were reflected in Certificate No. 1080 (2,000,000 free trading shares), Certificate No. 1081 (10,000,000 restricted shares), and Certificate No. 1082 (2,890,066 restricted shares).

[628]     JPTO Stip. Fact ¶ 47; KLM Ex. 49 at 1.  As set forth *infra* in Section E(3)–(5), Comu caused TBG to transfer the remaining 77,030,017 shares from the GANAS Certificates to various non-party affiliates, including Sunset Pacific, TKY Trust, DAPTCO Trust, FMS, Maybourne, and others.

[629]     JPTO Stip. Fact ¶ 48; KLM Ex. 49 at 3 (Certificate No. 1130).

[630]     JPTO Stip. Fact ¶ 49; KLM Ex. 49 at 4.  The 13 million shares received on March 25, 2010 were reflected in Certificate No. 1157 (2 million shares), Certificate No. 1158, (2 million shares), Certificate No. 1159 (3 million shares), Certificate No. 1160 (2 million shares), Certificate No. 1161, and (2 million shares), Certificate No. 1162 (2 million shares).

[631]     JPTO Stip. Fact ¶ 50; KLM Ex. 49 at 11 (Certificate No. 2504).

[632]     JPTO Stip. Fact ¶ 51; KLM Ex. 49 at 12 (Certificate No. 2531).

$125,000 in loans[633] made by TBG to Green Auto (which were not disclosed in the Bankruptcy Case) in return for additional stock (the "TBG Loan Recap").[635]

226.    As of February 18, 2014, TBG held 3,804,538 Green Auto shares, out of which 1,804,439 shares were turned over to Trustee after trial.[636]

227.    The remaining 77,030,017 shares from the Green Auto Stock have been sold for cash or transferred to Comu affiliates.[637]

### (b)    The Utah Shares (1,000,000 Shares Outstanding)

228.    According to Green Auto's SEC filings, TBG intended to reissue 1 million Green Auto shares related to the Utah Action under the name Cede & Co.,[638] which are reflected in Certificate No. 2553 and Certificate No. 2544 (the "Utah Shares").[639]

229.    The Utah Shares were apparently transferred by TBG to Westor Capital Group, Inc. ("Westor") on or about January 1, 2013, when TBG opened a brokerage account with Westor and deposited with Westor 1,000,000 Green Auto shares.[640] After the account was opened, Westor sold 8,100 Green Auto shares on behalf of TBG.[641]

---

[633]    JPTO Stip. Fact ¶ 52; KLM Ex. 49 at 51 (Certificate No. 3431).
[634]    KLM Ex. 139 at 12 (summarizing TBG loans to Green Auto).
[635]    KLM Ex. 273 (August 25, 2010 Comu email by Comu referencing $125,000 loan to Green Auto); see also KLM Ex. 116 at 22 (describing conversion of TBG debt to new shares).
[636]    JPTO Stip. Fact ¶ 55; Inj. Status Report at 11 (items #1, #5–#9).
[637]    See infra Section E(1)(c)–(e) & E(3)–(5).
[638]    KLM Ex. 150 at F-26.
[639]    KLM Ex. 13 at 3.
[640]    JPTO Stip. Fact ¶ 66.
[641]    JPTO Stip. Fact ¶ 66.

230. On or about April 16, 2013, the Securities Investor Protection Corporation ("SIPC") commenced an action under the Securities Investor Protection Act ("SIPA") in the United States District Court for the Southern District of New York (the "Westor Action").[642]

231. On April 16, 2013, the District Court entered a liquidation order pursuant to the provisions of SIPA.[643] The District Court then transferred the action to the United States Bankruptcy Court for the Southern District of New York,[644] where the Westor Action is pending as an adversary proceeding (the "Westor Adversary").[645]

232. On May 17, 2013, Comu caused to be filed on behalf of TBG a claim form in the Westor Adversary in which Comu asserted on behalf of TBG a claim in the amount of $37,993.84, and a claim for the 991,900 shares of Green Automotive stock that was transferred to Westor for sale,[646] which reflects the remaining balance of the 1,000,000 Utah Shares.

233. According to an interim report filed by the trustee in the Westor Adversary on February 12, 2014, the Westor trustee has received 139 customer claims, and "issued 84 determination letters allowing 74 claims, and denying 10 claims," and the trustee "continues to analyze and investigate the remaining claims."[647]

---

[642]     JPTO Stip. Fact ¶ 67. The Westor Action is styled *Securities Investor Protection Corp. v. Westor Capital Group, Inc.*, Case No. 1:13-cv-02531-HB, in the U.S. District Court for the Southern District of New York. The Court may take judicial notice of the docket sheet and pleadings filed in the Westor Action, which are available on Pacer. *See* FED. R. EVID. 201.

[643]     JPTO Stip. Fact ¶ 68; *see also* Westor Action, Doc. No. 4. The Court in the Westor Action appointed a trustee for the liquidation of Westor's business.

[644]     JPTO Stip. Fact ¶ 68.

[645]     The Westor Adversary is styled *Securities Investor Protection Corp. v. Westor Capital Group, Inc.*, Adversary No. 13-01331-cgm, pending in *In re The Bankruptcy Link*, Bankruptcy Case No, 95-88888, in the U.S. Bankruptcy Court for the Southern District of New York. The Court may take judicial notice of the docket sheet and pleadings filed in the Westor Adversary, which are available on Pacer. *See* FED. R. EVID. 201.

[646]     JPTO Stip. Fact ¶ 69; *see also* Inj. Status Report at 11 (item #11).

[647]     Westor Adversary, Doc. No. 30 at ¶ 6.

### (c)     The Comu Certificate (300,000 Shares Turned Over)

234.    Pursuant to Comu's January 5 Instruction Letter,[648] OMST transferred 300,000 restricted shares from TBG to Comu personally (the "Comu Certificate").[649]

235.    The Comu Certificate was not disclosed in any filing in the Bankruptcy Case until February 29, 2012, when Trustee filed an interim report disclosing that Comu had a "right to receive" the Comu Certificate, which would be included in the estate.[650]  The Comu Certificate was turned over to Trustee in 2010, apparently as part of the March 2010 Production.[651]

236.    Citing the March 2010 Production, Comu claims that Plaintiffs' revocation claim should be denied because he "promptly delivered" the Comu Certificate "to the Trustee, and Plaintiffs and their attorney physically reviewed the stock certificate before the deadline to object to [Comu's] discharge."[652]  Citing the Trustee's Notes, Comu argues

> that, on March 1, 2010, debtor Comu's attorney met with the Trustee to
> deliver documents which the Trustee had requested, and that on March 24,
> 2010 Plaintiffs' attorney met with the Trustee to review the documents
> produced by Comu, and that the attorney and the Trustee discussed
> pursuing fraud claims against Comu.[653]

237.    The Trustee's Notes reflect an entry stating, "Debtor atty to come meet with Diane and bring documents on Monday 3/8/10 at 3:00," but they do not specify what documents were produced as part of Comu's March 2010 Production.[654]  Trustee's Notes also reflect that on

---

[648]     KLM Ex. 313 at 4.
[649]     KLM Ex. 49 at 1.
[650]     Bankr. Doc. No. 37.
[651]     The Trustee Notes do not reflect whether or when the Comu Certificate was turned over to Trustee, although notes from January 17, 2012 indicate Trustee was considering whether to "sell certain stock issued to the Debtor which the Debtor wishes to purchase from the estate." Def. at 5 at 2.  Trustee testified – and Plaintiffs do not dispute – that the Comu Certificate was delivered to Trustee as part of the March 2010 Production.
[652]     Debtor's Answer ¶ 9.
[653]     Def. Pretrial Br. at 2–3 (relying on Def. Ex. 5 at 3).
[654]     Def. Ex. 5 at 3.

"3/24/10 – Emil Lippe, Jr. met with [Trustee] and reviewed documents produced by Debtor," but the notes do not specify what documents were reviewed by Prior Counsel.[655]

238.    Although Trustee confirmed receiving the Comu Certificate before the Discharge Date, Trustee testified that she relied on Comu's allegation that the shares were the product of a post-petition transaction and not part of the estate.[656] She further testified that Comu's misrepresentations and concealment of other material facts regarding the Green Auto Merger prevented her from appreciating Comu's true interests in the transaction before the Discharge Date. Trustee's counsel stated at trial that Trustee did not understand Comu's interest in the Green Auto Merger until after examining witnesses in 2012 and 2013, and after reviewing documents from the 2013 Electronic Production.

239.    There is no credible evidence that Comu produced any other documents before the Discharge Date pertaining to the Green Auto Merger other than the Comu Certificate.

240.    Katz testified at trial that he had no knowledge of the Comu Certificate or Comu's other interests and activities relating to the Green Auto Merger until after the Discharge Date, and Comu has not presented any credible evidence that any Plaintiff had any knowledge of Comu's interests in GANAS or Green Auto until after Discharge.

241.    Comu's production of the Comu Certificate to Trustee after the filing of his Schedules did not constitute "prompt" delivery, nor did it comply with the disclosure requirements in Comu's Bankruptcy Filings. Comu's deliberate concealment of his interests in GANAS and Green Auto prevented discovery of Comu's true interests until after the Discharge Date.

---

[655]    Def. Ex. 5 at 3.
[656]    *See supra* Section D.

242.    There is no basis for imputing knowledge of Comu's fraud to creditors based on his limited disclosure of information to Trustee, which was not disclosed in Comu's Bankruptcy Filings or at the Creditors Meeting.

243.    Based on the above, Plaintiffs did not have knowledge of Comu's fraud with regard to GANAS, the Green Auto Merger, or the Green Auto Stock before the Discharge Date.

### (d)    The Brown Shares (200,000 Shares Turned Over)

244.    Pursuant to Comu's January 5 Instruction Letter,[657] OMST transferred 200,000 restricted shares from TBG to Brown (the "Brown Shares").[658]  According to the Injunction Status Report, the Brown Shares have now been turned over to Trustee.[659]

### (e)    The Sunset Pacific Shares (2,500,000 Shares Turned Over)

245.    Pursuant to Comu's January 5 Instruction Letter,[660] OMST transferred 2,500,000 restricted shares from TBG to Sunset Pacific (the "Sunset Pacific Shares").[661]  Sunset Pacific exchanged the original certificate on November 8, 2011 for a new certificate, also reflecting 2.5 million shares.[662]

246.    Comu alleges the Sunset Pacific Shares were transferred pursuant to a Stock Purchase Agreement ("SPA") dated January 10, 2010, in return for a purchase price of $200,000 (the "Sunset Pacific SPA").[663]  In connection with the Sunset Pacific SPA, Phyllis executed a

---

[657]    KLM Ex. 313 at 5.
[658]    KLM Ex. 49 at 1.
[659]    Inj. Status Report at 11 (item #12).
[660]    KLM Ex. 313 at 5.  Comu instructed OMST to issue the Sunset Pacific Shares to Sunset Pacific at the 18208 Preston Road Address.  *Id.*
[661]    JPTO Stip. Fact ¶ 39; KLM Ex. 49 at 1 (Certificate No. 1091).
[662]    KLM Ex. 51 at 11; *see also* Trustee Ex. 5 (Certificate  No. 4909).
[663]    Trustee Ex. 6 at 1-2 (the "Sunset Pacific SPA"); *see also* JPTO Stip. Fact ¶ 36, ¶ 37, ¶ 39.

promissory note dated January 10, 2010, payable to TBG in the principal amount of $250,000 plus 6% interest (the "Sunset Pacific Note").[664]

247.    The Sunset Pacific Note provides that it is payable in quarterly installments of interest only, commencing on June 1, 2010 and continuing quarterly until maturity of the note on March 1, 2015, when all principal and interest is due and payable.[665]

248.    No payments have been made on the Sunset Pacific Note.[666]  Comu testified at trial that TBG wrote off the balance of the Sunset Pacific Note.

249.    According to the Injunction Status Report, the Sunset Pacific Shares have now been turned over to Trustee.[667]

### 3.    TBG's Direct Cash Proceeds ($3,736,826 – *At Least*)

250.    Between 2009 and 2010, TBG collected at least $3,736,826.60 for the sale of almost 20 million shares of Green Auto Stock held in TBG's name.

#### (a)    *TBG – Direct Cash Sales ($974,616.60 or More)*

251.    TBG began selling the TBG Shares directly to purchasers for cash in November of 2009 (the "Direct Cash Sales").  Pursuant to Comu's January 5 Instruction Letter, OMST transferred 960,000 restricted shares out of TBG's holdings directly to private buyers, in return

---

[664]    Trustee Ex. 6 at 3-4; *see also* JPTO Stip. Fact ¶ 39.
[665]    Trustee Ex. 6 at 3-4; *see also* JPTO Stip. Fact ¶ 40.
[666]    JPTO Stip. Fact ¶ 41.  This transaction does not appear on the 2010 – 2011 tax returns for either TBG (Trustee Ex. 18; KLM Ex. 38) or Sunset Pacific (Trustee Ex. 35–36).
[667]    Inj. Status Report at 11 (item #4).

for which TBG received at least $155,000 in November of 2009,[668] reflecting TBG was selling

the Green Auto Stock at an average of approximately $0.165 per share before the Petition Date.

252. Between February 16, 2010 and March 29, 2010, TBG sold for cash 1,890,066

out of the 2,890,066 restricted shares represented in Certificate No. 1082 received by TBG on

January 13, 2010.[669] TBG accounts reflect direct payments to TBG for these stock sales, some at

$0.25 to $0.50 per share.[670]

253. Between April 23, 2010 and August 13, 2010, Comu sold for cash 1,896,100 out

of 3,000,000 shares represented in Certificate No. 1159,[671] which TBG received on March 25,

---

[668]     KLM Ex. 313 at 6–7; KLM Ex. 49 at 1. TBG accounts reflect wire transfers from the following buyers before the Petition Date: Marcy Gilbert ($20,000), Ila Jean Bacon ($10,000), Kyle Gilbert ($40,000), Joe Renner ($10,000), Sharon Hyde ($25,000), and Howard Waterman ($50,000). *Compare* KLM Ex. 18 at 6 *and* KLM Ex. 96 at 1 (TBG bank records reflecting wire transfers received from buyers); *with* KLM Ex. 49 at 1 (issuing stock certificates to these buyers on January 13, 2010). Out of the 960,000 sold as part of this transaction, 30,000 shares (sold to Richard Green and Kay Miller) have not been traced.

[669]     KLM Ex. 49 at 2 (260,000 shares sold February 16, 2010); KLM Ex. 49 at 3 (1,115,000 shares sold March 9, 2010); KLM Ex. 49 at 4 (515,066 shares sold on March 29, 2010). The remaining balance of Certificate No. 1082 was transferred, on March 9, 2010, to affiliates Campus Investments (500,000 shares, *see infra* Section E(5)(g)), and to Richard Kadish, who controls Energy Farms, Inc. (500,000 shares). KLM Ex. 49 at 3.

[670]     *Compare* KLM Ex. 49 at 2 (20,000 shares transferred to Gerald Kelly) *with* KLM Ex. 96 at 1 ($5,000 received from Kelly, reflecting a $0.25 per share sales price); *compare* KLM Ex. 49 at 4 (25,000 shares to Qualis) *with* KLM Ex. 96 at 2 ($12,500 received from Qualis, reflecting a $0.50 per share sales price); *compare* KLM Ex. 49 at 4 (20,000 shares to Cross) *with* KLM Ex. 101 at 3 ($5,000 received, reflecting 0.25 per share price); *compare also* KLM Ex. 49 at 3 (reflecting TBG transfers to Hyde, Waterman, Hinkley, Rotante, and Cattach); *with* KLM Ex. 96 at 1–2 (reflecting TBG cash receipts from the same individuals).

[671]     The OMST stock transfer report indicates that Certificate No. 1159 was issued on March 25, 2010 for 2 million shares, and Certificate No. 1157 was issued for 3 million shares. KLM Ex. 49 at 4. This appears to transpose the two certificates, because when TBG started selling the shares on April 23, 2010, Certificate No. 1159 reflects 3 million shares (KM Ex. 49 at 5), and a subsequent transfer of Certificate No. 1157 reflects 2 million shares.

2010 as part of the Dilution Shares.[672] TBG accounts reflect direct payments to TBG for these stock sales at $0.10 to $0.50 per share.[673]

254. Between June 14, 2010 and October 27, 2010, Comu sold for cash 1,600,000 out of 2,000,000 shares represented in Certificate No. 1156, which TBG received on March 25, 2010 as part of the Dilution Shares.[674] TBG accounts reflect direct payments to TBG for these stock sales at $0.10 per share.[675]

255. Between June 28, 2010 and October 27, 2010, Comu sold for cash 400,000 out of 2,000,000 shares represented in Certificate No. 1155, which TBG received on March 25, 2010 as part of the Dilution Shares.[676] These shares were sold to some of the same purchasers who previously made wire transfers to TBG accounts for stock purchases.[677]

---

[672] KLM Ex. 49 at 5 (580,000 shares sold on April 23, 2010); KLM Ex. 49 at 6 (936,100 shares sold on May 5, 2010); KLM Ex. 49 at 12 (380,000 shares sold on August 13, 2010). The remaining balance of Certificate No. 1159 was transferred to affiliates or associates, including Richard Kadish on April 23, 2010 (1,000,000 shares) (KLM Ex. 49 at 5); Marc Bryant on April 23, 2010 (20,000 shares) (KLM Ex. 49 at 5); Leon Bryan on May 5, 2010 (63,900 shares) (KLM Ex. 49 at 6); and Ed Baxter on August 13, 2010 (20,000 shares).

[673] *Compare* KLM Ex. 49 at 5 (20,000 shares transferred to Doolittle) *with* KLM Ex. 96 at 2 ($2,500 received from Doolittle, reflecting a $0.125 per share sales price); *compare also* KLM Ex 49 at 12 (125,000 shares to Hicks, and 50,000 shares to Stumpfl) *with* KLM Ex. 96 at 2 ($25,000 received from Hicks and $4,975 from Stumpfl, reflecting a $0.10 to $0.20 per share sales price); *compare also* KLM Ex. 49 at 6 (25,000 shares to Cattach) *with* KLM Ex. 96 at 2 ($12,475 received from Cattach, reflecting approximately $0.50 per share sales price).

[674] KLM Ex. 49 at 7–8 (437,000 shares sold on June 14, 2010); KLM Ex. 49 at 25 (650,000 shares); KLM Ex. 49 at 30 (513,000 shares on October 27, 2010). The remaining balance of Certificate No. 1156 was transferred to affiliates or associates, including Campus Investments (400,000 shares, *see infra* Section E(5)(g)) (KLM Ex. 49 at 8).

[675] *Compare* KLM Ex. 49 at 8 (50,000 shares transferred to Denisco) *with* KLM Ex. 96 at 2 ($5,000 received from Doolittle, reflecting a $0.10 per share sales price); *compare* KLM Ex. 49 at 25 (200,000 shares to Dr. Andreas) *with* KLM Ex. 96 at 2 ($19,958 received from Dr. Andreas, reflecting approximately $0.10 per share sale price).

[676] KLM Ex. 49 at 8–9 (180,000 shares sold on June 28, 2010); KLM Ex. 49 at 30 (220,000 shares sold on October 27, 2010). The remaining balance of Certificate No. 1156 was transferred to affiliates or associates, including Campus Investments (100,000 shares, *see infra* Section E(5)(g)) (KLM Ex. 49 at 8); Robert Kasprzak (affiliated with Maybourne) (500,000 shares, *see infra* Section E(5)(a)) (KLM Ex. 49 at 8); and ERI (1 million shares, *see infra* Section E(5)(c)) (KLM Ex. 49 at 30).

[677] *Compare* KLM Ex. 49 at 8 (shares transferred to Bacon and Gilbert) *with* KLM Ex. 96 at 1 (reflecting wire transfers to TBG from same purchasers).

256.    Between September 2, 2010 and October 27, 2010, Comu sold for cash 3,000,000 out of 10,000,000 shares represented in Certificate No. 2531, which TBG received on August 13, 2010 as part of the Dilution Shares.[678]

257.    Based on the above, in 2009 and 2010, TBG sold at least 9,746,166 shares directly to purchasers out of the TBG Shares.[679]    The Comu Value of these shares was $2,923,849.80, and at $0.10 per share the value was $974,616.60.

### (b)    TBG – OMST Escrow Sales ($2,762,220)

258.    In mid-2011, TBG's Direct Cash Sales ceased, and TBG began selling the TBG Shares through OMST (the "OMST Escrow Sales").  In addition to serving as Green Auto's transfer agent, OMST was appointed to serve as escrow agent[680] for TBG by virtue of an escrow agreement drafted by TBG and dated June 16, 2011 (the TBG Escrow Agreement").[681]  Pursuant to the terms of the TBG Escrow Agreement, OMST maintained an escrow account for TBG to hold funds received from purchasers of at least 10 million restricted shares of Green Auto stock, and to hold in escrow the shares of stock to be transferred to the purchasers.[682]

259.    Shortly before the effective date of the TBG Escrow Agreement, TBG transferred 11 million shares to OMST as custodian for the purpose of making sales in connection with the escrow, and OMST began selling TBG's stock on June 2, 2011.[683]  According to an AST stock

---

[678]    KLM Ex. 49 at 21 (1,800,000 shares sold on September 2, 2010); KLM Ex. 49 at 30 (1,200,000 shares on October 27, 2010).  The remaining balance of Certificate No. 2531 was transferred to affiliates or associates, including Ed Baxter (2 million shares, *see infra* Section E(5)(h)) (KLM Ex. 49 at 21; and ERI (5 million shares, *see infra* Section E(5)(c)) (KLM Ex. 49 at 28).

[679]    Additional 2010 transactions indicate there may have been further direct TBG sales in 2010.  *See, e.g.*, KLM Ex. 49 at 12.

[680]    Generally speaking, an escrow agent is an entity that has fiduciary responsibilities in the transfer of property from one party to another.  The transfer agent's obligations are defined by operative escrow agreements and the instructions it receives from the client.

[681]    JPTO Stip. Fact ¶ 53; *see also* Trustee Ex. 43; Troster Exam 17:20 – 18:18.

[682]    JPTO Stip. Fact ¶ 54; *see also* Trustee Ex. 43 at 1; Troster Exam 15:14 – 16:11.

[683]    KLM Ex. 51 at 40–41.

transfer ledger, the last of the TBG shares in escrow by OMST were sold on January 5, 2012, leaving 4,529 shares held in TBG's name,[684] which have been turned over to Trustee.[685]

260.    Comu controlled and directed, personally or through Baxter and Parsley, OMST's transfer of TBG Shares and the distribution of cash from TBG's escrow account.[686]

261.    According to a ledger prepared by Comu for Trustee, between June of 2011 and January of 2012, TBG sold 9,998,091 of the TBG Shares through the OMST escrow account.[687]

262.    According to an escrow ledger prepared by OMST for the TBG escrow account, between June 20, 2011 and January 4, 2012, TBG collected $2,762,220 in cash proceeds from the sale of TBG Shares after the deduction of fees to OMST (the "TBG Escrow Funds").[688]

263.    Based on Comu's representation that 9,998,091 shares were sold through the OMST escrow account, the TBG Escrow Funds reflect an average sales price of approximately $0.276 per share.

264.    The TBG Escrow Funds only reflect sales effected through TBG's escrow account at OMST.  They do not include TBG's Direct Cash Sales discussed *supra* (which were effected before the TBG Escrow Agreement was entered into on June 16, 2011),[689] nor do they include cash received by TBG and other affiliates in return for Green Auto stock sold through affiliates.[690]

---

[684]    KLM Ex. 161 at 4.
[685]    Inj. Status Report at 11 (item #1).
[686]    *See, e.g.*, KLM Ex. 39; KLM Ex. 51 at 76; KLM Ex. 55 at 1–2; KLM Ex. 56 at 3; *see also* Troster Exam 19:8 – 22, 26:21 – 27:7, 34:12 – 22, 40:5 – 22, 41:20 – 42:19, 63:23 – 64:9, 91:2 – 3, 98:17 – 99:1.
[687]    JPTO Stip. Fact ¶ 57; KLM Ex. 336 at 1.
[688]    Trustee Ex. 44 at 10; *see also* JPTO Stip. Fact ¶ 56; KLM Ex. 52.
[689]    *See supra* Section E(3)(a).
[690]    *See infra* Section E(4)–(5).

**4.     Canadian Trust Proceeds ($1,271,953)**

265.    Comu used the Canadian Trusts, which are family business trusts,[691] for the purpose of concealing and liquidating assets of Comu's bankruptcy estate.

266.    Comu, not Cem Comu, controlled and directed, either personally or through Baxter and Parsley at TBG or Regus Advisors, the distribution of cash proceeds received by TKY Trust and DAPTCO Trust from the sale of Green Auto stock.[692]

267.    A number of instructions to OMST jointly addressed or combined cash distributions and stock transfers from the escrow accounts for TKY Trust, DAPTCO Trust and TBG.[693]   Troster was at least on one occasion confused about which escrow account (TBG, DAPTCO, or TKY) would be credited with cash from stock purchases, and sought clarification from Comu, who directed where the funds would be deposited.[694]

### (a)     The TKY Shares ($1,048,973)

268.    TKY Trust is a discretionary family business trust that was formally established on January 6, 2010,[695] after the Petition Date but before Comu filed his Bankruptcy Filings. Under the TKY Trust documents, Cem Comu is the Trustee and Comu is a beneficiary,[696] a fact Comu did not disclose in his Bankruptcy Filings or at the Creditors Meeting.

269.    In December, 2009, Comu retained Brian Rudy at Synergy Business Lawyers in Vancouver, Canada ("Synergy") for the purpose of establishing TKY Trust, selected the trust's

---

[691]     JPTO Stip. Fact ¶ 38.
[692]     *See, e.g.*, Trustee Ex. 53 at 1; Trustee Ex. 54; Trustee Ex. 58 at 4; Trustee Ex. 59 at 4;  KLM Ex. 45; KLM Ex. 55 at 2–3; KLM Ex. 56 at 3; KLM Ex. 57 at 1–2; KLM Ex. 69 at 4; KLM Ex. 73 at 4; KLM Ex. 74 at 1; *see also* Troster Exam 27:8 – 12, 28:4 – 10, 29:19 – 23, 44:22 – 45:18, 46:20 – 47:20, 49:5 – 50:4, 108:3 – 14, 108:23 – 109:10.
[693]     *See, e.g.*, Trustee Ex. 54; Trustee Ex. 57 at 1; Trustee Ex. 58 at 2; Trustee Ex. 59 at 1; Trustee Ex. 67 at 1; KLM Ex. 31 at 3; KLM Ex. 45; KLM Ex. 46 at 1–2; KLM Ex. 55 at 2–3; KLM Ex. 57; KLM Ex. 58; KLM Ex. 59; KLM Ex. 60 at 1; *see also* Troster Exam 54:10 – 56:23, 92:20 – 93:2, 93:14 – 94:16, 96:4 – 14; 97:16 – 98:3.
[694]     *See, e.g.*, KLM Ex. 61; *see also* Troster Exam 98:8 – 14.
[695]     Trustee Ex. 27 at 1; *see also* JPTO Stip. Fact ¶ 38.
[696]     Trustee Ex. 27 at 1–2; *see also* JPTO Stip. Fact ¶ 38.

name, directed Synergy regarding the details of TKY Trust's control and beneficiaries, and approved the final trust documents.[697]  Although Comu could have retained control over TKY Trust, he specifically instructed Synergy to prepare the TKY Trust documents to reflect it was controlled by Cem Comu as trustee.[698]

270.    Pursuant to Comu's January 5 Instruction Letter,[699] OMST transferred 5,000,000 restricted shares from TBG to TKY Trust (the "TKY Shares").[700]  The Comu Value of the TKY Shares was $1,500,000, and at $0.10 per share the TKY Shares were worth $500,000.

271.    Comu alleges that the TKY Shares were transferred pursuant to an SPA between TBG and TKY Trust, dated January 10, 2010 (the "TKY Trust SPA").[701]  The purchase price for the TKY Shares was to be paid through a promissory note dated January 10, 2010 in the original principal amount of $500,000 plus 2% interest (the "TKY Note").[702]  Like the Sunset Pacific Note, the TKY Note was payable in quarterly installments of interest only, commencing on June 1, 2010 and continuing quarterly until maturity of the note on March 1, 2015, when all principal and interest was due and payable.[703]

272.    TKY Trust made no payments on the TKY Note until January 5, 2012.[704] According to Comu, TBG received only $116,500 in payments toward the TKY Note.[705]  Comu

---

[697]     KLM Ex. 97 at 1 (letter from Synergy to Comu stating, "We confirm that we have been retained by you for the purpose of establishing the trust"); KLM Ex. 259 at 39845 (confirming Synergy's retention by Comu for the purposes of forming the trust); *see also* KLM Ex. 258; KLM Ex. 307 at 1; KLM Ex. 309.
[698]     KLM Ex. 258 at 1 ("In some cases we may have made you the beneficiary appointor but in this case you advise us that your brother should have full control over the trust.  Please advise us if this is incorrect."); KLM Ex. 307 at 2 ("I would like my Brother to be Trustee.").
[699]     KLM Ex. 313 at 5.
[700]     JPTO Stip. Fact ¶ 42; KLM Ex. 49 at 1 (Certificate No. 1092).
[701]     JPTO Stip. Fact ¶ 36, ¶ 37, ¶ 42; *see also* Trustee Ex. 7 at 1–2.
[702]     JPTO Stip. Fact ¶ 42, ¶ 43; Trustee Ex. 7 at 4–5.
[703]     JPTO Stip. Fact ¶ 43; Trustee Ex. 7 at 4–5.
[704]     KLM Ex. 336 at 2.

testified at trial that TBG wrote off the remaining balance of the TKY Note. Comu could have applied sufficient payments to the TKY Note to satisfy the obligations to TBG, but chose to disregard those obligations and distribute cash proceeds elsewhere.

273. OMST served as escrow agent for TKY Trust by virtue of an escrow agreement dated December 1, 2011 (the "TKY Escrow Agreement"), which stated TKY Trust's intent to sell the 5 million TKY Shares to third parties.[706] As escrow agent, OMST was charged with holding both cash and Green Auto stock certificates for TKY Trust.[707] Cem Comu executed documents on behalf of TKY Trust that authorized OMST to take action with regard to the TKY Shares in accordance with Comu's instructions.[708]

274. In Comu's instructions to OMST regarding stock certificates and distributions, TKY's address is identified as 1066 W. Hastings Street, Suite 2480, Vancouver, BC, V6E3X2, Canada.[709] This is the address for Bryan Rudy at Synergy – who Comu retained in 2009 to establish the TKY Trust.[710]

275. OMST received instructions from both TBG and Regus Advisors regarding how to distribute cash proceeds of TKY Trust's sales of Green Auto stock received from TBG, which included cash distributions to both TKY Trust and TBG.[711] Per Comu's instructions, some

---

[705]   JPTO Stip. Fact ¶ 59; KLM Ex. 336 at 2. Between 2011 and 2012, TBG received at least $106,500 in cash distributions from the TKY Trust escrow account. Trustee Ex. 40 at 1 ($10,000); KLM Ex. 46 at 1 ($1,000); Trustee Ex. 58 at 1 ($2,000); KLM Ex. 65 at 1 ($6,000); KLM Ex. 66 at 1 ($1,000); KLM Ex. 68 at 2 ($6,000); KLM Ex. 69 at 1 ($9,000); KLM Ex. 70 at 1 ($38,000); KLM Ex. 72 at 1 ($12,500); KLM Ex. 73 at 1 ($5,500); KLM Ex. 75 at 1 ($15,500).
[706]   Trustee Ex. 49 at 1.
[707]   Trustee Ex. 49 at 1–2.
[708]   KLM Ex. 47; KLM Ex. 48; Trustee Ex. 48 at 1.
[709]   *See, e.g.*, KLM Ex. 66 at 1; KLM Ex. 313 at 5.
[710]   *See also* KLM Ex. 313 at 5 (Green Auto shares for TKY Trust are issued "c/o Brian Rudy at TKY Trust.)
[711]   KLM Ex. 69 at 1, 4. Instructions for TKY Trust cash distributions from the week before and the week after came from TBG. KLM Ex. 68 at 1; KLM Ex. 70 at 1.

certificates for TKY Shares were returned to TKY Trust care of TBG at the 18208 Preston Road Address.[712]

276.    Comu arranged for the sale of at least 4,800,000 of the 5,000,000 TKY Shares obtained from TBG on January 13, 2010.[713]  According to an AST transfer ledger, the last sale of stock from the TKY Shares occurred on March 14, 2012, leaving 22,533 shares.[714]

277.    According to an escrow ledger prepared by OMST, TKY Trust received a least $1,048,972.95 in cash payments into its escrow account with OMST for Green Auto stock.[715] Based on these stipulated facts, the TKY Shares were sold at approximately $0.22 per share. Assuming $1,048,972.95 reflects the sale of the total dissipated TKY Shares (4,977,467), it would reflect a $0.21 per share sales price.

278.    Based on the above, Comu – not Cem – established TKY Trust with fraudulent intent, controlled the distribution of TKY Trust assets, and used TKY Trust as a vehicle for the purpose of fraudulently concealing and liquidating assets of the bankruptcty estate.

### (b)    The DAPTCO Shares ($222,980)

279.    DAPTCO Trust was formed by Comu's brother, Cem Comu, who is also the Trustee of the DAPTCO Trust.[716]

280.    Pursuant to Comu's January 5 Instruction Letter,[717] OMST transferred 2,000,000 restricted shares from TBG to DAPTCO Trust (the "DAPTCO Shares").[718]  The Comu Value of

---

[712]      KLM Ex. 157 at 11.
[713]      JPTO Stip. Fact ¶ 58; KLM Ex. 336 at 2.
[714]      KLM Ex. 161 at 9.
[715]      JPTO Stip. Fact ¶ 60; *see also* Trustee Ex. 50 at 6; KLM Ex. 54.  Between 2011 and 2012, TKY received at least $271,500 in cash distributions out of the TKY escrow account, with the remainder going to other recipients, including TBG.  Trustee Ex. 40 at 1 ($66,000); Trustee Ex. 58 at 1 ($16,000); KLM Ex. 46 at 1 ($5,000); KLM Ex. 65 at 1 ($70,000); KLM Ex. 66 at 1 ($4,000); KLM Ex. 68 at 2 ($35,000); KLM Ex. 69 at 1 ($25,000); KLM Ex. 70 at 1 ($10,000); KLM Ex. 72 at 1 ($16,000); KLM Ex. 73 at 1 ($5,000); KLM Ex. 75 at 1 ($10,000); KLM Ex. 78 at 1 ($9,500).
[716]      JPTO Stip. Fact ¶ 38.
[717]      KLM Ex. 313 at 5.

the DAPTCO Shares was $600,000, and at $0.10 per share the DAPTCO Shares were worth $200,000.

281.    On January 5, 2010, Comu offered to transfer a portion of TBG's Green Auto Stock to Cem Comu for no consideration.[719]  DAPTCO has a $0 cost basis in the DAPTCO Shares,[720] indicating DAPTCO Trust paid no consideration for the DAPTCO Shares.

282.    Comu alleges that the DAPTCO Shares were transferred pursuant to an SPA between TBG and DAPTCO Trust, dated January 10, 2010 (the "DAPTCO Trust SPA").[721]  The purchase price for the DAPTCO Shares was to be paid through a promissory note dated January 10, 2010 in the original principal amount of $200,000 plus 2% interest (the "DAPTCO Note").[722]  Like the Sunset Pacific Note and the TKY Note, the DAPTCO Note was payable in quarterly installments of interest only, commencing on June 1, 2010 and continuing quarterly until maturity of the note on March 1, 2015, when all principal and interest was due and payable.[723]

283.    DAPTCO Trust made no payments on the DAPCTO Note until March 22, 2012.[724]  According to Comu, TBG received only $30,185 in payments toward the DAPTCO Note.[725]  Comu testified at trial that TBG wrote off the remaining balance of the DAPTCO Note.

---

[718]    JPTO Stip. Fact ¶ 44; KLM Ex. 49 at 1 (Certificate No. 1093).
[719]    Comu contacted Cem Comu to inform him that he would "like to issue some stock to you and Aylin [Comu's sister] – would you rather I issue to the name of your Trust?  If so - can you send that to me ASAP – I am sending out notice to transfer agent.  I will need name of Trust, Address and any Tax ID # they may have issued you."  KLM Ex. 261 at 1.  Cem responded: "You can issue it to me personally or 'Daptco Trust.'"  *Id.*
[720]    KLM Ex. 158 at 4.
[721]    JPTO Stip. Fact ¶ 36, ¶ 37; *see also* Trustee Ex. 8 at 1–2.
[722]    JPTO Stip. Fact ¶ 44; Trustee Ex. 8 at 4–5.
[723]    JPTO Stip. Fact ¶ 44, ¶ 45; Trustee Ex. 8 at 4–5.
[724]    KLM Ex. 336 at 2.
[725]    JPTO Stip. Fact ¶ 62; KLM Ex. 336 at 2.  Between 2011 and 2012, TBG received at least $30,185 in cash distributions from the DAPTCO Trust escrow account.  Trustee Ex. 53 at 2 ($5,000); Trustee Ex. 59 at 1 ($8,000); KLM Ex. 56 at 1 ($5,000); KLM Ex. 77 at 1 ($5,500); KLM Ex. 78 at 1 ($5,000); KLM Ex. 79 at 1 ($1,685).

Comu could have applied sufficient payments to the DAPTCO Note to satisfy the obligations to TBG, but chose to disregard those obligations and distribute cash proceeds elsewhere.

284.    OMST served as escrow agent for DAPTCO Trust by virtue of an escrow agreements dated December 1, 2011 (the "DAPTCO Escrow Agreement"), which stated DAPTCO Trust's intent to sell the 5 million DAPTCO Shares to third parties.[726]  As escrow agent, OMST was charged with holding both cash and Green Auto stock certificates for DAPTCO Trust.[727]  Cem Comu executed documents on behalf of DAPTCO Trust that permitted OMST to take action with regard to the DAPTCO Shares in accordance with Comu's instructions.[728]

285.    Comu instructed OMST to return the stock certificate for the DAPTCO Shares back to Comu at TBG's 18208 Preston Road Address.[729]

286.    Comu arranged for the sale of 1,400,000 of the 2,000,000 DAPTCO Shares obtained from TBG on January 13, 2010.[730]  DAPTCO Trust received at least $222,980 in cash payments into its escrow account with OMST for Green Auto stock.[731]  Based on these stipulated facts, the DAPTCO Shares were sold at approximately $0.11 per share.

287.    Based on the above, the evidence confirms that Comu controlled the distribution of the DAPTCO Shares, and used DAPTCO Trust as a conduit to fraudulently conceal and liquidate assets of the bankruptcy estate.

---

[726]    Trustee Ex. 46 at 1.
[727]    Trustee Ex. 46 at 1–2.
[728]    Trustee Ex. 45; KLM Ex. 158 at 8–9.
[729]    See KLM Ex. 315 at 57835_3, 24.
[730]    JPTO Stip. Fact ¶ 61; KLM Ex. 336 at 2.
[731]    JPTO Stip. Fact ¶ 63; see also Trustee Ex. 47 at 2; KLM Ex. 53.  Between March 29, 2012 and April 19, 2012, DAPTCO Trust received at least $39,500 in cash distributions out of the DAPTCO Trust escrow account, with the remainder going elsewhere.  KLM Ex. 56 at 1 ($6,000); Trustee Ex. 53 at 1 ($9,000); Trustee Ex. 59 at 1 ($15,000); KLM Ex. 78 at 1 ($9,500).

*(c)* ***Remaining Canadian Trust Shares (622,533 Turned Over)***

288.    According to the Injunction Status Report, 22,533 out of the original 5 million TKY Shares, and 600,000 out of the original 2 million DAPTCO Shares have been turned over to Trustee.[732]

### 5.    Dissipation & Liquidation of Stock Through Comu's Conduits

289.    In addition to the stock described above, Comu concealed, dissipated or sold millions of shares of TBG's Green Auto Stock, and moved cash, through a complex network of domestic and offshore affiliates that he controls, in which he holds an undisclosed interest, or which are controlled by Comu insiders (including in particular Dave Welch and Marc Bryant) (together, Comu's "Conduits").

*(a)*    ***Maybourne***

290.    In accordance with the Green Auto MOU,[733] and pursuant to Comu's January 5 Instruction Letter,[734] OMST transferred from TBG 2,000,000 free trading shares and 20,000,000 restricted shares directly to Maybourne in BVI, and another 20,000,000 restricted shares to Maybourne care of Newhaven as its corporate nominee[735] (the "Maybourne Shares").[736]

291.    The Comu Value of the Maybourne Shares was $12.6 million, and at $0.10 per share, they were worth $4.2 million.

---

[732]    Inj. Status Report at 11 (items #2 – #3).

[733]    Trustee Ex. 73.

[734]    KLM Ex. 313 at 4, 5–6.

[735]    Pursuant to corporate resolutions dated February 10, 2010, Newhaven was appointed to act as Maybourne's corporate nominee with respect to Green Car, with the authority to transfer stock and cash on behalf of Maybourne. KLM Ex. 362 at 21082_11–12; *see also* KLM Ex. 117 at 106 (Maybourne's Green Auto shares held care of Newhaven in London). Newhaven executed, on Maybourne's behalf, documents by which Maybourne transferred 20 million shares to Green Car. KLM Ex. 362 at 21082_4, 9. Newhaven has continued to represent Maybourne as nominee in the sale and transfer of Green Auto stock. *See, e.g.*, KLM Ex. 156 at 4–5, 9–10 (May 29, 2013 sale of Green Auto stock to various Australian purchasers, effected via Newhaven).

[736]    KLM Ex. 49 at 1.

292.    Correspondence indicates that TBG and FMS received cash transfers from Maybourne in connection with the sale of the Maybourne Shares.[737]

293.    Per Comu's instructions, on January 20, 2013 (shortly after the Maybourne Shares were issued), OMST cancelled the 20,000,000 restricted shares and transferred them to ZK Solutions, Inc. ("ZK Solutions"),[738] and transferred another 5,500,000 shares to Kasprzak on January 28, 2014.[739]

294.    As of May 14, 2013, Maybourne was identified as a "5% Shareholder" in Green Auto's SEC filings, with 18,621,899 shares held by Maybourne at Newhaven's address in London.[740]

295.    Maybourne also made two substantial transfers after the Agreed TRO was entered on December 20, 2013, including 13,967,302 shares to Newhaven on January 1, 2014,[741] and 4,000,000 shares to Kasprzak on January 15, 2014.[742]

296.    According to the Injunction Status Report, no Green Auto shares have been turned over from Maybourne, Newhaven, Kasprzak or ZK Solutions.[743]

---

[737]    *See, e.g.*, KLM Ex. 101 at 1–2 (March 16, 2010 email correspondence between Welch to Comu discussing funds "we had … come in" for Green Auto sales, and noting that "GZ" (*i.e.*, Zinn) of Maybourne was sending cash to Welch and Comu (*i.e.*,"$37.5 in transit"), which would be split among them (*i.e.*, "about 10K apiece DW, CJ, DK, PK" – referring to Welch, Comu, Peter Knight and David Knight).

[738]    KLM Ex. 313 at 1–2, 6; KLM Ex. 49 at 2. ZK Solutions has an address in Willis, Texas. KLM Ex. 313 at 6.

[739]    KLM Ex. 161 at 77. According to Comu's 2009 correspondence, Kasprzak holds an interest in the Green Auto MOU through Maybourne. *See* KLM Ex. 352 at 1–2.

[740]    KLM Ex. 150 at 46.

[741]    KLM Ex. 161 at 69.

[742]    KLM Ex. 161 at 69.

[743]    Inj. Status Report at 11 (items #1, #5–#9). As of October 3, 2011, Newhaven held 18,890,000 Green Auto shares on behalf of Maybourne, and Maybourne held another 2,000,000 shares directly in its name. KLM Ex. 117 at 106. According to Green Auto SEC filings, as of May 14, 2013, Maybourne held 18,621,899 Green Auto Shares. KLM Ex. 150 at 46.

### *(b)     First Market Services*

297.     In accordance with the Green Auto MOU,[744] and pursuant to Comu's January 5 Instruction Letter,[745] OMST transferred 2,000,000 free trading shares and 20,000,000 restricted shares from TBG to FMS (the "FMS Shares").[746]

298.     The Comu Value of the FMS Shares was $6.6 million, and at $0.10 per share, they were worth $2.2 million.

299.     In connection with the TBG Loan Recap, FMS received an additional 11,000,000 shares on December 30, 2010.[747]

300.     In 2012 and 2013, FMS received from Green Auto 500,000 Series A Convertible Preferred Shares ("Preferred Shares")[748] (valued at issuance at between $5 and $8.5 per share) in return for forgiveness of certain debts owed FMS.[749]

301.     According to the Injunction Status Report, no Green Auto shares held by FMS have been turned over to Trustee.[750]

### *(c)     Electronic Registry*

302.     One of the primary domestic Conduits for indirect cash sales of TBG's Green Auto Stock in the United States[751] was Electronic Registry, Inc. ("ERI"), a Wyoming or Nevada

---

[744]     Trustee Ex. 73.
[745]     KLM Ex. 313 at 4, 5.
[746]     KLM Ex. 49 at 1.
[747]     KLM Ex. 49 at 51.
[748]     KLM Ex. 161 at 88.
[749]     KLM Ex. 151 at 19.   It is unclear from the stock transfer records whether TBG (or funds attributable to the sale of TBG's Green Auto Stock) contributed to the FMS loan(s) that gave rise to the issuance of the Preferred Shares.  Even assuming TBG did not contribute, FMS subsequently transferred Preferred Shares to certain Domestic Conduits in which Comu  holds an equity interest.
[750]     Inj. Status Report at 11–14.
[751]     KLM Ex. 188 at 1 ("[A]ll transactions consummated in the US are to be sent … to ERI's office in Porter Ranch and funds sent to ERI account at BoA in Porter Ranch.").

corporation with offices in Porter Ranch, California (the "Porter Ranch Address").[752]  Marc Bryant ("Bryant") is ERI's President and CEO.[753]

303.    With the assistance of Peter Knight from dMedia – who also assisted Comu with setting up the Regus Advisors website – Comu and his affiliates managed and used the ERI website and email addresses to sell Green Auto stock.[754]

304.    In order to effect ERI stock sales, TBG, FMS and Maybourne transferred stock through the transfer agent to ERI, either directly or via other Conduits.[755]  Using form documents provided by Comu,[756] ERI would then sell the stock to private purchasers in return for cash, which would be deposited into a Bank of America Account held by ERI in Porter Ranch, California (the "Porter Ranch Account"),[757] and distributed to various recipients (including TBG) per instructions to Marc Bryant.[758]

---

[752]     *See, e.g.*, KLM Ex. 361 at 22 (Wyoming); KLM Ex. 224 at 21228 (Nevada).

[753]     *See, e.g.*, KLM Ex. 284 at 4 (President); KLM Ex. 361 at 4 (CEO).

[754]     KLM Ex. 218 at 1–2; KLM Ex. 282; KLM Ex. 350 at 1–2.

[755]     *See, e.g.*, KLM Ex. 268 at 2–3 (instruction letter from Comu to OMST for transfer of TBG shares to ERI); KLM Ex. 284 at 1, 3–4 (same); *see also* KLM Ex. 270; KLM Ex. 287.

[756]     *See* KLM Ex. 224 (attaching documents needed for ERI "to process certs and keep files in order," including a template instruction letter to the transfer agent for issuing new certificates, a template subscription agreement, and a credit card authorization form to make payment to ERI); KLM Ex. 361 at 3–4 (template SPA for ERI sales); *see also* KLM Ex. 200.

[757]     *See, e.g.*, KLM Ex. 361 at 2 (account ending in *1944).

[758]     On May 5, 2010, Bryant forwarded to Comu "the new info for ERI selling groups," which included ERI's EIN and an attachment that reflected bank wire information for the Porter Ranch Account. KLM Ex. 183 at 1–2; *see also* KLM Ex. 182.  According to email correspondence, "all transactions consummated in the US are to be sent … to ERI's office in Porter Ranch and funds sent to ERI account at BoA in Porter Ranch.  Once both aforementioned items are received, the agreed payment amount will be released by Marc Bryant on the following Friday to the proper party."  KLM Ex. 188 at 1; KLM Ex. 270 (email from Bryant to Comu: "sent $50,200.00 to TBG today"); *see also* KLM Ex. 219 at 1–2 (Comu sends "slightly revised" ERI profile to Bryant, and will send certificates for sale); KLM Ex. 361 at 4 (Comu forwarding to Bryant and Welch an "ERI Profile" reflecting wire transfer instructions for stock purchasers, and a form SPA for sales); KLM Ex. 200 (July 14, 2010); KLM Ex. 224 (July 1, 2010).

305.    In May of 2010, Comu instructed that future sales of TBG's Green Auto stock would be effected through ERI accounts.[759]  When ERI's inventory of Green Auto stock for sale transactions ran low, Bryant requested additional shares from TBG.[760]

306.    In 2010, TBG transferred 14,383,000 shares out of TBG's Green Auto Stock directly to ERI.[761]  Comu transferred an additional 9 million Green Auto shares to ERI for sale through Regus Advisors.[762]

307.    ERI was also a conduit for cash sales of the FMS Shares.  Welch was copied on Comu's correspondence pertaining to ERI transfers and sales.[763]  Bryant also gave instructions to OMST for transfers of Green Auto stock on behalf of First Market Services.[764]  ERI received 25 million Green Auto shares from FMS (which originated from TBG via the Green Auto MOU) for sale to private buyers.[765]

308.    ERI was also used to liquidate the Maybourne Shares.[766]  Through ZK Solutions, Maybourne transferred 14,500,000 shares to ERI for liquidation.[767]

---

[759]    On May 12, 2010, in response to an email informing Comu that TBG had received a $5K payment for Green Auto stock from Dale Sanders, who received 10,000 shares from TBG on June 14, 2010 (KLM Ex. 49 at 8, reflecting $0.50 sales price), Comu instructed that "for all future agents & transactions TBG is not offering any stock and all future orders to go thru ERI.  We will process this one to close our books."  KLM Ex. 218 at 1.

[760]    *See, e.g.*, KLM Ex. 284 at 1–2.

[761]    KLM Ex. 49 at 6 (2,000,000 shares); *id.* at 23 (4,000,000 shares); *id.* at 24 (450,000 shares); *id.* at 28 (5,000,000 shares); *id.* at 30–31 (2,933,000 shares); *see also* KLM Ex. 350 at 3, 5, 7–8, 10.

[762]    In connection with the TBG Loan Recap, Regus Advisors received 9,000,000 shares of Green Auto common stock on December 30, 2010.  KLM Ex 49 at 51. Regus Advisors transferred the Regus Shares to an entity called Global Trade Finance, Inc. on Feb. 2, 2011.  KLM Ex. 51 at 11. On June 13, 2011, Global Trade Finance, Inc. transferred the 9 million Regus Shares to ERI.  KLM Ex. 51 at 49.

[763]    KM Ex. 183 at 1; KLM Ex. 200 at 1; KLM Ex. 218 at 1; KLM Ex. 219 at 1; KLM Ex. 224 at 1; KLM Ex. 268 at 1; KLM Ex. 270; KLM Ex. 282; KLM Ex. 284 at 1; KLM Ex. 287.

[764]    KLM Ex. 155 at 2, 5.

[765]    KLM Ex. 51 at 22 (7,000,000 shares); *id.* at 36–37 (2,000,000 shares); KLM Ex. 161 at 9 (3,000,000 shares); *id.* at 39 (1,000,000 shares); *id.* at 42 (12,000,000 shares); *see also id.* at 89 (21,841 Preferred Shares); *id.* at 90 (47,901 Preferred Shares); KLM Ex. 268 at 1 ("12 million shares to ERI…."). FMS transferred an additional 7 million shares to ERI in December of 2010, which were transferred back to FMS the same month.  KLM Ex. 49 at 42, 46.

[766]    *See, e.g.*, KLM Ex. 268 (email from Welch to Kasprzak, who controlled the Maybourne Shares, forwarding template instruction form to OMST: "This is the form that you use by replacing TBG with ZK company… 12 million shares to ERI…").

309.     After receiving the above shares from TBG, FMS and Maybourne, ERI liquidated their Green Auto stock for cash in sales to private purchasers.[768]  TBG accounts reflect substantial cash distributions from ERI – **at least $850,000 in 2010 alone** – for the sale of the stock through ERI.[769]  Comu also directed ERI to send cash to various offshore accounts.[770]

### *(d)    West Point Advisors*

310.     In mid-March, 2010, Comu enlisted the services of Newhaven to incorporate West Point Advisors, Inc. ("WPA")[771] in BVI on his behalf, and establish a related HSBC bank

---

[767]     KLM Ex. 49 at 34 (2,500,000 shares); KM Ex. 49 at 45 (12,000,000 shares).

[768]     *See* KLM Ex. 350 at 2–11; *see also* KLM Ex. 49 at 9–10, 12, 19, 20, 23–26, 28–31, 33–35, 36–37, 42–43, 44–45, 46, 48, 49–52; KLM Ex. 51 at 2–6, 8–41, 43, 45–54, 56–65, 67–74, 78–80, 82, 84–90, 94, 96, 98–100, 102–105, 107–108, 110–113; KLM Ex. 161 at 4–6, 10–11, 13, 16–18, 22–25, 26, 28, 30–31, 33, 39–43, 45–55, 57–58, 89–90, 93, 97.

[769]     Sometimes payments for ERI stock would be made directly to TBG.  *Compare* KLM Ex. 49 at 45 (50,000 shares transferred from ERI to Josef Hammer) *with* KLM Ex. 96 at 2 (payment received from Hammer).  For other transactions, TBG received payments from ERI.  *See, e.g.*, KLM Ex. 96 at 2 (on August 31, 2010, TBG received $23,100 from ERI).  In an apparent effort to conceal the source of income, most TBG receipts from ERI are described in TBG ledgers prepared for Trustee in this Adversary as wire transfers from "Porter Ranch."  On November 24, 2010, Bryant confirmed in an email that he "sent $50,200.00 to TBG today."  KLM Ex. 270.  This transfer to TBG matches a $50,200 credit in TBG's accounts for November 24, 2010, which is described as "Trsfr Porter Ranch."  Trustee Ex. 25 at 4.  **According to its own ledgers, TBG received at least $850,000 in "Porter Ranch" income – *i.e.*, distributions from ERI – in 2010 alone.**  Trustee Ex. 25 at 3 ($19,200 in May, 2010); *id.* ($43,126 in June, 2010); *id.* ($55,790 in July, 2010); *id.* ($2,750 in August, 2010); *id.* ($133,050 in September, 2010); *id.* ($380,125 in October, 2010); *id.* at 4 ($140,200 in November, 2010); *id.* ($75,000 in December, 2010).

[770]     On July 2, 2010 Nick Toscano from WWA wrote in an email to Comu: "Not to be difficutl [sic], but you said yesterday it was HSBC and now it is AFR ASIA BANK Ltd  (Africa Asia Bank Ltd) Unfortunately no one that I would speak to in Europe will send their money there...  For reasons being; GACR is an American Stock, an American Company, Trading on an American exchange, sending Money to Africa...  It is hard enough in today's enviorment [sic] selling restricted stock (pink sheets); from a 3rd party (ERI) and now have to explain why there money has to go to Africa...  if it smells like fish it usually is..."  KLM Ex. 323.

[771]     Comu originally selected "Westgate Management Limited," as the name for his new BVI entity, but Westgate was ultimately unavailable, so, on April 23, 2010, Comu instructed Newhaven to incorporate the new entity as West Point Advisors Inc.  KLM Ex. 366 at 1–3; *see also* KLM Ex. 364 at 8700_1–3.

account in the Channel Islands (the "WPA Account").[772]   At trial, Comu continued to deny he

had any interest in the HSBC Channel Islands Account.

311.   Comu paid Newhaven £3,000 out of TBG's Wells Fargo account to form WPA,

provide a registered office, serve as Comu's nominee, and supply bank facilities at HSBC.[773]

312.   On March 23, 2010, as part of Newhaven's due diligence process for the

provision of nominee services,[774] which is required under BVI law,[775] Comu emailed Steven

Block and Christopher McNeill at B&G requesting a professional reference letter because Comu

---

[772]   KLM Ex. 175 (March 12, 2010 from Newhaven to Comu referencing Westgate Management Limited, and confirming: "I have this afternoon incorporated a BVI co under the above name for you."); KLM Ex. 176 at 1 (March 15, 2010 Newhaven email asking Comu to "confirm the currency(ies) you require the company to hold with HSBC"); KLM Ex. 177 at 1 (March 15, 2010 email from Comu to Newhaven: "I would like to confirm USD as basis of Account and confirm purchase of Ltd."); KLM Ex. 177 at 1 ("As and when the company has been confirmed and the corporate documents received from the BVI I shall be able to process the bank application.  I shall request a USD account to begin with."). Through Newhaven, in May of 2010, Comu set up an account at HSBC Plc in Guernsey, Channel Islands under the name "Newhaven Nominees Ltd/West Point Advisors Inc." (the "HSBC-WPA Account");  *See, e.g.*, KLM Ex. 365 at 1–2 (account ending in *7483); *see also* KLM Ex. 362 at 21080; KLM Ex. 363 at 1; KLM Ex. 364 at 1.  Newhaven finalized the documents for opening the HSBC-WPA Account in mid-May.  KLM Ex. 366 at 1–2.
[773]   KLM Ex. 366 at 1, 5 (payment from Comu made via TBG's Wells Fargo account ending in *8429 (converted from £3,000 to $4,477.20); *compare* KLM Ex. 18 (TBG Wells Fargo statements for account ending in *8429); *see also* Trustee Ex. 25 at 2 (TBG ledger reflecting $4,477.20 "fee expense"). *See also* KLM Ex. 272 (August 23, 2010 Comu email: "I recently acquired a full operating entity West Point Advisors Inc. for (£3,000.00)."); KLM Ex. 364 at 8701_1–2; *see also* KLM Ex. 366 at 1, 5.
[774]   KLM Ex. 176 at 1 (March 15, 2010 Newhaven email to Comu attaching "due diligence booklet," requesting professional references and other information); KLM Ex. 213 at 1–3 (between March 24 and March 30, 2010, Comu completed and forwarded the requested due diligence information to Newhaven).
[775]   KLM Ex. 206 at 15345 (Newhaven "Due Diligence" form sent to Comu stating: "The British Virgin Islands Government Code of Practice requires us to 'know our client' and we must know the proposed activities of a company to be formed by us.  We must also have basic information on the company's proposed shareholders, directors and officers.").

was "preparing to do some international work."[776] Comu attached a letter drafted for their signature, which was addressed to Newhaven in BVI.[777]

313. Newhaven incorporated WPA in the BVI on Comu's behalf on April 23, 2010,[778] and forwarded the incorporation documents to Comu on May 17, 2010.[779] Newhaven acts as Comu's nominee,[780] holding WPA and its assets in trust for Comu as WPA's sole principal and beneficiary.[781] As Comu's designated nominee, Newhaven agreed to "sign on the WPA's behalf," take "all reasonable care to ensure that Money Laundering activities do not take place," and "[i]f required, … provide documentary evidence of specific transactions without delay."[782]

314. Comu formed WPA and the WPA Account with the express purpose of selling TBG's Green Auto Stock.[783] Comu used WPA to liquidate Green Auto stock for cash the same

---

[776]      KLM Ex. 212 at 1 ("I am preparing to do some international work and need a professional reference letter.").

[777]      KLM Ex. 212 at 2. Comu's draft reference letter, which asked B&G to confirm that Comu had not "been a Director or otherwise concerned in the management of a company which has been subject to an insolvent liquidation or been the subject of a Judicial enquiry," was copied from a form reference letter Comu received from Newhaven as part of the required due diligence related to forming WPA. KLM Ex. 176 at 4432. As the McNeill trial testimony reflects, it is unclear whether B&G ever provided the requested reference (although Comu forwarded reference letters to Newhaven on March 24, 2010). KLM Ex. 213 at 17988_3.

[778]      KLM Ex. 364 at 8701_1–23.

[779]      KLM Ex. 364 (email attaching WPA documents). WPA's stated purpose is to provide "Investment Consulting & Advisory Services." KLM Ex. 206 at 15346.

[780]      While he retained beneficial ownership of WPA, Comu arranged for Newhaven to provide "directorship services" and "nominee services" for WPA on his behalf. KLM Ex. 206 at 15346_2–3, 15346_8.

[781]      On May 17, 2010, in reference to WPA, Charlotte Jacob at Newhaven asked Comu to confirm whether "the share issued in favour of Newhaven Nominees Ltd is to be held in trust for you?," to which Comu responded: "the answer is YES." KLM Ex. 367 at 1–2 (capitalization in original). In Newhaven due diligence documents, Comu is identified as WPA's sole "Principal," which is defined as "beneficial owner and controller" or "other persons to whose direction the company officials follow." KLM Ex. 206 at 15346_5–7.

[782]      KLM Ex. 206 at 15346_5.

[783]      KLM Ex. 195; KLM Ex. 196 at 1–2; see also KLM Ex. 188 at 1 (noting the use of an HSBC bank account and law firm in London as escrow agent for funds received for stock sales).

way he used ERI.[784] The form SPAs forwarded by Comu to colleagues for WPA and ERI are carbon copies – down to the font – except for the seller's name.[785]

315. On Comu's behalf, Newhaven arranged in June of 2010 for a second nominee company – JPG Corporate Services Limited ("JPG Corporate"), located in the Republic of Seychelles;[786] – "to be used for the purposes of WPA's Green Car business,"[787] in reference to the Green Car entity established in the BVI for the parties to the Green Auto MOU.[788] After receiving confirmation of JPG's appointment on June 28, 2010, Comu forwarded the information to Welch, Comu's partner at TBG and Regus Advisors, and a GETG officer, who executed the Green Auto MOU on behalf of FMS.[789]

316. On June 29, 2010, in response to JPG's request for "details on the securities to be held by" the nominee for WPA, Comu confirmed, "We have over 20M Shares in Green Auto that we would like to place to clients through authorized agents."[790] Comu forwarded to JPG Corporate a certificate for 1,163,000 Green Auto shares issued to TBG,[791] wire instructions for the WPA Account in Channel Islands, and an account held in Newhaven's name at The Bank of

---

[784] On July 19, 2010, Reuben Anstock at Newhaven confirmed regarding WPA "that whilst the funds will move into Newhaven Nominees' account, Corporate and Chancery will be organising the escrow agency administration services and [Newhaven] will release the funds when instructed to do so by yourself or them." KLM Ex. 202 at 2; *see also* KLM Ex. 188 at 1 (email confirming that the procedure for selling stock via ERI "is the same procedure through West Point Advisors in the UK" – transaction documents and payments were forwarded to Newhaven in London (as escrow agent) for processing through the related HSBC account, after which Newhaven released the purchase funds to designated recipients).

[785] *Compare* KLM Ex. 362 at 21081_1 – 3 (WPA form SPA, forwarded to corporate nominee on June 29, 2010) *with* KLM Ex. 361 at 3 – 4 (ERI form SPA, forwarded to WWA on June 11, 2010)

[786] JPG's address as WPA's nominee was "c/o ACT Offshore (Pty) Ltd, 1st Floor, Oliaji Trade Centre, Victoria, Mahe, Seychelles." KLM Ex. 195. ACT Offshore provides the same kind of corporate fiduciary and "nominee" services bas Newhaven. *See generally* http://www.actoffshore.co/.

[787] KLM Ex. 195.

[788] *See supra* Section E(1)(b).

[789] Upon receiving confirmation of JPG's nominee appointment for WPA, Comu forwarded the information to Welch (TBG Managing Partner who was also an insider of the GETG Entities and Regus Advisors, and who executed the Green Auto MOU on behalf of FMS). KLM Ex. 221 ("Game On!!").

[790] KLM Ex. 362 at 1; *see also* KLM Ex. 196 at 1–2; *see also* KLM Ex. 201 at 4.

[791] KLM Ex. 362 at 21079.

East Asia Limited in London (the "Newhaven East Asia Account");[792] a form stock purchase agreement for use in individual stock sales – which was drafted for Newhaven's signature on behalf of WPA as the "seller"[793] – an escrow agreement, and bank information for depositing cash proceeds of the sales.[794]

317.    On June 30, 2010, Comu confirmed that the Green Auto stock sales effected through WPA would "start at USD $5K and up to $l00K.  Shares are currently quoted @ .50/sh."[795]

### (e)    World-Wide Auric

318.    The parties to the Green Auto MOU used World-Wide Auric International ("WWA"), which has addresses and accounts in Lisbon, Portugal,[796] Leichtenstein and Turks & Caicos,[797] to liquidate their Green Auto stock.  Nick Toscano, a Comu insider at Regus Advisors,[798] was the parties' contact at WWA.[799]

319.    WWA assisted the parties with domestic and international sales of Green Auto Stock through both ERI and WPA.[800]  Comu forwarded ERI bank wiring instructions and a form SPA for ERI stock sales to Toscano for use in the sale of Green Auto stock.[801]

---

[792]      KLM Ex. 362 at 4 (Newhaven East Asia Account ends in **7002).
[793]      KLM Ex. 362 at 21081 – 21081_3.
[794]      KLM Ex. 362 at 1 (with attachments).
[795]      KLM Ex. 201 at 1.
[796]      KLM Ex. 158 at 2.
[797]      *See, e.g.*, KLM Ex. 42 at 1 (WWA address in Grand Turk, Turks & Caicos Islands).
[798]      *See supra* Section C(4) (Comu provided Toscano with a Regus Advisors email address when he established the new entity in mid-2010).
[799]      *See, e.g.*, KLM Ex. 323 at 1–3.
[800]      KLM Ex. 188 at 1 (email correspondence among Comu, Bryant, Welch and Toscano discussing Green Auto stock sales through ERI and WPA); KLM Ex. 282 (email correspondence among Comu, Toscano, Peter Knight, Welch and Bryant regarding use of ERI website for WWA transactions); KLM Ex. 323 at 1–3 (email correspondence between Comu and Toscano discussing international and domestic stock sales); KLM Ex. 361 (Comu email to Toscano, CC'd to Bryant and Welch, attaching ERI form documents required for stock sales).
[801]      KLM Ex. 361 at 1–3 ("Looking forward to working together.").

320.     Proceeds from stock sales effected through WWA were diverted to or through a variety of domestic and offshore accounts in accordance with Comu's instructions.[802]  These accounts include a bank account held by WWA at LET Bank in Liechtenstein (the "WWA Account"),[803] an account with Afr Asia Bank Ltd in Port Louis, Mauritius (the "Mauritius Account");[804] and a CitiBank account in New York (the "CitiBank Account").[805]

321.     Toscano raised concerns[806] about the various accounts that Comu proposed:

> Not to be difficutl [sic], but you said yesterday it was HSBC and now it is AFR ASIA BANK Ltd (Africa Asia Bank Ltd) Unfortunately no one that I would speak to in Europe will send their money there... For reasons being; [Green Auto] is an American Stock, an American Company, Trading on an American exchange, sending Money to Africa... It is hard enough in today's enviorment [sic] selling restricted stock (pink sheets); from a 3rd party (ERI) and now have to explain why there money has to go to Africa... if it smells like fish it usually is...[807]

322.     DAPTCO Trust transferred 500,000 Green Auto shares to WWA on March 22, 2012.[808]  OMST did not collect any cash for the transfer of 500,000 shares to WWA.[809]

323.     Although WWA was assisting with stock sales made through WPA and ERI, Comu paid commissions to WWA through the OMST escrow accounts held by TBG, DAPTCO

---

[802]     Toscano emailed Comu confirming he needed banking information for stock sales from Comu. KLM Ex. 323 at 2. In response, Comu indicated that "banking will be different but we may run either/or," and identified two accounts: one at Afr Asia Bank Ltd in Mauritius, and a Citibank account in New York. KLM Ex. 323 at 1.

[803]     *See, e.g.*, KLM Ex. 42 at 1 (wire transfer instructions for WWA account ending in *818-51).

[804]     *See, e.g.*, KLM Ex. 323 at 1 (account ending in *5016).

[805]     *See, e.g.*, KLM Ex. 323 at 1 (account ending in *9497).

[806]     Toscano also expressed concern that the draft SPA for ERI stock purchases did not represent that the stock was restricted. KLM Ex. 188 at 1 ("I only bring this to your attention because when the buyer receives the cert he or she can represent that either had no idea there was a year hold on the stock and request his funds back or pick up the phone?").

[807]     KLM Ex. 323 at 1.

[808]     KLM Ex. 81 (stock certificate issued to WWA); KLM Ex. 158 at 1 (instructions to AST to transfer 500,000 shares from DAPTCO Trust to WWA); KLM Ex. 161 at 9.

[809]     Troster Exam 89:5 – 90:7, 91:4 – 10, 96:19 – 23.

Trust, and TKY Trust.[810] At Comu's direction, between 2011 and 2012, WWA received at least $316,469 in cash distributions from OMST out of the TBG escrow account,[811] $34,075 from the DAPTCO escrow account,[812] and $220,037 from the TKY escrow account[813] (together totaling $570,581). TBG accounts also reflect substantial wire transfers directly to WWA.[814]

### (f)  EuroCap Investments

324.  Comu is Chairman[815] and a Director[816] of UK entity EuroCap Investments PLC ("EuroCap"),[817] a foreign Conduit he has used to conceal cash and liquidate TBG's holdings of Green Auto stock.

325.  EuroCap is affiliated with TBG[818] and shares the Galleria Address with Regus Advisors.[819] Comu is authorized "to sign and enter into any banking or securities transactions

---

[810]  KLM Ex. 39; KLM Ex. 41 at 2; KLM Ex. 42 at 1; KLM Ex. 45; KLM Ex. 46 at 2; KLM Ex. 55 at 2; KLM Ex. 56 at 2; KLM Ex. 60 at 1; KLM Ex. 80; Trustee 53 at 2; *see also* Troster Exam 36:2 – 3 (in the OMST transfer ledgers, "WWA" refers to World Wide Auric), 80:5 – 10 (same), 83:8 – 84:7 (OMST transfer records identify which shares were being transferred by WWA and which by TBG), 95:12 – 23 (per Comu's instructions, OMST combined wire transfers to WWA from the different escrow accounts).

[811]  Trustee Ex. 52 at 1 ($40,039); Trustee Ex. 57 at 1 ($11,750); KLM Ex. 31 at 1 ($9,650); KLM Ex. 39 ($92,400); KLM Ex. 41 at 1 ($49,800); KLM Ex. 43 at 2 ($44,140); KLM Ex. 60 at 1 ($8,840); KLM Ex. 62 at 1 ($7,290); KLM Ex. 63 at 1 ($5,625); KLM Ex. 64 at 1 ($7,500); KLM Ex. 71 at 2 ($39,435).

[812]  Trustee Ex. 53 at 1 ($8,000); Trustee Ex. 59 at 1 ($10,500); KLM Ex. 56 at 2 ($4,000); KLM Ex. 77 at 1 ($3,975); KLM Ex. 78 at 1 ($7,600).

[813]  Trustee Ex. 58 at 2 ($11,040); KLM Ex. 46 at 2 ($3,250); KLM Ex. 65 at 2 ($50,000); KLM Ex. 66 at 2 ($3,000); KLM Ex. 68 at 3 ($27,000); KLM Ex. 69 at 2 ($20,000); KLM Ex. 70 at 2 ($25,712); KLM Ex. 71 at 2 ($39,435); KLM Ex. 72 at 2 ($16,350); KLM Ex. 73 at 2 ($7,500); KLM Ex. 75 at 2 ($16,750).

[814]  KLM Ex. 19 at 26 ($58,500); KLM Ex. 19 at 30 ($49,200); KLM Ex. 19 at 31 ($37,200); KLM Ex. 19 at 32 ($30,000); KLM Ex. 19 at 32 ($3,000); KLM Ex. 19 at 44 ($6,000).

[815]  KLM Ex. 153 at 10; KLM Ex. 154 at 3; KLM Ex. 322.

[816]  *See, e.g.*, KLM Ex. 82 at 1, 5, 8, 10.

[817]  EuroCap was originally formed as Optical Dynamics PLC, and changed its name to EuroCap on November 1, 2011. KLM Ex. 82 at 10. EuroCap is listed on London's GXG exchange. KLM Ex. 82 at 10. EuroCap's UK filing describes its business as follows: "The company is now seeking to make investments on operating companies with proven business models and management teams capable of sustaining growth." KLM Ex. 82 at 10.

necessary in the day to day affairs of" EuroCap.[820] Baxter – a TBG and Regus Advisors insider – served as a Director of EuroCap in 2011.[821]

326. In December of 2011, TBG transferred $125,000 to EuroCap in two transactions identified in a TBG "General Ledger" as "business registration expenses."[822]

327. On November 8, 2011, Comu caused TBG to transfer 10 million shares of restricted Green Auto stock to EuroCap.[823] On November 13, 2013, at Comu's direction (as Chairman of EuroCap), TBG transferred 2 million shares back to TBG.[824] On December 17, 2013, Comu sold 330,000 shares to private buyers through EuroCap in return for $33,000 in cash proceeds (reflecting a $0.10 per share stock price).[825] Comu admitted at trial that if he had effected this transfer three days later it would have violated the Agreed TRO.

328. As of December 31, 2012, EuroCap had 24,000,800 shares outstanding,[826] of which TBG holds at least 10 million[827] (which, according to the Injunction Status Report, have now been turned over to Trustee).[828] Comu has not, however, turned over the Green Auto shares held by EuroCap to Trustee.[829]

---

[818] EuroCap's UK corporate filings disclose that in 2012, EuroCap was invoiced £21,723 TBG for "consulting services" from TBG, which was "settled by the issue of 10,000,000 Ordinary shares" to TBG. KLM Ex. 82 at 19. EuroCap's UK filings also disclose that EuroCap received loans from both TBG (£7,028) and Regus Advisors (£18,724). KLM Ex. 82 at 19.
[819] KM Ex. 153 at 1; KLM Ex. 154 at 2–3.
[820] KLM Ex. 153 at 10.
[821] KLM Ex. 82 at 8; KLM Ex. 153 at 3.
[822] Trustee Ex. 26 at 5, 8.
[823] Trustee Ex. 4; KLM Ex. 51 at 110.
[824] KLM Ex. 154; KLM Ex. 161 at 59.
[825] KLM Ex. 153; KLM Ex. 161 at 62.
[826] KLM Ex. 82 at 17.
[827] KLM Ex. 82 at 19.
[828] Inj. Status Report at 14 (item #71).
[829] Inj. Status Report at 11–14.

### (g)  Campus Investments

329.   As noted above, Comu has been involved with Campus Investments, a UK entity, since before the Petition Date.[830]  TBG transferred 1.3 million Green Auto shares to Campus Investments,[831] some of which Campus then liquidated for cash.[832]  Even though these shares were ostensibly sold by Campus Investments, TBG received direct payments from at least two of these purchasers.[833]  Comu has not turned over any Green Auto shares held by Campus Investments or any other assets related to Campus.[834]

### (h)  Other Conduits for Liquidating Stock

330.   FMS shares the 11700 Preston Road Address with Brand Marketing, Inc. ("Brand Marketing"), First Orient Holdings Limited ("First Orient"), and Equity Market Development, Inc. ("EMD"), all of which are identified in Green Auto's 2013 SEC filings as holders of at least 5% of Green Auto's outstanding stock.[835]  EMD also shares addresses with ERI at the Porter Ranch Address.[836]  Instructions for EMD stock transfers are made by Marc Bryant and ERI.[837]  EMD has been used by TBG,[838] FMS,[839] and Maybourne[840] to transfer and conceal their Green

---

[830]   See supra Section B(3).
[831]   KLM Ex. 49 at 3 (500,000 shares); KLM Ex. 49 at 7–8 (500,000 shares); KLM Ex. 51 at 54–55 (300,000 shares).
[832]   KLM Ex. 49 at 4–5.
[833]   Compare KLM Ex. 49 at 5 (certificates issued to Mary Denisco (40,000 shares) and Gary Kulis (30,400 shares); with KLM Ex. 96 at 2 (TBG payments received from Denisco ($5,000) and Kulis ($7,600), reflecting an average approximate sales price of $0.18 per share); see also KLM Ex. 49 at 8 (TBG sold an additional 50,000 shares to Denisco on June 14, 2010).  Campus Investments also transferred cash to TBG accounts.  See, e.g., KLM Ex. 96 at 2.
[834]   Inj. Status Report at 11–14.
[835]   KLM Ex. 150 at 46 (First Orient and Brand Marketing each holding 47 million shares, and EMD holding 26,189,152 shares).
[836]   KLM Ex. 117 at 58 (1 million EMD shares held "c/o ERI" at Porter Ranch Address).
[837]   See, e.g. KLM Ex. 51 at 108; KLM Ex. 161 at 26.
[838]   KLM Ex. 49 at 4 (3,500,000).
[839]   KLM 49 at 37 (1,000,000 shares); KLM Ex. 51 at 108 (800,000 shares from Smarter, which originated from FMS via David Knight (KLM Ex. 49 at 13)); KLM Ex. 161 at 89 (27,500 Preferred Shares); KLM Ex. 161 at 95 (125,000 Preferred shares received from FMS via Brand Marketing (KLM Ex. 161 at 88)).

Auto stock holdings. FMS also used Brand Marketing[841] and First Orient[842] to transfer and hold Green Auto shares.

331. FMS and Comu also used affiliated entities Global Market Advisors, Inc. ("GMAI"), Global Trade Finance, Inc. ("Global Trade"), and Eurasia Finance and Development Corp. ("Eurasia Finance")[843] to transfer their Green Auto shares[844] and dissipate or liquidate those shares through ERI,[845] Cede & Co.,[846] or to private buyers.[847]

332. FMS also used Relaunch Consulting Group ("Relaunch") to transfer and sell Green Auto shares. Marc Bryant and ERI instructed the transfer agent regarding trades and sales for Relaunch.[848] FMS transferred 4 million Green Auto shares to Relaunch,[849] after which Relaunch transferred over 2.5 million shares to ERI to liquidate for cash.[850]

---

[840] KLM Ex. 161 at 7 (100,000 shares received via Newhaven (KLM Ex. 51 at 106) and Cede & Co. (KLM Ex. 161 at 1)).

[841] KLM Ex. 161 at 88 (125,000 Preferred Shares).

[842] KLM Ex. 161 at 88 (125,000 Preferred Shares).

[843] GMAI is a wholly-owned subsidiary of Global Trade, which in turn is wholly-owned by Eurasia Finance. KLM Ex. 150 at 50. According to Green Auto's 2013 SEC filings, Eurasia Finance held 47 million Green Auto shares. *Id.*

[844] KLM Ex. 49 at 11 (1,000,000 shares to GMAI from TBG; KLM Ex. 51 at 11 (9,000,000 shares from Regus Advisors to Global Trade); KLM Ex. 161 at 33 (1,500,000 shares from Global Trade to Eurasia Finance); KLM Ex. 161 at 88 (125,000 Preferred Shares from FMS to Global Trade); KLM Ex. 161 at 89 (125,000 Preferred Shares from Global Trade to Eurasia Finance).

[845] KLM Ex. 51 at 49 (9,000,000 shares (which originated with Regus Advisors) transferred from Global Trade to ERI).

[846] KLM Ex. 161 at 68, 71 (1,500,000 from Eurasia Finance to Cede & Co. via Wilson Davis & Co.)

[847] KLM Ex. 49 at 26 (1 million shares from GMAI to a single apparent purchaser, Susan Loguercio).

[848] KLM Ex. 51 at 67, 81, 88–90, 92–93.

[849] KLM Ex. 51 at 36 (4,000,000 shares from FMS).

[850] Per instructions from ERI or Bryant, Relaunch transferred over 2.5 million shares to ERI. KLM Ex. 51 at 67 (1 million shares, per ERI instructions); KLM Ex. 51 at 83 (1 million shares, per Bryant instructions); KLM Ex. 51 at 89 (66,818 shares, per ERI instructions); KLM Ex. 51 at 89 (46,875 shares, per Bryant instructions); KLM Ex. 51 at 89–90 (180,472 shares, per Bryant instructions); KLM Ex. 51 at 90 (225,000 shares, per Bryant instructions).

333. Another Conduit for the transfer and sale of Green Auto shares was Vertex International Group LLC ("Vertex").[851] According to Green Auto SEC filings, as of May 14, 2013, Vertex is identified as a holder of at least 5% of Green Auto's outstanding stock, with 24,737,792 shares.[852] FMS transferred millions of Green Auto shares to Vertex,[853] which in turn sold millions of Green Auto shares to private purchasers in 2012 and 2013.[854]

334. The parties also used Diversified Equities Inc. ("Diversified Equities")[855] and Diversified Services Group Inc. ("Diversified Services")[856] to transfer their Green Auto shares.

335. The parties also used Independent Asset Group, Inc. ("IAG") to dissipate their Green Auto shares,[857] which in turn transferred the shares to other Conduits or sold the shares to private buyers.[858]

336. The parties also used offshore entity Investment and Finance Company Limited ("IFC")[859] to transfer[860] and liquidate millions of Green Auto shares for cash either directly or through ERI.[861]

---

[851] Vertex is one of the entities used by Bryant to transfer and liquidate the FMS Shares received from TBG pursuant to the Green Auto MOU. For example, in 2012 and 2013, many of the instructions to AST for the transfer of Green Auto stock held by ERI, EMD and FMS came from Vertex. KLM Ex. 161 at 10 (ERI stock transfers made per instructions from Vertex); id. at 11 (same); id. at 57 (same); id. at 37 (FMS stock transfers made per instructions from Vertex); id. at 97 (EMD stock transfers made per instructions from Vertex).

[852] KLM Ex. 150 at 46.

[853] KLM Ex. 161 at 5 (3,000,000 shares from FMS); KLM Ex. 161 at 89 (31,250 Preferred Shares from FMS); KLM Ex. 161 at 90 (47,901 Preferred Shares from FMS via ERI).

[854] Like ERI, Vertex was used as a vehicle for selling millions of Green Auto shares in return for cash. See, e.g., KLM Ex. 161 at 25 (approximately 2 million shares sold to private buyers). See also KLM Ex. 161 at 27, 28, 29, 32, 42, 90, 91, 92, 93, 94, 96.

[855] KLM Ex. 161 at 58 (999,478 shares from ERI); KLM Ex. 161 at 58 (58,366 shares received from Vertex); KLM Ex. 161 at 59 (659,313 shares from FMS); KLM Ex. 161 at 97 (15,200 Preferred Shares from EMD); KLM Ex. 161 at 97 (774 Preferred Shares from ERI); KLM Ex. 161 at 98 (2,245 Preferred Shares from Vertex).

[856] KLM Ex. 161 at 23 (100,000 shares from FMS); KLM Ex. 161 at 41 (200,000 shares from TBG via Comu insider John Potter).

[857] KLM Ex. 161 at 53 (2,500,000 shares from ERI); KLM Ex. 161 at 60 (1,717,157 shares from Diversified Equities); KLM Ex. 161 at 95 (15,000 Preferred Shares from Vertex); KLM Ex. 161 at 98 (18,219 Preferred Shares from Diversified Equities); KLM Ex. 161 at 101 (5,318 Preferred Shares from Bio-Global – violated TRO)

[858] KLM Ex. 161 at 60, 61, 62, 67, 71, 98, 99, 100.

337.    TBG and FMS also transferred shares through Smarter, Inc. ("Smarter"),[862] an entity controlled by GETG and Regus Advisors insider David Knight.[863]    According to the Injunction Status Report, 200,000 shares held in the name of Smarter have now been turned over to Trustee,[864] but at least 200,000 shares held by Smarter were transferred after the Agreed TRO was entered on December 20, 2013.[865]

338.    Comu and FMS used two intermediaries to sell their Green Auto shares: Greenstar Financials, Inc. ("Greenstar"), a Florida corporation,[866] and First Clearing LLC ("First Clearing").[867]    Greenstar received 17.5 million shares (plus 36,000 Preferred Shares) directly or indirectly from the parties to the Green Auto MOU,[868] and liquidated millions of those shares for

---

[859]    Bryant instructed OMST regarding trades for IFC.  KLM Ex. 51 at 45.  IFC has an address in Curaçao, Netherlands Antilles.  KLM Ex. 117 at 78.

[860]    KLM Ex. 51 at 26–27 (8,760,000 shares from dMedia);  KLM Ex. 51 at 44–45 (4 million shares to ERI, per instructions from Bryant).  IFC transferred 5,000,000 shares to One World Energy LLC, which were subsequently transferred back to IFC (per instructions from IFC).  KLM Ex. 161 at 36, 53.

[861]    KLM Ex. 51 at 44–45 (4,000,000 shares from IFC to ERI, per instructions from Bryant); *see also* KLM Ex. 51 at 33; KLM Ex. 161 at 8, 15, 27, 30.

[862]    KLM Ex. 49 at 13 (200,000 shares from TBG and 1,000,000 shares from FMS transferred to Smarter via David Knight); KLM Ex. 51 at 108 (800,000 shares from Smarter to EMD, per instructions from Bryant).  Smarter subsequently transferred 200,000 shares to Benchmark Advisory Partners, LLC ("Benchmark") in July of 2013, KLM Ex. 161 at 49.

[863]    *See infra* Section B(3), C(4); *see also* KLM Ex. 117 at 151 (Smarter, Inc.'s Green Auto shares delivered to care of David Knight in Las Vegas, Nevada).

[864]    Inj. Status Report at 11 (item #10) (Certificate No. 2563, dated August 18, 2010).

[865]    Smarter transferred 200,000 shares to DMS Consulting, LLC ("DMS") on December 26, 2013 – after the Agreed TRO was entered.  KLM Ex. 161 at 63.

[866]    *See, e.g.*, KLM Ex 42 at 7 (OMST wire transfer instructions for Greenstar).

[867]    *See* KLM Ex. 129 at 7–8 (Comu uses First Clearing to sell stock holdings held in his Personal Wachovia Securities account).

[868]    KLM Ex. 161 at 24 (500,000 shares from FMS); KLM Ex. 161 at 25 (3,000,000 shares from FMS); KLM Ex. 161 at 28 (2,000,000 shares from ERI); KLM Ex. 161 at 36 (3,000,000 shares from FMS); KLM Ex. 161 at 38 (1,000,000 shares from FMS); KLM Ex. 161 at 45 (1,000,000 shares from ERI); KLM Ex. 161 at 46 (1,000,000 shares from ERI); KLM Ex. 161 at 57 (1,500,000 shares from ERI); KLM Ex. 161 at 93 (6,000 Preferred shares from ERI); KLM Ex. 161 at 94 (5,000 Preferred shares from Vertex); KLM Ex. 161 at 95 (5,000 Preferred shares from Vertex); KLM Ex. 161 at 97 (5,000 Preferred shares from EMD); KLM Ex. 161 at 98 (5,000 Preferred shares from IAG); KLM Ex. 161 at 99 (5,000 Preferred shares from IAG); KLM Ex. 161 at 100 (5,000 Preferred shares from IAG)

cash.[869]  Similarly, First Clearing received 1.6 million shares directly or indirectly from the parties to the Green Auto MOU,[870] which First Clearing then transferred to Cede & Co.[871]

339.    Many of the Conduits have transferred their Green Auto stock holdings from TBG, Maybourne and FMS to Cede & Co. or BK Cede & Co. Fast Balance.[872]

340.    TBG, Maybourne and FMS also transferred millions of Green Auto shares to or through other Comu insiders, and Conduits controlled insiders, including Bryant (who controls ERI and other Conduits used to dissipate Green Auto shares);[873] dMedia[874] (controlled by Peter

---

[869]    KLM Ex. 161 at 26, 29–30, 32, 35, 38, 40–41, 43, 45, 47, 50, 52–54, 57, 60–61, 64, 69, 79, 84, 94, 96–101.  Comu instructed OMST to distribute over $100,000 in cash to Greenstar out of the escrow accounts for TBG, DAPTCO Trust and TKY Trust, which does not include cash distributions made after the escrow accounts were closed.  KLM Ex. 41 at 3 ($15,750); KLM Ex. 60 at 3 ($4,000); KLM Ex. 62 at 2 ($1,500); KLM Ex. 66 at 3 ($2,000); KLM Ex. 68 at 2 ($8,000); KLM Ex. 69 at 2 ($12,000); KLM Ex. 70 at 2 ($2,000); KLM Ex. 71 at 2 ($16,400); KLM Ex. 72 at 2 ($3,200); KLM Ex. 74 at 2 ($4,000); KLM Ex. 75 at 3 ($22,000); KLM Ex. 77 at 2 ($1,200); Trustee Ex. 53 at 3 ($8,000); Trustee Ex. 58 at 3 ($2,000); Trustee Ex. 59 at 2 ($2,000).

[870]    KLM Ex. 161 at 2 (800,000 shares from EMD); KLM Ex. 161 at 7 (800,000 shares from EMD);

[871]    KLM Ex. 161 at 2 (800,000 shares to Cede & Co); KLM Ex. 161 at 8 (800,000 shares to Cede & Co.).  All of these 1.6 million shares have been combined into Certificate No. 700001 held by Cede & Co.  KLM Ex. 161 at 54.

[872]    3.5 million from TBG via EMD (KLM Ex. 49 at 4 → KLM Ex. 49 at 6 → KLM Ex. 161 at 54 (Certificate No. 700001)).  Maybourne transferred to Newhaven 2,600,000 shares between May 14, 2010 and November 26, 2012.  KLM Ex. 49 at 6 (500,000 shares); KLM Ex. 51 at 107 (2 million shares); KLM Ex. 161 at 29 (100,000 shares).  Between December 6, 2011 and July 31, 2012, Newhaven transferred 1,100,000 shares to Cede & Co.  KLM Ex. 161 at 1 (Certificate No. 5005 & No. 5006); KLM Ex. 161 at 14 (Certificate No. 5261); KLM Ex. 161 at 18 (Certificate No. 5327).  Cede & Co. transferred 100,000 of those shares to EMD (an entity controlled by Bryant) on February 12, 2012 (KLM Ex. 161 at 7 (Certificate No. 5112)), and the remaining 1 million shares were transferred to Cede & Co. Fast Balance Certificate No. 700001.  KLM Ex. 161 at 54.

[873]    KLM Ex. 49 at 5 (20,000 shares from TBG); KLM Ex. 51 at 94 (100,000 shares from John Potter).   On April 23, 2010, FMS transferred 500,000 shares to Bryant (230,000 of which Bryant returned to FMS on January 25, 2011).  KLM Ex. 49 at 5; KLM Ex. 51 at 9.  Bryant liquidated many of these shares for cash.  KLM Ex. 49 at 20, 21, 36, 44.

[874]    Pursuant to Comu's January 5 Instruction Letter (KLM Ex. 313 at 7), OMST transferred 1,000,000 restricted shares from TBG to dMedia, care of Peter Knight.  KLM Ex. 49 at 1.  dMedia received an additional 5 million shares from FMS on April 23, 2010.  KLM Ex. 49 at 5.  In addition to millions of shares transferred to dMedia by TBG and FMS, dMedia received 9 million shares as part of the TBG Loan Recap on December 30, 2010.  KLM Ex. 50 at 3.  Pursuant to instructions from Bryant, OMST transferred 1 million shares from dMedia to ERI on October 6, 2011.   KLM Ex. 51 at 102. dMedia transferred another 8,670,000 shares to IFC in April of 2011.  KLM Ex. 51 at 26– 7.  On September 28, 2012, dMedia transferred 5 million shares to Comu insider David Knight (KLM Ex. 161 at 23 (Certificate No. 5456)), who in turn transferred all 5 million shares to ERI on November 8, 2012.  KLM Ex. 161 at  28.

Knight, and active in business of TBG, Regus Advisors, the GETG Entities, and ERI);[875] Texas

Atlantic Capital, LLC ("TAC")[876] (which shares offices with various Comu affiliates at the

15950 Dallas Parkway Address, and is controlled by Comu insider Saul Albom);[877] Ed Baxter

and the entity he controls called Bois d'Arc Partners, LLC ("Bois D'Arc")[878] (Baxter is a TBG

and Regus Advisors insider);[879] Energy Farms, Inc.[880] ("Energy Farms") (an entity controlled by

Comu insider Richard Kadish);[881] the GETG Entities in which Comu holds an interest[882] Bio-

---

[875]    *See supra* Section C(4); *see also* KLM Ex. 25 at 7 (GETG Director); KLM Ex. 104 (GETG); KLM Ex. 198 at 1 (Regus Advisors); KLM Ex. 227 at 1–2 (TBG & Regus Advisors); KLM Ex. 321 at 2 (TBG & GETG); KLM Ex. 218 at 1 (TBG & ERI); KLM Ex. 282 (ERI & WWA).  Some dMedia stock transfers are effected pursuant to instructions from Bryant to the transfer agent.  *See, e.g.*, KM Ex. 51 at 102.  dMedia, which is run by GETG and Regus Advisors insider Peter Knight, is based in Park City, Utah.  KLM Ex. 117 at 41; KLM Ex. 313 at 7.

[876]    Pursuant to Comu's January 5 Instruction Letter (KLM Ex. 313 at 7), TBG transferred 300,000 shares to TAC.  KLM Ex. 49 at 1.

[877]    KLM Ex. 117 at 165; KLM Ex. 313 at 7.  At all relevant times, Albom was paid out of TBG accounts.  See KLM Ex. 89 at 13–14, 17 (TBG checks to Albom).

[878]    *See, e.g.*, KLM Ex. 49 at 5 (25,000 shares to Baxter from TBG); KLM Ex. 49 at 12 (20,000 shares to Baxter from TBG); KLM Ex. 49 at 21 (2,000,000 shares to Baxter from TBG); KLM Ex. 161 at 3 (2,045,000 shares from Baxter to Bois D'Arc).

[879]    At all relevant times, Baxter was a Managing Partner of TBG or Regus Advisors, and was paid out of TBG accounts.  *See supra* Section C(3)–(4); *see also generally* Baxter testimony admitted at trial.

[880]    Pursuant to Comu's January 5 Instruction Letter (KLM Ex. 313 at 4, 6), OMST transferred 720,050 shares from TBG to Energy Farms, care of Richard Kadish.  KLM Ex. 49 at 1.  TBG also transferred over 1.7 million shares directly to Kadish.  KLM Ex. 49 at 3 (515,066 shares from TBG); KLM Ex. 49 at 5 (192,600 shares from TBG to Kadish via Campus); KLM Ex. 49 at 5 (1,000,000 shares from TBG to Kadish).  In 2010 and 2011, Kadish and Energy Farms sold off the shares to various private purchasers.  KLM Ex. 49 at 7, 20, 25–26, 44; KLM Ex. 51 at 37; KLM Ex. 161 at 4, 26, 44, 54.

[881]    Energy Farms is located in Corona Del Mar, California, and is controlled by Richard Kadish.  *See, e.g.*, KLM Ex. 313 at 4.  Kadish appears in correspondence among Welch and Comu regarding cash sales of Green Auto stock.  *See, e.g.*, KLM Ex. 101.  TBG made payments to (KLM Ex. 18 at 16 ($15,000)), and received payments from (KLM Ex. 18 at 6 ($5,000)), Energy Farms in late 2009.

[882]    *See supra* Section B(3); *see also* KLM Ex. 104 at 1 (GETG insiders include Potter, Dahl, Welch (via XL Biofuels and FMS), David Knight and Peter Knight).

Global,[883] XL Biofuels,[884] and GETG insiders John Potter,[885] Perry West;[886] and TBG employee Heather Jackson.[887]

### 6. Other Offshore Accounts to Conceal and Enjoy Undisclosed Assets

341.    In addition to the Turkish Bank Accounts described *supra*,[888] Comu has used other offshore entities and accounts to conceal and enjoy assets and cash, including the proceeds of Green Auto stock sales.

### (a) Continental Investments – UK

342.    Comu incorporated Continental Investments Holding Company Limited, a UK company ("CIHC")[889] on March 18, 2010 (before the Discharge Date), using the nominee services of Mansion House Capital ("Mansion House"),[890] (which, like Newhaven, concealed Comu's ownership of the entity). Anne Boureau ("Boureau") was appointed as Comu's nominee to serve as CIHC's sole director and shareholder.[891] Comu's contact at Mansion House was Patrick Kelly, a Comu insider at Regus Advisors.[892]

343.    At Comu's instruction, Boureau signed a letter, dated April 19, 2010 and addressed to Beykoylu at Turkish Bank in London, UK, authorizing Cem Comu to "to open and

---

[883]    KLM Ex. 161 at 95 (95,485 Preferred Shares from FMS). Bio-Global has liquidated some of these shares for cash in transactions effected after the Agreed TRO was entered. KLM Ex. 161 at 101.
[884]    KLM Ex. 161 at 89 (3,750 Preferred Shares from FMS); KLM Ex. 161 at 90 (5,748 Preferred Shares from FMS).
[885]    KLM Ex. 49 at 4 (300,000 shares from TBG).
[886]    KLM Ex. 49 at 45 (500,000 shares from ERI). West transferred these 500,000 shares back to ERI in 2011. KLM Ex. 51 at 54.
[887]    KLM Ex. 49 at 4 (50,000 shares).
[888]    *See supra* Section B(2).
[889]    KLM Ex. 178 at 1 (March 18, 2010 email to Comu confirming incorporation of "your company" CIHC); *id.* at 4625 (certification of CIHC incorporation). After receiving the incorporation information from Patrick Kelly at Mansion House, Comu responded, "You the best!! Pls send invoice and Bank Wire Info. Many thanks again- looking forward to the many deals in front of us!!" KLM Ex. 211 at 1.
[890]    Mansion House apparently used an online UK service to incorporate Continental Investments. *See generally* http://www.companiesmadesimple.com (website used for incorporation documents).
[891]    KLM Ex. 178 at 2–3.
[892]    *See supra* Section C(4) (Comu provided Kelly with a Regus Advisors email address when he established the new entity in mid-2010).

operate a Corporate Bank Account for the benefit and use of" CIHC (the "CIHC Turkish Bank Account").[893]   Comu instructed Boureau regarding follow up communications with Turkish Bank required to open the account.[894]

344.   When asked at his 2013 deposition whether he was familiar with CIHC, Comu unequivocally answered "No," and he denied being involved with its formation.[895]   After reviewing his deposition and deposition exhibits (which were produced in the 2013 Electronic Production), Comu produced an "errata" changing his "No" answer to "Yes."[896]

### (b)   Continental Partnership – Comu BVI

345.   In June of 2010, Comu again enlisted the services of Newhaven to establish a new BVI entity in his name, related to CIHC, called Continental Partnership, Inc. ("CPI").[897]

346.   Comu structured CPI the same way he structured WPA in order to conceal his beneficial ownership: Newhaven was appointed as registered agent for CPI,[898] and agreed "to

---

[893]   KLM Ex. 214 at 1–2 (Comu forwarded a form letter for opening CIHC Turkish Bank Account to Mansion House); KLM Ex. 180 at 1–2 (Mansion House returned the signed letter to Comu ("Happy hunting.")); KLM Ex. 215 at 1–2 (Comu forwarded the signed letter to Cem to facilitate opening the CIHC Turkish Bank Account).

[894]   KLM Ex. 217 (May 22, 2010 email from Comu to Boureau thanking her for her "assistance in opening a new Bank Account for Continental," and informing her that Turkish Bank needed "to confirm your instruction and grant the authorization").

[895]   KLM Ex. 345 at 1–2 ("Q. If you were involved in setting up a UK entity, would you remember? A. Right, but I never set up the UK entity.   Q. … If you had, would you remember?   A.  Oh, if I did, yes. ***   Q. … So you're sure that you weren't involved in setting up a UK entity called Continental Investment Holding Company?   A.  Well, I hope not.   Q.  Are you sure that you weren't involved or are you not sure?  A.  No. I'm sure I am not involved.").

[896]   KLM Ex. 345 at 1–2.  Comu explained that he "found Cert. of Inc.," that "[a]ll I did was buy Cert. of Inc.," and that his "brother set it up."  There is no evidence that Cem Comu was involved with the incorporation of Continental Investments.

[897]   On June 18, 2010, Newhaven informed Comu that "names beginning with Continental Group, Holdings Investment" (to mirror Comu's UK entity, Continental Investments) were unavailable, and proposed the name Continental Partnership Inc. as an alternative.  KLM Ex. 206 at 15343.  Comu approved CPI as the corporate name and instructed Newhaven to register the entity.  KLM Ex. 206 at 15343.  Newhaven incorporated CPI, a BVI company, on Comu's behalf on June 18, 2010.  KLM Ex. 204 at 14676 (certificate of incorporation); *id.* at 14676_2–23 (Memorandum of Understanding and Articles of Incorporation for CPI).  Comu paid Newhaven £750 to set up CPI.  KLM Ex. 272; *see also* KLM Ex. 206 at 15341

[898]   KLM Ex. 204 at 14676_3.

provide nominee director and shareholder services [for CPI] on the same reduced fee terms as we provide for [WPA]."[899]   Comu confirmed with Newhaven that CPI would enjoy "the same policy of privacy … with ownership and directors being BVI."[900]

347.    Throughout the Adversary – and in his trial testimony – Comu has falsely claimed that CPI is owned and controlled by his brother, Cem.   And when confronted at his 2013 deposition, Comu denied involvement with CPI.[901]   But Comu's own correspondence (obtained in the 2013 Electronic Production) confirms that CPI and its accounts remained under Comu's – not Cem's – ownership and control: "[I]n the matter of Continental Partnership Inc., please note that *this business entity will be strictly under my ownership and control* and therefore no further need from my brother….   As such I would like to activate some banking for this and transfer funds."[902]   Comu also personally controlled CPI's bank account(s),[903] which Comu established for the express purpose of real estate and stock investments.[904]

348.    Comu concealed his control of CPI in order to conceal his ownership of the Oaks North Residence, which Comu purchased through CPI on October 15, 2010, for $397,000 in

---

[899]     KLM Ex. 206 at 15342.  KLM Ex. 132 at 6 (Newhaven was appointed on June 18, 2010, to act as nominee shareholder and sole director for CPI).

[900]     KLM Ex. 206 at 15343.

[901]     KLM Ex. 345 at 1 ("Q.  Okay. So back to Continental Partnership, Inc., your testimony is you had nothing to do with the establishment of that entity?  A. No, I don't recall that – being involved with that.  Q. I'm sorry?  A. I don't recall being involved with that.").

[902]     KLM Ex. 202 at 2 (emphasis added).

[903]     On August 16, 2010, Charlotte Jacob at Newhaven forwarded to Comu due diligence documents Newhaven required to set up CPI's account at HSBC and asked Comu to confirm the currencies to be held.  KLM Ex. 203 at 1 (with HSBC due diligence form attached).  Comu responded on August 17, 2010 that CPI's account would "primarily be USD," and informed Newhaven that he "*wanted to operate this [CPI] account – personally*."  KLM Ex. 204 at 1 (emphasis added).  Comu inquired whether he could conduct CPI's banking individually, "or must everything go through" Newhaven like WPA.  KLM Ex. 202 at 2.  Reuben Anstock confirmed that Newhaven "will have to run everything through us as per WPA," and referred Comu's banking question to Charlotte Jacob.  KLM Ex. 202 at 1–2.  On August 24, 2010, Newhaven informed Comu that it was "not possible for [Newhaven] to grant control over the bank account unless we are the nominees of the company," and that if Comu only needed the entity, and not a bank account, Newhaven "will need to resign as nominees."  KLM Ex. 206 at 15341.

[904]     KLM Ex. 275 at 1 ("In regards to CPI – I would like to open & operate a Bank Acct and look to make investments of Real Estate and/or Stocks.  As such could you please provide me the necessary docs and or resolutions that would allow me to have such authority?").

cash.[905]   The purchase of the Oaks North Residence was negotiated[906] and consummated by Comu[907] – Cem Comu's only involvement in the transaction was to execute documents per Comu's request as part of Comu's scheme to conceal his ownership of the property.[908]

349.   To further perpetuate the falsity that he did not own the Oaks North Residence, Comu executed a lease with CPI on October 15, 2010 (the "Oaks North Lease"), which calls for $1,500 in monthly rent for a five-year term beginning November 1, 2010 and ending November 1, 2015.[909]   The Oaks North Lease lists CPI as the landlord, with an address in Istanbul, Turkey for rent payments.[910]   There is no evidence of any rent payments made by the Comus to CPI.

350.   On October 19, 2010 – four days after the Oaks North Residence sale closed – Comu changed his mailing address for one of the Turkish Bank Accounts to an address in

---

[905]       KLM Ex. 130 (contract of sale for Oaks North Residence).
[906]       On September 15, 2010, Comu approved the $397,000 cash offer for the Oaks North Residence. KLM Ex. 279 ("Great Job on the House Negotiation.  Lets proceed – with the offer of $397,000.").
[907]       Although the contract of sale identifies CPI as the purchasing party, notices pertaining to "Buyer" of the Oaks North Residence are sent to "CJ Comu."  KLM Ex. 130 at 6.  The home warranty for the Oaks North Residence identifies Comu as the "home buyer," and was purchased and is held in Comu's name.  KLM Ex. 133 at 1, 4, 8, 11; KLM Ex. 131 at 1–2.  Cem Comu's signature on the purchase contract is a stamp as opposed to an original signature.  KLM Ex. 130 at 7.
[908]       In June of 2010, per Comu's instructions, Newhaven asked Cem Comu to execute the necessary documents by which Newhaven resigned as CPI's sole director, and transferred one (1) share of CPI to Cem Comu so he could vote as CPI's director.  KLM Ex. 266 at 1–3 ("CJ has asked me to contact you direct, regarding the above."); KLM Ex. 267 at 1, 4.  On September 16, 2010, per Comu's instructions, Newhaven forwarded the necessary documents for Cem Comu to temporarily assume the role of Director for CPI, which Cem Comu signed and returned.  KLM Ex. 210 at 1, 5–6.  Cem Comu was appointed as a CPI director at Comu's request, and after transferring its CPI share to Cem Comu, Newhaven resigned as CPI director on September 29, 2010.  KLM Ex. 132 at 1–6.
      On September 2, 2010, Comu provided Cem Comu with the information necessary to obtain a letter of reference from Turkish Bank to establish financial worthiness for the purpose of purchasing the Oaks North Residence.  KLM Ex. 276 at 1–2.  Cem Comu emailed Cigdem Beykoylu at Turkish Bank regarding his need for a reference letter because he was "planning on purchasing a home in TX," with a link to the listing for the Oaks North Residence.  KLM Ex. 276 at 1–2.  Beykoylu requested further information about the addressee, which Cem Comu forwarded to Comu for an answer ("I need a name?"). KLM Ex. 276 at 1.  In response, Comu provided the name of the RE/MAX agent who brokered the sale. KLM Ex. 276 at 1.  After Beykoylu provided the requested letter, Cem Comu forwarded it to Comu so he could proceed with  the purchase.  KLM Ex. 209; KLM Ex. 277 at 1.
[909]       KLM Ex. 136 at 1–2, 14.
[910]       KLM Ex. 136 at 1–2, 14.

Istanbul, Turkey.[911]   According to the Injunction Status Report, Comu has now turned over

$5,000 from this account, but has not turned over statements related to the account.[912]

351.   Comu used his purchase of the Oaks North Residence[913] to convert the Paladium

Residence into an income-producing asset.   The Comus vacated the Paladium Residence and

moved into the Oaks North Residence in October or November 2010, and have since rented the

Paladium Residence to tenants for $2,500 per month (the "Paladium Rents").[914]   The current

lease for the Paladium Residence runs for a five-year term, from August 1, 2012 to August 1,

2017 (the "Paladium Lease").[915]

352.   Mervyn Price (a Regus Advisors officer and director who is also involved in

Comu's UK businesses),[916] is the current tenant under the Paladium Lease.[917]   The Paladium

Lease lists Mervyn Price's address as 4206 Holland Avenue, in Dallas, Texas.[918]   According to

Dallas County property tax records, Price is the current owner of the property at 4206 Holland

Avenue.[919]

---

[911]   Cem Comu forwarded a document for Comu to sign in order to effect his change of address with Turkish Bank.  KLM Ex. 269 at 1–2, 4 (referencing Turkish Bank account ending in *9653).  Comu modified the letter slightly to reflect his name at the new mailing address, signed it, and sent it back on the same day.  KLM Ex. 283 at 1, 4.  The letter reads in Turkish: "Şubeniz nezdinde bulunan 4 0000 29653 nolu USD hesabıma kayıtlı adresimin aşağıdaki şekilde değiştirilmesini rica ederim."  KLM Ex. 283 at 4.  Roughly translated: "I am requesting a change of the registered address on the USD account number 4000029653 at this branch as described below."

[912]   Inj. Status Report at 12 (item #12).  Comu produced to Trustee an email dated April 15, 2014 "requesting information and statements" for the Turkish Bank account ending in *9653.  *Id.* at 14 (item #79).

[913]   Comu claims the Paladium Residence (valued at $379,370 in January, 2010) as his exempt homestead.   Trustee Ex. 94 at 1, 8.  Comu claims the homestead exemption pursuant to Texas Constitution, art. 16 §§ 50, 51; and under Texas Property Code §§ 41.001-.002.

[914]   KLM Ex. 137 at 1–2.

[915]   KLM Ex. 137 at 1.

[916]   KLM Ex. 14 at 3, 5 (Regus Advisors); KLM Ex. 106 at 11 (same); KLM Ex. 84 at 6–7 (Director & Shareholder of Puration UK); KLM Ex. 83 at 8 (Director, Hampshire Consultants Ltd (UK)).

[917]   KLM Ex. 137 at 1.

[918]   KLM Ex. 137 at 1.

[919]   Tax records, which are available on the Dallas Central Appraisal District website, confirm that Price has owned the Holland Avenue property since 2003.  *See* http://www.dallascad.org/AcctHistory.aspx?ID=001576003601B0000.   The Court may take judicial notice of these public tax records.  *See* FED. R. EVID. 201.

353. Comu has given inconsistent and misleading testimony regarding the ownership of the Paladium Residence and the Paladium Rents. Although Comu claims the Paladium Residence as his homestead, Paladium Residence property taxes for 2009 and 2010 were paid by TBG before the Petition Date.[920] The Paladium Lease, signed by Comu, requires rent payments be made to Sunset Pacific at the 18208 Preston Road Address.[921] Sunset Pacific's 2011 tax return declares $27,500 in gross Paladium Rents as income.[922] Sunset Pacific claimed a $6,970 depreciation deduction and other "rental real estate expenses" as deductions (totaling $22,470) against the gross Paladium Rents, resulting in a claimed $5,030 in net rental income.[923] Sunset Pacific's 2010 tax return declares no income from the Paladium Rents,[924] and Comu's 2010 and 2011 personal tax returns do not claim any Paladium Rents as income.[925]

---

[920]    *Compare* KLM Ex. 371 at 1 ($6,988.80 taxes paid January 31, 2009), *with* Trustee Ex. 24 at 1 ($6,988.80 check to David Childs Tax Assessor).

[921]    KLM Ex. 137 at 2, 14.

[922]    Trustee Ex. 36 at 6, 11. 1.    As of May 1, 2014, at $2,500 per month, accrued Paladium Rents since November 1, 2010 are $105,000, and accrued rents since August 1, 2012 are $50,000. Other than the $27,500 in gross rents declared in Sunset Pacific's 2011 tax return (which Comu has disavowed), there is no evidence of any payments toward the $105,000 in accrued Paladium Rents.

[923]    Trustee Ex. 36 at 4, 6, 9 (2011 tax return dated August 7, 2012). Comu admitted as evidence a second, later-filed 2011 tax return for Sunset Pacific that omits the Paladium Rents from Sunset Pacific's income. Def. Ex. 9 (dated August 13, 2012). Coincidentally, this second, revised tax return was filed shortly after this Court entered an order terminating abatement of the Adversary, which had been requested by Trustee while she evaluated potential claims. *See* Adv. Doc. No. 50 (August 7, 2012 order); *see also* Adv. Doc. No. 39.

[924]    Trustee Ex. 35.

[925]    Trustee Ex. 69; Trustee Ex. 70.

## II.    AUTHORITIES SUPPORTING PROPOSED CONCLUSIONS OF LAW

354.    The determinations, findings, judgments, decrees, and orders set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Bankruptcy Rule 7058. The Court hereby orders all of the findings of fact and conclusions of law contained herein.

355.    Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

### A.    JURISDICTION AND VENUE

356.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 28 U.S.C. § 1334(b).[926]

357.    This is a core proceeding under 28 U.S.C. § 157(b)(2).[927]

358.    Venue for this Adversary is proper in this Court pursuant to 28 U.S.C. § 1409.[928]

### B.    PROPERTY OF THE ESTATE

359.    Under Section 541(a), "property of the estate" includes in relevant part "the following property, *wherever located and by whomever held*:" (1) "all *legal or equitable* interests of the debtor in property as of the commencement of the case;"[929] and (2) "[a]ll interests of the debtor *and the debtor's spouse in community property* as of the commencement of the case" that are (A) "under the sole, equal or joint management and control of the debtor,"[930] or that are (B) "liable for an allowable claim against the debtor, or for both an allowable claim against the

---

[926]    JPTO Stip. of Law ¶ 1.
[927]    JPTO Stip. of Law ¶ 2.
[928]    JPTO Stip. of Law ¶ 3.
[929]    11 U.S.C. § 541(a)(1) (emphasis added); *see also* JPTO Stip. of Law ¶ 14.
[930]    11 U.S.C. § 541(a)(2)(A) (emphasis added); *see also* JPTO Stip. of Law ¶ 14.

debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable."[931]

360. "Property of the estate" also includes any "[p]roceeds, … rents, or profits of or from property of the estate, except such as are earning from services performed by an individual debtor after the commencement of the case."[932]

361. "[A]n interest of the debtor in property becomes property of the estate … notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law … that restricts or conditions transfer of such interest by the debtor."[933]

362. "A Chapter 7 debtor's exercise of dominion and control over, and indeed a subsequent conversion of, an estate asset to the exclusion of the bankruptcy estate can be neither countenanced nor disregarded."[934]

## C. PLAINTIFFS' REVOCATION CLAIMS

363. Plaintiffs' revocation claims are brought pursuant to 11 U.S.C. § 727(d)(1) and § 727(d)(2).[935] Fraud under § 727(d) may be shown by the same grounds that would prevent discharge under § 727(a).[936]

364. Plaintiffs' revocations claims are timely because they were filed within (1) one year of the Discharge being granted.[937]

365. Plaintiffs bear the burden of establishing the elements of their revocation claims by a preponderance of the evidence.[938]

---

[931] 11 U.S.C. § 541(a)(2)(B).
[932] 11 U.S.C. § 541(a)(6); *see also* JPTO Stip. of Law ¶ 14.
[933] 11 U.S.C. § 541(c)(1); *see also* JPTO Stip. of Law ¶ 15.
[934] *McNally v. Echart (In re Echart)*, 374 B.R. 596, 599 (Bankr. E.D. Tex. 2007).
[935] JPTO at 2.
[936] *See, e.g.*, *Johnson v. Meabon (In re Meabon)*, NO. 10-30455, ADV 12-3218, 2014 WL 1371583, at *5 (Bankr. W.D.N.C. Apr. 8, 2014).
[937] JPTO Stip. of Law ¶ 4; *see also* 11 U.S.C. §727(e).

366.    Based on the evidence set forth above, Plaintiffs have met the standards for revocation of discharge under both 11 U .S.C. § 727(d)(l) and (2).[939]

### 1.    Comu had a continuing duty to make complete and accurate disclosures.

367.    The purpose of provisions like §727 is to ensure that those who seek bankruptcy protection "'do not play fast and loose with their assets or with the reality of their affairs.'"[940] As the Fifth Circuit has stated,

> The Bankruptcy Code provides the method by which debtors may "reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."   This "fresh start" policy, however, requires that the debtor honestly comply with the requirements of the Code.  If the debtor fails to comply with the requirements of the Code, the discharge may either be denied or revoked.   Revocation of discharge, therefore, occurs because of a failure to comply with the requirements of the Code which would have otherwise entitled the debtor to discharge.[941]

368.    As this Court stated in a similar case, "[a] discharge in bankruptcy is a privilege, not a right.  To obtain (and retain) this privilege, a debtor must act with absolute candor and cooperation *vis-a-vis* the trustee."[942]   In order to avail himself of that privilege, Comu was

---

[938]    JPTO Stip. of Law ¶ 5; *see also, e.g.*, *Reed v. Cooper (In re Cooper)*, 426 B.R. 227, 238 (Bankr. N.D. Tex. 2010), *aff'd*, 443 Fed. App'x 888 (5th Cir. 2011).

[939]    Bench Conclusion No. 1.

[940]    *Neary v. Hughes (In re Hughes)*, 353 B.R. 486, 499 (Bankr. N.D. Tex. 2006) (quoting *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 66 (1st Cir. 2004)).

[941]    *United States v. Cluck*, 87 F.3d 138, 140 (5th Cir. 1996) (internal quotations and citation omitted); *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 207–08 (5th Cir. 1999) ("It goes without saying that the Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets.... Viewed against the backdrop of the bankruptcy system and the ends it seeks to achieve, the importance of this disclosure duty cannot be overemphasized.").

[942]    *Reed*, 426 B.R. 227, 240 (Bankr. N.D. Tex. 2010); *see also McNally*, 374 B.R. at 600 ("A Chapter 7 debtor's right to obtain a discharge is absolutely and unconditionally dependent upon an honest and complete disclosure of all assets and the tendering of all non-exempt assets to the trustee for administration."); *Hughes v. Wells (In re Wells)*, 426 B.R. 579, 598 (Bankr. N.D. Tex. 2006) ("Discharge is a privilege, not a right, and it should only be provided 'to those debtors who put forth a good faith effort in producing an entire picture of their financial affairs.'") (quoting *J.P. Morgan Chase Bank v. Hobbs (In re Hobbs)*, 333 B.R. 751, 755 (Bankr. N.D. Tex. 2005)).

subject to the broad disclosure rules in the Bankruptcy Code.[943] "As is often stated, the prompt and unconditional fulfillment of that duty is the *quid pro quo* for the protections offered by an order of discharge and any refusal by a debtor to fulfill those obligations, when taken with the requisite mental state, must trigger a corresponding deprivation of that remedy for which bankruptcy relief is sought."[944]

369. Comu therefore had "a continuous, affirmative duty to disclose" in his Bankruptcy Filings complete and accurate information regarding his creditors, debts, assets (whether present, future, contingent or equitable), and business affiliations.[945] As stated by this Court in *In re Braymer*:

> Bankruptcy law presupposes that one who seeks its protection will deal honestly and fairly with creditors by furnishing a complete and accurate schedule of assets. The trustee and creditors are entitled to honest and accurate signposts on the trail showing what property has passed through the debtor's hands during the period prior to bankruptcy. A debtor has a paramount duty to consider all questions posed on statement or schedules carefully and see that question is answered completely in all respects. Additionally, a debtor has an ongoing obligation to disclose all transfers, attempted transfers, unlisted assets and other relevant information.[946]

370. Comu's honest disclosures in his Bankruptcy Filings "'serve the important purpose of insuring that adequate information is available for the Trustee and creditors without

---

[943] *Lowe v. King (In re King)*, Bankr. No. 05–56485–C, Adv. No. 06–5122–C, 2006 WL 3861097, at *3–*5 (Bankr. W.D. Tex. Dec. 29, 2006) (citing 11 U.S.C. §§ 521(1) and 521(3)).

[944] *McNally*, 374 B.R. at 600; *see also In re Hicks*, 184 B.R. 954, 957 (Bankr. C.D. Cal. 1995) ("[T]he debtor's duty of full disclosure ... is the *quid pro quo* for the fresh start provided by the discharge."); *Hill v. Muniz (In re Muniz)*, 320 B.R. 697, 699 (Bankr. D. Col. 2005) ("Those persons who seek the extraordinary relief of a bankruptcy discharge may not ignore their legal obligations to the court and the trustee and still expect to receive a discharge of debt.").

[945] *Roberts v. McVay (In re Roberts)*, NO. CIVA SA-07-CV583-XR, 2010 WL 376399, at *5 (W.D. Tex. Jan. 25, 2010) (citing *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593–94 (Bankr. N.D. Tex. 1991) ("A debtor has a paramount duty to carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects.")); *see also Banc One, Texas, N.A. v. Braymer (In re Braymer)*, 126 B.R. 499, 502 (Bankr. N.D. Tex. 1991) (hereafter, *Braymer*) (Comu had the burden "to use reasonable diligence in completing [his] schedules and list of debts").

[946] *Braymer*, 126 B.R. at 503 (citations omitted); *see also Morton*, 127 B.R. at 593.

need for investigation to determine whether the information provided is true.'"[947] "[N]ondisclosure can prevent a trustee [or a creditor] from even knowing of the assets' existence in time to object to discharge, resulting in the discharge being procured by the debtor's failure to fulfill his duty to disclose."[948]

371. Comu's duty of disclosure is not dependent on the value of the undisclosed assets.[949] "A debtor must be scrupulous in giving notice of all assets to which others may make a legitimate claim, and may not avoid questions by failing to disclose the asset even though he or she may think it may be theirs to keep."[950] "[D]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or unavailable to the bankruptcy estate."[951] "The basic principle behind the Statement of Financial Affairs is to give both the UST and any creditors an accurate portrait of the debtor's financial situation, and exclusions based upon the debtor's belief they have no value do not help fulfill that purpose."[952]

372. Even if an account is not held in the debtor's name, it must be disclosed if the debtor utilizes the account.[953] And even if a particular asset should ultimately be excluded from

---

[947] *Lightfoot v. Landry (In re Landry)*, 350 B.R. 51, 60 (Bankr. E.D. La. 2006) (quoting *In re Pratt*, 411 F.3d 561 (5th Cir. 2005)).

[948] *Lowe*, 2006 WL 3861097 at *5 (citations omitted).

[949] *See, e.g., In re Loew*, No. 11–13339–JNF, 2012 WL 1229904, at *6 (Bankr. D. Mass. Apr. 11, 2012) ("[T]he value of the Debtor's assets is not the issue, it is the completeness and accuracy of the Debtor's description of his assets at the commencement of the case, which was notable for its omissions.").

[950] *Braymer*, 126 B.R. at 502 (citing *Woodson v. Fireman's Fund Insurance Co. (In re Woodson)*, 839 F.2d 610, 616 (Bankr. 9th Cir. 1988)).

[951] *Neary v. Darby (In re Darby)*, 376 B.R. 534, 540 (Bankr. E.D. Tex. 2007) (hereafter, "*Darby*") (quoting *Matter of Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992)).

[952] *Roberts*, 2010 WL 376399 at *5.

[953] *See, e.g., Croge v. Katz (In re Katz)*, 203 B.R. 227, 234 (Bankr. E.D. Pa. 1996) ("The Debtor's failure to disclose the [account] is also significant. Substantial funds belonging to the Debtor admittedly flowed in and out of that account, even if the account was not in the Debtor's name and other persons utilized it.").

the property of the estate, a debtor's interest in that asset must be disclosed – and failure to do so constitutes fraud by the debtor.[954]

## 2.    Fraudulent Intent Supporting Revocation

373.    A debtor's fraudulent intent is an element of revocation under both § 727(d)(1) and § 727(d)(2).  A statement is made with knowledge of its falsity if the debtor knew it to be false or if it was made with reckless disregard for its truth.[955]   Fraudulent intent "'involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression.'"[956]

374.    A finding of fraudulent intent under § 727(d) may be proved by showing either actual intent to deceive or a reckless indifference for the truth,[957] and "may be based on inferences drawn from a course of conduct ... [or] from all of the surrounding circumstances."[958]

375.    "[M]ultiple inaccuracies" in a Debtor's bankruptcy filings "are usually evidence of a pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent."[959]   Fraud may be presumed for purposes of § 727(d)(1) when there

---

[954]    *Croge*, 203 B.R. at 233 ("At least the existence of the trust of which the Debtor is a beneficiary should have been disclosed."); *see also Braymer*, 126 B.R. at 502.

[955]    *See, e.g.*, *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 285 B.R. 778, 784 (Bankr. D. Conn. 2002).

[956]    *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685–686 (6th Cir. 2000) (quoting *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)).

[957]    JPTO Stip. of Law ¶ 6; *see also Reed*, 426 B.R. at 239; *Neary v. Hughes*, 353 B.R. at 504; *see also Sholdra v. Chilmark Fin., LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

[958]    *Yonikus*, 974 F.2d at 905; *see also* JPTO Stip. of Law ¶ 7; *First Tex. Svgs. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir. 1983) (finding that a debtor's whole pattern of conduct evidences his fraudulent intent); *Reed*, 426 B.R. at 238 ("'[P]roving a knowing and fraudulent intent is not a simple matter, for rare will be the debtor who provides direct evidence of his fraudulent intent.'") (quoting *McNally*, 374 B.R. at 599); *Darby*, 376 B.R. at 540 ("[T]he existence of a fraudulent intent is most often betrayed by an examination of a course of conduct."); *Braymer*, 126 B.R. at 503-04 (citing facts that "reveal a pattern of the Debtor's attempts to hide assets from her creditors").

[959]    *Lightfoot*, 350 B.R. at 59; *see also Oldendorf v. Buckman*, 173 B.R. 99, 105 (E.D. La. 1994) ("[T]he existence of more than one falsehood, together with the failure to clear up all the inconsistencies when filing amended schedules, may constitute reckless indifference to the truth, and, therefore, the requisite intent to deceive.").

are material omissions in a debtor's bankruptcy schedules.[960]  "Fraudulent intent may be inferred

if the false statement is not explained satisfactorily."[961]  Undervaluation of a material asset on a

debtor's schedule is also sufficient to show bankruptcy fraud.[962]

376.    A debtor's failure to disclose information in response to direct questioning at the

meeting of creditors or in depositions supports a finding of fraudulent intend required to support

revocation.[963]  Even if information is ultimately disclosed by amending a debtor's Schedules or

SOFA (which never occurred here), a debtor's disclosure of relevant information only upon

questioning by creditors or the trustee can create a negative implication from which the

bankruptcy court may infer fraudulent intent.[964]

377.    A debtor's inclusion of some information about a particular asset or activity in his

Schedules does not excuse his failure to supply *all* material information about that asset or

---

[960]    *See, e.g.*, *In re Hayes*, 270 B.R. 183, 186 n.2 (Bankr. S.D.N.Y. 2001) ("[W]here, as here, the fraud concerns a material omission, elements of fraud such as reasonable reliance, harm or detriment to creditors and a causal relation between the omission and the creditor's detriment are presumed from a finding of materiality.") (citations omitted).

[961]    *See, e.g.*, *Malicki v. Bernstein (In re Bernstein)*, 447 B.R. 684, 702 (Bankr. D. Conn. 2011) (citations omitted).

[962]    *See, e.g.*, *United States v. Walker*, 29 F.3d 908, 913 (4th Cir. 1994) ("Whether or not Walker attempted *physically* to conceal the property listed in the Statement of Financial Affairs, his substantial undervaluing of that property constitutes an attempt to conceal assets from the trustee or from an officer of the court that was perpetrated during the commission of the bankruptcy fraud for which he was convicted."); *see also Berkery v. Commissioner, Internal Revenue Service*, 192 B.R. 835, 841 (E.D. Pa. 1996) (material undervaluation of an asset is one of the recognized "badges of fraud" that serve as circumstantial evidence of fraudulent intent) (citations omitted).

[963]    *See, e.g.*, *Yoppolo v. Sayre (In re Sayre)*, 321 B.R. 424, 429 (Bankr. N.D. Ohio 2004) ("One of the underlying purposes of the first meeting of creditors is to allow a trustee, and other interested parties, to question the debtor face-to-face which, given human nature, may yield information not otherwise disclosed in the petition.  Yet … when specifically asked about the omissions at issue in this case, the Debtor gave wrongful information that, notwithstanding emotional considerations, had to be known to her.  When viewed at in conjunction with the fact that like omissions existed on her bankruptcy petition, there is simply no alternative viable explanation other than to conclude that the Debtor sought to defraud her estate of assets.").

[964]    *Sholdra*, 249 F.3d at 382 ("We disagree because the amended schedules and statement of financial affairs fail to create a genuine issue of material fact. While it may have been better practice for Appellee to disclose the existence of such amendments, they do not negate the fact that Appellant made knowingly false oaths in his original schedules and statement of financial affairs."); *Yoppolo*, 321 B.R. at 427–28 ("[A]mending one's bankruptcy petition, as the Debtor eventually did here, will not cure prior transgressions.").

activity where elsewhere requested in Bankruptcy Filings or upon questioning.[965]  As one court noted in a similar case, "it is not uncommon for persons engaged in a wrongful activity to hedge their bets by taking steps to give their actions less of an appearance of impropriety."[966] Therefore, where a debtor's bankruptcy filings "only represent half the picture," and the debtor deliberately obfuscates the whole picture, the court can infer fraudulent intent necessary to support revocation.[967]

378.   Comu suggested in his trial testimony that various omissions were mere mistakes. But as this Court has noted, where a debtor fails to disclose information based on "a *mistaken and stubborn belief*," which is coupled by evidence that the debtor "*concealed* the fact" in question, and that he "admitted" the fact only after "the Trustee *discovered and confronted*," then the debtor's omission becomes "*more* than *simply mistaken beliefs and stubbornness*," and the debtor's omission of the fact supports the existence of the fraudulent intent required for revocation.[968]

379.   "Knowingly and fraudulently hiding assets when it occurs is an abuse of the bankruptcy process. A debtor who fraudulently manipulates the bankruptcy system to avoid paying just debts is not eligible for the same fresh start as the honest debtor."[969]

### 3.   Revocation is Warranted Under § 727(d)(1) and § 727(d)(2)

380.   Under Section 727(d)(1) of the Bankruptcy Code, the Court "shall revoke a discharge" if "such discharge was obtained through the fraud of the debtor."[970]

---

[965]   *See, e.g.*, *Yoppolo*, 321 B.R. at 428–29.

[966]   *Yoppolo*, 321 B.R. at 428.

[967]   *Yoppolo*, 321 B.R. at 428.

[968]   *Reed*, 426 B.R. at 239-40 (emphasis in original) ("[I]t became a situation of Mr. Cooper intentionally not disclosing, and then later, deliberately withholding property that he (whether he liked it or not and whether he thought it was fair or not) was required to deliver to the Trustee.").

[969]   *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997).

[970]   11 U.S.C. § 727(d)(1).

381.    To achieve revocation under § 727(d)(1), the "requesting party" – here, Plaintiffs, not the Trustee[971] – must show they "did not know" of the "fraud of the debtor" … "until after the granting of such discharge."[972]

382.    There are two subsets of "fraud of the debtor" under § 727(d)(1) – the failure to disclose assets at the time of the bankruptcy Petition ("undisclosed assets"), and "false oaths."[973]

383.    The first subset of "fraud of the debtor" under § 727(d)(1) is undisclosed assets at the commencement of the bankruptcy case.[974]  A debtor's failure to disclose the existence of assets in his bankruptcy filings support revocation under § 727(d)(1) if the omissions were knowingly and fraudulently made, they were material, and plaintiffs or trustee (whomever is asserting the revocation claim) were unaware of the facts at issue when the Debtor sought his discharge.[975]

384.    The second subset of "fraud of the debtor" under § 727(d)(1) is false oaths. The elements of a false oath claim for revocation include a statement that: (1) was made under oath; (2) was false; (3) the debtor knew was false; (4) was made with fraudulent intent; and (5) related

---

[971]    Section 727(d)(1), by it own terms, requires only that the "requesting party" – here, Plaintiffs – were unaware of Comu's fraudulent acts, thus it is irrelevant whether or not the Trustee was on notice of Comu's fraudulent conduct.  Moreover, courts have rejected the notion that, for the purposes of § 727(d)(1) revocation analysis, knowledge of the debtor's fraud can be imputed between the trustee and creditors.  As the court aptly stated in *Walton v. Staub (In re Staub)*, 208 B.R. 602, 606 (Bankr. S.D. Ga. 1997), "[t]o say the Debtors lack 'clean hands' to make this equitable appeal understates the obvious, and their appeal to equity is outrageous considering their own fraud."  *See also Darby*, 376 B.R. at 543 n.9. Nor should Comu be absolved of his own fraudulent conduct based on the Trustee's failures.  *Cf. Citibank, N.A. v, Emery (In re Emery)*, 132 F.3d 892, 896 (2nd Cir. 1998) ("[W]e do not believe that Congress intentionally drafted a statute to punish fraudulent conduct by debtors that at the same time provides a period of immunity for such debtors.").

[972]    11 U.S.C. § 727(d)(1); *see also* JPTO Stip. of Law ¶ 8.

[973]    JPTO Stip. of Law ¶ 8; *see also, e.g.*, *Mazer v. Jones (In re Jones)*, 178 B.R. 1, 4 (Bankr. D.N.M. 1995); *Walton*, 208 B.R. at 604; *(In re Wilson)*, Nos. 99–13695–JMD, 01–1058–JMD, 2002 WL 1067450, at *5 (Bankr. D.N.H. May 28, 2002) ("A complaint seeking to revoke a debtor's discharge pursuant to section 727(d)(1) may be based upon a determination under section 727(a)(2) that the debtor has concealed or transferred assets with fraudulent intent or a determination under section 727(a)(4)(A) that the debtor knowingly and fraudulent [sic] made a false oath or account in connection with his or her bankruptcy case.") (citations omitted.)

[974]    JPTO Stip. of Law ¶ 9.

[975]    JPTO Stip. of Law ¶ 9; *see also, e.g.*, *Darby*, 376 B.R. at 539-40.

materially to the bankruptcy case.[976]  "False oaths may be in the form of either false statements or omissions on the schedules and statement of financial affairs or false statements by the debtor during the course of the bankruptcy proceedings."[977]

385.   Under both subsets of § 727(d)(1), an omission is material "if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[978]  A finding of materiality is not dependent upon the value of the omitted assets or whether the omission was detrimental to creditors.[979]

386.   Based on the evidence set forth above, Plaintiffs have proved by far more than a preponderance of the evidence that revocation of discharge is warranted under both subsets of § 727(d)(1), due to a substantial number of false oaths made with fraudulent intent (which continued through trial), and due to substantial undisclosed assets and valuable interests.

387.   Moreover, because Comu engaged in an active and ongoing scheme to conceal his assets and business activities from the Trustee and his creditors, any partial disclosure of information made prior to discharge was, as a matter of law, insufficient to constitute "knowledge" of the Plaintiffs that would bar their revocation claim.   Debtor's continuing duty under the Bankruptcy Code to make full and accurate disclosure of all information material to the bankruptcy estate prohibits Debtor from relying on partial and misleading disclosures as evidence of Plaintiffs' knowledge of Debtor's fraud, particularly where other material facts were

---

[976]    JPTO Stip. of Law ¶ 10; *see also, e.g.*, *Lightfoot*, 350 B.R. at 60.
[977]    *Lightfoot*, 350 B.R. at 60; JPTO Stip. of Law ¶ 10.
[978]    JPTO Stip. of Law ¶ 11; *see also Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992); *Darby*, 376 B.R. at 542.
[979]    JPTO Stip. of Law ¶ 11; *see also Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005).

intentionally withheld or concealed.[980]  Therefore, for the purposes of § 727(d)(1), Plaintiffs "did not know" of the Debtor's fraud before discharge.

388.    Accordingly, Plaintiffs have satisfied their burden of establishing by a preponderance of the evidence that revocation of discharge is warranted under § 727(d)(1) due to fraud of the Debtor.

389.    Plaintiffs also seek revocation under Section 727(d)(2), which provides that "the court shall revoke a discharge" if "the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee."[981]

390.    By the plain statutory language, a claim under § 727(d)(2) does not require plaintiffs to show they "knew of [the Debtor's] fraud" before discharge as § 727(d)(1) requires. Plaintiffs' knowledge of Comu's fraud prior to the Discharge Date is therefore not relevant to the Court's inquiry under § 727(d)(2), which does not require Plaintiffs to show they "did not know" of Comu's fraud prior to discharge.[982]

391.    Even if Plaintiffs' pre-discharge knowledge were relevant, Comu's concealment of assets preludes any finding that Plaintiffs knew of Comu's fraudulent conduct.

392.    Based on the evidence detailed *supra*, Plaintiffs have satisfied their burden of establishing by a preponderance of the evidence that revocation of discharge is warranted under § 727(d)(2) due to Debtor's failure to report and tender all non-exempt assets to the Trustee.

---

[980]    *Cf. Hill*, 320 B.R. at 699 ("Those persons who seek the extraordinary relief of a bankruptcy discharge may not ignore their legal obligations to the court and the trustee and still expect to receive a discharge of debt.").

[981]    JPTO Stip. of Law ¶ 13; *see also Reed*, 426 B.R. at 238.

[982]    *See Lincoln Nat. Life Insur. Co. v. Silver (In re Silver)*, 367 B.R. 795, 824 (Bankr. D.N.M. 2007) (debtor's failure to report her interest in certain property violated § 727(d)(2), regardless of whether the creditor knew about the property).

393. Based on the above, Plaintiffs request the Court enter judgment revoking Debtor's Discharge without further delay pursuant to 11 U.S.C. § 727(d).

### 4. Comu's Objections to Revocation

394. In response to Plaintiffs' revocation claims, Comu argued that "Plaintiffs missed the deadline to object to Comu's discharge, and the Plaintiffs have sued their former attorney for missing the deadline."[983]

395. A prior final fraud judgment is non-dischargeable under Bankruptcy Code § 523(a)(2)(A) as a debt for money obtained by fraud.

396. As Debtor's counsel admitted at trial, the Judgment Debt – which was predicated on underlying claims for fraud in a case involving the same parties to this Adversary[984] – would have been nondischargeable under 11 U.S.C. § 523(a)(2) had there been a timely objection.[985]

397. But the failure of Plaintiffs' Prior Counsel to file a timely objection to discharge based on Comu's pre-petition fraud does not excuse Comu's failure to comply with his continuing and affirmative duty of disclosure to Trustee and creditors – and therefore, cannot as a matter of law, bar Plaintiffs' claims for revocation, which are based on a separate subset of Section 727(d), and which are based on Comu's post-petition fraud.

398. Moreover, Comu's subsequent decision to disclose some assets or material information that were omitted or misrepresented in his Bankruptcy Filings does not excuse his earlier fraud – "rather, it solidifies its existence."[986]

---

[983]    JPTO at 6.

[984]    *Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991); *accord In re Gupta*, 394 F.3d 347, 350 (5th Cir. 2004) ("A bankruptcy court may apply collateral estoppel in a dischargeability proceeding to preclude relitigation of state court findings that are relevant to dischargeability."); *In re Gober*, 100 F.3d 1195, 1201 (5th Cir. 1996) (same).

[985]    "[T]he plain meaning of the [Section 523(a)(2)(A)] is that debtors cannot discharge any debts that arise from fraud so long as they are liable to the creditor for the fraud." *In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749 (5th Cir. 2001).

399.    Trustee's knowledge of any facts or assets that Comu disclosed in the March 2010 Production to the Discharge Date cannot be imputed to Plaintiffs.[987]

400.    Moreover, where Comu remained silent about assets and material financial information, and "chose to disclose material financial information *only* when directly asked or confronted with the truth," his "behavior justifies a presumption of fraud, as this is the essence of intent to deceive."[988]    As the Bankruptcy Court in *In re Henley* pointed out, holding otherwise would send "a dangerous message: that as long as a debtor eventually discloses his earlier omission, any earlier fraudulent intent is negated.  In effect, this would mean that there are no consequences for a debtor's failure to make proper and timely disclosures."[989]

401.    As the Bankruptcy Court stated in *In re Pongvitayapanu*,

> Finally, the Court must also consider the way in which the Debtor has elected to defend this lawsuit.  The Plaintiff has made showings that raise serious concerns about the Debtor's conduct in his bankruptcy case.  Yet, [Debtor's] responses come through counsel, fail to address serious allegations, are often opaque, and, at times, flippant.  It is clear that "[a] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath."[990]

---

[986]    *Tow v. Henley (In re Henley)*, 480 B.R. 708, 796 (Bankr. S.D. Tex. 2012) (citing *In re Gartner*, 326 B.R. at 375); *In re Huff*, 349 B.R. at 594 (finding that the debtor's admissions at her meeting of creditors were not the result of her honest intent, but rather due to what the court called the "unavoidable result of two knowledgeable creditors being present at the meeting"); *see also Sholdra*, 249 F.3d at 382.

[987]    *Cf. Tow*, 480 B.R. at 795 (a creditor's knowledge of a debtor's assets, ownership interest, or any other information does not relieve the debtor of his duty to the trustee).

[988]    *Tow*, 480 B.R. at 795 (italics in original) (citing *In re Gartner*, 326 B.R. at 375 ("The decision to amend the Schedules only after untruths are uncovered is evidence of fraudulent intent."); *Satriale v. Mumin (In re Mumin)*, No. 97–14424DAS, 1998 WL 160992, at *3 (Bankr. E.D. Pa. April 1, 1998) ("An inference of fraud is permissible [ ] when the evidence indicates that the amendment is not in fact voluntary because the amendment is offered only as a result of development during the meeting of creditors, after the debtor 'knew the cat was out of the bag,' [or] well after the meeting of creditors ...").

[989]    *Tow*, 480 B.R. at 776.

[990]    *Beer Sheva Realty Corp. v. Pongvitayapanu (In re Pongvitayapanu)*, 487 B.R. 130, 141–142 (Bankr. E.D.N.Y. 2013) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 111 (1st Cir. 1987)).

### D. TRUSTEE'S CLAIMS

402. To establish reverse veil piercing under Texas Law and determine that a corporation is the alter ego of an individual, Trustee has the burden of establishing by a preponderance of the evidence that: (1) the individual has an actual ownership interest or a de facto ownership in the corporation; (2) the corporation was organized and/or operated as a mere tool or business conduit for the individual, considering the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal and/or illegal or improper purposes; and (3) applying the reverse veil piercing will not prejudice non-culpable shareholders or other stakeholders or creditors.[991]

403. Reverse piercing of the corporate veil is a Texas remedies doctrine that permits creditors (or a bankruptcy trustee) to hold a corporation liable for the debts of a controlling shareholder of the entity when such controlling shareholder has used the corporation to perpetuate fraud on his creditors by, inter alia, using the corporation to shield personal assets from preexisting personal liability.[992]

404. Comu is the *de facto* owner of TBG,[993] and TBG is the alter ego of Comu.[994]

405. Phyllis's purported ninety-eight percent (98%) limited partnership interest in Sunset Pacific is property of the Comu bankruptcy estate pursuant to § 541(a)(2)(A).

406. Sunset Pacific is the alter ego of Comu.[995]

---

[991] *Cadle Co. v. Brunswick Homes, LLC (In re Moore)*, 379 B.R. 284, 289 (Bankr. N.D. Tex. 2007).
[992] *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243-44 (5th Cir. 1990); *In re Moore*, 379 B.R. at 295.
[993] Bench Conclusion No. 2.
[994] Bench Conclusion No. 3.
[995] Bench Conclusion No. 4.

407.    In order to state a claim for declaratory relief under 28 U.S.C. § 2201, *et seq*. (the "Declaratory Judgment Act"), a party must provide sufficient facts to demonstrate (1) a substantial controversy, (2) the controversy is between parties having adverse legal interests, and (3) the imminent and real nature of the controversy.[996]

408.    Pursuant to the Federal Declaratory Judgment Act, Trustee is entitled to a judgment declaring that, as of the Petition Date, the assets of TBG and Sunset Pacific are property of Debtor's bankruptcy estate.

409.    Under § 542(a) of the Bankruptcy Code, an entity (here the Debtor) has an affirmative obligation to turn over to the trustee any property that was in such entity's possession, custody or control during the pendency of the case, and must account for such property or the value of such property unless it is of inconsequential value.[997]  If the entity is no longer in possession of the property of the estate or its value at the time of the turnover action, then the trustee is entitled to recovery of a money judgment for the value of the property of the estate that was disposed of by such entity.[998]  As the Bankruptcy Court in *In re Borchert* explained, § 542(a)

> provides for more than turnover of the actual property.  It also provides that:
>
>> "... an entity ... in possession ... during the case of property that the trustee may use, sell or lease under section 363 ... shall deliver to the trustee, and account for, such property, or the value of such property ...."
>
> The foregoing is applicable to any entity that possessed property belonging to the debtor at any time during case pendency, whether or not it had possession at the time a demand for turnover was made. It means

---

[996]    *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S. Ct. 956, 959-60 (1969).

[997]    Trustee's Damages Brief at 2.

[998]    *In re USA Diversified Products, Inc.*, 100 F.3d 53, 55 (7th Cir. 1996); *In re Newman*, 487 B.R. 193, 199 (B.A.P. 9th Cir. 2013) (citation omitted); *In re Calvin*, 329 B.R. 589, 602 (Bankr. S.D. Tex. 2005); *In re Pilate*, 487 B.R. 345, 349 (Bankr. D.C. 2013) (and cases cited therein); *In re Borchert*, 143 B.R. 917, 919 (Bankr. N.D. 1992).

that such entity must account to the trustee for the property itself or be prepared to surrender its value if for some reason the property itself no longer exists. What this means in a Chapter 7 is that if an entity in possession of estate property receives notice of the bankruptcy filing but nonetheless transfers the property to anyone other than the trustee, it does so at its peril.  In the absence of the property itself the trustee in such instance is entitled to recover the value of the estate property from the entity making the transfer.[999]

410.    The unjust enrichment doctrine in Texas is summarized in *Burlington Northern Railroad Co. v. Southwestern Electric Power Co.*, as follows:

> The doctrine of unjust enrichment belongs to the measure of damages known as quasi-contract or restitution ....
>
> The unjust enrichment doctrine applies the principles of restitution to disputes which for one reason or another are not governed by a contract between the contending parties .... When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, the law implies a contractual obligation upon the defendant to restore the benefits to the plaintiff.... Unjust enrichment is typically found under circumstances in which one person has obtained a benefit from another by fraud, duress or the taking of undue advantage ....[1000]

### E.    DAMAGES AND EQUITABLE RELIEF

411.    The Court's final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  FED. R. CIV. P. 54(c); FED. R. BANKR. P. 7054(a).   Consistent with Rule 54(c), an injunction may be issued even if not specifically requested in the pleadings where it is supported by the evidence presented.[1001]

---

[999]    *In re Borchert*, 143 B.R at 919.

[1000]    *Burlington Northern Railroad Co. v. Southwestern Electric Power Co.*, 925 S.W.2d 92, 96–97 (Tex. App.—Texarkana 1996), *aff'd*, 966 S.W.2d 467 (Tex. 1998); *see also Ed & F Man Biofuels Ltd. v. MV Fase*, 728 F. Supp. 2d 862, 868-69 (S.D. Tex. 2010).

[1001]    *Pipkin v. JVM Operating, L.C.*, 197 B.R. 47, 56 (E.D. Tex. 1996) ("Although plaintiff does not explicitly seek an injunction in his pleadings, the facts as presented would support an order of equitable relief if plaintiff prevails.) (and quoting from  FED. R. CIV. P. 54(c)).

412.    The bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Courts interpret Section 105 liberally.[1002]

413.    Pursuant to 11 U.S.C. § 542(a) the Trustee is entitled to an order directing the turnover of all property and assets of TBG and Sunset Pacific that still exist.

414.    To the extent the assets of TBG and/or Sunset Pacific have been sold or otherwise disposed of since the Petition Date, Trustee is entitled to a judgment pursuant to 11 U.S.C. § 542(a) against Comu, TBG and Sunset Pacific, jointly and severally for the value of the assets that existed on the Petition Date and that are not turned over to the Trustee because they have been sold or otherwise disposed of by Comu.[1003]

415.    For purposes of the Trustee's recovery under 11 U.S.C. § 542(a), Trustee requests that the Court enter judgment for $5,858,778, which reflects actual cash proceeds from the sale of Green Auto stock, and includes: (1) TBG direct sales (conservatively, $974,616.60);[1004] TBG sales effected through OMST ($2,762,220);[1005] sales effected through TKY Trust ($1,048,973);[1006] sales effected through DAPTCO Trust ($222,980);[1007] and cash received by TBG for stock sales effected through ERI (conservatively, $850,000).[1008]

416.    Where a debtor has fraudulently concealed or transferred assets of the bankruptcy estate, the property may be dissipated before a court can adjudicate the respective rights of the

---

[1002]    *See, e.g.*, *Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).

[1003]    Bench Conclusion No. 5.

[1004]    *See supra* FOF Section E(3)(a).

[1005]    *See supra* FOF Section E(3)(b).

[1006]    *See supra* FOF Section E(4)(a).

[1007]    *See supra* FOF Section E(4)(b).

[1008]    *See supra* FOF Section E(5)(c), and, in particular FOF ¶ 309 & n.769.

parties, and thus an injunction may issue prohibiting transfer of the property that is the subject of the adversary proceeding.[1009]

417.     In order to establish entitlement to a preliminary injunction a plaintiff must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any damage the injunction might cause the opponent; and (4) that the injunction will not disserve the public interest.[1010]

418.     An injury is irreparable if it cannot be undone through monetary remedies.[1011] Monetary remedies may not suffice where "economic rights are especially difficult to calculate."[1012] Therefore, it is appropriate to award an injunction where "it is shown that a money judgment will go unsatisfied absent equitable relief."[1013]

419.     Moreover, a preliminary injunction designed to freeze the status quo by preserving particular and discrete assets which are in dispute is appropriate so long as the equitable remedy would be available to plaintiff as final relief.[1014]

420.     Federal courts need no independent basis of jurisdiction to enter an injunction in support or construction of their own orders.[1015]

---

[1009]     *See, e.g.*, *In re Focus Media Inc.*, 387 F.3d 1077, 1084–1085 (9th Cir. 2004), *cert. denied*, 544 U.S. 923 (2005); *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985); *In re Moss*, 258 B.R. 405, 427 (Bankr. W.D. Mo. 2001); *Steinberg v. Esposito*, 33 B.R. 812, 813–14 (N.D. Ill. 1983); *In re Newman*, 6 B.R. 798, 802–03 (Bankr. S.D. N.Y. 1980).

[1010]     *Blue Bell Bio–Medical v. Cin–Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989).

[1011]     *Cho v. Itco, Inc.*, 782 F. Supp. 1183, 1185 (E.D. Tex. 1991).

[1012]     *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991). ).

[1013]     *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, 876 F. Supp. 482, 487 (S.D.N.Y. 1994); *Collins v. Aggreko, Inc.*, 884 F. Supp. 450, 452 (D. Utah 1995) ("Irreparable harm could result if defendants will be unable to pay damages."); *see also Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 473 (5th Cir.1985) ("The absence of an available remedy by which the movant can later recover money damages, however, may also be sufficient to show irreparable injury."); *Chemlawn Services Corp. v. GNC Pumps, Inc.*, 690 F. Supp. 1560, 1569 (S.D. Tex. 1988), *aff'd*, 856 F.2d 202 (5th Cir. 1988).

[1014]     *Dixie Carriers, Inc. v. Channel Fueling Service, Inc. (In re Fredeman Litigation)*, 843 F.2d 821, 827 (5th Cir. 1988).

## F.  DEBTOR'S BAD FAITH ABUSE OF THE BANKRUPTCY PROCESS.

421.  "[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."[1016]

422.  Section 105(a) of the Bankruptcy Code states:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

423.  Failure to make a full and accurate disclosure constitutes a bankruptcy crime under 18 U.S.C. § 152, whereby it is a crime when: "A person who—... (2) knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11; (3) knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury under section 1746 of title 28, in or in relation to any case under title 11."[1017]

424.  It is well established that under 11 U.S.C. § 105(a), a bankruptcy court has broad powers to implement the provisions of Title 11 and to prevent abuse of the bankruptcy process.[1018] Such orders are necessary "'to protect the integrity of the Bankruptcy Code as well as the judicial process,'"[1019] and to enable bankruptcy courts "to maintain control of their

---

[1015]  *Royal Ins. Co. of America v. Quinn–L Capital Corp.*, 3 F.3d 877, 881 (5th Cir. 1993), *cert. denied*, 511 U.S. 1032 (1994); *see also Global Int'l Airways Corp.*, 76 B.R. 700, 705 (Bankr. W.D. Mo. 1987) (noting power of bankruptcy court to issue injunctions "to recover assets of the estate which were transferred after bankruptcy."); *Pipkin v. JVM Operating, L.C.*, 197 B.R. 47, 54 (E.D. Tex. 1996) ("Although title to a portion of the property covered by the injunction had recently passed from the debtor, successful administration of the estate necessarily depends upon preserving those assets which were, allegedly, wrongfully withheld prior to transfer. The distribution of assets by the debtor requires successful collection of those assets, and it is the loss of estate assets against which the injunction is designed to protect.").
[1016]  *Pepper v. Litton*, 308 U.S. 295, 304 (1939).
[1017]  18 U.S.C. § 152.
[1018]  *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997).
[1019]  *In re Arkansas Communities, Inc.*, 827 F.2d 1219, 1222 (8th Cir. 1987) (quoting *In re Silver*, 46 B.R. 772, 774 (D. Colo. 1985)).

courtrooms and of their dockets."[1020] In order to protect abuses of the Bankruptcy Code and the judicial process, courts have the authority to sanction both attorneys and litigants.[1021] Use of this authority is appropriate when the bankruptcy is filed not for the purpose of reorganization, but simply to delay a creditor's state-court remedies.[1022]

425.  A federal court may also use its "inherent power to impose attorney's fees as a sanction for bad-faith conduct."[1023] Sanctions may be imposed:

> when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons .... if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party.... The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.[1024]

426.  In order for the Court to impose sanctions pursuant to its inherent power or § 105(a), it must make "a specific finding of bad faith."[1025] "Bad faith, for the purposes of section 105 is characterized as an attempt to abuse the judicial process."[1026]

427.  "When a bankruptcy filing is motivated by a desire to delay a creditor from enforcing its rights in an ongoing dispute, the filing is an abuse of process."[1027]

---

[1020]  *In re Volpert*, 110 F.3d at 501.
[1021]  *In re Collins*, 250 B.R. 645, 657–59 (Bankr. N.D. Ill. 2000).
[1022]  *Jones*, 40 F.3d at 1089–90.
[1023]  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).
[1024]  *Id.* at 45–46 (internal quotations omitted); *see also Bynum v. Am. Airlines, Inc.*, 166 Fed. App'x 730, 735 (5th Cir. 2006) ("One aspect of this inherent power is the power to impose sanctions, including attorney's fees, on litigants for conduct that is in bad faith, vexatious, wanton or undertaken for oppressive reasons.").
[1025]  *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th Cir. 1999); *see also Crowe v. Smith*, 261 F.3d 558, 563 (5th Cir. 2001); *Matta v. May*, 118 F.3d 410, 416 (5th Cir. 1997).
[1026]  *In re Gorshtein*, 285 B.R. 118, 124 (Bankr. S.D.N.Y. 2002) (citing *In re Spectee Group, Inc.*, 185 B.R. 146, 155 (Bankr. S.D.N.Y. 1995)).

428.   Based on the evidence detailed *supra*, Comu's conduct constitutes bad faith abuse of the judicial process.

429.   Sanctions in the form of attorneys' fees are proper here "[c]onsidering the severity of the Debtor's misconduct—including lying under oath on his Petition, Schedules, and SOFA, and at the meeting of creditors and before this Court—and thus an "assessment of attorney's fees" is warranted.[1028]

*[end of page]*

---

[1027]   *In re Collins*, at 657 (citing *Jones v. Bank of Santa Fe (In re Courtesy Inns, Ltd., Inc.)*, 40 F.3d 1084, 1085, 1090 (10th Cir. 1994)); *see also Wright v. Tackett*, 39 F.3d 155, 158 (7th Cir. 1994) (affirming sanctions against litigant who filed federal pleadings in a bad faith attempt to delay and disrupt state court proceedings); *Cinema Service Corp. v. Edbee Corp.*, 774 F.2d 584, 586 (3d Cir. 1985) (bankruptcy petition filed for improper purpose where debtor filing on the eve of a foreclosure sale "was precipitated, not by a desire, or need for reorganization, but simply to stave off a sheriff's sale on Cinema's state court judgment"); *In re Collins*, 250 B.R. at 664 ("The Court finds that Collins and Brisky and the Firm filed the Chapter 7 petition, not to obtain relief for an honest but unfortunate debtor, but as a cutthroat litigation tactic intended to delay and frustrate Lloyd's in the course of litigation that both parties have pursued for years. Furthermore, they attempted to use the bankruptcy system to bring an abrupt and favorable end to the litigation after forming the belief that Collins was going to lose on the merits."); *cf. In re Am. Telecom Corp.*, 304 B.R. 867, 873 (Bankr. N.D. Ill. 2004) (substantial judgment entered against a debtor is often the trigger for the filing of bankruptcy).
[1028]   *In re David*, 487 B.R. 843, 874 (Bankr. S.D. Tex. 2013).

Dated: June 16, 2014.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**
300 West 6th Street, Suite 2050
Austin, TX 78701
(512) 320-7200
(512) 320-7210 (fax)

By: _____
Kendyl T. Hanks, SBT #24032273

**ATTORNEYS FOR PLAINTIFFS**


**REED & ELMQUIST, P.C.**
501 N. College Street
Waxahachie, TX 75165
(972) 938-7339 (direct)
(972) 923-0430 (fax)

By: _/s/ David W. Elmquist*_  (*with permission
    David W. Elmquist – SBT #06591300

**ATTORNEYS FOR INTERVENOR, CO-PLAINTIFF,
AND THIRD-PARTY PLAINTIFF DIANE G. REED,
CHAPTER 7 TRUSTEE**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 16, 2014, a true and correct copy of the foregoing Brief in Support of Proposed Findings of Fact and Conclusions of Law has been served electronically on Dennis Olson, counsel of record for the Defendants, and on David Elmquist, attorney of record for the Trustee.

By: _____
Kendyl T. Hanks, SBT #24032273